

**U.S. Department of the Interior**

Bureau of Land Management    January 2005

# Northeast National Petroleum Reserve – Alaska

# FINAL Amended Integrated Activity Plan/ Environmental Impact Statement

# Volume 1

Abstract, Executive Summary, and Chapters 1, 2, 3, and 4.1 to 4.6



Ex. A, p. 1

# EXECUTIVE SUMMARY

The Bureau of Land Management (BLM) is proposing to amend the 1998 *Northeast Integrated Activity Plan/Environmental Impact Statement* (1998 Northeast IAP/EIS) and subsequent Record of Decision (ROD) to consider opening portions of the BLM-administered lands that are currently unavailable or under a No Surface Activity restriction for oil and gas leasing in the Northeast National Petroleum Reserve – Alaska (Planning Area). In addition, the BLM proposes to consider developing performance-based lease stipulations and Required Operating Procedures (ROPs) in the Planning Area similar to the stipulations and ROPs included in the *Northwest National Petroleum Reserve – Alaska IAP/EIS Record of Decision* (Northwest IAP/EIS ROD). The BLM believes that performance-based lease stipulations and ROPs would provide the agency greater flexibility in safeguarding important surface resources from the impacts of oil and gas activities.

In amending the 1998 Northeast IAP/EIS, the BLM comports with the recommendation of the President's National Energy Policy Development Group that the President direct the Secretary of the Interior to "consider additional environmentally responsible oil and gas development, based on sound science and the best available technology, through further lease sales in the National Petroleum Reserve – Alaska." The recommendation further states that "such consideration should *include areas not currently leased within the northeast corner of the National Petroleum Reserve – Alaska*"

> *The energy resources of the National Petroleum Reserve-Alaska are essential to meeting our nation's energy demands, will enhance domestic energy production, and decrease our nation's dependency on foreign oil sources.*

(bold added). Congress, in a 1981 amendment to the Naval Petroleum Reserves Production Act (NPRPA; 42 USC § 6508), also directed the BLM to undertake an expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve - Alaska, including the Planning Area. Executive Order 13212 directs "executive departments and agencies (agencies) shall take appropriate actions, to the extent consistent with applicable law, to expedite projects that will increase the production, transmission, or conservation of energy."

North Slope oil production, centered at the massive Prudhoe Bay field, is key to meeting the nation's domestic oil supply. The North Slope contributes about 16 percent of America's current domestic production. The oil industry has discovered and developed other fields both to the east and west of Prudhoe Bay. However, production is in decline from these older fields, and there are indications that the Planning Area contains oil and natural resources that could help to stem the decline.

To carry out its management responsibilities and respond to the nation's energy needs and the President's National Energy Policy, the BLM is proposing to amend its 1998 Northeast IAP/EIS to:

- Consider leasing portions of lands currently closed or under a No Surface Activity restrictions to oil and gas leasing in the Northeast National Petroleum Reserve - Alaska; and
- Consider developing performance-based lease stipulations and ROPs to provide the BLM greater flexibility in protecting important surface resources from the impacts of oil and gas activities, similar to those developed for the Northwest National Petroleum Reserve – Alaska.

> *To carry out its management responsibilities and respond to the nation's energy needs and the President's National Energy Policy, the BLM is proposing to amend its 1998 Northeast IAP/EIS to:*
> - *Consider leasing portions of lands currently closed or under a No Surface Activity restriction to oil and gas leasing in the Northeast National Petroleum Reserve - Alaska; and*
> - *Consider developing performance-based lease stipulations and ROPs to provide the BLM greater flexibility in protecting important surface resources from the impacts of oil and gas activities, similar to those developed for the Northwest National Petroleum Reserve – Alaska.*

# EXECUTIVE SUMMARY

Subsistence activities in the Planning Area, particularly hunting and fishing, are important to local residents, including the Iñupiat, the Native people of Alaska's North Slope. Subsistence hunting and fishing are central to the Iñupiat's ages-old cultural system. Moreover, subsistence activities provide critical sustenance for people who live off Alaska's road network at an extreme distance from the nation's food-distribution system.

Several portions of the Planning Area have particularly important surface values. The Teshekpuk Lake Special Area (TLSA), created in 1976, in the northern third of the Planning Area, was designated to protect caribou and waterfowl habitat; it also is the area with the highest potential for oil and gas resources. The Colville River Special Area (CRSA), in the southernmost part of the Planning Area, provides habitat for raptors, moose, and fish. In addition, the CRSA contains world-class paleontological deposits. Provisions in the NPRPA required that any oil and gas exploration or development within a special area "shall be conducted in a manner which will assure the maximum protection of such surface resources to the extent consistent with the requirements of the Act for the exploration of the reserve." The NPRPA further states that oil and gas activities are subject to "conditions, restrictions or prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significant adverse effects on surface resources in the National Petroleum Reserve - Alaska" (42 USC § 6508).

This amendment analyzes a No Action Alternative and three other action alternatives. All three action alternatives would make additional areas of the Planning Area available for oil and gas leasing, and adopt performance-based lease stipulations and ROPs, in a manner consistent with responsible protection of other important surface resources. These alternatives present a range of actions that the BLM could take to achieve these objectives, consistent with statutory direction for management of the National Petroleum Reserve – Alaska.

> *Performance-Based Lease Stipulations and ROPs*
>
> - *Performance-based lease stipulations and ROPs would afford the BLM increased flexibility to allow for improved and timely resource mitigation. They are driven by an objective; for example, "minimize disruption of caribou movement and subsistence use." The activities on the ground must meet this objective. The also identify current accepted standards such as "all pipelines must be a minimum of 7 feet as measured from the ground to the bottom of the pipeline." Under the No Action Alternative, the current prescriptive stipulations provide for an elevation of 5 feet, a standard that does not always effectively allow for caribou movement.*
>
> - *Performance-based lease stipulations and ROPs would allow the BLM to implement adaptive management principles, recognizing that knowledge about natural resource systems is sometimes uncertain and changing. The ability to adapt management decisions would allow the BLM to meet resource management objectives, outcomes, and goals identified during the environmental analysis.*
>
> - *Making the Amended IAP/EIS lease stipulations and ROPs consistent with those developed in the Northwest IAP/EIS (performance-based) would allow future Planning Area lessees to work from the same standards and rules, and allow them to focus on exploration and development methods to meet the desired resource objectives, outcomes, and goals for all of the northern section of the National Petroleum Reserve – Alaska. (Note: Any newly-developed and adopted lease stipulations and ROPs would not apply to current lessees. Any changes to the current 1998 ROD lease stipulations would be accomplished through negotiations with current lessees and additional NEPA actions.)*

Each alternative includes mitigation measures that broadly apply to the Planning Area. For example, stipulations and ROPs address: waste prevention, handling, and disposal; spill prevention and response; potential impacts of oil and gas exploration and development; protection of subsistence activities; protection of vegetation, fish, wildlife, cultural, and paleontological resources; and protection of endangered and threatened species.

The alternatives presented in this amendment are consistent with the purposes of the National Petroleum Reserve – Alaska's governing statutes. Each alternative offers a different balance between serving the "total energy needs of the nation," a goal of the NPRPA, while protecting surface resources from "unnecessary and undue degradation," as required by the Federal Land Policy and Management Act; providing maximum protection of surface resources in special areas to the extent consistent with the goals of the NPRPA; and providing conditions, restrictions or

prohibitions to mitigate significant adverse effects on surface resources as required by the NPRPA. See Table 2-1 in Chapter 2 (Alternatives) for a comparison of these alternatives. The alternatives are described below:

**Alternative A (No Action Alternative).** Alternative A is comprised of decisions established in the ROD for the 1998 Northeast IAP/EIS. The decisions described in this alternative constitute the existing management practices of the Northeast National Petroleum Reserve - Alaska.

