IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE WILDERNESS SOCIETY,                           )
900 17th St. NW, Washington, D.C. 20006;          )
NATURAL RESOURCES DEFENSE COUNCIL,                )
1200 New York Ave., NW, Suite 400, Washington, D.C. 20005;  )
GREENPEACE, INC., 1436 U St. NW, Washington       )
D.C. 20009;                                       )
SIERRA CLUB,                                      )
730 Polk Street, San Francisco, CA 94109;         )
DEFENDERS OF WILDLIFE,                            )
1101 14th St., NW, Suite 1400, Washington, D.C. 20005;  )
ALASKA WILDERNESS LEAGUE,                         )
320 4th St., NE, Washington, D.C. 20002;          )
ALASKA CENTER FOR THE ENVIRONMENT,                )
519 West 8th Ave., Suite 201, Anchorage, AK 99501;  )
and NORTHERN ALASKA ENVIRONMENTAL CENTER,         )
218 Driveway St., Fairbanks, AK 99701,            )
                                                  )
                      Plaintiffs,                 )   CASE NUMBER  1:98CV02395
                                                  )
                                                  )   JUDGE: Louis F. Oberdorfer
                 v.                               )
                                                  )   DECK TYPE: Civil General
BRUCE BABBITT, Secretary of the                   )
Interior, and the BUREAU OF LAND                  )   DATE STAMP: 10/05/98
MANAGEMENT, UNITED STATES                         )
DEPARTMENT OF THE INTERIOR,                       )
Department of the Interior, 1849 C. St. NW,       )
Washington, D.C. 20240,                           )
                                                  )
                      Defendants.                 )

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

I. NATURE OF THE CASE

1.  This action challenges the defendants' violations of the National Environmental Policy

Act (NEPA) in connection with the Northeast National Petroleum Reserve-Alaska Final

Integrated Activity Plan / Environmental Impact Statement (August 1998) (FEIS). The FEIS

Ex. B, p. 1

does not constitute an adequate detailed statement addressing the impacts from and alternatives to oil and gas development in northeast corner of the National Petroleum Reserve-Alaska (hereinafter referred to as NPR-A planning area) as required by NEPA. 42 U.S.C. § 4332(C); 40 C.F.R. § 1500 et seq.

## II. JURISDICTION

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02 and 5 U.S.C. § 706. Venue is appropriate under 28 U.S.C. § 1391(e).

## III. PLAINTIFFS

3. The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic. It has approximately 250,000 members nationwide, 1,000 of whom live in Alaska, and has had a longstanding involvement with the issues surrounding the impacts of oil and gas development on public lands, including lands across Alaska's Arctic and within the NPR-A.

4. Natural Resources Defense Council is a non-profit environmental membership organization with more than 350,000 members throughout the United States. It has had a longstanding and active interest in the protection of the environment in Alaska's Arctic, particularly in the oil fields. With its nationwide membership and a staff of lawyers, scientists, and other environmental specialists, it plays a leading role in a diverse range of land and wildlife management and resource development issues. Over the years, it has participated in a number of court cases involving resource development issues in Alaska's Arctic.

2

5.   Greenpeace, Inc. is an independent campaigning organization with about 450,000 members in the United States.  It seeks to expose global environmental problems and to find solutions for a peaceful and lasting future.  Greenpeace seeks to ensure the earth's ability to nurture life in all its diversity, including protecting bio-diversity in all its forms and ending the abuse of the oceans and fresh water.

6.   Sierra Club is a national non-profit organization having approximately 525,000 members dedicated to the exploration, enjoyment, and preservation of the scenic and natural resources of the United States, including federal lands in Alaska.  The Sierra Club works towards educating and enlisting the public to protect and restore the quality of the natural environment. The Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, public lands and waters, endangered species, clean water and clean air.  The Sierra Club has long been active in issues relating to the impacts of oil and gas leasing and development on public lands, including the NPR-A.

7.   Defenders of Wildlife is a non-profit wildlife conservation organization with more than 270,000 members and supporters nationwide, including Alaska.  It works to protect wildlife and emphasizes appreciation and protection for all species in their ecological role within the natural environment.  Through its Washington, D.C. office and field offices around the country, it has invested considerable organizational resources in protecting the important wildlife populations located in the NPR-A.

8.   Alaska Wilderness League is a non-profit organization with approximately 7,000 members and activists.  It was founded in 1993 to advocate for protection of Alaska's public

3

lands which are threatened with environmental degradation. Since its inception, it has taken an active role on issues related to oil and gas development in Alaska.

9. Alaska Center for the Environment is an Alaska non-profit environmental advocacy and education organization that is dedicated to the conservation of Alaska's natural ecosystems. It has approximately 9,000 members in Alaska and throughout the United States.

10. Northern Alaska Environmental Center is an Alaska non-profit environmental advocacy and educational organization with 1300 members. It has empowered citizens to take an active role in protecting natural habitats and wild places in arctic and interior Alaska since 1971. It advocates for Arctic wilderness, wildlife, and traditional ways-of-life, transportation and infrastructure alternatives that minimize impacts on wild lands, and clean water and wild rivers to protect health, fish, and recreational opportunities.

11. The defendants' unlawful actions adversely affect each plaintiff's organizational interests and its members' use and enjoyment of the public lands in and resources of the NPR-A planning area.

12. Each of the plaintiff groups has members who either reside near, visit or otherwise use and enjoy the NPR-A planning area for fishing, hunting, subsistence, recreation, wildlife viewing and education, research, photography, or aesthetic and spiritual enjoyment, or who reside elsewhere in or outside Alaska and who enjoy or otherwise use migratory wildlife from the NPR-A planning area. The oil and gas leasing activities proposed for the NPR-A planning area will directly and irreparably injure these interests.

