# Amendment to the Northeast National Petroleum Reserve Integrated Activity Plan/ Environmental Impact Statement

# **Record of Decision**

_____/s/ Chad Calvert_____  　　　　　_____January 11, 2006_____
Chad Calvert 　　　　　　　　　　　　　　Date
Deputy Assistant Secretary
Land and Minerals Management

---

Prepared by:

U.S. Department of the Interior, Bureau of Land Management
Anchorage, Alaska

# DECISION

The plan described in this ROD is hereby adopted for future management of the Northeast National Petroleum Reserve-Alaska. This plan includes the features and conditions of the "final Preferred Alternative" described in the *Northeast National Petroleum Reserve-Alaska Final Amended Integrated Activity Plan/Environmental Impact Statement,* with clarifications and minor modifications explained in Appendix A.

This ROD concludes the Amended IAP/EIS process for the Northeast Planning Area of the National Petroleum Reserve-Alaska. It fulfills the National Environmental Policy Act (NEPA) requirements associated with management planning on the BLM-administered public lands in the Planning Area, including the identification of lands available for oil and gas leasing. It also serves as the NEPA documentation for the first oil and gas lease sale under the amendment, which is currently expected to occur in October/November 2005. Subsequent lease sales may also be held for lands within the portion of the Planning Area available for lease. The Final Amended IAP/EIS may also serve as the NEPA documentation for future lease sales pending a determination by BLM that the EIS addresses potential impacts associated with any future lease sale.

The Final Amended IAP/EIS provides extensive site-specific analysis of the potential environmental and cumulative impacts of future oil and gas lease sales and exploration and development activities projected under the different alternatives on specific resources located in the Planning Area. The Final Amended IAP/EIS does this by first providing detailed information about the environment that will be affected by the alternatives considered, including the specific physical, biological, socio-economic and cultural resources in the Planning Area and their specific locations, and displays that information in detailed maps, figures and tables (see Chapter 3). Reasonable exploration and development projections or scenarios for each alternative were then developed, based on existing technology and known information about the potential oil and gas resources in the Planning Area (see Chapter 4). Finally, these projections or scenarios are applied to the site-specific information about resources in the Planning Area to predict the potential environmental impacts on specific resources from the development scenarios under each alternative (see Chapter 4). The resulting information about the direct, indirect and cumulative impacts on the varied resources from each management alternative forms the basis for BLM's decision regarding lands that will be made available for oil and gas leasing in the Planning Area and under what conditions.

Following leasing, any future proposed exploration or development projects in the Planning Area will be subjected to further appropriate site-specific NEPA analysis before permits or approvals for those projects will be granted, ensuring that BLM's decisions continue to be well informed as activities proceed. These subsequent NEPA reviews will analyze potential environmental impacts to resources based on specific projects and specific plans submitted for each proposed project, and will consider any new information about affected resources and applied technology. These subsequent NEPA reviews will occur for each stage of oil and gas exploration and development activities prior to BLM authorization. They will be site-specific analyses and will be based on information about the individual projects and the specific site conditions and impacts from those projects. These additional reviews will be tiered to the Final Amended IAP/EIS and will be conducted before any on-the-ground oil and gas exploration or development plans are approved.

The BLM plan for management of the Northeast National Petroleum Reserve-Alaska is presented here and includes the lease stipulations and ROPs that are described in detail in Appendix B and shown on Map 1 of this ROD.

DECISION

## PLANNING AREA

Excluding Teshekpuk Lake, which is deferred from leasing, all BLM-administered lands (including non-Federal surface with federally owned subsurface lands) within the Northeast National Petroleum Reserve-Alaska are made available for oil and gas leasing. No Surface Occupancy (NSO) lease stipulations and additional protections for important surface resources will be imposed along coastal areas, key rivers and deep water lakes, goose molting areas, and caribou use areas. Prior to authorizing any leasing in the Teshekpuk Lake deferral area, additional NEPA documentation will be completed and any necessary additional lease stipulations and ROPs will be established. In addition, although the CRSA will remain available for leasing, whether to offer lands in the CRSA in a particular lease sale has been deferred until the Colville River Management Plan is completed.

