DECLARATION OF JACOB ADAMS

JACOB ADAMS, under penalty of perjury, declares:

**I. MY PERSONAL KNOWLEDGE OF THE NORTHEAST NPR-A PLANNING AREA.**

1. I am an Inupiaq Eskimo. I am 59 years old. I have resided on the Arctic Slope of Alaska all my life. I have firsthand knowledge of the lands and resources in the Northeast National Petroleum Reserve-Alaska ("Northeast NPR-A"), having hunted and fished for subsistence purposes throughout this area my entire life.

2. From 1972 to 1983, except for a nine-month period in 1980 (when I served as Mayor of the North Slope Borough), I served as the Vice-President for Lands of the Arctic Slope Regional Corporation ("ASRC"). Since 1983, I have served as the President of ASRC.

3. ASRC was established in 1972, pursuant to Section 7 of the Alaska Native Claims Settlement Act ("ANCSA") to receive and administer lands and monetary benefits provided to North Slope Inupiat as part of the land claims settlement. ASRC is wholly owned by the approximately 8500 Inupiat of the Arctic Slope. Every Inupiaq resident of the Arctic Slope is an ASRC shareholder. ASRC's corporate mission requires it to be a responsible steward of the land and its resources, and to be ever mindful that development in the Arctic must protect the fragile land and the subsistence resources on which we all rely.

4. The National Petroleum Reserve-Alaska is situated within the boundaries of the Arctic Slope Region.

5. From 1972-1980, and 1982 to 2001, I also served as an elected member of the North Slope Borough ("NSB") Assembly. The boundaries of the NSB are roughly the same as the Arctic Slope region.

6. I am a whaling captain. I have been a voting member of the Alaska Eskimo Whaling Commission ("AEWC") since its formation in August 1977. Through a cooperative agreement with the United States Department of Commerce, National Oceanic and Atmospheric Administration, the AEWC oversees subsistence-whaling activities on the Arctic Slope. Pursuant to challenged amended IAP/EIS, BLM will include stipulations in all leases requiring lessees to consult with the AEWC and the Barrow and Nuiqsut Whaling Captains Associations before conducting open water activities, in order to minimize impacts to the fall and spring subsistence whaling.

7. Every spring, on an annual basis, I engage in subsistence bird hunting in the area south and east of Barrow, including the area covered by the amended IAP/EIS. Species I hunt on a regular basis include Stellar's Eiders, Spectacled Eiders, Speckled Belly Geese, White Geese and Black Brant.

8. The Northeast NPR-A is dotted with subsistence cabins that have been used and maintained by Inupiaq families

for generations. See Attachment A to my Declaration. These Inupiaq subsistence cabins provide a base for continuation of traditional subsistence hunting and fishing activities. My family has a cabin located west of Teshekpuk Lake, which I have circled on Attachment A. I use the cabin every May for bird hunting, including use of the area covered by the IAP/EIS. Each July, August and September I use the cabin as a base for fishing and caribou hunting, including use of the area covered by the IAP/EIS.

**II.   THE IMPORTANCE OF THE EIS PROCESS TO ASRC'S SHAREHOLDERS -- THE INUPIAQ RESIDENTS OF THE ARCTIC SLOPE.**

9.   The National Petroleum Reserve in Alaska ("NPR-A") is situated in the heart of the Inupiaq Eskimo aboriginal territory. Four of the eight villages in the Arctic Slope Region (Barrow, Atqasuk, Wainwright and Nuiqsut) -- comprising almost 80 percent of the population of the North Slope Borough -- are within NPR-A. The so-called "Northeast National Petroleum Reserve-Alaska Planning Area," which is the subject of the EIS at issue in this litigation, includes areas that have been used extensively by Inupiaq residents of the villages of Barrow, Atqasuk and Nuiqsut for subsistence hunting and fishing purposes since time immemorial.

10.   Because the Arctic Slope Inupiat have depended upon the marine mammals and upland species for their subsistence

from time immemorial, their information concerning these species and their environment is often superior to that of the scientists working for the government and environmental organizations. Inupiat provide a component of practical, experience-based knowledge of the Arctic environment that is unavailable from other sources. Government planners have learned to value Inupiaq input. In recent years, Inupiaq estimates of the health of the bowhead whale population, for example, have proved more accurate than the predictions of government scientists. More recently, when the United States Fish and Wildlife Service ("Service") proposed listing vast areas of the Arctic Slope as critical habitat for the Spectacled and Stellar's eiders, Inupiaq organizations, including ASRC, took the lead in convincing the Service that designation of critical habitat was unnecessary and would have devastating economic impacts on the region.

