Deirdre McDonnell
Layla Hughes
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:05-cv-00008-JKS |
| P. LYNN SCARLETT, Acting Secretary of the Interior[1]; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS, Regional Director, United States Fish and Wildlife Service[2]; BUREAU OF LAND MANAGEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, and UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) ) ) ) ) ) ) ) |
| Defendants, and | ) ) |
| CONOCOPHILLIPS ALASKA, INC., ANADARKO PETROLEUM CORPORATION, ARCTIC SLOPE REGIONAL CORPORATION, and STATE OF ALASKA, | ) ) ) ) |
| Intervenor-Defendants. | ) ) |

**PLAINTIFFS' OPENING BRIEF**

---

[1]  Pursuant to Fed. R. Civ. P. 25(d)(1), P. Lynn Scarlett has been automatically substituted for Gale Norton.
[2]  Pursuant to Fed. R. Civ. P. 25(d)(1), Tom Melius has been automatically substituted for Rowan Gould.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.      THE TESHEKPUK LAKE SPECIAL AREA.................................................2

    II.     LEGAL AND ADMINISTRATIVE HISTORY ....................................................6

    III.   THE PLANNING PROCESS FOR THE PLAN AMENDMENT .........................8

ARGUMENT ......................................................................................................................13

    I.      BLM'S DECISION IS ABITRARY AND CAPRICIOUS IN
         VIOLATION OF THE ADMINSTRATIVE PROCEDURE ACT
         BECAUSE IT FAILS TO RECONCILE ITS DUTY TO PROVIDE
         MAXIMUM PROTECTION TO THE OUTSTANDING
         RESOURCES OF THE SPECIAL AREA WITH ITS DECISION TO
         REDUCE PROTECTION........................................................................................14

    II.     THE FINAL AMENDED INTEGRATED ACTIVITY PLAN/
         ENVIRONMENTAL IMPACT STATEMENT DOES NOT COMPLY
         WITH THE NATIONAL ENVIRONMENTAL POLICY ACT. .........................19

         A.   The BLM Violated NEPA by Failing To Supplement the Draft
              EIS To Allow For Public and Agency Review of the New
              Preferred Alternative. ...................................................................................19

         B.   The Final EIS Does Not Contain a Full Accounting of the
              Cumulative Impacts of the Decision..............................................................24

         C.   The BLM Violated NEPA By Failing To Consider the Effects of
              Oil Development Alternatives In Combination With Global
              Climate Change. ............................................................................................26

         D.   The Final EIS Does Not Contain the Site-Specific Analysis
              Necessary To Support a Leasing Decision. ...................................................35

              1.   The Leases at Issue Here Represent An Irretrievable
                  Commitment of Resources Requiring Site-Specific Analysis
                  Because the Lessee Is Given the Right To Develop Oil. ........................36

              2.   The Final EIS Violates NEPA Because it Fails To Analyze
                  Impacts on a Site-Specific Level. ..........................................................37

          E.   The Final EIS Fails To Analyze The New Mitigation Measures
              Adequately......................................................................................................39

    III.   THE BIOLOGICAL OPINION FOR THE DECISION VIOLATES
         THE ENDANGERED SPECIES ACT................................................................41

          A.   The Biological Opinion Fails to Consider All Impacts Resulting
              from the Action and Other Projects in the Reserve .......................................41

B.   The Biological Opinion Fails To Consider Impacts of the Actual Decision. .................................................................................................44

IV.   BECAUSE THE DECISION IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA, NPRPA, NEPA AND THE ENDANGERED SPECIES ACT, THE COURT SHOULD VACATE THE ROD AND ENJOIN ANY IMPLEMENTATION OF THE DECISION. ..........................................................................................................48

CONCLUSION...............................................................................................................................50

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alpine Lakes Prot. Society v. Schlapfer, 518 F.2d 1089 (9th Cir. 1975) ..................................... 48

America Bioscience, Inc. v. Thompson, 269 F.3d 1077 (D.C. Cir. 2001) .................................... 48

America Motorcyclist Association v. Watt, 714 F.2d 962 (9th Cir. 1983) ................................... 48

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) ................................................ 48, 49

Bob Marshall Alliance v. Hodel, 852 F.2d 1223 (9th Cir. 1988) .................................................. 36

Cady v. Morton, 527 F.2d 786 (9th Cir. 1975) ............................................................................ 48

California v. Block, 690 F.2d 753 (9th Cir. 1982) .......................................... 19, 22, 27, 35, 37, 38

Carmel-By-the-Sea v. United States Department of Transport, 123 F.3d 1142 (9th
      Cir. 1997) ........................................................................................................................... 39

Churchill County v. Norton, 276 F.3d 1060 (9th Cir. 2001) ....................................................... 27

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) .............................................. 13

City of South Pasadena v. Slater, 56 F. Supp. 2d 1106 (C.D. Cal. 1999) .................................... 49

Coalition for Canyon Preservation v. Bowers, 632 F.2d 774 (9th Cir. 1980) .............................. 37

Conner v. Burford, 848 F.2d 1441 (9th Cir. 1988) ....................................... 36, 37, 41, 44, 45, 47

Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121 (D. D.C. 2001) .................................. 42, 43

Defenders of Wildlife v. EPA, 420 F.3d 946 (9th Cir. 2005) ....................................................... 48

Dubois v. United States Department of Agriculture, 102 F.3d 1273 (1st Cir. 1996) .............. 20, 22

Earth Island Institute v. United States Forest Serv., 442 F.3d 1147 (9th Cir. 2006) ......... 27, 28, 31

Forest Conservation Council v. United States Forest Service, 66 F.3d 1489 (9th Cir.
      1995) ................................................................................................................................. 49

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S.
      167 (2000) .......................................................................................................................... 13

Gifford Pinchot Task Force v. United States Fish & Wildlife Serv., 378 F.3d 1059
    (9th Cir. 2004) ...............................................................................................................13

Half Moon Bay Fishermans' Marketing Association v. Carlucci, 857 F.2d 505 (9th
    Cir. 1988)...........................................................................................................19, 20, 23

Idaho Sporting Congressional v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002)...............................27

Kandra v. United States, 145 F. Supp. 2d 1192 (D. Or. 2001) ......................................................42

Kern v. BLM, 284 F.3d 1062 (9th Cir. 2002)........................................................................24, 28

Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989 (9th Cir. 2004) .............................13, 27

Marsh v. Or. Natural Resources Council, 490 U.S. 360 (1989) ....................................................13

Mont. Wilderness Association v. Fry, 310 F. Supp. 2d 1127 (D. Mont. 2004)..............................44

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
    Insurance Co., 463 U.S. 29 (1983) ...........................................................................14, 15, 18

National Audubon Society v. United States Forest Serv., 46 F.3d 1437 (9th Cir.
    1994)..............................................................................................................................28

Native Ecosystems Council v. Dombeck, 304 F.3d 886 (9th Cir. 2002)........................................24

Natural Resources Defense Council v. Evans, 232 F. Supp. 2d 1003 (N.D. Cal. 2002) ...............49

Natural Resources Defense Council v. United States Forest Serv., 421 F.3d 797 (9th
    Cir. 2005)........................................................................................................................27

Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372 (9th Cir.
    1998)........................................................................................................................31, 39

North Slope Borough, 642 F.2d at 607 ..........................................................................................45

Northern Center v. Norton, 361 F. Supp. 2d 1069 (D. Alaska 2005) ......................................26, 35

Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846 (9th Cir.
    2005)................................................................................................................................31

Portland Audubon Society v. Endangered Species Committee, 984 F.2d 1534 (9th
    Cir. 1993).........................................................................................................................25

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)............................................39

Roosevelt Campobello International Park Commission v. EPA, 684 F.2d 1041 (1st Cir. 1982) ..................................................................................................................45

Save the Yaak Committee v. Block, 840 F.2d 714 (9th Cir. 1988) ...............................49

Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987) ...................................................49

Sierra Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983) .............................................36

Steamboaters v. Federal Energy Regulatory Committee, 777 F.2d 1384 (9th Cir. 1985) ..........................................................................................................................49

TVA v. Hill, 437 U.S. 153 (1978) ..........................................................................44, 45

Tenakee Springs v. Block, 778 F.2d 1402 (9th Cir. 1985) .......................................37, 38

Thomas v. Petersen, 753 F.2d 754 (9th Cir. 1985) .......................................................49

Thompson v. Department of Labor, 885 F.2d 551 (9th Cir. 1989)................................25

Turtle Island Restoration Network v. NMFS, 340 F.3d 969 (9th Cir. 2003)................13

Washington Toxics Coalition v. EPA, 413 F.3d 1024 (9th Cir. 2005).........................49

## DOCKETED CASES

The Wilderness Society, et al., v. Norton, et al., No. 98-2395 (D.D.C., filed Oct. 5, 1998) ..................................................................................................................7

## FEDERAL STATUTES

5 U.S.C. § 706(2) ...................................................................................................13, 48

16 U.S.C. § 1536(a)(2) (2000) ..............................................................................41, 47

42 U.S.C. § 4332(2) ......................................................................................................37

42 U.S.C. § 6504(b) ............................................................................................6, 14, 39

42 U.S.C. § 6506a(b) .....................................................................................................17

Pub. L. 94-258, 90 Stat. 303 (1976)..............................................................................6

## FEDERAL REGULATIONS

40 C.F.R. §1502.1 ...................................................................................................27

40 C.F.R. § 1502.14 ...............................................................................................27

40 C.F.R. § 1502.16(h) ..........................................................................................39

40 C.F.R. § 1502.9(c)(1) ........................................................................................20

40 C.F.R. § 1508.7 .................................................................................................24

50 C.F.R. § 402.02 .................................................................................................42

50 C.F.R. § 402.14(h)(2) ........................................................................................42

46 Fed. Reg. 18,026 (Mar. 23, 1981) ...............................................................20, 27

70 Fed. Reg. 4140 (Jan. 28, 2005). .......................................................................10

# INTRODUCTION

This case challenges the government's decision to reverse the long standing practice of keeping sensitive habitat in the Teshekpuk Lake Special Area off limits to oil activities.  From the time the 23 million acre area of federal land on Alaska's North Slope was designated the National Petroleum Reserve—Alaska (Reserve) in 1976, the area around Teshekpuk Lake has been recognized—by Congress and by multiple administrations—as an internationally unique resource worthy of special protection.  With this decision, however, and over the objections of other expert agencies, wildlife experts, Native communities, and sport hunting and conservation groups,  the Bureau of Land Management (BLM) has authorized leasing of the entire Teshekpuk Lake Special Area.  In so doing, BLM violated several laws.

BLM never explained how rolling back protections for this area met its obligation under the National Petroleum Reserves Production Act (NPRPA) to give the area "maximum protection."  BLM developed its radical new approach late in the process and did not vet it through a draft environmental impact statement (EIS) in violation of the National Environmental Policy Act (NEPA).  The EIS it did produce fails to show the full impacts of the decision.  For example, it completely fails to acknowledge that changes to the Northeast plan will spur increased development in the adjacent Northwest Planning Area with potential significant impacts to wildlife.  The EIS also ignores the combined effect of the oil development authorized and the ongoing rapid warming of the Arctic on the key species of the area.  Moreover, the Fish and Wildlife Service's (FWS) biological opinion for the threatened Stellers and spectacled eiders relied on by BLM fails to account for increased development in adjacent areas in violation of the Endangered Species Act.

For all of these reasons, this Court should vacate the decision, enjoin scheduled lease sales, and remand the issue to the agency for further review.

# BACKGROUND

I.     THE TESHEKPUK LAKE SPECIAL AREA

For planning purposes, BLM has broken the Reserve into three planning areas.  See Ex. 42 at 299 (3 FEIS Map 1-1).  The decision challenged here comes as an amendment to the oil leasing plan for the Northeast Planning Area.  The Northeast Planning Area is comprised of 4.6 million acres stretching from the coast on the north, bordered by the Colville River to the East and the Ikpikpuk River on the West.  See Ex. 42 at 15, 299 (1 FEIS at 1-7; 3 FEIS Map 1-1).  The native village of Nuiqsut is located inside the Northeast Planning Area as well as the majority of the Teshekpuk Lake Special Area.  The special area is approximately 1.7 million acres, 32% of which is water.  Ex. 7 at 20 (Audubon Report at IV.1-1).  The special area takes its name from Teshekpuk Lake itself -- the largest and deepest lake north of the Brooks Range.  Id.

It is the area around Teshekpuk Lake, however, that provides key wildlife habitat.  In particular, the area north of the Lake, with its mosaic of deepwater lakes and wetlands, is the most productive and diverse ecosystem in the American Arctic.  Id.

The area north of Teshekpuk Lake provides bird habitat of international significance.  Indeed, "[t]he Teshekpuk Lake Goose Molting Area may be the single most important area for molting brant and other geese in the Arctic . . .."  Ex. 42 at 136 (1 FEIS at 3-42).  Vast numbers of migratory birds from various parts of the world use this area for molting, nesting, and staging.  Ex. 7 at 20 (Audubon Report at IV.1-1).  Geese rely heavily on this area for molting--in particular, Pacific black brant, greater white-fronted geese, and Canada geese.  Ex. 7 at 21 (Audubon Report at IV.1-2).  During the molting stage, geese loose their flight feathers and replace them with new ones.  During this period, the geese are flightless and extremely vulnerable to predators and to disturbance.  Ex. 38 at 3 (Smith email to Lewis, 10/13/04) ("During molt, brant are flightless for 3-4 weeks, at which time they are sensitive to disturbance, energetically stressed, and vulnerable to predation.").  In addition, the migration and molt use

much of their energy and to survive they need access to high quality forage. The area around Teshekpuk Lake provides a unique combination of low-lying lakes, lush vegetation, and freedom from disturbance. Ex. 7 at 21 (Audubon Report at IV.1-2).

