Notes: Meeting/Conference Call With Service, MMS and BLM to Discuss Section 7 Consultation for NW NPR-A IAP/EIS

Date: 03/19/2003

Time: 9:00 am

Location: Fairbanks Fish and Wildlife Field Office / Phone Link

Attendees: Joel Hubbard (MMS), Fred King (MMS), Lisa Rotterdam (MMS), John Payne (BLM), Curt Wilson (BLM), Dave Yokel (BLM), Jonathan Priday (FWS), Ted Swem (FWS), Steve Lewis (FWS)

Points of Discussion:

1. Ted defined the incremental and phased consultation processes. Ted had questions concerning BLM's and MMS's role in the consultation. Curt Wilson explained that MMS is writing the IAP/EIS but BLM is the decision making agency. MMS may also provide technical support at meetings and public hearings.

2. Ted summed up the Service's progress in developing a Biological Opinion (BO) for the Northwest National Petroleum Reserve-Alaska (NW NPR-A) Integrated Activity Plan / Environmental Impact Statement (IAP/EIS). He explained that the Northeast NPR-A IAP is very different than the NW NPR-A IAP. The NW NPR-A IAP has much more liberal leasing stipulations, no likely deferrals and threatened eiders are much more concentrated (~70% of spectacled eiders and ~90% of Steller's eiders on the North Slope). Ted mentioned that the probability of "Jeopardy" is low because development would have to happen is areas of high eider concentrations. However, because BLM makes no assumptions about where production activity might occur and there are no lease deferrals in areas of high spectacled and Steller's concentrations, the Service cannot discount Jeopardy. He also mentioned that a previous lawsuit against the Service over failure to designate critical habitat on the North Slope signals probable litigation on any BO that does not include leasing deferrals within the "Barrow Triangle". Therefore, we should not be hasty in taking conservation options off the table and discounting adverse impacts to threatened eiders as a result of the action.

3. Ted and Jonathan make point that BLM/MMS's EIS is not an adequate substitute for a Biological Assessment. The document is unwieldy, eider information specific to the Planning Area is absent, activity information difficult to extract, and threatened species analysis does not consider several avenues of take. Service is very concerned about the uncertainty in the project description. The effects analysis did not quantify impacts to threatened eiders. Document repeatedly uses qualitative terms such as "moderate", "minimal" and "unlikely" to quantify impacts. Ted brought up commitment MMS, BLM and the Service made

last November to work with each other early in future consultation processes. Although this commitment was not made in time for development of the NW NPR-AIAP/EIS, the Service hopes that BLM and MMS will ask the Service for assistance in developing BAs for future projects. In particular the Service would like to help steer the development of the "effects analyses" so that our BOs will be easier to write and more defensible in court (better way of doing business).

4. In response to Ted's uneasiness with the uncertainty contained within the IAP/EIS, Curt Wilson said the likely Alternative chosen for the Record Of Decision (ROD) would be a mix between Alternative B and C. However, he could not offer the Service any assurances that Alternative A would not selected. John Payne mentioned that the preferred alternative would be available in 1 month and that maybe the Service could revisit the BO then. Curt Wilson interrupted John Payne and said that he is receiving significant pressure from his supervisor to finalize the ROD on time and that delaying the final BO is not an option. Ted mentions that he understands the pressure to get the BO out on time, but if the BO is developed using the current IAP/EIS's Alternative A, we are looking at either a "Jeopardy" call or a BO that is very vulnerable to litigation. Ted also emphasized that industry deserves to be able to lease and plan for development without having a Jeopardy dropped on them 10 years from now (very costly and unfair).

5. At the heart of Ted's concern with the uncertainty in the IAP/EIS surrounding potential development in NW NPR-A, is the high potential for recoverable oil and gas deposits within the "Barrow Triangle". He mentioned that the Barrow Triangle was nesting habitat for over 90% Alaska breeding population of Steller's eiders. Ted then made the case for lease deferrals within the "Barrow Triangle" for Steller's and deferrals in other areas for specs. Curt Wilson responded that any lease deferral areas would probably not be where there are high densities of threatened eiders. Fred King mentioned that of all places lease deferrals may be considered, the Barrow Triangle was the least likely and that lease deferrals for listed species were off the table. Ted responded that it may be possible to avoid a potential Jeopardy through designation of special areas within the lease sale area that would be subject to permit stipulations specifically targeted to reduce potential impacts to listed eiders. Ted then mentioned that these stipulations could easily be incorporated into the IAP/EIS as an amendment (one page memo). Curt Wilson responded to Ted's idea on additional stipulations wanting to know what measures the Service would propose. Ted admitted that he wasn't sure but that it would be a good idea if experts from MMS, BLM and FWS could meet ASAP hi order to develop these measures. Dave Yokel agreed that forming a working group was a good idea but he was concerned that BLM does not control the majority of the surface lands within the Barrow Triangle. John Payne asked Ted if a Habitat Conservation Plan was appropriate for split jurisdiction lands. A long discussion ensued about what authority BLM had over production on split-estate lands. Curt Wilson admitted that the IAP/EIS did not adequately address

the issue and that he would consult with BLM's lawyers and insert new information into the IAP/EIS.

6. Fred King and Curt Wilson agreed to commit their staff to work with the Service to devise potential protection measures for threatened eiders. Joel Hubbard, John Payne and Dave Yokel agreed to be members of the team. Because various members of the working group were unavailable to meet from 03/22 through 04/07, Ted mentioned that the group might have to meet this Friday (03/20/2003) if the Service has any chance of getting a final BO to BLM by the April 22, 2003 deadline. Ted promised that he would email Curt Wilson a list of meeting times ASAP. Ted went on to say that in order to save time the Service would distribute a list that outlined what avenues of take the Service would consider in the BO. Fred King responded that MMS would put together a document that combines all leasing/exploration/development assumptions together in an easy to read/analyze package.

