Deirdre McDonnell
Layla Hughes
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:     (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY,<br><br>      Plaintiffs,<br><br>      v.<br><br>P. LYNN SCARLETT, Acting Secretary of the Interior; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS, Regional Director, United States Fish and Wildlife Service; BUREAU OF LAND MANAGEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>      Defendants, and<br><br>CONOCOPHILLIPS ALASKA, INC., ANADARKO PETROLEUM CORPORATION, ARCTIC SLOPE REGIONAL CORPORATION, and STATE OF ALASKA,<br><br>      Intervenor-Defendants. | Case No. 1:05-cv-00008-JKS |

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 702-706; 42 U.S.C. § 4332; 16 U.S.C. § 1536; 42 U.S.C. §§ 6504(b), 6508)**

## NATURE OF THE CASE

1. This action arises from the Bureau of Land Management's (BLM) plan to open a vital wildlife area, previously protected from oil development, to leasing and to abandon previous mitigation measures. The Defendants' decision together with the Northeast National Petroleum Reserve-Alaska Final Amended Integrated Activity Plan / Environmental Impact Statement (January 2005) (FEIS) violates the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), the National Petroleum Reserve Production Act (NPRPA) and the Administrative Procedure Act (APA).

2. The FEIS does not constitute an adequate detailed statement addressing the impacts from and alternatives to oil and gas development in the Northeast portion of the National Petroleum Reserve-Alaska (hereinafter referred to as Northeast planning area) as required by NEPA. 42 U.S.C. § 4332(C); 40 C.F.R. § 1500 et seq.

3. The leasing decision also threatens to jeopardize the threatened Steller's and spectacled eiders in violation of the ESA, 16 U.S.C. § 1536(a)(2), because the Fish and Wildlife Service's biological opinion does not fully consider these impacts to the species of the activities authorized by the decision in violation of 16 U.S.C. § 1536(b).

4. The leasing decision violates the NPRPA, 42 U.S.C. §§ 6504(b), 6508, which require resources in the Teshekpuk Lake Special Area be provided maximum protection.

## JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02, 16 U.S.C. §1540(g)(1)(A), and 5 U.S.C. § 706. Plaintiffs have provided notice for an action under 16 U.S.C. § 1540(g)(1)(A) as required by 16 U.S.C. § 1540(g)(2)(A). Venue is appropriate under 28 U.S.C. § 1391(e).

**PLAINTIFFS**

3.  The National Audubon Society, founded in 1905, is a not-for-profit corporation organized under the laws of the State of New York, with its headquarters office in New York, New York, and a state office in Anchorage, Alaska. Audubon also has over 500 local chapters around the country, including six chapters in Alaska. Audubon's mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity. Audubon has about 500,000 members nationwide, including approximately 2,100 members in Alaska. Audubon has been actively involved in advocating for protection of the biological resources in the Western Arctic.

4.  Alaska Wilderness League is a non-profit organization with approximately 10,000 members and activists. It was founded in 1993 to advocate for protection of Alaska's public lands that are threatened with environmental degradation. Since its inception, it has taken an active role on issues related to oil and gas development in Alaska.

5.  The Center for Biological Diversity is a non-profit organization based in Tucson, Arizona. It works to protect wild places and their inhabitants. It believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. It has been actively involved in protecting Alaska's wildlife since the early 1990s, including various efforts to protect wildlife found in the National Petroleum Reserve—Alaska (Reserve) and its adjoining marine environment. These efforts include working on critical habitat designation for the spectacled and Steller's eiders and a variety of work to protect the endangered bowhead whale. It has approximately 17,000 members some of whom live in Alaska.

6. Natural Resources Defense Council is a non-profit environmental membership organization with more than 550,000 members throughout the United States. It has had a longstanding and active interest in the protection of the environment in Alaska's Arctic, including the wildlife and wilderness values of the Reserve. With its nationwide membership and a staff of lawyers, scientists, and other environmental specialists, it plays a leading role in a diverse range of land and wildlife management and resource development issues.

7. Northern Alaska Environmental Center is an Alaska non-profit environmental advocacy and educational organization with approximately 1,300 members. It has empowered citizens to take an active role in protecting natural habitats and wild places in arctic and interior Alaska since 1971. It advocates for Arctic wilderness, wildlife, and traditional ways-of-life, transportation and infrastructure alternatives that minimize impacts on wild lands, and clean water and wild rivers to protect health, fish, and recreational opportunities. It has been actively involved in efforts to protect the key values of the Reserve from the threats of oil and gas development.

