Alaska Center for the Environment * Alaska Coalition * Alaska Wilderness League
Campaign for America's Wilderness * Center for Biological Diversity
Natural Resources Defense Council * Northern Alaska Environmental Center* Sierra Club
The Wilderness Society * U.S. PIRG * World Wildlife Fund

August 20, 2004

NPR-A Planning Team
Bureau of Land Management, Alaska State Office
222 West 7th Avenue
Anchorage, AK 99513-7599

*via fax and mail*

RE: Comments on the Draft Amended Integrated Activity Plan and Environmental Impact Statement for the Northeast Planning Area of the National Petroleum Reserve-Alaska.

Alaska Center for the Environment, Alaska Coalition, Alaska Wilderness League, Campaign for America's Wilderness, Center for Biological Diversity, Natural Resources Defense Council, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, U.S. PIRG and World Wildlife Fund submit the following comments on the Draft Amended Integrated Activity Plan and Environmental Impact Statement (draft IAP/EIS) for the Northeast Planning Area of the National Petroleum Reserve- Alaska (NPRA or Reserve) prepared by the U.S. Department of the Interior (Interior) Bureau of Land Management (BLM), and released for public review June 9, 2004.

The ecological integrity of the North Slope is at serious risk from poorly planned, piecemeal and damaging development**.** The National Academy of Sciences National Research Council March 2003 report *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope* confirms that oil and gas drilling has had profound impacts on the region's environment. Those effects stretch far beyond the immediate footprint of the industrial complex itself, and are having lasting cumulative impacts on the land, water, people and wildlife of America's Arctic. In the slow-healing arctic environment, some of the changes to the landscape may persist for centuries.

Our organizations seek effective protection for the nationally and internationally recognized wildlife habitats, wild rivers, cultural resources and wilderness found in the Reserve. The most biologically rich and recognized wildlife and wilderness values of the region are not permanently protected. A balanced approach to the management of these natural resources is needed to protect the most sensitive areas and cultures**.**

**I. SUMMARY OF KEY CONCERNS AND RECOMMENDATIONS**

Upon review of the above referenced draft IAP/EIS, we have found egregious failings in the planning process, analysis and proposed agency action. The preferred alternative is an extraordinary reversal devoid of scientific rationale that places the wildlife, fish and subsistence resources of the Teshekpuk Lake Surface Protection Area at significant risk. As written, the draft IAP/EIS needlessly violates the law and the agency's trust responsibility.

- The draft IAP/EIS fails to demonstrate that oil and gas development in the Teshekpuk Lake Surface Protection Area is warranted or permissible. BLM states that it is undertaking this NEPA process to fulfill the mandates of the President's energy policy, to meet its obligations under various federal laws, and to meet the country's energy needs. None of those statutes or proposals demonstrates a need to place the most sensitive biological and cultural resource values in the Northeast Planning Area at risk. Indeed, the proposed action violates BLM's obligations under the statutes governing management of the Reserve to protect the diverse biological and cultural values of the Reserve, including the obligation to provide maximum protection within the Teshekpuk Lake Special Area.

- BLM has impermissibly rejected consideration of reasonable alternatives as required by NEPA. None of the draft IAP/EIS alternatives provide adequate and appropriate protection for the unique cultural, natural, fish and wildlife, scenic and historical values as expressly required by Congress in the National Petroleum Reserve Production Act of 1976. At a minimum, BLM must consider alternatives B and C from the 1998 Northeast IAP/EIS as well as an alternative that includes permanent protection for the Teshekpuk Lake Special Area, Colville River Special Area and other biological hot spots in the Northeast Planning Area. These alternatives are more consistent with the purpose of fulfilling BLM's management responsibilities and responding to Congressional and Presidential directives than the alternatives BLM included in the draft IAP/EIS.

- The evaluation of potential impacts from oil development activities in the draft IAP/EIS is based upon a series of proposed development scenarios that are incomplete and unrealistic when evaluated in the context of existing development in the region. As a result, the nature and extent of potential direct, indirect and cumulative impacts are significantly understated. While BLM has acknowledged the proposed actions for the Northeast Planning Area are of a level of significance to warrant a full NEPA review, BLM has failed to address the NEPA requirements for such an analysis in this document. A generic discussion of resources and potential impacts like that contained in the draft IAP/EIS cannot suffice as the required site-specific analysis.

- The draft IAP/EIS fails to identify adequately the sources relied upon. An EIS "shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24. Throughout the Environmental Consequences chapter, the draft IAP/EIS reaches conclusions asserting no, negligible, minor or insignificant impacts to resources without identifying the sources relied upon for the particular conclusions it reaches. This violates 40 C.F.R. § 1502.24. It is not enough that an EIS contain a Bibliography. The text of the EIS must direct the reader to the sources in the Bibliography upon which the EIS relies in analyzing impacts and reaching conclusions about them.

- In a radical departure from the 1998 Northeast ROD, the proposed stipulations for mitigating impacts from oil and gas development are harmfully insufficient to protect surface resources and value. The draft IAP/EIS fails to evaluate the effectiveness of the proposed mitigation measures and fails to provide scientific rationale for weakening the stipulations from the 1998 Northeast ROD. Merely listing the mitigation measures is insufficient to qualify as reasoned discussion required by NEPA.

In the five years since the release of the 1998 IAP/EIS and ROD, we have accumulated additional information and analyses that require BLM to be more restrictive and protective in the Northeast Planning Area, not less. Despite the growing environmental and social concerns documented in The National Academy of Sciences National Research Council report *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*, millions of additional acres have been made available to the oil and gas industry on the North Slope without any additional environmental protections.

If BLM intends to proceed with this amendment process, the agency must complete a revised IAP/EIS to correct the legal and scientific inadequacies outlined above and in the original 1998 IAP/EIS. In a revised IAP/EIS, a management alternative must be selected that provides adequate protection to the ecological, wildlife, subsistence, cultural and wilderness resource of the Northeast Planning Area and the public must be given an opportunity to comment on that alternative. A more balanced, science based approach to energy development and environmental protection would enhance resource protection from the 1998 ROD and at a *minimum* do the following in the Northeast Planning Area:

Permanently protect the Teshekpuk Lake Special Area, Colville River Special Area and other biological hot spots
Protect the North Slope and Yukon Kuskokwim Delta communities' subsistence resources
Strengthen monitoring and lease stipulation requirements

## II. FAILURE TO COMPLY WITH LAWS GOVERNING MANAGEMENT OF THE RESERVE

### A. NO AUTHORITY FOR PROPOSED ACTION

BLM cites the President's energy policy, the Naval Petroleum Reserves Production Act (NPRPA), 42 U.S.C. § 6501, et seq., the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701, et seq., as the primary sources of authority for leasing in the draft Amended IAP/EIS. None of those statutes or proposals, however, provide authority or adequate justification for the action proposed by BLM in the draft IAP/EIS.

The National Petroleum Reserve Production Act does not direct BLM to pursue an aggressive leasing and exploration in the absence of adequate information and analysis. In fact, the 1980 appropriations rider calling for "an expeditious program of competitive leasing of oil and gas," 42 U.S.C. § 6508, does not authorize leasing at this time. Rather, it authorized only the lease sales in the early 1980s, and those leases have expired. As explained in the briefing associated with the plaintiffs' summary judgment on Count I of the First Amended Complaint (incorporated herein by reference) filed in *The Wilderness Society v. Norton*, No. 98-2395 (RWR) (D.C. D.C.), the Secretary of the Interior lacks authority to lease lands in the Reserve for oil and gas activities.

### B. PROPOSED ACTION FAILS TO PROVIDE MANDATED PROTECTION FOR THE MULTIPLE RESOURCE VALUES OF TH E RESERVE

**National Petroleum Reserve Production Act (NPRPA)**

Even if the 1980 appropriations rider did provide authority for continued leasing, it would not justify the extreme approach currently being undertaken by BLM. In the National Petroleum Reserve Production Act of 1976, Congress expressly recognized that the unique cultural, natural, fish and wildlife, scenic and historical values of the Reserve should be protected, and therefore transferred jurisdiction of the Reserve from the Secretary of the Navy to Secretary of the Interior. The National Petroleum Reserve Production Act directed the Interior Secretary to designate the Teshekpuk Lake, Utukok River Uplands, Colville River (and other areas yet to be determined) as Special Areas. Congress further directed the Interior Secretary to "assure maximum protection" for the subsistence, recreational, fish, wildlife, historical, and scenic values of the Special Areas (42 U.S.C. §§ 6502-03).

In 1998, the Final Environmental Impact Statement and Record of Decision (ROD)for oil and gas leasing in the Northeast Planning Area further recognized the unique values of the TLSA by designating the Teshekpuk Lake Surface Protection Area (TLSPA) which protected fish and wildlife habitats within an area 857,860 acres in size. This included a 588,998 acre no-lease area and a southern band of 268,861 acres with no-surface activity. In so doing, the Secretary determined that such measures were necessary to meet the maximum protection obligation of the NPRPA. "The decisions in this ROD provide the maximum protection for the significant the subsistence, recreational, fish, wildlife, historical, and scenic values of these Special Areas consistent with the requirements of the NPRPA for exploration of the Reserve" (1988 ROD at 14).

By proposing to remove 75% of the Teshekpuk Lake Surface Protection Area in the draft IAP/EIS Preferred Alternative, BLM is in clear violation of this legislative mandate. There is no new scientific information or rationale to justify this complete reversal from the1998 Northeast ROD. Leasing the entirety of the Arctic Coast without a careful analysis of the impacts and without permanently protecting key areas is unwise and inconsistent with the statute.

**Federal Land Management Policy Act (FLPMA)**

Further, BLM is obligated to manage the public lands consistent with the concept of multiple use. The definition of multiple use (43 U.S.C. § 1702(c)) obligates BLM to prioritize the national public interest in our public lands in terms of both current and long-term needs. These needs (and uses) are both market and non-market based. BLM must consider the "relative" value of resources and cannot authorize a particular use based purely on the contribution of that use to the economy. All management is bounded by the mandate to prevent "permanent impairment of the productivity of the land and the quality of the

environment." Under this provision, once a use runs its course, the land must be reclaimed to its original baseline health and integrity.

The counterpart provision to multiple use is sustained yield (43 U.S.C. § 1702(h)). It requires BLM to emphasize the long-term management potential of our public lands to satisfy the needs of both current *and* future generations. Needs are satisfied only to the extent that they do not permanently impair the productivity of the land or quality of the environment. Resources that may become more valuable as time passes include wilderness, wildlife habitat, and watershed protection.

The unnecessary or undue degradation provision (43 U.S.C. § 1732(b)) reads:

> In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

The impacts of an action are *unnecessary* if the BLM could avoid harm to the land or the environment, or if the BLM's actions are ill-advised (for example, the costs outweigh the benefits, the resources harmed are rare, or the action is not sustainable (43 U.S.C. § 1732(b). The impacts of an action could also be *undue* even where those impacts are considered *necessary* (e.g. unavoidable) to the proposed action. This type of situation could arise if the action permanently impairs the productivity of the land or quality of the environment. It could also arise where the action has an exceptionally high negative impact on other resources, or, similarly, where the action prevents the public from realizing other resource values

Despite acknowledging this legislative direction and authority in FLPMA (draft IAP/EIS at 1-6) BLM fails to balance short *and* long-term costs and benefits. The draft IAP/EIS fails to adequately disclose the extent to which resource uses result in significant losses of lands for wildlife habitat, subsistence, watershed protection and wilderness. The Preferred Alternative in draft IAP/EIS does not satisfy the unnecessary and undue degradation provision.

The many ways in which the proposed action violates the requirements of the NPRPA and FLPMA are descreibed in more detail in Section IV of these comments below.

**C. THE PROPOSED ACTION IS UNREASONABLY NARROW IN LIGHT OF THE PURPOSE AND NEED FOR THE ACTION**

The draft IAP/EIS narrowly defines the proposed action as an amendment to the 1998 IAP/EIS "to consider opening portions" of the Northeast Planning Area "that are currently unavailable for leasing," and "to develop performance based lease stipulations" for the Planning Area (draft IAP/EIS at 1-3). In contrast, the purpose and need for the proposed action is described in much broader terms focusing on the need to "carry out its management responsibilities and respond to Presidential and Congressional directives to the Secretary of the Interior" (draft IAP/EIS at 1-5). The narrowly framed proposed action in this case is not required by the several statutes setting out the Secretary's management responsibilities for the National Petroleum Reserve-Alaska and it is not required by any Presidential directive either. The proposed action being considered by BLM in this draft IAP/EIS is in fact inconsistent with the statutory mandate to protect the key fish, wildlife, subsistence, wilderness and other non-oil resources of the Reserve. BLM should consider a more reasonable proposed action and, as discussed below, a more reasonable range of alternatives that focus on better protection of the key surface resources of this incredibly important area.

The general focus of the purpose and need for this proposed action is not fundamentally different from the general focus of the 1998 process conducted by BLM: with a few exceptions (notably the 2002 President's National Energy Policy Development Group Report), both focus on carrying out the Secretary's management responsibilities and statutory direction for the Reserve. In 1998, BLM indicated that the Purpose and Need for the IAP/EIS was as follows:

Purpose and Needs: The Bureau of Land Management (BLM) initiated the Northeast National Petroleum Reserve-Alaska (NPRA) Integrated Activity Plan/Environmental Impact Statement (IAP/EIS) to determine the appropriate multiple-use management of this 4.6 million-acre area consistent with existing statutory direction for its management. Specifically, the Naval Petroleum Reserves Production Act of 1976

(NPRPA), as amended, encourages oil and gas leasing in NPRA while requiring protection of important surface resources and uses. To carry out its management responsibilities, BLM is addressing two major questions in this IAP/EIS. (1) What protections and enhanced management will be implemented for surface resources such as cultural, paleontological, subsistence, and recreation resources; fisheries; land; soils; vegetation; water; and wildlife within the planning area? (2) Will the BLM conduct oil and gas lease sales in the planning area and, if so, what lands will be made available for leasing?

* * *

This IAP/EIS was undertaken to fulfill BLM's responsibilities to manage these lands under the authority of the NPRPA and the Federal Land Policy and Management Act (FLPMA). The EIS also satisfies the requirements of NEPA and will afford the public and government officials an opportunity to take a comprehensive look at the future management of the area, including the potential for oil and gas leasing and possible Wild and Scenic Rivers Act designations. The plan is anticipated to have a life of 10 to 15 years, though it may prove suitable for either a shorter or longer period.

* * *

Preparing this IAP/EIS to examine opportunities for oil production on Federal lands while protecting other resource values furthers major goals of the NPRPA, namely helping meet the total energy needs of the Nation.... This IAP/EIS assesses the opportunities for making part or all of the planning area available for oil and gas leasing in a manner consistent with responsible protection of other resources. (Vol. 1, 1998 IAP/EIS at I-1 - I-2).

Using this Purpose and Need as its guide, BLM developed and considered five action alternatives. All but one of those alternatives would have made less land available for oil and gas leasing than the amount of acreage which BLM now proposes should be opened to leasing in its draft IAP/EIS.

BLM here has without justification focused on a very narrow proposed action that is not consistent with the broad purpose to serve its general management obligations and its statutory directives, including protection of critical surface resources of the Reserve. The draft IAP/EIS does not identify changes in these Congressional directives which require amendment of the 1998 IAP/EIS and ROD to allow more oil and gas leasing. In fact the draft IAP/EIS acknowledges that if anything, the oil industry has found more reserve potential in the available Northeast Planning Area acreage than was previously anticipated (draft IAP/EIS at 1-5). BLM further acknowledges that since 1998, the agency has also opened an additional 8.8 million acres (100% of the Northwest Planning Area) to oil and gas leasing. In this discussion, however, BLM fails to include the September 2003 Minerals Management Service 9.1 million acre offering (Lease sale 186) in the adjacent Beaufort Sea to oil and gas leasing. These facts clearly illustrate that there is plenty of land already open for leasing and that BLM should therefore be more protective of the Teshekpuk Lake Special Area to fulfill it's management responsibility to balance resource protection against what now obviously is an extreme oil and gas leasing agenda being pursued by the Bush Administration.

**National Energy Policy**

Neither does the President's energy policy require that BLM propose a narrow action focused on opening closed areas to leasing. As the draft EIS/IAP reports:

In 2002, the President's National Energy Policy Development Group recommended that the President direct the Secretary of the Interior to "consider additional environmentally responsible oil and gas development, based on sound science and the best available technology, through further lease sales in the National Petroleum Reserve - Alaska" and that "such consideration should include areas not currently leased within the northeast corner of the National Petroleum Reserve - Alaska" (draft IAP/EIS at I-5).

This policy does not require a narrow proposed action and is fully consistent with the broader purpose of fulfilling BLM's general management responsibilities.

