ANADARKO PETROLEUM CORPORATION

TEL 832/ 636-1000
P.O. BOX 1330 • HOUSTON, TEXAS 77251-1330



August 20, 2004

197615

2004 AUG 26 PM 1:00
BLM AK SO 952
ANCHORAGE AK

Susan Childs
Project Manager
Bureau of Land Management
Alaska State Office
222 West 7th Avenue
Anchorage, Alaska 99513-7599

    Re:    Draft Amended Integrated Activity Plan/Environmental Impact Statement – Northeast National Petroleum Reserve

Dear Ms. Childs:

Anadarko Petroleum Corporation (Anadarko) submits the following comments on the Bureau of Land Management's (BLM) Draft Amended Integrated Activity Plan/Environmental Impact Statement for the Northeast National Petroleum Reserve (NE IAP/EIS) for your consideration.



Anadarko is one of the largest independent E&P companies in the world and has been a major participant in the exploration, development, and production of oil and gas on the North Slope of Alaska for over ten years. We are a proven operator on the North Slope and an active drilling partner with ConocoPhillips in the Alpine field, the largest onshore domestic oil discovery in over a decade. With ConocoPhillips and others, we intend to pursue additional exploration projects across the North Slope.



The National Petroleum Reserve – Alaska (NPR-A) encompasses approximately 23 million acres of highly propsective petroleum lands on the North Slope of Alaska. There is a long history of Congressional enactments governing management of the Reserve that make it clear that the Reserve's non-petroleum values must be protected in a way that does not jeopardize its oil and gas development potential. The President's energy policy also directs the Secretary of the Interior to "consider additional environmentally responsible oil and gas development, based on sound science and the best available technology, through further lease sales in the [NPR-A]." These enactments make it clear that Congress has directed BLM to strike a balance between development of the oil and gas resources with protection of the environmental, subsistence and wildlife resources.

**004 Alternatives**

The NPR-A potentially contains extensive oil and gas resources, although the extent and location of these resources within the NE NPR-A are currently unknown. Exploration is the critical first step in defining the extent of these resources and the economic feasibility of their development. Therefore, all of the lands within the NE NPR-A should be made available to oil and gas leasing. Environmentally responsible exploration on these leases can be achieved through the application of appropriate stipulations, required operating procedures and development of site-specific permitting requirements through an analysis conducted under the National Environmental Policy Act.

**5**

Anadarko is fully committed to environmentally responsible development of the resources within the NPR-A as demonstrated by its performance in the NPR-A for the last ten years. We have successfully maintained the delicate balance between oil and gas development and protection of the environment in which those resources occur. Moreover, we are dedicated to working closely with the applicable State and Federal agencies, Native corporations and organizations and environmental groups to ensure that the concerns of all are addressed throughout the exploration, development and production of the resources of the NPR-A.

**6**

We commend BLM for the effort that it has undertaken to update the NE IAP with lease stipulations and required operating procedures similar to those applied in the Northwest National Petroleum Reserve. We believe that such an alignment of operating procedures will encourage more efficient resource management within the National Petroleum Reserve and the Northeast Plan Area in particular.

**General Comments**

**007 Alternatives**

Anadarko urges BLM to adopt and implement Alternative C in the record of decision. The NPR-A is one of the last few onshore areas remaining in North America that could contain large, conventional oil and gas resources. As such, these oil and gas resources must, consistent with the President's energy policy, be made available for environmentally responsible development to meet the ever growing energy demands of our nation. We believe implementation of Alternative C will achieve BLM's dual mandate to open the area to environmentally responsible oil and gas development while simultaneously minimizing potential impacts to the soil, water, air, vegetation, wildlife, archeological and paleontogical resources. The protective measures included in Alternative C are more than adequate to mitigate potential impacts from oil and gas development and will protect the wildlife, environment and traditional uses of the land.

**008 Alternatives**

Were BLM to implement its Preferred Alternative instead of Alternative C, potentially important oil and gas resources in the Barrow Arch would be needlessly removed from development. Although we recognize that there are sensitive resources in and around this area that require protection, we believe that

full leasing of the area should occur and that protection of sensitive resources can be successfully achieved through the adoption of performance based operating procedures and stipulations.

