# *Alaska Eskimo Whaling Commission*
P.O. Box 570 · Barrow, Alaska 99723 · Phone: (907) 852 2392

August 23, 2004            197605

Henri Bisson
Alaska State Director
NPR-A Planning Team
Bureau of Land Management
Alaska State Office (931)
222 West 7th Avenue
Anchorage, AK 99513

http://nenpra.ensr.com
FAX: 907-563-0439

Re:  Draft Amended Integrated Activity Plan/Environmental Impact Statement for the Northeast National Petroleum Reserve-Alaska

Dear Director Bisson:

The Alaska Eskimo Whaling Commission (AEWC) appreciates this opportunity to provide written comments on the Bureau of Land Management's Draft Amended Integrated Activity Plan/Environmental Impact Statement (DEIS) for the Northeast National Petroleum Reserve-Alaska (NPRA).

In addition, the AEWC would like to request the opportunity to meet with you in person in the near future to discuss the issues raised in these comments, especially those pertaining to adverse impacts to bowhead whales and the bowhead whale subsistence hunt.

If you have any questions, please call my office.

Sincerely,

Maggie Ahmaogak

CC:   Mayor George Ahmaogak
      Senator Ted Stevens
      Senator Lisa Murkowski
      Congressman Don Young

**COMMENTS
OF THE
ALASKA ESKIMO WHALING COMMISSION
ON THE
NORTHEAST NATIONAL PETROLEUM RESERVE – ALASKA
DRAFT AMENDED INTEGRATED ACTIVITY PLAN/
ENVIRONMENTAL IMPACT STATEMENT**

August 23, 2004

**INTRODUCTION**



A decision to open the Northeast National Petroleum Reserve – Alaska (NPRA) to additional leasing would be unreasonably premature at this time. The Bureau of Land Management (BLM) and its NPRA stakeholders have not had the opportunity to develop, implement, and evaluate the effectiveness of the mitigation measures developed in 1998 to support the extensive leasing plan developed for the Northeast NPRA at that time.



As a general proposition, Congress, in the Federal Land Preservation and Management Act, has directed BLM to foster "multiple use and sustained yield" on the nation's public lands. With respect to development on public lands used for subsistence, like those of the North Slope, a narrower and more specific directive was created. With the enactment of the Alaska National Interest Land Conservation Act (ANILCA), Congress specifically recognized the fragile and opportunistic nature of the subsistence lifestyle so vital to North Slope Native culture,



> *The continuation of the opportunity for subsistence uses by rural residents of Alaska . . . is essential to Native physical, economic, traditional, and cultural existence.*
>
> *The situation in Alaska is unique in that, in most cases, <u>no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife</u> which supply rural residents dependent on subsistence uses.*

16 USC 3111 (1),(2), emphasis supplied.



Thus, Congress recognizes that for the vast majority of North Slope Natives, there is no other source of food and essential supplies to replace those obtained from subsistence hunting. If BLM fails in its duty to create a regulatory framework that enables oil and gas development to go forward without damage to subsistence uses, people of the North Slope will be forced to leave their homes and resort to welfare or face starvation. The history of interaction between "western" or industrialized cultures and aboriginal

subsistence cultures is a grim reminder of the common fate of the Native peoples who in the past have faced a situation such as the one faced by North Slope Natives today. Just as people can die, so can communities and cultures. Aboriginal subsistence communities do not survive the loss of their subsistence resources.

[7] Congress has recognized the gravity of the risk here, and has tasked BLM with the protection and preservation of North Slope subsistence resources and uses even as it leases portions of the North Slope for oil and gas development. Certainly Congress has set BLM a daunting task in directing the agency to foster the co-existence of subsistence uses and oil and gas development in the NPRA. However, the task is not insurmountable and Congress has provided BLM with high quality, science based guidance in the 2003 <u>Report of the National Research Council Committee on Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope</u>, the National Academies Press, Washington, D.C. Following the recommendations of this Report should enable BLM to meet its statutory obligations as set forth in ANILCA and FLPMA. Failure to follow the recommendations will create substantial risk of failure in meeting those and other legal and regulatory obligations.

## SUMMARY

[008 Alternatives] The analysis in the current Draft Environmental Impact Statement (DEIS) does not support the opening of new areas of the Northeast NPRA to oil and gas leasing. Rather, the DEIS supports the adoption, by BLM, of "Alternative A", its "no action" alternative. Federal law requires that the substantial impacts to wildlife, habitat, and subsistence uses threatened by the present level of leasing (the "no action" alternative) must be mitigated to an extent that enables the North Slope subsistence communities to continue their subsistence lifestyle. With the 1998 Decision to open the Northeast NPRA to oil and gas leasing, BLM developed an extensive catalogue of mitigation measures. The effectiveness of these measures in protecting North Slope subsistence in the face of the level of development contemplated under the 1998 Decision has not been proven. Therefore, expanded leasing cannot be supported.

