[29] Furthermore, BLM admits that leasing under Alternative A in fact could threaten the subsistence way of life of North Slope Native communities. See DEIS Section 4.3.13.4. To address these impacts, BLM relies on "rigorous management and safety practices, planning requirements, and adherence to federal and state operational guidelines, procedures, and stipulations, including those specifically targeted for the Planning Area." DEIS, p. 4-88. Yet, by its own admission, BLM is not in a position to evaluate the effectiveness of these mitigation measures. DEIS Section 4.3.13.3 "Effectiveness of Stipulations and Required Operating Procedures of the No Action Alternative."

[030 ANILCA] Since BLM is unable to demonstrate the effectiveness of mitigation measures necessary to bring NPRA leasing within the parameters of ANILCA and FLPMA, the agency is not in a position to recommend an expansion of industrial activities in the Northeast NPRA.

    2.    <u>The mitigation measures adopted as part of the 1998 Northeast NPRA ROD are not adequate to meet the requirements of ANILCA and FLPMA.</u>

[31] BLM is responsible for managing the nation's public lands "on the basis of multiple use and sustained yield", as well as in a manner that "will protect the quality of . . . scenic, historical, ecological, [and] environmental values", that will "provide food and habitat for fish and wildlife", and that will "provide for outdoor recreation and human occupancy and use." 43 USC 1701 (7), (8), 1732(a) (2003).

[32] Furthermore, BLM must give priority to subsistence use on Alaska's public lands. 16 USC 3111, 3114 (2000). In ANILCA, Congress expressly stated its intent that in land use decisions the BLM must give priority to rural Alaskans, like the Native subsistence communities of the North Slope, who are dependent on fish and wildlife for food and other supplies. Congress reinforced its intent to protect and preserve subsistence uses by setting specific bounds on the range of BLM's discretion to limit subsistence uses on public lands in Alaska. Any such decision must be "consistent with sound management principles" and must include "reasonable steps . . . to minimize adverse impacts upon subsistence uses and resources." 16 U.S.C. 3120(a) (2000).

[33] Congress set these limitations on BLM's authority in explicit recognition of the fact that people in rural Alaska have "no practical alternative means" to obtain food and other supplies if their subsistence resources are lost. 16 USC 3111(2) (2000). Thus, Congress tasked BLM with ensuring that rural Alaskans dependent upon subsistence for their livelihood will be able to continue their subsistence activities in a way that maintains their livelihood if BLM permits alternate uses, such as oil and gas development, on lands used for subsistence.

    a.    *BLM has not adequately accounted for the offshore impacts of its onshore leasing program.*

**034
ANILCA**

As already noted in these comments, BLM, in its 1998 ROD disregarded the adverse impacts to our communities' critical bowhead subsistence hunt, including vital interactions between the caribou and bowhead hunts, and the need for consultation and coordination with the AEWC.[1] In general, BLM has given little or no weight to the potentially devastating impacts that can result from the cumulative effects of OCS oil and gas development and the offshore components of NPRA development. This is a glaring omission of the 1998 Decision and one that BLM must rectify before it can adequately consider additional Northeast NPRA leasing.

      c.    *BLM has not established that adverse impacts to subsistence resources can be minimized, as required by Section 810 of ANILCA.*

**35**

In its ANILCA §810 analysis for the 1998 Decision, BLM concluded that under the cumulative case, <u>leasing in the Northeast NPRA pursuant to what is now Alternative A would result in significant restrictions to subsistence uses</u>. BLM attempted to rationalize its decision to go forward with leasing at that time on two principal grounds.

**36**

First, the agency argued that "even if BLM were to adopt the [1998] no-action alternative, the cumulative impacts on surrounding lands still would reach the may-significantly-restrict threshold under ANILCA §810." BLM thus concluded that the additional impacts brought about by its proposal for leasing in the Northeast NPRA were "necessary" since they would be minimal when compared with impacts already accruing. (1998 Northeast NPRA ROD "ANILCA Section 810 Summary," p. 2, section 1.)

