# COMMENTS OF
# CONOCOPHILLIPS ALASKA, INC.

196557

# NORTHEAST NATIONAL PETROLEUM RESERVE – ALASKA AMENDED INTEGRATED ACTIVITY PLAN/ ENVIRONMENTAL IMPACT STATEMENT

## August 23, 2004

ConocoPhillips Alaska, Inc. (CPAI) submits the following comments on the Bureau of Land Management's ("BLM's") "Draft Amended Integrated Activity Plan/Environmental Impact Statement" ("DEIS") for the Northeast Planning Area of the National Petroleum Reserve -- Alaska ("Petroleum Reserve").

In summary, CPAI believes that oil and gas exploration and development in the Petroleum Reserve can be accomplished in a manner that is protective of the environmental resources and the traditional use of the land.  CPAI supports the BLM in undertaking additional leasing in the Petroleum Reserve.  We also support the adoption of performance-based stipulations and required operating procedures.  These revised protections would provide a framework that enables compliance efforts to be more efficient, and allow for modification of oil and gas operations/practices as new technologies are continually developed.

Alternative C makes all lands available for leasing in a manner that provides meaningful access to the northernmost part of the Petroleum Reserve.  As CPAI has testified in other BLM scoping meetings, this is the area with the highest oil and gas potential.  Only Alternative C, as currently presented in the DEIS, allows access to these areas and will allow exploration and

**5** development to move forward.  That being said, CPAI does recognize the importance of the area north of Teshekpuk Lake as important habitat for molting geese.  We are confident that we can operate in this area with minimum impact; however, we prefer to support a modification of Alternative C that would offer protection of these areas during this critical life stage of geese.

**6** CPAI proposes a modification of Alternative C that would allow leasing the entire Northeast Planning Area, including the 213,000 acres north of Teshekpuk Lake, but would do so by including certain No Surface Occupancy restrictions around those lakes designated as highly sensitive for geese molting.

**7** Finally, CPAI does not agree that the existing 3-mile buffer on either side of Fish and Judy Creeks needs to be retained.  The science did not support this stipulation when it was developed in 1998 and, in our opinion, the original requested buffer of 1.5 miles is fully protective of the resources.

**8** Please consider the following more detailed comments as you move forward with evaluating changes in the Northeast Planning Area.

### A.    Congress Mandated Expeditious Oil And Gas Development in the Petroleum Reserve

**9** The Petroleum Reserve encompasses approximately 37,000 square miles (23 million acres) on the North Slope of Alaska.  In 1923, by Executive Order, President Harding set aside or "reserved" the public land within the present boundaries of the Petroleum Reserve for the purpose of oil and gas production, but only for military use during wartime by the United

States ("U.S.") Navy.[1]  For this reason, the Petroleum Reserve was originally known as the

"Naval Petroleum Reserve in Alaska."  The Petroleum Reserve was the fourth area so "reserved."

10

In 1976, the Naval Reserves Production Act ("Production Act")[2] transferred

jurisdiction over the Petroleum Reserve from the Navy to the Department of the Interior ("DOI"),

which renamed the Naval Petroleum Reserve the "National Petroleum Reserve."  The Production

Act mandated development of the four naval petroleum reserves "in a manner consistent with the

total energy needs of the Nation . . ."[3]  Further, the Production Act lifted the restrictions that

prohibited production for purposes other than wartime use and directed the Secretary of the

Interior to maximize production from the three reserves located in the contiguous U.S.[4]

Recognizing that development of the Alaska Petroleum Reserve would not be feasible for several

years because of the absence of transportation,[5] Congress withdrew those lands "from all forms

of entry and disposition" under the public land and mineral leasing laws[6] and required extensive

study and exploration of the Alaska Petroleum Reserve's petroleum, environmental, wildlife and

scenic resources.[7]  In the interim, the Production Act expressly prohibited any "development

---

[1]      Exec. Order No. 3797-A (Feb. 27, 1923).

[2]      Pub. L. No. 94-258, 90 Stat. 303 §§ 101-107 (codified as amended at 42 U.S.C. §§ 6501-6508).

[3]      H.R. Rep. No. 81, pt. 1 at 2 (1975), *reprinted in* 1976 U.S.C.C.A.N. at 492.

[4]      Pub. L. No. 94-258 § 201, 90 Stat. 303, 307-08 (1976) (amending 10 U.S.C. § 7422).

[5]      H.R. Rep. No. 81, pt. 1 at 8 (1975), *reprinted in* 1976 U.S.C.C.A.N. at 498.

[6]      42 U.S.C. § 6502.

[7]      42 U.S.C. § 6505(b), (c).

leading to the production of petroleum from the reserve . . . until authorized by an Act of Congress."[8]

In 1980, as part of the Presidential policy to accelerate domestic oil production, the DOI Appropriations Act rescinded the withdrawal of Alaska Petroleum Reserve lands, lifted the ban on activities related to petroleum development, and directed DOI to conduct "an expeditious program of competitive leasing of oil and gas."[9]  The DOI Appropriations Act also provided that the detailed studies required to be conducted pursuant to the Production Act would satisfy the requirements of the National Environmental Policy Act ("NEPA") for the first two million acres proposed to be leased.[10]  Shortly thereafter, BLM conducted its first and second lease sales in 1982 and 1983, respectively.

Because subsequent sales were not exempt from NEPA compliance, BLM initiated an Environmental Impact Statement ("EIS") for additional oil and gas leasing in the Petroleum Reserve.[11]  The preferred alternative identified in the Final EIS was to conduct five additional sales between 1983 and 1987 of an average of two million acres per sale.[12]  The preferred alternative also identified several environmentally sensitive areas to be deferred or deleted from leasing.[13]  The third sale was held in July 1983.  In July 1984, a fourth sale offering

---

[8]    42 U.S.C. § 6504(a).

[9]    Pub. L. No. 96-514, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C. § 6508).

[10]    Id.

[11]    Final EIS Petroleum Reserve.

