August 23, 2004

196407

Henri Bisson
Alaska State Director
NPR-A Planning Team
Bureau of Land Management
Alaska State Office (931)
222 West 7th Avenue
Anchorage, AK 99513

http://nenpra.ensr.com
FAX: 907-563-0439

Re:    Draft Amended Integrated Activity Plan/Environmental Impact Statement for the
       Northeast National Petroleum Reserve-Alaska

Dear Director Bisson:

The North Slope Borough (Borough) appreciates this opportunity to provide written comments on the Bureau of Land Management's (BLM's) Draft Amended Integrated Activity Plan/Environmental Impact Statement (Draft IAP/EIS) for the Northeast National Petroleum Reserve-Alaska (NPR-A).

001
Timing

The NSB supports oil exploration and development in the NPR-A that maintains healthy wildlife populations and protects subsistence opportunities. But a responsible balance must be struck between the protection of critical areas and development. Approaching a consensus position on the proposed amendment has presented a difficult challenge for the Borough , other North Slope entities and our residents. We faced these same questions in 1997 and 1998, but clearly, the stakes are higher now. Given the importance and complexity of the management decisions now before us, there simply has not been enough time for necessary discussion among either our affected communities and groups, or among the people of the North Slope and the BLM, other involved federal and state agencies, the oil and gas industry, and outside parties with a stake in the process. This has been particularly frustrating because we have been clear since the beginning and throughout this process that appropriate time must be provided to do the job right, and because to a large extent other substantial BLM and Interior Department planning efforts (Northwest NPR-A, Alpine Satellite Development Project, OCS Lease Sales 186 and 195) have competed for our attention and resources. Accordingly, we have adopted a position that likely does not reflect the best effort and analysis that would have been possible with sufficient time to engage all stakeholders in a meaningful dialogue.

002
Timing

As we see it, there are two possible solutions to schedule-driven problems with this review. The BLM could further extend the comment period on the Draft. The extension should be of sufficient duration to allow for meaningful dialogue and several multiple-stakeholder work sessions. This would clearly be the best solution. Failing that, the BLM must extend the time it has allowed between the end of the comment period and the

**Exhibit 29, page 1 of 34**

Henri Bisson
August 23, 2004
Page 2

projected publication of the Final IAP/EIS. While doing this, the agency must commit to fully engage the people, governments, and other groups of the North Slope in additional consultation and as partners in the preparation of a final preferred alternative. Additional analysis must address the potential impacts of realistic management alternatives on subsistence resources, harvests, and practices. The analysis must be presented in a way that allows our people to assess how the management changes proposed on paper will translate to implementation on the ground. This must be done with reference not to general zones within the planning area, but to specific townships. Reviewers, and especially our Inupiat residents, must be able to gauge whether the mitigation measures proposed would be implemented in a manner that provides the protections claimed. That assessment is not possible with the effects analysis and mitigation measures as they are now written.

003
Timing

The BLM and others may respond that a demand for substantially more time is unreasonable, and that a "typical" management plan or EIS is developed in less time. We cannot say whether that is the case, but suggest to you that the circumstances surrounding this planning effort are in no way "typical". First, we as Inupiat people are going to be more directly and intimately affected by the decisions the BLM makes than "typical" stakeholders elsewhere because our relationship to the land at issue here is more direct and intimate. That is why the law requires that special focus be given to the potential subsistence impacts of federal actions. Second, most of us who have an interest in this review, as well as being subsistence users who participate in a mixed subsistence/cash economy, already have precious little time to engage in it. We have what for anyone else would be two full-time jobs: A cash day job, and the complex, time-consuming, and culturally significant job of subsistence. Here again, as a federal agency, attention to the special circumstances of subsistence users is required to be a component of your environmental justice analysis. We will discuss further on in our comments the environmental justice implications of failure to provide adequate time for our Inupiat residents to fully participate in this review, and to fully address key subsistence questions in the draft plan.

4

North Slope testimony and comments should be given deference in the BLM's decisions. It is our borough residents who will be most directly affected by any decision to either expand areas open to industrial activity in the NPR-A, or to weaken existing conditions applicable to those activities. Our comments below will be in three parts. First, we will explain in general terms our basic position. Second, we will comment on additional general concerns raised by the Draft Plan. Finally, we will comment on specific provisions and language contained in the Draft Plan.

## GENERAL POSITION

5

The primary issue raised by your proposed amendment of the existing 1998 IAP/ROD is whether to open additional acreage within the planning area to oil and gas leasing or surface facilities. Secondary to that issue is the question of the structure of management that should be applied within the area. Finally, there are significant questions regarding

Henri Bisson
August 23, 2004
Page 3

how specific provisions and language contained within the new proposed management structure would affect its implementation.

## The Areas Now Closed to Leasing and Surface Facilities Should Remain Closed

**006 Purpose**

We are not aware of significant new wildlife or subsistence data, or industry technology that has been reported, discussed, and validated since 1998 that would justify opening areas that are now closed to leasing or surface facilities. The BLM's preferred alternative would leave 213,000 of the 600,000 acres now closed off-limits to leasing for the protection of habitat critical to molting waterfowl. We believe that the remaining 387,000 acres are equally as deserving of closure for the protection of caribou, waterfowl, and fish populations, as well as for subsistence harvests.

**007 Alternatives**

All essential habitats of the Teshekpuk Lake Caribou Herd must be protected. Hunters from seven of our villages take animals from the Teshekpuk Lake Caribou Herd, making it the most important herd on the North Slope from a subsistence standpoint. This herd is not habituated to industrial activities, and would likely be displaced from preferred habitat if development is permitted and occurs in areas now closed. The result would be population effects on the herd and significant effects to subsistence harvests. Essential calving habitat around Teshekpuk Lake, insect relief habitat north of the Lake, and the narrow corridors between the Lake east to the Kogru River and the Lake northwest to Smith Bay that provide the only routes to calving and insect relief habitats, must remain free of permanent facilities.

**008 Alternatives**

All essential waterfowl habitat within the Teshekpuk Lake Special Area (TLSA) must be protected and remain free of permanent facilities. Continued deferral of tracts northeast of the Lake would protect significant goose molting habitat. Other critical molting habitat, as well as nesting habitat for a variety of waterfowl, would be placed at risk if additional areas north and east of the Lake were opened to development.

**9**

We have reviewed, fully concur with, and endorse the well-reasoned comments on this Draft Amended Plan submitted to you by Audubon Alaska. The organization has extensively reviewed all available credible data on the resources and current uses of the planning area. Like the Borough, Audubon would support a reasonable balance between oil and gas development within the NPR-A and conservation of the region's natural ecosystems. The organization's conclusion that the areas now closed should remain off-limits to development is based on the best available science. In particular, Audubon brings considerable expertise to its assessment that either of the proposed action alternatives presented in the Draft Amended Plan would subject birds, caribou, and other resources to unreasonable and unacceptable population-level risks.

**10**

Significant to the Borough also have been concerns with this proposed amendment raised by the Pacific Flyway Council, an organization of the fish and wildlife management agencies of the eleven western states, British Columbia, Alberta, and cooperators in Mexico. The Council reminds us that beyond local interests, there are significant national

Henri Bisson
August 23, 2004
Page 4

and international interests in the ecological features of the Teshekpuk Lake area that must be fully acknowledged and addressed in the EIS. Here too, we recognize the substantial expertise of the Council, and join in its position that the TLSA should remain off-limits to development.

## Shift From Prescriptive to Performance-Based Mitigation Acceptable if Done Right

<div style="border:1px solid #000; background:#ff0">011<br>Stips &<br>ROPS</div>

All protections afforded by the existing prescriptive mitigation measures must be carried forward if there is a shift to performance-based mitigation. We cannot support a change from the existing prescriptive mitigation structure to the proposed performance-based structure unless we can be assured that all protections provided by the 79 stipulations of the 1998 plan are preserved or enhanced. It is not clear from the proposed measures as they are now written that current protections will be fully carried forward. Central to BLM's position with respect to a shift to performance-based mitigation is the assertion that the conversion is one largely of form and that there would be no added impacts associated with the move. We do not agree with the conclusion, and believe that a central question must be whether additional impact-producing activities would be permitted to occur under the performance-based system that would not have been permitted under the prescriptive mitigation system. We believe that additional activities clearly would be permitted under the proposed performance-based measures as they are now written, and that additional impacts would occur. If additional unacceptable impacts are to be avoided, the measures must be significantly modified.

<div style="border:1px solid #000; background:#ff0">12</div>

The Draft Plan states (page 2-11, second bullet) that "Adaptive Management Concepts" embodied in the performance-based structure "will help the BLM make decisions effectively by utilizing a rigorous combination of management, research, and monitoring so that credible information is gained and management activities can be modified, over time, based on continuous experience." That sounds great, but raises four general concerns with respect to how the system will work in practice as compared with the prescriptive measures now in place.

<div style="border:1px solid #000; background:#ff0">13</div>

First, if the prescriptive component (requirement or accepted design practice) of a performance-based measure provides the same or a heightened level of protection embodied in a comparable current stipulation, we are of course pleased. Such is the case with the proposed shift from a prescribed minimum pipeline height of 5 feet to a mandatory accepted design practice of 7 feet.

<div style="border:1px solid #000; background:#ff0">014<br>Stips &<br>ROPS</div>

Second, in order to truly provide the same protections now provided by the prescriptive measures, implementation of the adaptive management concepts must allow not only for adjustments in the management of successive projects over time, but also must provide the ability to require changes in the facilities and operation of a single project where monitoring has revealed significant impacts beyond those predicted and beyond a level that would have been permissible under the prescriptive structure. This is a primary concern with the proposed conversion. What we do not want to see are facilities and operations being allowed and causing impacts that would not now be allowed, and there

Henri Bisson
August 23, 2004
Page 5

being no recourse to act after the fact to reduce those impacts. We do not want to find BLM and other agencies simply declaring that they will do a better job with the next project.

015
Stips &
ROPS

Third, under a truly adaptive, flexible, and performance-based management approach, exceptions would seem unnecessary. The burden must be unwaveringly on the applicant to meet stated objectives and performance criteria. Criteria unrelated to the particular objective of a measure, such as technological infeasibility and economics, must never be invoked to allow an applicant to circumvent that central objective. A performance-based measure with a built in exception clause that is triggered by criteria not related to its objective cannot honestly be called performance-based.

