HICKS, BOYD, CHANDLER & FALCONER, LLP
ATTORNEYS AT LAW
SUITE 200
825 WEST EIGHTH AVENUE
ANCHORAGE, ALASKA 99501
TELEPHONE: (907) 272-8401
TELECOPIER: (907) 274-3698
hbcf@hbcf.net

RECEIVED AUG 25 2004

August 24, 2004

NE NPR-A Amendment Planning Team
Bureau of Land Management
Alaska State Office (930)
222 West 7th Avenue
Anchorage, AK 99513-7599

Re:   Letter Commenting on the Draft Amended
      Northeast NPR-A EIS/IAP (w/corrected header)

Dear Ms. Childs:

Thank you for pointing out that the header on the letter from Kuukpik Corporation, the City of Nuiqsut, the Native Village of Nuiqsut, and KSOP commenting on the Draft Amended Northeast NPR-A EIS/IAP has an incorrect header. A copy of the letter with the correct header is enclosed. In addition, I have enclosed a copy of the signature page with the incorrect header crossed out, and the correct header filled in.

Sincerely,

HICKS, BOYD, CHANDLER &
FALCONER, LLP

By _____
    Brent Edwards

BE\lhf
Enclosure
cc:   Lanston Chinn (w/o encs)
      Isaac Nukipagak (w/o encs)
lfbe.kuukpik.childs.ltr.082404f



**KUUKPIK**
*corporation*

August 23, 2003

FAX (907) 271-5479

NE NPR-A Amendment Planning Team
Bureau of Land Management
Alaska State Office (930)
222 West 7th Avenue
Anchorage, AK 99513-7599

Attention: Susan Childs
Project Manager

                                            **Re: Comments on the Amended Draft
                                                    Northeast NPR-A EIS/IAP**

Dear Ms. Childs,

I.    **Introduction**

        These are comments from Kuukpik Corporation, the Native Village of Nuiqsut, the City of Nuiqsut, and the Kuukpikmuit Subsistence Oversight Panel ("KSOP") on the Draft Northeast National Petroleum Reserve Alaska Amended Integrated Activity Plan/Environmental Impact Statement ("Amended Draft EIS"). We are the economic, tribal, governmental, and cultural organizations for the community of Nuiqsut. Together we submitted a scoping comment letter for the BLM's proposed amendment on October 31, 2003 ("NE NPR-A Scoping Letter"). On pages 2 through 7 of that letter we described our organizations and the interests of the Nuiqsut community that we represent, and that discussion is incorporated by reference to avoid repetition. Suffice it to say that we represent the community and the organizations that would be most impacted by the proposed amendment of the Northeast NPR-A Final Integrated Activity Plan/Environmental Impact Statement ("1998 NE NPR-A EIS/IAP") and by changes in the 1998 Northeast NPR-A Record of Decision ("1998 NE NPR-A ROD").

        At different times, BLM has stated that it is amending the 1998 NE NPR-A EIS/IAP and ROD because of (1) the Environmental Policy and Conservation Act, (2) a recommendation from the President's National Energy Policy Development Group to consider additional leasing in the Northeast NPR-A, (3) new studies and information, and (4) better technology. The BLM cannot reasonably rely on any of these as a purpose or a need for

P.O. Box 89187 • Nuiqsut, AK 99789-0187 • TEL: (907) 480-6220 • FAX: (907) 480-6126
825 W. 8th Ave., Suite 206 • Anchorage, AK 99501 • TEL: (907) 279-6220 • FAX: (907) 279-6126

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 2 of 54

amending the 1998 NE NPR-A EIS/IAP. As we will see, the Energy Policy and Conservation Act instructs BLM to generate an inventory within two years of restrictions and impediments to the development of resources. It is implicit in Congress asking for an inventory that Congress would then consider passing legislation to remove those restrictions or impediments that Congress determined should be removed. BLM has put the cart before the horse and assumed a role for itself that Congress did not intend. Instead of generating the inventory, as has been done elsewhere in the country, the BLM in Alaska has taken it upon itself to remove what it feels are restrictions and impediments. The recommendation of the President's National Policy Energy Development Group is, well, a recommendation. Even if the recommendation could be a reason for the BLM to act (we think it cannot), amending the 1998 NE NPR-A EIS/IAP is unnecessary because that 1998 EIS already had recently considered additional leasing in the Northeast Planning Area and determined that it was not appropriate under the applicable statutory mandates. Also, this "recommendation" by an advisory group cannot legally override the reasoned choices that the BLM made in the 1998 NE NPR-A ROD. The Amended Draft EIS does not incorporate the new studies or the new technology that we were led to believe would be forthcoming during the scoping process for this Amended Draft EIS. The unspoken but real motivation driving BLM's actions here is a change in Presidential policy. Presidential policy alone is not a legally sustainable or sufficient reason to amend the 1998 NE NPR-A EIS/IAP or the 1998 ROD, particularly in light of Congress's intent to reserve those choices for itself.

   We hope that the BLM will end this amendment process and wait until there are valid reasons to amend or supplement the management of the Northeast NPR-A. No one wants to believe that the BLM is willing to make changes to the management of the Northeast NPR-A that are not sustainable or make choices that will cause an insurmountable rift between it and the people who live in the NPR-A. The wheels are set in motion, though, so we doubt that this amendment process will end with our comments. That being the case, these are also our comments on the substance of the Amended Draft EIS.

   The Amended Draft EIS itself has many deficiencies. Reasonable alternatives are left out of the Amended Draft EIS simply because they do not comport with the policy goals that the BLM is trying to implement through this amendment process. Additional alternatives need to be considered so that the BLM can fully consider the impacts of the alternative it has already decided to choose. The Amended Draft EIS repeatedly states that the same level of protection to surface resources is provided by the 1998 NE NPR-A ROD and the performance-based mitigation measures that the BLM is pushing. This is demonstrably not true, and until the analysis reflects the true impacts, the Amended Draft EIS cannot meet NEPA standards.

