Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 20 of 54

policy choices of the current Presidential administration.[61] In the absence of substantial new facts or information, the BLM cannot do this without effecting a change that is arbitrary and capricious. Such an arbitrary and capricious action does not meet the standard required of actions taken by a federal agency.[62]

Another legal flaw stems from the requirement that the BLM present a purpose and need for the amendment of the 1998 NE NPR-A EIS/IAP.[63] As discussed above, no purpose or need has been identified that would pass even the most deferential standard of review.

Amending the 1998 NE NPR-A EIS/IAP and ROD based solely on policy recommendations made by the NEPDG or on directives handed down from the President is also an error because it would lead to a major, long term breakdown of the relationship between the BLM and the community of Nuiqsut (and, we think, the other communities of the North Slope as well.) That this is likely to happen does not seem to be of concern to the BLM, which summarized the position it has put itself in by saying:

> Considerable changes to the decisions in the 1998 NE NPR-A IAP/EIS ROD without the consensus of local communities, governments, and agencies could create an insurmountable rift between the people of the North Slope and the federal government, especially if their Inupiat way of life was threatened.[64]

That statement pretty well hits the nail on the head.

It is very clear that the opposition of the Inupiat people and the local residents of Nuiqsut and the North Slope to the BLM's proposals is virtually unanimous. In our local

---

[61] The flip flopping on management decisions in order to implement a policy choice made by a current administration, which is exactly what the BLM is proposing to do, has not been looked upon favorably by the courts. See e.g. The Fund for Animals v. Norton, Civ. Action No. 02-2367 (EGS) (D.C. 2003); International Snowmobile Manufacturers Assoc. v. State of Wyoming, 2004 U.S. LEXIS 1796 (D.Wyo. Feb. 10, 2004)(granting preliminary injunction on a Record of Decision in part because the National Park Service never fully explained the reasons for changes from existing to proposed to final management plan.)

[62] 5 USCA 706(2)(A).

[63] 42 USCA 4332; 40 CFR 1502.13 "The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."

[64] Amended Draft EIS, Appendix B (ANILCA Section 810 Analysis), p. B-9 and B-11.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 21 of 54

discussions, it would be hard to find a single resident of Nuiqsut who supports what BLM is proposing to do. The BLM seems determined to ignore the opposition of the people whose lives and culture are most connected with the lands involved and who would be most affected by these actions. That the lands that BLM is so managing are entirely lands that are the birthright and heritage of our people and provide us our daily sustenance makes these actions even more offensive to us. This approach is even more inexplicable after the generally positive experiences that the community had dealing with the BLM during the collaborative process used to reach the current management plan.[65]

### III.   The Required Range of Alternatives Is Not Considered in the Amended Draft EIS

While we question the legal basis of this amendment process, we are also commenting on the deficiencies in the Amended Draft EIS. One prominent deficiency is the failure to consider other reasonable alternatives. The consideration of a reasonable range of alternatives in an EIS is one of the basic tenants of NEPA, and so the failure to consider reasonable alternatives must be corrected. This failure is manifested in several ways.

First, the BLM has announced from the beginning of this process that the stipulations adopted in the 1998 NE NPR-A ROD are going to change,[66] yet there is really only one alternative that is consistent with the BLM's already-made decision. In other words, Alternative A was out the window from the first press release (and even earlier, according to stories in Petroleum News Alaska and other oil industry-related publications). Alternative C is equally a no-hoper because it would open up every last acre of the Northeast Planning Area, and such an extreme position simply could not withstand challenge in light of the critical habitat areas involved and Congress' mandate that our subsistence way of life be protected. That leaves everyone wishing to comment with just Alternative B to choose from. Yet when it comes to opening some portion, but not all, of a previously restricted area of over 589,000 acres to leasing, having only one alternative presented or analyzed gives short shrift indeed to the variety and complexity of the areas, the habitat and the resources involved. While brevity is nice, it shouldn't come at the expense of a fair and thorough look at a realistic range of alternatives.

---

[65] The collaborative process is noted throughout the Amended Draft EIS, see e.g. pp. 4-146, 4-313.

[66] BLM to Hold Public Scoping Meetings for Revised Plan for Northeast National Petroleum Reserve-Alaska, BLM News Release No. 03-20, September 5, 2003: see also BLM Plans to Revise Plan for Northeast National Petroleum Reserve-Alaska, BLM Press release, April 15, 2003, http://aurora.ak.blm.gov/NPR_A/news.html#feb03mtg. See also a copy of a portion of BLM's website as it existed on January 13, 2004, a copy of which is attached to this letter and could be found unchanged at the time this letter was prepared at http://69.20.72.207/nenpra/default.html.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 22 of 54

With that summary in mind, let's take a more detailed look. The Amended Draft EIS has three "alternative" packages of mitigation measures. Alternative A is the No Action Alternative which maintains the "prescriptive based" stipulations that were adopted in the 1998 ROD. And then there are Alternatives B and C, both of which include the exact same "performance-based" stipulations (with the exception of the set back for the Tingmiaksiqvik river, identified on USGS maps as the Ublutuoch River, which is only included in Alternative B).[67] At the outset, it would appear that we have been presented with basically only two "alternative" mitigation measure packages and that our comments here will help the BLM pick and choose between the two alternatives. But, this appearance is only an illusion, since before the Amended Draft EIS was even published we were told by the BLM's Northeast NPR-A website:

> The BLM will reformat current prescriptive stipulations that apply to the Northeast National Petroleum Reserve - Alaska into a mixture of prescriptive and performance-based stipulations similar to those developed for the Northwest portion of the Reserve. (Emphasis supplied.)[68]

Agency representatives also told us that the BLM had already decided that performance based ROPs will be adopted in the end.[69] The pre-ordained outcome of this NEPA process is only confirmed in the Amended Draft EIS which states that this planning process will:

> Develop performance-based measures to protect important surface resources from the impacts of oil and gas activities, similar to those developed for the Northwest National Petroleum Reserve - Alaska.[70]

---

[67] Amended Draft EIS p. 2-28.

