Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 40 of 54

direct correlation between the TLH's calving success and the area around Teshekpuk Lake. The Amended Draft EIS does not analyze or consider the likely impacts on the TLH of deflection of pregnant cows that would be caused by industrial activities in these calving areas. All that the Amended Draft EIS says is that "[c]alving en route to calving grounds could result in reduced calf survival."[136] Duh! A statement of the obvious is no substitute for an analysis of the likely impact. This does not even begin to capture the significance of this information that the BLM had at its fingertips regarding calf survival! It is oversights like this that makes us doubt whether the BLM will fulfill its obligations under a performance based plan.

Second, the TLH's calving area seems to be much smaller than the CAH's traditional calving area.[137] With a smaller core calving area, the TLH may be more sensitive to displacement from facilities than the CAH have exhibited.[138] This was not considered in the Amended Draft EIS. A third factor, which is related to the second, is the type of habitat selected by the TLH to calve. Studies conducted since 1998 have shown that the TLH calve in areas dominated by Wet Graminoid, Moist Graminoid and Moist Tussock. Compare this with the Western Arctic Caribou Herd ("WAH") which calves in areas where Moist Dwarf-Shrub and Moist Low-Shrub dominate.[139] We could not find data detailing what vegetation type dominates the area where the CAH calve, but given the geographic similarities between where the WAH and the CAH calve, we think it is likely that they both calve in areas dominated by the same types of vegetation.[140] Until the Amended Draft EIS takes these factors into consideration, conclusory assertions that the TLH can shift its calving grounds without consequence are only wishful thinking.

A fourth difference between the CAH and the TLH are the relatively narrow strips of land to the east and west sides of the Teshekpuk Lake that are important travel corridors for

---

[136] Amended Draft EIS p. 4-111.

[137] Amended Draft EIS pp. 3-49 & 51, Calving Ground Habitat Selection: Teshekpuk Lake and Western Arctic Caribou Herds, 2001, Figs 10 & 12. Kellyhouse 2001,

[138] Amended Draft EIS. p. 4-210.

[139] Calving Ground Habitat Selection: Teshekpuk Lake and Western Arctic Caribou Herds, 2001, Figs 10 & 12. Kellyhouse 2001.

[140] The cumulative impacts section of the Amended Draft EIS says that it is predicted that climate change will increase the abundance of deciduous shrubs. Amended Draft EIS p. 4-390. The Amended Draft EIS says that climate change may cause caribou calving areas to shift, but there is no analysis whether global climate change will obliterate preferred calving habitat or what impacts that will have on caribou calving.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 41 of 54

caribou moving between the north and south of the lake.[141] These are areas where the entire TLH herd may pass through in large groups. We are not aware of any similar pinch points in the CAH's range, so this makes the TLH unique. How would large numbers of caribou react to infrastructure inside these pinch points? It is simply not enough to say that the conventional wisdom about mitigating impacts of industrialization applies to such areas.[142]

Finally, animals from the TLH overwinter in on the Arctic Coastal Plain more frequently and in greater numbers than the CAH. This means that animals from the TLH are more likely to encounter winter exploration than the CAH and will encounter permanent facilities year-round. What are the impacts increasing the frequency of winter encounters between caribou and oil and gas activities? What happens if these impact are spread across a significant portion of the TLH herd instead of on the relatively few stragglers from the CAH that remain on the Arctic Coastal Plain all winter?

Until the BLM has considered all of these factors, it has not taken a hard look at the impacts on the TLH of opening up more of the area around Teshekpuk Lake to surface occupancy. If the BLM insists on proceeding with this amendment process, the Amended Draft EIS needs to be revised to take these factors into account.[143]

**(b)    Impacts to Nuiqsut's Subsistence Activities**

The impacts of leasing additional areas around Teshekpuk Lake and removing the No-Surface Occupancy buffer on our subsistence activities are not considered in the Amended Draft EIS. This is because the Amended Draft EIS mistakenly says that Nuiqsut's residents do not use the Teshekpuk Lake area for subsistence activities.[144] This is inconsistent with Map 3-34[145] which shows that we do harvest caribou from all sides of Teshekpuk Lake except the west

---

[141] Amended Draft EIS p. 4-49.

[142] See Cronin, M.A., W.B. Ballard, J. Truett, and R. Pollard, 1994, p. 8, Mitigation of the Effects of Oil Field Development and Transportation Corridors on Caribou. Unpublished report sponsored by Alaska Oil and Gas Accoc.

[143] 40 CFR 1502.9(a) "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion."

[144] See Amended Draft EIS p. 3-83. See also Amended Draft EIS p. 4-229 "Hunters from Barrow and Atqasuk would be affected by development north and west of Teshekpuk Lake, where numerous subsistence camps, cabins and ice cellars are located."

[145] See also 1998 NE NPR-A EIS/IAP p. III-C-26.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 42 of 54

side. It is also inconsistent with what we and the people of Nuiqsut have periodically told the BLM, which is that the area around Teshekpuk Lake is used by Nuiqsut's residents for subsistence activities, and it is inconsistent with the direct personal knowledge and experience of all the signers of this letter.

Perhaps, the Amended Draft EIS discounted the importance of the Teshekpuk Lake area to Nuiqsut's hunters because we harvest caribou from this area with less frequency than other areas closer to Nuiqsut.[146] But, that is not a reason to drop impacts to Nuiqsut from the analysis. Areas that are used infrequently for subsistence activities can be "important harvest areas when they are used."[147] As explained in Nuiqsut Paisanich, A Cultural Plan

> Because of these seasonal and cyclic variations in wild resource patterns (as well as imposed hunting restrictions, Nuiqsut hunters must be flexible. If a primary resource fails, "normal" subsistence rounds may be completely changed, forcing reliance on different geographical areas and animal species. This explains why the hunting landscape must be extensive - in effect, an open range based on biological factors rather than modern land classifications.[148]

So, it is just plain wrong to say that Nuiqsut's residents harvest few caribou in the Teshekpuk Lake area and so leasing will not impact Nuiqsut's subsistence harvest activities directly.

