are of concern to the Service. We have recently been petitioned to consider listing yellow-billed loons under the Endangered Species Act. The Northeast Planning Area supports approximately 25 percent of Alaska's breeding population of yellow-billed loons, with notable concentrations to the west, southwest, and east of Teshukpuk Lake. These areas provide unusually high concentrations of deep-water lakes (over four meters deep) as compared to other areas on the ACP. Although aerial surveys over the last two decades do not suggest a change in the number of adult yellow-billed loons on Alaskan breeding grounds (Mallek et. al. 2004), the ability of surveys to detect a significant change is relatively low (i.e. relatively large population declines could occur before current survey methods would detect a significant declining trend).

Yellow-billed loons in the Northeast Planning Area could be impacted by activities that reduce productivity, including direct or functional loss of preferred breeding habitats, reduction in prey populations and increases in nest predators. Disturbance, pollution, and hydrologic changes associated with oil development are mechanisms that may make breeding habitats temporarily or permanently unsuitable and suitable alternative breeding sites may not be available. Increased opportunity for predation resulting from human-caused disturbance may decrease the already low annual productivity of yellow-billed loons, especially when combined with potential increases in predator numbers associated with industrial development. The Service and BLM have begun a collaborative effort to develop a Conservation Agreement for yellow-billed loons in the NPR-A. Additionally, the Service recognizes BLM's intent to protect yellow-billed loons by proposing Special Conditions associated with their habitats; however, we believe the language in Special Condition (b) should be strengthened to clearly prohibit development within defined buffers.

The king eider, another species for which the Service has management concerns, is found in significant numbers in the north-central portion of the Northeast Planning Area. A large area immediately north and west of Fish Creek supports the largest high-density nesting area for king eiders on the North Slope of Alaska (Larned et. al. 2003). King eiders surveyed as they migrate past Barrow have declined by approximately 50 percent since the mid-1970s (Suydam et. al. 2000). Additional measures to minimize disturbance and prevent increase in predators may be appropriate in high-density nesting areas.

In general, the DEIS needs further information on the importance of the Planning Area to shorebirds, and the potential impacts of oil and gas development on shorebirds. The DEIS concludes that oil leasing and development would likely have only minor impacts on shorebirds. Although such statements may be true when developments are viewed independently, the cumulative effects from many developments may have more than minor negative effects on a given species. This may be particularly true for species that use the drier habitats within the NPR-A. Such areas, frequently selected as sites for pads, pipelines and roads as managers attempt to avoid wetland sites, may be relatively limited and locally more important to some species compared to adjacent wetland areas. In the Northeast Planning Area, these drier areas are selected by buff-breasted sandpipers, a Species of High Conservation Concern (Brown et. al. 2001). Other species of Conservation Concern that occur in the NPR-A include American golden plovers, ruddy turnstones, sanderlings, red knots, bar-tailed godwits, and whimbrels.

Many species of shorebirds are highly site faithful, and loss or alteration of traditional breeding sites may prevent these birds from breeding successfully. Thus, displaced birds may become part of the nonbreeding portion of the population, resulting in reduced productivity and lower recruitment rates. Cumulative effects from many developments over a large area could have a negative impact on less common species, especially if facilities and roads are built in their preferred habitats. Most shorebirds occur in lower-than-expected densities adjacent to oil field roads (Troy 1993, 2000), and snow drifts and impoundments adjacent to oil field facilities during nest initiation can displace shorebirds from formerly suitable nesting. If additional leasing results in development of new oil fields, impacts to shorebirds will increase. Shorebird breeding densities in NPR-A tend to exhibit a coastal gradient, with higher densities nearer the coast compared to inland areas (Andres 2004), and concentrations of staging shorebirds are most notable at coastal locations, particularly north and east of Teshekpuk Lake. Development within the TLSA will have disproportionately greater effect than development further inland. Concerns are greatest for those species that are declining and are found in greater than average abundance in the TLSA, including dunlin, red phalarope, and ruddy turnstone (Andres 2004).

**Stipulations and Required Operating Procedures**

A major component of Alternatives B and C in the DEIS is the proposal to replace existing Stipulations with performance-based Stipulations and ROPs consistent with those authorized recently by the Northwest Planning Area ROD. The performance-based measures are objective-driven and include Requirements/Standards that are intended to impart greater flexibility to the lessee or operator in meeting objectives. These measures include five General Lease Stipulations, each with a single Requirement/Standard; 29 General Lease ROPs, some with multiple Requirements/Standards; and eight Stipulations that apply in Biologically Sensitive Areas. The No Action Alternative would retain the 79 existing Stipulations authorized by the 1998 ROD.

