*locations.*

*Requirement/Standard:*

*a. Cross-country use of heavy equipment and seismic activities is prohibited within ½ mile of occupied grizzly bear dens identified by the ADFG unless alternative mitigation measures are approved by the AO in consultation with the ADFG.*

*b. Cross-country use of heavy equipment and seismic activities is prohibited within 1 mile of known or observed polar bear dens or seal birthing lairs. Operators shall consult with the USFWS and/or NOAA Fisheries Service, as appropriate, before initiating activities in coastal habitat between October 30 and April 15.*

*Based on the language in our General Required Operating Procedure outlined above, please explain what component of the ROP would preclude continued use of a preferred habitat or does not adequately protect bears.*

The Service does not contend that the referenced ROP or its component Objective or Requirement/Standard would preclude continued habitat use or otherwise inadequately protect bears. In fact, in our August 2004 General Comments, we recognized that proposed Stipulations and ROPs, if consistently implemented, monitored and enforced, would likely reduce impacts to polar bears and their habitats in areas of development. In our August 2004 Specific Comments, we recommended the addition of a Requirement/Standard to ROP A-8 that would encourage participation in and compliance with the Incidental Take Program, which protects both the BLM and applicants from liability with regard to the take of polar bears under the Marine Mammal Protection Act.

As stated in response #1, only a relatively small percentage of den locations are known with certainty and the potential exists for development-related displacement or abandonment of undetected dens. The consultation required under Requirement/Standard (b) above combined with our recommended addition to ROP A-8 would allow case-by-case site specific evaluation of potential polar bear habitats and mitigation opportunities.

8. *Please provide the necessary data to support your recommendation on Page 14, Attachment [1], of a 2+ mile buffer and your position that the additional setback will be more effective than our proposed 1 mile buffer along the Colville River in protecting nesting raptors.*

Our recommendation of a two-mile buffer, as explained below, is based on the collective judgment of raptor experts. In 1999, raptor specialists met in Fairbanks for the NPR-A Raptor Disturbance and Mitigation Workshop. A focus of the workshop was the adequacy of the one-mile development exclusion buffer along the Colville River. The intent of the buffer is to prevent the loss of raptor nesting habitat, protect nesting raptors from disturbance, and to provide protection to the diversity of habitats and prey species that raptors depend on. Workshop participants recognized the lack of data that compares buffers surrounding raptor nesting areas,

DRAFT

particularly high-density cliff nesters. Biologists at the workshop also noted the expense, technical difficulties and intrusive nature of any research that would be aimed at comparing buffer sizes along the Colville. It was generally agreed that effective research of this type was not likely to occur. Regardless, it was the recommendation of these professionals that a larger, two-mile buffer along the Colville River would provide further protection for raptors, with particular regard to the wetlands and tall shrub habitats that harbor small bird prey species.

9. *Please provide specific data or information that supports your position that the proposed performance-based mitigation scenario offered in the Draft IAP/EIS will not be as effective in providing protection based on the stated Objective and Requirement Standard, while at the same time, providing specifics on your position that the BLM cannot assure enforced compliance of our mitigations required under our land management activities.*

The August 2004 comments were in reference to the analysis of impacts provided by the Draft IAP/EIS. The Service does not question BLM's ability or intent to design, implement and enforce fish and wildlife mitigation measures, and indeed recognizes the difficulties of this task. Our comments do, however, recommend that the realities of implementing and enforcing mitigation measures on the scale that exists in NPR-A be thoroughly examined and incorporated in the Final EIS analysis of impacts. Within this context, we will outline below the difficulties of mitigation implementation and enforcement that the Service has highlighted in previous comments.

