# FINAL BIOLOGICAL OPINION (01-12-2005)

## INTRODUCTION

This document transmits the U.S. Fish and Wildlife Service's (Service's) final biological opinion (BO) based on our review of the Bureau of Land Management's (BLM's) biological assessment covering the proposed Amendment to the Integrated Activity Plan/Environmental Impact Statement (IAP/EIS) for the Northeast National Petroleum Reserve-Alaska (NE NPR-A), and its effects on Steller's eiders (*Polysticta stelleri*) and spectacled eiders (*Somateria fischeri*) in accordance with section 7 of the Endangered Species Act of 1973 (Act), as amended (16 U.S.C. 1531 et seq.). The NE NPR-A IAP/EIS Amendment (Amended IAP/EIS) states that it supersedes the 1998 NPR-A IAP/EIS and is now the sole National Environmental Policy Act (NEPA) analysis for the NE NPR-A Planning Area (NE Planning Area). BLM's June 3, 2004, letter requesting formal consultation for the proposed action was received on June 7, 2004. On July 8, 2004, the Service sent a letter to the BLM stating that, if no major revisions were to be made to the Amended Draft IAP/EIS and the Draft Biological Assessment (Draft BA), all information required to initiate formal consultation had been received or was otherwise accessible for our consideration and reference. On December 24, 2004, the Service received BLM's final BA (BA). As stated in the BA, BLM expects oil and gas leases under its Amended IAP/EIS's Preferred Alternative to have a life of ~10 years. Oil field production infrastructure resulting from leasing is expected to operate at least 30 years. If significant new information becomes available that is not described in the Amended IAP/EIS or the NE NPR-A Biological Assessment (BA), BLM should reinitiate formal consultation with the Service.

BLM drafted the Amended IAP/EIS to determine the appropriate multiple-use management of 4.6 million acres of the NE Planning Area, consistent with existing statutory direction for its management. The NE Planning Area is within the breeding ranges of spectacled and Alaska-breeding Steller's eiders, both listed as threatened under the Act. We are particularly concerned with the proposed action because the NE Planning Area contains important breeding habitat for over 15% of spectacled eiders on the Arctic Coastal Plain (ACP) and the species occurs/nests at comparatively high densities within the identified "Area of High Geologic Potential" (Figures 1 and 3). Across the NE Planning Area, we have found that spectacled eiders and Steller's eiders are unevenly distributed. Both species show a general gradient in density from high in the Northern and Western portions of the NE Planning Area to low in the Southern and Southeastern portions. Spectacled eiders are more abundant and more widely distributed than Steller's eiders across the NE Planning Area (Figure 2).

The Amended IAP/EIS addresses the full range of BLM's management responsibilities in the NE Planning Area, with the potential use of the area for oil and gas development as a major focus. The management plan includes various current and future surface-impacting activities that may affect the threatened spectacled and Steller's eiders such as aircraft use, hazardous- and solid-material removal and remediation, overland moves, seismic activities, and oil leasing/exploration and development/production activities. Such activities, particularly oil development, temporary camps, and aircraft traffic may result in disturbance, altered habitat,

and spills of oil or other contaminants. These could adversely affect the behavior, distribution, and abundance of listed eiders in or adjacent to the NE Planning Area.

For long-term, multistaged activities for which agency actions occur in discrete steps, such as leasing large tracts of Federal land for mineral exploration, the Service must evaluate not only the proposed action, but also the potential resulting actions in order to determine the likelihood of the entire action violating section 7(a)(2) of the Act. Consulting on actions such as those described by the BA's Preferred Alternative is challenging in that the Preferred Alternative does not describe defined actions, but only contains the design standards that would be used to develop future actions. The Preferred Alternative also contains temporal and spatial uncertainty regarding future actions, resulting in corresponding uncertainty regarding potential impacts to listed eiders. Therefore, while developing the effects analysis and associated Incidental Take Statement (ITS) for this BO, we have provided the benefit of the doubt to the species by assuming the maximum potential conflict between activities that could reasonably occur under the BLM's Preferred Alternative.

This BO is based on information provided in BLM's December 24, 2004, BA to evaluate the effects of proposed oil leasing, exploration, development, production and abandonment actions under the BA's Preferred Alternative, and on other information available to the Service. The following document represents the Service's BO on the effects of the proposed action on the threatened spectacled eider (*Somateria fischeri*) and Steller's eider (*Polysticta stelleri*), in accordance with section 7 of the Act. Based on the information provided on the proposed and potential activities, and the information currently available on listed and proposed species and designated and proposed critical habitat, the Service has determined that it is unlikely that the action will violate section 7(a)(2) of the Act. Section 7(a)(2) of the Act states that Federal agencies must ensure that their activities are not likely to: 1) jeopardize the continued existence of any listed species, or 2) result in the destruction or adverse modification of designated critical habitat. To arrive at this "non-jeopardy" determination, we used a five-step approach for applying the section 7(a)(2) standards. The steps are as follows:

1. Define the biological requirements and current status of each listed eider species,
2. Evaluate the relevance of the environmental baseline to the species' current status,
3. Determine the effects of the proposed or continuing action on listed species,
4. Determine whether the species can be expected to survive with an adequate potential for recovery under the effects of the proposed or continuing action, the effects of the environmental baseline, and any cumulative effects, and considering measures for survival and recovery specific to other life stages, and
5. Identify reasonable and prudent alternatives (RPAs) to a proposed or continuing action when that action is likely to jeopardize the continued existence of a listed species. Thus, this step is relevant only when the conclusion of the previously described analysis for Step 4, above, is that the proposed action would jeopardize listed species. The RPAs would have to reduce the impacts associated with the proposed action to a level that does not jeopardize the species. Note that this step

2

is not included in the BO because the conclusion of this BO is that the proposed action will not jeopardize the continued existence of any listed species.

The BA and other documents provided to the Service include two important categories of information intended to clarify potential actions under the Amended IAP/EIS. Prior to leasing and exploration, it is difficult to predict exactly how much and where oil and gas development will occur. Therefore, to form a basis for predicting impacts to spectacled and Steller's eiders, BLM provided a "reasonable and foreseeable oil development scenario" that describes the location and extent of development expected by BLM in the NE Planning Area. Additionally, BLM further defined potential actions outlined in the BA through a set of explicit "assumptions" upon which impact evaluation could be based. One example is the assumption that all of the projected development would occur in the Area of High Geologic Potential (Figure 3). In combination, the development scenario and accompanying assumptions form the basis for the Service's impact evaluation, and provide a means of measuring the accuracy of this basis in the future. Thus, should the development scenario prove unrealistic or one or more assumptions be violated, BLM and the Service must evaluate whether the resulting impacts which are not considered in this BO warrant reinitiation of formal consultation.

This determination is also based on BLM's commitment to consult with respect to all aspects of future oil development, production and abandonment. Additionally, consultation requirements must be met before granting of an exception to a Required Operating Procedure (ROP). This does not mean that separate consultations must be done for each individual development project; several development projects may be covered under a single consultation as long as section 7(a)(2) of the Act is satisfied.

Despite this "no jeopardy" determination, the Service stresses that given the large amount of uncertainty described within the BA surrounding how where development may occur subsequent to leasing, how that development would be managed (Administrative Officer discretion over application of stipulations and ROPs), and how Steller's and spectacled eiders may be affected by development/production, it is difficult to evaluate potential impacts from oil development to these two species. The potential for significant impacts is highest in/adjacent to the northeast portion of the NE Planning Area, because we believe a large proportion of North Slope-breeding spectacled eiders nest within this area (Figure 4). If substantial development, beyond the levels identified in the BA, occurs within/adjacent to areas of high concentration for this species, the potential for significant impacts is high. If development is ultimately authorized in/adjacent to these areas, diligent management will likely be required to protect this threatened species. Because the effects of development on spectacled and Steller's eiders are inadequately studied and understood, we believe that the only certain way to avoid significant impacts is to exclude development from high-density nesting areas.

A chronology of consultation actions regarding the BA is provided in Appendix 1. A complete administrative record of this consultation is on file at the Fairbanks Fish and Wildlife Field Office, 101 12th Ave., Room 110, Fairbanks, Alaska 99701. If you have any

comments or concerns regarding this biological opinion, please contact Ted Swem, Endangered Species Biologist, Fairbanks Fish and Wildlife Field Office at 907/456-0441.

## DESCRIPTION OF THE PROPOSED ACTION

<u>Background</u>

Section 7(a)(2) of the Endangered Species Act, (16 U.S.C. § 1531 et seq.), requires that each Federal agency shall insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat of such species. When the action of a Federal agency may adversely affect listed species, that agency (i.e., the "action" agency) is required to consult with either the National Marine Fisheries Service (NMFS) or the U.S. Fish and Wildlife Service (Service), depending upon the protected species that may be affected.  For the actions described in this document, the action agency is the BLM.  Due to the protected species involved, the consulting agency is the Service. Section 7(b) of the Act requires that the consultation be summarized in a BO detailing how the action may affect protected species.  The purpose of this BO is to fulfill the section 7 requirements for consultation on oil activity within the NE Planning Area.  Section 7 regulations allow a formal consultation to encompass a number of similar actions within a given geographic area or a segment of a comprehensive plan (50 CFR 402.14). This opinion focuses on the potential effects of oil activity on the threatened Steller's eider (*Polysticta stelleri*) and spectacled eider (*Somateria fischeri*).

If a lease sale were to result from the Amended IAP/EIS, it would be the eighth sale in NPR-A since January 1982.  The first two oil and gas lease sales were held in January and May 1982.  Two subsequent sales followed in 1983 and 1984, and a fifth lease sale was canceled. In 1998 the BLM consulted with the Service pursuant to a new IAP/EIS for NE Planning Area.  The NE Planning Area IAP/EIS was somewhat similar to the current Amended IAP/EIS in that it described potential ground-impacting management actions such as oil and gas exploration and potential development/production activities.  In the BO for the 1998 NE Planning Area IAP/EIS, the Service issued incidental take for 25 spectacled eiders and 1 Steller's eider and stated that the action would not result in jeopardy for threatened eiders. Sales covered by the 1998 NE Planning Area IAP/EIS were held in 1999 and 2001.  In January 2004, BLM consulted with the Service pursuant to a new IAP/EIS for the NW Planning Area.  To date a total of approximately129 wells have been drilled in the NPR-A. Of 688 leases issued in various Federal offshore Beaufort Sea sales adjacent to the NE Planning Area, 52 are still active, and a total of 30 exploration wells have been drilled, plugged and abandoned.  Currently, only one offshore production facility is in operation in the Beaufort Sea.  Nine offshore wells are considered producible but uneconomic for development and production at current oil prices.

The oil and gas potential of the NE Planning Area is dominated by the "Beaufortian Play" which contains the Alpine Field.  A play refers to a group of petroleum deposits (pools) that

share a common history of hydrocarbon generation, migration, reservoir development and trap configuration. The Beaufortian Play contains greater than 52 percent of NPR-A's estimated economically recoverable oil and gas. The geologic conditions associated with the 500 million barrels targeted by the Alpine Oil Field in the NE Planning Area, are expected to persist west across the northern portion of the NE Planning Area into the NW Planning Area.

The following sections detail proposed oil leasing, exploration, development, production and abandonment within the NE Planning Area under the Preferred Alternative. Because BLM's BA provides reasonably certain estimates of leasing and exploration activity, this BO best assesses adverse impacts to listed eiders from these phases. Due to uncertainty in how much and where development will occur, BLM provided a list of assumptions upon which the impact evaluation and determination were based. Violation of one or more assumptions may result in effects that were not analyzed in the BO and therefore may require BLM to reinitiate consultation. For example, assuming that a given amount of development will occur, the impacts to listed eiders will vary with where development occurs because the density of listed eiders varies across the NE Planning Area. Obviously, the greatest impacts could occur where listed eider density is highest, such as the northeast portion of the NE Planning Area for spectacled eiders. BLM used a model incorporating geologic information, economics of extraction, and proximity to existing infrastructure in the Colville River Delta to estimate reasonable numbers and locations of oil developments within the NE Planning Area. One assumption used in our analyses, therefore, is that the results of this model reasonably predict the maximum amount of development and maximum resulting impact to eiders. If, however, development occurs that exceeds the original predictions of potential effects to listed eiders, reinitiation may be required.

Through the development of such assumptions, BLM is essentially agreeing to conditions that must be adhered for the BO and accompanying ITS to remain valid. For this reason, the assumptions are clearly documented in the BO and should be monitored by BLM as appropriate (Appendix 2). These assumptions are reiterated in the "Description of the Proposed Action" and "Effects of the Action" sections of this BO, and procedures for monitoring the enforceable elements of assumptions are presented in the Terms and Conditions.

<u>Reasonably Foreseeable Oil and Gas Leasing, Exploration, Development, Production and Abandonment Activities Under the Preferred Alternative</u>

The action primarily addressed within the Amended IAP/EIS is the opening up of previously protected areas within the NE Planning Area for oil and gas leasing/exploration. Although this BO assesses all impacts that may result from the proposed action (leasing through oilfield abandonment), separate consultations for individual developments and associated infrastructure will be conducted at a later date if oil is discovered and project-specific development plans are proposed. BLM issued a final BA to the Service on December 24, 2004, addressing their Preferred Alternative that will be further described in the final Amended IAP/EIS due out in February 2004. BLM fully describes its "Reasonable Foreseeable Oil Development Scenario" starting on page 4 of the BA.

Under the Preferred Alternative, BLM assumes that at $30-per-barrel oil, 2,054 million barrels of oil could be produced from in the NE Planning Area.  BLM's Preferred Alternative would offer 95% of BLM administered surface lands within the NE Planning Area encompassing about 4.6 million acres.  It also encompasses the bays, lagoons, inlets, and tidal waters between NE Planning Area's outlying islands.  BLM's analyses of the geologic plays indicate commercial fields are most likely to be discovered in the terrestrial portion of the NE Planning Area designated as the Area of High Geologic Potential. Although the Preferred Alternative provides an opportunity to lease in the immediate offshore area of the NE Planning Area, BLM does not anticipate production facilities offshore.  BLM plans to protect these shorelines and nearshore habitats with a ¾ mile no surface occupancy (NSO) requirement both offshore and onshore.  While BLM does not reasonably foresee any production facilities offshore, these areas likely would be included in the exploration phase. Offshore areas would likely be reached using directional drilling techniques either anchored onshore or from bottom-founded offshore ice islands.  The Preferred Alternative does not extend to subsurface estate owned by the North Slope Borough and regional or village corporations.

Within the Area of High Geologic Potential, BLM assumes that two Alpine-size fields, or anchor developments, would be discovered, with 5 additional satellite fields tied into the infrastructure of each of the anchor fields (10 satellites total).  BLM's reasonable and foreseeable scenario suggests each satellite field would be connected to an anchor development (Alpine-size) field (Figure 5).  Current pipeline engineering constraints dictate satellite fields be located within 20 miles of an anchor field.  Currently, no infrastructure exists to transport natural gas from the North Slope to a market.  While natural gas is a byproduct of oil development, BLM does not consider natural gas production as reasonably foreseeable.  Therefore, in this BO we did not consider impacts to listed species from gas development, production or gas-field abandonment.

BLM's reasonable and foreseeable scenario assumes the first fields developed in the NE Planning Area would approximate the size of the Alpine field (Figure 5) in extent of gravel cover, petroleum resources, associated activity, and current technology.  The following hypothetical discovery and related reasonably foreseeable development, and production schedule, is BLM's estimate of the types and timing of activities that may occur as a result of multiple lease sales under the Preferred Alternative.  Typically after a lease sale is held, the successful lessee enters into an exploration/delineation program.  If a successful discovery is made, production/support facilities are constructed followed by operation and, in approximately 30 years, abandonment of the sites.

*Leasing/Exploration/Delineation*

Under the Preferred Alternative outlined in BLM's BA, 95% of BLM-administered lands within the NE Planning Area would be made available for oil and gas leasing. The Preferred Alternative provides an opportunity to lease in the immediate offshore area of the NE Planning Area.  These shorelines will be protected by a ¾ mile no-surface occupancy (NSO)

requirement (Stipulation K-6, both offshore and onshore, to protect the nearshore habitats. While reasonable and foreseeable projections do not anticipate production facilities offshore, these areas likely would be leased and included in the exploration phase. The Preferred Alternative indicates the first lease sale in mid-2005, with leases issued later that year. Exploration actions would begin the following winter season.

Seismic surveying would occur during winter and is expected to begin during the winter season of 2005-2006. A maximum of 3 seismic crews are expected to collect seismic data in the NE Planning Area in future years. Winter seismic operations will be conducted by all-terrain ground vehicles supported by light aircraft. Support by aircraft (fixed wing and helicopter) will be required to survey potential sites during summer months to prepare for intensive activities. In addition to aircraft support, the only summer activity associated with seismic exploration would be annual maintenance of exploratory drill rigs.

Following the end of each winter seismic season, each seismic crew will store its equipment at a staging area (Pt. Lonely and/or Inigok), at locations that BLM assumes will be existing gravel pads built previously for some other purpose. During summer, a repair crew will spend 2-4 weeks performing annual maintenance and installing upgrades to seismic equipment. These activities will require aircraft support, with one to two fixed-wing and two to three helicopter flights per week. On completion of maintenance work, the crew would leave the equipment cold stacked and there would be no activity until the following winter. In the BA, BLM assumes the maintenance operations would be self contained and use accommodations that are part of the seismic camp. On completion of the work, all wastes would be removed and disposed of at approved disposal sites on the North Slope. None of these activities would require the establishment of new landfill locations. The approved landfill currently in operation at Deadhorse most likely would be used for materials not requiring additional treatment. Organic wastes would be disposed of in accordance with the Clean Water and Clean Air Acts, and the disposal of any liquid or solid waste would not be permitted on site (ROP A-2).

There would be a maximum of 4 exploration drill rigs available for use in the NE Planning Area at any one time, over a 10-year maximum exploration phase. Drilling would be conducted entirely during the winter months (early December to mid-April). On completion of drilling operations, all equipment and materials would be removed (during winter operations) over ice roads to staging areas and then to other locations on the North Slope, or to recycling centers out of the country. Drilling material (mud and cuttings) would be reinjected into the dry drill hole if the exploration well were unsuccessful. If drilling is successful, the well would be temporarily capped, and the operator would remove drilling materials (mud and cuttings) to an approved disposal area at Prudhoe Bay in accordance with the Clean Water and Clean Air Acts. No liquid or solid waste would be disposed of on site.

Ice roads would provide seasonal routes supporting winter activities. These temporary roads are constructed by spreading water from local sources (rivers and lakes) to build up a rigid base (Stipulation B-1). Low-pressure vehicles will be used to establish ice roads, which can

then be used by conventional vehicles. Ice roads would likely connect exploration and delineation drill sites to staging areas.

Ice pads are used commonly as platforms for winter exploration activities (e.g., NE Planning Area exploration, 1999-2003). Methodology used in ice pad construction is similar to ice roads. A typical ice pad is typically 1 foot thick, covers 6 acres, and requires approximately 500,000 gallons of water to construct. Depending on location, ice pads can range in size from 3-10 acres. Current ice-pad design technology could provide for some pads to remain intact over the summer season. During the summer season, these ice pads would house one exploration drill rig and/or seismic camp. Each of these rigs would be stored with towers or derricks folded and would present a silhouette of approximately 20 feet in height.

Materials and equipment necessary to support winter exploration activities will be moved to staging areas within the NE Planning Area by marine transport in the summer months (late July/August), and then overland on ice roads or hardened snow trails during winter exploration/delineation activities. The sealifts for exploration would use two to seven barges per year. The majority of large equipment movement would be by sealift to existing staging areas at Cape Simpson, Deadhorse, or Barrow or during summer months, then to the exploration pads over ice roads during winter months. These activities would occur annually during the exploration phase, which may last up to 10 years after the sale.

*Development/Production/Abandonment*

The following hypothetical reasonably foreseeable development, production and abandonment schedule, is BLM's estimate of the types and timing of activities that may occur as a result of multiple lease sales under the Preferred Alternative. Typically after a lease sale is held the successful lessee enters into an exploration/delineation program. If a successful discovery is made production/support facilities are constructed followed by operation and, in approximately 30 years, abandonment.

   1.  Development/Production:
Construction of gravel pads, roads, airstrips, and staging areas would be the first development activities to take place. Current technology uses gravel pads to support both anchor and satellite production facilities. Gravel requirements for current "all-gravel" pads raised 5 feet or more above a wet tundra surface are approximately 8,000-12,000 cubic yards per acre of surface footprint. Gravel roads (65 feet wide with 2:1 slopes) cover approximately 7.5 acres per mile, and require 40,000-60,000 cubic yards of gravel per mile. Airstrips (100 feet wide and 5,000 feet long) cover 11 acres and require 110,000 cubic yards of gravel. Total gravel estimates for 12 fields consisting of 2 CPFs and 10 satellite pads, is approximately 6,823,000 cubic yards. Any staging area or pump station sites would have similar gravel requirements. The preferred alternative estimates that the two staging area (50 acres each) would require an additional 900,000 cubic yards of gravel (BA Table 1).

Gravel mining and transportation would occur during winter months when gravel can be moved by heavy equipment over ice roads. Where gravel extraction has occurred on the North Slope, sites are typically 20-50 acres in size. The Preferred Alternative assumes development of up to 6 extraction sites. The location of those potential mine sites is unknown at this time. If larger deposits are found, extraction footprint per site could exceed 50 acres in size but the number of sites would be reduced, and the total disturbance footprint also would be less (300 acres). In the BA, BLM assumes that all 6 gravel extraction sites would be located within the Area of High Geological Potential because of the high cost of material transport over long distances over ice roads.

