# North Slope Borough
## OFFICE OF THE MAYOR

P.O. Box 69
Barrow, Alaska 99723
Phone: 907 852-2611 or 0200
Fax: 907 852-0337
email: george.ahmaogak@north-slope.org



George N. Ahmaogak, Sr., Mayor
February 24, 2005

**Via Fax. 202-208-6956**     30 pages
The Honorable Gale Norton
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Re:  Northeast National Petroleum Reserve – Alaska
     Final Amended Integrated Activity Plan/Environmental Impact Statement
     Comments and Request for Extension of Review

Dear Secretary Norton:

The North Slope Borough appreciates this opportunity to comment on the Final Amended Integrated Activity Plan/Environmental Impact Statement (EIS) for the Northeast Planning Area of the National Petroleum Reserve–Alaska (NPR-A). We remain strongly supportive of continued oil and gas leasing, exploration, and development within the NPR-A. We will insist, however, that these activities be conducted in an environmentally and culturally sensitive manner, and be supported by comprehensive science and rigorous analysis of the potential impacts to area resources and uses. This is no less than has been demanded of our Inupiat people in support of our subsistence whaling tradition.

### Introduction

It is with great disappointment that I tell you how deficient the EIS is in many critical respects. The document simply does not do the job of recognizing and fully analyzing the issues most critical to affected stakeholders, and especially to the most directly affected stakeholders, the Inupiat of the North Slope. It falls short of the rigorous analysis required by the governing National Environmental Policy Act (NEPA). It was developed with some opportunity for stakeholder input, but without real meaningful consultation. We have participated in meetings with BLM staff and had the opportunity to submit scoping comments and comments on the Draft, but we see little of our positions reflected in the final Preferred Alternative. Significantly, that alternative is radically different than anything presented in the Draft, and was never discussed with us except for a short

Honorable Gale Norton
February 23, 2005
Page 2

briefing conducted after the Final had been sent to the printer. Key components of it were never presented for comment in the Draft. In the very brief time we have had to review the new Preferred Alternative, we have identified significant questions that have not been analyzed in the Final.

Because we believe the Final EIS to be woefully inadequate, we respectfully request you reject BLM's recommended Preferred Alternative and select the No Action Alternative instead. In the future, amendments to the 1998 Record of Decision should not be considered before the completion of a comprehensive research program for the Planning Area. This program is needed to assess the impacts to the areas already subject to exploration and development activities, and its creation was implicit in the promise made in the 1998 decision that a Research and Monitoring Team would be put in place to continuously assess the impacts from industrial activities in the Planning Area.

To summarize our comments, we believe the main defects in the EIS include:

- Confusing text in the EIS that poorly describes BLM's actual intentions
- BLM's inept and often bewildering non-response to commenters' concerns about analytical defects that are endemic in the text
- A previously unannounced Preferred Alternative that raises numerous new issues and if adopted, would utterly fail to protect the internationally significant wildlife resources and subsistence uses of the Teshekpuk Lake Special Area and which could adversely impact the bowhead whale
- Empty 'mitigation' measures
- Inadequate treatment and protection of subsistence cabins and campsites
- Inadequate treatment of the impacts from new and damaging permanent roads
- Inadequate treatment of the impacts, including the cumulative impacts, to vegetation, caribou, birds (including endangered species), and subsistence that will be caused by industrial activities
- A failure to acknowledge the NSB's concurrent land management authority over NPR-A
- A failure to plan for studies (long overdue) and funding of institutions, such as the Subsistence Advisory Panel, that are needed to adequately assess and understand the resources and uses of the NPR-A and how industrial activities will impact them
- A completely unacceptable analysis under Section 810 of the Alaska National Interest Lands Conversation Act, an analysis that at best pays only lip service to BLM's duty to protect Alaska Native subsistence rights under that Act.

