Honorable Gale Norton
February 23, 2005
Page 11

In addition, referring to the clause "necessary to carry out exploration more economically", the response to our Comment No. 196407-063 on Page 6-320 makes the remarkable statement that "we believed the provision was necessary because a lease gives the lease holder the right to develop their lease and no Stipulation or Required Operating Procedure should be so costly that the ability to develop the lease is denied." That is simply absurd. Many mitigation measures will make operations more costly, and should do so in the interests of striking the appropriate balance between resource extraction and environmental, wildlife, and subsistence protection. The proposed NSO provisions are necessary and appropriate in highly sensitive areas, and will certainly constrain the ability of lease holders to develop tracts within them. The goal must be to attach appropriate protections to areas opened to leasing, provide adequate notice of all applicable mitigation requirements to prospective lessees, and let them factor the costs into their decisions concerning whether and how much to bid.

Lease Stipulation E-2 aims to protect fish-bearing water bodies, water quality, and aquatic habitat and would allow permanent facilities to be placed within 500 feet of fish-bearing water bodies and 100 feet of non-fish-bearing water bodies if the lessee can demonstrate that impacts "are minimal". The Borough made the point in our comments on the Draft that no criteria are identified that would be used to define the line between "minimal" and more than minimal impacts. We also pointed out that this approach undermines a primary reason for establishing buffers of this kind. BLM's response to our Comment No. 196407-064 references another response (-062) that does not at all address our comment.

We reiterate here that buffers are used to protect key resources, habitat, and uses not only from known and anticipated agents (e.g., noise), but also from potential unanticipated events like a well blowout or other hazardous discharge. Asking a lessee to demonstrate only that impacts "are minimal" implies that only planned operations, and not potential unanticipated events, be addressed. There is no way in which a lessee could demonstrate that the oil spill impacts associated with a proposed facility "are" minimal to any degree of certainty that would obviate the need for a buffer. It is true that with proper facility design and oversight of operations the *risk* of a major discharge can be characterized as minimal. It must also be acknowledged, however, that even where the risk of a discharge is minimal, the resulting impacts under certain circumstances can be substantial. Minimal absolute buffer zones must be maintained around fish-bearing and non-fish-bearing water bodies. BLM must respond to this point.

ROP E-7 seeks to minimize disruption of caribou movement and subsistence use. It would allow an exception to a required 500-foot separation between roads and pipelines where such separation is not feasible within "narrow land corridors between lakes" and where pipelines and roads converge on a drill pad. The only exception to the minimum distance of 500 feet between roads and pipelines should be where they converge on a drill pad. Narrow corridors funnel caribou as well. BLM should either not allow both roads

Honorable Gale Norton
February 23, 2005
Page 12

and pipelines in such locations, or should require burial of pipelines within roads as described in ROP E7-b.

ROP E-9 seeks to avoid human-caused increases in populations of predators of ground nesting birds, and would require lessees to utilize best available technology to prevent facilities from providing certain habitat for such predators. In Borough Comment No. 196407-067, we asked that lessees also be required to implement strict procedures governing all activities during construction and operation of facilities to prevent feeding, whether intentional or inadvertent, of these predators. In another example of non-responsiveness, BLM's response directs us to ROP I-1, claiming that in requiring lessees to conduct an orientation program for all personnel that must in part "address the importance of not disturbing archaeological and biological resources and habitats…and provide guidance on how to avoid disturbance", somehow our concern about feeding is not clearly addressed. Many might not equate feeding with "disturbance", and burying the issue within one of nine required components of an orientation program, rather than dealing with it directly, ignores its significance. Here, as elsewhere, common usage of language is strained when BLM could instead simply have adopted our language under the appropriate ROP.

ROP F-1b. requires that aircraft maintain a minimum altitude of 1000 feet over caribou winter ranges. The AO should be required to consult directly with the Alaska Department of Fish and Game in annually defining such ranges.

ROP F-1d. requires that aircraft flights near known subsistence camps and cabins during sensitive subsistence hunting seasons should be kept to a "minimum". The term "near" must be more clearly defined, and criteria must be established for evaluating what a minimum acceptable number of flights would be, including the potential for prohibiting flights altogether in some locations during some periods.

