Honorable Gale Norton
February 23, 2005
Page 21

activities will be restored. The response to Comment 196407-50 on Page 6-278 states that a short discussion of the GAO report has been added to Section 4.6.7, Abandonment. We have been unable to locate this addition. Section 4.6.7 deals with the environmental consequences of Alternative D on fish. Moreover, simply adding text that references the GAO report does not explain how BLM intends to address its findings and better ensure that when the time comes, sufficient financial resources will be available to restore any federal lands disturbed by oil industry activities in the NPR-A.

**Borough Authority** - On Page 6-215, the response to our Comment No. 196407-052 states "application of the NSB's land management regulations to oil and gas exploration and development activities on federal land within the National Petroleum Reserve-Alaska is subject to significant legal restraints, and therefore must be evaluated on a case-by-case basis as particular activities are proposed." As was the case in the Draft EIS, the Final EIS fails to provide any analysis to support that conclusion. Also as we stated in our comments, the Borough has concurrent jurisdiction in the NPR-A, derived from the jurisdiction transferred to the state under the Alaska Statehood Act and our status as a home rule municipality. No federal or state legislation enacted subsequent to the Alaska Statehood Act has eliminated or removed concurrent jurisdiction and the federal regulatory scheme is inadequate to address all local and environmental concerns. BLM must recognize Borough zoning and permitting authority.

### Recommendations

**Research -** Significant additional study of the resources and uses of the Planning Area are essential to the responsible management of the region. Examples of needed research include:

- Investigation of the effects of oil and gas activities on molting geese, including a behavioral study assessing how helicopters, airplanes, people walking on the tundra, vehicles, etc. affect molting geese.
- Determination of the benefit to geese that travel long distances to molt in the area northeast of Teshekpuk Lake.
- Determination of forage quality in the area currently defined as critical to calving for Teshekpuk Caribou Herd (TCH) relative to the quality of alternate areas to which the herd may be displaced.
- Investigation of the influence of predation on calving, including comparison of TCH predation rates versus those of other North Slope herds.
- Survey and inventory of all birds, fish and plant species in the Planning Area.

**Research and Monitoring Team (RMT)** – The long-term role of the RMT must be clearly defined.
- The RMT must continue to function, be fully funded, and its role expanded to provide advice for monitoring and research throughout all planning areas of the NPR-A. There has been some suggestion that the RMT will be disbanded once the North Slope Science Initiative (NSSI) is in place. This would be a mistake, as

**Exhibit 50, page 21 of 30**

Honorable Gale Norton
February 23, 2005
Page 22

the RMT's focus is exclusively on the NPRA, where the most intensive level of industrial activity is expected into the foreseeable future. The group must meet periodically in our affected North Slope communities.

- BLM has spent relatively little on addressing the main biological concerns in the Northeast Planning Area, especially related to issues northeast of Teshekpuk Lake. There are significant data gaps concerning resources in this area. It has been reported that BLM will spend several million dollars looking for hard rock reserves in the Southern Planning Area. It would be appropriate for BLM to spend a comparable or greater amount on biological and subsistence studies in the Northeast and Northwest Planning Areas, as this is where significant industrial activity is most likely to occur in the near term.

**Subsistence Advisory Panel (SAP)** – This group must actually assume a meaningful advisory role, be fully funded, and its functions expanded or clarified to include the review of all proposed activities at the design, environmental analysis, construction, and operations phases. In addition, it must be consulted in the consideration of any request for an exception to any stipulation or ROP, the objective of which is to directly or indirectly protect subsistence. Currently, the group primarily hears reports of the plans or activities of BLM or industry operators. Rarely are the members asked for advice, or provided enough advance notice of the substance of such requests to allow for a reasoned response. The group must meet periodically in our affected North Slope communities.

**Subsistence Conflicts** – BLM must utilize all tools available to ensure maximum protection of subsistence uses within the NPR-A. Particularly effective in achieving a positive working relationship between industry operators and subsistence users have been the instruments developed by the Alaska Eskimo Whaling Commission (AEWC) in its dealings with potential conflicts between offshore activities and the bowhead whale subsistence hunt. BLM should identify a mechanism for formalizing and requiring as conditions of project approval that applicants execute the Conflict Avoidance Agreements designed to reduce conflicts, and the Good Neighbor Policies designed to assure timely compensation in the event of an oil spill, that have become standard practice in dealings between the AEWC and offshore industry operators.

