

**KUUKPIK**
**CORPORATION**

P.O. Box 187
Nuiqsut, Alaska 99789-0187
TEL: (907) 480-6220
FAX: (907) 480-6126

February 28, 2005

The Honorable Gale Norton
Secretary of the Interior
U.S. Department of the Interior
1849 C. Street, N.W.,
Washington D.C.   20240

RE:    Northeast National Petroleum Reserve - Alaska
       Comments on Final Amended IAP/EIS

Dear Secretary Norton;

      Enclosed is a faxed copy of the letter from Kuukpik Corporation, the City of
Nuiqsut, the Native Village of Nuiqsut, and the Kuukpikmuit Subsistence Oversight Panel
commenting on the BLM's proposal to change the management of the Northeast NPR-A. The
last two pages of the enclosed letter have a different pagination than the remainder of the letter.
This is because an identical letter was sent from Anchorage to our office in Nuiqsut via e-mail
and via facsimile. The e-mailed version had an additional blank page at the end that was not
included in the faxed copy of the letter. The signature pages from the e-mailed version were
added to the text of the faxed copy.

      We apologize for any confusion that this might cause.

            Sincerely,

            KUUKPIK CORPORATION

            By

            Lanston Chinn
            Chief Executive Officer

**Exhibit 52, page 1 of 15**

# KUUKPIK
## CORPORATION

P.O. Box 187
Nuiqsut, Alaska 99789-0187
TEL: (907) 480-6220
FAX: (907) 480-6126

February 28, 2005

VIA FACSIMILE (202) 208-6956

The Honorable Gale Norton
Secretary of the Interior
U.S. Department of the Interior
1849 C. Street, N.W.,
Washington D.C. 20240

RE:     Northeast National Petroleum Reserve - Alaska
Comments on Final Amended IAP/EIS

Dear Secretary Norton:

The four organizations joining in this comment letter are the ANCSA village corporation, the municipal government, the tribe and a subsistence oversight panel representing Nuiqsut, which is the only community physically located within the area covered by the Final Amended IAP/EIS for Northeast National Petroleum Reserve-Alaska. Kuukpik Corporation, the City of Nuiqsut, the Native Village of Nuiqsut and the Kuukpikmuit Subsistence Oversight Panel would like you to consider these comments before making a final decision on whether to change the current management of the Northeast National Petroleum Reserve - Alaska ("NPR-A") per the Final Amended IAP/EIS. In a very polite, but firm way, the local people who will be impacted most by your decision want you to know that we vehemently oppose changing the management of the Northeast NPR-A at this time.

It has been and continues to be our position, that the 1998 Northeast NPR-A Record of Decision ("1998 ROD") balanced reasonable development and sound resource protections. That 1998 ROD gives industry the opportunity to develop resources in the Northeast NPR-A planning area while also establishing clear and balanced mitigation measures. The 1998 ROD also determined that a large area around Teshekpuk Lake should not be subjected to oil and gas activities at all (1998 ROD p. 2.) The 1998 ROD fulfilled the mandates from Congress expressed in the National Petroleum Reserve Production Act ("NPRPA") to offer leases within NPR-A while also meeting requirements that surface resources were to be protected throughout the reserve and that "maximum" protection was to be provided to the significant subsistence and wildlife values of the Teshekpuk Lake area in particular. (42 USCA 6504(b) & 6508(1).) In addition, the 1998 ROD fulfilled Congress' policy that "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend on subsistence uses of the resources of such lands." (16 USCA 3112(1).)

**Exhibit 52, page 2 of 15**

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 2 of 13

There have been no developments since 1998 which would justify reducing the protections provided in the 1998 ROD, for, make no mistake, reducing protections is what the Amended IAP/EIS is all about. The 1998 ROD was the result of a collaborative process that involved the local people, experts, environmental groups, and industry. Throwing out such a decision and replacing it with Alternative D (the final Preferred Alternative) would almost entirely ignore the concerns of the local community and the North Slope Borough and would be both erroneous and very damaging to the BLM's credibility as a land manager on the North Slope.

