INTRODUCTION

Specific mention was also made of tundra travel restrictions and aircraft use. Some comments recommended addressing an alternative that considers a full-field development scenario, including transportation infrastructure.

### 1.11.4.8    Oil and Gas Exploration and Development

A common concern expressed during scoping was the impact that oil and gas activities could have on the biological resources and the primitive natural values of this area. Local residents are very concerned with these issues relative to their subsistence use. Most questions about the future management of the Planning Area revolve around whether the BLM should offer oil and gas leases in the Teshekpuk Lake area and, if so, with what restrictions. Some people believe that advances in oil field technology, such as extended-reach drilling and smaller areas required for production pads, have greatly reduced the industry's impact on the environment. The BLM was encouraged to utilize realistic development scenarios, including the scenario of full-field development. Comments suggested considering technological advances in exploration and development, and addressing how the natural and human environment has changed in the Planning Area since 1998.

### 1.11.4.9    Stipulations, Regulations, and Required Operating Procedures

Comments ranged from retaining current stipulations to developing consistent, performance-based ROPs and stipulations throughout the National Petroleum Reserve – Alaska. Some commentors supported review of current stipulations to determine their current applicability and ability to protect surface resources, taking into account technological advancements. Some comments requested clarification about the need to revise the 1998 Northeast IAP/EIS stipulations and wanted to know which stipulations would be changed. Many commentors said stipulations should provide adequate protection to wildlife and sensitive resources, as well as subsistence and cultural resources. Some comments also made suggestions for specific stipulations and operating procedures.

## 1.12  Draft Amended IAP/EIS Review and Public Comment

The Notice of Availability (NOA) of the Draft Amendment to the Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement (IAP/EIS) and the Announcement of Public Subsistence-Related Hearings Schedule was published in the Federal Register on June 9, 2004. The public comment period was originally scheduled from June 9, 2004, through August 8, 2004, however, it was extended through August 23, 2004. Public notices announcing the comment period and public hearings were placed in newspapers at or near locations where public meetings were held. These newspapers included the Arctic Sounder (August 8 and 15, and October 28, 2004) and Tundra Drums (August 12 and November 11, 2004). Public service announcements were broadcasted on radio station KBRW from July 27 through August 17, and during late October through November 2004. The BLM issued a press release on June 9, 2004, notifying the public that the Draft Amended IAP/EIS was available for public review, and the schedule for public comment and ANILCA 810 subsistence hearings. Notices were posted at public gathering places in Nuiqsut, Barrow, Anaktuvuk Pass, and Atqasuk, all located on the North Slope of Alaska, and Bethel, Alaska, located on the Yukon Delta. Information on the Draft Amended IAP/EIS was also posted on the interactive website (http://nenpra.ensr.com). The public was able to access the website to download a copy of the Draft Amended IAP/EIS and provide their comments (including attachments). Comments and attachments posted to the website were incorporated into a database for later analysis by the core planning team.

## 1.13  Hearings

Public hearings and subsistence hearings were held in Anchorage on June 28, Fairbanks on June 29, Washington D.C. on July 1, Anaktuvuk Pass on August 3 and November 8, Nuiqsut on August 9 and December 1, Atqasuk on August 10 and November 4, Barrow on August 12 and November 5, and Bethel on August 17 and November 11, for the BLM to provide an overview of the alternatives and to take public comments and subsistence testimony. Over 214,000 comments were received on the Draft Amended IAP/EIS. These included letters, electronic mail, facsimiles, comments and attachments posted to the project website, and comments provided at the public

**Exhibit 42, page 19 of 300**

# CHAPTER 2
# ALTERNATIVES

Exhibit 42, page 20 of 300

## CHAPTER 2

# ALTERNATIVES

## 2.1  Introduction

This chapter presents four alternative approaches to achieving the purposes of this amendment to the 1998 Northeast National Petroleum Reserve – Alaska IAP/EIS. These alternatives present a range of actions in terms of the amount of additional lands in the Planning Area that would be opened to oil and gas leasing, and the types of mitigation measures (prescriptive-based or performance-based) that would be taken to protect surface resources within the Planning Area from the impacts of oil and gas development.

## 2.2  Formulation of the Alternatives

An interdisciplinary team consisting of BLM staff from the Alaska State and Northern Field Office, with additional input from other federal and state agencies, and affected communities on the North Slope of Alaska, assisted in the development of the alternatives for consideration in this Final Amended IAP/EIS. Additional input was obtained from 1) the public through a scoping process; 2) from comments on the Draft Amended IAP/EIS, with meetings held in key communities within and adjacent to the Planning Area, as well as in Anchorage and Fairbanks, and Bethel, Alaska, and in Washington D.C.; and 3) from public comments received during ANILCA 810 hearings held in key communities within and adjacent to the Planning Area, and Bethel, Alaska, concerning the potential impacts of the various alternatives on subsistence resources and activities. A full description of the scoping process is included in the *Public Scoping Summary Report for the Amendment to the Northeast National Petroleum Reserve – Alaska Integrated Activity Plan/Environmental Impact Statement* (ENSR 2004). A discussion of other management proposals considered during preparation of the Final Amended IAP/EIS is in Section 2.4.2, Other Management Recommendations.

As explained in Section 1.3.1 regarding the purpose and need for this amendment, the BLM began a planning process to amend the 1998 Northeast IAP/EIS Record of Decision. Three alternatives were developed for and evaluated in the Draft Amended IAP/EIS.

The ROD from the 1998 Northeast IAP/EIS provides the basis for Alternative A, which is the No Action Alternative. This alternative makes 4 million of the approximately 4.6 million acres within the Planning Area available for oil and gas leasing (Map 2-1), and utilizes 79 prescriptive-based stipulations to provide protection of environmental, cultural, and subsistence resources.

