Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| | **ORIENTATION PROGRAM** | |
| on how to avoid disturbance. Guidance shall include the production and distribution of information cards on endangered and/or threatened species in the planning area. The program shall be designed to increase sensitivity and understanding of personnel to community values, customs, and lifestyles in areas in which personnel will be operating. The orientation program shall also include information concerning avoidance of conflicts with subsistence, commercial fishing activities, and pertinent mitigation.<br><br>The program shall be attended at least once a year by all personnel involved in on-site exploration or development and production activities (including personnel of lessee's agents, contractors, and subcontractors) and all supervisory and managerial personnel involved in lease activities of the lessee and its agents, contractors, and subcontractors. Individual training is transferable from one facility to another except for elements of the training specific to a particular site.<br><br>Lessees shall maintain a record onsite of all personnel who attend the program for so long as the site is active, though not to exceed the 5 most recent years of operations. This record shall include the name and dates(s) of attendance of each attendee. | a. inform individuals working on the project of specific types of environmental, social, traditional and cultural concerns that relate to the region.<br>b. Address the importance of not disturbing archaeological and biological resources and habitats, including endangered species, fisheries, bird colonies, and marine mammals, and provide guidance on how to avoid disturbance.<br>c. Include guidance on the preparation, production, and distribution of information cards on endangered and/or threatened species.<br>d. Be designed to increase sensitivity and understanding of personnel to community values, customs, and lifestyles in areas in which personnel will be operating.<br>e. Include information concerning avoidance of conflicts with subsistence, commercial fishing activities, and pertinent mitigation.<br>f. Include information for aircraft personnel concerning subsistence activities and areas/seasons that are particularly sensitive to disturbance by low-flying aircraft. Of special concern is aircraft use near traditional subsistence cabins and campsites, flights during spring goose hunting and fall caribou and moose hunting seasons, and flights near North Slope communities.<br>g. Provide that individual training is transferable from one facility to another except for elements of the training specific to a particular site.<br>h. Include on-site records of all personnel who attend the program for so long as the site is active, though not to exceed the 5 most recent years of operations. This record shall include the name and dates(s) of attendance of each attendee.<br>i. Include a module discussing bear interaction plans to minimize conflicts between bears and | a. inform individuals working on the project of specific types of environmental, social, traditional and cultural concerns that relate to the region.<br>b. Address the importance of not disturbing archaeological and biological resources and habitats, including endangered species, fisheries, bird colonies, and marine mammals, and provide guidance on how to avoid disturbance.<br>c. Include guidance on the preparation, production, and distribution of information cards on endangered and/or threatened species.<br>d. Be designed to increase sensitivity and understanding of personnel to community values, customs, and lifestyles in areas in which personnel will be operating.<br>e. Include information concerning avoidance of conflicts with subsistence, commercial fishing activities, and pertinent mitigation.<br>f. Include information for aircraft personnel concerning subsistence activities and areas/seasons that are particularly sensitive to disturbance by low-flying aircraft. Of special concern is aircraft use near traditional subsistence cabins and campsites, flights during spring goose hunting and fall caribou and moose hunting seasons, and flights near North Slope communities.<br>g. Provide that individual training is transferable from one facility to another except for elements of the training specific to a particular site.<br>h. Include on-site records of all personnel who attend the program for so long as the site is active, though not to exceed the 5 most recent years of operations. This record shall include the name and dates(s) of attendance of each attendee.<br>i. Include a module discussing bear interaction plans to minimize conflicts between bears and |

Exhibit 42, page 99 of 300

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| **ORIENTATION PROGRAM** | | |
| Alternative A *Stipulation 63 and Alternatives B, C, and D ROP I-1* would be equally effective in reducing the impacts to **vegetation**; **birds**; **terrestrial mammals**; **endangered and threatened species**; and **subsistence** species and their users by making personnel involved in oil and gas activities more aware of the applicable stipulations and ROPs and their purpose. The stipulations should be equally effective in reducing disturbance to birds by providing all personnel with information concerning applicable required operating procedures and stipulations, and on the importance of not disturbing biological resources, habitats, and bird colonies. Personnel would be instructed annually on the required methods of handling garbage and waste which should help avoid the dumping of garbage and other wastes onto the tundra; impacts on **visual resources**, **wild and scenic river and wilderness**, should therefore be reduced, as well as make oil and gas sites less attractive for predators. Without this stipulation and ROP we would expect greater impacts on fish, birds, and terrestrial mammals and declines in outstandingly remarkable values for fish, wildlife and subsistence use. *Stipulation 63 and ROP I-1* would also reduce cultural conflicts as well as address potential **environmental justice** concerns by providing a cultural orientation program for all oil and gas workers involved in Planning Area activities in order to minimize cultural and resource conflicts with local inhabitants. Also, the stipulation would include information for aircraft personnel concerning subsistence activities and area/seasons that are particularly sensitive to disturbance by low flying aircraft. In addition to the training program required of all oil and gas workers, a module discussing bear interaction and minimizing conflicts between bears and humans would be included. | humans. | humans. |
| **TRADITIONAL LAND USE SITES** | | |
| 64. Lessees shall conduct an inventory of known traditional land use sites prior to any field activity. This inventory will be compiled from sites listed in the most current Traditional Land Use Inventory available from the NSB's Inupiat History, Language, and Cultural Commission, and shall be approved by the AO. Based on this inventory, the lessee shall develop a plan to avoid these sites and mitigate any potential damage that could result from field activities. The plan shall indicate how access to the site by local subsistence users will be provided. Lessees shall submit copies of the plan to BLM and the Subsistence Advisory Panel with any application for permit to drill. | *H-1 Required Operating Procedure as in No 26 above.* | *H-1 Required Operating Procedure as in No 26 above.* |
| 65. It is the responsibility of the authorized user to ensure that all individuals brought to the planning area under its auspices adhere to these stipulations. Authorized users of the planning area shall provide all employees, contractors, subcontractors, and clients with a briefing regarding stipulations applicable to the lease and/or permit. A copy of applicable stipulations will be posted in a conspicuous place in each work site and campsite. | *I-1 Required Operating Procedure as in No 63 above.* | *I-1 Required Operating Procedure as in No 63 above.* |
| Effectiveness of *Stipulations 64 and 65 and ROP H-1* shown in No. 26 above (Moderate). | | |

