Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON SUBSISTENCE-HARVEST PATTERNS** ||||
| warming of the climate regime in the Arctic could significantly affect subsistence harvests and uses if warming trends continues as predicted. Every community in the Arctic is potentially affected by the anticipated climactic shift and there is no plan in place for communities to adapt to or mitigate these potential effects. The reduction, regulation, and/or loss of subsistence resources would have severe effects on the subsistence way of life for residents of Nuiqsut, Atqasuk, Barrow, and Anaktuvuk Pass. If the loss of permafrost, and conditions beneficial to the maintenance of permafrost, arise as predicted, there could be synergistic cumulative effects on infrastructure, travel, landforms, sea ice, river navigability, habitat, availability of fresh water, and availability of terrestrial mammals, marine mammals, waterfowl and fish, all of which could necessitate relocating communities or their population, shifting the population to places with better subsistence hunting and causing a loss or dispersal of community. Allowing leasing and development of all or portions of the Teshekpuk Lake Special Area under the action alternatives would dramatically reduce the amount of undisturbed habitat to caribou, waterfowl, fish, and other subsistence species. These effects to subsistence species would be greatest under Alternative C. Effects to subsistence species would be similar under Alternative B and the final Preferred Alternative. Although much of the northeastern portion of the Planning Area would be closed to leasing under Alternative B, the amount of development proposed under this alternative would be about 20 percent greater than for the final Preferred Alternative. Teshekpuk Lake would be deferred from leasing under the final Preferred Alternative, protecting waterfowl and other subsistence species that use the lake. In addition, NSO restrictions on permanent facilities in caribou habitat protection areas and the Goose Molting Area would limit the amount of surface disturbance that could occur north and east of Teshekpuk Lake; these restrictions would reduce the likelihood of cumulative effects to subsistence resources. Under the No Action Alternative, 600,000 acres associated with Teshekpuk Lake Special Area would be closed to leasing. ||||
| **EFFECTS ON SOCIOCULTURAL SYSTEMS** ||||
| **General Effects**: Oil and gas development in the Planning Area would further the perception that local residents are being surrounded by development, and would likely be greatest for Nuiqsut residents. Atqasuk, Barrow, and Anaktuvuk Pass could also be affected. Oil spills could disrupt subsistence harvests by contaminating resources, or causing the perception that resources were contaminated. Stipulations would provide protections for subsistence resources, cabins, camps, and river corridors, as well as a system of negotiating conflicts between permittees, leaseholders, and subsistence users, and would help to allow cultural values to coexist with development. | **General Effects**: Effects would be greater in magnitude and extent than those occurring under the No Action Alternative. Development in areas north of Teshekpuk Lake could cause societal stress in Barrow, Nuiqsut, and Atqasuk by discouraging families from using traditional sites and increasing concerns about encroachment and contamination of subsistence resources. This alternative adopts a new approach to mitigation measures, relying on performance-based stipulations and ROPs rather than prescriptive-based stipulations. Local residents are less familiar with this new approach and have concerns about whether it would be as effective as the previous set of stipulations. Some local residents and organizations perceive the changes to the stipulation package as reversing commitments previously made. This could affect the sense of trust between local communities and the federal agencies managing the National Petroleum Reserve – Alaska. | **General Effects**: Effects would be greater in magnitude and extent than under the other alternatives, as the amount of oil exploration and development activity and area of disturbance could be up to 5 times higher under this alternative than the No Action Alternative, affecting more traditional use sites and increasing the likelihood of conflicts between industry and the subsistence way of life. | **General Effects**: Effects would be greater in magnitude and extent than those occurring under the No Action Alternative, similar to the effects that would occur under Alternative B, and less than the effects that would occur under Alternative C. Development in areas north of Teshekpuk Lake could cause societal stress in Barrow, Nuiqsut, and Atqasuk by discouraging families from using traditional sites and increasing concerns about encroachment and contamination of subsistence resources. The potential for development north of Teshekpuk Lake would be somewhat greater under this alternative than Alternative B, but restrictions on the amount of surface disturbance allowed in each lease tract and No Surface Occupancy restrictions in important caribou habitats to the east and southeast of the lake should reduce impacts to caribou and other subsistence resources. The likelihood of development occurring in close proximity to Nuiqsut would be similar under all alternatives. |

