

Figure 4-1. Seismic Surveys Conducted in the Northeast National Petroleum Reserve – Alaska.

ENVIRONMENTAL CONSEQUENCES

enough to proceed with exploration drilling, it is likely that local 3-D seismic surveys will be collected for field delineation.

The following discussion recognizes the tradeoff of 3-D (better resolution at higher cost) versus 2-D seismic surveys. General assumptions on the type and location of probable activities are used for the purpose of impact analysis. As seismic survey techniques improve, more seismic data may be gathered in less time than is described here.

At this time, the Teshekpuk Lake area, which is currently excluded from leasing (approximately 600,000 acres), is recognized as an area of high oil and gas potential. Seismic survey lines over the lake area are relatively sparse, so it is assumed that additional seismic survey work would be necessary prior to exploration drilling. Winter over-ice surveys were conducted on Teshekpuk Lake in 1974 and 1975 using dynamite as a sound source. Shot holes were drilled into the ice and then into the bottom of the lake, and then charges were detonated. Geophone arrays were installed on the frozen lake surface to record the returning signal. Approximately 120 miles of 2-D seismic data were collected. Although Teshekpuk Lake is a high priority area for 3-D seismic data acquisition, there may be attendant logistical problems for more preferable Vibroseis surveys in this area. Furthermore, the use of explosives to collect seismic survey information may not be appropriate if there are substantial impacts to fish and wildlife. A lake survey could be done during the summer using boats and airguns, as is done offshore, but these surveys could also impact fish and wildlife.

Under all of the alternatives, 3-D seismic survey data are more likely to be acquired than 2-D data. However, 2-D seismic data might be collected for regional reconnaissance purposes or as ties into or infill for existing surveys. These 2-D surveys would likely be designed to identify and delineate large, comparatively complex, and faulted structural prospects in the southern part of the Planning Area. Extensive 3-D seismic have been used in the Planning Area to direct exploration and appraisal drilling because of the size of the area, the economy of scale, and the opportunity to identify multiple prospects. There is a high probability that two additional large 3-D surveys would be conducted in the Planning Area in the future. The likelihood of other surveys occurring is more speculative, and would depend on exploration successes. It is important to note that there would be minimal duplication of future seismic surveys. Overlap would occur along survey borders or corners, depending upon how the surveys were oriented. To date, most surveys have been conducted at oil companies' requests and specifications rather than for speculative purposes by the seismic industry. Based on these general concepts, the number of seismic surveys required for each alternative have been estimated as follows.

*No Action Alternative (Alternative A).* Extrapolation of current 3-D seismic data gathering techniques suggests that the entire area could be covered by two to four additional 3-D surveys under the No Action Alternative. These surveys could take as little as 2 years, depending on the number of seismic operators and the number of crews they employed. Two to three 2-D seismic surveys would be needed to infill along the foothills and tie into existing 3-D surveys. The length of surveys would be much shorter than normal, however, and the total length for all surveys would be unlikely to exceed 250 miles. These surveys could be accomplished in a season or two. With aggressive exploration, seismic operations could be completed 2 to 3 years after the next lease sale. Weakened interest or regulatory issues would likely delay the onset of seismic operations and possibly extend the number of years required to complete the data-gathering process.

*Alternative B.* Extrapolation of current 3-D seismic data gathering techniques suggests that the entire area could be covered by two to five additional 3-D surveys under Alternative B. These surveys could take as little as 3 seasons, depending on the number of seismic operators and the number of crews they employed. The Teshekpuk Lake area would be a separate survey, irrespective of its size. Two to three 2-D seismic surveys would be needed to infill along the foothills and tie into existing 3-D surveys. However, the length of surveys would be much shorter than normal, and the total length for all surveys would be unlikely to exceed 250 miles. These surveys could be accomplished in a season or two. With aggressive exploration, seismic operations could be completed 2 to 3 years after the next lease sale. Weakened interest or regulatory issues would delay the onset of seismic operations and possibly extend the number of years to complete the data gathering process. Two-D seismic surveys might not even be conducted if the 3-D coverage was gathered quickly.

*Alternative C.* Extrapolation of current 2-D and 3-D seismic data gathering techniques suggests the entire area could be covered by a similar level of effort as described for Alternative B—250 miles of additional 2-D surveys and two to five additional 3-D surveys.

