## Production

### Production Facilities

A CPF would serve as the operational center for long-term production activities in a North Slope oil field. In addition to oil-production equipment, the CPF typically includes living quarters and offices, maintenance shops, storage tanks for fuel and water, power generators, waste-treatment units, and a communications center. For most North Slope projects, many components of the CPF are constructed as transportable modules in offsite locations, perhaps outside Alaska, barged to the North Slope, then moved over gravel roads or winter ice roads to the field and assembled. All buildings are supported above the ground on pilings to accommodate ground settling or frost heaving. An airstrip usually is located near the CPF to allow transport of supplies and personnel to the field site.

The CPF typically is located on the largest and most central, or initial, development pad. Equipment at the CPF is used to separate the materials that are produced from the wells (oil, natural gas, and water) on the pad. The CPF would likely process production from smaller, outlying satellite pads as well. Produced oil is filtered (to remove sand) and processed (to remove water and gas) before being piped through a sales meter and into the sales-oil pipeline system. Gas is processed (to remove liquids and impurities), pressurized (compressed), and re-injected into the reservoir through service wells. Likewise, water is processed (chemically treated) and then re-injected into the reservoir for pressure maintenance. Re-injection of produced gas and water helps maintain reservoir energy, increasing the ultimate oil recovery. This practice normally is initiated from the onset of production.

### Production Rates

Because development well drilling occurs over several years, the production profile for a field is much broader than for any individual well within a field. Initial production usually occurs when sufficient volumes to effectively operate conditioning equipment are achieved. The production profile would typically increase to peak production volumes as additional development wells are drilled and completed. Production rates typically peak after several years, and may remain at this level for many years, depending on production handling design, future satellite field discoveries, reservoir and well performance, and other factors. Production rates would ultimately taper off from a single field as the reservoir energy is depleted and the recoverable oil is produced.

### Waterflooding

During production, waterflooding would constitute the major water demand. Waterflooding is a key secondary production practice that can substantially increase oil recovery. Injecting water into selected areas of the reservoir maintains subsurface pressure and promotes fluid flow to the production wells. To maintain reservoir pressure, the volume of oil withdrawn from the reservoir must be replaced with an equivalent or greater volume of water. Therefore, pressure maintenance requires large quantities of water. For example, a field with a daily production rate of 50,000 bbl of oil would require approximately 2 million gallons per day of water (1 bbl = 42 gallons) for balanced waterflooding, given that some volumetric allowances must be made for each fluid under subsurface conditions. At this example production rate, a waterflood program would require approximately 760 million gallons (2,352 acre-feet) of water each year.

To meet waterflood demands, potential sources of water could include nearby deep lakes. Normally, there are restrictions to withdrawals from surface water sources that are vital to fish and waterfowl. Water wells could also be drilled below the permafrost layer (up to 1,500 feet thick) and water pumped from subsurface aquifers, but this practice is costly.

Often, local freshwater sources are inadequate to meet the demands of waterflood programs, so seawater is used. Seawater supplies are virtually unlimited, and unlike freshwater, which must be treated so that it is chemically compatible with the formation into which it is injected, seawater is reasonably compatible (similar chemically) to the brines present in most petroleum reservoirs. Waterflood systems may include a seawater-intake and treatment plant located on the coast and an insulated pipeline from the seawater plant to service wells in the field. Waterflood programs using seawater are initiated from the onset of production for most North Slope oil fields. As the oil field

is produced, the volumes of formation water recovered with oil (water cut) increases. In time (5 to 7 years), injection water demands are met by produced formation water, and the seawater-waterflood system is shut down. Seawater from the treatment plant can then be used for the next field's waterflood program.

New oil fields in the northeastern portion of the Planning Area would likely receive seawater for waterflooding programs from existing facilities that currently serve fields in the Prudhoe Bay and Kuparuk River Unit areas. Seawater pipelines would be installed on vertical support member (VSM) pipeline supports that would also hold sales-oil and service pipelines. For areas farther to the west, seawater intake and treatment plants would likely be fabricated on barges and moved into temporary locations along the coast. Because the ability to incorporate waterflooding as a reservoir management strategy greatly improves recovery efficiency, the economics of fields discovered near the coastline could be improved. However, the value of increased oil recovery would be balanced against the increased costs of seawater-treatment facilities and temporary overland pipelines. With increasing distances inland, expensive heat generators and pump stations could be required to deliver treated seawater to remote fields in the severely cold winter temperatures of the North Slope. Small or very remote fields may not be able to justify the costs of startup waterflood programs and would rely entirely on later waterflooding using produced formation water.

### *Miscible Injection*

In addition to waterflooding, miscible fluid injection is used to increase the recovery of oil and maintain pressure in the reservoir. Miscible injection involves the injection of various types of gases (generally under high-pressure conditions) into the reservoir. The injected gases can include liquefied petroleum gas (LPG), methane, hydrocarbon gas mixtures, nitrogen, and $CO_2$. Hydrocarbon gases are primarily used on the North Slope because they are readily available. Lack of markets makes re-injection the best use and conservation of the commodity, since a portion of the re-injected gas would be available for future production and sales.

### *Abandonment*

At some time in the life cycle of a field, the revenue from production is insufficient to justify the expenses of operation. The end of economic life occurs before all of the recoverable oil is extracted from the reservoir. The factors leading to a decision to abandon a field could differ for each field, but declining production rates and oil price are usually the two key considerations.

Wells are plugged and abandoned as the field matures. Abandonment operations generally include removing all equipment, plugging all wells, restoring the site, cutting well casing at least 3 feet below the surface, and conducting final environmental studies. Gravel and gravel/sand pads may or may not be removed, depending on such factors as the impacts of removal, future use values, and the need to recycle and re-use gravel for ongoing projects. Reclaimed or abandoned pad sites may be revegetated with native species, or revegetated with species that would ultimately be replaced by native vegetation or allowed to bed naturally. Abandonment operations could take place over many years, as revegetation and environmental monitoring studies would continue to document the long-term effects of past operations at a particular site. A series of permitting and inspection activities would be associated with oil field abandonment, and would involve visiting the site as needed until satisfactory revegetation occurred.

## Transportation

### *Regional Oil Transportation*

A regional oil-transportation system for the North Slope oil fields was established in 1977 upon completion of the TAPS. Oil is transported some 800 miles through a 48-inch pipeline to the ice-free port of Valdez, Alaska. From the storage and marine loading terminal at Valdez, oil is loaded onto tankers and transported to U.S. and foreign markets.

Case 1:05-cv-00008-JKS    Document 60-3    Filed 05/24/2006    Page 3 of 20

ENVIRONMENTAL CONSEQUENCES

The throughput capacity of the TAPS pipeline is a vital factor to North Slope development. The maximum daily throughput capacity of TAPS is slightly over 2.0 MMbbl/day (achieved in 1988). Currently, TAPS throughput is 993,000 bbl per day (Alyeska Pipeline 2004). The minimum throughput for a viable TAPS operation has been widely debated by government and industry. The common perception is that a minimum throughput of between 200,000 and 500,000 bbl/day represents a realistic mechanical and economic limit to operation. When this minimum throughput rate would be reached is also speculative, because it is difficult to accurately predict the size and timing of new oil field development on the North Slope. However, based on the declining production trends of existing North Slope fields, and assuming no changes to economic conditions or discovery of major new oil fields, the operational limits of TAPS could be reached within the next 20 years. Industry is well aware of this future problem, and aggressive efforts are underway by North Slope producers to reverse the production decline trend by exploring for new fields and using innovative methods to develop marginal fields. Renewed industry interest in the Planning Area is an important strategy to maintain the throughput of TAPS within acceptable limits. Without this vital transportation system, continued production from the North Slope is unlikely. All National Petroleum Reserve – Alaska development scenarios assume that TAPS would continue to operate and carry North Slope oil production.

### North Slope Pipelines

The central portion of the North Slope contains numerous oil fields connected by pipeline gathering systems to TAPS Pump Station Number 1 (Map 3-3). Because of its location, most new oil development projects in the National Petroleum Reserve – Alaska would use the main line between the Kuparuk River Unit and TAPS Pump Station Number 1. The 24-inch Kuparuk River Unit pipeline has a capacity of approximately 350,000 bbl/day. As the large fields (Kuparuk, Milne Point) feeding this pipeline decline, excess pipeline capacity could be used by new fields. For the purposes of analysis in this amendment, it is assumed that a new pipeline would be constructed from the Planning Area to the Alpine oil field, and would then connect to the Kuparuk River Unit. This pipeline would likely follow existing pipeline or road right-of-ways and would result in little new surface disturbance.

