#### 4.6.8.1 Activities Not Associated With Oil and Gas Exploration and Development

Under the final Preferred Alternative, activities not related to oil and gas exploration and development that could affect birds in the Planning Area would be the same as those described under the other alternatives: private or commercial air traffic, aerial surveys to inventory wildlife or other resources, summer research camps, hazardous material or debris removal, subsistence hunting and fishing, and recreational camps and boating activity. The potential for disturbance, displacement, or mortality from non-oil and gas related activities, would likely be similar under the various alternatives. Lease stipulations to protect waterfowl, shorebirds, raptors, and other birds and their habitats would help to mitigate the potential effects of non-oil and gas activities on birds under the final Preferred Alternative.

#### 4.6.8.2 Oil and Gas Exploration and Development Activities

**Effects of Disturbances**

*Exploration*

Most seismic surveys to collect geological data and exploration drilling activities would occur during the winter months when birds are mostly absent from the Planning Area. Under the final Preferred Alternative, the types of effects of winter exploration activities on the bird species present in the Planning Area during the winter would be the same as those discussed under the other alternatives. Although impacts associated with winter exploration would likely be minor under any alternative, exploration could occur in the central portion of the Goose Molting Area under the final Preferred Alternative that is closed to development under the No Action Alternative and Alternative B. Conversely, small portions of the western and southeastern Goose Molting Area that are not protected under Alternative B would receive some protection under the final Preferred Alternative. The direct effects of exploration would likely include the temporary displacement of a small number of birds from preferred feeding or roosting areas.

During winter exploration activities, indirect impacts to birds could result from the construction of ice roads and ice pads and the associated water withdrawal. The types of effects that could result from ice road and ice pad construction under the final Preferred Alternative would be the same as those described under the other alternatives, and would primarily involve the temporary alteration of tundra habitats. Water withdrawal for ice road construction could also temporarily alter habitats adjacent to water source lakes, which could affect nesting or brood-rearing loons and waterfowl. Rolligons and track vehicles used during winter exploration could also temporarily affect tundra vegetation, resulting in minor impacts to tundra-nesting birds. Although exploration could occur in portions of the Goose Molting Area that are closed to oil and gas leasing under the No Action Alternative and Alternative B, other portions of the Goose Molting Area that are open to development under Alternative B would receive some protection under the final Preferred Alternative.

The use of airguns for seismic work in Teshekpuk Lake during the summer could temporarily displace loons and waterfowl from preferred feeding habitats while surveys were being conducted. Because setbacks around the perimeter of the lake presumably would eliminate the potential for disturbance to bird nesting near the lakeshore, only birds using open water habitats in lake would potentially be disturbed. Birds displaced by seismic activities would likely return to preferred habitats after the airgun arrays passed through the area. Disturbance to birds near the shoreline could result from support activities such as use of helicopters to transport personnel and supplies. Disturbance related to support activities could result in permanent or temporary displacement from nesting, feeding, or brood-rearing habitats. Conducting support activities after the completion of the nesting and brood-rearing periods would eliminate the potential for nest abandonment and loss of productivity. Under the final Preferred Alternative, exploration activities in Teshekpuk Lake would be deferred, thus delaying the potential for seismic exploration activities to impact birds.

ENVIRONMENTAL CONSEQUENCES

Predators, such as glaucous gulls, ravens, and Arctic foxes, could be attracted to anthropogenic food sources associated with summer maintenance of exploratory drilling and seismic equipment or winter exploratory activities. Under the final Preferred Alternative, the potential effects of increased predation would be mitigated by ROPs A-2 and E-9, and the overall effects to birds would likely be similar under the various alternatives.

### Oil and Gas Development

**Activities on Roads and Pads.** Activities related to oil development and production in the Planning Area, such as vehicle, aircraft, pedestrian, and boat traffic; routine maintenance activities; heavy equipment use; and oil spill clean-up activities could cause disturbances that would affect tundra-nesting birds. Under the final Preferred Alternative, these types of disturbances to birds would be the same as those discussed under the other alternatives. These disturbances could result in temporary displacement from preferred foraging, nesting, and/or brood-rearing habitats; decreased nest attendance or nest abandonment; and increased energy expenditures that could affect physiological condition, rate of survival, and productivity of birds. The likelihood for impacts to tundra-nesting birds would depend on the location of the disturbance, the bird species and the number of individuals in the area, and the time of year. The greatest potential for impacts from disturbance would most likely occur in habitats with high bird concentrations, such as the Teshekpuk Lake Goose Molting Area, or if species with low or declining populations, such as buff-breasted sandpiper or yellow-billed loon, were disturbed.

The potential for disturbance to birds from activities on roads and pads would likely be greater under the final Preferred Alternative, as compared to Alternative B, because under the final Preferred Alternative roads would be permitted throughout most of the Goose Molting Area and pads would be permitted in portions of the Goose Molting Area that were closed to development under Alternative B. Under the final Preferred Alternative, no surface occupancy, including the construction of roads and pipelines, would be permitted in the caribou migration corridor between Teshekpuk Lake and the Kogru Inlet. This would provide birds in this area with a greater level of protection from disturbance on pads under the final Preferred Alternative compared to Alternative B. An NSO area would also be established south/southeast of Teshekpuk Lake covering 141,000 acres identified as an important caribou calving area. Restricting surface occupancy in this area would also protect birds using the area. Some disturbance in this area would be possible, since road and pipeline right-of-ways would be allowed in the area.

The final Preferred Alternative would likely increase the risk of disturbance to internationally significant populations of molting geese, particularly brant that use the Goose Molting Area when compared to alternatives A and B. The reduction in protection under the final Preferred Alternative could also affect white-fronted and Canada geese. Disturbance that resulted in a reduction in the breeding success of geese and other waterfowl could also impact the success of subsistence and sport hunters in Alaska, the lower 48 states, Canada, Russia, and Mexico. Disturbance effects could also impact shorebirds if development occurred in areas of high shorebird concentration located north of Teshekpuk Lake. Lease Stipulation K-6 would establish a ¾-mile buffer inland from the coast, within which oil and gas facilities would be prohibited to the extent practicable to minimize hindrance or alteration of caribou movement within caribou coastal insect-relief areas. This lease stipulation could also help to reduce the potential impacts to waterfowl and their habitats in coastal areas.

Under the No Action Alternative, no permanent oil and gas facilities would be permitted within ¼ mile of the perimeter of any fish-bearing lake in the Deep Water Lakes Area south of Teshekpuk Lake. Under the final Preferred Alternative, facilities would generally not be permitted within this buffer, but could be permitted, on a case by case basis, in consultation with federal, state, and NSB regulatory and resource agencies. Permitting facilities within the ¼-mile buffer of fish-bearing lakes in the Deep Water Lakes Area could result in disturbance to yellow-billed loons and waterfowl near the facilities and access roads. However, other bird groups could also be disturbed if facilities were located outside the ¼-mile buffer. The extent of effects to birds from activities on roads and pads would depend on the species and numbers of individuals occurring in areas adjacent to the development. Although Lease Stipulation K-2 has been designed primarily to provide mitigation for deepwater fish habitat, it would also provide protection for birds using habitats near these lakes.

**Air Traffic.** Both fixed-wing aircraft and helicopters could be used to transport personnel, supplies, and equipment to airstrips or staging areas during development and production activities in the Planning Area. The types of disturbance effects to waterfowl and other bird groups from aircraft would be the same under the final Preferred Alternative as those discussed under the other alternatives, and could include displacement from preferred feeding habitats, temporary or permanent nest abandonment, and temporary or permanent displacement from molting or brood-rearing areas. However, some birds could habituate to aircraft activity and either remain in habitats located near aircraft activities, or move to nearby habitats. This may not be the case for brant, as they apparently do not habituate well to aircraft traffic (Derksen et al. 1992). Aircraft disturbance to brant may cause behavioral and physiological responses that could increase energy expenditures and reduce foraging time, which could increase the duration of the flightless period and susceptibility to predation. Birds could be displaced from optimal to sub-optimal habitats, causing birds to spend more time foraging to meet nutrient needs (Derksen et al. 1992).

Under the final Preferred Alternative, there would be the potential for a greater amount of disturbance to birds from aircraft activity in most of the Goose Molting Area as compared to Alternative B. This is due to the potential for placement of facilities in the central portion of the Goose Molting Area, which is not open to oil and gas leasing and development under Alternative B. Under the final Preferred Alternative, however, development would not be permitted in portions of the western, southeastern, and north coastal Goose Molting Area that are open to development under Alternative B, which could reduce the potential for aircraft disturbance to birds in these areas. Confounding the issue is the potential for pipeline construction throughout most of the Goose Molting Area, which would result in the potential for helicopter surveillance for pipeline inspection.

