COMMENTS AND RESPONSES

from the main body of the document, based on the most-recent data available, indicated that there would be no impact at the population level for all resources under Alternatives B and C; that if displacement of resources was to occur, this displacement would be temporary and localized; and that there would not be any limitation in access to subsistence users. Therefore, the threshold of "may significantly restrict" as defined by the courts was not exceeded by the actions proposed in Alternatives B and C, resulting in a finding of "would not significantly restrict" subsistence uses and needs.

**Comment From:** George Ahmaogak, Mayor North Slope Borough  (Comment Letter No. 196407)

*Our central concern with respect to the findings that neither Alternative B nor Alternative C would result in significant restriction of subsistence uses is that there is insufficient analysis to support the conclusions. BLM suggests that the avoidance of industrialized areas by subsistence users can be overcome by "effective communication and consultation by the oil industry, local communities, and the BLM". There is nothing to support this conclusion, no evidence that comparable efforts have been undertaken or ever proved successful to date, and no acknowledgement that if such efforts proved unsuccessful the conclusion of the analysis must be that there would certainly be significant restrictions of subsistence uses. Central also to BLM's conclusions is the degree to which proposed mitigation measures would provide protections comparable to those in place under the current plan. Here again, a comparison of the existing prescriptive measures and proposed performance-based measures reveals that the conversion is not simply one in form, but represents a significant potential weakening of protections now in place. Also unacknowledged in BLM's analysis is the potential for use of exception clauses to circumvent apparent protections. The granting of exceptions to mitigation measures for economic, technical, and other reasons unrelated to the objectives of the measures could significantly increase impacts on resources and subsistence. With the proposed mitigation measures and exception clauses written as they now are, it is clearly possible that their implementation could significantly restrict subsistence uses. BLM has not conducted an analysis of potential impacts under scenarios in which exception clauses allow non-compliance with mitigation measures that now appear to be a primary basis for the agency's conclusions that impacts to subsistence would be minimal. (Comment No. 196407-040)*

**Response To:**  Comment 196407-040

Justification for the ANILCA findings is based on the impact analyses for Alternatives B and C which relies upon the analysis of each individual resource presented in the Draft IAP/EIS. Those analyses, which are based on the best available science, found that there would not be significant impacts to the resources from the proposed Alternatives. To determine if a significant restriction of subsistence uses and needs may result from any one of the alternatives discussed in the Amended IAP/EIS, including their cumulative effects, the following three factors in particular are considered:
1) the reduction in the availability of subsistence resources caused by a decline in the population or amount of harvestable resources;
2) reductions in the availability of resources used for subsistence purposes caused by alteration of their normal locations and distribution patterns; and
3) limitations on access to subsistence resources, including from increased competition of the resources.

The Draft IAP/EIS has provided a full range of alternatives and through this NEPA process has evaluated those alternatives, and compared the effectiveness of the prescriptive and performance-based mitigations. Evaluating the performance based mitigation measures within an Alternative (A) that does not provide leasing in or around the most sensitive areas of this planning area is of little value in terms of assessing the effectiveness of mitigations. Alternative C in the amended Draft IAP/EIS makes 100% of the Northeast Planning Area available for oil land gas leasing and it is under this Alternative (C) that oil and gas development would most likely occur; thereby, providing analysts an opportunity to assess or evaluate the effectiveness of the proposed performance-based stipulations and required operating procedures. The BLM strongly believes that the Performance-based stipulation and ROP package is superior to the Prescriptive approach used in Alternative A in the 1998 ROD; the adaptability and flexibility provided by the Performance-based strategy allows the BLM to make decisions based on new information and project-specific details. This allows mitigations to be adaptable to the specific needs of the area of potential impact from oil and gas activities. The final exclusion clause has been amended to reflect that the granting of an exception must fully satisfy the objective(s) of the lease stipulation or ROP, please see Section 2.6.2.1 for a detailed description of the final proposed exception process. The BLM does not propose nor intend that the granting of exceptions would ever

**Exhibit 42, page 289 of 300**

**Comment From:**  State of Alaska  (Comment Letter No. 197620)

*Delete the classification of "No Surface Occupancy" and identify specific surface uses that would be allowed or prohibited in areas of important surface resource values.  (Comment No. 197620-006)*

**Response To:**  Comment 197620-006

The BLM considered your comments during the development of the Final Proposed Action.

