## APPENDIX D

# ENDANGERED AND THREATENED SPECIES CONSULTATION AND FINAL BIOLOGICAL ASSESSMENT



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7599
http://www.ak.blm.gov



6840(931)

Mr. James Balsinger
Regional Administrator, Alaska Region
National Marine Fisheries Service
P.O. Box 21668
Juneau, Alaska 99802-1668

Dear Mr. Balsinger:

The United States Department of the Interior (USDOI), Bureau of Land Management (BLM) has initiated the process to amend the 1998 Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement (IAP/EIS). The BLM is amending this existing plan to consider opening a portion of BLM-administered lands (public lands) that are currently unavailable for oil and gas leasing in the Northeast portion of the National Petroleum Reserve-Alaska (Northeast Planning Area). In addition, the BLM proposes to develop performance-based lease stipulations and Required Operating Procedures (ROPs) in the Northeast Planning Area similar to those stipulations and ROPs included in the Northwest National Petroleum Reserve–Alaska IAP/EIS Record of Decision (Northwest IAP/EIS ROD; USDOI BLM and MMS 2004).

The management plan will fulfill BLM's responsibility for managing lands in the Northeast Planning Area. The plan also fulfills mandates of the President's energy policy to undertake "environmentally responsible oil and gas development in the National Petroleum Reserve-Alaska." In 2002, the President's National Energy Policy Development Group recommended that the President direct the Secretary of the Interior to "consider additional environmentally responsible oil and gas development, based on sound science and the best available technology, through further lease sales in the Petroleum Reserve" and that "such consideration should include areas not currently leased within the northeast corner of the Petroleum Reserve".

Congress first authorized an oil and gas leasing program in the Northeast Planning Area in 1981. The BLM completed an Environmental Assessment (EA) of the Northeast Planning Area in 1981, and an EIS in 1983 (USDOI BLM 1983) that deleted some areas from leasing and recommended stipulations, especially in areas with high surface values. A total of four lease sales were held during 1982 to1985, resulting in the drilling of a single well that was abandoned as a dry hole in 1985.

As a result of renewed interest in the Northeast Planning Area, and the need to update the environmental analysis of potential impacts from oil and gas development, the BLM began an assessment in 1997 of the potential impacts from oil and gas development in the Northeast portion of the Petroleum Reserve, including all lands in the Petroleum Reserve east of the Northwest National Petroleum Reserve-Alaska. The Northeast Plan culminated in a ROD in October 1998 that superseded the decisions of the 1983 EIS and included a decision to make approximately 4 million of the 4.6 million acres available for oil and gas leasing (USDOI BLM and MMS 1998).

Among other decisions, this document made approximately 87 percent of the Northeast Planning Area available for leasing, while approximately 600,000 acres in the Teshekpuk Lake area remained unavailable for leasing and an additional 240,000 acres were restricted to leasing with no permanent facilities and no exploratory wells. The area that is closed to leasing near Teshekpuk Lake is an area with especially high oil and gas potential. By excluding these areas from future oil and gas leasing, approximately 2 billion of the estimated 3.2 billion barrels of technically recoverable oil in the Northeast Planning Area was made unavailable. The 1998 Northeast IAP/EIS ROD also contained a set of prescriptive-based stipulations to protect natural and cultural resources.

In the five years since the completion of the 1998 Northeast ROD, the BLM has held oil and gas lease sales, leasing 133 tracts in 1999, and leasing an additional 60 tracts in 2002. Many lease tracts were sold around the perimeter of the Teshekpuk Lake area. Since the initial lease sale, industry has completed many miles of seismic lines and drilled 14 exploratory wells. ConocoPhillips Alaska, Incorporated has proposed development of five drilling pads that would be satellites to its Alpine field, near the village of Nuiqsut. Two of the pads would be on public lands within the Northeast Planning Area.

To assess opportunities for oil and gas production on federal lands in the Northwest portion of the National Petroleum Reserve–Alaska (Northwest Planning Area), the BLM began assessing the potential impacts from oil and gas development in the Northwest Planning Area in 2001. The Northwest IAP/EIS was completed in December 2003 (USDOI BLM and MMS 2003) and culminated in a ROD in January 2004 that superseded the decisions of the 1983 EIS and included a decision to make 8.8 million acres available for oil and gas leasing. The ROD also contained a set of performance-based stipulations to protect natural and cultural resources in the Northwest Planning Area. These stipulations differ from those developed for the 1998 Northeast IAP/EIS in that they:

1. Do not include actions that already exist in the form of regulation or law;
2. Are reformatted into logical groupings, or Required Operating Procedures; and
3. Provides the BLM and other land users, including industry, greater flexibility by emphasizing the intent or objective of the mitigation to protect the environment.

To carry out its management responsibilities and respond to the Presidential and Congressional directives to the Secretary of the Interior, the BLM is proposing to amend its 1998 Northeast IAP/EIS to:

1. Consider leasing portions of lands currently closed to oil and gas leasing in the Northeast National Petroleum Reserve-Alaska;
2. Develop performance-based measures to protect important surface resources from the impacts of oil and gas activities, similar to those developed for the Northwest National Petroleum Reserve–Alaska.

The BLM is committed to ensuring that ecosystems in all portions of the National Petroleum Reserve-Alaska remain healthy and productive. The amended plan includes various current and future land based surface-impacting activities that may affect some species within the Northeast Planning Area of the Petroleum Reserve, and could result in an increase in marine barge traffic in the offshore environment. However, the increase in marine traffic would be minimal during the exploration phase, and is expected to have no impact on marine listed species. If development should result from successful exploration, its impacts would be analyzed in future National Environmental Policy Act compliance and Section 7, Endangered Species Act requirements.

Your staff has reviewed the amendment and preferred alternative. The Bureau of Land Management requests a letter of concurrence to conclude this informal Section 7 consultation

If you have any questions, please contact John Payne (907) 271-3431.

Henri R. Bisson
State Director

3

2 Enclosures
    1 - Notice of Intent (2 pp)
    2 - General Lease Stipulations and Required Operating Procedures (21 pp)

cc:
Project Manager, Northeast Petroleum Reserve-Alaska Plan Amendment


931:SChilds:sc:1985:4/30/04:

**Exhibit 43, page 4 of 63**



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7599
http://www.ak.blm.gov



6840(931)

Memorandum

To:      Regional Director, Regional 7, U.S. Fish and Wildlife Service

From:    State Director, Alaska

Subject: Initiation of Section 7 Consultation for the Northeast National Petroleum Reserve- Alaska Integrated
         Activity Plan/Environmental Impact Statement Plan Amendment

The United States Department of the Interior (USDOI), Bureau of Land Management (BLM) has initiated the
process to amend the 1998 Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental
Impact Statement (IAP/EIS). The BLM is amending this existing plan to consider opening a portion of BLM-
administered lands (public lands) that are currently unavailable for oil and gas leasing in the Northeast portion of
the National Petroleum Reserve-Alaska (Northeast Planning Area). In addition, the BLM proposes to develop
performance-based lease stipulations and Required Operating Procedures (ROPs) in the Northeast Planning Area
similar to those stipulations and ROPs included in the Northwest National Petroleum Reserve–Alaska IAP/EIS
Record of Decision (Northwest IAP/EIS ROD; USDOI BLM and MMS 2004).

The management plan will fulfill BLM's responsibility for managing lands in the Northeast Planning Area. The
plan also fulfills mandates of the President's energy policy to undertake "environmentally responsible oil and gas
development in the National Petroleum Reserve-Alaska." In 2002, the President's National Energy Policy
Development Group recommended that the President direct the Secretary of the Interior to "consider additional
environmentally responsible oil and gas development, based on sound science and the best available technology,
through further lease sales in the Petroleum Reserve" and that "such consideration should include areas not
currently leased within the northeast corner of the Petroleum Reserve".

Congress first authorized an oil and gas leasing program in the Northeast Planning Area in 1981. The BLM
completed an Environmental Assessment (EA) of the Northeast Planning Area in 1981, and an EIS in 1983
(USDOI BLM 1983) that deleted some areas from leasing and recommended stipulations, especially in areas with
high surface values. A total of four lease sales were held during 1982 to1985, resulting in the drilling of a single
well that was abandoned as a dry hole in 1985.

