Jeffrey W. Leppo
Laura J. Beveridge
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington  98101
Phone:  (206) 624-0900
Fax:  (206) 386-7500
Email:  jwleppo@stoel.com
Email:  ljbeveridge@stoel.com

*Attorneys for Intervenor-Defendants ConocoPhillips Alaska, Inc. and
Anadarko Petroleum Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY, <br><br> Plaintiffs, <br><br> v. <br><br> DIRK KEMPTHORNE, Secretary of the Interior; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS, Regional Director, United States Fish and Wildlife Service; BUREAU OF LAND MANAGEMENT; UNITED STATES FISH AND WILDLIFE SERVICE; and the UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br> Defendants, and <br><br> CONOCOPHILLIPS ALASKA, INC. ANADARKO PETROLEUM CORPORATION, ARCTIC SLOPE REGIONAL CORPORATION, and the STATE OF ALASKA, <br><br> Intervenor-Defendants | Case No. <br> <u>1:05-CV-00008-JKS</u> |

**INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' OPENING BRIEF**

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND ...................................................................................... 2

      A.    The Petroleum Reserve ............................................................. 2

      B.    Oil and Gas Activities in the Petroleum Reserve.................... 4

      C.    BLM's Land Management Decisions for the Northeast Planning Area ................ 6

III.  ARGUMENT ........................................................................................... 8

      A.    Standard of Review .................................................................... 8

      B.    BLM's Decision Complies with the Production Act ............... 9

            1.    Maximum Protection Only Applies to Exploration Under § 6504
                  and Must Be Consistent with the Purposes of the Production Act .......... 10

            2.    The Final Preferred Alternative Complies with the Production Act......... 13

            3.    The Record Supports BLM's Conclusion Regarding Maximum
                  Protection ................................................................................ 15

      C.    The FEIS Complies with NEPA .............................................. 20

            1.    BLM Was Not Required to Issue a Supplemental EIS on the Final
                  Preferred Alternative ............................................................. 20

                  a.    The Final Preferred Alternative Is a Result of the Public
                        Comment Process.......................................................... 21

                  b.    The Final Preferred Alternative Falls within the Range of
                        Alternatives Addressed in the DEIS ............................ 23

                  c.    NAS Commented on the Final Preferred Alternative ................. 26

            2.    The FEIS Analyzes All Reasonably Foreseeable Future North Slope
                  Oil and Gas Development ...................................................... 27

                  a.    NAS Has Failed to Preserve Its Cumulative Impacts
                        Argument ....................................................................... 28

                  b.    The FEIS Provides a Comprehensive Analysis of Reasonably
                        Foreseeable Future North Slope Oil Development...................... 29

            3.    BLM Took a "Hard Look" at Impacts Related to Global Climate
                  Change ............................................................................. 31

            4.    NAS's Additional NEPA Arguments Are Barred by the Doctrine of
                  Issue Preclusion ............................................................... 35

                  a.    The FEIS Is Sufficiently Detailed to Support BLM's Leasing
                        Decision ....................................................................... 36

                  b.    The FEIS Adequately Analyzes Mitigation Measures................ 38

D.    FWS's Biological Opinion Complies with the ESA ............................................... 42

    1.    FWS Properly Evaluated the Environmental Baseline ............................ 43

    2.    FWS Properly Evaluated the Effects of the Action .................................. 46

IV.    NAS IS NOT AUTOMATICALLY ENTITLED TO VACATUR OR INJUNCTIVE RELIEF ..................................................................................................................... 48

V.    CONCLUSION ..................................................................................................................... 49

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

# TABLE OF AUTHORITIES

## FEDERAL CASES

Ad Hoc Metals Coal. v. Whitman, 227 F. Supp. 2d 134 (D.D.C. 2002) .......................................26

Akiak Native Cmty. v. U.S. Postal Serv., 213 F.3d 1140 (9th Cir. 2000) ....................................42

Allen v. McCurry, 449 U.S. 90 (1980) ................................................................................36

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) ...............................................49

Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 1999 WL 33722331 (D. Ariz. 1999) ................................................................................................................35

Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 126 F.3d 1158 (9th Cir. 1997) ...........................................................................................................35, 40

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87 (1983) ......................8

Bennett v. Spear, 520 U.S. 154 (1997) ................................................................................8

Bob Marshall Alliance v. Hodel, 852 F.2d 1223 (9th Cir. 1988) ..................................................36

California v. Block, 690 F.2d 753 (9th Cir. 1982).........................................................20, 21, 26, 36, 38

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) ..................8, 9, 13, 20

Churchill County v. Norton, 276 F.3d 1060 (9th Cir. 2001) .....................................................20, 29

City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir. 1986).............................................................41

City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142 (9th Cir. 1997).............39, 41

Clements v. Airport Auth. of Washoe County, 69 F.3d 321 (9th Cir. 1995)................................36

Clyde K. v. Puyallup Sch. Dist. No. 3, 35 F.3d 1396 (9th Cir. 1994) ............................................9

Conner v. Burford, 848 F.2d 1441 (9th Cir. 1988) .........................................................36, 38, 46, 47, 48

Ctr. for Biological Diversity v. Fed. Highway Admin., 290 F. Supp. 2d 1175 (S.D. Cal. 2003) ..................................................................................................................29

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Dioxin/Organochlorine Ctr. v. Clarke, 57 F.3d 1517 (9th Cir. 1995) .............................................8

Dubois v. U.S. Dep't of Agric., 102 F.3d 1273 (1st Cir. 1996) ....................................................26

Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147 (9th Cir. 2006)........................................34

Enos v. Marsh, 769 F.2d 1363 (9th Cir. 1985) ......................................................................21, 24

Envtl. Def. Fund, Inc. v. Andrus, 619 F.2d 1368 (10th Cir. 1980)................................................38

Envtl. Protection Info. Ctr. v. U.S. Forest Serv., 2006 WL 1716746 (9th Cir. 2006) ..................30

Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir. 2003) ...........................................29

Gaule v. Meade, 402 F. Supp. 2d 1078 (D. Alaska 2005) ............................................................39

Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505 (9th Cir. 1988) ......21, 23, 24, 27

Havasupai Tribe v. Robertson, 943 F.2d 32 (9th Cir. 1991) ........................................................28

Hawkins v. Risley, 984 F.2d 321 (9th Cir. 1993) .........................................................................35

Headwaters, Inc. v. U.S. Bureau of Land Mgmt., 914 F.2d 1174 (9th Cir. 1990) .......................42

Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170 (9th Cir. 2000)................................42

Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392 (9th Cir. 1995) ............................................48

Idaho Sporting Cong., Inc. v. Jemmet, 1997 WL 855506 (D. Idaho 1997), aff'd, 139 F.3d 905 (9th Cir. 1998)........................................................................................................9, 42

Idaho Sporting Cong. v. Thomas, 137 F.3d 1146 (9th Cir. 1998) ................................................29

IlioUlaokalani Coal. v. Rumsfeld, 369 F. Supp. 2d 1246 (D. Haw. 2005) .............................28, 29

Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754 (9th Cir. 1996) ................35

Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062 (9th Cir. 2002) ...........................................30

Kettle Range Conservation Group v. U.S. Forest Serv., 148 F. Supp. 2d 1107 (E.D. Wash. 2001) ................................................................................................................21, 25

Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094 (9th Cir. 2002) .............................21, 23, 27

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517 (9th Cir. 1994) ...........................40

Lands Council v. Powell, 395 F.3d 1919 ...............................................................................32, 33

League of Wilderness Defs.-Blue Mountain Biodiversity Project v. Bosworth, 383 F.
   Supp. 2d 1285 (D. Or. 2005)...........................................................................................28, 29

Morongo Band of Mission Indians v. FAA, 161 F.3d 569 (9th Cir. 1998) ....................................8

Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,
   463 U.S. 29 (1983) ...........................................................................................15, 16, 18,
                                                                                                                   19

Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800 (9th Cir. 1999) ...........................30

N. Alaska Envtl. Ctr. ("NAEC") v. Norton, 361 F. Supp. 2d 1069 (D. Alaska 2005) .......... passim

NAEC v. Kempthorne, 2006 WL 2061246 ......................................................................... passim

N. Plains Res. Council, Inc. v. U.S. Bureau of Land Mgmt., 298 F. Supp. 2d 1017 (D.
   Mont. 2003)....................................................................................................................36, 38

N. Plains Res. Council v. Lujan, 874 F.2d 661 (9th Cir. 1989) ....................................................38

Nat'l Med. Enters., Inc. v. Sullivan, 957 F.2d 664 (9th Cir. 1992) ..............................................16

Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677 (9th Cir. 2000)...........35

Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg. Inc., 906 F.2d 934 (3d Cir. 1990) ........49

Neighbors of Cuddy Mountain v. U.S. Forest  Serv., 137 F.3d 1372 (9th Cir. 1998).............34, 39

Northwest Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468 (9th Cir. 1994)....................16

Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846 (9th Cir. 2005) ..........................34

Offshore Sportswear, Inc. v. Vuarnet Int'l, B.V., 114 F.3d 848 (9th Cir. 1997) ..........................36

Okanogan Highlands Alliance v. Williams, 236 F.3d 468 (9th Cir. 2000) .............................39, 40

Orantes-Hernandez v. Thornburgh, 919 F.2d 549 (9th Cir. 1990) ...............................................49

Rendleman v. Shalala, 21 F.3d 957 (9th Cir. 1994) ....................................................................16

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989).................................20, 29, 39

Save Our Heritage, Inc. v. FAA, 269 F.3d 49 (1st Cir. 2001) ......................................48

Sierra Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983) ...........................................36

Swan View Coalition, Inc. v. Turner, 824 F. Supp. 923 (D. Mont. 1992) ....................48

Tripati v. Henman, 857 F.2d 1366 (9th Cir. 1988) ......................................35, 36

U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752 (2004) ..............................28, 29

U.S. v. Berkowitz, 927 F.2d 1376 (7th Cir. 1991)...........................................41

U.S. v. Romero-Bustamante, 337 F.3d 1104 (9th Cir. 2003) ...................................10

U.S. v. S. Fla. Water Mgmt. Dist., 28 F.3d 1563 (11th Cir. 1994).............................30

Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519 (1978) ..........28, 29, 32, 34

Washington v. Daley, 173 F.3d 1158 (9th Cir. 1999)......................................8

Western Radio Servs. Co. v. Espy, 79 F.3d 896 (9th Cir. 1996)...............................8

Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853 (9th Cir. 2004) ............8, 39, 41

## FEDERAL STATUTES

5 U.S.C. § 706(2) ....................................................8

16 U.S.C. § 1536(a) ..............................................8, 43

16 U.S.C. § 1536(o) ................................................43

16 U.S.C. § 1538 ...................................................43

16 U.S.C. § 1540(g) ...............................................42

42 U.S.C. § 4332 ..................................................39

42 U.S.C. § 6501 ..................................................2, 3

42 U.S.C. § 6503(b) ..............................................13, 20

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

vi

42 U.S.C. § 6504 ..........................................................................................10

42 U.S.C. § 6504(a) ...............................................................................3, 9, 10, 11, 12

42 U.S.C. § 6504(b) ......................................................................................11

42 U.S.C. § 6504(c) ......................................................................................11

42 U.S.C. § 6506a ...............................................................................3, 5, 11, 24

42 U.S.C. § 6508 ............................................................................................3

## FEDERAL REGULATIONS

40 C.F.R. § 1502.2(b) ...................................................................................32

40 C.F.R. § 1502.9(c)(1) ..................................................................21, 25, 26

40 C.F.R. § 1503.1 .......................................................................................27

40 C.F.R. § 1503.3(a) ...................................................................................29

40 C.F.R. § 1503.4 .......................................................................................21

40 C.F.R. § 1508.7 ................................................................................29, 30, 32, 35

40 C.F.R. § 1508.8(a)-(b) ..............................................................................32

43 C.F.R. § 2361.1 .......................................................................................15

43 C.F.R. § 3130 ............................................................................................5

43 C.F.R. § 3130.4-1 ....................................................................................24

43 C.F.R. § 3131.3 ..........................................................................................5

43 C.F.R. § 3135.2 ..........................................................................................5

43 C.F.R. § 3150 ............................................................................................5

43 C.F.R. § 3152.2 ..........................................................................................5

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

43 C.F.R. § 3160 ....................................................................................................5

43 C.F.R. § 3162.3-1 ..............................................................................................5

50 C.F.R. § 402.02 ..................................................................................44, 45, 46

50 C.F.R. § 402.14(g) .............................................................................43, 44, 45

50 C.F.R. § 402.16 ...............................................................................................45

## FEDERAL REGISTER NOTICES

46 Fed. Reg. 18,026 (Mar. 23, 1981) ..................................................................21

42 Fed. Reg. 28,723, (June 3, 1977) ....................................................................12

51 Fed. Reg. 19,926 (June 3, 1986) ...............................................................44, 45

## LEGISLATIVE HISTORY

S. Rep. No. 96-985 (1980) ...................................................................................11

H. Rep. No. 94-81 – Part I (1975).................................................................11, 13

H. Conf. Rep. No. 94-942 (1976) ...............................................................3, 11, 12,
                                                                      15, 18, 20

## MISCELLANEOUS

LR 16.3(c)(2) .........................................................................................................2

Fed. R. Civ. P. 12(b)(6)........................................................................................42

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

## I.     INTRODUCTION

This is the third in a series of lawsuits brought by a coalition of advocacy groups (collectively referred to herein as "NAS") seeking to foreclose oil and gas leasing, exploration, and development within the National Petroleum Reserve-Alaska ("Petroleum Reserve").  As acknowledged by Congress, the President, and all parties to this litigation, the Petroleum Reserve is a vast and remote area that contains both nationally-significant oil and gas reserves and highly sensitive wildlife and subsistence resources.  Moreover, as fate would have it, high oil potential areas are often found in the same region of the Petroleum Reserve as high value surface resources.  The concurrent location of high potential areas and sensitive surface resources presents the U.S. Bureau of Land Management ("BLM"), the federal agency responsible for administering the Petroleum Reserve, with a particular challenge.  Under the National Petroleum Reserves Production Act (the "Production Act"), BLM must establish an "expeditious" oil and gas leasing program while simultaneously mitigating "reasonably foreseeable and significantly adverse" environmental impacts and providing designated special areas, such as the Teshekpuk Lake Special Area ("TLSA"), with "maximum protection" during exploration activities.

The present case concerns BLM's most recent effort at balancing oil and gas development with environmental protection.  In response to a presidential directive instructing the agency to consider leasing currently closed areas, particularly in the northeast corner of the Petroleum Reserve, BLM amended the 1998 management plan for the Northeast Planning Area. BLM's final decision – which is the result of a two-and-a-half-year planning process and based on a three-volume, 2,000-page Final Integrated Activity Plan/Environmental Impact Statement ("FEIS"), a 71-page biological opinion ("Northeast BiOp"), and a nearly 100-page Record of Decision ("ROD") – makes high potential lands in TLSA available for leasing, subject to sweeping limitations on surface disturbance, and applies performance-based lease stipulations and required operating procedures ("ROPs") to all oil and gas activities regardless of where in the Planning Area they occur.  The final decision thus reflects BLM's consistent conclusion that the goals of the Production Act, and the President's energy policy, are best met by opening high potential areas to leasing while protecting surface resources through an unprecedented array of pre-leasing restrictions and requirements on potential future exploration and development activities.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

1

In contrast, NAS's persistent contention – argued again here in the context of claims under the Production Act, the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA") – is that the only way to protect surface resources is to close vast tracts with the most promising oil and gas potential to leasing. In essence, NAS's arguments amount to an "all or nothing" approach to managing the Petroleum Reserve in which conservation is incompatible with, and therefore trumps, oil and gas leasing, exploration, and development.

Intervenor-Defendants the State of Alaska, Arctic Slope Regional Corporation, ConocoPhillips Alaska, Inc., and Anadarko Petroleum Corporation (collectively "Intervenors") submit this consolidated response brief on the merits of NAS's claims.[1] As addressed below, for the third time, NAS's all or nothing arguments are both without merit and incompatible with the Production Act. Contrary to NAS, determining how to provide TLSA with the statutorily required level of protection while opening high oil potential areas necessary for an expeditious leasing program was the primary focus of the planning process. In addition, the administrative record demonstrates that BLM engaged in just the type of informed, public decisionmaking that NEPA requires and prepared an FEIS that more than adequately evaluates the direct, indirect, and cumulative environmental impacts of a range of management alternatives. Moreover, in compliance with the ESA, using the best available scientific and commercial data, the U.S. Fish & Wildlife Service ("FWS") determined that BLM's final decision will not jeopardize two threatened eider species resident in areas of the Petroleum Reserve during the brief Arctic summer. Because the final decision meets the statutory mandate of the Production Act and because the final decision fulfills the requirements of both NEPA and the ESA, this Court should grant Intervenors' motion for summary judgment and dismiss NAS's claims with prejudice.

