# Northeast National Petroleum Reserve-Alaska

## Final Integrated Activity Plan/ Environmental Impact Statement

## Volume I

*Prepared by*

U.S. Department of the Interior
Bureau of Land Management

*in cooperation with the*

U.S. Department of the Interior
Minerals Management Service

August 1998

Exhibit C, page 1 of 15

important caribou habitat available for leasing. A slightly modified set of these stipulations was developed specific to the Preferred Alternative, incorporating comments received from the public during the comment period on the Draft IAP/EIS.

Several alternatives recommend creation of specially designated areas. The Secretary of the Interior is authorized to identify specific lands in the NPR-A as "Special Areas." Areas around Teshekpuk Lake and the Colville River were designated as Special Areas in 1977. Under some of the alternatives, BLM would recommend that the Secretary designate lands along the Ikpikpuk River important for their paleontological values as a Special Area and that the Secretary add the Pik Dunes, an unusual feature in the planning area of importance for caribou, to the Teshekpuk Lake Special Area. Under various alternatives, BLM would have recommended that Congress designate the Colville River as a wild, scenic, or recreation river under the Wild and Scenic Rivers (WSR) Act. A review of the physical characteristics of the Colville River and associated resource values determined that the Colville River was "eligible" for designation under the WSR Act. Based on comments received on the Draft IAP/EIS, the other landowners within the potential WSR corridor do not support designation and would be unwilling to cooperate in management of a wild and scenic river. Therefore, a determination that the Colville River is "unsuitable" for designation under the WSR Act has been included in the Preferred Alternative. In several alternatives, BLM proposes to work with nearby landowners, including the State and the Arctic Slope Regional Corporation, to create a Bird Conservation Area under the Partners in Flight Program. This designation would highlight consideration of this habitat for land managers. Should a new Special Area, a Wild and Scenic River, or a Bird Conservation Area, result from the plan, BLM would draft specific plans or studies for these areas. Finally, under some alternatives, BLM proposes to undertake a plan to guide future studies of caribou and waterfowl populations in the Teshekpuk Lake area.

The alternatives presented in the IAP/EIS are consistent with the purposes of the NPR-A's governing statutes. Each alternative addresses a different balance between serving the "total energy needs of the nation" and protecting the surface resources, including providing "maximum protection" for resources in Special Areas, as required by the NPRPA. The alternatives are:

**Preferred Alternative**: The Preferred Alternative protects habitats important to molting geese and the Teshekpuk Lake caribou herd by making them unavailable for leasing or by strict restrictions on oil and gas surface occupancy. In addition, surface use restrictions and other stipulations are applied to other habitats identified as having high surface resource values, including areas identified by North Slope residents as important subsistence use areas, such as Fish and Judy creeks and the Ikpikpuk and Miguakiak rivers. Similar restrictions and stipulations are applied to the Colville, Kikiakrorak, and Kogosukruk rivers to protect raptor nesting and subsistence. Areas along the later two rivers are added to the Colville Special Area and the Pik Dunes is added to the Teshekpuk Lake Special Area under the Preferred Alternative. While protecting these resources, the alternative makes 87 percent of the planning area available for leasing. Through the use of stipulations, leasing would be conducted in a manner that is consistent with the protection of the surface resources, including requiring a thorough consultation with affected communities, establishment of a subsistence advisory panel, and creation of an Interagency Research and Monitoring Team. This team would coordinate research and monitoring efforts related to the effectiveness of stipulations and surface resource impacts. No roads connecting outside the planning area (other than temporary ice roads) will be allowed.

**Alternative A (No Action Alternative)**: Alternative A, the "no action" alternative, describes the current management situation as required by NEPA. The BLM would continue to authorize such activities as winter overland supply moves to North Slope villages, other scientific studies, and Special Recreation Permits for commercial guides. (All alternatives would allow such activities to continue.) The alternative represents an assessment that the Nation's long-term energy needs might be better met and the resources of the Reserve are better protected by deferring leasing until such time in the future when petroleum is in greater demand and petroleum exploration and production technology creates fewer impacts to surface resources. Alternative A has two options, one allowing seismic (as is currently the case) and one prohibiting seismic.

**Alternative B**: Alternative B makes 53 percent of the planning area available for oil and gas leasing. Lands identified as important for paleontological resources, recreational use, and habitat for caribou, waterfowl, and fish would not be made available for oil and gas leasing. Lands from which the village of Nuiqsut's Alaska Native Claims Settlement Act corporation are entitled to select would not be leased for oil and gas until the corporation's entitlement has been satisfied. An area along the Ikpikpuk River would be recommended as a new Special Area and the alternative would recommend that the Pik Dunes be added to the Teshekpuk Lake Special Area. A corridor along the Colville River would be recommended as "wild" river under the WSR Act, and BLM would work with adjacent landowners to establish a Bird Conservation Area along the Colville and some of its tributaries.

# II. ALTERNATIVES

**A. INTRODUCTION:** This section presents the Bureau of Land Management's (BLM's) alternative management approaches for 4.6 million acres in the northeastern part of the National Petroleum Reserve-Alaska (NPR-A). These alternatives are organized to present a range of actions that BLM could take to manage the surface and subsurface resources of the planning area consistent with the existing statutory direction for management of the NPR-A.

Before considering the various management strategies put forward for consideration in these alternatives, readers should be aware that some management actions will occur under all alternatives. These include fulfilling BLM's responsibility to convey land to individual Alaskan Natives and to Native corporations under the Native Allotment Act and the Alaska Native Claims Settlement Act (ANCSA), respectively. In cooperation with other Federal, State, and North Slope Borough (NSB) resource management agencies, BLM also will conduct studies, such as inventory and monitoring of resource populations and conditions under all alternatives. These studies will assess the health of biological resources, the location and significance of other resources, and the effectiveness of management practices in protecting these resources. The scope of these studies will reflect the level of impacting actions allowed and the protective measures imposed under the plan adopted through this Integrated Activity Plan/Environmental Impact Statement (IAP/EIS). For a general description of the anticipated inventory and monitoring program, see Appendix A.

**B. LAND USE EMPHASIS AREAS:** Each alternative contains management actions for the entire planning area. Certain parts of the area, however, are particularly important because of their surface-resource values. In the IAP/EIS, these areas are called Land Use Emphasis Areas (LUEA's), and much of the discussion of the alternatives is organized to show what management is proposed in each alternative for each LUEA. Nearly all LUEA's identify specific resource values, such as important bird or caribou habitat, that are linked to specific pieces of land. In this way, BLM will be able to focus specific management measures for each resource on the appropriate lands. Some alternatives propose special designations for some LUEA's, and nearly all LUEA's have stipulations identified to protect specific resources within them.

