Jim Zelenak
09/10/2004 04:40 PM

To: Larry Bright/R7/FWS/DOI@FWS
cc:
Subject: last update (for today)

includes legislation

Talking_Points_9_10_04b.doc

Jim Zelenak
U.S. Fish and Wildlife Service
101 12th Ave., Box 19
Fairbanks, AK 99701
ph: (907) 456-0354
fax: (907) 456-0208
jim_zelenak@fws.gov

Service Briefing – NPR-A Northeast Planning Area Draft Amended IAP/EIS

Talking Points

<u>Background</u>
- 4.6-million acre NE Planning Area, roughly 20% of 23.5-million acre NPR-A
- 1998 ROD
    - 4 million acres (87%) available for oil leasing/development
    - Leasing prohibited on 589,000 acres, including Teshekpuk Lake (TL) and the area to its N, to protect unique goose-molting habitat and caribou insect-relief habitats
    - Leasing with No-Surface-Activity (NSA; see *Terms* below) requirement on 276,000 acres S and W of TL to protect caribou calving habitat and migration corridors
    - 79 prescriptive stipulations
- About 1.4 million acres leased to date, including area with NSA requirement
- Current IAP/EIS
    - Alternatives
        - No Action (retain 1998 ROD)
        - Alternative B (draft Preferred Alternative) – Would make 96% of the Planning Area available for leasing/development while placing 213,000 acres off-limits to leasing/development
        - Alternative C – Would make the entire Planning Area available for leasing/development
    - Alts. B and C would rescind the existing NSA requirement
    - Alts. B and C would replace prescriptive stipulations with performance-based stips/ROPs
    - Alts. B and C could allow permanent infrastructure (pipelines, causeways, docks, and production pads) *in* TL and other large lakes (this is unprecedented among North Slope oil fields)
- Important Terms
    - NSA (No Surface Activity) – this is BLM's interpretation of the surface requirement authorized by the 1998 ROD for a 276,000-acre swath of lease tracts west and south of TL. The 1998 ROD prohibited permanent oil and gas surface occupancy and seasonal exploratory or delineation wells, but allowed seismic activities, winter overland moves, and other nonpermanent activities.
    - NSO (No Surface Occupancy) – what BLM is proposing in terms of surface requirements for the current EIS. This designation would prohibit permanent oil and gas surface occupancy but would allow seasonal exploratory or delineation wells; it would replace the existing NSA and may also be applied to a 3-mile buffer along the inside perimeter of proposed "no-lease" areas, or to the entire area proposed by the Service as a no-lease zone and permanent control area.
    - No-Exemption Clause – BLM is proposing this clause be attached to NSO requirements so that any future requests for exemptions would have to undergo additional NEPA analysis (as opposed to the exemption process defined for other

stips/ROPs, whereby exemptions could be granted based on economics and other factors, without a need for additional NEPA analysis)

