Log-in



**Alaska Wilderness League \* Audubon Alaska \* Earthjustice \***
**Northern Alaska Environmental Center \* Sierra Club \***
**Trustees for Alaska**

February 25, 2005

<u>Sent via facisimile and regular mail</u>

Gale Norton, Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Dear Secretary Norton,

Thank you for the opportunity to provide comments on the Final Amended Integrated Activity Plan and Environmental Impact Statement for the Northeast Planning Area of the National Petroleum Reserve-Alaska (NPR-A or Reserve) prepared by the U.S. Department of the Interior (Interior) Bureau of Land Management (BLM), and released for public review January 28, 2005. Alaska Center for the Environment, Alaska Coalition, Alaska Wilderness League, Audubon Alaska, Campaign for America's Wilderness, Center for Biological Diversity, Northern Alaska Environmental Center, Sierra Club, The Wilderness Society, and Trustees for Alaska are deeply concerned about the management of this public land and the future of America's Arctic.

We are deeply disappointed with the new preferred alternative revealed for the first time in the Final EIS. Our groups commented on the Draft Environmental Impact Statement for the NE amendment and expressed our concern that opening previously protected parts of the Teshekpuk Lake Special Area was reckless. In our comments on the DEIS, we urged BLM to consider alternatives that provided additional protection to the Teshekpuk Lake area rather than dismantling protections. Instead, the new Preferred Alternative provides even less protection than the preferred alternative in the draft.

Our comments on the DEIS addressed a variety of concerns. In addition to the lack of a range of alternatives, the NEPA analysis was based on an unrealistic development scenario, failed to make adequate reference to the underlying science, did not contain adequate site-specific analysis, failed to analyze mitigation measures and did not analyze fully the cumulative impacts of the leasing decision. We also pointed out that the proposal to remove protections from the Teshekpuk Lake area and weaken stipulations violated BLM duty under NPRPA to provide maximum protection to special areas and to avoid undue degradation as required by FLPMA. Additional concerns included BLM's failure to comply with ANILCA sec. 810. As the FEIS does not cure any of the problems identified in our comments to the DEIS, we incorporate those comments here by reference. This comment letter will focus on problems introduced by the new preferred alternative.

1

**Exhibit P, page 1 of 34**

I.    THE NEW PREFERRED ALTERNATIVE THREATENS KEY
RESOURCES AND IS INSUFFICIENTLY ANALYZED AND
SUPPORTED IN THE FEIS.

We strongly oppose adoption of the new preferred alternative, which fails to put a
single acre of land off limits to oil and gas leasing. The Bureau of Land Management
(BLM), in developing, presenting and selecting Alternative D as the Preferred Alternative
in its Final Environmental Impact Statement (FEIS), provides insufficient data, analysis,
and explanation to demonstrate that this process and preferred alternative will provide
adequate protection for resources and comport with BLM's duties under NEPA, FLPMA,
and NPRPA, especially its obligation to provide maximum protection to the wildlife and
other surface resources of the Reserve. The proposal fails even to meet the National
Energy Policy's call for additional *environmentally responsible gas and oil
development, based on sound science*." (emphasis added). The Preferred Alternative
effectively dissolves and eliminates the Teshekpuk Lake Special Area, recognized by
Congress and Interior for nearly 30 years as well as the Teshekpuk Lake Surface
Protection Area designated in 1998. The 1998 stipulations have been gutted and
converted to vague ROPs (FEIS, Alt. D), which are not binding agreements tied to leases.

The preferred alternative should be rejected and BLM should evaluate more, not
less, protection for the critical Teshekpuk Lake region. Teshekpuk Lake is a unique
ecological resource that has been recognized for its outstanding habitat. *See* Auduon
Alaska, Wildlife and Oil Development at Teshekpuk Lake (Attachment A).

A.    Because The Preferred Alternative Introduces a Completely New
Approach Not Analyzed in the DEIS BLM Must Prepare a
Supplemental DEIS To Allow Agencies and the Public To Comment
on This Approach.

"[A]n agency's failure to disclose a proposed action before the issuance of a final EIS
defeats NEPA's goal of encouraging public participation in the development of
information *during* the decision making process." *Half Moon Bay Fishermans'
Marketing Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (quoting *California v.
Block*, 690 F.2d 753, 771 (9th Cir. 1982)) (emphasis in original)). Accordingly, an
agency must issue a supplemental draft EIS where "the alternative finally selected by [the
agency is not] within the range of alternatives the public could have reasonably
anticipated [the agency] to be considering," and "the public's comments on the draft EIS
alternatives [do not] apply to the chosen alternative and inform [the agency] meaningfully
of the public's attitudes toward the chosen alternative." *Id.* (quoting *Block*, 690 F.2d at
772; *cf. Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1291-92 (1st Cir. 1996)
(discussing relevance of 40 C.F.R. § 1502.9(c)(1) and language in "Forty Most Asked
Questions Concerning CEQ's NEPA Regulations," 46 Fed. Reg. 18026 (1981)).

The BLM introduced a new alternative in the Final Amended Integrated Activity
Plan/Environmental Impact Statement (FEIS) that was not disclosed to the public or
evaluated in the Draft. That alternative, which the BLM identifies as the final Preferred

2

Alternative, differs significantly from the three alternatives analyzed in the draft. Under this alternative, the BLM proposes to lease approximately 217,000 acres of sensitive wildlife habitat north of Teshekpuk Lake in seven large lease tracts ranging from 46,000 to 59,000 acres within which "permanent surface disturbance" is limited to 300 acres. FAEIS at 2-12.[1] That area is off-limits to leasing under Alternatives A and B and is open to leasing with no unusual conditions in Alternative C. That area amounts to more than half of the area opened by the Preferred Alternative and is highly sensitive wildlife habitat. Nonetheless, the BLM failed to supplement the Draft EIS to allow the public and experts from other agencies to review and comment on this new proposal and its potential impacts to wildlife. In so doing, the BLM acted arbitrarily and precluded meaningful public comment on the Preferred Alternative in violation of NEPA.

