DEAN K. DUNSMORE
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Telephone:(907)271-5452
Facsimile: (907)271-5827
Email: dean.dunsmore@usdoj.gov

ROBERT GULLEY
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, D.C. 20044-7369
Telephone: 202-305-0500
Facsimile: 202-305-0275
Email: robert.gulley@usdoj.gov

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, et al. <br><br> Plaintiffs, <br><br> v. <br><br> DIRK KEMPTHORNE, Secretary of the Interior; HENRI BISSON, et al. <br><br> Defendants, | ) <br> ) <br> ) <br> ) <br> ) No. 1:05-cv-00008-JKS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANTS' BRIEF

TABLE OF CONTENTS

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

    A. The NPRPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

    B. Leasing in the NPRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

    C. The ROD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

I. THE COURT'S REVIEW IS GOVERNED BY THE APA . . . . . . . . . . . . . . . . . . . . . . . -5-

II. DEFENDANTS' DECISION IS LIMITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

III. DEFENDANTS HAVE COMPLIED WITH THE NPRPA. . . . . . . . . . . . . . . . . . . . . . . -8-

IV. BLM HAS EXPLAINED ITS DEPARTURE FROM THE PRIOR PLAN . . . . . . . . . . . -11-

V. JUDICIAL REVIEW OF NEPA COMPLIANCE IS LIMITED . . . . . . . . . . . . . . . . . . . -13-

VI. BLM WAS NOT REQUIRED TO SOLICIT NEW COMMENTS UNDER NEPA . . . . -14-

VII. CUMULATIVE IMPACTS ARE ADEQUATELY ANALYZED . . . . . . . . . . . . . . . . . -18-

    A. Failure to Comment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

    B. Development in NW Planning Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

    C. Global Climate Change. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

        1. Climate Change Is Addressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

        2. Potential population level effects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

        3.The  impacts of global climate are sufficiently detailed. . . . . . . . . . . . . . . -27-

VIII. THE FEIS CONTAINS AN ADEQUATE SITE-SPECIFIC ANALYSIS . . . . . . . . . . -29-

IX. THE FEIS ADEQUATELY DISCUSSES MITIGATION . . . . . . . . . . . . . . . . . . . . . . . -31-

X. THE BIOLOGICAL OPINION FOR THE NORTHEAST PLANNING AREA
    PROPERLY ANALYZED THE PROPOSED ACTION. . . . . . . . . . . . . . . . . . . . . . . -33-

    A. Endangered Species Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

    B. *Conner v. Burford*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

    C. Listed Species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

    D. Consultations For the Northwest And Northeast Planning Areas. . . . . . . . . . . . . -37-

E. The NE BiOp Properly Analyzed The Effects Of The Action. . . . . . . . . . . . . . . . -39-

F. FWS Properly Evaluated the Action in the ROD. . . . . . . . . . . . . . . . . . . . . . . -41-

XII. NO INJUNCTIVE RELIEF SHOULD BE ENTERED . . . . . . . . . . . . . . . . . . . . . . . . -43-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

GLOSSARY OF ACRONYMS

as used herein

| | |
|---|---|
| APA | Administrative Procedure Act 5 U.S.C. §§ 701-706 |
| AR | Administrative Record |
| BLM | Bureau of Land Management, Department of the Interior |
| CRSA | Collville River Special Area |
| Draft EIS | Northeast National Petroleum Reserve-Alaska Draft Integrated Final Activity Plan/ Environmental Impact Statement, AR 3677 |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act, 16 U.S.C. § 1531-1544 |
| FEIS | Northeast National Petroleum Reserve - Alaska, Final Amended Integrated Activity Plan/Environmental Impact Statement, AR 9413 |
| FEP | Full economic potential for recovering oil |
| FWS | United States Fish and Wildlife Service, Department of the Interior |
| MMS | Minerals Management Service, Department of the Interior |
| *NAEC* | Northern Alaska Environmental Center v. Norton, 361 F.Supp.2d. 1069 (D. Alaska, 2005) |
| *NAEC* Case | Northern Alaska Environmental Center v. Kempthorne, No. 05-35085 2006 WL 2061246 (9th Cir. 2006), affirming Northern Alaska Environmental Center v. Norton, 361 F.Supp.2d. 1000069 (D. Alaska, 2005) |
| NE Biop | Final Biological Opinion (4-12-2005), AR 8354 |
| NE NPRA | Northeast Planning Area of the National Petroleum Reserve - Alaska |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321 et. seq. |
| NMFS | National Marine Fisheries Service |
| NPRA | National Petroleum Reserve - Alaska |
| NPRPA | National Petroleum Reserve Production Act as Amended, 42 U.S.C. § 6501 *et seq.* |
| NW Biop | Northwest BiOp; Endangered Species Act, Section 7 Biological Opinion for the Northwest National Petroleum Reserve - Alaska Integrated Activity Plan/Environmental Impact Statement |
| NW FEIS | Northwest National Petroleum Reserve - Alaska, Final Amended Integrated Activity Plan/Environmental Impact Statement, November 2003 |

NW NPRA     The Northwest Planning Area of the National Petroleum Reserve - Alaska

NW ROD      Northwest National Petroleum Reserve - Alaska Integrated Activity Plan/Environmental Impact Statement Record of Decision, January 2004

Pet-4       National Petroleum Reserve No. 4

Pls' Brief  Plaintiffs' Opening Brief (Docket Entry No. 49)

ROD         Record of Decision: Northeast National Petroleum Reserve - Alaska, Final Amended Integrated Activity Plan/Environmental Impact Statement, AR 9413

ROPs        Required Operating Procedures

RPA         Reasonable and prudent alternative

RPM         Reasonable and prudent measures

TLSA        Teshekpuk Lake Special Area

1998 NE FEIS     Northeast National Petroleum Reserve -Alaska, Final Integrated Activity Plan/Environmental Impact Statement, August 1998

1998 NE Plan     Northeast National Petroleum Reserve - Alaska, Final Integrated Activity Plan/Environmental Impact Statement Record of Decision, October 1998

Defendants respond in opposition to Plaintiffs' Opening Brief (Docket Entry No. 49)(Pls'
Brief). Plaintiffs seek review of a decision to amend the Bureau of Land Management's (BLM)
Integrated Activity Plan for oil and gas leasing in the 4.6-million acre Northeast Study or
Planning Area of the National Petroleum Reserve-Alaska.

Defendants note that this case is in essentially the same posture and presents some of the
same fundamental issues that were addressed in the recent decision in *Northern Alaska
Environmental Center v. Dirk Kempthorne,* No. 05-35085, 2006 WL 2061246 (9th Cir. July 26,
2006), *affirming Northern Alaska Environmental Center v. Norton*, 361 F. Supp.2d 1069 (D.
Alaska 2005)(hereinafter referred to as the *"NAEC* case"). The subject matter of that decision, as
is this case, was an environmental impact statement and a biological opinion prepared to
determine whether to open up additional areas of the National Petroleum Reserve-Alaska for oil
and gas leasing and development and, if so, pursuant to what conditions.

On January 11, 2006, Deputy Assistant Secretary of the Interior Chad Calvert signed the
Record of Decision: Northeast National Petroleum Reserve-Alaska, Final Amended Integrated
Activity Plan/Environmental Impact Statement (hereinafter referred to as ROD). AR 9413.[1]/ The
ROD makes certain additional lands within the Northeast Planning Area available for oil and gas
leasing, utilizing performance-based mitigation measures to protect important resources within
the Northeast Planning Area from the impacts of oil and gas activities.

The ROD was preceded by the Northeast National Petroleum Reserve-Alaska, Final
Amended Integrated Activity Plan/Environmental Impact Statement, January 2005, (hereinafter
be referred to as "FEIS") AR 7866, and consultation and preparation of a Final Biological
Opinion (01-12-2005), AR 8354, (hereinafter referred to as "NE BiOp") and the Northeast
National Petroleum Reserve-Alaska, Final Amended Integrated Activity Plan/Environmental

---

[1]/    AR refers to the Administrative Record as certified in Defendants' Notice of Filing of
Certified Index of Administrative Record (Docket Entry 22), and the reference is to document
number as set forth in that index.

Impact Statement Supplemental Information Report, AR 9390.[2]/

Plaintiffs contend that the FEIS is inadequate under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*, and that the NE BiOp is inadequate under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544. Plaintiffs also contend that BLM's decision fails to ensure the management of special areas in accord with the requirements of 42 U.S.C. § 6504(b)(2006).[3]/ Each of these contentions should be rejected.

STATEMENT

A. **The NPRPA**. On February 27, 1923, President Warren G. Harding reserved Naval Petroleum Reserve No. 4 on the North Slope of Alaska by executive order "for oil and gas only." Exec. Order No. 311 (Feb. 27, 1923). Petroleum Reserve No. 4 ("Pet-4") encompassed approximately 23 million acres of land, running along the Arctic Ocean from Icy Cape in the west to the mouth of the Colville River in the east. *United States v. Alaska*, 521 U.S. 1, 32 (1997). *See also* 3 FEIS, Map 1-1.[4]/ Pet-4 was placed under the jurisdiction of the Department of the Navy. Exec. Order PlO. 311.

More than half a century later Congress passed the 1976 Naval Petroleum Reserves Production Act (NPRPA) of April 5, 1976, Pub. L. No. 94-258, 90 Stat. 303, *codified at* 42 U.S.C. §§ 6501-6507 (1976).[5]/ The NPRPA was triggered by a growing nationwide need for oil that "dwarfed" the Navy's needs. 1 FEIS at I-8. Jurisdiction over Pet-4 was transferred to the Department of the Interior and Pet-4 was renamed the National Petroleum Reserve–Alaska

---

[2]/     A Supplemental Information Report has been recognized as a means by which an agency can determine if an EIS must be supplemented. *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 565-66 (9th Cir. 2000); *Friends of the Clearwater v. McAllister*, 214 F. Supp.2d 1083, 1087-88 (D. Oregon 2002).

[3]/     This latter issue was not presented in the *NAEC* case.

[4]/     The NPRA has been sub-divided for administrative purposes by BLM into three areas: The Northeast Planning Area, the Northwest Planning Area, and the Southern Area.

[5]/     The NPRPA has been amended and as so amended and applicable to this action remains codified at 42 U.S.C. §§ 6501-6508 (2000) and 42 U.S.C.A. §§ 6504-6506a(West 2006 Pocket Part).

National Audubon Society, et al. v. Kempthorne, et al.
Case No. 3:05-cv-00008
DEFS' BRIEF      2

(hereinafter referred to as NPRA). 42 U.S.C. §§ 6502 (1976). While contemplating continued

exploration of the Petroleum Reserve, the NPRPA required further authorization by Congress

before "development leading to production of petroleum from the reserve shall be undertaken . . .

." 42 U.S.C. § 6504(a), (d)(1976).

The NPRPA also required the preparation of a study "to determine the best overall

procedures to be used in the development, production, transportation, and distribution of

petroleum resources in the reserve," 42 U.S.C. § 6505(b)(1) (1976), together with recommended

procedures and any proposed legislation necessary to implement such procedures not later than

January 1, 1980." 42 U.S.C. § 6505(b)(2)(1976). The studies were completed and submitted to

Congress for review in 1978 and 1979. 1 FEIS at 1-8.

B. **Leasing in the NPRA**. In 1980 Congress amended the NPRPA to authorize "an

expeditious program of competitive leasing of oil and gas" in the NPRA. Act of Dec. 12, 1980,

Pub. L. No. 96-514, 94 Stat. 2957, 2964-65, *codified at,* 42 U.S.C. § 6508 (1982).[6]/ *Accord*

*Kunaknana v. Clark*, 742 F.2d 1145, 1147-1149 (9th Cir. 1984). Little activity occurred in the

NPRA from the mid-1980's through the mid-1990s. 1 FEIS at 1-8.

