Deirdre McDonnell
Layla Hughes
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:05-cv-00008-JKS ) |
| DIRK KEMPTHORNE, Secretary of the Interior[1]; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS, Regional Director, United States Fish and Wildlife Service[2]; BUREAU OF LAND MANAGEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, and UNITED STATES DEPARTMENT OF THE INTERIOR, | ) ) ) ) ) ) ) |
| Defendants, and | ) ) |
| CONOCOPHILLIPS ALASKA, INC., ANADARKO PETROLEUM CORPORATION, ARCTIC SLOPE REGIONAL CORPORATION, and STATE OF ALASKA, | ) ) ) ) |
| Intervenor-Defendants. | ) ) |

**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Dirk Kempthorne has been automatically substituted for P. Lynn Scarlett.

[2] Pursuant to Fed. R. Civ. P. 25(d)(1), Tom Melius has been automatically substituted for Rowan Gould.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................3

I.     BLM FAILED TO EXPLAIN HOW THE DECISION TO OPEN SENSITIVE AREAS TO OIL DEVELOPMENT AND SCALE BACK PROTECTIVE MEASURES FULFILLS ITS DUTY TO PROVIDE MAXIMUM PROTECTION TO THE TESHEKPUK LAKE SPECIAL AREA..........................................................................3

    A.   BLM Violated The Administrative Procedure Act By Adopting a Radically Different Plan To Achieve Maximum Protection Without Adequate Explanation.........................................................................4

    B.   BLM Was Required To Provide Maximum Protection to the Teshekpuk Lake Special Area. .....................................................10

II.    BLM VIOLATED NEPA. ...................................................................11

    A.   BLM Violated NEPA by Including a Significantly Different Preferred Alternative in the Final EIS Without Preparing a Supplemental Draft EIS. ...............................................................11

    B.   The Final EIS Violates NEPA By Failing To Include A Complete Analysis Of Cumulative Impacts In The Northwest Planning Area..............16

    C.   BLM Failed to Consider or Compare the Effects of the Oil Development Alternatives in a Warming Climate..........................19

III.   THE BIOLOGICAL OPINION WAS NOT BASED ON A COMPLETE BASELINE IN VIOLATION OF THE ESA. ................................23

IV.   INJUNCTIVE RELIEF IS THE APPROPRIATE REMEDY FOR THE VIOLATIONS HERE. ...................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

Allentown Mack Sales and Serv., Inc. v. NLRB, 522 U.S. 359 (1998) .........................................4

Alpine Lakes Prot. Society v. Schlapfer, 518 F.2d 1089 (9th Cir. 1975).....................................25

Altamirano v. Gonzales, 427 F.3d 586 (9th Cir. 2005) ...............................................................10

American Motorcyclist Association v. Watt, 714 F.2d 962 (9th Cir. 1983)..................................25

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ...........................................10

Cady v. Morton, 527 F.2d 786 (9th Cir. 1975)...........................................................................25

California v. Block, 690 F.2d 753 (9th Cir. 1982)..................................................................12, 20

Christensen v. Harris County, 529 U.S. 576 (2000) .......................................................................7

Churchill County v. Norton, 276 F.3d 1060 (9th Cir. 2001) ........................................................20

City of Angoon v. Hodel, 803 F.2d 1016 (9th Cir. 1986) ............................................................17

City of Los Angeles v. Department of Commerce, 307 F.3d 859 (9th Cir. 2002) .........................6

Commissioner of Internal Revenue v. Ewing, 439 F.3d 1009 (9th Cir. 2006)...............................6

Dubois v. United States Forest Sev., 102 F.3d 1273 (1st Cir. 1995)............................................15

Earth Island Institute v. United States Forest Serv., 442 F.3d 1147 (9th Cir. 2006) ....................22

Earth Island Institute v. Rutherford, -- F.3d -- 2006 WL. 2291168 (9th Cir. 2006)......................24

Half Moon Bay Fishermens' Marketing Association v. Carlucci, 857 F.2d 505
    (9th Cir. 1988) .......................................................................................................................12

Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002) ..............................17

Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094 (9th Cir. 2002) .........................................15

Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
    Insurance Co., 463 U.S. 29 (1983) ........................................................................................7

N. Alaska Environmental Ctr. v. Norton, 361 F. Supp. 2d 1069 (D. Alaska 2005) ..........16, 18, 19

N. Alaska Environmental Ctr. v. Kempthorne, 2006 WL 2061246 (9th Cir. 2006)..................3, 18

National Audubon Society v. United States Forest Serv., 46 F.3d 1437
  (9th Cir. 1994) ................................................................................................22

National Wildlife Federation v. National Marine Fisheries Serv., 422 F.3d 782
  (9th Cir. 2005) ..................................................................................................7

Native Ecosystems Council v. Dombeck, 304 F.3d 886 (9th Cir. 2002)......................................18

Native Ecosystems Council v. United States Forest Serv., 418 F.3d 953
  (9th Cir. 2005) ...............................................................................................4, 8

Natural Resources Defense Council v. United States Forest Service, 421 F.3d 797
  (9th Cir. 2005) ................................................................................................19

Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372
  (9th Cir. 1998) .............................................................................................20, 23

Northwest Motorcycle Ass'n v. United States Dep't of Agriculture 18 F.3d 1468
  (9th Cir. 1994) ...............................................................................................8, 9

Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846
  (9th Cir. 2005) .............................................................................................20, 23

Rock Creek Alliance v. Fish and Wildlife Serv., 390 F. Supp. 2d 993
  (D. Mont. 2005) .................................................................................................8

Sierra Club v. Marsh, 816 F.2d 1376 (9th Cir. 1987)....................................................25

Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985)........................................................25

United States v. Mead Corp., 533 U.S. 218 (2001) .......................................................7

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,
  435 U.S. 519 (1978)............................................................................................17

Washington Toxics Coalition v. EPA, 413 F.3d 1024 (9th Cir. 2005)........................................25

# FEDERAL STATUTES

5 U.S.C. § 706 ...........................................................................................................24

42 U.S.C. § 6506a(b) ..............................................................................................5, 11

42 U.S.C. § 6506a(n)(2) .............................................................................................10

# FEDERAL REGULATIONS

40 C.F.R. § 1502.14 ...................................................................................................19

40 C.F.R. § 1502.9(c)(1) .............................................................................................12

43 C.F.R. § 2361.1(e)(1) ..............................................................................................5

50 C.F.R. § 402.02 .....................................................................................................24

## INTRODUCTION

This case challenges the Bureau of Land Management's (BLM) decision to depart from the well-established practice of protecting from oil leasing the most sensitive parts of the internationally-significant migratory bird and wildlife habitat in the Teshekpuk Lake area—a region that has been recognized by Congress and previous administrations, including the Reagan Administration, as worthy of special protection.  When BLM initially proposed to reduce the area reserved for wildlife by 75% it received strong opposition from a spectrum of organizations and entities including fellow federal agencies such as the Environmental Protection Agency (EPA) and Native entities such as the North Slope Borough and Kuukpik Corporation.  In its final analysis, despite Congress's direction to afford maximum protection to the outstanding resources of the Teshekpuk Lake Special Area, BLM adopted an unprecedented and untested approach—opening the entire area to leasing and relying on restrictions on the number of acres that can be occupied by drilling pads to meet its protection obligations.  The Court must reject Defendants attempt to recast this extreme departure as an attempt to balance competing interests in response to the strong negative comments it received because it is inconsistent with the facts. The Court must hold BLM to its duty under the Administrative Procedure Act (APA) to explain how this abrupt departure comports with its statutory obligation to protect the values of the Special Area.