Under this alternative, management practices would emphasize prescriptive-based restrictions on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence use areas, and other resources. At the same time, approximately 87 percent (4 million acres) of the Planning Area's 4.6 million acres would be available for oil and gas leasing (Map 2-1). The prescriptive-based stipulations developed for this alternative in the 1998 Northeast IAP/EIS ROD are listed in Appendix E. Appendix F (Standardized Stipulations Applied to Mitigate the Impacts of Non-Oil and Gas Authorizations) lists stipulations that apply to all non-oil and gas-related activities in the Planning Area.

> - *Although 87 percent of the Planning Area is currently available to oil and gas leasing, 56% of the high potential area is off limits or encumbered by no-surface activity restrictions.*
> - *The portions of the Planning Area currently unavailable for exploration and development may contain 1.9+ billion barrels of economically-recoverable oil and 3.5 trillion cubic feet of gas.*

**Alternative B.** Alternative B utilizes performance-based lease stipulations and ROPs. Approximately 95 percent (~4.4 million acres) of the Planning Area's 4.6 million acres would be available for oil and gas leasing. Approximately 213,000 acres north of Teshekpuk Lake would be unavailable for leasing to provide protection for fish and wildlife habitat and subsistence uses, while providing access to new oil and gas resources on approximately 387,000 acres currently unavailable for leasing (Map 2-2). Performance-based lease stipulations and ROPs (patterned after those developed for the Northwest portion of the National Petroleum Reserve – Alaska) would be used to mitigate the impacts of energy development, and other land uses, on other resources. Lease stipulations and ROPs would provide clearly defined setbacks, restrictions (including seasonal restrictions), and guidance for all aspects of oil and gas-related operations. These measures would provide protection for important natural resources, including water quality, vegetation, wetlands, fish and wildlife habitat (including habitat for threatened and endangered species), cultural and paleontological resources, subsistence uses and access, and scenic and recreation values. Additional seasonal and spatial stipulations would provide maximum protection of environmentally sensitive areas, including Special Areas. These areas, which are described in Section 2.2.1 (Areas with Additional Stipulations) and in the stipulations outlined in Section 2.6 (Stipulations and Required Operating Procedures), include:

> *To foster a Nation of citizen stewards, Secretary of the Interior Gale Norton is advancing a 4 C's philosophy—conservation through communication, consultation and cooperation that begins at the grassroots level. In developing the final Preferred Alternative, the BLM has consulted continually with the communities in the area. A concerted effort was, and continues to be made, to closely coordinate with the U. S. Fish and Wildlife Service as well as other stakeholders to develop appropriate protections for migratory waterfowl that depend on the area.*

- Rivers Area
- Deep Water Lakes
- Teshekpuk Lake
- Goose Molting Area
- Teshekpuk Lake Caribou Habitat Area
- Coastal Area
- Colville River Special Area
- Pik Dunes

**Alternative C.** Alternative C would utilize the same performance-based stipulations and ROPs developed for Alternative B and are intended to mitigate the impacts of energy development and other land uses on resources in

# EXECUTIVE SUMMARY

the Planning Area. All of the Planning Area would be available for leasing; however, seasonal and spatial stipulations would be applied to protect environmentally sensitive areas (Map 2-3). These areas are described in Section 2.2.1 (Areas with Additional Protections) and in the stipulations outlined in Section 2.6 (Stipulations and Required Operating Procedures), and are the same as those identified above for Alternative B.

**Alternative D (Final Preferred Alternative).** Alternative D, the final Preferred Alternative, utilizes performance-based stipulations and ROPs. Approximately 95 percent (~4.4 million acres) of the Planning Area's 4.6 million acres would be available for oil and gas leasing. Under Alternative D, Teshekpuk Lake (approximately 211,000 acres) would be deferred from leasing. This deferral would provide protection for fish and wildlife habitat and subsistence uses, while providing access to new oil and gas resources on approximately 389,000 acres (Map 2-4). Alternative D would utilize similar performance-based stipulations and ROPs developed for Alternative B intended to mitigate the impacts of energy development and other land uses on resources in the Planning Area. Seasonal and spatial stipulations would be applied to protect environmentally sensitive areas. These areas are described in Section 2.2.1 (Areas with Additional Protections) and in the stipulations outlined in Section 2.6 (Stipulations and Required Operating Procedures), and are similar to those identified above for Alternative B. In addition, no permanent oil and gas facilities, excluding pipelines, would be allowed on approximately 217,000 acres associated with goose molting lakes to the north of Teshekpuk Lake, with no exceptions allowed. In addition, the area north of Teshekpuk Lake has been divided into seven lease tracts, ranging in size from 45,950 to 57,960 acres. No more than 300 acres of surface disturbance would be allowed in each lease tract. No permanent oil and gas facilities, including pipelines and publicly-funded community roads, east of Teshekpuk Lake and west of the Kogru Inlet, would be allowed on approximately 16,000 acres. Finally, no permanent oil and gas facilities would be allowed on approximately 141,000 acres south/southeast of Teshekpuk Lake, excluding pipelines and publicly-funded community roads.

> *Additional Protective Measures Included in the Final Preferred Alternative D*
>
> - *All deep-water lakes south of Teshekpuk Lake would have a ¼ mile buffer that is protected from permanent oil and gas activities.*
> - *<u>All</u> water intake structures in fish-bearing or non-fish-bearing waters would be designed, operated, and maintained to prevent fish entrapment, entrainment, or injury.*
> - *The 1998 Northeast IAP/EIS subsistence consultation buffer has been expanded to include the entire Planning Area, not just portions of several buffers along various rivers as is the case in the 1998 Northeast IAP/EIS ROD.*
> - *The minimum required height of any new pipeline constructed is 7 feet as measured from the ground to the bottom of the pipeline at vertical support members; the current requirement is 5 feet.*
> - *All river setbacks (with the exception of the Ikpikpuk River) have been maintained as they were developed for the 1998 Northeast IAP/EIS ROD. The 3-mile setback on Fish Creek would continue to be off-limits to permanent oil and gas surface facilities.*
> - *The Tingmiaksiqvik River (Ublutuoch River) has been added to the list of rivers with set-backs that provide additional fish protection.*
> - *Activities along Coastal Areas include consultation requirements with the Nuiqsut Whaling Captains Association, Alaska Eskimo Whaling Commission, the Barrow Whaling Captains Association, and North Slope Borough to minimize impacts to subsistence whaling activities.*
> - *A Caribou Movement Corridor would be established to minimize disturbance and hindrance of caribou, or alteration of caribou movements (that are essential for all season use, including calving and rearing, insect relief, and migration) in the area extending eastward for 4 miles from the eastern shore of Teshekpuk Lake toward the Kogru Inlet.*
> - *A Southern Caribou Calving Area would be established to minimize disturbance and hindrance of caribou, or alteration of caribou movements (that are essential for all season use, including calving and post calving, and insect relief) in the area south/southeast of Teshekpuk Lake.*
> - *7 Lease Tracts with surface occupancy restrictions would be identified to limit surface disturbance in the Goose Molting Area (north of Teshekpuk Lake), providing protection to key surface resources and subsistence resources from permanent oil and gas development and associated activities.*

Case 1:05-cv-00008-JKS   Document 28-2   Filed 03/28/2006   Page 6 of 19

**Summary of Impacts.** The analyses of oil exploration and development scenarios for each alternative, and the potential impacts from actions taken under each alternative, are in Chapter 4 (Environmental Consequences). The analyses assume that the stipulations identified in Appendix E for the No Action Alternative, or the lease stipulations and ROPs identified in Section 2.6 (Stipulations and Required Operating Procedures) for the final Preferred Alternative D, and alternatives B and C, would be adopted under each alternative. The analyses also assume compliance with existing laws and regulations. The impacts of each alternative are summarized below. A comparison of the overall impacts of each alternative is presented in Table 2-3 in Chapter 2.