13. Each of the plaintiffs submitted comments to BLM on the draft EIS and FEIS for the NPR-A planning area. Each of the plaintiffs monitors the use of public lands and compliance with the law respecting these lands, educates its members and the public concerning the

4

management of these lands, and advocates policies and practices that protect the natural value and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the plaintiffs will be directly and irreparably injured by defendants' violations of law as described in this complaint.

## IV. DEFENDANTS

14. Defendant Bruce Babbitt is sued in his official capacity as Secretary of the Department of the Interior.

15. Defendant Bureau of Land Management (BLM) is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the NPR-A planning area.

## V. BACKGROUND

### A. National Petroleum Reserve-Alaska History

16. In 1923, President Warren G. Harding set aside 23.5 million acres in northern Alaska as the Naval Petroleum Reserve Numbered 4, to be administered by the Navy as an assured future oil supply for defense purposes.

17. In 1976, President Gerald Ford signed the Naval Petroleum Reserves Production Act (NPRPA). Pub. L. 94-258, 90 Stat. 303 (1976). Among other things, the NPRPA transferred jurisdiction over Naval Petroleum Reserve Numbered 4 from the Secretary of the Navy to the Secretary of the Interior and renamed it the National Petroleum Reserve-Alaska. In making the transfer, Congress expressly recognized that the protection of the unique natural, fish and wildlife, scenic and historical values of the NPR-A would better be evaluated and managed under

5

the authority of the Secretary of the Interior. The NPRPA expressly prohibits production of petroleum from the NPR-A or development leading to production of petroleum unless authorized by Congress. Pub. L. 94-258, 90 Stat. 304, 42 U.S.C. § 6504 (1976).

18. While the NPRPA prohibited oil and gas production of the NPR-A without additional Congressional authorization, it did permit exploration. The NPRPA expressed Congress' intent that the Secretary of the Interior manage NPR-A in a manner consistent with the total energy needs of the Nation. Pub. L. 94-258, 90 Stat. 303 (1976).

19. The NPRPA requires that exploration activities conducted within the Utukok River and Teshekpuk Lake areas and any other area designated by the Secretary of the Interior as containing "any significant subsistence, recreational, fish and wildlife, or historical or scenic value" be conducted in a manner which assures "maximum protection" of these surface values. Pub. L. 94-258, Sec. 104(b), 90 Stat. 304, 42 U.S.C. § 6504 (1976).

20. In 1977, the Secretary of the Interior adopted regulations for management and protection of the NPR-A. The regulations indicate that surface values of the NPR-A may be protected by limiting, restricting, or prohibiting the use of and access to lands within the NPR-A, including "Special Areas." 43 C.F.R. § 2361.1(e)(1) (1997).

21. In 1977, the Secretary of the Interior designated the Utukok River Uplands, Teshekpuk Lake and the Colville River as Special Areas within the NPR-A. 42 Fed. Reg. 28,723 (1977). The Teshekpuk Lake Special Area and the Colville River Special Area are within the NPR-A planning area.

22. In passing the NPRPA, Congress recognized that "The northeastern coastal plain area [of NPR-A] is considered to be the best waterfowl nesting area on the North Slope" of Alaska. H. R. Rep. No. 94-81, Part 1, p. 8 (to accompany H. R. 49) (March 18 and April 22, 1975). For

example, the Teshekpuk Lake watershed provides nesting habitat for many migratory waterfowl species, including northern pintails, oldsquaws, king elders, Pacific brant, greater white-fronted geese, tundra swans, and three species of loons -- Pacific, red-throated and yellow-billed.  The Teshekpuk Lake Special Area provides essential molting habitat for significant populations of migratory Pacific brant, greater white-fronted geese and Canada geese.  Spectacled and Steller's elders, both listed as threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., have relatively high nesting densities in areas around Teshekpuk Lake.

23.  The Teshekpuk Lake area also encompasses major calving grounds for the 25,000 caribou of the Teshekpuk Lake herd.  This caribou herd is an important food resource for local Alaska Native families.

24.  The Colville River is the largest of Alaska's rivers that flow to the Arctic Ocean.  The river and its tributaries provide important habitat for moose, brown bears, wolves, wolverines and at least twenty species of anadromous and freshwater fish.  It is a vital source of subsistence resources for area residents and is a spectacularly scenic area with substantial recreation values and potential for remote, wilderness experiences.  The Colville River is known for high concentrations of song birds and birds of prey, including Arctic peregrine falcons, gyrfalcons and rough-legged hawks.  It is recognized as one of the most significant regional habitats for raptors in North America.

25.  The NPR-A planning area includes several other areas that may have resource values sufficient to warrant special protection.  These include, but are not limited to, the Fish Creek area, and the Ikpikpuk, Kikiakrorak, and Kogosukruk Rivers.

7

## B. Leasing in NPR-A

26.  In 1980, Congress passed an appropriations bill for fiscal year 1981 that, among other things, included a provision directing the Secretary of the Interior to carry out "an expeditious program" of oil and gas leasing in the NPR-A. Act Making Appropriations for the Department of the Interior and Related Agencies, Title I, P.L. 96-314, 94 Stat. 2957, 2964 (1980).  Pursuant to this appropriations rider, the Secretary undertook a leasing program.  BLM completed the program in 1983.  All leases issued under this program have expired, and no crude oil field was developed as a result of it.