## ENVIRONMENTAL IMPACT ANALYSIS

The environmental impacts analysis in the Final Amended IAP/EIS considers not only the direct and indirect impacts of the various alternatives, but also the cumulative impacts of the different alternatives. The Final Amended IAP/EIS notes that in general the incremental contribution of an alternative to cumulative impacts may be proportional to the projected level of activities for that alternative. However, the analysis in the Final Amended IAP/EIS also recognizes that the impacts of a particular alternative on specific resources depends on the overall level or scale of oil and gas activities that occur and the nature and concentration of resources impacted in any given location. As a result, the impacts analysis in the Final Amended IAP/EIS takes into consideration that the impacts of a particular alternative will be greater in areas of higher oil and gas potential (because more activities may occur there) and greater for activities which occur in areas with high rather than low surface resource values. This is the case, for example, with the action alternatives (including the final Preferred Alternative, as modified by this ROD), which will make available for leasing different amounts of lands surrounding Teshekpuk Lake – lands that not only containing high oil and gas resource potential, but also high wildlife, wildlife habitat, subsistence and other resource values. To account for the greater potential for impacts on surface resources in this sensitive area, BLM has included in the final Preferred Alternative extensive mitigation (a combination of general and site-specific lease stipulations and ROPs). These mitigations consist of various prohibitions and restrictions on oil and gas activities, including a deferral of leasing the remaining un-leased portion of Teshekpuk Lake (approximately 211,000 acres), are designed to minimize impacts and maximize protection of important surface resources in this area while providing development opportunities. Additional mitigation are included in the plan presented in this ROD.

## STUDY REQUIREMENTS PRIOR TO ANY OIL AND GAS DEVELOPMENT ACTIVITIES

The BLM Alaska, in conjunction with appropriate Federal, State, NSB, and North Slope Science Initiative (NSSI) representatives, will develop a research study of the effects of disturbance on molting brant and other geese, which utilize the lakes north of Teshekpuk Lake (Map 1A in Appendix C). The study will be completed prior to any authorization of construction of permanent facilities within the goose molting area and will include at least 3 years of data collection focused on:

    1) providing baseline data for detection and/or measurement of disturbance
    2) identifying significant development related disturbance factors
    3) evaluating consequences to geese from disturbance within the GMA considering relevant ROPs and lease stipulations
    4) identifying additional mitigation measures to protect molting geese which may be necessary as a result of the study; including recommendations for appropriate placement of permanent facilities with respect to the study outcome based on (2)
    5) identifying specific location of facility(s) within the approximate 5000 acre parcel of land (as depicted on Map 1A in Appendix C) available within the GMA Lease Tracts F and G (also see Lease Stipulation K-11)

Any additional mitigation practices that are identified as a result of this study which are necessary to achieve the goal of Lease Stipulation K-4 will be implemented prior to authorization of any construction.

## LEASE STIPULATIONS AND REQUIRED OPERATING PROCEDURES

The lease stipulations and Required Operating Procedures (ROPs) that are part of this amendment impose restrictions on the establishment of permanent or temporary facilities in several areas within the Planning Area.

- Permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines, are prohibited in the streambed of the Colville, Ikpikpuk, Miguakiak, Kikiakrorak, Tingmiaksiqvik, and Kogosukruk Rivers, and Judy and Fish Creeks. Permanent oil and gas facilities are also prohibited within certain distances, ranging from ½ mile to 3 miles, of the high water mark of the banks of these rivers and creeks with the exception of the Ikpikpuk River, where permanent oil and gas facilities are prohibited within ¾ mile of the centerline of the river. These distances will be measured based on the hydrology at the time of application. On a case-by-case basis, and in consultation with Federal, State, and NSB regulatory and resource agencies (as appropriate, based on agency legal authority and jurisdictional responsibility), essential pipeline and road crossings to the main channel will be permitted (unless noted otherwise) through setback areas.

- Permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines, are prohibited on lakes or lakebeds and within ¼ mile of the ordinary high water mark of any deep lake as determined to be in lake zone III (i.e., depth greater than 13 feet [4 meters]. On a case-by-case basis, and in consultation with Federal, State and NSB regulatory and resource agencies (as appropriate, based on agency legal authority and jurisdictional responsibility), essential pipeline, road crossings, and other permanent facilities may be considered through the permitting process in these areas where the lessee can demonstrate on a site-specific basis that impacts will be minimal and if it is determined that there is no feasible or prudent alternative.

- Permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines, are prohibited onshore within ¼ mile of the ordinary high water mark of Teshekpuk Lake – No Exceptions.

- The plan adopts a number of mitigation to reduce the impacts on resources in the GMA. In the 242,000 acres illustrated on Map 1 as "NSO Goose Molting Area Lakes", no permanent oil and gas facilities, except for pipelines will be allowed, and no exceptions to this prohibition will be granted. Prior to permitting the construction of a pipeline within the GMA, a BLM sponsored workshop will be convened among appropriate Federal, State, NSB, and affected communities to determine the best corridor for pipeline construction in efforts to minimize impacts to wildlife and subsistence resources and users. Exploratory drilling within the GMA shall be limited to temporary facilities such as ice pads, ice roads, ice airstrips, and temporary platforms, although an exception will be considered if the lessee demonstrates that construction of permanent facilities outside the identified Goose Molting NSO Areas (such as gravel airstrips, storage pads, and connecting roads) is environmentally preferable (also see Lease Stipulation K-11 regarding allowable surface disturbance). In addition, several other standards will apply to permitted activities.

- Several standards and restrictions will be enforced in the TLCHA (TLCHA) to minimize disturbance to caribou, or alteration of caribou movement. Public transportation routes, i.e., "publicly funded community roads" will be prohibited within the TLCHA. Only "in-field" roads will be permitted within the TLCHA. "In-field" roads, for the purpose of the plan adopted in this

DECISION
_____

ROD, are defined as operational gravel strips that will be utilized by industry to conduct operational activities associated with development and production activities. The actual length/width and construction details of any road using gravel will be required as a component of any permit application for permanent facilities. A consultation requirement for permitted activities will include an extensive review by the NSB and the Subsistence Advisory Panel of any permit application for development projects that will be proposed in the Northeast Planning Area. Prior to authorization of construction of permanent facilities (outside NSO areas established in other stipulations), the lessee shall design and implement a study of caribou movement unless an acceptable study(s) specific to the Teshekpuk Lake Caribou Herd has been completed within the last 10 years. The study shall include a minimum of four years of current data on Teshekpuk Lake Caribou Herd movements and the study design shall be approved by the Authorized Officer (AO) in consultation with the appropriate Federal, State, and NSB wildlife and resource agencies and prior to authorizing the construction of permanent facilities in this area. The study should provide information necessary to determine facility (including pipeline) design and location. (See Lease Stipulation K-5, Appendix B.)

- In the Coastal Area, permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines established to support exploration and development activities shall be located at least ¾ mile inland from the coastline to the extent practicable. Where, as a result of technological limitations, economics, logistics, or other factors, a facility must be located within ¾ mile inland of the coastline, the practicality of locating the facility at previously occupied sites such as Camp Lonely, various Husky/U. S. Geological Survey (USGS) drill sites, and Distant Early Warning (DEW)-Line sites, shall be considered. Use of existing sites within ¾ mile of the coastline shall also be acceptable where it is demonstrated that use of such sites will reduce impacts to shorelines or otherwise be environmentally preferable. All lessees/permitees involved in activities in the immediate area must coordinate use of these new or existing sites with all other prospective users.

- Exploration and development operations shall be conducted in a manner that minimizes the likelihood for unreasonable conflict between oil and gas and subsistence activities (including, but not limited to bowhead whale subsistence hunting). Before conducting open water activities, the lessee shall consult with the Alaska Eskimo Whaling Commission, the Nuiqsut Whaling Association, Barrow Whaling Captains Association, the NSB, and affected communities to minimize impacts to the fall and spring subsistence whaling activities of the communities of the North Slope.

- If necessary to construct permanent facilities within the CRSA, all reasonable and practicable efforts shall be made to locate permanent facilities as far from raptor nests as feasible. Within 15 miles of raptor nest sites, significant alteration of high quality foraging habitat shall be prohibited unless the lessee can demonstrate on a site-specific basis that impacts will be minimal or it is determined that there is no feasible or prudent alternative. Of particular concern are ponds, lakes, wetlands, and riparian habitats. On a case-by-case basis, and in consultation with appropriate Federal and State regulatory and resource agencies, essential pipeline and road crossings will be permitted through these areas where no other feasible or prudent options are available. Restrictions will also apply to overland moves, seismic work, and any similar use of heavy equipment (other than actual excavations as part of construction) on tundra surfaces during the winter season. In addition, although the CRSA remains available for leasing, lands within the CRSA will not be offered for lease until the Colville River Management Plan is completed.