11. Exploration, development and production of oil and gas from lands within the Northeast NPR-A Planning Area could have a serious negative impact upon the subsistence lifestyle of ASRC's Inupiat shareholders, unless that exploration, development and production is done in an environmentally and culturally sensitive way. For this reason, all Inupiaq organizations on the Arctic Slope, including ASRC, the North Slope Borough, and the affected villages, have taken a lively

interest in the Northeast NPR-A EIS process. BLM held numerous meetings in ASRC's villages and consulted with Inupiaq political, corporate, and tribal organizations, as a result of which many Inupiaq concerns have been addressed.

12. ASRC believes that the great majority of its shareholders -- the Inupiaq residents of the Arctic Slope – will benefit from the Secretary's decision to open additional areas in the Northeast NPR-A to commercial oil and gas leasing subject to the lease stipulations and required operating procedures, many of which were added at the request of the Arctic Slope Inupiat.

**III. THE 2006 ROD.**

13. The proposal by BLM to lease areas within the Northeast NPR-A that were placed off limits to oil and gas leasing in the original Northeast NPR-A IAP/EIS aroused a great deal of concern among some of ASRC's shareholders.

14. Richard Glenn, ASRC's Vice President/Lands testified at a hearing held in Barrow on August 12, 2004, and expressed qualified support for opening additional areas in Northeast NPR-A, provided that subsistence is protected and Inupiaq communities are consulted throughout the development process.

15. The North Slope Borough and the Village of Nuiqsut continued to support a "No Action" alternative following issuance of the FEIS and submitted additional comments.

16. Before issuing the ROD the Secretary considered the comments of the NSB and Nuiqsut and made a number of changes and clarifications to the preferred alternative announced in the FEIS.

17. The ROD modifies and strengthens the protections for subsistence activity contained in the FEIS preferred alternative. Specifically, the ROD expands the areas and times where surface facilities and activities are restricted, imposes additional study and community consultation requirements, and restricts activity in the vicinity of subsistence cabins.

18. ASRC has carefully considered the Amended IAP/EIS and ROD and believes that it represents a balanced accommodation of subsistence and economic development concerns. Not every concern raised by Arctic Slope residents and community organizations has been addressed to their satisfaction. Much will depend upon the cooperative efforts of Inupiaq residents, lessees and federal officials.

19. The Amended IAP/EIS contains a thorough discussion of the environmental impacts associated with the decision in the ROD, and together with the many public hearings and other opportunities to comment provided fair and informed input to the decision making process.

20. No decision of this nature can ever be made without

some misgivings. Ultimately, however, ASRC believes that a workable balance has been struck that will be in the long term best interests of ASRC and its shareholders -- the Inupiat residents of the Arctic Slope.

## IV. THE INTEREST OF ASRC, ITS SHAREHOLDERS, AND ALL ALASKA NATIVES IN RESPONSIBLE OIL AND GAS DEVELOPMENT.

21.  The Inupiat did not bring oil and gas development to the Arctic Slope, and did not necessarily welcome the intrusions of the oil industry on our aboriginal homelands. We were not given a choice, however, and had to adapt to the new reality. In my lifetime, we have gone from an economy based almost entirely on subsistence to a mixed economy in which cash jobs, a certain level of economic activity and a commercial tax base are necessary to maintain the schools, transportation, health care, sanitation facilities and other amenities that are taken for granted elsewhere in the United States. The only Arctic Slope resource capable of supporting and sustaining this economic structure is environmentally responsible oil and gas exploration, development and production. In recent years, however, declining Arctic Slope production has severely impacted revenues to the North Slope Borough, threatening many basic services.

22.  When the Alaska Native Claims Settlement Act ("ANCSA") was enacted in 1971, NPR-A was closed to commercial

oil and gas leasing. Although Arctic Slope villages in NPR-A were permitted to select surface estate in the vicinity of the villages in the normal ANCSA pattern, ASRC did not receive the subsurface beneath these villages, nor was it permitted to take any of its four million acre ANCSA 12(c) entitlement from within NPR-A. Instead, ASRC was forced to make "in lieu" selections outside NPR-A, in many instances distant from any of its villages. Thus, the Inupiat of the Arctic Slope were prevented from acquiring some of the more prospective oil and gas lands within their region.