The goose molting area is of special significance to Pacific black brant. In 2001, more than 36,000 black brant molted in the area north and east of Teshekpuk Lake. This represents nearly one-third of the world-wide population. Id. In addition to molting, the Planning Area is also used by many brant for breeding habitat. Ex. 42 at 135 (1 FEIS at 3-41). Black brant "winter along the Pacific Coast from the Aleutian Islands south to Mexico" and along the Asian coast. Id. As a result, brant have substantial subsistence value to people from Alaska and are hunted by sports hunters in many areas. Id.

The black brant population has been trending downward in recent years. Ex. 42 at 136 (1 FEIS at 3-42.) Indeed, based on the most recent counts, the managers anticipated having to impose a very restrictive hunting management strategy that would represent a 50% decrease in the current harvest level. Ex. 41 at 3 (FWS Memo to BLM, 11/23/04, at 3).

Black brant are more vulnerable to disturbance than many other species and are particularly vulnerable during the molting period.

> Aircraft traffic and other potential oil and gas related activity (vehicular traffic, human activity on nearby pads and roads) has been documented to be a disturbance to molting brant and other geese. The disturbance is normally observed as movement away from the activity and toward 'escape' habitat such as the ocean or the middle of a lake or lagoon. These reactions bring a halt to feeding and resting and cause reductions in nutrient uptake. This leaves the birds, in an energetic sense, less prepared for migration. In addition, oil and gas infrastructure and human activity, such as the disposal of refuse, may increase predator numbers (foxes, gulls, and ravens) in NPR-A as they apparently have in other portions of northern Alaska, thereby increasing predation pressure on molting brant.

Ex. 38 at 6 (Smith email to Lewis, 10/13/04). Several studies indicate that pedestrian traffic may have an even greater impact on birds than vehicles. Ex. 42 at 196 (1 FEIS at 4-100).

Development also brings increased predator populations because human structures can provide habitat for and attract predators such as ravens, glaucous gulls, and arctic fox.  Id. at 200 (id. at 4-104).  Although efforts have been made to avoid attracting predators to drill sites, these measures have not been completely successful.  Ex. 41 at 9 (FWS Memo to BLM, 11/23/04, at 9).  For instance, FWS pointed out that although "[m]itigation measures currently in place [are] taken seriously by operators (at the Alpine facility and elsewhere)" they "have not been able to completely prevent ravens from nesting at development facilities."  Id.; see Ex. 4 at 1 (FWS comments on 1998 DEIS).

The Teshekpuk Lake area also provides the calving grounds for one of the Arctic's major caribou herds.  At 45,000 animals, the Teshekpuk Lake herd is the most important caribou herd for subsistence in the region.  Ex. 42 at 140 (1 FEIS at 3-50).  The Teshekpuk Lake herd's range covers most of the western Arctic west of the Colville River.  Ex. 7 at 2 (Audubon Report at II.1.2-1).  In May, most of the herd moves toward Teshekpuk Lake, with most pregnant cows continuing to the calving areas east and north of the lake, while most bulls remain southwest of the lake.  Id. at 2-3 (Audubon at II.1.2.-1 to II.1.2.-2).  In late June and July most of the herd seeks insect relief in the Northwest Planning Area on unvegetated or elevated sites between Dease Inlet and the mouth of the Kogru River.  Id. at 2-3 (Audubon at II.1.2.-1).  Most parturient cows travel through the narrow migration corridor between the lake and the Kogru River.  Ex. 42 at 140 (1 FEIS at 3-50).  Caribou disperse from November to April with most of the Teshekpuk Lake herd wintering on the coastal plain from Teshekpuk Lake to the Chukchi Sea.  Id.

The Teshekpuk Lake caribou herd travels to the area north and east of the Lake each year to calve.  The Teshekpuk Lake herd shows high fidelity to a concentrated calving area in this region.  Ex. 42 at 231 (1 FEIS at 4-367).  Successfully accessing the calving ground is vital to the herd's reproductive success.  Id.  In 2001, calving success for radio-collared cows that did make

it back to the calving rounds was 88 percent, while cows that calved outside the area had only a ten percent success rate.  Id. at 140-41 (1 FEIS at 3-50 to 51).

The calving area is particularly vulnerable to disturbance because caribou cows and calves are most sensitive to traffic.  Id. at 206 (1 FEIS at 4-110).  The Central Arctic herd, which calves in the areas of existing development on State lands, has been displaced from its traditional calving grounds.  Id. at 207 (1 FEIS 4-111).  Studies of the Central Arctic herd indicate "avoidance of habitats within 3 miles of existing Prudhoe Bay area facilities by cows and calves during calving and early post-calving periods . . . ."  Id.  Cows may avoid crossing roads during calving season.  Id. at 227 (1 FEIS 4-363).  The Wildlife Society, an independent association of wildlife management professionals, stated in the record that "[i]t is not possible to reduce or mitigate disturbance of caribou during calving."  Ex. 23 at 2 (The Wildlife Society Comments).

The Teshekpuk Lake area also provides important insect relief habitat.  During the summer, caribou movement and behavior is "greatly influenced by harassment from mosquitoes and oestrid flies."  Ex. 42 at 141 (1 FEIS at 3-51).  Caribou suffer significant energetic losses from biting insects and may be distracted from foraging if unable to escape from insect harassment.

The Teshekpuk Lake Special Area also contains important habitat for a variety of species including polar bear, various shorebirds, loons, and the threatened Stellers and spectacled eiders.  Polar bears have been using the coastal area in and around the planning area with increasing frequency.  See Ex. 41 at 2 (FWS Memo to BLM, 11/23/04, at 2).  The rare yellow-billed loon nests in the area and its habitat may be threatened by oil activities.  Not only is the loon vulnerable to disturbance, but water withdrawals from lakes that affect the hydrology could impact loons.  Ex. 38 at 4 (Smith email to Lewis, 10/13/04).  Moreover, the threatened spectacled eider is found in relatively high nesting densities in the Teshekpuk Lake area.  Id.  In

addition, Native subsistence users hunt and fish in the Teshekpuk Lake area year round.  Ex. 6 at 3 (Carroll comments 2/1/03).

II.     LEGAL AND ADMINISTRATIVE HISTORY

Congress, the Carter Administration, the Reagan Administration, and the Clinton Administration have all recognized the Teshekpuk Lake Special Area as worthy of recognition and protection.

The first recognition of the Teshekpuk Lake Special Area came when the Reserve was established in 1976 by the Naval Petroleum Reserves Production Act (NPRPA).  Pub. L. 94-258, 90 Stat. 303 (1976).  This legislation recognized that there were certain outstanding biological, cultural, scenic and recreational resources in the Reserve that required special protection. Congress cited the Teshekpuk Lake Area as one such area and authorized the Secretary to identify other such areas and designate them as Special Areas.  42 U.S.C. § 6504(b).  "The Teshekpuk Lake Special Area was designated primarily to protect important nesting, staging, and molting habitat for a large number of waterfowl."  Ex. 42 at 22 (1 FEIS 2-4).  Congress required that the Secretary afford designated Special Areas, such as the Teshekpuk Lake Special Area, "maximum protection."   42 U.S.C. § 6504(b).

The special values of the Teshekpuk Lake region were recognized again in 1983, when BLM published its first programmatic EIS considering what lands to offer for leasing in the Reserve.  Ex. 42 at 12a (1 FEIS at 1-3).  The preferred alternative identified areas of particularly sensitivity to be deleted from leasing.  Id.  Under this approach, the preferred alternative set aside a 217,000 acre block of land north and east of the Lake in recognition of its value to molting geese.  See Ex. 2 (1983 FEIS Map); Ex. 42 at 16 (1 FEIS at 1-8).

The need to protect the key habitat provided by the lands surrounding Teshekpuk Lake was once again recognized in the next leasing effort, but this time, based on newer evidence about the importance and sensitivity of the land, the Secretary expanded the area closed to

leasing or any surface activity.  In 1997, in response to renewed oil industry interest in the

Reserve, the BLM undertook an analysis to determine whether to conduct oil and gas lease sales

in a 4.6-million acre area located in the northeast corner of the Reserve.  See Ex. 42 at 12b (1

FEIS at 1-4); Ex. 5 at 6 (Northeast ROD at v).  The 1998 decision resulting from that process

opened 87% of the Northeast Planning Area to oil and gas leasing, but kept 589,000 acres of

important migratory bird and caribou habitat in the area surrounding Teshekpuk Lake off-limits

to leasing, including the critical lakes and wetlands to the north and east of the Lake.  See Ex. 5

at 8, 10 (Northeast ROD at 1 & Figure II.C.1).[3]

Under the current administration, interest in developing the Reserve has grown.  In 2001,

BLM began a process to consider leasing in the 8.8 million acre Northwest Planning Area.  Ex.

42 at 16 (1 FEIS 1-8).  BLM published a final EIS for the Northwest Planning Area in November

2003 followed by a record of decision in January 2004.  Id.  The Northwest record of decision

made 100% of the 8.8 million-acre planning area available for oil leasing, but deferred some of

the westernmost portions of the area from leasing for 10 years.  In addition, the Northwest

decision adopted a new approach to mitigation measures that eliminated many stipulations and

converted others into required operating procedures.

The Northwest decision was challenged in court by a coalition of conservation groups

including all of the Plaintiffs to this case.  This Court entered a preliminary injunction enjoining

activities on the ground under the plan, but allowed a lease sale to go forward.  Ultimately, this

Court entered summary judgment for the Defendants.  The case is currently on appeal to the

Ninth Circuit.

---

[3] The decision is the subject of an ongoing legal challenge.  The Wilderness Society, et al., v.
Norton, et al., No. 98-2395 (D.D.C., filed Oct. 5, 1998).

III.    THE PLANNING PROCESS FOR THE PLAN AMENDMENT

    Under the Bush Administration, oil production on public lands became an emphasis, as reflected in the administration's national energy policy, which called for the Secretary of Interior to "consider additional environmentally responsible oil and gas development, based on sound science and best available technology, through further lease sales in the National Petroleum Reserve –Alaska," including "areas not currently leased within the Northeast corner of the Reserve." Ex. 42 at 13 (1 FEIS at 1-5).  On June 23, 2003, BLM officially began the NEPA process for the Northeast plan amendment by publishing a notice of intent to amend the plan in the Federal Register.  Ex. 11 at 1 (68 Fed. Reg. 37,173 (June 23, 2003)).  The announcement stated that "[i]nformation gained since the completion of the [1998] Northeast plan has led the BLM to conclude that it is appropriate to consider amending it . . .." Id. at 2 (id. at 37,174).  The notice stated that the goals of the amendment were to consider leasing additional areas and to consider abandoning the stipulations of the Northeast plan, which BLM described as "inappropriately or needlessly restrictive," in favor of performance based standards.  Id. at 1-2 (id. at 27,173 - 27,174).

    BLM published a notice of availability for its draft EIS on June 9, 2004.  Ex. 17 at 1 (69 Fed. Reg. 32,365 (June 9, 2004)).  In the draft EIS, BLM considered three alternatives: alternative A, the "no action" alternative would have kept the 1998 ROD in place; alternative B was identified as the agency's preferred alternative; and alternative C made the entire planning area available to leasing.  Id. at 2 (id. at 32,366).  Alternative B made much of the previously-protected area around Teshekpuk Lake available to leasing, opening an additional 387,000 acres, but maintaining a 213,000 acre no-lease zone in an area northeast of the lake that provides important goose molting habitat.  See id.; Ex. 18 at 9-10 (1 DEIS 2-7 to 2-8).  The deferral area in Alternative B closely resembled the goose molting area kept of limits by Secretary Watt in the 1980's.  Cf. Ex. 2 (1983 FEIS Map).  The draft EIS's alternatives B and C contained the same set of mitigation measures, similar to those recently adopted in the Northwest decision, which

eliminated many of the stipulations contained in the Northeast plan and converted others from stipulations to "required operating procedures" (ROPs).  Id.

BLM received over 214,000 comments on the draft EIS, most strongly opposed the preferred alternative.  Ex. 42 at 19, 286 (1 FEIS at 1-18; 2 FEIS at 6-3); Ans. ¶ 42.  Plaintiffs commented on the draft EIS, highlighting the threats posed by leasing in the Teshekpuk Lake area and urging BLM to consider alternatives that would provide more protection to resources, rather than opening new areas to leasing.  Ex. 24 (Alaska Wilderness League, et al., DEIS comments); Ex. 28 (National Audubon Society DEIS comments).  BLM also received comments in opposition to the preferred alternative, most of which endorsed the no action alternative, from a variety of agencies and entities, including the United States Fish and Wildlife Service (FWS), United States Environmental Protection Agency (EPA), Ducks Unlimited, the Pacific Flyway Council, the Wildlife Society, over 100 ornithologists, the Eskimo Whaling Commission, Kuukpik Corporation, the North Slope Borough, and the Inupiat Community of the Arctic Slope. Ex. 42 at 291 (2 FEIS at 6-40 [listing the agencies]); Ex. 31 (FWS DEIS comments); Ex. 33 (EPA comments); Ex. 21 (Ducks Unlimited comments); Ex. 19 (Pacific Flyway comments); Ex. 23 (The Wildlife Society comments); Ex. 30 (Ornithologists' comments); Ex. 26 (Eskimo Whaling Commission comments); Ex. 32 (Kuukpik Corp. comments); Ex. 29 (North Slope Borough comments); and Ex. 20 (Inupiat Community comments).

The FWS comments stated that there is no new evidence that would indicate oil development could occur in the Teshekpuk Lake area with less impact to wildlife than previously expected.  Ex. 31 at 7-8 (FWS DEIS comments, Attachment 1 at 2-3).  FWS stated

> Due to the continuing importance of the TLSA to molting geese, other waterbirds, caribou and subsistence users, and the lack of any new information regarding the likelihood of impacts or the ability to mitigate them, the Service believes avoiding surface disturbance in this biologically sensitive area, as presented in the No Action Alternative, would provide the greatest level of protection (and least risk) to wildlife, and is our preferred management approach.