7. After commitments to forming a working group were made by the three agencies, Dave Yokel mentioned that the Service should do an analysis where they put together a worse case scenario (Alternative A entirely in areas of high Steller's and spec, concentrations) and start taking development away in chunks until Jeopardy can be discounted. Ted responded by saying that with no limits on development, it is unlikely that stipulations would result in a non-Jeopardy determination. Ted then went on to request that BLM and MMS need to be assisting the Service in analyses required for a BO. He pointed out that this is BLM's consultation and they should take ownership for materials that are used to generating a BO.

8. All three agencies agreed to have their experts meet ASAP. Ted reemphasized that delay in getting the working group together could result in delays with the final BO. Ted promised to email Kurt Wilson ASAP with possible dates for a
   ■ meeting. Jonathan Priday committed to getting members of the working group a list outlining potential avenues of take by the end of the day. Ted said this list is very important in that it should help each member identify the areas of the IAP/EIS where levels of uncertainty need to be reduced. Ted finished the call by reminding the action agencies that their plans to modify the NE NPR-A LAP will require reinitiating formal consultation. As a result, it is likely that additional take of listed eiders will be added to the baseline sections of future BOs. He identified attempts at stripping out protections for the Teshekpuk Lake Special Area and changing the IAP's 76 permit stipulations as avenues for additional take of listed eiders. Curt Wilson said he was well aware of this and that he had been spending some time thinking about how it may impact the consultation on the NW Planning Area.

Section 7 Consultation Update on North-west NPR-A IAP/EIS
Conference Call at 9:00 am on Wednesday, March 19, 2003

I. Updates
   a. BLM/MMS
      i. Status of draft IAP/EIS
      ii. Comment period
      iii. What do comments received to date look like
   b. FWS
      i. Where we are in the consultation process
      ii. When do we envision delivering draft Biological Opinion (BO)

II. What the Service Is Consulting On (similar to NE NPR-A)
   a. Max. leasing/exploration/production scenario (Alternative A / 30$/bbl) i. Oil and gas leasing ii. Exploration/delineation iii. Future production/development scenarios (jeopardy analysis)

III. Service's Thinking on Jeopardy
   a. No jeopardy (extremely low densities of birds, sufficient habitat will still be available, oil spill is not reasonably expected to occur)

IV. Service's Thinking on Reasonable and Prudent Measures
   a. 4 total that deal with the following:
      i. Collisions to drill rigs and production infrastructure (power lines, towers, electrical lines, etc.) ii. Potential increases in subsistence hunting iii. Disturbance from oilfield infrastructure (includes production activities, mining etc.)
      iv. Potential increases is available food and/or nesting/denning habitat to predators

V. Service's Thinking on Terms and Conditions
   a. 5 total that require (still in early stages):
      i. Cooperating with Service to put together a lighting and/or marking regime to improve visibility of oil infrastructure to migrants ii. Generate annual report detailing the educational, regulatory, and enforcement actions taken to ensure that predators or scavengers are not given access to human food or refuse iii. Use current technology to prevent facilities from providing nesting, denning, or shelter sites for ravens, raptors, and foxes iv. Prohibit hunting of threatened eiders and the use of lead shot for waterfowl hunting by persons accessing the area using oil and gas facilities such as roads and runways

Exhibit 8, page 4 of 5

        v. Restrict all activity/disturbance within 200 meters of occupied spectacled or Steller's eider nests, from May 20 through August 1

VI. Service's Thinking on Conservation Recommendations (not yet developed)

VII. Additional Information Needed From Action Agencies (assistance)
    a. Analysis on impacts of potential exploration and development in marine, inter-tidal and estruine environments to threatened eiders in the Planning Area (need quantification, oil spill analysis focuses on terrestrial)
    b. Analysis of potential collision hazards to include power lines, phone lines, towers, drill rigs and production infrastructure (see Lease Sale 186 and Northstar BOs)
    c. Quantification of total habitat loss as a result of the action (The IAP/EIS says total disturbance footprint from production pads is less than 1500 acres. However, this does not consider the following:
        i. Maximum leasing/exploration/development scenario (Alternative A at 30$/bbl)
        ii. The IAP/EIS cites Alpine as a model production pad but Alpine has grown beyond estimate (estimates average pad with airstrip will be 100 acres but likely larger)
        iii. 200 meter buffer to infrastructure as used in NE NPR-A BO
        iv. Maximum road scenario
        v. Intra-NW NPR-A gravel mining
        vi. Maximum pipeline scenario
        vii. Expansion/construction of potential staging areas
    d. Analysis (quantification) of all potential aircraft flights and water craft support resulting from action over the 30 year life of production facilities
        i. Exploration/delineation support
        ii. Infrastructure construction
        iii. Production support/maintenance
        iv. Research (include non oil and gas related)
        v. Recreation

VIII. Requests for Future Analyses
    a. IAP/EIS's endangered species section needs to read like a Biological Assessment (BA) (will email CD-North BA generated by ABR Inc.)
    b. Qualitative words like minimal and moderate need to be defined
    c. All potential avenues of take need to be addressed
    d. Potential effects of the action need to be quantified (i.e.: acres of habitat destroyed, potential numbers of eiders impacted)
    e. Activity information pertaining to potential impacts to endangered species needs to be grouped together in a single chapter. Information in the NW-NPR-A IAP/EIS is very fragmented and finding/extrapolating necessary information to do an analysis is very labor intensive.