8. Sierra Club is a national non-profit organization having approximately 750,000 members dedicated to the exploration, enjoyment, and preservation of the scenic and natural resources of the United States, including Alaska. Approximately 2,000 Sierra Club members live in Alaska. The Sierra Club works towards educating and enlisting the public to protect and restore the quality of the natural environment. The Sierra Club's interests encompass a wide range of environmental issues, including wildlife conservation, public lands and waters, endangered species, clean water and clean air. The Sierra Club has long been active in issues relating to the impacts of oil and gas leasing and development in America's Arctic, including the Reserve.

9. The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic. It has approximately 200,000 members nationwide, 675 of whom live in Alaska, and has had a longstanding involvement with the issues surrounding the impacts of oil and gas development on public lands, including lands across Alaska's Arctic and within the Reserve.

10. Members of the Plaintiff groups reside near, visit or otherwise use and enjoy the Northeast planning area for recreation, wildlife viewing, education, research, photography, or aesthetic and spiritual enjoyment, or enjoy or otherwise use migratory wildlife from the Northeast planning area. The oil and gas leasing activities proposed for the Northeast planning area will directly and irreparably injure these interests.

11. The Defendants' unlawful actions adversely affect each plaintiff's organizational interests and its members' use and enjoyment of the public lands in and resources of the Northeast planning area. The oil and gas leasing activities proposed for the Northeast planning area will directly and irreparably injure these interests.

12. Plaintiffs submitted comments to BLM on the draft EIS and final EIS for the Northeast planning area. Each of the plaintiff groups monitors the use of public lands and compliance with the law respecting these lands, educates its members and the public concerning the management of these lands, and advocates policies and practices that protect the natural value and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the

Plaintiffs will be directly and irreparably injured by Defendants' violations of law as described in this complaint.

## DEFENDANTS

13.     Defendant P. Lynn Scarlett is sued in her official capacity as Acting Secretary of the Department of the Interior.

14.     Defendant Henri Bisson is sued in his official capacity as the Bureau of Land Management State Director for Alaska.

15.     Defendant Tom Melius is sued in his official capacity as the Regional Director of the United States Fish and Wildlife Service.

16.     Defendants Bureau of Land Management (BLM) and the United States Department of the Interior are agencies of the United States entrusted with the conservation and management of resources within the Northeast planning area.

17.     Defendant Fish and Wildlife Service is an agency of the United States Department of Interior charged with implementation of the Endangered Species Act for listed species in the Northeast planning area.

## BACKGROUND

**The Planning Area**

18.     The Reserve covers 23.5 million acres of public land on Alaska's North Slope, making it the largest single unit of unprotected public land in the nation. The Reserve stretches from the Colville River delta in the east to the Chukchi Sea in the west and from the Arctic Ocean in the north to the Brooks Range in the south. Several communities with primarily Alaska Native residents are inside the Reserve's borders. The Reserve has high values for many species of fish and wildlife, including Alaska's largest caribou herd, large carnivores, marine mammals,

millions of migratory birds, and one of the densest populations of nesting birds of prey in the world.

19. The Northeast planning area consists of 4.6 million acres, including most of the Tesehekpuk Lake Special Area and portions of the Coville River Special Area.

20. The Teshekpuk Lake Special Area encompasses approximately 1.7 million acres. The prominent feature of the special area is Tesehkpuk Lake, the largest and deepest lake in Alaska north of the Brooks Range, and its associated wetlands. Tesehkpuk Lake, along with many smaller lakes and adjacent wetlands, comprise the most productive, diverse, and sensitive wetlands ecosystem in the American Arctic, and one of the most important in the circumpolar Arctic.

21. The Teshekpuk Lake watershed provides nesting habitat for many migratory waterfowl species, including northern pintails, long-tailed ducks, king eiders, brant, greater white-fronted geese, tundra swans, and three species of loons -- Pacific, red-throated and yellow-billed. The Teshekpuk Lake Special Area provides essential molting habitat for significant populations of migratory brant, greater white-fronted geese and Canada geese. Spectacled and Steller's eiders, both listed as threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq*., have relatively high nesting densities in areas around Teshekpuk Lake.

22. The Teshekpuk Lake area also encompasses the calving grounds for the 45,000 animal Teshekpuk Lake Caribou Herd and provides important insect-relief habitat for this herd. This caribou herd is an important food resource for local Alaska Native families.