First, the quoted text of the President's policy --- "such consideration should include areas not currently leased within the northeast corner of the National Petroleum Reserve - Alaska" --- does not mandate that BLM open areas for leasing that were closed under the 1998 IAP/EIS and ROD. Instead, the policy refers

to areas "not currently leased." Since BLM has only leased 1.4 million acres of the 4,007,000 acres available for leasing by the 1998 ROD, there remain plenty of lands now open for leasing and not yet leased.

Even if the policy could be interpreted to suggest consideration of the option of opening areas now closed to leasing, it does not require that such an option be considered exclusively or that BLM so narrowly define its proposed action (or, as discussed below, the alternatives it considers in the EIS). BLM could, fully consistent with this policy, consider a range of options for the Planning Area.

Finally, if the policy were to be interpreted to exclude any other reasonable options, it would violate BLM's governing statutory mandate and could not be pursued. Congress has not ratified the President's energy policy, and it may not do so. The President's energy policy does not trump laws passed by Congress which require a balanced approach to exploitation and protection of the Reserve's resources. Moreover, BLM should not base decisions on a policy that was determined during closed door meetings with oil industry officials and no public process pursuant to NEPA. Accordingly, the energy policy does not provide a legitimate basis for narrowly focusing the proposed action on opening new areas, to the exclusion of other options consistent with the broad purpose of fulfilling BLM's management responsibilities.

**Energy Policy Conservation Act**

The draft IAP/EIS also claims that the Energy Policy Conservation Act (draft IAP/EIS at I-5) requires that BLM now consider opening closed areas to leasing. President Clinton signed H.R. 2884 the Energy Policy and Conservation Act reauthorization bill, into law on November 9, 2000. Along with the reauthorization the president's authority to draw from the Strategic Petroleum Reserve, Congress did include a provision that requires the secretaries of the Interior and Energy to undertake a national inventory of onshore oil and natural gas reserves. H.R. 2884 did not direct or mandate additional public lands be made available to the oil and gas industry.

> SEC. 604. SCIENTIFIC INVENTORY OF OIL AND GAS RESERVES.
>
> (a) In General.--The Secretary of the Interior, in consultation with the Secretaries of Agriculture and Energy, shall conduct an inventory of all onshore Federal lands. The inventory shall identify--
>
> (1) the United States Geological Survey reserve estimates of the oil and gas resources underlying these lands; and
>
> (2) the extent and nature of any restrictions or impediments to the development of such resources.

Furthermore, in response to this legislative direction, the Department of the Interior did release a study of "restrictions and impediments" to the development of oil and gas resources on federal lands in the Rocky Mountain region in January 2003. According to this report (Scientific Inventory of Onshore Federal Lands' Oil and Gas Resources and Reserves...) 88% of the region's "technically recoverable" natural gas resources, and 85% of the "technically recoverable" oil on federal lands are currently available for leasing and development. In addition, a significant portion of those acres have not yet been explored and developed. An Associated Press computer analysis published June 1, 2004 found that nearly three fourths of the 40 million acres of public land currently leased for oil and gas development in the continental U.S. is not producing any oil or gas.

Despite BLM assertions, the vast majority of oil and gas resources on the public lands of the Rocky Mountain West are, by the Administration's own admission, available for leasing and development, and very little is off limits for environmental reasons. Considering the fact that on the North Slope alone, 8.8 million acres (100%) of the Northwest NPRA Planning Area, 9.1 million acres (97%) of the Beaufort Sea, 4 million acres (87%) of the Northeast Planning Area and approximately 15 million acres of state land are open to oil and gas development, the conclusion for the yet to be completed Alaska report will not vary greatly from the Rocky Mountains. The Energy Policy and Conservation Act provides no justification for leasing in the most environmentally and cultural regions of the Reserve. If anything, the Rocky Mountain

EPCA report illustrates the need for BLM to provide stronger environmental protections on our public lands.

Thus, BLM has unreasonably focused its proposed action on opening closed areas and weakening protective stipulations, even though such a narrow focus is not required by the purpose of the action-to fulfill BLM management responsibilities and respond to Congressional and Presidential directives-and even though this proposed action is actually inconsistent with BLM's fundamental obligation to protect the fish, wildlife, subsistence, wilderness and other values of the Reserve.

**III. FAILURE TO COMPLY WITH NEPA**

**A. INADEQUATE RANGE OF ALTERNATIVES**

BLM has impermissibly rejected consideration of reasonable alternatives that are consistent with the overall purpose of the draft IAP/EIS.

Because the purpose and need of the draft IAP/EIS is to "carry out its management responsibilities" under the NPRPA, FLPMA, and NEPA, among the reasonable alternatives BLM must consider are those considered but rejected in 1998. After all, the same "management responsibilities" under NPRPA, FLPMA, and NEPA drove development and consideration of those alternatives. BLM cannot eliminate those alternatives from analysis now by classifying its proposed change to the 1998 IAP/EIS as a mere "amendment." *See* draft IAP/EIS at 2-9. Nothing in 40 C.F.R. § 1502.9, governing the preparation of supplemental EISs, allows BLM to eliminate from consideration reasonable alternatives within the parameters of the purpose and need for the action. Denominating BLM's new EIS an Amended EIS does not excuse BLM from the duty to review all reasonable alternatives.

Indeed, since 1998 there have been significant developments that require reconsideration of BLM's rejection of the more conservation oriented alternatives rejected in 1998. Among these developments, BLM has recently decided to lease all 8.8 million acres of Northwest Planning Area of the Reserve, which decision it claims already serves the directive in the President's energy policy to make lands available for leasing. *See* Northwest NPRA ROD (January 2004), at 3. Further, there have occurred a number of lease sales in both the Northwest and Northeast Planning Areas of the Reserve; exploration (drilling and seismic) has occurred at multiple sites in the Northeast Planning Area; and ConocoPhillips Alaska, Inc. has discovered oil and gas in the Northeast Planning Area and submitted a satellite development proposal to BLM for these discoveries. These actions have dramatically increased the development pressures on the Reserve and its natural resources and thus made the reconsideration of the less aggressive development alternatives rejected in 1998 not only timely, but prudent and reasonable. In fact, ConocoPhillips's discoveries in areas open to leasing under the 1998 ROD prove that there is no need to open areas closed to leasing under the same ROD. These discoveries prove that oil and gas resources can be found in areas outside of the Teshekpuk Lake Surface Protection Area and that there is no need to put these internationally significant wildlife and subsistence resources at risk.

NEPA requires that, "to the fullest extent possible," agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."42 U.S.C. 4332(2)(E)(2000). To fulfill this requirement, the agency must prepare an EIS that "rigorously explore(s) and objectively evaluate(s) all reasonable alternatives" to the proposed action. 40 C.F.R. 1502 14(a). Because the consideration of an appropriate range of alternatives is so important to the NEPA process "the existence of a viable but unexamined alternative renders an environmental impact statement inadequate." Resources Limited Inc. v. Roberston, 35 F.3d 1300, 1307 (9th Cir.1993).

In the five years since the release of the 1998 IAP/EIS and ROD, we have accumulated additional information and analyses that require BLM to be more restrictive and protective in the Northeast Planning Area, not less. Despite the growing environmental and social concerns documented in The National Academy of Sciences National Research Council report *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope,* millions of additional acres have been made available to the oil and gas industry on the North Slope without any additional environmental protections.

For all of these reasons, if BLM elects to go forward with the amendment process, the agency must include and analyze Alternatives B and C from the 1998 IAP/EIS in the draft IAP/EIS. BLM must also include and analyze alternatives BLM failed to consider in the 1998 IAP/EIS and this draft IAP/EIS. To comply with NEPA, FLPMA and NPRPA, BLM must consider an alternative that includes permanent protection for the Teshekpuk Lake Special Area, Colville River Special Area and other biological hot spots in the Northeast Planning Area. In addition, BLM must consider an alternative that strengthens the inadequacies of 1998 ROD stipulations detailed in our March 12, 1998 Northeast Planning Area draft IAP/EIS comments hereinafter incorporated by reference.

**B. FAILURE TO COMPLETE A SITE -SPECIFIC ANALYSIS**

The decision to offer leases based on a general EIS violates clearly established NEPA law requiring site specific analysis before development rights are granted.

NEPA and its implementing regulations require that an EIS be a "detailed" statement. *"See 42 U.S.C. 4332"*. "What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *Natural Resources Defense Council v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972). Settled case law holds that "detailed" means "site-specific." "Site-specific analysis is essential to meaningful environmental analysis." *State of California v. Bergland*, 483 F. Supp 465, 483 (E.D. Ca. 1980), *aff'd and rev'd in part sub nom. State of California v. Block,* 690 F.2d 753 (9th Cir. 1982). An EIS cannot be the basis for federal action if it

> fails to consider the *individualized, 'on the ground' effects on local environments*. . . .[and] does not provide the *detailed analysis of local geographic conditions* necessary for the decision-maker to determine what course of action is appropriate under the circumstances.

*Natural Resources Defense Council v. Morton*, 388 F. Supp. 829, 833, 838-9 (D.D.C. 1974) (emphasis added), *aff'd without opinion* 527 F.2d 1386 (D.C. Cir.), *cert. denied* 427 U.S. 913 (1976); *see also Natural Resources Defense Council v Hodel*, 819 F.2d 927, 928 (9th Cir. 1987) (*Morton* is "the leading case in this area" holding that NEPA requires "assessment of the environmental effects . . . in specific areas."); 40 C.F.R. § 1502.14 (EIS must "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public.").

The draft IAP/EIS for the Northeast Planning Area is not site-specific. A generic discussion of resources and potential impacts like that contained in the draft IAP/EIS simply cannot suffice as the required site-specific analysis. Under different circumstances the broad-scale approach that BLM has taken in the draft Amended IAP/EIS might possibly be acceptable in a programmatic EIS, if the programmatic EIS does not purport to become the basis for authorization of discrete activities, such as oil and gas leasing, in particular areas of the Reserve. This draft IAP/EIS, however, does not claim to be a programmatic EIS, but forms the basis for a leasing program. Based on this NEPA process, BLM will issue leases that authorize oil and gas exploration and development. Accordingly, the choice among alternatives will have direct, on-the-ground impacts that must be considered on a site-specific basis. The draft IAP/EIS will establish the lease stipulations and ROPs that are intended to protect surface resources when exploration and development occur. Decisions such as these will impact the environmental and subsistence resources directly and, therefore, must be considered on a site-specific basis.

The leases BLM is planning to issue in the draft IAP/EIS represent an irretrievable commitment of resources because the lessee is given the right to develop oil and gas. Courts have established that oil leases, such as those proposed here, that do not preclude surface occupancy represent an irreversible and irretrievable commitment of resources. *See* Bob Marshall Alliance, 852 F.2d at 1227; Burford, 848 F.2d at 1451; Sierra Club v. Peterson, 717 F.2d at 1414. As the court found in Burford it is too late to perform site specific analysis after the commitment has been made. BLM has already made the choice to give the oil companies the right to develop oil. Promises to conduct future NEPA analysis are only relevant if the agency retains the authority to say "no" to development.

Accordingly, if BLM intends that the draft IAP/EIS be the basis for authorizing oil and gas leasing in particular areas of the Reserve, it must be scaled so that it is site-specific. An adequate site-specific analysis cannot rely on a hypothetical development scenario not tied to any particular location and a general, region wide assessment of total affects. BLM must instead assess the impacts of potential oil exploration and development on all the resources of particular areas. Until this analysis is done, the IAP/EIS may serve as programmatic planning document, but cannot be used as a basis for entering into oil and gas leases.

**C. INADEQUATE DESCRIPTION OF OIL AND GAS EXPLORATION AND DEVELOPMENT**

As discussed above, a hypothetical development scenario not tied to particular locations cannot serve as the basis for a NEPA required site specific analysis. Furthermore, BLM's hypothetical development scenario is incomplete and unrealistic when evaluated in the context of existing development in the region. As a result, the nature and extent of potential impacts are significantly understated. The draft IAP/EIS fails to describe adequately potential scenarios for oil field exploration and production activities and infrastructure. The requisite analysis necessary to authorize exploration and development leases is not provided. Indeed, BLM concedes that development is described only in a general sense (draft IAP/EIS at 4-10)

**Transportation**: The discussion of roads illustrates the complete failure of this document to fulfill the agency's NEPA and trust responsibilities. The draft IAP/EIS at 4-22 outlines one oil field development scenario that includes 55 miles of permanent gravel road yet BLM continues to refer to this development scenario as "roadless" throughout the document. No matter what BLM labels the 55 miles of road, the environmental consequences of any road are significant and require a complete direct, indirect and cumulative impacts analysis. Dismissing the potential for hundreds of miles of connecting roads, the draft IAP/EIS' permanent road impacts analysis section only addresses the potential for <u>one</u> permanent road to be built (draft IAP/EIS at 4-41 and 4-451) within the planning area and even there dismisses that possibility as unlikely. Continuing this misleading and unrealistic development scenario, BLM asserts that a road connecting the Planning Area to the east is unlikely yet the draft IAP/EIS removes the 1998 ROD prohibition on the construction of roads to outside infrastructure and acknowledges that ADOTPF is currently looking at building such a road (draft IAP/EIS at 4-452).

Furthermore the draft IAP/EIS allow roads for exploration (draft IAP/EIS at 2-52) but the environmental consequences section addressing exploration (4-166 and 4-361) fails to acknowledge this fact. This is a significant departure from current North Slope practices and there is no explanation, scientific rationale or impacts assessment completed.

**Petroleum Operations – Technology Advancement**. This section claims that a number of operations will have less environmental impact, yet does not provide references for this information. These is no reason the public should take these at face value and BLM must document the supporting evidence

Instead of just touting the benefits of technological advances, the draft Amended IAP/EIS should also acknowledge their limitations. For instance, the NRC reported noted the limits to reducing footprint size by placing wells more close together:

> In the current design, which is used for pads at the Alpine oil fields, wells at 43c (109f) are spaced only 3m (10 ft) apart (Hazen 1999). Accommodating such a concentration of heat in permafrost requires sophisticated design with extensive refrigeration by passive heat pipes (or thermo-siphons) and insulation. Hazen (1999) calculated that, without refrigeration the thaw chimneys would coalesce at all depths, and all the permafrost—about 300 m (1,000 ft) thick—under the row of wells would thaw. Then, the natural surface, gravel pad, and well houses would settle nonuniformly from 2 to 6 m (6.5 to 20 ft). With refrigeration to a depth of 15 m (50 ft) and insulated conductor pipe to 24 m (80 ft), Hazen (1999) estimated that all of the permafrost except for the top 12 m (40 ft) will thaw. NRC at 109.

And despite promises to use the "best available technology" the proposed stipulations no longer require the use of that technology. An explanation must be provided in order to adequately assess the feasibility of these technology advancement claims (draft IAP/EIS at 2-54).

**Petroleum Operations – Timing**. This section should provide timelines showing what activities are expected during development and production throughout each month of the year, so that the environmental effects on wildlife and human communities and subsistence can be more clearly understood. The draft IAP/EIS should make clear that oil production activities on the North Slope take place throughout the year, particularly air and road transportation access to the oil fields, and the production of oil.

**Exploration.** This section is incomplete and inaccurate. It does not reflect the scope of activities allowed for exploration of oil and gas exploration outline in the proposed stipulations. And in some instances there are direct contradictions. For instance, there is no mention of the gravel airstrips and connecting roads authorized by Lease Stipulation D-2. Further the draft IAP/EIS claims exploration will be conducted entirely in the winter months (draft IAP/EIS at 4-14) ending April 1 yet Lease Stipulation K-5b Teshekpuk Lake Caribou Habitat Area allows exploratory drilling May 20 to August 20. Why is the 1200 foot buffer removed around subsistence cabins and what rationale was provided, if any, to the North Slope communities? The draft IAP/EIS must clearly explain these changes to activities allowed for exploration and adequately evaluate the subsequent increased direct, indirect and cumulative impacts particularly since the agency and industry often claim there is no impact from exploration.

Furthermore, this section needs to describe the constraints to ice road use. The draft IAP/EIS is not clear at all about how much reliance there will be on ice roads, compared with driving directly on the tundra ("rolligon trails" or "off-road travel") or construction of permanent roads. If indeed, access is more likely to be done by driving directly onto the tundra, with hundreds of trips with very heavy loads needed for moving drill rigs, etc., this needs to be explained as one of the assumptions and the impacts of the likely transportation modes need to be discussed fully and associated environmental impacts analyzed fully.

**Development- Field layout**. The draft IAP/EIS presents a muddled picture regarding whether ice roads will be used at all for access for development, given that for practical and economic reasons, winter ice roads are likely to be limited to 50 to 100 mi in overall length and the winter season is shortening. Therefore, the draft IAP/EIS needs to fully assess the environmental impact of construction of permanent gravel roads in the Northeast Planning area. Analysis of the effects of permanent roads, both within oil fields, connecting to satellites, and connecting outside the planning area should have been done since there are no prohibitions of this infrastructure.