**009 Alternatives**

If BLM believes the whole area should not be opened to leasing, we nevertheless encourage BLM to open the area north and east of Teshekpuk Lake, and defer a decision whether to open Teshekpuk Lake itself to leasing. Such an alternative would balance protection of the sensitive resources of the NE NPR-A with development of its energy resources. We believe that concerns regarding potential impacts to environmental resources and wildlife that may be raised as a result of opening the area north and east of the Lake to leasing can be addressed through site-specific analysis for a given project and the adoption of appropriate seasonal stipulations.

**010 Stips & ROPs**

The BLM should clarify in the final document that not all of the required operating procedures (ROPs) will be imposed on all projects. Those that are to be included as conditions of approval should only be imposed if the site-specific analysis under the National Environmental Policy Act for that project supports its inclusion.

**011 Stips & ROPs**

We acknowledge the potential need for set backs to streams and rivers located within the NPR-A. However, we urge BLM to review and address some of the extensive setbacks that would be imposed. In our opinion, the proposed three-mile setback is unnecessary. Moreover, it is twice the one and a half mile setback recommended in 1998.

**012 Stips & ROPs**

It appears that a number of the required operating procedures unnecessarily duplicate existing regulatory requirements imposed by either state or federal agencies. In the draft IAP/EIS, it states that BLM has "eliminated the redundancy of requirements that already exist in the form of regulation or law." IAP/EIS at 2-11. BLM should review all of the required operating procedures and include only those that are not duplicative. We have highlighted a few examples of duplicative required operating procedures below.

**Specific Comments**

**013 Stips & ROPs**

Section 2.6.2.1- Stipulation(s) and the Required Operating Procedure(s) Exception Process: This section should be revised to be aligned with BLM's existing regulations regarding exceptions to stipulations found at 43 C.F.R. § 3101.1-4 as the procedures set forth here are unduly restrictive. In addition, it states that "a lessee/permittee shall notify the AO in a timely manner that an exception is going to be requested." Assuming this provision was included to allow BLM ample time to meet any consultation requirements it may have prior to a revision of a stipulation, BLM should be more specific regarding the applicable time frame to provide lessees sufficient notice. We recommend BLM delete the quoted language or modify it to provide a more definitive time frame.

**[014 Stips & ROPs]**

ROP A-2: This required operating procedure (ROP) mandates that lessees prepare a comprehensive waste management plan that is to be submitted to the authorized officer for approval. The requirement is unnecessarily duplicative of existing regulatory requirements imposed by other federal and state agencies. We recommend that BLM modify the requirement to remove those provisions, such as disposal of pumpable waste products, which are addressed by other applicable regulations.

**[015 Stips & ROPs]**

ROP A-4: This ROP requires a lessee to develop a comprehensive spill prevention and response contingency plan in accordance with 40 C.F.R. § 112. Lessees must already prepare such a plan under existing regulations, and including this requirement as a ROP is unnecessarily duplicative. Moreover, subparagraph (b) seems to imply that even if a lessee has a permit authorizing a discharge into marine waters, BLM could still prohibit such a discharge. Such a decision is beyond the scope of BLM's authority, and we recommend that BLM revise the ROP to delete this provision.

**[016 Stips & ROPs]**

ROP A-6: This ROP prohibits the surface discharge of reserve pit fluids unless the lessee has an applicable federal, state and/or local permit. This requirement seems unnecessarily duplicative of already existing regulations; therefore, we recommend that it not be included in the ROD.

**[017 Stips & ROPs]**

ROP E-11: This ROP requires a lessee to conduct surveys for spectacled and stellar's Eiders and yellow-billed loon for three years prior to any authorization for construction. On page 2-13 of the IAP/EIS, BLM acknowledges that mitigation of resources will "come with some costs to oil and gas operations;" however, lessees should not be required to shoulder the whole burden. Requiring three years of surveys prior to construction will needlessly extend the required planning process and may deprive a lessee of the ability to utilize the full lease term as construction would not be allowed prior to the completion of the requisite surveys. We recommend that BLM shorten the number of years such surveys would be required and provide a definition of what activities would fall within the prohibition on construction.