[009 Marine Mammals] Furthermore, the 1998 mitigation measures do not address the likely and potentially extensive impacts to bowhead whales, the bowhead migration, and the Alaskan Eskimo bowhead whale subsistence hunt from oil and gas leasing under the 1998 Decision. Barge traffic associated with NPRA development has already been identified as a potential factor leading to an apparent deflection of the 2003 fall bowhead whale migration at Barrow. With warmer winters and the retreating ice pack, the fall bowhead migration is occurring closer to shore than has been observed in years of heavy ice cover. Thus, as work continues to ramp up on the NPRA, bowheads are increasingly likely to encounter NPRA-related boat traffic during their fall migration. In the absence of adequate mitigation, these encounters threaten the whales and the bowhead subsistence hunt.

Finally, Congress has provided BLM with guidance concerning the need for a comprehensive program of planning and research to be undertaken in cooperation with other federal, state, and local agencies to provide the information and coordination necessary for management of the NPRA consistent with Federal law.

In light of the above, a decision by BLM to open additional areas of the Northeast NPRA to oil and gas leasing would be premature at this time, in violation of BLM's obligations under ANILCA, FLPMA, Executive Order 12898, and potentially the Endangered Species Act.

I. THE DEIS COMPELS THE ADOPTION OF "ALTERNATIVE A" AND THE EXPANSION OF MITIGATION MEASURES UNDER THAT ALTERNATIVE

   A. BLM Cannot Open Additional Areas of the Northeast NPRA to Oil and Gas Leasing Until It Determines Whether the Mitigation Measures Developed In 1998 Provide Required Protections.

In its 1998 decision regarding the Northeast NPRA, BLM opened <u>almost 90 percent</u> of the Northeast NPRA to development, creating an extensive and, from the perspective of our subsistence communities, a very high risk experiment in the 'multiple use" management of two potentially mutually exclusive activities – subsistence and oil and gas development. In January of this year, virtually the entire Northwest NPRA was similarly opened, adding almost 9 million acres to the 4 million acres already opened under the 1998 decision. With these two decisions, BLM has opened the overwhelming majority of our North Slope communities' traditional onshore subsistence hunting areas to oil and gas leasing.

Our communities support onshore oil and gas development, if it is done properly. Furthermore, based on our experience with oil and gas development in the OCS, we are confident that onshore development, if done properly, can co-exist with our traditional subsistence lifestyle. Moreover, as discussed later in these comments, it is precisely this type of co-existence that Congress has directed the Department of the Interior to foster on public lands through BLM's congressionally mandated management of those lands on the basis of "multiple use and sustained yield" 43 U.S.C. 1701(a)(7) (2003).

In the 1998 Integrated Activity Plan/Environmental Impact Statement (IAP/EIS) for the Northeast NPRA, BLM reviewed numerous impacts to North Slope subsistence resources and activities expected to occur as a result of oil and gas development under what, in the current action, is referred to as "Alternative A" or the "no action" alternative. These impacts are broad in scope – geographically, across resources, and through time. In a best case scenario, they will result in long term (in some cases effectively permanent) alterations to the distribution of terrestrial wildlife, with likely reductions in the size of some of these populations. They will bring about permanent changes –

physical, economic, social, and cultural – to our subsistence communities, in addition to the drastic changes that our communities have experienced in the past half century.

15. Because of the broad scope of the environmental and social impacts contemplated under Alternative A and recognizing the central role of subsistence to the survival of our communities, the BLM, in 1998, adopted an extensive catalogue of restrictions and stipulations, including numerous measures intended specifically to mitigate anticipated adverse impacts to subsistence resources and uses. In particular, the critical caribou calving and hunting areas around Teshekpuk Lake were closed to leasing and and other important waterfowl and caribou habitat were protected. Of equal importance, BLM included in its Stipulations for the 1988 Record of Decision (ROD, Decision) requirements for consultation and the development of conflict avoidance agreements. In the AEWC's view these mitigation measures offer a very promising approach to reducing conflicts between subsistence activities and oil and gas development in the NPRA, and the AEWC supports their inclusion in the 1998 ROD Stipulations.

16. However, at this time, exploration under the 1998 plan has barely begun. Neither our communities, nor the industry, nor BLM have had an opportunity to determine whether the restrictions, stipulations, and mitigation measures developed for the 1998 Plan will prove to be effective in allowing the "multiple use" of the NPRA that BLM is tasked with fostering. Draft Environmental Impact Statement (DEIS) Section 4.3.13.3 "Effectiveness of Stipulations and Required Operating Procedures of the No Action Alternative." Thus, in the present DEIS, BLM cannot cite to any change in circumstances that would make the additional leasing in the Northeast NPRA any more reasonable to consider than it was in 1998.