**037
ANILCA**

In making this argument BLM does not even attempt to address the tests created by Congress in ANILCA and FLPMA. Rather, it proposes a tortured and self-serving rationalization, saying in effect that "the damage will occur anyway" so adding to it is justified. This is a complete misapplication of the cumulative effects analysis, leading to a result that is in direct contravention of the purposes for which that analysis was created. Moreover, in making this rationalization, BLM conveniently fails to note that the "impacts on surrounding lands" are due in major part to actions by BLM and its sister agency at the Department of the Interior, MMS. Taking this amazingly arrogant proposition to its logical conclusion, <u>BLM would interpret the congressional directives of ANILCA as saying that the agency can justify an action threatening significant</u>

---

**38**

[1]Caribou meat is the principal staple for bowhead subsistence hunters who must spend weeks at their ice camps during the bowhead migration and hunting seasons. In addition, the sinew from the caribou leg is the only material that can be used to sew the *umiaq* used in spring bowhead whaling. People have tried using synthetic materials, but they do not have the strength and suppleness of caribou sinew and can cause boats to develop leaks.

impacts to subsistence on the grounds that the agency has already allowed such impacts to occur.

**039 ANICLA**

The second basis on which BLM sought to justify its Decision in 1998, and the only one on which the 1998 Decision in fact can be justified, consistent with federal law, is the promise of extensive mitigation measures including prohibitions and restrictions on oil and gas activities, and provisions for extensive consultation with the local communities. As pointed out by BLM in the current DEIS and noted earlier in these comments, sufficient time has not passed for these mitigation measures to be developed and implemented so that the affected parties can see whether they will be sufficient to minimize impacts to our subsistence uses of the NPRA, as guaranteed by ANILCA and FLPMA.

**040 ANICLA**

Thus, the timing of a decision to increase leasing in the Northeast NPRA is premature. Furthermore, as discussed, it is vital to the success of BLM's proposed mitigation measures that the agency show itself to be a trustworthy steward of public lands, and an expansion of leasing at this time would demonstrate the precise opposite. Taken together, these factors virtually guarantee that a decision by BLM to go forward with additional leasing at this time will result in severe adverse impacts to our communities' subsistence uses of the public lands and renewable resources of the Northeast NPRA. Such a decision therefore will place BLM in violation of its responsibilities for protecting and preserving subsistence uses in the NPRA, as directed in FLPMA and ANILCA.

3. <u>BLM cannot even begin to evaluate the extent of impacts from oil and gas development in the Northeast NPRA without first undertaking substantial research and coordination, as recommended by the NRC Committee.</u>

**41**

Given its responsibility for managing the NPRA in a manner that permits subsistence and oil and gas development to thrive in close proximity, BLM must make its management decisions on the basis of scientific research. In particular, if BLM is to oversee the expansion of oil and gas development in the NPRA in a manner consistent with federal environmental and regulatory statutes, it must be able to assess the <u>cumulative effects</u> of all activities in northern Alaska potentially having an adverse effect on subsistence uses. However, the knowledge base for making these assessments is not available, as noted by Congress in 1999 when it asked the National Research Council to review the state of current knowledge and to make recommendations regarding the information needed to support an integrated, comprehensive analysis of cumulative impacts associated with North Slope oil and gas development. <u>See</u> U.S. Congress: Conf. Rept 106-379 (H.R. 2684) Fiscal Year 2000 Appropriations for the Environmental Protection Agency.

In its 2003 report, the National Research Council Committee on Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope (NRC Report or Report, NRC Committee or Committee) found that "the effects of North Slope

industrial development on the physical and biotic environments and on the human societies tht live there have accumulated, despite considerable efforts by the petroleum industry and regulatory agencies to minimize them." NRC Report, p.10. The Committee found further that "continued expansion is certain to exacerbate some existing effects and to generate new ones – possibly calling for regulatory revisions." *Id.,* p. 11.  The Committee went on to advise Congress that "if wise decisions are to be made, the nature and extent of undesirable effects likely to accompany future activities must be fully acknowledged and incorporated into regulatory strategies and decision-making.  This is precisely the type of decision-making Congress anticipated being applied in the NPRA when it made its 1999 research directive.