[12]    Final EIS Petroleum Reserve at v.

[13]    See Final EIS Petroleum Reserve, Plate 1.

64 tracts totaling 1.5 million acres attracted no bids and a fifth Petroleum Reserve sale scheduled for 1985 was canceled.

As a result of BLM's August 1998 Final Integrated Activity Plan/Environmental Impact Statement ("1998 EIS") and Record of Decision ("ROD") for the Northeast Planning Area, which is now under review again and the subject of these comments, BLM issued 133 leases with winning bids totaling $104,635,728.[14] BLM then held an additional lease sale in June 2002, with the winning bids totaling more than $63,811,496.[15] In June of 2004, BLM sold 123 lease tracts on 1,403,561 acres with winning bids totaling $53.9 million. CPAI and its partners were the most active of all companies in these recent lease sales and CPAI has participated in all but two of the exploration wells that have been drilled since 1999 on these leases. CPAI and Anadarko are proceeding forward at this very time with an EIS that analyzes the potential impacts from development of several of these discoveries on leases in the Northeast Planning Area as part of its Alpine Satellite Development Project.

Furthermore, a continued expeditious leasing program in the Petroleum Reserve satisfies the intent of Executive Order 13212, "Actions to Expedite Energy-Related Projects," issued by President Bush. This Order directed BLM to conduct further lease sales in the Petroleum Reserve provided it could be done in an environmentally responsible manner. As explained below, by making a business out of "doing it right" CPAI has demonstrated that oil and gas exploration and development in the Alaskan arctic can be done in an environmentally sound manner that makes use of sound science and the best available technology.

---

[14]    See DEIS at III-5.

[15]    Id.

**B.**      **The Significant Economic Benefits of Oil And Gas Development**

15

The U.S. economy will benefit significantly from additional domestic oil production.  Slightly lower U.S. crude oil production combined with a strong increase in oil demand led the U.S. to import more than half of its petroleum supply in recent years, with the North Slope of Alaska producing approximately 20 % of the domestic production.  The federal government further projects that the proportion of the Nation's oil coming from overseas will continue to climb, approaching two-thirds by 2020.[16]  Without question, this level of dependence on foreign oil is inconsistent with U.S. national security interests.   Further, it is abundantly clear that American dependence on foreign oil plays a significant role in recent trade deficits.  This will only continue to worsen if domestic oil production is not increased.  Additional development in the Petroleum Reserve would help to slow the rate of increased dependence on foreign oil and the rate of increase in trade deficits.   State, local and federal government will also directly benefit economically from additional oil exploration and development in the Petroleum Reserve via bonus bids, rentals, and royalties.

16

17

As summarized above, the BLM has already generated substantial state, local, and federal revenue through lease activities as a result of its recent sales in the Northeast and the Northwest Planning Areas.  Moreover, the BLM has estimated that making the entire Northeast Planning Area available for lease under Alternative C would generate substantial economic activity in revenues to government, employment, and personal income.  For example, the

---

[16]      U.S. Energy Information Administration. Annual Energy Outlook 2002; See also DEIS at I – 3.

estimated property taxes, royalties, and severance taxes for Alternative C at $30 per barrel is estimated to be in excess of $1 billion in property tax, $7 billion in royalties, and $5 billion in severance. See Table 4-17. The anticipated increased production from the Northeast Planning Area as a result of Alternative C is estimated to generate an increase of from 4 to 14 fold gain over employment under the status quo No Action Alternative. See DEIS at 4-334. Additionally, the number of jobs created by exploration, development, and production would peak at 2,219 to 9,090 during development, declining to 810 to 3,736 jobs during production; the number of resident jobs generated would be 156 to 638 during the peak and 17 to 79 jobs during production. Id.

018
Economy

A simple comparison of Sections 4.4.18 and 4.5.18 and the economic analysis therein shows that important economic effects would be lost by choosing Alternative B over Alternative C and excluding such a significant portion of land from the high prospective area. For example, a comparison of Table 4-11 and Table 4-17 on the estimated property taxes, royalties and severance taxes at $30 per barrel shows a total loss of $1.75 billion over a 34 year window, as broken out below, including a loss of nearly half a billion dollars each to the North Slope Borough (NSB) and the State of Alaska and more than $600 million to the federal government.

### LOST REVENUE ASSOCIATED WITH ALTERNATIVE B

| LOST PROPERTY TAXES $ MILLION | | LOST ROYALTY $ MILLION | | | LOST SEVERANCE $ MILLION |
|---|---|---|---|---|---|
| NSB | ALASKA | NSB | ALASKA | FEDERAL | ALASKA |
| $176.5 | $14.3 | $316.9 | $316.9 | $633.8 | $288.5 |

In addition, incremental oil production from the Petroleum Reserve will support continued operation of the existing fields on the North Slope and efficient use of pipeline infrastructure. The Trans-Alaska Pipeline System ("TAPS") achieved maximum daily throughput of over 2.1 million barrels per day (MMbbd) in 1988, whereas the current TAPS throughput is just over 1 MMbbd. The lower mechanical and economic limits for viable TAPS operation are between 200,000 and 500,000 bbd. With production from the current North Slope fields in decline, the Petroleum Reserve is an important part of strategies to maintain the TAPS throughput within acceptable limits. From the above discussion it is easy to understand why increased leasing in the Northeast Planning Area must begin in 2005 as recommended in order to maximize the likelihood that additional discoveries will continue to be found -- discoveries which are needed to provide the continued employment and economic benefits upon which Alaska and its rural populations depend. It is critical to bring additional discoveries on line in order to maximize production from existing fields and to ensure efficient use of existing infrastructure.