016
Monitoring

Fourth, a performance-based mitigation system requires a long-term commitment to fund research, monitoring, and enforcement. Performance-based mitigation can only work if there is a clear requirement for long-term comprehensive research and monitoring to establish baseline data and impacts associated with industrial operations. As discussed above, there must also be the ability to require significant alterations in industrial facilities and operations if significant impacts are identified. As we have noted before, we see it as a significant failing by BLM that far more effort and money has not been spent collecting both baseline and impact information within the Northeast Planning Area since the first planning process was concluded in 1998. It was well known then that industry had great interest in the region. It was well documented that the area is critical to a variety of resources and to subsistence users. The Research and Monitoring Team (RMT) created subsequent to adoption of the 1998 Plan made recommendations and money was spent, but it took far too long for BLM to accept and act on those recommendations. It is

017
Research

seen on the North Slope as a troubling lack of agency commitment to the protections promised in 1998 that the RMT's charter was allowed to lapse, and that the group did not meet for more than a year before it was reconstituted. BLM has offered the suggestion that a broader multi-agency science strategy can be developed for the entire North Slope. That is an admirable and ambitious goal, but should not be pursued at the expense of the area-specific work of the RMT when clearly the Northeast NPR-A is currently the primary focus of industry interest on the North Slope.

**Subsistence Cabins and Campsites Must be Protected**

018
Cabins &
Camps

The use and enjoyment of cabins and campsites must be protected. The EIS must analyze how any change in management is likely to affect cabin and campsite users. Buffer zones prohibiting surface facilities around all established cabins and campsites must be maintained. Whether structures exist on these sites, and regardless of their legal status, they must be recognized as subsistence use sites critical to the nutritional and cultural well-being of our residents. The issue must be clearly highlighted in the document.

**GENERAL COMMENTS ON DRAFT**

Henri Bisson
August 23, 2004
Page 6

**Purpose and Need**

019
Purpose

There have been inconsistent explanations of the BLM's goals in undertaking this proposed amendment, and in the finality of certain decisions regarding revision of the existing management structure. With respect to the need to open areas now closed or subject to No Surface Occupancy restrictions, the Draft's Executive Summary states that the "energy resources of the Petroleum Reserve are essential to meeting our nation's energy demands, will enhance domestic energy production, and decrease our nation's dependence on foreign oil sources." It is unclear how something as speculative as the recoverable oil reserves of the NPR-A can be "essential" to meeting an ever-rising national demand for energy. Likewise, there was much talk during the scoping phase of this effort about "new information" that justified a review of the existing management plan. BLM has never adequately responded to the assertions of many scoping commenters strongly questioning whether there was any technical, biological, or subsistence data newly available that would justify a reassessment of the 600,000 acres now closed to leasing or surface facilities. In fact, significant arguments were offered that the balance of new information should favor maintaining or enhancing existing protections. These also have never been sufficiently addressed by BLM.

020
Purpose

021
General

With respect to the extent to which key decisions appear already to have been made by BLM, on the one hand, a No Action Alternative is presented that would appear to leave the existing management structure in place. That would include the 79 prescriptive lease stipulations and area closures. On the other hand, however, the BLM's project website states that the agency "**will** reformat current prescriptive stipulations…into a mixture of prescriptive and performance-based stipulations…" The site also claims that the BLM has not made any decision to "change the meaning or intent of any Northeast National Petroleum Reserve-Alaska stipulations." Taken together, the statements would seem to presuppose that a conversion in structure would not result in any change in potential impacts to resources or uses. That conclusion simply cannot be reached without substantial analysis lacking in the Draft Plan.

**Alternatives**

022
Alternatives

The three alternatives presented in the Draft Plan are not a sufficient range of choices. As noted above, BLM has indicated on its project website and elsewhere that it has already made the decision to convert the existing 79 stipulations into performance-based mitigation measures. If this is the case, then Alternative A is meaningless as written. If this is not the case, then offering conflicting information on an issue of such central importance to reviewers violates the National Environmental Policy Act (NEPA) regulations governing the preparation of EIS alternatives.

23

Implementing regulations at 40 CFR 1502.14 identify the Alternatives section as the "heart" of an EIS. The section should "present the environmental impacts of the proposal and the alternatives in **comparative** form, thus **sharply defining the issues** and providing a **clear basis for choice among options by the decision-maker and the**

Henri Bisson
August 23, 2004
Page 7

**public.**" (emphasis added) The regulations at Section 1502.14 further specify that an EIS' alternatives analysis must:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives, which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

| 024<br>Alternatives |
|---|

Not analyzed is a modified No Action Alternative that would seem logically to flow from a No Action adherence to the status quo paired with BLM's statements concerning its decision to restructure mitigation measures. Such an alternative would leave the areas now closed and off-limits to surface facilities as they are, while converting the stipulations from prescriptive to performance-based as they apply to the remaining acreage of the planning area. The statement that the decision has been made to make the conversion into thinking that this alternative is included in the document might understandably have misled a reviewer. It is not. A reviewer might understandably have been misled into thinking that support for Alternative A was meaningless if a conversion of mitigation measures was certain to occur. Such confusion over a choice that would predictably be the central focus of many potential commenters seems a plain and legally indefensible flaw in the Draft Plan.

**New Information**

| 025<br>Subsistence |
|---|

The subsistence users themselves must confirm any new subsistence information. If BLM has new information relating to subsistence species or uses in the Planning Area, that information should be shared, discussed, analyzed, and corroborated with the affected North Slope communities as was done in a subsistence workshop during preparation of the 1998 EIS.

**Definitions**

| 026<br>Stips &<br>ROPs |
|---|

Small points in definitions can have big impacts on management. The definition of "consultation" as it is referenced in the stipulations states, in part, that "consultation implies that the BLM or the Lessee/Permittee will contact other agencies or entities to either **inform** them of potential actions and/or to seek input on noted topics." (page 2-12) This is absolutely unacceptable. One party simply "informing" another of its intentions must never be recognized as consultation. That the definition of consultation now contains that clause is contrary to common usage, and is likely to have been missed by

Henri Bisson
August 23, 2004
Page 8

many reviewers. They are likely therefore to have mistakenly believed that consultation requirements necessarily strengthen the package of proposed mitigation measures far more than might be the case with the definition reading as it now does.

<table>
<tr><td style="background-color:yellow">027<br>Stips &<br>ROPS</td><td>In addition, in the definition of "permanent oil and gas facilities", material sites are specifically excluded, and therefore not subject to restrictions on the placement of such facilities. This is a problem in several respects. First, many reviewers may not realize that "material sites" means, or at least includes, gravel mines. Where gravel mines are developed is a significant issue for many reviewers, including the Borough, area communities, and residents. They are not less, and perhaps more permanent, than production facilities, pipelines, docks, roads, and the other facilities listed in the definition, and may cause impacts surpassing such facilities in both scope and duration. Any provision dealing with gravel mines must refer to them using that commonly used name. Further, such sites clearly are "permanent" alterations of the North Slope landscape, have been recognized as permanent in the past, must be recognized as permanent facilities under the proposed amendment, and must be made subject to all restrictions on the placement of such facilities.</td></tr>
</table>

## Fish Concerns

028
Subsistence

Fish form an important nutritional and cultural staple of the coastal Inupiat diet in Arctic Alaska. This is generally not well known or described in the literature (Braund 1993). Most research has focused on the Inupiat's reliance on and associations with marine mammals. The broad whitefish, or *Aanaakliq,* is perhaps the most important fish resource in the central North Slope, much of which is encompassed by NPR-A. As many as 30,000 fish are taken by the Barrow residents in a single year (Braund, 1993).  Over 150 years ago R. Maguire, Commander of the HMS Plover during the Franklin search, commented on the people of Point Barrow:

> "October 24, 1853 ....The people seem to depend a good deal this season upon the fish and Venison brought in from the land, as parties are continually setting out to assist in bringing in what is already on the way or in procuring other supplies. They still try for small fish along the cracks in the ice but their success is indifferent....." (Bockstoce, 1988).

This pattern has changed little if at all.  Broad whitefish from the NPR-A and surrounding area are traded for other resources between communities across the North Slope. Clearly, this resource really has Slope-wide importance.

029
Fish

The Borough's Department of Wildlife Management has been involved in studies of broad whitefish since 1988, conducting research and gathering traditional knowledge from local fishermen about NPR-A. Broad whitefish have a complex and interesting life history. In the NPR-A region they mature at an average of 12 years, live to 40 years old, can achieve 5+ kg, and are excellent eating by any standard (Philo et al., 1993). Broad whitefish migrate considerable distances and use a variety of habitats (Morris, 2003). The

Henri Bisson
August 23, 2004
Page 9

**029 (Cont'd) Fish**

central part of the North Slope (including the NPR-A) is more or less the center of concentration for this species in northern Alaska. The broad whitefish requires a number of different habitats throughout its life.  These include deep river habitat for spawning and over-wintering, rivers and streams as migration corridors, nearshore brackish habitat for feeding of certain size classes, and lakes for feeding and overwintering. For access to important lake habitat, many use seasonal (ephemeral) streams. Fish may spend just a summer or up to perhaps 10 years in a lake before they leave to spawn (Morris, 2003).

**030 Fish**

In the Northeast Planning Area, the small seasonal creeks feeding the Miguakiak River are very important and must be protected should development occur. The highest catch rates noted in recent studies occurred in these small drainages (NSB unpublished data). Bridging small creeks rather than using culvert pipe can generally achieve protection of these drainages.  While bridging is more expensive, it is necessary to assure the continued abundance of this important subsistence resource. Neither the body of the Draft Amended Plan, nor the specific proposed mitigation measures, adequately addresses or analyzes the bridge versus culvert question or provides assurances that seasonal and ephemeral streams will be appropriately protected.

**031 Stips & ROPS**

All of the various NPR-A aquatic habitats, including lakes, streams, nearshore, and river delta habitat require protection.  Measures that can effectively protect fish are well understood, but must be strictly imposed and enforced to prevent detrimental impacts. The Draft Amended Plan provides no assurances that such measures will be required.

**32**

From cooperative telemetry studies with the State of Alaska Department of Natural Resources, funded through the Alaska Department of Community and Regional Affairs, there are data that show the importance of Teshekpuk Lake to fish. The western attached basins are quite important for overwintering of broad whitefish. The eastern basin is important for rearing and feeding of broad whitefish and several other species.  The species list for the lake basin includes at least 12 species (Philo et al., 1993).

**033 Teshekpuk Lake**

Teshekpuk is the third largest lake in Alaska; however, very little scientific information about the Lake or its fishery resources is available, as studies have been few and infrequent (Bendock and Burr, 1984; Philo et al., 1993).  Leasing of the Lake must not even be considered until the fish biology of this huge water body is better understood. Likewise, drilling within the Lake basin must be prohibited and not considered until the physical and biological properties of the Lake are well understood. Any major release of oil into Teshekpuk Lake or connected water bodies would significantly affect the region's fish resources, as well as devastate large concentrations of waterfowl, and impact the subsistence harvests of several communities.