   The impacts of additional leasing and increased surface occupancy in the Teshekpuk Lake Special Area are also not fully considered in the Amended Draft EIS. This is an area that is recognized for its importance to caribou, waterfowl and subsistence users. Impacts to these surface resources and resource users need to be adequately analyzed. Finally the

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 3 of 54

---

sociocultural and socioeconomic impacts on the community of Nuiqsut from the proposed changes are not adequately described or considered.

The deficiencies are so extensive that if the BLM insists on pressing forward with this NEPA process, it should correct the deficiencies in the Amended Draft EIS and make a revised Amended Draft EIS available for public comment. The version of the Amended Draft EIS that we are commenting on is simply too incomplete for the public to provide meaningful comments.

II.     **The Lack of Legal Authority for Amending the 1998 NE NPR-A EIS and ROD.**

The BLM has asserted that this amendment process is necessary; (1) because Congress amended the Energy Policy and Conservation Act in 2000; (2) to implement the recommendations of the President's National Energy Policy Development Group; and (3) because of what the BLM has learned since the 1998 NE NPR-A EIS/IAP was finalized. When the reasons given by the BLM for this amendment process are put to the test, they all prove hollow. So, what is driving the BLM's amendment of the NE NPR-A EIS/IAP and ROD? It all boils down to policy. Policy alone is not a legally sufficient reason to amend the 1998 NE NPR-A EIS/IAP and ROD.

(a)     **The Amendment to the Energy Policy and Conservation Act.**

Let's start by looking at the Energy Policy and Conservation Act ("EPCA"). The amendment to EPCA passed by Congress in 2000 calls for inventorying oil and gas assets, not for changing recently and properly adopted surface use restrictions. Our research has not shown any other area of the country where an EPCA process has involved the type of wholesale changes to land use provisions that are proposed here. As we will see, EPCA provides no authority for the proposed changes.

The BLM identifies the amendment to Section 604 of EPCA in the "Purpose and Need" section of the Amended Draft EIS as a reason for amending the 1998 NE NPR-A EIS/IAP.[1] This amendment to EPCA provides:

---

[1] Amended Draft EIS p. 1-5.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 4 of 54

> (a) In General.--The Secretary of the Interior, in consultation with the Secretaries of Agriculture and Energy, shall conduct an <u>inventory</u> of all onshore Federal lands. The inventory shall identify--
>
> > (1) the United States Geological Survey reserve estimates of the oil and gas resources underlying these lands; and
> >
> > (2) the extent and nature of any restrictions or impediments to the development of such resources.[2]

(emphasis added) Presentation of the inventory to the Committee on Resources of the House of Representatives and to the Committee on Energy and Natural Resources of the Senate is required within 2 years of this amendment (i.e. 2002).[3]

In giving this instruction, Congress was asking for information on restrictions and impediments so that it could decide whether to pass legislation in particular instances that would make development easier. "Restriction" and "impediment" are neutral terms. A provision barring oil drilling on the White House lawn is a restriction or an impediment, but that doesn't by itself mean that removing that restriction is the right or appropriate thing to do.[4] Instead of giving Congress the information that it requested about restrictions and impediments to development in Alaska, the BLM is proceeding on its own to decide what is and isn't appropriate. The fact that national energy policy legislation is deadlocked in Congress doesn't change the fact that EPCA does not give the BLM any authority to do what it is doing. In fact the BLM hasn't even done what EPCA does require, namely generating that inventory (which has been done elsewhere in the country).

Identifying the extent and nature of any restrictions on the development of the oil and gas resources beneath the NPR-A can be done by reading the 1998 NE NPR-A ROD,[5] then

---

[2] 42 USCA 6217, Amended Draft EIS p. 1-5.

[3] 42 USCA 6217(c). There is no mention of this requirement in the Amended Draft EIS.

[4] It's hard to see how land use provisions recently adopted as part of a valid NEPA process constitute "impediments", but the analysis is no different even if such a provisions are considered an impediment.

[5] Understanding what the potential resource is the first part of the EPCA process, and the United States Geological Service ("USGS") has performed its part of the work mandated by EPCA by updating its estimate of oil and natural gas beneath the NPR-A. http://pubs.usgs.gov/of/2003/of03-044/text.htm#sum.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 5 of 54

---

submitting a report to the appropriate Congressional subcommittees. The process here is not consistent with how the BLM is applying EPCA elsewhere in the United States. When the BLM conducted its EPCA review for five oil and gas producing basins in the Rocky Mountains region all it did was identify restrictions in the existing leases.[6] That inventory did not purport to change the management of those basins or amend the existing leases. As discussed in Footnote 49 below, the President's own National Energy Policy Development Group (the very group on whose recommendations the BLM relies to justify this process) has issued a policy recommendation to President Bush that demonstrates that it, too, believes that EPCA authorizes only study of restrictions on development, not executive action.

Absolutely nothing in EPCA directs the BLM to amend the 1998 NE NPR-A EIS/IAP or ROD. This fact is born out by the BLM's past practice which shows that it has not interpreted EPCA as requiring anything more than a report. We find it interesting then that EPCA was not identified as authority for amending the management of the Northeast NPR-A until after the scoping comment period had ended.[7] If EPCA was truly one of the reasons for the BLM's decision to amend the 1998 NE NPR-A EIS/IAP and ROD, BLM would not have waited until months after the amendment process had started to cite EPCA for the first time as a justification for the process. Our organizations' scoping comments of last October challenged the BLM's authority to amend the 1998 NE NPR-A EIS/IAP and ROD.[8] The sudden appearance of EPCA as a justification after the close of scoping sounds a lot like BLM recognized it was on weak ground and was grasping for any support it could find elsewhere. EPCA, however, doesn't provide that support.