[68] We have attached hereto as document No. 2 a printout of the website maintained for this planning process as it existed on January 13, 2004. The quoted passage continues to be posted on the planning process website. See http://69.20.72.207/nenpra/default.html.

[69] During multi-day meetings with representatives of all of our organizations on December 4th and 5th, 2004, at BLM's Alaska Headquarters in Anchorage, Peter Ditton, former Associate State Director for the BLM made it clear that the BLM was set on changing the existing Northeast NPR-A management plan to incorporate performance-based stipulations.

[70] Amended Draft EIS p. 1-9. Compare Amended Draft EIS p. 2-11 which says that these stipulations "if adopted" would result in similar management in the Northeast NPR-A and the Northwest NPR-A. One or two statements like this in the Amended Draft EIS do not cast doubt on the meaning of the BLM's clear statements that a change to performance-based mitigation measures is going to occur.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 23 of 54

So, maintaining the stipulations developed in the 1998 NE NPR-A ROD has never been an alternative.[71] The BLM also dismisses the request we made during scoping that it "develop and examine an alternative . . . that strengthens the existing NE NPR-A ROD's subsistence stipulations" because it does not fall within the realm of the performance based measures that defines the scope of its purpose.[72]

NEPA requires the exploration and objective evaluation of reasonable alternatives.[73] Section 810 of ANILCA also requires the consideration of alternatives.[74] That's alternatives - plural. The BLM has already decided that performance-based measures will be implemented in the Northeast NPR-A, and it has confined its planning process to only developing performance-based measures. How then can there be alternative mitigation packages that are considered and analyzed in the Amended Draft EIS or the Section 810 analysis? Cramming an already-made decision through this process by narrowly defining the decision to be made and then providing only one alternative that is consistent with that decision is not in

---

[71] Right off the bat, pre-ordained EIS results such as those demonstrated by these quotes are impermissible under federal law. Under federal regulations, "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 CFR 1502.1.

[72] NE NPR-A Scoping Letter p. 38; Amended Draft EIS p. 2-10. The BLM should have also considered a program using local residents to monitor industry activities and to check on compliance with the applicable stipulations or ROPs. We brought this up in our Scoping Letter as an alternative that should be considered. NE NPR-A Scoping Letter p. 38-39.

[73] 42 USCA 4332(C)(iii); 40 CFR 1502.2(g) "Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 CFR 1502.1. EISs shall be "used by Federal officials in conjunction with other relevant material to plan actions and make decisions."; 40 CFR 1502.14 (the alternatives are the heart of the EIS); 40 CFR 1504.14(d)(shall include the no action alternative.)

[74] Not only is the Section 810 ANILCA analysis of the alternatives worthless because the BLM has a pre-ordained outcome, but that analysis also uses the NEPDG's recommendation that the President direct the secretary to consider additional leasing in the Northeast NPR-A in its evaluation of the availability of other lands. See e.g. Amended Draft EIS, Appendix B, p. B-9. This is problematic since there are no other lands that meet the purpose, but the BLM still concludes that other lands that it administers are either too remote to develop economically or have a low potential for recoverable oil.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 24 of 54

---

compliance with the letter or the spirit of NEPA or ANILCA.[75]

       When it comes to opening more land for leasing in the Northeast NPR-A the BLM has 589,000 acres that contains highly sensitive wildlife habitat that it needs to consider. There is no explanation in the Amended Draft EIS why, under Alternative B, 213,000 acres is unavailable for leasing or how the location of the 213,000 acres that are not available for leasing in this scenario were chosen.[76] Maybe if the 213,000 acres where leasing is not allowed under Alternative B were shifted to different parts of the area around Teshekpuk Lake, the impacts of making the additional acreage available to leasing would be significantly different. Or, what if, in addition to withholding 213,000 from leasing, some additional acreage that is of high value to wildlife is also made unavailable for leasing. These are the types of alternatives that need to be analyzed in order to sharply define the issues and provide the BLM a clear basis for choice among options.[77] Consideration of other reasonable leasing scenarios is also necessary to determine under Section 810 of ANILCA whether the use, occupancy, or disposition of subsistence lands can be reduced or eliminated.[78]

       A draft EIS is supposed to be as complete as possible. The Amended Draft EIS is clearly not as complete as possible since it effectively writes-off the No Action Alternative just because it is not consistent with the BLM's pre-ordained decision and because alternative leasing scenarios are not explored. When a draft EIS is incomplete and deficient "so as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."[79] A failure to include an adequate range of alternatives is precisely the type of deficiency where a second opportunity for public comment should be provided after the revisions are made. Additionally, since the decision to implement performance-based ROPs and stipulations has already been made, the revision of the Amended Draft EIS needs to consider

---

[75] See e.g. State of Wyoming v. United States Department of Agriculture, 277 F.Supp.2d 1197, 1122 (D. Wyo. 2003). See also International Snowmobile Manufacturers Assoc. v. State of Wyoming, 2004 U.S. LEXIS 1796 (D.Wyo. Feb. 10, 2004)(prejudged political decision coupled with the lack of a hard look in the Final EIS leads to the conclusion that there is a substantial likelihood that agency decision is arbitrary and capricious.)

[76] We suspect that the location of the 213,000 acres unavailable for leasing under alternative B was chosen because it contains the most significant goose molting lakes in the Northeast NPR-A. Compare Map 2-2 with Map 3-15.

[77] 40 CFR 1502.

[78] 1416 USCA 3120.

[79] 40 CFR 1502.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 25 of 54

more than one performance-based alternative.