Not only were we incorrectly cut out of the analysis of the impacts that allowing more surface occupancy in the Teshekpuk Lake Special Area would have on subsistence, the analysis of the impacts to subsistence is also deficient. This is because the impacts of roadless development in this area are not analyzed. All that the Amended Draft EIS says is that:

---

[146] See appendix J, p. J-33 for a comparison of the percentage caribou harvested by Nuiqsut residents broken down by area. This comparison chart also has a large percentage of caribou harvests falling into the "unknown" category and it is not based on the total harvest numbers for Nuiqsut, and so the relatively low percentage of caribou shown as harvested in the Teshekpuk Lake Area is not definitive. We note that there is not a similar break down for the other communities on the North Slope that also rely on the Teshekpuk Lake area for their caribou harvest.

[147] Amended Draft EIS p. 3-71.

[148] Arctic Environmental Information and Data Center-under the auspices of the North Slope Borough–1979. "Paisanich" means "heritage. The North Slope Borough Planning Commission adopted Resolution No. 95-05, endorsing Nuiqsut Paisanich, A Cultural Plan, as the "establishing the guiding principles for Nuiqsut development."

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 43 of 54

> Nuiqsut subsistence users have repeatedly stated during scoping meetings that air traffic
> reduces harvest access and success. The opening of the areas north and west of
> Teshekpuk Lake could increase the amount of aircraft disturbance to subsistence species,
> relative to the No Action Alternative. . ..[149]

That doesn't really tell us anything. The severity of the impact is a function of the amount of air
traffic. Will air traffic increase from one flight a week over the Teshekpuk Lake Special Area to
two flights per week, or to 100 flights per week?  Other than some discussion in the cumulative
impacts section that is based on unsupported an unrealistically low estimates of the number of
flights that a roadless facility would require[150] there is no estimate of the number of flights
needed to develop and support roadless facilities in the Teshekpuk Lake Special Area. In order to
accurately consider the impacts of roadless development in the Teshekpuk Lake Area, or
anywhere else in the Northeast NPR-A for that matter, the Amended Draft EIS needs to consider
the actual amount of aircraft disturbance and not provide some meaningless statement that
aircraft traffic will increase.[151]

> The BLM's advances no valid reason for the proposed reversal in the management
of the area around Teskekpuk Lake which is not surprising since, as we discussed in section II of
this letter, policy, not reason, is driving the BLM to consider additional leasing and to eliminate
the No-Surface Occupancy strip in the Teshekpuk Lake Area.  We have already explained that
satisfying the whims of the current Presidential administration is not a proper basis for the BLM
to reverse its current management of the Northeast NPR-A. But, if the BLM insists on
proceeding with its plans to amend this management plan, then it must consider the impacts of
this change on the TLH and on our subsistence activities in a revised Amended Draft EIS.

---

[149] Amended Draft EIS p. 4-227 & 228.

[150] Amended Draft EIS is at page 4-382. This says that if two major roadless
developments (2 CPFs, each with 5 satellites) are built at the same time then "approximately 28
to 56 round trips [via aircraft] per month could be required during the development period and 12
to 28 round trips per month could be required during the production period." Based on our direct
experience, this estimate is complete and utter nonsense. The development of the Alpine CPF
and its satellite at CD-2 required more than 400 round trips during some months, and even after
start-up of both the Alpine CPF and CD-2 the Alpine airstrip still received over 125 round trip
flights per month. (See footnote 153 below).

[151] Estimates of the number of air craft flight necessary to develop and operate roadless
facilities in the NPR-A should be based on actual experiences with the construction and
operation of the Alpine development. A partial summary of Alpine's aircraft flights can be found
in the June 2002 Colville River Unit Satellite Development Revised EED, p. 2-33 (depicting the
number of round trips to Alpine between May 2000 and February 2002.)

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 44 of 54

_____

## V.    The Sociocultural Impacts of Amending The Draft EIS

The essence of our interests in the management of the Northeast NPR-A stems from our concerns about the sociocultural impacts of changes in the management of the Northeast NPR-A. The health and well being of the residents of Nuiqsut is tied closely to subsistence activities that take place throughout our subsistence range. Subsistence provides sustenance to Nuiqsut's residents.[152] But it's more than that, as explained in the Nuiqsut Paisanich:

> Today, as in the past, subsistence harvest of wild resources is the central occupation of traditionalist Inupiat. Most of the people in Nuiqsut and other northern Alaska villages are traditionalists. Despite their acceptance of many elements of Euro-American culture, technology and economy, these people continue to participate in and depend on the subsistence way of life, either as hunters or as sponsors and sharers of the hunt. Subsistence provides such necessities as food and clothing, and it organizes the people's lives seasonally, socially, and ceremonially in the defining patterns of their culture.[153]

Subsistence activities are the vehicle through which we pass our culture and our values onto the next generation.[154] It is also through the subsistence harvest that successful hunters are able engage in the sharing of meat, a tradition that is a significant part of our culture and that is key to the cohesiveness of families and communities. Because of the connections between sociocultural impacts and impacts to subsistence, these are discussed together in our comments.[155]

So, what impacts on our culture does the Amended Draft EIS acknowledge will occur as a result of amending the management of the Northeast NPR-A? According to the Amended Draft EIS, the impacts of Alternative B "would be greater in intensity, area, and

_____

[152] See Amended Draft EIS p. 3-82 for Nuiqsut's annual subsistence harvest.