The Service has concerns with several aspects of the proposed Stipulations and ROPs. Throughout the DEIS it is stated that these measures will provide protection for a variety of resources and will mitigate adverse impacts associated with oil leasing and development. This statement is based on the assumptions that 1) Stipulations and ROPs will be implemented and enforced consistently, and 2) they will be effective in achieving mitigation objectives; neither is assured. Many of the Requirements/ Standards contain language suggesting implementation will be subjective and, therefore, inconsistent (e.g. pg. 2-15 "All feasible precautions shall be taken…," pg. 2-17 "…may be authorized," "…prohibited unless authorized," pg. 2-18 "…may be required"). Additionally, lessees may be granted exemptions from Stipulations and ROPs if they are able to demonstrate that the impacts of their activities would be minimal, or that implementing the measure is technically not feasible or economically prohibitive. However, the criteria that would be used to determine minimal impact, technical and economic feasibility, and thresholds for granting exemptions are not clearly defined. Even if implemented and enforced, the effectiveness of the proposed mitigation measures remains unknown. These uncertainties should be clearly articulated in the final EIS.

The DEIS presents in several places that Stipulations and ROPs proposed under Alternatives B and C will impart resource protection similar to or greater than those currently in place in the Planning Area. Yet, major components of the existing Stipulations would be eliminated under these Alternatives. For example, much of the impact analysis conducted for the 1998 IAP/EIS was predicated upon a "roadless" development scenario that, while permitting in-field roads, prohibited a road connection to existing infrastructure outside the Planning Area. This requirement, which recognizes the potential for significant impacts of increased access in biologically sensitive areas, was incorporated into the 1998 ROD but is not a component of Alternatives B and C in the DEIS. Similarly, existing Stipulations prohibit exploratory drilling in lake beds and construction of permanent or gravel facilities, including roads, during exploration. These prohibitions are not included under Alternatives B and C, which, despite terrestrial and aquatic buffers, could allow drilling, pipelines, causeways and production pads in some lakes, including Teshekpuk Lake and large goose molting lakes, and which could allow construction of gravel roads and pads for exploration activities. It seems clear that the potential exists for greater impacts under proposed Stipulations and ROPs than under the existing management regime.

Criteria that would be used to determine if objectives of specific Stipulations and ROPs are met are not defined. For instance, the objective of ROP A-2 is to avoid human-caused changes in predator populations, which implies the need for sound pre-activity baseline data on predator populations; yet collecting baseline data is not a requirement. Requirement/Standard (a) of this ROP states: "All feasible precautions shall be taken to avoid attracting wildlife to food and garbage," yet it does not indicate what course of action would be taken if predator numbers increase in association with leasing or development activities despite feasible precautions. That is, it does not describe an adaptive management approach that would be used to correct such a situation. Although North Slope operators have, with the encouragement of resource agencies, implemented measures to reduce the availability of artificial nesting or denning structures and anthropogenic food sources, these measures have not been completely effective, as evidenced by the continued nesting of ravens on permanent and temporary structures and the persistence of unusually large concentrations of gulls associated with human activities.

Impacts to molting geese north of Tehsekpuk Lake continue to be a major concern with respect to potential oil development. Although Requirements/Standards (h) and (i) of proposed Lease Stipulation K-4 state that "[n]onessential" helicopter overflights "may be" suspended and restrictions on fixed-wing aircraft "may include" limits on the number of flights and flight corridors, there are no unequivocal restrictions on these activities, which are known to impact molting geese. It is unclear what constitutes a "nonessential" helicopter flight and under what conditions or upon what criteria restrictions on helicopter and fixed-wing aircraft travel would be implemented. Given the importance of this area to molting geese, the Service believes that clearly defined restrictions governing air traffic in the vicinity of the goose molting area are needed for the Final EIS.

In addition to the Stipulations and ROPs proposed in the DEIS for the Colville River Special

Area, the Service recommends permanent facility setbacks of *at least* 2 miles from the northern and western bluffs of the river due to the unusual concentration of nesting raptors in these areas and the uncertainty regarding how these birds would react to disturbance within this corridor. The larger buffer also would enhance the protection of adjacent habitats used as foraging areas by raptors. We also recommend that roads, if necessary, be minimized to a single consolidated crossing of the Colville River and CRSA, and that aircraft be restricted to altitudes of at least 1,500 feet AGL within 1/2 mile of cliffs identified as raptor nesting areas from March 15 - August 5.