(1) Effectiveness of mitigation measures. The Draft EIS uses a baseline for its analysis of impacts that the proposed performance-based mitigation measures will be effective in accomplishing stated objectives. Even if implementation and enforcement goes smoothly, there are no data to suggest that these measures will achieve the intended objective. As an example, the oil and gas industry has been aware of the potential problems associated with elevated predator populations for a number of years. Mitigation currently in place at the Alpine facility, and taken seriously by operators, has not been effective at eliminating nesting and denning habitat for ravens and foxes. Our purpose is to alert BLM that all mitigation measures, whether performance-based or prescriptive in nature, and regardless of intention, may not be 100% effective.

(2) Exceptions to mitigation measures. Exceptions to specific mitigation measures have been and continue to be a reality of management. The Service agrees with BLM that this is a necessary part of effective land management. Our recommendations have been to reduce the uncertainty associated with this process by outlining what criteria will be used to grant exceptions.

(3) Monitoring and enforcement. The NPR-A is a vast landscape and the details of leasing, exploring and development are many. It is not possible for BLM staff to observe every step of every project proposed on NPR-A. Again, an example involves the predator issue. A Biological Opinion Term and Condition associated with the 1998 IAP/EIS requires new infrastructure to be free of nesting platforms for ravens. However,

DRAFT

one of the first exploratory wellheads in NPR-A was quickly exploited by a pair of ravens. BLM was not aware of this situation until it was brought to their attention. This is not an indictment of BLM staff, rather it represents the reality of the situation which should be expressed more completely in the Final EIS.

You have requested information supporting our position that the proposed performance-based stipulations will not be as effective as the existing set of stipulations. Our comments compare two proposed alternatives for designing and implementing mitigation measures. Neither alternative will be 100% effective. However, taken as a whole, the Service's evaluation was that the proposed performance-based mitigation measures will not provide fish and wildlife protection comparable to that provided by the existing management regime for the following reasons:

(1) Substantial protections which the Service has determined are important to fish and wildlife and that were provided by the existing stipulation package would be eliminated under the performance-based measures that would be implemented under Alternatives B or C. For example, these protections include the prohibition on in-lake construction of permanent gravel roads, pads and other facilities.

(2) The proposed Stipulations and ROPs contain language indicating that they may or may not be required, with no clear criteria for determining when they would or would not be implemented.

(3) Exceptions to Stipulations and ROPs could be granted for a variety of reasons, with no process, clear criteria, or definitions for establishing thresholds that would guide the exception process.

*10. In addition, please provide a substantiated discussion including data that supports the contention that the mitigation process as proposed in Section 2.6 is inadequate. The BLM believes that the flexibility provided in the proposed performance based mitigation package would allows us to better meet the objective at the time a specific development is proposed.*

Please refer to our response to #9, above.

*11. Please provide support for the contention that any form of human activity within a 296,000 acre area could not be managed through activity restrictions and transportation management to minimize impacts to molting geese.*

Activity restrictions and transportation management could certainly minimize some impacts to molting geese. The question is whether we have enough scientific information to conclude that such mitigation measures would assure that population-level impacts would not occur. The 1997 workshop participants concluded that such information did not exist (Yokel 1997); we think that is still the case. As indicated in the answer to question #4, workshop participants concluded that

DRAFT

not enough scientific information was available to develop stipulations that provided full protection for molting geese. Although many activities are ongoing in the TLSA, oil and gas exploration and development will be additive. While activity restrictions and transportation management would likely diminish impacts to molting geese, according to the 1998 EIS, population-level effects may still result under the package of stipulations developed at the 1997 workshop (BLM 1998: IV-F-11).