Within the High Geologic Potential Area, BLM assumes that 2 Alpine-size fields, or anchor developments, would be discovered, with 5 additional satellite fields tied into the infrastructure of the anchor fields. Each anchor development would consist of gravel pads covering a total of 100 acres (including an airstrip of 5,000 feet, secondary drill pad, and connecting road). Runways would be oriented in a west-southwest/east-northeast direction similar to the Barrow Airport. Power, telephone, and other communication lines would be buried in the roads or installed on the pipeline vertical support members (VSMs) to the extent practicable (Draft IAP/EIS: ROP E-14). Each anchor facility would have one tall (up to 60 feet) communication tower. BLM assumes 1 communication tower would be co-located on each facility pad and all guy wires would be marked to increase visibly to birds. Towers will also be constructed in a manner to discourage nesting/perching of avian predators. Each anchor development would have a secondary drill pad located within a 3-mile radius of the main pad. The secondary pad would be connected to the anchor facility by a 3-mile long gravel road. No overnight accommodations would be available at the secondary pad.

Each anchor pad would contain a central production facility (CPF) that serves as an operational center for long-term production activities in an oil field. In addition to oil-production equipment, the CPF typically includes living quarters, offices, maintenance shops, storage tanks for fuel and water, power generators, waste-treatment units, and a communications center. For most North Slope oil projects, components of the CPF are constructed as transportable modules at offsite locations, and then moved to staging areas in the summer by sealift. The following winter they are moved overland on ice roads to the field and assembled. All buildings are supported on pilings to accommodate ground settling or frost heaving. An airstrip usually is located near the CPF to allow transport of supplies and personnel to the field site. BLM assumes that none of these facilities would require a new landfill location. No liquid or solid waste would be disposed of on site. Organic wastes will be shipped to incineration units at Deadhorse or Barrow and disposed of at permitted NSB landfills.

A typical satellite field would be developed from a single gravel pad with a footprint of approximately 10 acres. Each pad would hold approximately 30 wells and would be accessed from the anchor development on a permanent gravel road 60 feet wide, with a 2:1 aspect, and up to 20 miles in length. BLM assumes that 5 satellite fields would be developed for each anchor facility. However, satellite field development would not be expected for several years after an anchor facility is developed (similar to Alpine development), and would have a production life of approximately 10 years.

The time required to drill, and complete, a production well depends largely on the depth. Currently on the North Slope, it takes approximately 20-30 days to drill and complete a 10,000-foot well. This equates to approximately 12-18 wells per rig over a 12-month period. BLM assumes that there would be a maximum of 8 production drill rigs operating at any given time over a period of 6 years. Safety considerations normally restrict operations to one rig drilling on each pad at a time. Using the above example, where up to 30 wells from each pad are needed for initial reservoir development, drilling operations would take 3-4 years to complete. The overall development phase from construction of a staging area and remote base camp to production startup could take up to 5 years, depending on the size and location of the new field.

The locations of new pipelines constructed in the NE Planning Area depend on both the location and sequence of discoveries of commercial-sized oil fields. BLM assumes that one connecting pipeline would be constructed within the NE Planning Area that will run west to the existing Alpine facility, which has infrastructure available to connect to the Trans-Alaska Pipeline System. The Preferred Alternative assumes that 205 miles of pipeline would be installed during the winter, coinciding with the construction of the development and production facilities. It would consist of approximately 97 miles of elevated field gathering lines for oil and 108 miles of elevated oil trunk lines. Outside the NE Planning Area it is likely that 120 miles of common carrier trunk line would be constructed on State lands to the east to transport product to market. BLM assumes that no pipelines would be established as subsea infrastructure. These pipelines would consist of connecting multiphase pipelines (24-inch oil pipeline and a 14-inch water pipeline) installed aboveground on VSMs, and would be a minimum of 7 feet above the tundra (ROP E-7). The VSMs would be spaced 55-70 feet apart. Routine pipeline maintenance would occur during winter months when the pipeline could be readily accessed by ice road or hardened snow trail, with summer activities on an emergency basis only. Throughout the year pipelines would be pigged and electronically monitored to determine pipeline integrity.

Development of staging areas would occur in winter prior to the start of development activities. The number of barges required in each sealift to support development activities would be up to 20 barges/year. However, the modules and equipment still would be offloaded from barges in 3-5 days and stored on the staging area pad until winter, when they would be transported by ice road to the anchor development site. The individual modules could be 20-30 feet in height. After transportation to the anchor development sites, these modules would become the site's operation and housing facilities complex. There likely would be two large sealifts (1 year apart) for each anchor development.

BLM estimates that the first production pad (anchor pad) would be installed in 2013 (8 years after first lease sale). Production would likely begin in 2014 (9 years after the lease sale), and peak rates would be 77 million barrels per year. Up to 489 production and injection wells would be drilled for all 12 fields over a period totaling 6 years. A

maximum of 8 drill rigs would be used to drill wells. Oil field infrastructure would likely include processing facilities and a permanent airstrip and would operate year-round for at least 30 years.

2.  Associated Activity:

BLM assumes all development within the NE Planning Area will be roadless and aircraft and sealifts will be the principle mode of transportation and supply during the summer. Aircraft activity will likely be the principle method of supply early in the development phase prior to construction of staging areas. Therefore, the highest level of aircraft activity would likely occur during the period when both construction and development drilling are occurring. From June 1, 2001, to July 15, 2002, there were a total of 1,474 aircraft landings or take offs (a daily average of 32.8 operations) at the Alpine site (Johnson, et al. 2003; ABR 2001). BLM expects similar levels of aircraft activity during the summer development phases for each of the anchor developments. The number of summer (June 1 to September 30) aircraft flights to support activities outlined in the BA is estimated at 224,596 (BA Table 2). There would also be some truck traffic from the main facilities to satellite and secondary pads on a daily basis. In addition there would be monthly helicopter flights along pipelines to monitor integrity.

Once a staging area is completed, BLM assumes that the facility would be supplied by annual sealift. Most of these supplies would arrive at a staging area in containers by barge in late July or August. The containers would be offloaded with cranes and stacked on gravel pads at the staging area. The typical container is less than 10 feet in height. This vessel traffic generally would be limited to routes in shallow, nearshore waters between staging areas connected to existing infrastructure (e.g., West Dock or Oliktok Point) and staging areas within the NE Planning Area such as Cape Lonely.

Under the Preferred Alternative, watercraft are allowed for summer transportation and supply. Nonrecreational airboat use will be allowed on all streams, lakes, and estuaries seasonally accessible by motorboats. Airboats would be prohibited in seasonally flooded tundra and shallow waters with wetland vegetation adjacent to streams, lakes, and estuaries (BA Appendix D). However, BLM assumes no facilities would be constructed adjacent to waterways that could support nonrecreational use of watercraft because of setbacks required by stipulations K-1, 2 and 3. Boats and other watercraft would likely be used by researchers during study efforts if facilities, or areas of concern, were located near large waterbodies such as the Beaufort Sea, rivers, or large, deepwater lakes. These activities would occur during summer months, but their numbers, locations, and type of activities remain speculative because data quantifying this activity has not been collected for the NE Planning Area.

There likely will be annual summer oil-spill-response training, which typically involves 20-40 individuals for 1-2 days each summer at each anchor facility. This activity would result in an increase in aircraft landings and take offs. Because BLM assumes that no facilities would be located along navigable waters due to stipulations K-1, 2 and 3,

watercraft activity similar to that used for Alpine is not expected to occur and all oil-spill-response activity will be confined to gravel pads.

All developments described by the Preferred Alternative would be made unavailable/inaccessible to the general public for recreational or tourism activities. However, the facilities would be available for use to rural subsistence users. Subsistence use of the NE Planning Area is variable due to the availability and location of species available for subsistence harvest. The BA states that it is possible that subsistence activities could be enhanced by the road infrastructure described in this reasonably foreseeable scenario, but the potential is not quantifiable.

Abandonment and reclamation of satellite fields likely would coincide with abandonment and reclamation of corresponding anchor development sites. Abandonment operations typically include removal of all equipment, cutting well casings a minimum of 3 feet below the surface, and plugging wells. Gravel, or gravel/sand pads would not be removed but allowed to bed naturally. Overall, abandonment operations would take many years, as revegetation and environmental monitoring studies continue to document the long-term effects of operations at a particular site. A series of permitting and inspection requirements are associated with abandonment procedures (ROP G-1). Abandonment activities would occur during winter months when ice roads could be constructed to allow the removal of equipment. Monitoring abandonment would require periodic revisits throughout subsequent summers to gather information on environmental parameters related to natural bedding and to document success of abandonment actions. On the North Slope, monitoring of abandonment sites typically involve one helicopter with a crew of three visiting the site annually for the first 5 subsequent years followed by increasing time gaps over the next 10 years.

*Interrelated and Interdependent Actions*

For this BO, the Service considered activities that would be interrelated and interdependent to the proposed action as well as accidental events that may occur as a result of the proposed action. Interrelated actions are those actions that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those actions that have no independent utility apart from the action being considered in the BO. Interrelated and interdependent activities that may occur in conjunction with the proposed action include oil/gas development on Native surface/subsurface lands, additional telecommunications infrastructure, increased research activity, increased subsistence hunting, offshore oil exploration/development, onshore support facilities, additional staging areas, access roads, onshore and offshore pipelines, and accidental oil spills originating from pads, pipelines, and supply vessels.

STATUS OF THE SPECIES

*Steller's eider*

The Alaska-breeding population of Steller's eider was listed as threatened on June 11, 1997 (Federal Register 62(112): 31748- 31757).  This action was based on a substantial decrease in the species' nesting range in Alaska, a reduction in the number of Steller's eiders nesting in Alaska, and the resulting increased vulnerability of the remaining breeding population to extirpation.  Historically, Steller's eiders nested in Alaska in two general regions:  western Alaska, where the species has been nearly extirpated, and the North Slope, where the species still occurs.  In western Alaska, Steller's eiders occurred primarily in the coastal fringe of the Yukon-Kuskokwim Delta, where the species was common at some sites in the 1920s, was still present in the 1960s, but was not recorded as breeding from 1976-1994 (Kertell 1991, Flint and Herzog 1999).  In 1994, 1996-1998, and 2002, 1-2 nests were found at either or both the Tutakoke River and Hock Slough study sites on the Yukon-Kuskokwim Delta (Flint and Herzog 1999).  In 2004, 1 nest was found on Kigigak Island that successfully hatched 7 young (Service, unpublished).

On the North Slope, Steller's eiders historically occurred from Wainwright east, nearly to the United States-Canada border (Brooks 1915).  The species may have abandoned the eastern North Slope in recent decades, but it still occurs at low densities from Wainwright to at least as far east as Prudhoe Bay.  The majority of sightings in the last decade have occurred east of Point Lay, west of Nuiqsut on the Colville River, and within 90 km (56 miles) of the coast. Near Barrow, Steller's eiders still occur regularly, though they do not nest annually.  In some years, up to several dozen pairs may breed in a few square kilometers.

Aerial breeding pair surveys conducted in late June indicate a population of about 1200 birds (Mallek 2001).  A separate aerial survey, timed in mid-June, indicates a smaller population, averaging about 150 birds from 1992-2003 (Larned et al. 2003).  Both surveys likely underestimate actual population size, however, because an unknown proportion of birds is missed when counting from aircraft, and no species-specific correction factor has been developed and applied.  Nonetheless, these observations indicate that hundreds or low thousands of Steller's eiders occur on the North Slope.  These surveys do not demonstrate a significant population trend over the last decade.  However, based on the observed interannual variability, it is estimated that it would take 14 years to detect a trend equivalent to a 50% change over 10 years (Larned et al. 2001a).  Thus, current sampling intensity is too low to provide useful trend detection over short time intervals for this very rare species. There is some support for the belief that Steller's eiders have abandoned formerly occupied areas and have reduced their breeding frequency in eastern portions of the North Slope; if true, this suggests that the Alaska-breeding population has declined on the North Slope in recent decades (Quakenbush et al. 2002).

Steller's eiders spend most of the year in marine habitats.  During winter, most Steller's eiders concentrate along the Alaska Peninsula from the eastern Aleutian Islands to southern Cook Inlet in shallow, near-shore marine waters (Jones 1965, Petersen 1980).  They also

13

occur in the western Aleutian Islands and along the Pacific coast, occasionally to British Columbia, along the Asian coast (from the Commander Islands to the Kuril Islands), and some are found along the north Siberian coast west to the Baltic States and Scandinavia (Cramp et al. 1977). In spring, large numbers concentrate in Bristol Bay before migration. In 1992, an estimated 138,000 Steller's eiders congregated there before sea ice conditions allowed movement northward (Larned et al. 1994). Spring migration of Alaska-breeding birds typically involves small flocks following offshore ice leads north through the Bering Strait as early as mid-May and reaching Pt. Barrow by early June. In contrast, southerly migration begins in mid-July with brood-rearing females and broods leaving nesting areas from late August to mid-September. Anecdotal information suggests that Steller's eiders migrate south in small flocks along the coast.

Steller's eiders arrive in pairs on the North Slope in early June. Nesting effort varies widely from year to year. In the13 years from 1991-2003, there were 6 "nesting years" (1991, 1993, 1995, 1996, 1999, 2000) when typical breeding activities occurred, and 6 "non-nesting years" (1992, 1994, 1998, 2001, 2002, 2003) when birds appeared in early summer, but no nests were found and Steller's eiders are believed not to have nested (Quakenbush et al. 1995, Obritschkewitsch et al. 2001, Service, unpublished data). Four nests were found in 1997, but these were initiated late (early July) and none survived past mid-incubation (Service and NSB, unpublished data). The reasons for the observed variation in nesting effort are unknown, but an association has been noted between nesting years and years of lemming abundance. Nest success could be enhanced in years of lemming abundance because predators are less likely to prey on eider nests when small mammals are abundant. It has also been hypothesized that avian predators such as pomarine jaegers (*Stercorarius pomarinus*) and snowy owls (*Nyctea scandiaca*), which nest at high densities only when lemmings are abundant, may provide protection for nearby eider nests incidental to defense of their own nests (Quakenbush and Suydam 1999). If this hypothesis is correct, the presence of nesting jaegers or owls may be an essential element of breeding habitat.

In nesting years, initiation dates are typically in the first half of June (Quakenbush et al. 1995), and hatching dates range from 7 July to 3 August (Quakenbush et al. 1998). Nests in Barrow are located in wet tundra, in areas of low-center polygons or low (indistinct flat-centered) polygons, frequently within drained lake basins (Quakenbush et al. 1998). Average clutch sizes at Barrow ranged from 5.3-6.3 in five different years, with clutches up to 8 reported (Quakenbush et al. 1995). Nest success (proportion of nests at which at least 1 egg hatched) at Barrow averaged approximately 17% from 1991-2002 (Service, unpublished data). Egg loss was attributed mostly to predation by predators, including jaegers, common ravens (*Corvus corax*), and possibly glaucous gulls (*Larus hyperboreus*) and arctic foxes (*Alopex lagopus*) (Quakenbush et al. 1995, Obritschkewitsch et al. 2001). The fledging period is not known, but is estimated to be 37 days (Obritschkewitsch et al. 2001). Broods most often used ponds with emergent grass (*Arctophila fulva*) (Quakenbush et al. 1998). Broods were reared close to their nest site; 8 broods tracked near Barrow in 1995 remained within 650 meters of their nest sites during the first 32 days after hatching (Quakenbush et al. 1998).

Males typically depart the breeding grounds after females begin incubating. Based on observations in the Barrow area, and on a small sample of birds equipped with satellite transmitters, males depart Barrow around the end of June or early July (Quakenbush et al. 1995, Obritschkewitsch et al. 2001, Service, unpublished data). Both males and females tracked with satellite transmitters in a non-breeding year dispersed across the area between Wainwright and Admiralty Inlet in late June and early July, with most birds entering marine waters by the first week of July. The satellite-tracked birds used coastal locations from Barrow to Cape Lisburne, and made extensive use of lagoons and bays on the north coast of Chukotka (Service, unpublished data). Visual observations in other years confirm the use of nearshore areas of the Chukchi Sea; small groups of males (less than 10) have been observed in July near Barrow (Service, unpublished data). Females that fail in breeding attempts may remain near Barrow later in the summer; a single failed-breeding female equipped with a transmitter in 2000 remained near the breeding site until the end of July, and stayed in the Beaufort Sea off Barrow until late August. Females and fledged young depart the breeding grounds in early to mid-September.

In mid-August, Alaska-breeding Steller's eiders migrate to molting areas, where they congregate in large flocks in protected waters. Concentrations of molting Steller's eiders have been noted in Russia on the Chukchi and Bering seacoasts, near Saint Lawrence Island in the Bering Sea, and along the northern shore of the Alaska Peninsula (Kistchinski 1973, Fay 1961, Jones 1965, Petersen 1981). Satellite-tracked birds from Barrow molted at Nunivak Island, Cape Avinof (Kuskokwim Shoals), Nelson Lagoon/Port Moller, and Izembek Lagoon (Service, unpublished data).

Causes of suspected population decline are not known. Possible causes of decline in the Barrow area include artificial increases in predator populations, subsistence harvest and ingestion of lead shot. In 2003, a Recovery Plan was finalized by the Service that provided strategies to recover the Alaska-breeding population of Steller's Eiders to the point that protection under the Act is no longer required (i.e., "delisting" is appropriate). Interim objectives identified were: 1) to prevent further declines of the Alaska-breeding population (including both the northern and western Alaska subpopulations); 2) to protect Alaska-breeding Steller's Eiders and their habitats; 3) to identify and alleviate causes of decline and/or obstacles to recovery; and 4) to determine size, trends, and distribution of the northern and western Alaska-breeding subpopulations. The Recovery Plan also outlined tasks as being high priority actions needed to achieve the ultimate and interim objectives listed above. The tasks include: 1) reduce exposure to lead; 2) reduce nest predation; 3) reduce hunting and shooting mortality; 4) elucidate distribution and abundance; 5) acquire information on marine ecology; 6) acquire information on breeding ecology; 7) acquire demographic information needed for population modeling efforts; 8) maintain or re-establish subpopulation on Yukon-Kuskokwim Delta; and 9) develop partnerships for recovery efforts.

*Spectacled eider*

The spectacled eider was listed as a threatened species under the Act in May 1993. Currently, primary nesting grounds are the Yukon-Kuskokwim Delta, the North Slope (Cape Simpson to the Sagavanirktok River) of Alaska, and in the Chaun Gulf and the Kolyma, Indigirka, and Yana river deltas of arctic Russia. Post-breeding flocks of staging and molting spectacled eiders have been observed in Mechigmenan Bay (on the eastern coast of Russia's Chukotsk Peninsula), Alaska's Ledyard Bay (southwest of Point Lay), Peard Bay, Norton Sound, and 80 km south of Saint Lawrence Island. An estimated 7,149 spectacled eiders occupied the Arctic Coastal Plain of Alaska in June 2003 (Larned et al. 2003) although this estimate is likely an underestimate of actual population size because an unknown proportion of birds is missed when county from aircraft and no correction factor has been applied to this estimate. This estimate of 7,149 comprises about 2% of the estimated 375,000 world population (Larned and Tiplady 1999).

From late December to early April, the only known wintering area of spectacled eiders is within leads in the pack ice southwest of St. Lawrence Island in the Bering Sea (Larned et al. 1997, Petersen et al. 1999). Leads in ocean ice are important pathways for marine bird and mammal species migrating along the Beaufort Sea coast in Alaska and Canada. All species of eiders use this lead system, typically flying at altitudes less than 30 meters (Johnson and Richardson 1982). During spring migration spectacled eiders migrate offshore along the Bering (median 15.3 km), Beaufort (median 6.6 km for males, 16.6 km for females), and Chukchi (median 34.9 km) Sea coasts (P. Flint pers. comm.). Very little is known about migratory routes east of Barrow because the definitive lead system transforms into numerous branches varying in location and extent from year-to-year. Because few spectacled eiders are observed in marine areas along the Beaufort coast in spring, a majority may migrate to nesting areas overland from the Chukchi Sea (TERA 2003). Migration of eiders (the majority of which are king and common eiders) along Alaska's northern coast has been described in several studies (Thompson and Person 1963, Johnson 1971, Woodby and Divoky 1982). Spectacled eiders are observed in mixed flocks of king, common, and sometimes Steller's eiders, but the proportion of both spectacled and is quite small. Although information specific to listed eider flight behavior is lacking, a spectacled eider was seen striking a utility wire near an electric light in white-out conditions on St. Lawrence Island in 1998 (Service, unpublished data). In summer 2003, 4 dead/injured spectacled eiders were retrieved by the Service that likely collided with overhead power lines/guy wires (3 at Barrow and 1 at Prudhoe Bay) (Service, unpublished data).

Spectacled eiders arrive on North Slope breeding grounds paired, often in small flocks, in late May to early June. Spectacled eiders nest mainly from the Sagavanirktok River to the Chukchi Sea, and only sparsely to the east (Larned et al. 2001a). Based on Service aerial surveys (1998-2002, Arctic Coastal Plain east to the Arctic National Wildlife Refuge), the highest densities were found south of Barrow, with smaller areas of concentration east of Teshekpuk Lake, on the Colville River Delta, and near western Simpson Lagoon. Overall density was estimated to be 0.22 birds per square kilometer in 2002 (Larned et al. 2002).

Male spectacled eiders begin to depart breeding areas during incubation, which is during late June on the North Slope. On the North Slope, pair numbers peak in mid-June and the number of males declines 4-5 days later (Smith et al. 1994, Anderson and Cooper 1994, Anderson et al. 1995). Following their late June departure from the nesting areas, males apparently make little use of the Beaufort before migrating to the Chukchi Sea. During late June the Beaufort Sea has little open water, hence males present at breeding grounds east of Barrow normally do not use marine habitats and fly directly overland (most heading to a molting/staging area in Ledyard Bay) (TERA 2003). Later in the season (late June through September), when females depart the North Slope, much more of the nearshore zone is ice-free, allowing for extensive use of the western Beaufort Sea. Radio telemetry studies have shown that most female spectacled eiders that migrate west toward Barrow use the nearshore zone of the Beaufort Sea as they transit to their molting/staging areas. In 2000, 13 female spectacled eiders tracked via radio telemetry primarily used the western Beaufort (71% of all bird-days) while areas near Stockton Island were also extensively used (17% of all bird-days) (TERA 2003). Females remained in the Beaufort Sea nearshore zone for an average of about two weeks (range 6-30 days).