Of the many environmental impact statements we have reviewed in recent years, this has been the most difficult to navigate through and review. It routinely offers opinion and assurance of good agency intentions in the place of appropriate analysis. It is often only with great patience and resolve that one may even find in the 410-page Comments and Responses chapter, or elsewhere in the Final, a response to a comment submitted on the

Honorable Gale Norton
February 23, 2005
Page 3

Draft EIS. Even then, responses are often non- or only partially responsive. With respect to comments that did receive meaningful treatment, it is often the case that suggested language was added to the appropriate text of the document, but that conclusions regarding potential effects have not been altered accordingly. A supplemental 53-page errata on the Comments chapter alone is only one indicator of the scope of problems with this EIS. Neither the Draft nor Final EIS presents sufficient new information that would justify amendment of the current management plan. In the end, the Final EIS simply does not support any change in management of the Northeast Planning Area that would open areas now closed to leasing.

We recognize of course, that to allow leasing but truly prohibit surface occupancy would likewise accomplish our goal of maximum resource and subsistence protection. We have concluded, however, that given the varying definitions of No Surface Occupancy proposed, and the potential for post-lease exceptions to the prohibition to be granted, the areas should remain closed.

If only because the new Preferred Alternative is so new, but also recognizing its complexity, the difficulty of using this EIS, the fact that very few hard copies were distributed, and the near impossibility of effectively reviewing the document via a CD or the internet, we ask that you formally postpone your decision for a minimum of thirty days beyond the date when the Record of Decision (ROD) could be issued. We feel that the fact the Final was not fully released until the 53-page errata supplement to the Comments and Responses chapter was made available is more than adequate reason to extend the review period. Prior to the supplement's distribution several days after initial distribution of the EIS, that critical component of the document was demonstrably incomplete.

At this point in our review, we believe that the only responsible action that you can take is to adopt the No Action Alternative, retain the current management plan, and initiate a comprehensive research program guided by the advice of the Research and Monitoring Team (RMT) established by the 1998 ROD. You must take the time necessary to assess the impacts of any operations conducted in areas now open to leasing, determine the effectiveness of the various mitigation measures now in place, and engage in meaningful consultation with all stakeholders, especially those in the North Slope communities that will be most directly affected by your decisions.

**Process Issues**

**No Action Alternative** - It has still not been acknowledged that the reviewing public was told in press releases and on the BLM project website that the prescriptive stipulations of the current plan *would* be converted to performance-based measures, thereby giving the clear impression that the Draft's Alternative A was not the viable no action required by NEPA. Repeating in the Final that no decision regarding such conversion has yet been made does not overcome the false information given elsewhere, and BLM must recognize

Honorable Gale Norton
February 23, 2005
Page 4

that the inconsistencies could surely have influenced potential commenters. Even at this writing, the project website *still* states that:

"The BLM <u>will reformat</u> current prescriptive stipulations that apply to the Northeast National Petroleum Reserve - Alaska into a mixture of prescriptive and performance-based stipulations similar to those developed for the Northwest portion of the Reserve. Prescriptive stipulations are very specific and in some cases inappropriately or needlessly restrictive. Performance-based stipulations would accomplish the same goal, as well as add flexibility to increase or decrease mitigation measures accordingly (see example below)." (underline added)

**Comments and Responses Chapter** – This chapter is a quagmire of cross-references between poorly organized, numerically non-sequential, and partially- or non-responsive responses. There is great inconsistency in the way different comments and commenters are treated. It is not insignificant that the individual testimony from public hearings is misidentified as being letters. It is not insignificant that no affiliation is given for many individuals who clearly provided comments on behalf of organizations. It is not insignificant that BLM in at least one case used a label to identify a comment letter that intentionally or otherwise undercuts the significance of the letter.

As is more fully explained below, testimony delivered on my behalf by a member of my senior staff at the Barrow public hearing on the Draft EIS was described as being from a letter, and was attributed only to the staff member, and not to the North Slope Borough. This is really inexcusable, and presents to reviewers, and especially to North Slope reviewers, an incomplete account of the comments submitted by the North Slope Borough. It is our experience that many other stakeholders look specifically for Borough comments as a barometer of local concerns, in the same way that we look to the comments of other agencies and organizations specifically because of the constituency they represent or expertise they embody. BLM has done a disservice to the Borough, to these other agencies, organizations, and stakeholders, and to all reviewers of the Final EIS by failing to properly attribute all comments not only to individual commenters, but also to affiliated organizations where indicated. See, for example, the comments of Steve Zack (Wildlife Conservation Society), Kristen Cummings (National Wildlife Federation), Stan Senner (Alaska Audubon), Isaac Nukapigak (President, Kuukpik Corporation), Rosemary Ahtuangaruak (Mayor, City of Nuiqsut).