Stipulation K-2 deals with deep-water lakes. Our Comment No. 196407-073 pointed to the exception clause embodied in the last sentence of the Requirement/Standard as being overly broad. The response to our comment on Page 6-341 refers us, without any convenient means of locating it, to another response appearing on Page 6-318. This response does not address the concern raised. The provision has not been changed. It still would allow permanent facilities where the lessee can demonstrate that impacts would be minimal _or_ "if it is determined that there is no feasible or prudent alternative." Clearly, a lessee would not need to demonstrate that impacts would be minimal if it is determined that there is no feasible or prudent alternative. This does not provide adequate assurance of protection against the placement of permanent facilities that have the potential to cause more than "minimal" impacts. If BLM feels that technical or economic infeasibility should ever be the justification for allowing more than minimal environmental and subsistence impacts, that position should be clearly stated. The point at which the justification would not suffice should also be made clear, e.g., at a "moderate" level of impacts? A "significant" level?

**Exhibit 50, page 12 of 30**

Honorable Gale Norton
February 23, 2005
Page 13

Stipulation K-4d. states that "aircraft use…by oil and gas lessees and all other users shall be minimized, and possibly suspended, in and around Goose Molting Area lakes from May 20 through August 20…" BLM must indicate what criteria will be used to determine whether flights have been adequately minimized and at what threshold of potential impact will flights be suspended. What is meant by "around" Goose Molting Area lakes must be defined. Also, the preambles to the lettered standards under both Exploration and Development state that they will be followed for "permitted activities". BLM must explain this term with reference to the specification in "d" that flight restrictions will apply to oil and gas and "all other users" and the reference in "g" to "authorized users".

Stipulation K-5 applies to the Teshekpuk Lake Caribou Habitat Area. Requirement/Standard "a" requires the study of an area before authorization of the construction of permanent facilities. BLM should consult with appropriate federal, state, and Borough agencies in approving the design, conduct, and data interpretation of such studies. In addition, BLM must explain what is meant by "study data may be gathered concurrently with other activities". No potentially impacting oil and gas activities should be allowed if this provision is to be effective in establishing critical baseline information against which the impacts of permitted operations and facilities can be gauged.

Stipulation K-7 is intended to protect raptor foraging habitat, and is divided between Requirements/Standards for Permanent Facilities and for Activities. We argued in our Comment No. 196407-077 that the phrase "if necessary" beginning the Requirement/Standard for Permanent Facilities must be clarified. It is not specified under what conditions it would be "necessary" to construct permanent facilities within the Colville River Special Area. Unless it is based on the identification of an environmentally preferable alternative, and with a demonstration that the objective of the stipulation is fully met, an exception is not "necessary" and should never be granted. This point was not addressed in the response to our comment.

As we stated in our comment, the Requirement/Standard for Activities is confusing and appears internally inconsistent. It has not been modified. The response provided misses the point with respect in defending the dates cited. The restriction applies "during the winter", yet goes on to say that motorized ground-vehicle use shall be minimized from April 15 through August 5. The inconsistency we noted could have been corrected by the removal of the term "during the winter".

Here again, our concern that exceptions would be allowed where "no feasible or prudent alternative" is available has not been addressed. Such exceptions would allow significant alteration of high quality raptor foraging habitat within 15 miles of nests and "essential" pipeline and road crossings through ponds, lakes, wetlands, and riparian habitats. The proposed ROP represents a significant weakening of the comparable existing Stipulation 24.

**Exception Process** – We believe that the process that must be followed and criteria applied when an exception to a stipulation or ROP is sought has been greatly improved

Honorable Gale Norton
February 23, 2005
Page 14

over that presented in the Draft by the addition of the clause now requiring that any
exception must still satisfy the objective(s) of the stipulation or ROP. This is central in
establishing any kind of reasonable balance between the flexibility BLM seeks in shifting
to a performance-based system and maintaining appropriate protection of all surface
values. BLM's taking issue with our assertion that many stipulations and ROPs have built
in exception clauses simply defies the obvious. It should not have escaped the agency's
attention that a great many commenters identified the presence of such clauses in many
mitigation measures as a significant problem with the proposed management scheme.
Any time a prohibition is followed by a clause beginning with the word "unless" that
would allow non-compliance with the prohibition, we interpret that as a built in exception
clause. Such clauses remain a problem, but the language present in the current 1998 plan
that has now been added to the new proposal strengthens the entire exception process.