**Southern Planning Area** - With an IAP/EIS process shortly to begin for the Southern Planning Area, basic survey and inventory studies must be initiated immediately. BLM is incredibly far behind in documenting what biological resources exist on its land. Given the mandate to balance resource extraction with the preservation of environmental, wildlife, and human resources and uses, BLM must make the effort to gather critical baseline data now, ahead of any significant industrial activity.

### ANILCA Section 810 Analysis

In the Alaska National Interest Lands Conservation Act of 1980 (ANILCA), Congress declared that rural Alaskans rely on subsistence resources, but that "continuation of the opportunity for subsistence use of resources on public and other lands in Alaska is

**Exhibit 50, page 22 of 30**

Honorable Gale Norton
February 23, 2005
Page 23

threatened ...."[1] Congress further acknowledged that "the continuation of the opportunity for subsistence uses ... is essential to Native physical, economic, traditional, and cultural existence."[2] In Section 804 of ANICLA, therefore, Congress declared that the "taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes."[3] Furthermore, to make sure that they do nothing to threaten the continuation of subsistence activities on federal lands, Congress required federal agencies to follow the requirements of Section 810 of ANICLA. Section 810 sets forth a two-tier procedure for making decisions that might adversely impact subsistence.[4]

The first tier requires a process of evaluating the impacts of an action to subsistence uses, and evaluating alternatives that would reduce or eliminate the impacts. See Section 810(a).[5] At the end of this process, the agency must determine whether the action "would significantly restrict subsistence uses." Id. The second tier is triggered if, after the first tier analysis, the agency concludes that the contemplated action may significantly restrict subsistence uses.

In the second tier, when there is the possibility of a significant restriction, the agency must first give notice to the State and various agencies and hold public hearings in the vicinity of the proposed action. See Section 810(a)(1) and (2).[6] Then, before proceeding with the action, the agency must make determinations that:

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands,

> (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and

> (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

Section 810(a)(3)(A), (B), and (C).[7]

BLM's Preferred Alternative in the Final EIS will severely damage subsistence resources and the Native peoples that depend on those resources for their sustenance, spiritual well

---

[1] 16 U.S.C. § 3111.
[2] 16 U.S.C. § 3111(1).
[3] 16 U.S.C. § 3114.
[4] 16 U.S.C. § 3120.
[5] 16 U.S.C. § 3120(a).
[6] 16 U.S.C. § 3120(a)(1) & (2).
[7] 16 U.S.C. § 3120(a)(3).

Honorable Gale Norton
February 23, 2005
Page 24

being, and culture. BLM's Section 810 evaluation,[8] unfortunately, fails to recognize that obvious fact. BLM gives only lip service to the two-tiered procedure that Congress mandated, ignoring the spirit and intent behind Section 810's passage.

In the 1998 Northeast NPR-A ROD, Secretary of the Interior Babbitt recognized the importance of the Teshekpuk Lake Special Area for subsistence and protected much of it from oil and gas leasing, exploration and development. Unfortunately, the new Preferred Alternative in this Final EIS now proposes that these protections be revoked. BLM's Section 810 analysis fails to adequately capture and evaluate the potentially significant adverse impacts to subsistence that would result from such action.

BLM's Section 810 evaluation begins with the erroneous assertion that: "Anaktuvuk Pass, Atqasuk, Barrow and Nuiqsut ... are located within or adjacent to the Northeast Planning Area," when in fact none of these villages are adjacent to the Planning Area and only Nuiqsut is within it. Id. This striking error shows that BLM did not undertake its duties under Section 810 seriously.

After starting with this inauspicious error, the Section 810 evaluation then examines each alternative in the 2005 FEIS relative to the initial factors set out in Section 810(a).

    1) The No Action Alternative

Section 810(a) requires that BLM:

> evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.

Id.

BLM's analysis equates the Final EIS's No Action Alternative with the 1998 Preferred Alternative chosen by Secretary Babbitt. It asserts that: "The evaluation and findings presented here reaffirm the previous conclusion [in the 1998 Section 810 evaluation] that impacts to subsistence as a result of this [No Action] alternative would be minimal." Id. at B-5. That statement is at best misleading. The 1998 Section 810 evaluation found that the Cumulative Case would "significantly restrict" subsistence. See 1998 ROD at 17-18. A "significant restriction" to subsistence from the Cumulative Case should not seem minimal to BLM, and is certainly not minimal to the Inupiat residents who depend on area resources for their sustenance and culture.