Our comments in this letter go to the Final Northeast NPR-A Amended IAP/EIS ("FEIS") and the Alaska National Interests Lands Act ("ANILCA") Section 810 analysis on which you are to base your decision. These decisional documents are seriously flawed because of the prevalence of data gaps and an absence of real analysis of the impacts of the action alternatives. Documents with these kinds of flaws cannot support a rational decision to adopt any of the alternatives discussed other than the No Action alternative.

We have already our made our position on the push to change the management of the Northeast NPR-A known to the BLM through our participation in the National Environmental Policy Act (NEPA) and the ANILCA § 810 public processes that have preceded the decision you now face. Enclosed on disk are electronic copies of our October 31, 2003 scoping letter and our August 23, 2004 letter commenting on the Draft EIS for your ease of reference. The points and comments made in these letters are further support for our position that you should adopt the No Action alternative. We refer you to the detailed discussions, critiques and evidence in those attached letters, as we will not repeat all of those points in this letter. Since most of our comments in those letters remained unaddressed in any substantive or satisfactory way, the information can be as easily accessed by reviewing those letters as by setting it all forth yet again. We also join in the North Slope Borough's letter addressed to you dated February 24, 2005, which identifies significant failures in the FEIS and the ANILCA section 810 analysis of the action alternatives.

Our organizations represent Nuiqsut's economic, subsistence, tribal, and governmental interests at the most basic local level. Kuukpik Corporation is the Alaska Native Claims Settlement Act ("ANCSA") Native village corporation for Nuiqsut. Kuukpik owns the surface estate of over 46,400 acres of surface lands in the Northeast NPR-A planning area and is by multiple orders of magnitude the largest private owner of surface lands in the Northeast NPR-A Planning Area. ANCSA also entitles Kuukpik to select approximately 22,000 acres of additional lands currently owned and administered by BLM. Kuukpik would take title to those additional lands subject to the land use provisions established by either the 1998 ROD or the record of decision which you are currently making, so your decision is critical to it as a landowner, as well as in its capacity as a representative of its shareholders. Over 95% of Nuiqsut's residents are Kuukpik shareholders, are married to Kuukpik shareholders, or are the

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 3 of 13

offspring of Kuukpik shareholders. Kuukpik has taken the lead role for the community of
Nuiqsut on oil and gas development issues since Kuukpik, the City and the Native Village passed
a joint resolution calling for Kuukpik to do so on June 26, 1995.

The Kuukpikmuit Subsistence Oversight Panel ("KSOP") is a panel of five
Nuiqsut subsistence users selected jointly by the City, the Native Village and Kuukpik. KSOP
was established in 1997 pursuant to an agreement between Kuukpik and the operator of the
Alpine oil field to monitor the health of subsistence resources within Kuukpik's ANCSA Section
11(a)(1) Withdrawal Area and the surrounding area. KSOP's panel reports any impacts caused
by oil and gas activities in the monitoring area to Kuukpik and to the current operator of the
Alpine field, ConocoPhillips Alaska Inc. KSOP and its members are the eyes and ears of
Nuiqsut's subsistence users and are on the front line of subsistence resource protection in the
Northeast NPRA, the Colville River Delta, and the lands to the east and south of the Colville
River Delta.

The City of Nuiqsut is the local municipal government for Nuiqsut and represents
all of the residents of Nuiqsut, both Native and non-Native. The Native Village of Nuiqsut is the
federally chartered tribe for the Kuukpikmiut, the people of Nuiqsut, and represents the
traditional government of the Kuukpikmiut. Each signer of this letter also writes to you as
individual Nuiqsut residents and as village leaders.

We collectively represent Nuiqsut, a rural village located on Alaska's North Slope
and just inside the eastern boundary of the NPR-A. Approximately 500 people live in Nuiqsut,
virtually all of whom are Inupiat Eskimos heavily dependent on traditional subsistence resources.
Our dependence on subsistence is confirmed by State of Alaska studies showing Nuiqsut has one
of the heaviest per capita consumptions of subsistence resources in the State of Alaska at 397
pounds per person per year. In 1993, over 90% of Nuiqsut's households and 73% of its residents
took part in subsistence activities, harvesting an average of 2,943 pounds of food per household.
Subsistence resources are shared routinely in the village and with other villages. Sharing of
resources is "essential to the maintenance of family ties, kinship networks and community well
being." (FEIS p. 3-88, emphasis added.) As documented by the FEIS, this network of sharing is
built upon on some hunters gathering a surplus of subsistence resources and accordingly is more
sensitive to disruption than the harvest and use of resources by the primary producer.