Alternative B makes approximately 4,387,000 acres (95% of the Planning Area) available for oil and gas leasing (approximately 387,000 more acres than under the No Action Alternative; Map 2-2), and utilizes performance-based stipulations and required operating procedures (ROPs) patterned after those developed for the Northwest IAP/EIS ROD to provide greater flexibility to the BLM in providing protection for environmental, cultural, and subsistence resources. This modification in mitigation measures, from prescriptive-based stipulations toward adaptive-management concepts and performance-based standards, would assist in ensuring that performance-based mitigations in the form of general and site specific stipulations and ROPs were applied consistently across the Northeast and Northwest National Petroleum Reserve – Alaska. These performance-based mitigations would allow the BLM to implement adaptive management principles, recognizing that knowledge about natural resource systems is sometimes uncertain and changing.

Alternative C makes approximately 4,600,000 acres (100 percent of the Planning Area; approximately 600,000 more acres than under the No Action Alternative) available for oil and gas leasing (Map 2-3). Alternative C also utilizes the same performance-based stipulations and ROPs as developed for Alternative B.

**Exhibit 42, page 21 of 300**

## ALTERNATIVES

A fourth alternative, Alternative D, the Agency's final Preferred Alternative, was developed by the BLM based on public comments received on the Draft Amended IAP/EIS and ANILCA 810 subsistence hearings. This alternative makes approximately 4,389,000 acres (95 percent of the Planning Area) available for oil and gas leasing (approximately 389,000 more acres than under the No Action Alternative; Map 2-4). Under Alternative D, Teshekpuk Lake (approximately 211,000 acres) is deferred from leasing; this deferral would preclude exploratory drilling and pipeline construction, and current leases would not be affected by the deferral. Alternative D also utilizes the same performance-based stipulations and ROPs developed for alternatives B and C. In addition, three new stipulations are proposed for the final Preferred Alternative, and additions, deletions, and edits have been made to the proposed performance-based mitigations designed for alternatives B and C that would apply to the final Preferred Alternative and would increase protection to surface resources throughout the Planning Area. The additional stipulations and changes would prohibit permanent oil and gas facilities (No Surface Occupancy; NSO), on approximately 374,000 acres, although pipelines and publicly-funded community roads would be allowed in this area. Exploration activities would be allowed within this NSO, including seismic acquisition and exploratory drilling. These stipulations would protect calving, post-calving, insect-relief, and migration habitat for caribou and molting habitat for geese. Finally, a new site-specific stipulation would establish a maximum limit of 300 acres of permanent surface disturbance from oil and gas activities within each of seven lease tracts identified north of Teshekpuk Lake. Theses seven lease tracts range in size from approximately 46,000 acres to 59,000 acres.

As required by 43 CFR 2361.1, each of the four alternatives proposed through this amendment process, using protective stipulations and ROPs, contains measures to mitigate or avoid unnecessary surface disturbance and minimize ecological disturbance throughout the Planning Area to the extent consistent with the purposes of the NPRPA for the exploration of the Planning Area. Also, each alternative presents a different approach to providing maximum protection to surface resources within two designated Special Areas in the Planning Area—the Teshekpuk Lake Special Area and the Colville River Special Area (Map 1-3). The Teshekpuk Lake Special Area was designated primarily to protect important nesting, staging, and molting habitat for a large number of waterfowl. The area also provides important habitat for caribou and is an important subsistence use area. Section 104(b) of the NPRPA of 1976 [42 USC § 6504 (b)] states that any exploration within the Teshekpuk Lake Area shall be conducted in a manner which will assure maximum protection of significant surface values "….to the extent consistent with the requirements of this Act [NPRPA] for the exploration of the reserve." Public Law 96-514 of December 12, 1980, amended the NPRPA authorizing oil and gas leasing in the Reserve, and as codified in 42 USC 6508 stated "There shall be conducted, not withstanding any other provision of law and pursuant to such rules and regulations as the Secretary may prescribe, an expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve in Alaska, provided that (1) activities undertaken pursuant to this section shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse affects on the surface resources of the National Petroleum Reserve in Alaska..."

The Colville River Special Area, a third of which is in the Planning Area, was created to protect the Arctic peregrine falcon, which at that time was an endangered species. Provisions in the NPRPA require that any oil and gas exploration or development within a special area "shall be conducted in a manner which will assure the maximum protection of such surface resources to the extent consistent with the requirements of [the] Act for the exploration of the reserve" (42 USC § 6504[b], 6508).

In the No Action Alternative, maximum protection of the Teshekpuk Lake Special Area was provided by making an extensive portion (approximately 600,000 acres) of the area in and near Teshekpuk Lake unavailable for oil and gas leasing. In addition, under this alternative, No Surface Activity restrictions are imposed on approximately 250,000 acres of additional lands. (No Surface Activity; Map 2-1). The BLM also identified specific stipulations to protect caribou in the Teshekpuk Lake Special Area (see Special Caribou Stipulations Area Stipulations 25, 33, 36, and 49 in Appendix E).

For the Colville River Special Area under the No Action Alternative, no permanent oil and gas facilities, except pipeline crossings, would generally be allowed within 1 mile of the west bluff (or bank if there is no bluff) along that portion of the Colville River (Stipulation 39). For the Kikiakrovak and Kogosukruk rivers, also within the Colville River Special Area, no permanent oil and gas surface facilities, except essential transportation crossings, would be

**Exhibit 42, page 22 of 300**

allowed within 1 mile of the bluff (or bank if there is no bluff; Stipulation 39). In addition, an area within 2 miles of the bluff on either side of these two rivers would receive special consideration within the consultation framework described in stipulations 61 and 62.

Under Alternative B, the BLM would provide protection of surface values in the Teshekpuk Lake Special Area and the Colville River Special Area. Protection of the Teshekpuk Lake Special Area would be provided by making much (approximately 213,000 acres) of the area northeast of Teshekpuk Lake unavailable for oil and gas leasing.

Under Alternative B, no permanent oil and gas facilities, except essential pipeline and road crossings, would generally be allowed within 1 mile of the west bluff (or bank if there is no bluff) along that portion of the Colville River within that portion of the Planning Area within the Colville River Special Area (Lease Stipulation K-7). For the Kikiakrovak and Kogosukruk rivers, also within the Colville River Special Area, no permanent oil and gas surface facilities, except essential pipeline and road crossings, would be allowed within 1 mile of the bluff (or bank if there is no bluff; Lease Stipulation K-1.d). If necessary to construct permanent facilities within the Colville River Special Area, all reasonable and practicable efforts would be made to locate permanent facilities as far from raptor nests as feasible. Within 15 miles of raptor nests, substantial alteration of high quality raptor foraging habitat would be prohibited unless the lessee can demonstrate on a site-specific bases, that impacts would be minimal or it is determined that there is no feasible or prudent alternative.