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| **TRADITIONAL LAND USE SITES** | | |
| Effectiveness of *Stipulations 64 and 65 and ROP 1-1* shown in No. 63 above (Moderate). | | |
| **OTHER ACTIVITIES** | | |
| 66. The authorized user shall protect all survey monuments and be responsible for survey costs if remuneration is required as a result of the user's actions. | Federal Law (18 USC 1858)** | Federal Law (18 USC 1858)** |
| *Stipulation 66 and Federal Law 18 USC 1858* would be equally effective in ensuring that survey monuments and bench marks are protected. According to 18 USC 1858, "Whoever willfully destroys, defaces, changes, or removes to another place any section corner, quarter-section corner, or meander post, on any Government line of survey, or willfully cuts down any witness tree or any tree blazed to mark the line of a Government survey, or willfully defaces, changes, or removes any monument or bench mark of any Government survey, shall be fined under this title or imprisoned not more than six months, or both" (High). | | |
| 67. All activities shall be conducted to avoid or minimize disturbance to vegetation. | *C-2 Required Operating Procedure as in No. 24 above.*<br>*D-2 Required Operating Procedure as in No. 27 above.*<br>*E-5 Required Operating Procedure as in No. 32 above.* | *C-2 Required Operating Procedure as in No. 24 above.*<br>*D-2 Required Operating Procedure as in No. 27 above.*<br>*E-5 Required Operating Procedure as in No. 32 above.* |
| Effectiveness of *Stipulation 67 and ROP C-2* shown in No. 24 above.<br>Effectiveness of *Stipulation 67 and ROP D-2* shown in No. 27 above.<br>Effectiveness of *Stipulation 67 and ROP E-5* shown in No. 32 above. | | |
| 68. The BLM, through the AO, reserves the right to impose closure of any area to operators in periods when fire danger or other dangers to natural resources are severe. | Federal Law (40 CFR 9212.2)** | Federal Law (40 CFR 9212.2)** |
| *Alternative A Stipulation 68 and Alternatives B, C, and D Federal Law 40 CFR 9212.2* would be equally effective, as *40 CFR 212.2* provides policy for BLM fire management activities and specifically states: "To prevent wildfire or facilitate its suppression, an authorized officer may issue fire prevention orders that close entry to, or restrict uses of, designated public lands" (High). | | |
| 69. The authorized user shall be financially responsible for any damage done by a wildfire caused by its operations. | Federal Law (4 CFR 103-104; 43 CFR 2920.1-2; 43 CFR 9212.1; 43 CFR 9212.4; 43 CFR 9239; BLM Fire Trespass Handbook H-9238)** | Federal Law (4 CFR 103-104; 43 CFR 2920.1-2; 43 CFR 9212.1; 43 CFR 9212.4; 43 CFR 9239; BLM Fire Trespass Handbook H-9238)** |
| *Alternative A Stipulation 69 and Alternatives B, C, and D Federal Law (4 CFR 103-104; 43 CFR 2920.1-2; 43 CFR 9212.1; 43 CFR 9212.4; 43 CFR 9239; BLM Fire Trespass Handbook H-9238)* would be equally effective in ensuring that the responsible party is financially responsible for any damage done by a wildlife. The *Federal Laws and BLM Handbook H-9238* identified above would complement *Stipulation 69* and would provide procedures for identifying and prosecuting the responsible party. | | |
| 70. Construction camps are prohibited on frozen lakes and river ice. Siting of construction camps on river sand and gravel bars is allowed and, where feasible, encouraged. Where leveling of trailers or modules is required and the surface has a vegetative mat, | *Required Operating Procedure A-5 as in No. 14 above.*<br>*Lease Stipulation E-2 as in No.41 above.* | *Required Operating Procedure A-5 as in No. 14 above.*<br>*Lease Stipulation E-2 as in No.41 above.* |

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| leveling shall be accomplished through blocking rather than use of a bulldozer. | | |
| Effectiveness of *Stipulation 70 and ROP A-5* shown in No. 14 above. Effectiveness of *Stipulation 70 and Lease Stipulation E-2* shown in No. 41 above. | OTHER ACTIVITIES | |
| 71. Use of pesticides without the specific authority of the AO is prohibited. | Federal Law** (unlikely that BLM would use pesticides in Planning Area) | Federal Law** (unlikely that BLM would use pesticides in Planning Area) |
| *Alternative A Stipulation 70 and Alternatives B, C, and D Federal Law* should provide the same benefit in reducing potential effects on **fish and fish habitat** from the improper use of pesticides. (Moderate) | | |
| 72. The feeding of wildlife by authorized users is prohibited. | Alaska Administrative Coded 5 AAC 92.230** | Alaska Administrative Code 5 AAC 92.230** |
| *Alternative A Stipulation 72 and Alternatives B, C, and D Alaska Administrative Code 5 AAC 92.230* are equally effective in prohibiting the feeding of wildlife. 5 AAC 92.230 applies to all activities in the Planning Area under all alternatives. Specifically, the law states: A person may not intentionally feed a moose (except under terms of a permit issued by the department), bear, wolf, coyote, fox, or wolverine, or negligently leave human food, pet food, or garbage in a manner that attracts these animals" (Moderate). | | |
| 73. Hunting and trapping by lessee's employees, agents, and contractors are prohibited when persons are on "work status." Work status is defined as the period during which an individual is under the control and supervision of an employer. Work status is terminated when the individual's shift ends and he/she returns to a public airport (e.g., Fairbanks, Barrow, Nuiqsut, or Deadhorse). Use of lessee facilities, equipment, or transport for personnel access or aid in hunting and trapping is prohibited. | *1-1 Required Operating Procedure as in No. 63 above.* | *1-1 Required Operating Procedure as in No. 63 above.* |
| Effectiveness of *Stipulations 64 and 65* shown in No. 63 above. | | |
| 74. Lessees shall conduct a cultural and paleontological resources survey prior to any ground-disturbing activity. Upon finding any potential cultural or paleontological resource, the lessee or their designated representative shall notify the AO and suspend all operations in the immediate area of such discovery until written authorization to proceed is issued by the AO. | *E-13 Required Operating Procedure*<br>Objective: Protect cultural and paleontological resources.<br>Requirement/Standard: Lessees shall conduct a cultural and paleontological resources survey prior to any ground-disturbing activity. Upon finding any potential cultural or paleontological resource, the lessee or their designated representative shall notify the AO and suspend all operations in the immediate area of such discovery until written authorization to proceed is issued by the AO.<br>Paleontological resource protection addressed in NEPA review of project. | *E-13 Required Operating Procedure*<br>Objective: Protect cultural and paleontological resources.<br>Requirement/Standard: Lessees shall conduct a cultural and paleontological resources survey prior to any ground-disturbing activity. Upon finding any potential cultural or paleontological resource, the lessee or their designated representative shall notify the AO and suspend all operations in the immediate area of such discovery until written authorization to proceed is issued by the AO.<br>Paleontological resource protection addressed in NEPA review of project. |

*Alternative A Stipulation 74 and Alternatives B, C, and D ROP E-13* would provide equal benefit in reducing potential impacts to **cultural and paleontological resources** by requiring surveys for these resources and authorization of the AO before conducting any ground-disturbing activities. Additionally, if the survey was to miss such resources and