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| | | **EFFECTS ON SOCIOCULTURAL SYSTEMS** | |
| | | **Cumulative Effects**: Impacts to the sociocultural systems of the Iñupiat of the North Slope have occurred since the first direct interactions with non-Natives in the first quarter of the 19th century. Since that time, the Iñupiat have adapted to new technologies, new external pressures, and regulatory actions. By the mid-20th century, Iñupiat settlement patterns had changed significantly. The population became centralized into a few communities, when they previously had been spread in small family-based units across the North Slope. The cumulative effects of oil and gas development on sociocultural patterns over the last 50 years are hard to establish with quantitative precision given the lack of baseline data. Nonetheless, there is evidence that North Slope sociocultural systems have been subject to ongoing, additive, and synergistic cumulative impacts. Stresses on North Slope sociocultural systems include residents' inability to access traditional use areas, threats to resources/life ways and to spiritual connection with the land, having to deal with multiple environmental impact assessments and other development processes, and being ignored or discounted by agency representatives. Long-term stresses would result in greater impacts to sociocultural systems. The possibility of a major oil spill, and its effects on bowhead whales and other marine mammals, fish, and wildlife, is of great concern to residents, although no such spill has occurred recently on the North Slope. These stresses accumulate because they interact and are repeated with each new lease sale, EIS, development proposal, and facility expansion. These effects would be greatest under Alternative C, not only because it would result in a greater amount of surface disturbance (as many as 2,000 acres) than the other alternatives (1,570 acres for Alternative B, 1,100 acres for the final Preferred Alternative, and 500 acres for the No Action Alternative), but the entire Planning Area would be available for oil and gas leasing and development. However, the amount of wealth, including income from royalties, taxes, and jobs, generated by oil and gas activity and available to residents of the North Slope would be approximately two- to nine-fold greater under this alternative than the other alternatives. The effects on wealth and subsistence resources would be least under Alternative A, while the effects on wealth and subsistence resources under Alternative B and the final Preferred Alternative would be between the No Action Alternative and Alternative C. | | |
| **General Effects**: Impacts to subsistence species and harvest patterns (as discussed above) would also have disproportional impacts on the minority Iñupiat population, which is dependent on subsistence resources. As effects to subsistence species would likely be localized, short term, and minor, environmental justice effects would be minor as well. In the unlikely event that a major oil spill occurred in a key harvest area or near a community, environmental justice effects would be much greater. | **General Effects**: Effects would be greater in magnitude and extent than those occurring under the No Action Alternative. This alternative adopts a new approach to mitigation measures, relying on performance-based stipulations and ROPs rather than prescriptive-based stipulations. Local residents are less familiar with this new approach and have concerns about whether it would be as effective as the previous set of stipulations. Some local residents and organizations perceive the changes to the stipulation package as reversing commitments previously made. This could affect the sense of trust between local communities and the federal agencies managing the National Petroleum Reserve – Alaska. | **General Effects**: Effects could be approximately 5 times greater than under the No Action Alternative, and 20% greater than under Alternative B, in magnitude and extent. | **General Effects**: Effects would be greater in magnitude and extent than those occurring under the No Action Alternative, but less than those that would occur under alternatives B and C because less oil and gas development would likely occur and caribou and other subsistence species would be given additional protection in the Lease Tract/Goose Molting areas and Caribou Movement Corridor and Southern Caribou Calving Area. This alternative also adopts a new approach to mitigation measures, relying on performance-based stipulations and ROPs rather than prescriptive-based stipulations. As with alternatives B and C, some local residents and organizations perceive the changes to the stipulation package as reversing commitments previously made. This could affect the sense of trust between local communities and the federal agencies managing the National Petroleum Reserve – Alaska. |
| | | **EFFECTS ON ENVIRONMENTAL JUSTICE** | |