*Final Preferred Alternative (Alternative D).* Extrapolation of current 2-D and 3-D seismic data gathering techniques suggests the entire area could be covered by a similar level of effort as described for alternatives B and C—250 miles of additional 2-D surveys and two to five additional 3-D surveys. Seismic surveys would probably not occur in Teshekpuk Lake unless it became likely that Teshekpuk Lake would become available for leasing after the 10-year deferral period.

### Roads and Drilling Pads

Exploratory drilling would generally be limited to temporary facilities such as ice roads, pads, and airstrips, and temporary platforms, unless the lessee can demonstrate that construction of permanent facilities, such as gravel airstrips, storage pads, and connecting roads is environmentally preferable or necessary to carry out exploration more economically (Lease Stipulation D-2). In the Teshekpuk Lake Caribou Habitat Area, however, exploratory drilling would only be allowed from current production pads or platforms sited within a lake body from May 20 through August 20, depending upon which alternative is chosen, to minimize impacts to caribou in the area. Ice roads would provide seasonal routes for heavy equipment and supplies moved to remote staging areas or well locations. These temporary, seasonal roads are constructed by spreading water pumped from local lakes to build up a rigid surface. Typically, ice roads are designed to be a minimum of 6 inches thick and 30 to 35 feet wide, and can be tens of miles long. Water supplies must be located along the proposed route to supply approximately 1 to 1.5 million gallons of water per mile of road. New ice-road construction methods, such as using aggregate chips shaved from frozen lakes, substantially decrease both water demands and construction time. For example, under good (very cold) conditions, an ice-road-buildup rate using only liquid water is 1.5 inches per day, whereas using aggregate chips could increase the buildup rate to 4.5 inches per day, with equivalent reduction in the volume of water required. Ice bridges over rivers and lakes are constructed by similar flooding and composite (aggregate chip) methods, but the ice thickness is increased to rest on the bottom of shallow rivers or lakes. Floating ice bridges are used to cross deep rivers, such as the Colville River.

Ice drilling pads are commonly used as platforms for winter exploration wells. Ice pads are constructed much like ice roads, with the tundra surface flooded with water to build up progressive layers of ice. As with ice roads, the use of aggregate chips speeds the process while decreasing water demands. A typical ice pad is designed to be a minimum of 1-foot thick, covers 6 acres, and requires approximately 500,000 gallons of water to construct. Depending on the well site, ice pads could range in size from 3 to 10 acres. Water requirements vary, depending on the pad size and availability of aggregate chips shaved from nearby lakes.

### Exploration and Delineation Wells

Exploration operations require movement of heavy equipment (a drilling rig) and large amounts of materials (steel casing, drilling mud, fuel) to remote locations, which typically occurs on ice roads during the winter months. Transportation logistics must also allow for regular crew changes and re-supply. An exploration well crew could consist of 30 to 60 people, working 1- to 2-week shifts, who would be transported to the site by aircraft landing on constructed ice runways. Large lakes (1 mile more across) could be prepared quickly as winter landing strips.

The oil and gas companies have used, and are testing, alternative methods to manage exploration and production operations in areas where traditional methods would be limited or challenging because of distance, water availability, or terrain. ConocoPhillips has obtained permits and staged a drilling rig on an insulated ice pad west of Teshekpuk Lake throughout the summer in order to have the rig available on-site for exploration work the following winter. By over-summering the rig at remote sites, more of the time that would have been required to build an ice pad, possibly build an ice road, and mobilize and demobilize the rig was available for drilling and/or well testing activities.

ENVIRONMENTAL CONSEQUENCES

Anadarko field-tested a new drilling system, the Arctic Platform, which has potential for use in the National Petroleum Reserve – Alaska. The Arctic Platform is like an offshore platform, but is used on land. A self-contained drilling system and crew quarters sit atop a deck made of interlocking modules that rest on pilings set into the permafrost below the tundra. The platform is elevated approximately 12 feet off the tundra, eliminating the need for gravel or ice pads. Surface use of this technology could allow operators to perform exploration drilling outside the winter season, since ice pads would not be required. This technology could also allow access to remote areas, to areas where water to build ice roads is scarce, and to areas where steep grades make it difficult to set a rig. The Arctic Platform could be used for exploration drilling and as a production unit.