Oil production from satellite fields, in addition to water handling and gas reinjection capabilities at the Alpine oil field production facility, have the potential to affect the timing of development of future discoveries in the National Petroleum Reserve – Alaska. Originally, peak oil production at the Alpine field was expected to last for 3 to 5 years after startup (2001), with production rates declining to about half of peak rate in 15 years. Recent developments and future development of current proposals at Alpine field satellite fields will delay the originally anticipated production decline. ConocoPhillips Alaska, Inc., has plans to increase the handling capacity of the production facilities at the Alpine field, but has not proposed to increase the pipeline carrying capacity from the Alpine field to the Kuparuk River Unit pipeline. Consequently, the initial production from National Petroleum Reserve – Alaska discoveries may be delayed. Unlike discoveries in the Colville River Delta, some National Petroleum Reserve – Alaska production may be delayed by 5 to 10 years after initial discovery unless additional pipeline capacity is added to the existing Alpine oil field.

### Future National Petroleum Reserve – Alaska Pipelines

The actual locations of new pipelines in the Planning Area would depend on the location and sequence of commercial-sized discoveries. At present, there is no reliable way of predicting where or when new commercial fields would be discovered and developed. Fields developed early in the future development cycle could establish the first pipeline corridors connecting new Planning Area fields to existing infrastructure east of the Colville River. Fields developed later in the cycle would be likely to use the existing pipelines, should capacity be available. If large fields were discovered late in the exploration sequence, new sales-oil pipelines could be built. It is possible that commercial-sized fields discovered by different companies would be shut in (i.e., not produced) until an agreement was reached to share the costs of constructing a pipeline system through the Planning Area.

The diameters and lengths of new pipelines in the Planning Area would depend on the characteristics of new fields (undiscovered at present) and the resource-development scenarios for each leasing alternative (Figure 4-2). Generally, infield pipelines (flowlines) carry multi-phase slurries (oil, gas, water) from wellhead manifolds to CPFs. Return lines containing gas or water would carry these substances back to injection wells on production

Northeast National Petroleum Reserve – Alaska
Final Amended IAP/EIS                                    4-35                                    January 2005

Exhibit 42, page 181 of 300

pads. Infield flowlines would be relatively small in diameter (4 to 10 inches). Somewhat larger sales-oil pipelines (12 to 16 inches) would carry metered sales-quality oil from individual fields to a centrally located main line (16 to 20 inches). This main pipeline would then connect several producing fields to the Kuparuk River Unit pipeline (24 inches) and then on to TAPS (48 inches).

### *Pipeline Construction*

Pipeline construction techniques have evolved over decades of experience in the Arctic environment on the North Slope. The following assumptions about the general engineering for pipeline design and construction would apply to future National Petroleum Reserve – Alaska projects.

Pipeline crossings of large rivers, such as the Colville River, could use horizontal directional drilling techniques similar to those used at the Alpine oil field. Narrow streams would likely be crossed by elevated pipelines to minimize impacts to streambanks and riparian vegetation, and to avoid potential problems associated with corrosion, maintenance, and abandonment of buried pipelines. It has been determined that the construction of a bridge over the Colville River would be expensive. Nonetheless, construction of a bridge over the river was recently analyzed in the *Alpine Satellite Development EIS* (USDOI BLM 2004c).

- Relatively wide, shallow rivers could be crossed by trenching and burying insulated pipelines in the riverbed. These pipelines would be installed during winter at locations selected to minimize disturbance to overwintering fish habitat.

- Narrow streams could be crossed by elevated pipelines on suspension spans, as fewer impacts would occur to the stream, streambanks, riparian habitat, and aquatic resources if a properly designed elevated pipeline crossing were to be used.

- Pipeline alignments would be routed to avoid crossing lakes.

- Pump stations could be required along the new mainline route, depending on distances, pipeline diameters, and production rates.

- Future pipeline routes and installation designs would depend on site-specific conditions evaluated by preconstruction engineering studies.

Typically, pipeline routes are laid out in straight-line segments (or alignments) and are installed aboveground on VSMs. On the North Slope, this installation method is preferred over buried pipelines, because aboveground pipelines take less time to construct, cause less disruption to the land during installation, are easier to monitor and repair, and provide more flexibility for later modification (e.g., adding new pipelines) than buried pipelines. Typically, VSMs are spaced 55 to 70 feet apart. Currently, within the Planning Area, they are installed with minimum heights of 5 feet above the ground to minimize disturbance to caribou herd movements. Pipeline clearance is generally higher (up to 20 feet) over topographic lows (stream valleys), because engineering calls for a nearly level pipeline route. Small, shallow lakes could be crossed by elevated VSMs, whereas large or deep lakes would have pipeline VSMs routed around their shorelines with some setback. Powerlines could be placed in cable trays on VSMs or suspended from VSMs.

### *"Roadless" Development*

The term "roadless" development does not mean an absence of roads. Rather, it indicates an attempt to minimize the construction of permanent roads. It should be recognized that most fields would be connected by winter ice roads to allow transport of heavy equipment and supplies to outlying field locations. These seasonal roads would be used for 4 to 5 months each winter (December to April). In addition to ice roads, remote fields would use alternate transportation systems, such as marine barging and/or airstrips for year-round access. Within individual fields, short gravel roads (i.e., permanent roads) would connect production pads and facilities. In addition, gravel roads could connect nearby fields to one another to allow sharing of infrastructure.



Figure 4-3. Sample Pipeline Layout.

Roadless development is a North Slope concept that was prompted by both economic and environmental concerns. The Badami and Alpine fields adopted "roadless" development, because it is cheaper and creates less environmental impact. It is assumed that future activities in the National Petroleum Reserve – Alaska would follow the example of these development projects for several reasons:

- The smaller field sizes predicted for the National Petroleum Reserve – Alaska probably could not support the high cost of long, permanent roads;

- The availability of road-construction material (gravel) is likely to be limited in the Planning Area;

- Field construction activities normally are scheduled for the winter months, when overland travel is possible and wildlife presence is lower; and

- Smaller fields in the National Petroleum Reserve – Alaska would not require the same level of supply/service operations as multibillion-barrel fields, such as Prudhoe Bay and Kuparuk River Unit.

From a safety standpoint, permanent roads would allow direct monitoring of pipelines and more rapid response time, should repairs be necessary. However, "roadless" development would not preclude access for pipeline inspection; rather, the mode of transportation would change with the seasons. During the winter months, visual inspections could be conducted by nearby ice roads, by snowmachines where ice roads were not present, and by aircraft. In summer months, visual inspections would be conducted primarily using aircraft and possibly Rolligons. Seasonal restrictions on aircraft operations would likely be enforced to protect waterfowl from disturbance. It is likely that pipeline repairs would involve the same forms of transportation. Hovercraft might be used for emergency repair work, particularly during periods when the tundra was wet (as opposed to frozen). Should an emergency pipeline repair be necessary, an on-site coordinator would consider the tradeoffs associated with various remediation strategies. It should be noted that pipeline monitoring on the North Slope is now done largely using remote instrumentation. Numerous monitoring and safety systems are installed to provide redundancy in these electrical and mechanical safety systems. For example, mechanical shutoff valves are being replaced by vertical expansion loops to provide a more failsafe method of controlling pipeline pressures and leaks.

Although "roadless" development is a requirement of Lease Stipulation 48 in the 1998 Northeast IAP/EIS ROD, a permanent bridge with a road crossing is being considered at the Alpine field (USDOI BLM 2004c). In addition, the State of Alaska is proposing to construct an all-season gravel road from the Spine Road to and across the Colville River to the border of the National Petroleum Reserve – Alaska (Petroleum News Alaska 2002), just south of Nuiqsut. The primary candidate is an 18-mile route that would exit the Spine Road at the far western terminus (near the Tarn development) of the Kuparuk River Unit road system and proceed westward to a crossing of the Colville River 3 miles south of Nuiqsut (Map 3-44). The Spine Road would connect this road to the Dalton Highway.

**Development Scenarios**

### *Resource Potential and Related Activities*

A variety of activities are associated with petroleum development, beginning with tract leasing and concluding decades later with abandonment of depleted fields. A general time frame for exploration, development, and production activities on the North Slope is shown in Table 4-2. For the purposes of environmental analysis in this amendment, future petroleum-related activities are assumed to be correlated to the economic resource potential made available through leasing. This implies that all of the modeled petroleum resources would be discovered and developed by industry, which is very optimistic since all of the possible economic resources may not be attractive to industry. Typically, larger and more profitable fields are discovered earlier in the exploration cycle. Smaller and less profitable fields may not be of interest to companies driven by profit motives. Companies may view the geologic or economic opportunities differently, and industry perceptions of economic potential may differ from those represented in our scenarios.

Readers should be fully aware that the environmental analyses in this amendment are based on hypothetical development activities associated with estimates of undiscovered oil and gas fields. There are many uncertainties in attempting to predict future activities. An accurate accounting of oil reserves is possible only after the production cycle is completed, perhaps decades into the future. Given that environmental analyses and decisions regarding leasing must be done now, the BLM is projecting these future production estimates based on the data currently available.