Although set-backs from the goose molting lakes would provide a buffer within which facilities could not be located, continual aircraft flights into facilities located between buffer zones would have the potential to disturb molting geese. Aircraft disturbance could have moderate impacts on tundra nesting waterfowl and shorebirds under the final Preferred Alternative. Impacts may be greater on brant that apparently do not habituate well to some types of aircraft traffic. Helicopter traffic during pipeline surveys or other activities may result in greater impacts to brant than other types of aircraft traffic. If all of the development in the Goose Molting Area is connected by a road system and individual fields are supplied from staging areas located on coast, it is possible that individual fields could be supplied via the road system and aircraft disturbance could be minimized. The level of impacts would depend on the final development scenario, the number and location of fields, and whether construction and production activities were conducted primarily with air or road support.

If a CPF were located within the ¼-mile buffer around deep-water lakes the potential effects of aircraft disturbance would be similar under the action alternatives and would increase from that of the No Action Alternative. The degree of effects to birds would depend on the number of birds present and which species of birds were using habitats near the facility. Although Lease Stipulation K-2 was designed primarily to mitigate potential impacts to fish, this lease stipulation, which would provide for agency consultation prior to development within the ¼-mile buffer, could also help reduce potential impacts to birds.

**Watercraft.** Several types of watercraft could be used during the summer to transport equipment and supplies and to conduct oil spill response training drills. Summer barge traffic, with the potential to temporarily displace molting and staging waterfowl, could occur in offshore waters of the Planning Area from mid-July through October. These impacts would likely be minor. Displaced waterfowl would probably move to adjacent habitats or return to original habitats after the barges passed though the area, and barge traffic would not be expected to substantially impact waterfowl. There may be a greater likelihood for disturbance to waterfowl under the final Preferred Alternative as compared to Alternative B, because of the increased potential for development in the Goose Molting Area that may require increased barge support at coastal staging areas. Under the final Preferred Alternative and Alternatives B, the potential for barge and vessel traffic to disturb birds would be greater than for the No Action Alternative, and less for Alternative C.

Oil spill response training activities using watercraft could be conducted on rivers and lakes several times during the summer. Disturbance from watercraft activity along rivers could affect birds such as ruddy turnstones, semipalmated plovers, and Baird's sandpipers that use gravel bars. The results of disturbance may include failure

to nest or nest abandonment (Rodgers and Smith 1995). The potential for these activities to disturb waterfowl and shorebirds under the final Preferred Alternative would likely be increased compared to Alternative B because there would be a greater likelihood that facilities would be located in areas of high bird use within the Goose Molting Area, and a road system through the area would allow access to goose molting lakes. However, wildlife resource surveys would be conducted prior to development to identify suitable areas for spill response training activities.

### *Habitat Losses and Alteration*

**Permanent Habitat Loss.** Gravel mining and placement for the construction of oil field infrastructure would have the greatest potential to result in the loss of tundra-nesting bird habitat. As much as 1,090 acres of tundra could be covered by gravel placement under the final Preferred Alternative and up to 210 acres could be impacted by gravel mining. During the construction of oil field roads and pads, tundra covered by gravel as well as tundra associated with gravel mine sites would be lost as nesting, brood-rearing, and foraging habitat for birds. The potential effects of habitat loss under any alternative would likely have moderate impacts to tundra-nesting birds and would depend on the location of the development, the types of habitat lost, and the level of bird use in the areas to be developed. The impacts of permanent habitat loss on tundra-nesting birds under the final Preferred Alternative may be reduced compared to Alternative B due to the reduced amount of tundra covered by gravel for construction of facilities under the final Preferred Alternative. Loss of habitat in areas of high bird use in the Goose Molting Area, however, could cause greater impacts to birds under the final Preferred Alternative compared to Alternative B. In addition, the potential for roads to be constructed throughout the Goose Molting Area under the final Preferred Alternative would further increase the potential for habitat loss in areas of high bird use. Birds that use drier habitats may be more affected by habitat loss than those that use wet habitats, because less dry habitat is available in the National Petroleum Reserve – Alaska. Loss of dry habitat could be especially important for buff-breasted sandpiper, which is a species of concern with low population numbers that uses dry habitats. As under Alternative B, there would be an increased potential for birds to be affected by a functional loss of habitat under the final Preferred Alternative in areas near roads and pads if development-related disturbances precluded birds from utilizing these habitats. The potential for habitat loss to impact tundra-nesting waterfowl and shorebirds would be greater under alternatives B and D as compared to the No Action Alternative, but would be less than would occur under Alternative C.

**Temporary Habitat Loss.** In addition to permanent habitat loss, temporary loss of tundra habitat adjacent to gravel roads and pads could occur as a result of thermokarst, dust deposition, snow accumulation, and impoundment formation. Water withdrawal from lakes during ice-road construction could temporarily affect birds in adjacent habitats if the lakes did not have adequate recharge capabilities. Under the final Preferred Alternative, the types of effects to birds resulting from temporary habitat loss would be the same as those discussed under the other alternatives. As with permanent habitat loss, the degree of effects would depend on the location of gravel infrastructure and local use of adjacent habitats by bird populations. Temporary habitat loss under the final Preferred Alternative could potentially have a reduced impact on tundra-nesting birds, compared to Alternative B, because of the reduced amount of habitat that would be affected. The potential for locating facilities and a road system in the Goose Molting Area under the final Preferred Alternative, however, would increase the potential for impacts to birds as compared to Alternative B. The potential for temporary habitat loss to impact birds under the final Preferred Alternative and Alternative B would be greater than those under the No Action Alternative, but less than would occur under Alternative C.

### *Mortality*

Bird mortality could result from collisions with vehicular traffic, buildings, elevated pipelines, towers, boats, or bridges. The potential for collisions with oil field structures or equipment is discussed under the No Action Alternative. The potential impacts to bird populations as a result of collisions in areas of oil and gas development would likely be minor. Without knowing specific locations of potential developments, it is difficult to compare potential impacts among alternatives. However, there may be an increased risk of bird collision with offshore barge and vessel traffic under the final Preferred Alternative compared to the No Action Alternative and Alternative B because facilities could be constructed in portions of the Goose Molting Area that would be unavailable for leasing under Alternative B. These facilities could be accessed by roads from staging areas on the coast which could result in increased barge and vessel traffic under the final Preferred Alternative. Under the action alternatives, ROP E-10

would require illumination to prevent migrating waterfowl from colliding with drilling structures, production facilities, and other structures exceeding 20 feet in height. Although there is no similar action under the No Action Alternative, the potential risk of bird collisions with oil field infrastructure could still be greater under the action alternatives because the potential benefits of illumination of facilities may not be adequate to mitigate for the presence of facilities within or near areas of high bird use. The potential for bird mortality to result from collisions with vessel traffic and oil field facilities and equipment depends on facility location and on the species and numbers of birds in developed areas.

Some predators, such as ravens, gulls, Arctic fox, and bears, could be attracted to areas of human activity where anthropogenic sources of food and denning or nesting sites were present. The potential impacts of increased numbers of predators on birds are discussed under the other alternatives. Increased predation pressure could have moderate impacts on tundra-nesting birds. Under the final Preferred Alternative, the types of effects to bird populations would be the same as those discussed under the other alternatives. Under the final Preferred Alternative, there may be the potential for greater bird mortality due to predation than under Alternative B if predators were attracted to development in areas of high bird use that are closed to leasing under Alternative B. Under Alternative B and the final Preferred Alternative, the potential for bird mortality to result from increased levels of predation would be greater compared to the No Action Alternative and less compared to Alternative C. Although all alternatives have ROPs or lease stipulations in place to eliminate attraction of predators to anthropogenic sources of food, the action alternatives would require the lessee to use the best available technology to prevent facilities from providing nesting, denning, or shelter sites for ravens, raptors, or foxes. Still, it may be difficult to totally exclude ravens from nesting on oil field structures. There would be no equivalent lease stipulation under the No Action Alternative.