**Comment From:**  State of Alaska  (Comment Letter No. 197620)

*Chapter 2, Alternatives, Section 2.6.1, Definitions, Body of Water or Waterbody, Page 2-12. The definition of body of water or water body states "a lake, river, stream, creek, or pond that holds water throughout the summer and supports a minimum of aquatic life." The definition should be revised to include ephemeral streams that may only contain water for part of the summer season. These streams can serve as important migratory corridors that also provide seasonal rearing habitat for some species of fish such as Arctic grayling.  (Comment No. 197620-047)*

**Response To:**  Comment 197620-047

We have taken your comment into consideration in finalizing the Preferred Alternative mitigations.

**Comment From:**  Jean and Harold Kolb  (Comment Letter No. 197627)

*The entire Teshekpuk Lake Surface Protection Area should remain closed to drilling as in the current leasing plan to protect the remarkable wildlife habitat it encompasses. The wetlands, sedge meadows, and waters of the Teshekpuk Lake area are necessary for tens of thousands of molting geese of many species who are flightless and vulnerable in that condition. The area is also used by other wildlife including 45,000 caribou. BLM's Preferred Alternative would reduce protection of Teshekpuk by 75%. It would eliminate nearly all the current wildlife protections and allow permanent gravel roads for exploration as well as construction activities that would infringe on sensitive buffer zones. (Comment No. 197627-002)*

**Response To:**  Comment 197627-002

The BLM considered your comments during the development of the Final Proposed Action.  See response to comment 197617-072 under topic Special Designation Areas.

**Comment From:**  Tom and Sally Overholt  (Comment Letter No. 197629)

*We are writing to voice our opposition to the BLM proposal to reduce the size of the Teshekpuk Lake Surface Protection Area from its current size of nearly 858,000 acres to 213,000 acres. The TLSPA encompasses a complex of wetlands that is crucial to thousands of molting geese, a major herd of caribou, and many other wildlife species. The caribou herd is an important resource for subsistence hunters on the North Slope. Oilfield development in this area would negatively impact these animals. We urge you not to reduce the size of the Protection Area.  (Comment No. 197629-001)*

**Response To:**  Comment 197629-001

The BLM considered your comments during the development of the Final Proposed Action.

**Comment From:**  Gerhard Olving  (Comment Letter No. 197630)

*I understand you are considering reducing the Teshekpuk Lake Surface Protection Area by some 75%! With about 1.4*

**Exhibit 42, page 290 of 300**

COMMENTS AND RESPONSES

*million acres in the North-eastern Reserve already leased and being explored (for oil and gas), there should be no problem keeping the Teshekpuk Lake surroundings protected in perpetuity. Permitting people with their equipment (trucks, airplanes, drilling gear, etc.) will have a devastating impact on wildlife.* **(Comment No. 197630-001)**

**Response To:** Comment 197630-001

The BLM considered your comments during the development of the Final Proposed Action.

**Comment From:** Christiane Raymond (Comment Letter No. 197631)

*understand that the Bureau of Land Management (BLM) is proceeding with a proposal to reduce the Teshekpuk Lake Surface Protection Area of the National Petroleum Reserve-Alaska. As a member of National Audubon, Sierra Foothills Audubon in California, and as an avid outdoor enthusiast I am incensed by the BLM's failure to recognize the devastating impact an acreage reduction would have on two of our country's most important and precious resources: our indigenous peoples and wildlife.* **(Comment No. 197631-001)**

**Response To:** Comment 197631-001

The BLM considered your comments during the development of the Final Proposed Action.