As a result of renewed interest in the Northeast Planning Area, and the need to update the environmental analysis
of potential impacts from oil and gas development, the BLM began an assessment in 1997 of the potential impacts
from oil and gas development in the Northeast portion of the Petroleum Reserve, including all lands in the
Petroleum Reserve east of the Northwest National Petroleum Reserve-Alaska. The Northeast Plan culminated in a
ROD in October 1998 that superseded the decisions of the 1983 EIS and included a decision to make
approximately 4 million of the 4.6 million acres available for oil and gas leasing (USDOI BLM and MMS 1998).

Among other decisions, this document made approximately 87 percent of the Northeast Planning Area available for
leasing, while approximately 600,000 acres in the Teshekpuk Lake area remained unavailable for leasing and an

approximate additional 240,000 acres were restricted to leasing with no permanent facilities and no exploratory wells. The area that is closed to leasing near Teshekpuk Lake is an area with especially high oil and gas potential. By excluding these areas from future oil and gas leasing, approximately 2 billion of the estimated 3.2 billion barrels of technically recoverable oil in the Northeast Planning Area was made unavailable. The 1998 Northeast IAP/EIS ROD also contained a set of prescriptive-based stipulations to protect natural and cultural resources.

In the five years since the completion of the 1998 Northeast ROD, the BLM has held oil and gas lease sales, leasing 133 tracts in 1999, and leasing an additional 60 tracts in 2002. Many lease tracts were sold around the perimeter of the Teshekpuk Lake area. Since the initial lease sale, industry has completed many miles of seismic lines and drilled 14 exploratory wells. ConocoPhillips Alaska, Incorporated has proposed development of five drilling pads that would be satellites to its Alpine field, near the village of Nuiqsut. Two of the pads would be on public lands within the Northeast Planning Area.

To assess opportunities for oil and gas production on federal lands in the Northwest portion of the National Petroleum Reserve–Alaska (Northwest Planning Area), the BLM began assessing the potential impacts from oil and gas development in the Northwest Planning Area in 2001. The Northwest IAP/EIS was completed in December 2003 (USDOI BLM MMS 2003) and culminated in a ROD in January 2004 that superseded the decisions of the 1983 EIS and included a decision to make 8.8 million acres available for oil and gas leasing. The ROD also contained a set of performance-based stipulations to protect natural and cultural resources in the Northwest Planning Area. These stipulations differ from those developed for the 1998 Northeast IAP/EIS in that they:

1. Do not include actions that already exist in the form of regulation or law;
2. Are reformatted into logical groupings, or Required Operating Procedures; and
3. Provides the BLM and other land users, including industry, greater flexibility by emphasizing the intent or objective of the mitigation to protect the environment.

To carry out its management responsibilities and respond to the Presidential and Congressional directives to the Secretary of the Interior, the BLM is proposing to amend its 1998 Northeast IAP/EIS to:

1. Consider leasing portions of lands currently closed to oil and gas leasing in the Northeast National Petroleum Reserve-Alaska;
2. Develop performance-based measures to protect important surface resources from the impacts of oil and gas activities, similar to those developed for the Northwest National Petroleum Reserve–Alaska.

The BLM is committed to ensuring that ecosystems in all portions National Petroleum Reserve-Alaska remain healthy and productive. The amended plan includes various current and future land based surface-impacting activities that may affect species listed under the Endangered Species Act of 1973, as amended (16 USC 1531 *et seq.*) within the Northeast Planning Area of the Petroleum Reserve. Your staff at the Northern Fish and Wildlife Service Field Office have been consulted informally in regards to Section 7, Endangered Species Act requirements for this plan amendment. This memorandum requests a species list for any listed species in the region. In addition, BLM would like to enter into formal Section 7 consultation for this plan amendment. A biological assessment is currently being prepared and will be submitted in the near future.

If you have any questions, please contact John Payne (907) 271-3431.


Henri R. Bisson
State Director


2 Enclosures
    1 - Notice of Intent (2 pp)

3

2 - General Lease Stipulations and Required Operating Procedures (21 pp)

cc:
Manager, Northern Fish and Wildlife Service Field Office
Project Manager, Northeast Petroleum Reserve-Alaska Plan Amendment

BIOLOGICAL ASSESSMENT

## TABLE OF CONTENTS

Page

D.1 Introduction and Background......................................................................................................D-3
D.2 Description of Proposed Activities Using the Agency Final Preferred Alternative and Key
    Assumptions in the Analysis......................................................................................................D-5
    D.2.1 Reasonable and Foreseeable Oil Development Scenario and Key Assumptions ............D-5
    D.2.2 Phase I: Leasing and Exploration ................................................................................D-8
    D.2.3 Phase II: Development, Production, and Abandonment ..............................................D-10
    D.2.4 Production................................................................................................................D-16
    D.2.5 Abandonment and Restoration of Production Sites ....................................................D-17
    D.2.6 Lease Stipulations and Required Operating Procedures .............................................D-17
    D.2.7 Private Lands ...........................................................................................................D-18
    D.2.8 Other Key Assumptions ...........................................................................................D-18
D.3 Description of Listed Eiders Occurring in the Northeast National Petroleum Reserve – Alaska .............D-18
    D.3.1 Spectacled Eider .....................................................................................................D-18
    D.3.2 Steller's Eider .........................................................................................................D-23
D.4 Avenues of Take for Listed Eider species Resulting from Activities in the Northeast National
    Petroleum Reserve – Alaska ...................................................................................................D-25
    D.4.1 Summer Seismic Surveys ........................................................................................D-25
    D.4.2 Habitat Loss in High Density Nesting Areas.............................................................D-25
    D.4.3 Oil Field Disturbance...............................................................................................D-28
    D.4.4 Collisions (Strikes) .................................................................................................D-35
    D.4.5 Increased Predation .................................................................................................D-39
    D.4.6 Oil Spills ................................................................................................................D-40
    D.4.7 Increased Subsistence Hunting ................................................................................D-41
    D.4.8 Toxics  42
    D.4.9 Mitigating Measures ...............................................................................................D-42
    D.4.10 Effects of Abandonment .........................................................................................D-43
    D.4.11 Protection Recommendations ..................................................................................D-44
D.5 Cumulative Effects on Spectacled and Steller's Eiders .............................................................D-44
    D.5.1 Potential Effects to Subsistence Harvest ..................................................................D-44
    D.5.2 Potential Effects to Commercial Fishing ..................................................................D-45
    D.5.3 Recreational Activities.............................................................................................D-45
    D.5.4 Nuiqsut Road Construction......................................................................................D-45
D.6 Agency Determination ............................................................................................................D-45
D.7 Bibliography   ........................................................................................................................D-46

### List of Tables

D-1 Gravel Footprint and Zones of Influence for Production and Related Facilities .........................D-11
D-2 Predicted Number of One-way Aircraft Flights Annually in the Planning Area during June through
    September ..............................................................................................................................D-14
D-3 Predicted Number of Vehicle Trips and Miles That May be Driven Monthly Annually in the Planning
    Area during June through September and Over the Life of the Project .......................................D-15
D-4 Gravel Footprint and Zones of Influence for Production and Effects on Eiders .........................D-26

**Note to Reader:** This document contains references to maps, figures, and tables that are part of the *Northeast National Petroleum Reserve – Alaska Final Amended Integrated Activity Plan/Environmental Impact Statement* (Final Amended IAP/EIS). They are referenced in this document, but contain the original numbering scheme used in the Final Amended IAP/EIS.

**Exhibit 43, page 9 of 63**

Exhibit 43, page 10 of 63

## APPENDIX D

# BIOLOGICAL ASSESSMENT

## D.1  Introduction and Background

The United States Department of the Interior (USDOI), Bureau of Land Management (BLM) has initiated an amendment to the Northeast National Petroleum Reserve – Alaska Integrated Activity Plan/Environmental Impact Statement (Amended IAP/EIS; amendment). The BLM is amending its 1998 Northeast IAP/EIS to consider opening portions of the BLM-administered lands that are currently unavailable for oil and gas leasing in the Northeast National Petroleum Reserve – Alaska. In addition, the BLM proposes to develop performance-based lease stipulations and Required Operating Procedures (ROPs) for the Northeast National Petroleum Reserve – Alaska (Planning Area), similar to those stipulations and ROPs that were included in the Northwest National Petroleum Reserve – Alaska IAP/EIS Record of Decision (Northwest IAP/EIS ROD; USDOI BLM and MMS 2004).

The Amended IAP/EIS will fulfill the BLM's responsibility for managing lands in the Planning Area. The amendment will also fulfill mandates of the President's energy policy to undertake "environmentally responsible oil and gas development in the National Petroleum Reserve – Alaska." In 2002, the President's National Energy Policy Development Group recommended that the President direct the Secretary of the Interior to "consider additional environmentally responsible oil and gas development, based on sound science and the best available technology, through further lease sales in the National Petroleum Reserve – Alaska" and that "such consideration should include areas not currently leased within the northeast corner of the National Petroleum Reserve – Alaska."