## II.    BACKGROUND

### A.    The Petroleum Reserve

In 1923, President Warren G. Harding reserved, by executive order, Naval Petroleum Reserve No. 4 on the North Slope of Alaska "for oil and gas only." Exec. Order No. 3797-A (Feb. 27, 1923). In 1976, Congress passed the Production Act, 42 U.S.C. § 6501, et seq., which

---

[1] Pursuant to LR 16.3(c)(2), Intervenors' response is deemed a cross-motion for summary judgment.

renamed and transferred jurisdiction over the Petroleum Reserve (as well as three other petroleum reserves in the contiguous 48 states) from the Navy to the Department of the Interior, in order to meet the growing energy needs of the domestic economy. See FEIS at 1-8.[2] The Petroleum Reserve now consists of 23 million acres and includes several designated "special areas," such as the area surrounding Teshekpuk Lake, where significant subsistence, wildlife, and other important surface resources are concentrated. Id. at 1-3; ROD at 4.

Initially, the Production Act withheld authority for most oil and gas activities, including leasing or production, pending additional study, but allowed a federal exploration program to take place. FEIS § 1.5; H. Conf. Rep. No. 94-942, at 21 (1976). In designated special areas, Congress required that "exploration" be conducted "in a manner" which assured "the maximum protection of such surface values to the extent consistent with the requirements" of the Production Act. 42 U.S.C. § 6504(a). The maximum protection requirement was not intended to be "a prohibition of exploration activities within such areas," but rather a means of ensuring that "exploration-related activities" would be "conducted in a manner which will minimize the adverse impact on the environment." H. Conf. Rep. No. 94-942, at 21. In 1980, Congress amended the Production Act to provide for "an expeditious program of competitive leasing of oil and gas" and indicated that all activities undertaken pursuant to the leasing program should be restricted by the Secretary of the Interior ("Secretary") as "necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" in the Petroleum Reserve. 42 U.S.C. § 6506a(a)-(b).[3]

Pursuant to section 6506a of the Production Act, BLM has prepared, and periodically updated, "integrated activity plans" for the Northeast and Northwest Planning Areas of the Petroleum Reserve. FEIS § 1.5. In response to new information about commercially recoverable oil north of Teshekpuk Lake and a presidential directive instructing BLM to consider leasing closed portions of the Northeast Planning Area subject to performance-based restrictions

---

[2] Federal Defendants intend to lodge the full FEIS, ROD, and Northeast BiOp with the Court. To avoid duplicative filings, Intervenors have not submitted excerpts of these documents. Intervenors' citations to the FEIS, ROD, and Northeast BiOp are to the original page numbers. Materials cited from the administrative record ("AR") are attached hereto as exhibits ("Ex."). Exhibits submitted by NAS are cited to as "Pls.' Ex."

[3] Originally enacted as 42 U.S.C. § 6508, this section was recodified as § 6506a in 2005.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

like those used in the Northwest Planning Area, BLM recently revised the land management plan for the Northeast Planning Area.  FEIS at ES-2, 1-5.  BLM's final decisions regarding the Northeast Planning Area, and the associated environmental review required by NEPA and the ESA, are the subject of the present litigation.

**B.    Oil and Gas Activities in the Petroleum Reserve**

The importance of potential oil and gas development in the Petroleum Reserve for the State of Alaska, the Inupiat, and other residents of the North Slope cannot be overstated. Virtually all economic activity on the North Slope is tied to the oil and gas industry, either directly through economic opportunities or indirectly through tax revenues.  See Docket No. 31 (Declaration of Jacob Adams ("Adams Decl.") ¶¶ 26-29, 34 (energy industry creates jobs for Inupiaq shareholders and contracts for regional corporations; revenue is used to support schools, transportation, health care, and public utilities));[4] FEIS at 3-114 to 3-127, 4-406 to 4-411 (North Slope petroleum activity provides regional and statewide employment opportunities; local and state revenues from Petroleum Reserve lease sales and activities are used to provide essential public services).

Recognizing that economic stability is tied to petroleum development, both the Inupiat and the State of Alaska have worked closely with BLM and industry to ensure that oil and gas activities take place in an environmentally responsible manner that does not compromise traditional uses of the land or natural resources.  Adams Decl. ¶¶ 14-18 (indicating ROD adopted many of Inupiat's recommendations)); Ex. A (AR 8910) (State's comments on FEIS). Moreover, as both the Inupiat and BLM point out, advances in industry technology over the past 20 years have substantially reduced environmental impacts associated with oil and gas activities in the Arctic.  See, e.g., Adams Decl. ¶ 32 (due to technological innovations "almost all areas of the Arctic Slope and NPR-A may be safely leased, explored, and developed, so long as appropriate regulations and stipulations are in place"); FEIS at 4-454 to 4-455.  These impact-reducing technologies include, among others:  (1) improved seismic information that reduces the number of dry wells and fosters efficient facility placement; (2) extended-reach, directional-

---

[4] Jacob Adams is President of the Arctic Slope Regional Corporation ("ASRC") and is an Inupiaq Eskimo with first-hand knowledge of the Northeast Planning Area and its subsistence resources.  Adams Decl. ¶¶ 1, 6-8.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

drilling capabilities, which provide access to petroleum deposits without disturbing sensitive surface resources; (3) a reduction in drilling-pad footprints; (4) use of ice roads, ice pads, and vehicles modified to decrease tundra impacts; and (5) re-injection procedures for spent drilling fluids and rock cuttings that eliminate surface disposal.  Adams Decl. ¶ 32; FEIS § 4.7.4.

In addition, oil and gas activities in the Petroleum Reserve are subject to extensive regulation.  Federal regulations implementing the Production Act ensure that environmental review occurs at each stage of oil and gas activity and provides BLM with ample opportunity to impose additional restrictions when appropriate.[5]  See 43 C.F.R. pts. 3130, 3150, 3160.  At the leasing stage, both the Production Act and its implementing regulations authorize the inclusion of conditions that allow federal and state agencies to regulate activities during the subsequent exploration and development stages.  42 U.S.C. § 6506a(b); 43 C.F.R. § 3131.3.  Before conducting seismic surveys or drilling exploratory wells, lessees must obtain, as applicable, a geophysical exploration permit, see 43 C.F.R. subpt. 3152, or a permit to drill pursuant to 43 C.F.R. pt. 3160.  Approval of both exploration and drilling permits involves additional environmental review and allows BLM to add requirements to drilling permits beyond those stipulated in a lease.  43 C.F.R. §§ 3152.2, 3162.3-1.  If exploration reveals commercial quantities of oil, lessees must then undergo another round of environmental review and permitting before development and production.  See generally 43 C.F.R. pt. 3160; FEIS, App. C.[6]

Given the extensive regulatory and environmental requirements imposed at each stage, the time period between closure of the lease sale and the moment when on-the-ground exploration, let alone development or production, begins is typically quite long.  BLM anticipates that it may take up to 10 years to discover additional recoverable petroleum deposits in the Northeast Planning Area.  FEIS at 4-17 to 4-18.  BLM further estimates that, after discovery, it will take another three to six years before development leads to full-scale

---

[5] Like other federal oil and gas programs, oil and gas activity in the Petroleum Reserve can be divided into several distinct stages:  (1) leasing, (2) exploration, and (3) development. FEIS § 4.2.1.2.

[6] In addition, both the Production Act and its implementing regulations allow BLM to suspend operations and production on any lease "in the interest of conservation."  42 U.S.C. § 6506a(k); 43 C.F.R. § 3135.2.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

production. Id. Thus, the agency decisions at issue in this case constitute the first step in a lengthy, highly regulated environmental review and permitting process.

**C.    BLM's Land Management Decisions for the Northeast Planning Area**

Released in January 2005, the FEIS is a comprehensive environmental analysis that supports BLM's decision to open additional areas in the Northeast Planning Area to oil and gas activity subject to extensive performance-based mitigation and serves as the NEPA document for the first lease sale. Because approximately two-thirds of the Planning Area's recoverable oil potential is located in coastal regions of TLSA – which also contain essential caribou and waterfowl habitat and serve as important subsistence use areas – the challenge presented by the Production Act's dual mandate was a central focus of the planning process. From the start, BLM acknowledged the need to carefully consider and balance the competing interests and values of those interested in conducting oil and gas activities in the Petroleum Reserve, those dedicated to the protection of important surface resources, and the Native groups on the North Slope who are dependent on the resources of the Petroleum Reserve for both subsistence and the economic opportunities associated with energy development.

BLM initially analyzed three alternative management plans in the draft environmental impact statement ("DEIS"), each of which offered a "different approach" to balancing energy development and environmental protection in the Northeast Planning Area consistent with the Production Act. FEIS at 2-3; Ex. B at 3 (DEIS at ES-2). Under Alternative A, the "no action alternative," no new areas would be opened to leasing and the prescriptive restrictions provided under the 1998 Northeast management plan would remain in effect. FEIS at ES-3, § 2.3.1. If adopted, Alternative A would have left nearly 60 percent of the high potential area off limits to leasing or encumbered by no-surface-activity restrictions. Id. In contrast, Alternative B would open approximately 95 percent of the Northeast Planning Area to oil and gas leasing; however, 213,000 acres of high potential land north of Teshekpuk Lake would remain closed. Id. at ES-3, § 2.3.2. In addition, performance-based lease stipulations and ROPs patterned after those developed for the Northwest Planning Area would be implemented to protect important surface resources.[7] Id. Finally, under Alternative C, all BLM-administered lands within the Northeast

_____

[7] The validity of these performance-based stipulations and ROPs was sustained by both this Court and the Ninth Circuit in plaintiffs' unsuccessful challenge to the Northwest Planning

Planning Area would be available for oil and gas leasing, subject to performance-based stipulations and ROPs necessary to protect wildlife and traditional uses of the land.  Id. at ES-3 to ES-4, § 2.3.3.

Rather than endorsing one of the management alternatives in the DEIS, the FEIS presented a fourth management plan, Alternative D, as the "Final Preferred Alternative."  Id. § 2.3.4; ROD at 17-21.  Developed in response to nearly 215,000 comments, including those submitted by NAS and Intervenors, Alternative D provided access to high potential oil and gas resources on 389,000 previously unavailable acres, including the area north of Teshekpuk Lake unavailable under Alternative B.  However, Alternative D imposed significant protective measures on exploration and development in both TLSA and elsewhere in the Planning Area in order to achieve a level of environmental protection greater than Alternative C and similar to Alternative B.  FEIS at ES-6.

Alternative D, as modified by the Secretary, defers leasing of Teshekpuk Lake for 10 years and imposes no-surface-occupancy ("NSO") restrictions on approximately 529,700 acres of goose molting and caribou habitat in TLSA.  Alternative D also divides the area north of Teshekpuk Lake into seven large lease tracts and limits surface disturbance in each tract to 300 acres.  In addition, all leases, regardless of their location, are subject to varying restrictions depending on the physical, biological, and cultural features present on that particular lease block. FEIS, Map 2-4, 2-12, 2-13; ROD at 18-19.  For example, a web of NSO stipulations are imposed on nearly every lease to protect coastal areas, key rivers, and deep-water lakes.  Id.  Meanwhile, additional restrictions are imposed on a lease-by-lease basis to protect water quality, vegetation, wetlands, fish and wildlife habitat, cultural resources, subsistence uses, and scenic recreation values.  ROD at 18-19 & App. B.  Finally, Alternative D imposes special restrictions on lease blocks or portions of lease blocks inhabited by ESA-listed species.  ROD at 22-25.  The Final Preferred Alternative, thus, allows prospective lessees to determine whether exploration and development of a given lease is technically feasible and economically profitable in light of the restrictions that apply to that particular tract.

---

Area management plan.  N. Alaska Envtl. Ctr. ("NAEC") v. Norton, 361 F. Supp. 2d 1069 (D. Alaska 2005), aff'd sub nom NAEC v. Kempthorne, 2006 WL 2061246 (9th Cir. 2006).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

On January 12, 2005, FWS issued the Northeast BiOp, which concluded that the proposed and potential activities identified in the FEIS were "unlikely" to violate section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).[8]  In January 2006, the Secretary released the ROD selecting the Final Preferred Alternative, with minor modifications.  ROD at 3.  As explained below, the final decision, and the administrative record upon which it is based, demonstrate that BLM fulfilled the Production Act's express statutory directive to implement an expeditious, yet environmentally responsible, leasing program in the Northeast Planning Area and that the decisionmaking process more than satisfies the requirements of NEPA and the ESA.

### III.    ARGUMENT

#### A.    Standard of Review

The agency decisions at issue in this case are reviewed under the standard set forth in the Administrative Procedure Act ("APA").  Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 865 (9th Cir. 2004); Bennett v. Spear, 520 U.S. 154, 177-78 (1997).  Under the APA, an agency's decision may only be set aside if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

APA review is highly deferential.  Western Radio Servs. Co. v. Espy, 79 F.3d 896, 900 (9th Cir. 1996) (courts must accord considerable deference to agency decisions and presume validity of agency actions); Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 573 (9th Cir. 1998) ("'This inquiry must be searching and careful, but the ultimate standard of review is a narrow one.'") (citation omitted); Washington v. Daley, 173 F.3d 1158, 1169 (9th Cir. 1999) (courts may not substitute their judgment for that of agency).  Even greater deference is warranted when the challenged action relies on a high level of technical expertise.  Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983); Dioxin/Organochlorine Ctr. v. Clarke, 57 F.3d 1517 (9th Cir. 1995); Morongo, 161 F.3d at 576. The Court must also defer to the agency's reasonable interpretations of its statutory mandates. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984).

---

[8] FWS concluded that take of spectacled and Steller's eiders over the 30 year life of the proposed action would be very small.  Northeast BiOp at 41 (anticipating annual take of spectacled eiders to be .00001 of adult breeding population and less than .0003 of reproductive effort; anticipating annual take of Steller's eiders to be .0001 of adult breeding population and .0002 of average reproductive effort).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

NAS, therefore, bears the significant burden of directing the Court to evidence in the record demonstrating that BLM's actions were arbitrary and capricious.  Idaho Sporting Cong., Inc. v. Jemmet, 1997 WL 855506, at *13 (D. Idaho 1997), aff'd, 139 F.3d 905 (9th Cir. 1998); Clyde K. v. Puyallup Sch. Dist. No. 3, 35 F.3d 1396, 1398 (9th Cir. 1994).

**B.    BLM's Decision Complies with the Production Act**

No party to this case disputes that Teshekpuk Lake Special Area is a sensitive region with important surface, wildlife, and subsistence resources or that those important resources deserve the protection afforded by the Production Act.  However, the parties disagree about when and how the maximum protection requirement set forth in 42 U.S.C. § 6504(a) should be applied.

As long-standing opponents of Alaskan oil and gas development, NAS attempts to argue that the maximum production requirement applies to all oil and gas activity undertaken in designated special areas pursuant to any section of the Production Act.  In addition, NAS asserts that maximum protection must mean the "greatest" protection possible – *i.e.* closure of TLSA to leasing.  NAS is wrong on both counts.  As demonstrated below, the maximum protection requirement only applies to federal exploration activities authorized by section 6504, not oil and gas activities permitted pursuant to the leasing program in section 6506a.  In addition, it is clear from the statutory language and legislative history that neither the designation of special areas nor the maximum protection requirement is meant to prevent the discovery and recovery of economically viable petroleum reserves.

BLM, cognizant of its statutory obligation to conduct an expeditious oil and gas program while minimizing adverse impacts in TLSA, has reasonably determined that the required level of protection can be achieved through targeted restrictions that protect sensitive resources where they are located while allowing carefully regulated oil and gas activities in less sensitive portions of TLSA.  BLM's position, embodied in the Final Preferred Alternative and supported by Intervenors, who represent a broad array of Native, government, and industry interests, is consistent with the Production Act.  Chevron, 467 U.S. at 843-44.

NAS, unable to claim otherwise, therefore casts its policy objection to BLM's approach as an APA argument, maintaining that BLM has not adequately explained why the Final Preferred Alternative fulfills the maximum protection requirement.  However, NAS's contention that BLM failed to "wrestle" with the meaning of maximum protection during a three year

administrative process which largely focused on various ways to protect TLSA rings hollow. Instead, the administrative record both documents BLM's attention to the issue and fully supports BLM's determination that the Final Preferred Alternative fulfills the maximum protection requirement as articulated in the Production Act.