While LUEA's provide much of the structure of the presentation of the alternatives, they are not in themselves administrative or legislative designations, and they carry with them no new regulatory authority. They simply are tools that BLM is using to identify geographic areas, generally important for specified resources, where it is considering management emphases to meet its responsibilities under existing authorities.

The primary existing authority for managing the NPR-A is the National Petroleum Reserves Production Act (NPRPA). Under the Act, the Secretary of the Interior has very broad authority. His authority to protect surface resources is especially high in "Special Areas" designated by the Secretary. Special Areas are those areas within the NPR-A containing "significant subsistence, recreational, fish and wildlife, historical, or scenic value." Federal regulations (43 CFR 2361.1(c)) provide for the Secretary to undertake maximum protective measures for Special Areas consistent with the purposes of the NPRPA. Parts of two Special Areas are in the planning area: the Teshekpuk Lake Special Area (TLSA) and the Colville River Special Area (CRSA). Both encompass large geographic areas and are important to a variety of resources. See Section III.B.1 for a more detailed description of these Special Areas. All the LUEA's identified in the IAP/EIS are entirely or partly in the TLSA or the CRSA. Maximum protection of surface values within Special Areas is provided through the restrictions on various activities included in each alternative and the stipulations described in Section II.C.7.

Each LUEA is described below and depicted on an accompanying map. Table IV.D.1 highlights some of the management proposed for each LUEA. Stipulations also have been developed to control activities in the different LUEA's.

**1. Teshekpuk Lake Watershed:** The LUEA's boundary coincides with that of the TLSA within the planning area, although the latter's boundary extends to the west beyond the planning area. (Fig. II.B.1). This LUEA is

one of the most productive, diverse, and unique wetland ecosystems on the North Slope. Teshekpuk Lake's range of habitat types includes a 20-foot (ft) deep basin and a complex shoreline that features bays, spits, lagoons, islands, beaches, and extensive shoal areas. The waterflow patterns in this extraordinarily flat landscape are complex, and the outlets and inlets can reverse flow, depending on lake levels and stream flows. The Miguakiak River reversed its flow in 1977, so that discharge from breakup flooding on the Ikpikpuk River flowed into Teshekpuk Lake. There also are numerous deep lakes, some as deep as 50 ft, around Teshekpuk Lake that provide overwintering habitat for fish. Numerous small streams within the watershed provide riverine habitat for aquatic and migratory animals.

**2. Goose Molting Habitat:** This LUEA is wholly encompassed by the TLSA (Fig. II.B.2). The lakes to the north and east of Teshekpuk Lake are the most significant habitat for molting black brant, Canada geese, and greater white-fronted geese in the Arctic. Up to 23 percent of the Pacific flyway population of brant molt in this area (33,000 were counted one year). Up to 27,000 Canada geese have been counted. Up to 28,000 molting greater white-fronted geese and snow geese also use the area. Molting geese, which are highly sensitive to human disturbance, are present in the area from late June to mid- to-late August.

**3. Spectacled Eider Breeding Range:** This LUEA is wholly encompassed by the TLSA (Fig. II.B.3). The 1997 spectacled eider population on the North Slope is estimated to be 5,827 (uncorrected for visibility), which is by far the largest breeding population in North America. The 1997 population is estimated to be 14,300 with the visibility-correction factor applied. About 16 percent of the North Slope population nests within the planning area near Teshekpuk Lake, mostly to the north and west of the lake. The spectacled eider is listed as threatened under the Endangered Species Act (ESA).

Since the planning process began, the Steller's eider has been listed as threatened. Steller's eiders are known to nest in the planning area, but densities are too low to estimate concentration areas. For this reason, we have not developed a LUEA for the Steller's eider.

**4. Teshekpuk Lake Caribou Habitat:** This LUEA is wholly encompassed by the TLSA (Fig. II.B.4). Caribou of the Teshekpuk Lake Herd calve from late May to mid-June. Since 1976, studies show that the main areas for calving can shift somewhat within the broad area identified on Fig. III.B.5.a-1, with concentrations occurring in several different locations around the lake from year to year. For the remainder of the summer, areas of shorelines, barren dunes, and ridges can provide relief from intense insect harassment, which can significantly affect energy budgets and future productivity of cows. The land between Teshekpuk Lake and the Beaufort Sea from the Ikpikpuk River to the Kogru River are particularly valuable for this purpose.

**5. Fish Habitat:** This LUEA contains numerous waterbodies that provide important spawning, migration, rearing, and overwintering habitat for both anadromous and resident species of fish (Fig. II.B.5). Current fish use includes a substantial subsistence harvest by the residents of Barrow and Nuiqsut and a commercial take at the mouth of the Colville River. The LUEA extends ½ mile (mi) on the east side of the Ikpikpuk River, both sides and the bed of the Miguakiak River, the west side of the Colville River, and around (and including the bed of) Teshekpuk Lake (where BLM manages the land). It extends ¼ mi from both sides of portions of Fish and Judy creeks and around the perimeter of any fish-bearing lake in the deep-lake zone identified on Fig. II.B.5. It also includes the beds of these portions of the two streams and these lakes. The Miguakiak River, Teshekpuk Lake, and the northern part of the Ikpikpuk River are within the TLSA. The west side of the Colville River is within the CRSA.

**6. Colville River Raptor, Passerine, and Moose Area:** The boundary of the LUEA extends from the eastern boundary of the planning area to 1 mi west of the bluffs of the Colville River from approximately Ocean Point to the southern end of the planning area and 1 mi either side of bluffs on the Kogosukruk and Kikiakrorak rivers (Fig. II.B.6). The part of this LUEA on the Colville is within the northern portion of the CRSA as are the very northern reaches of the Kogosukruk and Kikiakrorak rivers. The lower two-thirds of the Colville River supports the highest concentrations of raptors, passerines, and moose on Alaska's North Slope. More than half of the known peregrine, gyrfalcon, and rough-legged hawk territories along this reach are in the planning area. Overall, the population of peregrine falcons has increased since its low in 1973 at the time it was listed as endangered under the ESA. It is now delisted. Current population levels should be maintained, if the peregrine is to remain off the list. The raptors nest on bluffs adjacent to the river and are sensitive to disturbance. The moose and passerine bird habitats along the Colville River represent a mixed ownership of Federal, State, and Arctic Slope Regional Corporation lands. Under all alternatives except Alternative A, the BLM will propose and work toward developing a cooperative agreement with the other landowners to include part of the LUEA in a Bird Conservation Area (BCA) under the Partners in Flight program (Fig. II.B.7). While this designation carries no mandated restrictions, it will highlight for all three land managers a habitat with special values (see Sec. II.F.9 for a description of BCA's).