Major Service Issues (with a focus on the area N of TL)
- Pacific brant
    - Recent (post-1998) data suggest TL molting area even more important than previously thought – up to 30% (> 36,000 brant) of entire population may molt here, though much annual variation; no other known comparable molting areas
    - As a whole (and despite significant Service/Partners effort and expense), brant population continues to decline, now well below Pacific Flyway management goals; harvest restrictions appear imminent
    - Important subsistence resource for North Slope, western AK (Y-K Delta), and southwestern AK Native communities
    - During molt, flightless for 3-4 weeks
        - Susceptible to disturbance (air, road, boat traffic, other human activities)
        - Vulnerable to predation
    - Potential for irreparable disturbance-related population-level impacts
        - Behavioral – displacement (no known suitable alternate habitat)
        - Physiological – reduced nutrient uptake and lipid reserves (important for successful molt and subsequent migration)
        - Predation – increased predator numbers likely to accompany development, which provides human food sources, nesting and perching platforms, den sites, etc.
- Teshekpuk Lake Caribou Herd
    - Most important subsistence herd on the North Slope, provides majority of caribou harvested by Barrow, Nuiqsut, Wainwright and Atquasuk
    - Most successful calving occurs adjacent to and E of TL
    - Most of herd seeks insect-relief habitats N of TL
    - To access calving, post-calving, and insect-relief habitats, most of herd must pass through 2 narrow migration corridors E and NW of TL; for cows, this occurs just before or just after calving, when they are most sensitive to disturbance
- Other molting geese – large numbers of white-fronted and Canada geese, increasing numbers of snow geese
- Spectacled eiders – highest breeding density in NE Planning Area occurs N of TL
- Other breeding and brood-rearing waterfowl (pintails, king eiders, yellow-billed loons, long-tailed ducks)
- Coastal area N of TL
    - Polar bear denning habitat (may become increasingly important if global climate trends continue)
    - Salt marsh and mudflat habitats important for staging and migrating shorebirds
- Impacts of road access in TL area
- Implementation and effectiveness of performance-based stips/ROPs
    - Exceptions based on economic impacts to industry
    - Effectiveness has not been verified through research and monitoring

Service Approach and Recommendations

- The No Action Alternative, by maintaining the leasing and management strategy authorized by the 1998 ROD, would provide the greatest level of protection for the unique and irreplaceable biological resources of the NE Planning Area, particularly with regard to the area adjacent to and N of TL.
- In recognition of BLM's difficult challenge, the Service proposed a package of modifications to BLM's draft Preferred Alternative that we feel are necessary to adequately protect trust resources in the event that a decision is made to allow leasing and development in the currently closed area N of TL; our recommendations include:
    o Increasing the proposed no-lease area from 213,000 to 296,00 acres to protect molting lakes used by nearly 90% of molting brant in any year (our proposal would also increase protection for other molting geese, breeding and brood-rearing waterfowl [including threatened spectacle eiders], shorebirds, polar bears, and the TL Caribou Herd);
    o Prohibiting surface development and permanent infrastructure (retaining the existing NSA requirement) within TL and other large lakes;
    o Restricting non-emergency air traffic over the goose-molting area from June 15-Aug. 20;
    o Retaining the existing NSA requirement (or changing it to a No-Surface-Occupancy [NSO; see *Definitions*] requirement) on 276,000 acres W and S of TL to protect caribou calving, migration and insect-relief habitats;
    o Roadless design for any oilfield developments within the current no-lease and no-surface-occupancy areas;
    o Prohibiting construction of permanent facilities for oil exploration activities (almost all exploration on the North Slope currently occurs in winter using temporary facilities including ice roads, pads, and airstrips);
    o Other recommendations focused on the Colville River Special Area

Partners' Positions
- State of Alaska – supports Alternative C (although ADF&G biologists expressed concern about potential impacts to caribou and waterfowl)
- North Slope Borough – prefers the No Action Alternative
- Audubon Alaska – prefers the No Action Alternative
- Pacific Flyway Council – prefers the No Action Alternative
- The Wildlife Society – prefers the No Action Alternative

BLM Proposed FEIS Alternatives
- After reviewing Service recommendations, BLM requested a meeting to discuss other alternatives for consideration in the FEIS
- These new alternatives (see attached maps) essentially present a "middle ground" between BLM's draft Preferred Alternative (213,000-acre no-lease zone) and the Service recommended modifications to it (296,000-acre no-lease zone plus other mitigation measures); new alternatives are summarized below:
    o Alt. 1: 270,000-acre no-lease zone (with possible addition of another 20,000 acres [Pitt Point and Garry Creek])
    o Alt. 2: 233,000-acre no-lease zone