      B.     <u>The New Preferred Alternative Is Not Supported By Sound Science And Threatens Resources.</u>

Significant additional development and activity within key, currently-protected habitats (e.g. Goose Molting Area, Caribou Calving Area) are proposed in the preferred alternative based on the potential employment of a new set of performance-based lease stipulations and Required Operating Procedures (stipulations and ROPs), which are allegedly to be imposed under the strategy of "adaptive management" in newly opened areas of the Planning Area. However, these mitigation measures and their predicted effectiveness are not adequately described or defined nor are they substantiated by sound science. Formulation of Alternative D and its stipulations and ROPs, evaluations of their effectiveness, and evaluations of final impacts by industrial development upon ecological and social resources are based upon subjectivity and optimistic-but-inappropriate assumptions rather than quantitative analysis and science.

No new biological information or scientific studies are presented to justify any reduction in long-standing protection for key ecologically sensitive areas; instead, new biological information justifies greater ecological sensitivity and value in those areas, and therefore, continued protection. In several contexts, key knowledge or available published scientific information are omitted or disregarded. Further, no scientific process or quantitative evaluation is provided demonstrating how the Preferred Alternative was developed, analyzed, or selected. The Preferred Alternative has no demonstrable relation to sound science and fails to provide maximum protection to the special area.

Unlike the alternatives examined in the DEIS the new preferred alternative attempts a strategy that opens all areas to leasing and purports to provide protection to the most sensitive areas by limiting development on seven large lease tracts to 300 acres each. Three hundred acres of surface disturbance in each of seven lease tracts north of Teshekpuk Lake could still result in dozens of pads and traffic between them, a maze of pipelines, etc., throughout the GMA.

---

[1] This alternative differs from the other three in several other ways such as the proposal to defer leasing in Teshekpuk Lake.

Moreover, in its Preferred Alternative, BLM would apparently allow gravel mines in the seven lease tracts north of Teshekpuk Lake. Since gravel mines are not considered "permanent facilities," they would not be counted toward the 300-acre disturbance per lease tract limit. This is another reason why BLM's 300-acre limitation is insufficient protection in the GMA.

New biological information not included in the FEIS indicates a possible reduction in numbers of winter black brant populations (with subsistence ramifications), and recent increases in molting percentages of brant, white-fronted, and snow geese in the GMA northeast of Teshekpuk Lake (Mallek, USFWS biologist, pers. comm.). This information contributes toward a greater need and rationale for protection of the GMA from development and disturbance and does not support reduced protections as proposed in Alternative D.

The caribou calving area protected (141,000 acres) is a small fraction of the critical calving habitat. The caribou migration area is only four miles wide and mostly underwater. This four-mile corridor is likely to prove inadequate for efficient overland caribou migration and is therefore inadequate mitigation. There is no protection given to the narrow caribou migration corridor northwest of Teshekpuk Lake.

BLM states that the stipulations and ROPs for the Preferred Alternative D were developed through "knowledge of the resources" (p. 2-16), however that knowledge appears to be primarily speculative; little scientific knowledge or data are cited when stipulations are described (Chapter 2), including the sources of scientific studies justifying specific distances, buffers, and other thresholds when designated. No data are provided from BLM's monitoring of current development and the relative success of the prescribed stipulations and ROPs. Such data are essential in formulating and evaluating FEIS Alternative D stipulations and ROPs.

For example, ROP F-1 (permitted aircraft activities, pp. 2-45, 2-46) designates dates and altitudes and buffer distances to avoid impacts on wildlife, but offers no discussion or cited references for the parameters required. Miller et al. (1994) and Jenson (1990) would have been helpful here, but apparently were ignored. Furthermore, the exception "…unless doing so would endanger human life or violate safe flying practices." makes this ROP virtually meaningless because of the frequency of poor weather and low ceilings on the coastal plain.

The FEIS fails to state a rationale for the formulation of the "No Surface Occupancy" ("NSO") zone within the Goose Molting Area (GMA), apparently using buffers around lakes, though these buffers are not clearly defined or described anywhere in the FEIS. Map 2-4 apparently illustrates two different buffer distances around GMA lakes, but no supporting text describes them, and the multi-overlays are difficult at best to interpret. In order to understand the degree to which the NSO would reduce impacts to geese, it would be necessary to quantify the proportion of geese that would be separated from disturbance by buffer distances. Further, the FEIS should have reviewed the disturbance literature and made explicit, scientific predictions regarding the degree to

4

which geese would be disturbed by industrial activities or disturbance mitigated at those buffer distances.

The employment of buffers is not defined well in the FEIS. Are buffer areas completely off-limits, or just the bounds within which BLM *may* restrict activities? This makes a highly significant difference in how stipulations and ROPs would be evaluated for effectiveness. ROP E-11 (yellow-billed loon, b.) (2-27, 2-45) specifically states that "Development *may* be prohibited within buffers or activities curtailed while birds are present." [Emphasis added.]