In 1997 BLM began assessing the potential impacts from oil and gas development in the

NPRA, particularly in the Northeast Planning Area. *Id*. This led first to the issuance of the

Northeast National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/

Environmental Impact Statement in August 1998 (hereinafter referred to as "1998 NE FEIS"),

and the Northeast National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/

Environmental Impact Statement Record of Decision, in October 1998 (hereinafter referred to as

"1998 NE Plan"). *Id*. Pursuant to the NE Plan, approximately 4 million acres of the Northeast

---

[6]/       The NPRPA was amended again in section 347 of the act of August 8, 2005, Pub. L. No.
109-58, 119 Stat. 594, 704-08. Defendants' action for which plaintiffs seek review occurred after
August 8, 2005; and therefore, is governed by the NPRPA as amended by this act. As amended, the
NPRPA now provides that "The Secretary [of the Interior] shall conduct an expeditious program of
competitive leasing of oil and gas in the Reserve in accordance with this Act." 119 Stat. 704, 42
U.S.C.A. § 6506a(a)(West 2006 Pocket Part).

Planning Area ("NE NPRA") was made available for oil and gas leasing under the conditions and stipulations in that ROD.[7]/

In 2001, BLM also began planning for potential leasing in the adjoining Northwest Planning Area of the NPRA ("NW NPRA"). *Id*. That planning culminated in Northwest National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/ Environmental Impact Statement in November 2003, and Northwest National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/ Environmental Impact Statement Record of Decision in January 2004. *Id*. That decision opened approximately 8.8 millions acres of the NW NPRA for oil and gas leasing, *id*., and was the subject of proceedings and decision in the *NAEC* case.

In 2002, one of the recommendations of the President's National Energy Policy, in part, directed the Secretary of the Interior to "consider additional Environmentally responsible oil and gas development... through further lease sales in the National Petroleum Reserve-Alaska," and that "such consideration should include areas not currently leased in the northeast corner of the National Petroleum Reserve-Alaska." ROD at 3 (Emphasis added). In implementing this directive, BLM published on June 23, 2003,  a notice of intent to amend the 1998 NE Plan and a call for nomination of areas to be addressed in the any amendment of that plan. 68 Fed. Reg. 37173, AR 28. The purpose of the proposed amendment was to evaluate additional lands for potential exploration and development of new oil discoveries and to consider the use of performance-based stipulations similar to those developed for the NW NPRA. AR 41 at 1; AR 1355 at 2.

Notice of the availability of the Northeast National Petroleum Reserve-Alaska Draft Integrated Final Activity Plan/ Environmental Impact Statement, AR # 3677, was published on June 9, 2004, 69 Fed. Reg. 32365, AR 3777-78. Following public comment and hearing, BLM issued the FEIS in January 2005, AR 7866. Notice of the availability of the FEIS was published on January 28, 2005. 70 Fed. Reg. 4140; AR 8657. BLM issued the ROD on January 11, 2006.

---

[7]/    That NE Plan is the subject of the litigation in *Wilderness Society at al. v. Gale Norton et al.* No. 1:98CV02396(RWR)(D.DC.).

C. **The ROD**. In the ROD, BLM adopted with minor modifications and clarifications the preferred alternative in the FEIS. ROD at 3. Subject to numerous restrictions, the ROD makes approximately 389,000 additional acres of land available for oil and gas leasing in the 4.6 million-acre Northeast Planning area. ROD at 3. This encompasses lands with the highest oil and gas potential in the NE NPRA and represents a roughly 10% increase in the amount of land previously available for leasing in the planning area. The ROD deferred leasing on the 211,000 acres of Teshekpuk Lake, which provides important over-wintering habitat for fish and breeding habitat for waterfowl, and in the Colville River Special Area, which provides important habitat for the Arctic peregrine falcon and other raptors.

The preferred alternative included an extensive array of carefully balanced stipulations and required operating procedures ("ROPs") and it reflected the extensive input that the BLM received throughout the planning process.[8]/ 1 FEIS at 2-37 *et seq.*. As the ROD at 3 explained: "[t]he plan emphasizes restrictions on surface activities, consultation with local residents, and coordinated scientific studies to protect wildlife habitat, subsistence areas, and other resources."

## ARGUMENT

### I. THE COURT'S REVIEW IS GOVERNED BY THE APA

NEPA does not contain judicial review provisions, and does not create a private right of action to enforce the requirements of NEPA. *Sierra Club v. Penfold*, 857 F. 2d 1307, 1315 (9th Cir. 1985). The authority to review an agency's compliance with NEPA is governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706 (1994). *Earth Island Institute v. United States Forest Service*, 351 F.3d 1291, 1300 (9th Cir. 2003); *Sierra Club v. Penfold*. The adequacy of a biological opinion is also reviewed under the APA. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118,

---

[8]/    Stipulations are conditions that apply to the lease.  ROD 53-54 (definitions of "lease stipulation" and "site-specific lease stipulation").  The ROPs are requirements that apply to permits for activities associated with oil and gas operations.  *Id.* at 54 (definition of "Required Operating Procedures").

1124-25 (9th Cir. 1997). Finally, the NPRPA also contains no provisions for judicial review. The standards for judicial review under the NPRPA are also governed by the APA. *See Ninilchik Traditional Council v. United States*, 227 F.2d 1186, 1194 (9th Cir. 2000).

Under the APA, 5 U.S.C. § 706, a court may review an agency's action to determine whether it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, contrary to constitutional right, power or privilege, in excess of statutory authority, or if the agency failed to observe procedure required by law. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-14 (1971); *National Association of Home Builders v. Norton*, 340 F.3d 835, 840-41 (9th Cir. 2003). Under the arbitrary and capricious standard, courts engage in a substantial inquiry, but are not to substitute their judgment for that of the agency. *Citizens to Preserve Overton Park*, 401 U.S. at 415-16; *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987). An agency's action would be arbitrary and capricious:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacture's Ass'n v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43 (1983). *Accord United States v. Clark*, 912 F.2d 1087, 1090 (9th Cir. 1990).

The presumption is that the administrative action is correct. *Wilderness Public Rights Fund v. Kleppe*, 608 F.2d 1250, 1254 (9th Cir. 1979). The court's role is only to ensure that the agency considered all of the relevant factors and that its decision contains no clear error of judgment. *Arizona v. Thomas*, 824 F.2d at 748.

Judicial review is confined to the administrative record before the agency. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Friends of the Earth v. Hintz*, 800 F.2d 822, 828-29 (9th Cir. 1986). A court may consider material not in the record for very limited purposes, including when needed to obtain background information, to explain technical terms or if the agency relied on materials not in the record. *Center for Biological Diversity v. United States Fish & Wildlife Service,* 450 F.3d 930, 943 (9th Cir. 2006); *Southwest Center for*

*Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9ᵗʰ Cir. 1996); *ASARCO, Inc. v. EPA*, 616 F.2d 1153, 1159-60 (9th Cir. 1980). However, consideration of extra-record material to determine the correctness or wisdom of an agency's decision is not permitted. *ASARCO, Inc.* 616 F.2d at 1160. Post-decisional information may not be advanced as a rationalization either for sustaining or attacking an agency's decision. *Southwest Center for Biological Diversity,* 100 F.3d at 1450-51.[9]/

## II. DEFENDANTS' DECISION IS LIMITED

Missing from plaintiffs' contentions is a recognition of the limited nature of the decision made in the ROD. The only activity authorized by the ROD is leasing. With respect to leasing, the ROD specifically states:

> The oil and gas lease is a binding agreement between BLM and the lessee that does not authorize subsequent surface disturbing activity. All surface disturbing activities such as exploratory drilling, road/pipeline construction, seismic acquisition, and overland moves require additional authorization(s) issued subsequent to leasing.

ROD at 56. The ROD also emphasizes the series of conditions on leases:

> The lease stipulations and ROPs are requirements, procedures, management practices, or design features that the BLM, through the ROD, could adopt as operational requirements. These requirements will be addressed through the permitting process. An oil and gas lease does not itself authorize any on-the-ground activity. Seismic operations, drilling, ice road construction, pipeline construction, etc. require additional land use authorizations.

*Id*. at 53.

The ROD then describes the subsequent stages in this process. *Id*. at 56. *See also* 1 FEIS at 4-14 to 4-45. These include further analysis of site-specific and project specific impacts, the

---

[9]/    Given these principles, defendants object to the court's consideration of Exhibits 8-10, 12, 16, 45, 59, 60 and 80 that accompanied Pls' Brief. While Exhibits 8-10, 16 and 80 may have appeared in the record certified in *Northern Alaska Environmental Center et al. V. Gale Norton et al.*, No. J04-0006-Civil (JKS), they are not so certified in this case. Defendants join in the objections to Exhibits 45, 59 and 60 stated in Intervenor-Defendants' Motion to Strike Extra-Record Materials (Docket Entry No. 67) and Intervenor-Defendants Reply Memorandum in Support of Motion to Strike Extra-Record Materials (Docket Entry No. 76). Defendants do not object to Exhibits 61 through 79 to the extent they are offered only to prove actual or threatened injury necessary for the court to have jurisdiction over this action.

effectiveness of mitigation, mitigation measures, and specifically includes further NEPA

compliance. ROD at 56. Additional NEPA analysis will be completed subsequent to any leasing:

> Following, leasing, any future proposed exploration or development projects in the Planning Area will be subjected to further appropriate site-specific NEPA analysis before permits or approvals for those projects will be granted, ensuring that BLM's decisions continue to be well informed as activities proceed. These... subsequent NEPA reviews will occur for each stage of oil and gas exploration and development activities.

*Id*. at 9.

Thus, no surface activities are authorized under the ROD, and none will occur until there

has been application for and further analysis of the environmental impacts of any such activities.

This case is, therefore, very similar to the *NAEC* case. As in that case the court's review should

recognize the multi-stage nature of oil and gas exploration and development, the uncertainty

where development might occur and speculative nature of data actually available prior to the

completion of exploration.

III. DEFENDANTS HAVE COMPLIED WITH THE NPRPA.

Plaintiffs contend that defendants have not in the ROD provided for the "maximum

protection of surface values" of the special areas required NPRPA, 42 U.S.C. § 6504(b)(2000).[10]/

Plaintiffs ignore the plain language of the statute which emphasizes that maximum protection of

surface values of Special Areas should be balanced with the NPRPA's requirement for

exploration of the Reserve. The plain language of the statute qualifies the maximum protection

requirement with the provision that it be "consistent with the requirements of the Act for

exploration of the reserve." 42 U.S.C. § 6504(a):[11]/

> Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, or recreational, fish and wildlife, or historical or scenic value, shall be

---

[10]/    Since no surface disturbing activities are authorized by the ROD, no "surface values", are affected by the issuance of that ROD. Therefore, there clearly has been no violation of the requirements of either 42 U.S.C. § 6504(a) or 42 U.S.C.A. § 6506a(b)(West 2006 Pocket Part).

[11]/    Plaintiff references this provision as 42 U.S.C. § 6504(b). The Act of August 8, 2005, Pub. L. No. 109-58, 119 Stat. 708, struck former 6504(a) and redesignated the former subsection (b) as subsection (a). 42 U.S.C.A. § 6405(a)(West 2006 Pocket Part).

conducted in a manner which will assure the maximum protection of such surface values **to the extent consistent with the requirements of this Act for the exploration of the reserve**.(Emphasis added

The primary requirement of the NPRPA has been to conduct an expeditious program of oil and gas exploration and competitive leasing. In enacting the NPRPA, Congress expressly stated that "[m]aximum protection of such surface values' is not a prohibition of exploration-related activities within such areas" but instead is to be balanced with ensuring "that such exploration operations will be conducted in a manner that will minimize the adverse impact on the environment." H.Conf. Rep. No. 94-942, 94th Cong. 2d Sess at 21, *reprinted in* 1976 U.S.C.C.A.N. 523.  Subsequently, when Congress amended the NPRPA in 1980 Pub. L. No. 96-514, 94 Stat. 2964-65, 42 U.S.C. § 6508 (1982), to authorize leasing, it added a section that stated in part:[12]/

> There shall be conducted, notwithstanding any other provision of law and pursuant to such rules and regulations as the Secretary may prescribe, an expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve in Alaska. (Emphasis added.)

Further, BLM's regulations, 43 C.F.R. 2361.1(e)(1) recognizes that the balance between resource protection and energy development may be struck in different ways, including through limitations or restrictions on oil and gas activities:

> To the extent consistent with the requirements of the Act and after consultation with appropriate Federal, State, and local agencies and Native organizations, the authorized officer may limit, restrict, or prohibit use and access to lands within the Reserve, including special areas.  On proper notice as determined by the authorized officer, such actions may be taken to protect fish and wildlife breeding, nesting, spawning, lambing of calving activity, major migrations of fish and wildlife, and other environmental, scenic, or historic values. (Emphasis added.)