The significantly different preferred alternative for leasing in the Northeast planning area of the National Petroleum Reserve Alaska (Reserve), which BLM announced for the first time in the final environmental impact statement (EIS), should have been the subject of a supplemental draft EIS so the public and other agencies would have had the opportunity to participate fully in the analysis of this alternative.  The Court should reject BLM's attempts to portray the new alternative as responsive to Fish and Wildlife Service (FWS) comments when it if fact was not. Pls.' Reply Ex. 2 at 4 (FWS Specific Comments at 3) (recommending making most sensitive

areas unavailable to leasing); Id. at 7 (id. at 6) ("leasing and development within the Goose Molting Area would likely be detrimental to the population."6).  The analysis of the affects of the new proposal was hampered by BLM's refusal to circulate a supplemental draft EIS.  Had BLM vetted the new proposal through the draft process, it would have been clear that the proposal does not provide anywhere near enough protection for the sensitive wildlife of the Special Area.

The final EIS acknowledges that both oil development activities and global climate change will have significant impacts on the resources in the Planning Area.  Nowhere, however, does the final EIS put those two categories of impacts together to present a comparison of the effects of the four alternatives in a warming climate.  Since BLM recognizes that global climate change is occurring, the final EIS should have included a changing climate in the analytic baseline, so that the effects of the action alternatives could be compared.  Defendants and Intervenors mischaracterize Plaintiffs' argument as a simple contention that global climate change should have been addressed in the direct effects subsection of Chapter 4, rather than in the cumulative effects subsection.  This contention ignores that the comparison of alternative is the heart of the EIS and without it the EIS cannot serve its central function.

After promising this Court and the Ninth Circuit that the cumulative impacts of the decision to allow oil development in the Northwest planning area of the Reserve and this decision to reduce previous protections would be fully analyzed when this decision was made, BLM now asks the Court to allow it to postpone this analysis once again.  The Court should reject this suggestion.

Defendants and Intervenors defend the failure to include an accurate assessment of oil activities in the neighboring Northwest planning area in the baseline used to analyze the impact of the Northeast decision on the threatened spectacled and Steller's eider by saying that this error can be remedied by later consultations.  Under the Endangered Species Act (ESA), the biological

opinion must contain a complete assessment of the environmental baseline.  As ESA regulations make clear, the Northwest oil leasing was part of the baseline.  Accordingly, its full impacts should have been considered in the biological opinion here.

Subsequent to Plaintiffs' submission of their opening brief, the Ninth Circuit decided the appeal of this Court's decision regarding the leasing decision for the adjoining Northwest planning area.  See N. Alaska Envtl. Ctr. v. Kempthorne, 2006 WL 2061246 (9th Cir. 2006).  As Plaintiffs stated in their opening brief, three of the claims there were similar to claims that were litigated in the Northwest case.  See Pls.' Br. at 35, 39, 44.  Accordingly, Plaintiffs acknowledge that these three claims—that the decision required site-specific analysis under NEPA, that NEPA requires a more thorough analysis of mitigation measures, and that the ESA analysis cannot be limited to a hypothetical scenario—are governed by the Ninth Circuit's decision and will not pursue those claims further here.  The Ninth Circuit's decision affirms this Court's holding that any amendment to the Northeast plan must contain a complete analysis of the cumulative of the decision combined with the Northwest decision.  Accordingly, the Ninth Circuit's decision undermines BLM's contention that the cumulative impacts of these two decisions were speculative and can better be analyzed later.  The Ninth Circuit's decision has no bearing on the claims that the decision violated the APA by failing to justify its decision under the maximum protection standard, that the global warming analysis is inadequate under NEPA, and that the endangered species consultation was based upon an incomplete baseline.

## ARGUMENT

I.    BLM FAILED TO EXPLAIN HOW THE DECISION TO OPEN SENSITIVE AREAS TO OIL DEVELOPMENT AND SCALE BACK PROTECTIVE MEASURES FULFILLS ITS DUTY TO PROVIDE MAXIMUM PROTECTION TO THE TESHEKPUK LAKE SPECIAL AREA.

"The [APA], which governs the proceedings of administrative agencies and related judicial review, establishes a scheme of 'reasoned decision making. . ..'  Not only must an

agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." Allentown Mack Sales and Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998) (citations omitted). In furtherance of this requirement courts have held that an agency must articulate a reasoned basis for its decision. Native Ecosystems Council v. United States Forest Serv., 418 F.3d 953, 965 (9th Cir. 2005) (stating agency must "provide [the court] with a satisfactory explanation supported by the record showing the necessary rational basis"). Here, BLM's decision to abandon the previously established protections requires it to explain how its decision fulfills the maximum protection standard.

Defendants and Intervenors attempt to escape this requirement by arguing first that the decision is insulated by a Congressional grant of wide discretion. This discretion is not so broad, however, that it obviates the agency's duty to explain its decision under the APA. Second, they argue the agency was not obligated to provide an explanation for its change because the basic State Farm obligation to explain does not apply to this decision. In fact courts consistently apply State Farm to decisions like this. Finally, Defendants and Intervenors nevertheless seek to point to an explanation, based on the national energy policy and the administration's desire to recover more oil as reasons for the change, but they do not point to any explanation of how the agency concluded that the level of protection provided by the decision fulfills the maximum protection standard.