Impacts would be of several general types. Except for overland moves, non-oil and gas activities would generally occur during the summer, and be of short duration (e.g., aircraft flight or landing) and localized (e.g., a research or recreational camp). These activities would be unlikely to have more than short-term and localized impacts. Seismic activities, overland moves, and exploratory drilling would all occur during the winter when the ground is frozen and snow-covered and many species have migrated out of the area. These activities could briefly impact the species that remain through the winter. Their effects could linger into the following summer or longer, in the form of varied impacts to vegetation and soils, and ranging from the compression of standing dead vegetation to crushed tussocks and dead or broken shrubs.

> *It is possible to develop oil resources identified as unavailable under the 1998 Northeast IAP/EIS while protecting important biological and subsistence resources using performance-based stipulations and ROPs. It is estimated that the final Preferred Alternative would provide an estimated 1.7+ billion barrels of economically recoverable oil potential at an average oil price of $30, as opposed to an estimated 600 million barrels under the No Action Alternative as discussed in the 1998 Northeast IAP/EIS ROD.*

During the fall and winter harvest seasons, subsistence resources are available well beyond the coastal areas and rivers that are accessible during the summer. Winter allows subsistence hunters access to an expanded harvest area, which could potentially lead to greater frequency of industry/hunter contact and consequent disruption of harvest activities. Winter is also a time when wildlife are exposed to natural environmental stresses: limited forage, severe cold, high winds, and compacted snow cover. The effects of seismic surveying activities on subsistence resources (as well as on the harvest of these resources) could be more pronounced during winter.

The greatest impacts would be associated with oil and gas development. Placement of gravel drilling pads, roads, airstrips, and staging areas, and the activities that take place on them, as well as construction of oil and gas pipelines, would permanently disturb or destroy soil and vegetation; impound and disturb water; disturb, displace, or kill fish and wildlife; risk disturbing or destroying paleontological and cultural (archaeological and historic) resources; and potentially affect subsistence (by affecting species or impeding user access) and recreation. The impacts from developing and using these facilities would vary by resource. Because the land likely to be disturbed is a very small percentage of the 4.6 million surface acres the BLM manages in the Planning Area, impacts to soil, vegetation, water, and paleontological and cultural resources would be minor. Impacts to fish, wildlife, subsistence, and recreation extend beyond the immediate vicinity of the disturbed ground and, depending on location and protective measures used, could be out of proportion with a development's small footprint. If a development were to lead to a crude oil or refined fuel spill, particularly one that extended beyond a drilling pad, impacts could be greater.

**Alternative C** will have the greatest impact, primarily because it would likely lead to the most seismic surveys, exploratory drilling, and development of oil. Under this alternative, 4.6 million acres of the Planning Area would be open to leasing, although stipulations and ROPs would place restrictions on where surface impacts could occur. In most instances, impacts would be minor. The footprint would be unlikely to directly impact more than 2,000 acres of soil or vegetation. Individual fish, mammals, and birds would probably die or be displaced, but it is likely that few or no populations would be measurably affected. Impacts to subsistence and recreation generally would not exceed minor levels. Three potential occurrences could increase the level of impact to some resources under Alternative C. One is oil field development in the caribou insect-relief areas and core calving grounds to the south, east, and north of Teshekpuk Lake, which are used by the Teshekpuk Lake Herd caribou and are currently protected as no-lease or no-surface-occupancy areas. Development in these areas could interfere with caribou

# EXECUTIVE SUMMARY

movements and have some reproductive consequences, which could in turn impact subsistence hunters and those dependent on them. Secondly, development in the Goose Molting Area could interfere with waterfowl breeding, brood-rearing, and molting activities. Thirdly, an oil spill could cause moderate or greater impacts if the spill were to occur in or enter a river delta or nearshore area occupied by waterfowl. If development activities were to have effects on a rare or vulnerable species, moderate or severe impacts could result. Certain vulnerable bird species (those with declining or small or sensitive populations, such as the threatened spectacled eider), could be moderately impacted if development occurred where a species was concentrated. Rare plants could be impacted severely if development overlapped the area in which such plants exist.

**Alternative B** would have less impact than Alternative C. Approximately 213,000 acres to the north of Teshekpuk Lake would be unavailable for leasing. This area is an important goose molting area, and is also an important travel corridor for caribou moving between wintering and breeding/insect-relief grounds. For the remaining portion of the Planning Area, impacts that could result from oil and gas exploration and development under Alternative C would also apply to this alternative. The performance-based ROPs and stipulations developed for Alternative C would also apply to the Alternative B.

The **final Preferred Alternative D** would have less impact than Alternative C and would provide a similar level of protection as Alternative B in terms of large surface restrictions and/or land deferrals. Teshekpuk Lake (211,000 acres) would be deferred from leasing. Similar performance-based lease

> *A 217,000 acre area that is important use habitat for molting geese and other waterfowl will be deferred from leasing under the final Preferred Alternative D. In addition to providing secure habitat for birds, this area provides important habitat for caribou to use as insect-relief habitat.*

stipulations and ROPs developed for Alternative B would be applied to the final Preferred Alternative, which are intended to mitigate the impacts of energy development and other land uses on resources in the Planning Area. Seasonal and spatial stipulations would be applied to protect environmentally sensitive areas. These areas are described in Section 2.2.1 (Areas with Additional Protections) and in the stipulations outlined in Section 2.6 (Stipulations and Required Operating Procedures), and are similar to those identified above for Alternative B. As described above, no permanent oil and gas facilities, excluding pipelines, would be allowed on approximately 217,000 acres north of Teshekpuk Lake, with no exceptions allowed. No permanent oil and gas facilities, including pipelines and publicly-funded community roads, would be allowed on approximately 16,000 acres east of Teshekpuk Lake and west of the Kogru Inlet. No permanent oil and gas facilities, excluding pipelines and publicly-funded community roads, would be allowed on approximately 141,000 acres south/southeast of Teshekpuk Lake. In addition, the area north of Teshekpuk Lake would be divided into seven lease tracts ranging in size from approximately 45,950 to 57,960 acres (approximately 374,000 total acres). Surface disturbance would be limited to no more than 300 acres within each of the lease tracts north of Teshekpuk Lake.

Teshekpuk Lake provides habitat for a variety of fish and wildlife, and the protected areas near Teshekpuk Lake provide important goose molting habitat, and calving, post-calving, insect-relief, and migration habitat for caribou. For the remaining portion of the Planning Area, impacts that could result from oil and gas exploration and development under Alternative B would also apply to this alternative.

**Alternative A, the No Action Alternative,** would have the least impact of the four alternatives due mainly to approximately 600,000 acres remaining off-limits to future leasing and development, as well as the continued No Surface Activity stipulation south of Teshekpuk Lake affecting approximately 240,000 acres. The area unavailable for leasing is centered around Teshekpuk Lake and includes important habitat for caribou, waterfowl, and other wildlife. It is also an important area for subsistence uses. The stipulations that were developed under the 1998 Northeast IAP/EIS ROD are prescriptive in nature, and while providing similar levels of protection to the resources within the Planning Area, they do not allow for modification or change when new information becomes available, either through monitoring, scientific studies, or new technological advances. The BLM believes that performance-based stipulation and ROPs and the greater flexibility they offer to adapt requirements/standards to specific situations and to modify the requirements/standards if they prove ineffective, not only are adequate, but would increase the agencies ability to protect surface resources and subsistence use.

In addition to the potential effects of actions in the Planning Area, the cumulative analysis includes the potential effects of activities elsewhere that may affect the important resources of the Northeast National Petroleum Reserve - Alaska and surrounding areas. The conclusions of the cumulative analyses are summarized below.