27.  In 1997, in response to renewed oil industry interest in NPR-A and to a request from Alaska's Governor Tony Knowles, BLM undertook an analysis to determine whether to conduct oil and gas lease sales in a 4.6 million acre area located in the northeast corner of the NPR-A.  On February 13, 1997, BLM published a Notice of Intent to prepare an Integrated Activity Plan / Environmental Impact Statement for the NPR-A.  62 Fed. Reg. 6797 (1997).

28.  Ten months later, BLM completed a draft analysis of the impacts of oil and gas leasing on the 4.6 million acre planning area.  Notice of availability of the draft EIS was published in the Federal Register on December 12, 1997.  62 Fed. Reg. 65,440 (1997).

29.  The draft EIS set out five alternatives designated A through E.  All alternatives proposed oil and gas leasing, except Alternative A.  BLM accepted comments on the draft EIS over a ninety day period, until March 12, 1997.

30.  The draft EIS did not designate a Preferred Alternative.

31.  The FEIS was published and made available on August 7, 1998 for a thirty day public comment period.  63 Fed. Reg. 42,431 (1998).  The FEIS included the same five Alternatives A - E included in the draft EIS, but for the first time also included a Preferred

8

Alternative. The Preferred Alternative proposes opening 87% of the 4.6 million acre NPR-A planning area to oil and gas leasing.

## VI. FEIS ANALYSES

### A. Need for Leasing

32. According to the FEIS, domestic oil and gas production is declining and by the year 2020, nearly two-thirds of the nation's oil supply will be imported. The FEIS states that importation at this level makes the nation dependent on foreign oil, places it at risk of another oil embargo, and exacerbates the trade deficit. FEIS, p. I-2. Thus, the FEIS states that leasing in the NPR-A planning area would be conducted to meet the nation's future energy needs. The FEIS acknowledges, however, that no final national energy policy is in place. FEIS, p. V-349. Moreover, the FEIS states that "interest [in the NPR-A] has increased as industry infrastructure has come closer to the Reserve's boundary and advances in technology have both reduced costs and environmental impacts and increased industry's understanding of the resources." FEIS, p. I-1. The FEIS further states that "[a] recent oil discovery on the Colville delta plays a large role in renewed exploration interest in the NPR-A." FEIS, p. III-A-5.

### B. Alternatives Discussion

33. The FEIS restricts its discussion of alternatives to only those BLM considered within its existing statutory obligations. Though including varying leasing and surface occupancy restrictions, none of the alternatives in the FEIS proposes permanent protection for environmentally sensitive areas and wildlife resources within the NPR-A planning area, including the previously designated Teshekpuk Lake and Colville River Special Areas, except for limited recommendations for Wild and Scenic River Act status for portions of the Colville River included in some alternatives.

9

34. The FEIS proposes a recommendation to the Secretary of the Interior to add an area encompassing approximately two miles on either side of the Kikiakrorak and Kogosukruk Rivers and the Kogosukruk River's tributaries to the Colville River Special Area. No permanent protection is discussed or proposed in any alternative for these areas.

## C. Direct and Indirect Impacts

35. The Preferred Alternative makes a 589,000 acre area north and east of Teshekpuk Lake, and much of the Lake itself, unavailable for leasing. FEIS, p. II-19. Within this area, however, "ice roads, seismic activities, winter overland moves and other nonpermanent activities other than exploratory or delineation wells" may be permitted.

36. The Preferred Alternative imposes a restriction against permanent oil and gas surface activities within 1 mile of the west bluffs of the Colville River. FEIS, p. II-20. "Essential pipeline crossings" would be permitted, however, within this area.

37. The Preferred Alternative imposes a restriction against permanent oil and gas surface activities within one mile of the bluff on either side of the Kikiakrorak and Kogosukruk Rivers. "Essential transportation crossings" would be permitted, however, within this area. FEIS, p. II-20.

38. The FEIS does not adequately analyze the potential impacts to Special Areas or to the Kikiakrorak and Kogosukruk Rivers from construction activities necessary to set up these "essential" pipeline and transportation crossings.

39. The FEIS assumes that Point Pitt/Camp Lonely, located on the Arctic coast in the Teshekpuk Lake Special Area, may eventually be used as a staging area. FEIS, p. IV-A-13. From this marine receiving point, heavy equipment and supplies would be transported to remote oil fields within the planning area. The FEIS does not adequately discuss the potential for

Ex. B, p. 10

disturbance and environmental impacts from extensive road and air traffic through the Teshekpuk Lake Special Area.

40. The FEIS similarly assumes that Umiat, located upstream in the Colville River Special Area may eventually be used as a staging area. FEIS, p. IV-A-13. From this receiving point, heavy equipment and supplies would be transported to remote oil fields within the planning area. The FEIS does not adequately discuss the potential for disturbance and environmental impacts from staging activities through the Colville River corridor.

41. With respect to the effects of habitat destruction on nesting success of various species of birds within the NPR-A planning area, the FEIS states: "At present, we do not have adequate data for most species that would allow accurate determination of effects at various levels of reproductive success for most species." FEIS, p. IV-C-25. Despite this lack of data, the FEIS concludes that under Alternatives B and C and the Preferred Alternative, only minor effects to bird populations will occur from gravel pad, road, and airstrip construction and gravel mining. FEIS, pp. IV-C-25, IV-D-10, IV-G-30, IV-G-32.