- Within the Pik Dunes, surface structures, except approximately perpendicular pipeline crossings and ice pads, are prohibited.

- Within the Caribou Movement Corridors and the Southern Caribou Calving Areas, no permanent oil and gas facilities, except pipelines, will be allowed on approximately 320,000 acres (Map 1).

> Prior to approving a proposal for the construction of a pipeline, a BLM sponsored workshop will be convened among appropriate Federal and State agencies, NSB, and affected communities to determine the best corridor for pipeline construction in efforts to minimize impacts to wildlife and subsistence resources and users.

- Surface disturbance is limited to 300 acres within each of the seven lease tracts north of Teshekpuk Lake (Map 1). No Exceptions to this 300 acre limitation will be allowed. However, the 300 acre limitation does not apply to surface disturbance activities from pipeline construction. Prior to approving a proposal for construction of a pipeline, a BLM sponsored workshop will be convened among appropriate Federal and State agencies, NSB, and affected communities to determine the best corridor for pipeline construction in efforts to minimize impacts to wildlife and subsistence resources and users.

- Multi-year surveys/studies are required on a Planning Area-wide basis to prevent the taking of spectacled and Steller's eiders (listed as threatened species under the Endangered Species Act) and yellow-billed loons. Multi-year surveys are required within the TLCHA to minimize disturbance to caribou, or alteration of caribou movements. Multi-year studies are required to ascertain the effects of disturbance on molting geese (especially Brant), which utilize the lakes north of Teshekpuk Lake.

## OVERLAND TRAVEL AND ASSOCIATED ACTIVITIES

Overland travel and associated activities for permitted uses are guided by specific ROPs. Under BLM's off-highway vehicle (OHV) classification system the Planning Area is designated as "Limited," confining recreational OHV use to winter use of snow machines and other low ground-pressure vehicles. Within the National Petroleum Reserve-Alaska, no summer recreational use of OHVs is permitted. The summer use of OHVs (including all-terrain vehicles and airboats) to support traditional subsistence activities and access is allowed. The use of airboats during the summer is limited to streams, lakes, and estuaries that are seasonally accessible by motorboat. To prevent impacts to soils, water quality, vegetation, and wildlife (in particular nesting waterfowl), airboat use in areas of seasonal flooding of tundra and temporary shallow waters adjacent to streams, lakes, and estuaries is prohibited.

## CONCLUSION

This Decision satisfies the goals of the NPRPA to conduct an expeditious program of oil and gas leasing, while providing maximum protection to the important surface values of Special Areas. It places strict restrictions on land use activities and imposes all practicable mitigation and monitoring to ensure adequate protection of surface resources of the Planning Area including Special Areas, and the prevention of unnecessary and undue degradation. The BLM's obligations to protect threatened and endangered species, subsistence uses and resources, wildlife and their habitat, fisheries, wild and scenic rivers, and wetlands and floodplains resources is also satisfied through this Decision.

# ALTERNATIVES

The alternatives presented in the Final Amended IAP/EIS are consistent with the purposes of the statutes governing the National Petroleum Reserve–Alaska. Each alternative offers a different approach to serving the "total energy needs of the nation" and balancing the goals of providing for expeditious exploration and development of the Reserve in accordance with the NPRPA. The alternatives provide maximum protection to surface resource values of the designated Special Areas and protecting all surface resources from "unnecessary and undue degradation" as required by FLPMA.

## Final Decision

The Final Decision is very similar to Alternative D described in the Final Amended EIS/IAP, but provides additional mitigation to protect important surface resources. (See Appendix A for explanations of clarifications and modifications.) The Preferred Alternative makes available approximately 95 percent (approximately 4,389,000 acres) of the Planning Area's approximately 4.6 million acres for oil and gas leasing (Map 1). Management practices will emphasize performance-based lease stipulations and ROPs on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence use areas, and other surface resources. Under the Final Decision, Teshekpuk Lake (approximately 211,000 acres) will be deferred from leasing. This deferral will preclude exploratory drilling and development activities, including pipeline construction. Current leases will not be affected by the deferral. Although the CRSA will remain available for leasing, offering lands in the CRSA for lease will be deferred until the completion of the Colville River Management Plan.