23.  In 1980 Congress changed its policy and opened NPR-A to commercial oil and gas leasing. Since the rationale for the original ban on ASRC's acquisition of subsurface within NPR-A no longer existed, Congress, in Section 1431(o) of the Alaska National Interest Lands Conservation Act of 1981 ("ANILCA"), partially addressed the inequity to ANCSA by permitting ASRC to exchange its in lieu subsurface (but not any of its 12(c) entitlement) for subsurface beneath village corporation lands within NPR-A at such time as lands within the vicinity of the villages were opened to commercial oil and gas leasing. ASRC has exercised its 1431(o) option at Nuiqsut, and has acquired most of the subsurface beneath the village of Nuiqsut. Any revenues received by ASRC from these lands will be shared with all Alaska Natives pursuant to the

sharing mechanism of ANCSA Section 7(i).

24. In addition to ANILCA § 1431(o) subsurface acquired beneath the village of Nuiqsut, in 1984 Congress approved a land exchange between ASRC and the United States pursuant to which ASRC acquired approximately 57,000 acres of surface and subsurface (excluding natural gas and sand and gravel) in the area south of Barrow known as "South Walakpa." Any revenues received by ASRC from these lands will be shared with all Alaska Natives pursuant to the sharing mechanism of ANCSA Section 7(i).

25. ASRC's subsurface at Nuiqsut and South Walakpa is believed to be prospective for oil and gas. Because these lands are surrounded by public lands within the planning area, the feasibility of producing oil and gas from these lands will be enhanced by the federal government's decision to lease the surrounding public acreage.

26. Economic conditions in the villages within NPR-A are unique. Our villages exist as isolated tracts of private land surrounded by lands owned by the federal government. Transportation in and out of our villages is by airplane only. We have few direct connections to the economy of the rest of the state, except through the oil and gas industry. Virtually all economic activity on the Arctic Slope is traceable to the oil and gas sector, either directly, or indirectly through the

North Slope Borough whose tax revenues and income ultimately derive from oil and gas production. Whether the economy of the villages within NPR-A will grow or stagnate and decline depends to a significant extent on the development policies of the federal government, which owns the lands surrounding these villages.

27. With Prudhoe Bay oil production in decline, it is very important to the State of Alaska's and the Arctic Slope's economy that appropriate new frontier areas be leased, explored and developed. Arctic Slope oil development currently funds more than 80% of the State of Alaska's budget. ASRC's shareholders and other Arctic Slope residents benefit from state funded programs. The State, which will receive 50 percent of the revenues from leasing in NE NPR-A, is required to give priority to use by subdivisions of the State -- including the NSB -- most directly or severely impacted by oil and gas development in NPR-A. Arctic Slope oil production also provides a large and important property tax base for the North Slope Borough government. Borough tax revenue is used to provide for education and many other essential public services and facilities to our eight Arctic Slope villages, to our shareholders and to other Borough residents. Oil and gas related activities are the primary private sector economy in the Arctic. Oil development creates jobs for our shareholders

as well as oil field services contract opportunities for ASRC, its subsidiary companies, our village corporations, and the other Arctic Slope businesses.

28.  ASRC and its subsidiary companies have been active in almost every aspect of North Slope oil exploration, development, production and transportation since 1971.  ASRC's involvement has included serving as a contractor on oil field developments, performing design and engineering work, building and maintaining pipelines, leasing its private lands for exploration and development, protecting shareholder interests, and a variety of other oil field service and related Arctic Slope activities.  ASRC also has joint ventures or revenue sharing agreements with its villages to provide sand and gravel for resource development.

29.  Energy companies are sensitive to local hire/ contracting demands.  As the resident regional corporation, ASRC has a reasonable expectation that one or more of its subsidiaries will receive contracts in connection with exploration, development of and production from the areas opened up by the ROD.

30.  The plaintiffs, and other non-resident, urban-based environmental organizations have an agenda to restrict as much as possible oil and gas development in the Arctic.  They have attempted to create an impression that the NPR-A is a virgin

wilderness area, filled with exotic animal species, and untouched by the hand of man. Obviously, the facts are much different. The Northeast NPR-A Study Area is heavily used by the Inupiat of the region. There are hundreds of allotments, cabins (including my own), and hunting and fishing camps scattered throughout NPR-A, including the Northeast NPR-A Planning Area. The three federal oil and gas exploration programs conducted between 1944 and 1981 resulted in very extensive seismic surveys and the drilling of 109 exploratory wells all across the NPR-A. Drilling many of these wells also involved the construction of gravel airstrips, camp facilities and roads from airstrips to the drilling pad sites.

31. The impacts of oil and gas activity within the petroleum reserve have been extensively studied in response to Congressional mandates. Even though these earlier exploration programs were carried out using technology and practices that would be considered primitive by today's standards, the impacts on the land and its resources have been all but unnoticeable in most instances, and minimal overall.