Id. at 8 (id. at 3).

The EPA's comments on the draft EIS stated the agency "has concluded that the Preferred Alternative would likely result in significant adverse environmental impacts to important fish and wildlife resources and in particular to critical waterfowl habitat, caribou calving and insect-relief areas, and caribou migration corridors in the Teshekpuk Lake Special Area." Ex. 33 at 4 (EPA DEIS detailed comments at 1). EPA also noted "the stipulations and required operating procedures (ROPs) proposed for the Preferred Alternative do not adequately ensure protection of surface resources and subsistence use in the Planning Area." Id. EPA recommended that BLM not open additional acreage to leasing at this time but instead suggested that BLM develop a new alternative that would propose modifications to the mitigation measures without opening additional areas to leasing. Id. at 2 (id. at 2).

Oil industry comments, however, favored Alternative C. See Ex. 27 at 1 (CPAI comments at 1); Ex. 25 at 2 (Anadarko comments at 2). The industry insisted that closing the goose molting area to leasing would compromise its ability to develop oil successfully. Ex. 27 at 10 (CPAI comments at 10). Both Conoco-Phillips and Anadarko recommended that the entire goose molting area be open for leasing and suggested that lakes with high densities of geese could be protected with "no surface occupancy" buffers. Id. at 12 (id. at 12); Ex. 25 at 2-3 (Anadarko comments at 2-3). In addition, Anadarko suggested that if BLM feels that is must leave some area off the table for leasing, it could defer the Lake itself, but should include the goose molting area north of the lake in leasing. Ex. 25 at 3 (Anadarko comments at 3).

On January 28, 2005, BLM published a notice of availability in the Federal Register for the final EIS. See Ex. 47 (70 Fed. Reg. 4140). The final EIS considered four alternatives -- Alternatives A, B, and C from the draft EIS and an entirely new preferred alternative, Alternative D. Ex. 42 at 21-22 (1 FEIS at 2-3 to 2-4). The new preferred alternative, as suggested by the oil companies, made almost 4.4 million acres of the planning area, including the entire area around

Teshekpuk Lake, immediately available for leasing. Id. at 22 (id. at 2-4). The only area not immediately made available for leasing was the subsurface land under Teshekpuk Lake itself, which was deferred from leasing, again consistent with oil company advice. Id. at 66 (id. at 2-89).

In Alternative D, the BLM adopted a different approach not considered in the draft EIS to seek to protect resources around the Teshekpuk Lake. Ex. 36 (Stuart Paulus Notes, 9/21/04) (noting that BLM was developing new alternative that was "very different"). Instead of setting aside the sensitive regions around the lake as every preceding Secretary has done, BLM proposed a plan to lease the entire area, but impose some limitation on surface development. It provided that the area north of the lake would be divided into seven large lease tracts and that the maximum area to be covered by gravel pads, airstrips, and roads, not counting pipeline disturbance, may not exceed 300 acres on each tract. Ex. 42 at 22 (1 FEIS at 2-4). In the area north of the lake, Alternative D would have "No-surface occupancy" buffers that preclude some permanent oil facilities around some of the lakes identified as important habitat for molting geese. Id. at 16; 300 (id. at 2-11; Map 2-4). These areas, however, would be open to exploration, construction of permanent pipelines, and publicly funded permanent roads. Id. Similarly, a swath of land south and southeast of Teshekpuk Lake would be protected with a stipulation under Alternative D that purports to limit surface occupancy, but again allows pipelines, public roads, and exploration activities. Id. at 26-27 (id. at 2-11 to 2-12). Finally, a four-mile portion of the corridor between Teshekpuk Lake and the Kogru Inlet would be leased, subject to a stipulation that would prohibit all permanent facilities, but would allow exploration during the winter. Id. at 26 (id. at 2-11).

On February 18, 2005, several groups requested BLM extend the statutorily mandated thirty day waiting period to give them time to assess the new preferred alternative unveiled in the

final EIS.  Ex. 49 at 1 (Alaska Coalition, et al., letter to BLM).  BLM rejected this request on

February 25, 2005.  Ex. 51 (BLM letter to Earthjustice).

The new preferred alternative was rejected by most of the entities that had criticized the

draft preferred alternative.  BLM received approximately 500 letters regarding the final EIS.  Ex.

56 at 42 (2006 ROD at 42).  Significantly, experts who had commented in opposition to

Alternative B did not consider the new preferred alternative an improvement.  EPA stated: "This

alternative presents additional environmental risks over the Preferred Alternative proposed in the

Draft EIS."  Ex. 53 at 1 (EPA FEIS comments).

The North Slope Borough also objected strenuously to the final EIS.  It criticized the

"previously unannounced Preferred Alternative that raises numerous new issues and if adopted,

would utterly fail to protect the internationally significant wildlife recourses and subsistence uses

of the Teshekpuk Lake Special Area . . . ."  Ex. 50 at 2 (NSB FEIS comments at 2).  The

Borough noted that the new alternative "represents a novel approach to management."  Id. at 7

(id. at 7).  Among the Borough's  primary concerns was the lack of protection for the Teshekpuk

Lake caribou herd.  The Borough noted that opening the area north of the lake with buffers

around the lakes could actually concentrate infrastructure on the limited higher ground used by

caribou.  Id. at 8-9 (id. at 8-9). Some similar objections were raised on behalf of local residents in

a letter submitted by Kuukpik Corporation, The Native Village of Nuiqsut, the City of Nuiqsut,

and the Kuukpikmuit Subsistence Oversight Panel.  Ex. 52 (Kuukpik, et al., letter).  Kuukpik

noted that since the preferred alternative first appeared in the final EIS, the document failed to

"incorporate feedback on the effectiveness of the Preferred Alternative."  Id. at 8 (id. at 7).

Despite these objections, Chad Calvert, Deputy Assistance Secretary for Land and

Minerals Management, signed a final record of decision (ROD) on January 11, 2006, adopting

the preferred alternative with only minor adjustments.  Id.

## ARGUMENT

This action challenges the decision to dramatically decrease protection to the Teshekpuk Lake Area as a violation of the National Petroleum Reserves Production Act, the National Environmental Policy Act, and the Endangered Species Act.  All of these claims are reviewable under the Administrative Procedure Act.  See Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 992 (9th Cir. 2004); Turtle Island Restoration Network v. NMFS, 340 F.3d 969, 973 (9th Cir. 2003).  "The agency's actions, findings, and conclusions will be set aside if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Klamath-Siskiyou Wildlands Ctr., 387 F.3d at 992 (citation omitted) (quoting 5 U.S.C. § 706(2)(A)). The Court's review under the APA "is 'narrow' but 'searching and careful.'" Gifford Pinchot Task Force v. United States Fish & Wildlife Serv. 378 F.3d 1059, 1065 (9th Cir. 2004) (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971))).

Plaintiffs have standing to challenge the decision to amend the Northeast EIS and plan. Members of Plaintiffs' organizations reside near, visit or otherwise use and enjoy the Northeast Planning Area and wildlife from the area for recreation, wildlife viewing, education, research, photography, or aesthetic and spiritual enjoyment.  See Exs. 61-79 (Member Declarations). Plaintiffs, accordingly, have advocated actively for conservation issues in the Reserve and have sought to educate members of the public about the extraordinary wilderness, wildlife, and other natural values of the Reserve.  Plaintiffs' members would be injured by oil development in the Reserve that diminished its wilderness or natural qualities, or harmed wildlife habitat and wildlife.  Plaintiffs have standing to bring this action, because they will suffer injuries in fact, traceable to the Defendants' actions, that would be redressed by a favorable decision of this Court setting aside the Defendants' arbitrary and unlawful actions.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).

I.     BLM'S DECISION IS ABITRARY AND CAPRICIOUS IN VIOLATION OF THE
       ADMINSTRATIVE PROCEDURE ACT BECAUSE IT FAILS TO RECONCILE ITS
       DUTY TO PROVIDE MAXIMUM PROTECTION TO THE OUTSTANDING
       RESOURCES OF THE SPECIAL AREA WITH ITS DECISION TO REDUCE
       PROTECTION.

       BLM has failed to explain its departure from the well-established practice of providing

significant protection to the caribou calving and goose molting habitat in the Teshekpuk Lake

Special Area.  Under the APA, this departure must be supported by a reasoned analysis.  Yet

nowhere in the record does BLM explain how this reversal still satisfies the maximum protection

standard of the NPRPA.

       When Congress transferred jurisdiction over the Reserve from the Navy to the

Department of Interior, it determined the unique wildlife and subsistence values in the area

deserved recognition and protection.  In recognition of the unique values in the Reserve, the Act

included a provision requiring maximum protection for the Utukok River and Teshekpuk Lake

areas, along with "other areas designated by the Secretary of the Interior containing any

significant subsistence, recreational, fish and wildlife, or historical or scenic value . . .."  42

U.S.C. § 6504(b). The Teshekpuk Lake Special Area was one of the first special areas the

Secretary formally designated in 1977.  See Ex. 1 at 4 (42 Fed. Reg. 28,720, 28,723 (June 3,

1977)).  Congress required that these areas be afforded "maximum protection . . . consistent with

the requirements of th[e] Act for the exploration of the reserve."  42 U.S.C. § 6504(b).  In the

leasing program undertaken by both the Reagan Administration in the 1980's and the 1998

Northeast Plan, sensitive areas of the Teshekpuk Lake Special Area were protected through no-

lease zones and strict no-surface occupancy restrictions.  See supra at 6-7.

       The decision here substantially reduces protection to the Teshekpuk Lake Special Area,

but BLM fails to explain how this dramatic switch in management comports with the

requirement that the Secretary provide "maximum protection" to the area.  An agency acts

arbitrarily and capriciously when it deviates from its prior position without an adequate

explanation.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42

(1983) (an agency reversing course must "supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.").  "A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress.  There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.'"  Id. at 41-42 (quoting Atchison, T. & S.F.R. Co. v. Wichita Bd. Of Trade, 412 U.S. 800, 807-08 (1973)).  Of course, an agency is not prohibited from changing its view of the proper course, but when it does so it must provide a reasoned analysis to support its change.  See State Farm, 463 U.S. at 57.

The final EIS clearly indicates that the new preferred alternative provides significantly less protection than the 1998 decision did.  For every resource considered, the final EIS comes to the conclusion that the preferred alternative would have greater impacts.  See, e.g., Ex. 42 at 219 (1 FEIS at 4-347) (vegetation); id. at 225 (id. at 4-361) (birds); id. at 232 (id. at 4-368) (caribou).  Indeed, for birds BLM concludes that impacts "would be 4 times greater than those" expected under the 1998 decision.  Id. at 225 (1 FEIS at 4-361).  Similarly, the final EIS acknowledged that the decision could effect caribou productivity and population numbers, concluding that impacts to caribou would be greater under BLM's preferred alternative than under the 1998 decision.  Id. at 232 (1 FEIS at 4-368). These impacts where amplified by other experts who believed the impacts of the preferred alternative would be even more dramatic than what BLM described.  See Ex. 23 at 3 (The Wildlife Society comments) (the EIS "grossly underestimates the potential impacts of the petroleum exploration and development to molting geese and the Teshekpuk Lake Caribou Herd.").

Not only is the alternative chosen a reduction of protection from the 1998 decision, it provides even less protection for key wildlife resources than the draft preferred alternative that was severely criticized by experts.  The new preferred alternative opens the entire area around Teshekpuk Lake that all the experts agreed needed protection from oil activities and which the

draft preferred alternative protected from leasing at least in part. As the EPA noted in response to the new preferred alternative, "[t]his alternative presents additional environmental risks over the Preferred Alternative proposed in the Draft EIS." Ex. 53 at 1 (EPA FEIS comments). The EIS itself acknowledges that BLM is taking risks with wildlife, stating that the "Preferred Alternative would likely increase the risk of disturbance to internationally significant populations of molting geese, particularly brant that use the Goose Molting Area when compared to alternatives A and B." Ex. 42 at 220 (1 FEIS at 4-356). The new preferred alternative also fails to increase protection for caribou. The EIS acknowledges that the new preferred alternative could have serious impacts to caribou, at least equivalent to those expected under Alternative B. Id. at 117 (1 FEIS at 2-140) ("effects to caribou would be similar to those for Alternative B").

Given these greatly increased impacts, BLM must explain how the reversal of its longstanding protection measures could be compatible with the maximum protection standard. This is particularly important here given that BLM acknowledges that it has reduced protection for the internationally-significant populations of migratory birds the special area was designated to protect. Yet BLM has done nothing more than assert that the amended leasing plan is consistent with the maximum protection standard because it contains stipulations and required operating procedures. See Ex. 56 at 30 (2006 ROD at 29). The record of decision and final EIS contain no analysis indicating how the various alternatives comport with this requirement and do not reveal how BLM arrived at the conclusion that its decision provides "maximum protection" to the Teshekpuk Lake Special Area. Chapter 4 of the EIS, the analysis of environmental effects, includes no mention of the maximum protection standard. It is not sufficient for BLM merely to recite that it has imposed mitigation measures. By using the phrase "maximum protection," Congress intended that resources be given as much protection as possible, not minimal or adequate protection. See Webster's Third New International Dictionary at 1396 (defining maximum as "greatest in quantity or highest in degree attainable or attained"). By contrast the

law applicable to the Reserve as a whole requires the Secretary to include "conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the reserve." 42 U.S.C. § 6506a(b).  Thus, in the Reserve as a whole BLM must mitigate adverse impacts, but in the Special Area, Congress required even more.  Yet, all BLM offers is a statement that it has imposed stipulations.  BLM does not explain why more protection was not possible, a flaw all the more significant because this decision scales back protections previously used in a successful leasing program.