23. The Teshekpuk Lake area is valuable to subsistence fishermen and caribou hunters. The area is used year round for subsistence and contains numerous camps and cabins.

**National Petroleum Reserve-Alaska History**

24. In 1923, President Warren G. Harding set aside 23.5 million acres in northern Alaska as the Naval Petroleum Reserve Numbered 4, to be administered by the Navy as an assured future oil supply for defense purposes.

25. In 1976, President Gerald Ford signed the Naval Petroleum Reserves Production Act (NPRPA). Pub. L. 94-258, 90 Stat. 303 (1976). Among other things, the NPRPA transferred jurisdiction over Naval Petroleum Reserve Numbered 4 from the Secretary of the Navy to the Secretary of the Interior and renamed it the National Petroleum Reserve-Alaska. In making the transfer, Congress expressly recognized that the protection of the unique natural, fish and wildlife, scenic and historical values of the Reserve would better be evaluated and managed under the authority of the Secretary of the Interior. The NPRPA expressly prohibits production of petroleum from the Reserve or development leading to production of petroleum unless authorized by Congress. 42 U.S.C. § 6504.

26. While the NPRPA prohibited oil and gas production of the Reserve without additional Congressional authorization, it did permit exploration.

27. The NPRPA requires that exploration activities conducted within the Utukok River and Teshekpuk Lake areas and any other area designated by the Secretary of the Interior as containing "any significant subsistence, recreational, fish and wildlife, or historical or scenic value" be conducted in a manner which assures "maximum protection" of these surface values. 42 U.S.C. § 6504(b).

28. In 1977, the Secretary of the Interior adopted regulations for management and protection of the Reserve. The regulations indicate that surface values of the Reserve may be

protected by limiting, restricting, or prohibiting the use of and access to lands within the Reserve, including "Special Areas." 43 C.F.R. § 2361.1(e)(1).

29. In 1977, the Secretary of the Interior designated the Utukok River Uplands, Teshekpuk Lake and the Colville River as Special Areas within the Reserve. 42 Fed. Reg. 28,723 (1977).

30. In passing the NPRPA, Congress recognized that "The northeastern coastal plain area [of the Reserve] is considered to be the best waterfowl nesting area on the North Slope" of Alaska. H. R. Rep. No. 94-81, Part 1, p. 8 (to accompany H. R. 49) (March 18 and April 22, 1975).

31. In 1980, Congress passed an appropriations bill for fiscal year 1981 that, among other things, included a provision directing the Secretary of the Interior to carry out "an expeditious program" of oil and gas leasing in the Reserve. 42 U.S.C. § 6508. Pursuant to this appropriations rider, the Secretary undertook a leasing program. BLM completed the program in 1983. All leases issued under this program have expired, and no oil field was developed as a result of it.

32. In 1997, in response to renewed oil industry interest in the Reserve and to a request from Alaska's Governor Tony Knowles, BLM undertook an analysis to determine whether to conduct oil and gas lease sales in the 4.6 million acre area located in the northeast corner of the Reserve.

33. This analysis resulted in a final EIS that was published and made available on August 7, 1998. 63 Fed. Reg. 42,431. The preferred alternative proposed opening 87% of the 4.6 million acre northeast planning area to oil and gas leasing. Under the preferred alternative, a 589,000-acre portion of the Teshekpuk Lake Special Area was made unavailable for leasing.

Further area around this no-lease zone was made available to leasing, but surface uses were prohibited.

34. On October 7, 1998, Secretary of Interior Bruce Babbitt issued a final record of decision (hereinafter the 1998 plan) adopting the preferred alternative presented in the final EIS with minor changes.

35. This decision is the subject of an ongoing legal challenge by several conservation organizations. The Wilderness Society v. Norton, No. 98-2395 (D.D.C. filed Oct. 5, 1998).

36. The Secretary has since conducted three lease sales and winter exploration has been proceeding in portions of the leased area. BLM has recently approved development on some of these leases in the Northeast area.

**The Northeast Amendment Process**

37. On June 23, 2003, BLM officially began a new NEPA process for the Northeast planning area by publishing a notice in the Federal Register announcing its intent to amend the Northeast plan. The announcement stated that "[i]nformation gained since the completion of the Northeast plan has led the BLM to conclude that it is appropriate to consider amending it . . . ." The notice stated that the goals of the amendment were to consider leasing additional areas and to consider abandoning the stipulations of the Northeast plan, which BLM described as "inappropriately or needlessly restrictive," in favor of performance based standards. 68 Fed. Reg. 37,173, 37,174 (June 23, 2003).