**Development – Gravel requirements.** The draft IAP/EIS fails to show sites of any potential gravel sources that may be developed in the Northeast Planning Area; therefore the potential effects cannot be analyzed (draft IAP/EIS at 4-60 and 4-451). BLM claims that deposits with suitable quantities of mineral materials (sand and gravel) have not been identified in the Planning Area. Yet, gravel use is essential for any oil field development, and the effects of gravel mining can permanently alter the nature of the habitat in river floodplains. Furthermore in the Alpine Satellite Development Plan Draft Environmental Impact Statement (January 2004) ConocoPhillips relies on the Clover site within the Northeast Planning Area as a source of sand and gravel. These two draft EIS' are obviously not in harmony on this issue and that fact demonstrates that BLM's draft IAP/EIS was not issued after careful and searching analysis of all potential environmental effects.

**Development and Production- Well Drilling**. The assumptions given for extended-reach wells document a number of limitations that cast into doubt the likelihood that the best available technology will actually be used for field development. In fact the draft IAP/EIS at 4-36 argues that no surface occupancy restrictions will reduce industry interest since "directional drilling beyond one mile would cause economic burdens." Furthermore, the draft Amended IAP/EIS has dropped an important stipulation from the 1998 ROD related to this issue,

> Stip 32. Lessees shall use maximum economically feasible extended-reach drilling for production drilling to minimize the number of pads and the network of roads between pads.

**Development and Production – Water Demand**. This section only addresses water used for drilling and camp use, but ignores water needed for ice roads in the event that production sites are not located on a road network. If ice roads are not needed during the production phase because roads will be built, this should be clearly stated.

Assumptions regarding oil field development should be realistic, complete and supported by documentation. An impact analysis should include but not be limited to the following:

- An objective impact assessment criteria adequately defining the extent, intensity, and duration of effects on vegetation, fish and wildlife habitats and populations, subsistence and other resources. Scientific justification for the criteria, as well as citations for impact levels, needs to be provided.
- The impacts of a creating a network of connecting access roads, pipelines airstrips, docks, support bases and other infrastructure.
- The extraction of gravel needed to construct roads and oil fields must be fully described and discussed. Gravel requirements have consistently and significantly surpassed assumptions.
- Direct and cumulative effects of seismic surveys. BLM should compile a map showing year-by-year the geographic array of all past seismic lines and the total concentrations.
- Predict impacts to air quality during construction and operations.
- An adequate analysis of water needs for development including a discussion of sources of water and the effects of drawdown on these sources. This is especially critical given that the assumptions regarding oil field development rely on this use of ice roads and enhanced recovery of oil.
- An analysis of water quality, expected pollutants and their including an analysis of meteorological factors and baseline conditions. Provide data on expected mobile or permanent sources or concentrations of air pollutants from development. The locations of wastewater treatment facilities and discharges should also be included.
- Articulation of how proposed development in the northeast NPRA will be linked to, in fact may facilitate development, outside the area currently proposed for leasing.
- An analysis of the effect on global warming and climate change. Scientific evidence indicates North Slope oil fields are a significant source of greenhouse gases.
- An analysis of the effect of global warming on oil field exploration and development facilities and assumptions about ice roads and other technology.

**D. CUMULATIVE IMPACTS**

Under NEPA regulations, an agency preparing an EIS must in the EIS

> Identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix. 40 C.F.R. § 1502.24.

Throughout Chapters four and five, the draft IAP/EIS fails to identify any methodologies BLM used in undertaking its analyses. This is particularly evident in Section 4.6, concerning Cumulative Effects. There are many possible approaches to analyzing cumulative effects, but the Section does not identify which one, if any, BLM has used. This omission violates 40 C.F.R. § 1502.24.

In fact, it is apparent that BLM is not sure how to approach the evaluation of cumulative effects and therefore it never clearly selected a scale with which to do perform the evaluation. The draft IAP/EIS's asserts that:

> The incremental contribution of the alternatives also depends on the geographic area that is considered under the cumulative scenario. The cumulative impact area could encompass the National Petroleum Reserve-Alaska, the ACP, or the entire North Slope. For some resources, only activities in the immediate area would have effects. For example, well drilling many miles from the nearest river would not be likely to have any effects on wild and scenic rivers. For some resources, activities in a broad area could have a cumulative effect. For example, caribou migrate long distances, and activities occurring in any part of their range could affect them (draft Amended IAP/EIS at 4-416 – 417).

Perhaps because the draft IAP/EIS is not adequately site-specific in its analysis, however, after making this statement the Section does not go on to delineate what are the cumulative impact areas for any particular resource. This failure must be corrected in any final EIS.

The cumulative effects Chapter is also defective because it is based on a demonstrably unsupported and obviously unwarranted assumption. That assumption is embodied in this statement:

> In addition, the factors (variables) being considered in the cumulative analysis determine the "percentage" that would be attributed to a given alternative. As stated above, *the incremental contribution of an alternative to cumulative impacts is assumed to be proportional* to the projected level of activities for that alternative. *Id.* at 4-417 (emphasis added).

There is no scientific basis for making this "proportional" impacts assumption, and the draft IAP/EIS pointedly does not identify one. To the contrary, the draft IAP/EIS later admits that for birds, at least,

> The extent of the impacts of disturbance or habitat loss on tundra nesting birds would be related to the location and timing of the disturbance. The effects of habitat loss related to placement of gravel infrastructure would also depend on the location of the infrastructure and the species and number of individuals in the immediate area. *Id.* at 4-420

This statement is true, of course, for all other resources, too. And it means that the "proportional" assumption is completely unwarranted and may not be used in analyzing direct, indirect, or cumulative effects.

To the contrary, implicit in NEPA's requirement that an EIS be site-specific is the recognition that the type, quantity and quality of effects depends on project and site-specific factors that cannot be generalized and may not be used except, perhaps, in a programmatic EIS that is not intended to analyze or approve specific agency actions. Yet the false assumption of "proportionality" infects the entire cumulative effects analysis in the draft Amended IAP/EIS. This must be changed if any final EIS is to survive scrutiny for consistency with NEPA.

This subsection also asserts that

> There would be a small increase in the short-term impacts to visual resources from non-oil and gas activities. Short-term impacts, such as green trails, and ongoing activities would not accumulate.
> * * *
> Short-term activities do not contribute to overall cumulative impacts on resources, except in a "momentary" sense. The incremental contribution of these types of activities to cumulative impacts would be zero. *Id*. at 4-16.

No analysis or justification is provided for these unwarranted conclusions. Impacts that occur over brief periods of time can still have great significance, and no scientific principle holds that such impacts cannot accumulate and create a cumulative effect, including synergistic effects.

The cumulative impacts analysis also is deficient because it does not take into account possible synergistic effects, such as habitat fragmentation from roads and pipelines leading to territorial repositioning by predators into areas where threatened, endangered, or otherwise sensitive prey find favorable habitat. Any final EIS must discuss possible synergistic effects generally and in the context of cumulative effects.

There is no field-tested data to demonstrate that NPRA will not evolve into a far greater infrastructure of interconnected roads, pipelines, and drill pads, which could have significant impacts on NPRA's wildlife resources. Cumulative analysis should include all facilities, as well as secondary effects of development such as impoundments, dust shadowing, culvert failures and oil spill sites. This kind of trend analysis would show rates of gravel fill and extraction, rates of construction of roads and pipelines, number of drill pads and production pads, and distance between roads, pipelines, and other facilities within each oil field and between oil fields.

BLM's prediction that future impacts may be smaller than past and present impacts is irrelevant to the cumulative impacts analysis. The task of the cumulative impacts analysis is to identify the past and present impacts and explain how they will interact and contribute with the future impacts of this project and other similar activities. Given that about 1% of oil facilities have been restored, NRC Report at 144, the draft IAP/EIS should not dismiss these past developments—many of these developments are continuing to have effects that are accumulating.

The draft IAP/EIS also failed to identify why BLM reaches different conclusions about the cumulative impacts of the proposed action than the National Academy of Sciences March 2003 report *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*. A revised IPA/EIS must remedy this situation.

**Global Warming**

The Amended IAP/EIS discussion of the impacts from climate change at 4.6.5.11 is inaccurate and incomplete.

First, the discussion starts off by inaccurately identifying CO (carbon monoxide) as a principal greenhouse gas, but does not mention CO2 (carbon dioxide). Second, the discussion is so generalized as to be meaningless. While it identifies the general categories of impacts from climate change, e.g., sea-level fluctuation, effects on Arctic tundra, it does not even take a stab at theorizing how these will affect the specific resources in Planning Area, the entire Reserve, or the Arctic Coastal Plain. This failure stands in stark contrast to the full paragraph the subsection devotes to the adverse affects on the oil and gas industry's operations on the North Slope from climate change. *Id.* at 4-360. Though incomplete, this paragraph about the problems confronting industry from climate change illustrate the need for BLM to do the same for the natural resources it is obligated to manage and protect.

The subsection also asserts that

> Because climate change must be viewed from a global perspective, the magnitude of the emissions potentially contributed by oil and gas activities in the Planning Area needs to be viewed in that context. Activities associated with exploration, development, and production of oil and gas resources from the Planning Area will produce some of the listed greenhouse gases, primarily as a result of power requirements and fuel consumption, activities that produce CO2. The incremental contribution of greenhouse gases from the proposed alternatives in the Planning Area would be negligible when compared to total greenhouse gas contributions. *Id*. at 4-360.

This quotation again demonstrates BLM's failure to provide site-specific data and information in the draft Amended IAP/EIS. The statements do not put the contributions of greenhouse gas emissions in any properly scaled context. Negligible when compared to what? Total greenhouse gas contributions from all activities across the North Slope? Within the Reserve? And what are quantities of the "total greenhouse gas" emissions BLM is comparing? And do they take into account only the emissions occurring during the exploration and production of oil and gas, or do they include emissions occurring when the oil and gas are refined for market, transported and then consumed? These questions need to addressed and resolved in any final EIS if for no other reason than without an accurate assessment of the quantities of greenhouse gases involved and an identification of their sources, BLM cannot prepare and include in the EIS an adequate discussion of mitigation measures needed to address greenhouse gases and their impacts. NEPA requires that there be such a mitigation discussion in every EIS.

Due to global warming, the ice cover of the Arctic has been shrinking at a rate of 3% per decade. The NRC warns that this "loss of sea ice would reduce critical habitat for marine mammals and seabirds that use ice shelves and flows as platforms for feeding, resting, reproducing, and molting." NRC Report at 92. The NRC has concluded that "climate warming at predicted rates in the Beaufort Sea region is likely to have serious consequences for ringed seals and polar bears, and those effects will accumulate with the effects of oil and gas activities in the region." NRC Report at 169. The draft Amended IAP/EIS should have

discussed the additional impacts to ice dependent species from oil and gas development in the context of impacts from global warming.

Global warming could also have a serious impact on subsistence, beyond the population level effect it could have on various species. According to the NRC, "if migrations of bowhead whales (*Balaena mysticetus*), for example, were to shift farther offshore and if populations of seals near the coast were to be seriously reduced, the consequences for coastal human subsistence cultures could be dramatic." NRC Report at 92. The effect of distribution of subsistence species altered by offshore activities combined with the effects of global warming on subsistence need to be discussed in the cumulative impacts analysis.

Further areas where the cumulative impacts analysis is wanting are described in the following sections on particular resources.

**IV. INADEQUATE ANALYSIS AND IMPERMISSIBLE IMPACT TO SPECIFIC RESOURCES**

In this section we highlight failures in the draft IAP/EIS regarding many of the important resource values of the Reserve. We discuss here how the deficiencies of the draft IAP/EIS and the proposed action result in violations of several statutes, including NEPA, NPRPA, FLPMA, MMPA and other laws.

The Reserve has long been recognized as containing major areas important to wildlife. In sharp contrast to the treatment given Reserve Nos. 1, 2, and 3, the NPRPA transferred jurisdiction over Reserve No. 4 to the Secretary of the Interior and renamed it the National Petroleum Reserve in Alaska. In so doing, Congress expressly recognized that protection of the unique natural, fish and wildlife, scenic and historical values of the Reserve would better be evaluated and managed under the authority of the Secretary of the Interior. Congress directed the Interior Secretary to "assure maximum protection" for the subsistence, recreational, fish, wildlife, historical, and scenic values of the Special Areas (42 U.S.C. §§ 6502-03).

BLM has consistently argued that there was significant new biological information driving this amendment process. According to the June 23, 2003 Federal register notice inviting scoping comments "BLM has conducted various scientific studies on the biological resources of the area ….information gained since the completion of the plan has led BLM to conclude that it is appropriate to consider amending it." "We've learned a lot during the past four years," Alaska BLM Director said in the press release announcing the proposed changes to the 1998 ROD. "We know that we can safely explore this area without significant impact to sensitive wildlife and subsistence resources. We also believe that we can develop critical hydrocarbon resources in a manner that protects these same values."

In our scoping comments we asked BLM to provide the public with the specific scientific information on which it was proposing to weaken protections or overturn limitations in the 1998 ROD, protections which are in themselves already insufficient to meet the requirements of National Petroleum Reserve Production Act of 1976.To this day, BLM has failed to provide that information except in the most general and subjective terms. We are not aware of any new information that has been analyzed since 1998 that would justify weakening the protections now in place in the Northeast Planning Area. Audubon Alaska's August 2004 comments on this draft Amended IAP/EIS detail the scientific failings of the document and are hereinafter incorporated by this reference.

It is impossible and inappropriate to conclude that areas presently off-limits to leasing or development can be safely developed. There is no justification for a conclusion that the limited *exploration* that has occurred in any way demonstrates that *development* can safely occur. This is a particularly egregious claim considering the Research Monitoring Team mandated by the 1998 ROD has yet to implement a monitoring program, the industry's first full field development proposal outlines a level of development specifically prohibited in the 1998 ROD and BLM is expanding the activities allowed for oil and gas exploration.

The draft IAP/EIS fails to provide any scientific analysis or justification for modifying the Teshekpuk Lake Surface Protection Area (TLSPA) within the Teshekpuk Lake Special Area (TLSA). The TLSA, approximately 1.75 million acres (708,000 ha), was established by the Secretary of Interior in 1977 because of its extraordinary fish, wildlife, and subsistence values. It encompasses highly vulnerable and important habitats, including a high percentage of wetland and riparian communities and significant wildlife

populations, including black brant and other waterfowl nesting, molting, and staging areas, as well as the calving grounds for the Teshekpuk Caribou Herd (TLH). The TLSA is also a particularly important nesting area for threatened spectacled eiders and rare yellow-billed loons.

The TLSA has significant wilderness and subsistence values and represents an important ecological benchmark for future research and monitoring activities of Arctic wetlands. The U.S. Bureau of Land Management (BLM) (1978) has identified the border of Teshekpuk Lake as an area of concentrated archeological sites. The area around the lake was identified by the U.S. Geological Survey (USGS) as a potential landform and lifeform natural landmark (BLM 1978), proposed by Veireck and Zasada (1972) as an ecological reserve, and proposed by Koranda and Evans (1975) as a potential natural landmark.

The Nature Conservancy's *Alaska Yukon Arctic Ecoregional Assessment Update #11* distributed in August 2004 further documents the scientific significance of the Teshekpuk Lake Special area. BLM must incorporate this new information in the revised IAP/EIS.

In 1998, the Final Environmental Impact Statement and Record of Decision for oil and gas leasing in the Northeast Planning Area further recognized the unique values of the TLSA by designating the Teshekpuk Lake Surface Protection Area (TLSPA) which protected fish and wildlife habitats within an area 857,860 acres in size. This included a 588,998 acre no-lease area and a southern band of 268,861 acres with no-surface activity. This action was taken to protect the unique and sensitive habitat values of that region. Audubon Alaska's (2002) western Arctic synthesis provided further confirmation that the conservation measures applied to the TLSA, including the no-lease and no-surface activity zones, were justified on biological grounds and should remain in place. This position is widely shared by Arctic scientists and the Native people who live on Alaska's North Slope.

The draft IAP/EIS proposed action and inadequate analysis allow impermissible impact to the Northeast Planning Area resources and violates this legislative mandate to assure maximum protection.

**A. CARIBOU**

The Teshekpuk Lake Surface Protection Area (TLSPA) was established in the Northeast Planning Area, in part, to protect important caribou calving and insect-relief habitat for the Teshekpuk Lake Caribou Herd (TLH). The 1998 IAP/EIS and ROD restricted development in this area following lengthy and detailed consultation with local residents and caribou scientists.

The Preferred Alternative of the draft IAP/EIS reduces the TLSPA by 75 percent. This represents an extreme departure. Only 213,000 acres north and northeast of Teshekpuk Lake would be restricted from leasing. Most of the concentrated calving area would now be open to leasing and industrial development in contrast to the 1998 ROD which protected most of the concentrated calving area either in no-surface activity or no-leasing restrictions. Important caribou insect relief habitat would also be open to leasing and industrial development under the preferred alternative. For example the 1998 ROD protected 74 percent of the concentrated calving area. In contrast under BLM's Preferred Alternative, only 12 percent of this sensitive area is protected. Thus 88 percent of the TLH's concentrated calving area would be at risk. The 1998 ROD also protected 84 percent of the TLH's insect relief habitat. BLM's Preferred Alternative significantly reduces that protected area. Only 41 percent of insect relief habitat is now protected from leasing and industrial development.