**[018 Stips & ROPs]**

ROP E-12: The ROP requires the development of an ecological land classification map prior to the approval of facility construction. This ROP needs to be clarified to specify who will be responsible for the creation of such a map. We respectfully suggest that such a requirement should rest with BLM rather than a lessee. Although we agree that such a map may be a useful tool, mandating its development prior to any and all facility construction is unnecessarily broad.

**[019 Stips & ROPs]**

G-1 Lease Stipulation: We fully support a requirement to rehabilitate the lands upon the conclusion of oil and gas development activities, and BLM's ability to waive such a requirement in certain circumstances. However, we do not support BLM's ability to require that some or all of the facilities be left in place,

**019 (Cont'd) Stips & ROPs**

especially without adequate compensation to the lessee for those facilities along with an appropriate release of liability. Therefore, we recommend that if this provision is retained in the ROD, it be modified to delete the following sentence: "The AO may determine that it is in the best interest of the public to retain some or all facilities." In the alternative, if the sentence is retained, we recommend BLM revise it as follows: "The AO may determine that it is in the best interest of the public to retain some or all of the facilities; however, such a requirement will be subject to BLM and the lessee reaching an agreement regarding compensation and liability."

**020 Stips & ROPs**

Definition of Consultation on page 2-24 of IAP/EIS: This definition should be deleted as unnecessary and duplicative of the definition previously included at page 2-12 of the IAP/EIS.

**021 Stips & ROPs**

ROP H-1: Under this ROP, lessees are required to consult directly with affected communities in an effort to "provide opportunities for participating in planning and decision making to prevent unreasonable conflicts between subsistence uses and oil and gas and related activities." Anadarko fully supports consulation with the affected communities and is committed to a close, co-operative relationship with the potentially affected Native organizations and people. However, we also strongly believe that BLM has a strategic role to play in such consultation. Therefore, we recommend that BLM revise this ROP to provide for BLM's active participation in and facilitation of any consultation thereby achieving consistency and a better understanding of all of the stakeholders issues and concerns. If the provision is retained without the above-recommended revisions, it should nevertheless be revised as follows: Subparagraph (b) should be revised to delete any requirement to provide documentation of consultation as part of a plan of operations. Such a requirement is unnecessary and unduly restrictive. In addition, the last sentence of this paragraph should be deleted. Any analysis of the potential effects of a proposed plan of operations will be included in the applicable environmental analysis of the project prepared by BLM. Mandating such a requirement for a plan of operations unduly shifts BLM's burden to conduct this analysis onto the lessee.

**022 Stips & ROPs**

K-1 Lease Stipulation: With respect to Fish Creek, this lease stipulation prohibits the placement of permanent oil and gas surface facilities within 3 miles of the bank's high water mark. We believe this provision should not be a lease stipulation and should instead be a ROP that would only be imposed if site-specific analysis supports the need to impose such a restriction. Moreover, the setback should not be automatically imposed as 3 miles. If the site-specific analysis supports a shorter setback, then such a shorter one should be imposed. The same is true for the prohibition regarding the location of surface facilities within a half mile of Judy Creek.

**Exhibit 25, page 5 of 6**

[023 Stips & ROPs]

K-4 Lease Stipulation: This stipulation should be revised to remove subparagraph (c). Winter exploration activities do not impact molting geese; therefore, this provision is unnecessary.

[024 Stips & ROPs]

K-5 Lease Stipulation: Subparagraph (a) should be revised to clarify what constitutes an "acceptable study."

[25]

The NPR-A is one of the most promising areas in the United States for the discovery of large deposits of oil and gas. Anadarko has demonstrated that it can, and will, operate in a manner that is protective of the cultural and environmental resources of the NPR-A, through the use of best management practices and application emerging technologies. We are committed to a collaborative effort between industry, Native organizations, and state and federal agencies to ensure that these important oil and gas resources are development in such a manner to protect the varied resources of the NPR-A.

[26]

We appreciate the opportunity to comment. Should you have any questions regarding the above suggestions, please either Greg Hebertson at 832/636-1649 or Mark Hanley at 907/273-6310.

Sincerely,

*[signature]*

Greg Hebertson
Project Manager
Alaska and Canada Frontier Exploration

BLM AK SO 952 ANCHORAGE AK  2004 AUG 26 PM 1:00