17. The President, as part of his national energy policy, has directed BLM <u>to consider</u> additional leasing in the Northeast NPRA. <u>BLM has not been directed to undertake such leasing, nor should it.</u> Some of the key subsistence mitigation measures associated with the 1998 ROD rest on consultation with our communities, information sharing, and the development of mutually acceptable operating practices. For these mitigation measures and the required "multiple use" of the NPRA to have a chance to work, it is crucial that our communities be able to develop a relationship of mutual trust and respect with BLM and with the NPRA lessees.

18. The AEWC has worked for twenty years with the National Marine Fisheries Service (NMFS) and numerous outer continental shelf (OCS) oil and gas operators, developing and refining mitigation measures to enable those operators to conduct business in the Beaufort Sea OCS during the open water season while ensuring that our bowhead whale subsistence hunters have the opportunity to take whales during the fall migration. We believe that we have achieved remarkable success with an undertaking that, at the outset, appeared doomed to failure. We attribute the major portion of this success to the fact that we have been able to develop a relationship of relative trust and mutual respect with the regulatory agency (NMFS) and with the long-term OCS operators. This relationship has enabled the OCS stakeholders to negotiate mutually acceptable

mitigation measures and to develop a close working relationship that even allows for a cooperative "micro-management" of activities during critical times for our bowhead subsistence harvest.

**019 Government**

The current DEIS Alternatives B and C would overturn vital components of the agreement between our communities and the BLM, upon which the 1998 Decision rests, especially with respect to critical wildlife habitat.  If it were to adopt this alternative, BLM would commit a devastating breach of trust with our communities before the stakeholders have had the opportunity to begin to implement the 1998 mitigation measures, thus dooming these critical measures to certain failure before they are even tested.  Under this scenario, BLM will have little hope of meeting its congressional directive to accomplish "multiple use" in the NPRA.  <u>Thus, having fulfilled its Executive directive to consider additional leasing in NPRA, the rational determination for BLM to make is that, at this time, additional leasing in the Northeast NPRA is not within the scope of BLM's statutory authority.</u>

    **B.    Far From Supporting a Decision to Open Additional Areas of the Northeast NPRA to Leasing, the DEIS Supports the Adoption of Alternative A with an Expansion of BLM's Mitigation Measures Under the 1998 Decision.**

**020 Marine Mammals**

    In both the current DEIS and the 1998 IAP/EIS, BLM failed to adequately address the adverse impacts to the bowhead subsistence hunt that are certain to occur with onshore oil and gas development in the NPRA.  In fact in Section 4.3.12.2 of the DEIS, BLM concludes that "the No Action Alternative would not likely affect marine mammals."  This is a shocking conclusion that is directly contradicted by numerous findings of the current environmental analysis – <u>e.g.</u>, "summer barge traffic, which would transport equipment and supplies to staging areas along the coast . . . would likely occur in offshore waters of the Planning Area from mid-July through October" (coinciding with the bowhead migration, DEIS Section 4.3.8.2, p. 4-101); "under the cumulative case, bowhead whales could be exposed to increased disturbance" (DEIS Section 4.6.9.10, p. 4-394); "disturbance from noise produced by marine vessel traffic supporting oil and gas activities in the Planning Area could be unavoidable . . . increased barge traffic associated with development could also displace migrating whales" (DEIS Section 4.7.10, p. 4-422).  Numerous other examples are available in the DEIS.

**021 Marine Mammals**

Support for this "no impact" conclusion is further eroded by a direct review of relevant literature, which makes it clear that <u>increases in vessel traffic during the Beaufort Sea open water season, in the absence of appropriate mitigation, in fact will adversely affect bowhead whales and our bowhead subsistence hunt</u>.  Changes in bowhead whale behavior and deflections to their migratory routes from shipping noise, offshore drilling, and seismic vessels is well documented in the scientific literature as summarized in Richardson et al. (1995). Richardson, W.J., C.R. Green, Jr., C.I. Malme, and D.H.

Thomson, 1995, <u>Marine Mammals and Noise</u>, Academic Press, New York. The authors conclude that "in general, bowheads react strongly and rather consistently to approaching vessels of a wide variety of types and sizes."