In its Report, the NRC Committee identified numerous gaps in data that are fundamental to the evaluation of the interaction between subsistence use and oil and gas development in the NPRA.  The following are a sample of the extensive knowledge gaps noted by the NRC Committee:

- available data are inadequate regarding the full effects of industrial noise . . . on fall migrating bowhead whales, NRC Report p. 102;
- because of a lack of information it is not possible to determine whether biota associated with North Slope lakes are protected by regulations that cap water withdrawal from lakes, *Id.,* p. 129;
- large-scale industrial development could harm widely distributed fish, such as grayling, arctic cisco, broad whitefish, and other species in other areas, by interfering with their migration patterns or their overwintering habitat, *Id.,* p. 130;
- no studies were found that demonstrate quantitatively whether spatial redistributions alter the sustainable equilibrium harvest or change the time it takes to harvest caribou or bowhead whales, *Id.,* p. 144;
- a sample of time series emission data coupled with a diffusion model would help to establish where and how much air pollution North Slope residents are exposed to, *Id.;*
- there is no integrated, North Slope-wide framework for wildland evaluation, mapping, ranking, planning, and analysis of effects, *Id.,* p. 148;
- there has been a steady erosion of wild-land values over a vast area through a series of individual, project-by-project decisions by different state and federal government agencies, *Id.;*
- human-health effects, including physical, psychological, cultural, spiritual, and social, have not been adequately addressed or studied, *Id.;*

With respect to the physical health effects experienced by North Slope Native people in the face of oil and gas development that has already occurred, the NRC Committee found that a "higher consumption of nonsubsistence food . . . [has] increased the incidence of diabetes." *Id.,* p. 139.  This underscores the fact that for Native people, accustomed to a subsistence diet, the continuation of subsistence uses in the NPRA is essential not only for cultural survival, but for sheer physical survival as well.

 45. To address the critical data gaps that it identified and to support the congressional mandate to protect and preserve the existing subsistence uses of the NPRA, the NRC Committee recommended two actions.  <u>First, the Committee recommended the development of a "comprehensive slope-wide land-use plan to guide industrial development</u> and assist in planning for the eventual departure of the oil and gas industry from the region." *Id.*, p. 151.  In response to this recommendation, the North Slope Borough has undertaken the revision of its comprehensive plan, with the intent of creating mutually compatible land use directives for subsistence and oil and gas development.  The ultimate success of this plan, however, will depend upon the willingness of the U.S. Department of the Interior and state agencies to cooperate and coordinate with the Borough in the implementation of the comprehensive plan.

 46. Second, the Committee recommended the development and implementation of a "coordinated and comprehensive research plan" for the identification, evaluation, and tracking of key indicators of human and environmental health on the North Slope.  <u>See *Id.*, p. 151.  Again, as the NRC Committee noted, the success of such a plan hinges, in large part, on the ability of government agencies to **work with** the local subsistence communities</u>.  In particular, the Committee recommended that

> *to increase the likelihood that the research would be of the broadest usefulness in decision making and to have the greatest scientific validity . . . traditional and local knowledge, especially information gathered by subsistence hunter, should be incorporated into the research plan at all stages of research, from study design through interpretation and presentation of the results.*

*Id.*

 47. To ensure the ultimate quality and reliability of the science on which oil and gas development decisions are based, the Committee went on to recommend that "thorough, independent peer review should be conducted at all stages of the research, from study design to publication of results." *Id.*  Furthermore, recognizing the need to protect subsistence activities, the Committee recommended that "social costs should play central role in decision; slope-wide, jurisdictionally coordinated framework for wild-land evaluation . . . needed." *Id.*, p. 148.

 48. Congress has set BLM a daunting, but not impossible task in directing the agency to foster the co-existence of subsistence uses and oil and gas development in the NPRA.  However, the Congress also has provided BLM with high quality, science based guidance in the NRC Report.  Following the recommendations of this Report should enable BLM to meet its statutory obligations as set forth in ANILCA and FLPMA.  Failure to follow the recommendations will create substantial risk of failure in meeting those obligations.

| | |
|---|---|
| 049<br>General | Finally, for purposes of the present determination, it is clear that the information available to BLM for making a decision to increase the area of the Northeast NPRA open to oil and gas leasing is profoundly inadequate. Therefore, the only responsible course for BLM at this time, consistent with federal law, is to defer any decision regarding increased leasing in the Northeast NPRA until such time as the structure and information necessary to support the decision are in place. |