C. **The Greatest Oil and Gas Potential in the Petroleum Reserve is Near The Coast**

BLM's risked mean estimate of conventionally recoverable oil reserves in the Northeast Planning Area is 5.27 billion barrels of oil and 16.41 trillion cubic feet of gas or 58 and 44 percent, respectively, of the total risked mean estimate for the entire Petroleum Reserve. Id. See DEIS at 3-16 and 3-17. First, these data show that the resource potential in the Petroleum Reserve is not uniformly distributed, but is focused in the Northeast Planning Area. Second, the resource potential in the Northeast Planning Area itself is not uniformly distributed and instead is

**021 (Cont'd) Basic**

focused on a narrow band of land in and around the coast.   As the data summarized below point out, "the highest conventionally recoverable and economic potential lies in the northern third of the Artic coastal plain below the Barrow Arch.  This structural ridge has been a focus for regional oil and gas exploration, and all currently producing fields on the North Slope are located on or near the Barrow Arch."[17]   Historical exploration experience over the last 15 years agrees with the BLM statement and clearly shows that the greatest potential for commercial hydrocarbon occurrences in the Petroleum Reserve exists within 40 miles from the crest of the Barrow Arch.

**22**

For example, during the past 15 years:

- 63 separate prospects have been drilled
- 36 discoveries (57% of the prospects)
- 26 developments (43% of the prospects -- on State and NPRA leases within 40 miles of the crest of the Barrow Arch)
- 5 developments undergoing environmental analysis and permitting

Whereas, South of the 40-mile zone (since 1950 North Slope-wide)

- 53 separate prospects drilled to date
- 14 sub-economic gas discoveries (26% of the prospects)
- 1 sub-economic oil discovery (2% of the prospects)
- 0 developments

**23**

The entire 213,000 acres north of Teshekpuk Lake in BLM's Preferred Alternative lies within this high resource potential area.  BLM is proposing to restrict leasing of this area.  CPAI

---

[17] See DEIS at 3-17.

8/23/2004
**Exhibit 27, page 9 of 34**

believes this action is unnecessary and suggests changes that would allow access to this high

prospectivity area in a manner that would be protective of the environment, fish and wildlife, and

cultural resources.

**24**

> ### D.    BLM Should Not Exclude Portions Of The High Prospectivity Area From Leasing Because Such Exclusions Will Reduce The Potential For Oil And Gas Development Without Any Added Value To Wildlife Or Traditional Lifestyles

**25**

Alternative A, the No Action Alternative, is comprised of decisions established in the

ROD for the 1998 EIS.  Under this Alternative BLM would retain the prescriptive restrictions on

surface activities and would continue to exclude leasing on 13% of the Northeast Planning Area

acreage.  Alternative B, the Preferred Alternative, makes many positive changes but would still

unnecessarily exclude 213,000 acres of the high prospective area from the lands available for oil

exploration and development.  Such a broad based exclusion will significantly reduce the

likelihood of successful oil and gas exploration and development; and as discussed above will

significantly reduce state, local, and federal revenue through lost property taxes, royalty, and

severance tax, and will do so without any significant additional protection of the environment

beyond that afforded by the stipulations that would govern in the absence of the proposed

exclusion.

**26**

CPAI does not believe this decision is the best interest of the federal, state, and local

government and believes making the land available for leasing along with the application of

specific No Surface Occupancy stipulations would permit surface activities to occur in a manner

that is protective of the environment and traditional land use.  Allowing access to this acreage

when combined with modern exploration and development techniques – including horizontal and

extended reach drilling – would permit the recovery of the hydrocarbons located in this high

prospectivity area.  For this reason, CPAI believes an approach that lies somewhere between

Alternatives B and C is more appropriate.


## THE CPAI PROPOSAL TO MODIFY ALTERNATIVE C

As explained herein and in detail in the DEIS, the land with the highest oil and gas

potential occurs in the northernmost part of the Petroleum Reserve.  Therefore, it is critical that

meaningful access to this area be granted and BLM's preferred alternative does not do that.  As

further detailed below, the modern exploratory drilling practices used on the North Slope,

combined with certain operational restrictions, will protect wildlife resources and traditional uses

of the land.

Further, if a hydrocarbon accumulation is found, and if it is found in commercial

quantities and proposed for development, NEPA requires a detailed site-specific analysis of the

proposed project, complete with recommended mitigation measures to minimize adverse impacts

to wildlife resources and traditional land use.   It is at this stage where "site-specific" stipulations

beyond what is being proposed by the BLM in this EIS would be developed.   The ongoing

operations of CPAI in the Petroleum Reserve have clearly demonstrated our ability to explore

and develop new opportunities on the North Slope while minimizing any impact on the

environment, traditional subsistence activities or cultural resources.

CPAI recognizes that the area north of Teshekpuk Lake is an important biological area

particularly for molting geese; however, we are confident that we can explore and develop in this

area without significant adverse impacts.  CPAI believes the entire high-prospectivity area

should be open for leasing.  We do, however, propose that BLM do so through the imposition of

030 (Cont'd)
Alternatives
the stipulations and ROPs proposed for Alternative C combined with additional No Surface

Occupancy restrictions in certain highly sensitive areas outlined in the attached figure.  This

figure highlights those lakes identified in the DEIS as having the highest use by molting geese

(Map 3-15 as >500 and > 1000 geese).  Making the additional 213,000 acres north of Teshekpuk

Lake available for leasing is the right geological and economic decision to make.  Doing so

through the imposition of designated No Surface Occupancy restrictions is the right

environmental decision to make.  Combined, the decision would protect certain highly sensitive

resources but still allow enough surface access to explore and potentially develop hydrocarbon

resources in this area.  Sufficient transportation corridors would be available to access land

031
Infrastructure
between these No Surface Occupancy areas and directional drilling technology would allow

access to potential hydrocarbon resources beneath these lakes.  Proceeding in this manner would

permit the discovery and removal of oil and gas deposits in a manner consistent with the original

intent behind the creation of the Petroleum Reserve.