### Bowhead Whale Concerns

**034 Marine Mammals**

Changes in bowhead whale behavior and deflections from their migratory routes associated with shipping noise, offshore drilling, and seismic operations is well documented. The relevant scientific literature as summarized in Richardson *et al*. (1995). Richardson *et al*. (1995) states, "In general, bowheads react strongly and rather

**Exhibit 29, page 9 of 34**

Henri Bisson
August 23, 2004
Page 10

consistently to approaching vessels of a wide variety of types and sizes." Reaction distances of bowheads to drilling island activities were summarized by the National Research Council (2003), which reported that reaction distances ranged from 6 to 19 miles. Brewer *et al*., (1993) noted (p. 27): "It appears that when the whales were approximately 30 km west of the industrial activity [Kuvlum#1] and its associated ice conditions, they were again observed over a wider range of latitudes and maintained a dispersed pattern at least until they reached the Point Barrow area." Generally, the loudest sound sources from offshore drilling activities were generated by ships and icebreakers associated with the drilling operations.

Richardson *et al*. (2003) reported a statistically significant displacement of bowhead whales from Northstar Island when exposed to low intensity sounds from relatively small vessels working near the drilling island. They noted that the "southern edge of the migration corridor was slightly farther offshore at the noisiest times as compared with typical times." Displacements on the order of 1.4 to 2.1 miles in 2001, and 1.4 to 2.9 miles in 2002 were detected. The main sound source was from the small vessels in the area and not the drilling activities on the island itself. Should shipping along the Beaufort Sea coast increase as a result of NPR-A development, even the subtle effects on bowhead migratory behavior noted above could lead to a decrease in subsistence whale harvest success in the fall hunting communities of Barrow and Nuiqsut.

The tendency for bowheads to migrate closer to shore in light ice years versus heavy ice years in the mid-Beaufort Sea during autumn has been demonstrated in at least two publications (Moore et al., 2000; Treacy, 2003). McDonald and Richardson (2004) noted that the distribution of whales was strongly near shore in 2003. They estimated that roughly 75% of the population (e.g., ~7,800 bowheads) came within about 27 km (17 mi) of Northstar Island in fall 2003. Sea ice retreat over the last decade in the Beaufort Sea coupled with the behavioral response of bowheads to sea ice (i.e., closer to shore in light ice years) could lead to much higher exposure to nearshore shipping noise. This suggests that the restrictions in the migration normally associated with Pt. Barrow in spring are also occurring at times during the autumn migration near Prudhoe Bay (Zeh et al., 1993). These factors clearly will increase the interactions between migrating bowhead whales and ship traffic.

The above data and findings must be more fully integrated into BLM's analysis of the potential impacts of expanding NPR-A industrial activities and associated vessel traffic on bowhead whales and bowhead subsistence harvests.

### Exception Clauses

The second sentence in the paragraph at the bottom of page 2-13 is at best unnecessary, and at worst, inaccurate. In referring to the Congressional mandate that oil and gas exploration, development, and production activities in the NPR-A be conducted in a manner that prevents unnecessary surface damage, minimizes ecological disturbances, and avoids conflicts with subsistence activities, the sentence states that "such protection efforts are not intended as a prohibition of petroleum and related activities". It bears

Henri Bisson
August 23, 2004
Page 11

035 (Cont'd)
Stips & ROPs

noting in this context that other related mandates require that oil and gas activities within a designated special area "shall be conducted in a manner which will assure the maximum protection of such surface resources to the extent consistent with the requirements of [the] Act for the exploration of the Reserve" (42 U.S.C.6504(b), 6508), and that oil and gas activities must include or provide for "conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the NPR-A". (42 U.S.C. 6508(1)) It would be more accurate to say that these mandates taken together encourage leasing leading to oil and gas development and production, but envision also that stringent protections, including prohibitions of petroleum and related activities, must be employed where necessary. As we have said, the Borough supports responsible, environmentally and culturally sensitive exploration and development within the NPR-A and elsewhere on the North Slope. Where significant impacts cannot be avoided, however, protection of the environment, fish and wildlife resources, and subsistence opportunities must take precedence over efforts to exploit our region's oil and gas resources. It is not just our hope that the balance is struck in that way; it is the law, and BLM must comply with it.

036
Stips &
ROPs

Where the lines will be drawn in striking an appropriate balance is the central issue of this planning process. The document does not provide sufficient assurances to the directly affected North Slope community that the trade-offs BLM might be willing to make somewhere down the line are trade-offs we can live with. The agency has not fully explained why, as is stated beginning on the last line of page 2-13, "there will remain a need to consider exceptions and modifications on a case-by-case basis" in the context of a performance-based system. Moreover, the guidelines offered on page 2-14 for use in considering exceptions appear to be a significant weakening of those identified in the 1998 Plan in that each of them may not be linked to a required finding that "the alternative means proposed by the lessee fully satisfies the objective(s) of the stipulation." As it appears on page 2-14, it seems that the requirement that the alternative proposed by the lessee/permittee fully satisfies the objective(s) of the lease stipulation or ROP is only linked to the third bulleted guideline, when in the 1998 Plan, it was linked to each of the comparable guidelines. This may be a simple error in editing, with the clause following "and" meant to appear as a fourth bullet, but it must be clarified. As written, the exception guidelines are an open door for lessees/permittees seeking to avoid compliance with particular stipulations or ROPs. An applicant apparently need only show that compliance would be technically not feasible or too expensive. The consultation requirement provides us little comfort since, as discussed above, the AO need only "inform" the Borough of potential actions.

037
Stips &
ROPs

Editing questions notwithstanding, we believe that given a shift to a performance-based system and the mandates described above, all exception clauses must be eliminated from the proposed mitigation measures or significantly narrowed to allow only for circumstances in which an environmentally preferable alternative to compliance is identified. The exception clauses contained in many of the proposed performance based measures are unacceptable. Key terms are undefined, and no criteria are given that would

Henri Bisson
August 23, 2004
Page 12

govern the granting of exceptions. The result is that the Borough and other reviewers have no real sense of how much protection is embodied in the proposed mitigation measures, and what impacts to the environment, wildlife resources, and subsistence are possible or even likely.

038
Stips &
ROPs

In particular, we strongly believe that the economics of a project should never be permitted to dictate whether or to what degree a protective measure is applied. It is not clear whether or to what extent some overarching exception clause utilizing the guidelines indicated on page 2-14 would apply where a specific stipulation or ROP already contains its own exception clause or where a specific stipulation or ROP contains no exception clause. It is unclear whether a prescriptive component of a proposed stipulation or ROP, like the 7-foot pipeline elevation requirement of ROP E-7 for instance, is subject to exception. Knowing the full extent to which any or all of the protective provisions of the proposed stipulations and ROPs are subject to exception is critical for two reasons. First, North Slope governments, organizations, and residents who will be most directly affected by implementation of this Plan must know what we are commenting on or agreeing to. Second, the Draft argues that mitigation measures would reduce impacts of certain facilities or operations, but does not adequately analyze the effects of those facilities or operations if exception clauses are applied to reduce the scope or effectiveness of the mitigation measures.

**Subsistence**

039
Alternatives

The evaluation of Alternative A in the mandated ANILCA Section 810 Analysis of Subsistence Impacts found in Appendix B of the Draft reaffirms the conclusion of the 1998 analysis of the current management plan that the alternative would not significantly restrict subsistence uses and needs. We concur with the finding, but only to the extent that existing stipulations are strictly adhered to. Should the granting of exceptions to these stipulations become routine, and incremental impacts accumulate, restrictions on subsistence uses and needs could occur. The analysis also concludes with respect to both Alternative B and Alternative C that they would not significantly restrict subsistence uses and needs. We strongly disagree with these conclusions. We agree with the conclusion that the cumulative case would result in a reasonably foreseeable and significant restriction of subsistence use for at least four affected North Slope communities

040
Alternatives

Our central concern with respect to the findings that neither Alternative B nor Alternative C would result in significant restriction of subsistence uses is that there is insufficient analysis to support the conclusions. BLM suggests that the avoidance of industrialized areas by subsistence users can be overcome by "effective communication and consultation by the oil industry, local communities, and the BLM". There is nothing to support this conclusion, no evidence that comparable efforts have been undertaken or ever proved successful to date, and no acknowledgement that if such efforts proved unsuccessful the conclusion of the analysis must be that there would certainly be significant restrictions of subsistence uses. Central also to BLM's conclusions is the degree to which proposed mitigation measures would provide protections comparable to

Henri Bisson
August 23, 2004
Page 13

**040 (Cont'd)
Alternatives**

those in place under the current plan. Here again, a comparison of the existing prescriptive measures and proposed performance-based measures reveals that the conversion is not simply one in form, but represents a significant potential weakening of protections now in place. Also unacknowledged in BLM's analysis is the potential for use of exception clauses to circumvent apparent protections. The granting of exceptions to mitigation measures for economic, technical, and other reasons unrelated to the objectives of the measures could significantly increase impacts on resources and subsistence. With the proposed mitigation measures and exception clauses written as they now are, it is clearly possible that their implementation could significantly restrict subsistence uses. BLM has not conducted an analysis of potential impacts under scenarios in which exception clauses allow non-compliance with mitigation measures that now appear to be a primary basis for the agency's conclusions that impacts to subsistence would be minimal.

**041
ANILCA**

The finding regarding the cumulative case requires BLM to hold hearings in the potentially affected communities as specified in ANILCA Section 810 (a)(1) and (2), and to make three determinations required by section 810 (a)(3)(A),(B), and (C). The three determinations are: 1) that such a significant restriction of subsistence is necessary, consistent with sound management principles for the utilization of public lands; 2) that the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition; and 3) that reasonable steps will be taken to minimize adverse impacts to subsistence uses and resources resulting from such actions.

If BLM intended that the public hearings on the Draft Amended IAP/EIS also serve as the community hearings required under ANILCA Section 810, we believe that the public was not made sufficiently aware that the North Slope hearings recently conducted were meant to serve that dual function. Even if proper formal notice had been given, BLM's failure to highlight at the hearings themselves the findings of the Section 810 analysis and the additional requirements imposed by a finding of a significant restriction of subsistence uses was contrary to the most basic intent of the ANILCA requirement. In order to elicit from subsistence users the focused testimony necessary to enable BLM to meaningfully consider appropriate factors and make required determinations, the full Section 810 analysis process must be explained. It has not yet been, and our subsistence users have not yet been appropriately engaged by BLM in the analysis.