After we first heard that the BLM was relying on EPCA as a reason to amend the 1998 NE NPR-A EIS/IAP and ROD, we thought that perhaps the community was missing something in its analysis. So, we asked the BLM in a letter to explain how EPCA could constitute the need or purpose for amending the management of the Northeast NPR-A. (See letter dated January 6, 2004 attached hereto as document No. 1). We never received a response.[9]

---

[6] See http://www.doi.gov/epca/.

[7] EPCA was first mentioned to representatives from the community of Nuiqsut at a meeting with the BLM and other agencies on December 4th, 2003. This supposed purpose and need for the proposed amendment should have been disclosed during scoping in order to give participants in the scoping process an opportunity to help the agency define the scope of this NEPA process.

[8] NE NPR-A Scoping Letter pp. 15-21.

[9] We do not think that our request for an explanation was unreasonable. After all, the City of Nuiqsut is a governmental entity, the Native Village of Nuiqsut is a federally recognized tribe,

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 6 of 54

There is something more going on here, as we will see shortly.

### (b) The NEPDG's Recommendation That Additional Leasing in the Northeast NPR-A be Considered.

BLM also claims that it is amending the 1998 NE NPR-A EIS/IAP and ROD because of the National Energy Policy Development Group's ("NEPDG's") recommendation that President George W. Bush direct the Secretary of the Interior to:

> consider additional environmentally responsible oil and gas development based on sound science and the best available technology, through further lease sales in the National Petroleum Reserve - Alaska . . .. [S]uch considerations should include areas not currently leased within the northeast corner of the National Petroleum Reserve - Alaska

Like EPCA, this is identified in the "Purpose and Needs" section of the Amended Draft EIS.[10] Unlike EPCA this was an excuse for the amendment of the NE NPR-A EIS/IAP and ROD that was advanced during scoping. But wait a minute, this is just a recommendation. How does a recommendation from an *ad hoc* advisory group provide legal authority to amend a recent Record of Decision? It doesn't. Nowhere does the Amended Draft EIS claim that the President has directed the consideration of additional leasing in the Northeast NPR-A. In the same letter that we asked the BLM to explain how EPCA led to its decision to amend the NE NPR-A EIS/IAP and ROD, we asked it to explain how this recommendation to the President amounted to anything. As we have already said, the BLM did not respond. Even if the President had directed that this recommendation be followed, a valid administrative action cannot be changed without "a satisfactory explanation for [the] action including a rational connection between the facts found and the choices made."[11] In addition, under federal regulations, "Environmental impact

---

and Kuukpik Corporation owns the only large tracts of private land in the Northeast NPR-A and will own another 22,000 acres in the Northeast NPR-A once it has completed its ANCSA selections.

[10] Amended Draft EIS p. 1-5.

[11] International Snowmobile Manufacturers Assoc. v. State of Wyoming, 2004 U.S. LEXIS 1796 (D.Wyo. Feb. 10, 2004), Quoting Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto Co., 463 U.S. 29, 43 (1983). The flip flopping on management decisions in order to implement a policy choice made by a current administration (which is exactly what the BLM is proposing to do when all the camouflage is stripped away), is disfavored by the courts. See e.g. The Fund for Animals v. Norton, Civ. Action No. 02-2367 (EGS) (D.C. 2003); International Snowmobile Manufacturers Assoc. v. State of Wyoming, 2004 U.S. LEXIS 1796 (D.Wyo. Feb.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 7 of 54

statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."[12]

The fact that the 1998 NE NPR-A EIS/IAP and ROD were so recent, only about four years old, at the point in time that this amendment process was announced, makes it that much harder to show that satisfactory explanation and the type of new or additional facts that would justify such changes. The very decision being proposed here, opening up the area around Teshekpuk Lake, was considered only four years before, in the 1998 NE NPR-A EIS/IAP. In that document, Alternative D considered leasing 73% of the area in the Northeast NPR-A <u>with a high potential</u> for oil and gas (as opposed to the total acreage in the Northeast NPR-A).[13] This Alternative looks nearly identical to the leasing scenario in Alternative B of the Amended Draft EIS which makes only 7% more of the area with a high potential for oil and gas available for leasing.[14] Alterative E in the 1998 NE NPR-A EIS/IAP considered leasing all of the Northeast NPR-A.[15] Alternative C in the Amended Draft EIS also considers leasing all of the Northeast NPR-A.[16] So, leasing of additional areas in the Northeast NPR-A has already been recently considered in form and substance virtually unchanged from what is now being proposed - and not adopted.

As we will see, the new or additional facts that are necessary to justify amending the 1998 NE NPR-A EIS/IAP do not exist.

(c)     **What the BLM has Learned Since 1998.**

Finally, BLM initially claimed (prior to and during scoping) that amendment of the 1998 NE NPR-A EIS/IAP is appropriate because it had "learned a lot during the last four

---

10, 2004)(granting preliminary injunction on a Record of Decision in part because the National Park Service never fully explained the reasons for changes from existing to proposed to final management plan.) See additional Discussion at II (d), below.

[12] 40 CFR 1502.1.

[13] 1998 NE NPR-A EIS/IAP p. II-22 and II-27.

[14] Amended Draft EIS p. 2-3, 4-165, Map 2-2.

[15] 1998 NE NPR-A EIS/IAP p. II-22 and Map II-28.