### IV. The BLM's Proposed Changes in Management Will Not Provide the Same Level of Surface Resource Protections as the 1998 NE NPR-A ROD

Another deficiency in the Amended Draft EIS is the systematic failure to consider or analyze the differences between the 1998 NE NPR-A ROD and the mitigation measures proposed for Alternatives B and C. Instead of finding analysis, we find that the Amended Draft EIS repeatedly makes conclusory statements that the package of mitigation measures proposed under Alternatives B and C would provide the same level of protection to surface resources as the stipulations adopted in the 1998 NE NPR-A ROD. For example, page 2-11 says:

> In the end, the level of resource protection developed in the Northwest National Petroleum Reserve - Alaska, the Preferred Alternative [Alternative B] and Alternative C of this amendment, is similar to, or even greater than, the level of resource protection provided in the 1998 Northeast IAP/EIS Record of Decision.[80]

The Amended Draft EIS points to a couple of instances (such as the ROP that sets a standard pipeline height of 7 feet measured at the VSMs) where Alternatives B and C would provide more protection than the 1998 NE NPR-A ROD and therefore concludes that the overall level of protection is similar or greater than the 1998 stipulations.[81] Nothing could be farther from the truth.

For instance, the proposed mitigation packages for Alternatives B and C uniformly allow exceptions to their standards with a lesser showing than the 1998 NE NPR-A ROD. The impacts of this difference are not analyzed in the Amended Draft EIS, as they are required to be. The exception clause in the 1998 NE NPR-A ROD provides:

---

[80] See also Amended Draft p. 4-231 & 4-312 (the BLM holds that performance based stipulations and Required Operating Procedures will provide equivalent protection [to subsistence].); p. 4-235 & 4-314 (the BLM proposed the new approach to mitigative measures in order to achieve equivalent protection [from sociocultural impacts.]) p. 4-145 "The BLM holds that the new approach will provide equivalent protection with more flexibility."

[81] Amended Draft EIS p. 4-232. See also Amended Draft EIS p. 4-184 (specificity in set back requirements.)

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 26 of 54

---

In the event that an exception to a lease or permit stipulation is requested, and before an exception may be granted, the Authorized Officer (AO) shall find that implementation of the stipulation is:

(1)   a)    technically not feasible, or
       b)    economically prohibitive, or
       c)    an environmentally preferable alternative is available, <u>and</u>

(2)   the alternative means proposed by the lessee fully satisfies the objective(s) of the stipulation.[82]

The "and" is underlined in this quote because during the meetings between Nuiqsut's representatives and the BLM on December 4th and 5th of 2003, some BLM representatives suggested that under the 1998 ROD an exception can be granted if implementation of a stipulation is not technically feasible or is cost prohibitive.[83] The placement of the "and" between numbers 1 and 2 of the 1998 exceptions clause is not an accident. It means that the conditions in subparagraphs (1) and (2) of the 1998 exceptions clause must be met before an exception can be granted. <u>In other words, the 1998 ROD requires that the objectives of a stipulation are always met by a lessee.</u>

     Now, compare the 1998 NE NPR-A ROD with the exceptions clause proposed for Alternatives B and C which reads:

In the event that an exception to a stipulation or ROP is requested, and before an exception may be granted, the lessee/permittee shall demonstrate to the satisfaction of the AO that implementation of the stipulation or ROP:

- is technically not feasible; or
- is economically prohibitive, or
- has an environmentally preferable alternative <u>and</u> the alternative proposed by the lessee/permittee fully satisfies the objective(s) of the lease stipulation or ROP.[84]

---

[82] Amended Draft EIS, Appendix E, p. E-1.

[83] Amended Draft EIS p. 4-410 correctly reads the exception clause in the 1998 NE NPR-A ROD as requiring that the alternative proposed by the lessee fully satisfy the objectives of the stipulation.

[84] Amended Draft EIS p. 2-14.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 27 of 54

The difference between the two exception clauses may seem subtle, but it has enormous significance. By changing the exceptions clause so that the objective of a lease stipulation or ROP must only be met when the lessee or permittee is proposing an environmentally preferable alternative, lessees and permittees are no longer required to satisfy the objective of a stipulation or ROP when an exception is needed because meeting the requirements of a stipulation or ROP is technically not feasible or is economically prohibitive. As stated in the 1998 NE NPR-A ROD, "[e]xceptions to stipulations may be granted under strict conditions."[85] But strict conditions no longer must be met in order to get an exception under Alternatives B and C.

Let's take a look at a very concrete example of what the difference means. When ConocoPhillips Alaska, Inc. ("CPAI") proposed to put the pad for CD-6 inside the Fish Creek No-Surface Occupancy zone,[86] it had to establish that placing CD-6 outside the buffer zone was technically not feasible, economically prohibitive, or that placing CD-6 inside the buffer zone was environmentally preferable, and in addition, CPAI needed to establish that under any of these exceptions, that the objectives of the Fish Creek No-Surface Occupancy zone are still met. Under Alternatives B and C, all CPAI would need to do is show that placing CD-6 outside the Fish Creek No-Surface development zone is technically not feasible or is cost prohibitive. In either of these events, CPAI would not be required to meet the objective of the Fish Creek No-Surface Occupancy zone. Alternatively, under Alternatives B and C, CPAI could get an exception if it shows that developing a gravel pad inside the Fish Creek No-Surface Occupancy zone was environmentally preferable and met the objectives of the No- Surface Occupancy restriction.[87]

In our experience, the oil industry always claims that a proposed new development project on the North Slope is pressing the envelope of affordability and the limits of technology.[88] If the BLM's AO believes the lessees assertions, then the ROPs and lease

---

[85] Amended Draft EIS, Appendix A, p.7.

[86] 1998 NE NPR-A ROD, stipulation 39(d).

[87] We note that Alternatives B and C maintain essentially the same river (but not lake) setbacks as stipulation 39 of the 1998 NE NPR-A ROD, and in the case of Alternative B adds the Tingmiaksiqvik (Ubltouch) river to the rivers receiving surface buffer zone protections. Amended Draft EIS p, 2-55 - 2-57. However, these setbacks are substantially weakened under Alternatives B and C since an exception can be granted without meeting the objectives of these setbacks.