[153] Nuiqsut Paisanich, p. 25.

[154] Amended Draft EIS p. 3-87. Somehow, basic statements of fact like this one in the Affected Environment Section are changed into "perceptions" of Nuiqsut's residents in the Environmental Consequences Section. See e.g. p 4-145 "Nuiqsut residents perceive direct connections between the general well-being of their community and subsistence harvests." This change from fact to perceptions consistently downplays the impacts of oil and gas development on Nuiqsut.

[155] The ties between the Inupiat's culture and subsistence is discussed at pages 3-87 through 3-89 of the Amended Draft EIS.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 45 of 54

duration" than impacts under the current management of the Northeast NPR-A.[156] This is a pretty
bland statement and gives no sense of the degree of difference in impacts, which surely is a
significant part of what any decision-maker needs to know in deciding what is required by the
"maximum protection" required by Congress for subsistence, fish and wildlife surface values in
the Teshekpuk Lake Special Area.[157] Or to decide whether a decision will have the least averse
impact as possible on subsistence uses.[158] Looking on a little further we see that:

> The roadless development proposed for the Planning Area would require increased
> staging and overland travel during the winter, and in summer would require increased use
> of aircraft for supplies, equipment, and crew changes, as compared to the No Action
> Alternative. In all seasons, noise, lights, personnel, and traffic near oil and gas-related
> infrastructure could temporarily deflect or divert caribou in areas where activities are
> occurring; however, gravel pads could attract caribou during some seasons as insect-relief
> habitat. These effects could change the distribution, timing, and location of the caribou
> harvest, which could require increased effort and expenditure on the part of subsistence
> hunters, resulting in sociocultural consequences such as increased stress and a decreased
> sense of well being. Increased fuel costs and wear and tear on equipment would increase
> the need for wage labor to support subsistence pursuits and reduce the time available to
> pursue these activities, which would also result in sociocultural consequences, such as
> increased stress and a decreased sense of well-being. Increases in the speed, range, and
> reliability of outboards and snowmachines have facilitated the mixed subsistence and
> wage economy, but are unable to compensate for continued development and production
> activities in important subsistence harvest areas. (Emphasis added.)[159]

This is also pretty uninformative. It tells us that increased activity will occur outside the village
which may lead to "increased stress" or a "decreased sense of well being." These are pretty
vague concepts and, again, give the decision-maker on the ROD no sense of the difference in
impact between the present and the proposed regimes. The impacts of oil development since
Prudhoe Bay have been increases in alcoholism, higher levels of suicide and accelerating
westernization and acculturation. Talking about those changes and "increased stress" or a
"decreased sense of well being" in the same breath practically mocks the impacts that our people
and culture are undergoing. Reading the Amended Draft EIS, it almost sounds as though a
psychologist and Prozac are suitable mitigation measures. This is nonsense and does not remotely

---

[156] Amended Draft EIS p. 4-234.

[157] 42 USCA 6504(b).

[158] 16 USCA 3112(1).

[159] Amended Draft EIS p. 4-234.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 46 of 54

approach the type of analysis and discussion required by NEPA, particularly in light of the decreased level of protections offered by the Preferred Alternative in many areas, as discussed above.

The quoted text does a little better when it comes to economic consequences. It tells us that we may need to travel farther and at an increased cost in order to harvest caribou, but these are statements of the obvious. It does not tell us how much farther and at what extra cost. Nowhere does the text try to grapple with the differences that would be caused by the lower levels of protection to our lands and subsistence resources that would be afforded by Alternative B and C. Given Congress' mandate for "maximum protection,"[160] and the least averse impacts on subsistence, the BLM's preference for after-the-fact monitoring instead of prescription poses especially great risks. The ROP's "close the door after the cow is out" approach[161] poses huge risks for our subsistence resources, our culture, and our people, but this is the low level of the analysis.

Unlike the prior uninformative statements in the course of the analysis portion of the sociocultural text, the conclusion of the sociocultural impacts section for Alternative B indicates that there can be impacts on "social cohesion". The conclusion also says that "[a]s harvests decreased, resources would no longer be available in amounts suitable for sharing, resulting in changes in social organization and cultural values."[162] We think that this is more like the sociocultural impacts that we are facing, but these are just conclusions. Where's the analysis to support them? Where in the Amended Draft EIS are we told that we can expect our harvest of subsistence resources to drop? How are we told that social cohesion will unravel?

Given the absence of real analysis in the body of the sociocultural analysis, we have to wonder what's going on here. It's certainly a lot easier to slip something controversial into the conclusion than to explain the underlying basis for that conclusion in the main part of the section. After all, in the descriptive and analytical parts of the discussion, people expect to see detail and the type of discussion of information that would actually inform a reader. We understand that this is a rush process, as all of BLM's oil and gas-related work on the North Slope seems to be recently. However, the BLM needs to provide that analysis and description and take into account the very real differences in impacts that we have identified in this letter and in our prior scoping letter.

What the Amended Draft EIS needs to analyze is how oil and gas activities

---

[160] 42 USCA 6504(b).

[161] See discussion in section IV, above.

[162] Amended Draft EIS p. 4-236.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 47 of 54

outside the village are impacting us and how those impacts would be different under the decreased level of protections and the greater development of areas critical to our subsistence resources. Less undeveloped areas means greater concentration of effort in those areas and the potential for conflict within our community and between Nuiqsut and other communities if development in the Northeast NPR-A eventually becomes even halfway as successful and extensive as it has been in the Kuparuk area, let alone the Prudhoe Bay area. We already know that oil and gas activities impact us directly because we are avoiding permanent facilities while hunting.