**Alternatives**

The No Action Alternative represents the current management condition in the Northeast Planning Area, as approved by the 1998 EIS ROD, and it forms the basis of the DEIS analysis. The DEIS evaluates two alternatives for increasing the area available for oil leasing and development. Specifically, it analyzes the potential impacts to biological and cultural resources of allowing leasing and development in most (Alternative B) or all (Alternative C) of the current 589,000-acre no-lease area in the TLSA. Other major decisions considered in the DEIS include: 1) replacing existing Stipulations with performance-based Stipulations and ROPs consistent with those authorized by the January 2004 ROD for the Northwest Planning Area of the NPR-A, and 2) removing the surface occupancy restriction that governs a 269,000-acre band of lease tracts west and south of the current no-lease area.

As recognized by BLM in the DEIS, making some areas unavailable for oil leasing and development is one means of providing protection to important biological resources. Of the Alternatives considered in the DEIS, the No Action Alternative would extend the greatest protection to molting geese including Pacific brant, other migratory waterfowl and shorebirds, polar bears, and subsistence resources, particularly the Teshekpuk Lake Caribou Herd, and thus, is our preferred management approach. We recognize, however, that this approach limits opportunities to develop other resources, and that BLM faces a difficult challenge in trying to balance protection of unique biological resources with efforts to provide increased access to areas with high oil potential. Therefore, we have attempted to formulate an alternative management approach based on modifications to the draft Preferred Alternative that we believe would be essential to reduce the risk to fish and wildlife should a decision be made to expand leasing within the TLSA.

We initially focused our effort on Pacific brant because of their small and declining population, their potential vulnerability to development-related disturbances, their importance to subsistence, and the substantial segment of the population that annually molts in the area north of Teshekpuk Lake. Although our analysis is focused on brant, our recommendations are intended to protect other trust resources as well, including other geese. Reducing risks to molting geese would also benefit other species of concern including spectacled eiders and other waterfowl, loons, shorebirds, polar bears, and caribou. Of particular concern, the response of molting geese to oil field development cannot be predicted with confidence, and because the area is unique, there is a risk of irreversible population-level impacts. The distribution of molting geese varies annually,

thus we adopted a management goal of protecting the area used by at least 90 percent of molting brant in any year. We propose to protect the identified area by retaining its no-lease status. We point out, however, that by focusing on brant, our recommended no-lease area would not include all critical caribou habitats, particularly the important migration corridor east of Teshekpuk Lake. Although not our management responsibility, we recommend BLM address the issue of protecting important caribou habitats, including migration corridors.

We re-analyzed waterfowl survey data, with an emphasis on brant, to guide determination of an appropriate no-lease area. Preliminary results indicate that the draft Preferred Alternative would, on average, protect 56% of molting brant under a no-lease designation. The remaining brant use lakes that: 1) occur on the boundary between the no-lease area and the area available to leasing, 2) occur entirely within the area available for leasing, 3) occur on private land (Cape Halkett) or 4) occur on the boundary between public and private lands. Our analysis also indicates that by enlarging the no-lease zone presented in the draft Preferred Alternative from 213,000 to approximately 296,000 acres, the goal of protecting 90 percent of molting brant is nearly achieved. Although our proposed revision to the boundary of the no-lease area (Figure 1) falls just short of the 90% goal, due largely to the importance of lakes on private lands in the Cape Halkett area to molting geese, it does encompass molting lakes that support, on average, 89 percent of molting brant (Table 1). Our proposal also would protect larger portions of molting greater white-fronted, Canada, and snow geese (Figure 2). The modified boundaries would increase protection of habitats important to spectacled eiders, brood-rearing waterfowl, seaducks, shorebirds, and denning polar bears. Finally, the modified no-lease area would increase protection of calving, migration, and insect-relief habitat used by the Teshekpuk Lake Caribou Herd.

Outside the modified no-lease area, a rigorous adaptive management approach to monitoring and assessment could provide a better understanding of the risks entailed in exposing large flocks of molting geese to the disturbances that accompany oil development, should it occur, and information gained could be applied to future management decisions. That information gained, however, comes at the cost of diminished protection for wildlife in the portion of the Teshekpuk Lake area opened to development. Areas closed to leasing would function as a control with which to evaluate the effects of human activity. This approach controls risk to molting geese by limiting the proportion of their populations subject to disturbance while providing for a structured approach to reducing uncertainty.



Figure 1. Proposed modification to Draft Preferred Alternative, No-lease Zone.

Exhibit 39, page 16 of 19



Figure 2. Average number of adult geese counted on survey lakes, 1976-1978, 1982-2003. Data from U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage.