> 12. *Evidence does exist that there are disturbance activities such as helicopter flights resulting in adverse affects [sic] to molting geese with the level (number of birds) and severity (estimated weight loss) driven by the number of flights, elevation, and size of the helicopter (Jensen 1990, Miller et al. 1994). However, flight path and elevation controls could result in low levels of effects that would not likely impact survival (Miller 1994). Please provide the additional rational for your recommended protective measures (Page 14, Attachment, No. 3).*

Miller (1994) illustrated that flight path influences the number of molting geese that are disturbed by aircraft. Simply stated, Miller's conclusion was that aircraft disturbance was less likely to impact molting geese if the chosen route avoided areas of concentrated goose use. We have incorporated that logic into our recommendations, as high use by brant forms the basis for defining the "no-lease" area over which we proposed suspension of overflights during the molt period. Miller's work does not provide a reliable basis for choosing specific alternative routes, however. He used a 10-year average flock size per lake as the basis for comparing four routes, which were chosen arbitrarily for illustration purposes. Goose distribution is variable among years (in fact, change in the use patterns of geese in the molting area is the subject of a current USGS/BRD study). Proper route selection would require real-time survey data, and the ability to adapt to changing conditions.

Miller also stated that along a given flight path, weight loss of geese could be reduced by restricting timing, elevation, frequency, and aircraft type. Flights above 1220 m (>4000 ft) caused practically no weight loss. However, he also recognized some of the practical difficulties in implementing altitude restrictions, noting that, "Unfortunately, low cloud ceilings and poor visibility in this area often prohibit aircraft from flying at those [higher] altitudes."

The 1997 workshop participants struggled to identify a biologically valid safe threshold for aircraft activity, and were unable to do so. Therefore, the workshop participants took the approach of restricting aircraft use to the minimum that was absolutely necessary to sustain oil development activities. It was determined that helicopters were not essential where fixed-wing access existed; therefore, the workshop concluded that helicopters should be prohibited seasonally except in emergency. Fixed-wing flights were restricted to those necessary to provide for crew changes at facilities located within the goose molting area (estimated at two round-trip flights per week).

Miller (1994) did not identify a specific combination of flight frequency, route, timing, and aircraft type which would result in "low levels of effects that would not likely impact survival." His model helps predict which options would be more or less likely to result in impact, but he

DRAFT

recognized that, "A threshold value for weight below which brant might experience significantly lower survival has not been established" (Miller 1994: 346). No further progress on this issue has been made in the decade since Miller's publication. Thus, it will be difficult to prescribe a scientifically based "safe" level of aircraft activity within the goose molting area.

*13. Please provide supported justification for assuming all molting geese would be impacted on these "borderline lakes."*

Until recent years, the resolution of the molting goose survey data was sufficient only to assign birds to a lake, not to a specific location. This presents difficulties in classifying specific groups of birds as either "inside" or "outside' of a boundary line. Recognizing this, we classified geese using borderline lakes separately from those using lakes either wholly within, or wholly outside, a proposed lease area, and the data we provided in our August 2004 General Comments clearly identify those categories. There is no precise way to identify the proportion of the birds on borderline lakes that would be influenced by human activity, for a variety of reasons. However, documented lake use patterns of brant indicate that birds use the entire lake border for foraging. Flocks circumnavigate lakes continually as they reduce the standing crop of available forage (Derksen et al. 1982). This pattern likely allows forage to recover between foraging bouts. Development on any portion of a lake that is used by molting geese would likely interrupt or alter this cycle. We also know that geese, during their flightless period, move from one portion of a lake to another in response to disturbance.

The goal was to choose analytical conventions that were reasonable given the limits of our data and to apply them consistently. The decision to classify borderline lakes as "impacted" is based on documented forage behavior around lakes (as described above) and numerous observations by biologists of brant responding to disturbance by moving to the opposite side of a lake or even departing the lake altogether. Because the potential exists for development on the leased portions of these borderline lakes, molting geese using them could be impacted by disturbance and avoidance of previously available foraging areas. The model also assumed that birds immediately outside the lease area would be unaffected by activity within the lease area, a decision-rule which ignores the fact that the zone of influence of some activities (aircraft operation, for instance) would extend up to several kilometers beyond the boundary. In that regard, this decision-rule underestimates the potential for disturbance.

Given the uncertainties regarding the ultimate effects of behavioral and physiological responses of molting geese to human disturbance, we have emphasized repeatedly that a precise estimate of the proportion of geese that would be impacted as a result of oil and gas development is not possible. This analysis provided a useful framework for comparison of alternatives with respect to their effectiveness in protecting molting geese.