Predators of spectacled eider eggs include gulls, jaegers, and foxes. In arctic Russia, apparent nest success has been calculated to be as low as <2% in 1994 and 27% in 1995; foxes, gulls, and jaegers are suspected to have depredated most of the nests (Pearce et al. 1998). On Kigigak Island in the Yukon-Kuskokwim Delta, nest success ranged from 20-95% in 1991-1995 (Harwood and Moran 1993, Moran and Harwood 1994, Moran 1995, Moran 1996). Nest success may have been higher in 1992 than in other years of observation, because foxes were eliminated from the island prior to the nesting season that year. Apparent nest success in 1991 and 1993-1995 in the Kuparuk and Prudhoe Bay oil fields on the North Slope ranged from 25-40% (Warnock and Troy 1992, Anderson et al. 1998).

Spectacled eider incubation lasts 20-25 days (Dau 1974, Kondratev and Zadorina 1992, Harwood and Moran 1993, Moran and Harwood 1994, Moran 1995). Average clutch sizes on the North Slope average 3.2-3.8, with clutches up to 8 reported (Quakenbush et al. 1995, Troy pers. comm.). Hatching on the North Slope occurs from mid- to late July (Warnock and Troy 1992). Fledging occurs approximately 50 days after hatching. At this time, females with broods move directly from freshwater to marine habitats (Dau 1974, Kistchinski and Flint 1974).

On the nesting grounds, spectacled eiders feed by dabbling in shallow freshwater or brackish ponds, or on flooded tundra (Dau 1974, Kistchinski and Flint 1974). Food items include mollusks, insect larvae such as Tipulidae (craneflies), trichopterans (caddisflies), and chironomids (midges); small, freshwater crustaceans, and plants or seeds (Cottam 1939, Dau 1974, Kistchinski and Flint 1974, Kondratev and Zadorina 1992). Spectacled eiders in the marine environment feed predominately on clams and small amounts of snails, amphipods, and other bivalves. In March-April 1999 and 2001, studies within the spectacled eider wintering areas showed that the esophagi of collected eiders contained only clams, almost entirely *Nuculana radiata* with no trace of the once dominant and preferred *Macoma*

**Exhibit 44, page 17 of 71**

*calcarea* (Lovvorn 2002). Changes in the density of *Macoma calcarea* in the Bering Sea are coincident with an oceanic regime shift to warmer conditions in 1976-77 (Lovvorn et al. 2002 review). Exceptional climate change in the arctic and subarctic, and associated changes in marine communities and ice dynamics in spring, may have had important impacts on spectacled eiders.

The range-wide population of spectacled eiders is estimated at 375,000 (Larned and Tiplady 1999). From the early 1970s to the early 1990s, numbers of pairs on the Y-K Delta declined by 96% from 48,000 to 2,000, apparently stabilizing at that low level (Stehn et al. 1993, Petersen et al. 1999). This dramatic decline on the Y-K Delta was the primary reason the species was listed as threatened in 1993. On the North Slope, however, trends in population size are much less clear. Abundance indices from North Slope eider surveys in 1993-2003 do not show a statistically significant trend (Larned et al. 2001b, Larned et al. 2003), and data from prior to 1993 are not suitable for trend analysis.

Factors known or suspected to affect survival of spectacled eiders have been identified but the relative importance of these factors to the species' decline and recovery are not known. The extent and causes of population decline are difficult to assess because historical data are lacking for many locations. Several of the following factors are known to affect survival during the nesting season, but it is not clear whether they contributed to the decline of the spectacled eider population.

Lead poisoning is a confirmed cause of mortality of eiders that ingested lead shot on the breeding grounds in the Yukon-Kuskokwim Delta. Spent shot pellets are ingested, either as grit or by eiders foraging in sediments for food. The grinding action of the eider's gizzard, in combination with the acidic environment of its digestive tract, causes toxic lead salts to be released into the body. The proportion of spectacled eiders on the Y-K Delta's lower Kashunuk River drainage that contained lead shot in their gizzards is high (11.6%, n=112) compared to other waterfowl in the lower 48 states from 1938-1954 (8.7%, n=5088) and from 1977-1979 (8.0%, n=12,880). The lead exposure rate in spectacled eiders (based on X-rays) is likely biased low (Flint et al. 1997), because lead is retained in the gizzard for only about three weeks (Elder 1954, Dieter and Finley 1978, Anderson and Havera 1986, Franson 1986, Anderson et al. 1987). Blood analyses of spectacled eiders indicate elevated levels of lead in 13% of pre-nesting females, 25.3% of females during hatch, and 35.8% during brood rearing, indicating that successfully nesting females suffer higher exposure rated because of their prolonged residence in tundra habitats. Nine of 43 spectacled eider broods (20.9%) contained one or more ducklings exposed to lead by 30 days after hatch (Flint et al. 1997). Spent lead shot in the lower Kashunuk River area and on Kigigak Island is causing additive mortality in spectacled eiders, that is, mortality over and above that caused by natural circumstances (Grand et al. 2003). It is possible that exposure to lead occurs in small, localized hunting areas on the North Slope as well, however, there are no site-specific data on lead contamination in this region.

Predation pressure on spectacled eider eggs, young, and adults may have increased in recent decades. Predators include arctic foxes (*Alopex lagopus*), red foxes (*Vulpes fulva*), large

18

gulls (*Larus* spp.), jaegers (*Stercorarius* spp.), and snowy owls (*Nyctea scandiaca*). Native elders on the North Slope believe that fox numbers have increased in recent decades as a result of reduced trapping. Wastes made available from the commercial fishing industry in the Bering Sea and North Pacific, along with an increase in the garbage generated by coastal communities, have increased the year-round food supply for gulls. Glaucous gull populations could have increased in response to an increased food supply. However, a recent analysis of three aerial survey data sets revealed no clear evidence of an increase in North Slope gull numbers since the 1970's, although an increase of less than 100 percent would not have been detectable using this analysis (L. Noel, Entrix, pers. comm.).

Subsistence harvest of spectacled eider eggs and adults is another potential factor in the decline of the spectacled eider population. Alaska Natives have traditionally harvested eiders and their eggs in coastal villages during spring and fall. Subsistence harvest surveys for the North Slope indicate that an average of 155 spectacled eiders were taken at Wainwright during 1988-1989 and only 2 spectacled eiders were reported taken at Barrow during 1987-1990 (Braund et al. 1993). Yup'ik Eskimos on the Y-K Delta have traditionally harvested spectacled eiders for subsistence purposes (Klein 1966). Although the human population on the Y-K Delta has grown substantially, changes in the numbers of active hunters are unknown. Similarly, available harvest technologies have become increasingly efficient, but the actual effects of new technologies on harvest levels are unknown. The estimated harvest of spectacled eiders on the Y-K Delta from 1992-95 averaged 272 birds/year (Service, unpublished data); the 1992-2001 average is 123 birds/year (Service, unpublished data).

There are other sources of take such as avicultural egg collecting (until 1991), disturbance from research activity, and loss of habitat in growing communities and oilfields. Their overall impacts to the spectacled eider population is unknown.

Other potential factors that may affect spectacled eider survival have been suggested but not investigated. These include changes in the invertebrate community structure in winter habitats, bioaccumulation of contaminants in marine environments, human harvest for sport and subsistence outside in marine areas, disease, parasites, and accidental strikes and/or disturbance of benthic feeding areas by commercial fishing activity.

In 1996, a Recovery Plan was finalized by the Service that provided strategies to recover the Alaska-breeding spectacled eiders to the point that protection under the Act is no longer required (i.e., "delisting" is appropriate). Objectives identified were: 1) prevent further declines of the Alaska-breeding population (including both the northern and western Alaska subpopulations); 2) determine size, trends, and distribution of the northern and western Alaska-breeding subpopulations; 3) investigate population dynamics by conducting population viability analysis (PVA); 4) determine if population declines and/or reproductive failures result from accumulation of environmental contaminants; 5) investigate the habitats used and prey items selected by foraging spectacled eiders away from breeding grounds; 6) assess the contribution of subsistence harvest to population trends; 7) investigate whether predator-prey relationships can account for population declines; 8) determine genetic profile of 3 major populations; and 9) collect data on the impacts of diseases and parasites.

ENVIRONMENTAL BASELINE

Regulations implementing the ESA (50 CFR §402.2) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area. Also included in the environmental baseline are the anticipated impacts of all proposed Federal projects in the action area that have undergone section 7 consultation, and the impacts of State and private actions which are contemporaneous with the consultation in progress.

Status of Spectacled eiders and Steller's eiders within the action area

The NE Planning Area is nesting habitat to ~15% of spectacled eiders and less than 10% of Steller's eiders on the North Slope (Stehn and Platte 2000). In summer, spectacled eiders are widely distributed near lakes or coastal margins throughout much of the NE Planning Area with a trend toward higher abundance near the Beaufort Sea Coast. Steller's eiders are sparsely distributed across the NE Planning Area with a trend toward higher abundance near the northwest coast (Obritschkewitch et al. 2001). Both species are essentially absent from the Area from October to May (Larned et al. 2001). Although the breeding frequency has decreased for Steller's eiders on the North Slope, except near Barrow, no trend is discernible in spectacled and Steller's eider population sizes Slope-wide (Quakenbush et al. 2002). Furthermore, the factors that limit abundance on the North Slope have not been identified. Therefore, it is difficult to determine whether human activity and habitat alteration have affected the status of the species in the project area. However, factors that may have affected the status of the species in the project area include loss of breeding habitat, disturbance from oilfield operations, research efforts, ingestion of lead shot, increases in predator populations, and subsistence harvest.

Factors affecting the species within the action area

Breeding habitat on the North Slope has remained largely unaltered and uninhabited by humans. A small portion of the species' potential breeding range has been altered by oil and gas exploration/development. The NSB currently operates the only oil/gas production well within the NW Planning Area (located on Native land outside Barrow). To date, no oil and gas developments have been constructed on Federal lands within the NE Planning Area. However, in September 2004 the BLM issued a Record of Decision (ROD) for ConocoPhillips Alaska, Inc.'s (CPAI's) proposed Alpine Satellite Development Project (ASDP) located within the Colville River Delta and the NE Planning area of the NPR-A. CPAI plans to begin construction of ASDP in January 2005.

Despite the lack of development project in the NPR-A, oil and gas exploration has been ongoing within NPR-A since the early 1900s. Prompted by reports of oil seeps at Cape Simpson and concerns about domestic fuel supplies, President Warren Harding established Naval Petroleum Reserve Number 4 (PET-4) in 1923. Fuel shortages during World War II prompted the first intensive government-funded exploration program in NPR-A the Navy

20

from 1944 to 1952. This drilling produced eight oil and gas discoveries: Umiat, Fish Creek, South Barrow, Simpson, Meade, Wolf Creek, Gubik, and Square Lake.

With Alaska achieving statehood in 1959, petroleum exploration shifted to state lands on the North Slope in the area between the NPR-A on the west and the Arctic National Wildlife Refuge (ANWR) on the east. State lease sales in 1964 and 1965 were followed by the discovery of the Prudhoe Bay field in 1968. Four other very large oil fields were soon discovered near Prudhoe Bay, including the Kuparuk River Field, the Milne Point Field, the Endicott-Duck Island Field, and the Point McIntyre Field.

In 1973, President Gerald Ford signed an executive order to explore for oil in PET-4 (NPR-A). Twenty-eight exploration wells were drilled, and numerous finds of oil and gas were reported, but no commercial fields were discovered. The Act prohibited petroleum production in NPR-A until authorized by Congress.

In 1977, management of NPR-A was transferred from the Navy to the USDOI. In 1980, Congress granted authorization to develop oil and gas resources, and directed the Secretary to undertake "an expeditious program of competitive leasing of oil and gas" in the Reserve. The immediate outcome of the authorization was the series of lease sales held by the BLM in the early 1980s. An EA was prepared for NPR-A in 1981, and a subsequent EIS was prepared in 1983. The 1983 EIS process resulted in some areas being made unavailable for leasing, and recommended stipulations, especially in areas with high surface values.

In 1997, the BLM began assessing potential impacts from oil and gas development activities in the NE Planning Area. The 1998 NE IAP/EIS culminated in a ROD in October 1998 that superseded the decisions of the 1983 EIS and included a decision to make approximately 4 million acres available for oil and gas leasing. Under the tenets of the 1998 NE IAP/EIS, BLM issued a ROD in October 2004, for the proposed development of five drilling pads that would be satellites to the current Alpine Project Field, near the Village of Nuiqsut. Three of the pads would be located within the NE Planning Area.

In 2002, BLM began planning for a NW Planning Area IAP/EIS. The NW Planning Area is approximately 9.4 million acres, of which approximately 8.8 million acres are under federal jurisdiction. This plan, which culminated in a ROD in January 2004, superseded management guidelines developed under the 1983 EIS.

Human population growth in the vicinity of Barrow and other NSB communities has also resulted in localized habitat loss due to construction activities and off-road vehicle use. On-road and off-road vehicle traffic are potential sources of disturbance. Steller's eider research conducted in the Barrow area jointly by the Service and NSB is also a source of disturbance, because studies include efforts to locate nests and broods. One nest depredated in 2000 likely resulted from nest-search disturbance, when the nest was left exposed to a jaeger because of the proximity of the researcher (Obritschkewitsch et al. 2001). Investigator disturbance studies on spectacled eider nests on the Yukon-Kuskokwim Delta found that routine visitation to nests resulted in an 0.08% additional loss of egg production from 1994-

21

2002 (Bowman and Stehn 2003). Nest abandonment, in the absence of predation, has been documented after research-related trapping and handling of an incubating hen; it is possible that other forms of human disturbance near a nest could cause abandonment.

Lead or other sources of contamination of habitat or prey species are possible in localized areas within the range of Steller's and spectacled eiders. Listed eiders may swallow lead shot pellets when they probe the bottom for food, mistaking them for food items or grit. While on breeding grounds, listed eiders typically dig in the bottom of lakes and ponds for their food and are therefore at great risk for lead contamination. Although ingestion of lead is thought to take place primarily on the breeding grounds, exposure in marine molting and wintering areas has not been definitively excluded. Exposure of waterfowl to lead has been documented in the range of both spectacled eiders and the Alaska-breeding population of Steller's eiders. Elevated blood and tissue lead levels, morbidity, and mortality from lead poisoning were found in spectacled and common eiders (*Somateria fischeri* and *S. mollissima*, respectively) on the Yukon-Kuskokwim Delta (Franson et al. 1995, Flint et al. 1997, Flint and Herzog 1999). On breeding grounds near Barrow, one Steller's eider found dead in June had liver and kidney lead concentrations suggestive of lead poisoning, although several other Steller's eiders examined at the same time of year had lower lead tissue concentrations (Trust et al. 1997, Service, unpublished). Blood samples from nesting hens trapped near Barrow in 1999 and 2000 showed that all (8 of 8) had concentrations exceeding the clinical threshold for lead exposure and 7 of 8 exceeded thresholds for lead poisoning in waterfowl.

Often, with increases in human presence, there is a concomitant increase in nest predator populations such as gulls, ravens, and foxes. Residents of Barrow and other North Slope communities have observed an increase in populations of gulls and arctic foxes. Increased densities of arctic foxes and glaucous gulls associated with human development, particularly landfills, have also been noted at Barrow, Nuiqsut and Prudhoe Bay and common ravens have expanded their breeding range into these areas as well. Common ravens readily use oilfield infrastructure for nesting on the ACP. Ravens currently nest at Alpine (CD-1 and CD-2) and have even begun nesting at Northstar Island in the Beaufort Sea. There is very little information on predation of spectacled eider nests throughout most of the species' range in Alaska. Near Barrow, however, Steller's eider nest success in recent years has been very poor. Of 186 nests found from 1991-2000, only 15-18% survived until hatching, with predation thought to be the primary factor causing nest failures (Quakenbush et al. 1995, Obritschkewitsch et al. 2001). In addition to causing nest failures, predators at Barrow further reduced productivity through partial predation (where some but not all eggs in a nest were eaten) and by killing ducklings that survived the incubation period (Quakenbush et al. in prep.). Studies of nest predation in other areas have reported mixed results. For example, apparent nest success on the Indigirka River Delta, Russia in 1971 was 10-15%, and eiders nesting near gull nests had higher nesting success (Kistchinski and Flint 1974, Mayfield 1975). However, in 1994 nest success was <2% and nest predators such as arctic foxes, glaucous and herring gulls, and parasitic and pomarine jaegers are suspected to have depredated most of the nests (Pearce et al. 1998). Also, nearly complete predation of spectacled eider nests by jaegers and foxes was recorded on the Chaun River Delta, Russia

22

after a June snow storm (Kondratev and Zadorina 1992). Predation by gulls, jaegers, and arctic foxes probably affects the productivity of spectacled eiders throughout their range.

Sport hunting for Steller's and spectacled eiders was closed in 1991 by Alaska State regulations and Service policy. Outreach efforts have been conducted by the NSB and the Service to inform hunters of these closures. In 2003, a spring subsistence hunting season for migratory birds in Alaska was proposed. Although killing listed eiders is not permitted by spring hunting regulations, confusion over identification of eiders on the wing likely results in the shooting of protected species. An ESA consultation for this spring subsistence hunt was completed in May 2003 and adverse impacts identified in the BO are considered here and will be considered in future consultations concerning listed eiders in Alaska. Accurate information on current harvest rates is not available, but hunter surveys and other observations indicate that both intentional and unintentional shooting of Steller's and spectacled eiders likely continues in Northwest Alaska (Paige et al. 1996, Georgette 2000, Wentworth 2001).

Research efforts unrelated to listed eiders also result in impacts within the action area. Field research typically occurs during the summer months, but numbers, locations, and type of activities remain speculative because data quantifying this activity has not been collected by BLM for NPR-A. Through section 7 processes, the Service provides project applicants with recommendations and restrictions intended to minimize impacts of oilfield research on listed eiders. These include timing restrictions and buffers around known nest sites that likely reduce impacts to some degree. However, the benefits may be limited because some researchers are unaware of the requirement and hence never consult. However, without an improved understanding of the extent of research activities in NPR-A, it is difficult to determine whether the cumulative effects of field research may result in take.

All of the factors discussed here may have influenced populations of threatened spectacled and Steller's eiders in northern Alaska, although it is unknown if these factors played a major role in either species' decline.

## EFFECTS OF THE ACTION ON LISTED SPECIES

This section includes an analysis of the direct and indirect effects of the proposed action on listed eiders and/or critical habitat and its interrelated and interdependent activities. The following analysis is based upon BLM's stated assumption that all projected development will occur in their Area of High Geologic Potential. Furthermore, in order to err on the side of caution, we assume densities of listed eiders throughout the NE Planning Area to be equal to the highest densities of listed eiders observed within the Area of High Geologic Potential. The spectacled eider density figure used for the following analysis was derived from a multi-year aerial survey data set (1992-2002) collected by the Service designed specifically to detect spectacled eiders across the ACP. The entire survey area was divided into 10-km$^2$ blocks, and average density (among years) calculated for each block. The Area of High Geologic Potential includes areas of comparatively high spectacled eider density; thus we

chose the high end of the range of spectacled eider densities (1.1 observed birds/km$^2$) as the basis for analysis. The density value for Steller's eiders was derived from a multi-year aerial survey data set (1999-2002) designed to detect Steller's eiders in the "Barrow Triangle", a 2757-km$^2$ survey are south of Barrow and west of Admiralty Bay. Density values are available only for the survey area as a whole, and vary considerably among years. We chose to use the density recorded in 1999 (0.06 observed birds/km2), which was the highest of the 4 years. This is considered to be a comparative mid-level density, lower than that which was recorded in the immediate vicinity of Barrow, but higher than the overall average density across the ACP. No high-density Steller's eider clusters have been found in the NE NPR-A's Area of High Geologic Potential. However, given the evidence of past occupancy, the NE Planning Area, particularly the area north of Teshekpuk Lake, could reasonably be expected to provide suitable nesting and brood-rearing habitat for Alaska-breeding Steller's eiders in the event of population recovery.

The assumed densities for both species are intended to represent the high end of a reasonable range, in recognition of the uncertainties regarding the future location of facilities, as well as imprecise information on eider distribution. Thus, actual effects should generally be equal to or less than those noted in this assessment. The assumed densities, however, do not compensate for the bias inherent in estimating bird densities form the air. An established/accepted correction factor is not currently available to convert the numbers observed from the air to the actual number of birds present, compensating for those birds that are not detected from the aircraft. Without such a correction factor, we acknowledge that the aerial survey data used throughout this BO tend to underestimate eider density in all areas, including those where development is proposed as well as those where development is not proposed. The absence of a correction factor means our estimate of effects is biased low, but our estimate of the number eiders in areas that will remain unimpacted by development is similarly biased low. Thus, we may have underestimated the *number* of eiders affected but this bias does not affect our estimate of the *proportion* of the eider population to be affected.

*Oilfield Disturbance*

It is likely that disturbance in oilfields can adversely affect listed eiders during nesting, but these effects are usually assumed to be minimal in magnitude. Few quantitative estimates of the extent of adverse impacts of oilfield activity to nesting waterfowl exist for tundra environments. The few studies that have been done deal specifically with investigator disturbance. Several studies demonstrate negative effects of investigator disturbance on waterfowl nesting success. Infrequently, waterfowl will permanently abandon nests after they are disturbed. On the YKD, investigators estimated that nest trapping resulted in a loss of 5% of cackler geese eggs due to desertion (Mickelson 1975). A single search of study plots for an investigator disturbance study done for spectacled eiders on the YKD caused the loss of 0.08% of egg production (Bowman and Stehn 2003). Gulls were attracted to, and more nests were destroyed at, eider nesting islands after disturbance (Ahlund and Gotmark 1989). However, in 1997 investigators marked and visited spectacled eider nests at varying schedules and found no difference in survival rates due to observer impact (Grand and Flint 1997).