Of particular concern is the BLM's treatment of Letter No. 197606, attributed simply to "Ornithologists". In fact, the concise letter of slightly more than three pages focuses on the need to protect waterfowl habitat in the Teshekpuk Lake area, and is signed by nearly 200 "ornithologists and other wildlife professionals". The breadth and depth of biological expertise and experience embodied in the signatories of this letter by any measure far exceeds that of the authors of the EIS. Clearly, this letter and the comments drawn from it in Chapter 6 should have been identified in some manner that conveyed to reviewers that their source was this unique assemblage of talent and experience.

On another level, but equally significant, is the treatment of Letter No. 197978 attributed incorrectly to Myron "Manning", and not as it should have been, to Myron Naneng. Again, this "letter" is really drawn from the testimony delivered at the Bethel public hearing on the Draft EIS. Here also, no affiliation is provided, although Mr. Naneng clearly identified himself as President of the Association of Village Council Presidents (AVCP) and Chairman of the AVCP Waterfowl Conservation Committee (WCC). The AVCP is the non-profit coalition of 56 federally recognized Native tribal governments in southwest Alaska. The regional WCC has worked closely with both state and federal agencies for more than 20 years to co-manage waterfowl of the region, including brant and other species that also utilize the Northeast Planning Area of the NPR-A. As the leader of both of these organizations, Mr. Naneng possesses a singular expertise that would have been conveyed to all reviewers had those affiliations been properly noted in Chapter 6.

### Endorsement of AVCP Letter

As we have just noted the failure of the BLM to properly attribute Myron Naneng's oral comments to the AVCP and its WCC as well, it is appropriate here to discuss the recent February 9, 2005 letter sent to you by Mr. Naneng on behalf of the AVCP. The letter calls your attention to new information garnered from this season's survey of wintering brant in Mexico. Although the final numbers are not yet available, indications are that the count will be the lowest ever. If the low numbers hold, the result may be restrictive subsistence harvest regulations for the 2005 hunting season and beyond. The letter notes that studies indicate that up to 70% of the black brant that nest in southwest Alaska molt in the Teshekpuk Lake area. The AVCP is concerned that their conservation efforts may be undermined and critical subsistence harvests jeopardized further if oil and gas operations are allowed in the Northeast Planning Area. A key point of the letter is that BLM has erred in its conclusion that a restriction on the harvest of a species that constitutes a small percentage of resources harvested does not constitute a significant restriction on subsistence. The AVCP quite concisely explains that species-specific subsistence traditions are not interchangeable. We share the AVCP's frustration that as Native people, we must still explain the essence of our subsistence culture to an agency with significant responsibilities for implementing the protective provisions of ANILCA, the Migratory Bird Treaty Act, and other measures. Just as we have had to continually fight for the right to continue to harvest bowhead whales as that cultural tradition has been threatened by oil and gas operations, international politics, and faulty western science, we recognize the challenge faced by the AVCP in countering threats to its region's waterfowl resources on multiple fronts. The February 9 letter presents new and significant information, and makes a convincing case for the continued protection and closure to oil and gas leasing of critical goose molting habitat within the NPR-A. We fully endorse the comments of the AVCP, and share the group's commitment to preserve our shared resources and subsistence traditions.