A further improvement in the exception process would be the inclusion of a required
review of exception requests by the Subsistence Advisory Panel (SAP) and the Research
and Monitoring Team (RMT). In the case of the SAP, we are pleased to see on Page 6-
330 that in response to Comment No. 197615-013 by Anadarko, BLM has indicated that
it needs information regarding a request for an exception "in time to present the
information to the SAP, and the timing must be such that the SAP and local residents
have the necessary time to comment on the proposed exception." With respect to the
RMT, it is essential in considering any request for an exception that there be assessments
of the extent and credibility of any data that would support the request, and the need for
either additional research or monitoring as a condition for granting the request.

Reviews by both the SAP and RMT must be formally incorporated into the exception
process. BLM must make a commitment to long-term funding of these groups, including
the funding necessary to conduct periodic meetings in our affected North Slope
communities.

**Other Issues** – Other issues raised by the Final EIS are as follows:

On Page 6-61, in response to Borough Comment 196407-094 that dealt with a passage in
the Draft discussing Non-Oil and Gas Activities, and asked under what conditions non-
recreational airboat use would be allowed, BLM states in the Final that "Airboat use for
non-recreational activities, including wildlife surveys, research, and oil and gas activities
would be allowed during the summer months." (emphasis added) This demands further
explanation and analysis of potential impacts to wildlife and subsistence.

### Key Issues

**Cabins and Campsites** - Beginning on Page 6-121, responses are provided to comments
of the Borough and others concerning protection of subsistence cabins and campsites.
This is an issue of primary importance to the Borough and affected communities, as
continued use of these sites for subsistence is critical to the nutritional and cultural well-
being of our residents. We asked in our comments on the Draft that the Final highlight

Honorable Gale Norton
February 23, 2005
Page 15

how any change in management is likely to affect cabin and campsite users. Such analysis is still lacking in the EIS. Each of the responses to comments given is somewhat different, all are deficient, and none gets at the essence of the concerns of the potentially affected users of these important sites. The responses variously defer decision making, reference other responses elsewhere in the document that do not fully address the comment in this section, present facts that do not support their conclusions, or reference the BLM-Borough MOU as evidence of mitigation when that instrument provides none.

Nothing in the MOU developed between the Borough and the BLM (Appendix L) regarding cabins and campsites within the NPRA affords any additional protections for these critically important subsistence sites beyond those afforded by the proposed performance-based mitigation measures. Those measures clearly provide a reduced level of protection as compared with the measures existing under the current 1998 management plan. It is true that most cabins and campsites are located along the shores of the ocean, rivers, or lakes. Under the current plan permanent oil and gas facilities are prohibited within one mile of cabins and campsites, except that pipelines and roads would be permitted within ¼ mile of these sites. None of the proposed prohibitions of permanent facilities within ¾ mile of the coast, ½ to 3 miles of major rivers, ½ mile of Teshekpuk Lake and other deep water lakes, or ½ mile or more of goose molting lakes provides equivalent protection. Where a 3-mile buffer is now proposed, it is also in place under the current plan.

The response to our Borough Comment No. 196407-018 refers us to Response to Comment No. 197617-045, responding to a comment from the Environmental Coalition. It was extremely frustrating before the 53-page errata supplement was distributed to have taken the time to locate that response elsewhere in Chapter 6, only to find it cut off. Still, neither our comment, nor that of the Coalition, has been answered. We sought a clear analysis and explanation of the potential impacts of the full range of managed activities on the future use of established subsistence cabins and campsites. The ROP H-2 that we are directed to, deals only with the discretion of the BLM's AO to prohibit seismic work up to 1200 feet of any "known, long-term cabin or campsite."

**Roads** – The potential development of roads within the Planning Area was identified early as a primary concern with the proposed plan amendment. The discussion of the new Preferred Alternative contains no clear explanation of the road system that could be developed in any of the areas identified as critical to particular resources or in the Planning Area as a whole. In fact, the new alternative introduces great ambiguity surrounding this central issue. Even in the three different NSO areas, it is unclear what roads would be allowed. For the first time in any management plan we have reviewed, distinctions appear to be made between "inter-community roads", "other permanent roads constructed with public funds for general transportation purposes", and "inter-community public access roads". All of these strained distinctions and definitions seem unnecessarily convoluted, and obscure what is really being proposed in terms of allowable infrastructure and potential impacts.