The evaluation addresses Section 810(a)'s "availability of other lands" factor by claiming that "Other lands managed by BLM are either too remote for economically viable oil and

---

[8] The Section 810 evaluation is reproduced in Appendix B of Volume 3 of the Amended FEIS.

Honorable Gale Norton
February 23, 2005
Page 25

gas production, or have a low probability of containing sufficient quantities of oil or gas."
Id. at B-6. This claim is not credible given BLM's June 2004 oil and gas lease sale
offering of 9 million acres in the Northwest Planning Area of the NPR-A. It also ignores
the recent discoveries of oil and gas within the areas already leased in the Northeast
Planning Area. These discoveries will likely generate more interest in lands available but
not receiving bids in the two previous Northeast lease sales under the 1998 ROD.

As to the alternatives factor in Section 810(a), the evaluation sets up illusory, and very
extreme, straw man alternatives, apparently so that BLM can quickly dismiss them as
unrealistic options. The evaluation states that the only two options to satisfy this factor
are either to make other lands within NPR-A unavailable for oil and gas leasing or to not
allow oil and gas activity to occur at all. Id. at B-7. There are, of course, many other
options that have been suggested repeatedly to BLM throughout the development of both
the 1998 and 2005 Final EIS'. In failing to consider these other options, BLM
completely ignores the directives of the statutes (discussed below) that expressly allow
the Secretary to permit leasing to go forward while imposing prohibitions and restrictions
to protect subsistence and other surface resources in NPR-A.

      2) Alternative B

Alternative B would open 95% of the Northeast Planning Area to oil and gas activities.
This is not only 8% more acreage than now open under the 1998 ROD, but also some of
the most sensitive subsistence lands in the Area. Under this Alternative, BLM's Section
810 evaluation merely repeats the same themes, and erroneously reaches the same
conclusions, as it did under its discussion of Alternative A.

As to whether there would be a significant restriction of subsistence under Alternative B,
the Section 810 evaluation acknowledges that "Oil industry infrastructure on the east side
of the Colville River has resulted in the nonuse of this [huge] area by the residents of
Nuiqsut," that oil development under Alternative B could lead to "a dramatic shift in the
current use-area of the caribou, resulting in displacement of the herd," and that all this
could lead to a "result [that] would be an overall reduction in lands used for subsistence
purposes." Appendix B of the FEIS at B-8 to B-9. Yet astonishingly, BLM then
concludes that Alternative B "would not significantly restrict subsistence use by
communities" and that "impacts to subsistence resources and access to resources would
be minimal". This conclusion is reached even though "displacement of the Teshekpuk
Lake caribou herd could occur," despite the increase in key acreage made available, and
even though BLM acknowledged a page earlier that Nuiqsut villagers no longer hunt on
the east side of the Colville River because of the labyrinth of oil industry infrastructure.
Id. at B-10.

      3) Alternative C

Alternative C would make 100% of the lands in the Planning Area available for leasing,
or a 13% increase over that authorized under the 1998 ROD. Nonetheless, the Section

**Exhibit 50, page 25 of 30**

Honorable Gale Norton
February 23, 2005
Page 26

810 evaluation of Alternative C follows the same pattern as the discussion for the two previous alternatives. It largely repeats the same faulty reasoning and reaches the same unsupported finding as under the other alternatives that subsistence impacts would be minimal and subsistence would not be significantly restricted. See id. at B-10 to B-11. These conclusions plainly do not follow from the Section 810 evaluation's acknowledgment that "the impact of Alternative C would be greater than that of alternatives A or B," that caribou movements in the area "could be disrupted by oil development activities, with unknown effects on the productivity of the herd," that Nuiqsut residents no longer hunt to the east because of the existence of oil infrastructure, and that hunters would avoid hunting near any future oil and gas developments in the Planning Area. Id. at B-10.

     4) Alternative D (Final Preferred Alternative)

The Final Preferred Alternative is unlike any alternative identified and analyzed in the Draft EIS. Because of that, Alaska Natives and other members of the public who were worried about the subsistence impacts that would arise from BLM's proposal to now open now closed areas in the Planning Area to leasing had no opportunity to express their concerns about this alternative in the context of the requirements of Section 810. In failing to provide them with an opportunity to comment on the Preferred Alternative at Section 810 hearings, BLM violated both the spirit and intent of the public participation requirements of Section 810(a)(2) and (b).