The health and welfare of our members and constituency is critically important to
us. Since the harvest and sharing of subsistence resources is at the core of village life, the health
and welfare of Nuiqsut's residents is tied closely to the management of its subsistence resources.
Historically our subsistence range extended east into the area that is now Prudhoe Bay and to the
west through the NPR-A nearly to Barrow. Maps J-7 to J-12 in volume 3 of the FEIS show
Nuiqsut's traditional subsistence range. We have already seen Nuiqsut's traditional subsistence
range east of the village occupied by the bulk of the oil and gas infrastructure developed on the

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 4 of 13

North Slope so far. Very recently the Alpine field was developed just 8 miles to the north of the village in the Colville River Delta. Alpine is not at the periphery, but at the central core of our subsistence range. Still more development in our core subsistence range is imminent, as construction on two Alpine satellite oil fields began this winter, one only 4 miles to the north of the village. BLM has approved three other Alpine satellites to the west of Nuiqsut. After construction of this round of satellites is complete, Nuiqsut will be surrounded on three sides by oil and gas development.

Existing development profoundly affects the activities of Nuiqsut residents in their subsistence range. Surveys of Nuiqsut households in 1993 and 1994 showed that caribou were not harvested in industrialized areas, 4% of caribou were harvested within 5 miles of industrialized areas, 17% of caribou were harvested 6 to 15 miles from developed areas and 79% of caribou were harvested 16 miles or more distant from developed areas. More recent household surveys done between June 1999 and May 2000 continue to indicate that no caribou are harvested within developed areas. These surveys are discussed at page 3-85 of the FEIS. As the footprint of development expands, the areas where there will be little or no harvest success increase dramatically. Note that those developed areas with no harvest success include the many miles of pipelines and buffer areas on either side, which are conveniently omitted from most acreage estimates of the footprint of oil and gas development.

As the FEIS itself notes, the data above understates the impacts on subsistence users. The FEIS recognizes that the use of household surveys to measure the distance by which hunters avoid developed areas (as opposed to objective measures of where harvest activities occur) may underestimate the amount of resources harvested and the location of those harvests. (FEIS p. 3-71, 6-369.) Instead of filling this data gap, which was identified in our October 31, 2003 scoping letter (pp. 29-31), the FEIS ducks the issue by simply stating, "household surveys provide the best available data at this time." This is unacceptable because understanding the impacts of development on our subsistence activities is essential to a reasoned choice among alternatives impacting our subsistence range.

On the same page that the FEIS discusses evidence that the loss of our subsistence range is much, much greater than the footprint of the North Slope's industrialized areas, the FEIS recognizes that there is insufficient data to determine how subsistence activities will adjust to Alpine. This is not the only gap in the available data that is glossed over in the FEIS. BLM tells us that it can only vaguely discuss the sociocultural impacts of oil and gas activities in our subsistence range because there are "data gaps regarding sociocultural studies and the relationship between oil and gas development and sociocultural impacts." (FEIS p. 6-284.) BLM points to several forthcoming studies on the relationship between sociocultural stress and oil and gas development. Of course, those studies aren't out yet, so when it comes to analyzing the adverse effects on our people from adopting any one of the action alternatives, the FEIS can only make guesses and vague assumptions. This is totally unacceptable when we identified the need

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 5 of 13

to fill the data gaps surrounding subsistence and sociocultural impacts in our scoping letter. (See pp. 28 - 33 of our 10/31/03 scoping letter.) In fact, the necessity of understanding of the impacts of oil and gas development on our sociocultural institutions was recognized in the 1998 Northeast NPR-A EIS/IAP (p. IV-H-22.) Filling this data gap is essential to a reasoned decision and is required for a complete EIS (40 CFR 1502.22.)[1] For all BLM's talk about how new data and studies justify amending the 1998 ROD, BLM has not even gathered this most fundamental data which was identified as necessary some seven years ago.