Under Alternative C, the protections for the Teshekpuk Lake Special Area and Colville River Special Area are the same as for Alternative B, except that the 213,000 acres unavailable for leasing under Alternative B would be available under Alternative C.

Under Alternative D, the final Preferred Alternative, the protections for the Teshekpuk Lake Special Area and Colville River Special Area are different from alternatives A, B, and C as follows:

- Teshekpuk Lake (approximately 211,000 acres) would be deferred from leasing; this deferral would preclude exploratory drilling, however, current leases would not be affected by the deferral.

- Three additional stipulations (K-9, K-10, and K-11) would provide additional protection in the Teshekpuk Lake Special Area by prohibiting permanent oil and gas facilities, except (where applicable) pipelines and publicly-funded community roads, on approximately 217,000 acres north of Teshekpuk Lake, on 16,000 acres east of Teshekpuk Lake (where pipelines and roads would not be permitted), and on 141,000 acres southeast of Teshekpuk Lake, except pipelines and publicly-funded community roads.

- Exploration activities would be allowed within these NSOs, including seismic acquisition and exploratory drilling.

- These stipulations would protect calving, post-calving, insect-relief, and migration habitat for caribou, as well as molting habitat for geese.

- A new stipulation would establish a maximum limit of 300 acres of permanent surface disturbance from oil and gas activities (no exceptions would be permitted in this area) within each of seven lease tracts identified north of Teshekpuk Lake in the Teshekpuk Lake Special Area and the Goose Molting Area.

## 2.2.1    Areas with Additional Protections

Each alternative identifies areas with exceptionally important surface resources. These areas are not in themselves administrative or legislative designations, and they carry with them no new regulatory authority. They simply are areas that the BLM has identified, through the planning process, where resource concerns exist that may require consideration of special protections. These spatially defined "protection areas" were referred to as Land Use Emphasis Areas, or LUEAs, in the 1998 Northeast IAP/EIS ROD. In developing the final Preferred Alternative for this amendment, the concept of identifying key resource or "protection areas" remains, but the term LUEA is no longer used. The "protection areas" used for the final Preferred Alternative were also modified to some degree if a more logical organization was identified. For example, in the 1998 Northeast IAP/EIS, the Fish Habitat LUEA

**Exhibit 42, page 23 of 300**

### 2.2.1.5    Teshekpuk Lake Caribou Habitat Area

The Teshekpuk Lake Caribou Habitat Area includes suitable habitats in the Teshekpuk Lake region that are essential for all season use by caribou, including calving and rearing, insect-relief, and migration. Caribou of the Teshekpuk Lake Herd calve from late May to mid-June. Studies show that the main areas for calving can shift somewhat within the broad area, with concentrations occurring in several different locations around the lake from year to year (see Section 3.3.7.1; Terrestrial Mammals). For the remainder of the summer, areas of shorelines, barren dunes, and ridges can provide relief from intense insect harassment, which can affect caribou energy budgets and productivity of cows. The land between Teshekpuk Lake and the Beaufort Sea from the Ikpikpuk River to the Kogru River are particularly valuable for this purpose.

### 2.2.1.6    Coastal Area

The Coastal Area includes those areas within ¾ miles of the Beaufort Sea, extending from the western portion of the Planning Area just east of Smith Bay, to the Colville River Delta, including the Kogru River. The Coastal Area is important for caribou movement within coastal insect-relief areas, and for preventing contamination of marine waters, loss of important bird habitat, alteration or disturbance of shoreline marshes, and impacts to subsistence resources activities.

### 2.2.1.7    Colville River Special Area

The Colville River Special Area extends from the eastern boundary of the Planning Area to roughly 5 to 12 miles west or northwest of the bluffs of the Colville River, from approximately Ocean Point to the southern end of the Planning Area and 2 miles on either side of the Kogosukruk and Kikiakrorak rivers and tributaries of the Kogosukruk River. The lower two-thirds of the Colville River support the highest concentrations of raptors, passerines, and moose on Alaska's North Slope. More than half of the known peregrine, gyrfalcon, and rough-legged hawk territories along this reach are in the Planning Area. Overall, the population of peregrine falcons has increased since its low in 1973, when it was listed as endangered under the ESA. The species has since been de-listed, and population levels should be maintained if the peregrine is to remain off the list. The raptors nest on bluffs adjacent to the river and are sensitive to disturbance.

### 2.2.1.8    Pik Dunes

The Pik Dunes are located in the extreme southcentral part of the Teshekpuk Lake Special Area. This area was added to the Teshekpuk Lake Special Area in 1999 as a result of the 1998 Northeast IAP/EIS ROD. The dunes complex occupies roughly 15 square miles, with a maximum north/south extent of 5½ miles, and a maximum east/west extent of 5 miles. The Pik Dunes, which form a basin containing five lakes, are part of a larger dune area that has been stabilized and or vegetated for at least several thousand years. The Pik Dunes are unique, because they are still exposed and active. Beyond their geologic and scenic uniqueness, the dunes provide: 1) insect-relief habitat for caribou, 2) habitat for several uncommon plant species, and 3) data critical to understanding major climatic fluctuations over the last 12,000 years.

### 2.2.1.9    Caribou Movement Corridor Area

The Caribou Movement Corridor Area extends for approximately 4 miles from the eastern shore of Teshekpuk Lake towards the Kogru Inlet. This area is approximately 16,000 acres and has been identified as important for caribou movement during the calving and insect-relief seasons. The area is a relatively narrow passage between Teshekpuk Lake and the Kogru Inlet that has many smaller lakes, and has been identified as a "bottleneck" to caribou north/south movement.