ALTERNATIVES

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| **OTHER ACTIVITIES** ||| 
| they were discovered during construction, the AO must be notified and mitigation measures would be set in motion (High). |||
| 75. Petroleum exploration and production activities are prohibited within ½ mile of occupied grizzly bear dens, identified by the ADFG, unless alternative mitigation measures are approved by the AO in consultation with appropriate federal, state, and NSB regulatory and resource agencies. | *C-1 Required Operating Procedure*<br>Objective: Protect grizzly bear, polar bear, and marine mammal denning and/or birthing locations.<br>Requirement/Standard:<br>a. Cross-country use of heavy equipment and seismic activities is prohibited within ½ mile of occupied grizzly bear dens identified by the ADFG unless alternative mitigation measures are approved by the AO in consultation with the ADFG. | *C-1 Required Operating Procedure*<br>Objective: Protect grizzly bear, polar bear, and marine mammal denning and/or birthing locations.<br>Requirement/Standard:<br>a. Cross-country use of heavy equipment and seismic activities is prohibited within ½ mile of occupied grizzly bear dens identified by the ADFG unless alternative mitigation measures are approved by the AO in consultation with the ADFG. |
| *Alternative A Stipulation 75 and Alternatives B, C, and D - ROP C-1 would provide equal benefit in reducing potential impacts on **terrestrial mammals** by requiring avoidance of known grizzly bear dens. The ½ mile setback is thought to be sufficient to prevent disturbance to denning grizzly bears from seismic operations and other overland moves. The success of this ROP would be relative to the effort made to locate bear dens before initiating work (Moderate).* |||
| 76. Oil and gas lessees and their contractors and subcontractors will prepare and implement bear-interaction plans to minimize conflicts between bears and humans. These plans shall include measures to: (a) minimize attraction of bears to the drill sites; (b) organize layout of buildings and work areas to minimize human/bear interactions; (c) warn personnel of bears near or on drill sites and identify proper procedures to be followed; (d) if authorized, deter bears from the drill site; (e) provide contingencies in the event bears do not leave the site or cannot be deterred by authorized personnel; (f) discuss proper storage and disposal of materials that may be toxic to bears; and (g) provide a systematic record of bears on the site and in the immediate area. The lessee's shall develop educational programs and camp layout and management plans as they prepare their lease operations plans. These plans shall be developed in consultation with appropriate federal, state, and NSB regulatory and resource agencies and submitted to the AO. | *A-8 Required Operating Procedure*<br>Objective: Minimize conflicts resulting from interaction between humans and bears during leasing and associated activities.<br>Requirement: Oil and gas lessees and their contractors and subcontractors will, as a part of preparation of lease operation planning, prepare and implement bear-interaction plans to minimize conflicts between bears and humans. These plans shall include measures to:<br>a. Minimize attraction of bears to the drill sites.<br>b. Organize layout of buildings and work areas to minimize human/bear interactions.<br>c. Warn personnel of bears near or on drill sites and identify proper procedures to be followed.<br>d. Establish procedures, if authorized, to discourage bears from approaching the drill site.<br>e. Provide contingencies in the event bears do not leave the site or cannot be discouraged by authorized personnel.<br>f. Discuss proper storage and disposal of materials that may be toxic to bears.<br>g. Provide a systematic record of bears on the site and in the immediate area. | *A-8 Required Operating Procedure*<br>Objective: Minimize conflicts resulting from interaction between humans and bears during leasing and associated activities.<br>Requirement: Oil and gas lessees and their contractors and subcontractors will, as a part of preparation of lease operation planning, prepare and implement bear-interaction plans to minimize conflicts between bears and humans. These plans shall include measures to:<br>a. Minimize attraction of bears to the drill sites.<br>b. Organize layout of buildings and work areas to minimize human/bear interactions.<br>c. Warn personnel of bears near or on drill sites and identify proper procedures to be followed.<br>d. Establish procedures, if authorized, to discourage bears from approaching the drill site.<br>e. Provide contingencies in the event bears do not leave the site or cannot be discouraged by authorized personnel.<br>f. Discuss proper storage and disposal of materials that may be toxic to bears.<br>g. Provide a systematic record of bears on the site and in the immediate area. |

Exhibit 42, page 103 of 300

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| **OTHER ACTIVITIES** | | |
| *Alternative A Stipulation 76 and Alternatives B, C, and D - ROP A-8* would provide equal benefit in minimization of potential impacts to **terrestrial mammals** (grizzly bears) and **marine mammals** (polar bears) and to **recreation and wilderness** users of the area by requiring bear interaction plans that should avoid acclimatization of bears to human contact. The stipulation and ROP would benefit bears by reducing both the number of bears killed in "defense of life and property" and the number of bears becoming habituated to anthropogenic food sources (Moderate). | | |
| 77. Operators are encouraged to apply for a letter of authorization from the USFWS to conduct activities in polar bear denning areas. | *C-1b Required Operating Procedure as in No. 24 above.* | *C-1b Required Operating Procedure as in No. 24 above.* |
| *Effectiveness of Stipulation 77 and C-1b shown in No. 24 above.* | | |
| 78. Permanent structures, other than oil and gas facilities, are prohibited within 100 feet of the highest high water mark of the nearest body of water. | | |
| 79. Lessees shall use smokeless flares for handling routine conditions and use auxiliary smokeless flares for planned events that exceed the capacity of routine flares. Lessees shall use flares that meet the Federal New Source Performance design standards listed in 40 CFR 60.18. | Federal (Clean Air Act) and Alaska State Statute** | Federal (Clean Air Act) and Alaska State Statute** |
| *Alternative A Stipulation 79 and Federal (40 CFR 60.18) and State(18 AAC 50) regulations* should provide equal benefit in minimizing potential impacts to air quality by requiring the use of flares that meet the stated New Source Performance Standards for visible emissions from flares (High). | | |
| | **E-9 Required Operating Procedure** <br> *Objective:* Avoidance of human-caused increases in populations of predators of ground nesting birds. <br> *Requirement/Standard:* Lessee shall utilize best available technology to prevent facilities from providing nesting, denning, or shelter sites for ravens, raptors, and foxes. The lessee shall provide the AO with an annual report on the use of oil and gas facilities by ravens, raptors and foxes as nesting, denning, and shelter sites. | **E-9 Required Operating Procedure** <br> *Objective:* Avoidance of human-caused increases in populations of predators of ground nesting birds. <br> *Requirement/Standard:* Lessee shall utilize best available technology to prevent facilities from providing nesting, denning, or shelter sites for ravens, raptors, and foxes. The lessee shall provide the AO with an annual report on the use of oil and gas facilities by ravens, raptors and foxes as nesting, denning, and shelter sites. |
| *Alternative B, C, and D ROP E-9* should provide the same benefit in minimizing potential impacts to **birds, threatened and endangered species, and terrestrial mammals**, by requiring lessees to use the best technology to prevent facilities from becoming nesting or shelter sites for predators. Additional shelter or denning sites could result in an increased local predator population and consequent increased predation on other species. (Moderate) Alternative A has no direct counterpart (Low). | | |
| | **E-10 Required Operating Procedure** <br> *Objective:* Prevention of migrating waterfowl, including species listed under the Endangered Species Act, from striking oil and gas and related facilities during low light conditions. <br> *Requirement/Standard:* Except for safety lighting, | **E-10 Required Operating Procedure** <br> *Objective:* Prevention of migrating waterfowl, including species listed under the Endangered Species Act, from striking oil and gas and related facilities during low light conditions. <br> *Requirement/Standard:* Except for safety lighting, |