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON ENVIRONMENTAL JUSTICE** ||||
| | **Cumulative Effects:** Euro American presence, commercial whaling, and non-oil and gas development and oil and gas exploration and development have had cumulative impacts to Iñupiat culture and to fish and wildlife used for subsistence. Euro American presence has impacted the Iñupiat through disease and other ills. Commercial whaling nearly decimated whale stocks in the Chukchi and Beaufort seas; bowhead whale populations, though recovering, remain nearly 80 percent below their levels in the 1800s. Non-oil and gas development associated with military, residential, and commercial development have directly impacted several thousand acres of fish and wildlife habitat and has also indirectly affected habitat and animal behavior; these impacts have accumulated and persist today. Oil and gas exploration and development conducted by the federal government and industry have directly impacted the habitat use and behavior of subsistence species, and these impacts persist today. These effects have disrupted subsistence livelihoods, and may, in part, account for some of the social problems seen in the villages today. Under the cumulative case, currently planned development in the Planning Area and winter exploration throughout the entire area would continue. Seismic exploration would occur in winter and would include the drilling of exploratory and delineation wells in areas not excluded by buffers. Exploration and development could originate from Indigo, Point Lonely, and the Umiat vicinity, and could encompass important subsistence harvest areas for moose, fish, caribou, and furbearers, affecting subsistence users in Nuiqsut and to a lesser extent Atqasuk, Barrow, and Anaktuvuk Pass. If permanent development is pursued in areas newly opened to exploration and leasing under alternatives B, C, and the final Preferred Alternative, Iñupiat users could no longer utilize an area from 5 miles to 25 miles around those facilities for subsistence uses. The areas that would be potentially off-limits could represent a majority of the portion of the subsistence range that is presently undeveloped, and includes areas of great traditional and historic significance and key habitat areas for several crucial subsistence species. Allowing leasing and development of all or portions of the Teshekpuk Lake Special Area under the action alternatives would dramatically reduce the amount of undisturbed habitat to caribou, waterfowl, fish, and other subsistence species. These effects to subsistence species would be greatest under Alternative C. Effects to subsistence species would be similar under Alternative B and the final Preferred Alternative. Although much of the northeastern portion of the Planning Area would be closed to leasing under Alternative B, the amount of development proposed under this alternative would be about 20 percent greater than for the final Preferred Alternative. Teshekpuk Lake would be deferred from leasing under the final Preferred Alternative, protecting waterfowl and other subsistence species that use the lake. In addition, NSO restrictions on permanent facilities in caribou habitat protection areas and the Goose Molting Area would limit the amount of surface disturbance that could occur north and east of Teshekpuk Lake; these restrictions would reduce the likelihood of cumulative effects to subsistence resources. ||||
| **EFFECTS ON COASTAL ZONE MANAGEMENT** ||||
| **General Effects:** Conflicts could occur with specific statewide standards and NSB Coastal Management Program policies related to potential user conflicts between development activities and access to subsistence resources. These conflicts would relate to effects resulting from periodic disturbance and oil spills; however, no resource would become unavailable, undesirable for use, or experience substantial overall population reductions. The stipulations in place would reduce conflicts, making this alternative consistent with Alaska Coastal Management Program standards. For all other resources, there are no inherent conflicts between exploration and development activities and the statewide standards and enforceable policies of the NSB Coastal Management Program. With mitigating measures and | **General Effects:** Impacts to subsistence resources would be greater than under the No Action Alternative, as additional caribou, waterfowl, and fishing areas would be open to leasing and the expected level of development would be greater. | **General Effects:** Impacts to subsistence resources would be greater than under the other alternatives, as additional caribou, waterfowl, and fishing areas would be open to leasing and the expected level of development would be greater. | **General Effects:** Impacts to subsistence resources would be less than under alternatives B and C, as less oil and gas development would likely occur under this alternative, and caribou, waterfowl, and other subsistence species would be given additional protection in the Lease Tract/Goose Molting areas, Caribou Movement Corridor, and Southern Caribou Calving Area. |