Exploration wells in the northern portion of the Planning Area (the area of highest oil potential) are likely to range from 6,000 to 12,000 feet in depth. For these depths, most exploration wells could be drilled, logged, and tested within a single winter season. If a discovery were made, a second (delineation) well could be drilled from the same ice pad in a single season, depending on well depth and the efficiency of drilling operations. In the Teshekpuk Lake Caribou Habitat Area, however, exploratory drilling would only be allowed from current production pads or platforms sited within a lake body from May 20 through August 20 to minimize impacts to caribou in the area.

To define the limits of reservoirs after a discovery was made, several delineation/confirmation wells would likely be drilled before making a commitment to project development. Additional delineation wells surrounding the discovery well would likely be planned for the following winter or two, and would require new ice pads. Because of high development project costs, two to four successful delineation wells would likely be drilled to establish reservoir continuity over an area. For example, a possible field-development project consisting of two production well pads might require a total of seven wells (one exploration and six delineation wells). Delineation-well drilling would be coordinated with any existing 3-D seismic surveys.

During drilling operations, wells would be tested for the presence of hydrocarbons. If testing indicated that hydrocarbons were not present in commercial quantities, the wells would be plugged and abandoned. Cement plugs would be placed throughout the well bore to prevent migration of fluids and gases and to protect subsurface resources. Successful wells (discoveries) could be re-entered for use as production wells at a later time by drilling out the cement plugs, but most exploration wells would be considered expendable and would not be used for later production. If commercially producible hydrocarbons were found, equipment and materials could be left at the site, supported on pilings, to reduce mobilization time the following winter drilling season. Rock cuttings from delineation wells could be either backhauled to existing disposal wells or processed (ground and treated) for subsurface disposal in the abandoned wells. Upon completion of drilling operations, all equipment and materials would be moved back to staging areas on ice roads. No materials or drilling wastes (mud and cuttings) would remain at the site.

### *Water Demand and Rock Cuttings*

Drilling operations require large amounts of water to create drilling fluid. Drilling fluid is typically a preparation of water, clay, and chemicals that is circulated into a well during drilling. The drilling fluid is used to lubricate and cool the bit, transport rock cuttings to the surface, prevent sloughing from the sides of the drill hole, and provide a weighting medium to prevent the migration of oil and other fluids into the well. A 10,000-foot well could require approximately 850,000 gallons of water for drilling, in addition to approximately 100 gallons per day for each person in the drilling crew (for camp use). Approximately 50 to 60 people would be needed to operate a drilling rig. Over a 3 to 4 month drilling season, a one-well drilling operation could require a total of 1,650,000 gallons of water, which would be obtained (if possible) from a source close to the well site. The use of melted snow could supplement this water requirement. Estimated water requirements are much lower for development wells, because 50 percent or more of the drilling mud would be reconditioned and reused.

A typical 10,000-foot well could use 630 tons of drilling mud and produce 820 tons of rock cuttings. If an exploratory well were to be abandoned, drilling mud and cuttings could be re-injected into an appropriate formation through the borehole. If the well were to be converted to production, it would be temporarily shut in, and

the operator would dispose of drilling mud and cuttings at an approved grind and inject facility. No liquid or solid waste would be disposed of on site.

### *Effects of Shortened Drilling Seasons*

An important concern pertaining to oil and gas operations on the North Slope is that the winter drilling season has been reduced from 208 days in 1970 to 103 days in 2003 as a result of rising global temperature (Arctic Climate Impact Assessment [ACIA] 2004, Rhodes 2004). Because at least 120 days are needed to effectively conduct projects, the shortened seasons result in the need for more drilling seasons, causing projects to take longer to complete. As a result, projects have become more costly in an area already constrained by the high costs of finding and developing oil and gas resources. Because of the shortened season, a growing proportion of the available drilling season is used to build roads, and there is less time to drill wells. Seismic operations are also constrained because shorter seasons reduce the amount of data that can be obtained. In an effort to create a more flexible system for determining when operations can begin, in 2002 the ADNR divided the Alaska North Slope into four regions, allowing each region to independently determine when activities can commence (Anchorage Daily News 2004). One of these regions allowed operations to commence on December 23, 2003, the earliest opening in 8 years. The ADNR is also attempting to deal with the problem by testing ground transportation equipment. During 2003-2004, testing was conducted by tracking several types of equipment over test plots. The tests were conducted from October to January to determine the effects of equipment on the ground as it is freezing. The ADNR announced in March 2004 that based on the tests that were conducted, it will set tundra travel opening dates based on the type of equipment that will be used (Rhodes 2004).