Conventionally-recoverable (or geologic) resources refers to the oil and gas resources that are recoverable by current technology without regard to economic feasibility. The conventionally recoverable resource estimate provides a maximum theoretical limit for production, but does not accurately reflect realistic commercial activities. Engineering, economic, and environmental factors are included in evaluating the commercial viability of oil and gas prospects. When economic realities are considered, the amount of resources expected to be leased and commercially produced is lower than the largely unattainable geologic potential. For the purposes of this Amended IAP/EIS analysis, it is more reasonable to use resource volumes that are economically producible under the constraints appropriate to the area, rather than the full geologic endowment.

Resource production estimates are strongly influenced by oil prices, but opinions of economists about future oil prices are quite variable. The oil prices used to define reasonable limits for environmental analyses are average, long-term price trends that do not acknowledge short-term spikes. Recent EISs for the National Petroleum Reserve – Alaska used price scenarios of $18 and $30 per bbl for oil and $2.56 and $4.27 per Mcf for natural gas (USDOI BLM and MMS 1998, 2003). At $18 per bbl of oil, projected activities are negligible. The development of gas resources also is not economic at these prices.

During fall 2004, oil prices exceeded $30 per bbl; however, oil prices are not expected to remain above $30 per bbl over the long term. The Alaska Department of Revenue uses a price assumption of $22 per bbl, and the Organization of Oil Exporting Countries (OPEC) has attempted to keep oil prices within the range of $22 to $28 per bbl, with a target price of $25 per bbl. In constant dollars, the historical price of oil has averaged approximately $22 per bbl; however, market forces may hold the average price closer to $25 per bbl for the foreseeable future (Winneke 2003). For this assessment, resources and activity estimates for the alternatives were developed at $20, $25, and $30 per bbl of oil.

As discussed in Chapter 3 (Affected Environment), estimates for the risked mean economically recoverable oil resources for the Northeast and Northwest National Petroleum Reserve – Alaska range from 634 MMbbl to 5,697 MMbbl, assuming $20 per bbl and $30 per bbl prices, respectively. The 2002 oil assessment estimated oil resources in the Planning Area to range from 435 MMbbl (at $20 per bbl) to 3,611 MMbbl (at $30 per bbl).

### General Scenarios

The principal assumption for the multiple-sales scenario is that the total economic resource potential of the Planning Area could be discovered and produced, given the opportunity for exploration by industry. However, based on past experience, considerable effort could be required to discover all of the resources in this frontier province. As part of the USGS 1995 National Resource Assessment effort, Attanasi and Bird (1995) estimated the number of wildcat (exploration) wells needed to discover the total undiscovered oil resources in northern Alaska. For the central coastal plain subarea (containing the northern part of the Planning Area), it is estimated that between 40 and 180 wildcat wells would be required to discover all of the resources at prices ranging from $21 to $30 per barrel. From 1972 to present, only 35 exploration wells have been drilled in the Planning Area by industry and government programs.

For purposes of analysis, several general assumptions have been made:

- Multiple lease sales would be held;

- Industry would aggressively lease and explore the tracts offered, which could require large numbers of exploration wells and seismic surveys;

ENVIRONMENTAL CONSEQUENCES

- Economic conditions (particularly oil price) would remain favorable to development in northern Alaska;

- New geologic information would not substantially change the present assessment of resource potential, high-potential plays would not be condemned by future drilling, and new high-potential plays would not be discovered;

- Projections of well numbers, facilities, and infrastructure do not include potential developments at the Alpine oil field;

- Learning curves would improve efficiencies over time for both prospect identification and engineering technology, and would lead to higher commercial success rates; and

- Future petroleum production would use existing North Slope infrastructure, most importantly the TAPS pipeline.

Time frames for the development scenario are not included, because a future lease-sale schedule has not been established. However, it is safe to assume that development activities associated with multiple future sales would continue for many years, as industry would require time to thoroughly evaluate existing leases before additional tracts would be leased. The complete inventory of petroleum resources in the National Petroleum Reserve – Alaska could take many decades. For instance, two lease sales have already occurred as a result of the ROD for the 1998 Northeast IAP/EIS, and 17 exploratory wells have been drilled, with reports of unconfirmed discoveries of oil. However, 6 years after publication of the 1998 Northeast IAP/EIS ROD, it is still not certain if the unconfirmed discoveries are commercially viable, nor has the resource potential of the Planning Area been fully explored.

### Development Scenarios

Several leasing alternatives are considered in this amendment, each providing a different level of protection for environmental and cultural resources. The No Action Alternative (Alternative A) is used as a basis for comparison and is unchanged from the alternative contained in the 1998 Northeast IAP/EIS ROD for Northeastern National Petroleum Reserve – Alaska. The final Preferred Alternative and Alternative B represent an intermediate level of resource protection between the more restrictive 1998 Northeast IAP/EIS Preferred Alternative (Alternative A) and Alternative C in this EIS, which would open the entire Planning Area to leasing and development. The Full Economic Potential (FEP) is provided as a basis for comparison, but is not analyzed because it is unreasonable to expect that there would be no regulations for petroleum-related activities.

The oil development scenarios discussed below assume that oil prices will range between $20 and $30 per bbl (in constant dollars) in the foreseeable future, with the long-term price most likely averaging $25 per bbl. It is estimated that between 435 million and 3,611 million barrels of oil could be produced in the Planning Area at prices ranging from $20 to $30 per barrel of oil under the FEP scenario (Table 4-4). This development scenario assumes that all BLM-administered lands in the Planning Area (approximately 4.6 million acres) would be made available for leasing and that no regulatory restrictions would adversely affect leasing interest or the economic viability of any petroleum-related activity.

New commercial oil fields are most likely to be discovered in the northern portion of the Planning Area that has been designated as having high petroleum potential. This area encompasses approximately the northern one-third of the Planning Area (Map 3-4; USDOI BLM and MMS 1998). It is impossible to predict with certainty, however, what proportion of exploration and development could occur in the medium to low potential areas. Prospective offshore areas under National Petroleum Reserve jurisdictions could be reached using directional drilling techniques from onshore pads or from offshore artificial islands.

In the most likely ($25 per bbl) development scenario under the FEP assumptions, up to 19 fields could be discovered and developed (Table 4-4). These fields could include a mix of large fields with CPFs and surrounding satellite fields that depend on the central facility. Table 4-5 depicts the levels of petroleum-related activities and infrastructure estimated for the various price scenarios and alternatives. Table 4-6 provides the estimated amounts of surface disturbance for each alternative for the various price scenarios. The infrastructure estimates are based on

Northeast National Petroleum Reserve – Alaska
Final Amended IAP/EIS

4-40

January 2005

Exhibit 42, page 186 of 300

a general development plan modeled from the Alpine oil field, where a large CPF could have several satellite fields tied to it (see Table 4-3). The most likely ($25) scenario for the FEP includes three CPF fields and up to 16 satellite fields. Satellite fields would be located within 10 miles of a CPF field. Discovery of these new fields could require an estimated 140 exploration and delineation wells. This level of exploration is far greater than has occurred in the past. From 1972 to the present, approximately 35 wells have been drilled to test prospects in the Planning Area.

It is expected that the next lease sale in the Planning Area would take place in 2005, and that future lease sales would be scheduled bi-annually. Oil production resulting from leasing in 2005 would begin in approximately 7 to 9 years and peak approximately 10 years later at rates ranging from 14 to 77 MMbbls per year (final Preferred Alternative at $20 to $30 prices). Exploration wells have been drilled on leases awarded in lease sales since 1999, and there are reported discoveries of oil and gas, but there is no indication as to whether these discoveries are commercially viable. Therefore, it is not certain when or if production would begin from these leases.

### Differences in Activity Levels for Leasing Alternatives

The FEP scenario assumes that all of the Planning Area is available for leasing and petroleum activities and that regulatory restrictions would not be impediments to leasing or subsequent development activities. This assumption means that the total hydrocarbon resource from each play would be available for production, subject only to economic and engineering constraints. Under the FEP scenario, oil resources would range from 435 MMbbl at $20 per barrel to 3,611 MMbbl at $30 per bbl, with 2,911 MMbbls at the mid-range price of $25 per bbl.