### Effects of Abandonment and Rehabilitation

The impacts of abandonment and rehabilitation on birds would be similar in many respects to those incurred by construction activity. Activities occurring in the winter would cause little disturbance or displacement, because most species would be absent from the area. However, the melting of ice roads could be delayed, compared to surrounding tundra, causing the formation of impoundments. Delay in the melting of ice roads could also cause the complete loss of nesting habitat for a season, or cause compaction of vegetation, which would reduce the quality of the nesting habitat for a nesting season. Such impacts would only affect nesting in the summer following ice road use, and would be minor. Summer road and air traffic generated by abandonment and rehabilitation activities could cause disturbance, displacement, and mortality to birds that would be similar to, and at the same levels as, those caused by traffic during construction and production. If pads, roads, and airstrips were not revegetated, their value to birds would be lessened. If they were revegetated without removing the gravel, the habitat would not return to its current utility for most birds of the area. If gravel was removed, habitat similar to that existing in the area at the time of disturbance could be created and used by birds, though the precise mix of habitat types would likely not be the same as what originally occurred. Foam insulating materials used in pad construction could be broken up in the course of removal. Fine particles of foam not removed from the environment could be ingested by some birds incidentally; depending on the material's toxicity and the amount ingested, ingestion of foam could cause sickness or mortality, though the numbers of birds harmed or killed would be very small.

### Effects of Spills

Oil spills would have similar types of effects to tundra-nesting birds under all alternatives. There may be an increased risk of an offshore spill occurring under the final Preferred Alternative compared to Alternative B, because of the potential for increased barge traffic needed to supply facilities in the Goose Molting Area. Offshore spills would have the potential to spread through the action of wind and currents, and could affect molting waterfowl along the coastline or in Harrison and Smith bays, as well as shorebirds feeding in littoral habitats in the Colville River Delta. The potential for an offshore spill to impact birds under Alternative B and final Preferred Alternative would be greater compared to the No Action Alternative, but less compared to Alternative C.

Under the final Preferred Alternative, the potential for a terrestrial oil spill in the Goose Molting Area would be greater compared to Alternative B because of the potential to construct facilities and pipelines in the central portion

ENVIRONMENTAL CONSEQUENCES

of the Goose Molting Area under the final Preferred Alternative. A pipeline leak or other spill on terrestrial habitats could affect greater numbers of waterfowl and shorebirds because of the high concentration of nesting and molting birds found in this area. The potential for a terrestrial spill to impact birds under Alternatives B and the final Preferred Alternative would be greater compared to the No Action Alternative, and less compared to Alternative C.

Oil entering a river or stream could potentially spread into delta or coastal areas, where impacts to birds could be more severe. Waterfowl along the shoreline or in marine habitats and shorebirds in the littoral areas of the Colville River Delta could be impacted during the fall molting and staging period. Under the final Preferred Alternative, the potential that an oil spill would enter a major river or stream would be minimized by the setbacks from goose molting lakes associated with this alternative, although pipelines would not necessarily be prohibited in some of these areas. The other alternatives have lease stipulations with similar levels of protection.

### 4.6.8.3    Effectiveness of Stipulations

The final Preferred Alternative incorporates many of the "K" lease stipulations and establishes buffers around important goose molting lakes in the 213,000 acre portion of the Goose Molting Area that was unavailable to oil and gas leasing under Alternative B. In addition, the final Preferred Alternative establishes buffers around goose molting lakes located outside of the area protected under Alternative B. These buffers are established to protect important habitat for caribou and molting geese, and medium to high-density concentrations of white-fronted goose which are found on 85 percent of this area (Map 3-14). However, other bird species would also benefit from protection of this area. For example, medium to high-density concentrations of pintails and shorebirds are found on 86 and 84 percent of this area, respectively (Maps 3-16 and 3-19). Approximately half the area contains medium to high densities of tundra swans and Pacific loons (Maps 3-10 and 3-13).

Several new lease stipulations are added under the final Preferred Alternative. Lease Stipulation K-4(h) creates an NSO area of approximately 217,000 acres using buffer areas around the Goose Molting Lakes as the boundary. This allows areas of potential development within the Goose Molting Lakes habitat that were previously off limits to development and potentially compromises much of the protection provided by the NSO for waterfowl using the area. Additionally the lease stipulation allows pipelines and roads to be constructed within the NSO which also compromises the benefits of the NSO designation. Lease Stipulations K-9 and K-10 cover habitat important to caribou migration and calving but would also protect birds using these areas. Lease Stipulation K-11 delineates the area North of Teshekpuk Lake into seven large lease tracts and limits development within each tract to no more than 300 acres of disturbance. While surface disturbance is limited in these areas, the tracts effectively open areas of land within the Goose Molting Area that was off limits to development under the No Action Alternative and Alternative B.

Numerous lease stipulations and ROPs were developed to protect birds and their habitat within the Planning Area. The "A" ROPs would be effective in ensuring that solid, liquid, and hazardous wastes did not impact birds or their habitats, and in reducing the potential for garbage to attract animals that may prey upon birds in exploration and development sites. The "B" ROPs would be effective in ensuring that water withdrawals do not impact lakes, or lake habitats, used by molting geese, while the "C" ROPs would govern seismic ground operations during spring and summer to prevent seismic activity-related disturbance to geese during the nesting and molting periods. Disturbances caused by aircraft are controlled within the Goose Molting Area and raptor sites under ROP "F." Several of the "K" lease stipulations would be effective in protecting birds and their habitats, including habitats associated with rivers and lakes, the Goose Molting Area, and Coastal Area.

### 4.6.8.4    Conclusion

Under the final Preferred Alternative, the types of disturbances related to vehicle, aircraft, pedestrian, and vessel traffic, routine maintenance activities, heavy equipment use, facility noise, and oil spill clean-up activities would be similar to those described under the other alternatives. The potential for these disturbances to impact birds may be greater under the final Preferred Alternative compared to Alternative B, because of a greater potential for development to occur in portions of the area of high bird use in the Goose Molting Area. Although the level of

development would be reduced under the final Preferred Alternative compared to Alternative B, disturbance to birds could be greater due to the potential to locate facilities in the Goose Molting Area. This is due in part to the potential for the construction of roads throughout the entire Goose Molting Area. The overall effects of disturbance under the final Preferred Alternative and Alternative B would be greater than for the No Action Alternative, but less than those that would occur under Alternative C. The potential for habitat loss and alteration to affect tundra-nesting birds may be greater under the final Preferred Alternative compared to Alternative B, although the amount of tundra habitat that would be lost to gravel infrastructure would be less. Under the final Preferred Alternative, there would be a higher potential for infrastructure to be located in areas of high bird use in the Goose Molting Area. The potential for bird mortality resulting from collisions with vehicles or infrastructure and marine vessel traffic may be greater under the final Preferred Alternative because of the increased potential for development that may require offshore barge support. The potential for an oil spill to impact tundra-nesting birds would also be greater under the final Preferred Alternative, as compared to Alternative B, because of the increased potential for an off shore spill from a barge and the potential for a pipeline spill in the Goose Molting Area. The impacts from any alternative would depend on the location and size of the developments and the species and numbers of birds located in developed areas.

In general, impacts to birds from non-oil and gas activities, and from oil and gas activities, would likely be additive, except in those areas where the two types of activities overlapped. Impacts to birds from exploration and development activities would also be additive. However, once exploration and development/production ceased in an area, bird populations could recover from the effects of disturbance reducing overall effects in the Planning Area. In areas where two or more activities occurred, overall impacts would reflect those impacts associated with the first activity and any new impacts associated with later activities. Based on the reduced area of disturbance under the final Preferred Alternative compared to Alternative B, impacts to birds could be reduced. However, because more development could occur in areas of high bird use in the Goose Molting Area under the final Preferred Alternative compared to Alternative B, there may also be greater potential for bird disturbance to occur under the final Preferred Alternative. Because of the larger disturbance area and the potential for more oil and gas exploration and development activities, the potential impacts to birds under the final Preferred Alternative would be less than under alternatives B and C, but would be 4 times greater than those that would occur under the No Action Alternative. The level of impacts, however, would also be dependant on the location of facilities and development in the Goose Molting Area, which under the final Preferred Alternative, could increase the effects of development on sensitive species, such a brant. Potential impacts may be greater for brant than for other species due to their apparent inability to habituate to some types of disturbance (Derksen et al. 1992), their decreasing population size, and the potential for as much as 30 percent of the Pacific flyway population of brant to use the Goose Lake Molting Area. Impacts could be even greater if oil and gas activities occurred in areas with high bird concentrations, with high quality habitat, or used by species of concern.

### 4.6.9   Mammals

#### 4.6.9.1   Terrestrial Mammals

**Activities Not Associated With Oil and Gas Exploration and Development**

The types of impacts to terrestrial mammals under the final Preferred Alternative would be similar to those that would occur under the other alternatives, but could be more frequent, greater in extent, or longer in duration than those occurring under the No Action Alternative. A greater number of individual animals would be exposed to human activities. Aircraft traffic would more often pass overhead of caribou and other terrestrial mammals during flights to or from the camps and along aerial survey routes. The disturbance reactions of caribou and other terrestrial mammals would likely be brief, lasting for a few minutes to an hour. Some terrestrial mammals might avoid inventory survey and recreation camps during the 6 to 12 weeks of activities, while bears and foxes could be attracted to the camps. Impacts from recreation and overland moves would be the same as under the No Action Alternative. Current management practices and lease stipulations addressing land use authorizations for temporary facilities, overland moves, and recreation permits would effectively mitigate impacts from these activities on terrestrial mammals.