**Comment From:** Environmental Protection Agency (Comment Letter No. 197632)

*EPA recommends that the BLM develop and analyze a modified Preferred Alternative that incorporates the leasing acreage and No Surface Activity restrictions in Alternative A with a set of revised and improved performance-based stipulations and ROPs. Attachment 2 includes EPA's specific comments and recommendations for improvements to the proposed stipulation and ROPs that are included in the Draft EIS Preferred Alternative. We recommend that the BLM wait to open additional ecologically sensitive land to leasing within the Planning Area until after the new performance-based stipulations and ROPs have been used and their effectiveness has been tested and documented.* **(Comment No. 197632-004)**

**Response To:** Comment 197632-004

We have considered your recommendations in developing the final Stipulations. The BLM is confident in its ability to administer oil and gas activities in the Planning Area using the performance-based stipulations and ROPs. BLM strongly believes that performance based mitigation and the greater flexibility it offers to adapt requirements/standards to specific situations and to modify the requirements/standards based on their effectiveness will increase our ability to protect surface resources and subsistence use.

**Comment From:** Inupiat Community of the Arctic Slope (Comment Letter No. 197635)

*To what degree do the Inupiaq people have to tell the Federal Government that we want to protect our lands? It's been stated over and over again that the stipulations set in 1998 should not be changed. We want to protect our lands because if we do not speak out for protection of the lands from where we get our food, we would not be caretakers. The Inupiaq people are stewards of our lands and we want our generations that follow to subsist as we have.* **(Comment No. 197635-003)**

**Response To:** Comment 197635-003

The BLM considered your comments during the development of the Final Proposed Action.

**Exhibit 42, page 291 of 300**

**Response To:**  Comment 196407-088

The text discussing the Alaska Coastal Management Program has been changed to note the recent amendments to the program.

**Comment From:**  State of Alaska  (Comment Letter No. 197620)

*DNR Office of Project Management and Permitting Page 3-97 3rd paragraph. The listed federal authorizations referenced in 15 CFR 930.53(a)(l) are found in 11 AAC 110.400. (Activities requiring a federal authorization subject to consistency review.). It may be helpful to list both state and federal regulatory citations in this section describing the ACMP.* **(Comment No. 197620-103)**

**Response To:**  Comment 197620-103

We have added state regulation to sentence to read: "Federally permitted activities in the coastal area of National Petroleum Reserve – Alaska must undergo an ACMP review if they require a listed federal authorization (15 CFR § 930.53[a][(1]; 11 AAC § 110.400)."

**Comment From:**  State of Alaska  (Comment Letter No. 197620)

*Pages 4-149.4-238, and 4-3 17. These sections are correct in citing ACMP Statewide Standards at 6 AAC 80 that are currently in effect, however; these sections should note that 6 AAC 80 has been amended and new statewide standards are now at 11 AAC 112, but implementation of the new standards is pending approval by the Office of Ocean and Coastal Resource Management.* **(Comment No. 197620-104)**

**Response To:**  Comment 197620-104

We have added the following sentence to first instance in Chapter 4: "Pending approval by the Office of Ocean and Coastal Resource Management, 6 AAC § 80 will be amended and new statewide standards will be in 11 AAC § 112."

## TOPIC:  CONSULTATION WITH FEDERAL AGENCIES

**Comment From:**  Ron Kim  (Comment Letter No. 197611)

*The EIS for this project also reveals that Preferred Alternative B could harm and potentially jeopardize the existence of the Bowhead Whales, and Steller's and Spectacled Eider, who are protected by the ESA. The BLM should engage in Section 7 consultation with FWS about potential impacts to these species. The potentially detrimental effects of the project on the Bowhead Whales should be further investigated, particularly the potential impact of an oil spill and the effects of sound on the Whales; the ESA and MMPA should make the BLM reconsider interfering with the whales' migration path.* **(Comment No. 197611-004)**

**Response To:**  Comment 197611-004

As required under Section 7 of the Endangered Species Act, BLM is consulting with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to assure protection of listed species and their critical habitats. This consultation is briefly discussed on page 1-16 of the Draft IAP/EIS. Appendix D of the IAP/EIS includes copies of the letters initiating Section 7 consultation and the Biological Assessment on threatened Steller's and spectacled eiders prepared for consultation with the Fish and Wildlife Service.