Congress first authorized an oil and gas leasing program in the National Petroleum Reserve – Alaska in 1981. The BLM completed an Environmental Assessment (EA) of the National Petroleum Reserve – Alaska in 1981, and an EIS in 1983 (USDOI BLM 1983) that removed some areas from leasing and recommended stipulations, especially in areas with high surface values. A total of four lease sales were held during 1982 to 1985, resulting in the drilling of a single well that was abandoned as a dry hole in 1985.

As a result of renewed interest in the National Petroleum Reserve – Alaska, and the need to update the environmental analysis of potential impacts from oil and gas development in the National Petroleum Reserve – Alaska, the BLM began an assessment in 1997 of the potential impacts from oil and gas development in the Planning Area, including all lands east of the Northwest National Petroleum Reserve – Alaska. The 1998 Northeast IAP/EIS culminated in a ROD in October 1998 that superseded the decisions of the 1983 EIS and included a decision to make approximately 4 million of the 4.6 million acres available for oil and gas leasing (USDOI BLM and MMS 1998). The 1998 Northeast IAP/EIS ROD also contained a set of prescriptive-based stipulations to protect natural and cultural resources in the Northeast National Petroleum Reserve – Alaska.

Among other decisions, the ROD made approximately 87 percent of the Planning Area available for leasing, while approximately 600,000 acres in the Teshekpuk Lake area remained unavailable for leasing and approximately 240,000 acres were restricted to leasing with no permanent facilities and no exploratory wells. The area near Teshekpuk Lake that is closed to leasing is an area with especially high oil and gas potential. By excluding these areas from future oil and gas leasing, approximately 2 billion of the estimated 3.2 billion barrels of technically recoverable oil in the Planning Area was made unavailable.

In the 6 years since the completion of the 1998 Northeast IAP/EIS ROD, the BLM has held oil and gas lease sales, leasing 133 tracts in 1999, and an additional 60 tracts in 2002. Many lease tracts were sold around the perimeter of the Teshekpuk Lake area. Since the initial lease sale, industry has completed many miles of seismic lines and drilled 14 exploratory wells. ConocoPhillips Alaska, Inc., has proposed development of five drilling pads that

**Exhibit 43, page 11 of 63**

BIOLOGICAL ASSESSMENT

would be satellites to its Alpine field, near the village of Nuiqsut. Two of the pads would be within the Planning Area.

To assess opportunities for oil and gas production on federal lands in the Northwest National Petroleum Reserve – Alaska, the BLM began assessing the potential impacts from oil and gas development in this area in 2001. The Northwest IAP/EIS was completed in December 2003 (USDOI BLM and MMS 2003) and culminated in a ROD in January 2004 that superseded the decisions of the 1983 EIS and included a decision to make 8.8 million acres available for oil and gas leasing. The Northwest ROD also contained a set of performance-based mitigations to protect natural and cultural resources in the Northwest National Petroleum Reserve – Alaska. These mitigations differ from those developed for the 1998 Northeast IAP/EIS in that they:

- Do not include actions that already exist in the form of regulation or law;

- Are modified to reflect an adaptive management concept through the principles of performance-based mitigation measures.

These mitigation measures will provide the BLM and other land users, including industry, greater flexibility by emphasizing the intent or objective of the mitigation to protect the environment.

To carry out its management responsibilities and respond to the Presidential and congressional directives to the Secretary of the Interior, the BLM is proposing to amend its 1998 Northeast IAP/EIS Record of Decision to:

- Consider leasing portions of lands currently closed to oil and gas leasing in the Northeast National Petroleum Reserve – Alaska; and

- Develop performance-based mitigation measures to protect important surface resources from the impacts of oil and gas activities, similar to those developed for the Northwest National Petroleum Reserve – Alaska.

The BLM is committed to ensuring that ecosystems in the National Petroleum Reserve – Alaska remain healthy and productive. The management plan includes various current and future surface-impacting activities that could affect spectacled eiders (*Somateria fischeri*) and Steller's (*Polysticta stelleri*) eiders, species that are federally listed as threatened under the Endangered Species Act (ESA), such as aircraft use, hazardous and solid material removal and remediation, overland moves, seismic activities, and oil and gas leasing, exploration, development, and production activities. Such activities, particularly oil and gas activities, temporary camps, and aircraft traffic associated with wildlife studies and other surveys, could result in disturbance, altered habitat, and spills of oil or other contaminants. These occurrences could adversely affect the behavior, distribution, and abundance of individual eiders or the population occurring in or adjacent to the Planning Area.

This Biological Assessment (BA) is prepared in accordance with Section 7 of the ESA of 1973, as amended (16 USC 1531 et seq.) This document describes 1) the various activities that may occur under the management plan, and proposed oil and gas lease sales, to the standard of a reasonably foreseeable development scenario; 2) the distribution, abundance, and habitat use of listed eiders; 3) the potential impacts of proposed oil and gas leasing as well as exploration, development, and production activities that might occur in the future; 4) the potential impacts of other prescribed activities; and 5) the proposed mitigating measures that could reduce potential adverse effects on listed eiders. The BA covers all anticipated effects of the Amended IAP/EIS on listed eiders. This assessment provides sufficient information on listed eiders and the potential impacts of a reasonably foreseeable development scenario and activities that might occur in the future to support issuance of a Biological Opinion (BO) regarding the reasonable likelihood of the entire action violating Section 7(a)(2) of the ESA, as amended. The U.S. Fish and Wildlife Service (USFWS) previously issued a BO for the Northeast National Petroleum Reserve – Alaska during the 1998 Northeast IAP/EIS. Any BO resulting from the current BA would replace the existing 1998 Northeast IAP/EIS BO.

The analysis incorporates estimates of reasonably foreseeable development scenario for oil and gas development and production impacts on federally-listed eiders thought to be the maximum that could occur (i.e., it attempts to

**Exhibit 43, page 12 of 63**

estimate maximum potential impact to eiders given the entire range of potential impacts). Should commercially producible quantities of oil be discovered and development and production be proposed, additional and subsequent consultation would be conducted to consider the effects these activities The BLM also would consider the need for further consultation if 1) additional species were added to the list of species designated as threatened or endangered under the ESA, 2) the proposed actions were substantially modified, or 3) significant new effects-related information was developed.

A detailed description of the endangered and threatened species within the Planning Area and effects analyses of similar proposed actions were included in the following previously issued EISs and BOs:

USDOI BLM. 2004a. Alpine Satellite Development Plan Final Environmental Impact Statement, U.S. Department of the Interior, Bureau of Land Management, Anchorage Alaska.

USDOI BLM. 2004b. Alpine Satellite Development Plan Final Biological Assessment, U.S. Department of the Interior, Bureau of Land Management, Anchorage Alaska.

USDOI BLM and MMS. 1998. Northeast National Petroleum Reserve – Alaska Final Integrated Activity Plan/Environmental Impact Statement. BLM/AK/PL-98/016 +3130 +930. Anchorage, Alaska.

USDOI BLM and MMS. 2003. Northwest National Petroleum Reserve – Alaska Final Integrated Activity Plan/Environmental Impact Statement. BLM/AK/PL-04/02 +3130 +930. Anchorage, Alaska.

USDOI MMS, Alaska OCS Region. 2003. Beaufort Sea Planning Area Oil and Gas Lease Sales 186, 195, and 202, Final Environmental Impact Statement. OCS EIS/EA MMS 2003-001. Anchorage, Alaska.

USDOI USFWS. 2003. Biological Opinion for the Northwest National Petroleum Reserve – Alaska Integrated Activity Plan/Environmental Impact Statement, May 2003.

USDOI USFWS. 1998. Biological Opinion for the Northeast National Petroleum Reserve – Alaska Integrated Activity Plan/Environmental Impact Statement, March 17, 1998.

This BA references maps (2-4, 3-4, 3-33, and 3-34) and tables (4-4 and 4-5) that are included in the Final Amended IAP/EIS. Section 2.6 (Stipulations and Required Operating Procedures) of the Amended IAP/EIS contains the text for the lease-sale stipulations and ROPs discussed in the BA.