> 1.    **Maximum Protection Only Applies to Exploration Under § 6504 and Must Be Consistent with the Purposes of the Production Act**

As a threshold matter, NAS overstates the Production Act's maximum protection requirement in three ways. First, NAS maintains that maximum protection applies to designated special areas at each stage of oil and gas activity while a lesser standard, mitigation of "reasonably foreseeable and significantly adverse effects," applies to the remainder of the Petroleum Reserve. Docket No. 49 ("Pls.' Br.") at 17. However, the statutory language and legislative history clearly indicate that the maximum protection requirement applies only to designated special areas during exploration under 42 U.S.C. § 6504.

Initially enacted in 1976, section 6504(a) of the Production Act explicitly states that "[a]ny *exploration* within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary . . . containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the *exploration* of the reserve." 42 U.S.C. § 6504(a) (emphasis added); U.S. v. Romero-Bustamante, 337 F.3d 1104, 1109 (9th Cir. 2003) (plain meaning of statute governs absent absurd result). That Congress intended section 6504(a) of the Production Act to apply solely to exploration activities is further underscored by the title of the provision – "Conduct of *exploration* within designated areas to protect surface values," 42 U.S.C. § 6504(a) (emphasis added) – and by the legislative history:

> SEC. 104 makes it absolutely clear that *only exploration* is authorized at the National Petroleum Reserve in Alaska. * * * It is the intention of this provision to immediately authorize the Secretary to require that the *exploration* activities within these designated areas be conducted in a manner designed to minimize adverse impacts on the values which these areas contain. * * * To this end, the Secretary is expected to . . . schedule *exploration* activities in a manner which, and at such seasons as, will cause the least adverse influence on fish and wildlife. In scheduling *exploration* activities in such an area the Secretary should take steps to minimize any adverse effects on native subsistence requirements and associated fish and wildlife values. Specifically, he

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

> should conduct *exploration* activities in these areas during times of the
> year when the caribou calving season and the nesting and molting
> seasons of the birds can be avoided.

H. Conf. Rep. No. 94-942, at 21 (emphasis added) (there will be "no production" or development

in Petroleum Reserve without further legislation).

In addition, the Production Act and the legislative history establish that the maximum

protection requirement applies only to the *federal* exploration program. In transferring

jurisdiction over the Petroleum Reserve from the Navy, the Production Act explicitly directed the

Secretary to continue the ongoing, albeit languishing, exploration program conducted by the

Navy. H. Rep. No. 94-81 – Part I, at 8 (1975); H. Conf. Rep. No. 94-942, at 22; 42 U.S.C.

§ 6504(b)-(c). In 1980, Congress amended the Production Act to allow for a leasing program

leading to development and production with the intention that exploration of the Petroleum

Reserve would shift from the federal government to private entities. S. Rep. No. 96-985, at 33-

34 (1980) (amendment "close[s] out funding for Federal exploratory drilling and seismic data

gathering in anticipation of a rapid shift to private leasing").

Significantly, in doing so, Congress did not reimpose the maximum protection

requirement but instead stated that "[a]ctivities undertaken pursuant" to the amendment "shall

include or provide for such conditions, restrictions, and prohibitions as the Secretary deems

necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on

surface resources" in the Petroleum Reserve. 42 U.S.C. § 6506a(b). Moreover, section 6506a(b)

does not distinguish between activities undertaken in special areas and other areas of the

Petroleum Reserve; it applies to *all* activities taken pursuant to section 6506a. Id. Thus, while

the maximum protection requirement applies to designated special areas during the federal

exploration program contemplated by section 6504(a), activities undertaken pursuant to the

private leasing program established by section 6506a are subject to the mitigation standard set

forth in subsection (b). See FEIS at 6-202 (acknowledging distinction). Accordingly, this Court

should reject NAS's repeated attempts to expand the reach of the maximum protection

requirement beyond the now defunct federal exploration program governed by section 6504(a).

Second, contrary to NAS, "maximum protection" does not and cannot mean "as much

protection as possible" in an absolute sense. See Pls.' Br. at 16. Both the legislative history of

the Production Act and the regulatory history accompanying the establishment of TLSA indicate

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

that the maximum protection requirement was not intended to bar activity in designated special areas. In enacting section 6504, Congress specifically stated that "'maximum protection of such surface values' is *not a prohibition* of exploration-related activities within such areas" but instead is intended to ensure "that such exploration operations will be conducted in a manner which will *minimize the adverse impact* on the environment." H. Conf. Rep. No. 94-942, at 21 (emphasis added). The final rule creating TLSA similarly explains that "[m]aximum protection of designated special areas does not imply a prohibition of exploration or other activities." 42 Fed. Reg. 28,723 (June 3, 1977) (instructing BLM to take steps to "minimize adverse impacts" on resource values in TLSA). Thus, the legislative and regulatory history undermine any argument that maximum protection can only be achieved by closing special areas to oil and gas activity.

Instead, maximum protection is properly understood as a relative concept. As NAS acknowledges, the Production Act explicitly states that maximum protection must be *consistent* with the purposes of the Act – one of which is the establishment of an expeditious oil and gas program. H. Conf. Rep. No. 94-942, 14-15; 42 U.S.C. § 6504(a). Thus, what equals maximum protection must evolve as technology improves, information about the location of petroleum resources grows, the nation's energy needs change, and new areas are opened to leasing. Moreover, as BLM has stated during both previous and the present planning efforts, maximum protection can be achieved in a variety of ways for any given land management decision. See, e.g., ROD at 3 (indicating *each* alternative analyzed in FEIS offers "a different approach" to conducting an expeditious oil and gas program while providing maximum protection to special areas); Ex. C at 2, 3 (1998 Northeast Integrated Activity Plan/Environmental Impact Statement ("IAP/EIS") at vi, II-1) (indicating *all* six alternatives considered in 1998 Northeast IAP/EIS "are consistent with the purposes" of the Production Act, including maximum protection requirement); Ex. D at 2 (2003 Northwest IAP/EIS at ES-2) ("alternatives present a range of actions that BLM could take to manage surface and subsurface resources in the [Northwest] Planning Area consistent with statutory direction for management of the NPR-A").

Third, and finally, the statute and legislative history each make clear that discretion to determine the appropriate balance between energy development and protection of surface resource is vested in the Secretary of the Interior. H. Conf. Rep. No. 94-942, at 8 ("the Secretary

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

12

of the Interior is best qualified to make judgments regarding" the protection of surface values); H. Rep. No. 94-81 – Part I, at 9 (Department of Interior determines "oil and gas potential on this reserve, together with its other values"); 42 U.S.C. § 6503(b) ("Secretary of the Interior may promulgate such rules and regulations as he deems necessary and appropriate for the protection of such values within the reserve"). Accordingly, the Secretary's selection of the Final Preferred Alternative is entitled to a high level of deference. Chevron, 467 U.S. at 843-44.

>       **2.      The Final Preferred Alternative Complies with the Production Act**

Although, as explained above, BLM is not required to comply with section 6504 when authorizing activities under section 6506a, in the present case BLM determined, and the Secretary agreed, that the Final Preferred Alternative provides TLSA with maximum protection consistent with the Production Act. While NAS implies that TLSA has been thrown open to unrestricted oil and gas development, in reality the Final Preferred Alternative imposes numerous restrictions on activities conducted in this high potential area of the Petroleum Reserve. In addition to lease stipulations and ROPs designed to protect surface resources throughout the Northeast Planning Area, the Final Preferred Alternative includes nine resource-specific mandatory lease stipulations (known as K Stipulations) expressly "developed to ensure" that authorized activities comply with the maximum protection requirement in section 6504(a) as well as the mitigation requirement in section 6506a(b). ROD at 67-68; FEIS at 1-6. The objectives, requirements, and efficacy of each K Stipulation, which are described in detail in both the ROD and the FEIS, are briefly summarized below. ROD at 67-75; FEIS § 2.6.4.2, Tables 2-2, 2-3.

For starters, the Final Preferred Alternative defers leasing Teshekpuk Lake itself. ROD at 17 (noting that such a deferral will preclude exploratory drilling and development activities, including pipeline construction). In addition, the Final Preferred Alternative prohibits, without exception, all permanent oil and gas facilities – including gravel pads, pipelines, roads, and airstrips – on the Teshekpuk Lake shoreline. Id. at 70. The Final Preferred Alternative then imposes a variety of restrictions on the areas surrounding the lake.

Most significantly, the Final Preferred Alternative divides the area north of Teshekpuk Lake, where important goose nesting and molting areas and caribou calving and insect-relief habitat are located, into seven large lease blocks, ranging in size from 59,134 acres to 46,085

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

>                          13

acres, and then limits surface disturbance to 300 acres per tract, which is 0.7 percent or less of the total acreage available in any of the seven lease blocks. Id. at 74-75. Within each of these lease tracts, the location of oil and gas activities is further proscribed by NSO lease stipulations limiting exploration activities to the winter season and prohibiting permanent oil and gas facilities on over 242,000 acres of goose molting area lakes. Id. at 17 (explaining NSO restrictions in goose molting areas will simultaneously protect other waterfowl and caribou calving and insect-relief habitat); id., App. C, Map 1A (illustrating extent of NSO stipulation).

      While pipelines are allowed in the NSO areas, they will be subject to conditions developed by a workshop comprised of state, federal, and North Slope Borough representatives and charged with determining the best corridor for pipeline construction to minimize adverse impacts to wildlife and subsistence uses. Id. at 17, 70. In addition, under the Final Preferred Alternative, permanent facilities will not be authorized in the goose molting area until at least three years of data is collected and analyzed to identify additional mitigation measures. Id. at 17, 71. Finally, coastal areas north of Teshekpuk Lake are protected by a separate lease stipulation designed to, among other things, facilitate caribou movement to and from insect-relief areas, prevent contamination of marine waters, and protect subsistence activities by restricting the location of permanent facilities, including pipelines, to ¾ mile inland. Id. at 73.

      Similar restrictions apply to other regions of TLSA. Approximately 233,000 acres southeast and southwest of Teshekpuk Lake, which have been identified as important calving, post-calving, and insect-relief areas for the Teshekpuk Lake Caribou Herd, and approximately 45,000 acres east of the lake and 9,700 acres northwest of the lake, which serve as important caribou movement corridors, are protected by NSO lease stipulations that limit exploration activities to the winter, prohibit permanent facilities, and allow pipeline placement to be conditioned by the intergovernmental workshop described above. Id. at 18, 73-74; id. App. C, Map 1. In addition, the construction of permanent facilities in any area of TLSA identified as part of the Teshekpuk Lake Caribou Herd's "habitat area," which is not already directly protected by an NSO stipulation, is subject to a laundry list of additional requirements, including data collection, pipeline layout, and seasonal restrictions on heavy equipment use and ground and air traffic. See ROD at 71-72 (describing K-5 Stipulation).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

14

Indeed, despite NAS's contention that BLM failed to provide more protection for special areas than for the rest of the Northeast Planning Area, only a small fraction of TLSA is available for leasing subject to the general stipulations and ROPs that apply elsewhere in the Petroleum Reserve. Compare ROD, App. C, Maps 1, 1A with Pls.' Br. at 17. Moreover, the extensive mitigation measures imposed under the Final Preferred Alternative are exactly the type of restrictions envisioned by Congress and contemplated by the regulations. H. Conf. Rep. No. 94-942, at 21 (anticipating that maximum protection would be achieved by "schedule[ing] exploration activities in a manner which, and at such seasons as, will cause the least adverse influence" on wildlife and subsistence resources); 43 C.F.R. § 2361.1 (maximum protection may include scheduling restrictions and limitations on vehicle traffic and aircraft use).

> **3.    The Record Supports BLM's Conclusion Regarding Maximum Protection**

NAS does not and, due to the extensive resource-specific measures imposed on leases in TLSA, cannot argue that the Final Preferred Alternative violates the protective requirements set forth in the Production Act. Instead, NAS attempts to convince this Court that BLM's decision is arbitrary and capricious under the APA because BLM failed to explain its "dramatic" "departure" from the "longstanding" management practice of protecting sensitive areas in TLSA by prohibiting leasing. Pls.' Br. at 14-18. In addition, NAS maintains that BLM's "reversal" should be reviewed under the heightened explanatory standard allegedly set forth in Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29 (1983). Premised on several erroneous assumptions, NAS's argument is entirely without merit.

First, while NAS goes to great lengths to describe the Final Preferred Alternative as a policy change, BLM has never maintained, let alone promulgated a rule stating, that the only way to provide TLSA with maximum protection is to close the area to leasing. In fact, in 1998, and again during this planning process, BLM considered management options that opened TLSA to leasing with even *less* protection than provided by the current Final Preferred Alternative. See FEIS § 2.3.3 & Map 2-3 (describing Alternative C, which opens entire TLSA to leasing subject to general stipulations and ROPs); Ex. C at 4-15 (1998 Northeast IAP/EIS at II-2, II-28, II-39 to II-48) (describing Alternative E in 1998 Northeast IAP/EIS, which opens entire TLSA to leasing). During both planning processes, BLM concluded that implementation of these alternatives would be consistent with the Production Act. See ROD at 3; Ex. C at 2-3 (1998

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Northeast IAP/EIS at vi, II-1):[9] see also § III.B.1, supra.  Consequently, NAS is incorrect when it implies that BLM changed its policy when it adopted the Final Preferred Alternative.  Instead, BLM's decision to amend the 1998 Northeast IAP/EIS is properly characterized as a modification of a management plan to further an existing policy – i.e. promoting an expeditious oil and gas program.  See Northwest Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468 (9th Cir. 1994) (finding Forest Service's decision to ban off-road vehicles in areas where "historically allowed" did not constitute policy change).[10]

Second, even if adoption of the Final Preferred Alternative does constitute a policy change, State Farm does not require BLM to provide a greater justification of its actions than is ordinarily required by the APA.  Contrary to NAS, the Supreme Court in State Farm simply applied the traditional arbitrary and capricious test to an agency decision to rescind a regulation, without any indication that it was requiring more than is usually expected under that standard. State Farm, 463 U.S. at 42-43.[11]  As the Ninth Circuit has explained, "the question is not whether an agency regulation represents a change in policy, but whether it satisfies the standard that applies to all agency rulemaking."  Nat'l Med. Enters., Inc. v. Sullivan, 957 F.2d 664, 669 (9th Cir. 1992); Rendleman v. Shalala, 21 F.3d 957, 963 (9th Cir. 1994) (same).

Third, contrary to NAS, the administrative record reveals that BLM was "focused" on its duty to provide maximum protection and "wrestled" with the best way to protect TLSA throughout the planning process.  In addition, the record documents both why BLM decided to open new areas of TLSA to leasing and how the Final Preferred Alternative fulfills the maximum protection requirement.  State Farm, 463 U.S. at 42-43.  BLM's decision therefore cannot be found arbitrary and capricious, even under NAS's heightened interpretation of the APA standard.

---

[9] Significantly, NAS has never challenged BLM's conclusion that these less restrictive alternatives violate the Production Act's maximum protection requirement.

[10] NAS also attempts to argue that the switch from prescriptive to performance-based mitigation measures constitutes a policy change.  However, as BLM repeatedly states, performance-based measures are expected to provide the same, if not a greater, level of protection.  See, e.g., FEIS at 2-15 to 2-16.