Figure II.C.6

regulatory and resource agencies and submitted to the AO.

77. Operators are encouraged to apply for a letter of authorization from the FWS to conduct activities in polar bear denning areas.

78. Permanent structures, other than oil and gas facilities, are prohibited within 100 feet of the highest high water mark of the nearest body of water.

79. Lessees shall use smokeless flares for handling routine conditions and use auxiliary smokeless flares for planned events that exceed the capacity of routine flares. Lessees shall use flares that meet the Federal New Source Performance design standards listed in 40 CFR 60.18.

**b. Alternatives A through E:** The following stipulations are part of the action Alternatives B through E and, to a limited extent, are part of the no-action Alternative A, discussed above. They are based on existing policies and laws, knowledge of the resources present in the planning area, and current industry practices. Many of the stipulations listed below apply to activities other than oil and gas exploration and development and historically have been applied through BLM's various permitting authorities. To the extent these stipulations historically have been applied, they are applicable to Alternative A. The total stipulations package applies to the action Alternatives B through E. The stipulations could evolve over time. Future changes to the stipulations would be preceded by the appropriate level of National Environmental Policy Act (NEPA) analysis. Some stipulations apply only to the alternatives that are indicated in brackets. Those marked with an asterisk (*) would be incorporated as conditions of oil and gas lease sales for applicable lease tracts; those without an asterisk would be attached to applicable individual permits. If the BLM determines that additional stipulations are necessary during further NEPA analysis for any oil and gas activities (e.g., exploration and development activities) beyond those proposed by some of the alternatives presented above, BLM will include them in the appropriate future NEPA document for each such activity.

The management restrictions (stipulations) listed below may be modified or waived for specific authorizations and leases by the BLM Authorized Officer (AO) in the following instances:

a. if, and to the extent, the management restrictions listed below state that they permit such modifications;

b. if the restriction is not applicable for the activity or area for which the authorization is sought, e.g., restrictions specific to oil field development would not apply to Special Recreation Permits and restrictions applicable specifically to the Colville River area would not be applicable to authorizations for activities in other parts of the planning area;

c. if the proponent of an activity demonstrates to the satisfaction of the AO, in consultation with the appropriate Federal, State, and NSB agencies, that a modification or waiver is environmentally preferable;

d. if the lessee can demonstrate that the restriction(s) would make production technically infeasible or economically prohibitive and can demonstrate that the objectives of the stipulation can be accomplished through alternative means under Alternative D, the AO, after consulting with the appropriate Federal, State, and NSB agencies, may modify the restriction(s) in or allow exception(s) to stipulations that apply only within the Teshekpuk Lake Caribou Habitat LUEA in the case of oil and gas activities;

e. if the lessee can demonstrate that the restriction(s) would make production technically infeasible or economically prohibitive and can demonstrate that the objectives of the stipulation can be accomplished through alternative means under Alternative E, the AO, in consultation with representatives of the appropriate Federal, State, and NSB agencies, may modify the restriction(s) in or allow exception(s) to stipulations that apply only within the Teshekpuk Lake Caribou Habitat LUEA or the Goose Molting Habitat LUEA in the case of oil and gas activities.

Modifications or waivers may be granted in emergencies involving human health and safety. Modifications and waivers shall not relieve the proponent from restrictions imposed by other applicable Federal, State, or NSB law or regulation. Additional site-specific stipulations may result from subsequent site- or authorization-specific environmental analyses.

**Solid- and Liquid-Waste Handling, Hazardous-Material Disposal and Cleanup:**

1. All feasible precautions shall be taken to avoid attracting wildlife to food and garbage. Larger undertakings (those involving more than 15 persons) shall have a written procedure to ensure that the handling and disposal of putrescible waste shall be accomplished in a manner to prevent the attraction of wildlife

2. All solids and sludges shall be incinerated or disposed of by injection, in accordance with U.S. Environmental

Protection Agency (USEPA), State of Alaska Department of Environmental Conservation (ADEC), and the Occupational Safety and Health Act (OSHA) regulations and procedures.

3. All solid wastes shall be removed from BLM lands to ADEC-approved waste-disposal facilities. Solid-waste combustibles may be incinerated. All noncombustible solid waste, including ash from incineration and fuel drums, shall be removed for approved disposal. There will be no burial of garbage or human wastes.

4. Areas of operation shall be left clean of all debris.

5. All battery, hydrocarbon, and hazardous-material spills, including spills of seawater used for oil field waterflood, shall be cleaned up immediately and completely, and all contaminated or treated products removed in accordance with USEPA, ADEC, and OSHA regulations and procedures.

6. As soon as possible, but not later than 24 hours after any discharge, as defined in Alaska Statute Title 18, Chapter 75, Article 2, notice of such discharge shall be given to the AO and any other Federal and State officials as required by law.

7. For oil- and gas-related activities, a Hazardous-Materials Emergency-Contingency Plan shall be prepared and implemented prior to transportation, storage, or use of fuel. Staff shall be instructed in the procedures to follow. The plan shall include a set of procedures to ensure prompt response, notification, and cleanup should hazardous substances be spilled or if there is a threat of a release. This plan shall include a list of resources available for response (e.g., heavy-equipment operators, spill-cleanup materials or companies), and names and phone numbers of Federal, State, and NSB contacts.

8. Oil-spill-cleanup materials (absorbents, containment devices, etc.) shall be stored at all fueling points and vehicle-maintenance areas and be carried by field crews of all overland moves, seismic work trains, and similar overland moves by heavy equipment.

9. Fuel, other petroleum products, and/or other liquid chemicals designated by the AO, whether in excess of 660 gallons in a single tank or in excess of 1,320 gallons in multiple containers, shall be stored within an impermeable lined and diked area capable of containing 110 percent of the stored volume. The storage area shall be located at least 500 feet from any river, lake, or stream with the exception of small caches for motor boats and float planes. Material used as a liner must be capable of remaining impermeable during typical weather extremes expected throughout the storage period.

10. All fuel containers, including barrels and propane tanks, shall be marked with the responsible party's name, product type, and year filled or purchased.

11. Although fuels may be off-loaded from aircraft on ice, storage of fuels on lake or river ice or on active floodplains of any river or lake is prohibited.

12. Refueling of equipment within 500 feet of the water's edge of any lake or stream, with the exception of refueling motor boats, snowmachines, ski planes, and float planes, is prohibited.