**Exhibit N, page 4 of 10**

- - o Alt. 7: Instead of being designated as a no-lease zone, the Service's recommended boundary would be deferred from leasing for 10 years
  - o Alt. 8: Instead of being designated as a no-lease zone, the Service's recommended boundary would be available for leasing, but with an NSO requirement for the entire area
- In addition to varying-sized no-lease zones, BLM has developed a series of options or themes that could be applied to each new alternative, including the Service's recommendation; these are described below and illustrated on attached maps:
  - o Change the existing 276,000-acre NSA requirement to an NSO requirement (i.e. allow winter exploration and delineation drilling, but no permanent surface occupancy), or completely remove surface restrictions from this area
  - o Allow leasing but NSO in a 3-mile wide buffer along the inside perimeter of the "no-lease" zone
  - o Add an NSO requirement to 9,000-11,000 acres east of TL to protect key caribou migration corridor
- These alternatives were compared to Service recommendations, and all (including the Service's) were evaluated based on how well they would meet the following criteria:
  - o Protect 88-90% of critical goose-molting area
  - o Provide areas for oil and gas production facilities
  - o Minimize impacts to important wildlife species (caribou, polar bears, shorebirds)
  - o Provide opportunities for winter exploration activities
- We assume that Alt. C from the DEIS will be carried forward in the FEIS, although BLM has stated that, based on comments on the DEIS, they will not put forth an alternative that would allow surface development within TL

Service Position
- Although the No Action Alternative offers the best protection of trust resources, we believe our recommended modifications to the draft Preferred Alternative, if adopted as a package, represent the best option for meeting the 4 criteria above. This approach provides additional areas for production facilities and opportunities for winter exploration in the area of high oil potential while offering reasonable protection of trust resources
- Each of the new alternatives presented by BLM represents a trade-off of varying degree between reduced protection of trust resources and increased access, exploration and development of oil reserves (Edge effects and potential impacts of development "surrounding" sensitive habitats)
- We would not oppose changing the existing 276,000-acre NSA to an NSO (i.e., allowing winter exploration and delineation drilling, nor implementation of a 3-mile wide NSO buffer within our proposed boundary, so long as each includes a "no-exemption" clause, which would require that any proposed exemptions would have to undergo additional NEPA analysis)

**Summary of Pertinent Legislation, Executive Orders, and BLM Direction**

- NPRPA – Naval Petroleum Reserves Production Act (1976)

**Exhibit N, page 5 of 10**

- o  Provides that the Secretary of the Interior "shall assume all responsibilities" for "any activities related to the protection of environmental, fish and wildlife, and historical or scenic values" and "promulgate such rules and regulations as he deems necessary and appropriate for the protection of such values within the reserve" (42 U.S.C. Sec. 6503(b))
- o  Contains special provisions that apply to any exploration and development activities within the Teshekpuk Lake area and any other areas "designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value (42 U.S.C. Sec. 6504(b), 6508). These provisions require that any oil and gas exploration and development within a Special Area "shall be conducted in a manner which will assure the maximum protection of such surface resources to the extent consistent with the requirements of [the] Act for the exploration of the reserve (42 U.S.C. Sec. 6504(b), 6508)
- o  Such values may be protected by limiting, restricting, or prohibiting the use of and access to appropriate lands (43 CFR 2361.1(e)(1))

- FLPMA – Federal Land Policy and Management Act (1976)
    - o  Gives the Secretary broad authority to regulate the use, occupancy, and development of the public lands and to take whatever action is required to prevent unnecessary of undue degradation of the public lands (43 U.S.C. Sec. 1732)

- EPCA – Energy Policy and Conservation Act (2000, as amended)
    - o  Instructs the Secretary of the Interior to conduct and update regularly an inventory of all onshore Federal lands to identify (1) USGS reserve estimates of oil and gas resources, (2) restrictions or impediments to development of such resources, and (3) furnish such inventory data to certain congressional committees
    - o  Made permanent the President's authority under the Defense Production Act of 1950 "to issue any rules or orders…in order to maximize domestic energy supplies."

- Executive Order 13212
    - o  States that "agencies shall expedite their review of permits or take other actions necessary to accelerate the completion of [energy-related projects] while maintaining safety, public health, and environmental protections…"