NSO buffers within the GMA appear to be ¼ to 1 mile; neither size is sufficient to prevent disturbance to geese from aircraft. Derksen et al. (1992) and Ward et al. (1999) report disturbance from aircraft up to several kilometers away. Jensen (1990) reported the greatest disturbance from helicopter take-offs and landings and flights at 1550 to 2500 feet altitude, rendering BLM altitude restrictions ineffective. Using the Alpine model, an average of 18 take-offs and landings (up to 50) per day by helicopters alone may be expected at a processing facility during summer months in construction years (Johnson et al. 2003, Table 4, App. D-5). The FEIS fails to report this prediction; the stipulations and ROPs in K-4, Alternative D, fail to minimize such disturbance.

There are similar concerns with the Special Conditions in Yellow-billed Loon Habitats. For instance, ROP E-11 employs specific buffers around nests and nesting lakes and describes this as "accepted mitigation," with no scientific explanation or reference for the basis of the specific set-backs, and no reference for the basis or authority for acceptance. *See* FEIS at 2-45. No known literature would suggest these distances. Moreover, ROP E-11 requires yellow-billed loon surveys be conducted following "accepted BLM protocol," FEIS at 2-45, though no protocol is described nor is a reference citation provided. ROP B-2 (2-75 and in Ch. 4) regarding water level from deep lakes addresses only the percent of volume withdrawn. Recharge date is of primary importance to yellow-billed loon nesting success.

Evaluation of Effectiveness of stipulations and ROPs.

Most of the Stipulations and ROPs, including those based on similar mitigation strategies developed for the Northwest NPR-A Planning Area, are untested and unproven, and therefore evaluation of their effectiveness (Table 2-2 and Section 2.8) is not and cannot be science-based. In what is admittedly a "somewhat subjective" evaluation (FEIS at 2-57), effectiveness is allegedly "measured against how well the stipulation or ROP meets its stated goal." *Id.* However, there are no data for the untested stipulations and ROPs, and therefore there can be no scientific measurement. Effectiveness of stipulations and ROPs in the FEIS is in reality unknown; estimates are subjective at best and not based upon sound science. The presentation in the FEIS, however, carries a strong and misleading pretense of scientific analyses.

In addition, no quantifiable (scientific) standard exists to measure effectiveness of stipulations and ROPs as they are written. Management objectives for wildlife

5

mitigations are often couched in ambiguous terms of "minimizing impact." This is a nonsensical goal, since true minimization would require no development at all in the area. "Minimization" is undefined and nebulous, and, therefore, so is any estimate of effectiveness.

Rating levels for the stipulations and ROPs and their definitions as presented in the FEIS are unquantified and erroneous (2-57), and lack any scientific basis. Rating levels and evaluations do not directly reflect levels or significance of impacts on wildlife species, habitat, or environment, but rather they reflect levels of expectation of achieving generalized and unquantified objectives. Even a stipulation or ROP with a "High" rating estimate, therefore, could fail to avert a significant negative impact to a key species or habitat if (a) the objective is poorly defined, (b) the stipulation or ROP is not adequate, or (c) the unscientific estimation of effectiveness proves erroneous. For example, Alternative D's ROP E-11 (2-130) is evaluated as being of "Moderate" effectiveness, while the mitigation measures for yellow-billed loons remain starkly untried and untested, providing no scientific documentation or basis, and no reliable professional judgment from which to determine a "Moderate" level of achievement. All unknown or unverified levels of effectiveness of stipulations and ROPs are, by FEIS definition (2-57), to be ascribed a "Low" rating; they are not. By definition, most "High" and "Moderate" levels of effectiveness would be based on documentation; no documentation is cited in wildlife sections of this comparison.

Evaluations of effectiveness presume that stipulations and ROPs will be employed, but the FEIS does not state that all stipulations and ROPs will be used in all cases. Further, allowances of exceptions to stipulations and ROPs are often provided. For example, aircraft altitude requirements all may be disregarded for safe operations, and are likely to be frequently disregarded due to prevailing North Slope weather conditions requiring low-altitude overflights.

The FEIS depends upon an accurate estimation of the effectiveness of these stipulations and ROPs in order to describe, evaluate, and report the impacts to the resources of industrial development under the various alternatives and to ensure protection of key wildlife species and populations in the most sensitive ecological areas of the Planning Area. The estimates of stipulation and ROP effectiveness in the FEIS, however, are subjective and unquantifiable, and therefore are not based on sound science. Consistently and repeatedly, there are neither data nor scientific basis from which to presume their success or declare them successful or significant.

BLM asserts that "significant mitigating measures" have been developed in Alternative D to protect key caribou habitats. FEIS at 6-43. But there is no scientific analysis to indicate that these "significant mitigating measures" will reduce the impacts to caribou such that the resulting impacts will not be significantly detrimental to the health and long-term numbers of the herd.

In the FEIS evaluation of the effectiveness of stipulations and ROPs, BLM ignores its own recent history (and therefore likelihood) of abandoning road restrictions,

6

granting exemptions to buffer zones, and underestimating industry-related air traffic involved with developments in the Western Arctic.

Although the success of the Preferred Alternative depends upon the effectiveness of the performance-based mitigation measures or stipulations and ROPs to meet mitigation objectives, according to "Adaptive Management Concepts" (FEIS at 2-15), Adaptive Management is not defined in the FEIS, and there is no detailed discussion describing how this approach would be applied to a variety of potential development scenarios and what it would entail.