BLM regulations also state that maximum protection may include, but is not limited to, requirements for: 1) rescheduling activities and use of alternative routes, 2) types of vehicles and loadings, 3) limiting types of aircraft in combination with minimum flight altitudes and distances from identified places and 4) special fuel handling procedures. 43 C.F.R. § 2361.1( c).

Thus, the statute and its implementing regulations clearly establish that resource

---

[12]/    See also note 11 at 8, *supra*.

protection is to be balanced with the NPRPA's requirement for oil and gas development in the NPRA. BLM is provided with the discretion to impose appropriate restrictions to minimize the impacts and balance these with Congress' directive for exploration and development.

Consistent with the NPRPA, is the President's energy policy directive to the Secretary to consider additional environmentally responsible oil and gas development through further lease sales in the NE NPRA. ROD at 3.  All of the lands left unavailable for oil and gas leasing by the 1998 NE Plan were classified as having high oil potential. 1998 NE FEIS at Fig. III.A.1.a(3)-11; 1998 NE Plan at 3. Thus, 33 percent of the high oil potential area of the planning area under the 1998 Plan was unavailable for leasing. 1998 NE FEIS II-19.  The ROD reduces the portion of the lands with high oil potential unavailable for leasing to less than 12 percent. Moreover, the assessment of the economically recoverable oil resources under the ROD is nearly triple that of the plan adopted in 1998. FEIS at 4-41

Any impacts to the resources and mitigation that might be required by 42 U.S.C.A. §§ 6504(a) and 6506a (West 2006 Pocket Part) were duly considered, addressed and balanced. ROD at 6, 17-19, 23, 68-69; 2 FEIS at 2-27 to 2-33; 6-260 to 6-261. The ROD incorporates site-specific stipulations (K-3 through K-11) which were specifically designed to protect important surface values in the Teshekpuk Lake Special Area ("TLSA") and the Colville River Special Area ("CRSA"), portions of which are in the NE NPRA. 3 FEIS Map 1-3. Within each of these Special Areas, BLM has identified several smaller areas particularly deserving of protection for particular values. These include the Rivers Area, Deep Water Lakes, Teshekpuk Lake, Goose Molting Area, Teshekpuk Lake Caribou Habitat Area, Coastal Area, Colville Rivers Special Area, and Pik Dunes. FEIS 2-6; Maps 2-2, 2-3 and 2-4. In addition, the TLSA contains the Caribou Movement Corridor, Southern Caribou Calving Area, and Lease Tracts areas. FEIS at 2-6.

BLM made particular efforts to protect the important and abundant surface values of these areas.  For instance, to protect Teshekpuk Lake and the vegetation, cultural and paleontological values, fish and wildlife habitat, and subsistence associated with the lake's shore,

National Audubon Society, et al. v. Kempthorne, et al.
Case No. 3:05-cv-00008
DEFS' BRIEF

10

the Amended Plan prohibits - without exception - permanent oil and gas facilities within a 1/4 mile of the lake. ROD at 71, K-3. The Pik Dunes, also within the TLSA, is protected by a prohibition on surface structures, except for pipeline crossings and ice pads. ROD at 73; K-8. The Southern Caribou Calving Area is designed to minimize disturbance and hindrance of caribou, or alteration of caribou movements (including calving, post calving, and insect-relief). To minimize disturbance to molting geese and loss of goose molting habitat, the Amended Plan imposes many protective measures, such as a prohibition on permanent oil and gas facilities other than pipelines within 242,000 acres of no surface occupancy and further limits on many activities from June 15 through August 20 (the period when geese are present). ROD at 17, 71-72; K-4; 3 FEIS Appendix C, Map 1A (illustrating extent of NSO stipulation).

Similarly, in the CRSA Lease Stipulation K-7 requires:

> If necessary to construct permanent facilities within the CRSA, all reasonable and practicable efforts shall be made to locate permanent facilities as far from raptor nests as feasible. Within 15 miles of raptor nest sites, significant alteration of high quality foraging habitat shall be prohibited unless the lessee can demonstrate on a site-specific basis that impacts will be minimal or it is determined that there is no feasible or prudent alternative. Of particular concern are ponds, lakes, wetlands and riparian habitats. Note: On a case-by-case basis, and in consultation with appropriate Federal and State regulatory and resource agencies, essential pipeline and road crossings will be permitted through these areas where no other feasible or prudent options are available.

ROD at 73.

BLM, thus, fully considered the requirements of the NPRPA, and explained how its chosen course of action met those requirements, and balanced the resource protection provisions of the NPRPA with the directives in the Act and the National Energy Policy to offer leases in the NPRA for oil and gas development. While plaintiffs may have preferred that BLM use a different approach and have reached a different position, BLM did all that was required of it.

## IV. BLM HAS EXPLAINED ITS DEPARTURE FROM THE PRIOR PLAN

Plaintiffs contend that the ROD is arbitrary and capricious under the APA because it departs from the approach used in the 1998 NE Plan and changes the prior policy that did not authorize leasing in the TLSA, allegedly without providing an adequate explanation for that change. The ROD, as shown at 5, *supra*, changes the 1998 NE Plan with respect to areas

available for leasing including 389,000 acres of the TLSA as available for leasing. Any leasing on Teshepuk Lake itself (211,000 acres) is deferred, ROD at 3, 17.[13]/ BLM also decided to employ performance-based lease stipulations and required operating procedures (ROPs) are utilized to increase flexibility in protecting important surface resources rather than the prescriptive-based stipulations developed in the 1998 NE Plan. ROD at 3, 19.[14]/

    Plaintiffs contend, relying on *Motor Vehicle Manufacturers Assoc. V. State Farm Mutual Automobile Insurance Co.*, 364 U.S. 29 (1983), that the 2006 ROD represents a fundamental reversal in policy that must be explained. This contention must be rejected because it misreads the *Motor Vehicle Manufacturers Assoc.* decision. Further, no change in policy in involved.

    The decision in the ROD is more like the one at issue in *Northwest Motorcycle Assoc. v. United States Department of Agriculture*, 18 F.3d 1468 (9th Cir. 1994). In that case the contention was that an agency decision to prohibit the use of off-road vehicles ("ORV"), where this use had been permitted in the past represented a change in policy. 18 F.3d at 1479-80. The court noted therein that the true policy was the broader, established one of minimizing user conflicts, not where ORV use would or would not be permitted. *Id*. at 1480. Here the policy is not, as plaintiffs characterize it, the exclusion of leasing in the TLSA, but the policy imposed by the NPRPA to make lands in the NPRA available for oil and gas leasing and development with appropriate restrictions so as to minimize impacts and balance protections with leasing. Thus, as in *Northwest Motorcycle Assoc.*, the ROD merely modified a resource management plan and existing policy. *See also Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454-55 (9th Cir. 1996).

    Further, in *Motor Vehicle Manufacturers Assoc.* the agency offered no explanation for the apparent change in policy. 364 U.S. at 46-48. Here, BLM fully explained why it was deciding to offer a portion of the TLSA that had not been offered previously for leasing. ROD at 3, 10, 20-21. As noted, these lands lie within an area of the highest oil and gas potential, thus leasing them

---

[13]/    This deferral also precludes exploratory drilling and pipeline construction. Rod at 20.
[14]/    *Compare* 1998 NE NPRA Plan at 29-44 with ROD at 53-76.

is consistent with the National Energy Policy, and could help meet the national energy needs by stemming the decline of production on the North Slope. *Id*. at 3, 17, 21. An explanation for the change in position is all that is required by *Motor Vehicle Manufacturers Assoc.*

## V. JUDICIAL REVIEW OF NEPA COMPLIANCE IS LIMITED

NEPA mandates the preparation of an environmental impact statement (EIS) for any major Federal action "significantly affecting the quality of the human environment." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1062 (9th Cir. Sept. 3, 1998). The purpose of NEPA is to assure that agencies give proper consideration to and are aware of the environmental consequences of their actions, *i*d., and that relevant information is made available to the public. *Center for Biological Diversity v. United States Forest Service*, 349 F.3d 1157, 1166 (9th Cir. 2003). Once the courts are satisfied that an agency has taken a "hard look" at the environmental consequences, "judicial review is at an end." *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997).

NEPA's mandates are procedural, not substantive, and do not require a particular result. *Robertson v. Methow Valley Citizens  Council*, 490 U.S. 332, 333 (1989); *Laguna Greenbelt, Inc. v. United States Dept. of Transportation*, 42 F.3d 517, 523 (9th Cir. 1994). "'NEPA exists to insure a *process*, not to insure any [particular] result.'" *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 960 (9th Cir. 2003), *quoting*, *Inland Empire Public Lands Council v. United States Forest Service*, 88 F.3d 754, 758 (9th Cir. 1996). NEPA's purpose is merely to prohibit uninformed -- rather than unwise decisions. *Methow Valley Citizens' Council*, 490 U.S. at 350; *Center for Biological Diversity,* 349 F.3d at 1166. A reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of its proposed action. *Selkirk Conservation Alliance*, 336 F.3d at 958; *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).

A "Rule of Reason" is applied "to determine whether the [environmental impact statement] contains a 'reasonably thorough discussion of the significant impacts of the possible environmental  consequences.'" *Center for Biological Diversity*, 349 F.3d at 1166. As stated in

*City of Los Angeles v. Federal Aviation Admin.*, 138 F.3d 806, 807 (9th Cir. 1998): "If the agency discusses the main environmental impacts reasonably thoroughly, that's enough." As more recently stated in *Kern v. United States Bureau of Land Management*, 284 F.3d 1062, 1072 (9th Cir. 2002): "We examine the adequacy of the EIS using an objective good faith standard." As is shown in the *NAEC* case, 2006 WL 2061246 at *4-9, this review must recognize the limited nature of the agency's decision, the future reviews that will be completed, and the limited information known at the oil and gas leasing stage.

The detail required in an EIS depends on the nature and scope of the proposed action. *State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). This is a "pragmatic judgment" as to whether the form, content and preparation of an EIS "fosters informed decision making and informed public participation." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001).

Courts are to defer to an agency's choice of the methodology utilized in assessing the impacts of a proposal unless the agency has failed to address some factor. *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993). It is for the agency, not the courts, to determine the experts upon which it relies. *Price Road Neighborhood Assoc., Inc. v. United States Dept. of Transportation*, 113 F.3d 1505, 1511 (9th Cir. 1997); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d at 1359.

The FEIS at issue is an extensive, integrated document. The court should consider it in its entirety. *North Slope Borough v. Andrus*, 642 F.2d 859, 601 (9th Cir. 1980). A court should also refrain from flyspecking the EIS. *Half Moon Bay Fishermans' Marketing Assoc. v. Carlucci*. 857 F.2d 505, 508 (9th Cir. 1988).

## VI. BLM WAS NOT REQUIRED TO SOLICIT NEW COMMENTS UNDER NEPA

Plaintiffs contend that the preferred alternative adopted in the ROD was substantially different from the alternatives proposed in the Northeast National Petroleum Reserve-Alaska Draft Integrated Final Activity Plan/ Environmental Impact Statement, AR 3677, (hereinafter referred to as Draft EIS). On that premise, they contend that BLM was required to issue a second draft EIS with the new preferred alternative for public comment before adopting the alternative in

the ROD. Plaintiffs' contentions must be rejected. They are wrong because the preferred alternative was within the range of alternatives examined in the Draft EIS.

The Draft EIS at 2-3 *et seq.* proposed and discussed at length three alternatives. It examined the no action alternative, Alternative B (the initial preferred alternative) that would make 95% of the area available for leasing, and Alternative C that would make 100% of the NE Planning Area available for leasing. *Id.* At 2-7 to 2-9, 2-13 to 2-33. The FEIS commencing at 2-8 considered and addressed in detail four alternatives. These were the three alternatives considered in the draft, *id.* At 2-8 to 2-11, and an Alternative D now identified as the preferred alternative. *Id.* at 2-11 to 2-13. The ROD adopted Alternative D with additional mitigation to protect important surface resources. ROD at 17-18.