    A.    <u>BLM Violated The Administrative Procedure Act By Adopting a Radically Different Plan To Achieve Maximum Protection Without Adequate Explanation.</u>

Defendants and Intervenors imply that the statutory standard is easily met and the agency's abandonment of previous protections requires little explanation because the statutory language confers substantial discretion on BLM. See Defs.' Opp'n at 10 ("BLM is provided with the discretion to impose appropriate restrictions"); Int-Defs.' Opp'n at 12 ("discretion to determine the appropriate balance between energy development and protection of surface resources is vested in the Secretary of the Interior."). The Court should reject Defendants' and

Intervenors' attempts to render the maximum protection standard superfluous by conflating it with the standard applicable to the Reserve in general, which requires mitigation of significantly adverse impacts to resources.  Defendants and Intervenors point out that the standard calls for maximum protection consistent with the purposes of the National Petroleum Reserves Production Act (NPRPA).  Plaintiffs have never contended that maximum protection means absolute protection of all resources, but rather recognize that it requires the Secretary to maximize protection of the Special Areas while allowing for a leasing program.  See Pls.' Br. at 14.  The purposes of the NPRPA do not require every acre of the Reserve be developed.  Indeed, the government has always recognized that maximum protection may include putting areas off limits to leasing as Secretary Watt did and as Secretary Babbitt did.  Cf. 43 C.F.R. § 2361.1(e)(1) ("the authorized officer may limit restrict, or prohibit use of and access to lands within the Reserve").  Thus, there is some balance inherent in the standard, but contrary to Intervenors' suggestion, Congress did not give the Secretary unfettered discretion to strike any balance that she or he sees fit.  Int.-Defs.' Opp'n at 12.  Rather, that balance is constrained by the Congressional mandate that the outstanding resources of the designated special areas be given maximum protection.  This clearly means that BLM must do something more than "mitigate reasonably foreseeable and significantly adverse effects on the surface resources," as is provided for resources outside of special areas.  42 U.S.C. § 6506a(b).  The interpretation of the standard proffered by Defendants and Intervenors, which they allege is met simply because BLM included some stipulations in its decision, conflates the heightened standard applicable to special areas with the general duty to mitigate adverse impacts on resources throughout the Reserve and fails to give effect to Congress's command that designated special areas be given heightened

protection.[3]  The Court must not interpret the standard so as to render it meaningless.  See Comm'r of Internal Revenue v. Ewing, 439 F.3d 1009, 1014 (9th Cir. 2006) (describing "the basic principle of statutory construction that "'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (citations omitted).

Fundamentally, however, Defendants' argument does not undermine the duty to provide a rational explanation of the decision.  While suggesting that nearly any decision the agency reached would be rational, Defendants' argument does not of course go so far as to assert that the decision is committed to agency discretion.  Indeed, it could not because Congress has established a rigorous standard for protection of the surface values of the Reserve Special Areas. See City of Los Angeles v. Dep't of Commerce, 307 F.3d 859, 869 n.6 (9th Cir. 2002) (stating that the only time courts will find matter committed to agency discretion is "in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.") (citations omitted).  As a

---

[3] Contrary to Intervenors' suggestion, the nearly identical introductory language BLM used to describe the alternatives in all of the recent decisions involving the Reserve does not indicate that all of the alternatives considered in these processes provide sufficient protection to Special Areas.  Beginning with the 1998 decision, BLM stated that "Each alternative addresses a different balance between serving the 'total energy needs of the nation' and protecting the surface resources, including providing 'maximum protection' for resources in Special Areas, as required by the NPRPA."  Int.-Defs.' Ex. C at 2, 3 (1 1998 FEIS at iv, II-1); see also Pls.' Ex. 56 at 4 (2006 ROD at 3) (similar); Int.-Defs.' Ex. D at 2 (1 NW FEIS at ES-2) (similar).  This statement merely lays out the goals of the process—to examine different balances between facilitating oil development and protecting resources.  It does not include a conclusion that all of the alternatives succeed at providing maximum protection.  Indeed, as the alternatives considered in these two processes spanned the spectrum from lease the entire area without any no surface occupancy zones to an alternative that put the entire area off limits to leasing, a conclusion that all of these alternatives were consistent with the maximum protection standard could be possible only if that standard granted the Secretary virtually unlimited discretion.  As discussed above and in Plaintiffs' Opening Brief,  such an interpretation is inconsistent with the language of the statute.

result, the fact that the standard allows for some discretion does not change BLM's duty to explain its rationale. Because the agency is changing course from its previously articulated position, it must "supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42 (1983).

Defendants and Intervenors also argue that the State Farm principles do not apply to the decision here. State Farm, however, merely articulated principles based on the APA's prohibition on arbitrary decision making, which applies to almost all agency decisions. Plaintiffs are not, as Intervenors suggest, Int.-Defs.' Opp'n at 15, attempting to erect a heightened standard. Rather, the APA's prohibition on arbitrary decision making dictates that an agency explain how it reached its conclusions and applied the law. Here, BLM has retreated significantly from its previously adopted protective measures, yet concludes that this decision satisfies the maximum protection standard. For this change in agency conclusion, a reasoned explanation is required.

Courts apply State Farm principles to decisions similar to the one at issue here.[4] See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782, 798-99 (9th Cir. 2005) (upholding district court's invalidation of Biological Opinion and subsequent injunction against

---

[4] Application of State Farm is not limited, as Intervenors suggest, Int-Defs Opp'n at 15, to cases in which the agency has interpreted a statute through notice and comment rulemaking. Here, the agency has not promulgated a legally-binding interpretation of the statute. Instead it has applied the statutory standard to the facts. In doing this, it must explain how its actions comport with its statutory duty. Because this case does not involve an agency's legally-binding statutory interpretation, Intervenors' repeated citations to Chevron are inappropriate. See Int-Defs' Opp'n at 8, 9, 13, 20. In fact, later Supreme Court decisions make clear that Chevron deference is only appropriate when the agency's interpretation of the statute has the force of law, such as when it is contained in a regulation promulgated after notice and comment rulemaking. See United States v. Mead Corp., 533 U.S. 218, 228 (2001); Christensen v. Harris County, 529 U.S. 576, 587 (2000).

agency action where agency "completely reversed course" from previous Biological Opinions); Native Ecosystems Council v. United States Forest Serv., 418 F.3d at 963-64; Rock Creek Alliance v. Fish and Wildlife Serv., 390 F. Supp. 2d 993, 1010 (D. Mont. 2005) ("…the simple fact of contradictory conclusion is not, without more, damning.  However, a change in conclusion must be explained.").  In Native Ecosystems, the court found that the agency could not justify its reduction of protected habitat (hiding cover for elk) in a national forest, where the agency had presented a different position on the ability of the area to meet the hiding cover standard in the past.  Id. at 961, 963.  In holding that the agency's changed position was unjustified and therefore arbitrary, the court noted that the agency "has not presented any rational explanation for its calculation change and its varying calculations do not assist us in our attempt to discern whether the agency has complied" with the proper management standard.  Id. at 964.  Similarly, BLM has not here provided any justification for its changed views on the need to set aside the critical habitat lands north and east of Teshekpuk Lake.  Because BLM has adopted a new position using facts regarding wildlife impacts that previously caused it to draw different conclusions, it must offer a reasoned explanation.  Id.; Rock Creek Alliance, 390 F. Supp. 2d at 1010; see Pls.' Ex. 31 at 7 (FWS DEIS Comments, Attachment 1 at 2) ("[i]n our review of the DEIS and related documents, we found no new information relative to the potential impacts of oil and gas development on molting geese and caribou in the TLSA.").