**Cumulative Impacts.** Cumulative impacts from proposed activities in the Planning Area to air quality, paleontological resources, soils, water resources, water quality, fish and wildlife, endangered and threatened species, subsistence resources, recreation and wild and scenic river values, visual resources, and the economy are expected to be minimal on the North Slope, but could persist long term (approximately 10 years). Although non-oil and gas (e.g., DEW-line sites, villages, remote airstrips, and recreation), and oil and gas activities have directly impacted over 20,000 acres since the early 1900s, many of the impacts have lessened or have recovered over time through natural processes or reclamation.

Non-oil and gas activities, such as commercial and subsistence hunting, development within Native villages, and industrial activity in Europe and Asia have impacted resources on the North Slope in the past, and will continue to do so in the future. Air pollutants associated with industrial activities in Europe and Asia are believed responsible for causing Artic haze on the North Slope. Development of military facilities and villages has disturbed several thousand acres of soil, water, vegetation resources, and fish and wildlife habitat, and these effects that will persist indefinitely. Much of this development has occurred along the coastline, an area that provides important habitat for caribou seeking insect-relief, and for nesting and molting waterfowl. As a result of commercial whaling impacting bowhead whale and other whale stocks a century ago, limits are placed on the number of whales that can be harvest today by Native peoples of the North Slope. Subsistence harvests cause the loss of small numbers of waterfowl, caribou, and whales today, but populations of most subsistence species are healthy. Subsistence hunting, through direct take of animals, or indirectly from lead poisoning resulting from use of lead shot, could also result in small losses or declines in the productivity of spectacled or Steller's eiders, species federally-listed as threatened. Recreation and scientific survey activities have only minor cumulative impacts on North Slope resources.

Oil and gas activities have had substantial impacts on natural and social resources of the North Slope. Oil and gas facilities emit air pollutants, but air quality is good on the North Slope and is projected to improve as the amount of oil and gas production on the North Slope declines from historic levels and newer air emissions control technologies are used. Over 17,000 acres of surface disturbance has affected soil, paleontological, cultural, water, vegetation, and fish and wildlife habitat resources on the North Slope. Much of this disturbance occurred before the 1970s, and some has repaired itself through natural processes or through reclamation, but most effects of disturbance will persist for many decades. Some disturbed areas, such as gravel mine pits, now provide important overwintering habitat for fish.

A major concern associated with oil and gas displacement is the long-term displacement and functional loss of habitat for the Central Arctic Herd (CAH), Teshekpuk Lake Herd (TLH), and Western Arctic Herd (WAH) of caribou. Oil development in the Prudhoe Bay-Kuparuk area could be a cause of an observed shift in CAH calving distribution away from its calving range near the oil fields. Calving by TLH caribou could be reduced near the pipeline corridors, which would have a potential long-term (several-generation) effect on the distribution of the TLH caribou.

Oil and gas facilities not only displace caribou and other wildlife, but subsistence hunters also tend to avoid hunting near these facilities, and must travel further in search of fish and game than in the past. The communities of Anaktuvuk Pass, Atqasuk, Barrow, and Nuiqsut would be most affected; the community of Wainwright could also be affected, since the majority of the caribou it harvests are from the TLH caribou. Caribou could become unavailable, undesirable for use, or experience long-term population and productivity effects for a period longer than 5 years. These effects may disrupt sociocultural systems in the communities that are reliant on caribou for subsistence. Subsistence users could also be displaced even if the availability and distribution of subsistence resources did not change substantially. For example, Nuiqsut subsistence hunters no longer hunt in traditional areas where oil-field infrastructure now exists, even though subsistence resources continue to be available. Effects would be expected to disrupt community activities and traditional practices for harvesting, sharing, and processing

subsistence resources, but would not displace sociocultural institutions, social organization, or sociocultural systems.

Of particular concern to Native peoples is the risk of a major oil spill that could harm the land and subsistence resources. Although past spills have been small and have caused little harm, there is concern that a larger spill could occur in the future.

Residents of the North Slope have benefited from the income and jobs provided by the oil and gas industry. The economy for many villagers is a "mixed-economy," where residents are employed in jobs, but also continue their traditional subsistence ways. Income from jobs allows residents to buy snowmachines, boats, and other equipment to aid in subsistence hunting, but time spent working at a traditional job takes time away from subsistence activities. Over the next 20 to 30 years, the onshore and offshore oil industry in and near Prudhoe Bay is expected to decline, with a parallel decline in the economic indicators within the North Slope region. If oil production declines in the future, as predicted, and a natural gas line is not built to the North Slope to provide a new source of revenue, employment opportunities and income for residents, and the ability of the North Slope Borough to support and maintain the existing infrastructure, will decline.

Global climate change could alter the composition of vegetation species, increasing deciduous shrubs and decreasing sedges and grasses, and lead to higher rates of coastal erosion. Activities in the Planning Area are not expected to contribute substantially to greenhouse gas emissions, however, as burning of fossil fuels produced in the Planning Area would contribute less than 0.2 percent to annual greenhouse gas emissions based on estimates of future oil and gas production in the Planning Area. However, the effects of global climate change could exceed those effects to natural and social resources from man-induced activities on the North Slope.

New oil and gas exploration and development technologies developed during the past 30 years should ensure that future impacts from oil and gas exploration and development are less than has occurred historically for the same level of development. For example, use of ice roads and pads during exploration, and directional drilling during development, have reduced the amount of gravel that must be placed upon the tundra, and mined, to support oil and gas activities. Stipulations and ROPs developed for the 1998 Northeast IAP/EIS and this amendment would also reduce the effects of non-oil and gas, and oil and gas, activities on the North Slope. Still, as development continues to expand into new areas, effects to natural and social resources would increase and accumulate with past effects.

agencies, the BLM also will conduct studies, such as the inventory and monitoring of resource populations and conditions under all alternatives. These studies will assess the health of biological resources, the location and significance of other resources, and the effectiveness of management practices in protecting these resources. The scope of these studies will reflect the level of impacting actions allowed and the protective measures imposed under the plan adopted through this Amended IAP/EIS.

The BLM consults with the USFWS and NOAA Fisheries Service on any action that could impact threatened and endangered species in the Planning Area. The bowhead whale, spectacled eider, and Steller's eider may occur near areas that could be affected by oil and gas development in the Planning Area. The bowhead whale is listed as an endangered species under the ESA, while the two eider species are listed as threatened. The BLM has informally consulted with NOAA Fisheries Service, who indicated that only negligible effects on bowhead whales would occur under any of the alternatives evaluated in this document.

Appendix G contains a list of species that the BLM has identified as species of special status in Alaska. Most of the species listed in Appendix G are not found in the National Petroleum Reserve – Alaska. Only those species likely to be found in or near the Planning Area are discussed in the Amended IAP/EIS. The BLM will manage all permitted activities, pursuant to BLM Manual Section 6840 (*Special Status Species Management*), to ensure that actions requiring authorization or approval by the BLM are consistent with the conservation needs of special status species and do not contribute to the need to "list" any of them, either under the provisions of the ESA of 1973, as amended, or other provisions of this policy.

Current BLM policy does not provide for overland tundra travel during the summer season.

## 2.6 Stipulations and Required Operating Procedures

As discussed in Chapter 1 (Introduction), a set of performance-based stipulations and ROPs were developed to protect natural and cultural resources in the Northwest National Petroleum Reserve – Alaska. A similar set of mitigation measures was developed for this amendment, and if adopted, would result in a similar set of protective measures for both the Northwest and Northeast National Petroleum Reserve – Alaska. These mitigation measures would provide BLM greater flexibility to adapt management decisions to changing and uncertain environmental conditions on the ground.. These measures differ from the prescriptive-based stipulations developed for the 1998 Northeast IAP/EIS (and which also apply to the No Action Alternative), in that they:

- Do not include actions that already exist in the form of regulation or law; and

- Provide the BLM and other land users, including industry, greater adaptability in protecting surface resources by emphasizing the intent or objective of the mitigation. This principle is often referred to as "Adaptive Management Concepts." These principles will help the BLM make decisions effectively by utilizing a rigorous combination of management, research, and monitoring so that credible information is gained and management activities can be modified, over time, based on continuous experience. Table 2-2 provides a comparison and evaluation of effectiveness of the current management utilizing the 79 prescriptive-based stipulations from the 1998 Northeast IAP/EIS ROD and the proposed performance-based mitigation measures for alternatives B and C, and the Final Preferred Alternative D.