42. The FEIS states that "the reaction of eiders to disturbance in the oil fields is not understood." FEIS, p. IV-G-43. Nevertheless, the FEIS concludes that under Alternatives B and C and the Preferred Alternative, disturbances to eiders from activities in the planning area are not expected to cause significant population effects. FEIS, pp. IV-C-43, IV-D-14, IV-G-47.

43. The FEIS does not provide comprehensive information as to known locations of fish spawning, rearing and over-wintering habitats of freshwater, anadromous and marine fish species within the planning area. The FEIS also states that information on the specific design, location and timing of individual activities in the planning area is unavailable. FEIS, p. V-351.

11

Nevertheless, the FEIS concludes that Alternatives B and the Preferred Alternative will have no measurable impact on fish populations in the planning area. FEIS, pp. IV-C-20, IV-G-23.

44. Under each of the Alternatives except Alternative A, pipelines would be permitted in caribou calving areas and across the summer and winter ranges of North Slope caribou herds. FEIS, p. III-B-40. The FEIS also states: "The actual locations of new pipelines that may be constructed in the Northeast NPR-A Planning Area will depend on the location and sequence of commercial-sized discoveries; . . . [I]t is misleading to speculate on the exact locations of new pipelines in the NPR-A." FEIS, p. IV-A-23.

45. The FEIS notes that the "avoidance of the Prudhoe Bay complex of roads and pipelines by cow caribou represents a functional loss of habitat." FEIS, p. IV-C-30. The FEIS concludes, however, that under Alternatives B through E and the Preferred Alternative, pipelines to the TAPS facilities are not expected to affect the movement of caribou or alter their distribution or abundance. FEIS, pp. IV-C-31, IV-D-11, IV-E-12, IV-F-14, IV-G-34.

46. The FEIS states: "Investigations to identify gravel sources in the NPR-A have not been conducted but presumably will be initiated, if discoveries are made in the sale area following a lease sale." FEIS, p. IV-A-15. The FEIS relies on the fact that gravel will be obtained from existing borrow sites east of the NPR-A to conclude that gravel extraction activities will not have a measurable effect on various species or the environment. FEIS, pp. IV-G-5, IV-G-45. At the same time the FEIS states "[a]dmittedly, we have not studied the economic feasibility of gravel transportation in the NPR-A." FEIS, p. IV-A-15-16.

47. The FEIS bases its development scenarios on the assumption that the Trans-Alaska Pipeline System (TAPS) will carry the crude oil to Valdez. FEIS, p. IV-A-22. The FEIS states that oil production is not likely to occur for eight to twelve years from the time of leasing. FEIS,

12

p. IV-A-19. The FEIS does not adequately address the potential need for substantial repair and reconstruction of TAPS to keep it functional over the next several decades, or potential impacts of its operation beyond its originally anticipated useful life.

48. The FEIS bases several conclusions regarding the environmental impacts of oil spills on the assumption that the average crude oil spill is four barrels. FEIS, p. IV-G-29, IV-G-35. The FEIS further bases conclusions regarding the environmental impacts of oil spills on an assumption that approximately 75% of spills would occur on pads or roadbeds off the tundra surface. FEIS, p. IV-G-19, IV-G-22, IV-G-29. The FEIS does not adequately address the potential impacts from a more likely scenario of a range of spill sizes; nor does it adequately address the potential impact from pipeline spills.

49. The FEIS assumes enforcement of a "stipulations" package to conclude that impacts to various species and the environment will not be significant. FEIS, p. IV-G-22. The stipulations package, however, contains an exception clause which states that a waiver to individual stipulations may be granted where the stipulation is found to be technically infeasible, economically prohibitive, or an environmentally preferable alternative is available. FEIS, p. II-29.

### D. Cumulative Impacts

50. The section entitled "Major Projects Considered in the Cumulative Case" provides a number of tables that list past, existing and future oil and gas activities on the Alaska North Slope. FEIS, pp. IV-A-42 - IV-A-46. The environmental impacts of these activities are not analyzed in this section.

51. The section entitled "Effects of the Cumulative Case" acknowledges past and existing oil and gas activities on the Alaska North Slope largely by reference to the

13

aforementioned tables. The FEIS does not provide a thorough assessment of the environmental impacts of past and existing oil and gas activities either alone or in conjunction with proposed activities for the NPR-A planning area or in conjunction with reasonably foreseeable future activities.

52. The FEIS analyzes cumulative impacts with reference to hypothetical scenarios of potential future development on the Alaska North Slope. FEIS, pp. IV-H-2 - IV-H-3. This analysis is generally limited to three specific hypothetical scenarios.

### VII. TIMING OF SUIT

53. Although the Secretary of the Interior has indicated an intent to release a final decision in the near future, he had not issued a record of decision on the FEIS as of October 4, 1998.

54. The 1980 appropriations act calling for "an expeditious program" of oil and gas leasing in the NPR-A required that challenges to the adequacy of an EIS for activities authorized by the appropriations act be brought within 60 days after publication of the availability of the FEIS in the Federal Register. 42 U.S.C. § 6508. Though plaintiffs believe this requirement does not apply to the proposed new program of oil and gas leasing in the NPR-A planning area, this action is nevertheless filed within 60 days of August 7, 1998, the date notice of availability of the FEIS was published in the Federal Register, in order to preserve plaintiffs' claims under NEPA.

14

COUNT 4

Paragraphs 1 through 34 are re-alleged and incorporated by reference.

1. NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

2. An EIS must include "a detailed statement" that analyzes the direct, indirect and cumulative impacts to the environment of the proposed action along with reasonable alternatives to the proposed action. 42 U.S.C. § 4332(C); 43 C.F.R. § 1500 et seq.