The Final Decision makes available approximately 389,000 acres that were unavailable in the 1998 ROD. The additional lands made available by the Final Decision are within the area of highest oil and gas potential in the Northeast Planning Area, and are within the TLSA. However, several major protective measures have been developed to provide maximum protection to important surface resources and subsistence activities in the TLSA while allowing exploration development opportunities:

- Areas north of Teshekpuk Lake, within the GMA, that are important for molting brant and other sensitive waterfowl will be protected with a NSO lease stipulation (approximately 242,000 acres) (Map 1). Lakes and adjacent lands identified as important habitat for molting geese and other waterfowl will be included in the NSO area. Because many of these lakes are in very close proximity, the buffer areas around the lakes often overlap resulting in the NSO area depicted on Map 1. In addition to providing protection to molting geese and other waterfowl, this restriction will also provide protection for caribou calving and insect-relief habitats. While providing necessary protections to key resources, this lease stipulation will allow for exploration of the region. Within the NSO area(s), permanent oil and gas facilities will be prohibited, but a pipeline(s) will be allowed on conditions determined during a workshop to be convened to identify the best area for pipeline construction in efforts to minimize impacts to wildlife and subsistence resources and users. Exploration activities will be allowed within the NSO, including seismic acquisition and exploratory drilling during the winter season only. As previously described in the Decision Section, within the GMA, BLM will develop a research study of the effects of disturbance on molting brant and other geese, which utilize the lakes north of Teshekpuk Lake (Map 1A in Appendix C). The study will be completed prior to any authorization of construction of permanent facilities within the GMA. The study will include at least 3 years of data collection and will focus on the effects of disturbance on molting geese, specifically black brant, which utilize the lakes surrounding the specific study area(s). The results of the study will be used to identify additional mitigation to protect molting geese including recommendations for appropriate placement of permanent facilities based on the study 's findings. In addition, study results will be used to identify specific location of facility(s) within the approximate 5000 acre parcel of land (as depicted on Map 1A in Appendix C) available within the

ALTERNATIVES

GMA Lease Tracts F and G (also see Lease Stipulation K-11). See Lease Stipulations K-4, K-5, and K-11 in Appendix B.

- The area extending from the eastern shore of Teshekpuk Lake eastward towards the Kogru Inlet will be protected with a NSO stipulation (approximately 45,000 acres). This area is currently identified as important for caribou movement during the calving and insect-relief seasons. The area is a relatively narrow passage between the Teshekpuk Lake and Kogru Inlet that is inundated with many smaller lakes, and is currently identified as a "bottleneck" to caribou north/south movement. Within the NSO area, permanent oil and gas facilities will be prohibited, but pipelines will be allowed on conditions determined during a workshop to be convened to identify the best area for pipeline construction in efforts to minimize impacts to wildlife and subsistence resources. Exploration activities will be allowed within this NSO such as seismic acquisition and exploratory drilling during the winter season only. See Lease Stipulation K-9 in Appendix B.

- The area adjacent to the northwest corner of Teshekpuk Lake will be protected with a NSO lease stipulation (approximately 9,700 acres). This area is currently identified as important for caribou movement during the calving and insect-relief seasons. See Lease Stipulation K-9 in Appendix B.

- The areas southwest and southeast of Teshekpuk Lake will be protected with a NSO stipulation (approximately 233,000 acres). These areas have been identified as important for caribou calving and post-calving, and providing insect relief. Within these NSO areas, permanent oil and gas facilities will be prohibited, but pipelines will be allowed on conditions determined during a workshop convened to identify the best area for pipeline construction in efforts to minimize impacts to wildlife and subsistence resources and users. Exploration activities will be allowed within each NSO, such as seismic acquisition and exploratory drilling during the winter season only. See Lease Stipulation K-10 in Appendix B.

- The area north of Teshekpuk Lake is delineated into seven large lease tracts. These tracts range from 46,000 to 59,000 acres. A maximum limit of 300 acres of permanent surface disturbance resulting from oil and gas activities is established for each tract. This further reduces the potential impacts of oil and gas development by limiting impacts to a defined amount of surface disturbance. See Lease Stipulation K-11 Appendix B.