32. It is ASRC's view, based on its experience, that the knowledge gained from decades of Arctic oil and gas activity, combined with the improved technology now available, means that almost all areas of the Arctic Slope and NPR-A may be safely leased, explored and developed, so long as

appropriate regulations and stipulations are in place. These regulations and stipulations are familiar to BLM and other agencies of the Department of the Interior, the State of Alaska, and the North Slope Borough. These measures include seasonal and area limitations, buffer zones, requiring best available technology, using horizontal drilling technology and other approaches that have worked well on other Arctic Slope leases and producing areas.

33. The fate of ASRC's lands within NE NPR-A is directly linked to the leasing of adjoining federally owned lands. It is likely that if oil is discovered on any of the adjoining federal lands, production units will be formed that include both ASRC and federal lands. Depending on the size of discoveries, if any, on ASRC owned land within the Study Area, production from ASRC's lands could be delayed or deferred if there is no production from public land in the area to make those discoveries "commercial."

34. ASRC has a number of interests that would be directly and negatively impacted by the injunctive relief sought by the plaintiffs in this litigation. These interests include:

- Lost job opportunities to ASRC shareholders.
- Lost contracting opportunities to ASRC subsidiaries.
- Possible lost production of oil and gas from ASRC's

> lands if discoveries on those lands are non-economic without associated production from adjoining federally owned lands.
>
> - Reduction in quality of life on the Arctic Slope, the economy of which is now heavily dependent on jobs, economic activity and tax revenues from declining Prudhoe Bay production.

35. In ASRC's view, the EIS process resulted in a number of compromises favorable to outside environmental interests that, unlike ASRC's shareholders, will not be impacted directly by the decision to lease lands within NPR-A. Having participated in the process, however, ASRC accepts the result. The non-resident, urban-based environmental organizations that brought this litigation should do the same.

**V. ASRC'S PAST INVOLVEMENT AS AN INTERVENOR-DEFENDANT IN NEPA DISPUTES INVOLVING OIL AND GAS DEVELOPMENT ON THE ARCTIC SLOPE.**

36. ASRC, on behalf of itself and its shareholders, is in a unique position to provide useful information to the Court. ASRC and its shareholders are perhaps the only parties to this litigation that can see the dispute from both sides. The economic well-being of ASRC as a corporation and of each of its shareholders is critically dependent upon the continuation of oil and gas exploration, development and

production on the Arctic Slope. At the same time, as the only residents of the rural areas likely to be impacted by any such exploration, development and production, the Inupiat of the Arctic Slope have insisted that development occur in a manner that respects the subsistence lifestyle and culture of area residents.

37. Not only has ASRC played an active role in the environmental studies associated with major oil and gas proposals on the Arctic Slope, it has consistently sought -- and been granted -- permission to intervene in support of the environmental processes in which it has participated. These cases include:

   (1)   Gwich'in Steering Comm. V. Lujan, & National Resources Defense Council v. Lujan, No. 89-2393 (JHG) (D.D.C., dismissed 1992) (challenge to legislative EIS re opening Arctic National Wildlife Refuge to oil and gas leasing),

   (2)   Northern Alaska Environmental Center v. Army Corps of Engineers, No. A98-0217-CV (HRH) (D.Alaska, summary judgment granted for defendants May 25, 1999) (challenge to failure to prepare EIS for Corps of Engineers' permit in connection with oil development on Colville Delta), appeal dismissed,

   (3)   The Wilderness Society v. Norton, Civ. Action No. 98-02395 (RWR) (D.D.C., filed 1998, pending (challenge to initial Northeast NPR-A EIS and decision to open to commercial oil and gas leasing).

   (4)   Northern Alaska Environmental Center v. Norton, Case No. J04-0006CV (JKS) (challenge to NW NPR-A EIS and decision to open the area to

commercial oil and gas leasing).

38. In every instance to date, the federal courts have permitted ASRC to intervene as a party, without restrictions on the scope of ASRC's participation.[1]

DATED this 24th day of February, 2006, at Barrow, Alaska.

_____
Jacob Adams

AdamsDecl Feb 2006.044

---

[1] In <u>Northern Alaska Environmental Center v. Norton</u>, ASRC agreed to coordinate its briefing with other intervenor defendants and to avoid unnecessary duplication of arguments.

Map showing northern Alaska region including Barrow, Peard Bay, Plover Islands, Tangent Point, Cape Simpson, Drew Point, Pitt Point, Teshekpuk Lake, Smith Bay, Dease Inlet, Admiralty Bay, Meade River, Atqasuk, with "Jake Adams' Cabin" marked.

Attachment A
Page 1 of 1