In addition, Plaintiffs were unable to identify anything in the administrative record that indicates BLM focused on the duty to provide maximum protection and wrestled with its meaning in conjunction with the agency's decision to reduce drastically the wildlife protection measures.  To the contrary, the record indicates that BLM's biologist reviewed the preferred alternative and could not conclude that it even provides adequate protection, much less maximum protection.  See Ex. 35 at 1 (Yokel email to Childs re Preferred Alternative, 9/15/04) ("I'm not going to say this is adequate protection.").  This biologist noted that only 55% of high value brant molting habitat was protected under the new preferred alternative.  Id.

Without directly addressing its maximum protection obligation, but seeking to justify its change in position, BLM repeatedly asserts

> [s]ubsequent to the 1998 Northeast National Petroleum Reserve-Alaska IAP/EIS, the analyses in the 2003 Northwest National Petroleum Reserve IAP/EIS and the 2004 EIS on the Alpine Satellite Development Plan indicate that oil and gas leasing, exploration, development, and production activities with appropriate mitigation measure can occur in the National Petroleum Reserve-Alaska without significant impacts to wildlife.

See, e.g., Ex. 42 at 293 (2 FEIS at 6-150).  Even were it supported by the facts,[4] this statement does nothing to further BLM's duty to explain how its reversal conforms to the maximum protection standard.  Leasing in the Teshekpuk Lake Special Area was outside the scope of these documents.  These EISs do not consider how to provide maximum protection to the calving and insect-relief habitat critical to the Teshekpuk Lake caribou herd, nor do they consider how best to protect the internationally-significant goose molting habitat around Teshekpuk Lake.  Indeed, the FWS pointed out that previous experience with oil development in Prudhoe Bay does not provide an appropriate model for birds at Teshekpuk lake:  "[T]here is reason to believe that, for a variety of reasons, the huge concentrations of molting geese in the Teshekpuk Lake area would respond differently and perhaps be impacted to a greater degree than the much smaller concentrations of breeding geese in the existing oil fields."  Ex. 38 at 7 (Smith email to Lewis, 10/13/04).

Given the substantive duty to provide maximum protection to the unique resources of the Teshekpuk Lake Special Area, BLM's reversal of position here must be thoroughly explained.  BLM's failure to explain how this departure provides maximum protection renders the decision arbitrary.  See State Farm, 463 U.S. at 42.

---

[4]  These EISs do not support the proposition that oil development can occur without impacting wildlife.  For instance, in the 2003 Northwest EIS, BLM found

> Placement of gravel drilling pads, roads, airstrips, staging areas, and docks and the activities that take place on them, as well as construction of oil and gas pipelines will permanently disturb or destroy soil and vegetation; impound and disturb water; disturb, displace, or kill fish and wildlife; risk disturbing or destroying paleontological and cultural (archeological and historical) resources; and potentially adversely affect subsistence (by affecting species or impeding user access) and recreation.

Ex. 15 at 3 (1 2003 Northwest FEIS at II-17).

II.    THE FINAL AMENDED INTEGRATED ACTIVITY PLAN/ ENVIRONMENTAL
       IMPACT STATEMENT DOES NOT COMPLY WITH THE NATIONAL
       ENVIRONMENTAL POLICY ACT.

   A.    <u>The BLM Violated NEPA by Failing To Supplement the Draft EIS To Allow For
          Public and Agency Review of the New Preferred Alternative.</u>

   In the final EIS, the BLM proposed a novel approach to leasing in the sensitive

Teshekpuk Lake Special Area.  The BLM added a new Preferred Alternative, not disclosed in the

draft EIS, in which it proposed to lease more than 370,000 acres of the most important habitat in

the Reserve in seven large blocks based on an entirely new strategy of providing wildlife

protection by limiting the number of acres that could be disturbed by some development

activities.  <u>See</u> Ex. 42 at 22 (1 FEIS at 2-4).  The new Preferred Alternative was identified in the

final EIS as Alternative D and, with minor modifications, adopted by the BLM in the ROD.  Ex.

56 at 42 (2006 ROD at 41).  Alternative D is significantly different from the alternatives

evaluated in the draft EIS, and the BLM should have issued a supplemental draft EIS to allow for

meaningful public and agency comment on this novel approach.  By failing to do so and, instead,

discussing the new alternative for the first time in the final EIS, the BLM violated NEPA.

   "NEPA's public comment procedures are at the heart of the NEPA review process."  <u>Cal.

v. Block</u>, 690 F.2d 753, 770 (9th Cir. 1982).  They "reflect 'the paramount Congressional desire

to internalize opposing viewpoints into the decision-making process to ensure that an agency is

cognizant of all the environmental trade-offs that are implicit in a decision.'"  <u>Half Moon Bay

Fishermans' Mktg. Ass'n v. Carlucci</u>, 857 F.2d 505, 508 (9th Cir. 1988) (quoting <u>Block</u>, 690

F.2d at 771).  Public and outside agencies have the opportunity to comment on a proposed action

only when a draft EIS is circulated.  <u>Id.</u>  "No such right exists upon issuance of a final EIS."

<u>Block</u>, 690 F.2d at 771.  "Consequently, an agency's failure to disclose a proposed action before

the issuance of a final EIS defeats NEPA's goal of encouraging public participation in the

development of information <u>during</u> the decision making process."  <u>Half Moon Bay</u>, 857 F.2d at

508; <u>see also</u> <u>Block</u>, 690 F.2d at 771 ("By refusing to disclose its Proposed Action until after all

opportunity for comment has passed, an agency insulates its decision-making process from public scrutiny.  Such a result renders NEPA's procedures meaningless.").

To facilitate this important goal of public and agency participation, an agency "shall prepare" a supplemental EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns . . . ."  40 C.F.R. § 1502.9(c)(1).  "The use of the word 'shall' is mandatory, not precatory.  It creates a duty on the part of the agency to prepare a supplemental EIS if substantial changes from any of the proposed alternatives are made and the changes are relevant to environmental concerns."  Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1292 (1st Cir. 1996).  Therefore, an agency may not identify a new proposed action or Preferred Alternative in a final EIS without issuing a supplemental draft EIS unless:

> (1) "the alternative finally selected by [the agency] was within the range of alternatives the public could have reasonably anticipated [the agency] to be considering," and (2) . . . "the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform [the agency] meaningfully of the public's attitudes toward the chosen alternative."

Half Moon Bay, 857 F.2d at 508-09 (quoting Block, 690 F.2d at 772).  This test provides the agency "some flexibility to modify alternatives canvassed in the draft EIS to reflect public input ... without having to circulate a supplemental draft EIS describing the proposed action," id. at 508 (punctuation and citation omitted), but mandates a supplemental draft EIS when substantial changes are made in the proposed action.  Cf. Dubois, 102 F.3d at 1292 ("Thus, as explained by CEQ, an additional alternative that has not been disseminated previously in a draft EIS may be adopted in a final EIS, without further public comment, only if it is 'qualitatively within the spectrum of alternatives that were discussed' in the prior draft;  otherwise a supplemental draft is needed") (quoting Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981)).

In this case, the new Preferred Alternative differs substantially from the three alternatives evaluated in the draft EIS.  The new Preferred Alternative would open for leasing approximately

389,000 acres of sensitive wildlife habitat north of Teshekpuk Lake and rely on an entirely new approach that limits the footprint size of some facilities (pads but not pipelines) to reduce impacts to wildlife. Ex. 42 at 22, 73-75 (1 FEIS at 2-4, 2-96 to 2-98). It would allow leasing of approximately 370,000 acres of the most sensitive wildlife habitat in seven large blocks ranging in size from 46,000 to 59,000 acres. Id. at 22 (id. at 2-4); see also Ex. 3 (FWS Briefing Statement) (describing "most" sensitive habitat.). "To protect key surface resources and subsistence resources/activities," the new Preferred Alternative includes a lease stipulation restricting "surface disturbance," excluding pipeline construction, within each large lease tract to 300 acres. See id. at 34 (id. at 2-54). Moreover, for the first time, the alternative proposed deferral of leasing of Teshekpuk Lake itself to substitute for protecting the goose molting area around the lake. This new approach was not discussed in the draft EIS, and this new alternative could not reasonably have been anticipated. Indeed, it is an approach to leasing that BLM has never before implemented, or even considered.

There was no indication in the draft EIS that a new approach to leasing and protection would be implemented. Nor could one reasonably anticipate such an approach from the three alternatives evaluated in the draft EIS. Alternative A, the No Action Alternative, would continue management according to the 1998 ROD, leaving in place the stipulations and 589,000-acre no-lease area implemented by that decision. Ex. 18 at 9 (1 DEIS at 2-7, Table 2-1). The two action alternatives, B and C, would replace the 1998 stipulations with new performance-based stipulations and ROPs and open to leasing some of the area closed in the 1998 decision. Id. Alternative B, the original Preferred Alternative, would open 387,000 acres, while leaving closed 213,000 acres of extremely sensitive wildlife habitat north of Teshekpuk Lake. Id. Alternative C would open the entire planning area to leasing. Id. There is no indication in the draft EIS that any different approach would be used to lease any of the area made available under Alternatives

B or C.  Nor is there any suggestion that Teshekpuk Lake itself, rather than the area north of the lake would be closed to leasing.

The new leasing approach is a dramatic departure from previous leasing proposals.   The new seven large lease tracts cover approximately 372,000, or 96% of the 389,000 acres opened for leasing and not deferred under the new Preferred Alternative.  The new Preferred Alternative is a "different configuration of activities and locations" amounting to "substantial changes from the previously-discussed alternatives, not mere modifications 'within the spectrum' of those prior alternatives."  Dubois, 102 F.3d at 1292; see also Block, 690 F.2d at 772 (finding that a supplemental draft EIS was required when the agency changed the allocation of roadless areas in the national forest system among three categories); Ex. 34 (Craig email re NE sale, 9/10/04) (discussing "disturbing news" related to "large tract size," which "allow large companies to dominate an area" and reduce competition); Ex. 36 at 2 (Stuart Paulus Notes, 9/21/04) (showing that, after the draft EIS was issued, two alternatives were still being considered, one "similar," and one "very different").

In addition, instead of closing any of the goose molting area, the new preferred alterative substitutes a deferral of Teshekpuk Lake itself.  Though BLM may have thought this deferral of a similar amount of acreage to the goose molting area "could be played as a big concession,"  Ex. 22 at 2 (Craig email to Childs, 8/3/04), there is no indication that the Lake itself provides the valuable molting habitat found north of the Lake.  Ex. 42 at 135-38 (1 FEIS at 3-41 to 3-44) (describing waterfowl habitat).  Of course, it does nothing for caribou to defer leasing the Lake itself.  None of the alternatives in the draft EIS considered opening the core goose molting area and closing other areas—in particular Teshekpuk Lake—as a substitute.

By proposing the new Preferred Alternative in the final EIS without supplementing the draft EIS, BLM precluded meaningful public and agency review of the proposed leasing approach.  Comments on the draft EIS do not "apply to the chosen alternative and inform [the

agency] meaningfully of the public's attitudes toward the chosen alternative."  Half Moon Bay,
857 F.2d at 509 (quoting Block, 690 F.2d at 772).  Indeed, neither the public nor the cooperating
agencies had any indication that a new approach was being considered.  While public comments
may have given the agency some indication of the importance placed on the wildlife resources in
the area opened for leasing under the new Preferred Alternative, they did not, indeed, could not,
provide any input or critique on the proposal to protect key resources by authorizing large lease
tracts with surface disturbance limitations.  Similarly, the final EIS could not include comments
by the public and other agencies on the proposal to defer Teshekpuk Lake instead of any of the
goose molting or caribou calving habitat.

     The preclusion of public and agency participation is particularly egregious here, where
the agency has proposed a novel approach for protection of an area recognized internationally for
its wildlife and subsistence values and which Congress has demanded receive "maximum
protection."  See supra at 14-19.  Indeed, the 370,000 acres subject to the new leasing scheme
encompass some of the most important wildlife habitat in the Reserve and were closed to leasing
under both the 1998 decision and the original Preferred Alternative.  The record shows that the
new approach was developed, along with several others, after the draft EIS was issued and
without public input.  See Ex. 37 at 13-16 (BLM Briefing Presentation) (explaining four new
alternatives developed after the draft EIS was issued); Ex. 36 (Stuart Paulus Notes, 9/21/04)
(showing that, after the draft EIS was issued, two alternatives were still being considered, one
"similar," and one "very different").  Members of the public and local government entities
objected strongly during the statutorily mandated waiting period between issuance of the final
EIS and ROD.  See supra at 12.  The BLM, however, did not invite such comment, see Ex. 46
(Dear Reader Letter) (making no mention that comments could be submitted or would be
considered), and made no specific response to comments in its final decision.  See Ex. 56 (2006

ROD at 41) (stating that comments were considered and that most "did not contain any recommendations for technical improvements of the document").

NEPA requires more, particularly in this circumstance where a novel approach to leasing and protection was proposed for an area of such significance.  The BLM is not allowed to circumvent NEPA's comment requirements by developing a new approach to leasing such an important wildlife area without allowing for full public and agency participation.  It should be required to issue a supplemental draft EIS in order to consider and respond to comments on the new approach.

      B.    <u>The Final EIS Does Not Contain a Full Accounting of the Cumulative Impacts of the Decision.</u>

The final EIS violates NEPA by failing to analyze the full cumulative impacts of the plan to open the previously protected area around Teshekpuk Lake and reduce proscriptive stipulations.  In addition to the direct impacts of a proposed action, "NEPA always requires that an environmental analysis for a single project consider the cumulative impacts of that project together with 'past, present and reasonably foreseeable future actions.'"  <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 895 (9th Cir. 2002) (quoting 40 C.F.R. § 1508.7).  To fulfill NEPA's purposes, other actions must be analyzed as long as they are reasonably foreseeable. "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment.  Rather, it is designed to require such analysis as soon as it can reasonably be done." <u>Kern v. BLM</u>, 284 F.3d 1062, 1072 (9th Cir. 2002).