38. BLM published a notice of availability for its draft EIS on June 9, 2004. 69 Fed. Reg 32,365 (June 9, 2004).

39. In the draft EIS, BLM considered three alternatives. Alternative A, the "no action" alternative would have kept the 1998 ROD in place. Alternative B was identified as the agency's preferred alternative. Alternative C made the entire planning area available to leasing.

40. Alternative B made much of the previously protected area around Teshekpuk Lake available to leasing, opening an additional 387,000 acres to leasing, but maintaining a 213,000 acre no-lease zone in a portion of the area northeast of the lake providing important goose molting habitat.

41. The draft EIS's alternatives B and C contained the same set of mitigation measures, which eliminated many of the stipulations contained in the 1998 plan and converted others from stipulations to "required operating procedures" (ROPs)

42. Plaintiffs commented on the draft EIS, urging BLM to consider alternatives that would provide more protection than the 1998 plan to resources, rather than opening new areas to leasing.

43. BLM received a wide array of comments, most opposing the preferred alternative. BLM received comments in opposition to the preferred alternative, most of which endorsed the no action alternative, from a variety of agencies and entities, including Ducks Unlimited, the Pacific Flyway Council, the Wildlife Management Institute, nearly 200 ornithologists and other wildlife and environmental scientists, the Eskimo Whaling Commission, Kuukpik Corporation, the North Slope Borough, and the Inupiat Community of the Arctic Slope. There were over 200,000 members of the public who submitted comments, the vast majority in opposition to the plan to open additional areas to leasing.

44. The United States Fish and Wildlife Service's (FWS) comments stated that there is no new evidence that would indicate oil development could occur in the Teshekpuk Lake area

with less impact to wildlife than previously expected. FWS stated "Due to the continuing importance of the TLSA to molting geese, other waterbirds, caribou and subsistence users, and the lack of any new information regarding the likelihood of impacts or the ability to mitigate them, the Service believes avoiding surface disturbance in this biologically sensitive area, as presented in the No Action Alternative, would provide the greatest level of protection (and least risk) to wildlife, and is our preferred management approach."

45. The United States Environmental Protection Agency (EPA) submitted comments on the draft EIS, stating the agency "has concluded that the Preferred Alternative would likely result in significant adverse environmental impacts to important fish and wildlife resources and in particular to critical waterfowl habitat, caribou calving and insect-relief areas, and caribou migration corridors in the Teshekpuk Lake Special Area." EPA also noted "the stipulations and required operating procedures (ROPs) proposed for the Preferred Alternative do not adequately ensure protection of surface resources and subsistence use in the Planning Area."

46. EPA recommended that BLM not open additional acreage to leasing at this time. Instead, EPA suggested that BLM develop a new alternative that would propose modifications to the mitigation measures without opening additional areas to leasing.

47. On January 28, 2005, BLM published a notice of availability in the Federal Register for the final EIS. 70 Fed. Reg. 4119.

48. The final EIS considered four alternatives—alternatives A, B and C from the draft and a new preferred alternative, Alternative D. The new preferred alternative made the entire area around Teshekpuk Lake available for leasing. The only area not immediately made available for leasing was the subsurface land under Teshekpuk Lake itself, which was deferred for ten years.

49. In Alternative D, BLM created a different approach not considered in the draft with the purported purpose of increasing oil access while providing adequate protection for fish and wildlife. It provided that the area north of the lake would be divided into seven large lease tracts and provided that the maximum area to be covered by some permanent oil facilities may not exceed 300 acres on each tract. Pipelines would not be counted towards this limit on development.

50. In the area north of the lake, Alternative D would apply a stipulation that purports to preclude surface occupancy in certain small areas around lakes identified as important habitat for molting geese. These areas, however, would be open to exploration, and construction of permanent pipelines.

51. Similarly, areas south and southeast of Teshekpuk Lake would be addressed by a stipulation under Alternative D that purports to limit surface occupancy but allows pipelines and public roads.

52. A four-mile corridor east of Teshekpuk Lake toward the Kogru Inlet would be leased, subject to a stipulation that would prohibit all permanent facilities, but would allow exploration.

53. The final EIS analyzed the effects of the preferred alternatives and the other alternatives based on a hypothetical development scenario. BLM used the scenario to predict the amount of development it projected would occur under the alternatives and based its assessment of impacts on the number of acres that would be disturbed.