BLM provided no new scientific data, however, to support or justify reducing the TLSPA protections for these important caribou habitats. BLM's preferred alternative places the TLH at risk of being displaced from their calving grounds and by disrupting their movements during the critical insect season. Significant displacement and disturbance during calving and insects seasons would likely result in declining herd productivity resulting in population-level impacts to the TLH. A substantial decline in the TLH would reduce subsistence hunting opportunities for Native subsistence users on the North Slope.

Concerns about the TLH have also been raised by the National Research Council (2003) in their review and analysis of the cumulative effects of oil and gas activities on Alaska's North Slope. In that report, the NRC stated, "If the calving ground of the TLH continues to be protected, direct conflicts with parturient females

of that herd are unlikely, provided that their movements are not impeded. However if inland lease tracts in the northeastern portion of the National Petroleum Reserve-Alaska are developed, effects on midsummer distribution, habitat use, and productivity of the TLH caribou are possible."

**Specific Concerns:** The draft IAP/EIS at 4-210 acknowledges that the impacts of the Preferred Alternative to terrestrial mammals would be greater than the No Action Alternative because of the larger development scenario. However, it is inferred that the degree of impact would result from developing only "…345 to 4,310 additional acres of habitat…" This example significantly underestimates the potential impacts to mammals such as calving caribou or caribou seeking insect relief. In fact, the TLSPA was reduced by 75 percent from a no-lease or no-surface activity area of 857,860 acres to a no-lease area of 213,000 acres. The reference to a few hundred or few thousand acres only relates to the actual footprint of habitat loss. It must be recognized that Central Arctic Herd caribou were displaced by up to 2.5 mi from development infrastructure during calving. This additional avoidance zone is a substantially greater impact than the direct acres affected by development. An additional concern at Teshekpuk Lake is the highly constricted geography through which caribou must move to find insect relief. Placing an oilfield infrastructure within this geographically constricted region between lakes and coast is likely to further impede caribou movements.

The draft IAP/EIS states that "…many caribou movements to coastal insect-relief areas occur to the east of the lake, and therefore would not be affected under the Preferred Alternative, as a region northeast of Teshekpuk Lake would be excluded from leasing." This statement underestimates impacts by assuming that the periphery of the no lease area would not be influenced by adjacent development infrastructure and activities. It is quite possible, if not likely, that there would be an influence on caribou movements from adjacent developments several miles away. Areas on the coast or directly east of Teshekpuk Lake (which occur outside of the no-lease zone) could also influence caribou distribution and movements within the adjacent no-lease zone. Important insect relief habitat occurs right up to the coast and east and west of the lake. Fragmenting this habitat with oilfield infrastructure and activities would likely affect caribou movements. Although caribou may move through infrastructure when harassed by insects, they also must move back to prime foraging areas. The movement back to optimal foraging areas could be restricted by industrial infrastructure thus compromising the nutritional status of individuals and potentially resulting in herd decline.

The draft IAP/EIS at 4-214 again acknowledges that the Preferred Alternative would have greater impacts on caribou than the No Action Alternative. However, there is no clear quantification of those impacts. Later, it is inferred that the 213,000 acre no-lease area and caribou stipulations would protect caribou at Teshekpuk Lake. These assurances, however, are based on few data and there is little analysis to demonstrate that these are adequate conservation safeguards for this important caribou herd. The clear lack of analysis and quantification of degree of impacts between different alternatives is a serious flaw in this draft Amended IAP/EIS. Although the draft Amended IAP/EIS acknowledges that the Preferred Alternative has greater impacts than the No Action Alternative, it is difficult if not impossible to evaluate how much more impact there is. We simply cannot accept on good faith that the additional impact will be minimal and yet that it was the draft IAP/EIS asks us to do.

**Caribou Stipulations and Routine Operating Procedures:** Lease stipulations and routine operating procedures in the draft Amended IAP/EIS Preferred Alternative do not provide the same level of conservation safeguards and precautionary management as the 1998 IAP/EIS. For example, the major stipulations to minimize impacts to caribou that use the Teshekpuk Lake Caribou Habitat Area (TLCHA) are contained in Stiuplation K-5(a-e). Although these stipulations are designed to reduce or minimize industrial impacts to caribou, there are no clear measures of how effective they will be in reducing or minimizing impacts to caribou in this important habitat area. For example, K-5 a states that "Before authorization of construction of permanent facilities, the lessee shall design and implement a study of caribou movement … The study shall include a minimum of 3 years of current data on caribou movement and the study design shall be approved by the AO and should provide information necessary to determine facility design and locations." Certainly, a 3 year study would be valuable for helping design infrastructure in a way to minimize impacts to caribou. Three years, however, is a very short time frame from which to develop guidelines applicable to an environment that displays high annual variability and a species that

undergoes major and unpredictable fluctuations in population size. It is also of interest that a similar stipulation applied to the 1998 IAP/EIS but it was never implemented even though there have been major lease areas sold within the areas covered by the stipulation.

Lease Stipulation K-5 c requires that "…leasees shall orient linear corridors when laying out oil field developments, to the extent practicable, to address migration and corralling effects and to avoid loops of road and/or pipeline that connect facilities." Lease Stipulation K-5 d states "Ramps over pipelines, buried pipelines, or pipelines buried under the road may be required…" (emphasis added) It is unclear what stipulations like these really mean in terms of actual on-the-ground implementation. Unfortunately, there is no guarantee that these stipulations will be complied with if project costs are unfavorable. Another example, of "gray area" between intent and actual implementation is Stipulation K-5 e6, which applies to minimum aircraft heights over the Teshekpuk Lake Caribou Habitat Area "…unless doing so would endanger human life or violate safe flying practices." The likelihood of regularly applying this reasonable stipulation is probably low because the North Slope often experiences coastal fog and low overcast conditions requiring much lower flight levels. Clearly, the stipulations in the Preferred Alternative do not provide the same level of protection that the 1998 IAP/EIS provided because industrial infrastructure and activities were simply not permitted in the Teshekpuk Lake Surface Protection Area. The Preferred Alternative presents a major but uncalculated risk to caribou within the sensitive Teshekpuk Lake Caribou habitat Area.

Displacement and disturbance of calving caribou and caribou seeking relief from insects could result in reduced recruitment and higher rates of mortality, which may have population-level impacts on the herd. If there is significant oil development in the Teshekpuk Lake Surface Protection Area, it may not be possible to sustain current levels of Native subsistence harvest.

**B MOLTING GEESE**

Teshekpuk Lake area is the most significant waterfowl molting habitat on the Arctic coast of Siberia and North America (King and Hodges 1979, Silva 1985) with tens of thousands of geese gathering to molt around the Teshekpuk Lake wetlands each year. As many as 36,817 brant—up to 30 percent of all Pacific brant—gather each summer to molt north and east of Teshekpuk Lake (Derksen et al. 1979, 1981, 1982; Taylor 1995; Bollinger and Derksen 1996; Mallek 2004). These brant come from elsewhere on the North Slope, the Yukon-Kuskokwim Delta , the western Canadian Arctic, and Siberia (Bollinger and Derksen 1996). Numbers of greater white-fronted geese molting at Teshekpuk Lake are increasing and range as high as 35,000. These geese are part of the mid-continental population, wintering in gulf coastal states and Mexico. Thousands of Canada and snow geese also gather to mole in the safety of this unique Arctic wetland Complex.

The Teshekpuk Lake Surface Protection Area was established in the Northeast NPRA, in large part, to protect this unique goose molting area. The 1998 Northeast Planning Area ROD restricted development in this area following lengthy and detailed consultation with local residents and waterfowl biologists, to protect the Arctic molting geese. The Preferred Alternative of the draft Amended IAP/EIS reduces the TLSPA by 75 percent. Only 213,000 acres north and northeast of Teshekpuk Lake would be restricted from leasing. This substantial reduction in habitat protection will increase risks to these significant populations of molting geese.

Recent Analysis by the Alaska Science Center (Flint 2004) suggests that 44 percent of the molting brant in the TLSPA have used lakes over the last five years that would be available (in their entirety or in part) for leasing under the Preferred Alternative. Since this area provides critical molting habitat for up to 30 percent of the population of Pacific brant, potential impacts to this population during their sensitive molting season could have substantial consequences to the Pacific Flyway population. Furthermore, the Pacific Flyway population is substantially below management objectives. Thus increased development in this area may place this population at significant risk. In addition to brant, 44 percent of white-fronted geese and 58% of Canada geese have also used lakes for molting that would become available for leasing and industrial development under the Preferred Alternative.

Because of the importance of the Teshekpuk Lake region to molting geese and other waterfowl, the Pacific Flyway Council has recommended (2 July 2004 letter to Henri Bisson) that the sensitive goose molting area should not be offered for leasing; it should not be open to the construction of roads, pipelines or other facilities and seasonal human activity in this area should be restricted. The Council also recommends that the Teshekpuk Lake Special Area be given permanent protection from future development.

**Specific concerns:** In the comparison of alternatives the draft IAP/EIS at 2-81 recognizes likely impacts to “small numbers of nesting birds.” This analysis fails to clearly address the likely impacts of Alternatives B and C to the thousands of geese that molt north of Teshekpuk Lake

On p. 3-41, the draft IAP/EIS describes potential impacts to molting brant and uses a mean population number of 18,500 birds. However, the high number of molting brant is over 36,000 representing 30 percent of the Pacific Flyway Population. These numbers reflect a much more significant population and should be used here. The current language may result in an underestimate of potential impacts to this important population. Table 3-8 on p. 3-43 of the draft IAP/EIS summarizes abundance and density of selected birds in the NE Plan area. This table clearly underestimates the importance of the goose molting lakes north of Teshekpuk Lake. Tens of thousands of geese use this area and it is considered unique in the circumpolar Arctic.

The draft IAP/EIS describes effects of disturbance to birds and molting geese on p. 4-203. However, this analysis does not clearly address the issues of increased public access. This must be corrected. The draft Amended IAP/EIS continues on 4-205 by stating “some birds could acclimate to aircraft activity by either remaining in habitats located near aircraft activities, or by moving to nearby habitats.” This statement significantly downplays the likely impacts that air traffic has on molting brant because many investigators (e.g., Derksen et al. 1992) have documented that brant are not easily habituated to aircraft overflights. Furthermore, birds displaced from their optimal habitat may undergo nutritional stress. Considering the uniqueness of the Teshekpuk goose molting area, significant disturbance and/or displacement of geese could result in population-level impacts.

On p. 4-381, paragraph 2, the draft IAP/EIS states “In the context of the ACP and North Slope, however, the amount of potential bird habitat that could be directly or indirectly impacted long term by oil and gas activities on the planning area and elsewhere on the North Slope would be small—approximately 0.3 percent of the ACP and 0.08 percent of the North Slope.” In terms of potential impacts to birds, this statement is highly misleading. Birds do not use the Arctic coast in a uniform manner. They concentrate in optimal habitat for both nesting and molting. If there is substantial development in a high-density nesting or molting area, there could be significant population impact. For example, the Teshekpuk Lake molting goose area is unique in the circumpolar Arctic. If there was substantial development there, it could have significant population-level impacts to some populations such as Pacific brant. This analysis is seriously flawed.

On p. 4-386, the draft IAP/EIS states “The effects of future project infrastructure on bird populations, although additive to natural effects, would be expected to be less severe than those associated with previous Arctic oil field developments.” This conclusion is flawed and misleading. There has never been a development in an area like the Teshekpuk Lake goose molting. This area is unique and highly valuable to molting geese including brant, white-fronted geese, Canada geese and snow geese. Derksen et al (1992) described this area as “…unique, and no other known area could replace this habitat for brant anywhere within the Alaskan Coastal Plain.” Major industrial development in this area could displace molting geese and result in significant population-level impacts to some species (e.g., Pacific brant). We believe the superficial analysis and conclusion of this DEIS regarding birds is fatally flawed and may have been driven by a predetermined objective.

**Molting Goose Stipulations and Routine Operating Procedures:** In general, performance based stipulations and routine operating procedures provide more room for subjectivity, lack of consistency, and less conservation rigor than prescriptive stipulations. In comparison to the 1998 ROD, the changes we see in the draft IAP/EIS concern us.

For example, on p. 2-24 of the draft IAP/EIS, it states in ROP F-1e that "Aircraft use (including fixed-wing and helicopter) by oil and gas lesses in the Goose Molting Area should be minimized from May 20 through August 20, unless doing so would endanger human life or violate safe flying practices." This new language has much less conservation force than the 1998 ROD stipulation which suspended helicopter overflights in the Goose Molting LUEA between June 15-August 20. This is a significant difference. Recognizing that aircraft overflights can have significant impacts on molting geese (Derksen et al. 1992), this change in stipulation may result in substantial impacts to goose populations using this important molting area.

**C. NESTING WATERBIRDS**

The Northeast Planning Area is the most important breeding habitat for many migratory waterbirds including yellow-billed loons, red-throated loons, spectacled, Steller's, and king eiders, long-tailed ducks, and 17 species of shorebirds, including seven that are on the USF&WS's birds of conservation concern list. Many of these birds, such as yellow-billed loons, are very sensitive to human disturbance. There is a considerable body of scientific literature to show that the Teshekpuk Lake area is unique and irreplaceable habitat for many species of waterbirds. The significance and value of the Teshekpuk Lake area is recognized by the Fish and Wildlife Service, Alaska Department of Fish and Game, Pacific Flyway, California Waterfowl Association, Yukon Delta Native Villages, North Slope Borough, and many regional and national conservation organizations including the National Audubon Society. Many of the same organizations have recommended deferral of this area from leasing or outright permanent protection.

**Specific Concerns:** On p. 4-104/105, the draft IAP/EIS discussed effects of oil spills on birds. We are concerned that the draft IAP/EIS underestimates the difficulty of cleaning up oil spills in ice conditions that occur on this area for more than half the year. It would be difficult or impossible to clean up a significant marine oil spill prior to the ice-free period. This would represent a serious threat to migrating waterbirds during spring.

On p. 4-381, the draft IAP/EIS states "There would be minor differences in cumulative effects to birds under the alternatives." We strongly disagree with this statement and believe that the DEIS analysis is fatally flawed. Alternative A, the No Action Alternative, protects the TLSPA—857,860 acres—from leasing or surface activity. The Preferred Alternative only protects 213,000 acres—a 75% reduction compared to Alternative A. Alternative C opens all the area to leasing. The TLSPA is a high density nesting area for many species of waterfowl, loons, and shorebirds. It is also a unique molting area for four species of geese. The differences in cumulative effects between these alternatives is substantial and a revised IAP/EIS must provide a scientifically credible cumulative effects analysis.

**Stipulations and Routine Operating Procedures:** ROP E-11 (p. 2-22) requires aerial breeding pair surveys before approval of facility construction. However, non breeders, including molting waterfowl, are also important to monitor.

Under special conditions in yellow-billed loon habitat (p. 2-22/23), it states that "Development <u>may be</u> prohibited within buffers or activities curtailed while birds are present." (emphasis added) This does not give us any confidence that yellow-billed loons will actually be protected under this condition.

Under subsistence consultation, it is very important that consultation include Native communities in western and southwestern Alaska not just the those on the North Slope. Subsistence hunters on the Yukon-Kuskokwim Delta have a major interest in waterfowl and molting geese that use the TLSPA.

**Yellow Billed Loon***:* The Arctic breeding population of yellow-billed loons is distributed unevenly in NPR-A (North and Ryan 1986, North 1993) with localized pockets of relatively higher concentrations of pairs (North 1994, King and Brackney 1997). An estimated 3,100 individuals breed on the Arctic coastal plain, predominantly east and west of the Teshekpuk Lake area (Larned unpublished data 1993-1999; North 1994; King and Brackney 1997; E. Mallek, U.S. Fish and Wildlife Service [USFWS], Migratory Bird Management, Fairbanks, AK, personal communication 2002).

The breeding habitat of the yellow-billed loon is the most restricted of any loon species (Barr 1997), and specific lake selection and locales of breeding concentrations remain unpredictable (Earnst 2000). Habitat

availability is considered a limiting factor of yellow-billed loon populations, given the apparent nonbreeding individuals observed in summertime marine waters adjacent to the breeding range (North 1994, Barr 1997).

The yellow-billed loon is considered a vulnerable species on the breeding grounds because of low population densities, limited breeding habitat, low productivity levels, and extreme susceptibility to human disturbance (North 1994, Barr 1997). This species is sensitive to habitat change, appears to be intolerant of intense human activity, and is most susceptible to disturbance during nesting and chick rearing (North 1994, Barr 1997).