**022 Marine Mammals**

Richardson et al. (2003) reported a statistically significant displacement of bowhead whales from Northstar Island when exposed to low intensity sounds from relatively small vessels working near the drilling island. Richardson and Thomson, 2003, "Monitoring of industrial sounds, seals, and bowhead whales near British Petroleum's (BP's) Northstar oil development, Alaskan Beaufort Sea, 1999-2003." Draft report submitted to BP Exploration, Anchorage, AK and National Marine Fisheries Service, Anchorage, AK. They noted that the "southern edge of the migration corridor was slightly farther offshore at the noisiest times as compared with typical times." Displacements on the order of 1.4 to 2.1 miles in 2001, and 1.4-2.9 miles in 2002 were detected. The main sound source was from the small vessels in the area and not the drilling activities on the island itself. Should shipping increase along the Beaufort Coast associated with NPRA development, even subtle effects on bowhead migratory behavior such as these could lead to a decrease in whale hunting success in the fall hunting communities of Barrow, Nuiqsut, and Kaktovik.

**023 Marine Mammals**

In addition, the tendency for bowheads to migrate closer to shore in light ice years, compared with heavy ice years, in the mid-Beaufort Sea during autumn has been demonstrated in at least two publications. Moore, S.E. 2000, *Variability of Cetacean distribution and habitat selection in the Alaskan Arctic. Autumn 1982-91.*, "Arctic," 53(4), pp. 448-460; Richardson and Thomson, 2003, *supra*. In Richardson and Thomson (2003), the authors noted that the bowhead migration was strongly distributed near shore in 2003. They estimated that roughly 75% of the population (e.g., ~7,800 bowheads) came within about 27 km (17 mi) of North Star Island in fall 2003. Sea ice retreat over the last decade in the Beaufort Sea coupled with the behavioral response of bowheads to sea ice (i.e., closer to shore in light ice years) could lead to much higher exposure to nearshore shipping traffic and noise. These factors clearly will increase the interactions between migrating bowhead whales and vessel traffic.

**024 Marine Mammals**

It is important to note, in this regard, that while the bowhead migration was unusually close to shore at Northstar in 2003, it was unusually far offshore when it reached Barrow. Virtually all whales sited by Barrow crews were 20 or more miles from shore, as compared with their typical average distance of approximately 10 miles from shore. Barge traffic, some of it associated with NPRA, was unusually heavy between Northstar and Barrow late in the 2003 open water season, raising the possibility that the combined effects of noise at Northstar and NPRA-related vessel noise from late-season barging operations to the west of Northstar could have been associated with a deflection of the migration in that year.

**25**

BLM does note that <u>vessel traffic-related impacts to bowhead whales "could be mitigated by limiting vessel traffic during migration periods."</u> In its "Unavoidable Adverse Effects" analysis, (p. 4-422). The AEWC agrees with this assessment.

7

**Exhibit 26, page 7 of 15**

However, as currently drafted the Stipulations and ROPs for the 1998 Decision are not adequate to ensure that this type of mitigation measure will be implemented.

026 Stips & ROPs

Therefore, the AEWC strongly encourages BLM to work with the AEWC to develop stipulations that explicitly address open water season vessel traffic associated with oil and gas development in the NPRA.

## II. FAILURE TO ADOPT ALTERNATIVE A WOULD VIOLATE FEDERAL LAW AND POLICY

027 General

The Congress has directed the Secretary of the Interior and the Bureau of Land Management to manage the nation's public lands in accordance with existing federal law, with specific reference to the protection and preservation of subsistence uses on public lands and to federal laws relating to migratory birds and endangered or threatened species, and pursuant to specific policy directives. BLM's failure to adopt Alternative A at this time would violate these laws and policies. Furthermore, the analysis set forth in the current DEIS makes it clear that continued leasing, exploration, development, and production activity under the existing Northeast NPRA IAP/EIS will place the Secretary and the BLM in violation of Federal law and policy unless additional mitigation measures to protect wildlife and subsistence hunting are developed.

### A. Failure To Adopt Alternative A Would Place the BLM In Violation of Its Statutory Responsibilities Regarding the Management of Public Lands in Alaska.

1. By its own analysis in the current DEIS, BLM has not met the requirements of ANILCA and FLPMA with respect to leasing under the 1998 Northeast NPRA Decision.

28

In its analysis, in the current DEIS, of the impacts of Alternative A, BLM notes numerous, potentially severe adverse effects to wildlife under this alternative. See eg., Section 4.3.7.1, potential impacts to freshwater, anadromous, and amphidromous fish include loss of overwintering habitat, degradation or blockage of migratory corridors or feeding grounds; Section 4.3.9.1, permanent loss of terrestrial mammal habitat, reduced productivity of the Teshekpuk Lake caribou herd; Section 4.3.10.4, permanent loss of habitat for endangered spectacled and Steller's eiders; 4.8.12, development along the coast could change the distribution of caribou in the summer, when the greatest numbers are harvested; 4.8.13, habitat destruction would locally reduce or displace subsistence species; 4.9.9.1, it is likely that impacts on wildlife and habitat will lead to permanent irreversible losses of caribou and other terrestrial mammals.

**Exhibit 26, page 8 of 15**