### B. Implementation of the Preferred Alternative Would Violate the BLM's Responsibilities under Executive Order 12898.

| | |
|---|---|
| 50 | Executive Order 12898 gives specific recognition to the relative lack of political power of minority populations, and instructs federal agencies to address this imbalance in its decision-making processes. With respect to oil and gas development in the NPRA, BLM has correctly identified "subsistence effects" as the "primary measure of disproportionate effects." DEIS Section 4.3.14.1., p. 4-147. As with its responsibility for meeting the statutory planning standards of ANILCA and FLPMA, BLM, to meet the Executive standard of environmental justice must rely heavily on measures designed to mitigate the adverse effects of oil and gas development on subsistence resources and uses. The mitigation measures primarily available to BLM at this time are those developed as part of the 1998 ROD. |
| 051<br>Env. Just. | As BLM itself has pointed out, and as discussed elsewhere in these comments, the reliability of these mitigation measures has yet to be established. Therefore, BLM cannot be assured of meeting its responsibilities regarding environmental justice anymore than it can be assured of meeting its planning responsibilities under FLPMA and ANILCA with respect to current leasing in the Northeast NPRA. Opening the additional areas of the Northeast NPRA that BLM would propose for leasing under Alternatives B or C of the DEIS would seriously exacerbate already severe environmental justice issues by subjecting the most sensitive subsistence resource use areas to the adverse effects of oil and gas leasing. Such an action by BLM would represent blatant disregard for the principles of environmental justice. |

### C. Failure To Adopt Alternative A Will Place BLM at Substantial Risk of Violation of the Endangered Species Act

| | |
|---|---|
| 52 | Pursuant to the Endangered Species Act (ESA), BLM is responsible for ensuring that any take of an endangered or threatened species, incidental to activities authorized by BLM, will have a minimal effect on the long-term survival and recovery of that species. Congress has reinforced the BLM's responsibility for protecting endangered and threatened species during planning. <u>See</u> 43 USC 1732(b), "nothing in this Act shall modify or change any provision of Federal law relating to migratory birds or to endangered or threatened species." On the North Slope BLM must be concerned, in particular, about impacts to bowhead whales and spectacled and Steller's eiders. |

| | |
|---|---|
| 053 Marine Mammals | BLM attempts to dismiss potential adverse impacts of bowhead whales and their habitat, especially in the cumulative case, by pointing out that the bowhead population appears to have been increasing in recent years. Far from using apparent population health as a basis for dismissing bowheads from the discussion of impacts to endangered species, BLM should be looking at factors likely to be contributing to this recovery and developing mitigation measures to ensure that such factors continue in effect. |
| 054 Marine Mammals | As discussed previously in these comments, increasing vessel traffic in the Beaufort Sea poses risks to bowhead whales. The most immediate risks are associated with vessel noise. However, if vessel traffic is permitted to multiply, unregulated, in the Beaufort, collisions with and strikes from vessels could well become a serious hazard for these whales and a threat to the population's continued recovery. The dire circumstances of North Atlantic right whales presents a graphic and tragic example of the ravages vessel traffic can cause to right whale populations, including bowhead whales. See Knowlton, A.R., and Kraus, S.D. 2001. *Mortality and serious injury of northern right whales (Eubalaena glacialis) in the western North Atlantic Ocean.* In: "Right whales: Worldwide Status." Best, P.B., Bannister, J.L., Brownell, R.L.,Jr., Donovan, G.P. Eds. J. Cetacean Res. Manage. Special Issue 2. Cambridge, p. 309; Kraus, S.D., Hamilton, P.K., Kenney, R.D., Knowlton, A.R., and Slay, C.K. 2001. *Reproductive parameters of the North Atlantic right whale.* In: "Right whales: Worldwide Status." Best, P.B., Bannister, J.L., Brownell, R.L.,Jr., Donovan, G.P. Eds. J. Cetacean Res. Manage. Special Issue 2. Cambridge, p. 309. |
| 055 Stips & ROPs | Thus, it is incumbent upon BLM to take all steps necessary to ensure that vessel traffic associated with NPRA leasing is carefully regulated and that all potential impacts are clearly mitigated. |
| 056 Stips & ROPs | Similarly, BLM must carefully implement and evaluate the effectiveness of its mitigation measures for spectacled and Stellar's eiders before it can begin to consider making additional areas of the Northeast NPRA available for oil and gas leasing. |

**CONCLUSION**

| | |
|---|---|
| 057 Stips & ROPs | Based on its own analysis, BLM is not in a position to recommend the opening of additional areas of the Northeast NPRA to oil and gas development. At this time, BLM's focus should be on working with the AEWC, the North Slope Borough, and state and federal agencies to develop, implement, and evaluate mitigation measures necessary to ensure that development on NPRA lands currently subject to oil and gas leasing, in combination with OCS and state leases, does not unreasonably interfere with subsistence uses of the NPRA. |