032
Stips &
ROPs
A continued ban on leasing of this acreage also prohibits potential exploration and

development from occurring in the future when newer technology will be available.  Thirty plus

years of arctic exploration and development have resulted in significant advances in technology

that further minimize impacts to the environment.  Technological advances such as ice

roads/pads for exploration drilling, low pressure tires for seismic equipment, and extended reach

drilling have substantially reduced adverse environmental impacts from oilfield operations,

thereby negating the need for total exclusion.  It is accepted practice that special stipulations

applied during the permitting process are an effective management tool.  In fact this "Adaptive

Management" process has been embraced by the BLM in this EIS, and we feel that use of this

process can mitigate adverse environmental impacts such that the blanket exclusion in

**033 Development**

Alternative B could be modified. Small scale adjustments (< 1 mile) in well pad locations have been used to avoid placing facilities in sensitive or high use habitats on past projects, and CPAI would consider this same process for future development scenarios. With the suggested setbacks from lakes and restrictions on surface occupancy of lakes of high importance to molting geese, CPAI believes that exploration and development can be accomplished with a minimum of impacts especially given that additional site-specific impacts will be evaluated under NEPA for each proposed project.

**034 Infrastructure**

CPAI also suggests that any areas proposed for restricted surface activities or No Surface Occupancy, including buffer areas, take into consideration the differences in activity or type of infrastructure. For example, there is a substantial difference between a processing facility versus a drill site. A processing facility, with its additional infrastructure needs (oil processing, gas handling, a camp, etc.) may not be appropriate for some areas but a drill site might be acceptable. As currently identified in the DEIS there is no distinction between different types of activities or infrastructure. Additionally, seasonal restrictions would be more appropriate to impose in sensitive areas rather than a blanket exclusion. For example, the proposed restrictions on construction activity from May 20 to August 20 in Stipulation K-4 for the Geese Molting Area would allow for protection of the geese while still allowing development to occur. As with any of our projects, CPAI will work closely with agencies and local residents during site-specific NEPA analysis efforts to evaluate the suitability of different types of facilities in each area.

### E.    Performance Based Stipulations and Required Operating Procedures

35

CPAI commends BLM for recommending performance-based stipulations and required operating procedures (ROPs).  These revised protections would provide a framework that enables compliance efforts to be more efficient, and allow for modification of oil and gas operations/practices as new technologies are continually developed.  This in turn allows industry to continue operating in a manner that not only protects our workers but also protects the environment in which we work and local residents subsist.

36

In previous scoping meetings for this EIS, some have professed that BLM is in error for considering modification of the original 79 stipulations in the 1998 EIS.   In fact, BLM specifically stated in the 1998 EIS that the stipulations are based on "existing policies and laws, and on knowledge of the resources present in the planning area, and current industry practices".  1998 FEIS at II-1.   Indeed, BLM also noted in the 1998 EIS its intention for "inventory and monitoring of resource populations and conditions" to "assess the health of biological resources," and the "effectiveness of management practices in protecting these resources."  1998 FEIS at II-29.  Moreover, the stipulations applied only to the "general" decision to make the Planning Area, or particular portions of the Planning Area, available for oil and gas leasing.  "Additional site specific stipulations may be added by the Authorized Officer (AO) as determined necessary by further NEPA analysis and as developed through consultation with other Federal, State, and NSB regulatory and resource agencies".  1998 FEIS at II-48.  In addition, any development "including an exploratory drilling program or the construction of the infrastructure necessary for development of an oil discovery, would require further NEPA

analysis based on specific and detailed information about where and what kind of activity would occur".

In January 2004 the BLM issued a ROD for the Northwest Planning Area of the Petroleum Reserve. The Northwest Planning Area is subject to performance-based stipulations and ROPs similar to those proposed in Alternatives B and C for the Northeast Planning Area. Having this consistency in requirements across the boundaries of the two planning areas will make compliance efforts more efficient and will provide more clarity for the operators.

See Attachment 1 to this letter for detailed comments on the stipulations and ROPs.

### F.     Minimal Environmental Impacts

BLM has substantial experience and expertise related to the Northeast Planning Area environment as a result of the 1999 and 2002 lease sales and the resultant activities in the Northeast Planning Area associated with those leases. Furthermore, CPAI has a proven track record of environmental performance on Alaska's North Slope including the Petroleum Reserve. On the North Slope, exploration work only occurs during a brief winter period to minimize the impact on the tundra and wildlife resources.

Using these environmentally sound techniques, CPAI has participated in 15 exploration wells in the Petroleum Reserve all without significant environmental incident. It would be hard to discuss minimal environmental impacts and not consider the Alpine Development Project in the Colville Delta region. At the Alpine field, we have taken the best practices and technology from the past 30 years of Arctic development and demonstrated that we

can operate in a way that minimizes environmental impact and the size of our footprint.  At Alpine we have also proven that we can work closely with our neighbors and operate in a way that respects the subsistence way of life.  The CPAI spirit of ingenuity has been demonstrated at Alpine and is just another example of why leasing should be allowed in the entire Northeast Planning Area.  We can address environmental impacts and successfully mitigate for them.

<div style="border:1px solid #000; background:#ff0;">41</div>

As outlined above, these environmental safe guard efforts have paid off.  An EIS process is ongoing for new satellite field developments in the Northeast Planning Area and on State and Native corporation lands near the Alpine oil field.  These new developments confirm the strategic potential for oil and gas in this area.

### G.     Existing Leases

<div style="border:1px solid #000; background:#ff0;">042 Stips & ROPs</div>

CPAI requests clarification on how BLM will manage stipulations in existing leases. Page 2-34 of the DEIS states "Although lease stipulations *may* be revised to include more performance-based, rather than prescriptive-based, stipulations as a result of the NEPA process, it is not anticipated that the revisions would create different impacts from what might occur given the current stipulations." (emphasis added).  If Alternative B or C is adopted as a result of this current EIS amendment process, we assume that CPAI's leases *will* be modified to include the new stipulations.  We request that the process BLM will undertake for doing so is stated more clearly in the Final EIS.