We urge BLM to formally describe the Section 810 analysis process, present information obtained in this process, describe the method(s) used to evaluate this information and derive findings, and reveal the resulting finding(s) from the three steps in the Section 810(a)(3)(A),(B), and (C) Subsistence Determinations in meetings with our affected communities, and then release all this information for public review and comment before preparing the Final IAP/EIS. Preparing and presenting this documentation, and allowing full public discussion of all alternatives based on the Section 810 review before concluding the EIS process, would generate the best and most meaningful findings, and would to some extent allay the substantial concerns of our residents that apparent

Henri Bisson
August 23, 2004
Page 14

protections could be lost in the implementation of a final amended management plan by BLM.

042
Marine
Mammals

It is also essential that BLM's subsistence analysis recognize and analyze the potential that increased industrialization of the NPR-A, including development of coastal staging areas, heightened interest in adjacent offshore areas, and increased oil spill risks, might be perceived by the International Whaling Commission (IWC) to be placing increased pressure on the endangered bowhead whale population. The sense among our subsistence whalers who have participated in meetings of the IWC is that the organization, unable to directly control industrial activities, might reduce the Native subsistence harvest quota as a means of protecting the species. At its most recent July annual meeting in Sorrento, Italy the IWC accused oil companies of threatening the survival of an endangered population of whales. The IWC's scientific committee stated that noise, vessel traffic, and the potential for a catastrophic oil spill posed "an obvious threat" to the feeding grounds of the 100 remaining western Pacific gray whales. The full IWC passed a resolution endorsing the scientific committee's findings that the "onset of oil and gas development programmes is of particular concern with regard to the survival of this population". It is not unreasonable to expect a similar reaction if the IWC perceives a heightened threat to bowheads.

### Cumulative Effects

043
Cumulative

There must be some mechanism for recognizing and mitigating the potential cumulative impacts of multiple industrial operations within and outside of the Planning Area. The oil industry has made progress in being able to develop with a smaller footprint, but it is predicted that oil in NPR-A will be found in many small fields, resulting in a web of wells, pipelines, and roads. This expanding web of development will create incremental and increasingly significant cumulative impacts on wildlife and subsistence hunting.

ConocoPhillips' Alpine Production facility now sits just eight miles north of Nuiqsut in the Colville River Delta. The western reach of the sprawling Prudhoe Bay/Kuparuk oilfield complex is less than 25 miles east of the community. The Meltwater facility lies less than 20 miles to the southeast. There has already been extensive leasing and exploration west of Nuiqsut in the Northeast NPR-A Planning Area. When Alpine was being planned, the company at the time said that foreseeable development did not include any further construction in the Colville River Delta. Now agencies, the Borough, and the community of Nuiqsut are considering the Alpine Satellite Development Project that would place production pads in the Delta and the NPR-A. There have already been subsistence effects associated with existing facilities and operations. Hunters have been excluded from traditional hunting areas. Even where hunters have not been specifically prohibited from entering industrialized areas, they have largely avoided hunting in the vicinity of oil and gas facilities. There is already significant anxiety, tension, and stress within the community of Nuiqsut related to the continued expansion of oil and gas facilities into traditional subsistence areas. Among some residents, there is a sense that cultural systems are breaking down. There are divisions regarding how best to deal with

Henri Bisson
August 23, 2004
Page 15

**043 (Cont'd)**
**Cumulative**

both the effects and opportunities associated with expanding industrial development, and over what the community's role should be in the process. There is a need for steady cash employment, but industry jobs take residents away from their families, communities, and cultural activities and responsibilities. There have been persistent concerns over air quality and the overall effects of industrial operations on the health of residents. All of this must be more fully addressed in the EIS.

**044**
**Wildlife**

Wildlife resources have also been affected by industrial facilities and operations, impacting the resources themselves and subsistence harvests. Caribou have been displaced from traditional calving, insect relief, and hunting areas. Ice road river crossings have restricted fish movement, and may have contributed to several years of poor fish harvests in Nuiqsut. Subsistence whaling has been impacted by barge traffic associated with onshore exploration.

**045**
**Planning**

Any revision of the Northeast IAP must fully consider and implement the recommendations of the March 2003 National Research Council (NRC) Report on the "Cumulative Effects of Oil and Gas Activities on Alaska's North Slope." A primary conclusion of the report is that there has not been adequate communication and coordination among federal, state, and municipal permitting agencies, or adequate comprehensive planning to "identify the scope, intensity, direction, or consequences of industrial activities that are judged appropriate and desirable." We believe that multi-agency North Slope-wide comprehensive planning is long overdue. It cannot be delayed any longer, as the potential exists with this proposed IAP amendment to allow the expansion of industrial operations into areas utilized so intensively by wildlife and subsistence users. Additional recommendations of the reporting NRC Committee address the need for ecosystem-level research, documentation of human health effects, expanded socio-cultural research efforts, and investigation of the consequences of water withdrawals, impacts to zones of influence beyond industrial footprints, and air contamination. All of these issues and the others identified in the report must be addressed in this EIS.

**046**
**Impact**

The linkage between onshore and offshore operations and impacts must be thoroughly analyzed, including the potential for a westward expansion of onshore facilities and staging areas to stimulate increased offshore industry interest.

**047**
**Cumulative**

Repeated conclusions under the majority of resource categories in the Draft Plan that the cumulative effects would be similar under all three alternatives are simply baffling, and indicate a failure in analysis. At a minimum, each successive alternative would contribute greater impacts to the cumulative case within the planning area, and would also stimulate and facilitate greater development and associated impacts outside, and predominantly west of, the planning area.

### Hazardous Materials

**048**
**Haz Mat**

Section 3.2.10 must provide more details on known hazardous material sites within the

**Exhibit 29, page 15 of 34**

Henri Bisson
August 23, 2004
Page 16

048 (Cont'd)
Haz Mat

planning area. A commensurate plan to clean up all known hazardous material sites within the planning area must be an integral part of any new management plan for the region. The clean up must be accomplished on an expedited schedule. If oil and gas leasing can be placed on a fast track by the BLM, then clean up of known hazardous materials can likewise be undertaken aggressively.

## Abandonment

049
Site
Clearance

Greater attention must be paid in the EIS to issues associated with facility abandonment and site reclamation than was given those topics in the 1998 document. North Slope residents alone will have to deal with the consequences of inadequate requirements dealing with abandonment and reclamation. The 2003 NRC report also reached the conclusion that there has been inadequate analysis of the costs and impacts of the dismantlement and removal of infrastructure and the subsequent restoration and rehabilitation (DRR) of affected North Slope areas. The reporting Committee recommended development of a slope-wide land use plan that reflects an understanding of the likely costs and effectiveness of various DRR approaches.

Like the 1998 Northeast NPR-A Final Integrated Activity Plan/EIS, this DEIS does not adequately address issues associated with facility abandonment, dismantlement and removal of infrastructure, and subsequent site restoration, rehabilitation (DR&R) and reclamation. Some speculation is offered that CPAI could develop plans to dismantle at the time the abandonment phase occurs, but the DEIS does not even attempt an analysis of the needs, costs, or other issues that will factor into the decisions concerning DR&R. In the section describing elements common to all alternatives, for example, an assumption appears to have been made that gravel roads will be left in place upon abandonment. There is no basis for such an assumption. It will likely be required that some sections of road be removed. The potential impacts associated with leaving all roads in place, and with gravel removal and potential reuse, should be discussed. Similar discussion must address the fate of all gravel pads. North Slope residents alone will have to deal with the consequences of inadequate requirements dealing with abandonment and DR&R.

The failure to address this issue at this time results in a lack of information upon which to predict a requirement for financial assurances to ensure that the DR&R can be accomplished. This DEIS is incomplete because it fails to address these issues at all. Road and field abandonment must be fully addressed in the EIS, both in terms of the potential long-term impacts of a failure to fully achieve DR&R, and with respect to the impacts and costs associated with DR&R itself.

Ignoring this issue at this stage may pose an insurmountable obstacle to requiring DR&R in the future if it is determined that a course of action other than "abandonment" is environmentally appropriate. The failure to establish standards, requirements, or conditions at the time the project is approved may preclude the possibility of enforcement of DR&R requirements in the future. It is necessary to carefully analyze the potential

Henri Bisson
August 23, 2004
Page 17

need for DR&R and make an effort to articulate conditions now, so that future possibilities of restoring the environment are not foreclosed.

050
Site
Clearance

In addition, the EIS should address the General Accounting Office Report, GAO-02-357, entitled Alaska's North Slope: Requirements for Restoring Lands after Oil Production Ceases (June 2002) which concluded that the current DR&R requirements and financial assurances are insufficient to ensure that any federal lands disturbed by oil industry activities will be restored. This report correctly identifies a disconnect between the BLM's overall restoration goal and BLM's recognition that previously improperly plugged wells pose potentially costly environmental problems in the absence of any specific articulated requirements and the minimal BLM bonding requirements in the NPR-A. The report recommended that BLM develop specific DR&R requirements for future oil and gas activity in the NPR-A.

Under 42 USC 6508, oil and gas activities in the NPR-A "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the NPR-A. Even if it is not known at this time if the burden for appropriate DR&R may be lessened in the future because some of the infrastructure may be viewed as desirable at that time, this cannot excuse ignoring the need to assess the possible requirements and costs in this analysis.

## Environmental Justice

051
Environ.
Just.

Environmental Justice, as defined by Executive Order 12898, is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. **Fair treatment** means that no group of people, including a racial, ethnic, or a socioeconomic group, should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal programs and policies. **Meaningful involvement** means that: (1) potentially affected community residents have an appropriate opportunity to participate in decisions about a proposed activity that will affect their environment and/or health; (2) the public's contribution can influence the regulatory agency's decision; (3) the concerns of all participants involved will be considered in the decision making process; and (4) the decision makers seek out and facilitate the involvement of those potentially affected.

In sum, environmental justice is the goal to be achieved for all communities and persons across this Nation. Environmental justice is achieved when everyone, regardless of race, culture, or income, enjoys the same degree of protection from environmental and health hazards and equal access to the decision-making process to have a healthy environment in which to live, learn, and work

Henri Bisson
August 23, 2004
Page 18

**Local Borough Authority**

052
Jurisd.
Issues

On page 3-100 and elsewhere, the document states or implies that the North Slope Borough has no authority to place conditions on development in the NPR-A. The DEIS fails to provide any analysis to support that conclusion. The Borough has concurrent jurisdiction in the NPR-A, derived from the jurisdiction transferred to the state under the Alaska Statehood Act and our status as a home rule municipality. No federal or state legislation enacted subsequent to the Alaska Statehood Act has eliminated or removed concurrent jurisdiction and the federal regulatory scheme is inadequate to address all local and environmental concerns. The IAP/EIS must recognize Borough zoning and permitting authority and address the permit review, rezoning, and other governing provisions, criteria, and processes described in the Borough Charter and Municipal Code.