[16] Amended Draft EIS p. 2-8 and Map 2-3.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 8 of 54

years."[17] We were told during scoping meetings and in press releases that the BLM now had better information from new studies.[18] In our NE NPR-A Scoping Letter we showed that the "studies" that we were told justified the amendment of the 1998 NE NPR-A EIS/IAP were either incomplete or did not support the changes to the management of the Northeast NPR-A that the BLM wanted to consider in this amendment process.[19] We were not the only ones who did not find substance in the BLM's claim that what it had learned could justify amending the 1998 NE NPR-A EIS/IAP and ROD. The North Slope Borough said in its scoping letter that it was not aware of significant new data that justified amending the surface resource protections that are already in place. Representatives from other federal agencies had also informally agreed that no new studies changed the basic information that was discussed in the 1998 NE NPR-A EIS/IAP or that led to the management of the Northeast NPR-A as adopted in the 1998 NE NPR-A ROD.[20] Those scoping comments apparently caused the BLM to re-evaluate whether the proffered reasons withstood scrutiny. The BLM apparently concluded that they did not, since the BLM has now dropped those claims. <u>The "Purpose and Need" section in the Amended Draft EIS does not identify new or better information as a justification for this process</u>. We have completely reviewed the Amended Draft EIS and can tell that this is not an accident because, simply put, the BLM has not learned a lot in the years since the 1998 NE NPR-A EIS/IAP became final.[21] The studies that the BLM told us that it was relying on during scoping seem to no longer be driving it to amend the 1998 NE NPR-A EIS/IAP or ROD.

If it was not new studies or understanding about wildlife in the Northeast NPR-A that the BLM had learned from, could have it learned that there is a better way to explore for or to develop oil and gas that has less impact and would therefore perhaps justify opening areas to development that were judged too sensitive for development just four years before this process began? That can't be right because the 1998 NE NPR-A EIS/IAP and the Amended Draft EIS

---

[17] BLM to Hold Public Scoping Meetings for Revised Plan for Northeast National Petroleum Reserve - Alaska, September 5, 2003, Release No. 03-20.

[18] June 23, 2003 Notice of Intent published in the Federal Register says that "the BLM has conducted various scientific studies on the biological resources of the plan area in cooperation with the North Slope Borough, the State of Alaska, and other federal agencies." FR Vol. 68, No. 120, pp 37173-37174.

[19] NE NPR-A Scoping Letter pp. 16 - 21.

[20] NE NPR-A Scoping Letter p. 16.

[21] Since the 1998 NE NPR-A EIS/IAP was finalized, additional caribou surveys have reinforced the BLM's decision to not lease the area around Teshekpuk Lake. This letter will return to these caribou surveys in section IV below.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 9 of 54

basically use the same roadless development scenario.[22] The industry, which in 1998 touted roadless development as the wave of the future, is now abandoning the concept.[23] This is evidenced by the proposed Alpine Satellite Development plan, in which 4 of the 5 proposed satellites pads, and all of the satellite pads in the NPR-A, would be accessible by a road connected to the Alpine Central Processing Facility ("ACPF"). If the proposed road from the ACPF is built to the CD-6 and CD-7 satellites in the NPR-A, then common sense dictates that it is more likely that the next discovery to the west will be accessed by a road connected to one of these two facilities. The Amended Draft EIS itself acknowledges that reality when it states that development is more likely when it is near existing infrastructure and is less likely to be scattered about using wholly separate facilities.[24]

<u>This change in the layout of future development has not been incorporated into the impacts analysis of the Amended Draft EIS. Instead, the analysis of the impacts of potential future development is based on scenarios that, while promising in 1998, are now unlikely.</u> Perhaps the failure of the roadless development concept to live up to its promise is a change in the impacts of oil and gas exploration and development that could justify amending the NE NPR-A EIS/IAP. But, this change would not give the BLM justification to amend the NE NPR-A EIS/IAP to achieve the end results that the BLM apparently seeks from this process. Instead, it could only provide the basis for tightening environmental protections because likely development scenarios will now have greater a footprint, involve more facilities and consequently cause more and greater impacts.

New technology was another reason advanced by the BLM during scoping for the amendment of the 1998 NE NPR-A EIS/IAP and ROD.[25] The Amended Draft EIS provides an "update" to the 1998 NE NPR-A EIS/IAP identifying technological advances. Of the 9 advances

---

[22] Amended Draft EIS p. 4-22, 4-234, 4-325. 1998 NE NPR-A EIS/IAP p. IV-A-12.

[23] 1998 NE NPR-A EIS/IAP p. IV-A-12 "This concept of 'roadless development' . . . is likely to be the preferred strategy for future fields in the NPR-A for both practicality and cost reasons." Amended Draft EIS p. 4-30 (Assuming that future development will be roadless.). Compare with 2004 Draft Alpine Satellite Development EIS p. 2-39 (description of proposed action).

[24] Amended Draft EIS p. 3-16 "[T]he economics for development are more favorable if existing infrastructure is used. Consequently, new development is likely to expand incrementally from current North Slope infrastructure rather than appear as widely scattered startup projects."

[25] NE NPR-A Scoping Letter p. 17.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 10 of 54

identified, 7 were also known and listed as advances in the 1998 NE NPR-A EIS.[26] The one advance that was not expressly discussed in the 1998 NE NPR-A EIS/IAP, the modification of seismic operation vehicles in order to reduce ground pressure, is a practice that had been used for years before 1998 and is hardly a convincing reason to change the management of the NE NPR-A, much less amend the existing EIS or ROD.[27] It has no bearing on opening the area around Teshekpuk Lake to leasing or year-round surface occupancy.

The only other technological advance listed that was not included in the 1998 NPR-A EIS/IAP is the modular drilling platform that was tested on the North Slope by Anadarko.[28] We pointed out in our scoping letter that the Anadarko modular drilling platform was more of a technological failure than a technological advancement.[29] The modular drilling platform's failure to live up to its promises should have been mentioned in the Amended Draft EIS or mention of the platform should have been left out altogether. Regardless, the existence of the platform was not factored into the development scenario and so the platform's mere existence, probably in a scrap heap somewhere, basically has no bearing on whether it was

---

[26] Compare 1998 NE NPR-A EIS/IAP p. IV-A-9 with Amended Draft EIS p. 4-13.