[88] We discussed, and provided examples of this, at page 11 and footnote 16 of our March 8, 2004 letter commenting on the Draft Alpine Satellite EIS. That letter, and in particular the discussion of how the oil industry presents new prospects as marginal, is incorporated into this

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 28 of 54

stipulations proposed in Alternatives B and C will mean nothing. Compare that to the 1998 NE NPR-A ROD where the lessee also has to prove that the objectives of the stipulation are still met.

While we are being told that the cornerstone of the performance-based ROPs and stipulations proposed in Alternatives B and C is the requirement that industry meet objectives,[89] we are actually seeing that through application of the exceptions clause, the objectives can be avoided altogether. Protections to surface resources and to subsistence uses in the NPR-A will suffer when exceptions are granted to mitigation measures without meeting the objective of the mitigation measure. This potentially enormous difference in management styles is not even noted in the Amended Draft EIS. Not only is there no analysis of its potential impact, but at least once the Amended Draft EIS incorrectly states that the same exception clause applies to all alternatives discussed.[90] Had the Amended Draft EIS considered the differences in the exceptions clauses, there is simply no way that it could have rationally concluded that Alternatives B and C provide the same level of protection as the 1998 NE NPR-A ROD. On this fundamental point the Amended Draft EIS has not taken the required hard look at the effectiveness of the mitigation packages proposed in Alternatives B and C, nor has the Amended Draft EIS reasonably compared the effectiveness of Alternative B or C with the 1998 NE NPR-A ROD.

Another sweeping difference in the mitigation measures that cuts across all types of protection (and again that is not considered in the discussion of the impacts of the Preferred Alternative) is the shift in emphasis from enforceable standards to monitoring the effectiveness of new mitigation techniques. The Amended Draft EIS claims that many of the prescriptive "stipulations [in the 1998 NE NPR-A ROD] reflect knowledge gained from past mistakes".[91] But, as the Amended Draft EIS puts it "[t]he flexibility of the new approach [Alternatives B and C] places greater reliance on on-going monitoring to insure that modified procedures do in fact achieve equivalent protections."[92] We call this the "close the door after the cow is out" approach because it assumes that there is not a problem until the harm has occurred. Additional, unnecessary environmental impacts will inevitably result from substituting after-the-fact monitoring for impacts for standards that make a lessee show an acceptable level of impacts before those impacts occur. It is simply not possible that the after-the-fact monitoring proposed as part of the ROPs and stipulations in Alternatives B and C will provide a comparable level of

---

letter.

[89] Amended Draft EIS p. 2-11.

[90] Amended Draft EIS P. 4-312.

[91] Amended Draft EIS p. 4-139.

[92] Amended Draft EIS p. 4-146.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 29 of 54

protection to subsistence resources as now exists.

   The BLM may be content to learn from new mistakes in order to push through the current Presidential administration's policy, but it's our culture and way of life that is on the line. We are essentially being told by the BLM to leave it up to their good judgment. But in doing so, we must rely on the BLM to exercise its discretion (our scoping letter discussed extensively the lesser level of protection afforded by a discretionary system such as that proposed here, and that discussion is incorporated by reference.)[93]   The more discretion that the BLM has in the management of the Northeast NPR-A, the less legal recourse we have to challenge whether those decisions provide an appropriate level of surface resource protections. We are not saying that we think that the best way to manage the Northeast NPR-A is through court injunctions. But when the BLM recognizes that amending the 1998 NE NPR-A ROD will create an "insurmountable rift" between it and the people of the North Slope, and is willing to do it anyway, the protection of our way of life may rest only with higher authority. Reliance on the BLM to exercise its discretion is also not very comforting given the Amended Draft EIS's reliance on justifications that disguise rather than illuminate the real policy-based motivations underlying this process, not to mention the failure of the Amended Draft EIS to adequately disclose or consider the real impacts that would result.

   We also have our misgivings about whether the BLM will actually perform fully the monitoring activities in the NPR-A that it concedes are necessary to make sure, after the fact, that performance-based mitigation had worked. Sure, the Amended Draft EIS says over and over again that the "BLM is committed to directing the necessary resources to this on-going monitoring requirement."[94] Of course, Congress, not the BLM decides the level of BLM funding, and in this time of increasing federal budget deficits and with an administration in place that promises smaller, more business-friendly government, the BLM can hardly guarantee that it will receive the additional funding to carry out these blithely offered promises of future increases in monitoring efforts.

   Along these lines, recall as well that in the 1998 NE NPR-A ROD the BLM committed to setting up and funding the Research Monitoring Team ("RMT") to "coordinate research and monitoring projects related to the effectiveness of stipulations and surface resource impacts."[95] Yet, when the RMT's charter ended two years ago in November of 2002, the BLM

---

[93] NE NPR-A Scoping Letter, pp. 10-12.

[94] See e.g. Amended Draft EIS p. 4-146, 4-231, 4-235, 4-312, 4-314.

[95] 1998 NE NPR-A ROD, p. 6, See Amended Draft EIS appendix 1.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 30 of 54

did not renew it.[96]

A third sweeping difference between the 1998 Northeast NPR-A ROD and Alternatives B and C that is not analyzed in the Amended Draft EIS is the elimination of what the Amended Draft EIS calls the "redundancy of requirements that already exist in the form of regulation or law."[97] We think that redundancy between the 1998 NE NPR-A ROD and existing regulations and laws is important because regulations and laws can change while those contractual protections would remain in place. These redundancies have special significance to Kuukpik and to the people of Nuiqsut because Kuukpik may end up owning a substantial amount of the land that is currently leased subject to these "redundancies." In the case of future ANCSA selections by Kuukpik of lands subject to these leases, Kuukpik and the Arctic Slope Regional Corporation might well keep such contractual protections in place even if the federal or state law changed.[98] The Amended Draft EIS needs to consider what happens if the existing law or regulation is eliminated or weakened.