In the Description of the Affected Environment section, the Amended Draft EIS acknowledges that hunters <u>are</u> avoiding areas occupied by oil and gas infrastructure.[163] The Amended Draft EIS even attempts to quantify, for the first time that we have seen, the size of the area being avoided. It says that household surveys[164] in 1993 and 1994 showed that Nuiqsut residents harvested 0% of their caribou within industrialized areas, 4% of their caribou within 5 miles of industrialized areas, 17% of their caribou 6 to 15 miles from developed areas and 79% of their caribou 16 miles or more distant from developed areas. More recent household surveys were done between June 1999 and May 2000. These indicate that Nuiqust residents continue to harvest 0% of their caribou within developed areas, the percent of caribou harvested within 5 miles of developed areas had jumped from 4% to 22%, the remaining 78% were harvested more than 5 miles away from development.  The jump in the percentage of caribou harvested less than 5 miles away from development is attributed to the construction of the Alpine facilities in the Colville River Delta, an area where Nuiqsut's residents harvest a substantial number of caribou between June and September.[165] The percentage of caribou harvested within 5 to 16 miles of Alpine was 27%. 51% of the caribou were harvested 16 or more miles away from development.

These surveys have their limitations though, since the "development of Alpine is too recent and there is insufficient data available to conclude whether harvesters will increase their distance from development in response to this relatively new facility."[166] Nor were impacts being felt from the development of Meltwater or Tarn, the newest, and now closest developments

---

[163] Amended Draft EIS p. 3-85.

[164] For reasons explained in March 8, 2004 Letter Commenting on the Alpine Satellites Draft EIS, p. 40, household surveys are not the best way to conduct research into the areas where Nuiqsut's residents are harvesting caribou. We continue think that data gathered through surveys will only lead to underestimates of the impacts.

[165] Amended Draft EIS p. 3-86.

[166] Amended Draft EIS p. 3-86.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 48 of 54

to the east of Nuiqsut.[167] So, while the surveys may shed light on the how wide of an area is being avoided, they do not indicate how Nuiqsut's residents have adjusted to Alpine or the other recent development near the village.

Unbelievably, these surveys, for what they are worth, were not made a central part of the "analysis" of impacts on subsistence activities in the Amended Draft EIS. Instead, for Alternatives B and C, the Amended Draft EIS only confirms that avoidance is happening and summarizes the avoidance distances noted in 1993-1994 and 1999-2000 surveys.[168] This type of uninformative recital isn't analysis that helps the BLM or anyone else understand the likely impacts under the BLM's proposed performance-based mitigation package or the impacts of the different leasing scenarios under Alternatives B or C. Put as many points as there are expected production drill pads under the three alternatives[169] anywhere on a map of the Northeast NPR-A and shade in an area 16 miles in any direction from those points, and you begin to see the scope of impacts that we are concerned about. The areas potentially affected are enormous and represent potentially a majority of that portion of our subsistence range that is presently undeveloped.

Allowing development into the core areas now off-limits at Teshekpuk Lake would dramatically decrease core areas where these kinds of avoidance by definition will not occur. The Draft EIS does not acknowledge these impacts. Nor does it take any account of how avoidance of additional areas as a result of Stipulation D-2, with its permission to develop permanent facilities for exploration (if that is more economical), will impact the sociocultural health of our community. Putting a road into NPR-A, with potential public access into the heart of our remaining traditional range, would have enormous impacts, but one would never have any concept that this was a possibility from the Amended Draft EIS. How about avoidance for 16 miles in any direction from a road stretching far into NPR-A. The calculations are simple enough to do, but apparently the Amended Draft EIS would prefer not to include them because they interfere with the pre-ordained result of imposing these ROPs, opening 487,000 additional acres to leasing and the neat, but fallacious conclusion there's no problem here because the level of protections under the Preferred Alternative is equivalent or greater to that under the present regime.[170] How this type of analysis was not made part of the Amended Draft EIS is completely

[167] Amended Draft EIS p. 3-87.

[168] Amended Draft EIS p. 4-229. "Subsistence users tend to avoid areas of oil infrastructure and activities for the reasons noted in No Action Alternative" See also p. 4-310.

[169] Amended Draft EIS p. 4-35.

[170] Amended Draft pp.2-11, 4-231 & 4-312 (the BLM holds that performance based stipulations and Required Operating Procedures will provide equivalent protection [to

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 49 of 54

baffling, since we stressed in our scoping letter the significance of hunter avoidance.[171]

All that the Amended Draft EIS has to say about the cumulative impacts of subsistence user avoidance is:

> The continued expansion of this activity [oil and gas development] across the Arctic Coastal Plain from Prudhoe Bay westward could increase the area considered off-limits by resource users . . ..[172]

That's it. This is not analysis. Instead, it is once again stating the obvious, which is that impacts follow from development. Anyone can tell you that the proportion of Nuiqsut's subsistence range that is avoided because it is occupied by oil and gas infrastructure will only get larger, not smaller. But, where is the analysis of the cumulative impacts that have already mounted from Alpine which is only 8 miles from the village and from the extensive development to the east? What about the cumulative impacts from the likely approval and construction of the Alpine Satellites to the north and to the west of Nuiqsut? We think that it should be pretty obvious that areas in our subsistence range where we can harvest caribou without encountering oil and gas infrastructure are increasing in importance and will continue to shrink in size.[173]  It naturally follows that additional leasing in the Teshekpuk Lake area, and removing the No-Surface Occupancy strip to the south of the no leasing zone is going to have a profound impact on how and where we hunt. None of this was considered in the Amended Draft EIS.