13

Table 1. Proportion (%) of annual numbers of molting geese using lakes located in different land-use categories in the Northeast Planning Area of the NPR-A. Mean is the average proportion of geese using lakes in each category, calculated for all years of available survey data (1976-1978, 1982-2003); minimum and maximum show the range in proportions among years. "Not Available for Lease" represents molting lakes entirely protected within the boundary of the proposed no-lease zones; all other categories represent lakes that are partially or wholly outside the no-lease zones, or that occur on private land at Cape Halkett, and for which there is uncertainty with regard to protection of molting geese.

| Species | Draft Preferred Alternative No-lease Zone | | | | Modified No-lease Zone | | | |
|---|---|---|---|---|---|---|---|---|
| | Available for Lease | Private | Private Borderline | NPR-A Borderline | Not Available for Lease | Available for Lease | Private | Private Borderline | NPR-A Borderline | Not Available for Lease |
| **Brant** | | | | | | | | | |
| Mean | 6 | 5 | 4 | 30 | 56 | 1 | 5 | 4 | 1 | 89 |
| Minimum | 1 | 0 | 0 | 18 | 41 | 0 | 0 | 0 | 0 | 81 |
| Maximum | 16 | 10 | 10 | 43 | 70 | 7 | 10 | 10 | 5 | 97 |
| **Greater White-fronted Goose** | | | | | | | | | |
| Mean | 22 | 0 | 0 | 28 | 49 | 18 | 0 | 0 | 4 | 77 |
| Minimum | 6 | 0 | 0 | 16 | 27 | 1 | 0 | 0 | 0 | 63 |
| Maximum | 41 | 1 | 2 | 53 | 74 | 28 | 1 | 2 | 26 | 95 |
| **Canada Goose** | | | | | | | | | |
| Mean | 9 | 2 | 1 | 36 | 51 | 8 | 2 | 1 | 2 | 87 |
| Minimum | 1 | 0 | 0 | 23 | 30 | 3 | 0 | 0 | 0 | 76 |
| Maximum | 23 | 12 | 5 | 54 | 67 | 15 | 12 | 5 | 13 | 96 |
| **Snow Goose** | | | | | | | | | |
| Mean | 35 | 0 | 0 | 21 | 44 | 16 | 0 | 0 | 1 | 82 |
| Minimum | 0 | 0 | 0 | 1 | 7 | 0 | 0 | 0 | 0 | 52 |
| Maximum | 77 | 6 | 10 | 54 | 97 | 47 | 6 | 10 | 10 | 100 |

**Exhibit 39, page 18 of 19**

## Recommendations and Conclusion

Recognizing the irreplaceable nature of the fish and wildlife resources in the Northeast Planning Area, particularly within the TLSA, the Service prefers the protective measures provided in the No Action Alternative. However, if BLM decides a portion of the current no-lease area is to be made available for leasing, the Service believes such activity should proceed only under a management plan that prioritizes protection of molting geese and other trust resources while allowing phased development guided by a rigorous adaptive management approach. Therefore, should leasing be expanded in the TLSA, we recommend the following modifications to the draft Preferred Alternative to reduce risks to trust resources in the Northeast Planning Area:

1. The no-lease area proposed under the draft Preferred Alternative would be increased from 213,000 to approximately 296,000 acres to protect molting brant and other trust resources (see Figure 1).

2. Teshekpuk Lake and other fish-bearing lakes would be off-limits to surface development. A minimum ¼-mile undisturbed buffer around these lakes would be applied to prevent oil and other hazardous material spills from reaching these largely confined systems.

3. Other than approved surveys, non-emergency helicopter or fixed-wing transits over the no-lease zone would be prohibited from June 15 – August 20.

4. The no-surface-occupancy requirements for lease tracts west and south of the current no-lease area would be maintained to protect core calving habitat for the Teshekpuk Lake Caribou Herd.

5. To avoid the potential impacts of increased access in biologically sensitive areas, a roadless design would be required for any development proposed within the existing no-lease and no-surface-occupancy areas of the TLSA. Within the CRSA, roads will be minimized to a single consolidated crossing of the Colville River and CRSA, if necessary.

6. Leasing of tracts within the Colville River Special Area would be deferred until this area has an approved management plan. This is consistent with the recent Northwest NPR-A Final Integrated Activity Plan/EIS, and would protect nesting raptors and passerines.

7. The no-permanent-facilities buffer adjacent to the Colville River would be expanded from one to two miles to encompass important raptor foraging habitats.

8. Until an approved management plan is completed for the CRSA, aircraft would be restricted to altitudes of at least 1,500 feet AGL within 1/2 mile of cliffs identified as raptor nesting areas from March 15 - August 5.

9. Construction of permanent facilities for exploration would be prohibited.