*14. Is there any published literature or population viability analysis to support this 90 percent protection goal? Particularly as it appears that the factors influencing the population are occurring elsewhere, does FWS expect that any adverse impact (mortality, reduced reproduction) would be compensatory or additive?*

DRAFT

The management issues we face in the Teshekpuk Lake goose molting area are unique to the circumpolar Arctic. We know of no other area that supports an equivalent number of molting geese or a comparable proportion of molting brant. Therefore, there is no corresponding literature that can provide a definitive answer with regard to the effective level of protection needed for brant or other species of geese at this specific location. To address the issue of an appropriate level of protection for brant, we first collaborated with experts in the Service's Migratory Bird Management Office and the USGS/BRD. All of these individuals have conducted or are currently conducting research on or are involved in monitoring brant populations. The consensus was threefold. First, the Pacific brant population was relatively small, as compared to other geese species, and despite our best efforts to grow the population, it has been slowly declining for years and possibly declining more rapidly in the past nine years. Second, brant are known to be relatively sensitive to disturbance as compared to other common species. Third, the Teshekpuk Lake area has been documented to harbor a substantial segment of the Pacific brant population during molting.

Based on of these three factors, the Service determined that a high level of protection was warranted for this species to avoid any additional downward pressure on the population. We next discussed protection levels ranging from 80 to 100% with the Migratory Bird Management Office and USGS/BRD while analyzing the distribution of brant molting lakes north of Teshekpuk Lake. Aerial surveys indicate that, on average, approximately 9% of molting brant use lakes wholly or partially located on private land near Cape Halkett. These are molting lakes that could be affected by private development over which federal agencies have no control. A general consensus emerged among our staff and biologists with the Migratory Bird Management Office and USGS/BRD that a target protection level of 90% was warranted on federal property given that a portion of the remaining birds were outside of our management control. Through our analysis of the goose molting area we determined that we could approach this target and still provide an area northwest of Teshekpuk Lake for potential leasing.

Compensatory relationships in nature are most commonly related to influences of density dependence. The brant population is well below historic estimates and continues to decline. Thus, there is little likelihood that adverse effects would be compensated. Rather, such effects would be considered additive. This is corroborated by the UAF Pacific Black Brant Population Model, which assumes no compensatory mortality factors in the absence of harvest (Anker and Chelgren 1998). Further, brant that molt north of Teshekpuk Lake are primarily second-year birds (non-breeders) and after-second-year birds (primarily failed breeders). These age classes typically have higher survival rates than young of the year. If there was an increase in mortality due to development in the molting area, it would have a proportionally greater impact on the overall population than other mortality factors that affect a more representative age structure.

*15. To assist the BLM in refining our cumulative effects analysis, please provide information on allowable sports harvest and actual sports harvest and subsistence harvest.*

This information is provided in our response to request #2, above, and in the Pacific Flyway

Council Management Plan for Pacific Brant (Pacific Flyway Council 2002).

*16. Please provide information on how the Service determined that the current and expected future levels of harvest are sustainable. At what population level is avoidable harvest/mortality not compatible with maintenance of a sustainable population?*

The Pacific Flyway Council, composed of one member from the public wildlife agencies in each state and province in the western United States, Canada, and Mexico, sets harvest thresholds for Pacific brant, with input from the Service. The Service and the Department of the Interior are the regulatory entities that establish harvest regulations typically consistent with the Flyway Council recommendations. The Council, in cooperation with the Service, identifies specific criteria based on population estimates to guide modifications to allowable harvest. These criteria, specified in our response to request #2, are reviewed extensively by technical subcommittees within the Council, and are revised when new studies support improved management techniques. The Flyway Council has determined that if the 3-year population average is less than 90,000 birds, avoidable harvest mortality is not compatible with population goals, and a complete harvest closure would be implemented until surveys indicated the population had recovered to a point at which some harvest could again be allowed. The actual harvest limits/closures are set through a formal process. The Pacific Flyway Council provides recommendations to the Service's Regulations Committee. The Committee then provides a recommendation to the Service's Director, who advises the Assistant Secretary for Fish, Wildlife and Parks. Final determination of harvest levels rests with the Assistant Secretary for Fish, Wildlife and Parks.