Steller's and spectacled eider behavior appears to change with changing environmental conditions. At times, they have been observed foraging near human-made structures such as the Deadhorse and Barrow Airports (Service, unpublished). Steller's eiders regularly forage and rest adjacent to marine docks along the Alaska Peninsula, although in some situations they remain wary and avoid human and vessel activity (Service, unpublished). As such, we do not anticipate total abandonment of nesting areas as a result of human presence, but anticipate some level of impact due to the presence of investigators.

Potential avenues of disturbance associated with the proposed action include exploration/delineation activity, oilfield construction, oil spill response training, production activity, pipeline maintenance, staging area activity, infield roads, increased aircraft traffic, watercraft support, and gravel mining/transport. Disturbance resulting from production activity, infield roads, oil spill response training and staging area activity is expected to be constant/chronic and result in driving listed eiders out of habitats within a zone of influence around infrastructure. Therefore, these avenues of disturbance are addressed in the Habitat Loss subsection of this Effects of the Action section. Also, because BLM assumes that oilfield construction, pipeline maintenance and gravel mining/transport will only occur during winter when listed eiders are not present in the NE Planning Area, we do not believe these activities will disturb listed eiders. Therefore, this subsection only addresses adverse impacts to listed eiders resulting from aircraft traffic, watercraft support, and exploration/delineation activity.

Disturbance from aircraft traffic, watercraft support, and exploration/delineation activity could adversely impact Steller's eiders by: 1) displacing adults and/or broods from preferred habitats during pre-nesting, nesting, brood rearing and migration; 2) displacing females from nests, exposing eggs or small young to inclement weather or predators; and 3) reducing foraging efficiency and feeding time. The behavioral response of listed eiders to nesting disturbance is unknown. Some Steller's eiders nest and rear broods near the Barrow Airport and spectacled eiders have been seen nesting near the Deadhorse Airport. This indicates that some individuals may tolerate or habituate to frequent aircraft noise. However, individual tolerances are likely to vary and the intensity of disturbance associated with the proposed action would, in most cases, be more variable and potentially more disturbing than that experienced by birds near the Barrow and Deadhorse airports. Some birds may be displaced with unknown physiological and reproductive consequences. However, the number of listed eiders that would be exposed to oilfield activity is variable depending on the location of oilfield infrastructure within the NE Planning Area.

1. Aircraft Overflights

Aircraft would primarily be used to support winter oil exploration, development, production and abandonment activities in the NE Planning Area. Wintertime aircraft flights associated with oil activities should not affect listed eiders. Nesting Steller's and spectacled eiders could be disturbed by summer aircraft overflights in support of exploration, development, production and abandonment activities. However,

instances of disturbance to nesting spectacled and Steller's eiders is expected to be rare due to their extremely low densities across the North Slope. Across the ACP of the North Slope, breeding season density averages approximately one pair per 8 km$^2$ for spectacled eiders (Larned et al. 2002a). Steller's eiders are so rare in some years that they are not detected at all by aerial survey methods. In the core Steller's eider breeding area near Barrow, the highest density recorded in four years of aerial surveys was estimated as approximately one pair per 12.5 km$^2$ (Ritchie and King 2002). Densities elsewhere on the ACP are lower, possibly approaching zero in some areas in some years.

BLM's BA estimates that the number of summer aircraft trips flown in support of the proposed action within the NE Planning Area will number 224,596 over its estimated life (BA Table 2). In addition to aircraft flights to support oil activities, the BA assumes that facility tour (VIP) and research related flights would occur under the Preferred Alternative. Although not mentioned specifically in the DEIS, BLM's BA states that their estimates of flights resulting from the proposed action includes flights for VIP tours and research. However, BLM has stated that their flight estimates reflect the best available information on total expected flights and that the degree of uncertainty, expected variability among activities, and lack of flight data from other projects makes it speculative to parse flight estimates according to activity types. BLM also assumes that reasonably foreseeable future air traffic associated with research and facility tours would be few in number, sporadic in occurrence, of limited duration, and will not exceed the levels currently estimated for the project as a whole.

Summer aircraft traffic could adversely impact threatened eiders by: 1) displacing adults and/or broods from preferred habitats during pre-nesting, nesting, brood rearing and migration; 2) reducing foraging efficiency and feeding time; and 3) displacing females from nests, fragmenting broods and exposing eggs or small young to inclement weather or predators. The behavioral response of eiders to aircraft overflights is largely unknown. Some spectacled eiders nest and rear broods near the Deadhorse Airport, indicating that some individuals may tolerate or habituate to frequent aircraft noise. Similarly, some Steller's eiders nest and rear broods near the Barrow Airport, indicating that some individuals may tolerate frequent aircraft noise. However, individual tolerances are likely to vary and the intensity of disturbance associated with the proposed action would, in some cases, be greater than that experienced by birds near the two airports. Some birds may be displaced with unknown physiological and reproductive consequences. Also, the number of eiders that would be exposed to aircraft overflights is variable. This is, in part, because the potential flight paths to drilling sites within the NE Planning Area could range from short (e.g., a direct route from a staging area in Cape Simpson to areas just south of Smith Bay) to lengthy (e.g., a flight path from Alpine to a remote exploration site southwest of Teshekpuk Lake). Because the greatest potential for commercially developable oil lies just north of Teshekpuk Lake along the Beaufort Sea coast as it stretches northwest across the ACP, listed eiders between Alpine and the Barrow area are much more likely to be overflown than those elsewhere in the NE Planning Area.

In conclusion, BLM assumes that the most likely locations for exploration in the NE Planning Area are just west of the Coleville River along the coast as it stretches northwest across the ACP to Smith Bay (Area of High Geologic Potential). Steller's eiders are rare east of Admiralty Bay, and the probability of affecting large numbers is diminished because of the relatively short flight path between these areas and the proposed staging areas at Cape Simpson and Alpine (BLM assumes 0.06 birds/km$^2$ within the Area of High Geologic Potential). Although Spectacled eiders nest in much higher densities than Steller's eiders within the Area of High Geologic Potential, they still are so sparsely distributed across the area, that population level effects due to aircraft disturbance are unlikely (BLM assumes 1.11 birds/km$^2$). In addition, ROP F-1 seeks to ensure that aircraft used for permitted activities maintain protective altitudes over various portions of the NE Planning Area. Although these flight specific measures are designed to protect subsistence resources, they may also benefit listed eiders where listed eider and protected caribou habitats overlap. Therefore, while aircraft overflights could potentially cause adverse effects to individuals of either species, their low nesting densities combined with the number of summer flights anticipated and protections afforded via ROPs suggest that few individuals would likely be impacted. For these reasons, we do not believe that aircraft disturbance will cause population-level effects.

2. *Watercraft Support*

Disturbance to listed eiders from watercraft support emanating to/from staging areas is possible. Under the Preferred Alternative, nonrecreational airboats would be allowed on streams, lakes, and estuaries seasonally accessible by motorboats. Airboats would be prohibited in seasonally flooded tundra and shallow waters with wetland vegetation adjacent to streams, lakes, and estuaries (BA Table II-01). However, for this analysis it is assumed no facilities would be constructed adjacent to waterways that could support nonrecreational use of watercraft within inland waterways because of setbacks required by stipulations K-1, 2 and 3.

During the summer open-water season (mid-July to early October), the BA assumes some marine transportation of equipment and supplies needed for exploration and development. Thirteen vessel round trips per summer, from an equipment source area to a staging area, are forecast for each oilfield during the construction period (2 staging areas x 13 trips/year x 30 years = 520 trips total). Barges might also be used for transport because of logistic and economic issues associated with moving heavy equipment and materials, either by ice road or rolligon, over the long distances from current infrastructure.

During the production phase it is likely that facilities would be supplied by annual sealift. Most of these supplies would arrive in containers by barge in late July or August. The container would be offloaded with cranes and stacked on the gravel pad at the staging area. The typical container is less than 10 feet in height. Barge traffic

generally would be limited to routes in shallow, nearshore, waters between staging areas connected to existing infrastructure (e.g., West Dock, Oliktok Point or Deadhorse) and proposed staging areas along the NE Planning Area coastline, Cape Simpson and/or Barrow.

The amount of disturbance resulting from vessel traffic would likely last throughout the open-water season and would depend on trip frequency, which is determined by the number of concurrent projects and the stage of development. Supply vessels are likely to follow established routes, so area subject to disturbance would be limited. Spectacled and Steller's eiders that are accompanying young, staging or migrating in coastal or offshore waters during the staging/migration periods (late June/early July; late August/September), could encounter vessels associated with oil and gas activities in the NE Planning Area. Listed eiders and broods are expected to respond to such encounters by flying away. The level of disturbance anticipated will be variable depending on the extent, type and routes of supply/transport taken. However, because of the vast amount of available staging habitat in the Beaufort Sea, listed eiders would likely move to areas of low watercraft activity. Hence, impacts to listed eiders from watercraft activity are expected to be minimal.

Extensive nearshore and offshore aerial surveys in the Beaufort Sea in 1999 and 2000 detected two flocks of spectacled eiders (numbering 40 and 100) offshore in the Harrison Bay area (no Steller's eiders were observed) (Fischer at al. 2002). Satellite telemetry work done on spectacled eiders in the Prudhoe Bay oilfields during 2000 and 2001 showed that Smith Bay was an important marine area for females and Gwydyr Bay for males (TERA 2003). Vessels traveling from Deadhorse to the proposed staging areas may traverse both these bodies of water.

If watercraft activity occurs between October and May, the probability of encounters with spectacled or Steller's eiders would be low. This probability increases, however, if the action occurs between May and October because of the presence of spectacled and Steller's eiders migrating across the Chukchi and Beaufort seas to reach breeding grounds in the spring and when migrating to molting/staging areas in the summer and fall. Nonetheless, given the low density of these species in the marine environment, we assume that few listed eiders would encounter vessel traffic. Although numbers of birds displaced could be substantial depending upon the season of occurrence (tens or hundreds of individuals, particularly during fall migration), alternate foraging and staging habitat would be available away from probable routes. We believe that eiders would avoid such encounters by flying away, that the frequency of those disturbances will not reach the threshold that would impair survival, and that alternative suitable habitat is available. Under these conditions, take is unlikely, and impacts would not result in population-level effects.

3.  *Exploration/Delineation and Support Activity*

Exploratory/delineation drilling, seismic work and support activities within the NE Planning Area would occur mostly during winter when listed eiders are absent. However, indirect impacts on eiders could occur in summer as a result of winter exploration activities.  For instance, exploration drill rigs would be moved after winter either to an existing gravel pad and cold stacked, or cold stacked on a special ice pad designed to last from summer into the next winter.  Some disturbance to eiders could occur from aircraft travel to these sites in summer.  However, the frequency of these flights would be low.

The presence of maintenance personnel at the seismic camps in summer may cause some disturbance to eiders in the immediate vicinity of gravel/ice pads and could result in nest failure.  Following the end of each winter seismic season, each seismic crew would store its equipment at a staging area or special ice pad.  Sometime during the summer, a repair crew would spend 2-4 weeks performing annual maintenance and installing upgrades to the seismic equipment.  These activities would require aircraft support, with one to two fixed-wing and two to three helicopter flights per week.  Upon completion of the maintenance work, the crew would leave the equipment cold stacked and there would be no activity until the following winter.  BLM assumes that maintenance would be self-contained and use accommodations that are part of the cold-stacked seismic camp.  Also, on completion of the work, all wastes would be removed and disposed of at approved disposal sites on the North Slope.  None of these activities would require the establishment of new landfill locations.  The approved landfill currently in operation at Deadhorse most likely would be used for materials not requiring additional treatment.

We believe that the frequency and nature of disturbance from seismic camps and exploration/delineation support will not reach the threshold that would impair survival, and that alternative suitable habitat would be available.  Therefore, based on the frequency and nature of disturbance from seismic camps and exploration support assumed within the BA, population-level impacts to listed eiders via disturbance from exploration/delineation activity are unlikely.

In conclusion, the proposed oilfield activities may adversely affect individual listed eiders. However, their low nesting densities combined with the limited amount of proposed oilfield infrastructure/activity suggests that few individuals would likely be adversely impacted.

*Habitat Loss*

Exploration, development and production activities may result in disturbance and altered habitat effects on behavior, distribution, and abundance of listed eiders in or adjacent to the NE Planning Area.  Depending on location and season, oil/gas exploration, development, and production in areas where listed eiders occur could render habitats unavailable due to

disturbance or filling/coverage from construction activities, gravel mining, pads, and roads, facilities, and drilling activities.

Winter exploration activities and summer storage of a drill rig on an ice pad (5-6 acres) may alter habitats temporarily (e.g., compression of standing-dead vegetation, or delayed phenology of vegetation due to late ice melt). This activity could affect the distribution of eiders occurring in or adjacent to the NE Planning Area in subsequent summer seasons. The magnitude of these impacts depend on a variety of factors including habitat type, volume of ground ice, and local hydrology (Walker et al., 1987). Only a small portion of the tundra within the NE Planning Area would be affected during any particular year, particularly of the wetter habitats that listed eiders frequent.

BLM assumes that under the Preferred Alternative, 12 oilfields, 2 staging areas, 6 material sites and 555 km of oil pipeline are likely to be developed in/adjacent to the High Geologic Potential Area of the NE Planning Area. Substantial numbers of listed eiders could be affected by disturbance, though most incidents are expected to result in minor effects. However, the impacts of repeated disturbance could extend for longer periods and may potentially affect physiological condition, molt, nest success, and survival of individuals.

Placement of gravel fill for roads and pads will likely result in the destruction of breeding habitat and/or actual take of listed eiders or nests. The Preferred Alternative assumes that 0.9 $km^2$ of known habitat would be eliminated by gravel mining operations within the NE Planning Area. The actual gravel footprint assumed for development of anchor and satellite facilities (including associated roads), and staging areas would 5.5 $km^2$ (BA Table 1). The Service considers areas covered by gravel as permanently eliminated as productive breeding and foraging habitats for wildlife.

Because some maintenance of exploration, development and production facilities would be done during the summer breeding season, we expect displacement of local breeding individuals from affected sites and probably also from the immediate area. Also, alteration of nesting habitat adjacent to oilfield infrastructure could be caused by delayed snowmelt and compaction of vegetation in areas underlying ice roads, dust fallout from vehicle traffic, thermokarsting from tundra disturbance, and changes in the hydrologic regime due to industrial surface disturbance and water withdraw from local sources. In succeeding breeding seasons, displaced individuals may relocate to nearby habitat. Such displacements are not expected to cause long-term effects on population productivity given the relatively small areas likely to be involved at a given site, but could result in long term or permanent displacement of some individuals from preferred areas. The Service assumes that disturbance from exploration, production, and development is likely to be limited to within 200 meters of the activity; a few eiders may experience temporary, non-lethal effects that may continue through the summer. Therefore, we agree with BLM's estimate that 76.7 $km^2$ of potential listed eider habitat is likely to be impacted by oilfield infrastructure under the Preferred Alternative (assuming a 200 meter buffer around proposed footprints, which is based on the Service's standard recommended protective buffer around important habitats or sites). Because BLM assumes no active mining or pipeline maintenance would occur during

**Exhibit 44, page 30 of 71**

the breeding season when listed eiders are present in the NE Planning Area, we do not predict impacts within a zone of influence for material sites and pipelines.

While 76.7 km$^2$ may not be a significant proportion of the total amount of habitat available, within the Area of High Geologic Potential adverse effects to individuals are anticipated. Ultimately, cumulative habitat loss on the North Slope could eventually result in population-level effects. The presence of facilities and construction of gravel structures with the NE Planning Area could result in displacement of listed eiders from favored habitats and the associated energy/physiological costs could result in short-term negative effects during breeding, brood-rearing, or migration. Affected eiders may respond to oil production by relocating before or during the nesting phase, abandoning nests, or moving broods to a more secluded area after hatching. Observations from Prudhoe Bay suggest that spectacled eiders exhibit some tolerance of facilities (including production pads) and service roads (TERA 1996). Telemetry studies in 1993 and 1994 showed broods spending time within 200 m (656 ft) of facilities, and crossing roads (five known broods in 1995 and two in 1994) (TERA 1997).

We believe that potential impacts to eider habitat from seismic activity, ice roads and summer storage of equipment on ice pads would be short-term over a small proportion of the available habitat within the NE Planning Area. Construction and operation of exploration facilities, production infrastructure and access roads may displace and/or disturb individual eiders. However, the total area affected is small enough that it is not expected to result in population-level impacts. Also, ROP E-11 states, "Surveys shall be conducted by the lessee for at least 3 years before authorization of construction. If listed eiders are determined to be present within a proposed development area, the applicant shall consult with the FWS and BLM in the design and placement of roads and facilities in order to minimize impacts to nesting and brood-rearing eiders and their preferred habitats." Therefore, overall impacts to threatened eiders from habitat loss due to oilfield activity is not expected to result in population-level effects.

*Collisions with Drilling Structures, Towers, Overhead Wires and Associated Infrastructure*

Migrating birds are at risk of collision with objects in their path, particularly when visibility is impaired during darkness or inclement weather, such as rain, drizzle, or fog (Weir 1976). The incidence of bird collisions appears to rise when objects are illuminated with constant diffuse light, and the tendency for birds to be drawn to diffuse light appears to increase during rainy or foggy weather. Accidental strikes of "hundreds" of unidentified eiders were reported to have occurred in association with the Bering Sea crab fishery, presumably influenced by the bright lights used on fishing vessels (Service, unpublished). Comparisons have shown that blinking lights cause less mortality than constant lighting, and the color of the lights and the object may influence collision frequency (Weir 1976). Size, best expressed as cross-sectional are, also affects the number of birds that strike an obstruction.

Its been reported that 88% of eiders migrating over the Beaufort Sea flew below an estimated altitude of 10 m (32 ft) and well over half flew below 5 m (16 ft) (Johnson and Richardson 1982).  Although information specific to listed eider flight behavior is lacking, a spectacled eider was seen striking a utility wire near an electric light in white-out conditions on St. Lawrence Island in 1998 (Service, unpublished data).  In September-October 2001, several sea ducks fatally collided with Northstar Island.  In 2001, 36 birds were retrieved at Northstar Island and Endicott, all sea ducks, including 5 king eiders, 23 common eiders, and 8 long-tailed ducks (Service, unpublished data).  In 2002, 3 long-tailed duck fatalities resulted from platform strikes at Northstar. In 2003, 1 common eider and 1 long-tailed duck fatal collision have occurred at Northstar, 5 common eiders fatally collided with Endicott, and 4 dead/injured spectacled eiders have been retrieved by the Service that likely collided with overhead power lines/ guy wires (3 at Barrow and 1 at Prudhoe Bay) (Service, unpublished data).  The densities of Steller's and spectacled eiders on the North Slope are much lower than king eiders, common eiders and long-tailed ducks.  Therefore, the potential for Steller's and spectacled eiders striking nearshore oil infrastructure is much lower.

Because a significant number of threatened eiders on the North Slope migrate to/through the NE Planning Area either on route to breeding grounds or when returning to molting/staging areas, drilling, tower and wire structures associated with oilfield activity may pose collision risks to listed eiders.  Although the total profile of exploratory, delineation and production wells and associated structures is anticipated to be small relative to the NE Planning Area, the Service believes that potential structures pose a risk to migrating threatened eiders because: 1) the NE Planning Area encompasses a "major route" used by threatened eiders (Alaska breeding populations) migrating east and west to and from their breeding grounds (Johnson and Richardson 1982); 2) the artificial lighting associated with drill rigs and towers may serve as a magnet to migrants, particularly during fog and rain (Weir 1976); and 3) the flight altitude of migrating eiders is low and within the height range of oilfield structures.

Many listed eiders on the North Slope migrate through the NE Planning Area either on route to breeding grounds or when returning to molting/staging areas.  Therefore, based on our understanding of the biology of the species, their migration routes, distribution, behavior, and collision data from Northstar/Endicott, we believe that there is some risk of injury or death of some individuals from collisions with oil field structures.  However, the Preferred Alternative includes 2 ROPs that seek to mitigate this risk.  ROP E-10 requires all facilities greater than 20 feet in height to have special lighting protocols to make facilities more visible to low-flying birds in order to reduce collision risk.  ROP E-14 requires all utility and communication wires to be buried in access roads or suspended on VSMs.  The Service believes that these measures will significantly reduce collision risk, and that any possible remaining risk will not result in population-level effects.

*Increase in Predator Populations*

Several North Slope predators that prey on waterfowl eggs and young concentrate in areas where anthropogenic food sources are available.  Examples include large gulls, ravens, and arctic foxes that are abundant near camps, roads, oilfields, and villages.  For ravens and

foxes, there is evidence showing population increases and/or changes in distribution in response to anthropogenic food sources, and the breeding distribution of ravens has expanded onto the ACP because buildings and other structures in oil developments provide nesting sites where none sere historically available (Day 1998). The predation pressure that foxes, gulls and ravens exert on ground-nesting birds is well documented, and in some areas predation is the single most important factor affecting nest success.

Spectacled eiders may be adversely affected by increased numbers or altered distribution of predators. Ravens apparently never nested in Barrow until 1991 when a single pair began raising a brood each year on a man-made structure. In 1991, one of these ravens was seen depredating five eggs from two Steller's eider nests (Quakenbush et al. 1995). Currently ravens are nesting on oilfield infrastructure throughout the Prudhoe Bay Oilfields and into peripheral oilfields such as Northstar Island and Alpine. Although information showing a direct link between oilfield activities and waterfowl nest predation rates is lacking, the Service believes that actions that artificially enhance predator populations pose a potentially significant adverse impact to spectacled eiders.