**Definitions**

Definitions, and the choice and use of labels is not insignificant, especially when you are dealing with our Inupiat population that includes many elders and others for whom English is not a first language. While we do not believe that BLM intentionally intends to mislead interested parties as to the scope of protective measures proposed, it seems clear that the frequent use of labels to represent something other than their common meanings has that effect. It is disturbing that in every case where there is some ambiguity, the clear first impression is that protections are greater than they really are. No Surface Occupancy means three different things in three different areas as defined by the Preferred Alternative. Within each of the proposed seven large lease tracts north of Teshekpuk Lake, "surface disturbance" would appear to be limited to 300 acres. The description of this alternative on Page 2-12 states "each tract would establish a maximum limit of 300 acres of permanent surface disturbance resulting from oil and gas activities." That seems clear, but is not. Only later in the document is it revealed that the limitation excludes "surface disturbance activities from pipeline construction". We do not know what that means, but apparently there is some focus just on the placement of VSMs during construction, and not on the full length of any pipelines themselves. The distinction does not appear to matter, however, as it seems that unlimited lengths of pipelines would be allowed in each of the seven large tracts.

Page 6-151 - Comment 197980-021 dealt with definitions. The response provided highlights several recurrent problems in the Comments and Responses section of the FEIS.

First, the comment cited was not from a letter as indicated, but was drawn from the transcripts of the Barrow public hearing on the Draft EIS. Letters must be identified as letters, and testimony must be identified as testimony.

Second, the commenter, Charles Brower, is the Director of the North Slope Borough Department of Wildlife Management. He identified himself as such, but no affiliation is provided to allow reviewers to associate him with our municipal government. Mr. Brower made clear in the introduction to his comments that they were being made on my behalf as the Mayor of the Borough. All of his comments should have been identified as being made by the Borough. This raises a significant question regarding the ability of reviewers of this FEIS to both assess the expertise of commenters when their affiliations are not provided, and assign appropriate weight to particular comments. It is absolutely unreasonable to expect all reviewers to cross reference all numbered comments responded to in Chapter 6 with the full reproductions of comments included on the CD and the BLM project website.

Third, this response misses the point of the one part of the comment for which any response was attempted. The comment dealt with the Draft's definition of "consultation". The response states that "'informing' another of one's intentions does not mean that the opportunity for further communication is not possible or precluded." The problem is that

Honorable Gale Norton
February 23, 2005
Page 7

just such an interpretation was clearly possible from the definition given. That definition stated that the term "implies that the BLM or the Lessee/Permittee will contact other agencies or entities to *either inform them* of potential actions and/or to seek input on noted topics." While the definition has in fact been changed in the Final, that change is not referenced in the response. Instead, BLM refuses to acknowledge that our comment identified a serious problem with the former definition, and strains to provide a response that on its face is inadequate.

Fourth, the second point of comment 197980-021 dealt with the treatment and definition of gravel mine sites, and is not addressed at all. It is also not addressed under the topic of Gravel, Gravel Mines, Gravel Mine Reclamation beginning on page 6-203. Likewise, we raised the same issue in our Borough comment letter, and do not see a response under that topic.

Borough staff has already had to explain these strained definitions to residents of our affected communities several times since the Final was released.

### New Preferred Alternative

**Development of the Final Preferred Alternative** – The Final EIS raises as many questions concerning the new Preferred Alternative as it answers. The alternative is new and not like any of the alternatives presented in the Draft EIS. It is not a combination of elements of the Draft's alternatives. Rather, it represents a novel approach to management. There was no opportunity for the Borough, for other agencies and organizations, or for the public to review, comment on, and shape the components of this new proposal. Most significantly for our Inupiat residents there was no opportunity to comment on this Preferred Alternative through testimony at the public hearings conducted on the Draft. In particular, our Inupiaq-speaking elders possess substantial knowledge of the North Slope environment and resources, would have benefited from a translator-assisted advance review of the alternative, and could have contributed greatly to its analysis if given the opportunity.

BLM claims that the new Preferred Alternative was developed in response to comments received on the Draft EIS. This is never explained with reference to any specific comment, and certainly does not reflect the Borough's submitted comments. It clearly ignores the recommendations of many commenters with considerable expertise regarding the resources of the region. In contrast, the decision in 1998 to protect critical and vulnerable wildlife habitat around Teshekpuk Lake was made after extensive public input, including a combined caribou and goose and a subsistence workshop. To a far greater extent than the present proposal, that decision followed the recommendations of knowledgeable wildlife biologists, local governments, and local residents. The current proposal to greatly reduce protections of crucial wildlife habitat was developed without those workshops and against the advice of most knowledgeable wildlife biologists, local government bodies, and local residents.