**Exhibit 50, page 15 of 30**

Honorable Gale Norton
February 23, 2005
Page 16

Nowhere are industrial roads mentioned, and nowhere does it seem that roads from outside, into the Planning Area, are specifically prohibited as they are by Stipulation 48 under the current plan. Proposed ROP E-1 represents a huge potential reduction in environmental, resource, and subsistence protections. It would allow road connections with road systems outside the Planning Area, and requires only that "roads be designed, constructed, maintained, and operated to create minimal environmental impacts and to protect subsistence use and access to traditional subsistence hunting and fishing areas." It is noted that the provision "does not apply to intercommunity or other permanent roads constructed with public funds for general transportation purposes." Does this mean that such roads *can* be designed, constructed, maintained, and operated in a manner that would create *more* than minimal environmental impacts and *not* protect subsistence use and access to traditional subsistence hunting and fishing areas? As the response to Comment No. 197616-176 recognizes, "putting a road into NPR-A, with potential public access into the heart of Nuiqsut's remaining traditional range, would have *enormous* impacts as residents would likely avoid hunting in areas with permanent facilities, and would increase competition for subsistence resources with nonlocals." (emphasis added)

As noted above, labels can be misleading, and vague undefined labels in particular, can be interpreted broadly as future decision makers' desire. Our experience with the Dalton Highway has taught us that a road once classified as purely industrial and closed to public access can be reborn as a public access road, with all of the attendant potential impacts, issues, and expenses. It would not be a stretch to imagine a permanent road built with public funds into the NPR-A labeled as being dual-purpose and "for general transportation purposes" *and* open to industrial traffic. The issue of construction phasing is also not addressed. There is nothing in the definitions or text to prohibit a road into or within the Planning Area being identified and allowed as one phase of a road intended ultimately to connect distant communities.

**Vegetation** - Section 4.10.5 on Page 4-602 concludes that because "permafrost-related processes occurring on the ACP create a constantly changing landscape that influences successional patterns in plant communities.... changes in plant communities resulting from dust or snowdrift accumulations or the formation and draining of impoundments would not be considered irreversible." No data are offered to support this notion. The section would seem to conflict with Section 4.7.7.5 where it is stated that "...vegetation may be lost by indirect effects associated with dust...and alteration of natural drainage flows resulting from development." Also the analysis fails to address potential vegetative changes resulting from invasive plants. Linear corridors act as vectors to invasive plant species that often reproduce at very high rates. The resultant changes in plant competition would likely result in irreversible changes in landscape composition and functioning when scaled-up to consumers which rely on existing habitat and it's natural processes.

**Caribou** – Many of our concerns regarding the potential impacts to caribou from facilities and operations are noted in the discussion above. The Final EIS' treatment of various comments concerning caribou highlights a broader problem with the document. On Page 6-131, Audubon Alaska and the National Wildlife Federation provide a response

Honorable Gale Norton
February 23, 2005
Page 17

to Comment No. 197610-038. Here, as is the case with responses to comments elsewhere dealing with potential impacts to bowhead whales, birds, fish, and subsistence, it is stated that the "Final IAP/EIS has been revised in consideration of [the] comment", and substantial text that has been added to the body of the document is printed. In part, the text added to Section 4.6.9.1 identified in the response is as follows:

"Some TLH caribou movements during the insect-relief season (late June-August 15) would likely be affected by pipelines and road traffic. The critical part of the movement to the coastal insect-relief area is through the narrow corridor between Teshekpuk Lake and the Kogru River. Caribou must pass through these corridors to get to and from insect-relief areas. The area to the east of Teshekpuk Lake is a particular problem because nearly all of the parturient cows pass through this area either shortly before or after calving (Carroll Pers. Comm.). *Any development that occurs on the limited amount of habitat that is used by caribou migrating through this corridor would likely affect caribou movements.* Stipulation K-9 designates an NSO area extending from the eastern shore of Teshekpuk Lake approximately 4 miles eastward towards the Kogru Inlet (approximately 116,000 acres). The NSO designation prohibits permanent oil and gas facilities including major rights-of-way such as pipelines and roads. This stipulation should protect enough land to allow caribou use of this major migration corridor. However, pipelines could be allowed in the NSO area north of Teshekpuk Lake and south/southeast of the lake. Careful siting of pipeline and road rights-of-way would still be required to prevent affects on caribou use of this corridor. Additionally, *the areas that would be excluded from surface occupancy do not extend to the coast suggesting that there could be some development along the coastline. While a set-back from the coast is stipulated (Lease Stipulation K-6), development in the coastal area would likely impact caribou use of insect-relief areas near the coast, though the number of developments would be restricted by stipulation K-11.*" (emphasis added)

These are significant acknowledgements that did not appear in the Draft. In many cases, BLM seems more willing to identify potential impacts as described by commenters. The problem is that these additions, individually and cumulatively, seem to have had little impact on the agency's development of its Final Preferred Alternative. The shear weight of all of the text additions that identify new or more extreme effects is striking, and should clearly have led BLM to develop a Preferred Alternative identical or close to the No Action Alternative.