The Preferred Alternative would make also make 95% of the lands in the Planning Area available for leasing, an 8% increase over that authorized under the 1998 ROD. The discussion of the Preferred Alternative in the context of Section 810(a)'s three factors again largely repeats the same faulty reasoning and reaches the same unsupported finding as under the other alternatives. Here again, the facts presented do not support BLM's conclusions that minimal impacts to subsistence and no significant restrictions to subsistence would occur under the Preferred Alternative.

     5) Evaluation of Cumulative Case

The Section 810 evaluation of the Cumulative Case begins by listing the actions included in the analysis, but offers the qualification that they "are not limited to the following [actions]...." Appendix B of the Amended FEIS at B-14. It is never explained what other actions are included in the Cumulative Case. For appropriate analysis, the listing should be thorough and unqualified.

The Section 810 evaluation acknowledges that the Cumulative Case would significantly restrict subsistence. In applying the three criteria in Section 810(a)(3)(A), (B), and (C), however, the evaluation presents only unsupported conclusions. It states that BLM has "determined" that the three criteria are satisfied, but gives no analysis underlying these determinations, whether by reference to specific pages in the Final EIS or to any other documentation supporting its conclusions. See Appendix B of the Final EIS at B-17 to

Honorable Gale Norton
February 23, 2005
Page 27

B-18.  The failure to include any analysis makes it impossible to assess the validity of the reasoning behind BLM's conclusions.

It is never explained, for example, why BLM believes that opening 95% of the Northeast Planning Area to leasing is "necessary", or represents the "minimal" amount of public lands needed in order to comply with the cited Naval Petroleum Reserves Production Act of 1976 (NPRPA), the 1980 Appropriations rider, or the non-binding energy policy goals of the President. The new findings are never reconciled with the 1998 BLM recommendation and determination by Secretary Babbitt that making 87% of the Planning Area's lands available for leasing satisfied existing laws and was appropriately protective of subsistence.   In short, the need for a change in management is never justified.

BLM relies heavily on proposed Required Operating Procedures (ROPs) and stipulations to mitigate potential adverse impacts to subsistence. This approach effectively ignores Section 810(a)(3)(B)'s requirement that BLM minimize the amount of public lands used. Indeed, the requirement of Section 810(a)(3)(C) that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources" should be seen as additive to the requirement to minimize land use in subsection (B). Moreover, the proposed stipulations and ROPs are woefully inadequate to assure protection of subsistence resources. This is conceded in the Final EIS when it is stated that many of the 1998 Stipulations and ROPs would "differ in their effectiveness" and the effectiveness of subsistence-related Stipulations imposed by the 1998 ROD are at times candidly rated as being "more effective" than the proposed ROPs. See e.g., Vol. 1, FEIS, Table 2-2, at 2-76, 2-86, 2-110, 2-121.

BLM not only plays fast and loose with ANILCA's Section 810, but also provides no evidence of any effort to aggressively utilize other statutory authorities to protect subsistence. The NPRPA requires the Secretary of the Interior to give "maximum protection" to "any significant subsistence ... fish and wildlife ... values" in Special Areas.[9]  The 1980 Interior Appropriations rider, authorizing an "expeditious leasing program" for NPR-A and passed one day after ANILCA, directed that any decision to offer lands for leasing "provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of NPR-A.[10]  During consideration of the 1980 rider, Senator Ted Stevens stated: "I fully intend to see that leasing and associated activities in NPR-A are conducted in a manner which is not disruptive to the traditional and commercial activities of the Native people and the resources upon which they rely for subsistence."[11]  These authorities have not been applied by BLM in such a way to further Section 810's protective purposes.

---

[9]  42 U.S.C. § 6504(b).
[10]  Pub. L. 96-514, 94 Stat. 2964, December 12, 1980.
[11]  Congressional Record - Senate, November 13, 1980, p. 29490.

Honorable Gale Norton
February 23, 2005
Page 28

If Section 810 is to have any meaning, BLM must do more than simply announce that what it proposes to do adequately protects subsistence. Without more, the required Section 810 evaluation is merely an exercise in form over substance, stripped of its intended impact on decision-making, and a betrayal of yet another promise to Alaska Natives.