Ironically, although this NEPA planning process is marked throughout by the absence of essential information, during scoping and in press releases BLM told the public that it had learned a lot since the 1998 ROD was adopted. Initially this was BLM's primary reason for amending the 1998 Northeast NPR-A FEIS and changing the 1998 ROD. We, along with the North Slope Borough, the Environmental Protection Agency, the Environmental Coalition, and several individual commenters noted that BLM has never identified what it has learned that could possibly support the changes in management of the Northeast NPR-A proposed in the action alternatives. (See pp. 7 to 16 of our 8/23/04 letter and FEIS pp. 6-58, 63, 65, 67 - 70, 253 - 254.)[2] Responses in the FEIS to these comments are simply nonsense or makeweights. BLM indicates in one response that it "believes" that there is new information. (FEIS p. 6-67.) Believing that there is information when there clearly isn't is arbitrary without a doubt. Other than stating its "belief," BLM's responses to comments on the near total dearth of information, studies, and technology supporting amending management of the Northeast NPR-A are evasive. (See FEIS pp. 6-58, 63, 65, 68 - 70, 253 - 254.) BLM's responses on this issue only underscores the lack of the studies, information and technology in the Draft EIS that the public was told justified this NEPA process and changing management established in the 1998 ROD.

Even with the substantial gaps in data, and the absence of new information, it does not take a scientist to tell that Nuiqsut's residents are impacted by the loss of their traditional subsistence range to oil and gas activities. We already know this through our traditional knowledge and have made this fact clear to BLM ever since scoping began. More of Nuiqsut's

---

[1] 40 CFR 1502.22(b) permits an agency to forego filling data gaps if the cost of doing so is exorbitant or the means of obtaining the information is unknown. Neither excuse applies here as the FEIS notes that studies are forthcoming (FEIS p. 6-284), hence filling the data gap must not be exorbitantly costly and the means to fill the data gap must be known. All that your agency needs to do to fill these data gaps is wait for the completion of studies. There is absolutely no reason why management of the Northeast NPR-A needs to change before results of expected studies are finalized and released.

[2] New studies and information might justify tightening restrictions on lessees and increasing the size of the area around Teshekpuk Lake protected from surface impacts. However this is not in accord with the current Presidential administration's priorities and as such never received consideration as alternatives in this planning process. This is just one (in many) ways that the NEPA process has been result-driven rather than intended to assess impacts of an agency action.

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 6 of 13

subsistence range will slip away with the development of Alpine's satellites. Undoubtedly this makes Nuiqsut's residents more sensitive than residents of other North Slope villages to further oil and gas development.[3] This also exposes Nuiqsut's residents to greater impacts from the decision you make on the management of the Northeast NPR-A because the existing and growing impacts to our subsistence activities increases the significance to us of the areas in our traditional subsistence range that so far remain largely undisturbed. Most of that undisturbed range now is inside the Northeast NPR-A Planning Area.

        Despite the increasing importance of the NPR-A to our people and the uncertainties about the severity of the sociocultural impacts of further fractionalization or elimination of our subsistence range, the action alternatives considered in the FEIS would all increase impacts on Nuiqsut's subsistence users by opening lands around Teshekpuk Lake to leasing and/or surface occupancy. When setting aside this area (through the decision to not lease 589,000 acres and through the No-Surface Occupancy stipulations) then Secretary Babbitt noted that it:

>        encompasses important goose molting areas, caribou calving and insect-relief habitat, and all of Teshekpuk Lake. It is of special importance to subsistence users because of the caribou and fish resources in the area and the long-standing subsistence use of the area.

(1998 ROD p. 1.) Alternative B in the Draft EIS (and now the FEIS) would set aside only 213,000 acres of the 589,000 acres presently off limits to leasing. Alternative C would not set aside any of this area. The Draft EIS identified no justification for providing less protection to this surface area. The value of this area to caribou, birds and subsistence users is the same (or even greater) than in 1998. We aren't the only ones reaching this conclusion. The EPA "determined that the valuable biological, cultural and subsistence resources . . . in the Teshekpuk Lake Special Area . . . continue to merit the protections assured in [the 1998 ROD.]" (FEIS p. 6-253.) Likewise, the North Slope Borough commented that the area that would be opened to leasing under Alternative B was equally deserving "of closure for the protection of caribou, waterfowl, and fish populations, as well as for subsistence harvests" as the area set aside from leasing under that alternative. (FEIS p. 6-259.)