**Exhibit 42, page 24 of 300**

ALTERNATIVES

### 2.2.1.10    Southern Caribou Calving Area

The Southern Caribou Calving Area is found south/southeast of Teshekpuk Lake and is approximately 141,000 acres. This area provides important caribou calving, post-calving, and insect-relief habitat.

### 2.2.1.11    Lease Tracts Area

The Lease Tracts Area is found north of Teshekpuk Lake. This area would be delineated into seven large lease tracts that would range in size from approximately 46,000 to 59,000 acres. This area provides important caribou calving, post-calving, insect-relief habitat, and sensitive goose molting habitat.

## 2.3   Description of the Alternatives

The four alternatives developed for the Amended IAP/EIS differ in two important areas: 1) the amount of land that would be made available for oil and gas leasing, and 2) the types of mitigation (lease stipulations and ROPS) that would be used to protect surface resources (Table 2-1). The following sections discuss these elements in more detail for each alternative. In addition, two tables (Tables 2-2 and 2-3) found at the end of this chapter are used to compare the mitigations and their effectiveness, for each alternative, and to describe the likely effects of actions taken under each alternative.

### 2.3.1   Alternative A – No Action Alternative

Alternative A is the No Action Alternative and is comprised of decisions established in the ROD for the 1998 Northeast IAP/EIS. The decisions described in this alternative constitute the existing management practices of the Northeast National Petroleum Reserve – Alaska.

Under this alternative, approximately 87 percent (4 million acres) of the Planning Area's approximately 4.6 million acres would be available for oil and gas leasing (Map 2-1). Management practices would emphasize prescriptive-based stipulations on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence use areas, and other resources. The prescriptive-based stipulations developed for this alternative in the 1998 Northeast IAP/EIS ROD are listed in Appendix E. Appendix F (Standardized Stipulations Applied to Mitigate the Impacts of Non-Oil and Gas Authorizations), lists stipulations that apply to all non-oil and gas related activities conducted for the No Action and action alternatives. Table 2-2, found at the end of this chapter, compares and evaluates the effectiveness of the prescriptive-based stipulations developed for this alternative with the performance-based stipulations and ROPs developed for alternatives B, C, and D.

### 2.3.2   Alternative B

Alternative B makes available approximately 95 percent (4,387,000 acres) of the Planning Area's approximately 4.6 million acres for oil and gas leasing (Map 2-2). Management practices would emphasize performance-based stipulations and ROPs on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence use areas, and other resources. In addition, approximately 213,000 acres would be unavailable for oil and gas leasing, to provide for protection of wildlife and subsistence resources.

Performance-based stipulations and ROPs (patterned after those developed for the northwest portion of the National Petroleum Reserve – Alaska) would be used to mitigate the impacts of energy development and other land uses throughout the Planning Area. These mitigation measures would provide BLM greater flexibility to adapt management decisions to changing and uncertain environmental conditions on the ground. These restrictions are presented in Section 2.6.3 (Alternative B and Alternative C Stipulations and Required Operating Procedures) and pertain to these activities:

**Exhibit 42, page 25 of 300**

- Rivers Area (see Lease Stipulation K-1)

- Deep Water Lakes (see Lease Stipulation K-2)

- Teshekpuk Lake (see Stipulation K-3)

- Goose Molting Area (see Lease Stipulation K-4)

- Teshekpuk Lake Caribou Habitat Area (see Lease Stipulation K-5)

- Coastal Area (see Stipulation K-6)

- Colville River Special Area (see Lease Stipulation K-7)

- Pik Dunes (see Lease Stipulation K-8)

## 2.3.4    Alternative D – Preferred Alternative

Alternative D, the final Preferred Alternative, makes available approximately 95 percent (approximately 4,389,000 acres) of the Planning Area's 4.6 million acres for oil and gas leasing (Map 2-4). Management practices would emphasize performance-based stipulations and ROPs on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence use areas, and other resources. Under the final Preferred Alternative, Teshekpuk Lake (approximately 211,000 acres) would be deferred from leasing. This deferral would preclude exploratory drilling and pipeline construction. Current leases are not affected by the deferral.

The final Preferred Alternative makes available approximately 389,000 acres that were unavailable in the 1998 ROD. The additional lands made available by the final Preferred Alternative are within the area of highest oil and gas potential in the Northeast Planning Area, and are within the Teshekpuk Lake Special Area (TLSA). However, several major protective measures have been developed to protect important resources and subsistence activities in the TLSA:

- Areas north of Teshekpuk Lake that are important for molting black brant and other sensitive waterfowl would be protected with a No Surface Occupancy (NSO) stipulation (approximately 217,000 acres). Lakes and adjacent lands identified as important habitat for molting geese and other waterfowl would be included in the NSO area. Because many of these lakes are in very close proximity, the buffer areas around the lakes often overlap resulting in the NSO area depicted by Map 2-4. In addition to providing protection to molting geese and other waterfowl, this restriction would also provide protection for caribou calving, and insect-relief habitats. While providing necessary protections to key resources, this stipulation would allow for exploration of the region. Within the NSO area(s), permanent oil and gas facilities would be prohibited, but pipelines and inter-community or other permanent roads constructed with public funds for general transportation purposes would be allowed. Exploration activities would be allowed within the NSO, including seismic acquisition and exploratory drilling during the winter season only. See Lease Stipulation K-4 in Section 2.6.4 (Alternative D Stipulations and Required Operating Procedures).

- The area extending from the eastern shore of Teshekpuk Lake approximately 4 miles eastward towards the Kogru Inlet would be protected with a NSO stipulation (approximately 16,500 acres). This area has been identified as important for caribou movement during the calving and insect-relief seasons. The area is a relatively narrow passage between the Teshekpuk Lake and Kogru Inlet that is inundated with many smaller lakes, and has been identified as a "bottleneck" to caribou north/south movement. Within the NSO area, permanent oil and gas facilities would be prohibited, including pipelines and inter-community public access roads. Exploration activities would be allowed within this NSO including seismic acquisition and exploratory drilling during the winter season only. See Lease Stipulation K-9 in Section 2.6.4 (Alternative D Stipulations and Required Operating Procedures).