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| | **OTHER ACTIVITIES** | |
| | illumination of higher structures shall be designed to direct artificial exterior lighting inward and downward, rather than upward and outward. All drilling structures, production facilities, and other structures that exceed 20 feet in height shall be illuminated as outlined above. | illumination of higher structures shall be designed to direct artificial exterior lighting inward and downward, rather than upward and outward. All drilling structures, production facilities, and other structures that exceed 20 feet in height shall be illuminated as outlined above. |
| *Alternative B, C, and D ROP E-10* should provide the same benefit in minimizing potential impacts to **birds and threatened and endangered species, and terrestrial mammals**, by requiring lessees to apply lighting to structures in a manner that reduces bird collisions. Directing the lighting inward and downward is thought to reduce the attractiveness to birds and therefore reduce collisions. (Moderate) Alternative A stipulations have no direct counterpart. | | |
| | *E-11 Required Operating Procedure*<br>Objective: Minimize the take of species listed under the Endangered Species Act and minimize the disturbance of other species of interest from direct or indirect interaction with oil and gas facilities.<br>Requirement/Standard: In accordance with the guidance below, before the approval of facility construction, aerial surveys of breeding pairs of the following species shall be conducted within any area proposed for development.<br>Special Conditions in Spectacled and/or Steller's Eiders Habitats:<br>a. Surveys shall be conducted by the lessee for at least 3 years before authorization of construction, if such construction is within the USFWS North Slope eider survey area and at least 1 year outside that area. Results of aerial surveys and habitat mapping may require additional ground nest surveys. Spectacled and/or Steller's eider surveys shall be conducted following accepted BLM-protocol during the second week of June.<br>b. If spectacled and/or Steller's eiders are determined to be present within the proposed development area, the applicant shall consult with the USFWS and BLM in the design and placement of roads and facilities in order to minimize impacts to nesting and brood-rearing eiders and their preferred habitats. Such consultation shall address timing restrictions and other temporary mitigating measures, | *E-11 Required Operating Procedure*<br>Objective: Minimize the take of species listed under the Endangered Species Act and minimize the disturbance of other species of interest from direct or indirect interaction with oil and gas facilities.<br>Requirement/Standard: In accordance with the guidance below, before the approval of facility construction, aerial surveys of the following species shall be conducted within any area proposed for development.<br>Special Conditions in Spectacled and/or Steller's Eiders Habitats:<br>a. Surveys shall be conducted by the lessee for at least 3 years before authorization of construction, if such construction is within the USFWS North Slope eider survey area and at least 1 year outside that area. Results of aerial surveys and habitat mapping may require additional ground nest surveys. Spectacled and/or Steller's eider surveys shall be conducted following accepted BLM-protocol during the second week of June.<br>b. If spectacled and/or Steller's eiders are determined to be present within the proposed development area, the applicant shall consult with the USFWS and BLM in the design and placement of roads and facilities in order to minimize impacts to nesting and brood-rearing eiders and their preferred habitats. Such consultation shall address timing restrictions and other temporary mitigating measures, |

Exhibit 42, page 105 of 300

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| | **OTHER ACTIVITIES** | |
| | c. construction of permanent facilities, placement of fill, alteration of eider habitat, aircraft operations, and introduction of high noise levels. | c. construction of permanent facilities, placement of fill, alteration of eider habitat, aircraft operations, and introduction of high noise levels. |
| | c. To reduce the possibility of spectacled and/or Steller's eiders striking above ground utility lines (power and communication), such lines shall either be buried in access roads, or suspended on vertical support members, to the extent practical. Support wires associated with communication towers, radio antennas, and other similar facilities, shall be clearly marked along their entire length to improve visibility for low flying birds. Such markings shall be jointly developed through consultation with the USFWS. Overhead power and/or communication lines for oil and gas activities will be limited to the following circumstances. | c. To reduce the possibility of spectacled and/or Steller's eiders striking above ground utility lines (power and communication), such lines shall either be buried in access roads, or suspended on vertical support members, to the extent practicable. Support wires associated with communication towers, radio antennas, and other similar facilities, shall be clearly marked along their entire length to improve visibility for low flying birds. Such markings shall be jointly developed through consultation with the USFWS. |
| | | 1. Overhead power or communication lines may be allowed when located entirely within the boundaries of a facility pad; |
| | | 2. Overhead power or communication lines may be allowed when engineering constraints at the specific location make it unfeasible to bury or connect them to a vertical support member, or |
| | | 3. Overhead power or communication lines may be allowed when human safety would be compromised by other methods. (Note: This requirement standard would be Planning Area wide.) |
| | Special Conditions in Yellow-billed Loon Habitats: a. Aerial surveys shall be conducted by the lessee for at least 3 years before | Special Conditions in Yellow-billed Loon Habitats: a. Aerial surveys shall be conducted by the lessee for at least 3 years before |

Table 2-2. Continued.

| 1998 Northeast IAP/EIS Stipulations for the No Action Alternative | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for Alternative B and Alternative C | Comparable/Applicable Amended IAP/EIS Lease Stipulations and Required Operating Procedures for the Proposed Action |
|---|---|---|
| | **OTHER ACTIVITIES** | |
| | authorization of construction of facilities proposed for development which are within 1 mile of a lake 25 acres or larger in size. These surveys along shorelines of large lakes shall be conducted following accepted BLM protocol during nesting in late June and during brood rearing in late August.<br>b. Should yellow-billed loons be present, the design and location of facilities must be such that disturbance is minimized. Accepted mitigation is a 1-mile buffer around all recorded nest sites and a minimum 1,625-foot (500-meter) buffer around the remainder of the lake shoreline. Development may be prohibited within buffers or activities curtailed while birds are present. | authorization of construction of facilities proposed for development which are within 1 mile of a lake 25 acres or larger in size. These surveys along shorelines of large lakes shall be conducted following accepted BLM protocol during nesting in late June and during brood rearing in late August.<br>b. Should yellow-billed loons be present, the design and location of facilities must be such that disturbance is minimized. Accepted mitigation is a 1-mile buffer around all recorded nest sites and a minimum 1,625-foot (500-meter) buffer around the remainder of the lake shoreline. Development may be prohibited within buffers or activities curtailed while birds are present. |

*Alternative D ROP E-11* provides greater benefit than *Alternatives B and C* in minimizing potential impacts to birds and threatened and endangered species by requiring lessees to conduct studies of eiders and loons to ensure that facility siting minimizes impacts to birds and by improving the visibility of towers, power lines, and guy wires in a manner that reduces bird collisions. (Moderate) Alternative A stipulations have no direct counterpart.

\* The performance based stipulations and required operating procedures would offer greater flexibility to adapt requirements/standards to specific situations and to modify the requirements/standards if they prove ineffective. Prescriptive based mitigation often attempts to define a requirement with a "one size fits all" approach that does not allow adjustments when site and project-specific information. Accordingly, while we have in some cases found a performance-based stipulation or ROP to be less effective than the corresponding prescriptive stipulation in Alternative A, this lesser effectiveness may be compensated for by the additional flexibility in the performance based ROPs.

\*\*Existing laws and regulations that extend across all lands in Alaska and fall under the jurisdiction of the State of Alaska and other federal agencies. However, if BLM personnel observation that any of these statutes, laws, or regulations are being violated, the violations will be reported and proper actions will be taken to arrest the situation.

\*\*Existing laws and regulations that extend across all lands in Alaska and fall under the jurisdiction of the State of Alaska and other federal agencies. However, if BLM personnel observation that any of these statutes, laws, or regulations are being violated, the violations will be reported and proper actions will be taken to arrest the situation.