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON COASTAL ZONE MANAGEMENT** ||||
| regulatory oversight, it should be possible to comply with all of the standards and policies relevant to oil and gas activities that would be likely to have effects on the coastal resources or uses of the coastal zone. Applicable policies would be more precisely addressed when specific proposals were brought forward by lessees. | | | |
| **Cumulative Effects:** As most non-oil and gas development, and oil and gas development on the North Slope has occurred near the coastline, conflicts with the NSB and State of Alaska coastal zone management policies have occurred in the past. Specific issues include limits on access to coastal areas by Alaska Natives, disturbance to and deflection of caribou moving to insect-relief areas along the coast, loss of habitat, and loss of historical, cultural, and archaeological resources resulting from exploration and development along the coastline. Through consultation, conflicts between coastal zone management policies and proposed development that could occur in coastal areas have been reduced since implementation of coastal management policies. Most of the coastal area, from Atigaru Point to the boundary with the Northwest National Petroleum Reserve – Alaska, would be closed to leasing under the No Action Alternative. Lease Stipulation K-6, Coastal Areas, requires that permanent oil and gas facilities, including gravel pads, roads, airstrips, and pipelines established to support exploration and development activities shall be located at least ¾ mile inland from the coastline to the extent practicable. Where, as a result of technological limitations, economics, logistics, or other factors, a facility must be located within ¾ mile inland of the coastline, the practicality of locating the facility at previously occupied sites such as Camp Lonely, various Husky/USGS drill sites, and Distant Early Warning (DEW)-Line sites, shall be considered. Use of existing sites within ¾ mile of the coastline shall also be acceptable where it is demonstrated that use of such sites will reduce impacts to shorelines or otherwise be environmentally preferable. All lessees/permitees involved in activities in the immediate area must coordinate use of these new or existing sites with all other prospective users. Before conducting open water activities, the lessee shall consult with the Alaska Eskimo Whaling Commission, the Nuiqsut Whaling Association, and the NSB to minimize impacts to the fall and spring subsistence whaling activities of the communities of the North Slope. Adherance to this stipulation should ensure that coastal resources are adequately protected. All federal activities and federally-permitted activities must be reviewed for consistency with coastal management programs. Therefore, onshore activities within the Planning Area and some offshore activities identified under the alternatives should be assessed against the Alaska CMP, including the NSB CMP. ||||
| **EFFECTS ON RECREATIONAL RESOURCES** ||||
| **General Effects:** Non-oil and gas activities would cause temporary impacts to recreation values on 2,000 to 3,000 acres. Oil and gas exploration activities would cause short-term impacts on 16,000 to 24,000 acres. The greening of vegetation from ice pads, roads, airstrips, and compacted snow would occur on up to 950 acres. Seismic operations would result in many hundreds of miles of green trails. Short-term impacts would not accumulate. There would be a loss of solitude, naturalness, or primitive and unconfined recreation opportunities over an area of 110,400 acres (3% of the Planning Area) | **General Effects:** The area subject to recreation effects would be approximately 2 times the area affected under the No Action Alternative. Non-oil and gas activities would cause temporary impacts to recreation values on 2,000 to 3,000 acres. Oil and gas exploration activities would cause short-term impacts on 8,000 to 40,000 (24,000) acres. The greening of vegetation from ice pads, roads, airstrips, and compacted snow would occur on 250 to 2,500 (1,875) acres. Seismic operations would result in many hundreds of miles of green trails. There would be a loss of solitude, naturalness, or primitive and | **General Effects:** The area subject to recreation effects would be approximately 2.4 times the area affected under the No Action Alternative, 1.1 times the area affected under Alternative B, and 1.3 times the area affected under the final Preferred Alternative. Non-oil and gas activities would cause temporary impacts to recreation values on 2,000 to 3,000 acres. Oil and gas exploration activities would cause short-term impacts on 8,000 to 48,000 (32,000) acres. The greening of vegetation from ice pads, roads, airstrips, and compacted snow would occur on 300 to 3,050 (2,250) acres. Seismic operations | **General Effects:** The area subject to recreation effects would be approximately 2 times the area affected under the No Action Alternative, and about 16% and 24% less than area than would be affected under alternatives B and C, respectively. Non-oil and gas activities would cause temporary impacts to recreation values on 2,000 to 3,000 acres. Oil and gas exploration activities would cause short-term impacts on 8,000 to 32,000 (16,000) acres. The greening of vegetation from ice pads, roads, airstrips, and compacted snow would occur on 250 to 2,075 (1,500) acres. Seismic operations would result in many |