Other methods of dealing with the shortened season involve innovations to drilling equipment technology. During 2003 and 2004, Anadarko Petroleum Corporation drilled a test well to evaluate methane hydrate, a solid material that is formed from methane gas and water and is found at depth in the permafrost of the Arctic and in the deep sediment in the world's oceans (Petroleum News 2004). While the main purpose of the well was to conduct research on hydrates, the equipment used to drill the well has features that could change the way shallow exploration drilling is conducted in the Arctic. Rather than drilling from an ice pad, the derrick, associated equipment, and living quarters were placed on a platform composed of 16 aluminum modules supported on steel legs. The impacts on the ground are holes used for the leg supports, which can be easily filled at the completion of operations. The test well was initiated in the winter of 2003 and completed in the winter of 2004. Although no drilling was conducted in the intervening months between the winters, the rig and the equipment were left in place with no apparent effects to tundra or wildlife (Petroleum News 2004). Since an ice pad is not needed for this drilling rig, it is conceivable that this type equipment could extend the drilling season.

Another drilling innovation that would help mitigate the constraints of the shortened season is the newly constructed "Arctic Millenium [sic]" rig (Bradner 2004). The rig, built by NI Energy Development Inc., is highly automated and can drill beyond 20,000 feet, and the modular units into which the drilling rig breaks down for transportation are much lighter than conventional rigs. The lighter and more mobile modules have implications for the drilling season in that the rig can be more quickly mobilized to drilling sites and the individual modules are light enough to travel over packed snow as soon as the tundra freezes, rather than waiting for the construction of ice roads to transport the rig.

### Discovery and Development

Delineation and development activities could take from 4 to 10 years prior to production startup. Production activities would last between 10 and 50 years, depending on the size of the field. Abandonment activities, including well sealing and site restoration, could last 2 to 5 years after the end of production. This representative time frame suggests that new oil production would not be expected for at least 5 years following the lease sale, and it is more likely that 8 to 12 years would elapse before production from leases sold in the next Planning Area sale would begin. The discovery and development of commercial fields is likely to be staggered over a 10-year period, and petroleum activities could continue for decades after a lease sale.

ENVIRONMENTAL CONSEQUENCES

For this discussion, a field is an accumulation of oil and gas with proven reserves that has been developed and is producing crude oil. Fields can contain numerous reservoir pools produced through a common infrastructure. "Discovery" refers to a pool with unproven resources that has not been developed. Some discoveries require additional drilling to confirm that oil or gas is commercially recoverable.

After a field has been discovered and confirmed to be of commercial size by delineation wells and seismic surveys, a number of construction activities are required to establish a permanent production operation. A new field would contain production well pads that could potentially support tens to hundreds of wells, a pipeline gathering system to a Central Production Facility (CPF), infield roads, a crew support camp, and an airstrip. Figure 4-2 shows a possible layout for a CPF with five satellite fields. Table 4-3 shows the estimated area of surface disturbance and amount of gravel needed for oil and gas facilities for a typical field. A new sales-oil pipeline would be built to carry oil production to the existing pipeline network capable of supporting transportation needs. Winter ice roads would be used to move heavy equipment and materials to other North Slope oil fields, rather than a permanent gravel road. Light loads, such as camp supplies and crew changes, could be transported by fixed-wing aircraft or Rolligons. Roadless, or seasonal road development, would likely be the preferred strategy for future fields in the Planning Area, for resource protection, practicality, and cost reasons. There are circumstances, however, under which permanent roads could be appropriate, and permanent roads are currently being considered for the Alpine field as part of the Alpine Satellite Development Plan (USDOI BLM 2004c).