Table 4-4. Oil Resource Estimates for Each Alternative.

| Alternative | Low Price Scenario | | Medium Price Scenario | | High Price Scenario | |
|---|---|---|---|---|---|---|
| | MMbbl ($20/bbl) | Number of Fields[1] | MMbbl ($25/bbl) | Number of Fields[1] | MMbbl ($30/bbl) | Number of Fields[1] |
| A | 130[2] | 1 | NA | NA | 600[2] | 3 |
| B | 216 | 2 | 1,544 | 10 | 2,054 | 14 |
| C | 255 | 2 | 1,855 | 12 | 2,488 | 17 |
| D | 164 | 1 | 1,247 | 8 | 1,727 | 12 |
| FEP[3] | 435 | 3 | 2,911 | 19 | 3,611 | 24 |

[1] Number of fields includes large CPF fields with processing facilities and small satellites that share those facilities. Not every field includes both a CPF and multiple satellite fields, however.
[2] The 1998 Northeast IAP/EIS analyzed $18/bbl as a low price scenario. Adjusting for inflation, this price would be approximately $20/bbl in 2004. The high price scenario at $30 would be adjusted to approximately $34/bbl in 2004.
[3] FEP (Full Economic Potential) represents the total undiscovered, potentially commercial, petroleum endowment assessed in the Planning Area. The FEP development scenario is not analyzed here and is shown for comparison purposes only.
NA = Not analyzed. The 1998 Northeast IAP/EIS did not analyze a $25 per bbl scenario.

The resource estimates and associated activities for the FEP are reduced for the other leasing alternatives because there is an unavoidable trade-off between the level of protection and the feasibility of future petroleum operations. Total protection of the environmental and cultural resources is likely to require a total exclusion of petroleum-related activities. The effects of partial protection measures on future petroleum-related activities would depend on site-specific conditions. Ultimately, it is the industry perception of the opportunities for profitable operations that would set the level of future activities. Regulatory restrictions could affect several aspects of petroleum activities: leasing activity could be lower (fewer tracts leased, lower bonus bids), exploration effort could be reduced (fewer prospects drilled), and production could be delayed (project redesigns and biological studies). In some cases, potentially recoverable oil could be bypassed or marginal fields would not be developed.

ENVIRONMENTAL CONSEQUENCES

Table 4-5. Estimated Levels of Oil-related Activities for Each Alternative.

| Alternative | Exploration Wells[1] | | | Delineation Wells | | | Exploration/Delineation Drilling Rigs[2] | | | Production Drill Pads | | | Production and Service Wells[3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L[4] | M[4] | H[4] | L | M | H | L | M | H | L | M | H | L | M | H |
| A | 6 | NA | 21 | 4 | NA | 17 | 2 | NA | 3 | 1 | NA | 5 | 41 | NA | 180 |
| B | 6 | 43 | 57 | 4 | 32 | 42 | 1 | 3 | 5 | 2 | 12 | 16 | 80 | 420 | 580 |
| C | 7 | 52 | 70 | 5 | 39 | 52 | 1 | 4 | 6 | 2 | 14 | 20 | 80 | 500 | 710 |
| D | 6 | 34 | 48 | 4 | 26 | 35 | 1 | 2 | 4 | 2 | 10 | 13 | 61 | 336 | 489 |
| FEP[5] | 12 | 80 | 100 | 9 | 60 | 75 | 1 | 6 | 8 | 4 | 22 | 28 | 125 | 790 | 1,000 |

| Alternative | Production Drilling Rigs | | | Staging Bases | | | Peak Oil Production[6] | | | Pipeline Miles[7] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L | M | H | L | M | H | L | M | H | L | M | H |
| A | 1 | NA | 5 | 0 | NA | 1 | 13 | NA | 51 | 20 | NA | 110 |
| B | 1 | 6 | 9 | 0 | 1 | 2 | 19 | 68 | 92 | 110 | 220 | 220 |
| C | 1 | 8 | 11 | 1 | 2 | 3 | 22 | 82 | 111 | 110 | 220 | 330 |
| D | 1 | 5 | 8 | 0 | 1 | 2 | 14 | 54 | 77 | 110 | 180 | 190 |
| FEP | 2 | 12 | 15 | 1 | 3 | 5 | 34 | 128 | 159 | 110 | 330 | 440 |

[1] Exploration well totals include commercial discoveries and dry holes.
[2] Rig totals are the maximum number operating in any single year.
[3] Production to service well ratio is 2:1 (note that the Alpine oil field ratio is 1:1).
[4] Price Designation: $20/bbl, Low (L); $25/bbl Medium (M); and $30/bbl High (H).
[5] FEP (Full economic potential) represents the total undiscovered, potentially commercial petroleum endowment assessed in the Planning Area. The FEP is not analyzed here and is shown for comparison purposes only.
[6] Oil production in MMbbl per year.
[7] Pipeline miles do not include in-field flowlines, only gathering lines (from satellite fields) and overland sales lines connected to the exiting pipeline network on state lands to the east of the Planning Area.
NA = Not analyzed.

A precise evaluation of the economic impacts of regulatory restrictions is not possible because the magnitude of these effects would vary depending on the location of as-yet undiscovered oil fields. When and where these fields would be discovered, and which of these discoveries would prove to be of commercial size, cannot be accurately defined at the present time. At one extreme, if a prospect were located in an area unavailable for leasing, it obviously would not be leased or discovered. However, if an area was open to leasing and potentially commercial discoveries were made, compromises might be reached to mitigate impacts without undermining the viability of proposed projects. The effects on the amount of available oil resource from withdrawing areas from leasing or imposing regulations on future petroleum activities could range from minimal to severe, depending largely on the location of future discoveries.

A series of reductions are made to account for regulatory restrictions on future petroleum production. The first set of reductions is related to areas unavailable for leasing. This reduction is objective because affected play areas are measurable from maps. Because the exact locations of commercial fields are unknown today, it is assumed that the petroleum endowment in each geologic play is distributed evenly over the geographic extent of the play. Admittedly, this is a simplistic assumption because commercial fields would occur in localized pools. However, prior to extensive mapping and drilling, the opportunity to discover new fields is relatively uniform throughout a

play area. The fraction of the petroleum resource available for leasing and possible future development is determined as the available portion of each play in the Planning Area. For instance, the estimated oil resource for the Beaufortian Barrow Arch Play in the Planning Area is 2,930 MMbbls. By scaling from play area maps, it was determined that 20 percent of the play area would not be offered for leasing. Multiplying this fraction by the total play resource indicates that 586 MMbbls would not be available and consequently would not contribute to future production. The economically recoverable resources in each play are adjusted by geographic scaling from the total play endowments to determine the available portions within the Planning Area, and then all play resources are summed to an area-wide total.

A second set of reductions is also objective, as it is based on areas affected by no-surface-occupancy (NSO) restrictions in setbacks (or buffers) that provide protection for sensitive localities. No-surface-occupancy restrictions could reduce industry interest in leasing, add costs to operations, or present difficult engineering challenges. Reductions for production estimates are valid even if the area underneath the buffer and enclosed area is technically reachable by directional drilling. In most cases, surface restrictions that would require directional drilling beyond 1 mile would cause economic burdens that could result in bypassed resource recovery or the elimination of marginal projects.

Table 4-6. Estimated Number of Facilities (and Acres of Surface Disturbance) for Different Levels of Oil-related Activities for Each Alternative.

| Facility | Alternative A | | | Alternative B | | | Alternative C | | | Alternative D | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | L | M | H | L | M | H | L | M | H | L | M | H |
| Central Processing Facility (100 ac each) | 1 (100) | NA | 1 (100) | 1 (100) | 2 (200) | 2 (200) | 1 (100) | 2 (200) | 3 (300) | 1 (100) | 2 (200) | 2 (200) |
| Satellite fields (10 ac each) | 0 | NA | 3 (30) | 0 | 6 (60) | 10 (100) | 0 | 8 (80) | 11 (110) | 0 | 4 (40) | 8 (80) |
| Airstrip (11 ac each) | 1 (11) | NA | 1 (11) | 1 (11) | 2 (22) | 2 (22) | 1 (11) | 2 (22) | 3 (33) | 1 (11) | 2 (22) | 2 (22) |
| Roads (miles; 7.5 ac per mile) | 0 | NA | 30 (225) | 0 | 60 (450) | 100 (750) | 0 | 80 (600) | 110 (825) | 0 | 40 (300) | 80 (600) |
| Staging areas (50 ac each) | 0 | NA | 1 (50) | 0 | 1 (50) | 1 (50) | 0 | 1 (50) | 2 (100) | 0 | 1 (50) | 1 (50) |
| Gravel pits (20-50 ac each) | 1 (20) | NA | 2 (90) | 1 (30) | 5 (170) | 7 (230) | 1 (30) | 6 (210) | 8 (300) | 1 (20) | 4 (140) | 6 (210) |
| **Total Acres of Disturbance** | 131 | NA | 506 | 141 | 952 | 1,352 | 141 | 1,162 | 1,668 | 131 | 752 | 1,162 |
| NA – Not analyzed. | | | | | | | | | | | | |