ENVIRONMENTAL CONSEQUENCES

**Oil and Gas Exploration and Development Activities**

Under the final Preferred Alternative, oil and gas leasing and exploration would be allowed in the Planning Area, but lease stipulations would limit surface occupancy in the Goose Molting Area northeast of Teshekpuk Lake (approximately 217,000 acres), in the caribou calving area south and southeast of Teshekpuk Lake (approximately 141,000 acres), and in the caribou travel corridor between Teshekpuk Lake and the Kogru River (approximately 16,000 acres) (Figure 2-4). In addition, lease stipulations would provide seasonal and spatial protection to certain environmentally sensitive areas, including Rivers Area, Deep Water Lakes, Goose Molting Area, Teshekpuk Lake Caribou Habitat Area, Pik Dunes, Colville River Special Area, Coastal Area, and Teshekpuk Lake. The exposure of terrestrial mammals to oil and gas activities, and therefore the level of associated impact, could potentially be greater under the final Preferred Alternative than under the No Action Alternative, given that leasing of lands adjacent to Teshekpuk Lake could occur and the overall scale of development would likely be greater under the final Preferred Alternative. Exposure of terrestrial mammals to oil and gas activities under the final Preferred Alternative would be reduced compared to alternatives B and C because of the additional lease stipulations provided under this alternative.

*Effects of Disturbances*

**Seismic.** Impacts to terrestrial mammals would be similar to those discussed under the No Action Alternative but would be greater in frequency and extent, given the greater number of 3-D seismic surveys and the larger area open to surveys. A larger number of individual animals would likely be exposed to human activities. Aircraft traffic would more often pass overhead of caribou and other terrestrial mammals during flights to or from seismic camps. It is expected that the reactions of caribou and other terrestrial mammals to disturbance would be brief, although large numbers of wintering TLH caribou could be encountered, depending on the location of exploration activities. Some caribou and other large mammals would likely be displaced from the general area of the seismic work. Some terrestrial mammals would avoid seismic camps, while others, such as foxes, could be attracted to the camps by food odors. The potential for disturbance to hibernating bears would be greater under the final Preferred Alternative, compared to the No Action Alternative, because of the increased level of seismic activity occurring in the Planning Area. Bears, however, are only present at low densities in the Planning Area. Muskox and moose would most likely be present in their greatest numbers in the southern portion of the Planning Area, so impacts would be similar to those presented under the No Action Alternative, although the greater number of surveys would likely result in greater impacts. A greater number of lemmings and voles could be killed or disturbed by surface vehicles. The frequency and extent of seismic surveys would be similar to that proposed for Alternative B and less than that proposed for Alternative C.

The use of airguns for seismic work in Teshekpuk Lake during the summer would likely cause only temporary displacement of terrestrial mammals near the lake. Displacement would occur primarily from the support activity associated with the surveys, such as helicopter flights to bring equipment to the lake. Once surveys were finished, mammals would move back into the area around the lake. However, Teshekpuk Lake would be deferred from leasing under the final Preferred Alternative, which would likely limit seismic activity in the lake.

**Exploratory Drilling.** Under the final Preferred Alternative, it is projected that the number of exploration wells and delineation wells drilled would be greater than for the No Action Alternative and less than for Alternatives B and C. Types of impacts to terrestrial mammals would be similar to those discussed under the No Action Alternative, but somewhat greater in extent and frequency, as more exploration would occur, particularly in the area to the northwest, south, and east of Teshekpuk Lake, which would be excluded from leasing under the No Action Alternative. Exploratory drilling would be conducted during the winter, when wildlife are largely absent, although wintering TLH caribou could be present in large numbers if more exploration activity occurred in the southern portion of the Planning Area. Exploratory drilling could also occur from pads and platforms in lakes in the TLCH Area during summer, potentially disturbing mammals found near this activity. Moose, muskox, and grizzly bears would experience a greater level of impacts than under the No Action Alternative.

The implementation of lease stipulations and ROPs should ensure minimal impacts to terrestrial mammals. These lease stipulations and ROPs would include provisions to avoid known grizzly bear dens by ½ mile, methods to

avoid attracting wildlife to food and garbage, provisions to protect stream banks from damage during overland moves, provisions to minimize the effect of low-lying aircraft on wildlife (particularly over caribou winter ranges), and provisions to minimize the disturbance and hindrance of caribou in the TLCH Area.

**Oil Development.** Approximately 95 percent of the Planning Area would be made available for leasing under the final Preferred Alternative. Leasing would be allowed throughout the Planning Area. However, additional lease stipulations would limit development in the 217,000-acre region northeast of Teshekpuk Lake and would protect the caribou calving area south and southeast of Teshekpuk Lake (approximately 114,000 acres), and the caribou travel corridor between Teshekpuk Lake and the Kogru River (approximately 16,000 acres) by creating NSO areas.

The primary effects of oil and gas development on terrestrial mammals would be similar to those outlined under the No Action Alternative, and would result from construction of facilities such as roads and pipelines; motor vehicle traffic within the oil field(s) and on connecting roads; foot traffic near facilities and camps; aircraft traffic; crude-oil and fuel spills contaminating tundra, stream, and coastal habitats; and habitat alteration associated with gravel mining and construction. The greatest potential for impacts to caribou would be through disruption of calving areas and interference in the movement of mosquito-harassed TLH caribou between insect-relief habitat and foraging areas. These impacts would likely be greater under the final Preferred Alternative than under the No Action Alternative, given the larger development scenario that would affect approximately 0 to 2,915 additional acres of habitat (includes acres that could be indirectly lost due to alteration of plant species composition). Functional loss of habitat would be greater than the number of acres indicated, which is the actual development footprint plus indirect losses. Wolfe (2000) suggested that when caribou in the CAH avoided areas within 2.5 miles of roads and pipelines, the functional habitat loss increased from 2 percent (the immediate footprint of roads and gravel pads) to 29 percent.

Construction of permanent roads within the Planning Area would increase access to the area and could increase public and subsistence hunting of terrestrial mammals. Caribou would be most impacted by increased access for hunting, but other species (moose in particular) may also be impacted depending on the location of permanent roads. The overall number of animals taken would be unlikely to increase dramatically since most hunting would be for subsistence, but roads could focus hunts in particular portions of the Planning Area. Hunting pressure and harvests have increased for many wildlife species near the TAPS since its construction, but have not produced adverse population effects (TAPSO 2001). It is unlikely that the more remote roads associated with oil and gas development in the Planning Area would have as great an effect on wildlife populations as occurred along the TAPS corridor.

<u>Caribou</u>
Although much of the construction associated with oil and gas development would occur primarily during winter, development would bring year-round facilities and activities to caribou range. If a field were developed in the area surrounding Teshekpuk Lake (excluding the portion unavailable to leasing), production pads, pipelines, within-field roads, and other facilities would be located within areas used by the TLH caribou for calving, insect relief, and wintering. A field development in the northern section of the Planning Area would also require a connector pipeline to link the oil field with facilities to the east.

The types of impacts of field development on caribou would be similar to those outlined under the No Action Alternative. However, given the possibility that a field would be developed within the calving, insect-relief, and wintering grounds of the TLH caribou, impacts to caribou could be greater under the final Preferred Alternative than under the No Action Alternative. Overall, the level of impact would be dependent on the specific location of any oil field—a field in the central or southern portion of the Planning Area would not impact the TLH caribou calving grounds, although such a development could still affect migratory movements of TLH and WAH caribou as well as activities on their wintering ground.

Development in the TLH caribou calving grounds could displace some calving animals within 2½ miles of roads. Movements of some cows and calves across roads would also likely be reduced, and cow caribou might avoid crossing the roads during the calving season. Lease Stipulation K-4(h) would limit development north of

ENVIRONMENTAL CONSEQUENCES

Teshekpuk Lake and would help protect caribou calving areas in that region. Additionally, Lease Stipulation K-10 creates an NSO area south/southeast of Teshekpuk Lake (141,000 acres). This area in addition to the areas north of Teshekpuk Lake is important to caribou calving. These lease stipulations prohibit permanent oil and gas facilities excluding major right-of-ways such as pipelines and roads within this area. Lease Stipulation K-11 would delineate the area north of Teshekpuk Lake into seven large lease tracts and limits development to a maximum of 300 acres of permanent surface disturbance resulting from oil and gas development in each tract.