**Comment From:**  Environmental Coalition  (Comment Letter No. 197617)

*E. FISH The Essential Fish Habitat Section 4.3.7.3 claims that the proposed activities are not likely to affect salmon*

**Exhibit 42, page 292 of 300**

COMMENTS AND RESPONSES

*Essential Fish Habitat ("EFH"). However, the EFH requirement applies not only to salmon, but also to other marine habitat, whether or not the North Pacific Fisheries Management Council has elected to address other species and their habitat. Thus, this Section is incomplete. In its analysis, BLM must apply the Magnuson-Stevens Act's definition of EFH without regard to the Council's designation. So using the definition, it will be apparent to BLM that there is substantially more habitat that qualifies as EFH with and near the Planning Area. Impacts to that habitat must be analyzed.* **(Comment No. 197617-110)**

**Response To:** Comment 197617-110

The Magnuson-Stevens Fisheries Conservation and Management Act (MSA) is the principal federal statute providing for the management of U.S. marine fisheries. The MSA mandates the regional councils develop Fisheries Management Plans (FMPs) as the primary fisheries management tool. FMPs describe and define EFH for each life stage of managed species. The North Pacific Fisheries Management Council (NPFMC) has jurisdiction in Alaska and to our knowledge the council has not implemented FMPs nor do they actively manage fisheries associated with any Beaufort Sea stock, excluding salmon. In terms of EFH, it does make a difference whether the NPFMC designates a stock as an actively managed fishery.

**Comment From:** Environmental Coalition  (Comment Letter No. 197617)

*FAILURE TO MEET THREATENED AND ENDANGERED SPECIES OBLIGATIONS BLM and USFWS have failed to* **(Comment No. 197617-132)**

**Response To:** Comment 197617-132

As required under Section 7 of the Endangered Species Act, BLM is consulting with the U.S. Fish and Wildlife Service to assure protection of listed species and their critical habitats. This consultation is briefly discussed on page 1-16 of the Draft IAP/EIS. Appendix D of the IAP/EIS includes copies of the letter initiating Section 7 consultation and the Biological Assessment on threatened Steller's and spectacled eiders prepared for consultation with the Fish and

**Comment From:** Susanne C. Moser  (Comment Letter No. 197621)

*It would be a huge mistake to risk the internationally significant ecological resources of Teshekpuk Lake for a short-term supply of energy, especially when we know that the United States cannot drill its way to energy independence.* **(Comment No. 197621-007)**

**Response To:** Comment 197621-007

Subsequent to the 1998 Northeast National Petroleum Reserve-Alaska IAP/EIS, the analyses in the 2003 Northwest National Petroleum Reserve IAP/EIS and the 2004 EIS on the Alpine Satellite Development Plan indicate that oil and gas leasing, exploration, development, and production activities with appropriate mitigation measures can occur in the National Petroleum Reserve-Alaska without significant impacts to wildlife. Operational experience with exploration in the National Petroleum Reserve-Alaska supports that conclusion. As required under Section 7 of the Endangered Species Act, BLM is consulting with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service to assure protection of listed species and their critical habitats. The Teshekpuk Lake area has been designated as a Special Area in recognition that significant surface resources are present and that during oil and gas exploration, the area should be managed to assure maximum protection of identified surface values to the extent consistent with the requirements of the Naval Petroleum Reserve Production Act (NPRPA). The near-term energy needs of the United States will be met by a combination of imports from foreign sources, domestic oil and gas production, conservation measures, and other energy sources such as wind, solar, geothermal, hydroelectric, and nuclear. Each source makes a contribution to satisfying energy needs and each has technological, ecological, and economic advantages and disadvantages. In the period considered by the proposed action in this Draft IAP/EIS, fossil fuels will continue to be the single largest component of the domestic energy stream. One way to continue to meet the country's energy needs while investigating and transitioning to alternative energy sources is through oil and gas production in the National Petroleum Reserve-Alaska. As discussed on page 4-13 of the Draft IAP/EIS, the process of

**Exhibit 42, page 293 of 300**

leasing, exploration, and development, including the associated environmental reviews, takes many years. It is likely that 10 years or more would pass between a lease sale and the start-up of production from any discovered oil fields in the National Petroleum Reserve-Alaska.