# D.2 Description of Proposed Activities Using the Agency Final Preferred Alternative and Key Assumptions in the Analysis

## D.2.1 Reasonable and Foreseeable Oil Development Scenario and Key Assumptions

The 1998 Northeast IAP/EIS considered two sets of scenarios: the first lease sale scenario and the multiple lease scenarios. Because two lease sales have occurred since the 1998 Northeast IAP/EIS ROD, the scenarios presented in the Amended IAP/EIS and in this BA assume multiple lease sales and full development of the estimated resources within the constraints of the evaluated alternatives.

Under the final Preferred Alternative, all of the Planning Area is available for leasing, except for Teshekpuk Lake (approximately 211,000 acres), which is deferred from leasing. This deferral would also preclude exploratory drilling. An additional 374,000 acres north and east of Teshekpuk Lake would have No Surface Occupancy restrictions. Current leases would not be restricted by the No Surface Occupancy restrictions.

BIOLOGICAL ASSESSMENT

The reasonably foreseeable development scenario is based on a comprehensive geological analysis and computer simulation modeling completed in 2002 by the Minerals Management Service (MMS) and the BLM. In this analysis, the results of petroleum resource characteristics of commercial fields, and of areas where these fields are likely to be discovered and developed were modeled using an average oil price of $30 per barrel. The exact locations for future commercial projects are impossible to define prior to exploration drilling. It is uncertain whether any commercial fields would be discovered, particularly if oil prices were to fall below $20 per barrel for an extended period of time.

### D.2.1.1     Hydrocarbon Potential and Economics

Under the regulatory conditions of the final Preferred Alternative, it is estimated that up to 12 new fields would be developed as a result of multiple lease sales conducted in the Planning Area. Oil and gas fields on Alaska's North Slope typically are composed of one or more subsurface pools. These pools may, or may not, be grouped so that they can be produced from a common infrastructure. The first fields developed would be oil fields. Currently, no infrastructure exists to transport natural gas from the North Slope to a market. While natural gas is a byproduct of oil development, the BLM does not consider natural gas production to be reasonably foreseeable.

Assuming $30-per-barrel oil, 1,727 million barrels of oil could be developed in the Planning Area. Analyses of the geologic plays indicate commercial fields are most likely to be discovered in the portion of the Planning Area designated the "High Potential" area (i.e., the area having the highest economic potential for oil development, based on $30-per-barrel oil; Map 3-4). This High Potential area includes the area surrounding Teshekpuk Lake and the coastal areas to the north of the lake.

In previous oil leases, larger fields typically have been found earlier in the exploration cycle, and are more likely to be economically viable. This reasonable and foreseeable scenario assumes that the first fields developed in the Planning Area would be approximately the size of the Alpine field in extent of gravel cover, petroleum resources, associated activity, and current technology. The following hypothetical discovery and related reasonably foreseeable development and production schedule is the BLM's estimate of the types and timing of activities that could occur as a result of multiple lease sales under the final Preferred Alternative.

This analysis is based on two distinct, but related, phases in the discovery and development of an oil field on the North Slope of Alaska. In the first phase a lease sale is held, followed by the successful lessee entering into an exploration program. The second phase is success in discovery, followed by the construction of production facilities, operation and, in approximately 30 years, abandonment of the sites.

### D.2.1.2     Key Assumptions for Analysis

Key assumptions for this BA ensure that the analysis is conservative with respect to the listed eider species. The following reasonably foreseeable scenario assumes that all of the projected development under the final Preferred Alternative would occur in the area of high potential for oil and gas development (Map 3-4).

Beginning in 1986, extensive aerial waterfowl breeding population surveys (referred to as breeding pair surveys) have been conducted by the USFWS on the Arctic Coastal Plain (ACP) of Alaska. These surveys have provided population estimates for many species of breeding waterfowl throughout the ACP (Mallek et al. 2003). The timing of this breeding pair survey, however, is too late to accurately assess eider populations, as male eiders begin leaving the ACP in mid- to late June (before the start of the aerial breeding pair survey; Larned et al. 2003). In 1992, a second survey (referred to as the eider population survey) was begun in order to collect information at a more phenologically appropriate time for the detection of male eiders. This eider population survey has been conducted annually since 1992, and has provided data to develop a population index and distributional information for several species, including spectacled eiders. Given that Steller's eiders are present on the ACP in very low densities, the eider population survey's sampling intensity is inadequate for obtaining data to develop a population index for this species. Quakenbush et al. (2002) has suggested that the range of the Steller's eider in Alaska has been greatly reduced, mostly in the vicinity of Barrow. In 1999, a survey specifically designed to obtain

**Exhibit 43, page 14 of 63**

BIOLOGICAL ASSESSMENT

information on Steller's eiders in the Barrow area was initiated (Ritchie and King 2002, 2003). The survey area, which is referred to as the "Barrow Triangle," encompasses a 1,064-mi$^2$ (2,757-km$^2$) area south of Barrow and west of Admiralty Bay (see Ritchie and King [2004] for a complete description of the study area and slight differences among years). This survey has provided densities and population estimates of Steller's eiders in the Barrow area for the past 5 years.

The spectacled eider density used for this analysis was derived from population survey data collected between 1992 and 2002 (Larned et al. 2003). As some high density areas have been found in the Planning Area, the BLM chose the high end of the range of spectacled eider densities found on the eider population survey, or 2.85 observed birds per mi$^2$ (1.10 observed birds per km$^2$; Bob Platte, USFWS, pers. Comm.), as the basis for this analysis. A visibility correction factor has not been applied to this density estimate.

In order to be as conservative with respect to Steller's eiders, as they are likely to be the greatest densities of Steller's eiders present on the ACP. For this analysis, the BLM used a mid-level Steller's eider density of 0.16 observed birds per mi$^2$ (0.06 observed birds per km$^2$; Ritchie and King 2002, 2003), since high densities of Steller's eiders have not been found anywhere in the Planning Area. A visibility correction factor has not been applied to this density estimate.

The selected densities are intended to represent the high end of a reasonable range, in recognition of the uncertainties about the future location of facilities, as well as imprecise information on eider distribution. Use of these density figures would likely result in the overestimation of potential impacts to listed eiders, thus ensuring that if development were to occur elsewhere in the Planning Area, the effects generally would be equal to or less than those noted in this BA. However, the assumed densities do not compensate for the bias inherent in estimating bird densities from aerial surveys. An established/accepted visibility correction factor is not currently available to apply to eiders detected on the aerial surveys. A visibility correction factor would allow the numbers of individuals observed from the air to be converted to a more accurate representation of the actual number of birds present by compensating for those birds not detected from the aircraft. In the absence of such a correction factor, the BLM assumes that the aerial survey data used for this BA may underestimate both populations and densities of listed eiders within the Planning Area.

To address disturbance effects to eiders, in addition to the immediate habitat loss from gravel pad and road development, the BLM is assuming both a 656-foot (200-meter) and a 1,640-foot (500-meter) zone of influence occur around all gravel production and development pads and roads. The 656-foot (200-meter) zone of influence has been used in previous analysis by USFWS, but is based on best professional judgment and little empirical data supports its use. The additional 1,640-foot (500-meter) zone of influence will allow for a determination of the maximum number of eiders that potentially could be affected by production facilities.

Development assumes 48 exploration wells and 35 delineation wells would be drilled using four exploration drill rigs. Exploration and delineation drilling would occur during winter months. Previous experience, in an unproven, high-cost, frontier area, has shown that this many exploration wells typically are required to discover an estimated 12 economically developable fields. Delineation and appraisal exploration would require three winter seasons to determine the extent of each field. While exploration activities primarily would be a winter exercise, "cold stacking," or the storage of exploration equipment, would occur at designated sites that would be accessible by helicopter or fixed-wing aircraft during the summer season to allow for occasional routine inspections.

For analysis, it is assumed development would include two larger fields that would serve as Central Production Facilities (CPFs) that are Alpine field-like in design, each with five satellite fields connected to each CPF, for a total of 12 fields. The CPFs are stand-alone facilities, with processing equipment for separating oil and gas, handling waste, and transporting oil through pipelines to large-scale distribution systems. Satellite developments involve fields too small to support full-scale operations and must rely on CPF facilities to separate the oil and gas, waste handling, and the transport of oil to large-scale distribution systems. Each Alpine field-like CPF would consist of both a production and a processing facility, with a second production-only pad in the near vicinity (≤3 miles), an airstrip, and a connecting road when a second production pad is part of the CPF. Current technology and

**Exhibit 43, page 15 of 63**

BIOLOGICAL ASSESSMENT

economic considerations limit satellite fields to a maximum of 20 miles from a CPF. Current technology allows for "roadless" facilities, which means that roads could exist within and between the satellite and CPFs, but no roads would connect the CPFs to each other, and no "feeder" roads would connect to existing infrastructure in the Alpine field or to either of the CPFs. Geologic information, economics of extraction, and proximity to existing infrastructure in the Colville River Delta suggest this reasonably foreseeable development would take place within the area of high economic oil and gas potential. Within the Planning Area, the highest potential for success is in the northern portion of the Planning Area (Map 3-4). None of these facilities would require the establishment of new landfill locations. The approved landfill currently in operation at Deadhorse most likely would be used for materials not requiring additional treatment. Organic wastes would be disposed of in accordance with the Clean Water and Clean Air acts, and the disposal of any liquid or solid waste would not be permitted on site (ROP A-2).