[11] In fact, the language relied on by NAS to create the impression that there is a presumption in favor of an existing rule or policy is taken from an inapposite portion of State Farm in which the Supreme Court rejected an argument that rescission of a safety regulation should be reviewed under the narrower standard, "close to the borderline of nonreviewability," that applies when an agency refuses to promulgate a rule in the first place.  Id. at 41-43.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

Early on, BLM identified maximum protection for TLSA as a key issue.  See, e.g., Pls.'
Ex. 11 (AR 28) (notice of intent soliciting comments on measures to protect TLSA); Ex. E at 9
(AR 1355) (public scoping summary report listing maximum protection as an area of concern);
Ex. B at 5 (DEIS at 1-18); FEIS at 1-17; Ex. F (AR 6893) (email exchange identifying maximum
protection as a central issue).  BLM then spent the next several years developing, analyzing, and
responding to public and agency comments on a range of alternative management plans, each of
which presented a different approach to providing the important surface resources in TLSA with
maximum protection.  See, e.g., Ex. B at 3 (DEIS at ES-2); Ex. G at 10 (AR 3120) (draft notice
soliciting comment on different approaches to providing maximum protection); Ex. H (AR 4444)
(BLM/FWS email requesting interagency cooperation on developing management plan for
TLSA); Pls.' Ex. 35 (AR 5030) (BLM/FWS exchange on maximum protection); § III.C.1, infra
(discussing development of final alternative); FEIS at ES-2, ch. 2, 6-287 to 6-297 (response to
comments on TLSA); ROD at 3, 13, 17-22, 29-30.  In short, while NAS claims that it was unable
to locate "anything in the administrative record" revealing BLM's attention to the maximum
protection requirement, in actuality nearly the entire record demonstrates that BLM grappled
with the need to balance its statutory obligation to protect the myriad surface resources in TLSA
with its mandate to conduct an expeditious oil and gas program.[12]

The record also explains why BLM decided to open formerly closed areas of TLSA to
leasing.  As BLM stated in response to comments on the DEIS, the agency often reviews
management plans in response to new information or mandates.  FEIS at 6-63.  In the present
case, the record establishes that BLM's decision was based, in part, on the results of oil
exploration conducted near the Northeast Planning Area since the last lease sale, which suggest
that oil reserves in the Planning Area, and particularly north of Teshekpuk Lake, are greater than
originally believed.  Id. at 1-5, 6-30, 6-63, 6-260 to 6-261; ROD at 20; Ex. I (AR 768) ("BLM
geologists and petroleum experts believe that areas currently off-limits for exploration . . . may
contain more than two billion barrels of technically-recoverable petroleum"); Ex. J (AR 9403)

---

[12] A rough computer search of the text of the entire administrative record reveals 498
documents referring to "maximum protection," 813 documents addressing TLSA, 2,495
documents mentioning caribou, 982 documents concerned with molting geese generally, 1,129
discussing brant specifically, and over 2,500 related to subsistence issues.  Thus, taken as a
whole, it is difficult to see how NAS can argue that BLM ignored TLSA or the maximum
protection requirement.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

(same); Pls.' Ex. 27 at 8-11 (AR 4352) (industry comments regarding commercial potential north of Teshekpuk Lake).  In addition, both the FEIS and ROD indicate that BLM's decision to open new areas of TLSA to leasing is a direct response to the President's 2002 energy policy, which explicitly instructs the agency to consider leasing previously unavailable areas northeast of Teshekpuk Lake.  ROD at 3; FEIS at ES-1.  Finally, BLM states that leasing additional high potential lands in the Petroleum Reserve furthers the Production Act's goal of conducting an expeditious oil and gas program to meet the nation's growing energy needs in a time of declining domestic production and increasing international instability.  FEIS at 1-3 to 1-5, 6-261.  Given that the maximum protection requirement is not meant to prohibit oil and gas activity in special areas, each of BLM's stated justifications constitutes a rational and principled reason for choosing the Final Preferred Alternative over both Alternative B and the No Action Alternative.  H. Conf. Rep. No. 94-942, at 21; State Farm, 463 U.S. at 42-43.

Similarly, BLM explains how the Final Preferred Alternative will comply with the maximum protection requirement.  Blinded by its policy preference for area closures, NAS believes that BLM has violated the APA because it "has done nothing more than assert that the amended leasing plan is consistent with the maximum protection requirement because it contains stipulations and required operating procedures."  Pls.' Br. at 16.  NAS's position not only ignores the record, it fails to establish that the Final Preferred Alternative is arbitrary and capricious.

NAS is correct when it states that BLM determined that the Final Preferred Alternative satisfies the maximum protection requirement *because* of the extensive mitigation measures imposed on TLSA.  ROD at 10 (mitigation measures "are designed to minimize impacts and maximum protection of important surface resources" in TLSA "while providing development opportunities"), 22 (maximum protection is provided "through a combination of prohibitions, restrictions, and stipulations"), 29 ("lease stipulations were developed to ensure that the BLM authorized activities" are conducted "in a manner that assures maximum protection" of surface resources); FEIS at 2-49 ("Stipulations K-3 through K-8 will ensure" compliance with statutory mandates "by requiring special protection in the TLSA").  As emphasized above, this approach is consistent with the Production Act and its implementing regulations.  See § III.B.2, supra.

NAS is incorrect, however, when it states that BLM's analysis is "conclusory."  Both the FEIS and the ROD explain how a given protective measure will provide sensitive resources in

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

TLSA with maximum protection consistent with the Production Act. The K Stipulations applicable to goose molting areas, caribou habitat, and subsistence uses stand as a case in point. As BLM explains, Stipulation K-4 will "minimize disturbance to molting geese and the loss of goose molting habitat" *by*, among other things, prohibiting permanent oil and gas facilities, imposing seasonal restrictions on exploration and development, limiting air and ground traffic, and establishing monitoring requirements. Similarly, Stipulations K-5, K-6, K-9, and K-10 will minimize disturbances to caribou *by*, among other things, barring permanent facilities in movement corridors, calving areas, and insect-relief habitat, restricting siting and layout of permanent facilities in other Teshekpuk Lake Caribou Herd areas, conditioning pipeline location, and imposing seasonal restrictions on construction and air and ground traffic. Meanwhile, Stipulations K-3 and K-6 will protect subsistence cabins, campsites, and associated activities *by* prohibiting all permanent oil and gas facilities within ¾ mile of the Teshekpuk Lake shoreline and, to the extent practicable, in coastal areas. Finally, Stipulation K-11 will protect all of the above *by* limiting surface activity northeast of the lake to 2,100 acres. ROD at 67-75; FEIS at 2-49 to 2-56; <u>see also</u> <u>id.</u>, Tables 2-2, 2-3 (discussing effectiveness of K Stipulations).

NAS does not point to any evidence in the record challenging BLM's statements or indicating that the K Stipulations will not have their intended effect. Accordingly, NAS has not established that BLM "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence," or that BLM's decision is arbitrary and capricious in any other way. <u>State Farm</u>, 463 U.S. at 43. Instead, as demonstrated above and discussed further in section III.C.1 below, the Final Preferred Alternative is the result of a multi-year public process during which the agency considered and responded to comments from the public and government agencies on various ways to provide TLSA with maximum protection consistent with the Production Act. While NAS and some federal agencies may have preferred a different result, as FWS acknowledged, "the decision about a final preferred alternative is [BLM's] to make," Ex. K (AR 4430), and is therefore entitled to deference under both the Production Act

and the APA.[13]  42 U.S.C. § 6503(b); H. Conf. Rep. No. 94-942, at 8; Chevron, 467 U.S. at 843-44.

## C.     The FEIS Complies with NEPA

It is well established that NEPA "does not mandate particular results, but simply prescribes the necessary process" that an agency must follow in issuing an EIS.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); id. at 351 ("Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action.").  The NEPA process is designed to ensure that agencies take a "hard look" at the environmental consequences of their decisions.  Id. at 352. As the Ninth Circuit has held, the hard look standard "'is not susceptible to refined calibration,'" but instead requires the reviewing court to make "'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'"  Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)).

### 1.     BLM Was Not Required to Issue a Supplemental EIS on the Final Preferred Alternative

NAS contends that the Final Preferred Alternative constitutes a "dramatic departure" from the alternatives examined in the DEIS and that BLM was therefore required to issue a supplemental EIS in order to provide the public with an opportunity to comment on this "novel approach."  Pls.' Br. at 19-24.  NAS's argument is not supported by the case law and is not borne out by the administrative record.  Contrary to NAS, the record not only reveals that NAS submitted extensive comments on the Final Preferred Alternative but also that the Final Preferred Alternative was developed in direct response to public comments on the draft alternatives.  In addition, the record establishes that the Final Preferred Alternative further implements BLM's conclusion that sensitive resources in the Petroleum Reserve, and particularly TLSA, can be effectively protected by targeted resource-specific mitigation measures rather than area closures. Thus, far from a new approach, the Final Preferred Alternative is within the range of alternatives considered in the DEIS and reflects BLM's effort to respond to the often conflicting points of

---

[13] Indeed, FWS, in an email relied upon by NAS, stated that "given the conflicting issues" that BLM must "deal with," the Final Preferred Alternative was "as good as anything else that could 'reasonably' be suggested."  Pls.' Ex. 35 (AR 5030).

view.  Block, 690 F.2d at 771 (emphasizing "paramount Congressional desire to internalize opposing viewpoints into the [NEPA] decision-making process").

NEPA provides agencies with "'flexibility to modify alternatives canvassed in the DEIS to reflect public input.'"  Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 508 (9th Cir. 1988) (quoting Block, 690 F.2d at 771) (cited favorably by NAS).  The reason for this is self-evident.  As courts have explained, "[i]f an agency had to refile an EIS every time it felt compelled by public comment to reconsider" its alternatives "the agency 'as a practical matter [might] become hostile to modifying the alternatives to be responsive to earlier public comment.'"  Kettle Range Conservation Group v. U.S. Forest Serv., 148 F. Supp. 2d 1107, 1121 (E.D. Wash. 2001) (brackets in original) (quoting Block, 690 F.2d at 771); Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1118 (9th Cir. 2002) ("a supplemental EIS is not required for every change"); see also 40 C.F.R. § 1503.4 (listing modification of alternatives as an appropriate response to comments).

Thus, under NEPA's implementing regulations, a supplemental EIS on a final alternative is only required if the changes to the proposed action are both "substantial" and "relevant to environmental concerns."  40 C.F.R. § 1502.9(c)(1); Enos v. Marsh, 769 F.2d 1363, 1373 (9th Cir. 1985) (plaintiffs bear burden of demonstrating that environmental impacts of final action "differ from those assessed").  In addition, both case law and agency guidance make clear that supplementation is not required if the final alternative falls within the range of those considered in the DEIS and that comments on the draft meaningfully inform the agency of the public's attitude.  See 40 Most Asked Questions Concerning CEQ's [NEPA] Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981) (supplementation not required where final alternative is "qualitatively within the spectrum of alternatives" discussed in draft); Half Moon Bay, 857 F.2d at 508-09.

        **a.**      **The Final Preferred Alternative Is a Result of the Public Comment Process**

In the present case, the record demonstrates that the Final Preferred Alternative was a reasonable response to comments on the DEIS and falls squarely in the range of alternatives addressed therein.  Kettle Range, 148 F. Supp. 2d at 1121; Half Moon Bay, 857 F.2d at 508-09. As emphasized above, the need to balance access to high potential areas with "maximum

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

protection" for important surface resources in TLSA was a central issue throughout the planning process. See § III.B.3, supra. Consequently, many of the public and agency comments submitted on the DEIS contained specific recommendations for modifying the alternatives presented to address concerns regarding TLSA, and especially the key area north of Teshekpuk Lake. See Ex. L (AR 5067) (summarizing comments on alternatives). Chief among those comments were conflicting proposals submitted by FWS and ConocoPhillips. See Pls.' Exs. 31 (AR 4362) (FWS's comments expressing qualified support for Alternative B but proposing several modifications to protect Teshekpuk Lake, goose molting areas north of the lake, and caribou habitat), 27 at 8-13 (AR 4352) (ConocoPhillips' comments stating viable leasing program depends on access to commercially recoverable high potential areas north of Teshekpuk Lake and recommending adoption of Alternative C with additional NSO restrictions for goose molting areas); see also FEIS at 2-13 to 2-14; ROD at 40-41.

The record indicates that BLM took both the FWS proposal and the proposal submitted by ConocoPhillips, as well as numerous other comments, into consideration when reviewing the draft alternatives and that the Final Preferred Alternative was developed based on these comments. FEIS at 2-14; ROD at 41. In addition, contrary to NAS, the record makes clear that cooperating agencies with expertise in wildlife issues, such as FWS, were integrally involved in the development of the Final Preferred Alternative. After the close of public comment, BLM and FWS met several times to discuss ways to structure an alternative that would allow more access to high potential areas north of Teshekpuk Lake while protecting surface resources. Ex. K (AR 4430) (FWS meeting notes for August 26, 2004 indicating BLM asked FWS to consider additional ways to protect area north of Teshekpuk Lake while increasing access); Ex. M at 1 (AR 4500) (FWS meeting notes for August 31, 2004 indicating BLM and FWS discussed formulation of additional alternatives to address conflict between access and protection); Ex. N at 4 (AR 4877) (FWS briefing indicating BLM requested a meeting to discuss possible alternatives); Ex. O (AR 4505) (FWS memo listing four additional mitigation measures based on 1998 FEIS and ROD that if included in Final Preferred Alternative would "result in significant progress toward meeting [FWS's] stated goals" regarding impacts in TLSA); Pls.' Ex. 35 (AR 5030) (FWS email stating that Final Preferred Alternative is reasonable given "conflicting issues").

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

As the FEIS explains, the resulting Final Preferred Alternative incorporates aspects of both FWS and ConocoPhillips proposals, as well as comments submitted by state agencies and North Slope communities.  FEIS at 2-14.  While the Final Preferred Alternative opens high potential areas north of Teshekpuk, as requested by ConocoPhillips, the Final Alternative simultaneously either adopts or expands upon many of the mitigation measures recommended by FWS.  Compare Ex. O (AR 4505) (recommending expanded NSO areas and seasonal restrictions on aircraft for goose molting area lakes and NSO restrictions for caribou movement corridors and calving areas) with ROD at 67-75 (describing Stipulations K-4, K-5, K-9, K-10, and K-11); compare Pls.' Ex. 31 at 4, 19 (AR 4362) (recommending restricted activity on Teshekpuk Lake) with ROD at 17 (indicating deferral of Teshekpuk Lake precludes exploratory drilling and development activities, including pipelines).  Significantly, in response to both FWS and ConocoPhillips, the Final Preferred Alternative broadened the application of NSO restrictions north of Teshekpuk Lake to include not only goose molting area lakes but also adjacent lands between the lakes.  FEIS at 2-14; ROD at 17, Map 1A.  Although NAS appears surprised that the Final Preferred Alternative is not identical to the draft preferred alternative, the changes embodied in the Final Preferred Alternative represent exactly the kind of modifications that NEPA expects and encourages based on public comment.  Half Moon Bay, 857 F.2d 509 (plaintiffs should realize draft preferred alternatives are "tentative" conclusions subject to change in final document); Kootenai, 313 F.3d at 1118 ("it is not uncommon for changes to be made in a FEIS after receipt of comments on a DEIS and further concurrent study").

### b.     The Final Preferred Alternative Falls within the Range of Alternatives Addressed in the DEIS

Not only is the Final Preferred Alternative a reasonable response to public comment, it is also well within the range of alternatives considered in the DEIS.  Half Moon Bay, 857 F.2d 508-09.  The Final Preferred Alternative does not represent a "novel approach" to managing the Northeast Planning Area but is instead an application of the resource-based approach to protecting areas north of Teshekpuk Lake adopted in Alternative C, used elsewhere in the Northeast Planning Area under both Alternatives B and C, and in the Northwest IAP/EIS.  FEIS at ES-1 to ES-8; Ex. B at 4 (DEIS at 1-5) (informing public that BLM is considering adopting the approach to resource management used in Northwest Planning Area).  Significantly, BLM

concluded that the resource-based approach adopted by the Final Preferred Alternative would "provide a similar level of protection as Alternative B." FEIS at ES-6.

NAS does not challenge this determination. See Pls.' Br. at 16 (acknowledging same); Enos, 769 F.2d at 1373. Instead, NAS tries to make the Final Preferred Alternative sound like an "entirely new approach" by singling out three restrictions imposed under the Final Preferred Alternative and arguing that each one constitutes a "dramatic departure" from the management alternatives evaluated in the DEIS. However, the features NAS describes as "novel" were either on the table from the start of the planning process, addressed in the DEIS, or, as explained above, a response to public comment.

First, NAS asserts that the Final Preferred Alternative is "novel" because it allows leasing in "approximately 370,000 acres of the most sensitive habitat" north of Teshekpuk Lake. Pls.' Br. at 21, 22. However, the possibility that BLM would adopt an alternative that opened this area to leasing was contemplated from the beginning and, thus, could have been reasonably anticipated by NAS. Half Moon Bay, 857 F.2d 508-09. The federal register notice announcing BLM's intent to amend the 1998 Northeast IAP/EIS noted that certain areas in TLSA remain closed to leasing and specifically stated that BLM was commencing this planning process, in part, to evaluate whether "additional lands" were suitable for environmentally responsible oil and gas exploration and development. See Pls.' Ex. 11 (AR 28). Similarly, the DEIS indicates that the amendment process was a direct response to the President's energy policy, which instructed BLM to consider opening areas "not currently leased within the northeast corner" of the Planning Area. Ex. B at 2, 4 (DEIS at ES-1, 1-5). More significantly, the DEIS itself analyzed an alternative that opened the entire 370,000-acre area identified by NAS to leasing. Id. at 6-7 (DEIS at 2-8 to 2-9) (describing Alternative C).