13. To prevent and minimize present and future pollution, management decisions affecting waste generation shall be considered in the following order of priority:
    -Waste source reduction
    -Recycling of waste
    -Waste treatment
    -Waste disposal

    a. Lessees shall develop and obtain approval from the AO, in consultation with USEPA and ADEC, of a waste-management plan for all exploration, construction, and production operations (including activities conducted by contractors). The plan shall identify all waste streams by type and volume that will be produced during each operation, as well as method of disposal. For each waste stream, the leases will describe what actions will be taken to minimize the volume.

    b. Injection is the preferred method for disposal of muds and cuttings from oil and gas activities. Injection of nonhazardous oil field wastes generated during development is regulated by the Alaska Oil and Gas Conservation Commission, ADEC, and USEPA. Surface discharge of drilling muds and cuttings is allowed into reserve pits only when the AO, in consultation with appropriate Federal, State, and NSB regulatory and resource agencies, determines that alternative disposal methods are not feasible and prudent. If use of a reserve pit is proposed, the operator shall demonstrate the advantages of a reserve pit over other disposal methods and describe methods to be employed to reduce the disposed volume. On-pad temporary cuttings storage shall be allowed as necessary to facilitate annular injection and/or back haul operations.

    c. Wastewater disposal:
       (1) Unless authorized by the National Pollution Discharge Elimination System (NPDES) or State permit, disposal of domestic wastewater

into bodies of freshwater, including wetlands, is prohibited.

(2) Surface discharge of reserve-pit fluids is prohibited unless authorized by NPDES, ADEC, and NSB permits and approved by the AO.

(3) Subsurface disposal techniques shall be used to dispose of produced waters in upland areas, including wetlands. The AO, in consultation with ADEC and USEPA, may permit alternate disposal methods if the lessee demonstrates that subsurface disposal is not feasible or prudent.

(4) Discharge of produced waters into open or ice-covered marine waters of less than 10 meters in depth is prohibited. The AO in consultation with ADEC may approve discharges into waters greater than 10 meters in depth based on a case-by-case review of environmental factors and consistent with the conditions of a NPDES permit.

**Ice Roads and Water Use:**

14. The location of winter ice roads shall be offset from year to year to minimize vegetative impacts.

15. Compaction of snow cover or snow removal from fish-bearing waterbodies shall be prohibited except at approved ice-road crossings.

16. Water withdrawal from rivers and streams during winter is prohibited. Water withdrawal shall be prohibited during winter from lakes less than 7 feet deep, if they are interconnected with or subject to seasonal flooding by a fish-bearing stream. Water may be withdrawn from isolated lakes that are less than 7 feet deep that lack connection to or are not subject to seasonal flooding by a fish-bearing stream. The AO may authorize withdrawals from any lakes less than 7 feet deep, if the proponent demonstrates that no fish exist in the lake.

Generally, water drawdown during winter from lakes greater than 7 feet deep shall be limited to 15 percent of the estimated free-water volume (i.e., excluding the ice). The AO may authorize drawdown exceeding 15 percent from a lake greater than 7 feet deep if the proponent of the additional drawdown demonstrates that no fish exist in the lake.

17. Within the Goose Molting Habitat LUEA (Fig. II.B.2), water extraction from any lake used by molting geese shall not alter hydrological conditions that could adversely affect identified goose-feeding habitat along lakeshore margins.

18. Except for approved crossings, alteration of the banks of a waterway is prohibited. Clearing of willows along the riparian zone is prohibited.

**Overland Moves and Seismic Work:**

19. Seismic work is not allowed within 1,200 feet of any known, long-term cabin or campsite without the written permission of the AO.

20. The following restrictions apply to overland moves, seismic work, and any similar use of heavy equipment (other than actual excavations as part of construction) on unroaded surfaces during the winter season:

   a. Because polar bears are known to den predominantly within 25 miles of the coastline in the deeply drifted areas (6 feet or greater) adjacent to the high cut banks of drainages, seismic-program lines and overland moves should be aligned to avoid such areas by ¼ mile, if feasible. The cutting or compaction of such drifted snow is prohibited within 25 miles of the Beaufort Sea. Activities are prohibited within 1 mile of known or observed polar bear dens; obtain locations from U.S. Department of the Interior, Fish and Wildlife Service, (907) 786-3800. Operators are encouraged to apply for a letter of authorization from FWS to conduct activities in polar bear denning areas.

   b. Motorized ground-vehicle use shall be minimized within the Colville Raptor, Passerine, and Moose Area LUEA from April 15 through August 5. Such use will remain ½ mile away from known raptor nesting sites, unless authorized by the AO.

   c. Travel up and down stream beds is prohibited to help avoid disturbance to riparian vegetation, stream-channel morphology, and resident fish populations.

   d. Crossing of waterway courses shall be made using a low-angle approach in order to not disrupt the natural stream or lake bank.

   e. If snow ramps or snow bridges are used at waterway crossings for bank protection, the ramps and bridges shall be substantially free of soil and/or debris. Snow bridges shall be removed or breached immediately after use or before spring breakup.

   f. To avoid additional freezedown of deepwater pools harboring overwintering fish, waterways shall be crossed at shallow riffles from point bar to point bar whenever possible.

   g. On-the-ground activities shall employ low-ground-pressure vehicles such as Rolligon, ARDCO, Trackmaster, Nodwell, or similar type. A current list of approved vehicles can be

obtained from the AO. Limited use of tractors equipped with wide tracks or "shoes" will be allowed to pull trailers.
h. Bulldozing of tundra, trails, or seismic lines is prohibited. This stipulation, however, does not prohibit the clearing of drifted snow along a trail, seismic line, or in a camp, to the extent that the tundra mat is not disturbed. Snow may be cleared from a lake or river ice surface to prepare an aircraft runway, if approved by the AO in consultation with appropriate Federal, State, and NSB regulatory and resource agencies. Vehicles shall avoid using the same tracks for multiple trips over the same trails, thereby reducing the possibility of ruts.
j. Ground operations are to begin only after the seasonal frost in the tundra and underlying mineral soils has reached a depth of 12 inches, and the average snow cover is 6 inches deep.
k. Ground operations will cease when the spring melt of snow begins; approximately May 5 in the foothills area where elevations exceed 300 feet, and approximately May 15 in the northern coastal areas. The exact date will be determined by the AO.
l. No activity will occur within either the Goose Molting LUEA or the Teshekpuk Lake Caribou Habitat LUEA from May 1 through September 30. (Note that this overrides language in Stipulation 20k.)
m. To prevent surface disturbance to tundra and other vegetation, tracked vehicles will not execute tight turns by locking one track.