Noss and Cooperrider (1994) define adaptive management as: "The process of implementing policy decisions as scientifically driven management experiments that test predictions and assumptions in management plans, and using the resulting information to improve the plans."    The Canadian Ministry of Forests, Forest Practices Branch, defines adaptive management as:

> *Adaptive management is a systematic process for continually improving*
> *management policies and practices by learning from the outcomes of operational*
> *programs. Its most effective form- 'active' adaptive management- employs*
> *management programs that are designed to experimentally compare selected*
> *policies or practices, by evaluating alternative hypotheses about the system being*
> *manage.*
> (http://www.for.gov.bc.ca/hfp/amhome/Amdefs.htm).

Using an adaptive management approach includes an acknowledgement of uncertainty; implementation of a plan of action designed to reveal information that is unknown; monitoring of key indicators; analysis of management results relative to original objectives; and incorporation of results into future decision making.

In the FEIS it is unclear how Adaptive Management will actually be conducted in the NE NPRA. Implicit in the definition and characteristics of Adaptive Management is the need for a "control" or unaffected system (or portion thereof) with which to compare the results of experimentation and monitoring; BLM's approach of making the entire area available for leasing does not allow for this.

Adaptive Management requires the opportunity for monitoring and feedback of treatment effects and the adjustment or fine-tuning of management procedures. Given that the entire area will likely undergo development at nearly the same time, and that roads and airstrips and production facilities are not likely to be moved if stipulations or ROPs fail to achieve mitigation objectives, adjustment of procedures (facility siting, stipulations and ROPs) is precluded. There is little likelihood that corrective measures could be implemented once production is underway.

Shifting from prescriptive to performance-based stipulations would require a much greater level of monitoring, which is not evident in the FEIS. The brief section on Monitoring (2-56) lists very few stipulations and ROPs that have monitoring

**Exhibit P, page 7 of 34**

requirements associated with them. A rigorous and thorough set of monitoring goals must be developed and followed for all mitigation measures to achieve successful and effective adaptive management. Without effective monitoring, the concept of performance-based mitigation is untenable.

The Teshekpuk Lake Special Area, which, by all accounts, is an extremely valuable and sensitive area, would become the testing grounds for BLM's untried and unproven lease stipulations and ROPs and new attempt at Adaptive Management. There is no other area that can serve as a control for the Teshekpuk Lake area. Such risk and experimentation in a delicate and valuable area of international importance violates the precautionary principle and cannot be considered environmentally responsible. Nor can this approach be reconciled with the duty to provide maximum protection to special areas.

The EIS itself provides several illustration of the failure of the preferred alternative to meet the maximum protection standard BLM must achieve:

- Many of the evaluations of effectiveness of specific stipulations and ROPs related to wildlife are "Moderate," suggesting 75 – 90% achievement of mitigation objectives by the subjective definition in the FEIS. Even if this were true, mitigation at the level of 75 percent cannot be regarded as acceptable in this extremely sensitive and internationally ecologically valuable set of habitats.
- Given the value to waterfowl and shorebirds of the habitat north, northeast, and east of Teshekpuk Lake, Table 2-3 summarizes that "impacts to birds could be much greater than predicted based on amount of area disturbed" and "could affect the long-term health of the local population" of black brant and other waterfowl. FEIS at 2-139. Brant cannot tolerate reduced population health over the long term at this time, especially when current winter surveys indicate that the population may be well below 100,000 birds, the lowest population since surveys were begun.
- The Preferred Alternative "could result in long-term effects on the caribou herd's productivity and abundance." FEIS at 2-140. If this herd's productivity and abundance decline, it will have a significant impact on North Slope resident's subsistence harvest needs. Long-term effects on the caribou population must be clearly evaluated as well as the consequences to subsistence users of the North Slope.
- "The final Preferred Alternative would likely increase the risk of disturbance to internationally significant populations of molting geese, particularly brant that use the GMA..." FEIS at 4-356. This statement suggests not only risk but uncertainty of magnitude—hardly consistent with providing maximum protection.
- The final Preferred Alternative "potentially compromises much of the protection provided by the NSO" for waterfowl using the GMA. FEIS at 4-360 .
- Potential impact to birds in general, under the Preferred Alternative, "would be 4 times greater than those that would occur under the No Action Alternative."

8

FEIS at 4-361  And potential effects on species using the GMA, especially brant, could be increased.  Such impacts must be clearly analyzed and presented for the public to see and understand.  The analytical process must be transparent and scientifically defensible.

- Impacts on the Teshekpuk Lake Caribou Herd would be greater under the Preferred Alternative than under the No Action Alternative.  FEIS at 4-363 These impacts must be clearly defined and measured with a scientifically defensible process that is transparent and understandable to the public and other scientists.

- Impacts on two threatened species of eiders would be greater under the Preferred Alternative than under the No Action Alternative. FEIS at 4-372 These impacts must be clearly defined and measured with a scientifically defensible process that is transparent and understandable to the public and other scientists.

- Despite the similarity of "protected" acreages, Alternative D opens the entire GMA (currently and traditionally off-limits) to leasing and activity; 211,000 of the acres "protected" are Teshekpuk Lake itself, and they are only deferred from leasing for ten years.  The waters of Teshekpuk Lake are far different ecologically than the goose molting area, calving grounds, or insect relief habitat.  Protecting Teshekpuk Lake will not provide significant protection to the TLH or molting geese north and east of the lake.  This needs to be clearly spelled out.

II.    RATHER THAN COMPLYING WITH NEPA'S MANDATE TO PROVIDE THE PUBLIC WITH FULL INFORMATION, THE FEIS IS MISLEADING AND CONFUSING.