One of the purposes of the NEPA is to alert the public to what the agency intends to do and to provide the public with enough information to be able to participate intelligently in that process. *State of California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982). However, this does not mean that an agency must supplement an EIS and provide an opportunity to comment on every change made in a proposed action. *Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1118 (9th Cir. 2002).

Agencies have flexibility to modify alternatives discussed in a draft EIS in response to public comments without having to circulate a new draft for comment. *Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1539 (9th Cir. 1997); *Half Moon Bay Fisherman's Marketing Assoc. V. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988). A supplemental EIS is required only if an agency makes "substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9( c)(1). An agency need not prepare a supplement and solicit further comments if the alternative selected is within the range of the alternatives the public could reasonably have anticipated and if the comments received also apply to the chosen alternative. *Half Moon Bay Fisherman's Marketing Assoc.. 857* F.2d at 508-09; *State of California*, 696 F.2d at 772. In this case, Alternative D was well within the range of alternatives proposed in the draft EIS and did not require another solicitation for comments.

Plaintiffs allege that opening an additional 370,000 acres of habitat north of Teshekpuk Lake represents a fundamental change. Under Alternative C all of the NE Planning Area would be available for leasing, including all of the TLSA and Teshekpuk Lake subject to the same performance-based stipulations and ROPs considered in Alternative B. Draft EIS at 2-8 to 2-9; 2-13 to 2-26; 2-27 to 2-33. Alternative B, like Alternative D, would have made the same 95% of the area, including the TLSA, available for leasing. 1 FEIS at 2-8, 2-11; ROD at 19-20. See Draft EIS Maps 2-1 to 2-3 for a graphic comparison of the alternatives. The only real difference between Alternative B in the Draft EIS, and Alternative D in the FEIS and ROD is that Alternative D contains some additional or more restrictive stipulations and operating procedures. *Compare* Draft EIS at 2-13 to 2-26; 2-27 to 2-23, 2-35 to 2-87 *with* 1 FEIS at 2-12 t0 2-12, 2-37 to 2-56, 2-59 to 2-152 & ROD Appendices A & B. This comparison shows that Alternatives B and D are similar, and to the extent they differ, Alternative D contains more restrictive conditions. The differences between Alternatives D and B are not significant and do not warrant a new opportunity for comment.

Another change in Alternative D from Alternative B is that Alternative D includes a division of the area north of Teshekpuk Lake into seven large lease tracts in which a maximum of only 300 acres of permanent surface disturbance would be permitted. Draft EIS at 2-7 to 2-9; 2-13 to 2-34; FEIS at 2-11 to 2-12, 2-37 to 2-56; ROD at 20-22, 53-76. It is clear, however, that this limitation was designed only as a means to limit authorized activities and impose additional or enhanced mitigation measures; not as a new leasing proposal. ROD at 21, 75. The objective is to provide added protection to surface resources and subsistence resources and activities in the area north of Teshepuk Lake. ROD at 75.

Plaintiffs' contention that the Draft EIS provided no indication that Teshekpuk Lake would not be made available for leasing is incorrect. Alternatives C and B would have made the Lake available for leasing. Alternative A (the no action alternative) would have closed the Lake for leasing. 3 FEIS Maps, 2-1, 2-3. By deferring any leases in the Lake, Alternative D, like Alternatives B and C, considered the Lake suitable for leasing, but, like Alternative A, deferred

any leasing at this time. Thus, the Draft EIS considered various alternatives that might or might not make either Teshekpuk Lake and/or areas north of Teshekpuk Lake available for leasing. That is all NEPA required.

The preferred Alternative was also developed in response to comments received, including specific proposals from the Fish and Wildlife Service ("FWS") and ConocoPhillips. FWS's proposal supported Alternative B, but suggested the use of prescriptive stipulations from the 1998 NE Plan, and additional modifications to protect important surface resources such as the goose molting habitat north of Teshekpuk Lake and caribou habitat west and south of the Lake. AR 4362; ROD at 42. ConocoPhillips' proposal supported the adoption the adoption of Alternative C with certain restrictions around lakes in the goose molting area north of the Lake. AR 5352, ROD at 42. As explained in the ROD, BLM took these proposals and numerous other public comments into account, and the result was the reasoned Alternative D.

Further, Plaintiffs ignore that numerous comments on the FEIS and on Alternative D were submitted before the ROD was issued.[15]/ *E.g.* AR Nos. 8712-13, 8732-34, 8746-51, 8764-69, 8779, 8784-86, 8789, 8794-96, 8832-36, 8850-56, 8870-85, 8893-99, 8902-11, 8915. 8938-43, 8954, 8966, 8972-73, 8997-9015, 9017-29, 9032-59, 9063-67, 9070-9101, 9103-117, 9129-42.[16]/ Some of the comments specifically addressed Alternative D. *See* AR 8972, the International Wild Waterfowl Association objected to the proposed opening of goose molting north of Teshekpuk Lake; AR 8789, Ducks Unlimited objected to the opening of the seven proposed tracts north of the lake; AR 8908 The Wildlife Society objected to opening of areas northeast of Teshekpuk Lake and the effects of the proposed 300 acres of permanent surface disturbance in the seven tracts; and AR 8893 the North Slope Borough objected to the new preferred alternative (Alternative D). Three of the plaintiffs (Alaska Wilderness League,

---

[15]/    *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1118 (9th Cir. 2002), noting the public's right to submit comments on a final EIS.

[16]/    Note, the FEIS is dated January 28, 2005, and the ROD was not issued until just over a year later on January 11, 2006.

Northern Alaska Environmental Center and Sierra Club) in this action also submitted such comments to the FEIS and extended their thanks "for the opportunity to comment on the" FEIS. AR 8898 at 1. While, these plaintiffs requested that a supplemental EIS and opportunity to comment be prepared on the new preferred alternative, i*d*. at 2-3, they were able to and did, submit extensive comments on Alternative D. *Id*. 3-5, 8-9. BLM accepted the comments and announced that it would consider them. *E.g.* AR 9160, 9161-62, 9165.

Therefore, Alternative D was within the range of the alternatives considered in the Draft EIS, and the FEIS was available for comments. There was no need for a further opportunity to comment.

### VII. CUMULATIVE IMPACTS ARE ADEQUATELY ANALYZED

Plaintiffs contend that the FEIS does not adequately address two types of cumulative impacts. They argue that the FEIS does not fully account for the effects of relaxation of restrictions on oil and gas development in the NW NPRA. Pls' Br. At 25. Further, they argue that the FEIS fails to adequately consider the additional impacts to any of the alternatives as a result of global warming. *Id*. at 26-27 Both of these contentions should be rejected. First, plaintiffs' contentions were not raised in their comments. Second, BLM's analysis is adequate under NEPA.

The task of selecting the scope of an EIS is assigned to the special competency of the agency. *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976); *Selkirk Conservation Alliance v. Fosgren*, 336 F.3d 944, 958 (9th Cir. 2003). This includes consideration of cumulative impacts. *Id*. A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7, *Accord Earth Island Institute v. United States Forest Service*, 351 F.2d 1291, 1306 (9th Cir. 2003). Agencies "need not consider potential effects that are highly speculative or indefinite." *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1163 (9th Cir. 1998); *Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992). *See also Churchill County v. Norton*, 276 F.3d 1060, 1080 (9th Cir. 2001) *opinion modified, rehearing denied*, 282 F.3d 1055 (9th Cir.

2002), *cert denied*, 537 U.S. 822 (2002) (where uncertainty existed as to the extent of future actions, it was not arbitrary and capricious for the agency to find it would be speculative to analyze their cumulative impacts). NEPA does not require an agency "to consider the possible impacts of less imminent actions when preparing an impact statement on proposed actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410, note 20 (1976). As stated in *Kleppe*:

> Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment, and the condition of that environment presumably will reflect earlier proposed actions and their effects.

*Id*.

**A. Failure to Comment.** Significantly, Plaintiffs have not shown that they presented their arguments regarding BLM's cumulative impacts analysis in comments submitted to BLM. Plaintiffs did not presented them in their comments on the Draft EIS, AR 4334, 4438, or in comments to the FEIS, in AR 8789, 8893, 8898, 8908 8972, 8954, 9063.

Comments on a draft EIS are "shall be as specific as possible." 40 C.F.R. § 1503.3(a). Comments must alert the agency to the alleged problems so that they can be addressed. *Department of Transportation v. Public Citizen*, 541 U.S. 752, 764 (2004); *quoting*, *Vermont Yankee Nuclear Power Corp. V. Natural Resources Defense Council*, 435 U.S. 519, 553 (1978):

> Persons challenging an agency's compliance with NEPA must 'structure their participation so that it ... alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration.

In this instance, Plaintiffs had a clear opportunity to present issues regarding the sufficiency of the cumulative impacts analysis, and they did not do so at a time when they could have been considered by BLM in either the FEIS or the Supplemental Information Report, AR 9390.

**B. Development in NW Planning Area**. The FEIS specifically discusses at length and in detail the potential cumulative environmental impacts associated with proposed modifications to the 1998 NE Plan. 2 FEIS at 4-417 to 4-590. Plaintiffs flyspeck this analysis by alleging the FEIS does not analyze the effects of the so called "relaxation of restrictions" in the NE NPRA on future oil and gas development in the NW NPRA. In support of this allegation, Plaintiffs argue

that statements in the Northwest National Petroleum Reserve-Alaska Final Integrated Activity Plan/Environmental Impact Statement, November 2003 as ("NW FEIS") indicate that potential oil and gas development in the NW NPRA is constrained by the prior restrictions in the NE NPRA. They argue that the ROD removes these constraints and, thus, more development will occur in the NW NPRA.  They contend that BLM unlawfully failed to analyze the effects of this cumulative effect in the NE FEIS

Even if this question had been timely raised, Plaintiffs' contentions with respect to the NW FEIS are without merit. In the preparation of the NW FEIS, BLM projected the future economic potential ("FEP") for production in the NW Planning area as part of the hypothetical development scenario used to evaluate the effects of the action. BLM viewed this scenario as creating a conservative assumption for evaluating "worst case impacts." NW FEIS at IV-70. The estimated amount of full economic potential for recovering oil ("FEP") in NW Planning  was 2,100 MMbbls.  NW FEIS at Table IV-06.

BLM recognized that other factors could limit the ability of the area to realize the FEP. For the preferred alternative in the NW FEIS, BLM, as part of its conservative, worst case analysis, assumed that 40 percent of FEP might not be realized. *Id.* at IV-69. Using this assumption, BLM projected 1260 MMbbls of economically recoverable oil could be developed in the Northwest Planning Area and that, as a result, up to eight fields would be developed in the area.[17]/ *Id.* at Table IV-06. Of the alleged 40 percent of "lost opportunity" in the Northwest Planning Area, BLM attributed 20 percent to "restrictive regulations" in the Northeast Planning Area "through which most of the support for Northwest NPRA operations must pass." *Id.*

Subsequent to the NW FEIS, BLM commenced reconsideration of the 1998 NE Plan, prepared the FEIS, and issued the ROD. The selected alternative in the ROD replaces the

---

[17]/    The FEIS projects that half of this development, if it occurred, would not occur for at least 20 years and, thus, considered it to be speculative at this time. 2 FEIS Table 4-36 at 4-451.

prescriptive restrictions with restrictions that are performance-based. ROD at 17-19, 43-76.[18]/
BLM found that the performance based regulations provided a level of protection "similar to, or even grater than" the level of resource protection provided in the 1998 Northeast IAP/EIS.  Draft FEIS at 2-9.