The only case Defendants and Intervenors cite in support of their contention the Court's holding in State Farm does not apply here in fact stands for the opposite proposition.  In Northwest Motorcycle Ass'n v. United States Dep't of Agriculture, the court found the agency's conclusions were rational and were "supported by a reasonable explanation."  18 F.3d 1468, 1478 (9th Cir. 1994).  Here, unlike in Northwest Motorcycle Association, the Defendants have not provided a "rational and principled reason" for their decision.  Id. at 1480.  Moreover, the court there found the Forest Service's actions to be a continuation, rather than a change in policy,

because those actions *supported* and were designed "to further" an existing management standard.  Id.  Here, instead of furthering the existing standard of maximum protection, the agency's actions undermine this standard, and thus represent a change from previous policy.  While Defendants and Intervenors cite a list of stipulations and required operating procedures applied in the decision as proof that they complied with the relevant standard,[5] they offer no reference to the decision or accompanying EIS that explains how BLM applied the standard and why it concluded that more protection was not required by the statute.  To explain BLM's change, Defendants point to the National Energy Policy.  Defs.' Opp'n at 12-13.  The National Energy Policy, however, does not resolve BLM's duty under the statute to provide maximum protection.  It did not require BLM to offer every acre of the Reserve for oil leasing.  The National Energy Policy says nothing about the level of protection provided to resources and how this complies with the standard.  Intervenors further suggest that new information about the location of oil and gas deposits and the nation's increasing energy needs justify the changed decision.  Int.-Defs.' Opp'n at 17.  Again, this says nothing about the level of protection required to meet the maximum protection standard and whether it was met here.  As discussed above, the maximum protection standard does leave BLM some discretion to balance providing maximum protection to resources with the other purposes of the act.  The notion that there may be more oil in the area than previously anticipated only potentially goes to one part of the balance.  It does not explain how BLM applied the maximum protection portion of the standard.

---

[5] Intervenors' suggestion that the Audubon Society "has never challenged BLM's conclusion that these less restrictive alternatives violate the Production Act's maximum protection requirement," Int.-Defs.' Opp'n at 16 n.9, is incorrect.  Plaintiffs have always maintained that alternatives allowing oil development in the most sensitive goose molting and caribou calving habitat are fundamentally inconsistent with the standard.  See, e.g., Pls' Ex. 55 at 8 to 9 (Alaska Wilderness League, et al., FEIS comments at 8 to 9).

B.    BLM Was Required To Provide Maximum Protection to the Teshekpuk Lake Special Area.

Intervenor-Defendants' argument that the maximum protection standard applies only to exploration activities and no other step in the process completely overlooks the relevant provision of the statute—42 U.S.C. § 6506a(n)(2).  Indeed, the government has always recognized that the maximum protection standard applies to all activities conducted in the Reserve and has consistently applied it at the leasing stage.[6]  See Pls.' Ex. 42 at 14 (1 FEIS at 1-6) (stating in special areas "all activities were to 'be conducted in a manner which will assure maximum protection.'") (emphasis added)); Pls.' Ex. 56 at 30 (2006 ROD at 29) ; Pls.' Ex. 5 at 20 (1998 ROD at 13).  Although it is correct that when originally enacted in 1976, the maximum protection standard only applied to exploration, this was because all other oil activity including leasing was prohibited at the time.  When Congress enacted the provision that allowed leasing, it also provided that "any exploration or production undertaken pursuant to this section shall be in accordance with section 6504(a) of this title."  42 U.S.C. § 6506a(n)(2).  Thus, contrary to Intervenors' suggestion, when it authorized leasing, in addition to imposing a general duty to mitigate "significantly adverse effects on the surface resources," § 6506a(b)(2), Congress also

---

[6] For the first time in a footnote in its brief, BLM suggests that the maximum protection standard does not apply until "surface disturbing" activities are approved.  Defs.' Opp'n at 8 n.10.  This interpretation is contrary to the agency's long standing practice of applying the standard to leasing decisions.  See Pls.' Ex. 5 at 20 (1998 ROD at 13) (applying maximum protection standard to leasing decision); Pls.' Reply Ex. 1 at 3 (NW ROD at 7) (same); Pls.' Ex. 56 at 14 (2006 ROD at 13) (same).  Moreover, the court " 'may not accept . . . counsel's post hoc rationalizations for agency action; Chenery requires that an agency's' [decision] . . be upheld, if at all, on the same basis articulated in [the decision] itself.'"  Altamirano v. Gonzales, 427 F.3d 586, 595 (9th Cir. 2005) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962)).  BLM has always recognized that maximum protection can require no lease zones, or strict no surface occupancy stipulations, which must be decided upon at the leasing stage.

explicitly broadened the requirement to provide maximum protection to Special Areas beyond exploration to all oil and gas activities.

II.    BLM VIOLATED NEPA.

    A.    <u>BLM Violated NEPA by Including a Significantly Different Preferred Alternative in the Final EIS Without Preparing a Supplemental Draft EIS.</u>

Because a new preferred alternative adopting a radically different approach to protecting resources appeared for the first time in the final EIS, BLM was required to circulate a supplemental draft EIS for public and agency review and respond to comments on the new preferred alternative.  NEPA regulations require a supplemental EIS when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns."  40 C.F.R. § 1502.9(c)(1).  To determine whether changes are substantial enough to warrant a supplement, the Ninth Circuit considers whether "(1) 'the alternative finally selected by [the agency] was within the range of alternatives the public could have reasonably anticipated [the agency] to be considering,' <u>and</u> (2) if 'the public's comments on the draft EIS alternatives also apply to the chosen alternative and inform [the agency] meaningfully of the public's attitudes toward the chosen alternative.'"  <u>Half Moon Bay Fishermens' Mktg. Ass'n v. Carlucci</u>, 857 F.2d 505, 508-09 (9th Cir. 1988) (quoting <u>Block</u>, 690 F.2d at 772).  Given that the new preferred alternative adopted an approach to seeking to protect wildlife unlike any of the alternatives in the draft, it could not have been anticipated by those commenting on the draft and the comments on the draft do not apply to the alternative finally adopted.  The fact that many entities did express their dismay at the new alternative does not lessen the need for a supplemental draft.  NEPA does not allow the statutory waiting period (or an extended waiting period) to substitute for a draft EIS.

    Defendants' and Intervenors' argument that the new preferred alternative is within the range of alternatives considered in the draft ignores the fact that the new alternative takes a

completely different approach to protection that could not have been anticipated by any of the entities that commented on the draft. Defendants' and Intervenors' argument boils down to the assertion that because the alternatives considered included one opening the entire area to leasing and an alternative that would maintain previous protections, any alternative that offered some more areas for lease could have been anticipated. This is incorrect. The alternatives contained in the draft presented the question as how much of the sensitive area north and east of the lake should be protected. Alternative A included the no lease zones previously established in 1998. Alternative B reduced the size of the no lease zone, but did not lease the core goose molting habitat that was put off limits by Secretary Watt. Alternative C opened the entire area to leasing. These alternatives led to the conclusion that the question was how much of the goose molting area should be kept off limits to leasing. No one could have anticipated that BLM would consider opening the entire area but purport to provide protection with limits on the area that could be covered by drill pads and some other facilities (but not pipelines).