During scoping, several respondents expressed concern that the mitigation measures developed for the Northwest IAP/EIS (and for the Final Preferred Alternative D and Alternatives B and C for the amended IAP/EIS) would not be as effective, or provide similar levels of protection, as the stipulations developed for the 1998 Northeast IAP/EIS. These performance-based stipulations and ROPs were developed to allow the BLM and industry greater adaptability to mitigate impacts when more site and project specific information became available. By this, it should not be assumed that this flexibility and reliance on project-specific analysis would result in no, or inadequate, protection to the resource of concern. The BLM cannot abrogate its regulatory responsibility to take such action as deemed necessary to mitigate or avoid unnecessary surface damage and to minimize ecological disturbance throughout the National Petroleum Reserve – Alaska, consistent with the requirements of the NPRPA (43 CFR 2361.1). In the end,

the level of resource protection developed for the Northwest National Petroleum Reserve – Alaska, and the Final Preferred Alternative D and alternatives B and C of this amendment, would be similar to, or even greater than, the level of resource protection provided in the 1998 Northeast IAP/EIS Record of Decision.

Stipulations and ROPs for activities under alternatives B and C are listed in Section 2.6.3 (Alternative B and Alternative C Stipulations and Required Operating Procedures). Stipulations and ROPs for activities under the Final Preferred Alternative (Alternative D) are listed in Section 2.6.4 (Alternative D Stipulations and Required Operating Procedures). For a comparison of the protections provided by these mitigations under the different alternatives, see Table 2-2 at the end of this chapter.

Stipulations and ROPs were developed through the Amended IAP/EIS process and are based on knowledge of the resources in the Planning Area and industry practices; they are consistent with existing policies and laws. In developing these protective measures, the BLM has eliminated the redundancy of requirements that already exist in the form of regulation or law.

The stipulations and ROPs are requirements, procedures, management practices, or design features that the BLM, through the ROD, could adopt as operational requirements. These requirements would be addressed through the permitting process. An oil and gas lease does not in itself authorize any on-the-ground activity. Seismic operations, drilling, ice road construction, pipeline construction, etc., require additional land use authorizations. Any applicant requesting such authorization will have to address the stipulations and ROPs either before submitting the application (e.g., for subsistence consultation, brant surveys) or as part of the application proposal (e.g., for a proposal stating that garbage will not be buried, or that pipelines and roads will be separated by 500 feet or more). Requirements that are met prior to submission of the application, as well as procedures, practices, and design features that are an integral part of a proposal, do not need to be stipulated in a permit or lease. Because mitigating ROPs will be identified in the ROD as operational requirements, and not as general lease stipulations, their applicability goes beyond the oil and gas lease to any permitted activity where the requirement is relevant.

The Authorized Officer (AO) may add additional site-specific restrictions as deemed necessary by further NEPA analysis and as developed through consultation with other federal, state, and NSB regulatory and resource agencies. Laws or regulations may require other federal, state, and NSB permits (e.g., Clean Water Act Section 404) for an oil and gas project to proceed. Specific state permits may be required when the state has primary authority, under federal or state law or regulation, to enforce the provision in question. Specific permits issued by federal agencies other than the BLM could include permit conditions that are more stringent than those presented below.

## 2.6.1    Definitions

The following definitions in the context of this document, apply to general and site specific stipulations (K-Stipulations) and Required Operating Procedures (ROPs):

*Active Floodplain*: The lowland and relatively flat areas adjoining inland and coastal waters, including the flood-prone areas of offshore islands, composing, at a minimum, that area subject to a 1 percent or greater chance of flooding in any given year (also referred to as the 100-year or base floodplain).

*Authorized Officer (AO)*: A position of authority for approval of various activities through delegation from the Secretary of the Interior. Currently, the designated AO in the State of Alaska for leasing, surface use, and permitting are 1) State Director, 2) Manager of the Northern Field Office in Fairbanks, and 3) Deputy State Director of the Division of Energy and Solid Minerals.

*Body of Water or Waterbody*: A lake, river, stream, creek, or pond that holds water throughout the summer and supports a minimum of aquatic life.

*Consultation*: Consultation, as it is referenced in the stipulations, does not infer formal consultation as required under other legal mandates such as "Section 7 Consultation" under the ESA. Rather, consultation implies that the BLM or

developed for the Final Preferred Alternative (D) and alternatives B and C and probable effectiveness of stipulations and ROPs (Table 2-2).

A rating system was used to determine the probable effectiveness in achieving the mitigation objectives identified for the stipulations and ROPs. Effectiveness ratings are somewhat subjective and may be based on professional judgment on how effective the measure would be at mitigating and/or compensating for the impact. Goals for each mitigation measure have been established. Effectiveness is measured against how well the stipulation or ROP meets its stated goal. These ratings are used in Table 2-3 and as follows:

- High – achieves the desired results more than 90 percent of the time, and this is documented or obviously so;

- Moderate – between 75-90 percent effective, or logic dictates that is more than 90 percent effective, but no documentation exists; and

- Low – effectiveness is unknown or unverified, or is estimated to be effective less than 75 percent of the time.

The reader of this Amended IAP/EIS should keep in mind that stipulations and ROPs were often developed to address a specific, or narrow range of, resource concern(s). Thus, the effectiveness statement for each stipulation and ROP may only address one or a few resources.

## 2.9 Comparison of the Consequences of Each Alternative

Table 2-3, which follows Table 2-2, summarizes the likely effects of oil and gas exploration and development on resources in the Planning Area for each alternative. Information contained in these tables is discussed in more detail in Chapter 4 (Environmental Consequences).

## 2.10 Impacts to Current and Future Lease Holders from Revisions to 1998 Northeast IAP/EIS ROD

No changes to the stipulations attached to the existing leases would occur until after consideration in the full NEPA review for the amendment and renegotiations with leaseholders. Although lease stipulations may be revised to include more performance-based, rather than prescriptive-based, stipulations as a result of the NEPA process, it is not anticipated that the revisions would create substantially different impacts from what might occur given the current stipulations. In addition, this amendment analyzes the effects of prescriptive-based mitigation under the No Action Alternative, and effects that would occur under three action alternatives where performance-based stipulations and ROPs would apply. The analyses associated with the action alternatives provides the decision-maker with an assessment of the impacts that would occur if stipulations in existing leases were changed from prescriptive- to performance-based stipulations and ROPs.

tributaries in the northern part of the planning area. The coal and potential coalbed methane resources in the planning area are not well defined.

### 3.2.4.3 Seismicity

The National Petroleum Reserve – Alaska is not located near any tectonic plate boundaries where the relative motion between plates may generate earthquakes (USDOI BLM 1978a). Most earthquake activity in Alaska occurs along an arc extending east from the western edge of the Aleutian Islands, through south-central Alaska and into the central part of Interior Alaska. From 1960 through 2000, no earthquakes of 4.0 magnitude or greater (Modified Mercalli Intensity Scale of 1931) have been reported in the National Petroleum Reserve – Alaska. Areas east and south of National Petroleum Reserve – Alaska have reported many earthquakes of 4.0 magnitude or greater (Alaska Earthquake Information Center 2003).