3. The FEIS fails to consider adequately such impacts from and alternatives to proposed oil and gas leasing and development activities in the NPR-A planning area.

4. Defendants' failure to provide an adequate analysis of direct, indirect and cumulative impacts from and a reasonable range of alternatives to proposed oil and gas leasing and development activities in the NPR-A planning area violates NEPA and is arbitrary, capricious and not in accordance with law. 42 U.S.C. § 4332; 40 C.F.R. § 1500 et seq.; 5 U.S.C. § 706(2)(A).

PRAYER FOR RELIEF

Therefore, plaintiffs respectfully request that the Court:

1. Declare that defendants have violated NEPA and that the actions as set forth above are arbitrary, capricious and not in accordance with law;

2. Enter appropriate injunctive relief to ensure that the defendants comply with NEPA and to prevent irreparable harm to the plaintiffs and to the environment until such compliance occurs;

3. Award plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

4. Grant such other relief as the Court deems just and proper.

Dated this 5th day of October, 1998.

Respectfully submitted,

Eric P. Jorgensen (Alaska Bar # 894010)
Earthjustice Legal Defense Fund, Inc.
325 Fourth Street
Juneau, AK 99801
(907) 586-2751

Peter Van Tuyn (Alaska Bar # 8911086)
Michael J. Frank (Alaska Bar # 7410076)
Trustees for Alaska
725 Christensen Dr. #4
Anchorage, AK 99501
(907) 276-4244

Sharon Buccino (D.C. Bar # 432073)
Natural Resources Defense Council
1200 New York Avenue, N.W.
Suite 400
Washington, D.C.　20005
(202) 289-6868

By: Sharon Buccino
ATTORNEYS FOR PLAINTIFFS

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE WILDERNESS SOCIETY,                                          )
900 17th St. NW, Washington, D.C. 20006;                         )
NATURAL RESOURCES DEFENSE COUNCIL,                               )
1200 New York Ave., NW, Suite 400, Washington, D.C. 20005;       )
GREENPEACE, INC., 1436 U St. NW, Washington,                     )
D.C. 20009;                                                      )
SIERRA CLUB,                                                     )
730 Polk Street, San Francisco, CA 94109;                        )
DEFENDERS OF WILDLIFE,                                           )
1101 14th St., NW, Suite 1400, Washington, D.C. 20005;           )
ALASKA WILDERNESS LEAGUE,                                        )
320 4th St., NE, Washington, D.C. 20002;                         )
ALASKA CENTER FOR THE ENVIRONMENT,                               )
519 West 8th Ave., Suite 201, Anchorage, AK 99501;               )
and NORTHERN ALASKA ENVIRONMENTAL CENTER,                        )
218 Driveway St., Fairbanks, AK 99701,                           )
                                                                 )
                  Plaintiffs,                                    )
                                                                 )
                  v.                                             )    Civ. No. 98-02395 (RWR)
                                                                 )
BRUCE BABBITT, Secretary of the                                  )
Interior, the BUREAU OF LAND                                     )
MANAGEMENT, and the FISH AND                                     )
WILDLIFE SERVICE, UNITED STATES                                  )
DEPARTMENT OF THE INTERIOR,                                      )
Department of the Interior, 1849 C. St. NW,                      )
Washington, D.C. 20240,                                          )
                                                                 )
                  Defendants.                                    )
                                                                 )

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

I. NATURE OF THE CASE

1. This action challenges the defendants' violations of the law in connection with the

Northeast National Petroleum Reserve-Alaska Final Integrated Activity Plan / Environmental

1

DKT 38

Impact Statement (August 1998) (FEIS) and Record of Decision (October 1998). The Secretary of the Interior is proceeding with an oil and gas lease sale in the northeast corner of the National Petroleum Reserve-Alaska (hereinafter referred to as NPR-A planning area) without statutory authority. In addition, the FEIS is not an adequate detailed statement addressing the environmental impacts from oil and gas exploration and development activities in the NPR-A planning area as required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C) and 40 C.F.R. § 1500 et seq. The Secretary's decision does not meet the standards for protection of the resources of the NPR-A established by the National Petroleum Reserves Production Act (NPRPA), 42 U.S.C. § 6502 et seq. and the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., nor does it provide for the protection of wetlands as required by Executive Order 11990. Finally, the defendants are in violation of the Endangered Species Act, 16 U.S.C. § 1531 et seq. for failure to designate critical habitat for the threatened spectacled and Steller's Eiders and to avoid the impact of oil and gas activities on critical habitat.

## II. JURISDICTION

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02 and 5 U.S.C. § 706. Venue is appropriate under 28 U.S.C. § 1391(e).

## III. PLAINTIFFS

3. The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic. It has approximately 250,000 members nationwide, 1,000 of whom live in Alaska, and has had a long-standing

involvement with the issues surrounding the impacts of oil and gas development on public lands, including lands across Alaska's Arctic and within the NPR-A.

4. Natural Resources Defense Council is a non-profit environmental membership organization with more than 350,000 members throughout the United States. It has had a long-standing and active interest in the protection of the environment in Alaska's Arctic, particularly in the oil fields. With its nationwide membership and a staff of lawyers, scientists, and other environmental specialists, it plays a leading role in a diverse range of land and wildlife management and resource development issues. Over the years, it has participated in a number of court cases involving resource development issues in Alaska's Arctic.

5. Greenpeace, Inc. is a non-profit environmental organization with about 450,000 members in the United States. It seeks to expose global environmental problems and to find solutions for a peaceful and lasting future. Greenpeace seeks to ensure the earth's ability to nurture life in all its diversity, including protecting bio-diversity in all its forms and ending the abuse of the oceans and fresh water.