Performance-based lease stipulations and ROPs (patterned after those developed for the northwest portion of the National Petroleum Reserve – Alaska) will be used to mitigate the impacts of energy development and other land uses throughout the Planning Area. These mitigation will provide BLM the flexibility to adapt management decisions to changing and uncertain environmental conditions on the ground. These restrictions will provide protection for important natural resources, including vegetation, wetlands, water quality, fish and wildlife (including threatened species), cultural and paleontological resources, subsistence resources and traditional uses, and scenic and recreation values. The restrictions which are presented in Appendix B provide setbacks, consultation, guidance and limitations on all aspects of oil and gas related activities including:

- Waste Prevention Handling, Disposal, Spills, and Public Safety
- Water Use for Permitted Activities
- Winter Overland Moves and Seismic Work
- Oil and Gas Exploratory Drilling
- Facility Design and Construction
- Use of Aircraft for Permitted Activities
- Oilfield Abandonment
- Subsistence Consultation for Permitted Activities
- Orientation Programs Associated with Permitted Activities
- Endangered Species Act Section 7 Consultation Process

# SUMMARY

This Record of Decision (ROD) documents the Secretary of the Interior's decision to approve, with minor modifications and clarifications (see Appendix A), the Final Preferred Alternative as described in the Final Amended Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement (Final Amended IAP/EIS;amendment). This amendment, which was prepared by the Bureau of Land Management (BLM), describes a plan to make available for oil and gas leasing certain lands currently closed to leasing or under a No Surface Activity (NSA) restriction in the ~ 4.6 million acre Northeast National Petroleum Reserve-Alaska (Planning Area) and to utilize performance-based lease stipulations and required operating procedures (ROPs) to increase flexibility in protecting important surface resources from the impacts of oil and gas activities. The plan emphasizes restrictions on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence areas, and other resources. At the same time, it makes 4,389,000 acres (95 percent of the Planning Area) available for oil and gas leasing, and defers leasing on Teshekpuk Lake (approximately 211,000 acres). In addition, although the Colville River Special Area (CRSA) will remain available for leasing, this ROD defers offering lands in the CRSA in a lease sale, until the Colville River Management Plan is completed. The findings in the Final Amended IAP/EIS and the decisions reflected in this ROD were based upon an open and collaborative public process. Several Federal agencies, the State of Alaska, the North Slope Borough (NSB), Alaska Native regional and community organizations, and thousands of individuals and institutions shared their knowledge and insights about the Planning Area with the BLM.

## PLAN FOUNDATION

The Final Amended IAP/EIS fulfills the 2002 recommendation of the President's National Energy Policy that directs the Secretary of the Interior to "consider additional environmentally responsible oil and gas development, based on sound science and the best available technology, through further lease sales in the National Petroleum Reserve-Alaska" and that "such consideration should *include areas not currently leased within the northeast corner of the National Petroleum Reserve – Alaska*" (emphasis added).

In a 1981 amendment to the Naval Petroleum Reserves Production Act (NPRPA), 42 U.S.C. 6508, and Congress directed the BLM to undertake an "expeditious program of competitive oil and gas leasing" in the National Petroleum Reserve-Alaska. North Slope oil production, centered at Prudhoe Bay, significantly contributes to the Nation's domestic oil supply. The North Slope fields produce about 16 percent of America's current domestic oil production. The oil industry has discovered and developed other fields to the east and west of Prudhoe. However, production is declining from these older fields and there are indications that the Northeast National Petroleum Reserve-Alaska contains oil and natural gas resources that could help stem production decline on the North Slope.

## MANAGEMENT ALTERNATIVES

The Final Amended IAP/EIS analyzed a "No Action Alternative" and three other alternative future management plans for making part or all of the Northeast National Petroleum Reserve-Alaska available for oil and gas leasing in a manner consistent with responsible protection of other important surface resources. Each alternative offered a different approach to conducting "an expeditious program of competitive leasing of oil and gas" (a goal of the NPRPA) and protecting surface resources from "unnecessary and undue degradation," as required by the Federal Land Policy and Management Act (FLPMA), mitigating impacts of surface resources and providing maximum protection for surface values in designated special areas are required by the NPRPA. Each alternative also included management actions and mitigation that will broadly apply to the Planning Area. The Final Amended IAP/EIS also included lease stipulations and ROPs specific to portions of the Planning Area. These lease stipulations and ROPs address many of the issues identified by the public during the entire amendment process and include decisions the BLM must address in land management plans.