To conduct the cumulative impacts analysis, BLM must consider all past, present, and reasonably foreseeable future activities within the area.  One area of reasonably foreseeable future development is development within the Northwest Planning Area.  Ex. 42 at 253-54 (2 FEIS at 4-442 to 4-443).  The EIS indicates that production in the Northwest will include up to eight oil fields.  <u>Id.</u> at 254 (<u>id.</u> at 4-443).  This estimate, however, ignores the fact that

development in the Northeast facilitated by BLM's decision to open the Teshekpuk Lake area and reduce stipulations will lead to additional development in the adjacent Northwest planning area. BLM itself predicted this additional development in the Northwest EIS.

In the Northwest EIS, BLM stated that under the Northwest's preferred alternative "up to 40 percent of future development opportunities could be lost as a result of regulatory restrictions and mitigation measures. Of the 40 percent 'lost opportunity' estimate, 20 percent is attributed to the restrictive regulations in the adjacent Northeast Planning Areas." Ex. 15 at 8 (1 NW FEIS at IV-69).[5] BLM used these percent reductions in opportunity to estimate impacts by developing an estimate of the amount of recoverable oil—"full economic potential"—and reducing it by the lost opportunity. In the Northwest, BLM predicted full economic potential to be 2,100 million barrels (MMbbl) at $30 per barrel. Accordingly, after reducing this number by 40 percent, it predicted oil production under the alternative selected for the Northwest would total 1,260 MMbbl. Id. at 16. If the reduction is 20 percent instead of 40 percent, the development potential for the Northwest decision would be 1,680 MMbbl instead. This is more than what was predicted under Alternative A of the Northwest, the lease-it-all alternative.

---

[5] Plaintiffs were unable to locate this and other documents (Exs. 8, 9, 10, 12, 16, and 80) from the Northwest process in the record submitted by the Defendants. Because the Northwest decision and supporting documents were relied on by the agency in this decision, see, e.g., Ex. 42 at 293 (2 FEIS at 6-150), these documents were before the agency and are relevant to the decision here, they should clearly be part of the record. Portland Audubon Soc'y v. Endangered Species Comm., 984 F.2d 1534, 1548 (9th Cir. 1993) ("The 'whole record' includes everything that was before the agency pertaining to the merits of its decision."); Thompson v. Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989) ("The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." (quotations omitted). Plaintiffs request that the Court consider these documents as part of the record.

This increase in development could have potentially serious environmental consequences. BLM has acknowledged that the decision here may affect the Teshekpuk Lake caribou herd.  See Ex. 42 at  232 (1 FEIS at 4-368).   The Northwest EIS indicated that "If several lease sales were to occur under the Preferred Alternative, . . . [development] is expected to further impede movements of TLH caribou to insect-relief areas along the coast.  This effect . . . may reduce productivity of the TLH."  Ex. 15 at 17 (2 Northwest FEIS at V-136).  In the case of the threatened eiders, FWS opined that any development beyond that predicted at the time of the Northwest decision could present significant threats to the species.  Ex. 16 at 2, 5 (NW BiOp at C-2, C-8).

Nowhere in the Northeast Amendment final EIS does BLM even acknowledge that its decision to open the previously protected area and eliminate prescriptive stipulations will lead to greater development in the Northwest.  This is a critical flaw that leads to an incomplete picture of the cumulative impacts of the decision.  This shortcoming is all the more harmful here because BLM refused to consider the potential impacts of its plan to amend the Northeast plan when it prepared its analysis of the Northwest.  See Northern Center v. Norton, 361 F. Supp. 2d 1069, 1082 (D. Alaska 2005).

C.    The BLM Violated NEPA By Failing To Consider the Effects of Oil Development Alternatives In Combination With Global Climate Change.

The final EIS acknowledges that oil development activities may have significant impacts on important resources, such as caribou, polar bears, and birds, in the Northeast Planning Area. It also recognizes that global climate may dramatically alter important habitat and change the migration and feeding patterns of wildlife. The final EIS, however, does not put these two important categories of potential effects together to present a comprehensive evaluation of the effects of oil and gas development in a warming climate.  That failure obscures substantial, even

potential population-level effects and prevents the public and decision makers from accurately comparing the potential impacts of the four alternatives.

An EIS must "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1; see also Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004) (requiring a "thorough analysis of the potential environmental impacts"). In an EIS, "federal agencies [must] take a hard look at environmental consequences" before undertaking any major federal action. Natural Resources Def. Council v. United States Forest Serv., 421 F.3d 797, 811 (9th Cir. 2005) (internal quotations omitted). "A hard look includes 'considering all foreseeable direct and indirect impacts,'" Earth Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1159 (9th Cir. 2006) (quoting Idaho Sporting Cong. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002)), and "entail[s] both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." Id. at 1172. The EIS must not "improperly minimize negative side effects." Earth Island Inst., 442 F.3d at 1159.

Moreover, "the EIS's form, content and preparation [must] foster both informed decision-making and informed public participation." Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)). To that end, an EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. Thus, an EIS must compare the effects of taking no action to the effects that may occur if each alternative is taken. See, e.g., Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,027 (1981) ("[E]nvironmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward."). In that way, the public and decisionmaker may compare the likely outcomes and effects.

The final EIS does not meet this standard because it does not evaluate or compare the effects that oil development activities under the four alternatives will have in the context of a warming climate. The final EIS discloses that oil development may have effects on resources and includes brief discussions of global climate change. It does not, however, put the two together to allow the reader to compare the effects of oil development under each alternative in a warming environment. This gap in the analysis creates a very important deficiency in the final EIS. In combination, global climate change and oil development activities may have very significant, even potential population-level impacts to important resources, such as caribou, polar bears, and birds. See Ex. 59 at 8 (Schoen Expert Decl. ¶¶ 20, 21); Ex. 60 at 5 (Lentfer Expert Decl. ¶ 18); Ex. 45 (West, et al.).[6] The potential for these significant effects must be disclosed in the final EIS and must be presented in such a way that the reader and decisionmaker can compare the likelihood and scope of potential effects under the various alternatives. See, e.g., Kern v. BLM, 284 F.3d 1062, 1066 (9th Cir. 2002) (an agency must "consider every significant aspect of the environmental impact of a proposed action . . . [and] inform the public that it has

---

[6] These exhibits are not part of the administrative record in this case. The declarations of John Schoen and Jack Lentfer and the scientific article written by Cameron, et al. should be considered because they are "necessary to 'determine whether the agency has considered all relevant factors and has explained its decision.'" See Earth Island Inst., 442 F.3d at 1162 (quoting Southwest Ctr. for Biological Diversity v. United States Forest Serv., 100 F.3d 1443, 1450 (9th Cir.1996)). They also show that the agency "neglected to mention a serious environmental consequence . . . or otherwise swept stubborn problems or serious criticism under the rug." Nat'l Audubon Soc'y v. United States Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1994) (quotation omitted). These exhibits show that the BLM failed to compare the significant, population-level effects that may result from oil development activities under the four alternatives in a warming climate. They are intended not to prove that the effects they describe are certain to occur but, rather, to show that the potential impacts may be significant and should have been evaluated in the final EIS.

indeed considered environmental concerns in its decisionmaking process.") (internal quotation omitted).

Chapter 4 of the final EIS presents a description of the "environmental consequences" that might occur under each alternative. The comparison of effects for the alternatives is divided into a discussion of "applicable direct and indirect impacts" and a subsequent evaluation of "cumulative impacts." See Ex. 42 at 159 (1 FEIS at 4-9).

Each subchapter discusses the potential effects of oil development activities authorized under the alternative on resources such as vegetation, terrestrial and aquatic mammals, and birds. These sections assume that the climate is static and do not in any way account for or discuss the environmental changes that might occur as a result of a warming climate. Indeed, there is no mention of climate change in this analysis for any of the four alternatives.

In the discussions of potential effects to caribou under the four alternatives, for example, the final EIS describes disturbances that may be caused by vehicular and airplane traffic and development structures. See, e.g., id. at 206-08 (id. at 4-110 to 4-113) (No Action Alternative); Id. at 227-28 (id. at 4-363 to 4-364) (Alternative D). It also summarizes the effects that may be suffered by caribou if development were to occur in sensitive calving, migration, or insect relief areas. Id. at 227-28 (id. at 4-363 to 4-364). These effects are summarized in Table 2-2, which concludes that direct effects to caribou under the Preferred Alternative would be similar to Alternative B, less than Alternative C, and more than the No Action Alternative. Id. at 117 (id. at 2-140). Nowhere, however, does it describe how those effects may be magnified in a warming environment or how those combined effects would vary among alternatives.

Similarly, the final EIS states that seismic surveys could displace maternal polar bears and their cubs "leading to the abandonment of the den site and possible death of a small number of cubs." Id. at 214 to 215, 233 (id. at 4-119 to 4-120, 4-369. Denning polar bears also may be affected by the construction of pads or other facilities and may be "attracted to oil field camps by

food odors and curiosity," which could require that a small number of bears be shot in defense of human life and property.  Id. at 215, 233 (id. at 4-120, 4-369).  In addition, polar bears may be affected by offshore construction in the planning area.  Id. at 215 (id. at 4-120).

These sections make no mention of global climate change or its potential effects.  The discussion of direct and indirect effects does not account for the environmental changes that may result from a warming climate.

That is not to say, however, that the final EIS denies global climate change.  To the contrary, the final EIS acknowledges that a global warming trend is occurring.  The second section of the "description of the affected environment" includes a three-page explanation of global climate change and the effects it may have on the physical environment in the northern Arctic region.  See Ex. 42 at 131 to 133 (1 FEIS at 3-7 to 3-9).  These predicted effects include a reduction in sea ice, increased offshore exploration and development, the northward migration of woody trees, and the earlier thawing of rivers.  Id. at 132 to 133 (id. at 3-8 to 3-9).  The final EIS then acknowledges that these changes may have effects on "marine mammals (particularly polar bears), fish, and birds" and may push some Arctic species "toward extinction."  Id. at 133 (id. at 3-9).

The final EIS also presents some information about global warming in the cumulative impacts analysis for each resource group.  These discussions largely repeat the information presented at the beginning of the "affected environment" section but do provide some additional detail of the expected effects for each resource.  See, e.g., Ex. id. at 277 (2 FEIS at 4-518) (describing the effects global warming might have on terrestrial mammals); id. at 283 (id. at 4-524) (describing the potential effects on polar bears); see also id. at 255 to 256 (id. at 4-467 to 4-468) (discussing potential effects of global climate change).  In addition, after completion of the final EIS, the BLM prepared a Supplemental Information Report (SIR) in which it considered the

"effects of global climate change on polar bear habitat use and survival." Ex. 54 at 12-14 (SIR at 9-11).

The final EIS, however, never evaluates the potential effects of oil development activities discussed in the direct and indirect impacts sections in the context of the changes discussed in these global warming paragraphs. The closest that the final EIS comes to making this evaluation is to present a general conclusion that, for terrestrial mammals, such as caribou, global warming may cause the effects of oil development to "be exacerbated and extend beyond the life of the oil fields." Ex. 42 at 278 (2 FEIS at 4-519); id. at 118 (id. at 2-141); see also id. at 259 to 260 (id. at 4-494 to 4-495) ("Such impacts of climate change could accelerate or exacerbate changes in soil thermal regimes that occur with development potentially leading to greater impacts to vegetation from changes associated with thermokarst."), id. at 271 (id. at 4-512 ("[C]hanges in habitat structure associated with climate change would likely have a cumulative impact on bird populations.").

These statements are insufficient. They are just the sort of "perfunctory" analysis not allowed under NEPA. See Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846, 868 (9th Cir. 2005). There is no attempt to quantify the effects or allow the reader to compare the cumulative effects of the various alternatives. See Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1379 (9th Cir. 1998) (requiring "quantified or detailed information"). Nor does the final EIS acknowledge the significant risk of dramatic, population-level effects on wildlife such as caribou, polar bears, and birds or inform the reader that this risk is greatest under the alternatives that allow leasing in the areas north of Teshekpuk Lake. The failure to evaluate adequately the potentially significant effects of oil development activities in a warming climate violates NEPA. See Earth Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1172 (9th Cir. 2006) (finding that the Forest Service failed to take the "requisite 'hard look'" where FEISs did not adequately analyze probable tree mortality likely to produce adverse

effects on wildlife). The superficial statements in the cumulative impacts section do not satisfy the agency's obligation to evaluate potentially significant impacts.

Nor does the analysis in the Supplemental Information Report (SIR) help fill this gap. The SIR repeats the information from the final EIS related to the effects of global climate change on polar bears and provides some additional summary information. See Ex. 54 at 12-14 (SIR at 9-11). It then provides a description of the ways in which oil development activities and resulting carbon production may contribute to climate change. Id. at 13 (id. at 10). There is no discussion of the effects that oil development activities will have on polar bears in the context of a warming climate.

This analytic gap is significant. In combination, oil development and a warming environment may have dramatic effects on the resources in the Northeast Planning Area. Moreover, the four alternatives authorize different levels of activity in different locations around Teshekpuk Lake. Because some of those areas may become more important to wildlife as the climate changes, the combined effects may not simply be proportional to the acreage disturbed.