54. The development scenario was derived from an assumption about the price of oil and the amount of oil that is likely to be extracted at that price. This assumption is based on an oil and gas resources assessment conducted by BLM and MMS in 2002.

55.     The final EIS addresses climate change generally in the cumulative impacts section, but does not assess climate change as part of the comparative analysis of alternatives.

**The Biological Opinion**

56.     Because the Northeast planning area contains habitat of the Steller's and spectacled eiders, both of which are listed as threatened under the ESA, BLM requested Fish and Wildlife Service consultation on the plan.

57.     Steller's and spectacled eiders breed in the Northeast planning area. The area north and east of Teshekpuk Lake is particularly important to spectacled eiders, as it contains one of the highest concentrations of breeding pairs in the Arctic Coastal Plain.

58.     On January 12, 2005, the Fish and Wildlife Service issued a final biological opinion. The biological opinion was based on a hypothetical development scenario presented in BLM's Biological Assessment that assumed two anchor fields with five satellite fields tied into each of the anchor fields would be developed in the high oil potential area and that this development would be "roadless."

59.     The opinion analyzed the effects of the hypothetical development scenario and reached a conclusion of no jeopardy. The Fish and Wildlife Service, however, noted that it was difficult to assess the impacts on eiders because of the large degree of uncertainty involved and that development beyond that described in the hypothetical scenario created a high potential for significant impacts to eiders. The Fish and Wildlife Service also noted that the "most certain way to avoid significant impacts is to exclude development from high-density nesting areas."

60.     On January 11, 2006, Chad Calvert, Deputy Assistance Secretary for Land and Minerals Management signed a final record of decision (ROD). The ROD adopted the preferred alternative from the final EIS with minor adjustments.

## TIMING OF SUIT

61. The 1980 appropriations act calling for "an expeditious program" of oil and gas leasing in the Reserve required that challenges to the adequacy of an EIS for activities authorized by the appropriations act be brought within 60 days after publication of the availability of the final EIS in the Federal Register. 42 U.S.C. § 6508. Though Plaintiffs believe this requirement does not apply to the final EIS for oil and gas leasing in the Northeast planning area, this action was nevertheless filed within 60 days of January 28, 2005, the date notice of availability of the final EIS was published in the Federal Register, in order to preserve Plaintiffs' claims under NEPA.

## COUNT I (NEPA)

62. Paragraphs 1 through 61 are re-alleged and incorporated by reference.

63. NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

64. An EIS must include "a detailed statement" that analyzes the direct, indirect and cumulative impacts to the environment of the proposed action along with reasonable alternatives to the proposed action. 42 U.S.C. § 4332(C); 43 C.F.R. § 1500, *et seq.*

65. The final EIS proposes to open critical wildlife areas in the Northeast planning area to oil leasing without revealing the full impacts of the decision to sensitive areas. The final EIS understates the impacts to resources likely to be caused by the preferred alternative, provides a misleading comparison to the other alternatives, and fails to divulge fully the impacts of the decision on sensitive wildlife, such as birds.

66. The final EIS fails to analyze the impacts of the alternatives in the context of a changing climate.

67. The final EIS does not analyze the decision actually made—to authorize development leases on the entire planning area—instead, it only analyzes the effects of a general hypothetical development scenario. It does not analyze the extent to which different local geographic areas are differently affected by disturbance or development.

68. The final EIS does not analyze all of the activities that are permissible under the ROD. For instance, while the decision removes prior prohibitions against exploration in some areas outside of the winter season, it does not analyze the effects of such exploration.

69. The cumulative impacts section of the EIS fails to take into account increased development in the Northwest planning area that will be facilitated by development in the Northeast under the preferred alternative and does not reveal the full extent of cumulative impacts to the resources of the Reserve.

70. The final EIS fails to consider adequately impacts from and alternatives to proposed oil and gas leasing and development activities in the Northeast planning area.

71. Alternative D relies heavily on untested mitigation measures to provide protection to resources, but the EIS fails to explain the basis for the mitigation measures, fails to analyze their effectiveness, fails to cite scientific evidence in support of these mitigation measures and fails to analyze alternative mitigation measures.

72. The final EIS presents for the first time an alternative adopting an entirely new approach to attempting to protect wildlife relying on large lease tracts with limits for total area covered by some facilities. This new alternative was not within the range of alternative the public could have anticipated BLM to be considering and the comments on the draft do not also apply to the chosen alternative.