Direct effects of industrial development on the breeding grounds include disturbance by ground and air traffic, nest failure due to lake drawdown, toxic contamination, and vegetative disturbance on breeding lakes. Secondary effects—because of the availability of garbage— are increased predator populations, including glaucous gulls (*Larus hyperboreus*) (North and Ryan 1988) and parasitic jaegers (*Stercorarius parasiticus*) (Barr 1997, Johnson et al. 1996) and red (*Vulpes fulva*) and Arctic foxes (*Alopex lagopus*). An additional potential result of development is an increase in nest desertion subsequent to direct human disturbance (Gabrielson and Lincoln 1959, North 1994, Barr 1997, Fair 2002).

**Pacific Black Brant:** The area northeast of Teshekpuk Lake is one of the highest density nesting areas on Alaska's North Slope (USFWS, aerial breeding pair survey data). Approximately 33% of Arctic coastal plain brant nests occur in areas already affected by oil development (Johnson et al. 1996, Stickney and Ritchie 1996, Ritchie et al. 2000, Sedinger and Stickney 2000) and display low nesting success rates (BP 2001). Nesting success may decline because of predation by Arctic foxes (*Alopex lagopus*), glaucous gulls (*Larus hyperboreus*), ravens (*Corvus corax*), and brown bears (*Ursus arctos*) (Sedinger and Stickney 2000, BP Exploration [Alaska] [BP]) 2001). Greater numbers of predators may occur in industrial areas due to anthropogenic sources of food and shelter provided at developed sites (Eberhardt et al. 1982, Martin 1997, Day 1998). The National Research Council (NRC 2003) also found that disposal of garbage in industrialized areas of the North Slope was inadequate to prevent attracting high densities of potential bird predators.

Brood rearing in the western Arctic occurs primarily on Harrison Bay salt marshes between Kogru River and Fish Creek just east of Teshekpuk Lake (Ritchie et al. 2000). Brant may be vulnerable to displacement from optimal breeding-ground nutrient availability and to increases in predation and industrial disturbance during brood rearing. Brant feed more during nesting and depend more heavily on breeding grounds nutrient availability than other geese (Sedinger and Stickney 2000).

**D. MARINE MAMMAL PROTECTION**

The draft EIS/IAP fails to consider adequately the impacts that oil development and exploration may have on the polar bear population in the Planning Area, and it fails to provide adequate protections for this sensitive species. Specifically, the draft Amended IAP/EIS fails to consider adequately or provide sufficient protection for potential impacts of: seismic activity on denning bears, impacts of oil spills on the population directly and on polar bear food sources, human disturbance such as exposure and habituation to human food and DLP kills, bioaccumulation of toxics caused by releases into the air and water, and climate change.

Moreover, we have serious concerns regarding the increased authorization of incidental take permits of polar bears. Such takes of polar bears incidental to oil and gas activities can be authorized under section 101(a)(5)(A) of the MMPA. They are being sanctioned for large areas, both on and offshore, and are now also being allowed for year round oil and gas activities. These wide-ranging allowances, particularly permitting incidental takes during the winter months, lead to a much greater probability that the species will be impacted. USFWS has noted that winter oil and gas activities associated with exploration "have a far greater possibility of having a detrimental impact on the polar bear." 58 Fed. Reg. 60,402 at 60,406 (Nov. 16, 1993). In addition to having a more significant impact, interactions with polar bears are more likely during winter due to increased bear movements during this period.

Further, the United States has failed to fulfill its obligations to protect polar bears as required by the 1973 Agreement on the Conservation of Polar Bears ("Agreement"). Determined to halt the decline of the

world's polar bear population, Canada, Denmark, Norway, Russia, and the United States signed the Agreement in 1973. The Agreement requires signatories to protect the ecosystem and habitat of the polar bear and to advance polar bear protection efforts through coordinated national measures. Habitat protection is a fundamental aspect of the Agreement. Indeed, Article II of the Agreement requires that the United States "take appropriate action to protect the ecosystems of which polar bears are a part, with special attention to habitat components such as denning and feeding sites and migration patterns." (13 I.L.M. 13, T.I.A.S. No. 8409, 27 U.S.T. 3918, Art. II (Nov. 15, 1973)).

In order to comply with the Agreement, the Secretary of the Interior directed USFWS in 1993 "to develop and begin implementing a strategy for the identification and protection of important polar bear habitats." Despite this mandate, USFWS has yet to protect important polar bear habitat in a manner that complies with the Agreement. Moreover, during the thirty years that the Agreement has been in force, few affirmative steps have been taken to safeguard polar bear habitat, while oil and gas activities have proliferated throughout the arctic. The continued expansion of the oil and gas industry has had a detrimental impact on the polar bear.

The draft IAP/EIS claims opening the entire coast of the Northeast Planning Area to oil and gas development is unlikely to affect marine mammal populations because the Preferred Alternative mitigation measures prohibit construction of permanent facilities with ¾ miles of the coast (draft IAP/EIS at 4-215). Construction of permanent oil and gas structures is not the only cause of impact to these sensitive marine mammals as detailed in our Northwest IAP/EIS comments (incorporated hereinafter). Furthermore, the Preferred Alternative does not prohibit construction along the coast. Stipulation K-6 only requires permanent facilities be located beyond ¾ miles of the coast *to the extent possible* (draft Amended IAP/EIS at 2-32.

BLM continues to avoid adequate consideration of the effects of a large oil spill on the coast and the inability to clean up such a spill, especially in broken ice. BLM relies on little analysis in its assertion that oil spill clean up capabilities are sufficient yet this assertion is unsubstantiated by any evidence of effective clean up during those tests. Indeed, other Federal agencies have noted the severe oil spill response limitations in the offshore Arctic environment, including high winds, low temperatures and visibility, high rainfall or snowfall, and the presence of pack ice. See US Army Corp of Engineers FEIS for the Northstar Project at 8-51 (Corps observed that "[g]iven present oil spill response technology, broken ice, unstable ice, rough seas or high wind conditions could hamper the ability or prevent any cleanup response for over 50% of the year.").

BLM must adequately address the cumulative impacts to marine mammals form leasing 100% of the northwest Planning Area, 965 of the Northeast Planning Area and 97% of the Beaufort Sea.

**E. FISH**

The Essential Fish Habitat Section 4.3.7.3 claims that the proposed activities are not likely to affect salmon Essential Fish Habitat ("EFH"). However, the EFH requirement applies not only to salmon, but also to other marine habitat, whether or not the North Pacific Fisheries Management Council has elected to address other species and their habitat. Thus, this Section is incomplete. In its analysis, BLM must apply the Magnuson-Stevens Act's definition of EFH without regard to the Council's designation. So using the definition, it will be apparent to BLM that there is substantially more habitat that qualifies as EFH with and near the Planning Area. Impacts to that habitat must be analyzed.

Contrary to the 1998 ROD, the draft IAP/EIS authorizes exploratory drilling (Lease Stipulation D-2) in the rivers, streams and lakes beds without any impact analysis or scientific rationale. The 1998 ROD only authorized an exception if drilling in the river bed was environmentally preferable not simply "if there is no prudent alternative" (draft IAP/EIS at 2-52). This is simply one more example of BLM allowing changes in oil and gas related activities that will contribute to the direct, indirect and cumulative impacts to the resources the agency is mandated to protect.

Our March 8, 2004 comments on the *Alpine Satellite Development Plan draft Environmental Impact Statement* detail additional concerns about fish. Those comments are hereinafter incorporated by this reference.

**F. CULTURAL AND PALEONTOLOGICAL RESOURCES**

The Reserve is richly endowed with unique and important cultural and paleontological assets. Evidence of human habitation stretches back 11,000 years. It is important to note that that these resources are strictly non-renewable: once marred or destroyed, they are forever lost to future generations. Such fragility demands utmost care and humility from BLM managers and planners.

BLM's management of cultural resources is governed and guided by a host of laws, orders, and regulations. These include, but are not limited to, the Antiquities Act of 1906, the National Historic Preservation Act (NHPA), Executive Order 11593, the Archaeological Resources Protection Act (ARPA), and the Native American Graves Protection and Repatriation Act (NAGPRA). BLM's decisions regarding cultural resource management are also governed by the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA).

In the draft IAP/EIS, BLM repeatedly makes reference to the fact that BLM is unsure about the severity of impact on cultural resources that would come from oil exploration and development, citing the scattered natural of the cultural deposits and the unknown locations of many deposits. However, in each case BLM acknowledges that such activities may have an impact on cultural resources. In addition, the draft IAP/EIS notes that the more oil and gas associated activities, the greater the chance that locales of cultural resources would be impacted.

In addition, BLM acknowledges that the single greatest potential impact to cultural resources in the Northeast Planning Area is the construction of a permanent road both in terms of lineal coverage of ground and excavation of gravel yet the impact analysis fails to include all of the roads authorized by the proposed action. This failure is detailed earlier in these comments. For these reasons, cultural resource-specific stipulations and protections must be more adequately present in the chosen alternative.

**G. PROTECTED AREAS**

Although the North Slope is undergoing significant change, there are no permanently protected conservation units, except the very small, eastern tip of the Arctic Refuge. The lack of protected areas reduces our opportunity to establish ecological baselines from which we can evaluate long-term impacts from expanding industrial infrastructure and separate these from other environmental effects like climate change. The NRC (2003) has suggested that if cumulative effects are to be more completely assessed and tracked, there is a need for protected areas as benchmarks for science. It is not possible to tease apart the effects of development, climate warming, and other problems and changes without having "control areas" free of industrial influence.

The Secretary not only has the authority to present recommendations to Congress for wilderness and wildlife refuge designations within the Reserve, but under the authorities of the National Petroleum Reserves Production Act, the Alaska National Interest Lands Conservation Act, the Federal Land Policy and Management Act, and The Wilderness Act, the Secretary can take administrative action to permanently protect these area.

The lack of adequate protected areas leaves the future of the Reserve's most sensitive wildlife and cultural resources at risk. In fact the draft IAP/EIS at 4-34 acknowledges that "total protection of the environmental and cultural resources is likely to require a total exclusion of petroleum related activities." Yet BLM continues to push an aggressive leasing agenda in areas that scientists and local communities agree are highly vulnerable to disturbance.

By proposing to remove 75 % of the protections for the Teshekpuk Lake Special Area and to allow new oil and gas development, BLM is violating NPRPA, NEPA, FLPMA and other legislative mandates. By the agency's own admission the Preferred Alternative's *Additional Protection Areas* "are not in themselves administrative or legislative designations, and they carry with them no new regulatory authority. They

simply are areas that BLM has identified where resource concerns exists" (draft IAP/EIS at 2-5). BLM can not claim that these *Additional Protections* are adequate to meet the "maximum protection" standard.

**Wilderness**

There is little dispute about whether the Reserve has wilderness values. Its size and remoteness alone make it wild in the most definitive sense. This notion is emphasized in the 105(c) study in the beginning of the wilderness assessment. The authors of the study state, "Practically all of the 23 million-acre reserve is in a primitive state and is essentially de facto wilderness" (Department of Interior [DOI] 1979). Published in 1979, the 105(c) assessment is the most comprehensive wilderness assessment of the Reserve, and to date is considered an authoritative documentation of wilderness character by the Bureau of Land Management (draft IAP/EIS at 3-104).

BLM states the purpose of the draft IAP/EIS is to meet the agency's management responsibilities. This purpose is much broader than simply determining the appropriate parameters of an oil and gas leasing program. Consistent with this broad purpose, BLM must consider wilderness as a resource in all of the Planning Area and include wilderness in a range of reasonable alternatives.

Contrary to assertions in the draft IAP/EIS, Congress gave broad authority in 1976 to the Secretary to manage and protect the wildlife, wilderness, and other resources of the NPRA. 42 U.S.C. §§ 6503, 6504. Other statutes, such as FLPMA, 43 U.S.C. §1732, also give the Secretary the authority to manage the multiple resource values of NPRA land, a complete wilderness review was specifically authorized in the 1980 Alaska National Interest Lands Conservation Act (ANILCA). The draft Amended IAP/EIS is a multiple purpose land management document, which addresses a variety of issues, including oil and gas leasing. BLM has explicit authority to consider wilderness under ANILCA § 1320.

Even if BLM chooses not to recommend designation of any wilderness study areas within the Planning Area, NEPA requires BLM inventory all of resource values in the Planning Area including wilderness. Secondly, NEPA requires BLM analyze the impacts to wilderness values of oil and gas development for the entire affected environment. The draft IAP/EIS fails to adequately describe the wilderness resource or analyze the adverse impacts of oil and gas leasing on wilderness resources. The draft IAP/EIS asserts that opening 96% of the Northeast Planning Area to oil and gas development will only impact 6% of the wilderness resource values (draft IAP/EIS at 4-237). If the majority of the Planning Area qualifies as suitable wilderness (Department of Interior [DOI] 1979) then how could only 6% of the resource value be impacted?

The draft IAP/EIS violated NEPA because it fails to consider as reasonable alternative, potential wilderness designations in the Northeastern portion of the planning area. "The creation of wilderness is a reasonable alternative." Sierra Club v. Lyons, No. J00-0009-CV (D. Alaska March 30, 2001) (holding that Forest Service violated NEPA when it failed to consider new wilderness recommendations in Forest Plan).

Wilderness is a reasonable use that should be considered. We urge BLM to adhere to the intent of Section 1320 of ANILCA, and to ascertain the full extent of the Planning Area's wilderness resource values and to complete an adequate impacts analysis of all of the suitable wilderness lands.

**Wild and Scenic Rivers**

Recognizing the importance of rivers to every aspect of public land values, the Wild and Scenic Rivers Act requires the BLM, as part of its land use planning duties, to consider whether the rivers under its jurisdiction qualify for inclusion in the Wild and Scenic Rivers System. 16 U.S.C. § 1276(d). The agency must consider all stream segments under its jurisdiction and must recognize that all free-flowing rivers and streams with outstandingly remarkable values are eligible for Wild and Scenic River designation.

The draft IAP/EIS recognizes that the Colville River is eligible for designation as a Wild and Scenic River yet the draft IAP/EIS fails to provide the protection mandated by the Act. The draft IAP/EIS must adequately evaluate the adverse impact of roads, pipelines, seismic work and gravel extraction to the future designation of the Colville River. Contrary to the 1998 ROD, the draft IAP/EIS authorizes exploratory drilling (Lease Stipulation D-2) in the river bed itself without any impact analysis or scientific rationale.

The 1998 ROD only authorized an exception if drilling in the river bed was environmentally preferable not simply more feasible.

The Colville is the largest of Alaska's rivers that flow to the Arctic Ocean. The Colville River is perhaps best known for its remarkable densities of birds of prey, including Arctic peregrine falcons, gyrfalcons, rough-legged hawks, and golden eagles. The intact habitat of the Colville River played a key role in the recovery of the Arctic peregrine falcon, which was removed from the list of North American endangered species in 1996. The Colville and its tributaries also provide the most diverse and abundant habitat for song birds on the North Slope. In addition, this area provides important habitat for moose, brown bears, wolves, wolverines, and at least twenty species of anadromous and freshwater fish. It is vital source of subsistence foods for area residents, and is a spectacular scenic area with tremendous recreation values for remote, wilderness experiences. Once again, we strongly urge that the Colville River watershed be provided permanent protection from any leasing and development.

**H.AIR QUALITY**

In the 4.8.1 draft IAP/EIS discussion of Air Quality, the Relationship Between the Local Short-term Uses and Maintenance and Enhancement of Long-term Productivity, the air quality discussion inexplicably relates only to natural gas. *Id* at 4-425 ("The risk to air quality from natural gas development, production, and transportation would be similar to the risk from oil development, production, and transportation. Degradation of air quality related to construction, placement, and operation of gas exploration and production facilities would be the same as those for oil exploration and production facilities."). Aside from the fact that this statement contains no details as required of a "detailed statement" under NEPA, it's omission of oil and gas impacts violates 40 C.F.R. § 1502.16(a)'s discussion requirement.

**I. WETLANDS AND FLOODPLAINS**

In the 4.7.6 draft IAP/EIS discussion of Unavoidable Adverse Effects contains a meaningless statement, to wit:

> Biological resource areas that can be classified as having the function and value of wetlands and floodplains on the North Slope include vegetation, soils, and water resources and quality.

Vol. 1, draft IAP/EIS at 4-420. (The quoted material is repeated elsewhere in the draft Amended IAP/EIS. *See id.* at 4-427, 4-432, 4-441, and 4-455.) When stripped of the "that" clause, the first sentence of the quotation reads: "Biological resource areas … include vegetation, soils, and water resources and quality." However, that "areas … include … [water] quality" is not a meaningful statement. And that areas with biological resource may include vegetation, soils and water resources is self-evident and hardly informative.