<div style="border:1px solid #000; background:#ff0;">043 Stips & ROPs</div>

Additionally, CPAI suggests adding a discussion of the process for managing lease stipulations for lands currently leased, but later conveyed to Native corporations, and how CPAI's Alpine Satellites Development Project and our request for exceptions to certain of the stipulations will be treated in light of the timing of this process.

### H. Conclusion

044
Alternatives

CPAI supports a modification of Alternative C to allow leasing throughout the entire Northeast Planning Area but with implementation of selective No Surface Occupancy restrictions in the vicinity of highly sensitive geese molting lakes. We believe the legal, environmental and geologic data available to the BLM justify such a decision. Such a modification of Alternative C would not only comply with the mandates for management of the Petroleum Reserve and the President's energy policy, it would provide for a high level of environmental protection for the variety of important resources found in this area, and will maximize revenues to the federal, state, and local governments by allowing the greatest chance for exploration success.

045
Alternatives

Further, areas that are made available for leasing but do not allow permanent facilities (such as within 3 miles of Fish Creek) are of concern to CPAI. On the basis of subsurface data collected after the 1998 ROD for the Northeast Planning Area, much of the acreage within this setback is of great interest to us. The buffer should be scaled back to the original distance of 1.5 miles that was recommended during the 1998 EIS process. If, however, these restrictions are kept, the FEIS needs to retain the current process for granting exceptions that exists in the current ROD for the Northeast Planning Area.

46

The remainder of this letter comprises detailed comments to the DEIS. Attachment 1 is Detailed Analysis of the Proposed Stipulations And Required Operating Procedures Under Alternative B and Alternative C. Attachment 2 is Detailed Comments on the DEIS.

# ATTACHMENT # 1

## <u>Detailed Analysis of the Proposed Stipulations and Required Operating Procedures under Alternative B and Alternative C</u>

 Page 2-15:  ROP A-3, Requirement/Standard.  In last sentence add "field" before "staff" to make clear that only field staff, not all staff including corporate and global company staff, need instruction regarding procedures for hazardous materials contingency planning in the Planning Area.

 Page 2-16:  ROP A-4f.  Add "or his or her designee" after "AO" so that reports of spills within 24 hours of occurrence can be reported to the AO's designee, as is current practice.

 Page 2-16:  ROP A-4g, Identification of Oil Pans.  This ROP requires marking oil pans ("duck ponds") with the responsible party's name.  While CPAI does not object to this proposed practice it is not appropriate to have this type of detailed control of field operations in an ROP.  This requirement is more appropriate for a project-specific Plan of Operations, not as part of an EIS.

 Page 2-17:  ROP B-1, Requirement/Standard.  This states "Water withdrawal from rivers and streams during winter is prohibited."  It should be acknowledged that the State of Alaska now allows winter water withdrawal from the Colville River to construct an annual ice bridge.  CPAI requests that BLM modify this ROP by adding a statement such as "Winter water withdrawal from rivers or streams will be allowed on a site-specific basis after consultation with the Alaska

Department of Natural Resources, the Alaska Department of Fish and Game, the North Slope Borough, and local residents."

**051 Water W.**

Page 2-17: ROP B-2a. This statement needs to be clarified that this criterion is applicable to those lakes with fish identified by ADNR OHMP as being sensitive to water withdrawal (e.g. grayling, whitefish).

**052 Water W.**

Page 2-18: ROP B-2b. The current criterion allowed by the ADNR OHMP for these types of lakes is 30% under 5 feet of ice and this should be clarified.  It is important to also note that there is a collaborative study underway between ADNR OHMP, CPAI, BLM and UAF on the effects of water withdrawal on water quality and fish (namely ninespine stickleback and Alaska blackfish) in a shallow (6 feet) NPRA lake.   The intent is to demonstrate that water volumes higher than that currently allowed by ADNR for resistant species can be removed from these lakes without adverse impacts to the water quality or resident fish.

**053 Water W.**

Page 2-18: ROP B-2c.  This statement is confusing because criteria exist for withdrawing water from fish-bearing lakes as noted above.  Suggest rewording this to say that if no fish are identified as present in a lake, the available water under-ice may be authorized for withdrawal.

**054 Edits**

Page 2-18:  ROP B-2g.  Fish screens are now regulated by the Alaska Department of Natural Resources, no longer by the Alaska Department of Fish and Game.

**055 Edits**

Page 2-18: ROP B-2h. Add "access to water pumping stations on lakes" as approved for compaction of snow cover or snow removal from fish-bearing water bodies.

**056 Tundra Travel**

Page 2-19: ROP C-2a. CPAI commends BLM for adopting this requirement/standard that states "Ground operations shall be allowed only when frost and snow cover is at sufficient depths to protect the tundra." This replaces the previous strict blanket requirement of 12 inches of frost and 6 inches of snow regardless of the type of vehicle used. But, this requirement is listed under the heading "Winter Overland Moves and Seismic Work" and therefore applies to use of heavy equipment on non-roaded surfaces during the winter season. As such, it is unclear what stipulations, if any, address tundra travel outside the winter season. The State of Alaska allows low-ground-pressure vehicles to be used after spring breakup, usually starting around July 15 of each year. The State has a list of vehicles approved for summer tundra travel. Use of this equipment is allowed until winter tundra travel is suspended, normally around May 15 of each year.

**057 Tundra Travel**

Section 4.2 of the DEIS, "Ground-Impacting Management Actions", is divided between "Activities Not Associated With Oil and Gas Exploration and Development" (Section 4.2.1.1) and "Oil and Gas Exploration and Development Activities" (Section 4.2.1.2). Section 4.2.1.1 includes a discussion of Overland Moves and Other Land Use Permits that describes BLM's ability to issue minimum impact permits for overland moves, and mentions that the poor soil conditions in the Planning Area limit BLM's approval of most land use proposals for summer operations. This implies that BLM does issue some approvals for summer tundra travel – but, this same discussion is not present at Section 4.2.1.2 that relates to oil and gas activities. It is unclear why such approvals could be issued for other activities but not for oil and gas activities.