## SPECIFIC COMMENTS ON DRAFT

53

Please be clear that where comments on specific provisions below are in seeming conflict with the overall Borough position stated above, the above position controls. For example, comments below suggesting modification of mitigation measures dealing with Teshekpuk Lake should not in any way be taken as a retraction or repudiation of our primary position that Teshekpuk Lake should not be offered for lease.

054
Stips &
ROPs

Page Executive Summary-3 (ES-3), first paragraph: referring to Alternative B, it is inaccurate and misleading to state, "additional seasonal and spatial stipulations would provide **maximum** protection of environmentally sensitive areas, including sensitive areas." Clearly, greater protection would be afforded these areas by leaving them off-limits to leasing.

055
Seismic

Page ES-4, second full paragraph: it is stated here and elsewhere (see page 4-14) that seismic activities, overland moves, and exploratory drilling would all occur only in the winter. Certain mitigation measures would seem, however, to allow drilling and other activities to occur at other times of the year. It should be clarified that such activities will only be permitted during the winter, and all provisions of the document and mitigation measures inconsistent with that restriction must be eliminated.

56

Page ES-4, fourth full paragraph: BLM is correct in stating that "impacts to fish, wildlife, subsistence, and recreation extend beyond the immediate vicinity of the disturbed ground and, depending on location and protective measures used, could be out of proportion with the development's small footprint." This is an absolutely critical point that should be, but is not, carried forward throughout the document's analysis. It was a controlling factor during preparation of the 1998 Plan, and led to the closures of critical habitat and subsistence use areas that are the target of this proposed amendment.

057
Monitoring

Page 1-15, first paragraph after the bullets: It may have been clear from the various activities listed in the bullets and other developments across the North Slope that some new, broader organization and mission beyond that of the RMT was called for in the long

**Exhibit 29, page 18 of 34**

Henri Bisson
August 23, 2004
Page 19

**057 (Cont'd) Monitoring**

run. That was not the conclusion of the National Research Council's cumulative effects report, and it was not at all clear, and certainly not warranted, that such a group "replace the RMT" as is stated. Rather, just when industry interest was expanding dramatically into the NPR-A, it was against all reason and the wishes of the majority of its members, that the BLM allowed the RMT's charter to lapse in March 2003. The group has since been reconstituted, but not before considerably more than a year had passed without a meeting. This was particularly frustrating given that it had taken three years for the RMT to be organized and become fully operational to the extent that money was actually being allocated and spent on much needed research in NPR-A areas already by that time subjected to exploration activity.

### Stipulations and ROPs

**058 Stips & ROPs**

Page 2-16, A-4b: the ROP represents a weakening of existing Stipulation 14. The current measure requires use of an impermeable diked area for storage of a single tank in excess of 660 gallons or multiple tanks in excess of 1320 gallons. The proposed ROP only requires use of a lined and diked area for storage of materials in excess of 1320 gallons. The single tank 660-gallon threshold for lining and diking should be maintained.

**059 Stips & ROPs**

Page 2-16, A-5: the final clause would allow the AO to allow exceptions to the setback requirements if storage and refueling operations are "properly designed to account for local hydrologic conditions". The ROP is deficient in at least two respects. No criteria are given that would be used by the AO in making that determination. No consultation with other agencies or local communities is required.

**060 Stips & ROPs**

Page 2-19, C-2a: to be clear that heavy equipment used in the construction of ice roads will not be permitted to damage stream banks, compact soils, or cause the breakage, abrasion, compaction, or displacement of vegetation, this ROP should be revised to read "ground operations shall be allowed only when frost and snow cover is at sufficient depths to protect the tundra, *taking into account the specific vehicle(s) proposed for use.*"

**061 Stips & ROPs**

Page 2-19, C-2b: should be amended to read "*With the exception of heavy equipment used during construction of ice roads that is governed by C-2a above,* only low-pressure vehicles…."

**062 Stips & ROPs**

Page 2-19, D-1: this is a clear example of what is wrong with many of the proposed mitigation measures. It represents a significant weakening of the comparable existing Stipulation 28. The fatal flaw of the measure is the open-ended exception clause that would allow non-compliance when the lessee can demonstrate that the impacts of exploratory drilling would be minimal *or* it is determined that there is no feasible or prudent alternative. It does not define what criteria would be used to determine what impacts are "minimal" or whether an alternative is "feasible" or "prudent". There is no requirement that the AO consult with other agencies or affected communities in making those determinations. The need to show that impacts are minimal is presented in the alternative to the need to show that no feasible or prudent alternative exists. The

Henri Bisson
August 23, 2004
Page 20

implication is that a lessee need only show that no feasible and prudent alternative exists, even if the impacts would be more than minimal. The provision speaks of "impacts" rather than "risks" of a blowout. While it may be possible to demonstrate that the risks of a blowout are minimal, it is unclear how a lessee could show that the impacts of a blowout from a drilling structure placed in a fish-bearing river, stream, or lake would be minimal.

**063
Stips &
ROPs**

Page 2-20, D-2: this is another clear example of what is wrong with many of the proposed mitigation measures. It represents a significant weakening of the comparable existing Stipulation 27. The stated objective is to minimize surface impacts from exploratory drilling. A minor point is that it should be stated more broadly to minimize surface impacts from exploratory operations. The requirement/standard is that exploration must be carried out using temporary facilities. The fatal flaw of the measure is the open-ended exception clause that would allow non-compliance not only when an environmentally preferable alternative is identified, but also when permanent facilities are "necessary to carry out exploration more economically". Here, and in all other proposed measures where it appears, any exception based on criteria other than environmental preferability must be eliminated. Clauses appearing throughout the proposed measures that allow noncompliance with an objective based solely on economic considerations are especially galling in that they require only that noncompliance enable a project to be undertaken marginally more economically. The clauses do not require that the project be rendered wholly uneconomic, only that noncompliance would allow it to be undertaken "more" economically. The degree of offensiveness of these clauses notwithstanding, they must all be eliminated from the proposed mitigation measures.

**064
Stips &
ROPs**

Page 2-20, E-2: this is an example of another kind of flaw in the proposed measures. The stipulation aims to protect fish-bearing water bodies, water quality, and aquatic habitats by establishing buffer zones of 500 feet and 100 feet from fish-bearing and non-fish-bearing water bodies, respectively. A built-in exception clause would allow the placement of permanent facilities within these zones, however, if the lessee can demonstrate that impacts "are minimal". No criteria are identified that would be used to define what constitutes "minimal" or more than minimal impacts. Moreover, this approach seems to undermine one primary reason for establishing buffers of this kind. Buffers should be used to protect key resources, habitat, and uses not only from known and anticipated agents (e.g., noise), but also from potential unanticipated events like a well blow-out or other hazardous discharge. Use of the clause "are minimal" implies that the required demonstration by the lessee need only address planned operations, and not potential unanticipated events. There is no way in which a lessee could demonstrate that the oil spill impacts associated with a proposed facility "are" minimal to any degree of certainty that would obviate the need for a buffer. It is true that with proper facility design and oversight of operations the *risk* of a major discharge can be characterized as minimal. It must also be acknowledged, however, that even where the risk of a discharge is minimal, the resulting impacts under certain circumstances can be substantial. Minimal absolute buffer zones must be maintained around fish-bearing and non-fish-bearing water bodies.

**Exhibit 29, page 20 of 34**

Henri Bisson
August 23, 2004
Page 21

<div style="float:left">065<br>Stips &<br>ROPs</div>

Page 2-20, E-3: the measure concludes with the statement that a monitoring program "may" be required to address the objectives of water quality and free fish passage. A monitoring program associated with the placement of any causeway, dock, artificial island, or bottom-founded structure must be required. With the exception perhaps of a small dock, these are substantial facilities that have the potential to cause significant impacts to fish passage, subsistence use, and access to subsistence use areas. In addition, the requirement for any such monitoring program must be accompanied by the authority to require the cessation or modification of operations if significant impacts are identified.

<div style="float:left">066<br>Stips &<br>ROPs</div>

Page 2-21, E-8: the gravel mine site design and reclamation requirements and standards listed are neither true requirements nor standards. They simply present a short 3-item list of things to consider in preparing and reviewing a mine site plan. Two of the items are even presented as alternatives. One suggests locating mine sites outside the active flood plain, while a second deals with the design and construction of sites within active flood plains. Additional considerations must include proximity to critical wildlife concentrations and habitat, prevailing wind patterns and the potential for dusting impacts on water quality, vegetation, and wildlife, and proximity of important subsistence harvest sites and access routes. As we have argued above, gravel mine sites must be considered permanent facilities and be made subject to all prohibitions and conditions applicable to such facilities.

<div style="float:left">067<br>Stips &<br>ROPs</div>

Page 2-21 – 2-22, E-9: lessees should be required not only to utilize best available technology to prevent facilities from providing nesting, denning, or shelter sites for ravens, raptors, and foxes, but should also be required to implement strict procedures governing all activities during construction and operation of facilities to prevent feeding, whether intentional or inadvertent, of these predators.

<div style="float:left">068<br>Stips &<br>ROPs</div>

Page 2-23, F-1: the requirement/standard only applies to "permitted" activities. Why the distinction is made between such activities and other activities is unclear and seems irrelevant in addressing the potential effects of low-flying aircraft on wildlife, subsistence activities, and the peace of our communities. To the extent that BLM has jurisdiction over activities occurring within the NPR-A, this ROP should apply to all flights within the planning area. We expect that the operation of aircraft used to transport personnel, supplies, and equipment to industrial sites would be governed by some permit, and that therefore they would be subject to the ROP as written. It is unclear, however, whether aircraft operations used for pre-construction research, post-construction monitoring, or VIP and other industrial facility tours would be deemed to be used for "permitted" activities. Further, it is unclear whether the term "permitted activities" refers only to operations permitted by BLM, or applies also to activities permitted by any regulatory agency. Many of our residents will tell you from personal experience that any aircraft, whether used for permitted activities or not, is capable of disrupting wildlife and subsistence activities. All flights occurring within the planning area should be subject to appropriate operating restrictions. In addition, with respect to assessing the potential for aircraft disturbance of molting geese, the Draft focuses primarily on the effects of low

Henri Bisson
August 23, 2004
Page 22

altitude flights. Greater attention and analysis is warranted concerning the potential for frequency of flights to be a significant factor in determining the level of disturbance.

**069 Stips & ROPs**

Page 2-24, G-1: the last sentence of the Requirement/Standard should be modified to include the requirement that the AO consult with other federal, state, and local agencies in determining whether it is in the best interest of the public to retain some or all facilities upon abandonment or expiration of a lease.

**070 Stips & ROPs**

Page 2-24, H-1 and H-2: the positive aspects of the subsistence consultation provisions are dramatically undercut by the earlier definition of "consultation" that would allow a lessee/permittee to merely "inform" other agencies and entities of potential actions. For the reasons discussed above, that component of the definition must be eliminated.