[27] We were told during scoping that the criteria for tundra travel opening was being evaluated, and that this was a reason to revisit the 1998 NE NPR-A ROD. In our NE NPR-A Scoping Letter, we pointed out how the evaluation of the criteria for opening tundra travel was not completed and that the evaluation itself appeared to be driven by a goal to increase the number of tundra travel days, which could taint its objectivity. p. 18. Amended Draft EIS p. 4-19 says that based on this evaluation, tundra travel will now be opened by type of equipment. This has apparently led (although it is not at all clear in the Amended Draft EIS) the BLM to propose a change from the 1998 NE NPR-A ROD, Stipulation 24e which requires 12 inches of frost and 6 inches of snow cover to a ROP allowing tundra travel when "frost and snow cover is at sufficient depths to protect the tundra." Amended Draft EIS p. 2-18 and 2-19. However, the Amended Draft EIS does not make note of this change in its analysis of the impacts under Alternatives B and C. See e.g. Amended Draft EIS p. 4-178 discussing the potential for thermokarsting under Alternative B which identifies "the requirement that snow depth would average 6 inches before overland activities could commence" as minimizing damage to tundra. Assuming that there is no additional damage to tundra when tundra travel is opened by vehicle type, this minor change in management does not require the full blown amendment to the Northeast NPR-A EIS/IAP and ROD that we see happening here because it could have been accomplished through an Environmental Assessment followed by a Finding of No Significant Impact.

[28] For further mention of this drilling platform as an advance see Amended Draft EIS pp. 4-18 & 20.

[29] NE NPR-A Scoping Letter p. 22.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 11 of 54

---

appropriate to amend the 1998 NPR-A EIS/IAP.[30]

Interestingly, the Amended Draft EIS continues to identify extended reach drilling technology as a technological advance.[31] During scoping, we were told that extended reach drilling technology had limited application in the Northeast NPR-A due to subsurface geology.[32] Supposedly, because this limitation on the use of directional drilling was not discovered until after exploratory drilling in the No-Surface Occupancy zones in the eastern part of the Northeast NPR-A, this limitation was part of the reason for amending the 1998 NE NPR-A EIS/IAP. However, there is no mention of a technical limitation on extended reach drilling in the Amended Draft EIS,[33] and the zones where exploratory drilling has occurred remain intact under both Alternatives B and C (although other No-Surface Occupancy zones would be obliterated.)[34] Unless we've missed something, it appears that limitations on extended reach drilling is yet

---

[30] Another advance mentioned in the Amended Draft EIS is the Arctic Millennium Rig, which is modular, lighter, and can be transported over packed snow instead of over ice roads. Amended Draft EIS p. 4-20. We think that this advance in technology may be welcome from an impacts standpoint if in fact it can be so transported without damaging the tundra. But, this only helps "mitigate the constraints" of the ever shortening ice road season. This advance does not mitigate the impacts of exploration or the impacts of development considered in the 1998 NE NPR-A EIS/IAP. By contrast, if this same drill rig or one like it could be used to drill the Alpine Satellites, that could significantly reduce the impacts of the proposed Alpine Satellites which are currently under review because the proposed bridge across the Nigliq Channel would no longer need to accommodate a heavier, less modular, drill rig. We look forward to seeing this advance in technology discussed in the upcoming Alpine Satellites Final EIS.

[31] Compare 1998 NE NPR-A EIS/IAP p. IV-A-9 with Amended Draft EIS p. 4-13.

[32] NE NPR-A Scoping Letter p. 17, 26 - 27.

[33] Amended Draft EIS p. 4-36 notes that while oil beneath No-Surface Occupancy zones may be technically recoverable, "In most cases, the surface restrictions that would require directional drilling beyond 1 mile would cause economic burdens that would result in bypassed resource recovery or the elimination of marginal projects." There is nothing indicating that the economic burdens of directional drilling beyond a mile was not known at the time that the 1998 NE NPR-A EIS was finalized.

[34] The No-Surface Occupancy zones that would remain under Alternatives B and C would be subject to an exception clause that erodes the effectiveness of setting such areas aside. This letter will address the exceptions clause proposed for Alternatives B and C in section III below.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 12 of 54

another justification for this process which the BLM is no longer advancing.[35]

Since there is no new science in favor of changing the management of the Northeast NPR-A, and there have not been advances in the best available technology, what's to justify the amendment of the 1998 NE NPR-A EIS/IAP and ROD? There are other claimed justifications urged by the BLM, but they are similarly deficient. The Executive Summary and the "Purpose and Need" section of Amended Draft EIS tells the reader that by excluding areas from leasing, the 1998 ROD has made approximately 2 billion barrels of the 3.2 billion barrels of oil in the Northeast NPR-A unavailable for development.[36] <u>These numbers are not supported anywhere in the Amended Draft EIS!</u> According to the discussion of "Oil and Gas Exploration and Development Activities" and the discussion of the "Differences in Activity Levels for Leasing Alternatives"[37], at most, recovery of 2.488 billion barrels of oil is projected under Alternative C. This drops to 2.054 barrels of oil under Alternative B (the preferred alternative). The estimated recovery of oil under the 1998 NE NPR-A ROD should have been compared to these projections. The fact that this comparison was made in the Executive Summary, probably the only part of the Amended Draft EIS that most people read, makes it is especially misleading and deserving of a very prominent correction (if the BLM chooses to continue the amendment process).

In addition to the misleading comparison of oil that is not recoverable under the current management plan, the disparity between the projected recoverable oil under the current management of the NE NPR-A and the projected recovery of oil under Alternatives B and C is completely out of whack. Leasing 52% of the area with a high potential for oil leads to a projected recovery of only 600 million barrels of oil. But when about 30% more of this area is made available for leasing (i.e. 80% of the area of high oil potential) the projected amount of oil that can be recovered increases 3.4 times. Leasing that last 20% of the area with high oil potential only yields another projected 434 million barrels of oil of additional oil. These widely varying projections need rational explanation.[38]

---

[35] See also answer to frequently asked question number 14 (http://nenpra.ensr.com/nenpra/faq.htm) which does not mention limitations to the use of directional drilling in the Northeast NPR-A.