In addition to these failures to consider across-the-board differences between the 1998 NE NPR-A ROD and Alternatives B and C, the Amended Draft EIS fails to consider specific differences between the 1998 NE NPR-A ROD and Alternatives B and C. Take, just for example, the many differences that are not considered in the analysis of the impacts to fish under the different alternatives discussed on pages 4-192 to 4-197 of the Amended Draft EIS. These are:

(1)     The Amended Draft EIS says that the 1998 NE NPR-A ROD and Alternatives B and C "both prohibit exploratory drilling in rivers and streams . . . and in fish bearing lakes unless the lessee demonstrates, on a site specific basis, that biological impacts would be minimal

---

[96] http://www.susquehanna-innovations.org/ScanDocs/NewNPR_Ane050703/RestructRMteam050703.pdf. The BLM wants to replace the RMT with a "North Slope Science Strategy" and identifies four bogus reasons why this is "clearly" necessary, many of which did not materialize until after the RMT's charter ended. See Amended Draft EIS p. 1-15. Id. What is clear is that the BLM has not been using the RMT to monitor the effectiveness of the 1998 NE NPR-A ROD. The Amended Draft EIS needs to consider the impacts of a failure by the BLM to effectively monitor mitigation measures as part of any analysis of their effectiveness. The BLM's history with the RMT, and its poor excuses for replacing the RMT, make this a possibility that must be acknowledged and considered.

[97] Amended Draft EIS 2-11.

[98] Kuukpik is still entitled under ANCSA to select approximately 22,000 acres out of the eastern part of the Northeast NPR-A.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 31 of 54

or there is no other feasible alternative."[99] So, the Amended Draft EIS would have the reader believe that there is nothing here to analyze. But nowhere does the 1998 NE NPR-A ROD allow drilling in rivers, streams and lake beds when impacts are minimal or there is no other feasible alternative. Only Alternatives B and C would allow that.[100] Under the 1998 NE NPR-A ROD, exploratory drilling is not allowed in <u>any</u> lake (compare with Alternatives B and C which has no restriction on non-fish bearing lakes), river or stream. Exceptions to this prohibition can only be granted for shallow lakes that do not support significant fish or bird populations and that are hydrologically isolated, and only when it is environmentally preferable. An additional impact under Alternatives B and C that is not discussed is that <u>only</u> under the leasing scenario presented in these alternatives would exploratory drilling be allowed in Teshekpuk Lake. These are very different mitigation measures and circumstances and they need to be analyzed as such, along with their impacts.

(2)     The next subsection in the Amended Draft EIS, discussing the effects of gravel mine sites on fish, also fails to acknowledge the lower level of protection offered by Alternatives B and C. That sections says that both the 1998 NE NPR-A ROD and Alternative B and C are intended to "minimize the effects of gravel mining on fish by limiting gravel mine sites within the active floodplain of any river, stream, or lake unless the action enhances fish habitat."[101] That might be the intent, but the 1998 NE NPR-A ROD is more likely to achieve that intent since under the current management plan gravel mine sites within active flood plains are prohibited unless there is no feasible or prudent alternative or the location of the gravel mine in the flood plain enhances fish habitat. Compare this with Alternative B and C which only requires that the AO "consider . . . [l]ocations outside the active flood plain" and "[p]otential use of the site for enhancing fish and wildlife."[102] The level of protection to fish in Alternative B and C is clearly less than the level of protection in the 1998 NE NPR-A ROD, but the Amended Draft EIS incorrectly says that they provide an equivalent level of protection.[103]

(3)     With regards to the buffer zones around waterbodies, the Amended Draft EIS says "[s]ince the only difference between the two alternatives is the size of the buffer zone around

---

[99] Amended Draft EIS p. 4-194.

[100] See Amended Draft EIS p. 2-52 for a side by side comparison of stipulation 29 and Lease Stipulation D-1.

[101] Amended Draft EIS p. 4-194.

[102] See Amended Draft EIS p. 2-58 for a side by side comparison of stipulation 40 and ROP E-8.

[103] Amended Draft EIS p. 4-194.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 32 of 54

water bodies that do not contain fish, both alternatives would afford similar protection to fish and fish habitat."[104] But, this is not the only difference between the 1998 NE NPR-A ROD and Alternatives B and C. Alternatives B and C would allow permanent oil and gas facilities closer to fish bearing lakes than the 1998 NE NPR-A ROD if the lessee can demonstrate that impacts to fish would be minimal. A prospective showing that such impact should be minimal is not at all the same thing as those impacts turning out, in fact to be minimal. The protection afforded by the two alternatives is not similar, since only under Alternatives B and C are facilities located closer than 500 feet from a fish bearing waterbody and the associated "minimal impacts" allowed.

(4)     The Amended Draft EIS says that both alternatives "require extensive ecological mapping of proposed development sites in order to access [SIC] and minimize impacts to sensitive wildlife and fish habitats."[105] That's not quite correct either. The 1998 NE NPR-A requires more than just mapping - it also required consultation with federal, state, and NSB regulatory and resource agencies to identify key wetlands (including fish bearing lakes and streams) and for lessees to minimize the impact of industrial development on these wetlands.[106] Minimizing impacts includes avoiding siting facilities in the identified wetlands if feasible. None of this is required in Alternatives B and C.[107]

We have found few instances where the Amended Draft EIS accurately identifies differences between the mitigation measures in the 1998 NE NPR-A ROD and Alternatives B and C. We noticed that the differences in the mitigation measures controlling the amount of water that can be withdrawn from lakes are identified in the Amended Draft EIS. The 1998 NE NPR-A ROD allows the withdrawal of from lakes that are less than 7 feet deep that "lack connection to or are not subject to seasonal flooding by a fish bearing stream."[108] Compare this with Alternatives B and C. These would allow unlimited water withdrawals from lakes less than 5 feet deep regardless of whether the lake is connected to fish habitat.[109] The Amended Draft EIS reaches the conclusion that the despite the differences, the impacts to fish are the same because

---

[104] Amended Draft EIS p. 4-195.