The avoidance of developed areas by subsistence users has other impacts as well. There is the increased fuel and equipment maintenance costs that hunters incur if they travel farther than normal in order to hunt in an area where oil and gas infrastructure will not be encountered. There is also the time that is taken away from subsistence pursuits to participate in the wage economy in order to pay for these increased costs. These are acknowledged in the Amended Draft EIS as impacts, but there is nothing that even resembles analysis of the increased costs or time taken away from subsistence activities. Such analysis would have to build on a real

---

subsistence].); p. 4-235 & 4-314  (the BLM proposed the new approach to mitigative measures in order to achieve equivalent protection [from sociocultural impacts.]) p. 4-145 "The BLM holds that the new approach will provide equivalent protection with more flexibility."

[171]  NE NPR-A Scoping Letter pp. 29-31.

[172]  Amended Draft EIS p. 4-402.

[173]  We brought this up in our NE NPR-A Scoping Letter. See p. 6.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 50 of 54

analysis of the avoidance problem, but even that first building block is conspicuously absent.[174]

       Avoidance of additional development (including permanent facilities built for exploration because that was more economical) may also impact hunter success. When that happens, impacts on harvest success will be felt first in the institution of sharing. As the Alpine Satellite Draft EIS points out:

> The sharing of subsistence foods is essential to the maintenance of family ties, kinship networks and community well being. Disruption of subsistence-harvest patterns could alter these cultural values and affect community social structure. For the system of sharing to operate properly, some households must consistently produce a surplus of subsistence goods. For this reason, <u>the supply of subsistence foods in the sharing network is more sensitive to harvest disruptions than the actual harvest and consumption of these foods by the primary producer.</u> (Emphasis Added.)[175]

There is an apparent recent trend towards reduced sharing of subsistence resources in Nuiqsut. We first saw an indication that this was happening in the "Sociocultural Impacts of the Alpine Field on the Colville River Community of Nuiqsut: An Initial Assessment," prepared for Phillips (now ConocoPhillips) by Circumpolar Research Associates ("Alpine Sociocultural Impacts Study").[176] That a decline in the sharing of subsistence resources is happening in Nuiqsut is

---

[174] We identified these as impacts in our NE NPR-A Scoping Letter. See p. 29 -32. We have raised these issues in other comment letters as well. See March 6, 2004 Letter Commenting on the Alpine Satellite Development Plan (CD-3, 4, 5, 6 & 7) Draft EIS, pp. 39-41; Kuukpik and KSOP's March 31, 2003 Letter Providing Scoping Comments on the Alpine Satellite Development Plan (CD-3, 4, 5, 6 & 7) pp. 7 - 8; March 6, 2002 Letter Commenting on the Alpine Satellite Development Plan (CD 3 and 4) pp. 17 - 18, and 25; Kuukpik and KSOP's April 2, 2003 Letter Commenting on the Northwest NPR-A Draft EIS pp. 6 - 7.

[175] Alpine Satellite Draft EIS p. 4A.4-1 to 2. The Amended Draft EIS notes the importance of the sharing of subsistence resources but as a manifestation of the cultural value that we place on kinship and family relations. p. 3-88. We think that the quoted passage from the Alpine Satellite Draft EIS more accurately describes the importance of sharing subsistence resources as one of the practices that leads to family and community cohesion. The Amended Draft EIS does not appear to get the connection and in the Unavoidable Adverse Effects Section it concludes that some "cultural values, such as sharing, could be reinforced by shortages in the short term, but could be strained after several seasons of harvest shortages." Amended Draft EIS p. 4-423.

[176] The Alpine Sociocultural Impacts Study is attached to our March 6, 2002 satellite comment letter as document number 5. The study was released in 2002.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 51 of 54

confirmed in the North Slope Borough's 2003 Economic Profile and Census Report (in press).
With a reduced amount of sharing already becoming apparent, casual conclusions that "[a]s
harvests decreased, resources would no longer be available in amounts suitable for sharing,
resulting in changes in social organization and cultural values" just are not acceptable.[177]

As the people who are going to feel the impacts of the increased development and
decreased surface protections if the 1998 NE NPR-A ROD is changed to look like Alternative B
or C, we hoped to see the BLM take mitigation of the impacts to subsistence activities seriously.
It's an understatement to say that we have been let down. It is also apparent that amending the
management of the Northeast NPR-A to meet Presidential policy goals is overriding
Congressional intent that management of federal lands have the "least adverse impact possible on
rural residents who depend upon subsistence uses of the resources of such lands."[178]

The primary mitigation proposed by the BLM for all of these impacts is
consultation with the effected communities, primarily under ROPs H-1 and H-2. The Amended
Draft EIS has this to say about how the mitigation proposed for Alternatives B would limit
impacts to subsistence activities:

ROPs (e.g. H-1 and H-2) would minimize conflicts between subsistence uses and oil and
gas related activities.[179]

And

Required operating procedures H-1 and H-2 are subsistence-specific mitigation
procedures designed to provide opportunities for participation in planning and decision-
making to prevent unreasonable conflicts between subsistence users and oil and gas-
related activities including seismic operations.[180]

---

[177] Amended Draft EIS p. 4-236.

[178] 16 U.S.C. 3112(1).

[179] Amended Draft EIS p. 4-231.