DRAFT

Figure 1. Known polar bear den locations within and adjacent to the Northeast Planning Area of the NPR-A.




DRAFT

Table 1. Polar Bear Den Locations – Colville River to Ikpikpuk River (USGS/BRD Den Database).

| DEN I.D. | YEAR | LOCATION | LATITUDE | LONGITUDE |
|---|---|---|---|---|
| 238 | - | Colville River | 70.421 | 151.147 |
| 248 | - | Point Poleakoon – Smith Bay | 70.812 | 154.002 |
| 262 | - | Point Poleakoon – Smith Bay | 70.814 | 154.006 |
| 127 | 1910 | Cape Halkett | 70.833 | 152.25 |
| 131 | 1917 | Colville River | 70.2 | 150.833 |
| 151 | 1975 | Point Lonely | 70.88 | 153.91 |
| 233 | 1987 | Atigaru Point | 70.41 | 151.87 |
| 234 | 1989 | Atigaru Point | 70.399 | 151.897 |
| 605 | 1989 | Cape Simpson | 70.833 | 154.033 |
| 235 | 1993 | Colville River | 70.391 | 151.097 |
| 613 | 1993 | Lonely | 70.883 | 153.7 |
| 855 | 1994 | Lonely – Pack Ice | 70.864 | 152.833 |
| 653 | 1997 | Colville River | 70.429 | 150.556 |
| 654 | 1998 | Atigaru Point | 70.533 | 151.730 |
| 679 | 2000 | Lonely | 70.867 | 152.726 |
| 822 | 2002 | Colville River | 70.440 | 150.725 |
| 884 | 2003 | Eskimo Island | 70.577 | 151.924 |
| 886 | 2003 | Cape Halkett | 70.802 | 152.283 |
| 889 | 2003 | Eskimo Island | 70.575 | 151.923 |

DRAFT

Literature Cited

Alaska Migratory Bird Co-Management Council. 2004. Subsistence Harvest Surveys. http://alaska.fws.gov/ambcc/harvest.htm, http://alaska.fws.gov/ambcc/ambcc/Harvest/Subsistence%20EA%2004_total_Geese.htm.

Amstrup, S.C. 2000. Polar Bear. Pp. 133-157, *in* J.J. Truett and S.R. Johnson, eds., The Natural History of an Arctic Oil Feild: Development and the Biota. Academic Press, Inc. NY.

Amstrup, S.C. and C. Gardner. 1994. Polar bear maternity denning in the Beaufort Sea. Journal of Wildlife Management 58:1-10.

Anker, W. and N. Chelgren. 1998. Pacific Black Brant Population Model, User's Guide and Program Documentation. Department of Biology and Wildlife, University of Alaska – Fairbanks. http://www.cabnr.unr.edu/brant/brant-model/USER_MAN.htm

Anthony, R. M., and J. S. Sedinger. 1987. Productivity in a brant colony improves with removal of arctic foxes. U.S. Fish and Wildl. Serv. Res. Info. Bull. 87-7. 2 pp.

BLM. 1998. Northeast National Petroleum Reserve – Alaska, Integrated Activity Plan/Environmental Impact Statement. Bureau of Land Management, Alaska State Office, Anchorage, AK.

Carroll, G. M. 2003. Teshekpuk Lake Caribou Herd Caribou Management Report. Pages 280-303 *in* C. Healy, editor. Caribou Management Report of Survey-Inventory Activities 1 July 2000-30 June 2002. Alaska Department of Fish and Game. Federal Aid in Wildlife Restoration Grants W–27–4 and 5. Juneau, AK.