Solid waste collection from oil development and production activities on the North Slope is closely regulated and monitored by Federal, State, and local governments. The Alaska Department of Fish & Game has long-standing regulations prohibiting the feeding of game animals. The Alaska Department of Environmental Conservation (ADEC), in a recent upgrade of its solid waste regulations, has begun requiring animal-proof dumpsters across the North Slope. As a result, the North Slope Borough (the local agency responsible for solid waste disposal in the oilfields) outfitted the oilfield with scavenger proof dumpsters manufactured by the Haul-All Corporation, for disposal of putrescible waste.

As stated in the BA, BLM assumes that no new landfills will be constructed to handle wastes from future oilfield activity within the NE Planning Area. In addition, the Preferred Alternative's ROP E-9 and A-2 state that, "The lessee shall utilize best available technology to prevent facilities from providing nesting, denning, or shelter sites for ravens, raptors, and foxes. The lessee shall provide the AO with an annual report on the use of oil and gas facilities by ravens, raptors and foxes as nesting, denning, and shelter sites." and "Attracting wildlife to food and garbage is prohibited. All feasible precautions shall be taken to avoid attracting wildlife to food and garbage. Lessees and permitted users shall have a written procedure to ensure that the handling and disposal of putrescible waste will be accomplished in a manner to prevent the attraction of wildlife." Therefore, as a result of oil activity throughout the NE Planning Area, it is unlikely that there will be sufficient amounts of edible refuse available to result in artificially high predator population levels. Based on the limited number of oilfield facilities assumed by BLM and protections granted via ROPs, we do not believe that the proposed action will affect predator populations sufficiently to cause impacts to threatened eiders.

*Increased Subsistence Activity*

Alaska Natives have traditionally harvested listed eiders and their eggs in coastal villages during spring and fall. Subsistence harvest surveys for the North Slope indicate that an average of 155 spectacled eiders were taken at Wainwright during 1988-1989 and only 2 spectacled eiders were reported taken at Barrow during 1987-1990 (Braund et al. 1993). Although the human population within/adjacent to the NE Planning Area has grown substantially, changes in numbers of active hunters are unknown. Similarly, available harvest technologies have become increasingly efficient, but actual effects of new technologies on harvest levels are unknown.

Under BLM's Preferred Alternative, oil field development will be strictly infield and unconnected to other oilfields and/or road systems. Nonetheless, there remains a possibility that infield roads may allow local hunters increased access to previously inaccessible areas. For example, developments may be constructed so that their infield roads are within reach of navigable waterways or existing ATV trails from Nuiqsut. Hence, hunters from several other North Slope Villages might reach the road system by boat and use the roads for motorized access to previously inaccessible areas within the NE Planning Area. This increased access could result in added hunting pressure and greater distribution of lead shot.

Those hunters interested in harvesting waterfowl would likely access oilfield infrastructure during the period immediately following spring breakup, when most local hunters concentrate on geese and other returning birds. Although the Service has made an effort to educate the local hunting public about the plight of spectacled and Steller's eiders, and has stated that the prohibition against harvest of these species would be enforced, we believe that some level of harvest continues. However, the amount of harvest is unknown, as is whether the increased access scenario depicted here would result in increased harvest of spectacled or Steller's eiders in the NE Planning Area.

It currently is illegal to use lead shot for waterfowl hunting within the NE Planning Area. Its lethal and sublethal effects from ingestion by eiders and other waterfowl are well established (Flint and Grand 1997). The Service and other agencies have made efforts to educate North Slope residents on this issue, and clinics have been held to train local hunters how to adjust to the different ballistics of steel shot. Nonetheless, lead shot remains available and is still legal for use in hunting upland game birds such as ptarmigan. Whether through illegal use for waterfowl hunting, or legal use for ptarmigan hunting, use of lead shot could result in distribution of pellets in shallow tundra ponds where eiders could ingest them. Oil field development in the NE Planning Area may result in increased access by bird hunters, which could result in increased lead-shot deposition and distribution in tundra wetlands.

Although roads within oilfield developments may increase the access of local waterfowl hunters to previously inaccessible areas, the small additional area BLM assumes will be roaded, combined with the low densities of listed eiders around those areas is not expected to result in sufficient take to trigger population-level impacts. Additionally, local hunters that previously used areas where oil development occurs may actually avoid that area once a

development is constructed. Some villagers of Nuiqsut have told BLM staff they have reduced their use of the Colville River Delta in the vicinity of the Alpine development since its construction (BLM 2004). Therefore, overall impact to listed eiders from increased subsistence activity is currently expected to be low.

*Oil Spills*

Spilled oil can have significant impacts on birds. Exposure to oil can affect birds in several ways. Most birds that come into contact with oil die within a short period of time, often through loss of the insulative properties of their plumage so that hypothermia ensues (Hunt 1987, Piatt et al. 1990). Embryos or young can be killed by contact with adults that have oiled plumage (King and Lefever 1979, Peakall et al. 1982). Birds that ingest contaminated food can suffer fatal toxicological effects (Peakall et al. 1983). Species that feed on invertebrates or other organisms that bioaccumulate and/or biomagnify toxins are particularly vulnerable.

Oil spills and associated clean-up could result from the proposed project. Potential sources of a spill include a drilling blowout, failure of diesel fuel storage tanks, and spills from barges or trucks used to transport fuel oil. Historical data from North Slope oil production show that between 0 and 102 spills per year occurred from 1970-1997; most were small spills, as mean spill size in all years was < 100 bbl (MMS 2002). BLM estimates that over the useful life of the NE Planning Area small crude or refined oil spills (average size = 1-2 bbl) could number 1174 if the price of oil averages $30/bbl. Small spills, more likely, have the less impact to wildlife populations because a smaller area is affected and fewer individuals are likely to be exposed. Similarly, spills in the terrestrial environment, though possible, will likely have minimal impact because the density of Steller's and spectacled eiders is relatively low in the NE Planning Area and spills on land spread slowly and will be more easily detected and contained. Therefore, the Service considers that impacts from small marine spills and spills in the terrestrial environment are not likely to result in the take of individual Steller's and spectacled eiders. Because the Preferred Alternative states that all potential oil development or production will likely occur within terrestrial environments of the Area of High Geologic Potential and that those developments will be set back from rivers, coastal zones and deep water lakes, this BO does not address oil spills resulting from development/production within marine, riverine and/or tidal environments. Also, BLM's BA assumes the probability of oil spills resulting from exploration/delineation activities in the NE Planning Area to be zero.

The expected impacts of oil spills depends on how accurately spill characteristics, as well as the distribution and behavior of the birds are predicted. Estimating the probability of spills is fundamental: if no oil is spilled, there will be no impacts. If one or more spills occur, characteristics such as volume, trajectory, location and timing will greatly influence the impact on eiders. Patterns of use of the NE Planning Area by Steller's and spectacled eiders are also relevant. Evaluating the likelihood of spills from exploration and delineation in the NE Planning Area's marine/tidal environments is constrained by the small number of comparable offshore projects in North Alaska. The Amended IAP/EIS estimates that the risk

of one or more spills of at least 500 bbl over the life of the Preferred Alternative is 73%. Assuming factors similar to Northstar, the likelihood of a very large spill (blowout) >150,000 bbl in size occurring during the lifetime of the Amended IAP/EIS is 9.4 x 10^-7 (MMS 2002). However, the impacts of a spill to biological resources (e.g., eiders) vary with location spill, spill volume, spill trajectory, whether the resource is present during the time of year that spilled oil is present, and the length of time that oil persists in the environment. This is exemplified by Stehn and Platte's (2000) model that estimated mortality from a 30-day Beaufort Sea oil spill in July at 2-52 spectacled eiders. While, if a 30-day Beaufort Sea oil spill were to occur throughout August during the period of active westward migration, mortality resulting from a large spill is estimated to be 100 individuals. Oil-Spill-Risk Analysis modeling results within the BA state that spilled oil could enter a lake or pond but would likely be contained by the banks of these water bodies. BLM's BA outlined two spill scenarios designed to mimic a spill entering and spreading across a typical NE Planning Area lake complex that covers 1,134 acres, and a second spill scenario constructed to mimic a spill spraying onto the surrounding tundra and covering an area of 146 acres. Based on these scenarios, BLM estimated a maximum of 5 spectacled eiders would be exposed to oil from the aquatic spill, and 0.6 spectacled eiders would be exposed to oil from the terrestrial spill. The Service agrees that if such a spill does occur over the tundra and then seep into local lakes or other interconnected wetlands, small numbers of listed eiders could die, especially during the brood-rearing period in late summer. If a large spill were to occur in the NE Planning Area's marine environments, the BA estimates that less than 20 individuals would be killed. No estimates of spill risk from barges or trucks used to transport fuel oil to exploratory and delineation sites were given in the BA.

Historically, spills in the terrestrial environments of the North Slope are cleaned up quickly and spills typically remain on limited areas of tundra unless they reach a river, stream, or tidal water body. Off-pad spills on the North Slope generally cover small areas (<500ft$^2$). In marine environments cleanup is anticipated to be limited or prevented by ice and weather conditions in the area. In many cases, final cleanup of a marine oil spill may only be possible from early July through August after the NE Planning Area is ice free (National Research Council 1994). Because of unstable and broken ice conditions in the area, once a leak is detected, response for containment and cleanup of a spill will be delayed or hindered during 6 months of the year, and then only as weather permits. In addition, historical recovery rates of spilled oil are traditionally very low even when cleanup is not hampered by Arctic weather and frozen or partially frozen seas. Based on national and international data, recovery rates are usually below 10% and recovery of 20-25% is considered high (Alaska Department of Environmental Conservation 1998, National Research Council 1994).

Oil spill response activities such as hazing and other human activities (boat and air traffic) could also impact threatened eiders. Hazing may have limited success during spring when migrants occupy open water in ice leads. The hazing effect of cleanup activity or actively hazing birds out of ice leads that oil is expected to enter may be counterproductive, because there are few alternative habitats that flushed birds can occupy. Cleanup activities in leads

36

during May and open water in July through September are likely to adversely affect listed eiders.

In summary, accidental oil spills can have significant impacts on birds as a result of direct and indirect exposure. Potential sources of a spill include a drilling blowout, failure of diesel fuel storage tanks, or spills from barges or trucks used to transport fuel oil. Small spills are the most likely to occur but that also have the least potential impact to listed species because a smaller area is affected and fewer individuals are likely to be exposed. Similarly, spills in the terrestrial environment will likely have minimal impact because the density of Steller's and spectacled eiders is relatively low in the project area and spills on land spread slowly and will be more easily detected and contained. Large spills ($\geq 500$ bbl) spills in the NE Planning Area (especially in river or marine environments) would have greater impacts. However, the Preferred Alternative's stipulations K-1 through 8 state that all oil development/production will occur within terrestrial environments of the Area of High Geologic Potential and that those developments will be set back from rivers, coastal zones and deep-water lakes. Hence, we don't consider impacts of oil spills resulting from oil field activities within marine, riverine, near shore and/or tidal environments. In addition, BLM assumes that the probability of an oil spill occurring as a result of exploration/delineation to be zero. Also, the probability of a large oil spill contacting a significant number of spectacled or Steller's eiders is further diminished by considerations of timing, ice and weather conditions, effectiveness of spill response, and the dispersed nature of the birds' distribution. The coincidence of all those factors, which would have to occur simultaneously in order to appreciably reduce the likelihood of survival and recovery, is improbable. Thus, we conclude that such an impact is not reasonably certain to occur.

*Toxics Contamination*

Oil activity may also result in increasing contamination of marine habitats, due to the disposal of drilling muds and cuttings, or accidental eruption of oil from test wells during a blowout. Such contamination may impact individuals either through direct contact or indirectly as a result of effects on prey populations or important habitats. Information provided by the BLM indicates that industry's record in NPR-A allows the assumption of a probability of crude-oil release during exploration to be zero, however the potential for such an occurrence exists. To mitigate potential contaminate releases, the Preferred Alternative's ROP A-4 mandates several design/activity standards aimed at minimizing the impact of contaminants on fish, wildlife and the environment, including wetlands, marshes and marine waters, as a result of fuel, crude oil and other liquid chemical spills.

BLM's Preferred Alternative assumes that 57 exploration, 42 delineation and 489 production wells are to be drilled over the life of the NE Planning Area. A maximum of 8 drilling rigs would be operable in any one year, assuming one rig per platform. Discharges as a result of these wells are regulated by the Environmental Protection Agency through a National Pollutant Discharge Elimination System (NPDES). The EPA reinitiated consultation with the Service in July 2004 to determine the likelihood that the proposed discharges associated with oilfield activities would adversely affect listed species. The Service concurred with the

EPA that the proposed NPDES permit issuance would not be likely to adversely affect listed species. Therefore, the EPA and BLM have already satisfied the requirements of the Endangered Species Act regarding effluent discharges associated with oilfield activities in the NE Planning Area.

## CUMULATIVE EFFECTS

Cumulative effects include future State, local or private actions that are reasonably certain to occur in/adjacent to the action area considered in this BO. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act. Due to the large amount of wetlands, surface/subsurface lands under Federal management, and Native governments on the North Slope, most land use activities have a federal nexus through required federal permits or federal funding and are therefore not analyzed here.

When analyzing cumulative effects of a proposed action it is important to define spatial boundaries (geographical), temporal boundaries and types of actions that are reasonably foreseeable within those spatial and temporal boundaries. For this analysis of cumulative effects, the spatial boundary is the Arctic Slope of Alaska (North Slope). The North Slope is a 230,000 km$^2$ region north of the crest of the Brooks Range and is slightly larger than the State of Minnesota. It encompasses drainage basins that empty into the Beaufort and Chukchi Seas. The North Slope is divided into 3 major regions: the ACP, the Foothills and the Brooks Range. Most of the North Slope's surface/subsurface lands are managed by the Federal Government, State of Alaska and Native Corporations (very little private ownership). To date, all oil production on the North Slope has occurred on the ACP, but there is increasing exploration in the foothills. The only directly influenced area in the Brooks Range is the corridor for the Trans-Alaska Pipeline (TAPS), which crosses those mountains at Atigun Pass.

For this analysis, the temporal boundaries are January 1, 2005, to January 1, 2060 (55 years). Under the Preferred Alternative, 2060 is latest date oil infrastructure abandonment activity could still be taking place. A 55-year time frame was arrived at by adding BLM's assumed time frames for the exploration/delineation phase (10 years), development/production phase (30 years) and abandonment phase (15 years).

Generally, future State, and local government actions are likely to be in the form of legislation, administrative rules, or policy initiatives. Government and private actions may include changes in land use patterns, including ownership, zoning and intensity, any of which could affect listed eiders or their habitat. Even actions that are already authorized are subject to political, legislative, and fiscal uncertainties. These realities, added to the geographic scope of the action area, which encompasses numerous government entities exercising various authorities and split-estate lands, make any analysis of cumulative effects difficult. Therefore, these issues are addressed in a summary way below.

*State Actions*

State of Alaska actions reasonably certain to occur within/adjacent to the North Slope over the next 55 years include: oil and gas lease sales, exploration, development, and production; gravel mining, support facility construction, road construction, telecommunication infrastructure construction, pipeline/transport facility construction, and TAPS operation and maintenance. The State of Alaska has conducted annual areawide sales in the Beaufort Sea and on the North Slope since 1995. Each State Beaufort Sea offering extends from Barrow to the Canadian border, while onshore sales offer all unleased State lands between the Arctic National Wildlife Refuge and NPR-A. However, future State of Alaska oil and road building activities will be subject to Federal permitting requirements because these actions would likely occur in wetlands and/or nearshore areas requiring authorizations under the Clean Water Act and Rivers and Harbors Act. Therefore, because Federal approval requires section 7 consultation, the Service does not incorporate these State actions into the cumulative effects.

*Local Government Actions*

Local and regional government actions reasonably certain to occur within/adjacent to the North Slope over the next 55 years include: oil and gas lease sales, exploration, development, and production; gravel mining, support facility construction, road construction, pipeline/transport facility construction, telecommunication infrastructure construction, land reconveyances from Native corporations to private individuals, subsistence harvest activities, marine shipping, field research, tourism, Village growth and conservation work. Of these, the majority have a federal nexus and will require section 7 consultation; only marine shipping, field research, tourism, Village growth and conservation work lack a Federal nexus. However, except for Village growth, the Service is not aware of any specific future non-Federal activities on the North Slope that would cause greater impacts to listed eiders than those that presently occur.

The Service assumes that local governments will be faced with continuing pressures from economic expansion and population growth and movement. There will be demands for intensified development in rural areas, as well as increased demands for water, power, municipal infrastructure, and subsistence resources. This growth may in some cases affect listed eiders. For instance, as Barrow has grown over the last decade, several areas historically used for nesting by Steller's eider have been lost. However, today the Service and several local governments have positive working relationships and often work together to achieve balance between conserving listed eiders and ongoing Village growth. For instance, local governments are working collaboratively with the Service to develop a conservation plan aimed at providing a greater opportunity for recovery of listed eiders, while accommodating a growing human population (Barrow Conservation Plan).

*Private Actions*

Data quantifying current private activity on the North Slope does not exist, therefore projecting future private actions and corresponding impacts to listed eiders is extremely difficult. Private actions reasonably certain to occur within/adjacent to the North Slope that may impact listed eiders over the next 55 years include: subsistence activities, land use

changes, continued accumulation and persistence of lead shot in the environment, and loss of breeding habitat due to off-road vehicle use. The Preferred Alternative potentially may impact all these actions of which only land use changes are not described in the Effects of the Action Section. Private landowners may convert their lands from current uses, or they may intensify or diminish those uses. Individual landowners may voluntarily initiate actions to improve habitat, or they may abandon or resist improvement efforts. Their actions may be compelled by new laws, or they may result from growth and economic pressures. Changes in ownership patterns will have unknown impacts. Whether any of these private actions will occur is highly unpredictable, and the effects even more so. However, due to the miniscule amount of privately held land on the North Slope, any corresponding impacts to listed eiders from changes in surface activities on those lands are assumed to be minimal.

In summary, non-Federal actions are likely to continue affecting listed eiders on the North Slope. Cumulative effects on the North Slope are difficult to analyze, considering the area's broad geographic landscape, geographic and political variation, the uncertainties associated with government and private actions, and ongoing changes in the region's economy. Whether those effects will increase or decrease in the future is a matter of speculation; however, based on the population and growth trends identified in the Local Government subsection, cumulative effects are likely to increase. Although local governments are developing plans and initiatives, such as the Barrow Conservation Plan, which may mitigate impacts from increased local activity, these must be finalized and implemented in a comprehensive manner before the Service can consider them "reasonably foreseeable" in an analysis of cumulative effects.

CONCLUSION

After reviewing the proposed action (including the Reasonable and Foreseeable Development Scenario and associated list of assumptions), the current status of spectacled and Steller's eiders, environmental baseline for the action area, effects of the proposed action, and cumulative effects, it is the Service's biological opinion that actions outlined within BLM's BA and Amended IAP/EIS, as proposed, are not likely to jeopardize the continued existence of the spectacled and Steller's eider. There is no designated or proposed critical habitat on the North Slope for spectacled or Steller's eiders.

Regulations (51 FR 19958) that implement section 7(a)(2) of the Act define "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." In evaluating the impacts of the actions outlined in the BA and Amended IAP/EIS to Steller's and spectacled eiders, the Service identified a series of direct and indirect impacts that could result, such as disturbance from oil development/production activities, collisions with drill rig facilities by migrants, habitat loss and changes in the number or distribution of predators. However, the Service believes that the combined impacts to spectacled and Steller's eiders through these avenues will not rise to the level that the likelihood of survival

40

and recovery of either species is appreciably reduced for the reasons given in the *Effects of the Action* section of this BO.

Using methods and logic explained in the Incidental Take Statement (which follows this BO), the Service estimates that 19 adult and 85 eggs and/or young spectacled eiders will be taken during the life of the proposed project. Across the 30-year life of the project, this equates to an average of 0.6 adults and 2.8 eggs and/or young spectacled eiders taken per year. Thus, on average, roughly 0.00001 of the adult breeding population and less than 0.0003 of the annual reproductive effort will be taken as a result of this project (assuming a breeding population size of 7149 adults (Larned 2003), which result in 3000 pairs producing an average of 3 eggs per pair, both of which are conservative estimates to compensate for possible non-breeding pairs). The Service believes that this level of loss will not significantly affect the likelihood of survival and recovery of the spectacled eider.

It should be noted that for the purposes of determining jeopardy/non-jeopardy for this consultation, the impacts to spectacled eiders were evaluated at the scale of the North Slope breeding population. Therefore, the impacts of the proposed project would also not jeopardize the survival and recovery of the larger global population (i.e, the species).

Using methods and logic explained in the Incidental Take Statement, the Service estimates that 4 adult and 5 eggs and/or young Steller's eiders will be taken during the life of the proposed project. Across the 30-year life of the project, this equates to an average of 0.1 adult and 0.2 eggs or young Steller's eiders taken per year. Thus, on average, roughly 0.0001 of the adult breeding population and 0.0002 of the average annual reproductive effort will be taken as a result of this project (assuming a breeding population size of 1250 adults (Mallek 2001), which result in 500 pairs producing 5 eggs per pair every other year, which are conservative estimates to compensate for non-breeding pairs and for the fact that the species does not appear to nest every year in northern Alaska). The Service believes that this level of loss will not significantly affect the likelihood of survival and recovery of the Alaska-breeding population of the Steller's eider.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulations pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct. "Harm" is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. "Harass" is defined by the Service as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2),

taking that is incidental to and not intended as part of the agency action is not considered a prohibited taking provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement (ITS).

The measures described below are non-discretionary, and must be undertaken by BLM so that they become binding conditions of any grant or permit issued to an applicant, as appropriate, for the exemption in section 7(o)(2) to apply.  BLM has a continuing duty to regulate the activity covered by this Incidental Take Statement.  If BLM (1) fails to assume and implement the terms and conditions or (2) fails to require any applicant to adhere to the terms and conditions of the Incidental Take Statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, BLM must report the progress of the action and its impact on the species to the Service as specified in the *Terms and Conditions* section of this BO [50 CFR 402.14(i)(3)].