Honorable Gale Norton
February 23, 2005
Page 8

**Area North of the Teshekpuk Lake** - It is never fully explained how the proposed seven larger lease tracts would provide a net benefit with respect to environmental, wildlife resource, and subsistence protection as compared with standard sized tracts. This region north of Teshekpuk Lake is the calving grounds, and the primary summer foraging and insect relief area for the Teshekpuk Caribou Herd (TCH). It is never fully explained how the contours of these large tracts were developed. The potential effects of developing maximum acreage in close proximity across the border of adjoining large tracts, or even at the juncture of four large tracts, are never analyzed. The potential cascading effects of placing a coverage limit are never analyzed. Would a developer keep pad sizes smaller, particularly when the upper acreage limit is approached, with one result being smaller on-pad storage capability and the need for more frequent and highly impacting aircraft support flights?

It is never fully explained how the maximum 300-acre footprint compares with estimates of footprints had typical sized tracts been offered. We suspect, given that economically recoverable oil within the NPR-A is projected to be found in dispersed rather than concentrated locations, that the limitation is no real limitation at all. It would be more revealing for reviewers, and particularly for those familiar with North Slope facilities, to explain that a 300-acre limitation would still allow three full-scale developments the size of the existing 2-pad Alpine production facility within each of the large tracts. Moreover, the "limitation" would allow 21 such facilities in the area north of Teshekpuk Lake defined by the seven large tracts.

Though it is difficult to tell from Map 2-4, much of the area north of the Lake critical to molting waterfowl would also be subject to a form of BLM's No Surface Occupancy (NSO) restriction that would actually allow surface occupancy by pipelines and "inter-community *or other* publicly funded permanent roads constructed for general transportation purposes". It would seem that an industrial road not intended to connect communities, but also for general transportation purposes would be allowed through these areas. Pads would be concentrated in the drier areas not subject to that restriction where they would likely be placed anyway, and connecting pipelines and, perhaps, roads would be allowed anywhere. There is no analysis of the potential adverse impacts of this concentration of pads and other infrastructure in the drier areas that also concentrate calving caribou and animals seeking relief from insects. In effect then, a significant and highly impacting web of infrastructure could be developed in an area that is protected under the current management plan.

**Calving Area No Surface Occupancy Zone South of Teshekpuk Lake** – BLM has identified an area southeast of the Lake as the Southern Calving Area. In this area, a different No Surface Occupancy restriction applies. This restriction allows pipelines and inter-community public access roads as in the northern area, but appears to exclude the "other (non-inter-community) permanent roads" allowed there. We support any and all enhanced protections of the critical, relatively small, and concentrated calving areas of the TCH. However, the protected area defined by the new Final Preferred Alternative is inadequate, and contains only a small percentage of even the core calving area. It should

Honorable Gale Norton
February 23, 2005
Page 9

be expanded to include calving areas northeast of the lake and at least the entire core calving area south of the lake. This form of NSO restriction would provide inadequate protection for the TCH. Existing data indicates that the allowed infrastructure could greatly disrupt and displace calving caribou. A true NSO restriction, without exclusions or exceptions must be applied in these critical areas. It also appears that essentially unlimited development will be allowed on acreage adjacent to the critical calving areas. Substantial infrastructure developed around key areas could severely limit the access of cows to those areas. The Teshekpuk Caribou Habitat Area must be extended to the south to assure access to core calving areas.

**Migration Corridors** – BLM has identified yet another NSO restriction extending east of Teshekpuk Lake "toward", but not all the way to the Kogru Inlet. While we applaud this effort over the lack of any enhanced protection provided for in the Draft, the area defined is inadequate. Nearly all of the parturient cows, most calves, and other animals migrate through this corridor. As defined, it is only 4 miles wide. BLM may not realize, as do our local subsistence users familiar with the area, that most of the identified corridor is under water and unusable by migrating caribou. The land available to migrating caribou lies largely to the east of the defined corridor. BLM should have highlighted that any development north of the Lake is essentially contingent upon the placement of at least a pipeline in this limited dry land needed by migrating caribou. There is not yet sufficient data to support the claim that pipelines elevated seven feet at the VSMs assure free unimpeded passage of caribou. Again, as elsewhere, apparent protection really offers little protection at all. Appropriate protection of the TCH should include the designation of all land between the eastern shore of the Lake and the Kogru River as subject to a true NSO prohibition, with no exclusions and no exceptions. We recognize that such a prohibition would effectively preclude development north of the Lake. We believe that to be appropriate until BLM conducts the necessary focused analysis to describe the potential impacts to the TCH, and our five subsistence communities that depend on it, of placing a pipeline or other infrastructure within the migration corridor.