In addition, Section 4.11.4.9 on Page 4-613 deals with the potential effects to terrestrial mammals resulting from a large oil spill from a well blowout. The conclusion of the section that a very large spill would only affect caribou for one year conflicts with Section 4.11.4.5 on Page 4-610 where it is stated that some percentage of affected vegetation would "suffer longer-term consequences". Oil recovery and remediation of affected habitats could take on the order of decades. Moreover, the authors suggest that the amount of habitat affected by such a spill (up to 1500 acres from Section 4.11.4.5) would be minimal "when compared to the amount of caribou habitat available on the North Slope". The discussion does not seem account for the strong fidelity that TCH

Honorable Gale Norton
February 23, 2005
Page 18

caribou demonstrate to their calving grounds and insect relief/summer foraging areas. An oil spill in these areas would have disproportionately large effects to caribou given the biological value of the habitat to this herd. BLM should develop an oil spill response plan to mediate the detrimental impacts such an oil spill would have to caribou during the calving, summer foraging and insect relief seasons.

**Birds** – Much of the discussion concerning the potential impacts to birds suffers from a problem as common in the Final EIS as it was in the Draft. Conclusions are often not supported with appropriate citations to available data. On Page 4-593, BLM reaches the conclusion that "it is likely that habitat would not be a limiting factor for most species nesting in the Planning Area and that many birds displaced by disturbances related to oil and gas development would move to adjacent habitats". No scientific data are offered in support of this claim. Again, on Page 4-603, there are no data to support the conclusion for birds that "alternate habitats would likely be available adjacent to developments, and any habitat loss would have a minor effect." Also on that page, it states that some birds may collide with infrastructure, but that "such losses are not expected to have an effect on regional populations". This statement is not scientifically justified for any populations that are declining. Additional mortality will cause the populations, regional or global, to decline more rapidly. These are not small issues, and the lack of meaningful analysis referencing credible data is a significant failing of the EIS.

In addition, on Page 6-75 it is stated that Table 2-3 has been revised in response to our Comment No. 196407-079. The revisions have not responded to our entire comment. This is frequently the case in Chapter 6, where only a part of a multi-part comment is addressed. The table still only states under Alternative A that if a spill were to enter a river delta or nearshore marine habitats occupied by substantial numbers of birds, minor to moderate effects would be likely for stable/increasing and declining populations, respectively. As we stated in our comment, the same statement should appear under all alternatives.

**Threatened and Endangered Species** – The discussion on Pages 4-371 & 372 regarding the Effects of Disturbance to Bowhead Whales appears to focus only on oil and gas development and ignores increased real and potential effects due to exploration. The text concludes that "effects would be limited to short-term shifts of the southern edge of the migration corridor." It is unclear what is meant by "short-term" or "southern edge". As we noted in our comments on the Draft, barge traffic at Camp Lonely far to the east associated with exploratory operations in the Planning Area in 2003 altered the entire bowhead migration sufficiently that the animals remained far offshore of traditional harvest areas when sought by Barrow subsistence hunters. There is absolutely no analysis of the potential effects of this shift on the migrating and feeding whales.

**Subsistence** – Under this topic beginning on Page 6-361 of the Comments and Responses chapter, we were pleased to see notation in responses to most of our comments that text was being modified or added to the EIS to address our concerns. In many cases, the

**Exhibit 50, page 18 of 30**

Honorable Gale Norton
February 23, 2005
Page 19

additions are truly remarkably candid acknowledgements of potential effects that did not appear in the Draft. For example, text was added as follows:

Response To: Comment No. 196407-099, regarding Subsistence Harvest Patterns - Changed second sentence of 1st paragraph to "These activities could alter the availability of subsistence species in traditional harvest areas through direct interference with hunts. This direct interference could affect harvest patterns by requiring hunters to travel further because the subsistence resources are more wary and skittish than normal following a disturbance or are deflected from traditional harvest areas following the presence of vehicles, vessels, and aircraft. Nuiqsut residents noted in the Alpine Satellites Development Plan EIS that aircraft have diverted subsistence resources away from areas where hunters were actively pursuing them, directly interfering with harvests or causing harvest to fail (USDOI, BLM 2004:Section 4A, page 632). Increased travel..." Note: text added for oil related activities as well as non-oil in all alternatives (additive for each alternative). (emphasis added)

and;