**Conclusion**

We suggested when scoping began on this project that the reasons first given for considering substantial amendment of the existing 1998 management plan were not valid. BLM initially led off all meetings and press releases concerning the amendment with the assertion that "new information" justified a move to open additional lands to oil and gas leasing. A torrent of comments and testimony disputing that claim sought reference to specific studies and pointed to new data that seemed instead to justify heightened protection for planning area lands, resources, and subsistence uses. The claims of new information were largely silenced, but the process moved forward anyway.

We stressed early the need for an extended review period that would allow for meaningful consultation with all stakeholders, and especially with our most directly affected North Slope residents, in the development and analysis of a reasonable range of alternatives. BLM's apparent need, however, to push ahead and meet some arbitrary schedule resulted in a process less consultative than the 1997-1998 effort, which itself was constrained to meet a politically-driven schedule, but still managed to include caribou, waterfowl, and subsistence workshops with local residents. We urged as early as scoping that when the Draft EIS was published a minimum of 90 days should be allotted for review and comment. When the Draft was published, BLM initially provided for only a 45-day review. In asking for an extension of the comment period to more fully review the Draft EIS, we cited significant problems with the project website, delays in getting copies of the documents to our communities, conflicts in timing with subsistence and other critical demands on staff resources, problems with the schedule of public hearings, and the overall complexity of the document. We were granted less than half of the meager 45 additional days we sought.

Within the constraints of a too-brief review period, both the Borough and the Kuukpik Corporation of Nuiqsut submitted detailed and thoughtful comments on the Draft EIS and the insufficient range of alternatives it presented. The Borough also endorsed the well-reasoned and scientifically supported comments of others, including Audubon Alaska and the Pacific Flyways Council. None of us had the opportunity to comment on significant elements of the new Preferred Alternative identified in the Final EIS, and only revealed in briefings conducted after the document had been sent to the printer. We see little of our positions reflected in this alternative. In the place of appropriate detailed responses to comments and analysis on some key issues, as well as on many other merely important issues, BLM rests its case for its proposal on what it champions as a newly "flexible" slate of mitigation measures that will allow *greater* protection of the environment, wildlife resources, and our subsistence culture. The agency refuses to acknowledge that

Honorable Gale Norton
February 23, 2005
Page 29

such flexibility, in the hands of current or future BLM officials and subject to the same kind of changing political environment and pressure that led to this review in the first place, can be used equally effectively against the interests of environmental, wildlife resource, and our subsistence cultural values.

We have been disappointed so often in federal and state government pleas to "trust us to do the right thing", particularly in the context of our dealings with BLM's sister Interior Department agency, the Minerals Management Service, that we cannot continue to allow deferred decision making to be the way business is conducted in our ever-shrinking backyard. Where the baseline science is not there to support responsible decision making, BLM must accept its duty to see that the work is done in advance of leasing, exploration, and development. It seems to us that there are sufficient areas now open to leasing in both the Northeast and Northwest Planning Areas to satisfy the oil and gas industry in the near term. BLM should take the opportunity to assess the mitigation measures now in place in both of these regions before opening additional, highly sensitive areas to exploitation.

We hope you will take these comments to heart, recognize your statutory and moral obligation to protect and preserve the environment, wildlife resources, and subsistence use of the NPR-A as equal to your mandate to develop its energy resources, and leave the current management plan for the Northeast Planning Area in place and unchanged.

Sincerely,

George N. Ahmaogak, Sr.
Mayor

cc:    Henri Bisson, Director, AK Region BLM
       Thomas Nukapigak, Mayor, Nuiqsut
       Isaac Nukapigak, President, Kuukpik Corporation
       Leonard Lampe, President, Native Village of Nuiqsut
       Nate Olemaun, Mayor, Barrow
       Harry Hugo, Mayor, Anaktuvuk Pass
       Elizabeth Hollingsworth, Mayor Atqasuk
       Myron Naneng, AVCP
       George Olemaun, President, NSB Assembly
       Jacob Adams, President, ASRC
       Charles D.N. Brower, Directo,r NSB Wildlife
       Rex Okakok, Director, NSB Planning
       Harold Curran, NSB Attorney
       Dennis Roper, NSB Government Affairs
       NSB Planning Commission
       Maggie Ahmaogak, AEWC

Honorable Gale Norton
February 23, 2005
Page 30

    Geoff Carroll, ADF&G Barrow
    Colleen Berg, EPA Anchorage
    Larry Bright, U.S. Fish and Wildlife Service Fairbanks
    Governor Frank Murkowski
    Senator Ted Stevens
    Senator Lisa Murkowski