---

[3] By comparison, Barrow and Atkasuq are each over 130 miles away from the closest active commercial oil field. This is not to say that North Slope people from Barrow, Atkasuq and other communities are not directly impacted by oil and gas development, but so far Nuiqsut's residents have been subject to the greatest impacts.

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 7 of 13

---

The final Preferred Alternative continues to incorporate a plan to lease the area around Teshekpuk Lake.[4] However, the final Preferred Alternative proposes replacing the large surface area set aside in the 1998 ROD with a bewildering patchwork of No Surface Occupancy zones subjected to varying different exceptions that we still do not fully understand. (FEIS pp. 2-51 to 55.) The final Preferred Alternative's patchwork and mitigation measures look impressive on paper. However, the impacts of exploration and development of the Teshekpuk Lake area will still be great. This is borne out by the FEIS which says:

> The primary effect of oil and gas exploration and development activities in the area surrounding Teshekpuk Lake would be to deflect subsistence users from the vicinity of development pads, roads, and pipelines. In addition these activities would deflect caribou from their normal migration, calving, insect relief and grazing areas, and these activities may deflect the caribou from subsistence harvest areas used by Nuiqsut, Atqasuk, and Barrow residents.

FEIS p. 4-382. The FEIS goes on to say that under the Preferred Alternative:

> Oil and gas activities would inhibit subsistence users from harvesting in their traditional use areas, including areas previously unavailable for leasing.[5]

That these impacts are likely to follow from adopting the final Preferred Alternative makes sense because this alternative, like Alternatives B and C, fractionalizes the unbroken habitats used by the Teshekpuk Lake Caribou herd and relied upon by subsistence users as an area where hunters will not encounter development.

We think that the impacts of the final Preferred Alternative are understated in the FEIS since this is a wholly new alternative that was sprung on the public after the close of the formal comment period. Accordingly, the FEIS does not incorporate feedback on the effectiveness of the Preferred Alternative. The development of the Preferred Alternative certainly would have benefitted from feedback. In particular, on Pages 7 through 10 of its 2/24/05 letter the North Slope Borough identifies numerous ways that final Preferred Alternative's measures fail to come close to the type of protection that the Teshekpuk Lake area presently enjoys.

---

[4] The final Preferred Alternative would withdraw the lake itself from leasing for 10 years. As far as the final Preferred Alternative goes, this takes the lake off the table, for now. However, withdrawing the lake from leasing is different from the decision made in the 1998 ROD which was to not lease the lake. This change, like the other changes proposed in the action alternatives, is not supported in the FEIS.

[5] Despite predicting these types of impacts, the ANILCA section 810 analysis for the Preferred Alternative finds no significant restriction on subsistence uses by residents of Anaktuvuk Pass, Nuiqsut, Atqasuk, and Barrow. FEIS, Appendix B, p. B-13. It is unimaginable how this "finding" could have been derived from the discussion of the impacts in the FEIS.

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 8 of 13

Clearly, the Preferred Alternative needs input from the scientific community and the input of our communities and our primarily Inupiat speaking elders. Until these are part of an EIS covering the final Preferred Alternative, a decision on whether to adopt the final Preferred Alternative will not be supported by the required NEPA or ANILCA analysis.

Perhaps more importantly, the arrival of a mysterious final Preferred Alternative at the 11th hour disassociates and disenfranchises the people most impacted from the process and the end result. This is a very far cry from the collaborative approach that went into the development of the current management of the Northeast NPR-A. Alternatives B and C also do not reflect collaboration with us on how our subsistence range should be managed. Adopting an action alternative supported by any less of a collaborative process than the 1998 ROD will result in a management plan that is not supported by the most affected people. The only alternative before you that incorporates our input is the No Action alternative.

Moreover, the final Preferred Alternative, like Alternatives B and C, does little to minimize the impacts to us from opening the Teshekpuk Lake area to leasing. The FEIS identifies consultation requirements "intended to minimize conflicts between subsistence users and oil and gas activities" as the mitigation measures that directly addresses impacts to subsistence activities. (FEIS p. 4-385.) Make no mistake, impacts to us – the very people who are supposed to benefit from these consultation requirements – are not minimized by our being better informed about what is happening outside the village. Conclusions in the FEIS that consultation will be "highly effective" at mitigating the environmental injustice of opening the Teshekpuk Lake area to development (FEIS p. 4-393) are arrant nonsense. Equally absurd is the statement in the ANILCA Section 810 analysis that consultation is "adequate" to "ensure that significant restrictions to subsistence uses and needs will not occur." (Appendix B p. B-13.)