- The area south/southeast of Teshekpuk Lake would be protected with a NSO stipulation (approximately 141,000 acres). This area, in addition to areas north of Teshekpuk Lake, has been identified as important to caribou calving, post-calving, and insect relief. Within the NSO area, permanent oil and gas facilities would be prohibited, excluding pipelines and inter-community public access roads. Exploration activities would be

**Exhibit 42, page 26 of 300**

ALTERNATIVES
_____

allowed within this NSO, including seismic acquisition and exploratory drilling during the winter season only. See Lease Stipulation K-10 in Section 2.6.4 (Alternative D Stipulations and Required Operating Procedures).

- The area north of Teshekpuk Lake would be delineated into seven large lease tracts. These tracts would range from 46,000 to 59,000 acres. Each tract would establish a maximum limit of 300 acres of permanent surface disturbance resulting from oil and gas activities. The total allowed surface disturbance in the Lease Tract Area would be approximately 2,100 acres. See Lease Stipulation K-11 in Section 2.6.4 (Alternative D Stipulations and Required Operating Procedures).

Performance-based stipulations and ROPs (patterned after those developed for the northwest portion of the National Petroleum Reserve – Alaska) would be used to mitigate the impacts of energy development and other land uses throughout the Planning Area. These mitigation measures would provide BLM greater flexibility to adapt management decisions to changing and uncertain environmental conditions on the ground. These restrictions are presented in Section 2.6.4 (Final Preferred Alternative [Alternative D] Stipulations and Required Operating Procedures) and pertain to the following activities:

- Waste Prevention Handling, Disposal, Spills, and Public Safety

- Water Use for Permitted Activities

- Winter Overland Moves and Seismic Work

- Oil and Gas Exploratory Drilling

- Facility Design and Construction

- Use of Aircraft for Permitted Activities

- Oilfield Abandonment

- Subsistence Consultation for Permitted Activities

- Orientation Programs Associated with Permitted Activities

- Endangered Species Act Section 7 Consultation Process

Additional seasonal and spatial restrictions are applied to provide protection of specific environmentally sensitive areas. These areas are described in Section 2.2.1 (Areas with Additional Stipulations) and in the stipulations outlined in Section 2.6.4.2 (Stipulations That Apply to Biologically Sensitive Areas). These stipulations would also apply to the approximately 389,000 acres that are unavailable for leasing under the No Action Alternative, but would be made available under the final Preferred Alternative. Environmentally sensitive areas and their applicable stipulations are listed below.

- Rivers Area (see Lease Stipulation K-1)

- Deep Water Lakes (see Lease Stipulation K-2)

- Teshekpuk Lake (see Stipulation K-3)

- Goose Molting Area (see Lease Stipulation K-4)

- Teshekpuk Lake Caribou Habitat Area (see Lease Stipulation K-5)

- Coastal Area (see Stipulation K-6)

- Colville River Special Area (see Lease Stipulation K-7)

- Pik Dunes (see Lease Stipulation K-8)

- Caribou Movement Corridor Area (see Lease Stipulation K-9)

**Exhibit 42, page 27 of 300**

- Southern Caribou Calving Area (see Lease Stipulation K-10)
- Lease Tracts Area (see Lease Stipulation K-11)

## 2.4    Alternatives Considered but Eliminated from Detailed Analysis

### 2.4.1    Alternatives Considered in the 1998 Northeast IAP/EIS

Some commenters proposed that various alternatives from the 1998 Northeast IAP/EIS be analyzed in the Amended IAP/EIS. The scope of the proposed amendment is limited, however, to two specific objectives, Specifically, the purpose of the amendment is to consider: (1) leasing lands currently closed to oil and gas leasing in the Planning Area, and (2) developing performance-based measures to provide greater flexibility to the BLM in protecting important surface resources from the impacts of oil and gas activities. Three of the alternatives in the 1998 Northeast IAP/EIS (alternatives A, B, and C, which would allow 0, 53, and 72 percent of the lands to be leased, respectively), would make less land available for oil and gas leasing than is currently open for leasing under the No Action Alternative (which allows 87 percent of the lands to be leased) in the Amended IAP/EIS. As a result, alternatives A, B, and C in the 1998 Northeast IAP/EIS would not serve the purpose of the proposed amendment to consider increasing the amount of lands available for leasing and, thus, are outside the scope of the proposed amendment. For this reason, they were considered, but eliminated, from detailed analysis in this Amended IAP/EIS.

Alternatives D and E in the 1998 Northeast IAP/EIS are within the range of alternatives already considered and analyzed in detail in the proposed amendment. Alternative D (which would allow leasing on 90 percent of lands in the Planning Area), is nearly identical to Alternative A (the No Action Alternative) in the Amended IAP/EIS, as it would make only slightly more lands available for leasing in the Planning Area than is currently allowed under the No Action Alternative and would apply the same prescriptive-based mitigation measures. Alternative E in the 1998 Northeast IAP/EIS, which would open up all lands in the Planning Area to leasing, is identical to Alternative C in the Amended IAP/EIS, except Alternative E would apply prescriptive-based rather than performance-based stipulations. Alternative E, therefore, merely combines different elements of alternatives A and C already considered in the Amended IAP/EIS. As they are not significantly different from the existing alternatives analyzed in the Amended IAP/EIS, alternatives D and E from the 1998 Northeast IAP/EIS were considered, but eliminated, from analysis in the Amended IAP/EIS.

### 2.4.2    Other Management Recommendations

During scoping, the public suggested that alternatives be developed that opened more, or less, of the Planning Area to oil and gas leasing. Other comments suggested different approaches to resource protection, including providing more, or less, protection than what was afforded under the proposed alternatives. As discussed in Chapter 1 (Introduction), the BLM is amending the 1998 Northeast IAP/EIS to consider leasing lands currently closed to oil and gas leasing, and to develop performance-based measures to protect surface resources from oil and gas development. Alternatives that are evaluated in this amendment present a range of actions in terms of the amount of the Planning Area that would be open to oil and gas leasing, and types of measures (prescriptive-based and performance-based) that would be taken to protect surface resources within the Planning Area from the impacts of oil and gas development.