Table 2-3. Summary and Comparison of Effects on Resources by Alternative.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON AIR QUALITY** | | | |
| **General Effects:** Exploration, development, and production activities would cause small, local, temporary increases in the concentrations of criteria pollutants. Concentrations would be within the Prevention of Significant Deterioration (PSD) Class II limits and National Ambient Air Quality Standards (NAAQS). Therefore, effects would be minor. | **General Effects:** Concentrations of emissions could be up to 3 times higher than under the No Action Alternative, based on number of facilities developed, but would still be within the PSD Class II limits and NAAQS. Therefore, effects would be minor. | **General Effects:** Concentrations of emissions could be slightly higher than under Alternative B, and up to 4 times higher than under the No Action Alternative, based on number of facilities developed, but would still be within the PSD Class II limits and NAAQS. Therefore, effects would be minor. | **General Effects:** Concentrations of emissions would be slightly lower than Alternative B, but 2 times higher than under the No Action Alternative based on number of facilities developed, but would still be within the PSD Class II limits and NAAQS. Therefore, effects would be minor. |
| **Cumulative Effects:** The cumulative effects of all projects affecting the air quality of the North Slope of Alaska now and in the past have caused generally little deterioration in air quality, which remains better than required by national standards. Because oil production levels are predicted to be 30% lower under the reasonably foreseeable future development scenario than levels reached in the late 1980s, air emissions under this scenario are predicted to be at least 30% lower than air emissions in the late 1980s. Emissions from development resulting from the final Preferred Alternative and other alternatives would be small compared to the emissions from Prudhoe Bay and Kuparuk oil field production; projected emissions from the alternatives would account for only a small percentage of current and projected emissions. Assuming that air pollutants generated are proportional to oil production levels, the Planning Area would contribute approximately 6% (No Action Alternative) to 16% (Alternative C) of the projected total output of air emissions on the North Slope, assuming an oil price of $25 per bbl; the final Preferred Alternative and Alternative B would be intermediate to these levels. Use of newer air emissions control technology should help to lower emissions from historic levels. Arctic haze will continue to be of concern on the North Slope, but studies suggest that air emissions in Europe and Asia, and not on the North Slope, are the primary contributors to this haze. | | | |
| **EFFECTS ON PALEONTOLOGICAL RESOURCES** | | | |
| **General Effects:** Impacts from non-oil and gas activities would be minimal. Surface disturbance to 130 (at $20/bbl oil) to 510 (at $30/bbl oil) acres could impact paleontological resources. There is a very low risk that paleontological resources would be encountered and impacted would be minor during extraction of materials, surface disturbance, or oil spills associated with oil and gas development. Potential impacts would be minor. | **General Effects:** Surface disturbance to 140 ($20/bbl oil) to 1,570 ($30/bbl oil) (1,120; $25/bbl oil) acres could impact paleontological resources. The risk that paleontological resources would be encountered and impacted would be slightly higher than under the No Action Alternative, but potential impacts would still be minor. Gravel mining near rivers and lakes poses the greatest threat to paleontological resources. | **General Effects:** Surface disturbance to 190 to 1,975 (1,380) acres could impact paleontological resources. The risk that paleontological resources would be encountered and impacted would be slightly higher than under Alternative B, and nearly 4 times the level under the No Action Alternative, but potential impacts would still be minor. Gravel mining near rivers and lakes poses the greatest threat to paleontological resources. | **General Effects:** Surface disturbance to 130 to 1,300 (920) acres could impact paleontological resources. The risk that paleontological resources would be encountered and impacted would be 50% less than under Alternative C, but about twice as great as under the No Action Alternative; potential impacts would still be minor. Gravel mining near rivers and lakes poses the greatest threat to paleontological resources. |
| **Cumulative Effects:** Paleontological research and excavation, past non-oil and gas development, recreation, and oil and gas exploration and development have contributed to the loss of paleontological resources, either from removal or destruction. If paleontological resources removed in the past have been preserved in museum or private collections, their losses would not accumulate. If they have been lost forever, the impacts of this lost resource persist today. Approximately 2,500 acres on the North Slope have been disturbed or covered with gravel for non-oil and gas development. Approximately 1,750 acres have been disturbed from bladed and peat roads, exploration sites, and airstrips. Gravel mining has disturbed over 6,300 acres, much of this area along rivers where paleontological resources are often exposed or are close to the surface. Another 9,200 acres have been covered with gravel to create pads and roads. Paleontological resources found in these areas could be damaged, destroyed, or buried under gravel. Recent technological developments, including use of ice roads and pads, Rolligons, horizontal drilling, and roadless development have reduced the amount of surface disturbance associated with exploration and development activities, with likely benefits to near-surface paleontological resources. Non-oil and gas, and oil and gas, development over the next 25 years could result in disturbance to the Planning Area and North Slope over an estimated 500 and 4,000 acres, respectively. An additional 4,000 acres could be impacted by 2050 if development occurs in the Northwest and South National Petroleum – Reserve. The North Slope region is approximately 57 million acres, while the Arctic Coastal Plain (ACP), where most oil and gas development | | | |