**Table 2-3. Continued.**

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON RECREATIONAL RESOURCES** | | | |
| for the life of production fields and pipelines. Long-term impacts would accumulate over time. | unconfined recreation opportunities over an area of 244,800 acres (5% of the Planning Area) for the life of production fields and pipelines. | would result in many hundreds of miles of green trails. There would be a loss of solitude, naturalness, or primitive and unconfined recreation opportunities over an area of 268,800 acres (6% of the Planning Area) for the life of production fields and pipelines. | hundreds of miles of green trails. There would be a loss of solitude, naturalness, or primitive and unconfined recreation opportunities over an area of 203,200 acres (4% of the Planning Area) for the life of production fields and pipelines. |
| Opportunities for primitive recreation have and will continue to be reduced by oil and gas activities on the North Slope. Facilities at Deadhorse support recreational opportunities along the Dalton Highway and at Prudhoe Bay. There would technically be no cumulative impacts to Wilderness or Wild and Scenic Rivers because there are currently no such areas designated in the Planning Area. However, the area eligible for future designation would be reduced to the degree that major disturbance occurred. Projected cumulative activities could have local impacts on the free-flowing, unpolluted waters and could affect the outstandingly remarkable values of portions of the eligible Colville River. In such a case, the amount of area potentially suitable for designation would be reduced. Cumulative effects would be similar under all four alternatives. | | | |
| **EFFECTS ON VISUAL RESOURCES** | | | |
| **General Effects:** Impacts on visual resources from activities other than oil and gas would be minimal and short term. During exploration, seismic surveys could result in over 7,500 miles of visible green trails. It is estimated that the long-term disturbance associated with the new wells would be 100 to 380 acres. Ice pads, airstrips, and roads would cause greening and ring effects on up to 1,900 acres. During development, long-term visual effects would occur from production pads, roads, gravel pits, pipelines, and CPFs on 120 to 380 acres, and from pipelines on up to 660 acres. | **General Effects:** Effects on visual resources would occur over a greater acreage of land than under the No Action Alternative. During exploration, seismic surveys could result in over 7,500 miles of visible green trails. It is estimated that the long-term disturbance associated with the new wells would be 100 to 990 (750) acres. Ice pads, airstrips, and roads would cause greening and ring effects on up to 500 to 4,950 (3,750) acres. During development, long-term visual effects would occur from production pads, roads, gravel pits, pipelines, CPFs, and staging bases on 240 to 2,100 (1,450) acres, and from pipelines on up to 1,320 acres. | **General Effects:** Effects on visual resources would occur over a greater acreage of land than under the other alternatives. During exploration, seismic surveys could result in over 7,500 miles of visible green trails. It is estimated that the long-term disturbance associated with the new wells would be 120 to 1,220 (910) acres. Ice pads, airstrips, and roads would cause greening and ring effects on up to 600 to 6,100 (4,550) acres. During development, long-term visual effects would occur from production pads roads, gravel pits, pipelines, CPFs, and staging bases on 390 to 2,650 (1,820) acres, and from pipelines on up to 1,980 acres. | **General Effects:** Effects on visual resources would occur over a greater acreage of land than under the No Action Alternative, but over less acres than under alternatives B and C. During exploration, seismic surveys could result in over 7,500 miles of visible green trails. It is estimated that the long-term disturbance associated with the new wells would be 100 to 830 (600) acres. Ice pads, airstrips, and roads would cause greening and ring effects on up to 500 to 3,000 (4,150) acres. During development, long-term visual effects would occur from production pads, roads, gravel pits, pipelines, CPFs, and staging bases on 130 to 1,300 (920) acres, and from pipelines on up to 1,140 acres. |
| There would be a small increase in the short-term impacts to visual resources from non-oil and gas activities. Short-term impacts, such as green trails, and ongoing activities would not accumulate. Impacts from long-term or permanent facilities such as roads, pipelines, and gravel pads and pits would accumulate and would result in the long-term loss of scenic quality. Long-term impacts from production sites, staging areas, and pumping stations with a possible life span of over 30 years would affect visual resources in the North Slope. It is expected, however, that these impacts would be greatest within the Foreground-Middleground Zone of the viewer. Pipelines could be elevated above ground level and would be visible from ½ mile or more away. Except during construction and repair of pipelines, there would be no associated on-the-ground activity. Therefore, long-term impacts to visual resources from pipelines would be expected to be minimal if located beyond the Foreground-Middleground Zone of the viewer. | | | |