### *Staging Area*

Staging areas are used to support exploration, development, and abandonment activities. All materials and equipment necessary to develop a new field must be stockpiled, moved, and assembled in remote portions of the Planning Area, subject to seasonal constraints for transportation. Consequently, staging areas are very important components to development. Ideally, a staging area contains buildings for warehouses and crew quarters, gravel pads for stockpiling materials, and a serviceable airstrip. If located on the coastline, a causeway or dock may be needed for loading materials and equipment transported by barges. For purposes of this Amended IAP/EIS, it is assumed that each staging area would be approximately 50 acres.

Considering the expense to establish a new staging area in a remote site, it may be more cost-effective to reoccupy existing sites, even if some refurbishing is necessary. Camp Lonely, BLM-administered lands (Cook Inlet Region Incorporated [CIRI] lease site and the DEW-Line site), Inigok, and Umiat have been used as major staging areas for past National Petroleum Reserve – Alaska operations. The DEW-Line site at Camp Lonely is technically considered by the U.S. Air Force to be an inactive site that could fulfill the mission if called upon. Thus, consultation would be required for any use of the airstrip.

Development of staging areas would occur in winter prior to the start of development activities. The number of barges required in each sealift to support development activities would be up to 30 barges per year. Modules and equipment would be offloaded from barges in 3 to 5 days and stored on the staging area pad until winter. They would be transported by ice road during the winter to the CPF sites. Individual modules could be 20 to 30 feet in height. Each CPF would likely require one or two large sealifts (1 year apart), depending on its size. Modules would eventually become the site's energy generation, operations, and housing facilities complex.

It is likely that the first development operations in the Planning Area initially would be staged out of existing facilities at the Greater Prudhoe Bay Unit or Kuparuk River Unit. Both of these base camps have all-season airports, are connected by road systems, and have marine loading sites on the coast (West Dock and Oliktok Point). Materials and equipment likely would be moved to staging areas within the Planning Area using marine transport in the summer months and/or by trucks over ice roads in the winter months. Aircraft would access remote sites at all times of the year; however, air traffic would be restricted by low clouds and fog in the summer, and by storms with whiteout conditions in the winter.

After the tundra was sufficiently frozen and tundra travel had been authorized, ice roads would be constructed to remote development sites. Equipment could also be transported by Rolligon trail. Earth-moving equipment would

then move gravel to the site to establish a construction camp and perhaps a year-round airstrip. Later, drilling equipment and supplies would be moved to the site over ice roads. Production equipment (modules) and pipeline-construction materials would be moved during the final stages of development. The overall development phase, from construction of a staging area and remote base camp to production startup, could take 3 to 7 years, depending on the size and location of the new field.

Table 4-3. Estimated Area of Surface Disturbance and Amount of Gravel Needed for Oil and Gas Facilities for a Field Consisting of a Central Production Facility Field with Five Satellite Fields.

| Facility/Disturbance | Number of Facilities/Miles/Acres | Total Amount of Impact |
|---|---|---|
| **Development/Operational Facilities** | | |
| Central production facilities (2 pads, road, airstrip) | 1 | 100 acres |
| Satellite pad (10 acres each) | 5 | 50 acres |
| Satellite airstrip (1,30 feet x 5,000 feet; 11 acres each) | 1 | 11 acres |
| Roads to satellite fields (7.5 acres per mile)[1] | 50 miles | 376 acres |
| Total acres – pads, roads, and airstrips | | 537 acres |
| Staging areas (50 acres each) | 1 | 50 acres |
| Ice roads (10 miles per satellite pad)[2] | 50 miles | 250,000,000 gallons |
| **Gravel Consumption** | | |
| Central production facilities (10,000 cubic yards per acre) | 100 acres | 1 million cubic yards |
| Satellite pad (10,000 cubic yards per acre) | 50 acres | 500,000 cubic yards |
| Satellite airstrip (10,000 cubic yards per acre) | 11 acres | 110,000 cubic yards |
| Staging area (10,000 cubic yards per acre) | 50 acres | 500,000 cubic yards |
| Roads (41,000 cubic yards per mile) | 50 miles | 2.1 million cubic yards |
| Total gravel consumption | | 4.2 million cubic yards |
| **Field Pipeline Right-of-ways** | | |
| Vertical support members (VSMs; 96 per mile) | 53 miles | 5,088 VSMs |

[1] Assumes that there are 10 miles between each satellite pad and 3 miles between each Central Production Facility pad.
[2] Assumes that 10 miles of road are constructed for each satellite pad and that roads are constructed annually for 5 years.
Sources: USDOI BLM and MMS (1998, 2003) and USDOI BLM (2004).