The economic resource potential would also be reduced by subjective factors to account for added costs of operations, delays, project design changes, and biological studies (primarily ROPs and Lease Stipulations A to J; see Section 2.6, Lease Stipulations and Required Operating Procedures). The overall effect of these factors is referred to as the "cost of mitigation." The cost of mitigation assumes that all regulations would be enforced and exceptions to these regulations would not reduce the protection provided by original intent of the regulation. The cost burden associated with mitigation increases at lower oil prices because operators can little afford added costs or delays to marginal projects. At lower oil prices, projects become less profitable (or uneconomic) and operators could bypass otherwise commercial projects when investment returns are too small. The "cost of mitigation" is accounted for by using a sliding scale of reductions ranging from 20 percent at $30 per bbl, to 25 percent at $25 per bbl, to 30 percent at $20 per bbl. In general, these reductions are based on the assumption that although most of the oil would be found in Alpine oil field-sized accumulations (128 to 512 MMbbl) that would be economically recoverable, about 30 percent of the oil found in the Northeast National Petroleum Reserve – Alaska would be found in smaller accumulations that would have a lower probability of being recovered. These reductions include the effects of specific regulations as well as the cumulative burden of overlapping regulations. Regulatory

ENVIRONMENTAL CONSEQUENCES

impediments can involve protective measures for both biological and cultural resources. Subsistence use protection refers to unavoidable or unresolvable conflicts with subsistence uses of the area. This factor is given a subjective reduction factor of 10 percent.

The petroleum resource assessment indicates that a few plays could hold a large majority of the total resource endowment. Restrictions affecting these "rich plays" would have a disproportionate affect on the future development potential of the area. For example, the Beaufortian-Barrow Arch play (with analogs to the Alpine oil field) could contain approximately 80 percent of the economic oil resources. The geographic extent of this play overlaps many of the biologically and culturally sensitive areas in the northern portion of the Planning Area. Restrictions affecting this play could have a large impact on future oil and gas production from the National Petroleum Reserve – Alaska.

Using these general concepts and reduction factors, new resource estimates are defined for each of the leasing alternatives. The specific reduction factors are identified by the following abbreviations: areas unavailable for leasing (UL), no-surface-occupancy buffers (NSO), cost of mitigation (CM), and conflicts with subsistence use (S).

*No Action Alternative (Alternative A).* The No Action Alternative would provide for protection of wildlife resources (waterfowl and caribou) and subsistence values by withholding approximately 600,000 acres from leasing and development. Surface facilities and development activities would not be allowed in buffers around the closed areas and along important river systems. Prescriptive-based lease stipulations developed for the 1998 Northeast IAP/EIS would mitigate for impacts associated with petroleum exploration and development (see Appendix E). Approximately 87 percent of the Planning Area would be available for leasing, but three-quarters of the area with high oil and gas potential would be affected by area withdrawals and restrictive regulations. Under this alternative, oil production of 130 MMbbl to 600 MMbbl is estimated to occur if oil prices average between $20 and $30 per barrel. This represents a 72 percent reduction from the FEP estimated at that time (2,200 MMbbl at $30 per barrel). Specific reductions are listed as UL (22 percent), NSO (15 percent), CM (25 percent), and S (10 percent). Under this alternative, from one to three fields would be developed. Natural gas resources would not be considered for development in the reasonably foreseeable future.

*Alternative B.* Under Alternative D, over 95 percent of the area would be offered for leasing, but 213,000 acres in the northern (high potential) part of the Planning Area would not be available for leasing. Performance-based lease stipulations and ROPs described in Section 2.6.3 (Alternatives B and C Lease Stipulations and Required Operating Procedures) would apply. Under this alternative, oil production of 216 MMbbl to 2,054 MMbbls is estimated to occur if oil prices average between $20 and $30 per barrel. For the $25 scenario, the estimated production is 1,544 MMbbl. This represents a 47 percent reduction from the current FEP case (2,911 MMbbl; Table 4-4). The specific reductions are listed as UL (11 percent), NSO (11 percent), CM (15 percent), and S (10 percent). Under this alternative, from two to 14 fields would be developed, including a mix of large fields and surrounding satellite fields.

*Alternative C.* Under Alternative C, the entire Planning Area would be available to leasing. Performance-based lease stipulations and ROPs described in Section 2.6 (Lease Stipulations and Required Operating Procedures) would apply. Under this alternative, oil production of 255 MMbbl to 2,488 MMbbl is estimated to occur if oil prices average between $20 and $30 per barrel. For the $25 scenario, the estimated production is 1,855 MMbbl. This represents a 36 percent reduction from the current FEP case (2,911 MMbbl; Table 4-4). The specific reductions are listed as UL (0 percent), NSO (11 percent), CM (15 percent), and S (10 percent). Under this alternative, from two to 17 fields would be developed, including a mix of large fields and surrounding satellite fields.

*Final Preferred Alternative (Alternative D).* Under the final Preferred Alternative, over 95 percent of the area would be offered for leasing, but the 211,000 acre Teshekpuk Lake would be deferred from oil and gas leasing. In addition, permanent oil and gas facilities (except pipelines and publicly-funded community roads) would not be allowed on approximately 347,397 acres and no permanent oil and gas facilities, pipelines, or publicly-funded community roads would be allowed on 16,950 acres. Performance-based lease stipulations described in Section

2.6.4 (Alternative D Lease Stipulations and Required Operating Procedures) would apply. Under this alternative, oil production of 164 MMbbl to 1,727 MMbbls is estimated to occur if oil prices average between $20 and $30 per barrel. For the $25 scenario, the estimated production is 1,247 MMbbl. This represents a 58 percent reduction from the current FEP case (2,911 MMbbl; Table 4-4). The specific reductions are listed as UL (9 percent), NSO (24 percent), CM (15 percent), and S (10 percent). Under this alternative, from one to 12 fields would be developed, including a mix of large fields and surrounding satellite fields.

This alternative is considerably more optimistic about future petroleum development in the Planning Area than the Preferred Alternative adopted in the 1998 Northeast IAP/EIS ROD (the current No Action Alternative). Oil resources increase from 130 MMbbl to 164 MMbbl in the low price scenario and from 600 MMbbl to 1,727 MMbbl in the high price scenario. The increase can be attributed to an increase in the total resource endowment in the 2002 assessment, opening new areas to leasing (particularly in the high potential area north of Teshekpuk Lake), and a change to performance-based lease stipulations from the prescriptive lease stipulations adopted in the 1998 Northeast IAP/EIS ROD.

### Development of Natural Gas Resources

For all alternatives, the development scenarios do not include the recovery and sale of natural gas resources. When a new transportation system is constructed from the North Slope, this assumption will be revisited. In any case, gas development would probably not occur at prices below $3.00 per Mcf (equivalent to $20 oil prices). At an average price of $3.56 per Mcf (in constant 2004 dollars), natural gas resources could be profitably produced if largely contained as associated gas in established commercial oil fields or as satellites near existing facilities. At still higher gas prices of $4.27 per Mcf (equivalent to $30 oil prices), stand-alone gas fields could become economical to develop. At this high price level it is possible that industry would purposely explore for gas prospects in the southern half of the Planning Area, which is more likely to hold large gas fields than large oil fields. A discussion of efforts to get natural gas from the North Slope to markets is in Section 4.7.3.4 (Effects of the Cumulative Case; Speculative Development). Because gas production from the National Petroleum Reserve – Alaska is beyond the time period considered in the foreseeable analysis, effects from gas development and production are not addressed in this amendment.

### Permanent Roads

The scenarios for the alternatives evaluated in this amendment assume that a permanent road connecting the Planning Area oil and gas fields to the coast of the Planning Area or to potential infrastructure to the east would be unlikely. However, because the BLM believes that such a road is feasible, this amendment does not forbid construction of such roads within the Planning Area. Under the 1998 Northeast IAP, permanent roads connecting the Planning Area facilities to outside infrastructure are prohibited, without exception. However, the ADOTPF is proposing to construct an all-season gravel road from the western terminus of the Spine Road to the National Petroleum Reserve – Alaska boundary and Nuiqsut via a bridge across the Colville River (Petroleum News Alaska 2002). The Spine Road is connected to the Dalton Highway. Other proposals to develop a road from the Dalton Highway to the National Petroleum Reserve - Alaska are also being considered. If the regulatory framework of the Planning Area were to change and permanent roads within the Planning Area were built and connected to the proposed road to Nuiqsut, such a road system could theoretically support oil and gas activities in the Planning Area. New oil and gas discoveries, changing economics, developing technologies, material and time constraints on ice roads, construction of roads east of the Planning Area, and evolving regulatory framework are all factors that might influence the feasibility of "roadless" development versus the use of permanent roads. Consequently, the potential impacts of possible permanent roads are considered in Section 4.12 (Possible but Unlikely Permanent Roads).