Some TLH caribou movements during the insect-relief season (late June to August 15) would likely be affected by pipelines and road traffic. The critical part of the movement to the coastal insect-relief area is through the narrow corridor between Teshekpuk Lake and the Kogru River. Caribou must pass through these corridors to get to and from insect-relief areas. The area to the east of Teshekpuk Lake is a particular problem, because nearly all of the parturient cows pass through this area either shortly before or after calving (Carroll Pers. comm.). Any development that occurs on the limited amount of habitat that is used by caribou migrating through this corridor would likely affect caribou movements. Lease Stipulation K-9 designates an NSO area extending from the eastern shore of Teshekpuk Lake approximately 4 miles eastward towards the Kogru Inlet (approximately 16,000 acres). The NSO designation prohibits permanent oil and gas facilities including major right-of-ways such as pipelines and roads. This lease stipulation should protect enough land to allow caribou use of this major migration corridor. However, pipelines could be allowed in the NSO area north of Teshekpuk Lake and south/southeast of the lake. Careful siting of pipeline and road right-of-ways would still be required to prevent affects on caribou use of this corridor. Additionally, the areas that would be excluded from surface occupancy do not extend to the coast, suggesting that there could be some development along the coastline. While a set-back from the coast is stipulated (Lease Stipulation K-6), development in the coastal area would likely impact caribou use of insect-relief areas near the coast, though the number of developments would be restricted by Lease Stipulation K-11.

Traffic associated with hauling gravel from outside of the Planning Area could result in local disturbance and displacement of caribou within about 1 mile of the operations. A pipeline linking oil fields in the Planning Area with facilities at the Alpine and Kuparuk River fields would result in the disturbance and displacement of some caribou during winter construction, due to vehicle traffic along ice roads and air traffic. It is expected that these disturbances would be short term and occur within about 1 mile of the pipeline corridor.

Moose
Moose occur in low densities in the Planning Area during the summer, and are concentrated in major drainages at the southern edge of the Planning Area in the winter (Map 3-27). Unless an oil field were to be developed in the southern portion of the Planning Area, development would be unlikely to impact moose. Under the final Preferred Alternative, impacts to moose would be similar to those discussed under the No Action Alternative, although they could be greater in duration and area, given the larger overall development scenario under the final Preferred Alternative.

If gravel were mined from the southern portion of the Planning Area, a temporary displacement and disturbance of moose could occur. Borrow pit operations could potentially destroy or degrade 20 to 210 acres of moose habitat if gravel borrow operations occur in the southern portion of the Planning Area.

Muskox
Muskox occur in low densities in the Planning Area, although they may be present year-round. Potential effects of oil and gas development activities include displacement and disturbance of individual animals, direct habitat loss from gravel mining in river floodplains and placement of gravel at oil field facilities, and indirect habitat loss through reduced access caused by physical or behavioral barriers created by roads, pipelines, and other facilities. Under the final Preferred Alternative, impacts would be similar to those under the No Action Alternative, although they could be greater in duration and area, given the larger overall development scenario. Impacts would be greatest if development were to occur in the southern portion of the Planning Area.

### Grizzly Bears

Major sources of noise include construction of roads, installation of crude oil pipelines, pump stations, gravel mining, and drilling operations. These activities could disturb grizzly bears within a few miles of the noise sources. Industrial activities and human presence could also cause potentially serious disturbances to denning bears. Under the final Preferred Alternative, impacts to grizzly bears would be similar to those that would occur under the No Action Alternative, although the extent and duration of impacts could be greater because of the larger overall development scenario, depending on the location of the field development. Grizzly bears are present at low densities in the northern portion of the Planning Area, but could be attracted to some activities. It is likely that the greatest number of bears would be encountered during development activities in the southern portion of the Planning Area, since the greatest amount of suitable habitat is located in this area.

### Wolves

Under the final Preferred Alternative, oil and gas development would have a minimal impact on wolves, similar to the No Action Alternative. Potential effects to wolves would include short-term disturbance from air and surface traffic and human presence, and increased hunting and trapping pressure through improved access or increased human presence associated with oil development. If caribou abundance were negatively affected by oil and gas development, wolf abundance could in turn be affected. However, wolves are generally not abundant in the Planning Area.

### Wolverines

The potential effects of oil and gas development on wolverines under the final Preferred Alternative could include disturbance from air and surface vehicle traffic, increased human presence, and habitat alteration. Because wolverines are considered a shy and secretive species, they could be sensitive to oil exploration and development activities and abandon habitat areas near oil development. If caribou abundance was affected by oil development, wolverines could be affected in turn. Alteration of riparian habitats through gravel excavation or pipeline construction could affect wolverines, especially during the winter, when these habitats provide cover and important hunting areas. Wolverines are present at low density in the Planning Area and sightings have been infrequent. Documented sightings and harvest locations suggest that wolverines could be encountered along rivers and in the vicinity of Teshekpuk Lake. Under the final Preferred Alternative, some wolverines could be displaced near (within a few miles) oil field facilities. Impacts under this alternative are likely to be similar to, or slightly greater than, those that would occur under the No Action Alternative, given the larger overall development scenario.

### Foxes

Under the final Preferred Alternative, impacts to Arctic foxes would be similar to those discussed under the No Action Alternative, although they could be greater in duration and extent. Oil and gas development activities could affect Arctic foxes by increasing the availability of food and shelter. An increase in the fox population associated with oil development could affect some fox prey species (such as ground-nesting birds) in the development area and over a region larger than the oil field itself (Burgess et al. 1993). If development were to occur in the Arctic foothills or mountains, similar impacts to red foxes could occur.

### Other Mammals

Small rodents and their predators would be affected locally (i.e., through direct mortality and loss of habitat of individuals or small groups of lemmings and voles) along pipelines, gravel pads, and other facilities. Arctic ground squirrels sometimes den in gravel fill in the oil fields (Shideler and Hechtel 2000). The availability of suitable burrowing habitat could increase local densities of ground squirrels. Under the final Preferred Alternative, impacts to small mammals would be similar to slightly greater than those that would occur under the No Action Alternative, given the larger overall scale of the development scenario.

#### *Effects of Abandonment and Rehabilitation*

Abandonment and rehabilitation activities would disturb and displace terrestrial mammals in a manner similar to that associated with construction. The intensity of the disturbance would be less than during construction, however, because it is likely that caribou, muskox, and other terrestrial mammals would have become habituated to road and

air traffic over the course of construction and operation of the facilities. Some individuals could be killed by collisions with road traffic. If roads were left in place and maintained in useable condition upon abandonment, they could continue to provide improved access to hunting areas, with consequent hunting pressure on caribou and other subsistence species. Revegetation of the roads, pads, and the airstrip left in place would facilitate restoration of habitat. Plant communities on these raised gravel structures would likely be different from those that prevail in adjacent areas. Pads, roads, and the airstrip could provide some insect-relief habitat for caribou, if left in place. If gravel fill was removed and the pad revegetated with vegetation similar to the surrounding plant communities, caribou, and possibly other terrestrial mammals, would use the area. Foam insulating materials that could be used in pad construction could be broken up in the course of removal and used by fox as denning material. Depending on the material's toxicity and the amount ingested by fox, this could cause mortality, though the numbers of fox killed would likely be very small.

### *Effects of Spills*

The impacts of oil spills on terrestrial mammals are described under the No Action Alternative (Section 4.3.9; Mammals). Compared to the No Action Alternative, the risk of oil spills would be greater, but still small, under the final Preferred Alternative, given the greater extent of development. Activities occurring in the vicinity of Teshekpuk Lake could increase the likelihood that a spill would reach the lake under the final Preferred Alternative. The majority of impacts to terrestrial mammals would result from disturbance associated with spill clean-up activities rather than direct oiling.

## Effectiveness of Stipulations

Numerous lease stipulations and ROPs were developed to protect mammals. These include the "A" ROPs, which have been developed to reduce the potential for direct mortality due to oiling, ingestion of toxic materials, or contamination of habitat, prey species, and forage species, and to reduce the attractiveness of industrial sites to predators that could result in elevated predator populations.

Lease Stipulation D-1 would prohibit exploratory drilling in lakes, streams, lakebeds, and active floodplains unless impacts to wildlife were minimal, while Lease Stipulation D-2 would be effective in minimizing surface impacts from exploratory drilling by limiting exploratory drilling to temporary facilities such as ice pads, ice roads, ice airstrips, and temporary platforms, unless the lessee were to demonstrate that construction of permanent facilities was environmentally preferable.