**Comment From:** Environmental Protection Agency (Comment Letter No. 197632)

*Agency Consultation. The Final EIS should describe how and when resources and regulatory agencies would be consulted in a timely manner as decisions are made during implementations of stipulations and ROPs. We recommend that Final EIS describe how a project proponent and the BLM would coordinate with other decision makers in a timely manner, including the minimum time period required for notifications and consultation. EPA also recommends the BLM carefully review all of the proposed mitigation measures and verify with the appropriate resource and regulatory agencies that the proper notifications are specified.* **(Comment No. 197632-010)**

**Response To:** Comment 197632-010

Please see Section 2.6.2.1, Stipulations and Required Operating Procedures Exception Process, for a complete description of the BLM's Permitting/Authorization Process.

**Comment From:** Charles Brower (Comment Letter No. 197980)

*Small points in definitions can have big impacts on management. A definition of consultations must never include one party simply "informing" another of its intentions. Gravel mine sites must be recognized as permanent facilities, and be subject to all restrictions on the placement of such facilities.* **(Comment No. 197980-021)**

**Response To:** Comment 197980-021

"Informing" another of one's intentions does not mean that the opportunity for further communication is not possible or precluded. This general definition of consultation does mean that at a minimum "informing" interested parities of a proposed action must occur and if deemed necessary, will initiate further consultation. If informed parties have no issues and do not wish to participate in further discussion, that is there choice, and "consultation" may be complete.
Regarding subsistence consultation, the requirements for this process are much more extensive and are described under Required Operating Procedure H-1.

## TOPIC: CULTURAL RESOURCES

**Comment From:** Environmental Coalition (Comment Letter No. 197617)

*In the draft IAP/EIS, BLM repeatedly makes reference to the fact that BLM is unsure about the severity of impact on cultural resources that would come from oil exploration and development, citing the scattered natural of the cultural deposits and the unknown locations of many deposits. However, in each case BLM acknowledges that such activities may have an impact on cultural resources. In addition, the draft IAP/EIS notes that the more oil and gas associated activities, the greater the chance that locales of cultural resources would be impacted.* **(Comment No. 197617-115)**

**Response To:** Comment 197617-115

As stated in the EIS, as each undertaking is proposed, Section 106 will be required to identify cultural resources in the affected area (APE).

**Comment From:** Environmental Coalition (Comment Letter No. 197617)

*In addition, BLM acknowledges that the single greatest potential impact to cultural resources in the Northeast*

**Exhibit 42, page 294 of 300**

COMMENTS AND RESPONSES

lessee require additional land-use authorizations (e.g., permits and rights-of-way). ROPs, as conditions of those authorizations (rather than of the lease), will be operating requirements that apply on and off the lease tract. Furthermore, ROPs will be conditions attached to authorizations for activities where the applicant does not have (or need) an oil and gas lease. For example, ROPs will be conditions attached to Special Recreation Permits (guides), permits for geophysical exploration (seismic) and overland move right-of-ways (supply "trains"). Because ROPs: 1. apply to all authorized on-the-ground activities (not just those conducted by a leaseholder), 2. apply to operations on and off a lease tract, and 3. do not represent a legal "taking" (see Section 2.6, Stipulations and Required Operating Procedures, of the Final IAP/EIS) we believe they are more appropriately retained as ROPs rather than lease stipulations.

**Comment From:** Environmental Protection Agency  (Comment Letter No. 197632)

*Mechanisms for Compliance. EPA recommends the Final EIS include additional details for each ROP that explains the authorization(s), permit(s), or other action(s) to which it applies. It is important to describe the types of activities that would trigger each ROP, in order to determine when an ROP must be initiated and determine if the requirements would be more effective as a lease stipulation. The timing of requirements is important to understand in order for effective monitoring and enforcement to occur. It would be helpful to provide a listing of the types of authorizations and permits that the BLM typically processes for activities within the NPR-A, in order to understand when specific ROP requirements would apply. This information could be presented in tabular formats as an additional column in Table 2-2.* (**Comment No. 197632-007**)

**Response To:** Comment 197632-007

Compliance with Required Operating Procedures: Required Operating Procedures were developed with various mechanisms in place to ensure compliance. These mechanisms include the following:

1) Some ROPs are pre-application requirements, therefore compliance will precede approval of the proposed activity. For example, ROP H-1 (a) requires consultation with affected communities prior to submission of an application for relevant activities within the Northeast Planning Area. If consultation has not taken place, the application will be rejected or will be considered incomplete until such time the consultation has occurred.