## D.2.2    Phase I: Leasing and Exploration

Exploration is on-going in the Planning Area. This document assumes that there would be multiple lease sales in the future, with the first lease sale under the amended IAP/EIS occurring in mid-2005 and leases issued later that year. Exploration actions would begin the following winter season. Other lease sales would be conducted at 2- to 3-year intervals thereafter.

### D.2.2.1    Seismic Activities for Exploration

Most seismic surveying occurs during the winter months. Typically, three to four seismic crews are active on the North Slope each winter. It is expected that, on average, one to three 2-D seismic surveys would occur during the next 25 years. Additional 3-D seismic surveys would take place about two to three times during that period. Seismic crews are housed in mobile camps consisting of a "cat train" of trailer sleds pulled by tractors. Winter seismic operations are conducted by all-terrain ground vehicles and supported by light aircraft. Current seismic technology uses vibrator equipment (Vibroseis and airguns) to generate energy into the subsurface. A limited amount of support by aircraft (fixed-wing and helicopter) would be needed to survey potential sites during summer months to prepare for winter survey activities.

The only activities associated with these winter seismic surveys that would occur during the summer would be annual maintenance. Following the end of each winter seismic season, each crew stores its equipment at a staging area, which is usually an existing gravel pad built previously for some other purpose (e.g., during previous exploration in the Northeast National Petroleum Reserve – Alaska, seismic equipment was stored in the summer of 2003 at Lonely and Inigok, both previous development areas). Sometime during the summer, a repair crew would spend 2 to 4 weeks performing annual maintenance and installing upgrades to the seismic equipment. These activities would require aircraft support, with one to two fixed-wing and two to three helicopter flights per week. On completion of the maintenance work, the crew would leave the equipment cold stacked, and there would be no activity until the following winter. For analysis purposes, it is assumed that maintenance operations would be self contained and use accommodations that are part of the seismic camp. On completion of the work, all wastes would be removed and disposed of at approved disposal sites on the North Slope. None of these activities would require the establishment of new landfill locations. The approved landfill currently in operation at Deadhorse most likely would be used for materials not requiring additional treatment. Organic wastes would be disposed of in accordance with the Clean Water and Clean Air acts, and disposal of liquid or solid waste would not be permitted on site (ROP A-2).

Teshekpuk Lake is in the high potential area for oil and could be the subject of future exploration including the conduct of seismic surveys. Previous seismic surveys have been conducted in the lake and are not specifically prohibited under the final Preferred Alternative. The lake has large areas that are too deep to freeze from the lake surface to the lake bottom. Vibroseis surveys do not provide good data when conducted on ice that is not bottom-founded. It is therefore likely that any seismic surveys conducted in the lake (at least in the deep portions) in the future would be carried out during the ice-free period using an array of airguns as the sound source that would be towed behind a vessel. This type of surveying could potentially be conducted in other large lakes or in coastal

**Exhibit 43, page 16 of 63**

waters such as the Kogru Inlet. In coastal areas, larger boats may be utilized and the crew could be housed on the vessel. In inland areas, such as Teshekpuk Lake, the seismic crew would likely be housed in temporary field camps or shuttled each day by aircraft to and from existing facilities.

### D.2.2.2    Exploration Drilling

There would be a maximum of four exploration drill rigs operating in the Planning Area during any one year. Drilling depths for exploration and delineation wells average 10,000 feet, but would likely range from 6,000 to 12,000 feet. Onshore drilling would be conducted entirely during the winter months (early December to mid-April). A typical exploratory well (10,000 feet) could use about 630 short tons of drilling mud and produce about 820 short tons of dry-rock cuttings. Upon completion of drilling operations, all equipment and materials would be removed (during winter operations) over ice roads to staging areas and then to other locations on the North Slope, or to recycling centers out of the country. Due to the expense of constructing new staging areas, it is thought that previously-occupied sites such as Camp Lonely, Inigok, and Umiat would likely be the sites for such staging for exploration and production. Drilling material (mud and cuttings) could be re-injected into the dry drill hole if the exploration well was unsuccessful. If drilling was successful, the well would be temporarily capped, and the operator would remove drilling materials (mud and cuttings) and other camp wastes to an approved disposal area off site in accordance with the Clean Water and Clean Air acts. No liquid or solid waste would be disposed of on site, but would be removed from the staging area and disposed of at an approved site.

The final Preferred Alternative provides an opportunity to lease in the immediate offshore area of the Planning Area, which includes Kogru Inlet. Exploration drilling could potentially occur in these areas during the ice-free period from temporary platforms or vessels, such as barges or mobile drilling rigs. Drilling equipment could be transported by vessel to coastal area or by helicopter or ice road (from staging areas) to inland areas.

### D.2.2.3    Winter Transportation and Support Infrastructure for Exploration

Ice roads would provide seasonal routes supporting winter activities. These temporary roads are constructed by spreading water from local sources (rivers and lakes) to build up a rigid base (Stipulation B-1). New construction methods, such as the use of aggregate chips produced from frozen lakes, significantly decrease both water demands and construction time for ice roads. Low-pressure vehicles are used to establish ice roads, which can then be used by conventional vehicles. Ice roads are designed to be a minimum of 6 inches thick, 30 to 35 feet wide, and up to 50 miles long. Ice roads would connect each exploration drill site to the staging area during winter activities.

Ice pads are used commonly as platforms for winter exploration activities (e.g., Northeast National Petroleum Reserve – Alaska exploration, 1999-2003). The method used to construct ice pads is similar to that described for ice roads. The tundra surface is flooded with water to build up progressive layers of ice, although the use of aggregate chips speeds up the process while decreasing water use. A typical ice pad is designed to be a minimum of 1-foot thick, covers 6 acres, and requires approximately 500,000 gallons of water to construct. Depending on the location of exploratory wells, ice pads range in size from 3 to 10 acres. Current ice-pad design technology could allow some pads to remain intact over the summer season. During the summer season, these ice pads would house one exploration drill rig. Each of these rigs would be stored with towers or derricks folded, and would present a silhouette of approximately 20 feet in height.

As many as half of the ice pads could be multi-year pads used for summer activities, such as storage of equipment. Tundra habitat under the footprint of multi-years pads would be lost as spectacled and Steller's eider habitat during the lifetime of the pad. Vegetation under the footprint of multi-year pads would be relatively unaffected after the pad melted (McKendrick 2000). Some vegetation within a 3- to 6-foot (1- to 2-meter) wide band around the perimeter of multi-year ice pads could be damaged and require several years to recover. Under the maximum development scenario, 50 multi-year ice pads and 50 single-season ice pads covering 6 acres each could be constructed, resulting in a total footprint of 600 acres during the life of the project.

BIOLOGICAL ASSESSMENT

Materials and equipment necessary to support winter exploration activities could be moved to staging areas within the Planning Area by marine transport in the summer months (late July/August), and then overland on ice roads or hardened snow trails during winter exploration activities. The sealifts for exploration would use two to seven barges per year. The majority of large equipment movement would be by sealift to staging areas at locations such as Camp Lonely during summer months, then to the exploration pads over ice roads during winter months. These exploration staging areas would be small (500 feet by 500 feet gravel or sand-gravel pads), with summer activity limited to offloading and storage. When possible, existing pads would be used, although new pads could be constructed to support winter exploration activities.

Exploration activities, such as seismic surveys and drilling, could also occur during the ice-free period in coastal areas, such as Kogru Inlet and on large lakes such as Teshekpuk Lake. Equipment to be used for these activities could be transported directly to the site by vessel in the coastal areas, flown in via helicopter, or transported to coastal staging areas and then transported to the site during winter via ice roads.