Second, NAS maintains that the division of the area north of Teshekpuk Lake into seven large lease blocks with a 300-acre limitation on permanent surface disturbance constitutes an "entirely new strategy." Pls.' Br. at 19, 21. However, both the Production Act and regulations governing the Petroleum Reserve explicitly allow for lease tracts up to 60,000 acres in size. 42 U.S.C. § 6506a(h); 43 C.F.R. § 3130.4-1. Here, the tracts in question are within this standard, ranging in size from approximately 46,000 acres to 59,000 acres. ROD at 18. In addition, surface area restrictions of one kind or another are used in every draft alternative as a way to

National Audubon Society, et al. v. Kempthorne, et al.
1:05-CV-00008-JKS

24

minimize impacts on sensitive resources.  FEIS at 2-31 to 2-36, Tables 2-2, 2-3 (describing and evaluating effectiveness of surface disturbance restrictions in Alternatives A, B, and C).  Finally, it is clear from the record that the limitation on surface disturbance is a direct response to concerns, including those aired by conservation groups, EPA, and FWS, about opening the area north of Teshekpuk Lake.  See, e.g., FEIS 6-296, 6-298, 6-311; Ex. O (AR 4505).  Thus, far from a "dramatic" shift in approach, the 300-acre limitation on surface disturbance is simply an additional mitigation measure imposed pursuant to the resource-based approach to management present in both Alternative B and Alternative C and used in the Northwest Planning Area.  Cf. Kettle Range, 148 F. Supp. 2d at 1120-21 (supplemental EIS not necessary when alternative in final EIS contained same key features as those considered in draft); FEIS at ES-6 (impacts under Alternatives B and D are similar); 40 C.F.R. § 1502.9(c)(1) (change must be "substantial" for supplementation to be warranted).

Third, NAS maintains that BLM's decision to defer leasing Teshekpuk Lake as a "substitute for protecting goose molting areas" and that this decision also constitutes a "new approach to leasing" that "BLM has never before implemented, or even considered."  Pls.' Br. at 21.  NAS's position is premised on several flawed assumptions.  For starters, NAS maintains the record contains no "suggestion" that Teshekpuk Lake would be closed to leasing.  Id. at 22.  However, Teshekpuk Lake is not actually closed to leasing, it is deferred – a fact NAS points out elsewhere in its brief.  Id. at 11, 21.  In this respect, the Final Preferred Alternative is similar to Alternative B and Alternative C, both of which analyze Teshekpuk Lake as suitable for leasing.  FEIS at ES-3 to ES-4; ROD at 19-20.  Moreover, even if Teshekpuk Lake was "closed" to leasing, Alternative A contemplates this possibility.  Id.  In addition, contrary to NAS, deferral of sensitive areas is hardly a "new" approach, but, as NAS is well aware, one that has been implemented in other planning processes, including that for the Northwest Planning Area.  Ex. D at 2 (NW EIS at ES-2).  Finally, and most significantly, the record does not support the notion that deferral of Teshekpuk Lake was meant to be a "substitute" or a "concession" in exchange for opening "core goose molting areas."  Pls.' Br. at 22.  Instead, the record reveals that Teshekpuk Lake was deferred on its own merits as important fish and waterfowl habitat and a significant resource for subsistence harvest.  FEIS at 6-373 to 6-374.  Indeed, the evidence offered to support NAS's horse-trade theory consists entirely of stray remarks in a few emails made by a

staff employee at the Minerals Management Service ("MMS"), not BLM. Pls.' Br. at 22 (citing Pls.' Ex. 22 (AR 4136)). Such an interpretation is not reflected in *any* of the decision documents. Ad Hoc Metals Coal. v. Whitman, 227 F. Supp. 2d 134, 143 (D.D.C. 2002) (judicial review of agency action should be based on an agency's stated justifications not pre-decisional emails).[14]

### c.    NAS Commented on the Final Preferred Alternative

Finally, NAS's position that BLM must issue a supplemental EIS in order to provide the public with an opportunity to comment is undercut by the fact that NAS, along with several hundred others, did comment on the FEIS. ROD at 41 (indicating BLM received approximately 500 comments on FEIS); Ex. P (AR 8898) (NAS's 36-page comment letter on FEIS). For this reason, among others, NAS's reliance on Block and Dubois is unpersuasive. Block, 690 F.2d at 758 (supplementation warranted when final EIS circulated only to Congress and affected agencies); Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1293 (1st Cir. 1996) (noting public had no opportunity to comment).[15]

Here, the record reveals that BLM, NAS, cooperating agencies, and other members of the public treated the statutory waiting period following the notice of availability as a comment period. See Ex. P at 1 (AR 8898) (NAS letter thanking BLM for "the opportunity to provide comments" on the FEIS); Ex. Q (AR 8830) (letter from NAS's counsel requesting extension of

---

[14] NAS's other record citations are equally unavailing. NAS relies on a cryptic reference in notes written by an outside contractor (not an agency employee) indicating that BLM was considering two additional alternatives, "one similar" and "one very different." Pls.' Br. at 22 (citing Pls.' Ex. 36 (AR 5248)). However, the record indicates that BLM and FWS considered up to eight different additional alternatives before release of the FEIS. Ex. M ( AR 4500). Thus, there is no way to know whether the alternative referred to as "very different" is indeed the Final Preferred Alternative. NAS also selectively quotes from an email to suggest that the Final Preferred Alternative was "disturbing news." Pls.' Br. at 22 (citing Ex. 34 (AR 4878)). Read in its entirety, it is clear that what concerned the author was not environmental impacts but competition between prospective lessees. 40 C.F.R. § 1502.9 (changes must be relevant to environmental impacts). In any event, the impressions contained in each of these emails are not reflected in the decision documents and should be given little weight. Ad Hoc Metals, 227 F. Supp. 2d at 143.

[15] In addition, both Dubois and Block involve circumstances not present here. Compare Dubois, 102 F.3d at 1279, 1280 (new alternative would "more than double" impacts to water resources) with FEIS at ES-6 (Final Preferred Alternative will have impacts level similar to Alternative B); Block, 690 F.2d at 772 (requiring supplementation when "none of the draft EIS alternatives utilized all or most of the decisional criteria found in the Proposed Action").

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

"the public comment period" for FEIS); Ex. R (AR 8897) (BLM response rejecting request for "extension of public review period"); Ex. S (AR 9223) (NAS's FOIA request for all comments on FEIS).[16]  In addition, the record indicates that representatives of BLM met in person with North Slope communities, advocacy groups, and EPA to discuss the Final Preferred Alternative. Ex. T (AR 7865); Ex. U (AR 8431).  Finally, the record demonstrates that BLM reviewed all comments on the FEIS and included appropriate recommendations in the final decision.  ROD at 41; id., App. A (listing modifications to Final Preferred Alternative based on public comment).

Not only is this approach consistent with NEPA's implementing regulations – which allow both agencies and members of the public to comment on a final EIS *regardless* of whether the lead agency specifically solicits such comments – it obviates the need for a supplemental EIS.  40 C.F.R. § 1503.1; Kootenai Tribe, 313 F.3d at 1118 (rejecting argument for supplementation when public had opportunity to comment on final EIS after publication).  For this reason, as well as those stated above, the Final Preferred Alternative is evidence that NEPA functioned as it should during the amendment process.  Accordingly, the Court should reject NAS's claim.

### 2.    The FEIS Analyzes All Reasonably Foreseeable Future North Slope Oil and Gas Development

Notwithstanding the extensive analysis contained in the FEIS, NAS asserts that the cumulative case fails to fully consider the consequences of future oil and gas development in the adjacent Northwest Planning Area.  Specifically, NAS argues that BLM does not account for a potential increase in Northwest development resulting from the proposed amendments to the Northeast Planning Area management plan.  NAS's argument is based on a selective quotation from the 2003 Northwest IAP/EIS, which NAS misuses to narrowly contend that BLM's estimate of yet undiscovered recoverable petroleum reserves in the Northwest Planning Area should have been 20 percent larger than expected under the Northwest preferred alternative.

NAS's argument is problematic for several reasons.  First, although NAS submitted extensive comments on the DEIS, and was familiar with the Northwest IAP/EIS from previous

---

[16] Significantly, comments submitted by NAS on the FEIS, like those submitted on the draft EIS, articulate a preference for area closures over targeted mitigation measures and express support for the No Action Alternative.  Half Moon Bay, 857 F.2d at 508-09 (no supplementation where agency has been meaningfully informed of public's attitude).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

litigation, NAS failed to alert BLM to its factual concern during the public comment process. NAS is therefore barred from challenging the adequacy of the FEIS on this ground now. Second, contrary to NAS, the FEIS's lengthy cumulative impacts analysis not only addresses the full spectrum of reasonably foreseeable future oil and gas activities in the action area, it also considers the potential for increased production in the Northwest Planning Area. As demonstrated below, a comparison of the proper figures in the Northwest IAP/EIS and the current FEIS reveals that BLM increased its estimate of reasonably foreseeable future Northwest production by approximately 40 percent.

        **a.**        **NAS Has Failed to Preserve Its Cumulative Impacts Argument**

"Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764 (2004) (quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 553 (1978)). Accordingly, NAS cannot attack the adequacy of the cumulative case in court on a ground it did not raise during the administrative process. Dep't of Transp., 541 U.S. at 764; Havasupai Tribe v. Robertson, 943 F.2d 32, 34 (9th Cir. 1991) ("absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision"); 'Ilio'Ulaokalani Coal. v. Rumsfeld, 369 F. Supp. 2d 1246, 1253 (D. Haw. 2005). This is particularly true where, as here, the alleged defect is "one of degree" rather than an outright failure to provide a cumulative effects analysis. See League of Wilderness Defs.- Blue Mountain Biodiversity Project v. Bosworth, 383 F. Supp. 2d 1285, 1296 (D. Or. 2005) (specific cumulative effects argument barred when plaintiff failed to raise issue during comment period).

In the present case, NAS has failed to preserve its narrow cumulative impacts argument. While NAS submitted a 40-page comment letter on the DEIS, nowhere in the three pages devoted to cumulative effects does NAS mention the Northwest Planning Area, suggest that BLM underestimated future Northwest production, or, most importantly, refer BLM to the 20 percent figure in the Northwest IAP/EIS upon which it now relies. See Pls.' Ex. 24 at 11-14 (AR 4334). In short, although NAS now argues that BLM's alleged omission is a flaw of fatal magnitude, during the NEPA process NAS utterly failed to hint at, let alone specifically raise,

this concern.  ʻIlioʻUlaokalani, 369 F. Supp. 2d at 1253; Wilderness Defs., 383 F. Supp. 2d at 1296; 40 C.F.R. § 1503.3(a) ("[c]omments on an environmental impact statement or on a proposed action shall be as specific as possible").

As the U.S. Supreme Court has emphasized, administrative proceedings are not "a game or a forum to engage in unjustified obstructionism" by seeking to litigate contentions based on "cryptic or obscure reference[s]" that were never raised in public comments.  Vt. Yankee, 435 U.S. at 553-54.  Because NAS did not alert BLM to its concerns during the NEPA process, BLM did not have an opportunity to respond with an explanation or to otherwise address the issue.  ʻIlioʻUlaokalani, 369 F. Supp. 2d at 1253.  NAS has therefore forfeited its right to object to the cumulative impacts analysis on the specific grounds asserted.  Dep't of Transp., 541 U.S. at 764; Wilderness Defs., 383 F. Supp. 2d at 1296; ʻIlioʻUlaokalani, 369 F. Supp. 2d at 1253.

> **b.    The FEIS Provides a Comprehensive Analysis of Reasonably Foreseeable Future North Slope Oil Development**

Regardless of whether NAS preserved its argument, BLM's nearly 200-page cumulative case adequately addresses the impacts of "past, present, and reasonably foreseeable future actions."  FEIS § 4.7; 40 C.F.R. § 1508.7.  Courts in the Ninth Circuit review cumulative effects analysis under a "rule of reason standard" to determine whether the lead agency took a "hard look" at the environmental impacts of its proposed action.  Robertson, 490 U.S. at 346, 352; Churchill, 276 F.3d at 1071.[17]  However, courts need not "'flyspeck'" the cumulative impacts section for "'inconsequential, technical deficiencies.'"  Ctr. for Biological Diversity v. Fed. Highway Admin., 290 F. Supp. 2d 1175, 1189 (S.D. Cal. 2003) (citation omitted); Churchill, 276 F.3d at 1080.

The FEIS's exhaustive resource-by-resource cumulative impacts analysis demonstrates that BLM took a hard look at the cumulative impacts of North Slope oil production.  FEIS § 4.7. BLM identified four categories of oil and gas activity:  (1) past exploration, development, and production, which BLM defined to include past activities and associated present and ongoing infrastructure support, construction, and maintenance; (2) present exploration, development, and

---

[17] Rule of reason is highly deferential and does not materially differ from "arbitrary and capricious" review under the APA.  Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998); Friends of Yosemite Valley v. Norton, 348 F.3d 789, 800 n.2 (9th Cir. 2003) (equating rule of reason with standard for abuse of discretion).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

production, which includes activities currently under construction or approved for construction through 2008; (3) reasonably foreseeable future exploration, development, and production, which covers oil and gas discoveries or projections identifiable by location and expected to result in development activities within the next 20 years; and, finally, (4) speculative development – *i.e.*, undiscovered or potential petroleum resources and projects that could be developed beyond a 20-year time frame.  Id. § 4.7.3.[18]

Currently, BLM knows of no discovered economically recoverable petroleum reserves in the Northwest Planning Area.  Although a lease sale was held in June 2004, very limited exploration activity has occurred since then.  In addition, at present, there is no existing infrastructure to support oil and gas development in the Northwest Planning Area and there are no proposed development or production plans.  Consequently, under NEPA, BLM could have deemed all Northwest Planning Area production "speculative" and declined to analyze it.  See n.18, supra; Envtl. Protection Info. Ctr. v. U.S. Forest Serv., 2006 WL 1716746, at *7 (9th Cir. 2006).  Nevertheless, despite the absence of discovered recoverable reserves, BLM categorized half the estimated potential from the Northwest Planning Area as reasonably foreseeable and analyzed it as part of the cumulative case.  FEIS Table 4-36 n.4 (including 0.63 Bbbl[19] of Northwest potential in estimate for reasonably foreseeable future onshore production).  BLM then classified the remaining Northwest potential as speculative and, thus, not susceptible to or appropriate for environmental analysis.  Id.; see also id. at 4-425; n.18, supra; Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1075 (9th Cir. 2002) (court must defer to agency's determination of what actions are reasonably foreseeable so long as decision is "'fully informed and well-considered'").

---

[18] Although BLM provided both a description of and a production estimate for speculative development, BLM did not analyze its environmental consequences.  Id. § 4.7.3.4 & Tables 4-35, 4-36.  By definition, speculative future production is not reasonably foreseeable and is therefore outside the scope of NEPA's cumulative impacts requirement.  40 C.F.R. § 1508.7; Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 812 (9th Cir. 1999) (NEPA does not require agencies to hypothesize about future matters that are speculative); U.S. v. S. Fla. Water Mgmt. Dist., 28 F.3d 1563, 1573 (11th Cir. 1994) (same).

[19] BLM's reserves estimates are provided in units of billions of barrels ("Bbbl").  Confusingly, perhaps to give the impression of greater production, NAS has converted these estimates to millions of barrels ("MMbbl") by multiplying BLM's figures by 1,000.  However, optics aside, 1,000 MMbbls is the same as 1 Bbbl.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

NAS attempts to undermine the validity of BLM's analysis by arguing that BLM should have assumed that future Northwest development potential was 20 percent greater due to the "reduction" in "restrictive regulations" in the Northeast Planning Area. However, as a factual matter, NAS has not established that the 20 percent lost opportunity will be fully recovered under the extensive mitigation measures imposed by the Final Preferred Alternative, let alone that recovery of any such potential will occur within the reasonably foreseeable future. In addition, NAS's argument – which is based entirely on one sentence pulled out of context from the Northwest IAP/EIS – misreads both the Northwest IAP/EIS and the FEIS at issue here by comparing the wrong set of figures.

Instead of focusing on BLM's estimates of hypothetical reserves for a hypothetical development scenario in the Northwest Planning Area, NAS should have compared BLM's projections for reasonably foreseeable future Northwest production in the cumulative case. Had NAS done so, it would have discovered that BLM *did* assume a greater amount of Northwest production for purposes of assessing the cumulative impacts of the present action. Table IV-16 in the Northwest IAP/EIS – which is entitled "Production, Reserves, and Resource Estimates Used in the Cumulative Analysis" – attributes *0.37 Bbbl* to reasonably foreseeable future production in the Northwest Planning Area. Ex. D at 3 (2003 Northwest IAP/EIS, Table IV-16). In contrast, the comparable table in the current FEIS – also entitled "Production, Reserves, and Resource Estimates Used in the Cumulative Analysis" – attributes *0.63 Bbbl* to reasonably foreseeable future Northwest production. FEIS Table 4-36. Needless to say, 0.63 Bbbl represents a nearly 40 percent increase in estimated Northwest production over that assumed in the Northwest IAP/EIS. Thus, when the correct figures are used, it is apparent that BLM did exactly what NAS contends it should have done. Accordingly, whether NAS's cumulative impacts argument is barred because NAS failed to raise its specific concern during the NEPA comment process, or whether NAS's claim is dismissed because it is wrong on the merits, the result is the same.