**Oil and Gas Exploratory Drilling:**

21. From May 1 through September 30, exploratory drilling other than from production pads is prohibited in the Goose Molting Habitat LUEA and the Teshekpuk Lake Caribou Habitat LUEA. [Alts. D-E]

22. Oil and gas exploration activities will avoid alteration (e.g., damage or disturbance to soils, vegetation or surface hydrology) of critical goose-feeding habitat types along lakeshore margins (grass/sedge/moss), as identified by the AO in consultation with FWS, within the Goose Molting Habitat LUEA. [Alt. E]

23. Exploratory drilling is prohibited within 1,200 feet of any known long-term cabin or campsite without the written permission of the AO.

**Facility Design and Construction:**

24. At least 3 years prior to approval of any development plan for leases within the Teshekpuk Lake Caribou Habitat LUEA, the lessee shall design and implement a study of caribou movement within the LUEA. The study design shall be approved by BLM in consultation with appropriate Federal, State, and NSB regulatory and resource agencies. The study shall include a minimum of 3 years of data that will provide the data necessary to determine facility design and location, including pipelines, that will be part of the development plan. Lessees may submit individual plans or they may combine with other lessees in the LUEA to do a joint study. Total study funding by all lessees will not exceed $500,000. [Alts D-E]

25. Permanent oil and gas facilities (including gravel roads, pads, and airstrips but excluding pipelines) and material sites are prohibited within a 1,640-foot buffer zone surrounding all goose-molting lakes, and within a 3,280-foot buffer zone around all high-use lakes within the Goose Molting Habitat LUEA. Goose-molting lakes shall be identified by the AO in consultation with appropriate Federal, State, and NSB regulatory and resource agencies. (Currently known lakes are identified in Appendix E, Fig. E-6.) [Alt E;*]

26. To protect crucial caribou movement corridors for insect relief within 2 miles of the Beaufort Sea coastline including inlets and the Kogru River east of 152°36'30" west longitude, permanent oil and gas facilities shall be restricted to those facilities determined necessary by the AO, because other locations are either technically infeasible or economically prohibitive. Examples of facilities likely to be considered necessary under these criteria may include, but are not limited to: (1) a staging area, causeway, or dock that requires a year-round road to the inland area; (2) a seawater-treatment plant and associated pipeline or road; and (3) a production pad and associated pipeline for an oil field that cannot be produced from outside the 2-mile zone. Airports, camps, and some types of processing facilities are not likely to be considered necessary. When submitting a development and production plan that includes structures in this 2-mile zone, the lessee shall demonstrate to the satisfaction of the AO, in consultation with appropriate Federal, State, and NSB regulatory and resource agencies, the need for the location of permanent oil and gas facilities within this zone. [Alts. D-E; *]

27. Causeways, docks, artificial gravel islands, and bottom-founded structures may be permitted if the AO, in consultation with the State and NSB, determines that a causeway or other structure is necessary for field development and that no feasible and prudent alternatives exist. A monitoring program may be

required to address the objectives of water quality and free passage of fish, and mitigation shall be required where significant deviation from objectives occurs.

The Bureau of Land Management discourages the use of continuous-fill causeways. Environmentally preferred alternatives for field development include use of buried pipelines, onshore directional drilling, or elevated structures. Approved causeways must be designed, sited, and constructed to prevent significant changes to nearshore oceanographic circulation patterns and water-quality characteristics (e.g., salinity, temperature, suspended sediments) that result in exceedances of water-quality criteria, and must maintain free passage of marine and anadromous fish.

Causeways and docks shall not be located in river mouths or deltas. Artificial gravel islands and bottom-founded structures are prohibited in river mouths or active stream channels on river deltas, except as provided in the paragraph above. [Alts. B-E].

28. Two narrow land corridors between Teshekpuk Lake and the Beaufort Sea have been identified as crucial caribou movement corridors. These areas lie northwest and east of Teshekpuk Lake (Fig. E-5). Within these two identified areas, the following requirements may be imposed:

   a. Placement of permanent facilities may be prohibited or restricted; [Alt. E;*]
   b. Off-lease site development may be required; [Alt. E;*]
   c. Burial of pipelines may be required; [Alt. B-E;*]
   d. Permanent oil and gas facilities are prohibited within a zone extending 4 miles eastward from the eastern shore of Teshekpuk Lake in the area between the lake and Kogru Inlet, as depicted on Figure E-5. [Alt. E;*]

Proponents of modifications to these restrictions must demonstrate to the satisfaction of the AO, in consultation with appropriate Federal, State, and NSB regulatory and resource agencies, that such restrictions are not technically, economically, or environmentally practicable and that the goals of the stipulation can be accomplished through alternative means.

29. Maximum economically feasible extended-reach drilling shall be used for production drilling to minimize the number of pads and the network of roads between pads. [Alts. D-E; *]

30. All oil and gas facilities, except airstrips, docks, and seawater treatment plants, will be collocated with drill pads. If possible, airstrips shall be integrated with roads. Exceptions under Alternative E may be granted or required by BLM in consultation with appropriate Federal, State, and NSB regulatory and resource agencies if a development is permitted within 3,280 feet of a high-use goose-molting lake. [Alts. D & E;*]

31. Within the Teshekpuk Lake Caribou Habitat LUEA, lessees shall orient linear corridors when laying out oil field developments to address migration and corralling effects and to avoid loops of road and/or pipeline that connect facilities. [Alts. D-E]

32. Within the Goose Molting Habitat LUEA, oil and gas development activities shall avoid alteration of critical goose-feeding habitat types along lakeshore margins (grass/sedge/moss) as identified by the AO in consultation with FWS. [Alt. E]

33. Within the Goose Molting Habitat LUEA, oil and gas facility layout shall incorporate features (e.g., temporary fences, siting/orientation) that screen/shield human activity from view of any goose-molting lake, as identified by the AO in consultation with appropriate Federal, State, and NSB regulatory and resource agencies, within 3 kilometers. [Alt. E]

34. Major construction activities (e.g., sand/gravel extraction and transport, pipeline and pad construction, but not drilling) shall be suspended within the Goose Molting LUEA from June 15 through August 20, unless approved by the AO in consultation with the appropriate Federal, State, and NSB regulatory and resource agencies. [Alts. B-E]

35. Lessees shall separate elevated pipelines from roads by a 500-foot minimum, if feasible. Separation of roads from pipelines may not be feasible, for example, in narrow land corridors between lakes and where pipes and roads converge on a drill pad. [Alts. B-E; *]

36. To minimize delay or deflection of caribou movements, lessees shall place the pipeline on the appropriate side of the road (depending upon general caribou movements in the area). [Alts. B-E; *]

37. Ramps over pipelines, buried pipe, or pipe buried under the road may be required by the AO, after consultation with appropriate Federal, State, and NSB regulatory and resource agencies, in the Teshekpuk Lake Caribou Habitat LUEA where facilities or terrain funnel caribou movement. [Alts. B-E]