The FEIS is a misleading and confusing document that fails to live up to NEPA's promise "to provide a full disclosure of environmental concerns and a complete analysis for the public to review." Idaho Sporting Congress v. Thomas,137 F.3d 1146, 1152 (9th Cir.1998).  The FEIS fails to provide adequate analysis, often dismissing or overlooking relevant science. There appears to be a deliberate attempt to deemphasize the scientific evidence that shows serious impacts and to dismiss dissenting voices.  In addition, the FEIS contains a combination of misleading language and sloppy production that disinforms more than it informs.

A.  The FEIS Does Not Disclose Relevant Scientific Evidence and Fails To Analyze Impacts Fully.

BLM's evaluation of impacts on resources by projected development (Chapter 4 and Table 2-3 [pp. 2-131-on]) is a comparison among alternatives that largely generalizes to overall effects on "birds" and "mammals" and does not quantify or estimate the level or significance of impacts on the wildlife resources in a scientifically measured or modeled way, nor does it address measured or scientifically modeled effects on key sensitive species or populations, their health or long-term survival.  No scientific evaluations or predictive models are employed.

9

Numbers of acres disturbed is the currency used in most impact evaluation, with subsequent qualifications. The actual impacts to habitat types of differing wildlife value or to species of concern are not directly addressed or assessed. Further, the National Research Council review of "Cumulative Environmental Effects of North Slope Oil and Gas Activities" makes clear that impacts of oil and gas development extend beyond the immediate footprint of such developments.

Table 2-3 contains gross generalized understatements of impacts. For example, the table reports effects on birds to be "higher" under Alternative D (2-138), while the discussion of same in Chapter 4 describes impacts as four times higher in general and worse for sensitive species (4-361). However, there is no transparent analysis of how those measures were derived.

An overall rating of "minor population effects" on birds is apparently based on 2,810 acres of direct surface disruption. FEIS at 2-139 This rating is uselessly general, entirely unsubstantiated, and not scientifically derived, particularly in light of the cumulative effects discussion (below, same page), that states that "impacts to birds could be much greater than predicted based on amount of area disturbed," and could "affect the long-term health" of local populations of brant and other waterfowl.

Impacts to caribou "could be much greater than predicted based on the amount of area disturbed." FEIS at 2-140 How much greater? How significant to the caribou numbers, population, long-term health? No attempt is made to scientifically estimate or model these impacts on herd numbers. Providing a transparent analysis is fundamental for demonstrating the scientific credibility of this FEIS. Without providing the reader with an understanding of the process by which these estimates of impacts are derived, the conclusions of the FEIS are meaningless, subjective guesses.

Cumulative effects "could result in long-term effects on the caribou herd's productivity and abundance." FEIS at 2-140. No scientific analysis or modeling is presented here to predict the actual or estimated severity of this impact on the Teshekpuk Lake Caribou Herd and the subsistence hunt it supports. Cf. (Griffith et al. 2002).

The FEIS states that bird populations and habitat could recover after development/production ceased. FEIS at 4-107 4-377 This process would seem slow at best and unlikely for some key species, including for slowly recolonizing loons, particularly in light of the absence of habitat restoration in the Arctic to date. No science is cited for this general pronouncement nor was an analysis presented or described. No supporting literature is offered regarding the statement that bird populations and habitat "could recover" after development/production ceases.

The final conclusion for environmental consequences to birds by development under the Alternative A (No Action, status quo) scenario offers general proportional estimates of differences of affects to all birds, FEIS at 4-107, apparently derived from acreages of habitat disturbed (which the FEIS admits can be highly inaccurate for some species [2-

10

**Exhibit P, pg 10 of 34**

139]). There is no discussion or consideration of the variable effects on separate key species of concern, such as brant and yellow-billed loons, based on differing habitats, ecologies, and degrees of vulnerabilities by species or behavioral circumstances. The generality here obfuscates rather than illustrates critical impact potentials. No scientific references are cited or analyses provided for this final evaluation.

Impacts on birds are described as four times greater under Alternative D than under Alternative A. See FEIS at 4-361 This is a direct statement, but it is devoid of substantiating reference and vague in its blanket generalization. What is needed here is a description of the analytical process for how this estimate was derived. Without a scientific analysis, this estimate is meaningless.

The discussion suggests that the construction and use of connecting roads in GMA would reduce aircraft usage and resultant waterfowl disturbance. See FEIS at 4-357 Nowhere are the relative impacts on caribou by roads and brant by air flights compared or evaluated. Locating airstrips outside of goose molting and caribou calving areas may require longer roads. Altitude restrictions on aircraft for the benefit of caribou (K-5-d-6) will not benefit geese. It seems remarkable and unbalanced that the FEIS can predict to the acre how much disturbance would be wrought at any given market price for oil, but does not invoke the simplest model for interconnected development across the seven lease tracts (A-G, Map 2-4) or the effects upon key species' populations in the planning area. In general, and throughout the FEIS, actual impacts on individual key species are not scientifically evaluated, quantified, or adequately addressed. This is a fatal flaw of this FEIS and must be corrected for the FEIS and decision-making process to have scientific credibility.

Pipelines and "community roads" are allowed within the NSO. Inspection of pipelines will produce additional air or pedestrian traffic with concomitant disturbances to wildlife. Greater road access in this critical area of goose concentrations could have significant detrimental impacts on geese due to additional hunting pressure. The FEIS overlooks these impacts.