Plaintiffs argue that the FEIS is inadequate because it did not adjust the 1260 MMbbl of economically recoverable oil in the NW Planning Area upward by an additional twenty percent when it looked at cumulative effects in the NE FEIS. Plaintiffs ignore that the ROD authorizes only leasing; it does not authorize any on the ground activities. The projections of production in the NW NPRA is part of a hypothetical development scenario required under *Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1998), *cert. Denied sub nom, Sun Exploration & Production Co. v. Lujan,* 489 U.S. 1121 (1989), to evaluate the overall effects of the action at the leasing stage when information is not available as to whether any development will actually occur or if it does the amount and location that will occur. *NAEC* case, 2006 WL 2061246 at *5 (At the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any may eventually materialize."). Indeed, while some leases have been sold in the NW NPRA, there has, as of yet, been no discoveries or development in the NW NPRA. FEIS at 3-15. Under *Connor*, the evaluation of the actual effects of development in the NE Planning Area will occur if and when post leasing activities are proposed and concrete information is available. *NAEC* case, 2006 WL 2061246 at *6 (recognizing that post-leasing stages will require authorization and subsequent review when more specific information is available). It would indeed speculative to attribute at this time any effect to the limited changes in regulatory restrictions in the NE NPRA

---

[18]/    For the selected alternative, the ROD prescribes specific measures to protect important resources in the Teshekpuk Lake area. These include Stipulations and ROPs including a specific ROP to protect eiders (ROP E-11) and additional seasonal and spatial leases to protect sensitive areas, such as Teshekpuk Lake (Stipulation K-3), goose molting areas (Stipulation K-4) and caribou (Stipulations K-9 and 10). ROD, Appendix B, at 67-68.  In addition, surface disturbance within each of seven large tracts north of Teshekpuk Lake containing sensitive goose molting, caribou calving, post-calving and insect relief habitat will be limited to 300 acres. ROD at 13 and 74-75 (Stipulation K-11).

on any development that may, or may not, occur in the NW NPRA, particularly when additional opportunities will be available in the future to make that analysis based on actual information about the effects of the so-called relaxation of restrictions in the NE NPRA.

The analysis of the cumulative effects in the FEIS is adequate for the leasing stage of a multi-stage oil and gas development program. The factors associated with oil and gas development and their cumulative impacts are set forth in 2 FEIS 4-421 to 4-470. This includes consideration of development activities on the entire North Slope including the NW NPRA. Possible activities in the NW NPRA are specifically included in this discussion. *E.g.* 2 FEIS at 4-427, 4-436, 4-442 to 4-443, 4-451. The FEIS follows with a discussion of cumulative impacts on a resource by resource basis.[19]/ *Id*. At 4-471 to 4-588. Additional impacts associated with development in the NW NPRA are included in the resource by resource discussions. *E.g.* 2 FEIS 4-475, 4-479, 4-484, 4-490, 4-501, 4-502, 4-508, 4-516 to 517, 4-537, 4-541, 4-546, 4-586. Thus, BLM has considered and taken the required hard look at the potential impacts in the NW Planning Area at the leasing stage. That is all it was required to do.

C. **Global Climate Change**. Plaintiffs acknowledge that the FEIS includes an analysis of the effects of global climate change. Nevertheless, they contend the analysis is insufficient to satisfy the "hard look" standard under NEPA.

While the recent ruling in the *NAEC* case did not include a global climate change issue, the court did elucidate on the limited knowledge available at the leasing or planning stage and the opportunity for further analysis at later stages. Consistent with the reasoning in the *NAEC* case, the court should conclude that the discussion of any impacts associated with global climate change in the FEIS are more than adequate.

Further, plaintiffs rely on two declarations submitted after the administrative record in this case was closed and containing opinions outside the declarants' areas of wildlife expertise.

---

[19]/    *See*, 23-24, 32-33, *infra*, setting forth specific the resources and activities considered.

These declarations, which this court should not consider,[20]/ assume a level of certainty about the effects of global climate change for which no scientific evidence is supplied. The declarations fail to add any new, scientifically sound information not already considered in the FEIS.

**1. Climate Change Is Addressed**. Plaintiffs assert that the FEIS should have addressed global climate change in its discussion of the direct and indirect effects of the action, and not as part of a cumulative impact. Plaintiffs misapprehend the distinction between direct and indirect effects, on the one hand, and cumulative impacts, on the other.

The CEQ regulations define "direct and indirect effects as impacts "<u>caused by</u> the action" either immediately or later in time. 40 C.F.R. § 1508.8(a) - (b) (emphasis supplied). "Cumulative impacts" are impacts that result from "the incremental impact of the action <u>when added to other past, present and reasonably foreseeable future actions</u>. . . ." <u>Id</u>. at § 1508.7. Global climate change is neither a direct, nor an indirect effect of the proposed action. It would not be caused by the action of opening up additional lands in the NE NPRA to leasing and possible subsequent development. Global climate change is an ongoing phenomenon may be the result of past, present or reasonably foreseeable future events. These effects are properly considered in the FEIS as a cumulative impact.[21]/

The cumulative impacts section of the FEIS contains precisely the analysis plaintiffs allege is missing by setting forth the effects of global climate change as a cumulative impact together with the effects of energy development. The FEIS explains that the impacts of oil and gas activities in the Planning Area "could be much greater. . . than would be the case if the climate were relatively stable." FEIS at 4-418. *See also* FEIS at 4-491 (recognizing that the impacts of climate change "could accelerate or exacerbate changes in soil thermal regimes that occur with development," and lead to greater environmental impacts); and 4-565 (noting that the

---

[20]/   *See* 6-7, *supra*.

[21]/   Plaintiffs own arguments, Pls' Br at 28, that the FEIS must consider global climate change "in combination" with "oil development activities" shows that even they are talking about cumulative impacts.

effects of global climate change would be "interactive" with those of oil and gas activities). The FEIS also presents a careful and detailed analysis of the cumulative impacts of climate change and energy development on each physical, biological and social resource identified in the Description of the Affected Environment in Chapter 3. *See* effects on: air quality, FEIS at 4-473; paleontological resources, at 4-476; soils, at 4-480; water resources, at 4-486; vegetation, at 4-491; wetlands and floodplains, at 4-494; fish, at 4-502; birds, at 4-511 to 4-512; terrestrial mammals, at 4-518 to 4-519; marine mammals, at 4-524; bowhead whales, at 4-528; spectacled and Steller's eiders, at 4-536 to 4-537; cultural resources, at 4-540 to 4-541; subsistence, at 4-554 to 4-555; sociocultural systems, at 4-560; coastal zone, at 4-572; recreational resources, at 575; visual resources, at 578; and the economy, at 587.

Thus, the FEIS properly considered global climate change as a possible cumulative impact in combination with the effects of oil and gas activities and adequately describes the potential impacts of climate change on various resources and activities.

**2. Potential population level effects**. Relying exclusively on post-decisional declarations that the Court should decline to consider, plaintiffs maintain that the discussion of global climate change in the FEIS fails to account for potential population level impacts on certain species. Plaintiffs overlook the substantial discussion the Agency dedicates to this issue.

While emphasizing the scientific uncertainty that exists in predicting with precision the impacts of global climate change, the FEIS nevertheless projects that population levels of some species could be effected as a result of the combined effects of worldwide energy development and climate change. Contrary to plaintiffs' assertions, the FEIS acknowledges the extreme possibility that populations of some Arctic species could be "pushed toward extinction" if key habitat is lost and competition with other species is increased due to global climate change. 2 FEIS at 4-468.  The FEIS then provides thorough, detailed discussions of the potential impacts of oil and gas activities on particular wildlife populations, including caribou, brant and polar bears, each of which were singled out by Plaintiffs as deserving discussion.

For example, the FEIS notes at the outset that limitations exist in predicting the impacts

of global climate change on terrestrial mammals in complex ecosystems such as the Arctic. 2 FEIS at 4-518. With that qualification, the FEIS acknowledges that the effects of global climate change could amplify the impacts to caribou that could result from oil and gas activities alone. *Id.* at 4-518 to 4-519. The FEIS then undertakes a detailed analysis of the possible habitat that could be lost due to global climate change and concludes that this loss could be severe. *Id.* Specifically, the FEIS explains that "an increase in the abundance of deciduous shrubs, especially birch (less favorable caribou forage), and a decline in the abundance of grasses-sedges such as tussock cottongrass (an especially important food of calving caribou)" could occur if Arctic temperatures increase, thus "reducing the amount of available forage for caribou on the North Slope." *Id.* at 4-518. The FEIS considers that these changes in vegetation, along with the "invasion of taiga woody plants, a less favorable habitat" for caribou, and the early thawing of rivers could affect access to caribou calving grounds. *Id.* at 4-518, 4-555. Moreover, the FEIS explains that warming temperatures could result in "increased insect abundance and activity", thus increasing the importance of insect-relief areas for caribou, which in turn could be diminished due to increased coastal erosion and inundation of low-lying coastal areas. *Id.* at 4-518 to 4-519. Furthermore, the FEIS explains that changes in weather patterns could alter caribou movements and distribution. *Id.* at 4-518. The FEIS also notes that subsistence users could be required to turn to species which are more labor intensive to harvest, such as moose, if caribou populations are reduced or caribou movement patterns are changes. *Id.* at 4-555. Finally, the FEIS explains that if caribou populations are reduced, a corresponding reduction in caribou predators, such as wolves, bears, and wolverines, could also result. *Id.* at 4-519.

The FEIS provides a similar level of detail and analysis in its discussions of the potential effects of global climate change on bird and polar bear populations. *Id.* at 4-511, 4-455 (climate change could diminish sheet ice and tundra habitat such that bird populations could decrease, change their migration paths or, in the extreme instance, become extinct and describing potential loss of traditional bird harvest areas for subsistence use); at 4-524 and 4-555 (potential for climate change to cause reductions in the thickness of sea ice which could affect polar bear food

chains and populations). In addition to caribou, birds and polar bears, the FEIS recognizes the possibility that other resources, such as fish, could experience population level effects from global climate change, as well. *Id.* at 4-502, 4-555 (in-depth discussion of potential for warming temperatures to change marine currents, raise sea levels and inundate low-lying coastal areas, which could in turn alter sensitive habitat and population distribution of different fish species).

In short, the FEIS provides a thorough and thoughtful analysis of the possible population level effects of global climate change on various species. To the extent the declarations relied on by plaintiffs restate the potential impacts already discussed in the FEIS, the declarations fail to add any new information not already considered by the Agency in its cumulative impacts analysis.[22/]

Not only does the FEIS detail potential population level effects of climate change which may be attributable to energy development, it recognizes that these effects will vary depending on the location and level of activities under each alternative. 2 FEIS at 4-588 to 4-589. The FEIS explains that "the incremental contribution of an alternative to cumulative impacts is assumed to be proportional to the projected level of activities for that alternative," and recognizes that the cumulative impacts would be greater for activities in areas with higher surface resource values. 2 FEIS at 4-588; ROD at 10. This would be the case, for all alternatives for leasing different

---

[22]/    To the extent the declarants, neither of whom has provided any evidence that he is an expert on the subject of global climate change, describe potential impacts without supporting evidence, the declarations are speculative and irrelevant. An example of this is Plaintiffs' contention that the effects of climate change and energy development are synergistic rather than merely additive. Declaration of Jack Lentfer at 5 ("The combined synergistic effect of global warming and development in the Teshekpuk area on polar bears is likely greater than the additive effects if they could be considered individually"); Declaration of John Schoen at 8 ("The effects of oil development and global climate change may not simply be additive.") Synergistic effects are those for which the total effect of multiple actions is greater than the sum of the effects taken independently. 1 FEIS at 4-420. As explained in the FEIS, no evidence exists that the effects of climate change and development are in fact synergistic. *Id.* The FEIS states: "While synergistic impacts have been demonstrated in the laboratory (for certain types of chemical reactions, for example), there is almost no evidence of such impacts occurring when dealing with biological resources in the Arctic environment. Where synergistic impacts are not specifically accounted for in the analysis section, it is because there are neither studies nor information supporting the identification of such impacts." *Id.*

amounts of lands surrounding Teshekpuk Lake. 2 FEIS at 4-511 to 4-512, 4-519. Thus, the FEIS concludes that the incremental contribution to cumulative effects would be greatest under Alternative C, which would make all lands in the Planning Area available for leasing, and least under Alternative A, the No Action alternative. *Id.* at 4-519 (concluding that the direct, indirect and cumulative effects on caribou would be greater for alternatives that allow leasing in areas around Teshekpuk Lake); at 4-524 (explaining that the impacts to polar bears would be greatest under Alternative C); at 4-512 (concluding that the impacts on brant would be greater under the alternatives which make areas north of Teshekpuk Lake available for leasing and greatest under Alternative C).

Thus, the FEIS provides a sufficiently reasoned choice among alternatives and the NEPA required hard look by adequately comparing the cumulative effects of the various alternatives.