Because the strategy was new, the comments on the draft preferred alternative did not apply to the preferred alternative announced in the final EIS. None of the comments were addressed to the question of whether a limit on the size of well pads and roads was an effective means of reducing impacts to wildlife. There simply were no comments that addressed whether allowing some types of facilities, i.e., pipelines within the core goose molting habitat was advisable. In fact, it would appear that this does not offer the level of protection FWS sought. In its comments on the final EIS, FWS stated "leasing and development within the Goose Molting Area would likely be detrimental to the population." Pls.' Reply Ex. 2 at 7 (FWS Specific comments at 6). No one could have anticipated that the agency would adopt an alternative that instead of creating an intact no leasing or strict no surface occupancy zone, would use surface restrictions on some activities as a protective strategy. In fact, not one of the over 200,000

comments received on the draft EIS addressed the idea of opening sensitive areas to development and relying on large lease tracts with limits on some surface activities as a protective measure.

BLM defends the new alternative as responsive to FWS's comments. Even if this were true, NEPA limits an agency's authority to adopt a new alternative without circulating a supplemental draft EIS to situations where the new alternative was within the range of alternatives that could be anticipated. Here, not only was the new alternative so different from those in the draft it could not have been anticipated, it also was not responsive to comments. While BLM paints the new alternative as responsive to comments -- and in particular the FWS's comments -- none of the comments suggested using large lease blocks with a surface area restriction on leasing activities in the goose molting area as a protective measure. For instance, FWS's comments stated

> making some areas unavailable for leasing provides a high level of protection for surface resources. Combined with uncertainties regarding implementation and effectiveness of proposed mitigation measures, it seems clear that alternatives that open a larger area to oil leasing and development, particularly in biologically sensitive areas, will not achieve the same level of resource protection as an alternative that prohibits leasing and development in these areas.

Pls.' Reply Ex. 2 at 4 (FWS Specific Comments at 3). BLM's claim that FWS supported Alternative B" is not supported by the record. FWS's comments stated unequivocally

> the No Action Alternative, as compared to Alternatives B and C, would offer greater protection of surface resources, particularly for trust resources within the existing no-lease and no-surface occupancy areas in the vicinity of Teshekpuk Lake. For this reason, the Service prefers the protective measures of the No Action Alternative as compared to Alternatives B and C.

Id. Indeed, the only comments to which the new alternative appears responsive are the oil industry comments that insisted that the entire area be made available for leasing. See Pls.' Ex. 25 (Anadarko comments); Pls.' Ex. 27 (CPAI comments).

Defendants and Intervenors do not support the argument that using large lease blocks with surface area restrictions for some facilities is not a radically new approach. BLM points out

that "[t]he objective is to provide added protection . . .." Defs.' Opp'n at 16. This is precisely what is new about this proposal—BLM has never used a restriction on total acres occupied by some facilities as a means to mitigate environmental impacts of oil development in sensitive habitat. BLM's failure to issue a supplemental draft hampered its ability to fully analyze this new approach. Intervenors state that this strategy could have been anticipated because BLM's regulations allow for lease tracts this large. Int.-Defs.' Opp'n at 24. That the lease size does not violate the statute or regulations, however, does not make this approach foreseeable. Nor is it relevant to the most important difference in the new alternative—that it uses a new, unanticipated, and untested approach to seek to protect surface resources.

Defendants' assertion that the new preferred alternative is similar to the draft preferred alternative B is not supported. Indeed, the only way in which the new preferred alternative is similar to B is in the number of acres made immediately available for leasing. Equating number of acres available with impacts, however, ignores the fact that not all acres have the same habitat values. In fact, deferring the subsurface acres under Teshekpuk Lake as a means of protecting wildlife instead of protecting the area north of the lake is a fundamentally different approach that no one could have anticipated. As is clear from the record, the main concerns during this process were with molting geese and caribou. See, e.g., Pls.' Ex. 31 at 7-8 (FWS DEIS Comments, Attachment 1 at 2-3) (focusing on potential impacts to molting geese and caribou); Pls.' Ex. 28 (National Audubon Society DEIS comments at 1) ("We are particularly concerned about the Teshekpuk Lake Caribou Herd, molting geese, and nesting water- and shorebirds within this unique and sensitive portion of the Arctic Coastal Plain."); Pls.' Ex. 56 at 30 (2006 ROD at 29) (describing Teshekpuk Lake Special Area as providing important waterfowl and caribou habitat); Pls.' Ex. 23 at 1 to 2 (The Wildlife Society Comments at 1 to 2) (focusing on adverse impacts on molting geese and caribou around Teshekpuk Lake). Since Teshekpuk Lake does not offer high

value molting habitat and is obviously not a suitable caribou calving ground, no one anticipated that deferral of the lake would be offered up as a protective measure.

The fact that the new approach adopted in the final EIS provoked written protests from many sectors does not change BLM's legal duties. See Dubois v. United States Forest Sev., 102 F.3d 1273, 1292 (1st Cir. 1995). Under NEPA regulations, publication of a final EIS must occur 30 days before the agency can render a final decision. Thus, in all of the cases that courts have required a supplemental draft there was such a waiting period.[7] It is common during this time for interested parties to voice their views on the final EIS. This is not a substitute for the NEPA comment process, which "give[s] the agency the benefit of informed comments and suggestions as it takes a 'hard look' at the consequences of proposed actions." Id. at 1291.

As BLM itself noted, entities from the International Wild Waterfowl Association to the North Slope Borough objected to the new preferred alternative. BLM did not, as would be required if it had provided a supplemental draft, analyze and respond to the substance of these comments on the final EIS. Significantly, other government entities that would have commented on a supplemental draft EIS did not comment on the final preferred alternative. In particular, FWS did not comment on the new preferred alternative. Thus, BLM's failure to publish a supplement draft allows it to make the dubious claim that the preferred alternative was

---

[7] Kootenai Tribe of Idaho v. Veneman does not, as Intervenors suggest, stand for the proposition that the fact the public was able to comment on the final EIS obviates the need for a supplemental EIS, even where there are substantial changes to the proposal. Int.-Defs.' Opp'n at 27. Indeed, Kootenai did not even involve a changed proposal. In Kootenai, the court overturned a preliminary injunction against a rule. The court rejected an argument that the alleged need for a supplemental EIS supported the injunction where "the alleged defect at most could affect the propriety of implementation of the Rule on the 4.2 million acres added during the process; it could not provide a proper basis to enjoin implementation of the Rule in all respects, particularly as applied to the acreage identified in the DEIS." Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1118 (9th Cir. 2002).

responsive to FWS's concerns.  Without a supplemental draft, there is no way of knowing

conclusively how FWS would have responded to the new preferred alternative.  This is one of

the reasons the new alternative required BLM to circulate a supplemental draft.