## 3.2.5 Petroleum Resources

### 3.2.5.1 Petroleum Geology

The North Slope is an incredibly rich petroleum province, with an estimated in-place endowment of 63 Bbbl of oil and proven commercial oil reserves of 21 Bbbl (Alaska Department of Revenue 2002). The oil-in-place estimate is based on the total oil estimated to be present in discovered producing and non-producing fields of the North Slope. Another undiscovered 10.3 Bbbl may be recoverable in onshore and offshore areas. Gas resources may be as much as 100 trillion cubic feet (Tcf). Of the proven commercial reserves, about 13.9 Bbbl have been produced through 2002 (Alaska Department of Revenue 2003a). Exploration in northern Alaska has located 32 or more oil and gas fields, but most reserves are located in a few very large oil fields near Prudhoe Bay (Map 3-3). The key oil source-rock and reservoir sequences present in these commercial oil fields extend across much of the North Slope, including the National Petroleum Reserve – Alaska. Because of these geologic trends and the abundance of untested potential traps, northern Alaska and the adjacent continental shelf are considered to hold high potential for new oil and gas fields (Map 3-4).

### 3.2.5.2 Petroleum Activities in Northern Alaska

**Past Exploration Efforts**

Petroleum exploration in northern Alaska began in the early 1900s with field parties sponsored by the USGS. From 1944 to 1952, the U.S. Navy drilled exploration wells near oil seeps and on surface anticlines, resulting in several oil and gas discoveries. Umiat was the first oil field discovered in northern Alaska (1946). However, it remains undeveloped because development costs are prohibitive. The South Barrow gas field was the first significant gas discovery (1949) on the North Slope, and it was developed in 1958 by the federal government to supply fuel to the village of Barrow.

A second phase of National Petroleum Reserve – Alaska exploration started in the 1970s. It began under the auspices of the U.S. Navy, but was later coordinated by the USGS, with the passage of the Naval Petroleum Reserve Production Act in 1976. This exploration effort resulted in 28 exploration wells (Husky Oil Company) and 14,800 miles of seismic data (Geophysical Services, Inc.). Numerous oil and gas shows were reported, but no commercial fields were discovered. Gas fields near Barrow (Barrow and Walakpa) were developed through government subsidies and currently are produced for local use.

The discovery of the Alpine field in the Colville River Delta has helped renew exploration interest in the National Petroleum Reserve – Alaska. The Alpine field was discovered by ARCO and partners in the winter of 1994-1995 (Alaska Report 1996). Development and appraisal drilling has confirmed its reserve potential of 429 MMbbl, and in the fall of 2003 the Alpine field recorded 100 MMbbl of production (Alaska Oil and Gas Reporter 2003). The field may even have economically recoverable reserves as high as 500 MMbbl (Gingrich 2001). The Alpine field is the largest field discovered in Alaska since the discovery of the Point McIntyre field in 1988 and is one of the largest

fields discovered in the U.S. in recent decades. Of particular significance is that the Alpine field discovery has revealed a new geologic play in previously unknown sands in the Jurassic section. An oil and gas play has been defined by the USGS (1995) National Oil and Gas Assessment Team as "a set of known or postulated oil and (or) gas accumulations sharing similar geologic, geographic, and temporal properties, such as source rock, migration pathway, timing, trapping mechanisms, and hydrocarbon traps." The new Jurassic play is likely to extend westward into the National Petroleum Reserve – Alaska and will be a principal target for future exploration on the western North Slope (Kornbrath et al. 1997). Although the initial field discovery and development was outside of the Planning Area, delineation of the reservoirs in the field have resulted in a proposal to build satellite production sites that are in the National Petroleum Reserve – Alaska (USDOI BLM and MMS 2003). The Alpine field play has been the principal target for exploration on leases acquired in the Planning Area.

To date, 17 exploration wells and one sidetrack well have been drilled in the Planning Area on leases acquired since 1999 (Map 3-5). At least seven of these 17 wells encountered oil or gas and condensate. Long-term flow testing at the Spark 1A well produced 1,550 barrels of liquid hydrocarbons and 26.5 million cubic feet per day (MMcfd) of gas after fracture stimulation. Long-term flow testing at the Rendezvous "A" well produced 360 barrels per day of liquid hydrocarbons and 6.6 MMcfd of gas. Flow tests at the Lookout 2 well recovered 4,000 barrels per day of liquid hydrocarbons and 8 MMcfd of gas. All of these exploration wells targeted the Alpine field reservoir formation, which occurs within the "Beaufortian" play group. These wells are located 15 to 25 miles southwest of the Alpine field that is now producing more than 100,000 barrels (bbl) of oil per day (Alaska Oil and Gas Reporter 2003).

## Leasing and Development

### Leasing Activities

Petroleum leasing activities began in northern Alaska shortly after statehood in 1959. In the years following the 1968 Prudhoe Bay discovery, the State of Alaska has had many lease sales (USDOI BLM and MMS 1998). The BLM conducted four lease sales between 1981 and 1984. These sales offered tracts across the entire National Petroleum Reserve – Alaska; on the coastal plain, the foothills, and mountain front. Approximately 1.3 million acres were leased with bonus bids of about $83.5 million. Only one well was drilled before all the leases expired.

In 1999, the BLM offered 425 tracts (approximately 3.9 million acres) for lease within the Planning Area. A total of 133 tracts (867,000 acres) were leased, with successful bids totaling $104,635,728. Six oil companies (British Petroleum [BP], Anadarko Petroleum, Chevron, Phillips Petroleum, Atlantic Richfield Company [ARCO] Alaska, and R3 Exploration Corp) submitted 174 bids that concentrated in the northeast corner of the Planning Area. The highest bid for a single tract (5,756 acres) was $3,655,100, offered by ARCO Alaska and Anadarko Petroleum.

The BLM conducted another lease sale in June 2002 in the Planning Area. The 2002 lease sale generated winning bids totaling $63,811,496 on 60 tracts totaling 579,269 acres. Phillips Alaska and Anadarko Petroleum, the companies that have been most active in National Petroleum Reserve – Alaska, were awarded 34 tracts, with successful bids of $9.6 million. Two companies that have not been active in the National Petroleum Reserve – Alaska to date also submitted winning bids. TotalFinaElf E&P USA was awarded 20 tracts with successful bids totaling $53,532,000. TotalFinaElf submitted the six highest bids of the sale, bidding more than $10 million on each of two tracts and more than $7 million on a third. EnCana Oil and Gas (USA) Inc. also submitted successful bids for leases in the 2002 sale.

The BLM held an oil and gas lease sale on June 2, 2004 for 484 tracts in the Northwest National Petroleum Reserve – Alaska, and for 22 tracts that combine lands from the Northwest and Northeast National Petroleum Reserve – Alaska along the Ikpikpuk River that have not been offered to date. About 5.8 million acres were offered. The BLM may also hold lease sales in the Planning Area in 2005, depending upon the outcome of the Amended IAP/EIS.

Leasing and exploration activities in the Outer Continental Shelf (OCS) areas in the Beaufort Sea are summarized in USDOI BLM and MMS (2003). Seven lease sales have yielded 35 exploratory wells, which were drilled in Arctic federal waters between 1980 and 2003 (30 Beaufort Sea wells and five Chukchi Sea wells). Encana drilled the 35th exploration well in the winter of 2002-2003 at the McCovey prospect in the Beaufort Sea. The MMS classifies nine of

## 5.6 Public Review and Comment on the Draft Amended IAP/EIS

The Notice of Availability (NOA) of the Draft Amendment to the Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement (IAP/EIS) and the Announcement of Public Subsistence-Related Hearings Schedule was published in the Federal Register on June 9, 2004. The public comment period was originally scheduled from June 9, 2004, through August 8, 2004, however, it was extended through August 23, 2004. Public notices announcing the comment period were placed in newspapers with circulation in or near locations where public meetings were held. These newspapers included the Arctic Sounder (August 8 and 15, and October 28, 2004) and Tundra Drums (August 12 and November 11, 2004). Public service announcements were broadcasted on radio station KBRW from July 27 through August 17, and during late October through November 2004. The BLM issued a press release on June 9, 2004, notifying the public that the Draft Amended IAP/EIS was available for public review, and the schedule for public comment and ANILCA 810 subsistence hearings. Notices were posted at public gathering places in Nuiqsut, Barrow, Anaktuvuk Pass, and Atqasuk, all located on the North Slope of Alaska, and Bethel, Alaska, located on the Yukon Delta. Information on the Draft Amended IAP/EIS was also posted on the interactive website (http://nenpra.ensr.com). The public was able to access the website to download a copy of the Draft Amended IAP/EIS and provide their comments (including attachments). Comments and attachments posted to the website were incorporated into a database for later analysis by the core planning team.