6. Sierra Club is a national non-profit organization having approximately 525,000 members dedicated to the exploration, enjoyment, and preservation of the scenic and natural resources of the United States, including federal lands in Alaska. The Sierra Club works towards educating and enlisting the public to protect and restore the quality of the natural environment. The Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, public lands and waters, endangered species, clean water and clean air. The Sierra Club has long been active in issues relating to the impacts of oil and gas leasing and development on public lands, including the NPR-A.

3

7.  Defenders of Wildlife is a non-profit wildlife conservation organization with more than 270,000 members and supporters nationwide, including Alaska. It works to protect wildlife and emphasizes appreciation and protection for all species in their ecological role within the natural environment. Through its Washington, D.C. office and field offices around the country, it has invested considerable organizational resources in protecting the important wildlife populations located in the NPR-A.

8.  Alaska Wilderness League is a non-profit organization with approximately 7,000 members and activists. It was founded in 1993 to advocate for protection of Alaska's public lands which are threatened with environmental degradation. Since its inception, it has taken an active role on issues related to oil and gas development in Alaska.

9.  Alaska Center for the Environment is an Alaska non-profit environmental advocacy and education organization that is dedicated to the conservation of Alaska's natural ecosystems. It has approximately 9,000 members in Alaska and throughout the United States.

10.  Northern Alaska Environmental Center is an Alaska non-profit environmental advocacy and educational organization with 1300 members. It has empowered citizens to take an active role in protecting natural habitats and wild places in arctic and interior Alaska since 1971. It advocates for Arctic wilderness, wildlife, and traditional ways-of-life, transportation and infrastructure alternatives that minimize impacts on wild lands, and clean water and wild rivers to protect health, fish, and recreational opportunities.

11.  The defendants' unlawful actions adversely affect each plaintiff's organizational interests and its members' use and enjoyment of the public lands in and resources of the NPR-A planning area.

4

12. Each of the plaintiff groups has members who reside near, visit or otherwise use and enjoy the NPR-A planning area for fishing, hunting, subsistence, recreation, wildlife viewing and education, research, photography, or aesthetic and spiritual enjoyment, or who enjoy or otherwise use migratory wildlife from the NPR-A planning area. The oil and gas leasing activities proposed for the NPR-A planning area will directly and irreparably injure these interests.

13. Each of the plaintiffs submitted comments to BLM on the draft EIS and FEIS for the NPR-A planning area. Each of the plaintiffs monitors the use of public lands and compliance with the law respecting these lands, educates its members and the public concerning the management of these lands, and advocates policies and practices that protect the natural value and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the plaintiffs will be directly and irreparably injured by defendants' violations of law as described in this first amended complaint.

## IV. DEFENDANTS

14. Defendant Bruce Babbitt is sued in his official capacity as Secretary of the Department of the Interior.

15. Defendant Bureau of Land Management (BLM) is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the NPR-A planning area.

16. Defendant Fish and Wildlife Service (FWS) is an agency of the United States Department of Interior charged with implementation of the Endangered Species Act for listed species in the NPR-A planning area.

5

## V. BACKGROUND

### A. National Petroleum Reserve-Alaska History

17. In 1923, President Warren G. Harding set aside 23.5 million acres in northern Alaska as the Naval Petroleum Reserve Numbered 4, to be administered by the Navy as an assured future oil supply for defense purposes.

18. In 1976, President Gerald Ford signed the Naval Petroleum Reserves Production Act (NPRPA). Pub. L. No. 94-258, 90 Stat. 303, codified at 42 U.S.C. §§ 6501-6507 (1976). Among other things, the NPRPA transferred jurisdiction over Naval Petroleum Reserve Numbered 4 from the Secretary of the Navy to the Secretary of the Interior and renamed it the National Petroleum Reserve-Alaska. In making the transfer, Congress expressly recognized that the protection of the unique natural, fish and wildlife, scenic and historical values of the NPR-A would better be evaluated and managed under the authority of the Secretary of the Interior. The NPRPA expressly prohibits production of petroleum from the NPR-A or development leading to production of petroleum unless authorized by Congress. 42 U.S.C. § 6504(a) (1976).

19. Though the NPRPA prohibited oil and gas production in the NPR-A without additional Congressional authorization, it did permit exploration subject to certain limitations.

20. The NPRPA requires that exploration activities conducted within the Utukok River and Teshekpuk Lake areas and any other area designated by the Secretary of the Interior as containing "any significant subsistence, recreational, fish and wildlife, or historical or scenic value" be conducted in a manner which assures "maximum protection" of these surface values. 42 U.S.C. § 6504(b) (1976).

21. In 1977, the Secretary of the Interior adopted regulations for management and protection of the NPR-A. The regulations indicate that surface values of the NPR-A may be

6

protected by limiting, restricting, or prohibiting the use of and access to lands within the NPR-A, including "Special Areas." 43 C.F.R. § 2361.1(e)(1) (1997).

22. In 1977, the Secretary of the Interior designated the Utukok River Uplands, Teshekpuk Lake and the Colville River as Special Areas within the NPR-A. 42 Fed. Reg. 28,723 (1977). The Teshekpuk Lake Special Area and significant portions of the Colville River Special Area are within the NPR-A planning area.