The significance of the analytic failure can be demonstrated by examining potential impacts that may result from the combination of oil development activities and a warming climate to species of particular concern in the Northeast Planning Area, such as caribou, polar bears, and brant. Caribou are highly dependent on particular types of habitat for forage, and the availability of those habitat types can affect the ability of the individual animals to reproduce. See Ex. 59 at 4 (Schoen Expert Decl. ¶ 10). In addition, in the area around Teshekpuk Lake, caribou use specific locations for insect relief and are required to migrate through narrow corridors north and west of the lake. See id. at 3-4 (id. ¶¶ 7-8); Ex. 42 at 140-41 (1 FEIS at 3-50 to 3-51); Ex. 7 at 2 (Audubon Report at II.1.2-1). Global climate change may reduce the availability and change the location of these habitat areas by causing the northward movement of woody vegetation, increased erosion, and more frequent freeze/thaw cycles. See Ex. 59 at 7

(Schoen Expert Decl. ¶¶ 16-18). Global warming also may increase the importance of insect-relief areas because warmer temperatures may lead to larger insect populations. Id. at 7-8 (id. ¶ 19).

Together with the acknowledged affects of oil development, the affects of global warming may cause dramatic impacts to caribou in the Northeast Planning Area. See id. at 8 (id. ¶ 21 ("The ability of the herd to move, seek insect relief, and feed will be reduced. At the same time, oil development activities will restrict access to calving grounds and insect relief areas. These factors could affect the physiological condition of the animals in the herd, resulting in lower reproduction and calf survival. The herd could potentially be displaced from the area north of the lake altogether."). Ultimately, the combination of oil development activities and climate change could cause caribou to abandon the area altogether or, at least, result in a population decline significant enough to prevent current levels of subsistence harvest. Id. at 9 (id. ¶ 23).

The combination of oil development and global climate change may cause similar significant effects to polar bears. See Ex. 60 at 3-6 (Lentfer Expert Decl. ¶¶ 4-19). Rising temperatures will cause sea ice to melt which, in turn, will result in polar bears spending more time on land and less on the sea ice. See id. at 3 (id. ¶ 8). Less sea ice also may reduce the availability of certain types of prey and scavenge for polar bears. These disturbances may result in lower survival and reproductive rates. See id. at 3-5 (id. at ¶¶ 4-15). If polar bears spend more time on land, interactions with oil development facilities and human activities also will increase. These increased interactions and disturbances may have significant effects on polar bears in the area around Teshekpuk Lake.

In addition, global climate change and oil development activities may combine to cause significant effects to birds, such as brant. Brant depend on very specific types of habitat for molting and breeding. See Ex. 45 at 5 (Ward, et al., at 873). These habitats are found north of

Teshekpuk Lake.  Id.  Global climate change may cause these habitat areas to move or shrink. As brant habitat changes, dramatic shifts in migratory patterns may result.  Id. at 876-77.  Human activities also may contribute to these population-level effects.  Id.  In combination, oil development activities and warming temperatures may cause large-scale changes in brant migratory patterns and use of the area around Teshekpuk Lake.

Caribou, polar bears, and brant are only examples of a broader analytic failure of the final EIS to evaluate the potentially significant effects of oil development activities in a warming environment.  This failure prevents the reader and decisionmakers from properly comparing alternatives because the potential for significant effects is not the same for all development alternatives and is not simply proportional to the amount of area disturbed under each alternative. The Preferred Alternative allows development in areas particularly important, for example, to caribou, polar bears, and birds, while those areas are off limits under the No Action Alternative and Alternative B.  As a result, the risk of significant population level effects to caribou and other animals particularly dependent on the area north of Teshekpuk Lake from the combined effects of global warming and oil development is likely much higher under the Preferred Alternative than under the No Action Alternative and Alternative B.  Yet, the final EIS fails to assess this significant issue and therefore violates NEPA.

D.     The Final EIS Does Not Contain the Site-Specific Analysis Necessary To Support a Leasing Decision.[7]

Under NEPA, an agency must analyze all of the environmental impacts of an action before approving it.  The scope of analysis, however, is dictated by the nature of the decision. See California v. Block, 690 F.2d 753, 761 (9th Cir. 1982).  When agencies make broad program-level decisions, they conduct a similarly broad NEPA analysis that considers the program as a whole; such environmental impact statements are called programmatic EISs.  In these cases, a broad analysis is appropriate because the program-level decision does not commit resources on the ground.  An action that commits resources on the ground must be accompanied by a site-specific EIS that analyzes the on-the-ground impact of the proposed activity.

Here, BLM relied on an approach to its NEPA obligations that has been soundly rejected by the Ninth Circuit.  In California v. Block, the Ninth Circuit held the requirement to conduct site-specific analysis is triggered when "the agency proposes to make an 'irreversible and irretrievable commitment of the availability of resources,' to a project at a particular site."  Id. (quoting Sierra Club v. Hathaway, 579 F.2d 1162, 1168 (9th Cir. 1978)).  Here, however, even though the leases BLM has decided to authorize represent an irretrievable commitment of resources, it has failed to prepare a site-specific EIS.

---

[7] The argument presented in this section is substantially similar to an argument rejected by this Court with respect to the EIS for oil and gas leasing in the Northwest Planning area of the Reserve. See Northern Alaska Envt'l Ctr. v. Norton, 361 F. Supp. 2d 1069 (D. Alaska 2005), appeal pending, No. 05-35085 (9th Cir.).  Plaintiffs restate this similar argument with respect to the EIS for the Northeast planning area amendment in the event the Ninth Circuit upholds the argument on appeal or this Court uses the opportunity presented by this case to re-consider its conclusions in the previous action.

1.    *The Leases at Issue Here Represent An Irretrievable Commitment of Resources Requiring Site-Specific Analysis Because the Lessee Is Given the Right To Develop Oil.*

By selling oil and gas leases, BLM is irretrievably committing resources to development. See Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1227 (9th Cir. 1988), cert. denied 489 U.S. 1066 (1989); Conner v. Burford, 848 F.2d 1441, 1450 (9th Cir. 1988); Sierra Club v. Peterson, 717 F.2d 1409, 1414 (D.C. Cir. 1983). BLM intends the EIS to support a decision to issue leases granting lessees the "right to drill for, mine, extract, remove and dispose of all the oil and gas (except helium) in the [leased] lands . . . together with the right to build and maintain necessary improvements thereupon for the term indicated . . .." Ex. 57 at 1 (BLM Lease Form at 1). Therefore, it must complete a site-specific analysis.

The Ninth Circuit has established that oil leases, such as those proposed here, that do not preclude surface occupancy represent an irreversible and irretrievable commitment of resources. See Bob Marshall Alliance, 852 F.2d at 1227; Conner v. Burford, 848 F.2d at 1449-1451. As the court found in Conner v. Burford, it is too late to perform site-specific NEPA analysis after the commitment has been made. 848 F.2d at 1449-50. BLM has already made the choice to give oil companies the right to develop oil. Although it may, when faced with a development proposal, impose reasonable mitigation measures, it may not prevent all development. The leases BLM intends to issue allow the lessee to develop resources and occupy the surface. The lease states the lessee shall "minimize [] adverse impacts" to environmental and cultural resources and that BLM may require "modification to siting or design of facilities, timing of operations" and specification of reclamation measures "[**t**]**o the extent consistent with ease rights granted**." Ex. 57 at 2 (BLM Lease Form at 2 (emphasis added)). Compare Burford, 848 F.2d at 1448-49 ("the mitigation stipulations in non-NSO leases permit reasonable regulation of surface disturbing activities to reduce their impact on the environment. These stipulations do not, however, preclude the lessees from engaging in surface-disturbing activities altogether."). The

Court in <u>Conner v. Burford</u> found nearly identical language in the leases in question there significant, stating it "limits government control over post-leasing activities to reasonable regulations which are consistent with oil and gas development and production."  848 F.2d at 1449-50 (quoting leases as providing restrictions limited to those "not inconsistent with the purposes for which this lease is issued").  Thus, "[f]uture decisions concerning these areas will be constrained by [the choice to issue leases]."  <u>California v. Block</u>, 690 F.2d 753, 762 (9th Cir. 1982).  "[T]he promise of site-specific EIS's in the future is meaningless if later analysis cannot consider . . . preservation as an alternative to development."  <u>Id.</u> at 763.

> **2.**    *The Final EIS Violates NEPA Because it Fails To Analyze Impacts on a Site-Specific Level.*

The final EIS does not contain the site-specific analysis required by NEPA before a commitment of resources can be made.  "NEPA requires 'a detailed statement,' sufficient 'to give decision makers . . . removed from the initial decision sufficient data from which to draw their own conclusions.'"  <u>Tenakee Springs v. Block</u>, 778 F.2d 1402, 1407 (9th Cir. 1985) (quoting 42 U.S.C. § 4332(2)(C); <u>Coalition for Canyon Pres. v. Bowers</u>, 632 F.2d 774, 782 (9th Cir. 1980)).

In the final EIS, instead of analyzing the potential site-specific effects of oil exploration and development on the areas where BLM proposes to sell leases, BLM has only analyzed a "general" "hypothetical" development scenario.  <u>See</u> Ex. 42 at 185 (1 FEIS at 4-39).  Not only does the general scenario fail to assess site-specific impacts on all the areas BLM proposes to lease, BLM fails to tie the scenario to any particular area, stating "there is no reliable way of predicting where or when new commercial fields would be discovered and developed."  <u>Id.</u> at 181 (<u>id.</u> at 4-35). The hypothetical scenario projects total levels of development, but does not look at any particular areas.  Thus, the final EIS contains <u>no</u> site-specific analysis of the effects of oil and gas exploration and development on the individual areas to be leased.  Instead, as the

record indicates "this is like [a] programmatic EIS." Ex. 13 at 4 (Stuart Paulus Notes, 9/26/03, at 4).

Here, this method of analysis is particularly unsuitable because of the unique resources present. In fact BLM acknowledges as much, stating "impacts to birds from development would likely be much greater than if estimates of impacts are based solely on size of the facility footprint." Ex. 42 at 267 (2 FEIS at 4-508). The attempt to equate number of acres disturbed to level of impacts leads to patently incorrect conclusions here. This is illustrated by the final EIS itself. BLM attempts to apply its methodology in the case of birds and comes to the conclusion that "the potential impacts to birds under the final Preferred Alternative would be less than under alternatives B and C . . .." Id. at 225 (1 FEIS 4-361); see id. at 115 (1 FEIS 2-138). Elsewhere in the EIS, however, BLM has to recognize that opening the entire goose molting area to leasing will have serious consequences, leading it to state "[t]he potential for . . . disturbances to impact birds may be greater under the final Preferred Alternative compared to Alternative B . . .." Id. at 224 (id. at 4-360). These contradictory statements leave the reader uncertain as to what BLM's conclusion is and highlight the unsatisfactory results caused by BLM's methodology.

Although this type of broad-brush analysis may be appropriate when the agency is making a programmatic decision, when an agency makes an irretrievable commitment of resources, the decision must be preceded by a site-specific analysis. See California v. Block, 690 F.2d at 761; Tenakee Springs, 778 F.2d at 1407. BLM does not have discretion to define the level of specificity of the analysis in its EIS if it intends to make a commitment of resources. See Tenakee Springs, 778 F.2d at 1407 (internal citations omitted). Thus, the agency cannot escape its duty to conduct site-specific analysis at the time of commitment by deciding to make commitments on a broad scale.

E.    <u>The Final EIS Fails To Analyze The New Mitigation Measures Adequately</u>.[8]

With no areas designated as no-lease zones, the Preferred Alternative BLM adopted for the Northwest Planning Area depends entirely on lease stipulations and required operating procedures (ROPs) to provide maximum protection to the Teshekpuk Lake Special Area and reduce impacts to wildlife, scenic areas, and subsistence resources. Thus, a hard look at the effectiveness of these mitigation measures was central to a full evaluation of this alternative. Yet, nowhere in the EIS does BLM provide any critical analysis of the basis for its chosen mitigation measures, or its assertion that they will adequately protect resources. This shortcoming is particularly troubling here where the agency has a substantive duty to provide protective mitigation measures.

Under NEPA, an agency must describe and analyze the effectiveness of proposed mitigation measures. <u>See</u> 40 C.F.R. § 1502.16(h) (stating an EIS "shall include discussions of ... [m]eans to mitigate adverse environmental impacts"). "The requirement that an EIS contain a detailed discussion of possible mitigation measures flows both from the language of the Act and, more expressly, from CEQ's implementing regulations." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 351 (1989). "Mitigation must 'be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" <u>Neighbors of Cuddy Mountain v. United States Forest Serv.</u>, 137 F.3d 1372, 1380 (9th Cir. 1998) (quoting <u>Carmel-By-the-Sea v. United States Dep't of Transp.</u>, 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting <u>Robertson</u>, 490 U.S. at 353)).

Here, BLM has an additional substantive duty to provide maximum protection to resources within the Teshekpuk Lake Special Area. <u>See</u> 42 U.S.C. § 6504(b). BLM rejected its

---

[8] This argument is substantially similar to one rejected by this Court in the case challenging the Northwest EIS, but is presented here for the reasons stated above. <u>See</u> <u>supra</u> n.7.

original approach to protecting resources in the Special Area in favor of a new approach, using drastically fewer stipulations and converting many stipulations from enforceable lease terms to discretionary required operating procedures, but provided no explanation of how it derived the new mitigation package. Under NEPA, BLM was required to fully analyze this new approach.

Indeed, although one of the purposes of this EIS was to consider a change in mitigation measures, BLM failed to analyze different approaches to the problem. BLM did not analyze an alternative that opened the previously protected area while keeping the more restrictive mitigation measures in place, nor did it analyze changing the mitigation measures while keeping the protected area off limits. All of the action alternatives contained the same package of mitigation measures. Thus, BLM had no comparative analysis of the mitigation measures. While Alternative A, the no action alternative, included the original prescriptive stipulations, this did not provide a useful tool for analysis because it did not include increased leasing in the special area. BLM itself discounted the value of Alternative A as a means of comparative analysis for the mitigation measures stating, "[e]valuating the performance based mitigation measures within an Alternative (A) that does not provide leasing in or around the most sensitive areas of this planning area is of little value in terms of assessing the effectiveness of mitigations." Ex. 42 at 288 (2 FEIS at 6-17).