73. Defendants' failure to provide an adequate analysis of direct, indirect and cumulative impacts from and reasonable alternatives to proposed oil and gas leasing and development activities in the Northeast planning area violates NEPA and is arbitrary, capricious and not in accordance with law. *See* 42 U.S.C. § 4332; 40 C.F.R. § 1500, *et seq.*; 5 U.S.C. § 706(2)(A).

## COUNT II (ESA)

74. Paragraphs 1 through 73 are re-alleged and incorporated by reference.

75. Pursuant to Section 7 of the ESA, 16 U.S.C. § 1536, each federal agency undertaking an action which might adversely affect a threatened or endangered species must consult with either the Fish and Wildlife Service or the National Marine Fisheries Service to insure that its action is not likely to jeopardize the continued existence of that species.

76. The decision here may affect the spectacled and Steller's eiders, which are listed as threatened under the ESA. Accordingly, BLM was required to consult with the Fish and Wildlife Service.

77. Consultations under the ESA result in biological opinions, in which the consulting agency, here the Fish and Wildlife Service, must adequately address whether jeopardy to the species is likely. 16 U.S.C. § 1536(b).

78. In assessing the potential for jeopardy to the species, including from incidental take of the species, the Fish and Wildlife Service's biological opinion does not consider the full impacts of the action on the eiders, including the potential for the oil leases actually authorized, rather than merely a narrowly construed hypothetical scenario, to jeopardize the Steller's and spectacled eiders and the effects of opening the Northeast planning area to development on predicted levels of development and eider impact in the adjacent Northwest planning area.

79. The Fish and Wildlife Service's biological opinion on the Steller's and spectacled eider is arbitrary and capricious in violation of the Endangered Species Act, 16 U.S.C. § 1536(b) and the APA, 5 U.S.C. §§ 702, 706.

80. The Bureau of Land Management's decision to open the Northeast planning area to development in reliance on the FWS biological opinion was arbitrary and capricious in violation of the Endangered Species Act, 16 U.S.C. §§ 1536(b), 1536(a)(2) and the APA, 5 U.S.C. §§ 702, 706.

### COUNT III (NATIONAL PETROLEUM RESERVE PRODUCTION ACT)

81. Paragraphs 1 through 79 are re-alleged and incorporated by reference.

82. The National Petroleum Reserve Production Act, 42 U.S.C. §§ 6504(b), 6508, requires the Secretary of Interior to provide "maximum protection" to wildlife and subsistence resources in designated special areas.

83. The ROD dramatically decreases protection for the Teshekpuk Lake Special Area compared to the 1998 plan.

84. The ROD and final EIS fail to provide a rational explanation for how this decision is consistent with the duty to provide maximum protection to special areas.

85. Defendants failure to analyze and explain this decision violates their duty under the NPRPA and is arbitrary and capricious and otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully request that the Court:

1. Declare that Defendants have violated NEPA, the ESA, and the NPRPA and that the actions as set forth above are arbitrary, capricious and not in accordance with law;

2. Enter appropriate injunctive relief to ensure that the Defendants comply with NEPA, the ESA and the NPRPA and to prevent irreparable harm to the Plaintiffs and to the environment until such compliance occurs;

3. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and the Endangered Species Act, 16 U.S.C. §1540(g)(4); and

4. Grant such other relief as the Court deems just and proper.

Dated this 24th day of May, 2006.

Respectfully submitted,

 /s/ Deirdre McDonnell
Deirdre McDonnell (AK Bar # 0111082)
Layla Hughes (AK Bar # 0312094)
Eric P. Jorgensen (AK Bar # 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, Alaska Wilderness League, Center for Biological Diversity, Natural Resources Defense Council, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society*

## CERTIFICATE OF SERVICE

I, Deirdre McDonnell, hereby certify that on May 24, 2006, a copy of the SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF was served electronically on:

**Dean K. Dunsmore**
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B. Street, Suite 504
Anchorage, Alaska 99501-3657


**David C. Crosby**
DAVID C. CROSBY, P.C.
5280 Thane Road
Juneau, Alaska 99801-7717

**Ethan Falatko**
**Lawrence Z. Ostrovsky**
STATE OF ALASKA
Office of the Attorney General
P.O. Box 110300
Juneau, Alaska 99811-0300

**Jeff Leppo**
**Laura J. Beveridge**
STOEL RIVES LLP
600 University Street
Suite 3600
Seattle, WA 98101


  /s/ Deirdre McDonnell
  Deirdre McDonnell