The text goes on to tell the reader to "Please refer to the discussions in this section for each of these resources for information on unavoidable adverse effects on wetlands and floodplains." *Id.* at 4-420. This forces the reader to try to figure out from the text concerning those resources what might BLM might consider to be the "unavoidable" adverse effects. It is the agency's duty, however, to identify and discuss such effects in the EIS; it may not force that duty upon the reader of the EIS. *See* 40 C.F.R. § 1502.16(a) (requiring a discussion of "any adverse environmental effects which cannot be avoided"). Thus, the draft IAP/EIS is defective in that regard.

**J. VISUAL RESOURCES**

In the 4.9.17 draft IAP/EIS discussion of Irreversible and Irretrievable Commitment of Resources, for Visual Resources the draft IAP/EIS asserts that:

> There would be no irreversible or irretrievable commitment of visual resources. Proper removal, rehabilitation, and revegetation of development pads and other facilities would restore the perception of a natural environment. To the casual observer, viewsheds would appear natural.

*Id.* at 4-434. Elsewhere in the document, BLM asserts that there would be no requirement that gravel be removed. *See, e.g., id.* Vol. 2, App. at D-15 ("Gravel or gravel/sand pads would not be removed by allowed to bed naturally. Overall, abandonment operations would take many years"). In the *Alpine Satellite* draft

EIS, some alternatives also propose that gravel roads and pads would be left in place. Further, the drafted IAP/EIS indicates that the "burial of vegetation under gravel fill could be considered an irretrievable commitment of vegetation resources" given the potential recovery time. *Id.* at 4-431.

Thus, subsection 4.9.17 inaccurately concludes that the perception of the natural environment would be restored. This also means that draft IAP/EIS inaccurately assesses impacts to wilderness values. These inaccuracies must be corrected in any final EIS.

**V. FAILURE TO MEET THREATENED AND ENDANGERED SPECIES OBLIGATIONS**

BLM and USFWS have failed to meet their obligations under the Endangered Species Act in the proposed action in draft IAP/EIS. The Endangered Species Act imposes on federal agencies a strict substantive duty to ensure that its actions do not jeopardize the continued existence of a species listed, like the Stellar's and spectacled eiders, as threatened under the Act. Endangered Species Act, 16 U.S.C. 1536(a)(2)(2000).

**A.PROPOSED ACTION THREATENS LISTED EIDERS**

**Spectacled Eider:** The spectacled eider is a pelagic sea duck that was listed as threatened under the U.S. Endangered Species Act in May 1993 (U.S. Fish and Wildlife Service [USFWS] 1996). Ongoing surveys indicate that the North Slope component of the species numbers about 7,000 birds in recent years (Larned et al. 2003) with most breeding in the NPRA.

A high-density spectacled eider nesting area occurs northeast of Teshekpuk Lake (USFWS, Eider Breeding Population Survey Arctic Coastal Plain Alaska, 1998-2001) (see map in Audubon Alaska 2002). Nesting success varies substantially by area and year (Petersen et al. 2000). Predator numbers may increase in areas of industrial development because of the availability of garbage. Predators include Arctic fox, gulls, jaegers, and ravens (USFWS 1996, Petersen et al. 2000). Increasing predator numbers may reduce the productivity of nesting eider in and around development sites (Martin 1997, Day 1998).

Humans and aircraft at distances from 10 to 490 ft (3-150 m), respectively, have been known to flush spectacled eiders from their nests ( Petersen et al. 2000). Although there is a low altitude limit on aircraft overflights in the oil fields, increased flights in marginal weather have the potential to disturb nesting birds. Early nests are more successful than delayed nests (Petersen et al. 2000). Delayed nesting due to disturbance or re-nesting caused by increased predation or development activity may lower nesting success.

Industrial development in breeding habitats may result in wetland loss or changes due to drainage, impoundment, changes in permafrost, or disturbance (BP 2001, Balogh, personal communication 2002). One area of relatively high nesting density west of Teshekpuk Lake is already leased while the highest density nesting habitat occurs in the Teshekpuk Lake Surface Protection Area currently unavailable for leasing (Bureau of Land Management [BLM] 1998). We are unaware of new scientific studies that suggest leasing could occur in this area without placing waterbirds, including spectacled eiders, at risk.

**Steller's Eider:** The Alaska breeding population of Steller's eider is listed as threatened under the U.S. Endangered Species Act. Three breeding populations are recognized worldwide (U.S. Fish and Wildlife Service [USFWS] 2002). A small breeding population on the Arctic Alaska coastal plain, primarily in NPR-A, is the last in North America (USFWS 2000, Fredrickson 2001).

The breeding population of Steller's eiders in the northeastern NPRA could be vulnerable to habitat loss caused by expanded resource development in the Teshekpuk Lake Surface Protection Area. Nest placement data suggest no attraction to, nor avoidance of, manmade structures; however, most Steller's eider nests are greater than 1,640 ft (500 m) from roads (Obritschkewitsch et al. 2001). Furthermore, predation was the major cause of nest failure near Barrow (1997-2000), and high nest-failure rates may contribute to population decline and inhibit recovery (Obritschkewitsch et al. 2001). Increased predator numbers and predation is a recognized byproduct of oil exploration and development and may affect Steller's eiders where there is contact with oil fields (Martin 1997, Day 1998).

**B. PROPOSED ACTION THREATENS BOWHEAD WHALES**

The Bowhead whale was listed as endangered under the Endangered Species Conservation Act, the predecessor to the ESA, on June 2, 1970 (35 FR 84495). The species was then listed as endangered under the ESA in 1973. The DEIS recognizes that bowhead whales may be present in the Beaufort Sea, offshore of the northern planning area. Bowheads use portions of the Beaufort Sea for calving, migration, and feeding. The Bowhead's westward fall migration takes them through these waters from August to October. Their spring migration takes them through the western planning area from April to early June.

During both the fall and spring migrations, it is well documented that normal behavior patterns are disrupted by industrial activity. Disruptions in feeding, socializing, sexual behavior, communication, and cow/calf interactions have all been documented during these times. The long-term effects of these disturbances and injuries are unknown. In the fall, any disruption of feeding could be particularly harmful to the bowhead in meeting its energetic requirements for the winter. Disruption of migration in the fall could also be disastrous if bowheads were delayed or blocked from reaching their wintering grounds on the Bering Sea before freeze-up.

**Noise disturbance:** Bowheads, like all other marine mammals, live in a sound environment influenced by both natural and man-made factors. Noise in the marine environment is a major habitat issue with respect to offshore development and bowhead whales, and certain noise sources have been shown to cause behavioral changes in individual whales. There has been an increase in the underwater noise levels in the Beaufort Sea as a result of oil and gas and other industrial activities (67 Fed. Reg. 55768). The major sources of noise disturbance on bowheads from oil and gas activities is: seismic exploration; other industrial activities including drilling; dredging and construction; ships and boats; and aircraft.

The draft EIS/IAP recognizes the risk for noise disturbance associated with development in the Reserve, but writes it off as negligible. Yet, the document fails to provide any scientific support for the assertion that such disturbance is not significant and therefore does not constitutes harassment under the ESA. Assessing the effect of industrial noise on bowhead whales is complex. Despite the complexity of the science and the many unknown variables, it is clear that industrial noise associated with oil and gas development in the Arctic may effect bowheads in three major ways: avoidance, masking, and temporary or permanent hearing impairment.

Noise from fixed wing aircraft and helicopter associated with oil and gas activity and infrastructure also has the potential to harm or harass bowhead whales. Bowheads seem particularly responsive to noise from aircraft when they are in shallow water and when they are resting. The draft IAP/EIS fails to take a hard look at noise impacts from boat and air traffic and fails to analyze the cumulative impact of such traffic on bowheads from this project in conjunction with other boating activity in the bowheads migration area.

The draft IAP/EIS portrays that an oil spill is unlikely to reach or occur in the marine waters and therefore unlikely to impact bowheads. The agency reasoning is that the bowhead does not frequent near shore waters often. This reasoning is a broad generalization. In fact, bowhead whales may swim very close to shore on some occasions. Bowheads have been observed feeding not more than 1,500 ft (457 m) offshore in about 15 to 20 ft (4.6 to 6 m) of water. Smaller whales may swim in water depths of 14 to 18 ft (4.3 to 5.5 m). In general, bowhead whales seemed to migrate closer to shore in light ice years and farther offshore in heavy ice years. Furthermore, due to the fact that virtually the entire bowhead population funnels through a relatively narrow area in the Beaufort Sea twice per year, bowheads are more vulnerable to an oil spill here than anywhere else on their range.

Migrating bowhead whales can be injured or killed following a marine spill due to oiling of baleen, oil ingestion or contact with skin and eyes. However, like the Steller's eider, lack of data on bowhead whales leads to difficulties in accurately predicting the effects of an oil spill on bowhead whales. Some suggested impacts include, in addition to the above, adverse effects from inhalation of vapors, contaminated food sources and displacement from feeding areas, irritation of mucous membranes and respiratory tract and absorption of volatile hydrocarbons into the bloodstream, ulcer formation, severe skin inflammation, blood poisoning, damage to eyes from oil collected behind the eyes, serious impacts of oil and tar balls on the baleen and causing blockage between two parts of the bowhead stomach. "Because tar balls may persist in

the marine environment for up to 4 years, bowhead whales would not have to be present during an oil release to be affected adversely. Impacts could continue for years" (MMS, Northstar DEIS p. 6.9-27/2). Bowhead whales feed almost exclusively on zooplankton. It is imperative that any impact analysis considers the risks from an oil spill on the bowheads' main food source.

The draft IAP/EIS fails to draws a conclusion at all regarding impact levels of oil spills on endangered bowhead whales – one of the most important resources to local residents. BLM has not proven that it can respond adequately to a spill; furthermore, it does not fully understand the impacts of such a spill. -BLM must provide a realistic, balanced and scientific analysis regarding impacts to the bowhead from development of the NPRA.

**C. BIOLOGICAL ASSESSMENT IS FUNDAMENTALLY FLAWED**

The agency's reliance on a hypothetical scenario for the Biological Assessment in the draft IAP/EIS violates the ESA requirement to consider the entire agency action. The Biological Assessment must be coextensive with the agency action. When the action is the sale of an oil and gas lease, the scope of the action includes all activities that result from leasing. In addition the draft IAP/EIS does not meet the requirements under the ESA because the impacts analysis is flawed. Not only does the proposed action authorize development beyond the hypothetical scenario, such development also poses series threats to eiders.

Indeed, the Biological Assessment concedes that the agencies do not have adequate population data and site data on Steller's eiders, stating:

> This eider population survey has been conducted annually since 1992, and has provided data to develop a population index and distributional information for several species, including spectacled eiders. Given that Steller's eiders are present on the ACP in very low densities, *the eider population survey's sampling intensity is inadequate for obtaining data to develop a population index for this species* (Larned et al. 2003). Quakenbush et al. (2002) has suggested that the range of the Steller's eider in Alaska has been greatly reduced, mostly in the vicinity of Barrow. In 1999, a survey specifically designed to obtain information on Steller's eiders in the Barrow area was initiated (Ritchie and King 2004). The survey area, which is referred to as the "Barrow Triangle," encompasses a 1,064-mi2 (2,757-km2) area south of Barrow and west of Admiralty Bay (see Ritchie and King 2004 for a complete description of the study area and slight differences among years). This survey has provided densities and population estimates of Steller's eiders in the Barrow area for the past 5 years.
>
> *          *          *
>
> In order to be as conservative as possible with respect to Steller's eiders, we choose to use densities generated by the "Barrow Triangle" survey, as they are likely to be the greatest densities of Steller's eiders present on the ACP. For this analysis we used a mid-level Steller's eider density of 0.16 observed birds per mi2 (0.06 observed birds per km2; Ritchie and King 2004), *since high densities of Steller's eiders have not been found anywhere in the Planning Area*. A visibility correction factor has not been applied to this density estimate.

Biological Assessment at D-7 (emphasis added). The two italicized statements in the quote above are inconsistent. On one hand the Biological Assessment concedes that the sampling intensity is inadequate to develop a population index for the Steller's eider, but then other the other hand the Biological Assessment claims that high densities have not been found in the Planning Area. If the sampling intensity is inadequate, how can the Biological Assessment make the second claim without qualification? Indeed, since "high densities" is not defined, it is difficult to know what the statement means.

Under NEPA the lack of reliable population and site data triggers 40 C.F.R. § 1502.22's requirement that the agencies get the data or explain adequately why getting the data is not possible. This also applies to the lack of empirical data supporting an important assumption BLM makes in the Biological Assessment and elsewhere in the draft IAP/EIS about the "zone influence" from oil and gas facilities on eiders:

> To address disturbance effects to eiders, in addition to the immediate habitat loss from gravel pad and road development, the *BLM is assuming* both a 656-foot (200-meter) and a 1,640-foot (500-meter) zone influence around all gravel production and development pads and roads. The 656-foot (200-meter) zone influence has been used in previous analysis by USFWS, but is based on best professional judgment and *little empirical data supports its use*. The additional 1,640-foot (500-meter) zone of influence will allow for determination of the maximum number of eiders that potentially could be affected by production facilities. Biological Assessment at D-7 (emphasis added).

The Biological Assessment also makes other unreasonable assumptions. It states that

> Current technology allows for "roadless" facilities, which means that roads could exist within and between the satellite and CPFs, but no roads would connect the CPFs to each other, and *no "feeder" roads would connect to existing infrastructure in the Alpine Project area* or other facilities to either of the CPFs. Geologic information, economics of extraction, and proximity to existing infrastructure in the Colville River Delta suggest this reasonably foreseeable development would take place within the area of high economic oil and gas potential. *Within the Planning Area, the highest potential for success is in the northern portion of the Planning Area…. Id.* at D-8

In the *Alpine Satellite Development Plan Draft Environmental Impact Statement* (January 2004), however, BLM proposes permanent roads within the Planning Area, and a permanent road connection to Alpine. (The State of Alaska also has proposed a new permanent road that would connect the Reserve to the existing Spine Road.) Thus, the Biological Assessment's claim that there would be no "feeder" roads connecting to Alpine is inconsistent with BLM's own pending proposals to the contrary.

The Biological Assessment asserts there would be eight gravel extraction sites within the Planning Area, but since no site-specific analysis is provided, it is not possible for either the draft IAP/EIS or the Biological Assessment to analyze adequately whether development of these now unidentified sites, and the construction of other oil and gas facilities, would harm the eiders. Biological Assessment at D-12, D-25. Given that the Biological Assessment asserts that "oil and gas development activities with the greatest potential for causing loss of spectacled and Steller's eider habitat are gravel mining and placement," *id.* at D-25, knowing the location of these sites is essential. Therefore, as noted above about other data gaps, BLM's duties under 40 C.F.R. § 1502.22 are triggered.

The Biological Assessment predicts "similar levels of aircraft activity during the summer development phases for each of the CPF developments" as Alpine. Biological Assessment at D-14. It relies on stale Alpine flight data, which should be brought up to date. Further, it fails to include all potential developments, focusing only on CPFs.

The Biological Assessment fails to explain how BLM could legally allow "the areas … [to] be available to rural subsistence users" but not to "the general public." Biological Assessment at D-15. The increase in access by the general public could obviously cause impacts to eiders. *See id.* at D-28-29 (discussing eider reaction to foot traffic).

The Biological Assessment illegally fails to evaluate the effectiveness of the "summarized stipulations and ROPs directly applicable to eiders." Biological Assessment at D-16. BLM should consider adding restrictions on summer seismic surveys, as the Biological Assessment later indicates that " Conducting surveys after the completion of the nesting period would eliminate the potential for nest abandonment and lost productivity." *Id.* at D-24. For the same reason, additional seasonal restrictions on support activities should be evaluated and adopted.

**VI. FAILURE TO COMPLY WITH SECTION 810 OF ANILCA**

The draft IAP/EIS does not provide an adequate basis for determining compliance with section 810 of ANILCA. 16 U.S.C. § 3120.

**ANILCA § 810 Legal Mandate**

To fulfill the purposes and policies of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §1601 et seq., and as a matter of equity, Congress specifically invoked its constitutional authority over Native affairs and assumed the obligation to protect and provide for the opportunity for continued subsistence uses on the public lands for Alaska Natives. 16 U.S.C. § 3111(4). This unique "trust" obligation of the federal government stems from the agreements made by the United States and Alaska Natives, who, for their part, surrendered claims to vast tracts of land and unlimited aboriginal hunting and fishing rights in exchange for relatively small land selections and federal protection of their customary and traditional ways of life. In the context of ANILCA, the trust responsibility imposes fiduciary management duties upon federal agencies and demands a heightened standard of care to protect subsistence uses of Alaska Natives.

Consistent with this trust responsibility, the agencies within the Department of Interior that manage public lands in Alaska, such as the BLM, must refuse to take land management actions if they find that the actions would cause significant restrictions to subsistence uses and those actions cannot be mitigated.

Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3120, therefore requires the Secretary of Interior to take certain steps to eliminate or minimize adverse impacts to "subsistence" uses on the federal public lands under the Secretary's jurisdiction in Alaska. Section 810(a) requires that a subsistence evaluation be completed for any federal agency determination to "withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public land." 16 U.S.C. § 3120.