**57 (Cont'd) Tundra Travel**

From our past conversations with BLM, we have been told that the intent is not to disallow summer tundra travel in a manner consistent with that of the State of Alaska. CPAI requests that a specific stipulation be included if necessary to clarify such use.

**058 Stips & ROPs**

Page 2-19: ROP D-1, Requirement/Standard. This says exploratory drilling is prohibited in fish-bearing lakes, yet Alternatives B and C allow drilling in Teshekpuk Lake. Please clarify.

**59**

Page 2-20: ROP E-1. CPAI commends BLM for revising the previous stipulation 48 in the 1998 EIS that prohibited roads connecting the Planning Area to a road system outside of the Petroleum Reserve. We appreciate the BLM's acknowledgement of the importance of such a road system to the economics of petroleum development and to lowering the local residents' cost of living and improving their access to subsistence resources.

**060 Production**

Page 2-21: ROP E-5. CPAI commends BLM for acknowledging that "Where aircraft traffic is a concern, consideration shall be given to balancing gravel pad size and available supply storage capacity with potential reductions in the use of aircraft to support oil and gas operations." This decision can be critical to the acceptance of a project by local communities and to the economics of a project.

**061 Stips & ROPs**

Page 2-21: ROP E-7c. This states that "A minimum distance of 500 feet between pipelines and roads should be maintained when feasible." The 1994 report by the Alaska Caribou Steering Committee reviewed previous caribou research and came up with a recommended range of separation distance between a road and pipeline, to facilitate caribou passage. In this report, 350

feet was identified as the minimum distance, with 1000 feet as the maximum separation distance. To be consistent with these recommendations, CPAI requests that the minimum distance be changed to 350 feet.

**062 Stips & ROPs**

Page 2-22:  ROP E-9.  This requires that the lessee provide the AO with an annual report on predators' use of oil and gas facilities.  CPAI understands the concerns of resource agencies about the use of oil field structures by avian predators such as ravens.  CPAI is committed to working with resource agencies to develop design features that could minimize areas for perching or nesting.  We suggest that, in lieu of providing BLM with an annual report of predator use, CPAI will advise BLM of the sitings as they occur.  With the improvements in food waste management we have seen minimal sitings of avian predator use of facilities at Alpine indicating that reporting the specific instances of use would be more effective.

**063 Stips & ROPs**

Page 2-23: ROP F-1b. Restrictions on flights post-October 1 would affect the ability to conduct wildlife monitoring studies such as the grizzly bear program, the polar bear program, or caribou monitoring during the rut in mid-to-late October.  There should be some clarification about the ability to continue these scientific monitoring studies.  CPAI believes that the long-term monitoring results from these and other scientific studies will be helpful to the BLM and other resource agencies during future permit efforts.

**064 Stips & ROPs**

Page 2-23: ROP F-1e. A flight restriction of 2000 feet above ground level over the Teshekpuk Lake Habitat area between May 20 and August 20 would prohibit the monitoring of caribou and other wildlife by scientific researchers.  Under the Monitoring section 2.7 BLM references

**064 (Cont'd) Stips & ROPs**

stipulations and ROPs concerning the conduct of various wildlife, cultural and paleontological surveys prior to development. Many of these studies must be done at altitudes much less than 2000 feet above ground level (between 150 and 200 feet for loon surveys, 100 to 150 feet for eider surveys, and between 300 feet and 500 feet for caribou surveys). We agree that air traffic in these sensitive areas should be minimized, however as currently written, this ROP will prohibit the conduct of wildlife monitoring studies required by BLM. This contradiction in requirements should be clarified in the FEIS.

**065 Stips & ROPs**

Page 2-26: ROP I-1. This states that "all personnel" involved in oil and gas related activities shall be provided with information concerning applicable stipulations, ROPs etc. This should be changed to "all field personnel", as corporate and global employees do not require such information as they do not physically enter the Planning Area.

**066 Stips & ROPs**

Page 2-27: Stipulation K-1. This stipulation establishes setbacks measured from river banks' highest high water marks as determined by the hydrology at the time of application. CPAI suggests that the method of measurement of setbacks be consistent with that established in the Northwest Planning Area, where setbacks are measured from the centerline of rivers. Having different methods of measuring setbacks along rivers in the different planning areas will be confusing for operators. Additionally, it is likely more difficult in most cases to identify a highest high water mark, than a river centerline.

**067 Stips & ROPs**

Page 2-28: Stipulation K-1e, Fish Creek buffer. CPAI is disappointed that BLM plans to retain this 3-mile buffer on either side of Fish Creek. There is no scientific justification for this large a

**067 (Cont'd)
Stips &
ROPs**

buffer. During the 1998 EIS process Kuukpik Corporation recommended a 1.5-mile buffer at

Fish Creek and it was subsequently doubled arbitrarily to 3 miles. While CPAI appreciates

BLM's consideration of CPAI's request for an exception to stipulation 39 to place proposed drill

site CD6 inside this buffer as part of the Alpine Satellite Development Project, there is no

guarantee that the exception will be granted or that similar requests will be granted in the future.

CPAI is confident that development can occur in the Fish Creek area without significant impacts

to the environment or subsistence.

**068
General**

When the ROD was issued for the 1998 EIS, subsurface geologic data were not available

to the BLM when considering the possibility of setbacks in this area. Since the ROD, CPAI has

conducted multiple years of exploration drilling that has enhanced our (and the BLM's)

understanding of the subsurface structures. This new information has led us to the conclusion

that attaining economic viability for a development outside the existing buffer zone is not

possible. This information, combined with the fact that the 3-mile setback had no scientific or

traditional knowledge basis (i.e. the original suggestion from Kuukpik Corporation was 1.5

miles) serves to support our contention that the current setback is unreasonable and ultimately

not economic (for development) based on current knowledge. CPAI believes that the resource

can be developed in an environmentally responsible manner with consultation from local, federal

and State resource agencies.