**071 Stips & ROPs**

Page 2-26, I-1(b): the proposed orientation program must address not only the "importance of not disturbing archaeological and biological resources and habitats", but also the potential illegality of doing so.

**072 Cabins & Camps**

Page 2-27, K-1: the requirement that an increased setback of permanent facilities from certain water bodies where "subsistence cabins and campsites are *numerous*" must be defined with reference to specific locations within the planning area.

**073 Stips & ROPs**

Page 2-28 thru 2-29, K-2: the exception clause embodied in the last sentence of the Requirement/Standard is overly broad, and does not provide adequate assurance of protection against the placement of permanent facilities that have the potential to cause more than "minimal" impacts. As now written, use of the word "or" would allow greater than minimal impacts when it is determined that there is "no feasible or prudent alternative". Again here, as discussed above, technical or economic infeasibility should never be the justification for allowing significant environmental or subsistence impacts.

**074 Stips & ROPs**

Page 2-29, K-3: it is unclear why the Requirements/Standards for exploration and development are different. One indication of just how complex and confusing these proposed protective measures are is that it is at times difficult to determine between related provisions which embodies the higher standard. Exploration criteria "a." requires that activities not "unreasonably conflict" with traditional subsistence uses or "significantly impact" seasonally concentrated fish and wildlife resources. Development criteria "a." requires that the design and construction of facilities "minimize" impacts. The applicable standards of all criteria should be made consistent in requiring that conflicts with subsistence activities be avoided. In addition, a component must be added to each criteria comparable to that of Development criteria "b." that requires assessment of the potential impacts of the proposed project "in combination with other past, present, and reasonably foreseeable activities". Further, the lead-in to the Development criteria should conclude with the modified sentence "Activities *elsewhere* will only be permitted if…" to make it clear that under no circumstances will permanent facilities be permitted within the ¾ mile offshore and ¼ mile onshore buffer around Teshekpuk Lake. Finally, it is unclear why under Exploration criteria "b." there must be a demonstration of spill

**Exhibit 29, page 22 of 34**

Henri Bisson
August 23, 2004
Page 23

**074 (Cont'd) Stips & ROPs**

response capability during periods of open water when BLM has repeatedly stated elsewhere that all exploration activities would occur only during the winter. Even requiring response capability during periods of broken ice is a concern, as it implies that BLM would be willing to allow exploratory drilling to occur late enough in the spring for there to be an issue with blow-out or spill containment before break-up occurs. Here and throughout the document BLM must more clearly define the term "winter" to be tied to ice and snow cover, and not the calendar dates of December 21 through March 21. BLM must be clear that no exploration or construction activities will be permitted other than during the winter, and that seasonal exploratory drilling restrictions will be applied that will allow adequate time for the drilling of a relief well or other proven well-control measures, as well as spill containment and recovery, prior to break-up.

**075 Stips & ROPs**

Page 2-31, K-5: the word "activities" in the last sentence of standard "a." must be defined. The sentence now introduces confusion. It should be made clear that the intent of the stipulation is to require the gathering of 3 years of baseline data to be used in the siting and design of facilities and against which post-construction impacts can be measured.

**076 Stips & ROPs**

Page 2-32, K-6: the Barrow Whaling Captains' Association should be added to the list of parties to be consulted before open water activities can be conducted. The potential influence of Northeast NPR-A activities on Barrow hunters was made clear when barge operations associated with staging at Camp Lonely impacted Barrow subsistence whaling during the fall of 2003. Here also, the door seems open to an exception that would allow permanent facilities based solely on economics or "other factors". To say that due to such factors, the BLM may concur with a lessee's conclusion that a facility "must" be located within ¾ mile inland of the coastline begs the question as to how the agency will prioritize uses and surface values in the area. The issue of how BLM will balance competing values when faced with a proposed development, after huge sums of money have been spent on leasing and exploration, is central to our concern with a conversion to performance-based measures. The likelihood that it will institutionally and politically more difficult for BLM to reject a project or a request for an exception to a mitigation measure under those circumstances must be acknowledged by the agency. Our concern that there would be a "slippery slope" to development greased by economics, power, and influence is compounded by loose and vague language like that contained in this and other stipulations and ROPs.

**077 Stips & ROPs**

Page 2-32 thru 2-33, K-7: the phrase "if necessary" beginning the Requirement/Standard for Permanent Facilities must be clarified. It is not specified under what conditions it would be "necessary" to construct permanent facilities within the Colville River Special Area. Unless it is based on the identification of an environmentally preferable alternative, and with a demonstration that the objective of the stipulation is fully met, an exception is not "necessary" and should not be granted. The Requirement/Standard for Activities is confusing and appears internally inconsistent. The restriction applies "during the winter", yet goes on to say that motorized ground-vehicle use shall be minimized from April 15 through August 5. Exceptions where "no feasible or prudent alternative" is available

Henri Bisson
August 23, 2004
Page 24

**077 (Cont'd) Stips & ROPs**

would allow significant alteration of high quality raptor foraging habitat within 15 miles of nests and "essential" pipeline and road crossings through ponds, lakes, wetlands, and riparian habitats. The proposed ROP represents a significant weakening of the comparable existing Stipulation 24. As with many other proposed stipulations and ROPs, the exception here swallows the rule. Key terms are undefined, and no criteria are given that would govern the granting of exceptions. As noted above, the result is that the Borough and other reviewers have no real sense of how much protection is embodied in the proposed mitigation measures, and what impacts to the environment, wildlife resources, and subsistence are possible or even likely.

**078 Cumulative**

Page 2-34, last paragraph: this whole paragraph is misleading and confusing. We strongly disagree with the conclusion that "it is not anticipated that the revisions would create different impacts from what might occur given the current stipulations". Clearly, to the extent that the conversion from prescriptive to performance-based mitigation is intended to allow more flexibility and greater opportunities for exploration and development, there will be greater impacts. Also, as stated, making more lands available for leasing may lead to greater development. It must be recognized then that greater development would, in turn, contribute to greater cumulative impacts throughout the region. Finally, we find the statement that "it is speculative to estimate or analyze the impacts of leasing that has not yet been authorized" bizarre. We thought that was the whole reason an EIS has been produced.

**079 Birds**

Page 2-80 thru 2-81: the conclusions regarding effects on birds seem contradictory. The conclusion is reached under Alternative B that overall impacts to birds would be negligible to minor. It is also stated that effects to birds would be highest under Alternative C, yet the conclusion is reached that that alternative would "likely result in negligible population effects." A conclusion of "negligible to minor" effects under Alternative B versus "negligible" effects under Alternative C would imply that B, rather than C, would have a higher level of effects. Further, the discussion under Alternative A acknowledges that if a "spill were to enter a river delta or nearshore marine habitats occupied by substantial numbers of birds, minor to moderate effects would be likely for stable/increasing and declining species populations, respectively." The same should be acknowledged for the other two alternatives.

**080 Birds**

Page 2-81: any conclusion with respect to the potential overall loss of bird habitat on the North Slope in the cumulative effects analysis is essentially meaningless without reference to preferred and critical habitat or some other area-specific measure of habitat value. The conclusion that less than 1% of North Slope bird habitat would be affected by planning area development is irrelevant. In addition, the decline in populations of some North Slope bird species is not merely "apparent", but has been observed and documented. The section states the obvious in noting that there is "uncertainty regarding the ultimate effect of any spills on bird populations." What can surely and should be said is that if a significant spill were to occur at a time and in a place where a species in decline is concentrated, the population impact could be devastating.

Henri Bisson
August 23, 2004
Page 25

**081 Terrestrial Mammals**

Page 2-81 thru 2-82, Effects on Terrestrial Mammals: the table entries fail to characterize, either quantitatively or qualitatively, the potential effects of the alternatives on caribou and other terrestrial mammals. The table only states the obvious, i.e., that effects would occur over a greater area under Alternative B versus Alternative A, and a greater area still under Alternative C. Under both Alternative B and C, it is further explained that lease stipulations and ROPs "would help minimize impacts". Here, as in the table entries under birds, a worrisome conclusion regarding potential cumulative effects is stated, but then downplayed by meaningless estimates of the small percentage of overall habitat subject to disturbance.

**082 Impact**

Page 2-82, Effects on Marine Mammals, Endangered and Threatened Species; page 2-84 Subsistence Harvest Patterns: nowhere in any of these table sections is the potential for deflection of the fall westerly bowhead whale migration due to increased barge and vessel traffic discussed. Barrow subsistence whalers observed a significant offshore deflection of the 2003 migration associated with barge operations at Camp Lonely far to the east. While the impact to Barrow subsistence harvests was apparent, the impact on the whales themselves was less clear. Bowheads utilize a traditional migratory corridor for reasons presumably tied to the availability of food resources or other factors related generally to their well-being. It must be assumed that deflection from this path is in some way detrimental to the individual animals affected. The development of substantial staging areas within the Northeast and Northwest planning areas of the NPR-A, including the potential for an industrialization of Barrow as a base of oil industry operations, would present a significant risk to spring and fall migrating whales, other marine species, and subsistence harvests. The table's conclusion that "in the context of cumulative impacts on the North Slope, all three alternatives would be similar and would likely be additive with other impacts occurring on the North Slope" is both counterintuitive and lacking in supporting analysis. The document explains that industry interest in areas that are now closed and would remain closed to leasing and operations under Alternative A is high. Most of these areas would be opened under Alternative B. All of them would be open under Alternative C. A successful expansion of industrial facilities into these areas would certainly facilitate and enhance the likelihood of continued expansion along the Barrow Arch geologic formation into the Northwest NPR-A Planning Area and in adjacent offshore areas. This must be recognized and the potential impacts analyzed.

**083 Subsistence**

Page 2-84, Subsistence Harvest Patterns: here gain, it is counterintuitive to conclude that cumulative effects would be similar under all three alternatives. The differences in potential impacts between alternatives themselves would indicate a difference in their contributions to regional cumulative effects. In addition, as explained above, Alternatives A, B, and C, respectively, would increasingly enhance the likelihood of industrial expansion into the Northwest Planning Area, with a correspondingly increased level of cumulative effects.

**084 Sociocultura**

Page 2-84, Sociocultural Systems: under Alternative A, oil and gas development in the Planning Area would not simply "further the perception" that local residents are being surrounded by development, and increase the difficulty, expense, and risk of traveling to

Henri Bisson
August 23, 2004
Page 26

**084 (Cont'd) Sociocultural**

subsistence harvest areas. Those impacts would be a certainty for Nuiqsut residents, and to a lesser degree, for the residents of other North Slope affected communities. These effects will occur if development expands westward under the No Action Alternative, would be greater under Alternative B, and greatest under Alternative C. Once again, it is unreasonable to conclude that cumulative effects on sociocultural systems would be similar under all three alternatives.