[36] Amended Draft EIS Executive Summary p. 5, p. 1-4 & 5.

[37] Amended Draft EIS p. 4-11 and p. 4-34.

[38] Amended Draft EIS p. 4-37 says that the estimated recovery under alternative B is "considerably more optimistic." Part of this optimism is attributed to the increase in the "total resource endowment in the 2002 assessment." There is no mention of the increased resource endowment being applied to Alternative A and we cannot determine from the Amended Draft

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 13 of 54

In any event, the possibility that there may be more oil that will not be recovered under the current management of the Northeast NPR-A than under an amended plan it simply not relevant. <u>Congress has directed the BLM to manage the NPR-A under such conditions, restrictions, and prohibitions that are necessary to mitigate adverse impact on surface resources, and to provide maximum protection to the Teshekpuk Lake Special Area.</u>[39] These:

> protections efforts are not intended as a prohibition of petroleum and related activities. However, a balance must be achieved to provide opportunities for successful oil and gas operations while providing maximum protection for the environment and local residents.[40]

The 1998 NE NPR-A ROD achieved that balance by establishing prescriptive-based stipulations and by determining that a significant part of the Teshekpuk Lake Special Area would not be leased at all. These measures were adopted to protect the environment and the local residents, not to prohibit oil and gas activities.

We are not saying that the management in the 1998 NE NPR-A ROD is written in stone, but we are saying that focusing on the potential recovery of oil will always make surface protections look like prohibitions on petroleum activity. Congress has directed the BLM to provide these environmental protections, and differing amounts of oil in the area doesn't affect those Congressional mandates.

---

EIS whether the Alternative A estimate was appropriately adjusted. There is reason to believe that it has not been adjusted. See 1998 NE NPR-A EIS/IAP p. IV-G-1 (Estimate that 600 million barrels of oil could be recovered under the Preferred Alternative.) If the increased resource endowment was not applied to Alternative A, then the estimate of recoverable oil needs to be prominently corrected. Additional reasons for the estimate of oil recoverable under Alternative B are the opening of new areas for leasing and a change to performance-based stipulations. This does not make sense. As noted in the body of this letter, there is no rational proportionality between the area available for leasing and the estimate of recoverable oil. A change in management style also would not rationally lead to such a significant difference in the proportions of recoverable oil under the different alternatives since the BLM has successfully leased tracts in the NPR-A that are controlled by the stipulations that were developed in the 1998 ROD. In other words, industry has not shied away from leases that are controlled by the current management plan, and so it is not rational to conclude that industry interest would be significantly different in leases with performance-based ROPs and stipulations.

[39] 42 USCA 6504(b) and 6508(1), Amended Draft EIS p. 1-6. The Teshekpuk Lake Special Area is depicted on Map 1-3 in the Amended Draft EIS.

[40] Amended Draft EIS p. 2-13.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 14 of 54

---

      The BLM has also tried to justify the amendment of the 1998 NE NPR-A EIS/IAP by urging a supposed need for flexibility that it says is not built into the 1998 NE NPR-A ROD.[41] This reason for amending the 1998 NE NPR-A EIS/IAP and ROD has always rung hollow because the BLM has only had limited experience implementing the 1998 NE NPR-A ROD. As the Amended Draft EIS acknowledges, "the implementation of the 1998 package of prescriptive stipulations has been underway for a relatively short period of time, limiting an empirical assessment of effectiveness."[42] Logically, the same short time period also has limited the BLM's experience from which it can conclude that the 1998 NE NPR-A ROD is too inflexible. The BLM has not cited to any examples of times when the 1998 NE NPR-A ROD was too inflexible. In fact, in the Alpine Satellite planning process the BLM has seemed willing to allow lessees to virtually ignore the stipulations.[43] Perhaps what the BLM means to say is that it wants to have different stipulations that will allow lessees to do more. That is not achieved through greater flexibility, but instead is a fundamental change in management which does not provide the same level of protection as the 1998 NE NPR-A ROD.[44]

---

[41] See e.g. Amended Draft EIS p. 4-146.

[42] Amended Draft EIS p. 4-145.

[43] March 8, 2004 Letter Commenting on the Alpine Satellite Draft EIS pp. 25, n. 50, p. 26, p. 27 n. 62.

[44] In our NE NPR-A Scoping Letter we gave the BLM multiple reasons why the prescriptive mitigation measures in the NE NPR-A ROD are superior to the performance-based mitigation measure that the BLM has decided to adopt. See NE NPR-A Scoping Letter pp. 10 - 12, pp. 23- 26 and pp. 3 through 7 of the April 2, 2003 letter from Kuukpik and KSOP to Curtis Wilson commenting on the Northwest NPR-A Draft EIS, incorporated into the NE NPR-A Scoping Letter. These were more than just arguments why the BLM should not take the course it has chosen. These were also comments on the proposed change from the 1998 NE NPR-A ROD to the performance-based mitigation measures that basically the entire community of Nuiqsut specifically asked the BLM to consider and to address in the Amended Draft EIS. NE NPR-A Scoping Letter p. 24. The Amended Draft EIS does not address the loss of the advantages of prescriptive-based management that we identified during scoping. However, at page 4-184 the Amended Draft EIS does confirm that greater specificity, one of the advantages of prescriptive-based mitigation measures that we identified, provides greater protection. The BLM should have considered the lost advantage that greater specificity provides to mitigation measures and the other advantages of 1998 NE NPR-A ROD's stipulations that we identified during scoping as significant issues that needed to be analyzed in depth in the Amended Draft EIS. Since it did not, we specifically incorporate pp. 10-12, pp. 23- 26 of the NE NPR-A Scoping Letter and pp. 3 - 7 of the April 2, 2003 letter from Kuukpik and KSOP to Curtis Wilson commenting on the Northwest NPR-A Draft EIS. <u>We expect the BLM to address the lost advantages of prescriptive-</u>

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 15 of 54

After only 4 years of exploration, and before any development or production had occurred in the Northeast NPR-A, the BLM began to profess that it was ready to change how it manages the Northeast NPR-A so that it resembles its management of the Northwest NPR-A.[45] When the BLM first said this, it didn't make sense since the Northwest NPR-A management plan was still being formulated and had not been made public.[46] How could the BLM know that a management plan that was still on the drawing boards would be better than one that had been adopted after extensive consultation with all of the interested parties? Now that the Northwest NPRA's management plan has been adopted,[47] it has been effective for only a period of 8 months. Even during the short period of time that the Northwest NPR-A management plan has been in "effect", the BLM has not been able to test it because a lawsuit challenging that plan is pending in Federal Court.[48]

---

based management in the Final EIS as required by 40 CFR 1503.4.