[105] Amended Draft EIS p. 4-195.

[106] See amended Draft EIS p. 2-60 for a comparison of stipulation 46 and ROP E-12.

[107] Id.

[108] 1998 NE NPR-A ROD, Stipulation 20.

[109] Amended Draft EIS p. 2-17, ROP B-2.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 33 of 54

lakes that are less than 6 feet deep as some times of the year freeze to the bottom.[110] What about the biological benefits to fish in the lakes that are hydrologically connected to lakes that are less than 5 feet deep. The withdrawal of unlimited water from such lakes is not permitted in the 1998 NE NPR-A ROD. This makes sense because, logically, unlimited withdrawal from hydrologically connected shallow lakes is going to change water flow characteristics in other, fish-bearing lakes, which could interfere with fish migration and habitat in the lakes that do contain such fish, not only during periods of migration, but at other times.[111] But all the Amended Draft EIS does is conclude - without analysis - that unlimited withdrawal from five feet deep lakes does not have biological impacts.[112] Until there is analysis supporting this conclusion, no one can tell whether the impacts on fish under the different mitigation measures will be the same.

<u>Nowhere in the Amended Draft EIS is there any analysis of the impact of the many lowered levels of protection offered by Alternatives B and C that we have identified in this section. The Amended Draft EIS is incomplete and inadequate if it does not acknowledge and properly analyze the effects of such diminished protections.</u>

Even where the analysis in the Amended Draft EIS of the impacts of Alternatives B and C is not based on a comparison to the 1998 NE NPR-A ROD, it still fails to consider the actual mitigation measures proposed for Alternatives B and C. Take the discussion of impacts of Alternative B on wildlife for example. In this section it says that stipulation D-1 would "prohibit exploratory drilling in lakes streams and floodplains unless impacts to wildlife are minimal."[113] There is no mention that exploratory drilling in lakes, streams and floodplains would also be allowed if there is no feasible or prudent alternative. The Amended Draft EIS goes on to say that exploratory drilling would be limited to temporary facilities unless the lessee demonstrates that construction of permanent facilities is environmentally preferable.[114] There is no mention or

---

[110] 1998 NE NPR-A FEIS/IAP p. III-B-6. For some reason, the Amended Draft EIS cites to the 2002 Environmental Evaluation Document prepared for the proposed development of CD-3 and CD-4 as support for this proposition.

[111] Amended Draft EIS p. 4-194. The Amended Draft EIS, while discussing water resources, says that extensive use of lakes for water withdrawals could have "long term cumulative impacts on the Planning area, despite the restrictions imposed by the stipulations and ROPs."Amended Draft EIS p. 4-371 (Water resources section).

[112] Amended Draft EIS p. 4-193.

[113] Amended Draft EIS p. 4-213.

[114] Amended Draft EIS p. 4-213.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 34 of 54

discussion in the text of this section of the Amended Draft EIS that permanent facilities could be constructed to support exploration <u>if it would be more economical</u>.[115]

These conditions severely weaken the effectiveness of these two stipulations as mitigation measures. Until the actual ROPs and lease stipulations proposed for Alternatives B and C are considered, the Amended Draft EIS does not take a hard look at whether the impacts of Alternatives B and C would be the same as those under 1998 NE NPR-A ROD.

Elsewhere, instead of discussing the impacts under Alternatives B and C, the Amended Draft EIS only identifies the ROP or stipulation proposed for Alternative B and C and merely describes what the BLM intends the stipulation or ROP to do. This is simply repetition, not analysis, and it fails to account for the impacts involved. This repetitive approach is prevalent in the section discussing the impacts of Alternatives B and C on subsistence activities. That section is mostly a list of what the BLM seeks to accomplish with its proposed mitigation measures.[116] In this section, actual discussion of how a mitigation measure would reduce impacts, such as the elevating of pipelines to a minimum of 7 feet stands out because it is so rare. With the exception of this and one or two other explanations, there is no <u>analysis</u> of whether the measure would in fact accomplish its goal or how. The supposed hard look at impacts is simply a list. You can call a frog a prince, but until you analyze whether it's a frog or a prince, you'll never know which it is. The Amended Draft EIS needs to discuss how the mitigation packages in the alternatives <u>provide</u> protections, how this differs from the no action alternative, and what the different impacts would be.[117] Only then can the BLM say that it considered impacts and only then can the impacts of the proposed changes be understood.

The BLM's repeated assertion that Alternatives B and C would have no greater impacts than the status quo is also not borne out by a comparison of the stipulations themselves. Take for instance the proposed change from stipulation 27 in the 1998 NE NPR-A ROD which prohibits the construction of permanent oil and gas facilities during the exploration phase to lease stipulation D-2 in Alternative B and C which allows a lessee to build permanent exploration facilities if that would allow for more economical exploration.[118] This is a potentially radical change that would reverse standards that have prevailed on state and federal lands on the North

---

[115] Amended Draft EIS p. 2-20.

[116] Amended Draft EIS p. 4-232 & 4-233. Using the word "seek" 18 times. These pages also say that some ROPs and stipulations minimize or would minimize impacts - without explaining how.

[117] See <u>Friends of the Earth v. Hall</u>, 693 F.Supp 904, 939 (W.D. Seattle 1988).

[118] See Amended Draft EIS p. 2-52 for a side by side comparison.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 35 of 54

Slope since the 1970s. This practice was abandoned because building permanent facilities to support exploration has more impact than ice road supported construction, hands down, end of story.[119] So, how could Alternatives B and C that would allow the construction of permanent facilities during the exploration phase provide a level of protection equal to the 1998 NE NPR-A ROD? It can't. The potential that permanent roads may be used for exploration raises a whole host of other issues. Is the AO going to do a Section 810 analysis when a proposal gets made for such a facility? What about public input? The simple answer is that there apparently would be no public input. This provision essentially lets the oil industry say that if they can do something cheaper with a permanent facility, they can do so. What about environmental standards? Apparently cost counts most, since the language is not qualified. How much sense does it make to strictly regulate the size and location of development pads when an oil company can sashay in and get approval for an exploration-related pad or road just by showing that it's cheaper to do it that way? This is outrageous.