[180] Amended Draft EIS p. 4-232 and 233.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 52 of 54

_____

We see this again in the ANILCA Section 810 analysis where it says:

> Stipulation H [SIC][181] and ROPs H-1 and H-2 would be the primary mitigation measures in place to ensure adequate access to traditional hunting areas by the residents of Nuiqsut, Barrow, and Atqasuk in the Teshekpuk Lake Special Area. (Emphasis added).[182]

What besides wishful thinking has brought the BLM to the conclusion that consultation will mitigate the avoidance of oil and gas facilities by subsistence users and the increased impacts caused by opening all of these additional areas to industrialization?[183] There is no reason to believe that consultation will be as effective a mitigation measure as the BLM says. The effectiveness of a consultation requirement is pretty dubious since the BLM has acknowledged that amending the 1998 NE NPR-A will create an insurmountable rift between it and the people of the North Slope.[184] We've seen a certain amount of consultation with us and the community of Nuiqsut as part of this amendment process, but since the BLM has basically ignored pretty well everything that we've said and gone on and done what it wants to regardless of our protests, it's pretty clear that all the consultation in the world doesn't provide for practical protections or effect. All that "consultation" means is that we'll be better informed about what BLM plans to do to us or allow others to do to us. This process seems more politically motivated and pro-industry than it seems an even-handed, open-minded administrative process. We

_____

[181] There is not a "stipulation H". See Amended Draft EIS pp. 2-24 & 25.

[182] Appendix B, pp. B-9 & B-11.

[183] Maybe it is easy to reach this conclusion because there is basically no analysis of the impacts supposedly being mitigated. It only makes sense though that the impacts need to be understood before the effectiveness of mitigation measures can be evaluated. In fact, we pointed out in our NE NPR-A scoping letter how the consultation requirement in the 1998 NE NPR-A ROD has already suffered significant failures and urged that the consultation requirements be strengthened. NE NPR-A Scoping Letter p. 37. See also Kuukpik and KSOP's April 2, 2003 letter Commenting on the NW NPR-A Draft EIS, pp. 17 - 20.

[184] The Amended Draft EIS says that if such a discovery were to occur in the Teshekpuk Lake Special Area then a compromise might be reached on mitigation. Amended Draft EIS p. 4-35. But that's just it, compromising on mitigation will provide less protection to subsistence species and to our subsistence activities. We aren't going to get back to the same level of protection for the Teshekpuk Lake Special Area that we have today. If this planning process and the planning process that we are currently going through for the Alpine Satellites are any indication of what we can expect in the future, the possibilities are not promising that there will be compromised mitigation measures with the BLM or with the industry that provides the level of protection to subsistence activities that we find acceptable.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 53 of 54

certainly are not convinced that consultation gives us anything in substantive terms. The real
concerns of the local people affected by the BLM's decisions continue to go unheard.

Not only has the BLM unilaterally decided that consultation will be a sufficiently
effective way to mitigate impacts on subsistence activities, but Alternatives B and C would also
eliminate the requirement in the 1998 NE NPR-A ROD that lessees establish procedures for the
entrance to facilities, the use of roads, and the discharge of firearms that would be distributed to
the local people.[185] This is a step backwards as far mitigation of impacts to subsistence goes, yet
the Amended Draft EIS is telling us, once again, that the mitigation packages for Alternatives B
and C are "intended to protect subsistence resources to the same extent as" the 1998 NE NPR-A
ROD.[186] If this was true then why is a full blown amendment process even necessary?

The Amended Draft EIS almost says enough about sociocultural and subsistence
impacts to make it look as though it is analyzing the proposed changes to the management of the
Northeast NPR-A. But, when reviewed a little closer, we see that there are conclusions and
information, but basically no analysis. This is not the hard look at these impacts that NEPA
requires. Additionally, the BLM suggests that it can mitigate impacts to subsistence activities
with a consultation requirement. That is just wishful thinking, and the Amended Draft EIS and
ANILCA Section 810 Analysis need to be revised to reflect this.

**VI.    Conclusion**

We see so many problems with the Amended Draft EIS that we believe that, after
revisions, it will need to go out to public comment again if the public is to have the required
meaningful opportunity to comment on the proposed action.  Given the unspoken industry-
friendly policy change driving this process and the pre-ordained result, as well as the enormous
gaps in analysis and content that we have demonstrated above, the Amended Draft EIS seems
more like an exercise in wishful thinking on the BLM's part than the sort of thorough and
objective document contemplated by NEPA.  We think that it is grossly deficient, incomplete and
unresponsive to the concerns previously expressed by the people of Nuiqsut, who are in the
unenviable position of being those who will be most affected by the proposed action.

Our feelings are strong. Consultation only has mitigation value when the
consulting party has a willingness to actually make changes in response to the information
received. Recall the BLM's failure to discuss or even notify the Subsistence Advisory Panel of its
plan to initiate this amendment process and you can see how limited is the value of consultation
as mitigation in these circumstances. We are disappointed that BLM as a governmental

---

[185] NE NPR-A ROD Stipulation 60.

[186] Amended Draft EIS p. 4-231.

Letter to the BLM Commenting
on the Amended Draft NE NPR-A EIS/IAP
Page 54 of 54

institution has failed to meet its obligations because it has been biased towards allowing more development. This whole process was doomed to fail from the beginning because of the BLM's pro-oil industry bias. Nevertheless, we wish to acknowledge that the rank and file BLM personnel with whom we have dealt have been courteous throughout and have done their best in a most difficult situation.  We thank you for considering our comments.