Derksen, D. V., W. D. Eldridge, and M. W. Weller. 1982. Habitat Ecology of Pacific black brant and other geese moulting near Teshekpuk Lake, Alaska. Wildfowl 33:39-57.

King, J. G. and D. V. Derksen. 1986. Alaska goose populations: past, present and future. Transactions of North American Wildlife and Natural Resource Conference 51: 464-479.

Larned, W. W., R. Stehn, and R. Platte. 2003. Eider Breeding Population Survey, Arctic Coastal Plain, Alaska, 2003. Unpubl. U.S. Fish and Wildlife Service, Soldotna, AK. 44 pp.

Lensink, C. J. 1987. Numbers of black brant nesting on the Yukon-Kuskokwim Delta have declined by more than 60 percent. U.S. Fish and Wildl. Serv. Res. Info. Bull. 87-126. 2 pp.

Mallek, E. J. 2004. Teshekpuk Lake Area Molting Goose Survey - 2003. Unpubl. Report, U.S. Fish and Wildlife Service, Waterfowl Management, Fairbanks, AK. 13 pp.

DRAFT

Pacific Flyway Council. 2002. Pacific Flyway Management Plan for Pacific Brant. C/o U.S. Fish and Wildlife Service, Portland, Oregon.

Philo, L. M., G. M. Carroll, and D. A. Yokel. 1993. Movements of caribou in the Teshekpuk Lake Herd as determined by satellite tracking, 1990–1993. North Slope Borough Department of Wildlife Management Report. 60pp. Available from North Slope Borough Department of Wildlife Management, Box 69, Barrow, Alaska 99723.

Prichard, A. K., S. M. Murphy, and M. D. Smith. 2001. Analysis and mapping of satellite telemetry for the Teshekpuk Caribou Herd 1990-1999 with a note on 5 Western Arctic Caribou. Draft Report prepared by ABR Inc. for the North Slope Borough Department of Wildlife Management, Alaska Department of Fish and Game, and Bureau of Land Management. 102 pp.

Raveling, D. G. 1984. Geese and hunters of Alaska's Yukon Delta: management problems and political dilemmas. Transactions of North American Wildlife and Natural Resource Conference 49: 555-575.

Sedinger, J. S., C. J. Lensink, D. H. Ward, R. M. Anthony, M. L. Wege, and G. V. Byrd. 1993. Current status and recent dynamics of the black brant *Branta bernicla* breeding population. Wildfowl 44: 49-59.

Stirling, I. and D. Andriashek. 1992. Terrestrial maternity denning of polar bears in the eastern Beaufort Sea area. Arctic 45:363-366.

U.S. Geological Survey, Biological Resource Division. 2004. Alaska Biological Science Center Polar Bear Research Database.

Ward, D. H., E. A. Rexstad, J. S. Sedinger, M. S. Lindberg, and N. K. Dawe. 1997. Seasonal and annual survival of adult Pacific brant. Journal of Wildlife Management 61:773-781.

Ward, D. H., J. A. Schmutz, J. S. Sedinger, K. S. Bollinger, P. D. Martin, and B. A. Anderson. 2004. Temporal and geographic variation in survival of juvenile black brant. Condor 106:263-274.

Wolfe, R. J. and A. W. Paige. 1995. The subsistence harvest of black brant, emperor geese, and eider ducks in Alaska. Tech. Paper No. 224. Division of Subsistence, Alaska Dept. of Fish and Game, Juneau. 39 pp. + appendices.

Yokel, D.A. (editor). 1997. Proceedings of the Teshekpuk Lake Area caribou/waterfowl impact analysis workshop. USDI-BLM Northern District Office. Fairbanks, Alaska.

Personal Communication

Sowl, Kristine, Wildlife Biologist, Izembek National Wildlife Refuge, Cold Bay, AK.

DRAFT