*Oilfield Disturbance*

We believe that disturbances from oilfield activity can have adverse impacts to listed eiders during nesting, but these effects are usually assumed to be minimal in magnitude.  Oilfield activity could adversely impact Steller's eiders by: 1) displacing adults and/or broods from preferred habitats during pre-nesting, nesting, brood rearing and migration; 2) displacing females from nests, exposing eggs or small young to inclement weather or predators; and 3) reducing foraging efficiency and feeding time.  The behavioral response of eiders to nesting disturbance is unknown and few quantitative estimates of the extent of adverse impacts of oilfield activity to nesting waterfowl exist for tundra environments.  The few studies that have been done deal specifically with investigator disturbance.  Several studies demonstrate negative effects of investigator disturbance on waterfowl nesting success.  Infrequently, waterfowl will permanently abandon nests after they are disturbed.  On the YKD, investigators estimated that nest trapping resulted in a loss of 5% of cackler geese eggs due to desertion (Mickelson 1975).  A single search of study plots for an investigator disturbance study done for spectacled eiders on the YKD caused the loss of 0.08% of egg production (Bowman and Sten 2003).  Gulls were attracted to, and more nests were destroyed at, eider nesting islands after disturbance (Ahlund and Gotmark 1989).  However, in 1997 investigators marked and visited spectacled eider nests at varying schedules and found no difference in survival or productivity due to observer impact (Grand and Flint 1997).

Potential sources of disturbance addressed in the BA include oilfield construction, oil spill response training, production activity, pipeline maintenance, staging area activity, infield road traffic, increased aircraft traffic, watercraft support, and gravel mining/transport. Disturbance resulting from production activity, infield road traffic, and oil spill response training typically occurs on a regular basis and will likely displace spectacled eiders from nearby habitats (at least 200 m away) rather than periodically disturb them. Therefore, impacts from these activities are best covered in the Habitat Loss subsection of this ITS and are not addressed here.  Also, because BLM assumes that major oilfield construction, pipeline maintenance and gravel mining/transport will only occur during the winter months

when listed eiders are not present in the NE Planning Area, this ITS assumes that these activities will not disturb nesting listed eiders. Therefore, this section only addresses adverse impacts to listed eiders resulting from aircraft traffic and watercraft support.

1. Aircraft Overflights

Under the Preferred Alternative, we distinguish 3 different types of aircraft operations. Category 1 is point-to-point operations (landings at airstrips). These flights are considered relatively predictable in time and space, and of a steady state rate of occurrence. We do not believe take resulting from this type of flight is likely because listed eiders would have the opportunity to habituate to or remove themselves from the vicinity of aircraft if they felt threatened.

Category 2 would be fixed-wing flights unpredictable in time and space (i.e. wildlife surveys, VIP flight-seeing, etc.). Impacts from these flights are difficult to assess because we don't know how many or where they occur. However, we do know that they are so infrequent that given the low densities of listed eiders in the NE Planning Area, they are unlikely to occur near nests.

Category 3 is irregular helicopter trips to remote locations within the NE Planning Area. We believe take resulting from this type of flight is possible because listed eiders would not have the opportunity to habituate to or remove themselves from the vicinity of aircraft if they felt threatened. We do know that the number of helicopter trips at Alpine has varied greatly year to year. In 2001, there were 776 helicopter landings or takeoffs from Alpine from 1 June to 15 July. Irregular helicopter flights from Alpine are known to flush waterfowl from their nests (R. Johnson pers. comm.). Flushing listed eiders from nests can result fragmentation of broods and in exposing eggs or small young to inclement weather or predators. However, based on BLM's assumed densities for listed eiders in the Area of High Geologic Potential, our projected number of listed eiders that may be flushed, and a reasonably assumed probability of predation, we believe that take of eggs or young resulting from helicopter flights is unlikely.

As described in the *Effects of the Proposed Action* above, spectacled and Steller's eider adults and/or broods may occur below or adjacent to aircraft routes. At times, listed eiders have been observed foraging near the Deadhorse and Barrow Airports (Service unpublished). Disturbance from aircraft overflights to Steller's and spectacled eiders is unlikely because over most of the NE Planning Area there is a low probability that the few areas occupied during breeding and nesting periods would be overflown routinely by support aircraft. Also, most listed eiders that encounter Category 1 type flights would have the opportunity to habituate to or remove themselves from the vicinity of aircraft. In addition, ROP F-1 will minimize the effects of low-flying aircraft on listed eiders and ensure that aircraft maintain protective altitudes over various portions of the NE Planning Area. Therefore, due to the low densities of listed eiders in the NE Planning Area and observed tolerances of

43

nesting eiders to overhead flights near North Slope airports/airstrips we do not anticipate that aircraft flights, associated with the Preferred Alternative, will result in take of listed eiders, eggs and/or young.


2. Watercraft Support

Disturbance to Steller's and spectacled eiders from watercraft support emanating to/from staging areas is possible. Nonrecreational airboats would be allowed on streams, lakes, and estuaries seasonally accessible by motorboats. Airboats would be prohibited in seasonally flooded tundra and shallow waters with wetland vegetation adjacent to streams, lakes, and estuaries. For this analysis, it is assumed no facilities would be constructed adjacent to waterways that could support nonrecreational use of watercraft because of setbacks required by stipulations K-1, 2 and 3.

Extensive nearshore and offshore aerial surveys in the Beaufort Sea in 1999 and 2000 detected two flocks of spectacled eiders (numbering 40 and 100) and no Steller's eiders offshore in the Harrison Bay area (Fischer at al. 2002). Satellite telemetry work done on spectacled eiders in the Prudhoe Bay oilfields during 2000 and 2001 showed that Smith Bay was an important marine area for females and Gwydyr Bay for males (TERA 2003). Vessels traveling from Deadhorse to the proposed staging areas may traverse both these bodies of water. However, given the rarity of listed eiders, it is likely that few would encounter vessel traffic. Although numbers of birds displaced could be substantial depending upon the season of occurrence (tens or hundreds of individuals, particularly during fall migration), alternate foraging and staging habitat would be available away from probable routes. We believe that eiders would avoid such encounters by flying away, that the frequency of those disturbances will not reach the threshold that would impair survival, and that alternative suitable habitat is available. Under these conditions, take is unlikely.

3. Exploration/Delineation Activity

BLM assumes all exploratory/delineation drilling activities will occur during winter when listed eiders are absent from the NE Planning Area. If a seismic operation were to extend into May (a very unlikely scenario according to the Amended IAP/EIS), disturbance of early-arriving eiders could occur, causing increase in energetic demands.

The presence of maintenance personnel at the seismic camps in summer may cause some disturbance to eiders in the immediate vicinity of the gravel/ice pad and could result in nest failure. However, the only activities associated with seismic exploration that would occur during the summer would be annual maintenance. The BA assumes that the maintenance operations would be self-contained and use accommodations that are part of cold-stacked seismic camps. Also, upon completion of the work, all wastes would be removed and disposed of at approved disposal sites on the North

Slope, negating the need for new landfills.  The approved landfill currently in operation at Deadhorse most likely would be used for materials not requiring additional treatment.

Since all exploration/delineation would occur between October and May, the probability of terrestrial exploratory activities in the NE Planning Area resulting in encounters with spectacled or Steller's eiders would be low.  Despite potential encounters with seismic and support activities, eiders typically avoid such encounters by diving or flying away.  Substantial adverse effects on spectacled or Steller's eiders resulting from oil and gas exploration/delineation activities within the NE Planning Area are unlikely.  Therefore, the Service does not anticipate that disturbance from exploration and delineation activity will result in threatened spectacled or Steller's eiders abandoning nests.

In conclusion, oilfield activities described in the BA could adversely affect individual listed eiders.  However, low nesting densities combined with the limited amount of oilfield infrastructure/activity assumed throughout the BA, suggest that few individuals would be impacted.  Likewise, the wide range of tolerances found in individual birds to this type of potential disturbance make it difficult to predict whether adverse impacts would actually occur.  Therefore, the Service anticipates that no take of threatened eiders will result from the proposed oilfield activity.

*Habitat Loss*

Estimating take of listed eiders from oilfield activities such as filling of wetlands, extracting gravel and disturbance from operation oilfield infrastructure is extremely difficult due to a lack of available information on tolerance of sea ducks to oilfield activities and their ability/willingness to relocate successfully to other areas once disturbed.   Depending on location and season, oil/gas exploration, development, and production in areas where listed eiders occur could render habitats unavailable due to disturbance or filling/coverage from construction activities, gravel mining, pads, and roads, facilities, and drilling activities.  The Service anticipates that incidental take of listed eiders will be difficult to detect because injury or death to eggs, young, or adults may not be directly observed.

Incidental take resulting from oilfield activities is expected to be in the form of harm to adults and killing of eggs and young.  Using a conservative approach, the Service and BLM assume that listed eiders will be excluded from breeding habitat within a 200 meter zone of influence around placement of fill for roads and oilfield infrastructure.  By multiplying the proposed action's footprint/BLM's assumed zone of influence (200 m) by an assumed density for spectacled eiders within the Area of High Geologic Potential, we calculate that 85 spectacled eider eggs and/or young would be taken as a result of the proposed action (1.11 birds/km$^2$ x 76.7 km$^2$).  For Steller's eiders, we calculate that 5 eggs and/or young would be taken as a result of this proposed action (0.06 birds/km$^2$ x 76.7 km$^2$).

It is important to note that the above estimates for take due to habitat loss from oilfield development/production activities are crude. The estimates do not take into consideration that development/production may take place in locations within the Area of High Geologic Potential that do not contain high density nesting areas for spectacled eiders and medium density nesting areas for Steller's eiders. As oilfield development projects are proposed, the Service will be able to generate better assessments of incidental take based on eider densities in specific areas. Therefore, as permanent infrastructure is proposed in the future, the impacts of those individual actions and future development on threatened eiders would be reconsidered and refined during consultation.

*Collisions with Drilling Structures, Towers, Overhead Wires and Associated Infrastructure*

The Service anticipates that threatened spectacled and/or Steller's eiders may collide with drill rigs, production infrastructure and/or associated structures within the NE Planning Area. Such losses probably will not result in population-level impacts to listed eiders. However, BLM's uncertainty over locations of exploratory drilling within the NE Planning Area and oilfield infrastructure within the Area of High Geologic Potential makes quantifying potential bird strikes difficult. Also, limited information is available on spectacled and Steller's eider migration routes, behavior, and vulnerability to obstructions when migrating, and this further complicates estimating anticipated collisions. However, the anticipated footprint of all summer rig storage pads and production infrastructure is likely to be relatively small within the NE Planning Area (4.6 million acres) and we believe the majority of eiders encountering oilfield infrastructure during migration are likely to miss or avoid obstructions.

Estimating the number of Steller's and spectacled eider fatal collisions is extremely difficult due to a lack of information on sea duck strikes and the effectiveness of structure marking/lighting regimes coupled with uncertainty over locations, seasonality and duration of potential NE Planning Area activities. For this BO we assume that the majority of exploration activity, cold stacking, and development will occur in coastal portions of the NE Planning Area where listed eiders occur in moderate to high densities. Limited data is available for common eider (*Somateria mollissima*) strikes to Northstar Island, which is located adjacent to the NE Planning Area. From this data it is possible to extrapolate a generic strike rate for sea ducks per rig/tower-year by dividing the number of common eider strikes (6) to Northstar Island in 2002 by the most recent population estimate of common eiders migrating west over the Beaufort Sea (111,635) (Suydam et al. 1996, Service, unpublished). That number is then multiplied by the mean population index for spectacled eiders (7,149) and population estimate for Steller's eiders (1,250) on the North Slope to give a "strikes per rig/tower-year" estimate for both species (Mallek 2001, Larned et al. 2003). The results of this methodology estimate that 0.37 spectacled and 0.07 Steller's eiders will fatally collide with each rig, tower and/or rig-equivalent wire span per year.

The BA states that no more than 4 exploratory drill rigs per year would be operating or cold stacked within the NE Planning Area over the 10-year exploration period (40 rig-years). Also, the BA assumes that no more than 8 production drill rigs would be operating/cold

46

stacked within the Area of High Geologic Potential over a 6-year period (48 rig-years).  For the production phase, 2 communication towers will operate per year for 30 years (60 tower-years).  When these rig-year numbers are added and then multiplied by the strike rates for listed eiders mentioned above, we initially estimate 55 spectacled and 10 Steller's eiders will die from collisions with drill rigs and towers.  However, the Preferred Alternative's ROP E-10 requires structures that are potential collision hazards to implement marking/lighting regimes in order to reduce collision risk.  It has been documented that marked spans of overhead wires/structures resulted in 65% fewer collisions when compared to the same spans/structures prior to marking (Alonso et al. 1994 and Manville 2004).  Therefore, we assume that ROP E-10 will result in 65% fewer collisions than if infrastructure was unmarked.  Hence, we estimate that 19 spectacled and 4 Steller's eider will actually die from collisions with drill rigs and towers over the life of the proposed action.

It is important to note that the above estimates for fatal collisions to drill rigs, and towers are based on meager data.  The estimates do not take into consideration that eider strikes are episodic in nature, that some spectacled and Steller's eiders never migrate through the NE Planning Area, that the strike estimates above are based on surrogate species in the marine environment, that marking and lighting of rigs/structures may not be effective, that collision rates are not comparable for rigs and other structures and that the strike rates are generated from only one year of data at a single location on the North Slope.  Therefore, it may be necessary to reinitiate consultation if observed strike rates are higher than estimated for this analysis.

*Increase in Predator Populations*

State of Alaska, Department of Environmental Conservation regulations that govern refuse management in oilfields include provisions to make it illegal for any person to intentionally feed wildlife or leave human food or garbage in a manner that attracts wildlife [5 AAC 92.230].  The Service assumes that applicants will comply with all applicable regulations, leasing stipulations and ROPs governing waste management. The Preferred Alternative's ROP A-2 would likely prevent the attraction of predators to food and garbage, and ROP E-9 should prevent human-made structures from being used as nesting, denning, or shelter sites for predators.  These two ROPs should greatly reduce the attraction of predators to new areas of human activity and minimize additional predation of listed eiders.  Because there will be no increase in predator abundance caused by improper waste management or creation of artificial denning/nesting habitat, the Service anticipates that no predation of threatened eiders will result.

*Increased Subsistence Activity*

Alaska Natives have traditionally harvested eiders and their eggs in coastal villages during spring and fall.  Subsistence harvest surveys for the North Slope indicate that an average of 155 spectacled eiders were taken at Wainwright during 1988-1989 and only 2 spectacled eiders were reported taken at Barrow during 1987-1990 (Braund et al. 1993).  The Preferred

Alternative's ROP E-1 guarantees continued subsistence use and access to traditional subsistence hunting and fishing areas within the NE Planning Area. Although the human population within/adjacent to the NE Planning Area has grown substantially, changes in the numbers of active hunters are unknown. Similarly, available harvest technologies have become increasingly efficient, but the actual effects of new technologies on harvest levels are unknown.

BLM's BA assumes oil development within the NE Planning Area will only have infield roads (unconnected to other road systems). Nonetheless, it is possible that infield roads may increase the access of local hunters to previously inaccessible areas. This is especially true if development occurs on the eastern fringe of the Area of High Geologic Potential that is within reach of existing ATV trails extending north out of Nuiqsut. Waterfowl hunters would likely access oilfield infrastructure during the period immediately following spring breakup to hunt geese and eiders. Although the Service has made an effort to educate the local hunting public about the plight of spectacled and Steller's eiders, and has stated that the prohibition against harvest of these species would be enforced, some level of harvest may continue. It is unknown what that level is, or whether the increased access scenario depicted here would result in an increased harvest of spectacled or Steller's eiders in the NE Planning Area.

Although infield roads may allow for increased access for local waterfowl hunters to previously inaccessible areas, the small additional areas that may be opened up, combined with the low densities of listed eiders found within the Area of High Geologic Potential is not expected to result in additional take. Additionally, North Slope hunters that previously used areas where oil development occurs may actually avoid those areas in the future once a development is constructed. Some residents of Nuiqsut have told BLM staff they have reduced their use of the Colville River Delta in the vicinity of the Alpine development since its construction (BA page 29). Therefore, we expect that additional take is unlikely and the overall impact to listed eiders from increased subsistence activity is likely to be minimal.

*Oil Spills*

Oil spills in the terrestrial environments of the NE Planning Area, though possible, will likely have minimal impact because the density of Steller's and spectacled eiders is relatively low in the NE Planning Area and spills on land spread slowly and will be more easily detected and contained. Oil-Spill-Risk Analysis modeling results within the Amended IAP/EIS estimate that if a spill does occur on the tundra and then moves into local lakes or other interconnected wetlands, small numbers of eiders could die, especially during the brood-rearing period in late summer. If a large spill were to occur in the NE Planning Area's marine/tidal environments, the Amended IAP/EIS estimates that tens of individuals would be killed. However, the Preferred Alternative's stipulations K-1 through 8 states that all oil development/production will occur within terrestrial environments of the Area of High Geologic Potential and that those developments will be set back from rivers, coastal zones and deep-water lakes. Hence, we don't consider impacts of oil spills resulting from oil field activities within marine, riverine, near shore and/or tidal environments. The IAP/EIS Oil-

48

Spill-Risk-Analysis modeling runs predict the probability of a marine spill to be extremely low. In addition, BLM assumes that the probability of an oil spill occurring as a result of exploration/delineation to be zero.

Extent of mortality that will result from oil spills from the proposed action is extremely difficult to estimate. First, it is uncertain that oil will be spilled. As stated in the biological assessment, the likelihood of at least one spill of at least 500 bbl during the life of the Preferred Alternative (~55 years) is currently estimated to be 75%. In the event of such an oil spill, the number of oiled eiders will be greatly influenced by the number, location, volume, trajectory, and timing of spills as well as the period that oil remains in the environment. In addition, the low probability of such an event, combined with the uncertainty of the location of the spill, and the seasonal nature of the resources inhabiting the area, make it highly unlikely that a large oil spill would contact a listed eider. Spectacled and Steller's eiders are present on the North Slope for only 3-5 months out of the year. Even if an eider were present in the vicinity of an oil spill, it might not be contacted by the oil due to avoidance behavior, ice conditions or weather patterns. Furthermore, BLM requires companies to have and implement oil-spill-response plans to help prevent oil from reaching critical areas and to remove oil from the environment. Therefore, the probability of a large oil spill contacting a Steller's or spectacled eider is significantly less than 75% over the 55-year life of the Preferred Alternative. All of these factors serve to reduce the likelihood that a large oil spill will contact a Steller's or spectacled eider.

Considering the low probability that an oil spill will contact a listed eider, coupled with a variety of other factors that would need to occur before listed eiders would be oiled, the Service anticipates that it is highly unlikely that listed eiders will become oiled from oil spills within the NE Planning Area. However, should any oil spill within the NE Planning Area result in the oiling or death of any Steller's or spectacled eider, BLM should order immediate cessation of all operations responsible for the oiling pending reinitiation of consultation.

*Toxics Contamination*

Oil activity may also result in increasing contamination of marine habitats, due to the disposal of drilling muds and cuttings, or accidental eruption of oil from test wells during a blowout. Such contamination may impact individuals either through direct contact or indirectly as a result of effects on prey populations or important habitats. Information provided by the BLM indicates that industry's record in NPR-A allows for the assumption of probability of crude-oil release during exploration to be zero, however the potential for such an occurrence exists. To mitigate impacts from potential contaminate releases, the Preferred Alternative's ROP A-4 mandates several design/activity standards aimed at minimizing the impact of contaminants on fish, wildlife and the environment, including wetlands, marshes and marine waters, as a result of fuel, crude oil and other liquid chemical spills.

The EPA reinitiated consultation with the Service in July 2004 to determine the likelihood that the proposed discharges associated with oil and gas drilling would adversely affect listed species. In July 2004, EPA notified BLM that its tentative determination for NPDES

discharges associated with the NE NPR-A was to issue coverage to the applicant under the North Slope General Permit (NSGP) and that it is not necessary to consult to cover the proposed action under the existing NSGP, which had to consider ESA when it was issued. The Service concurs with the EPA that the proposed NPDES permit issuance for North Slope oil and gas activity in the NE Planning Area would not be likely to adversely affect listed species.  Therefore, the EPA and BLM have already satisfied the requirements of the Endangered Species Act regarding effluent discharges associated with oil and gas development in the NE Planning Area.  Therefore, the Service anticipates that no listed eiders will be taken as a result of discharges associated with proposed oil and gas activity.

*Conclusion*

In conclusion, the Service anticipates the proposed action will likely result in the take of 104 spectacled eiders and 9 Steller's eiders as a result of habitat loss/disturbance and fatal collisions with oilfield structures.  The take is expected to be in the form of harm, harassment and/or killing.  The Service has determined that this level of anticipated killing is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat.

While the incidental take statement provided in this consultation satisfies the requirements of the Act, as amended, it does not constitute an exemption from the prohibitions of take of listed migratory birds under the more restrictive provisions of the Migratory Bird Treaty Act. However, the Service will not refer the incidental take of any migratory bird or bald eagle for prosecution under the Migratory Bird Treaty Act of 1918, as amended (16 U.S.C. §§ 703-712), or the Bald and Golden Eagle Protection Act of 1940, as amended (16 U.S.C. §§ 668-668d), if such take is in compliance with the terms and conditions (including amount and/or number) specified herein.

## REASONABLE AND PRUDENT MEASURES

The Service believes that the following reasonable and prudent measures are necessary and appropriate to minimize take of Steller's and spectacled eiders:

1.  To minimize the likelihood that migrating spectacled and Steller's eiders will strike drill rigs, towers, and associated infrastructure within the NE Planning Area, BLM, appropriate cooperating agencies and the Service will cooperatively develop a lighting/marking protocol intended to reduce radiation of light outward from structures and to increase the visibility of structures to migrating eiders.