No enhanced protection is provided for the narrow migration corridor between the western shore of Teshekpuk Lake and the Ikpikpuk River. This is an important route for caribou moving to and from northern insect relief areas. Most bulls and nonparturient cows access those areas using this corridor. Like the eastern corridor, much of this route is under water, and cannot be traversed by caribou. Infrastructure that displaces caribou from the limited traversable lands within this corridor could significantly impact the herd. Here too, absent appropriate impact analysis, an NSO restriction, with no exclusions or exceptions, is necessary to allow enough dry-land access for caribou seeking insect relief north of the Lake.

**Protection of TCH Wintering Area** – There is insufficient analysis of the potential threats to the TCH associated with exploratory operations required to be conducted only in the winter. The EIS asserts that most of the herd is out of the Planning Area during the winter. This may be true most of the time, but there is data indicating that in some years

Exhibit 50, page 9 of 30

Honorable Gale Norton
February 23, 2005
Page 10

much of the TCH winters in the area of Teshekpuk Lake. These animals are already energetically stressed, and winter ice roads, seismic exploration, drilling, and associated aircraft and vehicle traffic could impact them significantly.

**Mitigation Measures** – The performance-based measures are intended, by design, to be somewhat vague. BLM asserts that this quality allows a flexibility that will enhance protections. We believe that adaptive management is superior in theory to wholly prescriptive management, but that substantially more data than are now available are required for adaptive management to be effective here. Absent sufficient data, we think it is important that the provisions proposed by BLM be clarified considerably if we are to be assured that adequate protections will be provided. We have identified substantial problems with the following measures:

Stipulation D-1 prohibits exploratory drilling in rivers, streams, and fish-bearing lakes, but would allow exceptions. As we stated in our Comment No. 196407-062:

"It represents a significant weakening of the comparable existing Stipulation 28. The fatal flaw of the measure is the open-ended exception clause that would allow non-compliance when the lessee can demonstrate that the impacts of exploratory drilling would be minimal *or* it is determined that there is no feasible or prudent alternative. It does not define what criteria would be used to determine what impacts are "minimal" or whether an alternative is "feasible" or "prudent". There is no requirement that the AO consult with other agencies or affected communities in making those determinations. The need to show that impacts are minimal is presented in the alternative to the need to show that no feasible or prudent alternative exists. The implication is that a lessee need only show that no feasible and prudent alternative exists, even if the impacts would be more than minimal. The provision speaks of "impacts" rather than "risks" of a blowout. While it may be possible to demonstrate that the risks of a blowout are minimal, it is unclear how a lessee could show that the impacts of a blowout from a drilling structure placed in a fish-bearing river, stream, or lake would be minimal."

The response provided on Page 6-318 is simply non-responsive. It again touts the greater "flexibility" of the performance-based mitigation system as more effective than the existing system. It does not provide the criteria we asked for. Explaining what criteria would be used in implementation does not reduce flexibility in any way. The response does not deal at all with the point regarding how a lessee might "demonstrate" that the "impacts", rather than the risks, of a blowout are minimal.

Stipulation D-2 is intended to minimize surface impacts from exploratory drilling. We commented that allowing an exception to the requirement that all exploratory drilling be limited to temporary facilities not only when an environmentally preferable alternative is identified, but also when permanent facilities are "necessary to carry out exploration more economically", was wholly inappropriate and unacceptable. We are pleased that the final clause has been removed from the Stipulation under the Preferred Alternative. BLM has failed to justify it, and it should be removed under all alternatives.