Response To: Comment 196407-105, regarding Sociocultural Systems -
The text in Conclusion (p. 4-233) was revised to read: "Most impacts associated with oil and gas exploration and development would be localized and would not substantially impact subsistence species if they do not occur in key habitat areas or migratory zones when animals are present. In addition, the ROPs and stipulations discussed above would be protective of subsistence species and could help resolve conflicts between the oil and gas industry and local residents as long as BLM does not overly allow exception clauses. Even in the best case scenario of species protection, however, subsistence users would still be constrained by the presence of oil and gas facilities from harvesting subsistence resources, would question the health of those resources, and would tend to harvest resources from five to 25 miles from areas of development, increasing the distance hunters must travel with each new wave of development. The power imbalance in negotiations having to do with land use in the National Petroleum Reserve-Alaska would limit the efficacy of the consultation process in that rule changes and exceptions to stipulations and ROPs could be approved unilaterally by the BLM. Without a veto power, local governments, tribal councils, and non-governmental organizations will have no ability to protect their communities' subsistence harvests, and make moot notions of partnering and cooperation in land use and management in the National Petroleum Reserve-Alaska. As expressed in public scoping testimony, local residents are fearful for the future of subsistence hunting on the North Slope, their ability to carry on with traditional customs and ways, and their ability to be able to pass along these traditions to their children." (emphasis added)

We were astounded to find that despite these substantial text modifications acknowledging that even in the best case scenario subsistence will be significantly impacted by expanding development, BLM remains convinced that leasing in additional areas should be allowed. We are left with the impression that only the technical

Honorable Gale Norton
February 23, 2005
Page 20

infeasibility of development and absolute lack of industry interest, as in the case of Teshekpuk Lake itself, will lead BLM to hold an area off-limits to leasing.

**Cumulative Effects** – In the Draft EIS, BLM did little more in analyzing the potential cumulative effects of the identified alternatives than rank the relative effects of those alternatives. In our comments on the Draft, we noted in particular a concern that BLM had failed to acknowledge that the proposed conversion from the existing prescriptive stipulations to a combination of stipulations and ROPs would likely increase cumulative effects. This seems clear if for no other reason than that the whole shift in management is intended to increase exploration and development in newly opened areas. BLM responded on Page 6-153 to our Comment No. 196407-078 with reference to the response to our Comment No. 196407-011, with no indication of how to find this response. Remarkably, when that response is located on Page 6-354, we find that it is incomplete due to a printing error. The errata pages indicate that the full response includes the oft-repeated BLM mantra that the agency "strongly believes that performance-based stipulations and Required Operating Procedures and the greater flexibility they offer to adapt requirements/standards to specific situations and to modify requirements/standards if they prove ineffective, not only are adequate, but will increase, not decrease our ability to protect surface resources and subsistence use." This response clearly ignores the central point of our comment. We await a meaningful response.

In many cases, however, under the topic of Cumulative Impacts and Analyses in the Comments and Responses chapter of the Final EIS, BLM has responded with substantial modifications or additions to the text of the EIS. Here again, with so many new and significant potential impacts acknowledged in the Final that were not presented in the Draft EIS, it seems remarkable that BLM continues to push for the opening of additional areas to leasing and potential exploration and development.

**Hazardous Materials** – We stated in our Comment No. 196407-048 that Section 3.2.10 must provide more details on known hazardous material sites within the planning area, and that a commensurate plan to clean up all known hazardous material sites within the planning area must be an integral part of any new management plan for the region. We suggested that if oil and gas leasing can be placed on a fast track by the BLM, then clean up of known hazardous materials can likewise be undertaken aggressively. We suggest now that given the response that an expedited clean up schedule is "outside the budget and procedural process", BLM should seek Administration support for additional funds to accomplish this task.

**Abandonment** – In Borough Comments Nos. 196407-49 and -50, we raised significant concerns regarding the costs and impacts of the dismantlement and removal of infrastructure and the subsequent restoration and rehabilitation (DR&R) of affected North Slope areas. We also cited the General Accounting Office Report, GAO-02-357, entitled Alaska's North Slope: Requirements for Restoring Lands after Oil Production Ceases (June 2002) which concluded that the current DR&R requirements and financial assurances are insufficient to ensure that any federal lands disturbed by oil industry