Statements in the FEIS about the effectiveness of consultation as a mitigation measure (and the only mitigation measure we might add) are advocacy for a desired end result, not analysis. A true analysis of the effectiveness of measures intended to mitigate the impacts to us cannot be done because of the data gaps as to the severity of the displacement of subsistence activities and the connection between such displacement and the health of village institutions. In addition, an assessment of the impacts of the final Preferred Alternative to subsistence resources that incorporates feedback from outside the agency is necessary. Without that data and analysis, there can be no real identification or evaluation of the adequacy of any measures to mitigate impacts on us.

Point in fact are the indications discussed at pages 50 and 51 of our August 23, 2004 letter that sharing of subsistence resources in Nuiqsut is in decline. That this is happening already under the 1998 ROD which incorporates the same weak consultation requirements and other, more concrete stipulations (such as buffer zones around subsistence cabins and camp sites) intended to mitigate impacts on us that were not made part of any of the action alternatives,

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 9 of 13

shows that consultation alone is not the mitigation that BLM advocates it to be. <u>Suffice to say for now that in no way does being better informed about why our ice cellars are empty mitigate an empty ice cellar. Nor does being better informed about why one has to travel farther and farther to find deflected caribou or to hunt outside the shadow of industrialization substitute for hunting where our forefathers taught us to hunt.</u>

Nothing justifies subjecting us and the resources on which we depend to the increased impacts of opening the Teshekpuk Lake area. The Draft EIS told us that the National Energy Policy Development Group (the "NEPDG") recommendation to President Bush (that he direct your agency to consider additional leasing in the NPR-A) was a justification for this NEPA process. In the FEIS we actually find this recommendation inconsistently referred to as either the President's energy policy (see e.g. pp. 1–5 & 6-254) or a recommendation from the NEPDG (see e.g. p. 1-5 & pp. 6-63, 255, 260, 367.)[6] Neither justifies changing management of the Northeast NPR-A. The latter is only a <u>recommendation</u> from a non-governmental committee to the President. The NPDEG's recommendation is not a directive to your agency. Even if this recommendation were a directive, we do not think your agency can legally take directives from such a non-governmental committee.

The President's policy is also an inadequate reason for opening the Teshekpuk Lake area to development impacts. Assuming that this President has articulated a policy directing your agency to revisit the management of the Northeast NPR-A, that mandate alone is not a basis on which a rational decision to amend a perfectly valid management plan can be based. This is where studies, information, and technology would come in to make the President's directive a rational reality. But, as we have already discussed, despite its assertions to the contrary, BLM has learned nothing that justifies amending management of the Northeast NPR-A in the ways proposed in the action alternatives. Without these, BLM has not articulated a legally supportable foundation for adopting an action alternative changing the management requirements of the Northeast NPR-A that are already in place. This is especially true when the 1998 ROD carefully (and we feel correctly) balanced development and protection and met NPRPA's and ANILCA's requirements. It would be an arbitrary agency action (and not in compliance with NEPA, Section 810 or the other cited statutes mandating subsistence protections) to undo that balance, or to adopt a management plan as different from the 1998 ROD as the action alternatives, based on just words from the President (pp. 16 to 21 of our 8/23/04 letter discuss this in more detail.)

Congress's 2000 amendment to Section 604 of Environmental Policy and

---

[6] We have reason to doubt that there is a Presidential policy since we have never seen any indication that the President accepted the recommendations of the NPDEG or directed your agency to look into leasing additional acreage in the Northeast NPR-A. The FEIS, we think, would have pointed to such a policy directive if it exists instead of further obscuring this issue by relying inconsistently on the NPDEG's recommendation and the President's own energy policy.