During the comment period on the Draft Amended IAP/EIS, the USFWS submitted a proposal that would leave approximately 296,000 acres northeast of Teshekpuk Lake unavailable to oil and gas leasing. The full text of the agency's letter can be read on the CD included with this document (see Comment Number 197619; U.S. Fish and Wildlife Service at Anchorage). This is an increase of 83,000 and 85,000 acres that would be made unavailable for leasing as compared to Alternative B (Preferred Alternative in Draft Amended IAP/EIS; 213,000 acres unavailable for leasing; Map 2-2), and the final Preferred Alternative (Alternative D; 211,000 acres in Teshekpuk Lake unavailable for leasing; Map 2-4), respectively. The USFWS believes their proposal would provide additional protection for molting brant and other wildlife.

Exhibit 42, page 28 of 300

development proposals to further its conservation and management objective to avoid BLM-approved activities that will contribute to the need to list such a species or their habitat. The BLM may require modifications to or disapprove a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. The BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 USC § 1531 et seq., including completion of any required procedure for conference or consultation.

### 2.6.4.2    Stipulations That Apply in Biologically Sensitive Areas

In addition to the stipulations and ROPs developed to protect surface resources throughout the Planning Area, the BLM has identified eleven additional stipulations in this section that would specifically apply to biologically sensitive areas. Two of these stipulations (Rivers Area [Lease Stipulation K-1] and Deep Water Lakes [K-2]) would apply to biologically sensitive rivers and lakes throughout the Planning Area.

The other nine stipulations were developed to ensure that the BLM would comply with the provisions of the NPRPA that require any oil and gas exploration or development within a special area to "be conducted in a manner which will assure the maximum protection of such surface resources to the extent consistent with the requirements of [the] Act for the exploration of the reserve" (42 USC § 6504[b], 6508). In addition, oil and gas activities must include or provide for "conditions, restrictions, and prohibitions as the Secretary [of the Interior] deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve – Alaska (42 USC § 6508[1]). Stipulations K-3 through K-8 would ensure that the BLM fulfills these statutory mandates in this amendment by providing special protections in the Teshekpuk Lake Special Area and Colville River Special Area. Specifically, Stipulation K-3 would ensure that exploration and development activities do not conflict with traditional subsistence users, historic travel routes, or fish and wildlife resources. Lease Stipulation K-4 would minimize disturbance to molting geese and loss of goose molting, eider, and other waterfowl habitat on or near Teshekpuk Lake from oil and gas exploration and development activities. Lease Stipulation K-5 would provide similar types of protection to caribou and their habitats near the lake. Under Stipulation K-6, coastal areas within the Teshekpuk Lake Special Area would be afforded special protection to minimize alteration of caribou movement within caribou coastal insect-relief areas and to protect other coastal and marine resources. Lease Stipulation K-7 would prohibit permanent oil and gas facilities, except for essential pipeline and road crossings, near the Colville, Kikiakrovak, and Kogosukruk rivers within the Colville River Special Area to protect the rivers' natural features and raptor habitat. Lease Stipulation K-8 would prohibit most surface structures in the Pik Dunes to protect caribou insect-relief habitat and the geologic and scenic uniqueness of the dunes. Lease Stipulation K-9 would protect caribou movement in the area between Teshekpuk Lake and Kogru Inlet. Lease Stipulation K-10 minimizes disturbance to caribou calving habitat south and southeast of Teshekpuk Lake. Lease Stipulation 11 protects key surface resources by limiting surface disturbance within identified lease tracts.

*K-1 Lease Stipulation – Rivers Area* (identified in Section 2.2.1.1; Rivers Area)
<u>Objective</u>: Minimize the disruption of natural flow patterns and changes to water quality; the disruption of natural functions resulting from the loss or change to vegetative and physical characteristics of floodplain and riparian areas; the loss of spawning, rearing or over-wintering habitat for fish; the loss of cultural and paleontological resources; the loss of raptor habitat; impacts to subsistence cabin and campsites; the disruption of subsistence activities; and impacts to scenic and other resource values.

<u>Requirement/Standard</u>: Permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines, are prohibited in the streambed and adjacent to the rivers listed below at the distances identified. With the exception of the Ikpikpuk River, these setbacks are measured from the bank of the river as determined by the hydrology at the time of application. The standard setback is ½ mile (from the bank's highest high water mark) and increased to ¾ mile (from the bank's highest high water mark) where subsistence cabin and campsites are numerous. Along the Colville River and a portion of the Ikpikpuk a 1-mile (from the bank's highest high water mark) setback is required to protect important raptor habitat. On a case-by case basis, and in consultation with federal, state, and NSB regulatory and resource agencies (as appropriate, based on agency legal authority and jurisdictional responsibility), essential pipeline

**Exhibit 42, page 29 of 300**

ALTERNATIVES

and road crossings to the main channel will be permitted (unless noted otherwise) through setback areas. The above setbacks may not be practical within river deltas. In these situations, permanent facilities shall be designed to withstand a 200-year flood event.

a.  Colville River: a 1-mile setback from the northern bluff (or bank if there is no bluff) of the Colville River extending the length of that portion of the river located within the Planning Area. Note: The Planning Area excludes conveyed Native lands along the lower reaches of the Colville River. Development of road crossings intended to support oil and gas activities shall be consolidated with other similar projects and uses to the maximum extent possible. Note: This provision does not apply to intercommunity or other permanent roads constructed with public funds for general transportation purposes. This preserves the opportunity to plan, design, and construct public transportation systems to meet the economic, transportation, and public health and safety needs of the State of Alaska and/or communities within the National Petroleum Reserve – Alaska.

b.  Ikpikpuk River: a ¾-mile setback from each side of the centerline (1½ miles total) of the Ikpikpuk River extending from the mouth south to Section 19, Township 7 North, Range 11 West, U.M. (Umiat Meridian). From Section 19, Township 7 North, Range 11 West, U.M., to Section 4, Township 3 North, Range 12 West, U.M., a 1-mile setback is required. Beginning at Section 4, Township 3 North, Range 12 West, U.M., a ½-mile setback from the centerline (1 mile total) will be required to the confluence of the Kigalik River and Maybe Creek. Note: The setback distances only apply to the east bank where the Ikpikpuk River is the Planning Area boundary.