## ALTERNATIVES

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| \[continued from previous page\] **EFFECTS ON PALEONTOLOGICAL RESOURCES** — would take place, comprises 13 million of those acres. Surface disturbance associated with all past and reasonably foreseeable non-oil and gas, and oil and gas development would impact approximately 0.05 percent of the Alaska North Slope and 0.2 percent of the ACP. Of this, gravel mining would account for about 500 acres in the next 25 years. These actions have the potential to add to the cumulative loss of paleontological resources. Site reclamation would not reduce this loss, as paleontological resources would have already been lost during site disturbance and development. As seismic surveys are completed in the Planning Area and the remainder of the North Slope, the level of seismic activity and potential for impacts to paleontological resources would decline. An estimated 300 (No Action Alternative) to 1,400 (Alternative C) 920; final Preferred Alternative) acres could be disturbed from oil and gas development in the Planning Area during the next 25 years. The amount of area disturbed by the alternatives would comprise 0.002% to 0.011% (0.007%) of the ACP, and 0.0005% to 0.0024% (0.0016%) of the North Slope. Stipulations and ROPs developed for the alternatives would minimize or prohibit exploration and development activities near major rivers, further reducing the likelihood of impacts to paleontological resources. | | | |
| **EFFECTS ON SOIL RESOURCES** | | | |
| **General Effects**: During exploration, construction of ice pads would cause localized areas of soil compaction and loss of surrounding vegetation; these impacts would occur on 60 to 230 acres over the life of the project, and would be negligible to minor. Another 210 acres would be impacted annually by ice roads. Seismic surveys would cause short-term impacts to soil; 6,600 acres would be impacted by 2-D surveys, and approximately 98,880 to 197,760 acres would be impacted by 3-D surveys during a 25-year period; long-term impacts would occur on about 150 acres. Placement of gravel fill could cover soil on 100 to 415 acres, and alter the physical qualities of soil on 200 to 600 acres. At gravel mine sites, soil productivity would be reduced on 20 to 90 acres. Construction of pipelines would disturb approximately 2 acres per mile for aboveground pipelines, and 1.5 acres per mile of underground pipeline. Provided oil spills were cleaned up immediately, there would be minimal contamination of soils. Given the small portion of the Planning Area affected, impacts to soils would be minor. | **General Effects**: A larger acreage of soil would likely be disturbed than under the No Action Alternative, and the risk of an oil spill would be higher. During exploration, construction of ice pads would cause localized areas of soil compaction and loss of surrounding vegetation; these impacts would occur on 60 to 600 (450) acres over the life of the project, and would be negligible to minor. Another 210 acres would be impacted annually by ice roads. Seismic surveys would cause short-term impacts to soil; 6,600 acres would be impacted by 2-D surveys, and approximately 98,880 to 247,200 acres would be impacted by 3-D surveys during a 25-year period; long-term impacts would occur on about 200 acres. A greater proportion of impacts could be to soils near Teshekpuk Lake. Placement of gravel fill would cause loss of soil productivity on 110 to 1,340 (950) acres, and alter the physical qualities of soil on 400 to 2,800 (2,000) acres. At gravel mine sites, soil productivity would be reduced on 30 to 230 (170) acres. Although a larger acreage would be impacted than under the No Action Alternative, the portion of the Planning Area affected would be very small, and overall long-term impacts to soils would still be minor (less than 1 percent of the | **General Effects**: A larger acreage of soil would likely be disturbed than under the other alternatives, and the risk of an oil spill would be higher. During exploration, construction of ice pads would cause localized areas of soil compaction and loss of surrounding vegetation; these impacts would occur on 72 to 730 (565) acres over the life of the project, and would be negligible to minor. Another 210 acres would be impacted annually by ice roads. Seismic surveys would cause short-term impacts to soil; 6,600 acres would be impacted by 2-D surveys, and approximately 98,880 to 247,200 acres would be impacted by 3-D surveys during a 25-year period; long-term impacts would occur on about 200 acres. The acreage of soil affected by seismic surveys would be greater than the acreage affected under the No Action Alternative and Alternative B. Placement of gravel fill would cause loss of soil productivity on 160 to 1,675 (1,170) acres, and alter the physical qualities of soil on 400 to 3,400 (2,400) acres. At gravel mine sites, soil productivity would be reduced on 30 to 300 (210) acres. The acreage of soil impacted would be slightly greater than under Alternative B. Since the portion of the Planning Area affected would be very small, overall impacts to soils would still | **General Effects**: A smaller acreage of soil would likely be disturbed than under alternatives B and C, and the risk of an oil spill would be lower. During exploration, construction of ice pads would cause localized areas of soil compaction and loss of surrounding vegetation; these impacts would occur on 60 to 500 (360) acres over the life of the project, and would be negligible to minor. Another 210 acres would be impacted annually by ice roads. Seismic surveys would cause short-term impacts to soil; 6,600 acres would be impacted by 2-D surveys, and approximately 98,880 to 247,200 acres would be impacted by 3-D surveys during a 25-year period; long-term impacts would occur on about 200 acres. The acreage of soil affected by seismic surveys would be greater than the acreage affected under the No Action Alternative, but less than the acreage affected under alternatives B and C. Placement of gravel fill would cause loss of soil productivity on 110 to 1,090 (780) acres, and after the physical qualities of soil on 200 to 2,400 (1,600) acres. At gravel mine sites, soil productivity would be reduced on 20 to 210 (140) acres. The acreage of soil impacted would be 3 times as great as the amount of soil impacted under the No Action Alternative, but 30% less than |

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| | Planning Area). | be minor. | under Alternative C and 20% less than under Alternative B. Since the portion of the Planning Area affected would be very small, overall impacts to soils would still be minor. |

**EFFECTS ON SOIL RESOURCES**

**Cumulative Effects:** Based on the above analysis, approximately 2,500 acres of direct impacts to soil from non-oil and gas activities persist today. Oil and gas activities have caused approximately 12,000 acres of direct impacts to soil that persist today. Since most of these impacts are associated with ongoing non-oil and gas residential and commercial development, and oil and gas activities, these impacts to soil are additive to future impacts and are likely to persist for several decades or more. However, the rate at which soil is disturbed by development has slowed substantially in recent years due to advances in technology and a slowing of oil field development on the North Slope. An estimated 4,000 acres could be disturbed from oil and gas development on the North Slope during the next 25 years. An additional 4,000 acres could be impacted by 2050 if development occurs in the Northwest and South National Petroleum – Reserve. Offshore development associated with leases in the Beaufort Sea could impact small areas along the coast for staging and storage of materials, but is unlikely to impact large areas of soil. These impacts are additive to the impacts to soil that have accumulated in the past and persist today, but in the context of the ACP and North Slope, these cumulative impacts would be small. Surface disturbance associated with all past and reasonably foreseeable non-oil and gas, and oil and gas, development could impact approximately 0.17% of the Alaska North Slope and 0.04% of the ACP. Of this, gravel mining would account for about 500 acres in the next 25 years. These actions have the potential to add to the cumulative loss of soil resources. If oil prices average $25 per bbl, development in the Planning Area would directly impact 300, 1,120, 1,380, and 920 acres of soil for alternatives A through D, respectively, and indirectly impact 400 to 2,400 acres of soil (1,600 acres under the final Preferred Alternative). Impacts associated with the Planning Area would be additive to past, present, and reasonably foreseeable future soil impacts on the North Slope. Global climate change could result in effects to soil from non-oil and gas development, and oil and gas exploration and development, on the North Slope that are much greater than predicted.

**EFFECTS ON WATER RESOURCES**

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **General Effects:** Non-oil and gas activities would have a minimal impact on water resources. Exploration and development would entail water withdrawal from lakes for drilling and construction of ice roads and pads; erosion and sedimentation; temporary impoundments and diversions; and removal of gravel from areas near streams and lakes. Stipulations addressing these activities would ensure that impacts would be negligible. | **General Effects:** Impacts to water resources would occur over a larger acreage, and more lakes could potentially be impacted by water withdrawal, than under the No Action Alternative. This alternative would allow drilling on and near Teshekpuk Lake, increasing the likelihood that water resources in this lake would be negatively impacted by an oil spill. Stipulations and ROPs would keep impacts to water resources minimal. | **General Effects:** Impacts to water resources would occur over a larger acreage, and more lakes could potentially be impacted by water withdrawal, than under the other alternatives. This alternative would allow drilling on and near Teshekpuk Lake, and in the area to the northeast, increasing the likelihood that water resources in deepwater lakes in this area would be impacted by an oil spill. Stipulations and ROPs would keep impacts to water resources minimal. | **General Effects:** Impacts to water resources would occur over a smaller acreage, and fewer lakes could potentially be impacted by water withdrawal, than under alternatives B and C. This alternative would defer leasing of Teshekpuk Lake, and would restrict permanent facilities with the Goose Molting Area, an area with lakes that are important to molting geese. This would reduce the likelihood of a spill from a production facility impacting lakes in this region. However, pipelines would be allowed in this area, so a spill from a pipeline could affect water bodies. Stipulations and ROPs would keep impacts to water resources minimal. |