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON THE ECONOMY** | | | |
| **General Effects:** Oil and gas exploration and development would benefit the economy be creating increased revenues and employment. On average, approximately $2.8 to $4.8 million would be generated annually in property taxes. There would be an annual royalty of $7 to $54 million for the federal government, and $7 to $54 million for the State of Alaska and the NSB. The average annual state severance tax would be $13 to $90 million. The number of jobs created by exploration, development, and production would peak at 1,300 to 1,600 during development, declining to 500 to 825 jobs during production. The number of resident jobs generated would be 42 to 44 during the peak, and 17 to 27 jobs during production. Disruptions to the harvest of subsistence resources could affect the economic well being of NSB residents, primarily through the direct loss of subsistence resources. | **General Effects:** The revenues and employment generated by oils and gas exploration and development would be greater than under the No Action Alternative. On average, approximately $5 to $32 million would be generated annually in property taxes, a 6-fold increase as compared to the No Action Alternative. There would be an annual royalty of $15 to $107 million for the federal government, and $15 to $107 million for the State of Alaska and the NSB. The average annual state severance tax would be $22 to $180 million, twice the amount that would occur under the No Action Alternative. The number of jobs created by exploration, development, and production would peak at 2,374 to 7,775 during development, declining to 810 to 3,005 jobs during production; this would be 2 to 4 times the number generated under the No Action Alternative. The number of resident jobs generated would be 156 to 510 during the peak (a 12-fold gain over the No Action Alternative), and 17 to 64 jobs during production. The likelihood for disruptions to the harvest of subsistence resources and associated economic impacts would be greater than under the No Action Alternative. | **General Effects:** The revenues and employment generated by oil and gas exploration and development would be greater than under the No Action Alternative and similar to or slighter greater than under Alternative B and the final Preferred Alternative. On average, approximately $6 to $37 million would be generated annually in property taxes, a 2 to 8-fold increase as compared to the No Action Alternative. There would be an annual royalty of $15 to $122 million for the federal government, and $15 to $122 million for the State of Alaska and the NSB. The average annual state severance tax would be $22 to $180 million, twice the amount that would occur under the No Action Alternative. The number of jobs created by exploration, development, and production would peak at 2,374 to 9,090 during development, declining to 810 to 3,654 jobs during production; this would be over five times the number generated under the No Action Alternative. The number of resident jobs generated would be similar to the number generated under Alternative B: 156 to 638 during the peak (a 14-fold gain over the No Action Alternative), and 17 to 79 jobs during production. The likelihood for disruptions to the harvest of subsistence resources and associated economic impacts would be greater than under the other alternatives. | **General Effects:** The revenues and employment generated by oil and gas exploration and development would be greater than under the No Action Alternative and similar to or lower than under alternatives B and C. On average, approximately $5 to $32 million would be generated annually in property taxes, a 2 to 6-fold increase as compared to the No Action Alternative. There would be an annual royalty of $13 to $107 million for the federal government, and $13 to $107 million for the State of Alaska and the NSB. The average annual state severance tax would be $22 to $178 million, about twice the amount that would occur under the No Action Alternative. The number of jobs created by exploration, development, and production would peak at 1,787 to 5,798 during development, declining to 405 to 2,386 jobs during production; this would be about three times the number generated under the No Action Alternative. The number of resident jobs generated would be up to 9 times the number generated under the Preferred Alternative: 78 to 407 during the peak, and 9 to 52 jobs during production. The likelihood for disruptions to the harvest of subsistence resources and associated economic impacts would be greater than under the No Action Alternative. |

Table 2-3. Continued.

| No Action Alternative | Alternative B | Alternative C | Final Preferred Alternative |
|---|---|---|---|
| **EFFECTS ON THE ECONOMY** | | | |
| **Cumulative:** Subsistence was, and continues to be, the basis of the economy and culture for the Iñupiat people. The assessment of past events begins with the advent of commercial whaling in the 1850s, which is considered the first major event that affected the North Slope economy, and ends with current (2004) oil and gas lease sales that could affect the future economy of the region. Aside from the petroleum industry, the NSB is the dominant economic organization on the North Slope. The NSB taxes the oil and gas facilities and uses the revenues to provide education and a wide array of other public services within its boundaries. Property taxes on oil and gas infrastructure provide over 95 percent of the total revenues received by the NSB. Population growth in the NSB grew sharply until the mid-1980s, and then has slowed significantly over the past several years and has declined for four straight years since 1999. Real (inflation adjusted) per capita personal income in the NSB has declined from peak years in the 1970s and early 1980s, with over $40,000 in income, to under $30,000 in income in the latter part of the 1990s. Increased income has led to the adoption of more efficient, reliable, useful, and less-demanding subsistence technology. However, full time employment has reduced the amount of time available for subsistence activities. The declining trend in revenues, jobs, and per capita incomes are expected to continue into the future (in the absence of a major economic event such as the natural gas pipeline project that would create a natural gas industry). It seems reasonable to envision a future trend with more North Slope residents participating in oil and gas activities as Borough-related employment opportunities become very limited. This could mean a tradeoff in subsistence activities as jobs in the oil and gas industry would not be able to provide the same level of flexibility as the Borough and construction jobs. Events in the reasonably foreseeable future, such as exploration and development in other areas of the National Petroleum Reserve – Alaska could mitigate these declining trends, but are not expected to offset these declines. The development associated with the Northeast National Petroleum Reserve – Alaska could also have implications at the national level. The Department of Energy estimated that the contribution of North Slope crude to domestically produced oil supplies would decline from 18 percent in 2004 to 14 percent in 2020; again, this decline could be mitigated, but not offset, by opening up the Northeast National Petroleum Reserve – Alaska to oil and gas exploration. Any increase in domestic oil production is expected to reduce U.S. dependency on foreign oil supplies, and, in turn, improve national energy security and the overall balance of trade. | | | |

# CHAPTER 3
# DESCRIPTION OF THE AFFECTED ENVIRONMENT

Exhibit 42, page 130 of 300

# CHAPTER 3

# DESCRIPTION OF THE AFFECTED ENVIRONMENT

## 3.1 Preview of this Section

This chapter provides an overview of the Planning Area's physical, biological, and social features that would be affected by the alternatives under consideration. This chapter focuses on the resource concerns that were identified in Chapter 1 (Introduction), and is useful in understanding the environmental, cultural, and social consequences of the alternatives. Much of the information in this chapter is taken from the 1998 Northeast IAP/EIS (Section III), Northwest IAP/EIS (Section III), and *Alpine Satellite Development Plan Final EIS* (Section 3; USDOI BLM and MMS 1998, 2003; USDOI BLM 2004c). Other information that has become available since the completion of the Northeast IAP/EIS in 1998 has also been included.