### *Gravel Requirements*

Much of the initial work for a new project would involve the construction of gravel pads for wellheads, production and support facilities, infield roads, and an airstrip. The development area must be level, stable, and elevated above the wet tundra surface. Because the tundra surface is unstable, and subject to flooding in summer and ice-jacking forces in winter, pads are designed to be at least 5 feet above the tundra surface.

Gravel is the preferred material for pad construction. Gravel borrow pits are relatively common east of the Colville River, but gravel is a scarce commodity in the Planning Area. A variety of alternate strategies could be adopted, including the following:

- Extracting gravel from existing sites;
- Developing new sand and gravel mine sites within the Planning Area;
- Barging construction materials to coastal staging areas;
- Processing bedrock for construction materials;
- Designing alternatives (year-round ice pads; composite all-season pads); and
- Reusing gravel from previous drillsites.

ENVIRONMENTAL CONSEQUENCES



Figure 4-2. Hypothetical Layout of a Central Processing Facility and Satellite Fields.

Project plans for new field development in the Planning Area would depend largely on site-specific conditions and the site location relative to sources of construction materials.

For permanent production facilities, the preferred pad design is one made up entirely of gravel. However, composite pads are a proven alternative. An all-gravel pad rising 5 feet or more above a wet tundra surface requires 8,000 to 12,000 cubic yards ($yd^3$) per acre of surface footprint (Table 4-3). Gravel roads (typically 52 feet wide from toe to toe with 2:1 slopes) cover approximately 7.5 acres per mile and require approximately 41,000 $yd^3$ of gravel per mile. Airstrips (typically 100 feet wide and 5,000 feet long) cover approximately 11 acres and could require 110,000 $yd^3$ of gravel. The airstrip could also have an apron and taxiway that could cover another 5 to 8 acres.

Site-specific conditions would dictate the facility requirements and consequent footprint size of new fields in the Planning Area. Small fields with a single production pad and an airstrip could have a footprint of approximately 50 acres. Large fields with multiple pads connected by service roads could have footprints of 200 acres or more. For purposes of analysis, it is assumed that new fields would have footprints of approximately 100 acres. The average gravel requirement for a footprint of 100 acres is approximately 1 million $yd^3$, or about 10,000 $yd^3$ per acre of footprint. Smaller satellite developments would require proportionally less gravel.

Several types of gravel pads have been used in the Planning Area. Gravel requirements are reduced substantially by composite pad designs, in which the lower portion of pads are built using blended (geotextured) mixtures of sand and silt. This lower lift is overlain by rigid foam (Styrofoam) insulation boards and then covered by a layer (2 feet thick) of clean gravel. Material for the lower portion of pads is common in surficial deposits throughout the Planning Area, and could be extracted and blended during winter months from borrow areas near the development site. Use of all-season pad designs could reduce the overall gravel requirement by 33 to 50 percent, as compared to use of all-gravel pad designs. In addition, the use of a blended sand-silt mixture for the lower portion of the composite pad would enhance reclamation after abandonment by providing a more natural substrate for re-vegetation.

Gravel used for developments in the eastern portion of the Planning Area could be extracted from existing or yet undiscovered borrow sites on lands east of the Colville River and then transported to the development sites by trucks over winter ice roads. For more distant sites in the central and western portion of the Planning Area, gravel could be mined from existing borrow pits, barged to coastal staging areas, and stockpiled for later transport by trucks over winter ice roads. Sand and gravel could also be extracted from new sites within the Planning Area. Investigations to identify gravel sources in the Planning Area are underway. It is possible that numerous gravel production sites would be needed. For each new site, overburden removal and sand/gravel mining could impact areas of 20 to 50 acres or more, depending on the thickness and extent of the deposit and amount of material extracted. Since 1973, North Slope oil development has resulted in approximately 1,200 acres of gravel mines, and a total gravel footprint of 9,640 acres. Thus, for this Amended IAP/EIS, an assumption was made that approximately 1 acre would be disturbed for gravel removal to meet the gravel needs for 5 acres for oil and gas development.