## 4.2.2   Oil Spills

This section summarizes the probability, behavior, and potential impacts that might result from a variety of oil spill scenarios. The spill scenarios used in this amendment, especially for larger volume spills, are likely to

ENVIRONMENTAL CONSEQUENCES

overestimate, in some cases substantially, the probability of a spill and/or the potential impacts. The probability of and impacts from oil spills on the North Slope have received extensive analysis and review in several recent EISs, EAs, and other reports. Though the details differ among several of the documents, the basic data and conclusions are generally similar. We incorporate these documents by reference and summarize the key points in this amendment. Referenced documents include the following:

- Northwest National Petroleum Reserve – Alaska Final IAP/EIS (USDOI BLM and MMS 2003)
- Northeast National Petroleum Reserve – Alaska Final IAP/EIS (USDOI BLM and MMS 1998)
- Alpine Satellite Development Plan EIS (USDOI BLM 2004c)
- Liberty Development and Production Plan Final EIS (USDOI MMS 2002a)
- Beaufort Sea Oil and Gas Development/Northstar Project Final EIS (USACE 1999)
- Renewal of the Federal Grant for the Trans-Alaska Pipeline System Right-of-Way Final EIS (USDOI BLM 2002)
- Environmental Report for the Trans-Alaska Pipeline System Right-of-Way Renewal (TAPSO 2001)
- Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope (NRC 2003)
- A Review of Oil Spill Risk Estimates Based on Current Offshore Development Technologies (NSB 2003a)

Spills could occur from pipelines, production and exploration pads, airstrips, roads, and bridges. Spills that leave the pads and roadbeds could reach one or more of several habitat types, including wet and dry tundra, tundra ponds, lakes, flowing creeks and rivers, and potentially the adjacent nearshore Beaufort Sea. Spills could occur anytime during the year.

In addition to hydrocarbon spills, spills of other types of materials are reported and tracked as well. For instance, seawater spills can be quite large and have the potential to effect large areas. Seawater spills to fresh water can have significant impact. Other types of spills that are reported and tracked include spills of sewage and hazardous materials. This analysis focuses on the probability and potential impacts of spills of hydrocarbons.

### 4.2.2.1  History of North Slope Oil Spills

The 30-year North Slope history shows that the vast majority of the oil, produced fluids, seawater, and other material spills that have occurred have been very small (less than 10 gallons; ¼ bbl) and very few have been greater than 100,000 gallons (2,380 bbl; NRC 2003). The probability of a very large spill greater than 1 million gallons is extremely low (USDOI BLM and MMS 1998).

The recent NRC (2003) report entitled *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope* summarizes the history of North Slope oil spills: "Major oil spills have not occurred on the North Slope or adjacent areas as a result of operations [of the oil fields]… Many small terrestrial spills have occurred in the oil fields, but they have not been frequent or large enough for their effects to have accumulated. They have contaminated gravel, which has been difficult to clean up and has made the gravel unavailable for rehabilitation." Appendices F and G of the same NRC report provide the most recent detailed analysis of risk, size, type, and general impacts of North Slope oil spills. These analyses are the basis for the above-quoted conclusion.

Most Alaskan North Slope spills have been contained on gravel pads and roadbeds (NRC 2003), and most of those that have reached the tundra have covered fewer than 5 acres (USDOI BLM and MMS 1998). Upon detection, spills were promptly contained and cleaned up as required by state, federal, and NSB regulations (NRC 2003). Impacts that have occurred were judged to be minor, and natural and/or anthropogenic-assisted restoration has generally occurred within a few months to years.

A key conclusion of Maxim and Niebo (2001a, b, c) is that although there continue to be oil spills on the North Slope and the total annual volume of oil spilled fluctuates substantially, there is nevertheless a general decreasing trend over the 30-year oil field operating history in the total annual volume of oil spilled. This trend is occurring despite better reporting of all sizes of spills, especially the small spills, and despite aging of much of the oil field infrastructure. Maxim and Niebo attribute this trend to improved technology, better engineering design, greater focus on clean operations, and greater awareness on the part of all the oil field personnel. Increasingly stringent federal, state, and NSB regulatory requirements for reporting spills, as well as for preparation of response plans and training, have also contributed to the declining long-term trend in total spill incidents.

### 4.2.2.2 Northeast National Petroleum Reserve – Alaska Oil Spill Analysis

The information, models, and assumptions used to analyze the potential for oil spills are described in Appendix K. Predicting an oil spill is an exercise in probability, based on historic data. There is uncertainty in the location, number, and size of any spills, the chemistry of spilled oil, and the environmental conditions at the time of a spill. This analysis considers the entire life of the Planning Area and much of the information in this section is reflected in the 1998 Northeast IAP/EIS (USDOI BLM and MMS 1998).

The oil-spill analyses in this amendment are based on three spill-size categories: 1) small spills (< 500 bbl); 2) large spills (≥ 500 to < 120,000 bbl); and 3) very large spills (≥ 120,000 bbl). Over the lifetime of exploration and development of the Planning Area, the probability of small spills occurring is high, and small spills are expected to occur. The probability of a large spill occurring is substantially less. Large spills are not expected to occur at the $20 per bbl price during the life of the Planning Area, given the low level of exploration and development activity that would occur at prices this low, but there would likely be at least one to two large spills during the life of the Planning Area with oil prices at $30 per bbl. The probability of a very large spill occurring is very low and considered extremely unlikely.

The responses to a spill and amount of oil removed are variable and dependent upon the weather conditions, time of year, location, the size of the spill, and other factors. The amount of oil removed can range from none to effectively all of the oil. By assuming no cleanup, the estimated effects to the resources would tend to be overestimated, or greater than what would actually occur.

**Large Oil Spills**

Of concern to stakeholders are the potential effects of oil spills on the environment. This section summarizes the key variables used for oil-spill analysis. For details on any of these points, please refer to Appendix K.

Information on large oil spills is based on historical data from the North Slope. This introduction summarizes the assumptions used to analyze large oil spills, which are a mixture of project-specific information, modeling results, statistical analysis, and professional judgment. Spills from TAPS are included in the analysis, including the spill that occurred in 2001 when a bullet punctured the 48-inch TAPS mainline. Approximately 6,800 bbl of crude oil were released from this intentional sabotage.

The estimated mean number of large spills assumed for each alternative at the $20, $25, and $30 price per barrel of oil are shown in Table 4-7. For the purposes of this analysis, no large spills are assumed to occur at the $20 per bbl price for any of the alternatives, given the low amount of exploration and development activity predicted to occur when prices are near this level. At the $25 per bbl price, one large spill is estimated to occur for alternatives B, C, and D. At the $30 per bbl price, the number of large spills estimated to occur from gravel pad facilities or pipelines anywhere in Planning Area is 0, 1, 2, and 1 for alternatives A, B, C, and D, respectively.

The estimated chance of one or more large spills occurring at the $20 per bbl price under alternatives A, B, C, and D is 8 percent, 13 percent, 15 percent, and 10 percent, respectively, for the life of exploration and development in the Planning Area. The estimated chance of one or more large spills occurring at the $25 per bbl price under the

ENVIRONMENTAL CONSEQUENCES

*Wildlife Surveys*

Aerial surveys for wildlife in the Planning Area could include fixed-wing aircraft surveys for waterfowl and caribou, or helicopter surveys for tagging and subsequent radio-tracking of grizzly bears or caribou. Low-level fixed-wing aerial surveys would probably have little effect on birds due to the short amount of time during which aircraft would be in a particular area. Ward et al. (1999) reported a decreasing level of response to aircraft overflights by brant with increasing lateral distance of aircraft. The majority of birds responded at lateral distances of ½ mile or less. Wildlife telemetry studies involving the use of helicopters could cause greater disturbance to birds due to the potential for prolonged periods of hovering over target animals, and take-offs and landings required for deploying ground personnel for attachment of transmitters. Additionally, pedestrian traffic has been shown to be more disruptive to some waterfowl species than other types of disturbance (Johnson et al. 2003b). The effects to birds from these activities could range from temporary displacement from preferred feeding habitats to nest abandonment and loss of production for the breeding season.

*Waste Removal*

Clean-up activities at abandoned sites in the Planning Area could involve the use of fixed-wing aircraft or helicopters to access remote areas. The effects of this traffic would be similar to those described above for conducting aerial surveys or for mobilizing and re-supplying summer camps. Ground activity by workers on foot could be more disruptive to some bird species than other types of disturbance (Johnson et al. 2003b).

*Summer Camp Support*

Aircraft activity to mobilize and re-supply summer camps could disturb birds along continually-used flight corridors and near airstrips during take-offs and landings. Effects of this type of visual and noise disturbance could range from temporary displacement from preferred habitats to nest abandonment. Fixed-wing and helicopter flights for mobilization and re-supply of summer camps would be intermittent, and could occur several days or weeks apart. It may be easier for birds to acclimate to flights that occur on a regular daily basis than to flights that occur on a more random basis. Birds could also suffer mortality due to collisions with aircraft.