Required Operating Procedure E-1 would be effective in protecting wildlife resources by requiring that all roads be designed, constructed, maintained, and operated to create minimal environmental impacts, while ROP E-7 would require that pipelines and roads be designed to facilitate caribou passage by elevating all aboveground pipelines at least 7 feet above the ground, burying pipelines, or providing ramps to facilitate caribou movements. In addition, ROP E-7(c) would require that a minimum distance of 500 feet separate pipelines and roads, when feasible. If fully implemented, these ROPs would be effective in reducing, but not eliminating, the impacts of oil development on caribou movements. Since caribou are sensitive to humans on foot and moving vehicles, there would be some negative effects on their ability to freely move through the area, regardless of how well the field was designed.

Required Operating Procedure F-1 would minimize the effects of low-flying aircraft on terrestrial mammals by requiring an altitude of at least 1,000 feet AGL (except for takeoffs and landings) over caribou winter ranges, limiting the number of takeoffs and landings in support of operations, and requiring aircraft altitudes of at least 2,000 feet AGL (except for takeoffs and landings) over the TLCH Area from May 20 through August 20. Assuming that aircraft operators were aware of the potential effects of aircraft on wildlife and took the appropriate actions to minimize those effects, disturbance impacts to terrestrial mammals could be effectively reduced.

Lease Stipulations K-5 and K-6 would require that the operator minimize disturbance and hindrance of caribou, or alteration of caribou movements through portions of the TLCH Area and the Coastal Area that are essential for all season use, including calving and rearing, insect relief, and migration. These lease stipulations would require

Case 1:05-cv-00008-JKS    Document 60-5    Filed 05/24/2006    Page 13 of 20

ENVIRONMENTAL CONSEQUENCES

studies of caribou movement, would restrict exploratory drilling, would protect major land corridors, would require field design that takes caribou movements into account, and would require various ground and air traffic controls. New lease stipulations associated with the final Preferred Alternative also provide protection for terrestrial mammals. Lease Stipulation K-4(h) creates an NSO in the Goose Molting Area north and east of Teshekpuk Lake (approximately 217,000 acres). This lease stipulation would provide protection for caribou calving and insect-relief areas located in this region and should effectively limit impacts to caribou associated with development. However, the NSO in this area would allow major right-of-ways for pipelines and roads, which could still potentially impact caribou calving areas and insect-relief habitat as well as caribou movements depending upon their location.

Lease Stipulation K-9 would designate an NSO area extending from the eastern shore of Teshekpuk Lake approximately 4 miles eastward towards the Kogru Inlet (approximately 116,000 acres). The NSO designation prohibits permanent oil and gas facilities including major right-of-ways such as pipelines and major roads. This lease stipulation should protect enough land to allow caribou use of this major migration corridor.

Lease Stipulation K-11 would delineate the area north of Teshekpuk Lake into seven large lease tracts and limits development to a maximum of 300 acres of permanent surface disturbance resulting from oil and gas development in each tract. This lease stipulation, along with Lease Stipulation K-4(h), would limit the amount of surface disturbance within the area north and east of Teshekpuk Lake and would help to minimize impacts to caribou calving and insect relief habitat and movements of caribou within the area. However, potential impacts would depend on the actual location of any developments within this area.

**Conclusion**

Under the final Preferred Alternative, oil and gas leasing and exploration would be allowed anywhere in the Planning Area, except where lease stipulations prohibit permanent oil and gas facilities in the area north and east of Teshekpuk Lake, south/southwest of Teshekpuk Lake and in the migration corridor between Teshekpuk Lake and the Kogru Inlet. In addition, lease stipulations and ROPs would provide seasonal and spatial protection to certain environmentally sensitive areas, including Rivers Area, Deep Water Lakes, Goose Molting Area, Teshekpuk Lake Caribou Habitat Area, Pik Dunes, Colville River Special Area, Coastal Area, and Teshekpuk Lake. The exposure of terrestrial mammals to oil and gas activities, and therefore the level of associated impact, would be greater under the final Preferred Alternative than under the No Action Alternative, given that leasing of lands adjacent to Teshekpuk Lake could occur and that the overall scale of development would likely be greater under the final Preferred Alternative. However, exposure of terrestrial mammals to oil and gas activities under this alternative would be less than would occur under alternatives B and C.

Among the terrestrial mammal populations that could be affected by management actions under the final Preferred Alternative are the TLH, WAH, and CAH caribou. Caribou could be exposed to helicopter traffic and other human activities associated with resource inventories, seismic operations, exploratory drilling, and pipeline construction. The TLH caribou movements within calving, insect-relief, and wintering areas could be disrupted by oil development activities. Although much of the construction associated with oil and gas development would occur primarily during winter, development would bring year-round facilities and activities into caribou range. If a field were developed in the area surrounding Teshekpuk Lake (excluding the NSO areas), production pads, pipelines, within-field roads, and other facilities would be located within areas used by the TLH for calving, insect relief, migration, and wintering. A field development in the northern section of the Planning Area would also require a connector pipeline to link the oil field with facilities to the east.

Studies done over the last decade have indicated that TLH caribou show high fidelity to the calving area near Teshekpuk Lake and that caribou that calve in the traditional calving area have much higher calving success than caribou found outside the area. Collared caribou that are found within the currently protected areas (as identified in 1998 ROD) during calving season have much higher calving success than caribou found outside the areas. In surveys conducted since 1990, 147 out of 163 (90 percent) TLH caribou that calved successfully calved within these protected areas. Of the 178 caribou that were found within the protected areas, 83 percent calved

Northeast National Petroleum Reserve – Alaska    4-367    January 2005
Final Amended IAP/EIS

Exhibit 42, page 231 of 300

ENVIRONMENTAL CONSEQUENCES

successfully. Of the 59 cows that were found outside the protected areas during calving season, 25 percent calved successfully (Carroll 2003).

If the TLH is displaced from its calving area, as the CAH has been, or if caribou are impeded from reaching the calving area, recent surveys indicate that calving success would most likely be reduced. While there have been no experiments conducted with the TLH to determine whether oil development in the calving area would displace caribou or affect the productivity of the herd, caribou behavior during 1997 and 2001 suggest that oil development in the TCH calving area could impact caribou. During 1996-97, most of the herd migrated much farther south than usual and many cows arrived late to the calving area. Only 8 of 21 collared caribou were found in the calving area during calving time and 6 of these calved successfully. Of the other 13 collared cows, only one calved successfully for an overall successful calving percentage of 33 percent. In 2001, heavy snow and a late snow melt-off slowed the migration and only 16 (44 percent) of 36 collared cows calved successfully. Calving success for collared cows that did make it back to the calving area in 2001 was much better (88 percent) than cows that did not make it back (10 percent). This suggests that if oil development takes place in such a way that it displaces caribou from the calving area, or interferes with their ability to get to the calving area, it could have an effect on productivity and population numbers (Carroll 2003).

The types of impacts of field development on caribou would be similar to those outlined under the No Action Alternative. However, given the possibility that a field would be developed within the calving, insect-relief, and wintering grounds of the TLH, impacts to caribou could be greater under the final Preferred Alternative than under the No Action Alternative. Lease stipulations created for the final Preferred Alternative would help to mitigate potential effects of development on the TLH. If fully implemented, these lease stipulations (along with the other proposed lease stipulations and ROPs) should limit the affects on caribou to a moderate level.

The WAH caribou could be exposed to oil development facilities in localized areas. Moose, muskox, grizzly bears, wolves, wolverines, foxes, and small mammals could be locally affected by activities associated with oil and gas exploration and development. Impacts to mammals would be similar to those discussed under the No Action Alternative, but could be more frequent, greater in extent, or longer in duration. A greater number of individual animals would likely be exposed to human activities. Aircraft traffic would more often pass overhead of caribou and other terrestrial mammals during flights, and a greater amount of habitat would potentially be permanently lost.

It is expected that impacts to terrestrial mammals in the vicinity of Teshekpuk Lake would be greater under the final Preferred Alternative than under the No Action Alternative, particularly with respect to caribou calving and insect-relief habitat. Overall, impacts throughout the Planning Area would be greater under the final Preferred Alternative, given the greater overall scale of the planned development. Impacts associated with the final Preferred Alternative would be less than Alternative B given the additional Lease Stipulations K-4(h), K-9, K-10, and K-11 which help to mitigate many of the potential impacts to caribou. Similarly, impacts to terrestrial mammals under the final Preferred Alternative would be less than would occur under Alternative C, which has fewer restrictions on the locations of oil and gas activity.