2) Other ROPs are required design features, and would have to be incorporated into the applicant's proposal. As an integral part of the proposal and the authorization, the requirement does not need to be stipulated to be enforceable. For example, a minimum pipeline height of 7 feet for above ground pipelines is a required design of any approved above ground pipeline (ROP E-7). Since the authorization (a ROW in this case) authorizes a pipeline with a minimum height of 7 feet, anything less (unless specifically approved through additional NEPA analysis and the permit) is not

**Comment From:** Environmental Protection Agency  (Comment Letter No. 197632)

*Effectiveness of Stipulations and ROPs. The performance-based stipulations and ROPs included in the Preferred Alternative are revisions to the 1998 Northeast NPR-A ROD stipulations and are patterned after stipulations and ROPs that were recently adopted in the Northwest NPR-A ROD. We recommend that the Final EIS report on the implementation and effectiveness of the stipulations that are in effect for the Northwest NRR-A ROD. The information would disclose to the public and decision maker the likely outcomes of the use similar mitigation measures in the Northeast Planning Area. We also recommend that the Final EIS discuss how specific stipulations in the 1998 ROD have not provided effective mitigation or have created an unnecessary restriction or impediment to surface activities, such s resource development, so the public and decision maker can understand the rationale behind the proposed revision.* (**Comment No. 197632-008**)

**Response To:** Comment 197632-008

The NW Record of Decision was only signed in January of 2004, since that time there has been very little commercial activity in the Northwest Planning area. Thus, there has been little opportunity to use the Stipulations and ROPs developed through that planning effort. However, BLM is confident that the new performance based approach is a

**Exhibit 42, page 295 of 300**

better way of doing business. Accordingly, we wish to implement this approach in the National Petroleum Reserve-Alaska where oil and gas exploratory drilling and development are occurring.  Also, see response to Comment No. 197632-003, Stipulations and Required Operating Procedures.

**Comment From:**  Environmental Protection Agency  (Comment Letter No. 197632)

*Basis for Numerical Requirements. The Final EIS should describe how specific numerical requirements such as set-back distances, buffer zone areas, dates, and aircraft altitudes were developed for stipulations and ROPs. EPA recommends that the descriptions include the appropriate references or other information sources that were used to determine each numerical requirement.*  **(Comment No. 197632-011)**

**Response To:**  Comment 197632-011

The specific numerical requirements such as setback buffer zones, dates, and flight altitudes that are contained in the stipulations and required operating procedures for the 1998 Northeast NPR-A IAP/EIS, the 2004 Northwest NPR-A IAP/EIS, and this final amended document were established based on the experience and professional judgment of experts from BLM in consultation with the USFWS, the Alaska Department of Fish and Game, the Minerals Management Service, the North Slope Borough, academia and industry.  Specific examples are ROP F-1.a, flight restrictions were developed in consultation with USFWS (letter dated May 26, 1995) following delisting of arctic peregrine falcon on October 5, 1994.  In February, 1999, at a BLM sponsored workshop a panel of raptor experts thought the requirement to be adequate.  Workshop panelists came from ADFG, USFWS, USGS, the North Slope Borough, and included university and industry biologists.  These restrictions were expanded as a result of that workshop.  ROP F-1.b was developed following the 1983 leasing EIS.  There exists at least one study (Calef, G., E. DeBock, and G. Lortie. 1976. The reaction of barren-ground caribou to aircraft. Arctic 29:201-212) describing the

**Comment From:**  Environmental Protection Agency  (Comment Letter No. 197632)

*Stipulations That Apply in Biologically Sensitive Areas. EPA recommends that the stipulations in this section be revised to align with our recommendation to develop and analyze a modified Preferred Alternative that maintains the current status of lands unavailable for leasing or under No Surface Activity restrictions.*  **(Comment No. 197632-026)**

**Response To:**  Comment 197632-026

The BLM considered your comments during the development of the Final Proposed Action and several stipulations applicable to biologically sensitive areas have been added.  See K-9, K-10 and K-11.