While this scenario assumes that Barrow could be used as a staging area for the western portion of the Planning Area, the BLM does not anticipate development projects in direct support of exploration activities to be located at or near that community. Barrow already is a regional hub for commerce on the western North Slope, with an established airport and other support facilities that can accommodate most large planes currently used to support the oil and gas industry in Alaska. Infrastructure currently exists in Barrow to handle sealifts during the summer months and air freight during winter months that routinely supply the community.

There would be some additional employment and investment in the community during the exploration and construction phases, but the level of additional employment would be small and short term. The majority of support for exploration is expected to be deployed from Deadhorse because of its proximity to the Dalton Highway (Haul Road) and its existing oil field contractor-support facilities and infrastructure.

## D.2.3    Phase II: Development, Production, and Abandonment

If exploration activities were successful and an economically viable field was discovered, companies likely would move forward to development and production. The first steps in these processes are to gather information and data, and to design and permit the project. All development projects would go through a National Environmental Policy Act evaluation and would require consultation with the USFWS pertaining to any species listed under the ESA. If ice roads or pads were needed during the production and abandonment phase, these activities would be essentially the same as those described in D.2.2.3 (Winter Transportation and Support Infrastructure for Exploration).

### D.2.3.1    Field Development

Analysis of hydrocarbon potential and economics (Section 4.2.1.2, Table 4-4 of the Final Amended IAP/EIS) indicates that up to 12 fields would be developed in the high price ($30 per barrel) scenario. These fields would be a mixture of large fields (CPFs similar to the Alpine field) and smaller satellite fields. It is assumed that two Alpine-size fields, or CPFs, would be discovered and developed in the Planning Area, with five additional satellite fields tied into the infrastructure of each of the CPFs. A reasonable and foreseeable scenario suggests that each satellite field would be connected to a CPF by a gravel road. Current pipeline engineering constraints dictate that satellite fields are located within 20 miles of a CPF. Discovered fields that do not have enough oil to be economically developed, or are too far away from a CPF using today's technology, would not be developed and would have no pads. For this impact analysis, we have assumed an average distance of 10 miles from each satellite facility to its associated CPF. None of these facilities would require a new landfill location. Organic wastes would be disposed of in accordance with the Clean Water and Clean Air acts. No liquid or solid waste would be disposed of on site.

Under the final Preferred Alternative, it is assumed that one of the CPFs would consist of two gravel pads covering a total of 66 acres, a 5,000-foot airstrip covering 11 acres, and a 3-mile connecting road (connecting the two pads),

which, at approximately 7.5 acres per mile, would cover 23 acres for a total of approximately 100 acres. The other CPF would consist of one large production and processing pad (approximately 50 acres) and a 5,000 foot airstrip covering approximately 11 acres. Runways would be oriented in a west-southwest/east-northeast direction, similar to the Barrow Airport.

A typical satellite field would be developed from a single gravel pad with a footprint of approximately 10 acres. Each pad would hold approximately 20 to 30 wells and would be accessed from the anchor development on a permanent gravel road approximately 62 feet wide at the base and up to 20 miles (average 10 miles) in length. Five satellite fields would be developed for each CPF. However, satellite field development would not be expected to occur until several years after the CPF was developed (this is true of the Alpine field development), and would have a production life of approximately 10 years. One 11-acre airstrip is assumed per group of five satellites.

Total areas of the gravel footprints for all of the above potential developments, as well as for two scenarios for summertime "zones of influence" (i.e., zones of potential disturbance to eiders) around the gravel pads are presented below in Table D-1.

There would be a maximum of eight development rigs operating in any given year. The time required to drill and complete a production well depends largely on the measured depth of the well. Currently on the North Slope, it takes approximately 20 to 30 days to drill and complete a 10,000-foot well. This equates to approximately 12 to 18 wells per rig over a 12-month period. Safety considerations normally restrict operations to one rig drilling on each pad at a time. Using the above example, in which up to 30 wells from each pad would be needed for initial reservoir development, drilling operations would take 3 to 4 years to complete. The overall development phase from construction of a staging area and remote base camp to production startup could take up to 3 to 4 years, depending on the size and location of the new field.

**Table D-1. Gravel Footprint and Zones of Influence for Production and Related Facilities.**

| Activity | Gravel Footprint in Acres (km²)[1] | 200-Meter Zone of Influence in Acres (km²)[2] | 500-Meter Zone of Influence in Acres (km²)[3] |
|---|---|---|---|
| CPF developments (2) | 161 (0.7) | 1,252 (5.1) | 4,019 (16.3) |
| Satellite developments (10) | 872 (3.5) | 17,436 (70.6) | 46,803 (189.4) |
| Gravel extraction sites (6 at 20-50 acres each) | 225 (0.9) | Not Applicable | Not Applicable |
| Staging areas (2) | 100 (0.4) | 257 (1.0) | 939 (3.8) |
| Total area | 1,356 (5.5) | 18,945 (76.7) | 51,761 (209.5) |

[1] Includes only the area under the gravel.
[2] Includes only the area outside the gravel but within 200 m of the gravel.
[3] Includes only the area outside the gravel but within 500 m of the gravel.

The description of exploration activities in Section D.2.2.3 (Winter Transportation and Support Infrastructure for Exploration) for staging areas and sealifts is also applicable during the development phase, with respect to the timing and types of activities. During development, the staging area(s) could be larger, up to 50 acres. Development of the staging area would occur in winter prior to the start of development activities. Where practical, staging areas used for exploration would be used for development. The number of barges required in each sealift to support development activities would be greater than the number required for exploration activities. However, the modules and equipment still would be offloaded from barges in 3 to 5 days and stored on the staging area gravel pad until winter, when they would be transported by ice road to the CPF development site. The individual modules could be 20 to 30 feet in height. After transportation to the CPF development sites, these modules would become the site's operation and housing facilities complex. There likely would be two large sealifts (1 year apart) for each CPF.

BIOLOGICAL ASSESSMENT

### Drill-Pad and Road Construction

Construction of gravel pads, roads, airstrips, and staging areas would be some of the first development activities to take place. Current technology uses gravel pads to support both CPFs and satellite production facilities. Gravel requirements for current "all-gravel" pads raised 5 feet or more above a wet tundra surface are approximately 8,000 to 12,000 cubic yards per acre of surface footprint. Gravel roads (approximately 62 feet at the base) cover approximately 7.5 acres per mile, and require 40,000 to 60,000 cubic yards of gravel per mile. Airstrips (100 feet wide and 5,000 feet long), cover 10 acres and require 110,000 cubic yards of gravel. The total gravel estimate for 12 fields, consisting of two CPFs and 10 satellite pads, is approximately 6,823,000 cubic yards. Any staging area or pump station sites would have gravel requirements. A staging area (50 acres) would require an additional 900,000 cubic yards of gravel.

Gravel mining and transportation would occur during the winter months, when gravel can be moved by heavy equipment over ice roads. Where gravel extraction has occurred on the North Slope, sites are 20 to 50 acres in size. Two CPF development sites and 10 satellite pads with roads would require approximately six extraction sites averaging 35 acres in size to be developed. The location of these potential mine sites are unknown at this time. If larger gravel extraction sites were discovered, the extraction footprint per site could exceed 50 acres in size, but the number of sites would be reduced, and the total disturbance footprint also would be less. Gravel extraction sites necessarily would be located within the area of highest geological potential because of the high cost of material transport.

### Development of Production Pad and Facility

The first production pad (anchor pad) would be constructed approximately 8 years after the lease sale. Up to 489 production and injection wells would be drilled in total for the 12 fields. Each field would likely take 3 to 4 years for the drilling of associated production and service wells. The wells would be drilled year-round from the gravel pads. A maximum of eight drill rigs would be used to drill wells in all fields during a given year.

### Central Production Facility

The CPF serves as the operational center for long-term production activities in an oil field. In addition to oil-production equipment, the CPF typically includes living quarters, offices, maintenance shops, storage tanks for fuel and water, power generators, waste-treatment units, and a communications center. For most North Slope projects, many components of the CPF are constructed as transportable modules in offsite locations, normally outside Alaska, and then moved to staging areas in the summer by sealift. The following winter they are moved overland on ice roads to the field and assembled. All buildings are supported on pilings to accommodate ground settling or frost heaving. An airstrip usually is located near the CPF to allow transport of supplies and personnel to the field site.

Power, telephone, and other communication lines would be buried in the roads or installed on the pipeline vertical support members (VSMs), to the extent practicable. Each CPF would have one tall (up to 60 feet) communication tower. Required Operating Procedure E-14 (see Section 2.6; Stipulations and Required Operating Procedures) would require that the tower guy wires be marked, increasing visibility to reduce potential collision by listed eiders.