### 3.    BLM Took a "Hard Look" at Impacts Related to Global Climate Change

NAS's argument regarding global climate change is puzzling. NAS maintains that the FEIS is fatally flawed because it does not address climate change in the sections of Chapter 4 dealing with direct and indirect effects. See Pls.' Br. at 30, 31. However, NAS is not arguing

that BLM failed to consider greenhouse gas emissions from oil and gas activities themselves or the consumption of petroleum produced under a given alternative. See 40 C.F.R. § 1508.8(a)-(b) (defining direct and indirect effects as impacts "*caused* by the action," either immediately or later in time) (emphasis added).[20] Instead, NAS appears to contend that BLM should have considered the impact of each alternative in "combination" with the phenomenon of climate change itself. See, e.g., Pls.' Br. at 28, 32-33. Because NAS is arguing that BLM should evaluate the impacts of the proposed action "together" with climate impacts caused by others, NAS is really arguing that climate change should be addressed as a "cumulative impact." Id. at 33; 40 C.F.R. § 1508.7 (defining cumulative impact as the incremental impact of the proposed action when added to other past, present, or reasonably foreseeable future actions).

As NAS acknowledges, this is *exactly* what BLM did. Pls.' Br. at 30-31; FEIS at 4-418 (stating oil and gas activities need to be viewed in "the context" of climate change and indicating "effects of global climate change" are assessed in cumulative case); see also FEIS § 4.7.7 (discussing impacts of climate change by resource), Table 2-3 (including climate change in summary and comparison of cumulative impacts).[21] Moreover, BLM's discussion of global climate change in the cumulative case contains the very analysis NAS claims is missing – namely, a recognition that climate change could lead to population level impacts on many North Slope species, including those identified by NAS, and that the "effects of past, current, and future activities" on North Slope resources "could," for some species, "be much greater" in a changing climate than a stable one. Compare FEIS at 4-418 with Pls.' Br. at 29.[22]

---

[20] Nor could NAS make such an argument. The FEIS states, and NAS does not dispute, that greenhouse gases from oil and gas activities and the burning of any fossil fuels produced under the alternatives are "negligible" in the context of global daily oil consumption and will not have a significant effect on the environment. FEIS at 4-418, 4-468, 6-13, 6-198; 40 C.F.R. § 1502.2(b) ("[i]mpacts shall be discussed in proportion to their significance"). Thus, an analysis of the direct and indirect impacts of each alternative on climate change would not provide a meaningful way to distinguish between them.

[21] In addition, the FEIS addresses climate change when describing the "affected environment." FEIS § 3.2.1.1.

[22] NAS has submitted extra-record materials purporting to demonstrate that BLM failed to consider the cumulative impact of climate change and oil and gas development. Intervenors' motion to strike the extra-record materials is currently pending before this Court. Should that motion be denied, the Court will see that these materials simply recite information already contained in the FEIS or in the Arctic Climate Impact Assessment ("ACIA"), which is referenced throughout the FEIS. See Docket Nos. 67, 75. In addition, NAS should have and

For example, the FEIS not only recognizes that climate change may cause caribou habitat to shift in response to changes in vegetation, increased insect abundance, and access to calving grounds but that climate change could "exacerbate" the effects of oil and gas development. FEIS at 4-518 to 4-519. In addition, the FEIS notes the possibility that the cumulative effects of development activity and global warming could lead to reductions in caribou populations. Id. at 4-519. Similarly, with regard to polar bears, the FEIS indicates that although the effects of climate change on polar bears is "unclear," global warming could increase terrestrial denning and bear-human interactions as well as negatively affect prey in a manner that might result in population level effects. Id. at 4-524; Pls.' Ex. 54 at 9-10 (Supplemental Information Report). However, because BLM found that impacts to polar bears of onshore development under each alternative would be similarly "short lived and localized," BLM did not explicitly find the combined impact of development and long-term climate change to be significant. FEIS at 4-524, 4-122, 4-213, 4-290, 4-370 to 4-371. Finally, the FEIS explains that climate related impacts to bird populations, including brant, are difficult to predict but that "changes in habitat structure associated with climate change," along with potential oil and gas activities, could have a cumulative impact on population – especially for shorebirds and waterfowl. Id. at 2-139, 4-511, 4-512.

In addition, contrary to NAS, the FEIS acknowledges that the cumulative impacts of oil and gas activity and climate change will vary depending on the level and location of activity expected under each alternative. Id. at 4-588 to 4-589. As BLM explained, "the incremental contribution of an alternative to cumulative impacts is assumed to be proportional to the projected level of activities for that alternative" and would be "greater" in areas with high surface values. Id. at 4-588; ROD at 10. Thus, BLM concludes that the incremental contribution to cumulative effects would be the greatest under Alternative C and least under the No Action Alternative. FEIS at 4-588 to 4-589; see also id. at 4-519 (indicating direct, indirect, and cumulative impacts to caribou would be higher under those alternatives that allow development in areas surrounding Teshekpuk Lake), 4-524 (while impacts to polar bears will "generally be

---

could have submitted the declarations written by their own members during the public comment process. Id.; Vt. Yankee, 435 U.S. at 553; Lands Council v. Powell, 395 F.3d 1919, 1029 n. 10. (9th Cir. 2005).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

similar" under alternatives, direct, indirect, and cumulative impacts under Alternative C would
be greatest), 4-512 (stating that alternatives which open areas north of Teshekpuk Lake would
have greater direct, indirect, and cumulative impacts on brant).  The fact that this central premise
applies to BLM's conclusions regarding all cumulative impacts does not make it any less
applicable to its analysis of global warming.

NAS's secondary argument is that the analysis contained in the FEIS is too "perfunctory"
to satisfy the "hard look" standard.  Pls.' Br. at 31 (claiming "quantified" or "more detailed"
information is required).  Here NAS misunderstands both the current state of knowledge on
climate change and the requirements of NEPA.  The FEIS, and the climate studies upon which it
relies, indicates that the ability to assess the impacts of climate change "is in its formative
phase."  FEIS at 3-8.  Specifically, the ACIA and the Intergovernmental Panel on Climate
Change ("IPCC") both state that there are "key uncertainties" in the assumptions underlying both
future emission scenarios and climate response models that make it impossible to predict the
timing or quantify the magnitude of climate change impacts – especially on a regional level.
Exs. V, W (excerpts from ACIA and IPCC).[23]  Thus, the FEIS concludes that "it is not yet
possible to know with confidence the net impact of such change."  FEIS at 3-8.  As NAS's own
case law indicates, generalized information can satisfy the "hard look" standard when more
definite information cannot be provided.[24]  See Neighbors of Cuddy Mountain v. U.S. Forest

---

[23] Both the ACIA and the IPCC analyze climate change by running a range of "possible"
emissions scenarios through a variety of climate response models.  The limited predictive value
of the scenarios and the results are well-documented in both studies.  Ex. V at 4 ("key
uncertainties" for climate change concern "quantification of the magnitude and/or the timing" of
climate's response to human activities); id. at 8 (future emission levels are "a product of very
complex, ill-understood dynamic systems, driven by forces such as population growth, socio-
economic development, and technical progress among others, thus making long-term predictions
about emissions virtually impossible"); id. (indicating results are not "predictions or forecasts"
but are projections with no probabilities assigned); Ex. W at 2, 7 (current status of regional
climate models for Arctic is inadequate).  Significantly, NAS's comments on the global warming
analysis do not indicate how BLM might go about quantifying climate change impacts.  Pls.' Ex.
24 at 13-14; Vt. Yankee, 435 U.S. at 553 (comment obligation of challengers asking agencies to
"embark upon an exploration of uncharted territory" is heightened).

[24] Cases cited by NAS on this point, each of which fault an agency for not quantifying
cumulative impact that could be readily quantified, are therefore inapposite.  See Ocean
Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 869 (9th Cir. 2005) (requiring agency to
quantify increased tanker traffic); Neighbors, 137 F.3d at 1378-79 (agency should calculate
impacts of proposed timber harvests on old growth habitat); Earth Island Inst. v. U.S. Forest
Serv., 442 F.3d 1147, 1172 (9th Cir. 2006) (agency must analyze probable tree mortality).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Serv., 137 F.3d 1372, 1380 (9th Cir. 1998); Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 764 (9th Cir. 1996) (NEPA does not require agencies to analyze the impractical).

At the end of the day, NAS's argument is little more than an objection to BLM's decision to address global climate change in the cumulative case rather than in the sections of the FEIS devoted to direct and indirect impacts. In this respect, NAS's argument is essentially one over format that NAS cannot win. Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677, 682 (9th Cir. 2000) (EIS must be read "as a whole"); Ass'n of Pub. Agency Customers v. Bonneville Power Admin., 126 F.3d 1158, 1188 (9th Cir. 1997) (hard look standard "does not require adherence to a particular analytical protocol"). As demonstrated above, BLM properly considered global climate change as a cumulative impact. 40 C.F.R. § 1508.7. Where, as here, the FEIS contains a thorough discussion of the proposed action in the context of climate change, the hard look standard is more than satisfied. Nat'l Parks, 222 F.3d at 682; Inland Empire, 88 F.3d at 764.

### 4. NAS's Additional NEPA Arguments Are Barred by the Doctrine of Issue Preclusion

NAS admits that its remaining NEPA arguments are "substantially similar" to those rejected by this Court in NAEC v. Norton, 361 F. Supp. 2d 1069, which concerned BLM's management decisions for the Northwest Planning Area. Pls.' Br. at 35 n.7, 39 n.8. On July 26, 2006, the Ninth Circuit affirmed the Court's opinion on all grounds. See NAEC v. Kempthorne, 2006 WL 2061246. NAS's repeat arguments are therefore barred by the doctrine of issue preclusion (also known as collateral estoppel).[25] As the U.S. Supreme Court has explained, "once a court has decided an issue of fact or law necessary to its judgment" that decision precludes "relitigation of the issue in a suit on a different cause of action" involving the same

---

[25] Even if the Ninth Circuit had not ruled before resolution of this case, NAS's arguments would still be barred. Hawkins v. Risley, 984 F.2d 321, 324 (9th Cir. 1993) ("'the preclusive effect of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided'") (citation omitted); Tripati v. Henman, 857 F.2d 1366, 1367 (9th Cir. 1988) ("'The established rule in federal courts is that a final judgment retains all its res judicata consequences pending decision of the appeal'") (citations omitted); Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 1999 WL 33722331, at * 8 n.7 (D. Ariz. 1999) (invoking rule in APA context).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

parties.[26] <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980); <u>Offshore Sportswear, Inc. v. Vuarnet Int'l,</u> <u>B.V.</u>, 114 F.3d 848, 850 (9th Cir. 1997).

By asking the Court to "re-consider its conclusions in the previous action," Pls.' Br. at 35 n.7, NAS is engaging in exactly the type of "duplicative litigation" to achieve an "inconsistent decision" that the doctrine of issue preclusion is intended to prevent. <u>Allen</u>, 449 U.S. at 94; <u>Tripati</u>, 857 F.2d at 1367. Because BLM and Intervenors should be able to rely on the favorable results of past litigation, NAS should not be allowed to relitigate admittedly identical legal issues in the context of this lawsuit. <u>Id.</u>; <u>Clements v. Airport Auth. of Washoe County</u>, 69 F.3d 321, 330 (9th Cir. 1995). Nonetheless, in the event that the Court decides to consider NAS's barred arguments, Intervenors have briefly addressed them below.

### a.    The FEIS Is Sufficiently Detailed to Support BLM's Leasing Decision

Once again, NAS tries to convince this Court that the FEIS violates NEPA because it is not "site specific" enough. And, once again, NAS relies on the same inapposite case law to create the illusion that BLM's resource-based analysis has been rejected by the Ninth Circuit. Specifically, as in the Northwest Planning Area litigation, NAS cites <u>California v. Block</u> and contends that because the lease sale constitutes an "irretrievable and irreversible commitment of resources" the FEIS must be "site-specific." Pls.' Br. at 35. NAS then extrapolates from <u>Block</u> and a series of cases, including <u>Conner v. Burford</u>, 848 F.2d 1441 (9th Cir. 1988), to argue that the FEIS cannot be site-specific because it is based on a "hypothetical development scenario." Pls.' Br. at 37. NAS's position is premised on an inaccurate description of the proposed action, is not supported by NAS's case law, and has been soundly rejected by this Court and the Ninth Circuit. <u>NAEC v. Norton</u>, 361 F. Supp. 2d at 1077-80; <u>NAEC v. Kempthorne</u>, 2006 WL 2061246, at * 4-6.

As <u>Block</u> makes clear, and NAS concedes, "the detail that NEPA requires in an EIS depends upon the nature and scope of the proposed action." 690 F.2d at 761; Pls.' Br. at 35.[27] In

---

[26] The parties in the Northwest Planning Area case and the instant lawsuit are identical. <u>NAEC v. Norton</u> was filed by the same five advocacy groups against the same federal agencies. As in this case, the Court granted the State, ASRC, ConocoPhillips, and Anadarko intervention to protect their interests. All parties were active in the appeal.

[27] Contrary to NAS, no party disputes that a sale of non-NSO leases constitutes a commitment of resources requiring preparation of an EIS. Consequently, NAS's reliance on <u>Conner</u>, as well as <u>Bob Marshall Alliance v. Hodel</u>, 852 F.2d 1223 (9th Cir. 1988), and <u>Sierra</u>

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

the present case, the proposed action is BLM's decisions to open additional areas of the Northeast Planning Area to oil and gas leasing, subject to certain enumerated restrictions, and to issue leases through a competitive lease sale. ROD at 9. By themselves, neither of these decisions give leaseholders permission to conduct exploration or development activities on their leases. ROD at 52 ("An oil and gas lease does not in itself authorize any on-the-ground activity."); FEIS at 2-16, 2-17 (same). Instead, the ROD, the FEIS, and the language of the lease all indicate that leaseholders must obtain additional permits and comply with various regulatory requirements, including another level of environmental review, *before* engaging in any surface disturbing activities. ROD at 9, 52; FEIS at 1-9 to 1-10, 2-16 to 2-18; Pls.' Ex. 57; § II.B, supra; NAEC v. Kempthorne, 2006 WL 2061246, at *6 (permits are required "before any activity for exploration or development occurs").

Moreover, prior to the lease sale, BLM cannot accurately predict where future development activities will take place. FEIS at 4-14 to 4-15. It is only after the lease sale, when leaseholders have an incentive to invest both time and financial resources in obtaining necessary permits, that applications to conduct exploration activities are submitted to the agency. Id.; § II.B, supra; NAEC v. Kempthorne, 2006 WL 2061246, at *4. After that, BLM estimates that it may take up to 10 years for exploration to reveal which leases contain quantities of petroleum worth developing. FEIS at 4-14 to 4-18. Because there is no reliable way to predict where or when new commercial fields will be discovered and where development will occur, BLM used, as it did in the Northwest planning process, a range of hypothetical development scenarios to evaluate the corresponding level of impact on each important surface resource in the Northeast Planning Area.[28] Id. at 1-19; NAEC v. Kempthorne, 2006 WL 2061246, at *4.

---

Club v. Peterson, 717 F.2d 1409 (D.C. Cir. 1983), is misplaced. The question at issue in each of those cases was *not* whether to prepare a "site-specific" EIS but whether to prepare *any* EIS at all. None of these cases say anything about the level of detail required in an EIS. See NAEC v. Kempthorne, 2006 WL 2061246, *5 (rejecting relevance of Conner to NAS's "substantially similar" argument in Northwest Planning Area litigation); N. Plains Res. Council, Inc. v. U.S. Bureau of Land Mgmt., 298 F. Supp. 2d 1017, 1022-23 (D. Mont. 2003) (noting limited applicability of Conner in similar circumstances).