38. At a minimum, aboveground pipelines shall be elevated 5 feet, as measured from the ground to the bottom of the pipe, except where the pipeline intersects a road, pad, or a ramp installed to facilitate wildlife

## II. ALTERNATIVES

passage. The AO, in consultation with appropriate Federal, State, and NSB regulatory and resource agencies, may make an exception if no feasible and prudent way exists to meet the requirement. [Alts. B-E]

39. Permanent oil and gas facilities, including roads, airstrips, and pipelines, are prohibited within and adjacent to waterbodies in the Fish Habitat LUEA at the distances identified below:

    a. **Ikpikpuk River:** a ½-mile setback from the bank of the Ikpikpuk River within the planning area.
    b. **Miguakiak River and Teshekpuk Lake:** a ½-mile setback from each bank of the Miguakiak River and around the perimeter of Teshekpuk Lake.
    c. **Fish Creek:** a ¼-mile setback from each bank of Fish Creek and extending the length of BLM-managed lands below the confluence of Inigok Creek.
    d. **Judy Creek:** a ¼-mile setback from each bank of Judy Creek and extending from the mouth to the confluence of an unnamed tributary in Sec. 8, T.8N., R.2W., Umiat Meridian.
    e. **Colville River:** a ½-mile setback from the highest high water mark on the western bank of the Colville River extending the length of BLM managed lands in the planning area.
    f. **Deep-Water Lakes:** a ¼-mile setback around the perimeter of any fish-bearing lake within or partially within the deep lake zone.

    On a case-by-case basis, essential pipeline and road crossings shall be permitted through setback areas in those instances where no other suitable sites are available. Stream crossings will be sited perpendicular to the main channel flow; lake crossings will be at the narrowest point. [Alts. B-E]

40. Gravel mining sites required for development activities shall be restricted to the minimum necessary to develop the field efficiently and with minimal environmental damage. Where feasible and prudent, gravel sites must be designed and constructed to function as water reservoirs for future use. Gravel mine sites are prohibited within active floodplains unless the AO, in consultation with appropriate Federal, State, and NSB regulatory and resource agencies, determines that there is no feasible and prudent alternative, or that a floodplain site would enhance fish and wildlife habitat after mining operations are completed and the site is closed.

    Mine site development and rehabilitation within floodplains shall follow the procedures outlined in McLean (1993) *North Slope Gravel Pit Performance Guidelines*, ADF&G Habitat and Restoration Division Technical Report 93-9.

41. Facilities, roads, airstrips, and pipelines shall be sited outside of the active floodplain of rivers and creeks with a minimum setback of 500 feet and 500 feet away from fish-bearing lake basins. [Alts. B-E].

42. Bridges, rather than culverts, will be used for road crossings on all major rivers, as identified by the AO in consultation with appropriate Federal, State, and NSB regulatory and resource agencies to reduce the potential of ice-jam flooding and erosion. Roads shall be designed and sited to minimize the length that is perpendicular to sheet flow. When necessary, culverts on smaller streams shall be large enough to avoid restriction on fish passage and adverse effect on natural stream flow. [Alts. B-E]

43. The natural drainage pattern shall be identified prior to and maintained during and after construction. Fill placed adjacent to a stream or lake shall be armored to limit erosion from flooding or wave action. Cross-drainage structures shall be sited, maintained, and properly abandoned to prevent impoundments or alteration of local or areawide hydrology.

44. Dewatering during construction shall be conducted using Best Management Practices (BMP's). A current list of BMP's shall be available from the AO. [Alts. B-E]

45. Permanent oil and gas facilities, except approximately perpendicular pipeline crossings, are prohibited in the Colville River Raptor, Passerine, and Moose Area LUEA. This restriction does not apply within 1½ miles of the Umiat airstrip. [Alts. B-E]

46. Surface structures, except approximately perpendicular pipeline crossings and ice pads, are prohibited within the Pik Dunes LUEA. [Alts. C-E]

47. Surface structures, except approximately perpendicular pipeline crossings and ice pads, are prohibited within the Ikpikpuk Paleontological Sites LUEA. [Alts. C-E]

48. Lessees shall minimize the impact of industrial development on key wetlands. Key wetlands are those wetlands that are important to fish, waterfowl, and shorebirds because of their high value or scarcity in the region. Lessees shall identify on a map or aerial photograph the largest surface area, including future expansion areas, within which a facility is to be sited or an activity is to occur. The AO shall consult with appropriate Federal, State, and NSB regulatory and

resource agencies to identify key wetlands. To minimize impact, the lessee shall avoid siting facilities in the identified wetlands unless no feasible and prudent alternatives exist. Key wetland types include (but are not limited to) fish-bearing lakes and streams, riparian shrub, and the following classes described by Bergman et al. (1977): shallow and deep-*Arctophila* ponds, deep-open lakes, basin-complex wetlands, and coastal wetlands.

49. Permanent oil and gas facilities are prohibited within 1 mile of known long-term cabins or campsites, except that pipelines and roads shall be allowed up to ¼ mile from such cabins or campsites. An exception to this restriction may be granted by the AO, if it is determined that no other feasible and realistic route exists and if a change would have minimal effect on subsistence users. [Alts. B-E]

**Ground Transportation:**

50. The following ground-traffic restrictions shall apply to permanent oil and gas-related roads in the areas and time periods indicated:

    a. Within the Teshekpuk Lake Caribou Habitat LUEA from May 20 through June 20: [Alts. D-E]
       (1) Traffic speed shall not exceed 15 miles per hour.
       (2) Traffic will be minimized (a reasonable target would be four convoy round-trips per day between facilities). Nonessential operations requiring vehicles shall be suspended during this time period.
    b. Within the Teshekpuk Lake Caribou Habitat LUEA from May 20 through August 1: [Alts. D-E]
       (1) Caribou movement shall be monitored.
       (2) Based on this monitoring, traffic will cease when a crossing by 10 or more caribou appears to be imminent.
    c. Within the Teshekpuk Lake Caribou Habitat LUEA from May 20 through August 20: [Alts. D-E]
       (1) Convoying shall be used to minimize the number of disturbances due to road traffic.
       (2) Personnel shall be bussed between work sites and other facilities to minimize the number of vehicles on the road.
    d. Within the Goose Molting LUEA from June 21 through August 20: [Alt. E]
       (1) Traffic shall be minimized (a reasonable target would be four convoy round-trips per day between facilities). Nonessential operations requiring vehicles shall be suspended during this time period.