Oil fields could be developed in three critical Teshekpuk Caribou Herd habitats—calving grounds, insect-relief areas, and wintering grounds. The Central Arctic Caribou Herd avoided areas within 2.5 m of roads and pipelines, functionally increasing habitat loss from 2% (the immediate footprint of roads and gravel pads) to 29% (Wolfe 2000), suggesting a factor of 14.5 times more habitat effectively lost as caribou avoided roads and pipeline areas—yet the FEIS simply states that impacts of Alternative D "could be greater." FEIS at 4-363 How much greater? Where is the scientific analysis? The FEIS must provide more than professional opinions. There must be a clear process by which these impacts are evaluated and mitigation measured. Without an analysis, this document and its conclusions are entirely subjective and meaningless. This analysis should apply predictive models based on North Slope data to evaluate long-term impacts to caribou productivity and population size.

11

The FEIS concludes that caribou movements in key areas could be disrupted, but offers no scientific or judgmental consideration of what kind of impact upon the caribou ecology, numbers, and subsistence hunting that disruption would be predicted to have. FEIS at 4-367. Again, the FEIS fails to provide any clear quantitative analysis or modeling to substantiate its conclusions.

After pointing out scientifically documented reproductive losses by caribou and the likelihood of impact, the FEIS concludes that Alternative D stipulations and ROPs will limit impacts to a Moderate level. FEIS at 4-367, 4-368. This seems to be in disagreement with the definition of Moderate (4-10), and should be reflected as High. A significant and measurable effect on caribou productivity is evident and reported here, but still there is no attempt to scientifically predict the level or significance of the impact on herd numbers.

The FEIS provides misleading information regarding the effects of development on yellow-billed loons. The FEIS reports (Johnson et al. 2003) that development did not alter the distribution and abundance of yellow-billed loon nests, FEIS at 4-101, but omitted that data do indicate a loss of productivity in areas near development (Rick Johnson, pers. comm.).

Overall, the FEIS fairly consistently reports greater impacts on wildlife under Alternative D than under Alternative A, but no attempt is made to quantify or predict significance. This is a very serious flaw of the FEIS. The FEIS must clearly report how these conclusions were derived and document the quantitative analysis used. Throughout the FEIS, habitat loss and alteration acreages seem to vary and not correlate, and to disagree with Table 4.6. No explanation, formulas, or citations are offered in the context of wildlife habitat loss

Threats to subsistence hunts of brant in the Yukon-Kuskokwim Delta are not addressed sufficiently. New winter survey data indicate that brant may be at a critical low, potential leading to the restriction or elimination of harvests.

Similarly, threats to the subsistence hunt of the Teshekpuk Lake Caribou Herd (TLH) are not adequately addressed. The TLH was in balance with a 10 percent subsistence take of the herd just a few years ago; a natural or anthropogenic reduction in current numbers or increase in subsistence take could reduce the balance, causing a significant decline in population numbers or limits to traditional subsistence harvest. No scientific analysis of this likelihood was undertaken or reported. No analysis was made of the impact of a community road north of Teshekpuk Lake in the NSO, which might greatly enhance subsistence hunting in this key area, further stressing caribou and brant populations.

In its response to Comment No. 197610-044 (6-131 and 6-132), BLM suggests that data regarding the subsistence take of TLH caribou is unavailable. However, this information is readily available in Alaska Department of Fish and Game Federal Aid reports, but is omitted in the FEIS.

Discussions of development impacts on TLH caribou omit the facts that in certain years, most calving occurs north of Teshekpuk Lake, and in some years most of the TLH winters right in the Teshekpuk Lake area. In those key years, caribou calving would be more highly impacted because those areas will contain development. Winter exploration activity will more greatly impact the TLH on years when they remain in the area to overwinter. Such years may be key, high-stress years for the herd and its productivity; impacts caused by industrial disturbance could be significantly higher and long-lasting. Neither of these potentially important impacts was discussed or presented in the FEIS.

Discussions of numbers of brant using the GMA state that up to 30 percent of the Pacific flyway population of brant molt here. That is a bit misleading: Up to 30% *in a given year* molt here, and it is not always the same individuals, so that a larger percentage of the population uses the GMA on some years of their lives.

Three hundred acres of surface disturbance in each of seven lease tracts north of Teshekpuk Lake could still result in dozens of pads and traffic between them, a maze of pipelines, etc., throughout the GMA. This scenario is largely overlooked (as well as potential effects on caribou and geese) in the FEIS. We must remember that Central Arctic Caribou avoided areas within 2.5 m of roads and pipelines, functionally increasing habitat loss from 2% (the immediate footprint of roads and gravel pads) to 29% (Wolfe 2000).

The analysis fails to take into account the fact that with exploration allowed virtually everywhere, there is a significant likelihood of future exceptions to the "NSO" stipulations. Past experience shows that the only truly effective way to protect resources is by putting them off limits to leasing. For instance, the first development approved in the Northeast planning area grants an exemption to a no permanent surface activity buffer. In the Northwest FEIS, BLM itself admitted "given the present agency policies on oil development, it is difficult to guarantee the permanence of restrictions of any kind." NW NPR-A FEIS at VII-229. Teshekpuk Lake is deferred only ten years, suggesting greater development pressure in the near future.

The FEIS does not include realistic descriptions of how new technologies will avoid or reduce disturbance to wildlife. Extended reach (i.e., directional) drilling is turning out to be less of an answer due to expense and geological conditions. *See* "Alpine No Environmental Showplace" (Attachment B); "The New Technology Scam" (Attachment C).

Finally, is any mitigation rated 75 percent or less effective (or untested and unproven), or any impact on key resources, species, or populations rated "moderate" or "high," acceptable for the most ecologically sensitive and valuable areas of the Northeast Planning Area? The FEIS does not address this underlying issue.