**3.  The  impacts of global climate are sufficiently detailed.** Plaintiffs assert that the Agency should have attempted to quantify the combined effects of climate change and energy development in the FEIS. Plaintiffs' assertion is in error, as it assumes a level of scientific certainty about the effects of global climate change contrary to the record, and ignores the applicable legal standard under NEPA.

The Supreme Court explicitly acknowledged the deference that is to be paid to an agency analyzing the cumulative impacts of a proposed action:

> Cumulative environmental impacts are, indeed, what require a comprehensive impact statement.  But determination of the extent and effect of these factors. . . is a task assigned to the special competency of the appropriate agencies.

*Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976). The scope and structure of a cumulative effects analysis "is a task assigned to the special competency of the appropriate agencies." *Id*. "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences." *Id*. at 410.[23]/

---

[23]/    A Court must grant the agency deference as to the extent and effect of the cumulative impacts it has identified. Although "[i]t is of course always possible to explore a subject more deeply and to discuss it more thoroughly[,t]he line-drawing decisions necessitated by this fact of life are vested in

(continued...)

In this instance, the BLM's detailed and comprehensive analysis of the cumulative impacts of global climate change is more than adequate to satisfy the "hard look" standard under NEPA. The analysis is based on an extensive review and thorough consideration of the relevant studies and scientific literature by known experts on the topic of climate change.[24]/ These authorities, including the Intergovernmental Panel on Climate Change (IPCC) and the Arctic Climate Impact Assessment (ACIA) (excerpts attached as Exhibits 1 and 2 hereto)[25]/ underscore the limitations that exist in predicting the magnitude and timing of the effects of global climate change. The IPCC explains that the ecological changes from global climate change "are likely to be significant," although "they cannot be reliably forecast or evaluated." Exhibit 1 at 12. Moreover, the existing scientific models for predicting the impacts of global climate change are less reliable on a regional than a global level. Exhibit 1 at 2: "'inter-model variability in the simulated regional changes are still too large to yield a high level of confidence....'" *See also*, Exhibit 2 at 3 (describing lower confidence in results at a smaller regional scale). Using these models to predict impacts on populations of particular species in a particular region, yields results which are even more uncertain. 1 FEIS at 3-8.

The FEIS also properly accounts for the considerable scientific uncertainty regarding climate change in its cumulative impacts analysis. Because the ability to assess "the impacts of

---

[23]/    (...continued)
the agencies, not the courts." *Coalition on Sensible Transportation v. Dole*, 826 F. 2d 60, 67 (D.D.C. 1987). The "hard look" under NEPA need only be sufficient to fulfill the purposes of NEPA to inform the public and "'to provide decision makers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences'" and "to make a reasoned choice of alternatives as far as environmental aspects are concerned.'" *Dubois v. United States*, 102 F. 3d 1273, 1287 (1st Cir. 1996). Under NEPA, agencies "need not consider potential effects that are highly speculative or indefinite." *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1163 (9th Cir. 1998); *Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992). *See also Churchill County v. Norton*, 276 F.3d 1060, 1080 (9th Cir. 2001) *opinion modified, rehearing denied*, 282 F.3d 1055 (9th Cir. 2002), *cert denied*, 537 U.S. 822 (2002).

[24]/    The Bibliography to the FEIS contains 21 separate scientific studies devoted to the topic of global climate change and considered by the Agency in its analysis. FEIS at Bibliography at 5, 7, 8, 14, 25, 32, 41, 48, 51, 52, 56, 60, 64, 72 and 75.

[25]/    Exhibit 1 is listed as a reference to the FEIS in the certified index of the record (Docket Entry No. 22. Exhibit 2 is referenced in 1 FEIS at 3-8.

climate change is in its formative phase," the FEIS cautions that "it is not yet possible to know

with confidence the net impact of such change." 1 FEIS at 3-8. Consistent with this conclusion,

the FEIS further states that "[i]t is expected that global climate change affects animal

populations, but the type, location, and magnitude of effects" is uncertain. 2 FEIS at 4-468 and 4-

565. *See also* 2 FEIS at 4-491 (recognizing that climate change could have major effects on

ecosystems in Alaska but that "the large amount of natural variation inherent in the system limits

our current understanding of the consequences of climate change.")

In light of the substantial uncertainty inherent in predicting the impacts of global climate

change, BLM's analysis of climate change in the cumulative impacts section of the FEIS more

than satisfies the "hard look" standard under NEPA. Any attempted delineation or quantification

of the effects of global climate change would be highly speculative. As already shown,

speculative analysis is not compelled under NEPA

## VIII. THE FEIS CONTAINS AN ADEQUATE SITE-SPECIFIC ANALYSIS

Plaintiffs contend that by deciding to offer lease in an additional portion of the NE

NPRA, defendants' supporting EIS must examine specific site-specific impacts of specific oil

and gas development in the lease area. The Ninth Circuit addressed this same argument in the

*NAEC* case. 2006 WL 2061246 at *4-6, and rejected it.[26]/

Since neither the ROD nor the leases that may be sold as a result of the decision will

authorize any surface activities, no environmental impacts can even flow from the decision of

lease sale. Any such impacts can occur only if specific proposals for exploration and

development are submitted and the proposals are permitted following further environmental

analysis.

---

[26]/    In the *NAEC* case, the Ninth Circuit found that the use of hypothetical scenarios rather than
a parcel by parcel specific analysis was sufficient at the leasing phase to meet the requirements of
both NEPA and the ESA. Issue preclusion bars relitigation of issues adjudicated in an earlier
proceeding if: (1) the issue sought to be precluded is the same as that involved in the prior action;
(2) the first proceeding must have ended with a final judgment on the merits; and (3) the party
against whom collateral estoppel is sought must be a party in the prior proceeding. *Reyn's Pasta
Bella v. VISA, USA*, 442 F.3d 741, 746 (9th Cir. 2006). The parties in this action are identical to the
parties in the prior case. Therefore, this determination is binding on plaintiffs in this action.

The FEIS addresses impacts of potential future lease sales. It does not address, and cannot address at this preliminary stage, impacts associated with specific exploration and development proposals. That is possible only after leases are issued and any such proposals are submitted. 1 FEIS I-9. *Accord NAEC* case, 2006 WL 2061246 at *5: "At the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any, may eventually materialize."

Nevertheless, BLM did provide appropriate site-specific analysis at the leasing stage. BLM considered the history and activities associated with oil and gas development, 1 FEIS at 4-10 to 4-38; developed multi-sale scenarios for such development, *id*, at 4-38 to 4-45; and then for each alternative extensively discussed the potential impacts associated with these scenarios for each resource or type of activity. *Id*. at 4-56 to 4-411. The FEIS also specifically discusses on a resource and activity basis the affected environment, 1 FEIS at 3-7 to 3-127, and the cumulative impacts associated with each alternative. 2 FEIS at 4-417 to 632.  This is the same methodology that BLM employed in the *NAEC* case, 2006 WL 2061246 at *4, where it also considered "hypothetical situations that represented the spectrum of foreseeable results, once all phases of the program were completed." The Ninth Circuit observed that any future exploration or development on the leases would require permits subject to additional protective conditions and subject to additional environmental analysis. *Id*. at *6. In view of this requirement and the hypotheticals analyzed in the NW FEIS, the Ninth Circuit concluded "that the government was not required at this stage to do a parcel by parcel examination of potential environmental effects. *Id*. Further, the Court of Appeals found that the methodology in the NW FEIS constituted a hard look under NEPA and that the ROD "should be accorded deference." *Id*. at 5

None of the cases referenced by plaintiffs support the contention that the FEIS is not sufficiently site-specific. In three cases the agencies prepared environmental assessments (EA), rather than an EIS. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988), *cert. denied sub nom.*, *Kohlman v. Bob Marshall Alliance*, 489 U.S. 1066 (1989); *Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983). The issue in

those cases was not the appropriate level of site-specific detail required in an EIS. In fact, the Ninth Circuit found *Connor* to be inapplicable to review the adequacy of an EIS, and in particular the NW FEIS, specifically for that reason. 2006 WL 2061246 at *5.

Two other two cases relied on by plaintiffs involve the adequacy of programmatic EISs for assessing site-specific impacts. *City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir, 1985); *State of California v. Block*, 690 F.2d 753 (9th Cir. 1982). In *Tenakee Springs* the adequacy of the environmental analysis was not directly addressed. In *California v. Block*, the court found that an EIS for nation-wide designation of wilderness areas based on an inventory of roughly 2,900 roadless areas in 62 million acres of the National Forest System was insufficient. As explained by the district court in that case, that EIS contained a mere two page computer print-out for each roadless area with little more information than the acreage and location of the area, general ecosystem and landform information and number of wildlife species in the area. *State of California v. Bergland*, 483 F.Supp. 465, 484 (E.D. Cal. 1980). The FEIS at issue in this case contains a far more extensive discussion of the affected environment and the specific effects of oil and gas leasing and development.

The decision in *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir. 1980), also offers no support to plaintiffs. That case involved the issue of the adequacy of an EIS for a federally funded construction of a specific section of U.S. Highway 2 in Montana, and on which preparatory activities had commenced prior to the filing of the action. F.2d at 780.

In sum, the FEIS which relied on hypotheticals represented the spectrum of foreseeable site specific impacts, and fully satisfied NEPA.

## IX. THE FEIS ADEQUATELY DISCUSSES MITIGATION

Plaintiffs contend that the discussion of mitigation measures in the FEIS is inadequate because it does not sufficiently address their effectiveness, does not explain "how it derived the new mitigation measures" and does not consider alternative implementation of mitigation measures. [Plaintiffs' brief at 39-40]  Plaintiffs are wrong.  The discussion of mitigation measures in the FEIS fully satisfies NEPA and plaintiffs  misstate NEPA's requirements.

Further, *NAEC* again disposes of plaintiff's criticism of the alternatives analysis.

An EIS must include a discussion of possible mitigation measures in sufficient detail that the environmental consequences of the measures are fairly evaluated. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351-53 (1989); *NAEC* case, 2006 WL 2061246 at *7; *Westlands Water District v. U.S. Department of Interior*, 376 F.3d 853, 872 (9th Cir. 2004). Notably, this standard does not require explanation how an agency derived mitigation measures. The agency is not required to formulate and adopt a complete mitigation plan. *Westlands Water District*, 376 F.3d at 873. Similarly, NEPA does not require "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action." *Id.* at 353 (Italics in original). *Methow Valley Citizens Council*, 450 U.S. at 352-353.

Contrary to plaintiffs' representations, the FEIS contains an extensive and thorough discussion of the mitigation measures and their effectiveness. For each alternative and every resource and activity considered, the FEIS contains a discussion entitled "Effectiveness of Stipulations" followed by a "Conclusion" that fully sets forth the environmental impacts as mitigated by the specific stipulations. 1 FEIS (air quality) at 4-59, 4-168 to 69, 4-255 to 56, 4-331; (paleontological resources) at 4-61, 4-170, 4-257, 4-332; (soil resources) 4-65 to 66, 4-173 to 74, 4-260 to 61,  4-335 to 36; (water resources) at 4-72 to 73, 4-180 to 81, 4-267 to 68, 4-342 to 43; (vegetation) at 4-79 to 80, 4-184 to 86, 4-272 to 72, 4-346 to 47, (wetlands & floodplains) at 4-82, 4-188, 4-274, 4-349 to 50; (freshwater & anadromous fish) at 4-90 to 91, 4-192 to 93, 4-276 to 77, 4-352 to 53, (marine fish) at 4-93 to 94, 4-195, 4-278, 4-353, (essential fish habitat) at 4-96, 4-197, 4-279, 4-354; (birds) at 4-106 to 07, 4-203 to 04, 4-284 to 85, 4-360 to 61; (terrestrial mammals) at 4-118 to 19, 4-208 to 210, 4-289 to 90, 4-366 to 68; (marine mammals) at 4-122, 4-212 to 13, 4-291 to 92,4-370 to 71; (threatened & endangered species) at 4-129 to 30, 4-218 to 19, 4-296, 4-376 to 77; (cultural resources) at 4-132 to 33, 4-220 to 21, 4-298 to 99, 4-378 to 80; (subsistence) at 4-138 to 39,  4-226 to 28, 4-303 to 04, 4-385 to 88; (sociocultural resources) at  4-143 to 45, 4-230 to 31, 4-305 to 06, 4-390 to 92; (environmental justice) at 4-147, 4-232, 4-307 to 08, 4-393 to 94; (coastal zone management) at 4-155, 4-238, 4-314, 4-399

to 400; (recreational resources) at 4-158 to 60, 4-241 to 42, 4-317 to 18, 4-403; (visual resources) at 4-161, 4-244, 4-320, 4-405 to 06; (economy) 4-248 to 49, 4-324 to 26, 4-411. BLM has duly considered the effectiveness of the mitigating effects of the stipulations and ROPs, and set forth the potential environmental impacts that will occur with those conditions in place. BLM also compared the effectiveness of the various mitigation measures under the different alternatives. 1 FEIS Table 2-2 commencing at 2-59. This analysis fully satisfies the standard described in the *NAEC* case, 2006 WL 2061246 at *8: "[T]he EIS provided the stipulations and ROPs for each alternative and also outlined their purpose and effectiveness with respect to various resources."