    B.    <u>The Final EIS Violates NEPA By Failing To Include A Complete Analysis Of Cumulative Impacts In The Northwest Planning Area.</u>

Defendants and Intervenors do not contend that the cumulative impacts analysis contains

a complete assessment of the effects of this decision on the Northwest plan area and the

resources that use both planning areas.  Rather they seek to prevent the Court from even

considering this issue by arguing that BLM was not aware of the problem even though it has

been a long standing area of contention and has even been litigated by the parties.  <u>See</u> <u>N. Alaska

Envtl. Ctr. v. Norton</u>, 361 F. Supp. 2d 1069 (D. Alaska 2005), <u>aff'd</u> 2006 WL 2061246 (9th Cir.

2006).  Indeed, in that litigation BLM promised that it would provide a complete analysis of the

impacts to the Northwest of the decision to open additional areas around Teshekpuk Lake to

leasing when it made this decision.  Now, in its attempt to do this BLM has used an oil

projection that by its own analysis is inappropriate because it fails to take account of additional

development in the Northwest that will be facilitated by opening up areas around Teshekpuk

Lake and reducing restrictive stipulations.  BLM provides no defense of this error,[8] but rather

argues that the analysis is still premature and again can be postponed until a later date.

   The Court should reject Defendants' and Intervenor-Defendants' argument that Plaintiffs

failed to preserve their cumulative effects argument because they did not bring this issue to the

agency's attention.  Int.-Defs.' Opp'n at 28.  Plaintiffs have met their responsibility "'to structure

their participation so that it is meaningful, so that it alerts the agency to [their] position and

contentions.'"  City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th Cir. 1986) (quoting Vermont

Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1978)).

Plaintiff National Audubon Society noted that the assessment of cumulative impacts on the

Teshekpuk Lake Herd needed to consider "cumulative effects of all development and industrial

growth in the western Arctic and throughout the range of Teshekpuk Lake caribou."  Pls.' Ex. 28

at 9 (National Audubon Society DEIS comments at 9).  Plaintiffs raised this issue "with

sufficient clarity to allow the decision maker to understand and rule on the issue raised."  Idaho

Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002).  BLM was well aware

that the issue of cumulative impacts on wildlife caused by the interplay between the Northwest

leasing decision and the decision to open additional area in the Teshekpuk Lake Special Area

was of great concern to Plaintiffs.  In fact, it was being litigated in the context of the Northwest

---

[8] Intervenors' argument, which BLM notably does not join, that BLM has accounted for
increased development in the Northwest as a result of the modifications to the Northeast
restrictions is simply incorrect.  BLM did rely on the expectation that the Northwest "would
produce up to 1,260 MMbbl of oil." Pls.' Ex. 42 at 254 (2 FEIS at 4-443).  In the table
Intervenors cite, it clearly indicates that BLM derived the number it used in the cumulative
impacts analysis from the 1,260 MMbbl figure in the Northwest and discounted this number by
half to reach the estimate it used in that table.  See Pls.' Reply Ex. 3 at 4 (2 FEIS at 4-451, Table
4-36) ("[i]ncludes . . . one-half of the resources of 1.260 Bbbls from Northwest National
Petroleum Reserve—Alaska at $30 per bbl.")).  Thus, analysis was clearly based on the 1,260
MMbbl figure, which the Northwest EIS clearly states includes a reduction based on the
restrictions of the 1998 Northwest plan that has now been amended.

Planning Area leasing decision when BLM issued the draft EIS here.  N. Alaska Envtl. Ctr. v. Kempthorne, 2006 WL 2061246 (9th Cir. 2006).  Where, as here, the agency understood the issue raised, the courts will find that the party exhausted its administrative remedies.  See Native Ecosystems Council v. Dombeck, 304 F.3d 886, 899 (9th Cir. 2002).

Defendants do not deny that the Northwest EIS stated that opening additional areas and scaling back restrictions in the Northeast would lead to greater development in the Northwest.  Nor does BLM deny that it made a mistake in failing to modify its projection of the level of development in the Northwest and the resulting cumulative impacts.  Moreover, Defendants cannot deny that there are potentially serious impacts here that need to be considered fully.  Indeed, as this Court noted in its opinion on the Northwest leasing decision, "Of course that document [the Northeast amendment EIS], and any action based upon it, i.e., relaxation of environmental protections that impact the NWPA, would be defective and thus unenforceable to the extent that cumulative impacts were not adequately considered."  N. Alaska Envtl. Ctr., 361 F. Supp. 2d at 1082.  Accordingly,  BLM should be estopped from arguing that it does not have to consider these cumulative impacts here.  Id.  Thus, the Court must reject Defendants' claims that it would be "speculative" to consider development in the Northwest planning area because the "ROD authorizes only leasing; it does not authorize any on the ground activities."  Defs.' Opp'n at 21; see also Int.-Defs.' Opp'n at 30 ("under NEPA, BLM could have deemed all Northwest Planning Area production 'speculative' and declined to analyze it.").

While Defendants suggest that the analysis of the cumulative impacts of this decision on the Northwest planning may be premature, the fact is BLM did this analysis.  The analysis, however, relies on a number that by BLM's own analysis is not appropriate here because it fails to take into account the increased development BLM said would be caused by the proposed changes to the Northeast plan.  This oversight is a significant one and does not amount to "flyspecking" the analysis.  See Int.-Defs.' Opp'n at 29.  In its analysis of the earlier proposal to

lease the Northwest planning area, BLM relied on the fact that much of the core caribou habitat

for the Teshekpuk Lake herd was off limits to leasing and that protective stipulations provided

additional protection as a basis for its finding that the impacts to the caribou herd were

acceptable.  See Natural Res. Def. Council v. United States Forest Service, 421 F.3d 797, 814

(9th Cir. 2005).  As this Court has recognized:

> The BLM admitted in the [Northwest] EIS that the protections within the
> Northeast planning area created insignificant cumulative impacts. An amendment
> to the Northeast IAP/EIS would surely alter this conclusion, and therefore the
> BLM must analyze these effects to satisfy NEPA's "hard look" requirement at
> some stage.

N. Alaska Envtl. Ctr., 361 F. Supp. 2d at 1082.  Given the significance of the mistake BLM

made here, the Court must remand the matter to the agency to prepare an accurate analysis of

cumulative impacts.  See NRDC v. United States Forest Serv., 421 F.3d 797, 812-14 (9th Cir.

2005) (finding mistaken calculation infected EIS and rendered it misleading in violation of

NEPA).