Public and subsistence hearings were held in Anchorage on June 28, Fairbanks on June 29, Washington D.C. on July 1, Anaktuvuk Pass on August 3 and November 8, Nuiqsut on August 9 and December 1, Atqasuk on August 10 and November 4, Barrow on August 12 and November 5, and Bethel on August 17 and November 11, for the BLM to provide an overview of the alternatives and to take public comments and subsistence testimony. Over 214,660 comments were received on the Draft Amended IAP/EIS. These included letters, electronic mail, facsimiles, comments and attachments posted to the project website, and comments provided at the public hearings. A summary of the comments received and specific comments and responses are presented in Volume II, Chapter 6, of this Final Amended IAP/EIS. All comment letters are reproduced on the CD located in the back pocket of Volume I.

## 5.7 Development of the Final Preferred Alternative

After completion of the public hearings and closure of the public comment period, the core planning team, resource staff, and management met to review the comments and alternative proposals and to develop the BLM's final Preferred Alternative. Several alternative proposals were received. These included proposals to close or open additional areas to leasing and development; place greater or lesser restrictions on the types of activities allowed under stipulations and ROPs; and combine elements of two or more alternatives (e.g., select Alternative A, but replace the 1998 stipulations with stipulations and ROPs developed for Alternative B).

During the comment period on the Draft Amended IAP/EIS, the USFWS submitted a proposal that would leave approximately 296,000 acres northeast of Teshekpuk Lake unavailable to oil and gas leasing. The full text of the agency's letter can be read on the CD included with this document (see Comment Number 197619; U.S. Fish and Wildlife Service at Anchorage). This is an increase of 83,000 and 85,000 acres that would be made unavailable for leasing as compared to Alternative B (Preferred Alternative in Draft Amended IAP/EIS; 213,000 acres unavailable for leasing; Map 2-2), and the final Preferred Alternative (Alternative D; 211,000 acres in Teshekpuk Lake unavailable for leasing; Map 2-4), respectively. The USFWS believes their proposal would provide additional protection for molting brant and other wildlife.

An alternative proposal was also submitted by ConocoPhillips Alaska, Inc. The full text of the company's letter can be read on the CD included with this document (see Comment numbers 196557 and 197611; ConocoPhillips Alaska, Inc.). Their proposal would allow for oil and gas leasing, exploration, and development within portions of

COMMENTS AND RESPONSES

- Sharon and Kenneth Wyberg (186677, 189912, 196953)
- Stan Senner (197978)
- Stephanie Danielson (184901)
- Steve Yates (121623)
- Steven DeCaluwe (138143)
- Steven Mueller (033673)
- Susanne Moser (197621)
- T.D. Kameron (92949)
- Taqulik Hepa (197988)
- Ted von Hippel (000039)

- Terry Cummings (196941)
- Thomas Itta (197979)
- Thomas Matthews (116072)
- Tom and Sally Overholt (197629)
- Tom Paragi (143335)
- Veronica Estelle (196456, 196457)
- Virginia Alden (196938)
- Wallace Elton (182141)
- Wayne T. Gilchrest (197984)

## 6.2.2 Public Subsistence-Related Meeting Testimony

Substantive comments received during the 12 public subsistence-related hearings have been addressed in the same manner as written comments. All of the following individuals spoke at the public meetings. The comments that received a written response have been assigned a discrete comment identification number located beside the name of the individual.

### 6.2.2.1 Public Subsistence-Related Meetings and ANILCA 810 Hearings on the Draft Amended IAP/EIS

*Anaktuvuk Pass, Alaska* (**Document Identification Number 197974**). The public subsistence-related hearing in Anaktuvuk Pass was held on August 3, 2004 in the Nunamiut School at 7 p.m. Approximately 22 people attended this hearing. The following attendees provided comments for the record:

- Anna Iona Hugo Nageak (197974-175)
- Charles S. Hugo (197974-171)
- Doreen Simmonds (197974-150)
- Joseph Akpik, Inupiat Community of the Arctic Slope (197974-113)
- Mark Major, ConocoPhillips Alaska (197974-093)
- Paul Hugo, North Slope Borough Assembly (197974-155)

*Anchorage, Alaska* (**Document Identification Number 197975**). The public subsistence-related hearing in Anchorage was held on June 28, 2004 in the Wilda Marston Theatre at 7 p.m. Approximately 33 people attended this hearing. The following attendees provided comments for the record:

- Deborah Williams, Alaska Conservation Foundation (197975-163)
- Eleanor Huffines, Wilderness Society (197975-122)
- Gregory Hebertson, Anadarko Petroleum (197975-104)
- John Schoen, Audubon Alaska (197975-089)
- Larry Houle, Alaska Support Industry Alliance (197975-195)
- Lynn Johnson, Dowland-Bach Corporation (197975-062)
- Paula Easley (197975-189)
- Rachel James, Alaska Coalition (197975-149)
- Rick Mott, ConocoPhillips Alaska (197975-076)
- Sara Chapell, Sierra Club (197975-114)
- Tadd Owens, Resource Development Council for Alaska (197975-066)
- Ted Von Hippel (197975-139)
- Tim Leach (197975-178)
- Tom Hendrix, Kuukpik Carlile Transportation, LLC (197975-203)

*Atqasuk, Alaska* (**Document Identification Number 197979**). The public subsistence-related hearing in Atqasuk was held on August 10, 2004 in the Community Center at 7 p.m. Approximately 36 people attended this hearing. The following attendees provided comments for the record:

- Bernadine Itta (197979-023)
- Mark Major, ConocoPhillips Alaska (197979-008)
- Thomas Itta, Sr. (197979-027)

*Barrow, Alaska* (**Document Identification Number 197980**). The public subsistence-related hearing in Barrow was held on August 12, 2004 in the Inupiat Heritage Center at 7 p.m. Approximately 76 people attended this hearing. The following attendees provided comments for the record:

- Beverly Hugo (197980-103)
- Charles Brower, North Slope Borough, Wildlife Department (197980-011)
- Charles Okakok (197980-175)
- Craig George, North Slope Borough, Department of Wildlife Management (197980-295)
- Douglas Edwardsen (197980-131)
- Edith Vorderstrasse (197980-186)
- Edward Itta (197980-048)
- Elsie Itta, Native Village of Barrow (197980-079)
- Geoff Carroll (197980-035)
- George Edwardsen (197980-196)
- Harry Brower, Jr. (197980-278)
- James Patkotak, Inupiat Community of the Arctic Slope (197980-111)
- Janice Meadows (197980-252)
- Jenny Ahkivgak (197980-274)
- Johnny Brower (197980-149)
- Ken Donajkowski, ConocoPhillips Alaska (197980-160)
- Kenneth Toovak Jr. (197980-063)
- Linda Wenning (197980-120)
- Mae M. Akpik (197980-228)
- Marie Carroll (197980-068)
- Max Ahgeak, Ukpeagvik Inupiat Corporation (197980-220)
- Paul Ningeok (197980-134)
- Percy Nusunginya, Native Village of Barrow Inupiat Traditional Government Council (197980-029)
- Richard Glenn, Arctic Slope Regional Corporation (197980-089)
- Richard Hutchinson (197980-271)
- Robert Edwardsen, Sr. (197980-106)
- Taqulik Hepa (197980-237)
- Warren Matumeak (197980-127)
- William Itta (197980-261)