23. In the Record of Decision, the Secretary directed that the Pik Dunes Land Use Emphasis Area be added to the Teshekpuk Lake Special Area and that areas encompassing approximately 2 miles on either side of the Kikiakrorak and Kogosukruk Rivers and the Kogosukruk's tributaries be added to the Colville River Special Area. ROD, p. 5, 6. BLM provided official publication of these additions to the Special Areas on April 6, 1999. 64 Fed. Reg. 16,747 (1999).

24. In passing the NPRPA, Congress recognized that "The northeastern coastal plain area [of NPR-A] is considered to be the best waterfowl nesting area on the North Slope" of Alaska. H. R. Rep. No. 94-81, Part 1, p. 8 (to accompany H. R. 49) (March 18 and April 22, 1975). For example, the Teshekpuk Lake watershed provides nesting habitat for many migratory waterfowl species, including northern pintails, oldsquaws, king eiders, Pacific brant, greater white-fronted geese, tundra swans, and three species of loons -- Pacific, red-throated and yellow-billed. The Teshekpuk Lake Special Area provides essential molting habitat for significant populations of migratory Pacific brant, greater white-fronted geese and Canada geese. Spectacled and Steller's eiders, both listed as threatened species under the Endangered Species Act, 16 U.S.C. § 1531 et seq., use areas around Teshekpuk Lake, and the spectacled eider in particular exhibits relatively high nesting densities in the Special Area.

25.  The Teshekpuk Lake area also encompasses major calving grounds for the 25,000 caribou of the Teshekpuk Lake herd.  This caribou herd is an important food resource for local Alaska Native families.

26.  The Colville River is the largest of Alaska's rivers that flow to the Arctic Ocean.  The river and its tributaries provide important habitat for moose, brown bears, wolves, wolverines and at least twenty species of anadromous and freshwater fish.  It is a vital source of subsistence resources for area residents and is a spectacularly scenic area with substantial recreation values and potential for remote, wilderness experiences.  The Colville River is known for high concentrations of song birds and birds of prey, including Arctic peregrine falcons, gyrfalcons and rough-legged hawks.  It is recognized as one of the most significant regional habitats for raptors in North America.

27.  The NPR-A planning area includes several other areas that may have resource values sufficient to warrant special protection.  These include, but are not limited to, the Fish Creek area and the Ikpikpuk River.

## B.  Leasing in NPR-A

28.  In 1980, Congress passed an appropriations bill for fiscal year 1981 that, among other things, included a rider directing the Secretary of the Interior to carry out "an expeditious program" of oil and gas leasing in the NPR-A.  Act Making Appropriations for the Department of the Interior and Related Agencies, Title I, Pub. L. 96-514, 94 Stat. 2957, 2964 (1980).  Pursuant to this appropriations rider, the Secretary undertook a leasing program.  BLM completed the program in 1983.  All leases issued under this program have expired, and no crude oil field was developed as a result of it.

8

29. In 1997, in response to renewed oil industry interest in NPR-A and to a request from Alaska's Governor Tony Knowles, BLM undertook an analysis to determine whether to conduct oil and gas lease sales in a 4.6 million acre area located in the northeast corner of the NPR-A. On February 13, 1997, BLM published a Notice of Intent to prepare an Integrated Activity Plan / Environmental Impact Statement for the NPR-A. 62 Fed. Reg. 6797 (1997).

30. Ten months later, BLM completed a draft analysis of the impacts of oil and gas leasing on the 4.6 million acre planning area. Notice of availability of the draft EIS was published in the Federal Register on December 12, 1997. 62 Fed. Reg. 65,440 (1997).

31. The draft EIS set out five alternatives designated A through E. All alternatives proposed oil and gas leasing, except Alternative A. BLM accepted comments on the draft EIS over a ninety day period, until March 12, 1998.

32. The FEIS was published and made available on August 7, 1998 for a thirty day public comment period. 63 Fed. Reg. 42,431 (1998). The FEIS included the same five Alternatives A through E included in the draft EIS, but for the first time also included a Preferred Alternative. The Preferred Alternative proposed opening 87% of the 4.6 million acre NPR-A planning area to oil and gas leasing.

33. On October 7, 1998, the Secretary of Interior issued a final Record of Decision (ROD) adopting the Preferred Alternative presented in the FEIS with minor changes. The Record of Decision indicated that it and the FEIS served as the final stage of compliance with NEPA for the initial oil and gas lease sale.

34. The Secretary and BLM rely on the 1980 appropriations rider as a current source of authority to conduct oil and gas leasing in the NPR-A, and have interpreted the rider as a directive or mandate to do so. 1 FEIS, pp. I-1, I-3, V-350, Appendix D-10; ROD, pp. v, 13.

9

35. On April 5, 1999, BLM gave final notice of the initial lease sale under the ROD. Pursuant to the notice, all tracts identified for leasing in the ROD are offered for lease. Bids for the initial lease sale will be opened May 5, 1999.

## VI. FEIS ANALYSES

### A. Lack of Site-Specific Impact Assessment

36. The FEIS recognizes in general that the NPR-A planning area is not homogenous and that certain surface and other resources are more abundant in, or dependent on the use of, different geographic areas within the planning area. E.g., 1 FEIS, p. I-10; pp. II-1 to 3.

37. The FEIS does not, however, analyze the impacts on important resource categories from predicted oil and gas related exploration and development activities for any particular local geographic area covered by the alternatives, but only describes impacts generically.

38. The FEIS acknowledges that it does not include information adequate to assess all the site-specific impacts of oil and gas exploration and development activities on many resources and defers such an analysis to post lease sale stages.