Here, although BLM did include a chart in the EIS that summarizes mitigation measures and labels their effectiveness as low, moderate, or high, the EIS fails to explain how it arrived at these assessments. Indeed, record documents reveal uncertainty about the effectiveness of mitigation measures. Ex. 58 at 2 (Draft EIS section). As the EPA pointed out in its comments, the EIS fails to reveal the basis for the decisions BLM made on specific numerical requirements "such as set-back distances, buffer zone areas, dates, and aircraft altitudes." Ex. 33 at 6 (EPA DEIS detailed comments at 2). There is no analysis in the EIS of the scientific basis for the mitigation measures chosen or the choices made.

Indeed, in response to EPA's criticism of the lack of explanation for the basis of the mitigation measures, BLM did not point to any discussion of mitigation measures in the final EIS. Instead, BLM noted only that the stipulations were developed with the input of experts and based on available research. Ex. 42 at 296 (2 FEIS at 6-311). Thus, the agency tacitly acknowledges the final EIS fails to provide analysis supporting the mitigation measures. NEPA, of course, requires that BLM perform its analysis in an EIS that is subject to comment and circulated to the public and decision maker. Merely asserting it has based its decisions on undisclosed expert advice cannot fulfill BLM's obligations under NEPA.

III.    THE BIOLOGICAL OPINION FOR THE DECISION VIOLATES THE
        ENDANGERED SPECIES ACT

The Endangered Species Act imposes on federal agencies a strict substantive duty to insure its actions do not jeopardize the continued existence of a species, like the Steller's and spectacled eiders, listed as threatened or endangered under the Act. 16 U.S.C. § 1536(a)(2) (2000). To facilitate compliance with this strict substantive standard, the Act requires agencies whose actions may affect a listed species to engage in a consultation process with FWS, which results in a biological opinion from FWS indicating whether an action is likely to jeopardize the species. 16 U.S.C. § 1536(b)(3)(A). FWS is required to consider the entire agency action in its jeopardy determination. See Conner v. Burford, 848 F.2d 1441, 1458 (9th Cir. 1988). The biological opinion produced by the FWS and relied upon by BLM to support its decision fails to meet his standard.

A.    The Biological Opinion Fails to Consider All Impacts Resulting from the Action
      and Other Projects in the Reserve

The biological opinion prepared by the FWS for the Teshekpuk Lake amendment recognizes that the recently completed decision to lease nearly 8 million acres of land in the immediately adjacent Northwest Planning area of the Reserve is part of the baseline with which the decision to open lands surrounding Teshekpuk Lake to leasing must be considered. Yet, the

biological opinion fails to deal with a critical variable:  the relaxation of restrictions on

Teshekpuk Lake area development will result, by BLM's own projection, in more development

in the Northwest Planning Area as well.  This is likely to lead to significantly greater effects on

Steller's and spectacled eiders overall, but the biological opinion utterly fails even to address the

issue.  This violates the Endangered Species Act.

Regulations promulgated pursuant to the Endangered Species Act require FWS to include

"[a] detailed discussion of the effects of the action on listed species or critical habitat" in its

biological opinion.  50 C.F.R. § 402.14(h)(2).  The effects of the action include "the direct and

indirect effects of an action on the species or critical habitat, together with the effects of other

activities that are interrelated or interdependent with that action, that will be added to the

environmental baseline."  50 C.F.R. § 402.02.  The environmental baseline, in turn,

> includes the past and present impacts of all Federal, State, or private actions and
> other human activities in the action area, the anticipated impacts of all proposed
> Federal projects in the action area that have already undergone formal or early
> section 7 consultation, and the impact of State or private actions which are
> contemporaneous with the consultation in process.

50 C.F.R. § 402.02.  In other words, "all human activities that impact the listed species must be

considered in the environmental baseline."  Kandra v. United States, 145 F. Supp. 2d 1192, 1208

(D. Or. 2001).

To fulfill its obligations under these regulations, FWS must take into account other

federal actions in its analysis of the environmental baseline.  Defenders of Wildlife v. Babbitt,

130 F. Supp. 2d 121, 127 (D. D.C. 2001).  It must then analyze the effects of the action under

consideration "in conjunction with the impacts that constitute the baseline."  Id. at 127-28

(noting that it is not enough to simply recite the activities and impacts that constitute the baseline

while "addressing only the impacts of the particular agency action in isolation").  The biological

opinion is not adequate unless it includes "an analysis of the status of the environmental baseline

given the" relevant impacts, as well as "an analysis of the effects of the action on the species

when 'added to' the environmental baseline—in other words, an analysis of the <u>total</u> impact on the species." <u>Id.</u> at 128 (emphasis in original).

The biological opinion failed to analyze the effects of BLM's decision to open the Teshekpuk Lake area when added to the environmental baseline. The environmental baseline in this case, as BLM and FWS acknowledged, includes federal actions related to development in the Northwest Planning Area. <u>See</u> Ex. 44 at 21 (NE BiOp at 21). At the time of its Northwest leasing decision, BLM predicted a certain level of development in the Northwest Planning Area, but acknowledged that opening the adjacent Teshekpuk Lake area would lead to increased development. <u>See</u> <u>supra</u> at 24-26. This predicted increased development could be crucial to a complete analysis of the impacts of federal activities in the NPR-A on Steller's and spectacled eiders. When it completed the biological opinion for the Northwest lease decision, FWS recognized that any level of development in the Northwest greater than described in the hypothetical scenario could have significant adverse effects on the eiders. Ex. 16 at 2, 5 (NW BiOp at C-2, C-8). Moreover, in documents in the record FWS expressed concern about further development threatening jeopardy, even as to just one more field in the area. Ex. 8 at 1; Ex. 9 at 2-3; Ex. 10 at 3; Ex. 12; and Ex. 80. According to BLM's own analysis, when the current federal action, opening the Northeast to development, is added to the environmental baseline, a higher level of development is likely to occur.

A proper evaluation of the effects of the action, therefore, must include an analysis of the impacts of opening the Northeast when added to the impacts of the existing federal actions in the area. The biological opinion fails to even acknowledge much less analyze the fact that the decision to expand leasing in the Teshekpuk Lake area will lead to more development in the Northwest and more impacts on eiders. As a result, the biological opinion violates the requirements of the Endangered Species Act.

B.    <u>The Biological Opinion Fails To Consider Impacts of the Actual Decision</u>.[9]

The agencies attempted to resolve the problem of uncertainty about the extent and location of oil development by relying upon "assumptions" about oil development and a hypothetical development scenario.  <u>See</u> <u>supra</u> at 37.  While the biological opinion relies on the assumptions to reach its no jeopardy conclusion, the limits on development actually adopted by the BLM in the ROD are much less restrictive and could result in development substantially different in extent and location from that described in the hypothetical scenario.  Thus, the scope of the biological opinion is much narrower than the scope of the agency action.  This approach does not meet the requirements of the ESA.

FWS' reliance on the hypothetical scenario to reach its no jeopardy conclusion is a violation of the ESA because "biological opinions must be coextensive with the agency action." <u>See</u> <u>Conner</u>, 848 F.2d at 1458.  When the action is the sale of oil and gas leases, the scope of the action includes all activities that result from the leasing.  <u>See</u> <u>id.</u> at 1453 (explaining agency action includes activities of leasing through abandonment); <u>Mont. Wilderness Ass'n v. Fry</u>, 310 F. Supp. 2d 1127, 1149-50 (D. Mont. 2004).  FWS may not segment its analysis by stage, magnitude, or geographical extent of development, but instead must "look at all the possible ramifications" of the Secretary's decision.  <u>Conner</u>, 848 F.2d at 1453 (quoting <u>North Slope Borough v. Andrus</u>, 642 F.2d 589, 608 (D.C. Cir. 1980)).

This obligation to consider the potential effects of the entire action must be interpreted against the background of the ESA's demanding protection standard.  The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  <u>TVA v. Hill</u>, 437 U.S. 153, 180 (1978).  It "mandates affirmative preservation of

---

[9]  The argument presented in this section is substantially similar to an argument rejected by this Court with respect to a biological opinion for oil and gas leasing in the Northwest Planning area of the Reserve, but is presented here for the reasons stated above. <u>See</u> <u>supra</u> n.7.

endangered life," <u>North Slope Borough</u>, 642 F.2d at 607, and its terms and structure leave no doubt that "Congress intended endangered species to be afforded the highest of priorities." <u>TVA</u>, 437 U.S. at 174.  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." <u>Id.</u> at 184.  The ESA reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species," and "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." <u>Id.</u> at 185.

Consistent with this standard, the Ninth Circuit has held "incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion." <u>Conner</u>, 848 F.2d at 1454.  In the face of uncertainty, agencies "may be required to make projections, based on <u>potential</u> locations and levels [of] oil and gas activity, of the impact of production on protected species." <u>Id.</u>; <u>see id.</u> (stating FWS must assess "<u>potential</u> conflicts between development and the preservation of protected species.") (emphasis added).  <u>Conner</u>, citing to the First Circuit, makes clear that this assessment of potential impacts cannot be limited only to those activities the agency believes are most likely to occur.  <u>See id.</u>; <u>see also</u> <u>Roosevelt Campobello Int'l Park Comm'n v. EPA</u>, 684 F.2d 1041, 1053 n.9, 1055 (1st Cir. 1982) (ESA requires FWS to assess the likelihood of jeopardy even for outcomes that have a low chance of occurrence and determine "whether, after using the best data available, it is established that the risk [from the activity] is so small as to insure that there is no likelihood of jeopardizing the . . . endangered species.").  Rather, <u>Conner</u> explained the agency should assess potential, and not just likely, conflicts between development and the preservation of protected species in order to ensure the benefit of the doubt is given to the species.  <u>Conner</u>, 848 F.2d at 1454.

The biological opinion in this case fails to meet this demanding standard because it examines the potential effects to eiders only under a limited development scenario that BLM

believed to be likely, even though the Secretary's decision authorizes development that exceeds the parameters created by the assumptions.

The scenario assumes up to 12 fields (two central facilities with five connecting satellites each) will be developed, Ex. 44 at 6 (BiOp at 6), but the ROD does not in fact so limit the number of fields. For a portion of the area north of Teshekpuk Lake where BLM has established seven larger lease tracts, the ROD limits the "total development footprint" for pads and roads to three hundred acres per lease tract. Ex. 56 at 75 (2006 ROD at 74 (Stipulation K-11)). BLM estimates one central facility covers 100 acres and connecting satellites 10 acres each, so even with connecting roads, well more than the 12 fields assumed by the biological opinion could be developed in just the seven large tracts alone. See Ex. 42 at 175 (1 FEIS at 4-29). Moreover, outside these seven tracts there could be additional development with no acreage limits. Thus, the ROD is not coextensive with the biological opinion.

Not only is development beyond the hypothetical scenario possible, such development also poses a serious threat to listed eiders. FWS acknowledges this serious threat directly in the biological opinion:

> The potential for significant impacts is highest in/adjacent to the northeast portion of the NE Planning Area, because we believe a large proportion of the North Slope-breeding spectacled eiders nest within this area. If substantial development, beyond the levels identified in the BA, occurs within/adjacent to areas of high concentration for this species, the potential for significant impacts is high . . .. Because the effects of development on spectacled and Steller's eiders are inadequately studied and understood, we believe that the only certain way to avoid significant impacts is to exclude development from high-density nesting areas.

Ex. 44 at 3 (Biological Opinion at 3 (citation omitted)). In the record, FWS stated even more clearly that development in areas important for spectacled eiders, as permitted by the ROD, has the potential to cause "population level" impacts. Ex. 39 (BLM Memo to FWS requesting clarification 10/22/04); Ex. 40 (Zelanak Notes and Draft Response 11/15/04).

This does not mean FWS must assume development will occur on every acre.  As suggested by Conner, using the best scientific data available, 16 U.S.C. § 1536(a)(2), concerning the biology of the species, "the FWS could have determined whether post-leasing activities in particular areas were fundamentally incompatible with the continued existence of the species." Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988).  Indeed, here, as in Conner, "by recommending the exclusion of areas where leasing would conflict with the conservation of protected species, the FWS implicitly admitted that . . . development would be incompatible with the conservation of the species in some areas that can be identified before any agency action is taken."  Id.  If, in this manner, FWS were able to find that jeopardy could be avoided by protecting certain areas from development, FWS could have issued a no jeopardy opinion conditioned by a requirement that development would not occur in identified areas.  This option provides "a reasonable alternative approach for oil and gas leasing in the face of uncertainty." See Conner, 848 F.2d at 1451.  Indeed, FWS recognizes that the best way to avoid population level impacts is to exclude development from areas important to the species.  Ex. 39 (BLM Memo to FWS requesting clarification 10/22/04).

Thus, the biological opinion in this case presents an assessment of the threat of jeopardy only for a narrow scenario of future development that is not co-extensive with the actual decision authorizing much broader development, even though the FWS recognized some development authorized by the decision presented serious threats, potentially even a threat of jeopardy, to the listed species.  Under these circumstances, it was unlawful for the FWS to issue a no jeopardy opinion that so fundamentally failed to assess the actual risks of potential development as required by Conner.

IV.    BECAUSE THE DECISION IS ARBITRARY AND CAPRICIOUS IN VIOLATION
       OF THE APA, NPRPA, NEPA AND THE ENDANGERED SPECIES ACT, THE
       COURT SHOULD VACATE THE ROD AND ENJOIN ANY IMPLEMENTATION OF
       THE DECISION.