"Subsistence," as that term is used in the statute, refers to customary and traditional hunting, fishing and gathering of wild renewable resources for food, clothing, shelter, and other basic purposes. 16 U.S.C. § 3113. Congress recognized that subsistence is essential to the economy and culture of Alaska Native people, and to non-Native economic and social needs. 16 U.S.C. § 3111(1). Congress further declared that agency actions on federal public lands in Alaska are "to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." 16 U.S.C. § 3112(1).

Section 810 of ANILCA sets forth a two-tier procedure. The first tier requires a NEPA-like process of evaluating the impacts of an action to subsistence uses, and alternatives that would reduce or eliminate the impacts. 16 U.S.C. § 3120(a). At the end of this process, unlike NEPA, the agency must determine whether the action "would significantly restrict subsistence uses." Id. The second tier is triggered if, pursuant to the first tier analysis, the agency concludes that "the contemplated action may significantly restrict subsistence uses." Kunaknana v. Clark, 742 F.2d 1145, 1151 (9th Cir. 1984). A significant restriction to subsistence may occur in at least two instances: (1) when an action substantially may reduce populations or their availability to subsistence users, and (2) when an action may substantially limit access by subsistence users to resources.

In the second tier, when there is the possibility of a significant restriction, the agency must first give notice to the State and various agencies and hold hearings in the vicinity of the proposed action. 16 U.S.C. § 3120(a)(1) & (2). Then, before proceeding with the action, the agency must make determinations that:

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands,
> (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and
> (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions. 16 U.S.C. § 3120(a)(3).

Properly interpreted, the subsection (A) "necessary" determination should allow significant restrictions to subsistence only where something more specific than agency policy goals compels them. The "necessary" requirement demands something more specific than a discretionary agency goal.

Similarly, the "minimal amount of public lands" determination should require the Department of the Interior to select the alternative that uses the least public land that would accomplish the general purposes of the action, taking into account the relative importance of different lands for subsistence uses.

**Proposed Action Violates ANILCA § 810: Inadequate ANILCA § 810 Finding**
The ANILCA 810 analysis in Appendix B of the draft IAP/EIS is fundamentally flawed. There is no scientific rationale to support BLM's conclusion that access and impacts to subsistence resources would be minimal if the agency removes 75% of theTeshekpuk Lake Surface Protection Area. (draft IAP/EIS at B-10).

The basis for the conclusions reached in the Analysis under the various exploration and development drat IAP/EIS Alternatives is unreliable. The level to which subsistence resources will be degraded by oil and gas exploration and development is inextricably linked to the impact these activities will have on fish and wildlife resources both throughout the planning area and at sites specifically used for subsistence. The Analysis does not even include all of the directly affected subsistence communities nor does it consider the additional cumulative impact to subsistence from the September 2003 Mineral Management Service offering of the adjacent 9.1 million acres in the Beaufort Sea. As discussed previously, the draft IAP/EIS fails to adequately assess the impact of oil and gas exploration and development on these resources, and on subsistence usage, on a site-specific basis. This failure to adequately disclose and analyze impacts to subsistence on a site-specific basis also violates NEPA.

An adequate assessment of impacts would likely conclude that proposed activities under all Alternatives that allow any exploration or development activities will, in fact, significantly restrict subsistence uses without regard to the cumulative case. In addition, given the uncertainty of information available concerning impacts on many wildlife species, BLM simply cannot justify any conclusion other than that a significant restriction may occur under each exploration and development Alternative. The ANILCA **§** 810 Finding for the Preferred Alternative in the draft IAP/EIS at B.2.2. is deficient.

Furthermore, the Analysis does not discuss the relevant sections of the Naval Petroleum Reserves Production Act (NPRPA). The NPRPA requires the Secretary of the Interior to give "maximum protection" to "any significant subsistence ... fish and wildlife ... values." 42 U.S.C. § 6504(b). The House Report accompanying passage of NPRPA says that the statute requires that the "Secretary of the Interior should take steps to minimize any adverse effects on native subsistence requirements and associated fish and wildlife values", and suggests scheduling of exploration activities as one way to reduce such impacts. U.S. House of Representatives, Interior and Insular Affairs Committee, House Report No. 94-81, Part I, p. 21 (March 18 and April 22, 1975), to accompany H.R. 49. The NPRPA, therefore, provides an independent basis for requiring the Secretary to chose an alternative, and mitigation measures, that satisfy any legitimate NPRPA oil and gas leasing objectives but which offers the maximum protection possible to subsistence resources. The ANILCA 810 discussion does not take into account the Secretary's NPRPA additional obligations concerning subsistence.

Because the draft IAP/EIS fails to properly conclude that the action alternatives will pose by themselves a threat of substantial restrictions of subsistence activities, the hearings that BLM says it intends to hold will not meet ANILCA's requirements. BLM cannot hold fair hearings if it fails to inform the affected public that it's proposed action standing alone will substantially restrict subsistence activities.

Based on information in the draft IAP/EIS, we do not believe the BLM can, at the conclusion of this process, reasonably make the findings required by the second tier of the section 810 process. BLM cannot establish that this intrusion into these key areas is necessary, and the Secretary has already determined that the 1998 decision uses the minimal amount of public lands. Moreover, the IAP/EIS fundamentally fails to demonstrate that the new proposed mitigation measures are sufficient or will be effective.

The draft IAP/EIS fails to specify the size, frequency and timing of sales, making such a determination all but impossible. The draft IAP/EIS does not contain sufficient justification for a conclusion that reasonable mitigation measures would be taken to minimize the effects on subsistence uses. Finally, as previously discussed, the draft IAP/EIS has completely failed to demonstrate that this particular leasing program is necessary at this time. Thus, as a matter of both NEPA and ANILCA analysis, at the present time there is an insufficient basis for resolving the second tier requirements of ANILCA 810.

**VII. FAILURE TO PROVIDE ADEQUATE STIPULATIONS**

The NPRA 1980 Appropriations Rider on which BLM relies for authority for this action requires that oil and gas leasing activities in the Reserve "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources." 42 U.S.C § 6508(1); see also 43 U.S.C. §§ 1701, 1702, 1732. Moreover, the NPRPA requires that the Secretary provide maximum protection to the resources of Teshekpuk Lake and Colville River Special Areas. As in the NEPA documents it prepared for the 1998 Northeast Planning Area, BLM attempts to comply with that requirement in large part by creating a series of conditions and restrictions that should, or might, be included on leases that are issued for oil and gas exploration. In comments submitted with regard to the 1998 Northeast NPRA DEIS, however, we outlined significant shortcomings of the lease stipulations proposed to protect surface resources in that planning area. BLM has not remedied many of those deficiencies, and we reiterate those comments here in reference to the Northeast Planning Area. Moreover, instead of striving to protect resources adequately in the Northeast Planning Area, BLM has proposed significantly weaker and even more discretionary stipulations and Required Operating Procedures (ROPs) in this draft IAP/EIS. Those protections are sufficiently weak and discretionary as to constitute a complete abdication of BLM's responsibility under the NPRPA and a complete failure to provide protection for environmental and socio-cultural resources.

As also pointed out in our Northwest comments, at 61 *et seq.* (comments incorporated herein by reference), the mitigation measures for the Northeast Planning Area adopted in the 1998 ROD are inadequate to protect the resources of the Planning Area. Yet now BLM proposes to weaken them further by substituting significantly weaker and even more discretionary stipulations and so-called Required Operating Procedures ("ROPs"). Rather than weakening the already deficient protections used in the Northeast Planning Area, BLM should have provided for additional protections in a new alternative in this draft IAP/EIS. Moreover, at the very least BLM should have provided some rationale for its choice to weaken the already deficient and addressed the potential impacts of the weakened protections. BLM's failure to do so renders the public and the agency incapable of making an informed decision about the sufficiency of the protections. A promise of greater protection (draft IAP/EIS at 2-11) is simply not enough.

Primarily, we are concerned that the stipulations and ROPs provided in the draft IAP/EIS for mitigating impacts from oil and gas exploration and development are harmfully insufficient to protect surface resources in the Northeast Planning Area. The decision to remove or weaken those protections violates BLM's duty under the NPRPA and FLPMA to protect the surface resources in the NPR-A.

BLM has not provided any justification for its decision to radically deviate from the protections required in the 1998 Northeast ROD. To do so, BLM should review the effectiveness of the stipulations from the Northeast ROD before determining which, if any, requirements should be changed. The review should include a report of the frequency and associated reasons for modifying and waiving stipulations in the Northeast Planning Area. Moreover, the draft IAP/EIS should contain scientific evidence that the stipulations will be adequate in mitigating impacts to an acceptable level. Similar stipulations on industrial development within oil fields have had a checkered history in preventing habitat loss and degradation elsewhere across the North Slope. Additionally, some rationale should be provided for downgrading some protections from stipulations to Required Operating Procedures (ROPs).

The draft IAP/EIS fails to provide any analysis or reasoning behind and predicted effectiveness of the new mitigation measures. At the end of each section of the effects analysis, the draft IAP/EIS merely lists the mitigation measures potentially relevant to the resource analyzed. Nowhere in the document is there an analysis of the mitigation measures effects rather simply unsupported conclusions that the measures will achieve the stated goals. A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA.

Furthermore, no where in the draft IAP/EIS does BLM define what constitutes an "economically prohibitive" stipulation. What criteria is used to determine if something is economically viable? Virtually every single stipulation and ROP can be waived if deemed economically prohibitive but there is no costs benefit discussion and/or analysis in the document. This is a significant failing. BLM has failed to define the term beyond "a suitable return on investment" (draft IAP/EIS at 7-3). Who determines what profit

margin the industry should be afforded at what cost to the public resources? At most, the draft IAP/EIS provides a vague description of the costs. A revised IAP/EIS must detail what criteria will be used to determine what is considered "economically viable".

While claiming that ROPs will be adequate because they will be supported by "rigorous monitoring," *see* draft IAP/EIS at 2-11, the draft IAP/EIS acknowledges the collapse of the role Research Monitoring Team ("RMT"). The RMT was, under the 1998 ROD, to play a key role in assuring that the Reserve's resources would be adequately monitored and protected. *See* 1998 ROD at 21 ("The Research and Monitoring Team will help guide the monitoring effort in the planning areas."); *see also* 1998 IAP/EIS at iv ( "Through the use of stipulations, leasing would be conducted in a manner that is consistent with the protection of the surface resources, including requiring … creation of an Interagency Research and Monitoring Team … [that] would coordinate research and monitoring efforts related to the effectiveness of stipulations and surface resource impacts.") In fact, the RMT was never constituted in an effectual manner and never did any research or monitoring. *Id.* at 1-15. BLM must disclose this fact and explain its impacts to the public and decision maker in any final Amended EIS. Equally important, BLM must justify adopting an entirely different approach to mitigation in light of the fact that no organized or "guided" research and monitoring of the effectiveness of the 1998 ROD's Stipulations has been done to show that the new approach will necessarily lead to better environmental protection for the Reserve's natural resources.

BLM claims the stipulations and ROPs will provide on-the-ground protections for surface resources over the entire Northeast Planning Area. BLM, therefore, must conduct a site-specific analysis in order to predict accurately the impacts of these protections. Such analysis must be done before leasing can occur.

Section 2.6 the draft IAP/EIS asserts that

> An oil and gas lease does not in itself authorize any on-the-ground activity. Seismic operations, drilling, ice road construction, pipeline construction, etc., require additional land use authorizations. Any applicant requesting such authorization will have to address the stipulations and ROPs either before submitting the application (e.g., for subsistence consultation, brant surveys) or as part of the application proposal (e.g., for a proposal stating that garbage will not be buried, or that pipelines and roads will be separated by 500 feet or more).

*Id.* at 2-12. This statement leaves the misimpression that BLM intends to retain authority to deny the lessees the right to enter on their leases to explore and produce oil and gas, i.e., that BLM intends to issue so-called No Surface Occupancy leases. The leases BLM previously issued for the tracts within the Northeast corner Planning Area, however, were not No Surface Occupancy leases. *See* Lease Form AK-3130-1 (April 1999). Unless BLM intends otherwise, the draft Amended IAP/EIS needs to make plain that BLM does not intend to issue No Surface Occupancy leases for tracts within the Planning Area.

The draft IAP/EIS also claims that "These performance-based stipulations and ROPs were developed to allow the BLM and industry greater adaptability to mitigate impacts when more site and project specific information became available." *Id.* § 2.6 at 2-11. These statements ignore the 1998 ROD and existing law.

The 1998 ROD expressly reserves to BLM the authority to add site-specific stipulations *after* a lease is issued:

> Additional site-specific stipulations may be added by the Authorized Officer (AO) as determined necessary by further NEPA analysis and as developed through consultation with other Federal, State, and NSB regulatory and resource agencies. ROD, Appendix B Stipulations, at 29; *see also id.* at 21.

Furthermore, under the Exception Clause embodied in the 1998 ROD's Stipulations, the Authorized Officer may modify a lease or permit stipulation if "an environmentally preferable alternative is available…." *Id.* at 29. BLM's *Offer to Lease and Lease for Oil and Gas* also expressly reserves the right in the Secretary of the Interior to make the lessee's activities "subject … to regulations and formal orders *hereafter promulgated* when not inconsistent with lease rights granted or specific provisions of this lease." *Id.* Form

AK-3130-1 (April 1999) at 1 (emphasis added). To that end, Section 6 of the *Lease* expressly limits the rights of and imposes duties on the lessee. Section 6 indicates that the lessee must

> Conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessees shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modifications to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures.…
>
> Prior to disturbing the surface of the lease lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the impacts to other resources. …. If the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operation that would result in destruction of such species or objects.

Similarly, regulations in 43 C.F.R. governing onshore oil and gas leases on public lands reserve in BLM powers to control activities on a lease beyond those expressly reserved in the text of the lease. *See e.g.*, 43 C.F.R. § 3161.2 ("The authorized officer may issue written or oral orders to govern specific lease operations. Any such oral orders shall be confirmed in writing by the authorized officer within 10 working days from issuance thereof. Before approving operations on leasehold, the authorized officer shall determine that the lease is in effect, that the operator is authorized to conduct such operations, that acceptable bond coverage has been provided and that the proposed plan of operations is sound both from a technical and environmental standpoint.").

The foregoing, therefore, already confer on BLM the flexibility of "adaptive management." Thus, it is unnecessary to amend the 1998 IAP/EIS to achieve that purpose. If, as it claims in the draft IAP/EIS, BLM wants to further describe the "objectives" of the existing ROD's stipulations, nothing prevents it from doing so. If, as it claims in the IAP/EIS, because of environmental considerations BLM wants to raise the minimum height required of a new pipeline from five to seven feet --- the example BLM uses in explaining its justification for proposing amendments to the 1998 Stipulations and for amending the 1998 IAP/EIS --- BLM may legitimately do so without any fear of a taking claim.

In sum, nothing in the 1998 IAP/EIS or ROD, or existing leases, laws or regulations, prohibits BLM from expanding on the Stipulations adopted in the 1998 ROD or from otherwise taking such management actions that are reasonably necessary to tighten environmental protections associated with exploration and development of the existing or future leases in the Reserve. Thus, BLM's proposal to amend Stipulations is not a legitimate.

**VIII. DISMANTLEMENT, REMOVAL, AND RESTORATION (DR&R)**

BLM has an overall restoration goal of returning the disturbed land to its previous primary uses as fish and wildlife habitat and for subsistence use by native villagers; however, it has yet to develop specific DR&R requirements to implement that goal. In addition, BLM currently uses minimum bond amounts that do not reflect differences in oil company experience and financial viability and are unlikely to cover the potential restoration costs that could be incurred (General Accounting Office. Report to Congress: Requirements for restoring Lands after Oil Production Ceases. Washington: 2002).

In order to ensure that the lands of the Reserve are properly restored after oil and gas activities cease, we recommend BLM issue specific dismantlement, removal, and restoration requirements that will allow BLM to meet its overall goal of returning the land to a condition that will sustain its previous uses including fish and wildlife habitat and subsistence uses. In addition, we recommend BLM review its existing financial assurances for oil and gas activities in the Reserve to determine whether they are adequate to assure the availability of funds to achieve its overall restorative goal.

**CONCLUSION**

The National Petroleum Reserve-Alaska is the largest single unit of public land in the Nation, and it harbors rich and important wildlife and wildlands. Healthy, productive ecosystems are fundamental for ensuring a sustainable economy for Alaska and maintaining the quality of our life style shared and valued by all Alaskans. We believe that a balanced approach for development in the Reserve requires permanent protection of its special places and values and that development must adhere to strict environmental standards, including those related to operations, cleanup and restoration.

Upon review of the above referenced draft Amended IAP/EIS, we have found egregious failings in the planning process, analysis and proposed agency action. The preferred alternative is an extraordinary reversal devoid of scientific rationale that places the wildlife, fish and subsistence resources of the Teshekpuk Lake Surface Protection Area at significant risk. As written, the draft Amended IAP/EIS needlessly violates the law and the agency's trust responsibility.