**069
Stips &
ROPs**

Page 2-31. K-4i. This recommendation implies that no wildlife monitoring studies will be

permitted during the period May 20 to August 20, which conflicts with statements in Section 2.7

Monitoring.

**70**

Page 2-31:  Stipulation K-5e2.  This states that in the Teshekpuk Lake Caribou Habitat Area, "The lessee or a contractor shall observe caribou movement from May 20 through August 20. Based on these observations, traffic will be stopped temporarily to allow a crossing by 10 or more caribou.  Sections of the road will be evacuated when migrations of large numbers of caribou appears imminent."  CPAI does not object to the intent of this stipulation but questions the practicality as written.  Would CPAI or the contractor be required to be at all locations along the roads 24 hours a day?  What if an attempt to evacuate disturbs more caribou than waiting in place?  Who makes that determination and what would be the consequences of vehicles disturbing the caribou when making a good faith effort to evacuate?

**071 Stips & ROPs**

CPAI has been operating in areas used by caribou for over 30 years and have always maintained a policy that caribou have the right of way across roads.  Workers are required to stop and allow passage of any caribou, regardless of their numbers.  We do not feel that this stipulation is warranted and suggest that specific discussions about caribou and traffic be deferred until a specific project is proposed.

**072 Stips & ROPs**

Page 2-32:  Stipulation K-5e4.  This states "Use of aircraft larger than a Twin Otter by authorized users of the Planning Area, including oil and gas lessees, from May 20 through August 20 within the Teshekpuk Lake Caribou Habitat Area, shall be for emergency purposes only."  This seems to conflict with the intent of ROP F-1c which states, "During the design of proposed oil and gas facilities, larger landing strips and storage areas should be considered so as to allow larger aircraft to be employed, resulting in fewer flights to the facility."



**072 Monitoring**

Page 2-32. K-5e.6.  See comments above concerning restrictions on flight altitudes within the Teshekpuk Lake Caribou Habitat Area and the conflict with BLM requirements for caribou monitoring.  As currently written, monitoring studies could not be accomplished with these flight restrictions in place.

# ATTACHMENT #2

## <u>Detailed Comments on the DEIS</u>

 Page Executive Summary – 2:  The correct name for this association is "Nuiqsut Whaling Captains Association."

 Page Executive Summary – 3:  Alternative B (Preferred Alternative).  Change the acreage of new oil and gas resources to 347,000 from 487,000.

 Page 1-4:  3rd full paragraph.  It is incorrect to say the Alpine Project field "…has been the principal target for exploration on leases acquired in the Planning Area".  Change to "…similar reservoirs have been the principal target…".

 Page 1-9:  3rd full paragraph.  Add the U.S. Coast Guard as a cooperating agency for the Alpine Satellite Development Project EIS.

 Page 1-21.  Switch explanatory text next to boxes for #3 Affected Environment and #4 Environmental Consequences.

 Page 2-12: Definitions, last sentence of Permanent Oil and Gas Facilities.  After "Material sites" add ", exploration wellheads," as excluded from the definition.

**080 Seismic**

Page 2-77 through 2-80.  Estimates for effects of seismic and ice roads on soils, water quality, vegetation, and wetlands and floodplains are unrealistically high.  For example the statement on page 2-78 that "Seismic surveys would cause persistent high-level damage to vegetation…" is erroneous and exaggerated, especially in light of improved attention to environmental protection and improved equipment for seismic surveys and ice road construction.  Techniques have greatly improved, and it can only be assumed that the authors are relying on outdated information for making these conclusions.  CPAI's experience does not confirm any "persistent high level damage".  Many of the estimates in these sections appear to be speculative and not backed by any scientific data.

**081 Subsistence**

Page 2-84:  Effects on Subsistence Harvest Patterns.  This states that subsistence resources including caribou would avoid areas of oil and gas activity, resulting in long-term localized effects.  One needs only to visit the Kuparuk or Prudhoe oil fields to see caribou herds at all-time high levels moving freely throughout the fields to know that this statement is false.  It is likely that the Teshekpuk Lake Herd may need a year or more to acclimate and become comfortable with the presence of facilities, but there is no reason to suspect that they would not become as comfortable moving through oil fields as are the Central Arctic and Western Arctic herds today.

**82**

Page 3-100, last paragraph before Section 3.4.6.  CPAI commends BLM for stating that "It is BLM's policy to consider local zoning to the extent practical in any decision regarding the use of federal lands.  Local land use plans in the National Petroleum Reserve – Alaska are acknowledged, but they do not necessarily control activities on federal lands."

**083 Edits**

Page 3-113, 4th full paragraph.  The proposed road to pads CD6 and CD7 would extend approximately 22 miles into the Planning Area, not 5 miles as stated.

**084 Roads**

Page 3-114, 2nd paragraph under Proposed Colville River Road from the Kuparuk River Unit to the National Petroleum Reserve – Alaska.  This states that the road would be capable of handling drilling rigs.  While this is true, it should be made clear that the bridge across the Colville River will not be designed to handle drilling rigs.  This would require industry to build an expensive ice bridge every time it needs to move a drilling rig across the river.  See also page 4-356.  Also in this paragraph there is a reference to Route A – this should be deleted or explained.

**085 Roads**

Page 3-114, 3rd paragraph under Proposed Colville River Road from the Kuparuk River Unit to the National Petroleum Reserve – Alaska.  This states that the road and bridge would enable oil and gas companies to develop staging areas to the east of the Colville River.  We believe the authors meant "west" of the river.

**086 Roads**

Page 3-114, Section 3.4.8.2, Aviation Systems.  There are only two major airstrips, not three,  in the Prudhoe Bay/Kuparuk area; Deadhorse and Kuparuk.  The Prudhoe airstrip shut down several years ago.  Same comment for 2nd paragraph on page 3-115.