**085 Environ. Just.**

Page 2-85, Environmental Justice: the environmental justice analysis is insufficient, and fails to consider significant potential impacts on the North Slope Inupiat population. A new performance-based approach to mitigation would be adopted under Alternatives B and C. The degree to which the numerous, vague, and easily-triggered exception clauses contained in the proposed stipulations and ROPs would prioritize economic and technological concerns over potential impacts to subsistence, sociocultural systems, the environment, and wildlife resources must be fully examined in the environmental justice analysis. The document must analyze all potential impacts that may be allowed to occur if exceptions to mitigation measures are granted.

**086 Environ. Just.**

The conclusions under Alternative C that effects could be "approximately 5 times greater" than under the No Action Alternative, and "20% greater than the Preferred Alternative" in magnitude and extent, make little sense without further explanation. It is simply wrong to conclude that because the amount of oil exploration and development activity could be up to 5 times higher under Alternative C than under Alternative A, that effects on any particular resource will be correspondingly 5 times greater. More important in assessing the potential for impacts than the simple volume of development are the timing, location, and design of facility construction and operation.

**087 Economy**

2-87, Effects on the Economy: all of the economic values given, both in terms of revenues and jobs created, must be clearly identified as being highly speculative, rather than certain, as is implied from the language used. Throughout the document, potential adverse impacts on resources and competing uses are described in speculative terms and offset by unsupported assurances that mitigation measures will minimize effects. A consistent treatment of potential positive and negative effects must be utilized in the document. It is inaccurate and misleading to state that certain revenues and jobs would be generated under any alternative. It is also inaccurate to state under the cumulative effects analysis that oil and gas production is the dominant economic activity on the North Slope without further explanation of the meaning of "dominance". It may be the dominant activity in the cash economy, but for the permanent Inupiat residents of the North Slope, subsistence has always been, and will continue to be, the dominant economic activity. Failure to recognize that subsistence is a form of economic as well as cultural activity explains why the impacts to subsistence are so often understated in the document. For our residents, their cash employment supports, rather than is supported by, their subsistence activities. The tax and other revenues generated by oil and gas leasing, facilities, and operations support our communities and allow them to continue to exist in locations chosen long ago exclusively for their proximity to valued subsistence resources. The Borough funds planning and zoning, wildlife management, search and rescue, education,

**Exhibit 29, page 26 of 34**

Henri Bisson
August 23, 2004
Page 27

history, cultural, and elder support programs all in support of the continued health and vitality of the subsistence culture of the Inupiat people. Conversely, our health, public safety, and counseling functions address to a great degree the symptoms resulting from stresses on the subsistence culture attributable in part to increasing industrialization.

**088 Coastal**

Page 3-97: the discussion concerning the Alaska Coastal Management Program must be modified to account for significant 2003 amendments of the state's program, and subsequent required amendments of applicable regulations and local district programs.

**089 Transportation**

Page 3-112, Transportation: the discussion of transportation beginning on page 3-112 contains no mention of the potential for ice road routes for support of winter exploration to extend northwest to Barrow, rather than connect with the Prudhoe Bay/Kuparuk transportation system. Such a route was proposed in association with ConocoPhillips' recent Puviaq exploration project. The successful use of Barrow as a staging area for exploration or development could stimulate greater interest in leasing, exploration, and development of Northwest planning area tracts, and could have cascading effects on a range of resources within and outside of the Northeast planning area. The potential also that development of coastal staging areas could stimulate greater offshore activity and development clearly merits more robust analysis in both the Northeast-specific and cumulative effects sections of the document.

**090 Subsistence**

Page 3-126: the household subsistence data presented is very confusing and poorly organized. It must be cleaned up. There is reference on pages 3-126 and 3-127 to 414 households. It is not clear what the parenthetical "(84%)" refers to with respect to the mention of these households under the barrow heading on page 3-127. Also, a "Nuiqsut" heading appears to have been left out on that page. In the discussion of Nuiqsut responses to the 1998-1999 Borough census survey, the terms "household", "resident", and "respondent" appear to be improperly used interchangeably. The latter two terms would imply that answers referred to subsistence food use by an individual, when "household" correctly represents the focus of the survey.

**091 Caribou**

Map 3-21: is difficult to interpret. All of the overlapping colors and patterns are confusing. For clarity, the ranges of the ranges of the three subject caribou herds should be depicted on separate maps.

**092 Edits**

Map 3-22: likewise, this map is confusing and extremely difficult to interpret. Some colors shown on the map do not appear to match any presented on the key, and it is likely that many in the reviewing public are not familiar with "kernel probabilities".

**093 Edits**

Map 3-35: appears to have omitted split estate lands around the community of Nuiqsut.

**094 Basic**

Page 4-6, Watercraft Use: it should be specified under what conditions "non-recreational airboat use would be allowed on all streams, lakes, and estuaries."

Henri Bisson
August 23, 2004
Page 28

<div style="float:left">095
Alternatives</div>

Page 4-7, Table 4-1: the data presented in the table seems open to question. It is counterintuitive to expect that for each listed activity, the frequency of occurrence would not change from current levels under the existing plan if either Alternative B or C were adopted, when they would open an additional 387,000 acres and 600,000 acres to leasing, respectively. It is predicted, for example, that there will be 4 acres disturbed for archeological research under Alternative A. It is unreasonable to assume that the same 4 acres would be disturbed with vastly more acreage open under the other two alternatives. It is predicted also, for example, that there will be 21 days of aerial wildlife surveys under Alternative A, but it is unclear whether this figure represents the number of calendar days on which surveys will be conducted or some measure of "total project days" calculated by multiplying the number of projects by the number of days of each project. This latter measure would be more meaningful in terms of assessing the potential impacts of the activity.

<div style="float:left">96</div>

Page 4-105, last sentences of the first paragraph under Conclusion: the section should note that stipulations designed to eliminate attraction of predators to camps or equipment maintenance sites may have proven somewhat effective with respect to bears and foxes at Alpine, but have not prevented ravens from nesting at the facility. Given that these ravens must be feeding, it is likely that their presence has resulted in some increase in depredation of the eggs and young of tundra-nesting birds. With respect to the second paragraph of the section, it is unclear how the conclusion was reached that aircraft disturbance of birds would be confined to an area within approximately 2300 feet of summer research camps or clean up sites, with little disturbance beyond 6500 feet. Here, and presumably throughout the analysis of potential aircraft disturbance of birds, there appears to be an assumption that some flight minimum altitude restrictions will be strictly adhered to. There is no such restriction specifically dealing with waterfowl under the current stipulations. In all cases where the document depends on explicitly stated or accepted minimum altitude restrictions as a means of providing adequate protection, there must be research into, and reporting and analysis of the frequency with which such restrictions are not met in cases when meeting them would endanger human life or violate safe flying practices. If restrictions are routinely not met, the potential impacts on birds are obviously far greater. The same analysis should be included for other resources, including marine mammals (see page 4-120, first full paragraph).

<div style="float:left">097
Birds</div>

Page 4-106, fifth full paragraph: it is unclear how the conclusions in the last sentence were reached. There seems to be an assertion that the potential for impacts to birds due to exploration activities would double for both Alternatives B and C relative to Alternative A. This requires greater explanation and support.

<div style="float:left">098
Marine
Mammals</div>

Page 4-124, third full paragraph: the conclusion that it is unlikely that any impacts to bowhead whales would occur from exploration activities under the No Action Alternative is not supported by any meaningful analysis. The paragraph itself states that noise-producing aircraft and marine vessel traffic would be the most probable sources of disturbance to bowheads during exploration. It seems clear that in 2003 fall migrating bowheads were deflected from their traditional migratory route due to marine barge

Henri Bisson
August 23, 2004
Page 29

traffic associated with staging activities at Camp Lonely in support of exploration. It is unclear what effect this deflection had on the animals, but it cannot be said that it had no effect.

<table>
<tr><td>

099
Subsistence

</td><td>

Page 4-135, Subsistence Harvest Patterns, first paragraph: omitted from the description of how listed activities could alter harvest patterns is direct interference with hunts. Most Nuiqsut hunters have experienced the failure of a hunt due to one or more of the listed activities. Game has been disturbed these activities while being approached or actively stalked by subsistence hunters, hunters have found animals far more wary and skittish than normal following disturbance, and hunters have found no game in traditional harvest areas following the presence of vehicles, vessels, and aircraft.

</td></tr>
<tr><td>

100
Effects of
Spill

</td><td>

Page 4-138, last paragraph: the section mentions, but does not adequately address the issue of resource tainting as a deterrent to harvest. Beyond avoiding consumption of species potentially affected by a spill due to fears of contamination, subsistence users would likely also allow a period for certain species, especially the bowhead whale, to fully recover following exposure to oil.  In addition, as discussed above, the EIS must analyze the potential for the Native subsistence harvest quota for bowhead whales to be reduced by the International Whaling Commission in response to a spill or a perception of greater threats to the welfare of the endangered population associated with increased industrialization of their marine habitat and adjacent onshore areas of the NPR-A. The issue is noted in a single sentence on page 4-144, but warrants additional analysis in light of the recent IWC resolution addressing oil industry threats to the western Pacific gray whale population.

</td></tr>
<tr><td>

101
Sociocultural

</td><td>

Page 4-141, last paragraph: we disagree with the conclusion reached in the last sentence of this page that holds that the No Action Alternative would be unlikely to cause further sociocultural impacts because the existing stipulations were developed "in participation" with local communities and the Borough. In the first place, we certainly did not have veto authority over the management plan finalized in 1998. While the consultation process then was far more substantial then for this proposed amendment, planning for the 1998 plan was also rushed and predictably produced a mitigation package that represented a compromise among many diverse interests. In addition, the degree to which post-lease activities may cause sociocultural impacts is dependent upon what is proposed and undertaken, where operations are to occur, and how they are to be conducted. Also, the EIS must not underestimate the degree to which the existence and application of the current exception clause and any such clauses made a part of an amended management plan, are likely to be factors in the social stresses associated with BLM's management of expanding NPR-A development. Uncertainty breeds anxiety. We hear often from oil companies that that predictability in permitting and operating conditions brings them comfort and enhances the likelihood of future development. We share the companies' desire for certainty. You heard that point raised in scoping comments on this proposed amendment, questioning both the need to reexamine a 5-year old management plan, and the proposed shift from prescriptive to performance-based mitigation. Reliance on the current exception clause to apparently allow the placement of a production pad within the

</td></tr>
</table>

Henri Bisson
August 23, 2004
Page 30

Fish Creek buffer as part of the Alpine Satellite Development Project has clearly been a point of contention and anxiety for Nuiqsut residents and others.