[45] BLM Plans to Revise Plan for Northeast National Petroleum Reserve-Alaska, BLM Press Release, April 15, 2003, http://aurora.ak.blm.gov/NPR-A/news.html#feb03mtg.; BLM to Hold Public Scoping Meetings for Revised Plan for Northeast National Petroleum Reserve - Alaska, BLM, News Release No. 03-20, September 5, 2003.

[46] Amended Draft EIS p. 2-11 says that during "scoping, several respondents expressed concern that the mitigation measures developed for the Northwest [NPR-A] IAP/EIS . . . would not be as effective" as the mitigation measures adopted in the 1998 NE NPR-A ROD. This is a little misleading since scoping for this amendment closed before the Northwest NPRA FEIS/IAP and ROD were finished. At that time we pointed out that we were expected to provide scoping comments on whether the 1998 NE NPR-A should be amended to look more like the management plan in the Northwest NPR-A when the final Northwest NPR-A EIS/IAP was not even published. It was unreasonable to not extend the period for scoping comments in order to allow commenters time to review the actual model plan. NE NPRA Scoping Letter p. 10.

[47] January 22, 2004, BLM press release, Interior Finalizes Plan for NW National Petroleum-Alaska, Designates More than 100,000 acres as Kasegaluk Lagoon Special Area. Available at http://www.ak.blm.gov/affairs/press/pr2003/pr012204.html.

[48] Northern Alaska Center for the Environment et. al. v. Norton et. al., Case No. J04-0006 CV (JKS). The Amended Draft EIS says that "[t]his package has been in effect long [SIC] for only a short while in the Northwest National Petroleum Reserve - Alaska, its effectiveness cannot yet be empirically evaluated." p. 4-314. Basically the same statement is used to describe the 1998 NE NPR-A ROD (see Amended Draft EIS p. 4-145) but, since only the Northeast NPR-A ROD management style has actually been used, the BLM has gained experience from that plan. It has gained no experience from the Northwest NPR-A management plan.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 16 of 54

---

       BLM also has suggested that there's some great merit to having consistency between the management standards of the Northeast NPR-A and the Northwest NPR-A that would justify sweeping the entire 1998 process and the consensus that was reached out of the way. Nonsense. The Northeast NPR-A alone contains over 4.6 million acres, an area larger than many entire States. The concept that those areas cannot be readily managed under somewhat different regimes is ludicrous. Any loss of convenience is far outweighed by the fact that the hard-won consensus of 1998 is being blown off by the BLM. Any administrative convenience for BLM is far outweighed by the fact that there is <u>no</u> consensus as to the proposed action and that BLM is cramming a program which is universally and vehemently opposed by the residents of the area down their throats. This is indeed a long way from the consensus approach of 1998, to which the oil industry itself was a party.

       **(d)**     **Changes in Presidential Policy**

       As shown above, none of the proffered reasons for amending the 1998 NE NPR-A EIS/IAP and ROD stand up to scrutiny or provide the necessary authority. So what is really going on?

       The only rational conclusion is that this whole EIS amendment process boils down to policy directives from the current Presidential administration. It is no secret that President Bush has taken a more pro-development stance than the Clinton administration (which was in office during the time leading up to the 1998 NE NPR-A EIS/IAP and ROD.) We did a little extra digging and found the NEPDG's policy recommendation to President Bush that he:

> [D]irect the Secretary of the Interior to examine land status and lease stipulation impediments to federal oil and gas leasing, <u>and review and modify those where opportunities exist</u> (consistent with the law, good environmental practice, and balanced use of other resources).
>
> • Expedite the ongoing Energy Policy and Conservation Act <u>study</u>[49] of impediments to federal oil and gas exploration and development.
>
> • Review public lands withdrawals and lease stipulations, with full public consultation, especially with the people in the region, to consider modifications where appropriate.[50]

---

[49] Note that the NEPDG's own analysis was that EPCA only authorized study of existing restrictions and impediments, not executive branch action.

[50] http://www.whitehouse.gov/energy/summaries.pdf.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 17 of 54

(Emphasis supplied.) Reviewing and modifying the 1998 NE NPR-A ROD is exactly what the BLM is doing in the Amended Draft EIS, although we think that this is not being done consistent with the law, or in furtherance of good environmental practice and balanced use of resources.[51] The BLM did not mention this NEPDG recommendation anywhere in the Amended Draft EIS, in its press releases, or on the project web site. We find this misleading.