Another difference between the 1998 NE NPR-A ROD and Alternatives B and C is that only the 1998 ROD prohibits permanent oil and gas facilities within one mile of long term cabins and campsites, except that pipelines and roads would be permitted within 1/4 of a mile of such sites.[120] There is nothing like this protection in Alternatives B and C despite the fact that these sites are recognized as "a vehicle for transmitting traditional and family history and knowledge to younger generations".[121] The level of protection is just not the same.

We have only identified examples of how the Amended Draft EIS fails to analyze the differences between the 1998 NE NPR-A ROD and the mitigation packages for Alternatives B and C, how it fails to analyze the actual stipulation or ROP proposed under Alternatives B and C, and how it fails to consider the effectiveness of the stipulations and ROPs. We could not possibly identify every place in the Amended Draft EIS where these shortcoming occur. But, the point should be clear that repeating the "no greater impacts" mantra will not make it true. The Amended Draft EIS needs to be rewritten to correct these deficiencies everywhere they occur

---

[119] Regardless of the likelihood that permanent facilities would be constructed to support exploration, the fact that the BLM is even considering such a radical change from the way that exploration has been done since the earliest days on the North Slope needs explanation in the Amended Draft EIS.

[120] NE NPR-A ROD Stipulation 47. Special consultation requirements also kick in for any activities within 2 miles of a long term cabin or campsite. NE NPR-A ROD stipulation 23. There is not an equivalent in Alternatives B or C.

[121] Amended Draft EIS p. 4-236. The quoted text goes on to say that the "discontinuance of such visits would decrease social cohesion in these communities." This is a pretty dire impact, but we are being told not to worry, the level of protection is the same.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 36 of 54

before the BLM can meet its obligation to conduct an analysis of the effectiveness of the ROPs and stipulations proposed under Alternatives B and C. Only then can the BLM have made the required comparison of the effectiveness of the new regime with the effectiveness of the stipulations adopted in the 1998 NE NPR-A ROD.[122] Only then should the public be expected to comment on the impacts of the proposed amendment.[123] The public must be given another opportunity to comment when these extensive systematic and serious deficiencies are cured.

The plain and simple fact is that after the necessary and required analysis of the mitigation packages proposed for Alternatives B and C is done, the BLM will have to reach the conclusion that less protection to surface resources is provided by these alternatives than under the 1998 NE NPR-A ROD. Our organizations and the community of Nuiqsut are completely and vehemently opposed to any weakening of the protection measures that are currently in place.

### IV.  Impacts of Amending the Management of the Area Around Teshekpuk Lake

In the 1998 NE NPR-A ROD, it was decided that 589,000 acres would not be leased in the Teshekpuk Lake area and that there would be a No-Surface Occupancy strip five to six miles wide along the southern edge of the area that was not leased.[124] When the surface in this area was set aside (through the No-Surface Occupancy stipulation and the decision to withhold other parts of the area from leasing) the 1998 NE NPR-A ROD noted that this was because it:

> encompasses important goose molting areas, caribou calving and insect-relief habitat, and all of Teshekpuk Lake. It is of special importance to subsistence users because of the caribou and fish resources in the area and the long-standing subsistence use of the area.[125]

---

[122] Additionally, the ANILCA Section 810 analysis says that the differences between the 1998 NE NPR-A ROD and Alternative B (other than opening additional areas in the Teshekpuk Lake Area to surface occupancy and leasing) would not reduce the level of protection afforded. This needs to also be corrected and the analysis needs to reflect the differences between the 1998 NE NPR-A ROD and Alternative B. See Amended Draft EIS, Appendix B, p. B-8.

[123] 40 CFR 1502.9(a) "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."

[124] Amended Draft EIS, Appendix A, p. 2.

[125] 1998 NE NPR-A ROD, p. 1. See Amended Draft EIS appendix A. The Amended Draft EIS also recognizes that:

> impacts to caribou would be greatly limited [under the No Action Alternative] since permanent oil and gas surface facilities would not be permitted in the

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 37 of 54

The area withheld from leasing and the No-Surface Occupancy strip are within the Teshekpuk Lake Special Area.[126] <u>The BLM has been directed by Congress to assure maximum protection of subsistence, fish and wildlife surface values in the NPR-A's special areas.</u>[127]

    We feel very strongly that the 1998 NE NPR-A ROD correctly set aside a large part of Northeast NPR-A in the Teshekpuk Lake area from leasing and surface occupancy. We are opposed to any changes that would provide less protection to this area. But, less surface protection to this critical and sensitive area is exactly what the BLM is trying to push through this NEPA process.

    We are being told that maximum protection will still be achieved in spite of leasing 376,000 of the 589,000 acres that were not available for leasing in the 1998 ROD, and eliminating the 5 to 6 mile wide No-Surface Occupancy zone, and replacing these with a modest buffer zone around the shore of Teshekpuk Lake and the coast[128] and restrictions on surface operations listed in stipulation K-5.[129] <u>Here's the same disconnect again. We are being told that protection equivalent to the 1998 NE NPR-A ROD will be provided when it clearly won't</u>. Just on the face of the BLM's assertion the disconnect is clear because, if the 1998 NE NPR-A provided maximum protection by eliminating surface impacts, how can maximum protection be achievable by allowing surface occupancy? The two are not equivalent.

    Digging a little deeper we find that the BLM is actually proposing fewer caribou

---

    Teshekpuk Lake Surface Protection Area.

Amended Draft EIS p. 4-118. See also Amended Draft EIS p. 4-309.

[126] Amended Draft EIS, Map 1-3.

[127] 42 USCA 6504(b).

[128] See lease stipulation proposed for Alternatives B and C with a No-Occupancy Zone extending 1/4 mile inland and 3/4 of a mile into the lake itself and 3/4 of a mile from the coast (subject to feasibility and economic considerations). Amended Draft EIS p. 2-29.