KUUKPIK CORPORATION


_____            _____
DATE                           BY:  ISAAC NUKAPIGAK
                               ITS:  PRESIDENT


                               NATIVE VILLAGE OF NUIQSUT


_____            _____
DATE                           BY:  BERNICE KAIGELAK
                               ITS:  VICE-PRESIDENT


                               CITY OF NUIQSUT


_____            _____
DATE                           BY:  ROSEMARY AHTUANGAUAK
                               ITS:  MAYOR


                               KUUKPIKMIUT SUBSISTENCE OVERSIGHT PANEL


_____            _____
DATE                           BY:  LEONARD LAMPE
                               ITS:  VICE-CHAIRMAN


cc:    Honorable George Ahmaogak, Sr., Mayor, North Slope Borough Mayor
       Mr. Rex Okakok, Sr., North Slope Borough Planning Dept.
       Arnold Brower Jr., ICAS

~~Bureau of Land Management~~    Letter to the BLM Commenting
~~Alpine Satellite Draft EIS~~    on the Amended Draft NE NPRA-A EIS/IAP
Page 54 of 54

institution has failed to meet its obligations because it has been biased towards allowing more development. This whole process was doomed to fail from the beginning because of the BLM's pro-oil industry bias. Nevertheless, we wish to acknowledge that the rank and file BLM personnel with whom we have dealt have been courteous throughout and have done their best in a most difficult situation. We thank you for considering our comments.

KUUKPIK CORPORATION

8/23/04
DATE

BY:   ISAAC NUKAPIGAK
ITS:  PRESIDENT

NATIVE VILLAGE OF NUIQSUT

8/23/04
DATE

BY:   BERNICE KAIGELAK
ITS:  VICE-PRESIDENT

CITY OF NUIQSUT

8/23/04
DATE

BY:   ROSEMARY AHTUANGARUAK
ITS:  MAYOR

KUUKPIKMIUT SUBSISTENCE OVERSIGHT PANEL

Aug. 23, 2004
DATE

BY:   LEONARD LAMPE
ITS:  VICE-CHAIRMAN

cc:   Honorable George Ahmaogak, Sr., Mayor, North Slope Borough Mayor
      Mr. Rex Okakok, Sr., North Slope Borough Planning Dept.
      Arnold Brower Jr., ICAS



**KUUKPIK CORPORATION**

P.O. Box 89187
Nuiqsut, Alaska 99789-0187
TEL: (907) 480-6220
FAX: (907) 480-6126

January 6, 2004

**FAX (907) 271-5479**

NE NPR-A Amendment Planning Team
Bureau of Land Management
Alaska State Office (930)
222 West 7th Avenue
Anchorage, AK 99513-7599

Attention:    Susan Childs and Curtis Wilson
              Project Manager

Re:    Request for Authority to Amend the 1998 Northeast NPR-A EIS/IAP and ROP

Dear Ms. Childs and Mr. Wilson:

We have complained before, in our October 31 scoping letter that this whole amendment process is being rushed and that it does not give the people of Nuiqsut and our local Nuiqsut organizations adequate time to see the final ROPS for the Northwest NPR-A, let alone think through the implications of conforming the requirements for the Northeast Planning Area to the as yet unfinalized Northwest ROPS. BLM's rush to hold a workshop earlier this month with state and local agencies and organizations before the ROPS for the Northwest Planning Area or its Record of Decision were even complete and before anyone had had a chance to review the 2,000 page final Northwest EIS itself seems part of the same pattern. The risk of being in a rush is that issues or concerns will be overlooked. We think that this rush to BLM's goal has obscured to date the fundamental question of whether or not this "amendment" process is even authorized or proper.

It seems to us that the BLM's proposed amendment of the 1998 Northeast NPR-A EIS/IAP and ROD has no legal authority or precedent. Initially, new studies and a couple of years of exploratory field experience, then the President's National Energy Policy, and, only recently, section 604 of the 2000 amendment to the Energy Policy and Conservation Act ("EPCA"), codified at 42 USCS 6217) have all been given to us by the BLM as reasons driving this "amendment" process. Our October 31, 2003 scoping letter challenged whether there were sufficient new studies or sufficient field experience to meet the requirements of the first of those standards. The President's National Energy Policy does not itself amend NEPA or provide authority for this process. Only after the challenge in our scoping letter did we hear for the first

Document No. _1_
Page _1_ of _3_

**Exhibit 32, page 57 of 61**

NE NPR-A Amendment Planning Team
January 6, 2004
Page 2

time that EPCA was a basis for this process. Nowhere, however, have we been given an explanation of how these, or any other authorities, authorize the process started by the BLM to amend the 1998 Northeast NPR-A EIS/IAP and ROD.

There are some additional problems raised by the fact that, as far as we can tell, EPCA was used as a reason for amending the Northeast NPR-A EIS/IAP and ROD for the first time at our meeting on December 3rd 2003, a little over one month after the scoping deadline. Accordingly, we, and presumably other agencies and members of the public who are interested in the BLM's management of the NPR-A, were not given the opportunity to provide scoping comments on the relevance of section 604 of the 2000 amendment to EPCA. We think that this is a significant flaw in the BLM's scoping process (although presumably the question of whether BLM has the legal authority to undertake this process at all could be raised at any time).

Putting aside this flaw for the moment, we are particularly puzzled by the BLM's recent citation to EPCA. The plain language of Section 604 of the 2000 amendment to EPCA calls for the "inventory" of restrictions and impediments to the development of resources. We fail to see how this directive to take inventory can be interpreted as a mandate from Congress to change the current management of the Northeast NPR-A. Our reading of EPCA is consistent with the EPCA inventory done by BLM for the oil and gas producing basins in Montana, Wyoming, Colorado and New Mexico.[1] This inventory resulted in a report that could be used to examine land management decisions. No changes to existing land management decisions were made in the report. This is what we think Congress intended when it amended EPCA in 2000.