2.  To avoid and reduce temporary impacts to productivity resulting from disturbance within 200 meters of occupied spectacled nests, from June 1 through August 15, ground level activity (by vehicle or on foot) within 200 meters of occupied spectacled eider nests will be restricted to existing thoroughfares.  Construction of permanent/temporary facilities, placement of fill, alteration of habitat, and introduction of high noise levels within 200 meters of occupied spectacled eider nests is prohibited. The Service does not intend this

50

RPM to be interpreted as a potential restriction on aircraft flights to areas of existing gravel fill.

3. One or more BLM compliance specialists will monitor industry compliance with stipulations, ROPs, and enforceable elements of assumptions listed in Appendix 4 of this BO at sites of oil and gas industry activity.

Terms and Conditions

In order to be exempt from the prohibitions of Section 9 of the Act, BLM must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary.

1. To minimize the likelihood that migrating spectacled eiders will strike structures associated with drilling activities, BLM, cooperating agencies and Service will cooperatively develop a lighting/operating protocol to be used on all drill rigs and associated production infrastructure. The Service and BLM will work together to identify when and where the protocol should be applied. Any protocol developed will be in compliance with Federal Aviation Administration (FAA) regulations. The lighting protocol shall ensure that radiation of light outward from all drill rigs and associated infrastructure will be minimized. This will be achieved by shading and/or light fixture placement to direct light inward and downward to living and work surfaces while minimizing light radiating upward and outward. Crane booms and/or drill rigs will be lowered any time there is no construction or drilling activity slated to occur for 30 days. This restriction applies only when spectacled and Steller's eiders may be present (15 May to 30 September).

2. Temporary impacts to spectacled eider productivity due to disturbance and direct habitat impacts must be minimized by ensuring protection of females with nests. Ground-level activity (by vehicle or on foot) within 200 meters of occupied spectacled eider nests, from June 1 through August 15, will be restricted to existing thoroughfares. This includes "working" gravel on existing fill (pads and roads). Construction of permanent facilities, placement of fill, alteration of habitat, and introduction of high noise levels within 200 meters of occupied spectacled eider nests will be prohibited. In instances where summer support/construction activity must occur off existing thoroughfares, Service-approved nest surveys must be conducted during mid-June of each year in which activities take place between June 1 and August 15. BLM and cooperating agencies will also work with the Service to schedule oil spill response training in riverine, marine and inter-tidal areas, that occurs within 200 meters of shore, outside sensitive nesting/brood-rearing periods or conduct nest surveys. The protocol and timing of nest surveys for spectacled eiders will be determined in cooperation with the Service, and must be approved by the Service. Surveys

should be supervised by biologists who have previous experience with spectacled eider nest surveys.

3.  One or more BLM compliance specialists will monitor industry compliance with stipulations, ROPs and enforceable elements of assumptions listed in Appendix 4 of this BO at sites of oil and gas related activity.  BLM will provide the Service with a copy of the monitoring plan.  Stipulations in special need of compliance monitoring include D-2 and K-1, 2, 3, 6 and 8.  ROPs in need of compliance monitoring include A-1 through 7, E-9, 10, 11, 12, 14 and F-1.  All acts of noncompliance or nonconformance to the ROPs, stipulations and enforceable elements of assumptions mentioned above will be reported in writing to the Field Supervisor, U.S. Fish and Wildlife Service, Fairbanks Fish and Wildlife Field Office, 101 12th Ave., Fairbanks, AK 99701.  In the event that noncompliance/nonconformance issues arise, BLM and the Service will cooperatively develop a strategy to eliminate the problem.

The Service believes that no more than 104 spectacled eiders and 9 Steller's eider will be incidentally taken during the life of the proposed project.  The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action.  If, during the course of the action, this level of incidental take is exceeded, such incidental take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measure provided.  The Federal action agency must provide, without unreasonable delay, an explanation of the causes of the take and review with the Service the need for possible modification of the reasonable and prudent measure.  If Steller's and/or spectacled eiders are encountered injured or killed, please contact the Fairbanks Fish and Wildlife Field Office, Endangered Species Branch, Fairbanks, Alaska at (907) 456-0499 for instruction on the handling and disposal of the injured or dead bird.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species.  Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.  We recommend the following actions be implemented during the leasing and exploration phase of this lease sale:

1.  BLM is encouraged to continue to contribute to monitoring efforts for threatened eiders and BLM special status species in the NE Planning Area.  Results will allow the Service and BLM to better evaluate abundance, distribution, and population trends of listed eiders and other special status species.  These efforts will enhance the likelihood that future oil development within the NE Planning Area will not jeopardize listed eiders or lead to listing additional species.

2.  BLM is encouraged to work with the Service and other Federal and State agencies in implementing recovery actions identified in the spectacled and Steller's eider recovery plans. Research to determine important habitats, migration routes, and wintering areas of spectacled and Steller's eiders would be an important step toward minimizing conflicts with current and future North Slope oil/gas activities.

3.  In order to minimize disturbance of nesting, brood-rearing, and migrating spectacled and Steller's eiders from aircraft flights to/from research areas and oilfield infrastructure, we ask that BLM limit summer aircraft traffic to small aircraft, restrict regular summer aircraft traffic to defined flight routes, and modify schedules of construction/activity to reduce traffic during the nesting season (June 20 to July 20).   Therefore, the Service believes that:

   A.  All flights should be restricted/minimized from June 20 to July 20,

   B.  All regularly scheduled flights within the NE Planning Area should occur according to a flight plan to be developed by BLM.  This flight plan should require pilots to use the shortest/quickest flight routes possible from destinations in order to minimize the number of nesting spectacled and Steller's eiders overflown and establish consistent flight routes that will allow birds to habituate to aircraft or evacuate flight routes. The flight routes outlined in the flight plan should not be deviated from unless required to protect human safety.  BLM should submit flight plans to the Service prior to permitting for input and guidance.

4.  To better understand the potential adverse impacts that summer (June 1 to September 30) aircraft flights have on spectacled eiders in NE NPR-A, the Service encourages BLM to collect and make available data on aircraft flights associated with construction, operation, support and abandonment of activities outlined in the Preferred Alternative. The Service is particularly interested in quantifying flights associated with research and facility tours.  Field research, flight seeing and facility tours in North Slope oilfields typically occur during the summer months, but numbers, locations, and type of activities remain speculative.  Our experience tells us that on an individual basis, these flights probably do not cause take of listed eiders.  However, without a greater understanding of the extent of these activities in NPR-A, it is difficult to determine whether the cumulative effects may result in take.  It is important to quantify these actions because they could result in: 1) displacing adults and/or broods from preferred habitats during pre-nesting, nesting, brood rearing and migration; 2) displacing females from nests, fragmenting broods and exposing eggs or small young to inclement weather or predators; and 3) reducing foraging efficiency and feeding time.

5.  We encourage BLM to require large structures that pose a collision risk to listed eiders be lighted and/or marked to improve visibility to listed eiders according to a strategy to be jointly developed by BLM and the Service.

   1)  This strategy will be developed using available information on bird avoidance measures including, but not limited to, results of the ongoing study

of lighting regimes for Northstar Island being conducted by BP Alaska, ABR, Inc., and the Service.

2) A draft strategy should be provided by the Service to BLM by 31 May 2005; the final strategy should be mutually agreed upon by BLM and Service by 1 April 2006, or a later date that is mutually agreed upon.

3) Any lighting requirements resulting from this strategy need not apply between November 31 and May 15, because listed eiders are not thought to be migrating through the NE Planning Area during this period.

4) This strategy should be modified, as appropriate, if significant new information on bird avoidance measures becomes available during activities covered by this consultation. Modifications to the strategy should be developed jointly by BLM and the Service.

Additional conservation recommendations may be proposed during subsequent consultations on oil related activities in the NE Planning Area. In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.


REINITIATION NOTICE

This concludes formal consultation on the actions outlined in BLM's final BA received on August 27, 2004. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: 1) the amount or extent of incidental take is exceeded; 2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; 3) the agency action is subsequently modified in a manner that causes an effect to listed or critical habitat not considered in this opinion; or 4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation. BLM must also reinitiate consultation if it becomes evident that any oil development and production outlined in the BA may take place without separate consultation on that action.

Thank you for your concern for endangered species and for your cooperation in the development of this biological opinion. If you have any comments or require additional information, please contact Ted Swem at (907) 456-0441 with the Fairbanks Fish and Wildlife Field Office, Endangered Species Branch, Fairbanks, Alaska.

LITERATURE CITED

ABR, Inc.  2002.  BA for the Spectacled Eider at the CD North Satellite Development, Colville River Delta, 2002.  Fairbanks, Alaska:  Phillips Alaska, Inc., 45 pp.

Ahlund, M., Götmark, F.,  1989. Gull predation on eider ducklings *Somateria mollossima*: effects of human disturbance. Biol. Cons. 48: 115-127.

Alaska Department of Environmental Conservation, Division of Spill Prevention and Response.  1998.  Response to comments and decision document for BP Exploration's Northstar Development project.  Unpublished report.

Alonso, J., Alonso, A., Rodrigo M.  1994. Mitigation of bird collisions with transmission lines through groundwire marking. Boilogical Conservation. 67:129-134.

Andersen, B., Ritchie, R., Stickney, A., and Wildman, A.  1998.  Avian studies in the Kuparuk oilfield, Alaska, 1998. Unpublished report for ARCO Alaska, Inc. and the Kuparuk River unit, Anchorage, Alaska.

Anderson, W., Havera, P., and Montgomery, R.  1987. Incidence of ingested shot in waterfowl in the Mississippi flyway, 1977-1979. Wildl. Soc. Bull. 15:181-188.

Anderson, W. and Havera, S. 1986. Blood lead, protoporphyrin, and ingested shot for detecting lead poisoning in waterfowl. *In* Lead Poisoning In Wild Waterfowl. *Edited by* J.S. Feierabend and A.B. Russell. National Wildlife Federation, Washington D.C. 10-18.

Anderson, B., Stickney, A., Ritchie, B., and Cooper, B.  1995.  Avian studies in the Kuparuk Oilfield, Alaska, 1994.  Unpublished report for ARCO Alaska, Inc. and the Kuparuk River Unit, Anchorage, Alaska.

Anderson, B. and Cooper, B.  1994.  Distribution and abundance of spectacled eiders in the Kuparuk and Milne Point oilfields, Alaska, 1993.  Final report. prepared for ARCO

Alaska, Inc., and the Kuparuk River Unit, Anchorage, Alaska by ABR, Inc., Fairbanks, Alaska, and BBN Systems and Technologies Corp., Canoga Park, CA.

Audubon Alaska.  2002.  Alaska's western Arctic: a summary and synthesis of resources.  Audubon Alaska, Anchorage, Alaska. 240pp.

Bureau of Land Management (BLM).  2004. Northwest National Petroleum Reserve-Alaska Integrated Activity Plan Biological Assessment, 2003. Final report generated for BLM North Field Office, Fairbanks, AK: 193-215

Bowman, T. and Stehn, R.  2003.  Impact of investigator disturbance on spectacled eiders and cackling Canada geese nesting on the Yukon-Kuskokwim Delta.  Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska.

Brackney, A. and King, R.  1993.  Aerial breeding pair surveys of the Arctic Coastal Plain of Alaska: Revised estimates of waterbird abundance 1986-1992.  Unpublished report prepared by U.S. Fish and Wildlife Service, Anchorage, Alaska.

Braund, S.  1993.  North slope subsistence study Barrow 1987, 1988, 1989. Submitted to U.S.D.I., Minerals Management Service, Alaska Outer Continental Shelf Region. OCS Study MMS 91-0086, Tech. Rep. No. 149. 234 p. + Appendices.

Brooks, W.  1915.  Notes on birds from east Siberia and Arctic Alaska.  Bulletin of the Museum of Comparative Zoology 59:359-413.

Connor v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988) (Decision: agency must consult on entire oil and gas leasing plan, "including the effects of leasing and all post-leasing activities" before initiation of agency action).

Cottam, C.  1939.  Food habits of North American diving ducks.  U.S. Department of Agriculture Technical Bulletin No. 643. Washington, D.C..

Cramp, S., Simmons, K., Ferguson-Lees, I., Gillmor, R., Hollom, P., Hudson, R., Nicholson, E., Ogilvie, M., Olney, P., Voous, K., and Wattel, J.  1977.  Handbook of the birds of Europe, the Middle East, and North Africa.  Vol I.  Oxford University Press, Oxford, United Kingdom.  722 pp.

Dau, C. and Anderson, P.  2002.  Aerial population survey of common eiders and other waterbirds in near shore waters and along barrier islands of the Arctic Coastal Plain of Alaska, 25-29 June 2002.  Unpublished report, U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage, Alaska. 16pp.

Dau, C. and Kistchinski, S.  1977.  Seasonal movements and distribution of the spectacled eider. Wildfowl 28: 65-75.

Exhibit 44, page 56 of 71

Dau, C.  1974.  Nesting biology of the spectacled eider, *Somateria fischeri* (Brandt), on the Yukon-Kuskokwim Delta, Alaska.  M.S. Thesis, University of Alaska, Fairbanks, Alaska.

Day, R.  1998.  Predator populations and predation intensity on tundra-nesting birds in relation to human development.  Unpublished report prepared for Northern Alaska Ecological Services, U.S. Fish and Wildlife Service, Fairbanks, Alaska.

Dieter, M. and  Finley, M.  1978. Erythrocyte *d*-aminolevulinic acid dehydratase activity in Mallard ducks: duration of inhibition after lead shot dosage. J. Wildl. Manage. 42:621-625.

Elder, W.  1954. The effects of lead poisoning on the fertility and fecundity of domestic mallard ducks. J. Wildl. Manage, 18:315-323.

Fay, F.  1961.  The distribution of waterfowl on St. Lawrence Island, Alaska.  Annual Report of the Wildfowl Trust 12:70-80.

Fischer, B., Tiplady, T., and Larned, W.  2002.  Monitoring Beaufort Sea Waterfowl and Marine Birds Aerial Survey Component.  Unpublished report prepared for Minerals Management Service (MMS), Anchorage, Alaska.

Flint, P., Grand, J., Morse, A., and Fondell, T.  2000.  Late summer survival of adult female and juvenile spectacled eiders on the Yukon-Kuskokwim Delta, Alaska.  Waterbirds 23:292-297

Flint, P. and Herzog, M.  1999. Breeding of Steller's eiders *Polysticta stelleri*, on the Yukon-Kuskokwim Delta, Alaska. Canadian Field-Naturalist 113: 306-308.

Flint, P., Petersen, M., and Grand, J.  1997.  Exposure of spectacled eiders and other diving ducks to lead in western Alaska.  Canadian Journal of Zoology 75:439-443.

Franson, J.  1986. Immunosuppressive effect of lead. In Lead Poisoning in Wild Waterfowl. *Edited by* J.S. Feierabend and A.B. Russel, National Wildlife Federation, Washington D.C. pp 32-37.

Franson, J., Petersen, M., Meteyer, C., and Smith, M.  1995. Lead poisoning of spectacled eiders (Somateria fischeri) and of a common eider (Somateria mollissima) in Alaska. Journal of Wildlife Diseases 31:268 -271.

Georgette, S.  2000. Subsistence use of birds in the Northwest Arctic Region, Alaska. Technical Paper No. 260, Alaska Department of Fish and Game, Division of Subsistence, Juneau.

**Exhibit 44, page 57 of 71**

Grand, J., Franson, J., Flint, P., and Petersen, M.  2003. Concentrations of trace elements in eggs and blood of spectacled and common eiders on the Yukon-Kuskokwim Delta, Alaska, USA. Envir. Toxic. Chem. 21:1673-1678.

Grand, J., and Flint, P.,  1997. Productivity of nesting spectacled eiders on the lower Kashunuk River, Alaska. Condor 99:926-932.

Grand, J., Flint, P., Petersen, M., and Rockwell, R.  Modeling population of spectacled eiders.  Website URL: http://www.absc.usgs.gov/research/speimod/

Harwood, C. and Moran, T.  1993.  Productivity, brood survival, and mortality factors for spectacled eiders on Kigigak Island, Yukon Delta NWR, Alaska, 1992.  Unpublished report prepared for U.S. Fish and Wildlife Service,  Bethel, Alaska.

Harwood, C. and Moran, T.  1991.  Nesting chronology, reproductive success, and brood rearing for spectacled and common eiders on Kigigak Island, 1991.  Unpublished report prepared for U.S. Fish and Wildlife Service,  Bethel, Alaska.

Hunt, G. Jr.  1987.  Offshore oil development and seabirds: The present status of knowledge and long-term research needs.  Pages 539-586 in D.F. Boesch and N.N. Rabailais, eds.  Long-term environmental effects of offshore oil and gas development.  Elsevier Applied Science: New York, New York.

Johnson, C., Burgess, R., Lawhead, B., Neville, J., Parrett, J., Prichard, A., Rose, J., Stickney, A., and Wildman, A.  2003.  Alpine Avian Monitoring Program, 2001.  Fourth Annual Synthesis Report.  Fairbanks, Alaska, ABR, Inc., 194 pp.

Johnson, R. and Richardson, W.  1982.  Waterbird migration near the Yukon and Alaska coast of the Beaufort Sea: II. Molt migration of seaducks in summer.  Arctic 35(2): 291-301.

Johnson, L.  1971.  The migration, harvest, and importance of waterfowl at Barrow, Alaska.  M.S. Thesis, University of Alaska, Fairbanks.

Jones, R.  1965.  Returns from Steller's eiders banded in Izembek Bay, Alaska.  Wildfowl Trust Annual Report 16: 83-85.

Kertell, K.  1991.  Disappearance of the Steller's eider from the Yukon-Kuskokwim Delta, Alaska.  Arctic 443: 177-187.

King, K. and Lefever, C. 1979.  Effects of oil transferred from incubating gulls to their eggs.  Marine Pollution Bulletin 10:319-321.

Kistchinski, A. and Flint, V.  1974.  On the biology of the spectacled eider. Wildfowl 25:5-15.

Kistchinski, A.  1973.  Waterfowl in north-east Asia.  Wildfowl 24:88-102.

Klein, D.  1966. Waterfowl in the economy of the Eskimos on the Yukon-Kuskokwim Delta, Alaska. Arctic 19:319-336.


Kondratev, A. and Zadorina, L.  1992.  Comparative ecology of the king eider *Somateria spectabilis* and spectacled eider  *Somateria fischeri* on the Chaun tundra. Zool. Zhur. 71:99-108. (in Russian; translation by J. Pearce, National Biological Survey, Anchorage, Alaska).

Larned, W., Butler, W., and Balogh, G.  1994.  Steller's eider migration surveys, 1992-1993. Unpublished report prepared by U.S. Fish and Wildlife Service, Anchorage, Alaska.  52 pp.

Larned, W., Balogh, G., Stehn, R., and Butler, W.  1993.  The status of eider breeding populations in Alaska, 1992.  Unpublished report prepared by U.S. Fish and Wildlife Service, Anchorage, Alaska.

Larned, W., Stehn, R., and Platte, R.  2003.  Eider breeding population survey, arctic coastal plain, Alaska, 2003. Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska. 17pp.

Larned, W., Stehn, R., and Platte, R.  2002.  Eider breeding population survey, arctic coastal plain, Alaska, 2002. Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska. 14pp.

Larned, W., Platte, R., and Stehn, R.  2001a.  Eider breeding population survey, arctic coastal plain, Alaska, 1999-2000. Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska.  52pp.

Larned, W., Stehn, R., Fischer, J., and Platte, R.  2001b.  Eider breeding population survey, arctic coastal plain, Alaska, 2001. Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska.  20 pp + figures.

Larned, W. and Tiplady, T.  1999. Late wintering distribution of distribution of spectacled eiders (*Somateria fischeri*) in the Bering Sea 1998. Unpublished report prepared for U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage, Alaska. 9pp.

Larned, W., and Tiplady, T.  1997.  Late winter population and distribution of spectacled eiders (*Somateria fischeri*) in the Bering Sea, 1996-1997.  Unpublished report prepared for U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage, Alaska.

Lovvorn, J.  2002,  A habitat variability analysis for Spectacled eiders wintering at sea, Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska.

Lovvorn, J., Richman, S., Grebmeier, J., and Cooper, L.  2002(review).  Diet and body condition of spectacled eiders wintering in pack ice of the Bering Sea, Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, AK.

Manville, A.  2004.  Bird Strikes and Electrocutions at Power Lines, Communication Towers, and Wind Turbines:  State of the Art and State of the Science –Next Steps Toward Mitigation.  Proceedings of the 3rd International Partners in Flight Conference, Aslomar, CA, March 20-24, 2002. PSW-GTR-191, pp. 25

Martin, P.  1997.  Predators and Scavengers Attracted to Locales of Human Activity.  NPR-A Symposium Proceedings, Anchorage.  OCS Study, MMS 97-0013.  Anchorage, Alaska: USDOI, MMS, Alaska OCS Region, pp. 6-19 to 6-24.

Mallek, E.  2001.  Aerial breeding pair surveys of the arctic coastal plain of Alaska-2000. Unpublished report prepared for U.S. Fish and Wildlife Service, Fairbanks, Alaska. 14 pp.

Mallek, E., Platte, R., and Stehn, R.  2002.  Aerial breeding pairs surveys of the Arctic Coastal Plain of Alaska - 2001.  Unpublished report prepared by U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage.

Mallek, E., Platte, R., and Stehn, R.  2003.  Aerial breeding pairs surveys of the Arctic Coastal Plain of Alaska - 2002.  Unpublished Report prepared for U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage.

Mayfield, H.  1975.  Suggestions for calculating nest success. Wilson Bull. 87:456-466.

McDonald, T., Wolfe, S., Jensen, P., Haley, W., Wilson, J., and Senner, R.  2002.  Risk assessment for a proposed spectacled eider unusually sensitive area (USA), Alaska North Slope. Prepared for BP Exploration Inc. and CPAI by West, Inc. and LGL Alaska Research Associates, Inc. 27 pp.

Mickelson, P.  1975.  Breeding biology of Cackling geese and associated species on the Yukon-Kuskokwim Delta, Alaska.  Wildl. Monogr. No. 45.  35pp.