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 10 of 13

Conservation Act ("EPCA") was another justification cited by the BLM for this NEPA process. We are pleased to see that this is no longer proffered in the FEIS purpose and needs section as justification for changing Northeast NPR-A management. However, EPCA pops up in a response to our comments at page 6-63 of the FEIS. We think (and hope) that that reference to EPCA in the comment response is due to an editing error and not because EPCA continues to be relied upon as part of the foundation for amending management of the Northeast NPR-A. Simply put, section 604 of EPCA requires an inventory of impediments to oil and gas development on federal lands that goes to Congress - nothing more. In no way does EPCA require or authorize an EIS or agency action changing existing management of federal lands. Pages 3 to 6 of our 8/23/04 comment letter explain the limited purpose of Section 604 of EPCA in more detail.

Certainly then, with greater impacts looming and no justification for allowing those impacts to occur in sight, the final Preferred Alternative does not provide the maximum protection to the wildlife and subsistence values in the Teshekpuk Lake area that is required by Congress as a condition of leasing in this portion of the NPR-A. (42 USCA 6504(b).) At best the Preferred Alternative provides "maximum" protection to bits and pieces of important caribou habitat in limited parts of the Teshekpuk Lake area. The other action alternative provide even less protection, so Alternative B or C merit no discussion beyond stating that adopting either would be unsustainable. BLM is required to provide a greater level of protection than the action alternatives provide,[7]

The action alternatives also incorporate performance based measures intended to mitigate impacts of activities throughout the Northeast NPR-A. We are told over and over again in the FEIS (as we were in the Draft EIS) that the performance based measures in the action alternatives provide the same level of protection to the environment, wildlife and people as the mitigation measures in the 1998 ROD. However, our comment letter on the Draft Amended EIS demonstrated at length that the ROPs would provide a decidedly inferior level of protection (see pp. 25-36 of our 8/23/04 comment letter.) More proof that the performance based measures are less protective will come when oil companies presently holding leases in the Northeast NPR-A clamor to get their lease stipulations changed to the more permissive performance based mitigation measures should an action alternative be chosen. Despite the demonstrable differences in protection provided by the current management versus the performance based measures, the best that the FEIS seems able to do in response to our concerns is to repeat the mantra that the levels of protection are the same. Frequent repetition of an untrue statement does not make that

_____

[7] The BLM responded to one of our comments on the Draft EIS by saying what is or is not adequate or maximum protection is a "matter of controversy." (FEIS p. 6-349.) We see no controversy here. Protection of the Teshekpuk Lake Caribou herd and subsistence activities in the Teshekpuk Lake area is simply inadequate under the final Preferred Alternative or under any other action alternative. The final Preferred Alternative does not even approach a level of protection which BLM could rationally find necessary and appropriate to mitigate foreseeable significant impacts to surface resources in the NPR-A. (42 USCA 6508(1))

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 11 of 13

---

statement more true.

      The "analysis" in the FEIS of the effectiveness of the ROPs typically circles back to the mantra that the levels of protection are the same or repeats BLM's belief or intent that the change will have no impact. (See e.g. FEIS pp. 2-16, 4-385, 392, 6-28, 66.) Assertions that performance based measures will provide protection equal to the 1998 ROD is results-driven advocacy or wishful thinking, not analysis. Analysis requires considering and drawing conclusions on what additional impact can reasonably be expected from more permissive performance based measures. Analysis requires considering and drawing conclusions on whether monitoring for impacts after the fact provides equivalent protections to the current impact mitigation which avoids impacts before they occur. Analysis requires consideration of the actual performance based measures being proposed, instead of ignoring key parts of the measures which undermine their effectiveness. Analysis requires consideration of the impacts that performance based measures would have on Nuiqsut's residents in terms of the time and effort necessary to participate in public process on protections so flexible that they are a moving target and subject to change with little public input.

      We have been asking for an analysis of the difference in impacts ever since BLM announced that management in the Northeast NPR-A was switching to performance based measures (see pp. 10-14 of our 10/31/03 scoping letter and pp. 26-36 of our 8/23/04 letter.) But, the FEIS, like the Draft EIS, does not analyze the many impacts of BLM's concededly pre-determined shift in management approach. The whole purpose of an EIS, and NEPA planning in general, is to assess the impacts of proposed agency actions. (40 CFR 1502.1) The FEIS fails in this fundamental purpose. Instead of assessing impacts of switching to performance based measures, the FEIS is a sales pitch for what BLM already decided to do. Until the impacts of changing the 1998 ROD's mitigation measures are assessed as required by NEPA, a decision by BLM to adopt performance based measures will not be legally supportable.