c.  Miguakiak River: a ½ mile (from the bank's highest high water mark) setback from the Migiuakiak River.

d.  Kikiakrorak and Kogosukruk Rivers: Note: The following discussion refers only to portions of the Kikiakrorak River downstream from Township 2 North, Range 4 West, U.M. and the Kogosukruk River (including the four tributaries off the southern bank) downstream from Township 2 North, Range 3 West, U.M. No permanent oil and gas surface facilities, except essential transportation crossings, would be allowed within 1 mile of the top of the bluff (or bank if there is no bluff) on either side of the rivers and several of the Kogosukruk River tributaries.

e.  Fish Creek: No permanent oil and gas surface facilities, except essential transportation crossings, would be allowed within 3 miles (from the bank's highest high water mark) of the creek downstream from the eastern edge of Section 31, Township 11 North, Range 1 East, U.M. or within ½ mile (from the bank's highest high water mark) of the creek farther upstream.

f.  Judy Creek (in the Planning Area): No permanent oil and gas surface facilities, except essential transportation crossings, would be allowed within ½ mile (from the bank's highest high water mark) of these waterbodies.

g.  Tingmiaksiqvik River (identified as the Ublutuoch River on USGS quadrangle maps): No permanent oil and gas surface facilities, except essential transportation crossings, would be allowed within ½ mile (from the bank's highest high waster mark) of this river from the eastern edge of Section 22, Township 8 North, Range 1 East U.M. (the western boundary of the Colville River Special Area) downstream to the confluence with Fish Creek.

*K-2 Lease Stipulation - Deep Water Lakes* (identified in Section 2.2.1.2; Deep Water Lakes)
Objective: Minimize the disruption of natural flow patterns and changes to water quality; the disruption of natural functions resulting from the loss or change to vegetative and physical characteristics of deep water lakes; the loss of spawning, rearing or over wintering habitat for fish; the loss of cultural and paleontological resources; impacts to subsistence cabin and campsites; and the disruption of subsistence activities.

**Exhibit 42, page 30 of 300**

Requirement/Standard: Generally, permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines, are prohibited on the lake or lakebed and within ¼ mile of the ordinary high water mark of any deep lake as determined to be in lake zone III (i.e., depth greater than 13 feet [4 meters]; Mellor 1985). On a case-by case basis, and in consultation with federal, state and NSB regulatory and resource agencies (as appropriate based on agency legal authority and jurisdictional responsibility), essential pipeline, road crossings, and other permanent facilities may be considered through the permitting process in these areas where the lessee can demonstrate on a site-specific basis that impacts would be minimal or if it is determined that there is no feasible or prudent alternative. Please see discussion regarding BLM's permitting/authorization process, Section 2.6.2.

*K-3 Stipulation - Teshekpuk Lake Shoreline* (identified in Section 2.2.1.3;
(Note: Under the Final Preferred Alternative Teshekpuk Lake would be deferred from additional oil and gas leasing)
Objective: Minimize the disruption of natural flow patterns and changes to water quality; the disruption of natural functions resulting from the loss or change to vegetative and physical characteristics of this large and regionally significant deep water lake; the loss of cultural and paleontological resources; impacts to subsistence cabins, campsites and associated activities; and to protect fish and wildlife habitat including important insect relief areas.

Requirement/Standard: Permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines, are prohibited within ¼ mile of the ordinary high water mark of Teshekpuk Lake – No Exceptions.

*K-4 Lease Stipulation - Goose Molting Area* (identified in Section 2.2.1.4; Goose Molting Area).
Objective: Minimize disturbance to molting geese and loss of goose molting habitat in and around lakes in the Goose Molting Area.

Requirement/Standard (General):
Within the Goose Molting Area no permanent oil and gas facilities, except for pipelines and publicly-funded community roads, would be allowed on the approximately 217,000 acres illustrated on Map 2-4. No exceptions will be considered.

Requirement/Standard (Exploration): In goose molting habitat area exploratory drilling shall be limited to temporary facilities such as ice pads, ice roads, ice airstrips, and temporary platforms, unless the lessee demonstrates that construction of permanent facilities (outside the identified Goose Molting No Surface Occupancy Areas) such as gravel airstrips, storage pads, and connecting roads is environmentally preferable (Also see Stipulation K-11 regarding allowable surface disturbance). In addition, the following standards will be followed for permitted activities:

    a.    From May 20 through August 20 exploratory drilling and associated activities are prohibited. The intent of this rule is to restrict exploration drilling during the period when geese are present.

    b.    Water extraction from any lake used by molting geese shall not alter hydrological conditions that could adversely affect identified goose-feeding habitat along lakeshore margins. Considerations will be given to seasonal use by operators (generally in winter) and geese (generally in summer), as well as recharge to lakes from the spring snowmelt.

    c.    Oil and gas exploration activities will avoid alteration (e.g., damage or disturbance of soils, vegetation, or surface hydrology) of critical goose-feeding habitat types along lakeshore margins (grass/sedge/moss), as identified by the AO in consultation with the USFWS.

    d.    Aircraft use (including fixed wing and helicopter) by oil and gas lessees and all other users shall be minimized, and possibly suspended, in and around Goose Molting Area lakes from May 20 through August 20 unless doing so would endanger human life or violate safe flying practices.