**Cumulative Effects:** See cumulative effects under water quality.

## ALTERNATIVES

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON WATER QUALITY** | | | |
| **General Effects:** Seismic surveys would cause persistent high-level damage to vegetation, which would affect water quality through thermokarst erosion. There would be long-term impacts to water quality on approximately 16 acres as a result of seismic activities. During each year of exploration, construction of ice pads and ice roads would temporarily alter water quality. Development activities would impact water quality on 130 to 510 acres. Construction and placement of gravel structures would result in increased turbidity and upslope water impoundment on 200 to 600 acres. Oil spills could have short-term effects on water quality in lakes and other large water bodies, but could have lasting toxicity effects in smaller ponds. | **General Effects:** Water quality would be impacted over a larger portion of the Planning Area than under the No Action Alternative. Short-term impacts during construction would include increased water impoundments, thermokarst erosion, diversions, and sedimentation. There would be long-term impacts to water quality on approximately 26 acres as a result of seismic activities. Development would impact water quality on 140 to 1,510 (1,120) acres. Construction and placement of gravel structures would result in increased turbidity and upslope water impoundment on 400 to 2,800 (2,000) acres. The potential for impacts to surface water quality would be greater than under the No Action Alternative. Because drilling would be allowed on and near Teshekpuk Lake, the potential for contamination of the lake by an oil spill would also be greater than under the No Action Alternative. | **General Effects:** Water quality would be impacted over a larger portion of the Planning Area than under the other alternatives. There would be impacts to water quality on approximately 26 acres as a result of seismic activities. Development activities would impact water quality on 190 to 1,975 (1,380) acres. Construction and placement of gravel structures would result in increased turbidity and upslope water impoundment on 400 to 3,400 (2,400) acres. The potential for impacts to surface water quality would be greater than under the other alternatives. Because more drilling in environmentally sensitive areas would occur, the likelihood of impacts to surface water quality from oil spills would be greater than under the other alternatives. | **General Effects:** Water quality would be impacted over a smaller portion of the Planning Area than under alternatives B and C. Short-term impacts during construction would include increased water impoundments, thermokarst erosion, diversions, and sedimentation. There would be long-term impacts to water quality on approximately 26 acres as a result of seismic activities. Development would impact water quality on 130 to 1,300 (920) acres. Construction and placement of gravel structures would result in increased turbidity and upslope water impoundment on 200 to 2,400 (1,600) acres. The potential for impacts to surface water quality would be greater than under the No Action Alternative. Because leasing would be deferred in Teshekpuk Lake, contamination of the lake by an oil spill would be unlikely and similar to the risk of a spill impacting the lake under the No Action Alternative. |

**Cumulative Effects:** Based on the above analysis, approximately 2,500 acres of direct surface disturbance have impacted water bodies and drainage patterns. Oil and gas activities have caused approximately 12,000 acres of direct impacts to lands on the North Slope, much of which consist of water bodies; indirectly impacted water bodies and flows on another 18,000 acres. Since most of these impacts are associated with ongoing non-oil and gas residential and commercial development, and oil and gas activities, these impacts to water are additive to future impacts and would be likely to persist for several decades or more. Several spills have occurred on the North Slope, but their effects have been minor and have likely not accumulated. Effects of discharges from offshore facilities and subsurface injection of drilling wastes are largely unknown, but likely have had little cumulative effect on water quality on the North Slope. Large amounts of debris was left on the North Slope from exploration and military activities from 1940 to 1970 that impacted water quality, but clean-up efforts since the 1970s have removed much of this debris. Assuming cumulative effects to water resources would occur in relation to the amount of surface disturbance across the North Slope, direct and indirect cumulative effects could occur on approximately 0.08 percent of the North Slope and 0.33 percent of the ACP. Of this, gravel mining would account for about 500 acres in the next 25 years. The majority of the impacts would result from oil and gas development activities, with construction of roads, permanent drill pads, and water use from lakes during the winter months being the major contributors. Impacts from activities other than those associated with oil and gas development (including any oil and gas-related roads) would be minor. Because of the abundance of water resources on the North Slope, the overall cumulative impact to water resources on the North Slope and in the Planning Area would probably be small in magnitude and most impacts would be local in nature. Global warming will lead to increased evaporation and in turn to increased precipitation (this is already occurring). Over the Arctic as a whole, annual total precipitation is projected to increase by roughly 20 percent by the end of this century, with most of the increase coming as rain. However, while there is high confidence that temperatures will rise and total annual precipitation will increase, it is not known whether the increase in precipitation will keep up with the warming and rate of evaporation. If precipitation does not keep up with the rate of evaporation, land areas could dry out. Another concern is the degree of permafrost thawing and subsequent drainage of water from the land. For example, summer thawing now results in a large amount of water on the surface. However, this moisture could be lost if the depth of the active layers increases. This could result in desertification in some areas as warming continues (ACIA 2004). Direct impacts

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| EFFECTS ON WATER QUALITY |||| 

to water quality from surface disturbance activities on the Planning Area would occur on approximately 250 (No Action Alternative) to 1,500 (Alternative C) acres (assuming an oil price of 25 per bbl), and indirect impacts would occur on 400 to 2,400 acres. Direct impacts associated with the past, present, and reasonably foreseeable developments could impact an additional 30,000 acres. Thus, direct impacts to water quality would occur on less than 0.2 percent of the ACP, and 0.04 percent of the North Slope from past, present, and reasonably foreseeable future activities. Indirect impacts to water quality could occur on approximately twice as much land as direct impacts. Approximately 600,000 acres in the TLSA would be closed to leasing under Alternative A. Wetland habitat comprises approximately 95 percent of this area. Thus, protection to water bodies would be greatest under Alternative A. Approximately 213,000 acres in the TLSA are closed to leasing under Alternative B, while Teshekpuk Lake (211,000 acres) is deferred from leasing under the final Preferred Alternative. Based on amount of surface area protected, water bodies would be nearly equally protected under these two alternatives. However, approximately 20 percent more development is projected to occur under Alternative B than the final Preferred Alternative, increasing the likelihood of impacts to aquatic bodies from construction of roads and pads, gravel mining, and other development and production activities under Alternative B. Under Alternative C, the entire Planning Area would be open to leasing. The amount of area disturbed from oil and gas activities is projected to be highest for this alternative. Thus, Alternative C would provide less protection to water resources than the other alternatives. The stipulations and ROPs provided for each alternative should reduce impacts from oil and gas exploration and development and keep impacts to water resources to a minor to moderate level. Still, future impacts to water resources would occur and would accumulate with past impacts.