## 3.2 Physical Environment

### 3.2.1 Climate and Meteorology

Winters are long and cold, and summers are short and cool in the Planning Area. The area is one of the harshest environments in North America, where snow may fall even in August. The average daily temperature falls below freezing more than 200 days per year in Nuiqsut. Seasonal snow cover on the North Slope can begin in late September to early October and may not disappear until mid-June.

The annual mean temperature in the Planning Area is about 10 degrees Fahrenheit (°F). Temperatures on the North Slope are typically below freezing from mid-October into May. Construction work and oil exploration are conducted in winter in many areas because both the ground and the streams are frozen enough to allow the use of heavy equipment on them. February is the coldest month, with an average temperature of about –21 °F. July is the warmest month, with an average temperature of 46 °F. Average snow depth from January through April is 10 inches in Barrow and 15 inches in Umiat, which is in the foothills. Snowfall is greatest in October but can occur during each month of the year.

Because winters in the Planning Area are long, most streams and lakes are frozen for much of the year. Summers, while short and relatively cool near the coast, are longer and warmer inland. The onset of snowmelt and subsequent runoff often begins earlier in the foothills than in the rest of the area and moves north as the summer season progresses. Similarly, freeze up usually begins first on the coastal plain and proceeds southward.

Prevailing winds blow cold air off the frozen Arctic Ocean and are strongest during winter, often creating blizzard conditions. Southerly winds may break this pattern on occasion. The annual mean wind speed in the region is approximately 13 miles per hour. Nuiqsut typically exhibits bimodal wind direction climatology dominated by northeasterly through easterly directions about 45 percent of the time, and west-southwesterly through westerly directions the remainder of the time (SECOR International, Inc. 2003).

#### 3.2.1.1 Climate Change on the North Slope

Carbon dioxide ($CO_2$) is a greenhouse gas, along with other gases such as methane. Greenhouse gases are vital because they maintain global ambient temperatures within ranges suitable for life on earth. However, excess greenhouse gas emissions increase the concentration of these gases in the atmosphere and contribute to overall global climatic changes, typically referred to as global warming. Carbon dioxide emissions are a product of fossil fuel combustion and tropical forest destruction, human activities that contribute to global climatic changes. Large

AFFECTED ENVIRONMENT

quantities of greenhouse gas emissions may decrease the amount of infrared or heat energy radiated by the earth back to space and upset the global temperature balance. Global warming may ultimately contribute to a rise in sea level, destruction of estuaries and coastal wetlands, and changes in regional temperature and rainfall pattern, with major implications to agricultural and coastal communities (Arctic Climate Impact Assessment [ACIA] 2004).

Global mean surface temperatures have increased 0.5 to 1.0 °F since the late 19th century (Figure 3-1). The 20th century's 10 warmest years all occurred in the last 15 years of the century. Of these, 1998 was the warmest year on record. The snow cover in the Northern Hemisphere and floating ice in the Arctic Ocean have decreased, and globally, the sea level has risen 4 to 8 inches over the past century. Worldwide precipitation over land has increased by about 1 percent. The frequency of extreme rainfall events has increased throughout much of the U.S.



Figure 3-1. Global Temperature Change (1880-2000).

Increasing concentrations of greenhouse gases are likely to accelerate the rate of climate change. Scientists speculate that the average global surface temperature could rise 1 to 4.5 °F in the next 50 years, and 2.2 to 10 °F in the next century, with significant regional variation. Evaporation would increase as the climate warms, which would increase average global precipitation. Soil moisture is likely to decline in many regions, and intense rainstorms are likely to become more frequent. Sea level is likely to rise 2 feet along most of the U.S. coast (USEPA 2003).

Calculations of climate change for specific areas are much less reliable than global ones, and it is unclear whether regional climate will become more variable. Computer models indicate that such increases in temperature will not be equally distributed globally but are likely to be accentuated at higher latitudes, such as in the Arctic, where the temperature increase may be more than double the global average. Warming during the winter months is expected to be higher than during the summer. Northern areas would also likely experience increased precipitation (USDOI BLM and MMS 1998).