Few gravel sources exist for sites in the southern part of the Planning Area. Surficial gravel sources are rare outside river corridors, so it is likely that alternative materials would be considered. Bedrock outcrops could be blasted and then crushed and blended with sand to make up suitable construction material. Unconsolidated sand and gravel deposits are available in river systems, but restrictions on their extraction are likely. Gravel trucked on long ice roads would add substantially to the cost of developments in the southern portion of the Planning Area.

### Development and Production Well Drilling

The number of production wells is determined by the unique characteristics of the oil reservoir, such as thickness, permeability, lateral continuity, and oil qualities. Well drainage areas vary, but generally do not exceed 640 acres per well. Thicker, high-quality reservoirs tend to have larger well-drainage areas. Thinner, or more laterally discontinuous reservoirs, normally require closer well spacing to achieve effective subsurface drainage. However,

horizontal wells with long lateral sections drilled in the reservoir can replace several closely spaced vertical wells. Later in the life cycle of a field, well spacing typically is reduced by infill drilling in the attempt to capture more oil reserves as the reservoir energy is depleted.

In addition to production wells, other wells are drilled to inject water or gas into the field to maximize oil recovery. These wells generally are referred to as service (or injection) wells. Numerous injection wells are required for waterflood programs, which are used routinely throughout the production cycle to maintain reservoir pressure. The proportion of producer to service wells can vary for each field, but a typical ratio of producers to service wells is 2:1 (i.e., one-third of the total number of wells are non-producing service wells).

Production pads are generally most efficiently spaced at distances of approximately twice the reservoir depth. For example, a reservoir at 8,000 feet requiring two production pads would normally have pads located approximately 16,000 feet apart (3 miles). Assuming an 8,000-foot step-out radius, approximately 4,600 acres (7.2 square miles) could be drained from each pad. If each well had a subsurface drainage area of 160 acres, each production pad would hold 29 producer wells and 15 service wells, for a total of 44 wellheads. Extra pad space could be allocated for additional infill production wells.

The time required to drill and complete a production well largely depends on the drilled (or measured) depth of the well. On the North Slope, it normally takes approximately 20 to 30 days to drill and complete a 10,000-foot well, which equates to approximately 10 to 12 wells per rig in a 12-month period. Safety considerations normally restrict operations to one rig drilling on each pad at a time. Using the above example, initial reservoir development drilling operations would take 3 to 4 years to complete. Seasonal restrictions on drilling operations and transportation capacity would increase the overall time to fully develop a field.

Another key consideration is the pressure regime and flow dynamics of oil reservoirs. Once production begins, reservoir dynamics must be carefully managed to optimize oil recovery. Discontinuous production is not an advisable engineering (or economic) practice for oil fields. Therefore, ensuring adequate production rates is a factor in well location selection and the timing of drilling activities.

### *Drilling Mud and Rock Cuttings*

Drilling operations for each development well require large amounts of drilling mud and produce large quantities of rock cuttings. The estimates provided for exploration/delineation wells would apply to development wells of equivalent depths. The goal of current North Slope drilling operations is zero surface discharge of wastes. Generally, dedicated disposal wells are used for injection of drilling wastes, although it is possible to inject wastes into shallow zones of production wells while allowing oil production from deeper zones. Up to 80 percent of the drilling mud may be reconditioned and reused, reducing the costs of both materials and disposal.

Generally, all wastewater, spent fluids, and chemicals would be disposed of offsite in injection wells approved by the USEPA or ADEC, depending upon waste characterization. Solid wastes would be incinerated and hauled to approved offsite landfills. Normal practices do not allow onsite burial of solid wastes.

### *Water Demand*

Water is needed for both drilling and camp use. Drilling water demand is estimated to be 21,000 to 63,000 gallons per day, or 850,000 or more gallons per well. Water demand is estimated to be 100 gallons per day per person. Potable water demand would drop after 2 to 4 seasons, when the major construction phase would be finished. Approximately 160 persons would be on site during the production and development phases for each CPF and four to six satellite fields (S. Rothwell, ConocoPhillips, pers. comm). Drilling-water demand over the 20-year production life of the field (largely for workover operations and infill drilling) would likely be less than the 21,000 gallons per day estimated above. Water requirements for ice roads needed for access to drilling areas are discussed under Section 4.3.4.1 (Water Resources, Effects of Disturbances, Ice Road and Pad Construction).