### 4.3.8.2 Oil and Gas Exploration and Development Activities

**Effects of Disturbances**

*Exploration*

Most seismic surveys and exploration drilling activities would occur during the winter months when most birds are not present in the Planning Area. Therefore, these activities would have no direct impacts on most species. A few species, including snowy owl, gyrfalcon, ptarmigan, and common raven, which could be present in the Planning Area during winter, could be temporarily displaced from preferred feeding areas by oil and gas exploration activities. There is also a potential that ravens could be attracted to seismic camps.

The use of airguns for boat-based seismic work in Teshekpuk Lake during the summer could temporarily displace loons and waterfowl from preferred feeding habitats while surveys were being conducted. Disturbance may result not only from airgun use but also from boat activity (Rodgers and Smith 1995). Because setbacks around the perimeter of the lake presumably would eliminate the potential for disturbance to birds nesting near the lakeshore, only birds using habitats in the open water of the lake would potentially be disturbed. Birds displaced by seismic activities would likely return to preferred habitats after the airgun arrays passed through the area. Disturbance to birds near the shoreline could result from support activities, such as use of helicopters to transport personnel and supplies. Disturbance related to support activities could result in permanent or temporary displacement from nesting, feeding, or brood-rearing habitats. Conducting surveys after the completion of the nesting and brood-rearing period would eliminate the potential for nest abandonment and loss of productivity.

Winter exploration activities could indirectly affect tundra-nesting birds during the summer breeding season. Ice-roads and ice-pads are sometimes used for transportation and storage of drilling and exploration equipment. Construction of these ice-roads and ice-pads could temporarily alter tundra habitats by compressing standing-dead vegetation or delaying the growth and development of vegetation, due to protracted ice melt. The altered vegetation could reduce the amount of suitable habitat for nesting birds, but these impacts would be small and would be likely to persist for 1 or 2 years (Walker et al. 1987a, b). In areas where winter ice-roads and ice-pads were constructed annually, varying the location of the roads and pads as directed under the lease stipulations could help mitigate potential impacts to tundra vegetation and nesting birds.

In some cases, equipment could be stored on ice-pads specially designed and constructed to last through the summer and into the following winter. The tundra under the footprint of these ice-pads would be lost as feeding, nesting, or brood-rearing habitat during the course of that season. Locating these summer ice pads in drier areas would help to reduce potential impacts to loons, waterfowl, and some shorebird species associated with wetter habitat types, but could increase the potential impacts to species that use upland habitats such as plovers and buff-breasted sandpiper.

Water used in the construction of ice roads and pads would be withdrawn from deep lakes in areas adjacent to the road and pad locations. Winter water withdrawal could alter lakewater levels and adjacent habitats, although flooding and recharge during spring break-up would likely minimize the potential for long-term effects (Rovansek et al. 1996). Lake recharge during spring would probably limit affects on invertebrate populations used for food by birds in the spring though this has not been studied directly. Bergman et al. (1977) and Derksen et al. (1981) reported that lakes with pendent grass had high levels of use by birds and seemed to be important to loons and waterfowl. Avoiding water withdrawal from lakes with pendent grass may reduce potential effects on waterfowl.

Rolligons and track vehicles used during seismic exploration could leave tracks on tundra habitats that would be observable for several years (Kevan et al 1995). These tracks could affect vegetation, soil chemistry, soil invertebrates, and soil thaw characteristics, key components of bird habitat. The most noticeably affected areas would include terrain with considerable microtopographic relief caused by mounds, tussocks, hummocks, and high-centered polygons. Wet areas are less likely to be affected than dry areas (Walker 1996). Snow acts as a buffer against these impacts; therefore avoiding areas with low snow cover, in addition to using lightweight vehicles, dispersing traffic patterns, and minimizing sharp turns, could help to minimize damage to vegetation used by birds (Walker 1996).

Predators, such as glaucous gulls and Arctic foxes, could be attracted to anthropogenic food sources associated with summer maintenance of exploratory drilling and seismic equipment. Garbage and shelter associated with winter exploration activities could also attract predators such as Arctic foxes and ravens, which may cause increased predation pressure on tundra-nesting birds. However, lease stipulations would require proper handling of non-hazardous waste to avoid human-caused changes in predator populations. This policy has apparently been successful at the Alpine field, where Johnson et al. (2003b) reported no increase in the numbers of most predator species after development. The one exception was common raven, which became more common and nested at the Alpine field after development.

### Development and Production

**Activities on Roads and Pads.** Activities related to oil development and production in the Planning Area, such as vehicle, aircraft, pedestrian, and boat traffic, routine maintenance activities, heavy equipment use, and oil-spill clean-up activities could cause disturbances that would affect tundra-nesting birds. These disturbances could result in temporary or permanent displacement from preferred foraging, nesting, and brood-rearing habitats, decreased nest attendance, nest abandonment, and increased energy expenditures that could affect the physiological condition of birds and avian survival or reproduction. The likelihood for impacts to tundra-nesting birds would depend on the location of the disturbance, the species and number of individuals in the area, and the time of year. Impacts would be most likely to occur if facilities were located in habitats with high bird concentrations, or if species with low population numbers or declining populations were disturbed. Species of particular concern include yellow-billed

ENVIRONMENTAL CONSEQUENCES

loon, red-throated loon, Sabine's gull, long-tailed duck, and buff-breasted sandpiper (Lanctot and Laredo 1994; Brown et al. 2000; Donaldson et al. 2001; Larned et al. 2003; Mallek et al. 2003). The Goose Molting Area and the Colville River are areas with high wildlife values that would be unavailable for oil and gas leasing and development under the No Action Alternative.

Most construction activities, including pipeline installation, and gravel mining and placement for oil field infrastructure (i.e., roads, airstrips, and pads, camps, staging areas, and processing facilities), would be conducted during the winter. With the exception of a few resident species, most birds are not present in the Planning Area during winter; therefore, there would be little disturbance to most birds.

During the summer, birds could be subjected to disturbances caused by vehicular and pedestrian traffic, and by noise from equipment on roads or at facilities, including large trucks hauling cranes and other equipment and road maintenance equipment on access roads and pads. In the North Slope oil fields, these types of disturbances have been documented for waterfowl, and have been shown to have greater effects on geese feeding close to roads than on geese feeding further away from them (Murphy et al. 1988; Murphy and Anderson 1993). Disturbances would be most prevalent during the pre-nesting period when birds gather to feed in open areas near roads, and during brood-rearing and fall staging when some geese exhibit higher rates of alertness in areas near roads than do birds in undisturbed areas (Murphy and Anderson 1993). Disturbance would occur most often within 160 feet of roads. However, Murphy and Anderson (1993) reported disturbances to birds as far as 500 to 685 feet from roads. Troy (1988) reported that most common shorebird species occurred in lower densities near roads in the Prudhoe Bay oil field than in areas away from roads. This apparent avoidance of roads, however, may have been related to an avoidance of heavily dusted areas on tundra adjacent to roads with high traffic levels rather than an avoidance of vehicular activity itself. Disturbance from vehicular traffic could affect activity and energy budgets and have negative impacts on nest density and success for some birds. Higher shorebird densities may occur in areas near the coast compared to inland areas and disturbance that occurred in coastal areas may have a greater impact on shorebirds than inland disturbances (see Map 3-19).

Some evidence suggests that pedestrian traffic may have a greater impact on some birds than vehicular traffic. During a study of the effects of disturbance related to the Lisburne Development in the Prudhoe Bay oil field, Murphy and Anderson (1993) reported that of the more common sources of disturbance, humans on foot elicited the strongest reactions from geese and swans. Ritchie (1987) reported that pedestrians caused greater disturbance to nesting raptors than other sources of disturbance. Johnson et al. (2003b) reported that aircraft and pedestrians elicited higher responses by nesting geese at the Alpine field than other sources of disturbance. Restricting or reducing the level of foot traffic on gravel roads and pads could help to reduce the potential for disturbance to foraging, nesting, or brood-rearing birds.