In general, impacts to mammals from non-oil and gas activities, and from oil and gas activities, would likely be additive, except in those areas where both types of activities occurred. Impacts to mammals from exploration and development activities would also be additive, except where development occurred in areas previously disturbed during exploration. In areas where two or more activities occurred, overall impacts would reflect those impacts associated with the first activity and any new impacts associated with later activities.

### 4.6.9.2 Marine Mammals

**Activities Not Associated With Oil and Gas Exploration and Development**

Under the final Preferred Alternative, impacts associated with non-oil and gas activities would be similar to those described under the No Action Alternative. These activities could occur throughout the Planning Area and would not be affected by the increased availability of land for oil and gas leasing.

Overland moves could disturb a small number of polar bears within approximately 1 mile of the vehicle train. Disturbance of maternity dens could result in den abandonment and death of cubs. Additionally, a few ringed seals could be disturbed if overland moves were to occur over floating, shore-fast ice. Recreational camps could attract a small number of polar bears, increasing the potential for negative human-bear interactions that could require that a small number of bears be shot in defense of human life and property. It is expected that small fuel spills would occur under the final Preferred Alternative. These small spills should not have negative impacts on marine mammal populations in or near the Planning Area.

Under the final Preferred Alternative, it is expected that the effects of non-oil and gas activities on marine mammals would be localized and short term, with no or minor effects to marine mammal populations.

**Oil and Gas Exploration and Development Activities**

*Effects of Disturbances*

A small number of polar bears could be affected by seismic exploration occurring along the coast, although ROP C-1 would prohibit seismic activities within 1 mile of known or suspected polar bear dens or seal birthing lairs. The potentially greater amount of seismic exploration that would occur under the final Preferred Alternative would increase the likelihood that polar bears would be disturbed, relative to the No Action Alternative, and would be the same as Alternative B, although the increase in impacts would be modest, given the relatively low number of bears denning in the Planning Area.

It is expected that aircraft traffic could potentially disturb marine mammals under the final Preferred Alternative. The effects of aircraft traffic disturbance would be similar to those discussed under the other alternatives, but could be greater in extent than for alternatives A and B, given the potential for development in the area north of Teshekpuk Lake and the greater likelihood that fields would be developed near the coast. Aircraft would generally fly at 1,000 feet or higher AGL, minimizing the potential for disturbance to seals.

Under the final Preferred Alternative, exploratory drilling near the coast during winter would have the same likelihood of displacing or attracting polar bears as under the other alternatives. Female polar bears denning within approximately 1 mile of the construction activity could be disturbed by vehicle traffic and construction noise, which could result in the abandonment of the den and the potential death of cubs. Polar bears could be attracted to drilling sites by food odors and curiosity, increasing the potential for negative human-bear interactions and the possible death of bears in defense of human life and property. Non-lethal means of deterrence would be used in most cases, minimizing the number of bears lost as a result of such encounters.

Under the final Preferred Alternative, Lease Stipulation K-6 would prohibit the construction of permanent structures within ¾ mile of the coast, although exploration could occur in the area. The effects of exploration activities would be localized and would be unlikely to affect marine mammal populations. Most exploration and development activities would occur onshore, and would not likely affect individual marine mammals or populations.

Under the final Preferred Alternative, the projected levels of activities associated with oil and gas leasing and development could be incrementally higher than under the No Action alternative, given the larger area that would be available for leasing and the greater likelihood that fields would be developed near the coast. Higher levels of development would result in a greater potential for disturbance to marine mammals from increased aircraft and overland traffic, and increased barge traffic to transport supplies and modules. However, the level of activity anticipated under the final Preferred Alternative is lower than that expected under Alternative C, since production would be limited to several 300-acre or smaller developments in the area north of Teshekpuk Lake. It is assumed that development operations in the Planning Area would be staged out of the Prudhoe Bay Unit or the Kuparuk River Unit facilities, with no dock or causeway constructed along the Planning Area coast. Materials and equipment would likely be moved to staging areas in the Planning Area using trucks over ice roads in the winter months. Under this scenario, increased summer barge traffic could result in local and short-term displacement of cetaceans and seals, and local and short-term changes in marine mammal behavior, as barges and sealifts passed

along the coast. It is not expected that local and short-term changes in distribution or behavior would reach levels that could result in high impacts to individual marine mammals or populations, although the fitness of some individuals could be impacted if disturbance were to become chronic. Mitigation measures that regulated the timing of shipments would minimize the potential for barge traffic to impact marine mammal populations. Under the final Preferred Alternative, the effects of oil and gas activities on marine mammals should be localized and short term, with few effects to species populations.

### *Effects of Abandonment and Rehabilitation*

Impacts of abandonment and rehabilitation activities are expected to be similar to those for construction. Aircraft flights could disturb ringed or bearded seals and non-denning polar bears, and spotted seals could be disturbed by spring or summer activities. Denning polar bears could be disturbed, and mortality caused to cubs abandoned or prematurely introduced to inclement weather, by activities within about 1 mile of their dens if these dens were not detected and avoided as required by ROP C-1.

### *Effects of Spills*

**Effects from a Large Spill.** Under the final Preferred Alternative, a large spill occurring near the Colville River could result in oil reaching the marine environment. Some spotted seals and beluga whales could be exposed to oil, as under the other alternatives.

Little or no contamination of benthic food organisms and bottom-feeding habitats of walruses, bearded seals, and gray whales would be expected, because little oil would be likely to reach offshore feeding areas. Thus, as under the other alternatives, a spill in the Colville River Delta would not be likely to have any effects on marine mammal food chains.

Polar bears could be vulnerable to a spill in the Colville River Delta during winter or during spring break-up. As under the other alternatives, the number of polar bears affected would likely be small. Under the final Preferred Alternative, as under the other alternatives, it is expected that few marine mammals would be affected by a large spill in the Planning Area.

**Effects from Small Onshore Spills.** As under the other alternatives, small onshore spills would not be expected to have effects on marine mammals, unless the spills were to occur near and contaminate streams that enter the Colville River Delta, Fish Creek or Judy Creek, or the Kogru River. Spills reaching those waterways could impact a small number of ringed seals, spotted seals, or beluga whales. A small number of polar bears could also be affected, as under the other alternatives. Small onshore spills would not be likely to affect bearded seals, walruses, or gray whales occurring offshore of the Planning Area.

In general, the effects of small onshore spills to marine mammals under the final Preferred Alternative are expected to be localized and minor, with few impacts to the populations.

### Effectiveness of Stipulations

The final Preferred Alternative includes the same lease stipulations and ROPs as outlined under alternatives B and C. These ROPs and lease stipulations should provide similar levels of protection as those developed for the No Action Alternative. The additional lease stipulations included in the final Preferred Alternative would have little effect on impacts to marine mammals.

### Conclusion

Under the final Preferred Alternative, the effects of non-oil and gas activities on marine mammals, particularly polar bears and ringed seals along the coast of the Planning Area, would be short term and localized, occurring within 1 mile of aircraft corridors, survey activities, recreational camps, and overland moves. Under the final Preferred Alternative, oil and gas leasing and development activities would likely result in a greater level of noise

# Final

# Amendment to the Northeast National Petroleum Reserve Integrated Activity Plan/ Environmental Impact Statement

## Volume 2

**Chapter 4: Environmental Consequences (Sections 4.7 to 4.12)**
**Chapter 5: Consultation and Coordination**
**Chapter 6: Response to Public Comments**

Prepared by

U.S. Department of the Interior, Bureau of Land Management
Anchorage, Alaska

January 2005

## 4.7.3  Oil and Gas Exploration and Development Activities Considered in the Cumulative Effects Analysis

This section discusses the history and projects the future of development in the region by identifying past, ongoing, and reasonably foreseeable oil and gas activities in the Planning Area and elsewhere on the North Slope. Oil and gas development is the main agent of industrial change on the North Slope. Oil and gas exploration and production activities have occurred on the North Slope since the early 1900s and production has occurred for more than 50 years. Associated industrial development has included the creation of an industry support community airfield at Deadhorse and an interconnected industrial infrastructure that includes roadways, pipelines, production and processing facilities, gravel mines, and docks. In 1977, the TAPS began to transport North Slope crude oil to a year-round marine terminal in Valdez, Alaska. Today, it continues to transport the North Slope's entire production, and it is projected to do so for many years into the future.

For this analysis, oil and gas scenarios were developed based on estimates of future activities. The scenarios are conceptual views of the future that include the timing and extent of future petroleum activities in the Beaufort Sea and on the North Slope. Estimates of anticipated production consider many factors, including the economically recoverable resources of the area, past industry leasing and exploration efforts, and future economic conditions.

For this cumulative analysis, oil and gas activities are divided into the following categories:

- Past Exploration, Development, and Production: Exploration, development, and production activities and associated infrastructure for past, present, and future operations on the North Slope. This category involves construction and ongoing maintenance of present infrastructure, including support facilities and transportation systems.