**Comment From:**  Leonard Lampe  (Comment Letter No. 197973)

*So, I recommend to the federal government, BLM, to work with the local people on the mitigation measures, and I thank you for your time.  Thank you.*  **(Comment No. 197973-054)**

**Response To:**  Comment 197973-054

See response to comment 197980-015 under NEPA Process

**Comment From:**  Paul Hugo  (Comment Letter No. 197974)

*As we all know this we are not entitled to NPR-A impact funds, which would have been very beneficial to our community. Currently, it is only the communities that are within the NPR-A that are entitled to receive those funds.  I would not support any changes to the existing prescriptive mitigation structure to the proposed performance-based structures unless we can be assured that all protections provided by the 79 stipulations of the 1998 Plan are preserved or enhanced.*  **(Comment No. 197974-157)**

**Exhibit 42, page 296 of 300**

COMMENTS AND RESPONSES

**Response To:** Comment 197974-157

Please see Table 2-2 for a complete description of the comparison and effectiveness analysis of the 79 prescriptive stipulations and Alternatives B, C, and the Final Preferred Alternative D.

**Comment From:** Charles Brower (Comment Letter No. 197980)

*All protections afforded by the existing prescriptive mitigation measures must be carried forward if there is a shift to performance-based mitigation. We will not support a change from existing prescriptive mitigation structure to the proposed performance-based structure unless we can be assured that all protections provided by the 79 stipulations of the 1998 Plan are preserved or enhanced.*

**Response To:** Comment 197980-019

Those stipulations that do not have a corresponding new performance-based stipulation or ROP already exist in the form of regulation or law. In those instances, the existing law or regulation has been noted.

## TOPIC: STIPULATIONS AND ROPS

### ISSUE: A-2

**Comment From:** Anadarko (Comment Letter No. 197615)

*ROP A-2: This required operating procedure (ROP) mandates that lessees prepare a comprehensive waste management plan that is to be submitted to the authorized officer for approval. The requirement is unnecessarily duplicative of existing regulatory requirements imposed by other federal and state agencies. We recommend that BLM modify the requirement to remove those provisions, such as disposal of pumpable waste products, which are addressed by other applicable regulations.* **(Comment No. 197615-014)**

**Response To:** Comment 197615-014

See response to comment 197615-012 under topic Stipulations and ROPs.

**Comment From:** USFWS Anchorage (Comment Letter No. 197619)

*Criteria that would be used to determine if objectives of specific Stipulations and ROPs are met are not defined. For instance, the objective of ROP A-2 is to avoid human-caused changes in predator populations, which implies the need for sound pre-activity baseline data on predator populations; yet collecting baseline data is not a requirement. Requirement/Standard (a) of this ROP states: "All feasible precautions shall be taken to avoid attracting wildlife to food and garbage," yet it does not indicate what course of action would be taken if predator numbers increase in association with leasing or development activities despite feasible precautions. That is, it does not describe an adaptive management approach that would be used to correct such a situation. Although North Slope operators have, with the encouragement of resource agencies, implemented measures to reduce the availability of artificial nesting or denning structures and anthropogenic food sources, these measures have not been completely effective, as evidenced by the continued nesting of ravens on permanent and temporary structures and the persistence of unusually large concentrations of gulls associated with human activities.* **(Comment No. 197619-032)**

**Response To:** Comment 197619-032

See response to comments 196407-011, 059 and 065 under stipulations and ROPs.

**Exhibit 42, page 297 of 300**

# Final

# Amendment to the
# Northeast National Petroleum Reserve
# Integrated Activity Plan/
# Environmental Impact Statement

## Volume 3

**Appendices**
**References**
**Glossary**
**Index**
**Maps**

Prepared by

U.S. Department of the Interior, Bureau of Land Management
Anchorage, Alaska

January 2005

**Exhibit 42, page 298 of 300**