Oil production equipment would include three-phase separators (oil, gas, and water are produced in varying proportions from each well); gas conditioning (natural gas liquids are stripped from produced gas); complex pipeline gathering and pressure regulation systems; and well monitoring and control systems. Oil from production wells would be filtered (to remove sand) and processed (removing water and gas) before being piped through a sales meter and into the sales-oil pipeline system. Gas would be processed (to remove liquids), pressurized (compressed), and re-injected into the reservoir through service wells. Likewise, water would be processed (chemically treated) and then re-injected into the reservoir for pressure maintenance. Re-injection of produced gas and water would increase oil recovery; this practice is normally initiated from the onset of production.

BIOLOGICAL ASSESSMENT

**Pipeline Infrastructure**

The actual locations of new pipelines constructed in the Planning Area would depend on both the location and sequence of discoveries of commercial-sized oil fields. Fields developed early would establish the first pipeline corridors connecting the Planning Area production to existing infrastructure at the Alpine field. Fields discovered and developed later would attempt to use these existing pipelines, if the capacity was available. If large fields were discovered late in the exploration sequence, they could require their own oil pipelines. It is possible that commercial-sized fields discovered by different companies would be shut in (not produced) until an agreement was reached to share the costs of constructing a large main line from the Planning Area to common carrier pipelines that connect to the Trans-Alaska Pipeline System (TAPS). In this analysis, one connecting pipeline would be constructed to the existing Alpine field facility, which has infrastructure available to connect to TAPS.

The scenario developed for the final Preferred Alternative assumes that 205 miles of pipeline would be installed during the winter, coinciding with the construction of the development and production facilities. The pipeline would consist of approximately 97 miles of elevated field gathering lines for oil and 108 miles of elevated oil trunk lines. The gathering pipeline would consist of connecting multiphase pipelines (a 24-inch oil pipeline, a 14-inch water pipeline, and a 10-inch gas pipeline for gas reinjection) installed aboveground on VSMs, and would be placed a minimum of 7 feet above the tundra. The VSMs would be spaced 55 to 70 feet apart. Routine pipeline maintenance would occur during the winter months, with summer activities occurring on an emergency basis only.

Possible future pipeline corridors in the Planning Area are speculative, but routes would be based on several factors, including oil-resource potential, previous leasing, and previous discoveries. The actual location of undiscovered, commercial-size fields and the timing of discovery are impossible to predict. For analysis purposes, 225 miles of common carrier trunk line would be constructed in the Planning Area, with an additional 120 miles constructed on State of Alaska lands to the east to transport product to market.

None of the pipelines described above would be established as subsea infrastructure.

**Aircraft Support During Development**

The highest level of aircraft activity would occur during the period when both construction and development drilling are occurring. From June 1, 2001 to July 15, 2002, there were a total of 1,474 aircraft landings or take-offs (a daily average of 32.8 operations) at the Alpine field (ABR Inc. 2001; Johnson et al. 2003a). About half of the aircraft operations were helicopter flights. The next largest group was primarily passenger planes (CASA, Twin Otter, Navajo, and Beech), averaging seven flights per day. On average, there was one DC-6 round trip flight per day. We expect similar levels of aircraft activity during the summer development phases for each of the CPF developments.

### Estimated Number of Flights

The total number of flights expected to occur on the Planning Area over the life of the project is estimated below in Table D-2. The *Alpine Satellite Development Plan EIS* (USDOI BLM 2004a) provided estimates of the aircraft flights that might be generated by construction, development, and operation of the Alpine field, and these estimates were used as a baseline in the development of estimates for vehicular traffic that might occur in the Planning Area under the proposed development scenario as the proposed development consists of two Alpine field-like developments. The estimates shown in Table D-2 allow for other unscheduled flights, and project-related research.

Aircraft flights that occur during winter months would have no effect on eiders as they are not on the North Slope at that time of year. Therefore predicted winter (October-May) aircraft flights were not included in the estimate. Exploration occurs during the winter; however, some flights are conducted during the summer in support of seismic equipment maintenance operations. Development and operation would require aircraft support. Construction of the facilities (gravel pads, pipelines, buildings, etc.) would result in the most traffic.

**Exhibit 43, page 21 of 63**

BIOLOGICAL ASSESSMENT

**Table D-2. Predicted Number of One-way Aircraft Flights Annually in the Planning Area during June through September.**

| Activity | Number of Flights Each /Summer[1] | Number of Months[2] | Number of Years | Total Summer Flights |
|---|---|---|---|---|
| Exploration | 40 | 1 | 10 | 400 |
| Construction | 8,160 | 4 | 2-4 | 32,640 |
| Operation | 3,882 | 4 | 30 | 116,460 |
| Abandonment | 19 | 4 | 5 | 96 |
| Non-Operational | 2,500 | 4 | 30 | 75,000 |
| Total | | | | 224,596 |

[1]If all phases of all activities envisioned in the development scenario occurred concurrently.
[2]Summer exploration flights are for maintenance of exploration equipment.

Summer aircraft flights were estimated based on the following information and assumptions:

- Construction flight numbers for the CPFs are estimated from the average number of flights recorded/day from June through August during the major construction period at the Alpine field facility, CD-1 and CD-2 (1999-2001; flight numbers reported in Johnson et al. 2003).

- Construction and operational flight numbers for the satellite developments are estimated from information on estimated flights contained in the *Alpine Satellite Development Plan Final EIS* and Biological Assessment (USDOI BLM 2004a, 2004b).

- Operational flight numbers for the CPFs are estimated from flight information for the Alpine field air strip from May through August of 2004 (ConocoPhillips Alaska, Inc. pers. comm.).

- The development scenario for the final Preferred Alternative assumes 2 Alpine-like CPFs and 10 satellite pads, therefore estimates from the *Alpine Satellite Development Final EIS* were multiplied by 2.

- Aircraft flights that occur during the winter months would have no effect on eiders as they are not on the North Slope at that time of year. Therefore, predicted winter (October-May) aircraft flights were not included in the estimate. Exploration occurs during the winter; however, some flights are conducted during the summer in support of seismic equipment maintenance operations. Development and operation would require aircraft support. Construction of the facilities (gravel pads, pipelines, buildings, etc.) would result in the most traffic.

- A flight equals a take-off or landing in a 24-hour period (i.e., all flights are one way).

- The estimation presented here assumes a linear progression from exploration through abandonment occurring concurrently, with exploration lasting 10 years, construction of CPFs lasting 4 years, individual satellites lasting 2 years, development lasting 30 years, and abandonment lasting 5 years. Actual timelines would likely be different and influenced by what is discovered, when it's found, economics, technology, and development permit requirements. Overlaps between phases should be expected. Therefore, any estimation of flights/month or year is likely an under-or over-estimation.

- Non-operation flight numbers from the *Alpine Satellite Development Plan EIS* (2,500 one-way/year) are included in the estimate for the 30-year operation period. This is likely an overestimation, as the majority of these flights are believed to be related to surveys required for development of the Alpine satellite fields. These surveys would be required for any development, but would likely only last for 3 to 5 years for any particular action. Additional flights may be required, based on monitoring requirements that could last for the life of the project, but this number is likely to be less than required pre-construction.

**Exhibit 43, page 22 of 63**

BIOLOGICAL ASSESSMENT

- The estimated flight numbers are based on current information. Actual flight numbers would be dependent on the level and timing of exploration, development, and production; limitations imposed by natural resource and subsistence protective measures; and future technology.

## Traffic

The construction and use of ice roads and gravel roads as proposed under the development scenario considered in this BA would generate a significant number of vehicle trips, with potential for eider disturbance or collision. The *Alpine Satellite Development Plan Final EIS* (USDOI BLM 2004a) provided estimates of the vehicular traffic that might be generated by construction, development, and operation of the Alpine field, and these estimates were used as a baseline in the development of estimates for vehicular traffic that might occur in the Planning Area under the proposed development scenario. The proposed development consists of two Alpine-like developments.

Vehicular traffic that takes place during winter months would have no effect on eiders, as they are not on the North Slope at that time of year. Therefore, predicted winter (October–May) traffic on gravel roads, and all predicted traffic on ice roads, were not included in the estimate. Exploration would result in no significant vehicular traffic. Development and operation would result in limited vehicular traffic. Construction of the facilities (gravel pads, pipelines, buildings, etc.) would result in the most traffic. Estimates of the annual and total number of vehicle trips are provided in Table D-3.