[28] In doing so, the FEIS provides ample information from which on-the-ground impacts to specific areas can be determined. See generally FEIS ch. 3 (describing affected environment by resource), ch. 4 (evaluating impacts of alternatives on each resource), Maps 2-1 to 2-4 (identifying geographic location of resource-based restrictions under each alternative), 6-217 (responding to comments on specificity of FEIS). NAS's sole complaint about this approach

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS
Seattle-3323009.2 0028116-00025

In <u>NAEC v. Kempthorne</u>, the Ninth Circuit endorsed BLM's reliance on hypothetical development scenarios, explaining that such an approach was an appropriate response to the phased nature of oil and gas development and consistent with NEPA case law in and outside the Ninth Circuit. 2006 WL 2061246, at * 4-6. Indeed, neither <u>Block</u>, nor any other case cited by NAS, holds that basing an environmental analysis on a hypothetical development scenario violates NEPA, even where an irretrievable commitment of resources has been made.[29] While a resource-based analysis of hypothetical development scenarios may not be what NAS has in mind when it invokes the term "site-specific," it does not follow that the FEIS is inadequate as a matter of law. As this Court has explained, due to the uncertain location of petroleum development, BLM reasonably determined that a resource-by-resource approach provided "less speculative" results than a lease-tract-by-lease-tract analysis while ensuring that environmental risks were closely considered. <u>NAEC v. Norton</u>, 361 F. Supp. 2d at 1079-80; <u>see also</u> <u>NAEC v. Kempthorne</u>, 2006 WL 2061246, at * 4-6.

### b. The FEIS Adequately Analyzes Mitigation Measures

The Final Preferred Alternative, as modified and endorsed by the Secretary, incorporates an extensive array of mitigation measures in the form of detailed performance-based lease stipulations and ROPs. <u>See</u> §§ II.B, III.B.2, III.C.1.a-b, <u>supra</u>. As the ROD indicates, BLM

---

relates to birds. However, once again, NAS has selectively quoted from the FEIS to create the appearance of confusion. The allegedly contradictory statements singled out by NAS can be easily reconciled when read in context. As the FEIS explains, while potential impacts to birds *throughout the Northeast Planning Area* are expected to be less under the Final Preferred Alternative than under Alternatives B and C, impacts to birds *within the goose molting area* are expected to be greater under the Final Preferred Alternative than under Alternative B. FEIS at 4-360 to 4-361.

[29] In <u>Block</u>, the Ninth Circuit directed the agency to "*forecast*" the potential lost value of the areas' wilderness features; it did not require the agency to analyze on-the-ground impacts of nonexistent development plans. 690 F.2d at 762-64 (emphasis added). Similarly, in <u>Conner</u> the Ninth Circuit acknowledged that the agency could only "*estimate*" impacts at the lease sale stage because there were no site-specific plans. 848 F.2d at 1450 (emphasis added). Other courts have also recognized that the amount and specificity of information necessary to meet NEPA's requirements must vary at each stage of oil and gas activity. <u>See</u> <u>N. Plains</u>, 298 F. Supp. 2d at 1020-22 (upholding EIS for onshore, non-NSO oil and gas leases based on "reasonably foreseeable development scenario"); <u>Envtl. Def. Fund, Inc. v. Andrus</u>, 619 F.2d 1368, 1371-72 (10th Cir. 1980) (noting EIS for "prototype" oil shale leasing program properly supported lease sale); <u>N. Plains Res. Council v. Lujan</u>, 874 F.2d 661, 666 (9th Cir. 1989) (finding EIS considering impacts of generic fuel plants adequate when federal coal leases created no entitlement to build on-site fuel plants and construction required separate authorization and environmental review).

National Audubon Society, et al. v. Kempthorne, et al.
1:05-CV-00008-JKS

concluded that by adopting these measures the agency had not only fulfilled the maximum protection requirement but had taken all practicable means to avoid or minimize environmental harm associated with the Final Preferred Alternative. ROD at 13. Once again, NAS has not claimed that any of the mitigation measures adopted by the final decision are ineffective or that the prescriptive approach used in the 1998 Northeast IAP/EIS is more effective.[30] Instead, as in the Northwest Planning Area litigation, NAS challenges the adequacy of the FEIS on the ground that BLM's analysis of mitigation measures is insufficient to satisfy NEPA. As demonstrated below, NAS's argument is not supported by case law or the content of the FEIS.

The U.S. Supreme Court has held that an EIS must include "a reasonably complete discussion of possible mitigation measures" to assist the agency in determining the severity of adverse effects and to analyze the potential for minimizing or avoiding adverse effects. Robertson, 490 U.S. at 352 (interpreting 42 U.S.C. § 4332(2)(C)(ii) and NEPA regulations). While subsequent courts have found that a failure to address mitigation altogether or the "mere listing" of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA, the applicable standard has not been expanded beyond that established in Robertson. See, e.g., NAEC v. Kempthorne, 2006 WL 2061246, at * 7; Neighbors, 137 F.3d at 1380; Westlands, 376 F.3d at 872; Gaule v. Meade, 402 F. Supp. 2d 1078, 1084 (D. Alaska 2005). Accordingly, based on the facts and record of each case, courts must determine whether the FEIS at issue discusses mitigation in "'sufficient detail to ensure that environmental consequences have been fairly evaluated.'" City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson, 490 U.S. at 353); Westlands, 376 F.3d at 872.

NAS's summary dismissal of BLM's mitigation analysis as a "mere listing" is belied by the FEIS. In the present case, the FEIS – which contains a 45-page discussion of mitigation measures in chapter 2, a 71-page side-by-side comparison of lease stipulations and ROPs that ranks their effectiveness, and devotes 72 sections in chapter 4 to the effectiveness of mitigation

---

[30] NAS does try to create the impression that lease stipulations are more "enforceable" than ROPs. However, NAS overstates the "unenforceability" of ROPs. ROPs are enforceable in the sense that everyone, leaseholders and non-leaseholders alike, must comply with them in order to obtain the approvals necessary to conduct activities in the Planning Area. FEIS at 2-15 to 2-16. Moreover, even if NAS were correct, mitigation measures "'need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements.'" Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 473 (9th Cir. 2000) (citation omitted).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

measures under each alternative for 18 resource categories – provides far more than a "mere listing" and easily satisfies the standard established by the Supreme Court. FEIS §§ 2.6, 4.3 to 4.6, Table 2-2 (evaluating effectiveness of mitigation measures), Table 2-3 (summarizing impacts by resource); see also ROD, App. B; NAEC v. Kempthorne, 2006 WL 2061246, at * 7 (approving similar analysis of mitigation measures in Northwest IAP/EIS) (citing Okanogan Highlands Alliance, 236 F.3d at 476).[31]

Indeed, NAS's single substantive complaint is that a draft version of what appears to be Table 2-3 suggests that, at some point in the planning process, there was "uncertainty" about the effectiveness of mitigation measures imposed under Alternative B to protect sociocultural systems. Pls.' Br. at 40 (citing Pls.' Ex. 58). However, the analysis contained in the FEIS indicates that BLM thought carefully about the effectiveness of mitigation measures, acknowledged potential areas of concern, and altered the Final Preferred Alternative in response. The final Table 2-2, which unlike Table 2-3 evaluates the effectiveness of the specific mitigation measures imposed by each alternative, concludes that the 1998 stipulations used in the No Action Alternative and the performance-based measures in Alternatives B, C, and D will "provide equal benefits in the avoidance and minimization of potential impacts to subsistence harvest patterns and sociocultural systems" and in addressing environmental justice issues. Id. at 2-121. In addition, the final version of Table 2-2 clarifies the nature of the "uncertainty" by explaining that local residents who are "less familiar" with a performance-based approach may have concerns about the effectiveness of the new mitigation measures. Id. at 2-146. Finally, the FEIS indicates that restrictions on surface disturbance and occupancy were expanded in the Final Preferred Alternative to protect subsistence resources, particularly caribou. Id. at 2-146 to 2-147, 6-280.

NAS's more generalized accusation is equally unavailing. NAS's entire argument on this point consists of a single sentence stating that the FEIS fails to justify the "numerical requirements" for "set-backs, buffers, and seasonal restrictions, and aircraft altitudes." Pls.' Br.

---

[31] The Ninth Circuit has approved mitigation discussions that are far less detailed than the analysis contained in the FEIS at issue here. See, e.g., Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 528 (9th Cir. 1994) (discussion of mitigation measures sufficient even though agency conceded measures might not be effective or effectiveness was unknown); Bonneville Power Admin., 126 F.3d at 1187 (discussion adequate where mitigation alternatives given for each resource type).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

at 40. NAS does not supply an example or contend that any particular restriction is inappropriate. It goes without saying that Intervenors should not be required to guess at the substance of NAS's arguments. U.S. v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir. 1991) (perfunctory and undeveloped arguments are waived). However, even a cursory reading of the FEIS indicates that the document contains the type of information NAS believes is absent. BLM's analysis of seasonal restrictions to protect subsistence resources like caribou and waterfowl serves as a case in point. The FEIS notes the importance of TLSA to both caribou and waterfowl during the summer months, FEIS at 3-40 to 3-44, 3-50 to 3-51, and then explains that impacts to these species will be minimized *by*, among other things, restricting ground and air traffic, prohibiting exploratory drilling, and suspending construction between the months of May and August. Id. at 2-51 to 2-53 (describing Stipulations K-4 and K-5); see also id. Table 2-2 (comparing effectiveness of Stipulations K-4 and K-5 and other alternatives); id. at 4-360, 4-366 to 4-367; § III.B.2-3, supra.

Finally, NAS's contention that BLM "provided no explanation of how it derived the new mitigation package" and failed to analyze an alternative that opened new areas to leasing while keeping prescriptive mitigation measures in place is also without merit. Both the ROD and the FEIS identify development of performance-based lease stipulations and ROPs similar to those used in the Northwest Planning Area as one of the stated purposes of the planning process. FEIS at 1-5; ROD at 3. As the FEIS explains, a performance-based approach will provide BLM and industry with greater flexibility to adapt management decisions and mitigation measures to the environmental conditions in the Petroleum Reserve. FEIS at 2-15; id. at 2-16 (stating performance-based approach will result in similar, if not greater, level of resource protection).

Given the purpose and need of the planning process, which NAS has not challenged, BLM was not required to analyze an alternative, other than the No Action Alternative, that imposed prescriptive mitigation measures. City of Carmel, 123 F.3d at 1155 (purpose and need statement dictate range of reasonable alternatives); City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved."). Agencies are neither expected nor required to devote their limited resources to examination of alternatives that are unlikely to be adopted or that do not meet policy objectives. Westlands, 376 F.3d at 871

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

(requiring analysis of alternatives that are "'inconsistent with the [agency's] policy objectives'" would "'turn NEPA on its head'") (citation omitted); Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1180 (9th Cir. 2000) (NEPA does not require consideration of alternative that is "unrealistic" in light of objectives); Akiak Native Cmty. v. U.S. Postal Serv., 213 F.3d 1140, 1148 (9th Cir. 2000) (agency is not required to consider alternatives that would not serve its purpose); Headwaters, Inc. v. U.S. Bureau of Land Mgmt., 914 F.2d 1174, 1180 (9th Cir. 1990) (agency is not required to consider alternative whose implementation is remote or speculative).

In sum, NAS has not provided this Court with any more reason to find BLM's analysis of mitigation measures inadequate than it did during the Northwest Planning Area litigation. See NAEC v. Norton, 361 F. Supp. 2d at 1080-81 (rejecting plaintiffs' "substantially similar" mitigation argument); NAEC v. Kempthorne, 2006 WL 2061246, at * 7-8 (same); Idaho Sporting Cong., 1997 WL 855506 at *13 (plaintiffs bear burden of directing court to evidence in record showing agency's actions are arbitrary and capricious).

## D.    FWS's Biological Opinion Complies with the ESA

NAS's Endangered Species Act claims are similar to the claims it presents under NEPA and to the ESA claims previously rejected by this Court in the Northwest Planning Area litigation.[32]  First, NAS contends that more development than previously thought will occur in the Northwest Planning Area and that the alleged increase should have been added to the "environmental baseline" in the Northeast BiOp.  Second, reprising its argument in NAEC v. Norton, NAS disputes the "reasonably foreseeable development scenario" analyzed by FWS in the Northeast BiOp, arguing that a greater level of development should have been attributed to the Final Preferred Alternative adopted by the ROD.  These arguments are contrary to law and unsupported by fact.  NAS's first argument lacks merit because FWS was not required to include speculative future development that is not yet ripe for ESA consultation in the environmental baseline.  NAS's second argument is likewise unavailing.  Not only has this Court and the Ninth

---

[32] NAS has amended its Complaint to add a claim against BLM under the ESA citizen suit provision.  16 U.S.C. § 1540(g).  As explained in Intervenors' opposition to the amendment, NAS's ESA claims are properly pled against FWS under the APA.  In addition, a claim against BLM cannot be ripe for review unless and until (1) the Northeast BiOp is invalidated through NAS's APA challenge *and* (2) BLM implements its decision in contravention of the ESA.  See Docket No. 64.  Accordingly, NAS's citizen suit claim should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Circuit upheld FWS's approach, NAS concedes that the agencies based their development projections on the best available technical and scientific information.  NAS has thus failed to demonstrate arbitrary or capricious conduct and has failed to provide the Court with a reason to question FWS's conclusion that the Final Preferred Alternative will only have a small impact on listed eider species.  See Northeast BiOp at 41 (anticipating annual take of Steller's and spectacled eiders to be, respectively, .0001 and .00001of adult breeding population); see also n.8, supra.

### 1.     FWS Properly Evaluated the Environmental Baseline

As under NEPA, NAS asserts that implementation of the Final Preferred Alternative will eventually lead to greater development in the Northwest Planning Area than previously anticipated. Pls.' Br. at 42.  Here, NAS contends that this alleged "increased development" should have been evaluated as part of the "environmental baseline" in the Northeast BiOp.  Id. at 43.  NAS is wrong as a matter of law.  Northwest development that exceeds the level previously analyzed, if and when it occurs, must undergo additional section 7 consultation consistent with the terms of the biological opinion prepared for the Northwest Planning Area ("Northwest BiOp").[33]  Consequently, such development does not constitute part of the "environmental baseline" for purposes of the Northeast BiOp.

Under the ESA, when section 7 consultation is required, FWS prepares a biological opinion containing its determination as to whether the agency's proposed action is likely to jeopardize the continued existence of any listed species.[34]  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)-(h).  In making this determination, FWS evaluates, among other things, the current status of the species, the effects of the proposed action, and cumulative effects, viewed in light of

---

[33] As in its NEPA cumulative effects argument, NAS has not established the factual premise for its ESA baseline argument – i.e., that amendment of the Northeast management plan will result in full recovery of "lost opportunity" in the Northwest.  See § III.C.2.b, supra.

[34] Prior to authorizing an action that may adversely affect a listed species, the federal agency proposing the action must consult with either FWS or the National Marine Fisheries Service (collectively "Services").  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a)-(b).  The relevant Service then prepares a biological opinion containing its determination as to whether the action is likely to "jeopardize" the species and recommending alternatives if "jeopardy" is likely.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.  The Services may also authorize "incidental take," which protects the action agency from take liability, provided that all associated terms and conditions are followed.  16 U.S.C. §§ 1536(o), 1538; 50 C.F.R. § 402.14.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

the "environmental baseline." 50 C.F.R. §§ 402.02, 402.14(g)(2)-(3). The environmental baseline is defined as including:

> the past and present impacts of all Federal, State, or private actions and other human activities in the action area, *the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation*, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02 (emphasis added). Thus, only those proposed federal actions for which section 7 consultations have been completed are included in the environmental baseline. <u>Id.</u> Future federal actions that have not undergone consultation are not included in the analysis, but instead are evaluated on their own merits when ripe for decision, in context of the environmental baseline existing at that time. <u>Id.</u>; 50 C.F.R. § 402.02 (noting that effects of an action under consultation are "added to the environmental baseline" for future consultations). This sequential approach ensures that each proposed action is fully and accurately analyzed before it occurs. <u>Id.</u>; 51 Fed. Reg. 19,926 (June 3, 1986) ("Future federal actions proposed for the same area would have to be separately evaluated under section 7 and could not occur unless they were able, in their own right, to avoid jeopardizing the continued existence of the affected species . . . .").