51. Major equipment, materials, and supplies to be used at oil and gas work sites in the Teshekpuk Lake Caribou LUEA shall be stockpiled prior to or after the period May 20 through June 20 to minimize road traffic during that period. [Alts. D-E]

52. Chasing wildlife with ground vehicles is prohibited.

**Air Traffic:**

(**Note:** BLM's authority to restrict air traffic is limited to the practices of those parties obtaining authorization to use BLM-administered lands.)

53. Use of aircraft larger than a Twin Otter by authorized users of the planning area, including oil and gas lessees, from May 20 through August 20 within the Teshekpuk Lake Caribou Habitat LUEA, shall be for emergency purposes only. [Alts. D-E]

54. Helicopter overflights by oil and gas lessees shall be suspended in the Goose Molting LUEA from June 15 through August 20. [Alts. B-E]

55. Fixed-wing aircraft takeoffs and landings by authorized users of the planning area shall be limited to an average of one round-trip flight a day from May 20 through June 20 at aircraft facilities within the Teshekpuk Lake Caribou Habitat LUEA. Within the Goose Molting LUEA, use of fixed-wing aircraft by authorized users shall be restricted from June 15 to August 20: (a) limited to two round-trip flights/week; (b) restricted to flight corridors established by BLM in consultation with appropriate Federal, State, and NSB regulatory and resource agencies. [Alts. B-E]

56. Aircraft shall maintain 1,000 feet aboveground level (AGL) (except for takeoffs and landings) over caribou winter ranges from October 1 through May 1 and 2,000 feet AGL over the Teshekpuk Lake Caribou Habitat LUEA from May 16 through July 31, unless doing so would endanger human life or violate safe flying practices.

57. Aircraft shall maintain an altitude of 1,500 feet AGL when within ½ mile of peregrine falcon nests from April 15 through August 5, unless doing so would endanger human life or violate safe flying practices.

58. Hazing of wildlife with aircraft is prohibited.

**Oil Field Abandonment:**

59. Upon abandonment or expiration of a lease or oil- and gas-related permit, all facilities shall be removed and the sites rehabilitated to the satisfaction of the AO, in

consultation with appropriate Federal, State, and NSB regulatory and resource agencies. The AO may determine that it is in the best interest of the public to retain some or all of the facilities. [Alts. B-E]

60. Roads, airstrips, and other gravel fill shall be removed or modified upon field abandonment to render them unusable for enhanced access into and within the Goose Molting LUEA. [Alt. E]

**Subsistence:**

61. During exploration, development, and production, the lessee shall monitor oil and gas activities to determine its effects on subsistence and provide reports to BLM and the Subsistence Advisory Panel. [Alts B-E]

62. Lessees shall not unreasonably restrict access in oil field development areas to subsistence users. [Alts. B-E].

    a. Lessees shall establish procedures for entrance to facilities, the use of roads, and firearms discharge. These procedures will be coordinated through the Subsistence Advisory Panel. In cases where the lessee and the Panel disagree, the AO will determine the appropriate procedure.
    b. Lessees shall develop and distribute information about how to hunt in development areas safely (so equipment is not damaged and people are not endangered) to the communities through newsletters, meetings, radio, and signs in both English and Inupiaq.

63. The lessee shall notify the AO of all concerns expressed by subsistence hunters during operations and of steps taken to address such concerns. The AO shall resolve any conflicts that arise between subsistence hunters and the lessee over what steps should be taken to address these concerns. [Alts. B-E].

64. Prior to submitting an exploration plan or development and production plan, the lessee shall consult with the potentially affected subsistence community(ies) (e.g., Nuiqsut, Barrow, Atqasuk), the NSB, and the Subsistence Advisory Panel to discuss potential conflicts with the siting, timing, and methods of proposed operations and safeguards or mitigating measures that could be implemented by the operator to prevent unreasonable conflicts. Through these consultations, the lessee shall make every reasonable effort to ensure that exploration, development, and production activities are compatible with subsistence hunting and fishing activities and shall not result in unreasonable interference with subsistence harvests in the planning area.

A discussion of resolutions reached during this consultation process and plans for continued consultation shall be included in the exploration plan or development and production plan. In particular, the lessee shall show in the plan how its activities, in combination with other activities in the area, will be scheduled and located to prevent unreasonable conflicts with subsistence activities. Lessees also shall include a discussion of multiple or simultaneous operations, such as ice-road construction and seismic activities, that can be expected to occur during operations to more accurately assess the potential for cumulative effects. Communities, individuals, and other entities who were involved in the consultation shall be identified in the plan. The lessee shall send a copy of the exploration or development and production plan to the potentially affected community(ies), the NSB, and the Subsistence Advisory Panel at the time they are submitted to BLM to allow concurrent review and comment as part of the plan approval process.

When conflicts arise between the lessee and other interested parties regarding what steps should be taken to address the concerns, the AO shall resolve the issue. [Alts. B-E]

**Orientation Program:**

65. The lessee shall include in any exploration or development and production plans a proposed orientation program for all personnel involved in exploration or development and production activities (including personnel of lessee's agents, contractors, and subcontractors) for review and approval by the AO. The program shall be designed in sufficient detail to inform individuals working on the project of specific types of environmental, social, and cultural concerns that relate to the northeastern part of the NPR-A. The program shall address the importance of not disturbing archaeological and biological resources and habitats, including endangered species, fisheries, bird colonies, and marine mammals and provide guidance on how to avoid disturbance. This guidance shall include the production and distribution of information cards on endangered and/or threatened species in the planning area. The program shall be designed to increase sensitivity and understanding of personnel to community values, customs, and lifestyles in areas in which personnel will be operating. The orientation program shall also include information concerning avoidance of conflicts with subsistence, commercial-fishing activities, and pertinent mitigation.

The program shall be attended at least once a year by all personnel involved in onsite exploration or development and production activities (including personnel of lessee's agents, contractors, and subcontractors) and all supervisory and managerial personnel involved in lease activities of the lessee and its agents, contractors, and subcontractors.

Lessees shall maintain a record of all personnel who attend the program onsite for so long as the site is active, though not to exceed the 5 most recent years of operations. This record shall include the name and dates(s) of attendance of each attendee. [Alts. B-E]

**Traditional Land Use Sites:**

66. Lessees shall conduct an inventory of known traditional land use sites prior to any field activity. This inventory shall include sites listed by the NSB's Inupiat History, Language, and Cultural Commission. Based on this inventory, the lessee shall develop a plan to avoid these sites and to mitigate any damage that could result from field activities. The plan also shall indicate how access to the site by local subsistence users will be provided. Copies of the plan shall be submitted to BLM and the Subsistence Advisory Panel with any permit application for exploration or development. [Alts B-E].