In its estimate of reasonably foreseeable future total disturbed area for the North Slope due to gravel use, BLM includes only gravel used by the Alpine field and by the

13

**Exhibit P, pg 13 of 34**

road from Kuparuk to Nuiqsut. *See* FEIS at 4-462. Because BLM recognizes that developments on state lands as well as other developments on federal lands are reasonably foreseeable, see e.g. FEIS at 4-438, 4-442, 4-443 (listing state leases that are reasonably foreseeable, assuming half of oil estimated from reserves and satellites will be brought into production within foreseeable future, and stating that up to 8 fields will be developed in the NW NPRA), BLM should include the gravel disturbance from these projects.

It is arbitrary for BLM to characterize gas development as speculative. Although a means of transporting the gas does not yet exist, this does not imply that development is speculative. If gas development is sufficiently certain to justify leasing and exploration, it is sufficiently certain to be analyzed in this EIS along with the effects of gas exploration.

B. The FEIS Does Not Fulfill its Purposes Under NEPA to Inform the Public and Decision Makers Because it is Misleading.

We are concerned that the document uses misleading language and creates unnecessary confusion regarding the preferred alternative. For instance, according to BLM "the term 'roadless' does not mean an absence of roads." FEIS at 4-36. This defies the plain meaning of the word. According to Websters' Third New International Dictionary, the suffix "less" means "destitute of: not having: free from." Thus, "roadless" means "not having" or "free from" roads.

Similarly, BLM labels stipulations as "No Surface Occupancy," or "NSO" even when they do allow many types of surface activity. This is inconsistent with the accepted definition of an "NSO" stipulation. In case law, the courts have defined an "NSO" stipulation as one that "absolutely forbids the lessee from occupying or using the surface of the land," Conner v. Burford, 848 F.2d 1441, 1447 (9th Cir 1988). Most of the lease stipulations here at minimum allow exploration and non-permanent oil structures, such as ice pads and exploration wells.

Key terms necessary to understanding the preferred alternative are not well defined. For example, the terms "Goose Molting Area," "goose molting habitat area," "GMA lakes," "acreage associated with goose molting lakes," and "Goose Molting NSO Area" are all found in the text, but loosely defined and used. Stipulation K-4d, applicable to within the GMA states that permanent industrial facilities will be sited "outside the identified NSO areas," so not all of GMA is NSO restricted, but Map 2-4 does not clearly delineate the differences. Moreover, Map 2-4 of the Preferred Alternative D does not facilitate understanding of the alternative, but rather is difficult to interpret, particularly in the GMA area, with color-blending and numerous overlays.

II. THE FEIS FAILS TO RESPOND TO CONCERNS RAISED IN COMMENTS.

Chapter 6 of BLM's Final Amended IAP/ EIS for the Northeast NPR-A, *Response to Public Comments*, seriously fails to address the public's numerous, fundamental concerns

14

**Exhibit P, pg 14 of 34**

about BLM's Draft Amended IAP/ EIS. BLM's characterizations of summarized public comments are misleading and the responses are vague and confusing.

BLM received nearly 215,000 individual public comments on the Draft Amended IAP/ EIS, a vast majority of which opposed the draft plan's preferred alternative and identified several concerns about opening 96 percent of the Northeast Planning Area of the NPR-A to oil and gas leasing. As it has done in the past, BLM dismisses a majority of the comments by classifying them as "in response to solicitations from advocacy groups...many of these were identical statements or slight variations thereof." At no point in the Final Amended IAP/ EIS does BLM acknowledge that such comments were overwhelmingly opposed to the preferred alternative presented in BLM's draft plan. BLM also fails to recognize the legitimacy of these individual comments regardless of whether or not they were similar to other comments. Nor does BLM offer a response to address the significance of such a high volume of comments opposing the preferred alternative in its Draft Amended IAP/ EIS.

In fact, the preferred alternative in the Final IAP/ EIS is appears BLM failed to take into consideration any of the substantive comments opposing the draft preferred alternative. BLM instead uses this section of the Final IAP/ EIS to crudely refute the points it chooses to acknowledge while dismissing everything else.

Many of the comments raised concern about BLM's failure to rigorously explore and objectively evaluate all reasonable alternatives as required under NEPA. On page 6-10 of Volume 2 of the Final Amended IAP/ EIS, under Section 6.3. General Comments and Responses, BLM grossly mischaracterizes this concern from the public. BLM describes the public's concern with the statement "Environmental Impact Statements are supposed to contain all possible and probable alternatives to the proposed action."

In actual fact, the concern identified by the public was indeed that BLM failed to rigorously explore and objectively evaluate all reasonable alternatives as required under NEPA, not that BLM was supposed to evaluate all "possible and probably alternatives" as misstated by BLM.

BLM further characterizes a reasonable alternative as having to meet the proposal objectives listed in Section 1.3 (Purpose and Need for the Proposed Action) of the Draft Amended IAP/ EIS[2]. However, this explanation draws attention to a major inconsistency between the Presidential directive to the Secretary of the Interior and the two-fold purpose of BLM's objectives in amending the 1998 Northeast IAP/ EIS. Mainly, the Presidential directive to the Secretary of Interior clearly instructs the consideration of "environmentally responsible oil and gas development, based on sound science and the best available technology..." This instruction is not clearly mentioned nor is it adequately reflected in BLM's two-fold purpose for amending the 1998 Northeast IAP/ EIS.

---

[2] *Northeast National Petroleum Reserve-Alaska Draft Amended Integrated Activity Plan/ Environmental Impact Statement*, Volume 1, Bureau of Land Management, U.S. Department of Interior, June 2004, page 1-5.