Plaintiffs also contend that the discussion of mitigations measures is inadequate because the FEIS does not consider the possibility of opening the previously protected area with more restrictive mitigation measures or keeping the protected area off limits. Of course, plaintiffs are really making a belated argument for consideration of more alternatives. In any event, placing the restricted are off limits would be inconsistent with the stated purpose and need for the agency's action. The Secretary was directed to conduct an inventory of oil and gas resources on federal lands, and to consider based on sound science and best available technology additional responsible oil and gas development in the NE NPRA including areas not currently available for leasing. 69 Fed. Reg. 32365 (June 9, 2004); 1 FEIS at 1-5 t0 1-6. An agency need not consider alternatives that are inconsistent with the purpose and need for the action. *Akiak Native Community v. U.S. Postal Service*, 213 F.3d 1140, 1148 (9th Cir. 2000).

Further, an agency need only consider a reasonable range of alternatives and not every available alternative. *NAEC* case, 2006 WL 2061246 *6. The mitigation regimen that BLM did consider and will impose includes stipulations and ROPs and the opportunity to impose more measures at later stages. This approach satisfies NEPA. *Id.* at *8.

Accordingly, BLM adequately examined mitigation measures, including the effectiveness of the measures.

### X. THE BIOLOGICAL OPINION FOR THE NORTHEAST PLANNING AREA PROPERLY ANALYZED THE PROPOSED ACTION.

Plaintiffs raise only two arguments to support their claim that the Biological Opinion for

the Northeast Planning Area, AR 8354 ("NE BiOp") is unlawful. First, they argue that the United States Fish and Wildlife Service ("FWS") improperly failed to take into account the effects of the proposed action in the Northeast Planning Area on development in the Northwest Planning Area. Second, Plaintiffs argue that FWS' use of a "reasonable and foreseeable oil development scenario" was unlawful because such a scenario is not coextensive with the proposed action. Both arguments are without merit, and, accordingly, Plaintiffs' ESA claim must be dismissed in its entirety.

As to the first argument, the proposed actions considered in the BiOps for the Northwest and Northeast Planning Areas were simply the hypothetical scenarios required by *Connor v. Burford* ("*Conner*"), 848 F.2d 1441, 1450 (9th Cir. 1988). Neither the Record of Decision for the Northeast nor the Northwest Planning Area authorizes any ground disturbing activity. All subsequent actions will require authorization and, thus, be subject to the consultation requirements of the Endangered Species Act ("ESA"). Accordingly, to the extent that there is any effect of the actions in the NE NPRA on development in the NE NPRA, those effects will be fully considered in subsequent consultations. If actual development in the NE NPRA proves to have an effect that invalidates the assumptions used in the Northwest BiOp, reinitiation of consultation on the NW BiOp will be required.

This Court has already rejected Plaintiffs' second argument in the *NAEC* case with respect to the Biological Opinion for the Northwest Planning Area ("NW BiOp"). *Northern Alaska Envtl. Ctr. v. Norton ("NAEC")*, 361 F. Supp. 2d 1069, 1083 (D. Alaska 2005). The Ninth Circuit has now affirmed this Court's decision that the use of the reasonable and foreseeable development scenario to evaluate the potential effects of the lease sale does not violate the ESA. *NAEC* case, 2006 WL 2061246, at *9 (9th Cir. July 26, 2006)"As the district court properly held, the projections used are based on potential oil and gas activity as envisioned by this Court in *Conner*."

The reasons why Plaintiffs' arguments lack merit will be presented in more detail below in sections X. E. and F.  However, first we provide background regarding the ESA (X. A.), the

controlling case law (X. B.), the listed species at issue (X. C.), and the history of the consultations (X. D.).

**A. Endangered Species Act**. Section 7 of the Endangered Species Act requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). To achieve this objective, the agency proposing the action ("the action agency") is required to consult with FWS or National Marine Fisheries Service ("NMFS") (the "consulting agency")[27]/ whenever a federal action "may affect" a threatened or endangered species. 50 C.F.R. § 402.14(a). Unless the action agency determines with the written concurrence of the consulting agency that an action is "not likely to adversely affect" the listed species or critical habitat, it must engage in "formal consultation." 50 C.F.R. §§ 402.14(a), (b). Formal consultation typically begins with a written request by the action agency, 50 C.F.R. § 402.14( c), and concludes with the issuance of a biological opinion by the consulting agency. 50 C.F.R. § 402.14(*l*)(1). The biological opinion assesses the likelihood of jeopardy to the species and whether the proposed action will result in destruction or modification of critical habitat. *See* 50 C.F.R. § 402.14(g).

In preparing a biological opinion, the consulting agency must evaluate the current status of the listed species and critical habitat and the effects of the action and cumulative effects on the listed species and critical habitat in the action area. 50 C.F.R. §§ 402.14(g)(2), (3). The term "action area" means "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The term "effects of the action" is defined to mean "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02.

---

[27]/    FWS and NMFS share responsibilities for administering the ESA depending on the species involved.  50 C.F.R. § 402.01(b).  FWS has responsibility for the species at issue in this case.

**B. *Conner v. Burford***. In *Conner*, the Ninth Circuit interpreted the mandate of § 7(a)(2) with respect to multistage activities in which agency actions occur in discrete steps, such as leasing large tracts of Federal land for mineral exploration and development. In the biological opinion at issue in *Conner*, FWS had divided the oil and gas activities into stages and assessed the biological effects of only the lease sale stage. *Conner*, 848 F.2d at 1452. It did not consider subsequent exploration and development activities because "there was 'insufficient information available to render a comprehensive biological opinion beyond the initial lease phase.'" *Conner*, 848 F.2d at 1452. The Ninth Circuit held that BLM had an obligation under § 7(a)(2) of the ESA to consult on "the effect of the entire agency action," which it determined to be "not only leasing but leasing and all post-leasing activities through production and abandonment." *Id.* at 1453, quoting *North Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980). Although the Ninth Circuit did not allow FWS to use incremental consultation to avoid considering the effects of all stages of the proposed oil and gas development, *Conner* at 1457-58, the Court recognized that the future consultations would provide a more accurate assessment of post-leasing activities because the comprehensive biological opinion it ordered "will rely on incomplete information as to the exact location, scope, and timing of future oil and gas activities." *Id.* at 1458, n. 42.

In the *NAEC* case, Plaintiffs relied on *Conner* to argue that FWS' use of a "reasonable and foreseeable oil development scenario" to evaluate the potential effects of the proposed action was unlawful because such a scenario is not coextensive with the proposed action. This Court rejected that argument holding instead that this scenario is "precisely the projection envisioned by the Ninth Circuit in Conner." *NAEC*, 361 F. Supp. 2d at 1083. The Ninth Circuit recently affirmed this Court's decision. The Ninth Circuit held that the use of the projections of oil and gas activity in the "reasonable and foreseeable oil development scenario" were what was "envisioned by this Court in Conner." *NAEC* case, 2006 WL 2061246, at *9.

**C. Listed Species**. The two listed eiders covered by the biological opinions are the Alaska-breeding population of Steller's eider and the spectacled eider. *See*, NE BiOp at 13-19. The Alaska-breeding population of Steller's eider was listed as threatened in 1997. *Id.* at 13; 62

Fed. Reg. 31,748 (June 11, 1997). Steller's eiders occur only intermittently as breeders in Alaska. NW BiOp at 13. There is only one documented nesting in the Northeast Planning Area after 1970. Within the NE NPRA, breeding Stellers' eiders were recorded north of Teshekpuk Lake, near Cape Halkelt and Pitt Point, prior to 1970. Pls' Br., Ex. 39 at 9. Since 1970, members of this population of Steller's eiders have been recorded as present but not breeding in these areas and at other locations north and east of Teshekpuk Lake. *Id.* No critical habitat has been designated for this population within the Northeast or Northwest planning Areas.

The spectacled eider was listed, also as threatened, in 1993. NE BiOp at 16; 58 Fed. Reg. 27,474 (May 10, 1993). At least 7,149 spectacled eiders occupied the Arctic Coastal Plain of Alaska in 2003 out of an estimated 375,000 world population. NE BiOp at 16. Within the NW NPRA, the highest densities of spectacled eiders in this area are south of Barrow, southeast of Peard Bay, including the Kungok and Kuk river drainages, adjacent to Dease Inlet, and the Meade, Chipp, and Inaru river drainages. Although breeding concentrations of spectacled eiders in the NE NPRA are fewer and smaller than in the NW NPRA, relatively high densities are found southeast of Smith Bay, northeast and southeast of Teshekpuk Lake and along Judy Creek. *Id.* at Fig. 4. No critical habitat has been designated for this species within the Northeast or Northwest planning Areas.

**D. Consultations For the Northwest And Northeast Planning Areas**. In the NW BiOp, FWS determined that BLM's decision to allow leasing in the NE NPRA was not likely to jeopardize the continued existence of the listed eiders. Consistent with the Ninth Circuit's direction in *Conner*, the FWS examined the effects of all potential activities from leasing through abandonment. *Connor*, 848 F.2d at 1458. Because the precise location and extent of future oil and gas activities were unknown, BLM used the best available information to make "projections" of effects "based on potential locations and levels [of] oil and gas activity." *Id.* at 1454. These projections are referred to as the "reasonable and foreseeable development scenario".

For purposes of developing the reasonable and foreseeable development scenario for the NW BiOp, BLM made an estimate of the oil resource potential of the NW NPRA. *See* NW FEIS

at IV-65.  With respect to this estimate, BLM cautioned that:

> Although they are based on sound professional judgment, there is no way to evaluate the accuracy of these future scenarios today.  There is no way to guarantee that the prerequisite conditions will be met; i.e., that a lease sale will be held, tracts will be leased, oil/gas pools will be discovered by exploration drilling, and discoveries will be economic to develop.  Considering past exploration efforts in NPRA that did not result in commercial production, the development scenarios offered here could be overstated.

NW FEIS at IV-45; *id.* at 66-67 ("[T]here is no way to accurately predict when or how much of the theoretical potential will actually be converted to future production."). In making this estimate, BLM employed a multi-sale scenario which assumed that the total resource potential could be discovered and developed in the Planning Area. *Id.* at IV-70 and Table IV-06.  By using the multi-sale scenario, BLM created a conservative assumption for evaluating the "worst case impacts". *Id.* at IV-70. BLM estimated the full economic potential for recovering oil ("FEP") in NW NPRA to be 2,100 MMbbls. NW FEIS at Table IV-06.

BLM recognized that other factors could limit the ability of the area to realize the FEP. For the preferred alternative, BLM assumed that 40 percent of FEP might not be realized.  *Id.* at IV-69. Using this assumption, BLM projected 1260 MMbbl of economically recoverable oil could be developed in the NW NPRA and that, as a result, up to eight fields would be developed in the area.[28]/ *Id.* at Table IV-06; NW BA 8; NW BiOp 6.  Of the 40 percent of "lost opportunity" in the Northwest Planning Area, BLM attributed 20 percent to "restrictive regulations" in the Northeast Planning Area "through which most of the support for Northwest NPRA operations must pass." *Id.*

Subsequent to the issuance of the NW BiOp, BLM amended the 1998 Record of Decision for the Northeast Planning Area (" 1998 NE Plan") to allow more oil to be developed in that Area.[29]/ The selected alternative in the amended ROD does not remove restrictive regulations; it simply replaces the prescriptive regulations with ones that are performance-based. ROD at 17.