    C.    <u>BLM Failed to Consider or Compare the Effects of the Oil Development
Alternatives in a Warming Climate.</u>

The final EIS acknowledges that both oil development activities and global climate

change will have significant impacts on the resources in the Planning Area.  Nowhere, however,

does the final EIS put those two categories of impacts together to present a comparison of the

effects of the four alternatives in a warming climate.  That failure violates NEPA.

An EIS "should present the environmental impacts of the proposal and the alternatives in

comparative form, thus sharply defining the issues and providing a clear basis for choice among

options by the decisionmaker and the public."  40 C.F.R. § 1502.14.  This obligation to compare

the effects of the various alternatives applies to direct, indirect, and cumulative impacts.  Cf. id. §

1508.8 (explaining that "effects" and "impacts" include direct, indirect, and cumulative).  The

agency must present this information in a comparative form that "foster[s] both informed

decision-making and informed public participation." <u>Churchill County v. Norton</u>, 276 F.3d

1060, 1071 (9th Cir. 2001) (quoting <u>California v. Block</u>, 690 F.2d 753, 761 (9th Cir. 1982)).  It

may not rely on perfunctory statements and, instead, must provide "'some quantified or detailed

information; . . . [g]eneral statements about possible effects and some risk do not constitute a

hard look absent a justification regarding why more definitive information could not be

provided.'" <u>Ocean Advocates v. United States Army Corps of Eng'rs</u>, 402 F.3d 846, 868 (9th

Cir. 2005) (quoting <u>Neighbors of Cuddy Mountain v. United States Forest Serv.</u>, 137 F.3d 1372,

1379-80 (9th Cir. 1998)).

     BLM has not met this standard.  The final EIS presents information about the effects of

oil development on important resources under the various alternatives.  It also recognizes that

global climate change is occurring and describes the effects that a warming climate may have on

wildlife habitat, feeding, and migration.  Nowhere, however, does the final EIS present a

comparative description of the effects of the four alternatives in a warming climate.  By

divorcing the comparison of oil development effects from global climate change, the final EIS

creates a significant gap in the comparison of the effects of the four alternatives.

     Defendants and Intervenor-Defendants attempt to downplay this omission in three ways.

First, they mischaracterize the argument as a simple contention that global climate change should

have been addressed in the direct effects subsection, rather than as a cumulative effect in the

cumulative effects subsection.  <u>See</u> Defs.' Opp'n at 23-24.; Int.-Defs.' Opp'n at 31-32.  That

contention misses the point.  Plaintiffs do not argue that the final EIS is deficient because BLM

included its analysis of global climate change in the wrong section.  Rather, Plaintiffs have

shown that the final EIS missed an important issue entirely: BLM failed to consider or present

the effects of the four oil development alternatives in the context of a warming climate.  This

analysis could have been included in the discussion either of direct or cumulative impacts, but, in

fact, it is in neither.

BLM could have presented this comparison in the discussion of direct effects in Chapter 4 by including global climate change in the comparative baseline. Since BLM recognizes that global climate change is occurring, the final EIS could have included a changing climate in the analytic baseline, so that the effects of the action alternatives were compared against a No Action Alternative which accounts for climate change. BLM chose not to do that. Instead, in Chapter 4, the final EIS compares the action alternatives with the effects of a No Action Alternative without considering global climate change; climate change is not discussed in this analysis. See Pls.' Br. at 29-30.

Rather than part of the baseline, the final EIS treats global climate change as a cumulative impact. Locating global climate change in the cumulative impacts section of the final EIS, however, does not change or lessen BLM's obligation to present a meaningful comparison of the effects of the four alternatives. The final EIS still must analyze the effects of oil development activities in a warming climate and present that analysis in a form that allows decisionmakers and the public to compare the likely effects of each alternative. The cumulative impacts section of the final EIS does not contain such a comparison of the effects of the oil development alternatives in the context of a warming climate.

Defendants and Intervenor-Defendants argue next that, in fact, the final EIS does satisfy NEPA because the cumulative impacts section is sufficiently detailed. See Defs.' Opp'n at 23-24; Int.-Defs.' Opp'n. at 31-32. To support this contention, Defendants and Intervenor-Defendants provide a list of the places in which the final EIS discusses climate change or the effects that a changing climate are predicted to have on key resources. Again, these citations do not address Plaintiffs' argument. The final EIS is deficient not because BLM failed to consider some new source of information about global climate change, but because there is no comparison of the effects of the alternatives given what is known about climate change.

Defendants and Intervenor-Defendants also reference statements in the final EIS which they claim show that the final EIS contains the missing analysis. See Defs.' Opp'n at 26-27; Int.-Defs.' Opp'n at 32-33. These statements largely reflect an assumption that a changing climate will make the predicted impacts for the four alternatives incrementally worse. See, e.g., Defs.' Opp'n at 26; Int.-Defs.' Opp'n at 33. In that way, these statements assume an answer to the question BLM was required to evaluate. BLM cannot assume that global warming simply will exacerbate impacts in the same way for all alternatives; it must actually analyze that issue and present the results of that analysis in the final EIS.[9]

The final EIS also includes some mentions that impacts may be "greater" or "exacerbated" in sensitive areas or for particular species. See Defs.' Opp'n at 24-26; Int.-Defs.' Opp'n at 32-33; Pls.' Br. at 31. These statements do not present a comparison of the effects of the four alternatives in a warming climate. Rather, they are just the sort of general, perfunctory

---

[9] This failure renders the final EIS deficient on its face. To show the significance of this failure, Plaintiffs rely on the expert declarations of John Schoen and Jack Lentfer. These declarations show that, when considered together, global climate change and oil development activities may have significant impacts on key resources. See Pls.' Ex. 59 at 8-9 (Schoen Expert Decl. ¶¶ 20-23); Pls.' Ex. 60 at 5-6 (Lentfer Expert Decl. ¶¶ 17-19). They show that, if BLM had analyzed the effects of the oil development alternatives in the context of a warming climate, the agency may very well have discovered that the effects are not incremental. That is, in concert, oil development and global climate change may have impacts not adequately reflected in an analysis which simply adds the incremental effects of each. See Pls.' Br. at 32-34. Accordingly, and as explained in more detail in Plaintiffs' Opposition to the Motion to Strike, Docket # 73, these declarations are properly before the Court to support "an allegation that an EIS has failed to mention a serious environmental consequence." Nat'l Audubon Soc'y v. United States Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1994) (citation omitted); see also Earth Island Inst. v. United States Forest Serv., 442 F.3d 1147, 1162 (9th Cir. 2006) ("We allow extra-record materials if necessary to 'determine whether the agency has considered all relevant factors and has explained its decision.'") (quoting Southwest Ctr. for Biological Diversity v. United States Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996)).

statements prohibited by NEPA.  See Ocean Advocates, 402 F.3d at 868; Neighbors of Cuddy Mountain, 137 F.3d at 1379-80.