*Bethel, Alaska* (**Document Identification Number 197978**). The public subsistence-related hearing in Bethel was held on August 17, 2004 in the Cultural Center at 7 p.m. Approximately nine people attended this hearing. The following attendees provided comments for the record:

- Agnes Pete Phillips (197978-071)
- Myron Manning, Association of Village Council Representatives (197978-050)
- Sally Rothwell, ConocoPhillips Alaska (197978-056)
- Stan Senner, Audubon Alaska (197978-087)

*Fairbanks, Alaska* (**Document Identification Number 197976**). The public subsistence-related hearing in Fairbanks was held on June 29, 2004 in Noel Wien Library Auditorium at 7 p.m. Approximately 32 people attended this hearing. The following attendees provided comments for the record:

- Arthur Hussey, Northern Alaska Environmental Center (197976-076)
- Ben Johnson (197976-121)
- Brodie Anderson, Northern Alaska Environmental Center (197976-052)
- Buzz Otis (197976-110)
- Chris Johansen (197976-093)
- Dan Simien, Laborer's Local 942 (197976-071)
- Dave Miller (197976-099)
- Dean Rampy, Doyon (197976-106)
- Debbie Miller (197976-151)
- Don Lowry, Operating Engineers Local 302 (197976-084)
- Jeff Merkel (197976-115)

## COMMENTS AND RESPONSES

- Jim Drew (197976-080)
- John Whitehead, ConocoPhilips Alaska (197976-059)
- John Zuleger (197976-132)
- Kevin Pomeroy (197976-108)
- Leon Tomasic (197976-102)
- Leonard Collins (197976-157)
- Margaret Russell, Greater Fairbanks Chamber of Commerce (197976-125)
- Rosemary Ahtuangaruak (197976-136)
- Sean Rice, A. Phillip Randolph Institute (197976-147)
- Steve Thompson, Mayor, City of Fairbanks (197976-087)

*Nuiqsut, Alaska* **(Document Identification Number 197973).** The public subsistence-related hearing in Nuiqsut was held on August 9, 2004 in the Kisik Community Center at 7 p.m. Approximately 44 people attended this hearing. The following attendees provided comments for the record:

- Bernice Kaigelok (197973-137)
- Eli Nukapigak (197973-106)
- Frank Matumeak (197973-094)
- Joe Nukapigak (197973-076)
- Joseph Eviklook (197973-071)
- Leonard Lampe, Kuukpik Subsistence Oversight Panel (197973-044)
- Maggie Kavosky (197973-111)
- Mark Ahmakak (197973-098)
- Rosemary Ahtuangaruak, Major, City of Nuiqsut (197973-117)
- Sally Rothwell, ConocoPhillips Alaska (197973-027)
- Sarah Kunaknana (197973-113)
- Thomas Ahtuangaruak (197973-132)

*Washington D.C.* **(Document Identification Number 197977).** The public subsistence-related hearing in Washington, D.C., was held on July 1, 2004 in the Pentagon City Doubletree Hotel at 7 p.m. Approximately 87 people attended this hearing. The following attendees provided comments for the record:

- Adam Kolton (197977-275)
- Beth Porterfield (197977-224)
- Brian Moore, United States Public Interest Research Group (197977-057)
- Dana Rudd, ConocoPhillips (197977-112)
- David Drasin (197977-271)
- Douglas Jaslow (197977-221)
- Ed Mulrernin (197977-122)
- Erica Stanley (197977-201)
- Gregory Herbertson, Anadarko Petroleum (197977-099)
- Heather Rorer (197977-238)
- James Weiffenbach (197977-255)
- Jeanne Watson (197977-206)
- Jennifer Schmidt (197977-256)
- John Garder (197977-088)
- Jon Owen, Campaign for America's Wilderness (197977-031)
- Jonathan Guerrero (197977-157)
- Keith McCoy, National Association of Manufacturers (197977-009)
- Ken Leonard, American Petroleum Institute (197977-023)
- Kristen Cummings, National Wildlife Federation (197977-047)
- Leslie Catherwood, Wilderness Society (197977-165)
- Margaret Pardue (197977-181)
- Marie-Laure Coüet (197977-095)
- Mark Young (197977-150)
- Matthew Frattali (197977-235)
- Melinda Pierce (197977-197)
- Michael Woodbridge (197977-160)
- Mikaila Milton (197977-263)
- Natalie Brandon, Alaska Wilderness League (197977-171)
- Paul Baicich (197977-249)
- Paul Cicio, Industrial Energy Consumers of America (197977-067)
- Peter Guerrero (197977-152)
- Rachel Bocchino (197977-209)
- Randy Moorman, Earth Justice (197977-077)
- Sam Frank (197977-145)
- Sara Williams (197977-243)
- Tara Schoepke (197977-287)
- Tayleah Surratt (197977-214)
- Timothy Stephany (197977-135)

**Response To:** Comment 196557-032

Although industry has made great improvements in technology to reduce impacts from oil and gas exploration and development on the North Slope, some effects, such as disturbances to fish and wildlife populations, and the tendency for subsistence hunters to avoid areas where development has occurred, will likely not be eliminated or substantially reduced by newer technology. Thus, the BLM must consider closing the most sensitive areas to leasing to protect fish and wildlife, subsistence, and other resources that can be affected by disturbance associated with oil and gas activities.

**Comment From:** Conoco Phillips (Comment Letter No. 196557)

*CPAI requests clarification on how BLM will manage stipulations in existing leases. Page 2-34 of the DEIS states "Although lease stipulations may be revised to include more performance-based, rather than prescriptive-based, stipulations as a result of the NEPA process, it is not anticipated that the revisions would create different impacts from what might occur given the current stipulations." (emphasis added). If Alternative B or C is adopted as a result of this current EIS amendment process, we assume that CPAI's leases will be modified to include the new stipulations. We request that the process BLM will undertake for doing so is stated more clearly in the Final EIS.* **(Comment No. 196557-042)**

**Response To:** Comment 196557-042

Section 2.9 that you are referring to on page 2-34 of the Draft EIS has been rewritten to clarify.

**Comment From:** Conoco Phillips (Comment Letter No. 196557)

*Additionally, CPAI suggests adding a discussion of the process for managing lease stipulations for lands currently leased, but later conveyed to Native corporations, and how CPAI's Alpine Satellites Development Project and our request for exceptions to certain of the stipulations will be treated in light of the timing of this process.* **(Comment No. 196557-043)**

**Response To:** Comment 196557-043

If a lease has been issued on lands later conveyed to a Native Corporation we can waive administration with the lease holder's concurrence or make the conveyance subject to the terms of the lease. The Alpine Satellite Development Project ROD was signed prior to completion of this amendment.

**Comment From:** Conoco Phillips (Comment Letter No. 196557A2)

*CPAI requests clarification on how BLM will manage stipulations in existing leases. We request information on the process BLM will undertake for modifying CPAI's leases to incorporate revised stipulations and required operating procedures; we suggest adding a discussion of the process for managing lease stipulations for lands currently leased, but later conveyed to Native corporations; and we request clarification and how CPAI's Alpine Satellites Development Project and our request for exceptions to certain of the stipulations will be treated in light of the timing of this process.* **(Comment No. 196557A2-008)**

**Response To:** Comment 196557A2-008

No changes to the stipulations attached to the existing leases will occur until after consideration in the full NEPA review for the Northeast National Petroleum Reserve-Alaska Amended IAP/EIS and subsequent renegotiations with the leaseholders. Any changes to stipulations attached to existing leases would only be made with the concurrence of the leaseholder.

Any decisions regarding land conveyance or the Alpine Satellite development plan are outside the scope of this amendment process.