### B. Lack of Wilderness Impact Assessment

39. The FEIS states that "practically all of the NPR-A today remains in a primitive state and is essentially de facto wilderness" and that "the overall impression of the planning area's over 4 million acres is that of a natural area, untrammeled by humans, with very few obvious signs of modern humanity's influence or presence." 1 FEIS, p. III-C-54.

40. The FEIS purports to analyze the environmental consequences of projected oil and gas exploration and development activities in sixteen different "resource" categories, including recreation and visual resources. 1 FEIS, pp. xi-xiii, IV-A-1. The FEIS does not assess wilderness as a separate resource category.

41. The FEIS contains no assessment of the relative impact of each alternative on the differing wilderness values of the distinct portions of the NPR-A planning area or an assessment of the impact of the alternatives on future wilderness protection options in the NPR-A.

### C. Lack of Adequate Cumulative Impacts Assessment

42. The FEIS includes a section entitled "Effects of the Cumulative Case" which purports to assess the "effects that past, present and reasonably foreseeable future actions might have on resources in and adjacent to the planning area." 1 FEIS, p. II-48.  This section acknowledges past and existing oil and gas activities on the Alaska North Slope largely by reference to FEIS tables that list past, present and reasonably foreseeable oil and gas activities on the Arctic coast of Alaska north of the Brooks Range -- a region often called the North Slope.  1 FEIS, pp. IV-A-42 to IV-A-46.  The FEIS addresses reasonably foreseeable projects by reference to three hypothetical future developments near the NPR-A planning area.  1 FEIS, pp. IV-H-2 to IV-H-3.

43. The cumulative case discussion, however, does not identify or analyze the impacts to several important resources resulting from these past and present actions.  1 FEIS, Section IV-H. In addition, the discussion does not identify or analyze the overall impact that can be expected if the individual impacts from past, present, proposed and reasonably foreseeable oil and gas leasing and development related activities are allowed to accumulate.  Id.

### D. Lack of Seismic Mitigation Assessment

44. The FEIS acknowledges that under the Preferred Alternative seismic and overland move operations could result in "a vegetative greening phenomenon caused by compacted snow and dead vegetative matter," causing adverse impacts including "many hundred miles of intermittent green trails visible from the air at any one time" that could last more than two or

11

three years. 1 FEIS, p. IV-G-83. The FEIS further states that, "[s]eismic operations would result in many hundreds of miles of green trails." Id. The FEIS acknowledges that even under Alternative A "complete recovery of vegetative cover damaged during seismic studies could take a year to decades." 1 FEIS, p. IV-B-3.

45. For ground operations, including seismic and overland moves, the FEIS states that "Greater snow depths [than six inches] are required to protect vegetative cover in tussock and moist sedge shrub tundra ...." 1 FEIS, p. IV-B-3. Tussock tundra and moist sedge shrub tundra cover more than 30% of the NPR-A planning area. 1 FEIS, Table III.B.2-1, pp. III-B-2, III-B-5.

46. Stipulation 24i for the selected Preferred Alternative requires only an average snow cover that is six inches deep before ground operations, including seismic and overland moves, may occur. 1 FEIS, p. II-32; ROD, p. 34. The FEIS fails to discuss other available mitigation measures, including greater snow depths, that would avoid significant damage, as a condition for seismic or overland move operations.

## VII. SPECIAL AREA PROTECTION

47. Alternatives B and C provide greater protection for the Teshekpuk Lake Special Area than the Preferred Alternative. Under Alternative B, the entire Teshekpuk Lake Special Area is not available for leasing. Under Alternative C, a portion of the Teshekpuk Lake Special Area is available for leasing. Under the Preferred Alternative, an even greater portion of the Teshekpuk Lake Special Area is available for leasing than under Alternative C.

48. Under the Preferred Alternative, certain areas falling within the Teshekpuk Lake Special Area that are south, west and east of the lake are made available for leasing that were not available under Alternative B or C. ROD, Figure II.C.I; 1 FEIS, Figures II.C.I and II.C.3, pp. II-23, II-26, II-19 and Figure II.C.4, p. II-26.

49.  Alternative B provides greater protection for the Colville River Special Area than the Preferred Alternative.  1 FEIS, pp. II-2, II-21.

50.  None of the alternatives proposes or considers special protections for the entire portion of the Colville River Special Area that falls within the NPR-A planning area.  1 FEIS, Figure I.1, p. I-4.

## VIII.  PROTECTION OF WETLANDS

51.  The NPR-A planning area is characterized by numerous lakes and Arctic plant species that occur in saturated or poorly drained soils.  1 FEIS, p. III-B-2.

52.  Executive Order 11990 defines wetlands as "those areas that are inundated by surface or ground water with a frequency sufficient to support and under normal circumstances does or would support a prevalence of vegetative or aquatic life that requires saturated or seasonally saturated soil conditions." Exec. Order 11990 § 7(c), 42 Fed. Reg. 26,961, 26,964 (1977), reprinted in 42 U.S.C. § 4321.

53.  The FEIS provides no information or discussion of wetlands values, location of wetlands, types of wetlands or wetlands functions within the NPR-A planning area.  The FEIS provides no discussion or consideration of the effects of the alternatives on the survival and quality of wetlands.  The FEIS provides no analysis of the impacts to wetlands from any exploration or development activities such as seismic studies, exploratory drilling, construction activities, gravel mining, gravel fill, water withdrawal and development drilling.

54.  Neither the FEIS nor the ROD contains a finding or determination that the Preferred Alternative presents the only practicable alternative.  Neither contains a determination that all practicable measures have been taken to minimize harm to wetlands.

13