The normal remedy under the Administrative Procedure Act for an unlawful agency

action is to "vacate the agency's action and remand to the agency to act in compliance with its

statutory obligations."  Defenders of Wildlife v. EPA, 420 F.3d 946, 978 (9th Cir. 2005); see also

Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (where a plaintiff

"prevails on its APA claim, it is entitled to relief under that statute, which normally will be a

vacatur of the agency's order"); 5 U.S.C. § 706(2) (directing "reviewing court" to "hold unlawful

and set aside" arbitrary or unlawful agency action).  Because BLM's amendment to the 1998

decision is arbitrary and in violation of NEPA and the ESA, the Court should vacate it.

The Court should also enter an injunction prohibiting BLM from taking any actions to

implement the amendment, and in particular prohibiting BLM from conducting a lease sale under

the 2006 ROD, while it is remedying the legal defects.  The bases for injunctive relief are

irreparable injury and inadequacy of legal remedies.  Amoco Prod. Co. v. Village of Gambell,

480 U.S. 531, 542 (1987).  The Supreme Court has held that, once irreparable injury is shown to

be "sufficiently likely," "the balance of harms will usually favor the issuance of an injunction to

protect the environment."  Id. at 545.

Consistent with Amoco, the NEPA cases in which the Ninth Circuit has denied or limited

injunctive relief were those where the defendants presented "unusual circumstances," such as

"no NEPA policy would be served" by complete injunctive relief.  Cady v. Morton, 527 F.2d

786, 798 n.12 (9th Cir. 1975); accord, Am. Motorcyclist Ass'n v. Watt, 714 F.2d 962, 966 (9th

Cir. 1983) ("strong environmental considerations" counseled against enjoining land management

plan which restricted motorized access to a fragile desert); Alpine Lakes Prot. Soc'y v.

Schlapfer, 518 F.2d 1089, 1090 (9th Cir. 1975) (logging not enjoined because of danger of

spread of insect infestation).

Thus, once the plaintiffs have submitted evidence of irreparable harm, the burden is on the opponent of the injunction to show "unusual circumstances" that would justify action in violation of the law.  Forest Conservation Council v. United States Forest Service, 66 F.3d 1489, 1496 (9th Cir. 1995); Save the Yaak Comm. v. Block, 840 F.2d 714, 722 (9th Cir. 1988); Steamboaters v. Fed. Energy Regulatory Comm., 777 F.2d 1384, 1386 (9th Cir. 1985); Thomas v. Petersen, 753 F.2d 754, 764 (9th Cir. 1985); City of South Pasadena v. Slater, 56 F. Supp. 2d 1106, 1143 (C.D. Cal. 1999).

Allowing BLM to issue leases in the Teshekpuk Lake Special Area under the January 2006 ROD would irreparably injure plaintiffs.  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).  "If such injury is sufficiently likely, therefore, the balance of the harms will usually favor the issuance of an injunction to protect the environment."  Id.

> In the NEPA context, irreparable injury flows from a failure to evaluate the environmental impact of a major federal action.  The harm at stake when the government fails to comply with the NEPA procedures 'is a harm to the environment, but the harms consists of the added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.'

Natural Res. Def. Council v. Evans, 232 F. Supp. 2d 1003, 1052 (N.D. Cal. 2002) (internal citations omitted) (quoting Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989)).

When the Court finds a procedural violation of the ESA, the proper remedy is "an injunction of the project pending compliance with the ESA."  Washington Toxics Coalition v. EPA, 413 F.3d 1024, 1035 (9th Cir. 2005); Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987); Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985).   Congress has limited the courts' discretion over remedies for substantial procedural violations through its command that agencies must insure that their actions do not result in jeopardy to listed species.  Id.; see also Washington

Toxics Coalition, 413 F.3d at 1035.  Because neither FWS nor the BLM have complied with their duties under the ESA, an injunction is appropriate.

## CONCLUSION

For the abovementioned reasons, Plaintiffs request the Court enter summary judgment on all counts and enter appropriate legal and injunctive relief as requested.

Dated this 24th day of May, 2006.

Respectfully submitted,

 /s/ Deirdre McDonnell
Deirdre McDonnell (AK Bar # 0111082)
Layla Hughes (AK Bar # 0312094)
Eric P. Jorgensen (AK Bar # 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email:  dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, Alaska Wilderness League, Center for Biological Diversity, Natural Resources Defense Council, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2006, a copy of the PLAINTIFFS' OPENING BRIEF, with accompanying materials, was served electronically on:

**Dean K. Dunsmore**
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B. Street, Suite 504
Anchorage, AK 99501-3657

**Jeffrey W. Leppo**
**Laura J. Beveridge**
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101

**David C. Crosby**
DAVID C. CROSBY, P.C.
5280 Thane Road
Juneau, AK 99801-7717

**Ethan Falatko**
**Lawrence Z. Ostrovsky**
STATE OF ALASKA
Office of the Attorney General
P.O. Box 110300
Juneau, AK 99811-0300

 /s/ Deirdre McDonnell
Deirdre McDonnell

## TABLE OF EXHIBITS

| Exhibit No. | AR No. | Description |
| --- | --- | --- |
| 1 | | 42 Fed. Reg. 28,720 (June 3, 1977) (excerpts) |
| 2 | * | 1983 National Petroleum Reserve – Alaska Preferred Alternative Map (Feb. 1, 1983) (1983 FEIS Map) |
| 3 | 3 | U.S. Fish & Wildlife Service, Briefing Statement (June 13, 1997) |
| 4 | 11 | U.S. Fish & Wildlife Service, comments on the 1998 draft EIS (March 12, 1998) |
| 5 | * | Northeast National Petroleum Reserve – Alaska, Record of Decision (Oct. 1998) (1998 ROD) (excerpts)[*] |
| 6 | 21 | Geoff Carroll (Alaska Department of Fish & Game), scoping comments (Feb. 1, 2003) |
| 7 | * | Audubon Alaska, Alaska's Western Arctic, A Summary and Synthesis of Resources (December 2002) (Audubon Report) (excerpts) |
| 8 | NW | Ted Swem (FWS), Notes summarizing Northwest National Petroleum Reserve – Alaska Meeting (March 19, 2003) |
| 9 | NW | Bureau of Land Management – Fish & Wildlife Service Northwest National Petroleum Reserve – Alaska Meeting Notes (March 19, 2003) |
| 10 | NW | Ted Swem (FWS), Edits to Northwest National Petroleum Reserve – Alaska Comment Letter (March 28, 2003) |
| 11 | 28 | Notice of Intent to Amend the Northeast National Petroleum Reserve Alaska Integrated Activity Plan, 68 Fed. Reg. 37,173 (June 23, 2003) |

---

* The Administrative Record did not provide a number for documents identified with asterisks, however, they were listed on the Reference List provided along with Record.

NW. Exhibits identified with "NW" were part of the Administrative Record for the Northwest Planning Area. See Pls.' Opening Brief n.7.

*National Audubon Society, et al., v. Norton, et al.,*
1:05-cv-00008-JKS

| 12 | NW | Ted Swem (FWS), Notes from Northwest National Petroleum Reserve – Alaska Meeting (Sept. 9, 2003) |
| 13 | 80 | Stuart Paulus (ENSR), Notes regarding project kickoff (Sept. 26, 2003) |
| 14 | 188 | BLM scoping presentation (Oct. 7, 2003) (excerpts) |
| 15 | * | Northwest National Petroleum Reserve – Alaska Final Environmental Impact Statement (Nov. 2003) (NW FEIS) (excerpts) |
| 16 | NW | U.S. Fish & Wildlife Service, Biological Opinion for the Northwest National Petroleum Reserve - Alaska Final IAP/EIS (Jan. 6, 2004) (NW BiOp) (excerpts) |
| 17 | 3777 | Notice of Availability of the Draft Integrated Activity Plan/Environmental Impact Statement, 69 Fed. Reg. 32,365 (June 9, 2004) |
| 18 | * | National Petroleum Reserve – Alaska Draft Amended Environmental Impact Statement (June 2004) (DEIS) (excerpts) |
| 19 | 3892 | Pacific Flyway Council, comments on the draft EIS (July 2, 2004) |
| 20 | 4384 | Inupiat Community of the Arctic Slope, comments on the draft EIS (July 20, 2004) |
| 21 | 4270 | Ducks Unlimited, comments on the draft EIS (August 18, 2004) |
| 22 | 4136 | James Craig (MMS) email to Susan Childs (BLM) (Aug. 3, 2004) |
| 23 | 4288 | The Wildlife Society, comments on the draft EIS (Aug. 19, 2004) |
| 24 | 4334 | Alaska Wilderness League, et al., comments on the draft EIS (Aug. 20, 2004) |
| 25 | 4306 | Anadarko Petroleum Corporation, comments on the draft EIS (Aug. 20, 2004) (Anadarko comments) |
| 26 | 5011 | Alaska Eskimo Whaling Commission, comments on the draft EIS (Aug. 23, 2004) |
| 27 | 4352 | Conoco-Phillips, comments on the draft EIS (Aug. 23, 2004) (CPAI comments) |

| 28 | 4438 | National Audubon Society and National Wildlife Federation, comments on the draft EIS (Aug. 23, 2004) |
| 29 | 4357 | North Slope Borough, comments on the draft EIS (Aug. 23, 2004) |
| 30 | 4481 | Ornithologists, et al., comments on the draft EIS (Aug 23, 2004) |
| 31 | 4362 | U.S. Fish and Wildlife Service, comments on the draft EIS (Aug. 23, 2004) |
| 32 | 4379 | Kuukpik Corporation, et al., comments on the draft EIS (Aug. 24, 2004) |
| 33 | 4841 | Environmental Protection Agency, comments on the draft EIS (Sep. 9, 2004) |
| 34 | 4878 | James Craig (MMS) email re NE sale (Sep. 10, 2004) |
| 35 | 5030 | Dave Yokel (BLM) email to Susan Childs (BLM) re Preferred Alternative (Sep. 15, 2004) |
| 36 | 5248 | Stuart Paulus Notes (Sept. 21, 2004) |
| 37 | 5765 | Bureau of Land Management, Briefing regarding final EIS, October 2004 (excerpt) |
| 38 | 6090 | L. Smith (FWS) email to S. Lewis (FWS) (Oct. 13, 2004) |
| 39 | 6369 | Bureau of Land Management, Memo to FWS requesting clarification of DEIS comments (Oct. 22, 2004) |
| 40 | 6802 | Jim Zelanak (FWS), Meeting Notes and Draft Response regarding BLM's request for clarification (Nov. 15, 2004) |
| 41 | 7066 | U.S. Fish & Wildlife Service, Memo to BLM re. Request for clarification of DEIS comments (Nov. 23, 2004) |
| 42 | * | Northeast National Petroleum Reserve – Alaska Final Amended Integrated Activity Plan / Environmental Impact Statement (January 2005) (FEIS) (excerpt) |
| 43 | * | Endangered and Threatened Species Consultation and Biological Assessment, Northeast National Petroleum Reserve – Alaska Final Amended IAP/EIS Appendix D (January 2005) (Biological Assessment) |

| 44 | 8364 | U.S. Fish and Wildlife Service, Final Biological Opinion (Jan. 12, 2005) (BiOp) |
|----|------|--------------------------------------------------------------------------------|
| 45 | | Ward, et al., "North American Brandt: effects of changes in habitat and climate on population dynamics," Global Change Biology (Jan. 27, 2005) |
| 46 | 8330 | Dear Reader Letter to Northeast Plan Amendment Final Environmental Impact Statement (Jan. 28, 2005) |
| 47 | 8657 | Notice of Availability of the Final Integrated Activity Plan/Environmental Impact Statement, 70 Fed. Reg. 4140 (Jan. 28, 2005) |
| 48 | 8658 | Notice of Availability of the Final Integrated Activity Plan/Environmental Impact Statement, 70 Fed. Reg. 4119 (Jan. 28, 2005) |
| 49 | 8830 | Alaska Coalition, et al., letter to BLM (Feb. 18, 2005) |
| 50 | 8893 | North Slope Borough, comments on final EIS (Feb. 24, 2005) |
| 51 | 8897 | BLM letter to Earthjustice (Feb. 25, 2005) |
| 52 | 8958 | Kuukpik Corporation, et al., comments on final EIS (Feb. 28, 2005) |
| 53 | 8963 | Environmental Protection Agency, comments on final EIS (Mar. 2, 2005) |
| 54 | 9390 | Northeast National Petroleum Reserve – Alaska Amended IAP/EIS Supplemental Information Report (January 2006) (SIR) |
| 55 | 8898 | Alaska Wilderness League, et al., comments on the final EIS (Feb. 25, 2006) (excerpt) |
| 56 | 9413 | Record of Decision for the Northeast National Petroleum Reserve – Alaska Plan Amendment (Jan. 11, 2006) (2006 ROD) |
| 57 | | BLM Lease Form |
| 58 | 3333 | Effects on Sociocultural Systems, draft (Dec. 14, 2004) |
| 59 | | Expert Declaration of John W. Schoen (May 16, 2006) |
| 60 | | Expert Declaration of Jack Lentfer (May 22, 2006) |

61              Declaration of David van den Berg (Northern Alaska
                Environmental Center, NAEC)

62              Declaration of Stanley Senner

63              Declaration of Betsy Goll

64              Declaration of Cindy Shogan

65              Declaration of Charles Clusen

66              Declaration of Brendan Cummings

67              Declaration of Eleanor Huffines

68              Declaration of Gary Braasch

69              Declaration of Jeff Fair

70              Declaration of Merritt Helfferich

71              Declaration of Mimi Hogan

72              Declaration of Rachel James

73              Declaration of Jack Lentfer

74              Declaration of Debbie Miller

75              Declaration of Pamela A. Miller

76              Declaration of Paul Morley

77              Declaration of Richard Nelson

78              Declaration of John Schoen

79              Declaration of David van den Berg

80      NW      U.S. Fish and Wildlife Service, comments on the draft EIS for the
                Northwest Planning Area (Apr. 2, 2003)