If BLM intends to proceed with this amendment process, the agency must complete a revised Amended IAP/EIS to correct the legal and scientific inadequacies outlined above and in the original 1998 IAP/EIS. In a revised Amended IAP/EIS, a management alternative must be selected that provides adequate protection to the ecological, wildlife, subsistence, cultural and wilderness resource of the Northeast Planning Area and the public must be given an opportunity to comment on that alternative. A more balanced, science based approach to energy development and environmental protection would enhance resource protection from the 1998 ROD and at a *minimum* do the following in the Northeast Planning Area:

- Permanently protect the Teshekpuk Lake Special Area, Colville River Special Area and other biological hot spots
- Protect the North Slope and Yukon Kuskokwim Delta communities' subsistence resources
- Strengthen monitoring and lease stipulation requirements

Thank you for your attention to our concerns and recommendations. We encourage you to contact us at anytime.

Respectfully Submitted,

Randy Virgin
Executive Director
Alaska Center for the Environment

Tim Bristol
Director
Alaska Coalition

Cindy Shogun
Executive Director
Alaska Wilderness League

Mike Matz
Executive Director
Campaign for America's Wilderness

Brendan Cummings
Staff Attorney
Center for Biological Diversity

Charles Clusen
Director, Alaska Projects
Natural Resources Defense Council

Arthur Hussey

Executive Director
Northern Alaska Environmental Center

Sara Chapell
Alaska Representative
Sierra Club

Eleanor Huffines
Alaska Regional Director
The Wilderness Society

Athan Manual
Director, Arctic Campaign
U.S.PIRG

Randall Snodgrass
Director, Government Relations
World Wildlife Fund

CC: Earthjustice
Trustees for Alaska
Audubon Alaska

**LITERATURE CITED**

Audubon Alaska (Schoen, J. and S., Senner Eds.). 2002. Alaska's western Arctic: a summary and synthesis of resources. Draft, 12-30-02. Audubon Alaska, Anchorage, AK.

Ballard, W.B., M.A. Cronin, and H.A. Whitlaw. 2000. Caribou and oil fields. Pages 85-104 *in* J.C., Truett and S.R. Johnson, editors. The natural history of an Arctic oil field. Academic Press, San Diego, CA.

Barr, J.F. 1997. Status report on the yellow-billed loon (*Gavia adamsii)* in Arctic Canada. Committee on Status of Endangered Wildlife in Canada.

Barry, T.W., and R. Spencer. 1976. Wildlife response to oil well drilling. Canadian Wildlife Service Program Notes 67. Ottawa, Ontario, Canada.

Bollinger, K.S., and D.V. Derksen. 1996. Demographic characteristics of brant near Teshekpuk Lake, Alaska. Journal of Field Ornithology 67(1):141-158.

BP. 2001. Brant (*Branta bernicla nigricans*). Pages 51-54 *in* Technical briefs: Alaska's north slope oilfields. BP, Anchorage, AK.

Brown, S., C. Hickey, B. Harrington, and R. Gill, editors. 2001. United States shorebird conservation plan. Manomet Center for Conservation Sciences, Manomet, MA.

Cameron, R.D., W. T. Smith, R. G. White, and B. Griffith. 2002. The Central Arctic caribou herd. Pages 38-45 *in* D. C. Douglas, P. E. Reynolds, and E. B. Rhode, editors. Arctic Refuge coastal plain terrestrial wildlife research summaries. U. S. Geological Survey, Biological Resources Division, Biological Science Report USGS/BRD BSR-2002-0001.

_____. 1995. Can petroleum development depress the productivity of Arctic caribou? Proceedings of the 2nd Int. Arctic Caribou Conference 36. University of Alaska Fairbanks, AK

_____, D.J. Reed, J.R. Dau, and W.T. Smith. 1992. Redistribution of calving caribou in response to oil-field development on the Arctic slope of Alaska. Arctic 45:338-342.

Carroll, G. 2002. Teshekpuk Lake caribou herd. Survey-inventory manage. rep., Unit 26A. *In* M.V. Hicks, editor. Caribou. Federal Aid Wildlife Survey-Inventory Activities July 1998–June 2000. ADF&G, Juneau, AK. *In prep.*

Cronin, M., H. Whitlaw, and W. Ballard. 2000. Northern Alaska oil fields and caribou. Wildlife Society Bulletin 28:919-922.

Dau, J.R., and R.D. Cameron. 1986. Effects of a road system on caribou distribution during calving. Rangifer Spec. Iss. 1:950101.

Day, R.H. 1998. Predator populations and predation intensity on tundra-nesting birds in relation to human development. Report to Northern Alaska Ecological Service, USFWS, Fairbanks, AK. ABR, Fairbanks, AK.

Derksen, D.V, K. Bollinger, D. Esler, K Jensen, E Taylor, M Miller, and M. Weller. 1992. Effects of aircraft on behavior and ecology of molting black brant near Teshekpuk Lake, Alaska. Final Report. DOI, USF&WS, Anchorage, AK.

_____, W.D. Eldridge, and M.W. Weller. 1982. Habitat ecology of Pacific brant and other geese moulting near Teshekpuk Lake, Alaska. Wildfowl 33:39-57.

_____, T.C. Rothe, and W.D. Eldridge. 1981. Use of wetland habitats by birds in the National Petroleum Reserve-Alaska. Resource Publication 141. USFWS, Washington, DC.

Derksen, D.V., M.W. Weller, and W.D. Eldridge. 1979. Distributional ecology of geese molting near Teshekpuk Lake, National Petroleum Reserve-Alaska. Pages 180-207 *in* R.L. Jarvis and J.C. Bartonek, editors. Management and biology of Pacific Flyway geese. Oregon State University, Corvallis, OR.

Earnst, S.L. 2000. Habitat-specific distribution and abundance of yellow-billed loons on the Arctic coastal plain of Alaska: February 2000 progress update. Unpublished report to USFWS, Nongame Bird Program, Anchorage, AK.

Eberhardt, L.E., W.C. Bengtson, J.L. Hanson, R.A. Garrott, and E.E. Hanson. 1982. Arctic fox home range characteristics in an oil-development area. Journal of Wildlife Management 46(1):183-190.

Ely, C.R., and A.X. Dzubin. 1994. Greater white-fronted goose (*Anser albifrons*). *In* A. Poole and F. Gills, editors. The Birds of North America 131. The Birds of North America, Philadelphia, PA.

Fair, J. 2002. Status and significance of yellow-billed loon populations in Alaska. Report to The Wilderness Society and Trustees for Alaska, Anchorage, AK.

Flint, P. 2004. Analyses of protection for molting geese provided by the preferred alternative. (unpublished memo 7-28-04) Alaska Science Center, Biological Resources Division, USGS, Anchorage, AK.

Fredrickson, L.H. 2001. Steller's eider (*Polysticta stelleri*). *In* A. Poole and F. Gill, editors. The Birds of North America: 571. The Birds of North America, Philadelphia, PA.

Gabrielson, I.N., and F.C. Lincoln. 1959. The birds of Alaska. Stackpole Company, Harrisburg, PA.

Gilliam, J.K., and P.C. Lent, editors. 1982. Proceedings of NPR-A caribou/waterbird impact analysis workshop. Bureau of Land Management, Anchorage, AK.

Griffith, B., D. Douglas, N. Walsh, D. Young, T. McCabe, D. Russell, R. White, R. Cameron, and K. Whitten. 2002. The Porcupine caribou herd. *In* D. Douglas, P. Reynolds, and E. Rhode, editors. Arctic Refuge coastal plain terrestrial wildlife research summaries. U.S. Geological Survey, Biological Resources Division, Biological Science Report BSR-2002-0001.

Johnson, C.B., M.T. Jorgenson, R.M. Burgess, B.E. Lawhead, J.R. Rose, and A.A. Stickney. 1996. Wildlife studies on the Colville River Delta, Alaska, 1995. Unpublished report for ARCO Alaska, Anchorage, AK. ABR, Fairbanks, AK.

Jensen, K.C. 1990. Responses of molting Pacific brant to experimental aircraft disturbance in the Teshekpuk Lake Special Area, Alaska. Ph.D. Thesis, Texas A&M University, College Station.

King, R., and A.W. Brackney. 1997. Aerial breeding pair surveys of the Arctic coastal plain of Alaska - 1996. Unpublished report. USFWS, Fairbanks, AK.

_____, and W.I. Butler. 1990. Teshekpuk Lake special area molting goose survey 1989. Unpublished report. USFWS, Anchorage and Fairbanks, AK.

King, J.G. and J.I. Hodges, 1979. A preliminary analysis of goose banding on Alaska's Arctic slope. In: Management and Biology of Pacific Flyway Geese (R.C. Jarvis and J.C. Bartonek, eds.). Oregon State University Bookstores, Inc., Corvallis, OR.

Koranda, J. and C. Evans. 1975. A discussion of sites recommended as potential natural landmarks in the Arctic lowland, natural region, northern Alaska. Prepared for the National Park Service. By the Tundra Biome Center, University of Alaska Fairbanks, Alaska.

Lanctot, R.B., and C.D. Laredo. 1994. Buff-breasted sandpiper (*Tryngites subruficollis*). *In* A. Poole and F. Gill, editors. The Birds of North America: 91. Academy of Natural Science, Philadelphia, PA.

Larned, W.W., R. Stehn and R. Platte. 2003. Eider breeding population survey – Arctic Coastal Plain, Alaska. Unpubl. Rept. USFWS, Migr. Bird Mgmt., Anchorage.

Mallek, E. 2004. Teshekpuk Lake area molting goose survey – 2003. unpubl. Report, U.S. Fish and Wildlife Service, Fairbanks. AK.

_____, R. Platte, and R. Stehn. 2001. Aerial breeding pair surveys of the Arctic coastal Plain of Alaska—2001. U.S. Fish and Wildlife Service, Waterfowl Management Report, Anchorage, AKI.

Martin, P. 1997. Predators and scavengers attracted to locales of human activity. Pages 6-19 to 6-24 *in* K.L. MiTLHell, report preparer. NPR-A Symposium Proceedings: Science, Traditional Knowledge, and the Resources of the Northeast Planning Area of the National Petroleum Reserve-Alaska. Department of Interior, Minerals Management Service, Anchorage, AK.

Meehan, R.H. 1986. Impact of oilfield development on shorebirds, Prudhoe Bay, Alaska. Ph.D. Thesis, University of Colorado, Boulder, CO.

Miller, M.W., K.C. Jensen, W.E. Grant, and M.W. Weller. 1994. A simulation model of helicopter disturbance of molting Pacific brant. Ecological Modeling 73:293-309.

Murphy, S.M., and B.E. Lawhead. 2000. Caribou. Pages 59-84 *in* J.C. Truett and S.R. Johnson, editors. The natural history of an Arctic oil field. Academic Press, San Diego, CA.

National Research Council of the National Academies. 2003. Cumulative environmental effects of oil and gas leasing on Alaska's North Slope. NRC, Washington D.C.

Nellemann, C. and R. Cameron. 1998. Cumulative impacts of an evolving oil-field complex on the distribution of calving caribou. Canadian Journal of Zoology 76:1425-1430.

_____, and _____. 1996. Effects of petroleum development on terrain preferences of calving caribou. Arctic 49:23-28.

North, M.R. 1994. Yellow-billed loon. *In* A. Poole and F. Gill, editors. The Birds of North America 121. Academy of Natural Science, Philadelphia, PA; American Ornithological Union, Washington DC.

_____. 1993. Distribution and migration of yellow-billed loons in North America. Bird Populations 1: 36-49.

_____, and M.R. Ryan. 1988. Yellow-billed loon breeding chronology and reproductive success in Arctic Alaska. Canadian Field-Naturalist 102:485-490.

_____, and _____. 1986. Yellow-billed loon populations on the Colville River Delta, Arctic Alaska: supplemental project report. Unpublished report. USFWS, Anchorage, AK.

Obritschkewitsch, T., P.D. Martin, and R.S. Suydam. 2001. Breeding biology of Steller's eiders nesting near Barrow, Alaska, 1999-2000. Technical Report NAES-TR-01-04. USFWS, Ecological Service, Fairbanks, AK.

Petersen, M.R., J.B. Grand, and C.P. Dau. 2000. Spectacled eider (*Somateria fischeri*). *In* A. Poole and F. Gill, editors. The Birds of North America: 547. The Birds of North America, Philadelphia, PA.

Ritchie, R.J., R.M. Burgess, and R.S. Suydam. 2000. Status and nesting distribution of lesser snow geese, *Chen caerulescens caerulescens*, and brant, *Branta bernicla nigricans*, on the western Arctic coastal plain, Alaska. Canadian Field-Naturalist 114:395-404.

Sedinger, J.S., and A.A. Stickney. 2000. Brant. Pages 221-232 *in* J.C. Truett and S.R. Johnson, editors. The natural history of an Arctic oil field. Academic Press, San Diego, CA.

Silva, J.B., compiler. 1985. Habitat evaluation for Teshekpuk Lake Special Area study. Arctic Resource Area, BLM, Fairbanks, AK.

Smith, W.T., and R.D. Cameron. 1985. Reactions of large groups of caribou to a pipeline corridor on the Arctic coastal plain of Alaska. Arctic 38:53-57.

Stickney, A.A., and R.J. RiTLHie. 1996. Distribution and abundance of brant (*Branta bernicla*) on the central Arctic coastal plain of Alaska. Arctic 49:44-52.

Taylor, E.J. 1995. Molt of black brant (*Branta bernicla nigricans*) on the Arctic Coastal Plain. Auk 112:904-919.

_____. 1993. Molting and bioenergetics of Pacific black brant (*Branta bernicla nigricans*) on the Arctic Coastal Plain, Alaska. PhD. Dissertation, Texas A&M Univ., College Station.

Troy, D.M. 1993. Tundra Birds. Chapter IV, *in* "Prudhoe Bay Waterflood Project: Tundra Bird Monitoring Program." Unpublished report available at U.S. Army Corps of Engineers, Alaska District, Anchorage.

*United States Bureau of Land Management. 1994. Northeast National Petroleum Reserve-Alaska Draft Integrated Activity Plan/Environmental Impact Statement. Anchorage, AK.*

_____. *1998. Northeast National Petroleum Reserve-Alaska, final integrated activity plan/environmental impact statement and record of decision. Anchorage, AK.*

_____. 1978. NPR-A 501 (c ) Values and Resource Analysis, Vol. 3, Section 6, Fish and Wildlife Resources. Dept. Interior, BLM NPR-A Task Force, Anchorage, AK.

United States Fish and Wildlife Service. 2002. Steller's eider recovery plan (draft). USFWS, Fairbanks, AK.

_____. 2000. Proposed critical habitat for the Steller's eider in Alaska. Briefing paper. USFWS, Ecological Service, Anchorage and Fairbanks, AK.

_____. 1996. Spectacled eider recovery plan. USFWS, Anchorage, AK

Veireck, L. and J. Zasada. 1972. A proposal for an ecological reserve system for the taiga and tundra of Alaska. Institute of Northern Forestry, U.S. Forest Service, College, Alaska.

Walker, D.A., P.J. Webber, E.F. Binnian, K.R. Everett, N.D. Lederer, E.A. Nordstrand, and M.D. Walker. 1987. Cumulative impacts of oil fields on northern Alaskan landscapes. Science 238:757-761.

Whitten, K. and R. Cameron. 1983. Movements of collared caribou, *Rangifer tarandus*, in relation to petroleum development on the Arctic slope of Alaska. Canadian Field-Naturalist. 97:143-146.

_____, G. Garner, F. Mauer, and R. Harris. 1992. Productivity and early calf survival in the Porcupine caribou herd. Journal of Wildlife Management 56:201-212.

Wolfe, R.J., and A.W. Paige. 1995. The subsistence harvest of brant, emperor geese, and eider ducks in Alaska. Technical Paper 224. Division of Subsistence, ADF&G, Juneau, AK.

Wolfe, S.A. 2000. Habitat selection by the calving caribou of the Central Arctic Herd, 1980-1995. M.S. Thesis. University of Alaska Fairbanks, AK.

_____, B. Griffith, and C.A. Gray Wolfe. 2000. Response of reindeer and caribou to human activities. Polar Research 19:63-73.

Yokel, D.A., editor. 1997. Proceedings of Teshekpuk Lake Area Caribou/Waterfowl Analysis Workshop. Bureau of Land Management, Fairbanks, AK.

Young, D., T. McCabe, R. Ambrose, G. Garner, G. Weiler, H. Reynolds, M. Udevitz, D. Reed. and B. Griffith. 2002. Predators. *Iin.* D. Douglas, P. Reynolds, and E. Rhode, e Editors. Arctic Refuge coastal plain terrestrial wildlife research summaries. U.S. Geological Survey, Biological Resources Division, Biological Science Report BSR-2002-0001.