**087 Roads**

Page 3-117, Section 3.4.8.6, Ice Roads.  States that "villagers have annually constructed an ice road from Nuiqsut to Oliktok or the nearest oil-exploration ice road, whichever is closer."  Note that CPAI has built the ice road from Nuiqsut to Kuparuk almost every year since the mid-1990s.



**088 Roads**

Page 4-13, Technology Advancement, last bullet.  Note that Anadarko's modular drilling platform is only designed for shallow drilling, much shallower that any exploration well CPAI has drilled or plans to drill.  Same comment for 3rd full paragraph on page 4-18.  Also in the second line at top of page 4-20, insert "shallow" in front of "exploration drilling".

**089 Roads**

Page 4-23, 2nd paragraph.  States gravel roads are typically 62 feet wide toe to toe with 3:1 side slopes.  In fact, roads are typically 52 feet wide toe to toe with 2:1 side slopes.

**090 Roadless**

Page 4-31, 1st full paragraph.  States that "roadless" development is a requirement of Stipulation 48 in the 1998 EIS.  This is not an accurate statement.  In fact, stipulation 48 allows roads connecting pads within fields, and roads connecting production sites between separate oil fields.

**091 Basic**

Page 4-31, 1st paragraph under Resource Potential and Related Activities.  The 2nd and 3rd sentences state:  "For the purposes of environmental analysis in this amendment, future petroleum-related activities are assumed to be correlated to the economic resource potential made available through leasing. This implies that all of the modeled petroleum resources will be discovered and developed by industry, which is very optimistic since all of the possible economic resources may not be attractive to industry."  This is a critical assumption that should be repeated throughout the environmental analysis sections to remind the reader that the DEIS analyses result in artificially high environmental impacts.

92

Page 4-41, Permanent Roads.  CPAI commends BLM for its statement that the DEIS amendment does not forbid construction of permanent roads "connecting the Planning Area oil and gas fields to the coast of the Planning Area or to potential infrastructure to the east".

093
Basic

Page 4-60, last paragraph before Placement of Gravel Fill.  In this and similar sections, the assumption that half the ice pads would be multi-year ice pads is erroneously high.  CPAI knows of only 3 multi-year (insulated) ice pads in the history of North Slope oil and gas activities.  Also see page 4-175.

094
Seismic

Page 4-67, 2nd paragraph.  Estimated acreage impacted by seismic lines is high.  What recent data are being used to support this conclusion?

95

Page 4-149, Section 4.3.14.4, Conclusion.  In this and similar sections a statement is made that redistribution of caribou, wolves, and wolverines occurred in response to various activities including the Puviaq test well.  CPAI is not aware of such redistribution and it was never brought up at any public meetings or other communications during the Puviaq activities.  Temporary displacement of wolverine could occur at any activity that is a noise source, but CPAI is not aware of these movements occurring in response to our activities.

96

Page 4-183, 2nd full paragraph.  CPAI commends BLM for recognizing that for buried pipelines, as compared to elevated pipelines, "potential impacts during construction could double through temporary impoundments, diversions, and sedimentation during construction.  Buried lines could

8/23/2004

also result in thermokarst, subsidence, and erosion problems that could persist beyond the construction phase."

**097 Seismic**

Page 4-186, 4th and 5th paragraphs.  Estimates of impacts to vegetation from camp move trails and ice pads are high because of erroneous assumptions.  For 3D surveys, which are much more prevalent than 2D surveys, camp moves occur down the center of the survey rather than following each of the survey lines, as is done for 2D lines.  Therefore a camp move in a 3D survey using the assumed area in this discussion would impact only 1/7 of the area of a camp move for a 2D survey.  Also in the third paragraph on page 4-186, the number of miles covered should be 5000 instead of 7500.  Additionally, because of new equipment including rubber tracks, there is not a problem with heavy equipment and tight turns.  Impacts are less on 3D surveys due to modern rubber tracks, broad designs and load vehicles.  As evidenced by recent studies, there is no lasting effect from modern seismic surveys.  More recent and applicable data should be used for this analysis.  The 1997 study by Emers and Jorgenson was done in the Alaska National Wildlife Refuge at seismic trails that were established decades ago using antiquated techniques.

**098 Edits**

Page 4-279.  Section 4.5.5 is missing a conclusion section.

**99**

Page 4-312, Section 4.5.12.4.  CPAI agrees with BLM's conclusion that "Most impacts associated with oil and gas exploration and development would be localized and would not have substantial impacts on subsistence species.  In addition, the ROPs and stipulations discussed

above would protect subsistence species and would help to resolve conflicts between the oil and gas industry and local residents."

**100**

Page 4-232, Section 4.5.15.4.  CPAI agrees with BLM's conclusion that "…no resource would become unavailable, undesirable for use, or experience significant overall population reductions."

**101 Edits**

Page 4-344, Table 4-21.  The Nanuq (CD-4) field should be moved to the category "Present Development and Production".

**102 Activities**

Pages 4-403 to 4-409, Table 4-27, Summary of Traditional Knowledge/Local Knowledge.  This table includes quotes from testifiers from as far back as the mid-1970s.  Many of the comments reference activities that have not been used on the North Slope for decades.  Some of the listed effects that are correlated to individual comments appear speculative and not directly tied to the activity mentioned in the comment.  There is no evidence to indicate that many of the issues discussed in the comments were related to oil and gas activity.  In contrast, many of the issues, such as low water levels, are naturally occurring phenomenon and have no relation to human-induced activities.  Also some listed effects are so far removed distance-wise from the activity discussed in the comment, that there is no possible way they could be connected.  We understand the importance of actual traditional knowledge, but recognize that just because an individual makes a statement does not mean it is true or has undergone enough scrutiny to be published as true, which is what the lay reader will assume.  This table needs to be completely redone. The reference to the table at the bottom of page 4-402, and the table itself, need to state that the

information in the table has not been verified and that the impacts are not proven to be caused by

oil and gas activities.

103
Edits

Page 4-464.  Section 4.11.3 is missing a conclusion section.