**102 Sociocultural**

The conclusion reached in the last sentence on page 4-141 is also inconsistent with statements elsewhere in the document, including the discussion appearing just two pages later. Page 1-143 describes a variety of ways in which industry operations under the No Action Alternative could alter subsistence harvest patterns, thereby affecting sociocultural patterns, increasing social stress, altering relations between communities, increasing racial tensions, increasing incidents of socially maladaptive behavior, and potentially straining "the ability of traditional Inupiat institutions to maintain social stability and cultural continuity."

**103 Sociocultural**

Page 4-143: we question the language employed and conclusions reached in the discussion under Effects of Disturbances. Nuiqsut residents do not merely "perceive" that they are being affected by oil and gas development encroaching from the east, they *have been and are* affected significantly. Nuiqsut residents do not just have the "perception" that they are being surrounded by development, they *are* surrounded by development. Nuiqsut residents do not just "perceive" direct connections between the general well-being of their community and subsistence harvests, there *is* such a connection. The link has been demonstrated by studies of Native health and the consumption of traditional foods, but is also clear in other contexts as well. The statement that "little data currently exists to support the correlation between oil and gas development and social stress" may be referring to a lack of targeted study of the issue, but ignores clear evidence that industrialization of our North Slope traditional homeland has been and continues to be a source of great stress for the Inupiat people.

**104 Stips & ROPs**

Page 4-145, second sentence: the package of mitigating measures contained in the 1998 IAP/EIS Record of Decision was not the result of "several years" of collaboration between communities near the planning area and the local, state, and federal agencies with management interests in the NPR-A. The entire planning process took less than two years, with the bulk of the effort confined to an aggressive 18-month schedule.

**105 Subsistence**

Page 4-233, Conclusion: we disagree with the conclusions reached with respect to the potential impact of Alternative B on subsistence species and subsistence harvest patterns. It is misleading to maintain that because most impacts associated with oil and gas exploration and development would be localized, they would not substantially affect subsistence species. If they occur in key habitat areas, like the goose molting and caribou calving, insect relief, and migratory zones that would be newly opened under this alternative, industrial facilities and operations could dramatically impact these populations and subsistence harvests. Moreover, the stipulations and ROPs contained in Alternative B in some cases represent a weakening of the existing 1998 stipulations, and in many cases contain exception clauses that, if utilized, could allow economic and other concerns to take precedence over the protections that are their objectives. The document fails to adequately assess the potential level of impacts to resources, subsistence harvests, and other values that could occur if lessees routinely seek these many possible exceptions and granted by BLM. As written, there are no sideboards placed on the frequency of their

Henri Bisson
August 23, 2004
Page 31

105 (Cont'd)
Subsistence

use, and no indication that ultimately the granting of exceptions will not become the rule. The paragraph notes that local residents are concerned about the future of subsistence hunting on the North Slope, and our ability to carry on with traditional customs and ways. The rapidity of this proposed amendment so soon after adoption of the 1998 Plan, the weakness of some key analysis in this Draft Plan, and the prevalence of open-ended and easily triggered exception clauses in many proposed mitigation measures validate our concerns.

Page 4-434, Sociocultural Systems: the Draft Plan does not adequately recognize and address the fact that the most likely long-term impacts of an increased industrialization of the NPR-A will be on the human residents of the North Slope, rather than on the wildlife resources of the region. There are numerous studies funded by the petroleum industry and others concluding that many potential impacts to wildlife can be mitigated to varying degrees. We are unaware, however, of any comparable literature finding that an adequate approach to mitigation of impacts on terrestrial subsistence activities has been identified and employed. Some mechanisms for mitigating the effects of offshore impacts appear to have been successful to varying degrees. "Oil-Whaler Agreements" have lessened the impact of seismic and other industry operations on subsistence bowhead whale hunting at Cross Island (NRC, 2003). Simply put, the North Slope experience has been that industrialization of an area results in exclusion of subsistence users from that area. Nuiqsut hunters do not use major portions of their former hunting areas to the east of the village. Another social issue has been well expressed by elder Sarah Kunaknana of Nuiqsut. At several public meetings she has issued a warning to other villages. She urged them not to let the prospect or reality of development create and drive a wedge between factions within their communities as it has at times in Nuiqsut.

## CONCLUSION

This planning process will in some way impact the North Slope environment, its wildlife resources, and the cultural, nutritional, and economic well-being of our residents for several generations. Under even the best of circumstances, the extent of those impacts cannot be predicted with any certainty. Unfortunately, this is not the best of circumstances. The amendment process was initiated without warning or consultation with our North Slope communities. Despite our early and repeated calls for adequate time to fully engage all interested parties in the process, an arbitrary and constrained schedule has and continues to compromise the effort. The Draft Amended Plan does not present an appropriate range of action alternatives, and indicates that the No Action Alternative will not be adopted without modification of mitigation measures now in place. BLM maintains that the proposed conversion of existing stipulations to performance-based mitigation measures is a change only in structure, and not in the extent or strength of protections. Careful analysis of comparable measures reveals that this is not the case. The inclusion of many exception clauses in proposed mitigation measures introduces great uncertainty as to the levels of actual resource and subsistence protections that would really exist under the two action alternatives. Likewise, these clauses introduce great uncertainty with respect to the level of impacts that BLM may allow to occur, call into

Henri Bisson
August 23, 2004
Page 32

question the strength of the full package of mitigation measures, and reveal significant gaps in analysis with respect to key issues at the heart of this planning effort. We have asked that all interested parties share a commitment to ensuring that this effort is conducted properly and thoroughly, with sensitivity to the concerns of the most directly affected stakeholders, and a willingness to work together to find solutions to the challenges that lie ahead. We have yet to see that commitment from the BLM or the State of Alaska. At the top levels of both the Interior Department and our state government there appears to be a willingness to disregard the best available science in pursuit of a pro-development agenda. We hope that BLM will take the opportunity before publication of the Final IAP/EIS to return to a science-based approach in its analysis, and will engage our most affected North Slope stakeholders as partners in development of an acceptable Northeast NPR-A management plan. Thank you for considering these comments.

Sincerely,


George N. Ahmaogak, Sr.
Mayor


cc:     Rosemary Ahtuangaruak, Mayor, Nuiqsut
        Isaac Nukapigak, President Kuukpik Corporation
        Leonard Lampe, President Native Village of Nuiqsut
        Edith Vorderstrasse, Mayor, Barrow
        Harry Hugo, Mayor Anaktuvuk Pass
        Elizabeth Hollingsworth, Mayor Atqasuk
        Charlotte Brower, President, NSB Assembly
        Jacob Adams, President ASRC
        Charles D.N. Brower, Director NSB Wildlife
        Rex Okakok, Director NSB Planning
        Harold Curran, NSB Attorney
        Dennis Roper, NSB Government Affairs
        NSB Planning Commission
        Geoff Carroll, ADF&G Barrow
        Ted Rockwell, EPA Anchorage
        Larry Bright, U.S. Fish and Wildlife Service Fairbanks
        Governor Frank Murkowski
        Senator Ted Stevens
        Senator Lisa Murkowski


**References**

Bendock, T. and Burr, J. 1984. Freshwater fish distributions in the central Arctic coast plain (Ikpikpuk to Colville river) Alaska Department of Fish and Game, Sport Fish Division, Fairbanks, Alaska. (unpublished report). 55 pp.

Henri Bisson
August 23, 2004
Page 33

Bockstoce, J.R. 1988. The journal of Rochfort Maguire, 1852-1854: two years at Point Barrow, Alaska aboard HMS Plover in the search for Sir John Franklin, Vol. I and II. Bockstoce, J.R., ed. The Hakluyt Society, London. 561 pp. Guson, Glagow.483 p.

Braund, S.R. and Associates. 1993. North Slope Subsistence Study: Barrow, 1987, 1988 and 1989. Prepared by Stephen R. Braund and Associates with the Institute of Social and Economic Research, UAA, Anchorage, AK. Report to U.S. Dept. of the Interior, Minerals Management Service, Alaska OCS Region, Anchorage, AK.

Philo, L.M., J.C. George and L.L. Moulton. 1993a. The occurrence and description of anadromous and freshwater fish in Teshekpuk Lake, Alaska 1990-1992. Unpublished report. Department of Wildlife Management, North Slope Borough, Barrow, Alaska.

Brewer, K.M., Gallagher, P., Regos, P. Isert, and J. Hall. 1993. ARCO Alaska Inc. Kuvlum #1 Exploration Prospect Site Specific Monitoring Program. Final Report from Coastal and Offshore Pacific Corporation, Walnut reek, CA 94598 to ARC Alaska, Inc. Anchorage, AK 99510 pp. 80.

Moore, S.E. 2000. Variability of Cetacean distribution and habitat selection in the Alaskan Arctic, Autumn 1982-91. Arctic, 53(4): 448-460.

Morris, W. 2003. Seasonal Movements and Habitat use of Arctic Grayling (*Thymallus Arcticus*), Burbot (*Lota lota*), And Broad Whitefish (*Coregonus nasus*) within the Fish Creek drainage of the National Petroleum Reserve-Alaska, 2001-2002. Technical Report NO. 03-02. Alaska Department of Natural Resources, Office of Habitat Management and Permitting, 1300 College Road., Fairbanks, Alaska 99701. 110 pp.

National Research Council. 2003. Cumulative environmental effects of oil and gas activities on Alaska's North Slope. March 2003. The National Academies Press. 5000 Fifth Street, NW, Box 285, Washington, DC 20055

Richardson, W.J. (ed.) 1999. Marine mammal and acoustical monitoring of Western Geophysical's open-water seismic program in the Alaskan Beaufort Sea, 1998. LGL Rep. TA2230-3. Rep. from LGL Ltd., King City, Ont., and Greenridge Sciences Inc., Santa Barbara, CA, for Western Geophysical, Huston, TX, and Nat. Mar. Fish. Serv., Anchorage, AK, and Silver Spring, MD. 390 p.

Richardson and Thomson. 2003. Monitoring of industrial sounds, seals, and bowhead whales near BP's Northstar oil development, Alaskan Beaufort Sea, 1999-2003. Draft report submitted to BP Exploration, Anchorage, AK and National Marine Fisheries Service, Anchorage, AK.

Henri Bisson
August 23, 2004
Page 34

Richardson, W.J., C.R. Greene Jr., C.I. Malme and D.H. Thomson. 1995. Marine mammals and noise. Academic Press., San Diego, CA. 576 pp.

Wursig, B. and Clark, C. 1993. Behavior. In: The bowhead whale. Society for Marine Mammalogy.