The BLM has not been at all candid about policy differences being the reason why it has decided to amend the NE NPR-A EIS/IAP and ROD. For example, during an interview with an Anchorage Daily News Reporter about the BLM's plans to amend the management of the Northeast NPR-A, Rebecca Watson, Assistant Secretary of the Interior (the federal department overseeing the BLM), responded to the statement:

> Some people have accused the Bush administration of rolling back sensible restrictions imposed under the prior administration.

by saying:

> Look back to what happened in 2000 when President Clinton was there. He signed the Energy Policy and Conservation Act. The EPCA study was done at the direction of Congress and President Clinton signed it. It directed the Bureau of Land Management and other agencies to look at the impediments to producing our oil and gas. What are the constraints? What are the other resource values we're trying to protect that may impede production of energy, and is there a smarter, better way to do it instead of simply saying, No, its off limits? (Emphasis added.) [52]

Nowhere does EPCA's inventory of stipulations and impediments requirement mention that the Clinton administration or Congress wanted the BLM to look at whether there is

---

[51] We found Information Memorandum ("IM") 2003-233 on the internet. This is a directive from the Secretary of the Interior to the state heads in the rocky mountain states where the BLM inventoried lease stipulations and impediments to take steps to reduce or eliminate these. http://www.blm.gov/nhp/news/releases/pages/2003/pr030807_EPCA.htm. This directive applies only to those areas where the EPCA inventory has been completed, and on its face does not appear to apply to Alaska, although it is certainly instructive of the BLM's general attitude towards existing environmental protections. IM 2003-233 references an IM 2003-137 that is also related to the "integration" of the EPCA inventory into land use planning. We could not find this IM, but we think that it is part of, or should be part of the BLM's administrative record for this amendment process.

[52] NPR-A Development Can Be Win-Win, Watson Says, Anchorage Daily News, June 27, 2004.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 18 of 54

---

a "smarter" way to protect resource values without impeding the production of oil. That comes straight from the NEPDG and maybe from President Bush if he adopted the NEPDG's recommendation. Again, the BLM is taking on a role Congress intended to perform itself.

Remember what Henry Bisson, State of Alaska Director for the BLM, said in the September 5, 2003 press release announcing public scoping meetings for the amendment of the 1998 NPR-A EIS/IAP and ROD:

> We've learned a lot during the past four years, . . . . We know that we can safely explore this area without significant impact to sensitive wildlife and subsistence resources. We also believe that we can develop critical hydrocarbon resources in a manner that protects these same values.[53]

As noted in our joint scoping letter, amending an EIS or an ROD is not about approving what the BLM has already decided to do.[54]

In addition, this focus on justifications which have since been dropped, while others have been added, improperly distorts the NEPA process. The justifications urged by the BLM are what people focused on during the scoping process, not the policy recommendations from the NEPDG. We certainly took Mr. Bisson's statement and ones similar to it seriously in our scoping letter and in this letter. We examined and addressed every justification and authority urged by BLM in our scoping letter[55] and in this letter. We and most other individuals and organizations commenting during this process do not have full time staff available for these issues. To the extent that this misdirection wastes limited resources, it improperly harms both the efficiency and the effectiveness of the public process that is at the very core of NEPA.[56]

---

[53] BLM to Hold Public Scoping Meetings for Revised Plan for Northeast National Petroleum Reserve - Alaska, September 5, 2003, Release No. 03-20.

[54] NE NPR-A Scoping Letter, pp. 14-15.

[55] NE NPR-A Scoping Letter pp. 16 - 27.

[56] The extent and scope of the administrative processes which the Bush administration has unleashed on the people of the North Slope and Nuiqsut in particular over the past two years could hardly have been better designed if its intent had been to stifle and diffuse effective comment by the Inupiat people of Nuiqsut and the North Slope. Not only has there been the lengthy and complex EIS proceedings for the Northwest NPR-A and this process for amending the applicable management practices for the Northeast NPR-A, but we have also been faced with an EIS for the Alpine Satellites which we and most of the reviewing agencies, including EPA under its Clean Water Act rating system, considered seriously and extensively inadequate. All

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 19 of 54

So, to the heart of the matter. A change in policy within the Executive Branch, standing alone (although it was not identified as a purpose or need in the Amended Draft EIS) is not a legally sustainable purpose or need for amending the management of Northeast NPR-A. This is because the BLM had been directed <u>by Congress</u> to manage the NPR-A with such restrictions and prohibitions as are necessary to mitigate adverse impact on surface resources and to provide "maximum protection" to the Teshekpuk Lake Special Area.[57] <u>Congress</u> also made clear that it is this nation's policy to manage federal lands in a manner that sustains the subsistence opportunities of Alaska's rural residents.[58] The BLM was following these directives <u>from Congress</u> in 1998 when it established the current management plan for the Northeast NPR-A.[59] Thus, in order to change that decision, the BLM "must examine the relevant data <u>and articulate a satisfactory explanation for its action</u> including a rational connection between the facts found and the choice made."(Emphasis supplied.)[60] What we are seeing here is that the choice to change the stipulations in the 1998 NE NPR-A ROD and to open more of the Northeast NPR-A has already been made. The BLM has been trying, maybe even struggling, to find a legal or factual justification for that choice. But its legal and factual reasons for amending the 1998 NE NPR-A EIS/IAP and ROD have no substance. In effect, the BLM is seeking to replace the rational decisions that it has previously made in response to directives <u>from Congress</u> with the

---

three of these agency actions seriously impact or threaten the community of Nuiqsut and our culture and way of life. Between these three EIS documents, we have had to review and comment on well over 5,000 pages of complex, difficult materials, which does not even count the additional materials involved in multiple drafts or the effort involved in scoping and public hearings. The shifting justifications in the amendment process here and the sheer volume of materials thrown at our people, for many of whom English is not their native tongue, denies us and other Inupiats on the North Slope the fair treatment and meaningful involvement that environmental justice requires. EO 12898. Nor has consultation been particularly useful in light of the hollowness of the reasons for amending the NE NPR-A EIS/IAP and ROD that were discussed during consultations.

[57] 42 USCA 6504(b); Amended Draft EIS p. 1-6.

[58] 16 USCA 3101(c) & 3112.

[59] Amended Draft EIS p. 1-6. 1998 NE NPR-A ROD p. v, see Amended Draft EIS Appendix A.

[60] <u>International Snowmobile Manufacturers Assoc. v. State of Wyoming</u>, 2004 U.S. LEXIS 1796 (D.Wyo. Feb. 10, 2004), Quoting <u>Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto Co.</u>, 463 U.S. 29, 43 (1983).