[129] Amended Draft EIS p. 2-31.Amended Draft EIS p. 1-6 indicates proposed lease stipulation K-5 provides maximum protection to the caribou calving in the Teshekpuk Lake Special Area. There is no explanation how the surface occupancy allowed under lease stipulation K-5 provide maximum surface protection as compared to the 1998 NE NPR-A ROD which does not allow <u>any</u> surface occupancy.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 38 of 54

protections in the Teshekpuk Lake Special Area than it did under <u>any</u> alternative in 1998.[130] Essentially then, we find that we are losing some of even the lowest levels of protections considered in the 1998 NE NPR-A EIS/IAP. This isn't even the "environmentally responsible" leasing that the NEPDG recommended, it looks more like the leasing of additional acreage, pure and simple.

This isn't just impacts to the uplands that we are talking about. Alternatives B and C would allow leasing and ultimately development in the waters of Teshekpuk Lake. This represents yet another reversal of the protections provided in the 1998 NE NPR-A ROD. Even the Amended Draft EIS says that allowing drilling in or near Teshekpuk Lake "is less protective of water resources" than the 1998 NE NPR-A ROD because of the risk of an oil spill in the lake is greatly increased.[131] Greatly increased risk of an oil spill reaching the lake, that doesn't sound like maximum protection to us. We are concerned that exploration and development in Teshekpuk Lake will have impacts that are not discussed in the Amended Draft EIS. Would the development of a field in Teshekpuk Lake happen from platforms or bottom founded gravel structures? How would exploratory drilling take place? From the ice? Has that been done before in a confined freshwater lake? What about impacts on the use of the concentration of cabins and campsites that are located all along the shore of Teshekpuk Lake?[132]

The mitigation measures that are offered in Alternatives B and C for the protection of Teshekpuk Lake (lease stipulation K-3) are also not very reassuring. We are particularly concerned about a blow-out in the lake during broken ice conditions. Alternatives B and C would allow drilling during broken ice conditions, even without demonstrated clean-up capability, if the lessee can show that there is an alternative method to prevent a well blow out. We do not believe that there is an effective method of preventing a well blow out. We do not think that the industry does either since, as we have seen with the Alpine Satellites, ConocoPhillips always wants the capability to bring in a rig to drill a relief well in the event of a

---

[130] Alternatives D and E in the 1998 NE NPR-A EIS/IAP considered leasing between 73% and 100% of the Teshekpuk Lake Special Area and included surface restrictions that are basically identical to lease stipulations K-5. NE NPR-A ROD Lease Stipulations, 25, 29, 33, 49, 50, 52, 54, 55; 1998 NE NPR-A EIS-IAP pp. II-42 through II-48, Stipulations 24, 31, 37, 50, 53, 55, 56. In addition, more protective mitigation measures were included in stipulation 26 (2 mile buffer along the coast where only critical surface facilities would be permitted) and stipulation 28 applicable to Alternative E only (restrictions on development to the east of Teshekpuk Lake (an area that would not be leased in Alternative D considered in the 1998 NE NRP-A EIS/IAP)). Alternatives B and C do not have equivalent protections.

[131] Amended Draft EIS p. 4-178.

[132] See Amended Draft EIS Map 3-28.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 39 of 54

---

blow out. Surely if it was as simple as employing alternative methods to prevent a blowout, ConocoPhillips would not be as concerned with its capability to respond to a blow out. Not only would there be no effective clean-up capability if there was a blow-out, we have to ask if a relief well would even be possible? Maybe the BLM is willing today to take on the risk that alternative methods to prevent a blowout will not fail, but if this wasn't an environmentally responsible choice in 1998, how can the BLM say that it is an environmentally responsible choice today?

If the BLM is going to purport to consider additional environmentally responsible leasing in the Teshekpuk Lake Special Area, it must actually consider the impacts to the environment. The Amended Draft EIS fails in this task because it does not consider the impacts of additional leasing and development on the TLH and on Nuiqsut's subsistence users.

(a)  **Impacts on the Teshekpuk Lake Caribou Herd**

The Amended Draft EIS completely misses the boat when it comes to impacts to the TLH from opening up more of the area around Teshekpuk Lake to surface occupancy (i.e by leasing more acreage and by eliminating the 5 to 6 mile No-Surface occupancy buffer zone). It does this by jumping to the conclusion that the TLH will adjust to industrialization in the same way that the CAH has.[133] This jump in reasoning is fatally flawed since there is no consideration of the TLH's specific circumstances or the geographic and topographical area involved. For one, the TLH animals have proven to calve less successfully outside the area around Teshekpuk Lake that is closed to leasing and surface occupancy. According to the summer of 1997 Alaska Department of Fish and Game Caribou Survey-Inventory the calving success rate for animals that calved outside the TLH's traditional calving grounds was poor - only 8%. In the same year, calving success for the animals that did calve in the traditional calving grounds was 75%.[134] This was not a one year occurrence. As the 2003 ADFG Caribou Survey-Inventory noted, 90% of the TLH animals that calved in the area around Teskekpuk lake since 1990 did so successfully whereas the overall calving success rate for TLH caribou calves born outside the Teshekpuk Lake area during this same period drops to 25%.[135]

Both of these ADFG Caribou Inventory-Surveys are listed in the Bibliography for the Amended Draft EIS - but nowhere does the Amended Draft EIS discuss the evidence of a

---

[133] Amended Draft EIS p. 4-113.

[134] G.M. Carroll, Management Report of Survey-Inventory Activities, M.V. Hicks (editor). Alaska Department of Fish and Game, 1999, p. 213.

[135] G.M. Carroll, Management Report of Survey-Inventory Activities, M.V. Hicks (editor). Alaska Department of Fish and Game, 2003, p. 289. Available at http://www.wildlife.alaska.gov/pubs/techpubs/mgt_rpts/ca03mt-north.pdf.