We don't see any precedent or authority in EPCA, the President's National Energy Policy or anyplace else for the "amendment" process which BLM has undertaken. For these reasons, by this letter we are asking BLM to explain to us and to the community of Nuiqsut on what authority BLM is relying for BLM's proposed amendment of the 1998 Northeast NPR-A EIS/IAP and ROD. It would also help us understand on what authority and precedent the BLM is relying if the BLM would direct us to other available EISs and management plans that were amended under the same authority and under similar circumstances.

---

[1] http://momentum.doi.gov/epca/Cover.pdf

Document No. 1
Page 2 of 3

NE NPR-A Amendment Planning Team
January 6, 2004
Page 3

_____

        If you have any questions, please contact Brian Boyd or Brent Edwards at 272-8401.

                    **KUUKPIK CORPORATION**

1-7-04
DATE

                    BY:  ISAAC NUKAPIGAK
                    ITS:  PRESIDENT

                    **NATIVE VILLAGE OF NUIQSUT**

1-6-04
DATE

                    BY:  BERNICE KAIGELAK
                    ITS:  VICE-CHAIRWOMAN

                    **CITY OF NUIQSUT**

1-6-04
DATE

                    BY:  ROSEMARY AHTUANGARUAK
                    ITS:  MAYOR

                    **KUUKPIKMIUT SUBSISTENCE OVERSIGHT PANEL**

01/06/04
DATE

                    BY:  LEONARD LAMPE
                    ITS:  CHAIRMAN



# Northeast National Petroleum Reserve Planning Area - Alaska

### Integrated Activity Plan/Environmental Impact Statement Amendment

**Home    NPR History    FAQ    Public Participation    News    Documents    Maps & Data    Links    Site Director**

## Welcome

The BLM believes that this is the ideal time to reevaluate the current plan, established in 1998, for the Northeast portion of the National Petroleum Reserve - Alaska for several reasons: First, the President's National Energy Policy and Section 604 of the Energy Policy and Conservation Act (EPCA) require that all Federal lands be inventoried to identify oil and gas resources underlying Federal lands and to identify the extent and nature of any restrictions or impediments to the development of such resources. Second, the current plan is 5 years old and since it was written, BLM has been gathering data and conducting additional biological studies to help assess the potential impacts of oil and gas exploration and development on biological and cultural resources. BLM is currently reevaluating the potential for exploration in the northeastern part of the Reserve through the NEPA process by writing an amendment to the 1998 Record of Decision EIS. Through the NEPA process, information will be collected and analyzed to ascertain if further exploration and development can in fact occur without significant impact to sensitive wildlife and subsistence resources. Therefore, the decisions made in 1998 must be reviewed to see if they still make sense, and if so, the questions of how the decisions should be changed need to be answered.

It is important to understand that BLM **HAS NOT** made any decisions to:

- Change the meaning or intent of any existing Northeast National PetroleumReserve-Alaska stipulations;
- Open additional lands for oil and gas leasing; and
- Reduce setbacks and buffer zones.

However, the BLM must go through an amendment process to the 1998 Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement to evaluate whether the oil and gas resources can be developed, while still protecting the environment.

The BLM will reformat current prescriptive stipulations that apply to the Northeast National Petroleum Reserve - Alaska into a mixture of prescriptive and performance-based stipulations similar to those developed for the Northwest portion of the Reserve. Prescriptive stipulations are very specific and in some cases inappropriately or needlessly restrictive. Performance-based stipulations would accomplish the same goal, as well as add flexibility to increase or decrease mitigation measures accordingly (see example below).

**Last Updated: January 8th, 2004**

**Exhibit 32, page 60 of 61**

## Prescriptive-based versus Performance-based

| Prescriptive-based **Example** from the 1998 Northeast National Petroleum Reserve-Alaska Plan | Performance-based **Example** that addresses the same issue. |
| --- | --- |
| **Stipulation 37** | **Required Operation Procedure** |
| Above ground pipelines shall be elevated at least 5 feet, as measured from the ground to the bottom of the pipe, except when the pipeline intersects a road, pad, or a ramp installed to facilitate wildlife passage and subsistence passage and access. The Authorized Officer, in consultation with appropriate Federal, State, and North Slope Borough regulatory and resource agencies, may make an exception if no feasible and prudent means exist to meet the requirement. | **Objective:** To minimize disruption of caribou movement and subsistence use.<br><br>**Requirement/Standard:** Pipelines and roads shall be designed to allow the free movement of caribou and the safe, unimpeded passage of the public while participating in traditional subsistence activities. Listed below are the current accepted design practices:<br><br>Above ground pipelines shall be elevated at least 5 feet as measured from the ground to the bottom of the pipeline (except where pipelines intersect a road, pad, in transition zones between buried and elevated pipelines or at ramps installed to facilitate wildlife passage and subsistence passage and access). |

Since the original plan was completed in 1998, the agency has awarded leases on about 1.4 million acres in the Northeast corner of the reserve and industry has drilled 13 exploratory wells. BLM geologists and petroleum experts believe that areas currently off-limits for exploration in the Reserve may contain more than two billion barrels of technically-recoverable petroleum. Many of these lands, near Teshekpuk Lake, are located within an area where substantial populations of caribou, raptors, and waterfowl occur. This will all be taken into account during the evaluation conducted in the Amendment document.

This page has been created by ENSR International for the Northeast National Petroleum Reserve - Alaska IAP/EIS Bureau of Land Management - Alaska Northern Field Office - 1150 University Ave. Fairbanks Alaska - 99709 Phone 1-907-474-2200 - If you encounter a problem with this site, please contact the Webmaster.

http://nenpra.ensr.com/nenpra/default.html

Document No. 2
Page 2 of 2

1/13/2004

**Exhibit 32, page 61 of 61**