Minerals Management Service (MMS).  2002.  Beaufort Sea Planning Area: EIS/EA for oil and gas lease sales 186, 195, and 202.  Draft Environmental Impact Statement.  Vol. 1: IV-8

Moran, T.  1996.  Nesting ecology of spectacled eiders on Kigigak Island, Yukon Delta NWR, Alaska, 1995.  Unpublished report prepared for U.S. Fish and Wildlife Service, Bethel, Alaska.

Moran, T.  1995.  Nesting ecology of spectacled eiders on Kigigak Island, Yukon Delta NWR, Alaska, 1994.  Unpublished report prepared for U.S. Fish and Wildlife Service, Bethel, Alaska.

Moran, T. and Harwood, C.  1994.  Nesting ecology, brood survival, and movements of spectacled eiders on Kigigak Island, Yukon Delta NWR, Alaska, 1993.  Unpublished report prepared for U.S. Fish and Wildlife Service, Bethel, Alaska.

National Research Council.  1994.  Environmental information for outer continental shelf oil and gas decisions in Alaska. National Academy of Sciences, Washington, D.C.

Obritschkewitsch, T.,  Martin, P., and Suydam, R.  2001.  Breeding biology of Steller's eiders nesting near Barrow, Alaska, 1999-2000.  Northern Ecological Services, U.S. Fish and Wildlife Service, Technical Report NAES-TR-01-04, Fairbanks, Alaska 113 pp.

Paige, A., Scott, C., Andersen, D., Georgette, S., Wolfe, R.  1996.  Subsistence use of birds in the Bering Strait Region, Alaska.  Technical Paper No. 239, Alaska Department of Fish and Game, Division of Subsistence, Juneau.

Palmer, R. (ed.).  1976.  Handbook of North American Birds.  Vol. 3.  Waterfowl.  Yale University Press, New Haven, CT.

Peakall, D., Miller, D., and Kinter, W.  1983.  Toxicity of crude oils and their fractions to nesting herring gulls 1.  Physiological and biochemical effects.  Marine Environmental Resources 8:63-71.

Peakall, D., Hallett, D., Bend, J., Foureman, G., and Miller, D. 1982.  Toxicity of Prudhoe Bay crude oil and its aromatic fractions to nesting herring gulls.  Environmental Resources 27:206-211.

Pearce, J., Esler, D., and Degtyarev, A.  1998. Nesting ecology of spectacled eiders on the Indigirka River Delta, Russia. Wildfowl 49:110-123.

Petersen, M., Douglas, D., and Mulcahy, D.  1995.  Use of implanted satellite transmitters to locate spectacled eiders at sea.  Condor 97: 276-278.

Petersen, M., Larned, W., and Douglas, D.  1999.  At sea distribution and abundance of spectacled eiders (*Somateria fischeri*): 120 year-old mystery solved. The Auk. 116(4): 1009-1020, 1999.

Petersen, M.  1980.  Observations of wing-feather molt and summer feeding ecology of

**Exhibit 44, page 61 of 71**

Steller's eiders at Nelson Lagoon, Alaska.  Wildfowl 31:99-106.

Petersen, M.  1981.  Populations, feeding ecology and molt of Steller's eiders.  Condor 83:256-262.

Piatt, J., Lensink, C., Butler, W., Kendziorek, M., and Nysewander, D.  1990.  Immediate impact of the "Exxon Valdez" oil spill on marine birds.  Auk 107: 387-397.

Quakenbush, L., Day, R., Anderson, B., Pitelka, F., and McCaffery, B.  2002.  Historical and present breeding season distribution of Steller's eiders in Alaska.  Western Birds. 33: 99-120

Quakenbush, L., and Suydam, R.  1999.  Periodic non-breeding of Steller's Eiders (*Polysticta stelleri*) near Barrow, Alaska, with speculation on possible causes.   Pages 34-40 *in* I.R. Goudie, M.R. Petersen, and G.J. Robertson, eds.  Behavior and ecology of sea ducks. Proceedings of the Sea Duck Symposium, 23rd Annual Pacific Seabird Group Meeting.

Quakenbush, L., Suydam, R., Fluetsch, K., and Donaldson, C.  1995.  Breeding biology of Steller's eiders nesting near Barrow, Alaska, 1991-1994.  Unpublished report prepared for U.S. Fish and Wildlife Service, Fairbanks, Alaska.  53 pp.

Quakenbush, L., Suydam, R., Fluetsch, K., and Obritschkewitsch, T.  1998.  Breeding habitat use by Steller's eiders near Barrow, Alaska, 1991-1996.  Unpublished report prepared for U.S. Fish and Wildlife Service, Fairbanks, Alaska. 19 pp.

Quakenbush, L., and Cochrane, J. 1993.  Report on the conservation status of the Steller's eider (*Polysticta stelleri*), a candidate threatened and endangered species.  Unpublished report prepared for U.S. Fish and Wildlife Service, Fairbanks, Alaska.

Richie, R., and King, J.  2002.  Steller's eider surveys near Barrow and the Meade River, Alaska, 2001.  Unpublished report prepared for North Slope Borough Department of Wildlife Management, Barrow, Alaska.

Silver v. Babbitt, 924 F. Supp. 976, 988 (D. Ariz. 1995), (Decision: for violation of section 7 consultation requirements, injunction is appropriate).

Silver, et al. v. Thomas, (CV-94-437-ACM), (D. Ariz. 1996) (Decision: An injunction was ordered because the USFS and FWS formally consulted on the LRMPs as amended, not on the original LRMPs).

Smith, L., Byrne, L., Johnson, C., and Stickney, A.  1994.  Wildlife studies on the Colville River Delta, Alaska, 1993.  Unpublished report prepared for ARCO Alaska, Inc., Anchorage, Alaska.

Stehn, R., and Platte, R.  2000.  Exposure of birds to assumed oil spills at the Liberty Project.

Unpublished report for U.S. Fish and Wildlife Service, Migratory Bird Management, Anchorage, Alaska.

Stehn, R., Dau, C., Conant, B., and Butler, W.  1993.  Decline of spectacled eiders nesting in western Alaska. Arctic 46(3): 264-277.

Suydam, R., Quakenbush, L., Dickson, L., and Obritschekewitsch, T.  1996.  Migration of king, *Somateria spectabilis*, and common, *S. mollissima v-nigra*, eiders past Point Barrow, Alaska, during spring and summer/fall 1996.  Unpublished report for U.S. Fish and Wildlife Service, Fairbanks, Alaska.

Troy Ecological Research Associates (TERA).  2003.  Spectacled eiders in the Beaufort Sea: Distribution and timing of use.  Unpublished report prepared for BP Exploration (Alaska) Inc., Anchorage, Alaska.

TERA.  1999.  Spectacled eiders in the Beaufort Sea: Distribution and timing of use. Unpublished report prepared for BP Exploration (Alaska) Inc., Anchorage, Alaska.

TERA.  1997.  Distribution and abundance of spectacled eiders in the vicinity of Prudhoe Bay, Alaska, 1991-1993.  Unpublished report prepared for BP Exploration (Alaska) Inc., Anchorage, Alaska.

TERA. 1996. Distribution and abundance of spectacled eiders in the vicinity of Prudhoe Bay, Alaska: 1994 status report. Unpublished report by Troy Ecological Research Associates,  Anchorage, Alaska, for BP Exploration (Alaska), Inc, Anchorage, Alaska. 11 p.

Thompson, D. and Person, R.  1963.  The eider pass at Point Barrow, Alaska.  J. Wild. Manage. 27(3): 348-356.

Trust, K., Cochrane, J., and Stout, J. 1997.  Environmental contaminants in three eider species from Alaska and Arctic Russia.  Technical Report WAES-TR-97-03.  U.S. Fish and Wildlife Service, Anchorage, Alaska.  44 pp.

Walker, D., Cate, D., Brown, J., and Racine, C.  1987.  Disturbance and recovery of arctic Alaska tundra terrain: A review of recent investigations. CRREL Report No. 87-11. Hanover, NH: US Army Corps of Engineers, Cold Regions Research and Engineering Lab.

Warnock, N., and Troy, D.  1992.  Distribution and abundance of spectacled eiders at Prudhoe Bay, Alaska: 1991.  Unpublished report prepared for BP Exploration (Alaska) Inc., Environmental and Regulatory Affairs Department, Anchorage, Alaska, by TERA, Anchorage, Alaska.

**Exhibit 44, page 63 of 71**

Weir, R. 1976.  Annotated bibliography of bird kills at man-made obstacles: A review of the state of the art and solutions.  Unpublished report prepared for Department of Fisheries & Environment, Canadian Wildlife Service-Ontario Region.

Wentworth, C.  2001. Subsistence waterfowl harvest survey.  Yukon-Kuskokwim Delta. 2000 results and comparative data, 1991-2000.  Unpublished report prepared for U.S. Fish and Wildlife Service, Anchorage, Alaska.

Woodby, D., and Divoky, G.  1982.  Spring migration of eiders and other waterbirds at Point Barrow, Alaska.  Arctic 35(3): 403-410.

**Exhibit 44, page 64 of 71**

APPENDIX 1

**Amended Northeast NPR-A IAP/EIS Consultation History**

03/06/03 -    BLM submits request for new information on threatened and endangered species pertaining to a second oil/gas lease under the 1998 NE NPR-A IAP/EIS

03/25/02 -    Service responds to BLM's request for new information on threatened and endangered species pertaining to a second oil/gas lease under the 1998 NE NPR-A IAP/EIS

10/31/03 -    Service provides scoping comments to BLM planners on proposed Amended NE NPR-A IAP/EIS

11/07/03 -    BLM emails Service alerting them to the fact that a new section 7 consultation with regards to the NE NPR-A may be coming.

11/28/03 -    Service and BLM exchange emails establishing channels of correspondence for formal consultations in Northern Alaska

12/03/03 -    BLM emails Service stating that BLM is moving forward with the preparation of an EIS for an amended NE NPR-A Integrated Activity Plan prepared in 1998.

12/04/03 -    Service and BLM exchange emails trying to establish a meeting date to discuss upcoming NE NPR-A consultation.

01/13/04 -    BLM emails Service inquiring if February 3 or 4 is a better date to have a meeting on NE NPR-A consultation.

01/30/04 -    Service emails BLM agenda for future meeting.

02/02/04 -    BLM mails annual report on oil/gas activities in NE NPR-A with potential to affect spectacled or Steller's eiders in 2003

02/03/04 -    BLM and Service meet to discuss scope and timeline for upcoming section 7 consultation on the proposed Amended IAP/EIS for NE NPR-A.

02/12/04 -    BLM mails the Service a preliminary draft of ROPs and stipulations regarding BLM's NE NRP-A Amended IAP/EIS.

03/19/04 -    BLM emails the Service a draft BA for the NE NRP-A Amended IAP/EIS. BLM requests that the Service review the document and provide feedback.

65

03/24/04 -     ENSR (BLM contractor) mails the Service a copy of the draft BA with previously excluded tables, maps and appendicies.

04/07/04 -     Service and BLM hold meeting to discuss inadequacies with the draft BA, the Service encourages BLM to get a copy of the BA done for CD-N (Alpine) as a template to follow.

04/08/04 -     Service emails copy of CD-N BA to BLM.

04/09/04 -     BLM emails service explaining their plan to consider the Service's comments and rewrite portions of the BA.

06/01/04 -     BLM emails Service asking them to review a draft letter initiating section 7 consultation.  Service replies that the letter is sufficient.

06/02/04 -     BLM sends memo to the Service requesting initiation of section 7 consultation on the NE NRP-A Amended IAP/EIS.

07/09/04 -     Service sends email to BLM providing feedback on most recent draft BA for the NE NRP-A Amended IAP/EIS.

07/12/04 -     BLM contacts Service attempting to set up a conference call with ABR and CPAI to discuss state of draft BA.

07/12/04 -     BLM emails ENSR and Service describing how the Service's comments on the draft BA will be addressed in the final version.

07/12/04 -     BLM emails Service setting up a conference call to seek clarification on the Service's requests for additional information before the final BA is published.

07/12/04 -     ENSR emails Service asking if they would like a set of tables and maps with the final BA.

07/13/04 -     Service emails ENSR with further information requests on oil spill behavior and probability.

08/27/04 -     BLM emails the Service final BA.

11/05/04 -     BLM and Service hold telephone call to discuss progress with the BO.

11/05/04 -     BLM emails the Service requesting an update on status of BO.

11/17/04 -     BLM emails the Service with status update on information request for BO.

11/19/04 -     BLM emails the Service with an Amendment to final BA.

11/29/04 -      BLM emails the Service with an Amendment to final BA.

12/10/04 -      BLM and Service meet to discuss altering Draft BO to reflect BLM Final
                Proposed Alternative (Alternative D).

12/23/04 -      BLM emails the Service its revised BA reflecting the Final Proposed
                Alternative

01/06/04 -      BLM and the Service agree that BLM has supplied all information necessary
                to finalize BO.

01/13/05 -      Service finalizes BO, signs cover letter and sends to BLM

67

APPENDIX 2

# BLM's Development Assumptions Under the Preferred Alternative

## 2. Description of Proposed Activities Using the Agency Preferred Alternative and Key Assumptions in the Analysis

### 2.1 Reasonable and Foreseeable Oil Development Scenario and Key Assumptions

The 1998 Northeast IAP/EIS considered two sets of scenarios: the first lease sale scenario and the multiple lease scenarios. Because three lease sales have occurred since 1998, the scenarios presented in the Amended IAP/EIS and in this BA assume multiple lease sales and full development of the estimated resources within the constraints of the evaluated alternatives.

Under the Preferred Alternative (Map 2-2), all but approximately 213,000 acres of the BLM administered lands within the Planning Area would be made available for oil and gas leasing. The 213,000 acres not available for leasing are located north of Teshekpuk Lake (Map 2-2).

The reasonably foreseeable development scenario is based on a comprehensive geological analysis and computer simulation modeling completed in 2002 by the Minerals Management Service (MMS) and the BLM. In this analysis, the results of petroleum resource characteristics of commercial fields, and of areas where these fields are likely to be discovered and developed were modeled using an average oil price of $30 per barrel. The exact locations for future commercial projects are impossible to define prior to exploration drilling. It is uncertain whether any commercial fields would be discovered, particularly if oil prices were to fall below $20 per barrel for an extended period of time.

### 2.1.1 Hydrocarbon Potential and Economics

Under the regulatory conditions of the Preferred Alternative, it is estimated that up to 14 new fields would be developed as a result of multiple lease sales conducted in the Planning Area. Oil and gas fields on Alaska's North Slope typically are composed of one or more subsurface pools. These pools may, or may not, be grouped so that they can be produced from a common infrastructure. The first fields developed would be oil fields. Currently, no infrastructure exists to transport natural gas from the North Slope to a market. While natural gas is a byproduct of oil development, the BLM does not consider natural gas production to be reasonably foreseeable.

Assuming $30-per-barrel oil, 2,054 million barrels of oil could be developed in the Planning Area. Analyses of the geologic plays indicate commercial fields are most likely to be discovered in the portion of the Planning Area designated the "High Potential" area (i.e., the area having the highest economic potential for oil development, based on $30-per-barrel oil; Map 3-4). This High Potential area includes the area surrounding Teshekpuk Lake and the coastal areas to the north of the lake.

In previous oil leases, larger fields typically have been found earlier in the exploration cycle, and are more likely to be economically viable. This reasonable and foreseeable scenario assumes that the first

68

fields developed in the Planning Area would be approximately the size of the Alpine Project field in extent of gravel cover, petroleum resources, associated activity, and current technology. The following hypothetical discovery and related reasonably foreseeable development and production schedule is the BLM's estimate of the types and timing of activities that could occur as a result of multiple lease sales under the Preferred Alternative.

This analysis is based on two distinct, but related, phases in the discovery and development of an oil field on the North Slope of Alaska. In the first phase a lease sale is held, followed by the successful lessee entering into an exploration program. The second phase is success in discovery, followed by the construction of production facilities, operation and, in approximately 30 years, abandonment of the sites.

## 2.1.2 Key Assumptions for Analysis

Key assumptions for this BA ensure that the analysis is conservative with respect to the listed eider species.  The following reasonably foreseeable scenario assumes that all of the projected development under the Preferred Alternative would occur in the area of high potential for oil and gas development (Map 3-4).

Beginning in 1986, extensive aerial waterfowl breeding population surveys (referred to as breeding pair surveys) have been conducted by the USFWS on the Arctic Coastal Plain (ACP) of Alaska. These surveys have provided population estimates for many species of breeding waterfowl throughout the ACP (Mallek et al. 2003). The timing of this breeding pair survey, however, is too late to accurately assess eider populations, as male eiders begin leaving the ACP in mid- to late June (before the start of the aerial breeding pair survey; Larned et al. 2003). In 1992, a second survey (referred to as the eider population survey) was begun in order to collect information at a more phenologically appropriate time for the detection of male eiders (Larned et al. 2003). This eider population survey has been conducted annually since 1992, and has provided data to develop a population index and distributional information for several species, including spectacled eiders. Given that Steller's eiders are present on the ACP in very low densities, the eider population survey's sampling intensity is inadequate for obtaining data to develop a population index for this species (Larned et al. 2003). Quakenbush et al. (2002) has suggested that the range of the Steller's eider in Alaska has been greatly reduced, currently being located mostly in the vicinity of Barrow. In 1999, a survey specifically designed to obtain information on Steller's eiders in the Barrow area was initiated (Ritchie and King 2002, 2003). The survey area, which is referred to as the "Barrow Triangle," encompasses a 1,064-mi$_2$ (2,757-km$_2$) area south of Barrow and west of Admiralty Bay (see Ritchie and King [2004] for a complete description of the study area and slight differences among years). This survey has provided densities and population estimates of Steller's eiders in the Barrow area for the past 5 years.

The spectacled eider density used for this analysis was derived from population survey data collected between 1992 and 2002 (Larned et al. 2003). As some high density areas have been found in the Planning Area, the BLM chose the high end of the range of spectacled eider densities found on the eider population survey, or 2.85 observed birds per mi$_2$ (1.10 observed birds per km$_2$; Bob Platte USFWS Personal Communication), as the basis for this analysis. A visibility correction factor has not been applied to this density estimate.

In order to be as conservative with respect to Steller's eiders, we choose to use densities generated by the "Barrow Triangle" survey, as they are likely to be the greatest densities of Steller's eiders present

on the ACP. For this analysis we used a mid-levelSteller's eider density of 0.16 observed birds per mi2 (0.06 observed birds per km2; Ritchie and King 2002, 2003), since high densities of Steller's eiders have not been found anywhere in the Planning Area. A visibility correction factor has not been applied to this density estimate.

The selected densities are intended to represent the high end of a reasonable range, in recognition of the uncertainties about the future location of facilities, as well as imprecise information on eider distribution. Use of these density figures would likely result in the overestimation of potential impacts to listed eiders, thus ensuring that if development were to occur elsewhere in the Planning Area, the effects generally would be equal to or less than those noted in this BA. However, the assumed densities do not compensate for the bias inherent in estimating bird densities from aerial surveys. An established/accepted visibility correction factor is not currently available to apply to eiders detected on the aerial surveys. A visibility correction factor would allow the numbers of individuals observed from the air to be converted to a more accurate representation of the actual number of birds present by compensating for those birds not detected from the aircraft. In the absence of such a correction factor, the BLM assumes that the aerial survey data used for this BA may underestimate both populations and densities of listed eiders within the Planning Area.

To address disturbance effects to eiders, in addition to the immediate habitat loss from gravel pad and road development, the BLM is assuming both a 656-foot (200-meter) and a 1,640-foot (500-meter) zone of influence around all gravel production and development pads and roads. The 656-foot (200-meter) zone of influence has been used in previous analysis by USFWS, but is based on best professional judgment and little empirical data supports its use. The additional 1,640-foot (500-meter) zone of influence will allow for a determination of the maximum number of eiders that potentially could be affected by production facilities.

Development assumes 57 exploration wells and 42 delineation wells will be drilled using five exploration drill rigs. Exploration and delineation drilling would occur during winter months. Previous experience, in an unproven, high-cost, frontier area, has shown that this many exploration wells typically are required to discover an estimated 14 economically developable fields. Delineation and appraisal exploration would require three winter seasons to determine the extent of each field. While exploration activities primarily would be a winter exercise, "cold stacking," or the storage of exploration equipment, would occur at designated sites that would be accessible by helicopter or fixed-wing aircraft during the summer season to allow for occasional routine inspections.

For analysis, it is assumed development would include two larger fields that would serve as Central Production Facilities (CPFs) that are Alpine Project-like in design, each with six satellite fields connected to each CPF, for a total of 14 fields. The CPFs are stand-alone facilities, with processing equipment for separating oil and gas, handling waste, and transporting oil through pipelines to large-scale distribution systems. Satellite developments involve fields too small to support full-scale operations and must rely on CPF facilities to separate the oil and gas, waste handling, and the transport of oil to large-scale distribution systems. Each Alpine Project-like CPF would consist of both a production and a processing facility. Current technology and economic considerations limit satellite fields to a maximum of 20 miles from an anchor facility. Current technology allows for "roadless" facilities, which means that roads could exist within and between the satellite and CPFs, but no roads would connect the CPFs to each other, and no "feeder" roads would connect to existing infrastructure in the Alpine Project area or other facilities to either of the CPFs. Geologic information, economics of extraction, and proximity to existing infrastructure in the Colville River Delta suggest this reasonably foreseeable development would take place within the area of high economic oil and gas potential. Within the Planning Area, the highest potential for success is in the

70

northern portion of the Planning Area (Map 3-4). None of these facilities would require the establishment of new landfill locations. The approved landfill currently in operation at Deadhorse most likely would be used for materials not requiring additional treatment. Organic wastes would be disposed of in accordance with the Clean Water and Clean Air acts, and the disposal of any liquid or solid waste would not be permitted on site (ROP A-2; see Appendix D).