      The FEIS makes two substantive improvements from the Draft EIS which we want to acknowledge and applaud. The first is a change in the exceptions clause from one which would have allowed exceptions resulting in no mitigation at all (Draft EIS p. 2-14) to one which requires meeting the objective as a requisite for the granting of an exception (FEIS p. 2-18). The second change is in Lease Stipulation D-2. In Alternatives B and C this stipulation would allow construction of permanent gravel infrastructure to support exploration if doing so is more economical for a lessee. (FEIS p. 2-24.) The final Preferred Alternative allows permanent gravel

---

[8] BLM's website for this planning process says that the mitigation measures in the 1998 ROD will be reformatted into performance based mitigation measures. http://69.20.72.207/nenpra/default.html. Identical language has been post on line since before the Draft EIS was released. BLM also expressed its impermissible pre-determination to switch to performance based measures during meetings with our representatives and in press releases (see 8/23/04 letter pp. 21 to 23.)

**Exhibit 52, page 12 of 15**

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 12 of 13

infrastructure for exploration only when this is environmentally preferable. (FEIS p. 2-42.) These two changes in the mitigation measures proposed for the final Preferred Alternative are welcomed by us and address two specific comments we raised in our 8/23/04 letter,[9] However, these changes do not come close to filling the gaps in analysis of the differences between the mitigation that the 1998 ROD provides and the mitigation that we can expect from the performance based measures proposed in the action alternatives. Until that analysis is done, an agency decision changing the management of the Northeast NPR-A by adopting performance based measures will be unsupported by the legally required NEPA analysis.

The bottom line is that BLM should not, and legally cannot, take a step as substantial and far-reaching as exposing the Teshekpuk Lake Area to the impacts of the action alternatives without legally adequate reasons. A sufficient reason to change that management is clearly lacking here. Nor can BLM adopt performance based measures without adequately analyzing the impacts that these will have. Accordingly, the only rational decision you can make is adopting the No Action alternative in your Record of Decision.

If, after reviewing this letter, the attachments and the Borough's February 23 letter, you are not convinced that you should not increase the impacts on Nuiqsut's people by changing the management of the Northeast NPR-A, then we would ask you to visit Nuiqsut so we can show you first hand the people, the place and the way of life that is at stake. We thank you for considering what we have to say and look forward to working with you, BLM and BLM's local representatives in the future.

---

[9] It is unlikely that permanent roads will ever be environmentally preferable to temporary ice based infrastructure and/or less damaging winter tundra travel, so this change makes sense. But, the "environmentally preferable" exception built into this stipulation can become a larger loophole than ever intended if industry is allowed to support a request for exceptions based on environmentally damaging scenarios. For instance using gravel infrastructure to support exploration would be environmentally preferable to infrastructure made from trash. That should not support granting an exception though. Stipulation D-2 should clarify that impacts from gravel roads are to be compared to impacts from currently approved winter exploration practices.

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 13 of 14

KUUKPIK CORPORATION

2/28/05
DATE

BY: ISAAC NUKAPIGAK
ITS: PRESIDENT

NATIVE VILLAGE OF NUIQSUT

DATE

BY: LEONARD LAMPE
ITS: PRESIDENT

CITY OF NUIQSUT

2-28-05
DATE

BY: THOMAS NUKAPIGAK    *Rhoda Bennett/ Acting Vice-Mayor*
ITS: MAYOR

KUUKPIKMIUT SUBSISTENCE OVERSIGHT PANEL

2/28/05
DATE

BY: GORDON BROWN
ITS: CHAIRMAN

Enclosure

cc:    Henry Bisson
       Susan Childs (via hand delivery)
       ENSR
       Honorable George Ahmaogak, Sr., Mayor, (North Slope Borough Mayor)
       Mr. Rex Okakok, Sr., (North Slope Borough Planning Dept.)
       Arnold Brower Jr., (ICAS)

Letter to Hon. Secretary Norton
RE: Northeast NPR-A FEIS
Page 14 of 14