Requirement/Standard (Development): In Goose Molting Area, the following standards will be followed for permitted activities:

**Exhibit 42, page 31 of 300**

ALTERNATIVES

a. Major construction activities using heavy equipment (e.g., sand/gravel extraction and transport, pipeline and pad construction, but not drilling from existing production pads) shall be suspended within Goose Molting Area from May 20 through August 20, unless approved by the AO in consultation with the appropriate federal, state, and NSB regulatory and resource agencies. The intent of this rule is to restrict activities that would disturb molting geese during the period when geese are present.

b. Water extraction from any lakes used by molting geese shall not alter hydrological conditions that could adversely affect identified goose-feeding habitat along lakeshore margins. Considerations will be given to seasonal use by operators (generally in winter) and geese (generally in summer), as well as recharge to lakes from the spring snowmelt.

c. Oil and gas activities will avoid altering (i.e.., damage or disturbance of soils, vegetation, or surface hydrology) critical goose-feeding habitat types along lakeshore margins (grass/sedge/moss).

d. Permanent oil and gas facilities (including gravel roads, pads, and airstrips, but excluding pipelines) and material sites will be sited outside the identified NSO areas. Additional limits on development footprint apply, see Lease Stipulation K-11.

e. Between May 20 and August, 20 within the Goose Molting Area, oil and gas facilities shall incorporate features (e.g., temporary fences, siting/orientation) that screen/shield human activity from view of any Goose Molting Area lake, as identified by the AO in consultation with appropriate federal, state, and NSB regulatory and resource agencies.

f. Strategies to minimize ground traffic will be implemented from May 20 through August 20. These strategies may include limiting trips, use of convoys, different vehicle types, etc. to the extent practicable.

g. Aircraft use (including fixed wing and helicopter) within the Goose Molting Area ,by authorized users shall be restricted from May 20 to August 20 unless doing so would endanger human life or violate safe flying practices. Restrictions may include 1) limited to two round-trip flights/week, and 2) restricted to flight corridors to be established by the BLM after discussions with appropriate federal, state, and NSB regulatory and resource agencies. Note: This site-specific stipulation is not intended to restrict flights necessary to survey wildlife to gain information necessary to meet the stated objective of this stipulation. However, flights necessary to gain this information would be restricted to the minimum necessary to collect such data.

*K-5 Lease Stipulation - Teshekpuk Lake Caribou Habitat Area* (identified in Section 2.2.1.5; Teshekpuk Lake Caribou Habitat Area)
Objective: Minimize disturbance and hindrance of caribou, or alteration of caribou movements through portions the Teshekpuk Lake Caribou Habitat Area that are essential for all season use, including calving and rearing, insect-relief, and migration.

Requirement/Standard: In the Teshekpuk Lake Caribou Habitat Area the following standards will be applied to permitted activities:

a. Before authorization of construction of permanent facilities (outside NSO areas established in other stipulations), the lessee shall design and implement a study of caribou movement unless an acceptable study(s) has been completed within the last 10 years. The study shall include a minimum of 3 years of current data on caribou movements and the study design shall be approved by the AO and should provide information necessary to determine facility (including pipeline) design and location. Lessees may submit individual study proposals or they may combine with other lessees in the area to do a single, joint study for the entire Teshekpuk Lake Caribou Habitat Area. Study data may be gathered concurrently with other activities.

Exhibit 42, page 32 of 300

b.  Within the Teshekpuk Lake Caribou Habitat Area, lessees shall orient linear corridors when laying out oil field developments to the extent practicable, to address migration and corralling effects and to avoid loops of road and/or pipeline that connect facilities.

c.  Ramps over pipelines, buried pipelines, or pipelines buried under the road may be required by the AO, after consultation with appropriate federal, state, and NSB regulatory and resource agencies, in the Teshekpuk Lake Caribou Habitat Area where pipelines potentially impede caribou movement.

d.  The following ground-traffic restrictions shall apply to permanent oil and gas-related roads in the areas and time periods indicated:

1.  Within the Teshekpuk Lake Caribou Habitat Area, from May 20 through August 20, traffic speed shall not exceed 15 miles per hour when caribou are within ½ mile on the road. Additional strategies may include limiting trips, using convoys, using different vehicle types, etc., to the extent practicable.

2.  The lessee or a contractor shall observe caribou movement from May 20 through August 20. Based on these observations, traffic will be stopped temporarily to allow a crossing by 10 or more caribou. Sections of road will be evacuated when migrations of large numbers of caribou appears to imminent.

3.  Major equipment, materials, and supplies to be used at oil and gas work sites in the Teshekpuk Lake Caribou Habitat Area shall be stockpiled prior to or after the period of May 20 through August 20 to minimize road traffic during that period.

4.  Use of aircraft larger than a Twin Otter by authorized users of the Planning Area, including oil and gas lessees, from May 20 through August 20 within the Teshekpuk Lake Caribou Habitat Area, shall be for emergency purposes only.

5.  Fixed-wing aircraft takeoffs and landings by authorized users of the Planning Area shall be limited to an average of one round-trip flight per day from May 20 through June 20, at aircraft facilities within the Teshekpuk Lake Caribou Habitat Areas.

6.  Aircraft shall maintain a minimum height of 1,000 feet AGL (except for takeoffs and landings) over caribou winter ranges from October 1 through May 1, and 2,000 feet AGL over the Teshekpuk Lake Caribou Habitat Area from May 20 through August 20, unless doing so would endanger human life or violate safe flying practices.

*K-6 Stipulation - Coastal Area* (identified in Section 2.2.1.6; Coastal Area)
Objective: Minimize hindrance or alteration of caribou movement within caribou coastal insect-relief areas; to prevent contamination of marine waters; loss of important bird habitat; alteration or disturbance of shoreline marshes; and impacts to subsistence resources activities.

Requirement/Standard: In the Coastal Area, permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines established to support exploration and development activities shall be located at least ¾ mile inland from the coastline to the extent practicable. Where, as a result of technological limitations, economics, logistics, or other factors, a facility must be located within ¾ mile inland of the coastline, the practicality of locating the facility at previously occupied sites such as Camp Lonely, various Husky/USGS drill sites, and Distant Early Warning (DEW)-Line sites, shall be considered. Use of existing sites within ¾ mile of the coastline shall also be acceptable where it is demonstrated that use of such sites will reduce impacts to shorelines or otherwise be environmentally preferable. All lessees/permitees involved in activities in the immediate area must coordinate use of these new or existing sites with all other prospective users. Before conducting open water activities, the lessee shall consult with the Alaska Eskimo

**Exhibit 42, page 33 of 300**