| EFFECTS ON VEGETATION |||| 

| **General Effects:** Non-oil and gas activities would have negligible effects on vegetation. Oil exploration would disturb vegetation on 6,600 acres from 2-D seismic work and approximately 98,880 to 197,760 acres from 3-D surveys. About 25 percent of the disturbance from 2-D would be medium to high short-term impacts, with a greater percentage at that level for 3-D; there would be long-term impacts on about 150 acres. Construction of ice pads would occur on 30 to 115 acres during the life of the project. Another 210 acres could be impacted annually by construction of ice roads. The construction of exploration well collars would result in permanent, minor vegetation destruction and alteration. Development activities would cause the loss of vegetation on 130 to 505 acres and the alteration of plant species composition on 235 to 710 acres, affecting a total of 365 to 1,215 acres. These impacts would be permanent if gravel pads remained after production ended, although some plant species would be able to grow on the pads. Development impacts would affect less than 0.03% of the total Planning | **General Effects:** Impacts from seismic surveys would be slightly higher than under the No Action Alternative. Oil exploration would disturb vegetation on 6,600 acres from 2-D seismic work and 98,880 to 247,200 acres from 3-D surveys; there would be long-term impacts on about 200 acres. Construction of ice pads would occur on 30 to 300 (255) acres during the life of the project. Another 210 acres could be impacted annually by construction of ice roads. Development activities would cause the loss of vegetation on 140 to 1,570 (1,120) acres and the alteration of plant species composition on 470 to 3,300 (2,360) acres, affecting a total of 615 to 4,875 (3,480) acres. These impacts would be permanent if gravel pads remained after production ended, although some plant species would be able to grow on the pads. Development impacts would affect less than 0.08% of the Planning Area and would not likely adversely affect any plant species or plant communities. Overall, a greater amount of vegetation would be impacted than under the No Action Alternative, but impacts would still be | **General Effects:** Impacts from seismic surveys would be higher than under other alternatives. Oil exploration would disturb vegetation on 6,600 acres from 2-D seismic work and 98,880 to 247,200 acres from 3-D surveys; there would be long-term impacts on about 200 acres. Construction of ice pads would occur on 30 to 366 (270) acres. Construction of ice roads and ice pads would impact vegetation on 240 to 580 (480) acres per year. Development activities would cause the loss of vegetation on 190 to 1,975 (1,380) acres and the alteration of plant species composition on 470 to 4,010 (2,830) acres, affecting a total of 660 to 5,985 (4,215) acres. These impacts would be permanent if gravel pads remained after production ended, although some plant species would be able to grow on the pads. Development impacts would affect less than 0.1% of the total Planning Area and would not likely adversely affect any plant species or plant communities. Overall, a greater amount of vegetation would be impacted than under the other alternatives, but impacts would still be minor, provided | **General Effects:** Impacts from seismic surveys would be lower than under alternatives B and C. Oil exploration would disturb vegetation on 6,600 acres from 2-D seismic work and 98,880 to 247,200 acres from 3-D surveys; there would be long-term impacts on about 200 acres. Construction of ice pads would occur on 30 to 250 (180) acres. Construction of ice roads and ice pads would impact vegetation on 240 to 460 (390) acres per year. Development activities would cause the loss of vegetation on 130 to 1,300 (920) acres and the alteration of plant species composition on 235 to 2,830 (1,890) acres, affecting a total of 365 to 4,130 (2,810) acres. These impacts would be permanent if gravel pads remained after production ended, although some plant species would be able to grow on the pads. Impacts under the final Preferred Alternative would be 33% and 20% less than would occur under alternatives C and B, respectively, but about 3 times greater than would occur under the No Action Alternative. Development impacts would affect less |

ALTERNATIVES

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON VEGETATION** | | | |
| Area and would not likely adversely affect any plant species or plant communities. Overall, impacts would be minor, provided rare plant populations were avoided through careful siting at the facilities-approval stage. | minor, provided rare plant populations were avoided through careful siting at the facilities-approval stage. | rare plant populations were avoided through careful siting at the facilities-approval stage. Increased development in the area around Teshekpuk Lake could disproportionately affect wet vegetation classes. | than 0.1% of the total Planning Area and would not likely adversely affect any plant species or plant communities. Overall, a greater amount of vegetation would be impacted than under the No Action Alternative, but less than under the other action alternatives. Impacts would be minor, provided rare plant populations were avoided through careful siting at the facilities-approval stage. Increased development in the area around Teshekpuk Lake could disproportionately affect wet vegetation classes. |
| **Cumulative Effects:** Approximately 2,500 acres of direct impacts and 5,000 acres of indirect impacts to vegetation from non-oil and gas activities persist today; oil and gas activities have caused approximately 12,000 acres of direct impacts and 21,000 acres of indirect impacts to vegetation that persist today. Since most of these impacts are associated with non-oil and gas residential and commercial development, and oil and gas activities, these impacts to vegetation are additive to future impacts and would be likely to persist for several decades or more. Although the increase in the amount of area disturbed by oil and gas development has slowed dramatically in recent years, it is estimated that an additional 3,500 acres could be covered by dust, changes in hydrology, and thermokarst. An additional 4,000 acres of vegetation could be impacted by oil and gas activities between 2030 and 2055; another 9,200 acres could be indirectly impacted by development. These impacts are additive to the impacts to vegetation that have accumulated in the past and persist today, but in the context of the ACP and North Slope, these cumulative impacts would be small. Based on direct (22,000 acres) and indirect (44,000 acres) impacts that could still persist in 2050, direct and indirect impacts to vegetation from activities on the North Slope would impact approximately 0.43 percent of the ACP and 0.10 percent of the North Slope. These estimates do not take into account the quality of the vegetation that would be impacted on the North Slope. If facilities were constructed in an area containing a population of a rare plant species, the impacts to that species could be high. Three rare North Slope plant species are known to occur in the Planning Area, and four other rare species are known to occur on the North Slope but have not been documented in the Planning Area. Because of the limited number of plants comprising rare plant populations on the North Slope, loss of one or more plant populations could be a significant cumulative impact to the species. Long-term impacts to vegetation from seismic surveys in the Planning Area would occur on approximately 140 (Alternative A) to 190 (alternatives B, C, and D) acres. Impacts from ice road construction would occur on another 210 acres annually, while impacts from ice pads would occur on 30 to 270 acres during the life of the project; these impacts to vegetation would be short-term and would not accumulate. If oil prices average $25 per bbl, development in the Planning Area would directly impact approximately 300, 1,120, 1,380, and 920 acres, and indirectly impact 450, 2,360, 2,730, and 1,890 acres of vegetation for Alternatives A through D, respectively. These impacts would be long-term and would accumulate. Total direct and indirect impacts to vegetation would occur on 0.02 (No Action Alternative) to 0.09 (Alternative C) percent of the Planning Area. Global climate change could alter the species composition, increasing deciduous shrubs and decreasing sedges and grasses. | | | |
| **EFFECTS ON WETLANDS AND FLOODPLAINS** | | | |
| Oil and gas development could cause loss of or disturbance to 310 to 1,050 acres of wetland soil. There would be long-term impacts to water quality in wetlands from exploration (28 acres) and development (310 to 1,050 acres). Seismic activities would result in 140 acres of long-term impacts to wetland vegetation. Ice roads and pads would impact up to 315 acres of | Oil and gas development could cause loss of or disturbance to 510 to 4,150 acres of wetland soil. There would be long-term impacts to water quality in wetlands from exploration (25 acres) and development (510 to 4,150 [2,965] acres). Seismic activities would result in 190 acres of long-term impacts to wetland vegetation. Ice roads and pads would impact 410 acres | Oil and gas development could cause loss of or disturbance to 560 to 5,105 (3,590) acres of wetland soil. There would be long-term impacts to water quality in wetlands from exploration (25 acres) and development (560 to 5,105 [3,590] acres). Seismic activities would result in 190 acres of long-term impacts to wetland vegetation. Ice roads and pads would | Oil and gas development could cause loss of or disturbance to 315 to 3,510 (2,395) acres of wetland soil. There would be long-term impacts to water quality in wetlands from exploration (25 acres) and development (315 to 3,510 [2,395] acres). Seismic activities would result in 190 acres of long-term impacts to wetland vegetation. Ice roads and pads would |

Exhibit 42, page 113 of 300