Temperatures in Alaska and throughout the Arctic appear to have fluctuated over the last few centuries. Changes in permafrost are an important indicator of climate change. Temperature data for the permafrost in Alaska have been collected from borings over the last 2 decades. Using oil exploration wells distributed in the Arctic coastal plain and foothills, Lachenbruch and Marshall (1986) measured the temperatures of permafrost to depths of more than 600 feet and showed that the mean surface temperature is likely to have warmed 4 to 8 °F during the last century.

The assessment of the impacts of climate change is in its formative phase, and it is not yet possible to know with confidence the net impact of such change. Possible impacts of global climate change on the North Slope include negative effects on the ecology of the Arctic tundra, sea ice, and changes in the permafrost depth. Reduction in sea ice

as a result of global climate change would affect marine mammals (particularly polar bears), fish, and birds, with related implications for Native subsistence harvests. A reduction in sea ice would likely increase marine transport and allow increased offshore extraction of oil and gas. Species ranges are predicted to move northward. Due to loss of habitat, or from competition from other species whose ranges shift northward, some Arctic species may be pushed toward extinction. Treeline is expected to move northward, with forests replacing tundra and tundra vegetation moving into unvegetated areas. Early thawing of rivers may impact caribou migrations to calving grounds. In addition, potential sea level rise, increases in severe weather, and thawing of tundra could have negative effects on oil and gas-related infrastructure. Elevated ultraviolet radiation levels could lead to higher levels of skin cancer, cataracts, and immune system disorders in Alaska Natives. However, some Arctic fisheries are expected to become more productive.

### 3.2.2 Air Quality

The Planning Area is in an area that is in attainment of the National Ambient Air Quality Standards (NAAQS) and the Alaska Ambient Air Quality Standards (AAAQS) for all criteria pollutants (Table 3-1). There are no federally protected Prevention of Significant Deterioration (PSD) Class I Wilderness Areas or National Parks within 60 miles of the Planning Area. The air quality in the Colville River Delta is generally good as a result of few pollution sources and good dispersion created by frequent high winds and neutral to unstable conditions in the lower atmosphere. Particulate entrainment (wind blown dust) tends to occur more in the summer months from sandbars along the riverbeds in the Colville River Delta, resulting in temporary increases in concentrations of airborne particulates. Existing onshore air quality in the Planning Area is relatively pristine, with concentrations of regulated air pollutants considerably lower than the maximum concentrations allowed under NAAQS and state air quality standards. Emission sources in the Planning Area consist mainly of diesel-fired generators in small villages, snowmachines, and small amounts of local vehicle traffic. Emissions sources at the Alpine field production and drilling areas include gas-fired turbines and heaters, incinerators, diesel-fired power generators, storage tanks, fugitive hydrocarbon emissions, and mobile sources (vehicle traffic and aircraft).

At Nuiqsut, existing emission sources consist of diesel-fired electric generators and home heaters, open burning, occasional small aircraft, and vehicle traffic. Regional sources of emissions consist of oil and gas production facilities 8 to 70 miles east of the Planning Area, including Kuparuk, Milne Point, Prudhoe Bay, North Star, Endicott, and Alpine fields.

An Ambient Air Quality Monitoring Station has operated at Nuiqsut since 1999 as a permit condition of the Alpine field. The condition required collection of at least 1 year of ambient nitrogen oxides ($NO_X$), sulfur oxides ($SO_X$), particulate matter less than 10 microns in diameter ($PM_{10}$), and dispersion meteorological data (Table 3-2). Data collected at Nuiqsut are representative of background or regional air quality in the Alpine field area. These data indicate that air quality is in compliance with both the NAAQS and the AAAQS for all pollutants and averaging periods. Particulate concentrations exceeded AAAQS on 1 day in 1999 as a result of wind-generated dust from the dried exposed banks of the Nigliq Channel. This measured high value at Nuiqsut does not mean that the AAAQS was violated. The AAAQS is attained when the expected number of days in a calendar year with a 24-hour average concentration above 150 micrograms per cubic meter is less than or equal to 1 day. (18 AAC § 50.010, Title 18 Environmental Conservation Chapter 50 Air Quality Control Article 1 Ambient Air Quality Management).

### 3.2.3 Physiography

Physiography can be described as the classification of large-scale landforms within a given area. The Planning Area contains two of the three primary physiographic regions of the National Petroleum Reserve – Alaska, the Arctic Coastal Plain and the Arctic Foothills of the Brooks Range (Map 3-1; Wahrhaftig 1965).