**Air Traffic.** Both fixed-wing aircraft and helicopters could be used to transport personnel, supplies, and equipment to airstrips or staging areas during development and production activities in the Planning Area. The potential for disturbance to waterfowl from aircraft is well documented (e.g., Schweinsburg 1974; Ward and Stehn 1989; Derksen et al. 1992; McKechnie and Gladwin 1993; Ward et al 1999). Johnson et al. (2003b) conducted the most thorough study of aircraft disturbance to waterfowl in the Arctic at the Alpine field. Responses of birds to aircraft included alert postures, interruption of foraging behavior, and flight. Aircraft disturbances could displace birds from feeding habitats and negatively impact energy budgets. Gollop et al. (1974b) and Ward et al. (1999) suggested that helicopters may be more disturbing to wildlife than low-flying fixed-wing aircraft, although Balogh (1997) indicated that fixed-wing aircraft flown at 150 feet AGL often caused spectacled eiders to flush, while helicopters flown at similar altitudes in the vicinity of Prudhoe Bay did not. In a simulation study, Miller (1994) suggested that altering direct helicopter routes in the Goose Molting Area would likely reduce the impacts of potential weight loss on molting brant substantially. The greatest disturbance to brant would result from flights parallel to the coast and 1 mile inland. Other studies have reported little response by molting waterfowl to aircraft over-flights (Gollop et al. 1974a). Under the No Action Alternative, permanent oil and gas facilities would be prohibited in high value waterfowl habitat surrounding Teshekpuk Lake and most aircraft overflights in this area would likely be at altitudes sufficiently high to avoid disturbance to waterfowl. Aircraft disturbance would be likely to affect waterfowl and other bird groups in portions of the Planning Area open to development, although

under the No Action Alternative, the effects of aircraft disturbance would likely be lower than that of the other alternatives.

The potential effects of routine aircraft flights into airstrips would range from bird avoidance of certain areas to abandonment of nesting attempts or lowered survival of young. The likelihood that noise associated with aircraft would have a negative impact on birds would probably be greatest during the nesting period, when the movements of incubating birds are restricted. The highest levels of aircraft noise would occur during takeoffs as engines reached maximum power levels. During landings, aircraft noise levels would be reduced as engine power decreased. In the Planning Area, aircraft activity would likely be greatest during the construction period, when more personnel and equipment would be transported to areas being developed than during the production period, when activity levels would be reduced (Johnson et al. 2003b).

The Alpine field avian monitoring program was a multi-year project designed to identify the potential effects of noise and disturbance from aircraft on birds nesting near the airstrip and on large waterbirds during brood-rearing (Johnson et al. 2003b). Other sources of disturbance included vehicle and pedestrian traffic, and predators. When compared to pre-construction numbers, waterfowl nests near the airstrip declined in the area within 3,250 feet of the airstrip after construction began (Johnson et al. 2003b). However, the number of post-development nests increased in the area between 3,250 and 5,000 feet from the airstrip. The decline could not be directly linked to disturbance, as other factors, such as lower temperatures and more severe flooding later into the breeding season during construction years, may also have influenced nest densities. During years of heavy construction, white-fronted goose nest sites were apparently displaced to habitats similar to those used prior to construction, but located further from the airstrip. Johnson et al. (2003b) suggested that preferred white-fronted goose nesting habitats in the Alpine field area had not been saturated with nests prior to development, and that suitable nesting habitat was available in areas away from the airstrip.

White-fronted geese showed some changes in distribution in relation to sources of disturbance at the Alpine field, including increased noise levels, aircraft, vehicles, and pedestrians. However, when comparing the nest densities of shorebirds and passerines on intensively studied plots near and away from the airstrip, nest densities of both groups were higher on study plots near the airstrip than on plots greater than 5,000 feet from the airstrip (Johnson et al. 2003b).

At the Alpine field, white-fronted geese at failed nests were more likely to take incubation recesses than geese at successful nests. A higher frequency and duration of recesses may allow for increased predation by jaegers, gulls, ravens and foxes at unattended nests. The probability of taking a recess increased as noise level increased, when aircraft were present, when the number of vehicles decreased, and when pedestrians were present. Geese nesting less than 6,500 feet from the airstrip were more likely to take a recess than birds greater than 6,500 feet from the airstrip. Of the various disturbance types, helicopters were the least predictable because they did not have a restricted flight pattern. Incubating white-fronted geese and tundra swans showed similar response to helicopters and fixed-wing aircraft, although monitored nests were closer to the airstrip than to the helipad. Airplanes and pedestrians elicited the highest rates of response from incubating geese, and vehicles elicited the lowest. Nevertheless, successful white-fronted goose nests were generally closer to the Alpine field airstrip, the flight path, and the nearest gravel source than unsuccessful nests, although most comparisons were not substantially different (Johnson et al. 2003b).

Johnson et al. (2003b) also reported on tundra swans and yellow-billed loons nesting in proximity to the Alpine field airstrip. There was no difference among years in the mean distance of tundra swan nests relative to the airstrip, closest gravel source, or aircraft flight path. In 1998, a tundra swan nested successfully 520 feet northeast of the airstrip, despite daily helicopter activity near end of the airstrip during late June and early July. Another pair of tundra swans nested successfully from at least 1997 through 2002 at a site approximately 1,470 feet southwest of the airstrip and 470 feet from the infield road. These nests were successful despite their proximity to the airstrip and their locations under the takeoff and approach patterns of aircraft. Disturbance effects of the various components of the Alpine field apparently were not severe enough to cause major changes in tundra swan nest-site selection. Similarly, no evidence was found that the development affected the distribution and abundance of

yellow-billed loon nests located near the airstrip, although the sample size was small. Johnson (1984) reported that at least three successful common eider nests were located within 975 feet of a helicopter pad on Thetis Island that averaged approximately 12 trips per day. Although the potential exists for displacement of some nesting birds near routinely used aircraft landing sites as a result of numerous overflights, landings, and takeoffs, some birds may habituate to routine air traffic.

During post-breeding studies in southwest Alaska, Ward et al. (1999) studied brant response to fixed-wing and rotary-wing aircraft and reported brant response to aircraft at a lateral distance to 3 miles, although the majority of birds responded to aircraft that were within a lateral distance of ½ mile or less. The greatest response to aircraft altitude occurred between 1,000 and 2,500 feet. Derksen et al (1992) also reported that molting brant in the Teshekpuk Lake Goose Molting Area were disturbed by helicopter overflights and that brant did not habituate to the overflights. Low-level helicopter survey flights to monitor pipelines for potential oil spills or leaks could also disturb tundra-nesting or post-breeding birds. Routine flights would be of short duration and occur in a particular area, and would likely cause minimal disturbance to birds. However, temporary displacement from preferred feeding, brood-rearing, or molting habitats could affect energy budgets of some birds, and incubating birds could be temporarily displaced from nests.

**Watercraft.** Several types of watercraft could be used during the summer for transportation of equipment and supplies and for oil spill response training drills. Summer barge traffic, which would transport equipment and supplies to staging areas along the coast and could temporarily displace molting and staging waterfowl, would likely occur in offshore waters of the Planning Area from mid-July through October. Displaced waterfowl would probably move to adjacent habitats or return to their original habitats after the barges passed through the area. There are also documented accounts of staging waterfowl hitting barges in low/poor light conditions late in the year associated with storm events. Barge traffic would not be expected to substantially impact molting waterfowl. Most of the area adjacent to the coastline would not be available to oil and gas leasing, and the potential for barge traffic to displace waterfowl under this alternative would likely be lower than under the final Preferred Alternative and alternatives B and C.

Oil spill response training activities using watercraft could be conducted on rivers and lakes several times during the summer open-water season. The vessels used would likely be small, maneuverable crafts, suitable for work in shallow waters. Spill response training activities would have the potential to disturb foraging, nesting, or brood-rearing waterfowl and other birds. Boat activity could cause alert postures, disruption of feeding behavior, and flight in waterfowl, shorebirds, and raptors (Burger 1986, Belanger and Bedard 1989, Steidl and Anthony 2000). Rodgers and Smith (1995) and Rodgers and Schwikert (2001) determined the required set-back distances for minimizing the potential for boat disturbance to various bird groups. Suggested buffer zones around areas of activity ranged from 325 feet for shorebirds to 600 feet for wading birds. Establishing buffer zones around known areas of waterfowl and shorebird activity, during oil spill response training activities, or conducting these activities in areas not frequented by these birds, could help to reduce negative impacts to birds.

### *Habitat Losses and Alteration*

**Permanent Habitat Loss.** Gravel mining and placement for the construction of oil field infrastructure would cause the loss of tundra-nesting bird habitat. During construction of oil field roads and pads, tundra covered by gravel, as well as tundra associated with gravel mine sites, would be lost as nesting, brood-rearing, and foraging habitat. This loss of habitat would continue through the duration of the operation of the proposed development, and would be permanent unless habitat restoration measures were successfully implemented after abandonment of the oil/gas field. However, the development scenario indicates that at abandonment of the field, gravel would not be removed but would be allowed to bed naturally. The potential long-term impacts associated with habitat loss could be minimized by locating gravel roads, pads, airstrips, and mine sites away from areas with high concentrations of tundra-nesting birds and areas that may be critical to species of special concern or species with declining populations. Under the No Action Alternative, Lease Stipulation 39 would provide for setbacks from lakes in the Deep Water Lakes Area south of Teshekpuk Lake; permanent oil and gas facilities could be prohibited within these