- Present Exploration, Development, and Production: Exploration, development and production activities that may be currently under construction or approved for construction in the near future (by 2008). This category includes other non-oil-field development, including support and transportation components.

- Reasonably Foreseeable Future Exploration, Development, and Production: Oil and gas discoveries, or other projects, that are identified by location and are expected to initiate development-related activities (e.g., site surveys, permitting, appraisal drilling, or construction) within the next 20 years.

- Speculative Development: Potential petroleum resources and projects that could be developed beyond a 20-year timeframe. The timing and location of these discoveries and projects cannot be established, so a detailed analysis is not possible at this time.

### 4.7.3.1  Past Exploration, Development, and Production on the North Slope and in the Planning Area

The North Slope of Alaska is a very sparsely populated region of extreme climate, with abundant energy and other natural resources. Exploration and industrial development for extraction of the mineral resources of the region (principally oil and gas), which has been active over the past 80 years, is the primary man-induced change to the North Slope (Table 4-31).

During the 80-year oil and gas exploration period, the most intense development activity occurred during the 1970s and early 1980s. It was during this period that the Prudhoe Bay and Kuparuk oil fields were developed, TAPS and the haul road were constructed, and a large portion of the roads, drilling pads, gravel sources, collector pipelines, and production facilities were built. It was also a period of much activity in the National Petroleum Reserve – Alaska, with thousands of miles of seismic lines surveyed and dozens of exploratory wells drilled. Since then, additional development has occurred, but incremental physical disturbance to the environment has been reduced.

ENVIRONMENTAL CONSEQUENCES

Table 4-31. Oil Exploration and Development on the North Slope.

| Date | Event |
|---|---|
| Before Recorded History | Visible oil seepages used by Native inhabitants of the North Slope. |
| 1882 | U.S. government representatives hear of oil seepages while traveling in the area. |
| 1886 | First non-Natives see seepages at Cape Simpson. |
| 1901 | Peters and Schrader traverse the Brooks Range and North Slope recording the geology and geography of the region. |
| 1906-1914 | E. Leffingwell mapped the Arctic Coast east of Barrow and much of the area that now comprises the Arctic National Wildlife Refuge. |
| 1909 | First description of Cape Simpson deposits published. |
| 1914 | First oil-related claim staked. |
| 1921 | Additional claims staked by individuals and industry. |
| 1921 | Large deposits of oil discovered in Oklahoma and Texas and industry loses interest in the remote Arctic. |
| 1922 | First industry-sponsored geological investigation of North Slope oil potential. |
| 1923 | Naval Petroleum Reserve No. 4 (PET-4) established. |
| 1923-1926 | First analysis of PET-4 potential. |
| 1943 | Territory of Alaska Bureau of Mines sends field party to the North Slope to investigate oil and gas seepages. |
| 1944 | Start of PET-4 petroleum exploration program; PET-4 headquarters established at Barrow; land north of the drainage divide of the Brooks Range withdrawn from pubic entry by the Secretary of the Interior; and Public Land Order 82. |
| 1945 | Thirty-one shallow core tests drilled at Cape Simpson and oil was produced. |
| 1945-1952 | Numerous geophysical studies conducted across PET-4 find oil and gas. |
| 1947 | Office of Naval Research establishes Arctic Research Laboratory. |
| 1949 | High sulfur, heavy oil found at a test well drilled near Fish Creek, and gas discovered near Barrow. |
| 1953-1968 | Federal geologic field studies continue in PET-4 and several major oil companies begin exploration. |
| 1957 | Oil discovered in Cook Inlet (south-central Alaska). |
| 1958 | Public Land Order 82 modified; federal leasing begins on the North Slope; first industry-sponsored geological field programs; and Alaska Statehood Act passed. |
| 1959 | Alaska becomes the 49th state in the Union. |
| 1962 | First industry-sponsored seismic program. |
| 1963-1967 | First industry exploration well drilled on the North Slope; 11 unsuccessful wells drilled; and industry interest in the North Slope wanes. |
| 1964 | First State of Alaska lease sale on the North Slope. |
| 1965 | Area that eventually includes Prudhoe Bay leased. |
| 1967 | Initial exploratory drilling at sites that would become Prudhoe Bay field. |
| 1968 | ARCO announces the discovery of Prudhoe Bay oil field, the largest in North America. |
| 1969 | Kuparuk, West Sak, and Milne Point fields discovered; Alaska State Lease Sale No. 23 held; and federal lease sales suspended on the North Slope for the next 10 years because the Secretary of the Interior imposed freezes due to Native claims. |
| 1970 | National Environmental Policy Act signed into law. |
| 1971 | Alaska Native Claims Settlement Act passed. |
| 1974-1976 | Federally-sponsored exploration along the Barrow Arch. |
| 1976 | PET-4 transferred from the Navy to the Department of the Interior and renamed the National Petroleum Reserve – Alaska; sale of crude oil from Petroleum Reserves 1, 2, and 3 authorized; and major exploration effort launched by the USGS in the National Petroleum Reserve – Alaska. |
| 1977 | Trans-Alaska Pipeline System operational. |
| 1979 | Initial leasing of portions of the state and federal OCS waters of the Beaufort Sea. |

Table 4-31. Oil Exploration and Development on the North Slope (Cont.).

| Date | Event |
|---|---|
| 1980 | Alaska National Interests Land Conservation Act passed. |
| 1981 | First OCS exploration well drilled. |
| 1982 | Initial leasing of portions of the National Petroleum Reserve – Alaska. |
| 1984-1985 | Seismic exploration of the Arctic National Wildlife Refuge 1002 Area conducted. |
| 1985 | First industry exploration well drilled in the National Petroleum Reserve – Alaska. |
| 1986 | Arctic Slope Regional Corporation well drilled within the coastal plain of the Arctic National Wildlife Refuge. |
| Various times | Initial leasing of portions of Arctic Slope Regional Corporation lands. |
| Early 1990s | Last of the National Petroleum Reserve-Alaska leases from the initial leasing program are relinquished. |
| 1994 | Discovery of the Alpine field. |
| 1998 | Northeast National Petroleum Reserve – Alaska IAP/EIS ROD signed. |
| 1999 | Lease sale held in Northeast National Petroleum Reserve – Alaska. |
| 2000 | Alpine production begins. |
| 2001 | Northstar field begins production; development of Liberty field suspended; Phillips (successor of ARCO) announces discoveries in National Petroleum Reserve – Alaska. |
| 2002 | Lease sale held in Northeast National Petroleum Reserve – Alaska. |
| 2003 | Beaufort Sea Sale 186 held. |
| 2004 | Northwest National Petroleum Reserve – Alaska IAP/EIS ROD signed. |
| 2004 | Lease sales held in Northwest National Petroleum Reserve – Alaska. |
| 2004 | Alpine Satellite Development Plan EIS ROD signed. |
| Source: NRC (2003) and USDOI BLM (2004a). | |

More recent fields have generally been developed in areas adjacent to existing producing areas, reducing the amount of additional support infrastructure (roads, pipelines, and processing facilities) needed to support additional production. At the same time, changes and improvements in technology have generally decreased the physical disturbance caused by more recent exploration, development, and production activities.

The Native population of the North Slope has established seven large communities from Kaktovik in the east to Point Hope in the west, and numerous smaller settlements for temporary occupancy. From these settlements, hunting and fishing areas (traditional subsistence use areas) extend across the landscape and coastal waters of the Chukchi and Beaufort seas. Of the four communities in proximity to the Planning Area, only Nuiqsut is (or will soon be) surrounded by oil development. Barrow, the largest village on the North Slope, is approximately 130 miles from Prudhoe Bay. The area of proposed oil leasing lies between the subsistence use areas of Barrow and Nuiqsut.

With expansion of the Alpine oil field, Nuiqsut will have oil field development extending farther into its subsistence use area. As future oil field development occurs in the Planning Area, the other North Slope communities would have oil field development closer to their villages, with an increasing likelihood of interaction between industrial activities and their subsistence use areas

The following section discusses the history of exploration and development on the North Slope, and is summarized from information in NRC (2003) and in the *Geology and Exploration of the National Petroleum Reserve – Alaska, 1974 to 1982* (Gryc 1988).

**Pre-1900s**

Oil seepages that are seen today along the Arctic Coast, from Skull Cliff on the Chukchi Sea to Brownlow Point on the Beaufort Sea, were the first evidences of potentially significant petroleum deposits on the North Slope of Alaska. Especially important were the active ponds of oil and layers of tar at Cape Simpson, just east of Barrow,