**Table D-3. Predicted Number of Vehicle Trips and Miles That May be Driven Monthly in the Planning Area during June through September and Over the Life of the Project.**

| | Trips/Month[1] | | Miles/Month[2] | | Total Trips[3] | | Total Miles[4] | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Maximum | Mean | Maximum | Mean | Maximum | Mean | Maximum |
| Exploration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Construction | 740 to 6,600 | 2,300 to 6,700 | 14,800 to 132,000 | 46,000 to 134,000 | 192,384 | 222,720 | 3,847,680 | 4,454.400 |
| Drilling | 420 to 840 | 450 to 900 | 8,400 to 16,800 | 9,000 to 18,000 | 28,224 | 30,240 | 564,480 | 604,800 |
| Operations | 90 | 120 | 1,800 | 2,400 | 21,600 | 28,800 | 432,000 | 576,000 |
| Total | | | | | 242,208 | 281,760 | 4,844,160 | 5,635,200 |

[1] Number of round trips per month in the Planning Area based on projected mean and maximum numbers of trips for Alternative F in the Alpine Satellite Development Plan Final EIS (USDOI BLM 2004a) Alternative F. Assumed that no more than five satellites would be developed at a time and therefore used the numbers provided in that document.
[2] Number of months traffic occurs during any year when eiders are present (June–September).
[3] Total number of miles driven per month, based on mean and maximum numbers of trips per month with an average of 20 miles per trip.
[4] Total number of round trips driven over the lifetime of the project month based on projected trips for Alpine Satellite Development Plan Final EIS (USDOI BLM 2004a). Alternative F times 2.4 as the final Proposed Action entails 12 fields while the Alpine Satellite Development Plan Final EIS entailed only 5 fields. Life of project consisted of construction, drilling, and 20 years of operations.
[5] Total number of miles driven over the life of the project based on the mean and maximum number of trips to be driven and an average of 20 miles per trip.

## D.2.3.2    Offshore Development Related to the Planning Area

The final Preferred Alternative would provide an opportunity to lease in the immediate offshore area of the Planning Area, including Kogru Inlet. The shorelines are protected by a ¾-mile No-Surface Occupancy (Map 2-2) requirement, both offshore and onshore, to protect the nearshore habitats. Reasonably foreseeable projections do not anticipate production facilities offshore. If a commercially viable discovery were made in the offshore area it most likely would be reached using directional drilling techniques anchored onshore, and a new analysis would be prepared to address the specific issues related to offshore production. If development occurred offshore, it likely

**Exhibit 43, page 23 of 63**

BIOLOGICAL ASSESSMENT

would be constructed using materials and techniques similar to those used at the island bearing the Northstar development (U.S. Army Corps of Engineers 1999).

## D.2.4    Production

The field infrastructure would include processing facilities and a permanent airstrip, and would operate year-round for at least 20 years. The first production from new leases could start up in 2018, with estimated peak rates of 77 million barrels per year (211,000 barrels per day).

### D.2.4.1    Production Activities

During production, the size of the gravel footprint would remain constant. There would be higher levels of human activity at the two CPF development sites than at the satellite, or secondary fields. The number of aircraft flights to support the facility is estimated at four propeller-driven passenger planes (CASA, Twin Otter, Navajo, Beech) and 5 to 10 to ten helicopter flights per week. There would be some truck traffic from the main facilities to satellite and secondary pads on a daily basis. There would be helicopter flights along the length of the pipeline to monitor its integrity on a monthly basis, at a minimum.

The pipelines would be pigged and electronically monitored to determine pipeline integrity. Pipeline maintenance would be planned, and would occur during the winter months when the pipeline could be readily accessed by ice road or hardened snow trail.

Wastes generated at the production facility would be incinerated at the facility or treated and transported to approved disposal sites on the North Slope.

### D.2.4.2    Watercraft Support to Production Facilities

It is likely that facilities would be supplied by annual sealift. Most of these supplies would arrive in containers by barge in late July or August. Containers would be offloaded with cranes and stacked on the gravel pad at the staging area. The typical container would be less than 10 feet in height. Vessel traffic generally would be limited to routes in shallow, nearshore waters between staging areas connected to existing infrastructure (e.g., West Dock, or Oliktok Point) and staging areas along the coastline in the Planning Area at potential sites such as Camp Lonely.

Non-recreational airboat use is allowed on streams, lakes, and estuaries seasonally accessible by motorboats. Airboats would be prohibited in seasonally-flooded tundra and shallow waters with wetland vegetation adjacent to streams, lakes, and estuaries. For this analysis, it is assumed that no facilities would be constructed adjacent to waterways that could support non-recreational use of watercraft, because of the setbacks required by stipulations K-1, K-2, and K-3.

### D.2.4.3    Public Access and Subsistence Activities

The developments would not be accessible to the general public for recreational or tourism activities. However, the areas would be available to rural subsistence users. Subsistence use of the Planning Area is variable based on the availability and location of subsistence species. It is possible that subsistence activities could be enhanced by the road infrastructure described in this reasonably foreseeable scenario.

### D.2.4.4    Spill-Response Training and Research Activities

There likely would be annual summer oil-spill-response training, which could involve 20 to 40 individuals for 1 to 2 days each summer at each CPF. There would likely be an increase in aircraft landings and take-offs, and if the facility were near water, there likely would be an increase in watercraft activity.

Boats and other watercraft could be used by researchers during study efforts if facilities, or areas of concern, were located near large waterbodies such as the Beaufort Sea, rivers, or large, deepwater lakes. These activities would occur during the summer months, but the numbers, locations, and types of activities remain speculative.

## D.2.5    Abandonment and Restoration of Production Sites

Abandonment and reclamation of satellite fields likely would coincide with abandonment and reclamation of corresponding CPFs. Abandonment operations would entail removing all equipment, cutting well casings a minimum of 3 feet below the surface, and plugging wells. Gravel or gravel/sand pads would not be removed, but allowed to bed naturally. Overall, abandonment operations would take many years, as revegetation and environmental monitoring studies would continue to document the long-term effects of operations at a particular site. A series of permitting and inspection activities would be associated with abandonment procedures (Lease Stipulation G-1). Abandonment activities would occur during winter months when ice roads could be constructed to allow the removal of equipment. Monitoring abandonment would require periodic revisits to gather information on environmental parameters related to natural bedding and to document the success of abandonment actions. Normally, one helicopter with a crew of three would visit the sites annually for the first 5 years, followed by visits with increasing time gaps over the next 10 years. Site visits would include a maximum of 1 day per visit, and 1 visit per year.

## D.2.6    Lease Stipulations and Required Operating Procedures

The final Preferred Alternative includes mitigating measures that are designed to reduce the potential take of spectacled and Steller's eiders. These measures are either lease stipulations (conditions that would apply to the lease) or ROPs (requirements that would apply to permits for activities associated with oil and gas operations). The full text for all stipulations and ROPs is given in Section 2.6 (Stipulations and Required Operating Procedures) of the Amended IAP/EIS. The following summarized stipulations and ROPs are directly applicable to eiders:

- Surveys would be required in the vicinity of proposed developments to direct project siting in a manner that prevents or reduces the taking of spectacled and Steller's eiders, and provides baseline information on the species near developments for impact monitoring.

- All utility and communications lines would be required to be buried in access roads or installed on the pipeline VSMs.

- All facilities greater than 20 feet in height would be required to have special lighting protocols. All communication towers, antennas, and similar facilities requiring support wires would be required to have markings to make support wires more visible to low-flying birds.

- All facilities would be required to be designed to prevent the nesting, denning, etc. of predatory species including gulls, ravens, raptors, foxes, and bears.

- Lessees would be required to develop oil-spill-response plans prior to any exploration or development drilling.

- Drilling pads and facilities would be relocated if necessary, up to 2 miles from the optimum pad location (the current North Slope maximum extended reach is 4 miles and a 2.5 departure ratio), if surveys indicated that relocation was necessary to avoid take.

- There would be restrictions on the establishment of permanent or temporary facilities on all deepwater lakes (lakes with depths greater than 13 feet); permanent facilities within ¼ mile of such lakes would be prohibited. No permanent facilities would be permitted in the streambeds of rivers. A no surface occupancy setback of ½ mile would be imposed on all major rivers (measured from the highest high water mark of the river, as determined by current hydrology at the time of application) for permanent facilities. Along rivers or river segments where subsistence concerns have been raised, setbacks for no surface occupancy would be increased to ¾ to 3 miles.

- Overland travel and associated activities for permitted uses would be restricted.