Here, FWS previously consulted on BLM's management plan for the Northwest Planning Area and determined that the leasing program would have a negligible effect on Steller's and spectacled eiders.[35] Ex. X at 5 (Northwest BiOp at C-39). FWS conducted its analysis based on BLM's assessment of the "reasonably foreseeable" development that might result, calculated in a highly conservative manner in favor of the species. <u>Id.</u> at 2. Due to inherent uncertainties regarding the location and extent of potential development, FWS expressly limited its "no jeopardy" conclusion to the reasonably foreseeable scenario, and required that consultation be reinitiated should development significantly exceed the prediction. <u>Id.</u> at 2-4. This Court upheld FWS's analysis as fully compliant with the ESA. <u>NAEC v. Norton</u>, 361 F. Supp. 2d at 1084 ("[G]iven the uncertainty behind petroleum development, the Court concludes that the BiOp

---

[35] NAS contends the Northwest BiOp found that "any" development beyond the reasonably foreseeable scenario would result in jeopardy. Pls.' Br. at 43. Yet NAS's citations do not support this sweeping statement. <u>See, e.g.</u>, Pls.' Ex. 10 at 3 (indicating that development would have to be *both* "significant" and in areas with "high concentrations of eiders" to result in population-level impacts); <u>id.</u> Ex. 8 at 1 ("[T]he probability of "Jeopardy" is low because development would have to happen in areas of high eider concentrations.").

adequately predicted the potential impacts to the eiders."); id. at 1083-84 (approving FWS's use of reopener provision requiring renewed consultation if development exceeds scenario analyzed). Thus, if unanticipated development in the Northwest Planning Area results from the final decision in this case, such development would be a *future* action that would be the subject of *future* section 7 consultation.[36]  50 C.F.R. § 402.02; Ex. X at 4 (Northwest BiOp at C-10) ("If [] development occurs that exceeds the original predictions of potential effects to listed eiders, reinitiation will be required.").  Such development, by definition, is not part of the current environmental baseline.  50 C.F.R. § 402.02 (baseline includes federal actions "that have already undergone . . . section 7 consultation").

Notwithstanding the plain language of the regulation, NAS argues that the "baseline" in this case should be deemed to include all "federal actions related to development in the Northwest Planning Area."  Pls.' Br. at 43.  This contention, which appears to be an effort to import NEPA's cumulative effects requirements into the ESA, is simply wrong.[37]  It is the effects of the "action" actually consulted upon – here, the reasonably foreseeable development

[36] More specifically, BLM must reinitiate consultation if the take limits set forth in the BiOps are exceeded, due to increased development or for any other reason.  50 C.F.R. § 402.16.  These safeguards ensure that unanticipated development will not cumulatively result in jeopardy to eiders.  Id.; 51 Fed. Reg. at 19,931-33.

[37] The ESA's analysis of effects is purposefully narrower than that required under NEPA.  The Services have stated this quite clearly in rejecting an argument similar to that presented here.  In response to comments on the ESA implementing regulations arguing that an ESA cumulative effects analysis should include reasonably foreseeable federal actions as well as state and private actions, the Services explained:

> Section 7 consultation will analyze whether the "effects of the action" on listed species, plus any additional, cumulative effects of State and private actions which are reasonably certain to occur in the action area, are likely to jeopardize the continued existence of the species.  Based on this analysis, the Federal agency determines whether it can proceed without exceeding the jeopardy standard.  If the jeopardy standard is exceeded, the proposed Federal action cannot proceed without an exemption.  This is a substantive prohibition . . . .  In contrast, NEPA is procedural in nature, rather than substantive, which would warrant a more expanded review of cumulative effects.  Otherwise, in a particular situation, the jeopardy prohibition could operate to block "nonjeopardy" actions because future, speculative effects occurring after the Federal action is over might, on a cumulative basis, jeopardize a listed species.  Congress did not intend that Federal actions be precluded by such speculative actions.

51 Fed. Reg. at 19,932-33.  This same rationale, as expressed in the plain language of the regulations, disposes of NAS's argument that the "baseline" should include speculative future federal actions that have not undergone section 7 consultation.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Seattle-3323009.2 0028116-00025

scenario previously approved by this Court – which must be added to the baseline, not speculative future development activities that will undergo separate section 7 consultation if they occur. 50 C.F.R. § 402.02; NAEC v. Norton, 361 F. Supp. 2d at 1083-84. NAS's "baseline" claim is thus at odds with the dictates of the ESA and must be rejected. Id.

### 2.    FWS Properly Evaluated the Effects of the Action

As stated above, NAS is precluded from relitigating "substantially similar" arguments brought and lost in a previous lawsuit between the same parties. See § III.C.4, supra; Pls.' Br. at 44 n.9. Nevertheless, NAS once again argues that FWS improperly narrowed the scope of the "action" consulted upon by relying on a "reasonably foreseeable development scenario" to analyze the effects of the Final Preferred Alternative. Id. For the reasons previously set forth by this Court in NAEC v. Norton and the Ninth Circuit in NAEC v. Kempthorne, and because the record demonstrates that BLM and FWS relied on the best available information to fully and conservatively evaluate the potential for oil and gas development to impact listed eiders, this claim should be rejected.

As in the Northwest Planning Area litigation, NAS relies primarily on Conner v. Buford to support its argument that the scope of the "action" analyzed in the Northeast BiOp was too narrow. However, Conner was premised on facts significantly different from those presented here. In Conner, FWS restricted its consultation to the effects of lease sales and did not consider any effects of future development, leaving such evaluation for future consultations. 848 F.2d at 1444. The Ninth Circuit rejected this "incremental-step consultation," finding that FWS was instead required to consult on the entire action, including "not only leasing but leasing and all post-leasing activities through production and abandonment." Id. at 1452-53; id. at 1457-58 (consultations must be "coextensive" with agency's action). The court thus directed FWS to prepare a biological opinion at the leasing stage that considered the effects of all phases of the agency action on protected species. Id. at 1458. The court acknowledged, however, that since "the precise location and extent of future oil and gas activities were unknown at the time," FWS must use the best available information to make "projections" of effects "based on *potential* locations and levels [of] oil and gas activity." Id. at 1453-54 (original emphasis).

In the present case, based on the requirements set forth in Conner, FWS evaluated the full range of oil and gas activity that could result from implementation of BLM's final decision,

National Audubon Society, et al. v. Kempthorne, et al.
1:05-CV-00008-JKS

46

including leasing, exploration, commercial production, and abandonment.  As authorized by Conner, FWS conducted this evaluation utilizing a "reasonable and foreseeable development scenario" formulated by BLM and MMS experts, using a "comprehensive geological analysis and computer simulation modeling" to identify the extent and location of activity potentially resulting from the Final Preferred Alternative.  Northeast BiOp at 3; FEIS, App. D at 6; FEIS at 4-40 to 4-45.  The formulation and key assumptions underlying this development scenario are described in BLM's Biological Assessment ("BA"), which provides detailed explanations of the reasonably foreseeable activities and their locations at each stage of oil and gas activity.  See FEIS, App. D at D-6 to D-10 (discussing anticipated leasing and exploration activities broken down into seismic activities, exploration drilling, winter transportation, and support infrastructure); id. at D-10 to D-16 (anticipated development activities, including drill-pad and road construction, and field development consisting of facility construction, pipeline construction, aircraft support, and related offshore activities); id. at D-16 to D-17 (projected production activities, including routine production operations, watercraft support, public access, and subsistence activities, and spill-response training and research); id. at D-17 (abandonment and restoration).

The BA also details how the impacts of the proposed action, including post-leasing activities, are significantly mitigated to benefit eiders through lease stipulations and ROPs.  Id. at D-17 to D-18, D-42 to D-43.  Moreover, in analyzing the potential impacts of the reasonably foreseeable development scenario on eiders, both BLM, in its BA, and FWS, in the Northeast BiOp, assumed "*the maximum potential conflict between activities that could reasonably occur under the BLM's Preferred Alternative*."  Northeast BiOp at 2 (emphasis added); id. at 24 (indicating FWS assumed eider densities at high end of reasonable range); FEIS, App. D at D-4 to D-5 (impacts analyzed in BA are believed to be "maximum" that could occur).  Based on this development scenario, which is essentially a "worst case" scenario with respect to eiders, FWS reasonably determined that, given the small number of eiders likely to be impacted and the substantial mitigation measures designed to reduce take, "it is unlikely that the action will violate section 7(a)(2)" of the ESA.  Northeast BiOp at 2; id. at 50-51 (describing reasonable and

prudent measures for protection of eiders).[38]

Both this Court and the Ninth Circuit have concluded that the methodology used by FWS here – consultation over the full range of potential eider population impacts based on a conservatively derived development scenario and safeguarded by additional consultation – fully satisfies the ESA and the dictates of Conner. NAEC v. Norton, 361 F. Supp. 2d at 1083-84 (finding use of hypothetical development scenario and future consultations in Northwest BiOp was reasonable); NAEC v. Kempthorne, 2006 WL 2061246, at * 9 (stating projections used in Northwest BiOp "are based on potential oil and gas activity as envisioned by this Court in Conner"); see also Swan View Coalition, Inc. v. Turner, 824 F. Supp. 923, 935 (D. Mont. 1992) (ruling that speculation concerning potential impacts of timber harvest was unnecessary where FWS reasonably predicted future production and built in safeguards to avert jeopardy if predicted levels were exceeded). In summary, as demonstrated above, the Northeast BiOp comprehensively analyzes the consequences of both leasing and post-leasing activities based on the best available scientific and technical information. It is consistent with the ESA, the Ninth Circuit's holding in Conner and NAEC v. Kempthorne, and this Court's prior rulings and should therefore be upheld.

## IV.    NAS IS NOT AUTOMATICALLY ENTITLED TO VACATUR OR INJUNCTIVE RELIEF

As a final salvo, NAS argues that it is entitled to a remand and injunctive relief as a matter of law. Pls.' Br. at 48-50. As demonstrated above, NAS has failed to establish a violation of the Production Act, NEPA, the ESA, or the APA and is thus entitled to neither. Even if this were not the case, contrary to NAS, "when equity demands [a challenged action] can be left in place while the agency" cures the defect. Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995) ("APA requires courts to take 'due account of harmless error'") (citations omitted); Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61 (1st Cir. 2001) (harmless error rule applies to both substantive and procedural missteps and requires evidence of "actual prejudice").

---

[38] Significantly, NAS does not challenge the accuracy of BLM's reasonably foreseeable development scenario, either by contending that the agencies relied on anything other than the best available scientific information or by offering evidence that a different development scenario is more realistic. Pls.' Br. at 44-47. Indeed, NAS does not clearly identify what sort of analysis it believes BLM and FWS should have engaged in.

Nor does an injunction automatically issue.  <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 534 n.1 (1987) (injunctive relief is an "extraordinary" remedy which is not to be granted as a matter of course).  In environmental cases, courts are still required to balance the equities and consider the public interest before granting injunctive relief.  <u>Id.</u> at 544-45 (courts may not presume irreparable injury); <u>Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg, Inc.</u>, 906 F.2d 934, 937 (3d Cir. 1990) (finding district court's presumption of irreparable harm reversible error).  Careful attention to the equities is particularly appropriate in the present case, where the only action authorized by the ROD is a lease sale that by itself will not result in any on-the-ground impacts and public policy concerns cut both ways.  <u>See</u> § II.B, <u>supra</u>; <u>Amoco</u>, 480 U.S. at 545 (plaintiffs must show environmental injury is sufficiently likely); FEIS at 1-3 to 1-5 (final decision is intended to fulfill nation's energy needs); ROD at 3 (same); Adams Decl. ¶¶ 24-26, 34 (Inupiat depend on revenues and employment opportunities resulting from lease sale).

Moreover, without knowing the nature of the violation, if any, it is not possible for NAS to establish the sufficiency of irreparable injury or for Federal Defendants and Intervenors to explain why the decision should remain in effect.  Intervenors therefore request that the Court allow additional briefing in the event that a violation is found in order to determine whether circumstances warrant either vacatur or injunctive relief and, if so, what the scope of that injunctive relief should be.  <u>Orantes-Hernandez v. Thornburgh</u>, 919 F.2d 549, 558 (9th Cir. 1990) (injunctions must be narrowly tailored).

## V.    CONCLUSION

For the reasons stated herein, and in Federal Defendants' opposition brief, Intervenors respectfully request that the Court deny NAS's motion for summary judgment and grant Intervenors' cross-motion for summary judgment thereby rejecting all claims asserted by NAS.

DATED this 3d day of August, 2006.

STOEL RIVES LLP

s/Laura J. Beveridge
Jeffrey W. Leppo, AK Bar #0001003
Laura J. Beveridge, *Pro Hac Vice*
600 University Street, Suite 3600
Seattle, Washington  98101
Phone:  (206) 624-0900

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

Fax:  (206) 386-7500
Email:  jwleppo@stoel.com
Email:  ljbeveridge@stoel.com
*Attorneys for Intervenor-Defendants*
*ConocoPhillips Alaska, Inc., and*
*Anadarko Petroleum Corporation*


David C. Crosby, AK Bar # 7106006
*Attorney for Arctic Slope Regional Corporation*


Ethan Falatko, AK Bar # 0112093
*Attorney for State of Alaska*

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

50

## Certificate of Service

I hereby certify that on August 3, 2006, a copy of foregoing Intervenor-Defendants' Opposition to Plaintiffs' Opening Brief, was served electronically on:

**Deirdre A. McDonnell**
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801

**Dean K. Dunsmore**
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska  99501-3657

**David C. Crosby**
DAVID C. CROSBY, P.C.
5280 Thane Road
Juneau, Alaska  99801-7717

**Ethan Falatko**
**Lawrence Ostrovsky**
STATE OF ALASKA
Office of the Attorney General
P.O. Box 110300
Juneau, Alaska  99811-0300

s/ Laura J. Beveridge
Laura J. Beveridge

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

51

## INTERVENOR-DEFENDANTS'
## TABLE OF EXHIBITS

| Exhibit Letter | AR No. | Description |
|:---:|:---:|:---|
| A | 8910 | Letter from Dick Lefebrve (Alaska Department of Natural Resources) to Henri R. Bisson (BLM) (February 28, 2005) |
| B | * | Draft Amendment to the Northeast National Petroleum Reserve Integrated Activity Plan/Environmental Impact Statement ("DEIS")  (June 2004) (excerpts) |
| C | * | Northeast National Petroleum Reserve Final Integrated Activity Plan/Environmental Impact Statement ("1998 Northeast IAP/EIS")  (August 1998) (excerpts) |
| D | * | Northwest National Petroleum Reserve Final Integrated Activity Plan/Environmental Impact Statement ("2003 Northwest IAP/EIS")  (November 2003) (excerpts) |
| E | 1355 | Public Scoping Summary Report for the Amendment to the Northeast National Petroleum Reserve-Alaska Integrated Activity Plan/Environmental Impact Statement  (February 2004) |
| F | 6893 | Emails between Chad Calvert (DOI) and Henri R.Bisson (BLM)  (November 17 and 18, 2004) |
| G | 3120 | BLM memorandum and attachments re draft Federal Register notice |
| H | 4444 | Emails between BLM and FWS re interagency discussions  (August 27, 2004) |
| I | 768 | Email from Janet Wolf (ENSR) to Susan Childs (BLM) and Ed Bovy (BLM)  (December 19, 2003) |
| J | 9403 | Emails between BLM and DOI  (January 10, 2006) |
| K | 4430 | FWS/BLM meeting notes re DEIS  (August 26, 2004) |

--------------------------

        * Documents identified with asterisks are included in the Reference List provided with the Administrative Record or in the FEIS Bibliography.

| Exhibit Letter | AR No. | Description |
|---|---|---|
| L | 5067 | Synopsis of comments received on DEIS  (August 23, 2004) |
| M | 4500 | BLM/FWS meeting notes re FEIS alternatives  (August 31, 2004) |
| N | 4877 | FWS briefing statement re DEIS  (September 10, 2004) |
| O | 4505 | FWS memorandum re comments on mitigation for preferred alternative  (September 1, 2004) |
| P | 8898 | Letter from environmental groups to Gale Norton (DOI) commenting on FEIS  (February 25, 2005) |
| Q | 8830 | Letter from environmental groups to Henri Bisson (BLM) and Susan Childs (BLM) requesting extension of public comment period on FEIS  (February 18, 2005) |
| R | 8897 | Letter from Henri R. Bisson (BLM) to Deirdre McDonnell (Earthjustice) rejecting request for extension of public review period on FEIS  (February 25, 2005) |
| S | 9223 | Letter from Deirdre McDonnell (Earthjustice) to John Montgomery (BLM) re FOIA request  (May 24, 2005) |
| T | 7865 | BLM presentation to communities of North Slope Borough re FEIS  (January 2005) |
| U | 8431 | Email from Susan Childs (BLM) to Henri Bisson (BLM) re briefing on FEIS  (January 14, 2005) |
| V | * | Excerpts from the Intergovernmental Panel on Climate Change ("IPCC") (2001). |
| W | * | Excerpts from the Arctic Climate Impact Assessment ("ACIA") (2004) |
| X | * | Northwest National Petroleum Reserve Biological Opinion  (2003 Northwest IAP/EIS, App. C) (excerpts) |