**Other Activities:**

67. It is the responsibility of the authorized user to ensure that all people brought to the planning area under its auspices adhere to these stipulations. Therefore, authorized users of the planning area shall provide all employees, contractors, subcontractors, and clients with briefings. The briefings shall cover the stipulations applicable to the lease and/or permit. A copy of applicable stipulations shall be posted in a conspicuous place in each work site and campsite.

68. The authorized user shall protect all survey monuments and be responsible for survey costs if remonumentation is needed as the result of the user's actions.

69. A letter of nonobjection from the surface landowner or the Native corporation(s) that have selected surface lands will be required to be on file with the AO before entry on those lands.

70. All activities shall be conducted avoid or minimize disturbance to vegetation.

71. The BLM, through the AO, reserves the right to impose closure of any area to operators in periods when fire danger or other dangers to natural resources are severe.

72. The authorized user shall be financially responsible for any damage done by a wildfire caused by its operations.

73. Construction camps are prohibited on frozen lakes or on river ice. The location of construction camps on river sand and gravel bars is allowed and, where feasible, encouraged. Where leveling of trailers or modules is required and the surface has a vegetative mat, leveling shall be accomplished with blocking rather than leveling with a bulldozer.

74. Use of pesticides without the specific authority of the AO is prohibited.

75. The feeding of all wildlife by authorized users is prohibited.

76. Hunting by lessees employees and by agents and contractors is prohibited. [Alts. B-E]

77. Off-pad activities by lessees, contractors, subcontractors, and their employees is prohibited within the Goose Molting LUEA from June 15 through August 20, except in emergencies or if approved by the AO. [Alt. E]

78. Public access to goose-molting areas by way of or through the use of oil field facilities is prohibited except by subsistence users. [Alt. E]

79. Upon finding any cultural or paleontological resource, the authorized user, or his or her designated representative, shall notify the AO and suspend all operations in the immediate area of such discovery until written authorization to proceed is issued by the AO.

80. Petroleum exploration and production activities are prohibited within ½ mile of occupied grizzly bear dens, unless alternative mitigative measures are approved by the AO in consultation with appropriate Federal, State, and NSB regulatory and resource agencies.

81. Oil and gas lessees and their contractors and subcontractors shall prepare and implement bear-interaction plans to minimize conflicts between bears and humans. These plans shall include measures to (a) minimize attraction of bears to the drill sites; (b) organize layout of buildings and work areas to minimize human/bear interactions; (c) warn personnel of bears near or on drill sites and the proper

procedures to take; (d) if authorized, deter bears from the drill site; (e) provide contingencies in the event bears do not leave the site or cannot be deterred by authorized personnel; (f) discuss proper storage and disposal of materials that may be toxic to bears; and (g) provide a systematic record of bears on the site and in the immediate area. The lessee's shall develop educational programs and camp layout and management plans as they prepare their lease operations plans. These plans shall be developed in consultation with appropriate Federal, State, and NSB regulatory and resource agencies and submitted to the AO.

82. Structures shall be restricted to an area at least 100 feet from the nearest body of water.

### D. COMPARISON OF ALTERNATIVES:

Table II.D.1 summarizes some of the key management actions proposed under each alternative. For a complete list of stipulations for each alternative, readers should refer to Section II.C.7. For the management constraints associated with Wild and Scenic River designations, readers should consult Appendix G. Table II.D.2 summarizes the impacts of the first sale under each alternative and the impacts of the multiple-sale scenario for each alternative. The alternatives are described in Section II.C. The cumulative case, Section IV.H, analyzes the effects that past, present and reasonably foreseeable future actions might have on resources in and adjacent to the planning area. In addition to the potential effects associated with actions in the Northeast NPR-A Planning Area, the cumulative-case analysis includes the potential effects of those activities listed in Tables IV.A.5-1 through 7. The cumulative-case analysis for each of the alternatives is presented in a comparative format in Table IV.H.1.

### E. NEED FOR FURTHER NEPA ANALYSIS:

Additional NEPA analysis would be required for any management decision that goes beyond the scope of this document. Where possible, the analysis would tier from this IAP/EIS.

One important aspect of this document is a possible oil and gas leasing program. It is the subject of much of the analysis in Section IV. In compliance with current Council on Environmental Quality regulations, part of this analysis relies on a hypothetical development scenario based on general information about where there is high potential for oil and gas in the planning area and current industry exploration and development practices. While this analysis is adequate for oil and gas leasing, any further development, including an exploratory drilling program or the construction of the infrastructure necessary for development of an oil discovery, would require further NEPA analysis based on specific and detailed information about where and what kind of activity would occur. This analysis would result in the appropriate NEPA documentation for specific projects.

The analysis contained in this IAP/EIS addresses the overall impacts of making certain lands available for oil and gas leasing. It also analyzes the impacts of a first sale and will act as NEPA documentation for that sale. Subsequent sales are authorized under Alternatives B through E and the Preferred Alternative. Prior to conducting each additional sale, the agency will conduct a NEPA analysis, tiering from the IAP/EIS. If the analysis in the IAP/EIS is deemed to be valid, the NEPA analysis for the second and subsequent sales may only require an administrative determination or an Environmental Assessment.

### F. INTERRELATIONSHIPS:

**1. Introduction:** Many Federal laws and executive orders apply in one way or another to the planning and permitting process for any development, including an oil and gas program, in the NPR-A. Some of the major laws and executive orders include the Endangered Species Act, National Historic Preservation Act (NHPA), Archaeological Resource Protection Act, Native American Graves Protection and Repatriation Act, Coastal Zone Management Act, Wild and Scenic Rivers Act (WSRA), Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), Clean Air Act (CAA), Clean Water Act, Rivers and Harbors Act of 1899, the Fish and Wildlife Coordination Act, and Executive Order 12898 on Environmental Justice.

**2. Endangered Species Act and National Historic Preservation Act Consultation and Coastal Zone Management:** The ESA specifies consultation with the FWS and the National Marine Fisheries Service. The NHPA requires consultation with the Alaska State Historic Preservation Officer and, when there are effects on cultural resources listed on or eligible for inclusion in the National Register of Historic Places, with the President's Advisory Council on Historic Preservation. The BLM has completed these consultations. The BLM also is working with the State of Alaska through its representative on the planning team to ensure that the mandates of the CZMA are met. The required compliance documentation is included in this final IAP/EIS.

**3. Wild and Scenic Rivers Act Compliance:** The WSRA requires that BLM address wild and scenic river values in its planning efforts. In this planning effort, BLM is re-evaluating studies previously completed pursuant to Section 105(c) of the NPRPA using new information gathered since those studies were published, which is discussed in this IAP/EIS. Based on its