**Exhibit P, pg 15 of 34**

In addition to misrepresenting the public's concern about BLM's insufficient range of reasonable alternatives in the Draft Amended IAP/ EIS, BLM's response to this charge does nothing to address the specific concern from the public that BLM failed to analyze a full range of reasonable alternatives as required under NEPA.

In its response, BLM provided no explanation as to why it found only three reasonable alternatives sufficient for evaluation in its Draft Amended IAP/ EIS. Nor did BLM demonstrate that the Draft Amended IAP/ EIS rigorously explored and objectively evaluated these alternatives. In short, BLM effectively dismissed the public's concern that the agency did not fulfill its mandate under NEPA and BLM's response provided no evidence to the contrary.

On page 6-11, BLM takes up the following comment: "The recent findings of the scientific community that oil and gas development have had very negative impacts on the Arctic terrain, contrary to the industry's assertions, makes critical a careful evaluation of any further Arctic development."

In BLM's response, the agency cites the 2003 report by the National Research Council, *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*. BLM attempts to address the public's concern about cumulative impacts from oil and gas development by stating that this report did not conclude that "oil and gas development have had very negative impacts on the Arctic terrain." Incredibly, BLM is quoting its own paraphrasing of thousands of public comments as not being a word-for-word conclusion in the NRC report, and then implies that this somehow invalidates the public's concern.

One need only look at the *Summary* section of the NRC report to see the extent to which this is false and misleading. On page 5 of the NRC report, in the *Findings* section under the subtitle *Growth of Industrial Activity,* the committee states: "Nearly all of the roads, pads, pipelines, and other infrastructure are still in place [on the North Slope] and are likely to remain so for some time. The environmental effects of such structures are manifest not only at the "footprint" itself (the area physically covered by the structure), but also at distances that vary depending on the environmental component affected. Effects on hydrologic processes, vegetation, and animal populations occur at distances of up to a few miles (several kilometers) from the physical footprint of a structure. Effects on wildland values – especially visual ones – extend much farther, as can the effects on marine mammals of sound caused by some offshore activities."[3]

The report goes on to state under the section *Damage to Tundra from Off-Road Travel,* "The tundra of the North Slope has been altered by extensive off-road travel…Seismic exploration has adversely affected vegetation and caused erosion, especially along stream banks. In addition, because seismic trails are readily visible from the air, they have degraded visual experiences on the North Slope over a large area. How

---

[3] *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*, National Research Council of the National Academies of Science, March 2003, page 5.

long damages caused by seismic surveys and other off-road travel will persist is not known, but some effects are known to have persisted for several decades."[4]

It is outrageous that BLM would mischaracterize the findings of the NRC report by implying that the report did not raise any negative impacts to the Arctic from oil and gas activities. It is even more disturbing that BLM failed to even acknowledge in its response the important and extremely relevant concerns raised in the NRC report.

In short, BLM's failure to fully acknowledge, evaluate and respond to the nearly 215,000 comments it received on its Draft Amended IAP/ EIS is unacceptable and undermines the aim of fundamental environmental laws such as NEPA. The volume of comments alone should have been enough to give BLM pause about its course in amending the 1998 Northeast IAP/ EIS. This, in addition to the overlooked substance behind these comments and BLM's total failure to address the issues of most concern to the public, should clearly demonstrate to Secretary Norton that BLM has failed to fulfill its obligation under the law and the preferred alternative presented in the Final Amended IAP/ EIS should be rejected.

Finally, not only did BLM disregard public comments, it also did not coordinate closely with USFWS in the formulation of Alternative D or in the creation of stipulations and ROPs and management scenarios. Comments from USFWS biologists and other expert professionals on the DEIS were largely ignored regarding the sensitivity of caribou and waterfowl populations in the important habitats around Teshekpuk Lake and the need to provide greater protection than was provided in Alternative B, the preferred alternative in the DEIS. Instead, a new Alternative D was formulated that protected none of the critical habitats from leasing, and that was selected as the Preferred Alternative of the FEIS. Alternative D is not a reasonable derivative from the DEIS and agency or public comments thereon.

Many of BLM's responses to comments on the DEIS (Chapter 6 of FEIS) from professional experts presenting their judgments and additional data and references attempt to explain away and avoid the comments by presuming that the FEIS Alternative D stipulations and ROPs will mitigate industrial impacts on resources within the Planning Area. Examples include BLM responses to Comment Letter Numbers 191279, 196949, 197606, 197610, and 197618 regarding Birds, Caribou, Stipulations and ROPs, and Wildlife (Chapter 6). As we have discussed at length above, these ROPs are not ad equate substitutes for full impact analysis and real protection measures.

## CONCLUSION

The Teshekpuk Lake area is a unique natural resource that is vital to wildlife and subsistence users on the North Slope and to scientists, wildlife watchers, subsistence and sport hunters throughout the United States. We are gravely concerned by BLM's

---

[4] *Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope*, National Research Council of the National Academies of Science, March 2003, page 6.

proposal to scale back protections for this area. Accordingly, we urge you at minimum to adopt the no action alternative. Any new analysis of the Northeast plan should consider adopting more protective measures in the Teshekpuk Lake area.


Respectfully submitted,

Deirdre McDonnell
Staff Attorney
Earthjustice

Cindy Shogun
Executive Director
Alaska Wilderness League

Stan Senner
Executive Director
Audubon Alaska

Sally Smith
Executive Director
Northern Alaska Environmental Center

Betsy Goll
Alaska Representative
Sierra Club

Eleanor Huffines
Alaska Regional Director
The Wilderness Society

Mike Frank
Senior Staff Attorney
Trustees for Alaska



CC:  Henri Bisson
     Susan Childs
     Rebecca Watson