---

[28]/    The FEIS projects that half of this development, if it occurred, would not occur for at least 20 years.  FEIS Table 4-36 at 4-451.

[29]/    The 1998 NE Plan opened 4 million acres in the NE NPRA for potential development whereas the amended ROD opened up 4,389,000 acres for potential development.

BLM found the level of protection afforded by the performance-based regulations adopted in the
ROD to be "similar to, or even greater than, the level of resource protection provided in the 1998
Northeast IAP/EIS." Draft EIS at 2-9. In addition, BLM included "extensive mitigation"
consisting "of various prohibitions and restrictions on oil and gas activities ... to minimize
impacts of and maximize protection of important surface resources in the area", including the
areas newly opened to development. ROD at 10.[30]/

     **E. The NE BiOp Properly Analyzed The Effects Of The Action**. Plaintiffs argue that
the NE BiOp is unlawful because it fails to analyze the effects of the "relaxation of restrictions"
in the Northeast Planning Area on the assumption that the economic recovery of oil in the
Northwest Planning Area was 1260 MMbbls.[31]/ Pls' Br. at 42. Plaintiffs ignore that the proposed
action analyzed in the NW BiOp was a hypothetical "reasonable and foreseeable development
scenario" that does not have any direct effects on the ground. As BLM acknowledged, "there is
no way to accurately predict when or how much of the theoretical potential will actually be
converted to future production."[32]/ NW FEIS at 66-67. *See also NAEC* case, 2006 WL 2061246
at *5 (At the leasing stage, "there is no way of knowing what plans for development, if any, may
eventually materialize."). The Ninth Circuit anticipated that future consultations regarding post-
leasing activities would be used to obtain a more accurate assessment of the effects of the action.
*Conner*, 848 F.2d at 1458, n. 42; *NAEC* case, 2006 WL 2061246 at *5 and *9. If such subsequent
consultations show that the proposed leasing actually causes an effect to listed species or critical

---

[30]/     *See* 10, 18 at 21, *supra*  n. 20(setting out some of the measures, and Stipulations and
Required Operating Procedures ("ROPs") to protect important resources).

[31]/     Contrary to what Plaintiffs allege, Pls' Br. at 42, BLM did not acknowledge that "opening
the adjacent Teshekpuk Lake area would lead to increased development."  BLM simply indicated
that regulatory restrictions in the NE NPRA "through which most of the support for NE NPRA
operations must pass" limited the potential in the NW NPRA to realize the full economic recovery.
In fact, the projected pipeline paths from the NW NPRA south of Teshekpuk Lake in an area that
already was opened to development by the 1998 ROD.  NW FEIS, Map 108.

[32]/     At this time, no significant exploration has taken place in the Northwest Planning Area to
give any indication of the actual commercial potential for development. Further, as discussed above,
past exploration efforts in NPRA did not result in commercial production suggesting that the
projected 1260 MMbbls may never be realized.  NW FEIS at IV-45.

National Audubon Society, et al. v. Kempthorne, et al.
Case No. 3:05-cv-00008
DEFS' BRIEF             39

habitat that was not considered in the BiOp, BLM will have to reinitiate consultation on the leasing decision. *NAEC* case, 2006 WL 2061246 at *9. Thus, Plaintiffs' concern that some so-called "relaxation of restrictions" may have an effect on listed eiders that is not considered and addressed is misplaced.

The Records of Decisions for the leasing decisions at issue here did not authorize any ground disturbing activities:

> An oil and gas lease does not in and of itself authorize any on-the-ground activity. Seismic operations, drilling, ice road construction, etc require additional land use authorization.

FEIS at 2-9; ROD Appendix B at 55. FWS expressly recognized that the effects of the actual on-the-ground activities will be considered and addressed in subsequent consultations regarding those post-leasing actions. NW BiOp at 3, 5; NE BiOp at 3 (conditioning BiOp on "BLM's commitment to consult with respect to all aspects of future oil development, production and abandonment").

Consistent with this approach, BLM placed conditions in all leases in the NW Planning Area requiring completion of consultation before any ground disturbing activity occurs:

> BLM may require modifications to or disapprove a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat.  BLM will not approve any ground-disturbing activities that may affect any such species or critical habitat until it completes its obligation under applicable requirements of the [ESA] including completion of any required procedures for conference or consultation.

ROD, Appendix at B-13 (Stipulation J-1); ROD 67 (ROP)(same).

Each succeeding consultation will provide evidence of the types, locations, and amount of activities and development that *actually* will occur on the ground.  If that evidence demonstrates that the assumptions regarding the amount of economically recoverable oil, or number of fields to support that development, is no longer valid, BLM will reinitiate consultation to allow FWS an opportunity to reevaluate its biological opinion regarding the plan for overall development.[33]/

---

[33]/    S*ee also NAEC* case, 2006 WL 2061246 at *9 (The reinitiation requirement "requires environmental analysis beyond this initial stage where agency action *causes* an effect to listed

(continued...)

NE BiOp at 5 ("If development occurs that exceeds the original predictions of potential effects to listed eiders, reinitiation of consultation may be required.").

In short, the NE BiOp provides a complete, comprehensive biological opinion regarding all of the potential effects of the reasonable and foreseeable scenario at the lease sale stage. The actual effects of subsequent development, if such development occurs, will be monitored and analyzed through subsequent consultations on post-leasing activities. If, based on actual evidence, the anticipated effects of the leasing decision at issue are going to be different from those originally anticipated, FWS will have an opportunity to evaluate the "new" action. Accordingly, Plaintiffs' argument must be rejected.

### F. FWS Properly Evaluated the Action in the ROD.

Plaintiffs once again argue that FWS cannot consider a reasonable and foreseeable development scenario because such a scenario is not coextensive with the proposed action. Pls' Br. at 44. This argument, however, has now been squarely rejected by the Ninth Circuit in the context of the NW BiOp. *NAEC* case, 2006 WL 2061246 at *8. Plaintiffs concede that their argument here regarding the use of the "reasonably foreseeable development scenario" is "substantially similar" to the argument in the *NAEC* case.[34]/ Pls' Br. at 44 n.9. Accordingly, the *NAEC* case dictates that Plaintiffs' argument must be rejected here.

---

[33]/    (...continued)
species or critical habitat that was not considered in the BiOp.")(emphasis added). Reinitiation of formal consultation is "required" and "shall be requested" by the action agency: (a) if the amount or extent of taking specified in the incidental take statement is exceeded; (b) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; © if the identified action is subsequently modified in a manner that causes an effect to listed species or critical habitat that was not considered in the biological opinion; or (d) if a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16(b). During any reinitiated consultation, BLM is prohibited from making any "irreversible or irretrievable commitment of resources" which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives which would avoid violating § 7(a)(2). 16 U.S.C. § 1536(d).

[34]/    Plaintiffs do not challenge the accuracy of BLM's reasonably foreseeable development scenario – they do not contend that the agencies relied upon anything other than the best available scientific information, nor do they offer evidence that a different development scenario is more realistic. Pls' Br. at 44-47.

No difference exists between the approach to the "reasonably foreseeable development scenario" in the NW and NE BiOp. Just as in the NW BiOp, FWS evaluated the full range of development activities that could result from the ROD regarding, including leasing, exploration, development, production, and abandonment.[35]/ *See* NE BiOp at 5-12. Just as for the NW BiOp, Minerals Management Service ("MMS") and the BLM developed the reasonable and foreseeable development scenario using a "comprehensive geological analysis and computer simulation modeling" to identify the extent and location of activity that could result from the 2006 ROD. NE BiOp 68; FEIS, D-6; NW FEIS, Appendix 7. Just as for the NW BiOp, in developing the scenario, BLM and MMS drew from their technical expertise as well as from recent experience with respect to development on the North Slope. ROD at 9. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-377 (1989) (where an agency's particular technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion.); *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1077 (9th Cir. 2003) ("We defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision.").

Further, just as in the NW NPRA, the scope of the potential effects of reasonable and foreseeable development scenario is constrained by Stipulations and ROPs that BLM will impose to mitigate the effects of the proposed action on the listed eiders, in most cases, without regard to where the activities are conducted. *See id.* at 14-18; ROD Appendix B at 55-75 (setting out the Stipulations and ROPs). Moreover, as in the NW BiOp, in analyzing the potential impacts of the

---

[35]/    The formulation and key assumptions underlying this development scenario are fully described in BLM's Biological Assessment, FEIS Appendix D, which provides detailed explanations of the reasonably foreseeable activities and their locations at each stage of oil and gas activity. *See* 3 FEIS, Appendix D, at D 5-10 (discussing anticipated leasing and exploration activities including seismic activities, exploration drilling, winter transportation and support infrastructure); at D 10-14 (anticipated development activities, including drill-pad and road construction, and field development consisting of facility construction, pipeline construction, aircraft support and related offshore activities); at D 15-16 (projected production activities, including routine production operations, watercraft support, public access and subsistence activities, and spill-response training and research); at D 16-17 (abandonment and restoration).

reasonably foreseeable development scenario on eiders, FWS gave "the benefit of doubt" to the species by assuming the "maximum potential conflict" between activities that could occur under the scenario. NE BiOp at 2.

In short, just as in the NW BiOp, FWS' use of the reasonable and foreseeable development scenario did not limit the scope of the consultation, as Plaintiffs argue, but simply allowed FWS to realistically narrow the uncertainty inherent in analyzing a multistage action when the precise location and full scope of all of the future actions are not known. That is what the Ninth Circuit recently confirmed was envisioned by *Conner*. Accordingly, Plaintiffs' attempt to reprise that argument here must be rejected.

## XII. NO INJUNCTIVE RELIEF SHOULD BE ENTERED

Plaintiffs seek not only a declaratory judgment that BLM has violated NEPA, the ESA, and NPRPA, but also entry of a injunction "prohibiting BLM from taking any actions to implement the amendment." Plfs' Br at 48. Even if the court were to find that there has been some failure to comply with any of the statutes, no injunction should be entered.

Injunctive relief is equitable relief and is not to be mechanically entered for every violation of law. *Amoco Production Co. V. Gambell*, 480 U.S. 531, 553-54(1987). Courts are to balance the competing claims of injury, the effect on the parties, and the public interest in the granting or withholding injunctive relief. *Id*. at 553. A balancing of the equities and consideration of the public interest would compel a denial of injunctive relief even if the court were to find a legal violation.

The only decision in the ROD is to offer leases for sale that will be subject to the stipulations and ROPs adopted therein. However, as shown at 7-8, *supra*, no actual on the ground activities are authorized and none could occur on a lease until after BLM examines the effects of a proposed activity, including consideration of additional protective conditions and approves it.

The fundamental basis for any injunctive relief is irreparable injury and inadequacy of legal remedies. *Amoco Production Co.*, U.S. at 553-54. At this stage, no activity is approved that will cause any irreparable injury to any plaintiff. No acre of land, wildlife habitat, or species will

be affected at all if these lease sales continue. Given the public interest in further exploration and

potential development of oil and gas resources in the NPRA, as stated in the NPRPA, 42

U.S.C.A. § 6506a (West 2006 Pocket Part) and the President's National Energy Policy, BLM

should be permitted to proceed with the lease sales authorized in the ROD.

CONCLUSION

For the foregoing reasons, all of plaintiffs' contentions should be rejected, and judgment

entered for defendants.

Dated this 3rd day of August, 2006.

s/ Dean K. Dunsmore
DEAN K. DUNSMORE
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Telephone:(907)271-5452
Facsimile: (907)271-5827
Email: dean.dunsmore@usdoj.gov

ROBERT GULLEY
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, D.C. 20044-7369
Telephone: 202-305-0500
Facsimile: 202-305-0275
Email: robert.gulley@usdoj.gov

Of Counsel:
Lisa M. Toussaint
Lisa Doehl
Office of Solicitor
Alaska Region
Department of the Interior
Anchorage, Alaska

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of August, 2006, a copy of the foregoing DEFENDANTS' BRIEF was served electronically on:

Deirdre McDonnell
Jeffrey W. Leppo
Laura J. Beveridge
Ethan Falatko
David C. Crosby


s/ Dean K. Dunsmore
DEAN K. DUNSMORE