Finally, Defendants and Intervenor-Defendants contend that any insufficiencies in the analysis should be excused as a result of uncertainty surrounding the effects of global climate change.  See Defs.' Opp'n at 27-29; Int.-Defs.' Opp'n at 34-35.  BLM cannot avoid its obligation to present a meaningful analysis of the effects of the oil development alternatives on these grounds.  Indeed, the final EIS contains significant information about the effects of oil development and about potential changes in habitat and other resources due to climate change. Plaintiffs do not contend that BLM was required to develop information about global climate change other than what is available and in the record.  Rather, the final EIS must take what is known about the effects of oil development activities under the four alternatives and analyze and compare it in the context of what is known about global climate change.

Ultimately, BLM has omitted an important step in the comparison of alternatives.  A warming climate may significantly affect the comparison of impacts under each of the oil development alternatives.  See Pls.' Ex. 59 at 8-9 (Schoen Expert Decl. ¶¶ 20-23); Pls.' Ex. 60 at 5-6 (Lentfer Expert Decl. ¶¶ 17-19).  The failure to consider or present a direct comparison of the effects of the four alternatives in a warming climate violates NEPA.

III.     THE BIOLOGICAL OPINION WAS NOT BASED ON A COMPLETE BASELINE IN VIOLATION OF THE ESA.

The biological opinion prepared by the FWS for the Teshekpuk Lake amendment recognizes that the recently completed decision to lease nearly 8 million acres of land in the immediately adjacent Northwest Planning area of the Reserve is part of the baseline with which the decision to open lands surrounding Teshekpuk Lake to leasing must be considered.  Because the projection of development used in this baseline was incorrect, see supra at 16 to 19, which Defendants here do not deny, the biological opinion is flawed and must be reconsidered. Confusingly, however, Defendants attempt to defend this flaw by arguing that the fact that these

leases will be subjected to additional development is not part of the baseline and analysis of this problem can be deferred to potential later section 7 consultations.  Int-Defs.' Opp'n at 43.

The relevant regulation clearly defines the "environmental baseline" as including "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal . . . section 7 consultation."  50 C.F.R. § 402.02.  Here the Northwest decision is such a project.  Accordingly, the anticipated impact of development in the Northwest must be considered here.  At the time of its Northwest leasing decision, BLM predicted a certain level of development in the Northwest Planning Area, but explicitly acknowledged that opening the adjacent Teshekpuk Lake area would lead to increased development.  See supra at 18-19.  Thus, this predicted increased development is now anticipated and must be considered as part of the baseline.  Accordingly, the FWS needs to prepare a revised biological opinion with the right projections to determine whether the leasing plan would jeopardize the spectacled and Steller's eider.  This is especially significance here where even small increases in development levels for eiders are potentially significant.

IV.    INJUNCTIVE RELIEF IS THE APPROPRIATE REMEDY FOR THE VIOLATIONS HERE.

Defendants do not dispute that under the APA, the appropriate remedy when a court finds that an agency decision is arbitrary is for the Court to vacate the decision.  Indeed, the APA explicitly instructs the Court to do so.  See Earth Island Institute v. Rutherford, -- F.3d -- , 2006 WL 2291168, *9-10 (9th Cir. 2006); 5 U.S.C. § 706  ("The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law .").

Defendants do not provide any basis for the Court to refuse to enter further injunctive relief here.  As Plaintiffs pointed out in their opening brief, the only NEPA cases in which the Ninth Circuit has denied or limited injunctive relief were those where the defendants presented "unusual circumstances," such as "no NEPA policy would be served" by complete injunctive

relief.  Cady v. Morton, 527 F.2d 786, 798 n.12 (9th Cir. 1975); accord Am. Motorcyclist Ass'n v. Watt, 714 F.2d 962, 966 (9th Cir. 1983) ("strong environmental considerations" counseled against enjoining land management plan which restricted motorized access to a fragile desert); Alpine Lakes Prot. Soc'y v. Schlapfer, 518 F.2d 1089, 1090 (9th Cir. 1975) (logging not enjoined because of danger of spread of insect infestation).  Although Defendants argue against an injunction in this case, they present no evidence that such unusual circumstances are present here.  Accordingly, if the Court finds for Plaintiffs on any of the NEPA claims, it should enjoin any implementation of the decision until BLM completes an appropriate supplemental EIS.

Defendants' and Intervenors' arguments on relief also do not address the fact that the ESA constrains the Court's discretion to deny injunctive relief for an ESA violation. Washington Toxics Coalition v. EPA, 413 F.3d 1024, 1035 (9th Cir. 2005); Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987); Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985).  Congress has limited the courts' discretion over remedies for substantial procedural violations through its command that agencies must insure that their actions do not result in jeopardy to listed species.  Id.; see also Washington Toxics Coalition, 413 F.3d at 1035.  Because neither FWS nor the BLM have complied with their duties under the ESA, an injunction is appropriate.

**CONCLUSION**

For the abovementioned reasons, and the reasons stated in Plaintiffs' Opening Brief, the Court should enter summary judgment in Plaintiffs' favor and enter appropriate legal and injunctive relief.

Dated this 18th day of August, 2006.

Respectfully submitted,


  */s/ Deirdre McDonnell*
Deirdre McDonnell (AK Bar # 0111082)
Layla Hughes (AK Bar # 0312094)
Eric P. Jorgensen (AK Bar # 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, Alaska Wilderness League, Center for Biological Diversity, Natural Resources Defense Council, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, a copy of PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT, with accompanying materials, was served electronically on:

**Dean K. Dunsmore**
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B. Street, Suite 504
Anchorage, AK 99501-3657

**Jeffrey W. Leppo**
**Laura J. Beveridge**
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101

**David C. Crosby**
DAVID C. CROSBY, P.C.
5280 Thane Road
Juneau, AK 99801-7717

**Ethan Falatko**
**Lawrence Z. Ostrovsky**
STATE OF ALASKA
Office of the Attorney General
P.O. Box 110300
Juneau, AK 99811-0300

  _/s/ Deirdre McDonnell_
Deirdre McDonnell

**TABLE OF EXHIBITS**

| <u>Exhibit No.</u> | <u>AR No.</u> | <u>Description</u> |
|---|---|---|
| 1 | NW | Northwest National Petroleum Reserve – Alaska, Record of Decision (Jan. 2004) (NW ROD) (excerpt) |
| 2 | 4360 | U.S. Fish and Wildlife Service, specific comments on the draft EIS (Aug. 23, 2004) |
| 3 | * | Northeast National Petroleum Reserve – Alaska Final Amended Integrated Activity Plan / Environmental Impact Statement (January 2005) (FEIS) (excerpt) |

NW.  Exhibits identified with "NW" were part of the Administrative Record for the Northwest Planning Area.  <u>See</u> Pls.' Opening Brief n.7.

*  The Administrative Record did not provide a number for documents identified with asterisks, however, they were listed on the Reference List provided along with Record.

*National Audubon Society, et al., v. Norton, et al.,*
1:05-cv-00008-JKS