UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY; ALASKA WILDERNESS LEAGUE; CENTER FOR BIOLOGICAL DIVERSITY; NATURAL RESOURCES DEFENSE COUNCIL; NORTHERN ALASKA ENVIRONMENTAL CENTER; SIERRA CLUB; and THE WILDERNESS SOCIETY, | No. 1:05-cv-00008-JKS<br><br>MEMORANDUM DECISION<br>[*PRELIMINARY*] |

Plaintiffs,

vs.

DIRK KEMPTHORNE,[1] Secretary of the Interior; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS,[2] Regional Director, United States Fish & Wildlife Service; BUREAU OF LAND MANAGEMENT; UNITED STATES FISH AND WILDLIFE SERVICE; and UNITED STATES DEPARTMENT OF THE INTERIOR,

Defendants, and

CONCOCOPHILIPS ALASKA, INC.; ANDARKO PETROLEUM CORPORATION; ARCTIC SLOPE REGIONAL CORPORATION; and STATE OF ALASKA,

Intervenor-Defendants.

---

[1] Dirk Hempthorne substituted for P. Lynn Scarlett.  FED. R. CIV. P. 25(d)(1).

[2] Tom Melius substituted for Rowan Gould.  FED. R. CIV. P. 25(d)(1).

# INTRODUCTION

In this case, the second involving the leasing of oil tracts in the National Petroleum Reserve – Alaska ("NPR-A") brought before this Court, Plaintiffs, environmental conservation organizations, challenge a proposal by the government to lease a portion of the NPR-A known as the Northeast Planning Area ("NE NPRA"). In the prior case, Plaintiffs challenged the decision of the government to lease portions of the Northwest Planning Area ("NWPA"), which the Court denied. *Northern Alaska Environmental Center v. Norton*, 361 F.Supp.2d 1069 (D. Ak. 2005), *aff'd sub nom. Northern Alaska Environmental Center v. Kempthorne*, ___ F.3d ___, 2006 WL 2061246 (9th Cir. July 26, 2006) ("*NAEC* ").[3] The history of NPR-A and the proceedings with respect to leasing in the NWPA is set forth in detail in the earlier case and is not repeated here.

Plaintiffs challenge the decision by the government to make available for leasing for oil exploration approximately 1.7 million acres including Lake Teshekpuk and the area immediately surrounding the lake, the Teshekpuk Lake Special Area ("TLSA"), rather than continuing the existing protections for what, in plaintiffs' view is an unique resource worthy of special recognition that has been recognized as such by Congress and multiple administrations since 1976. Specifically, plaintiffs criticize the process leading to this result and challenge the Final Environmental Impact Statement ("FEIS") and supporting Biological Opinion ("BiOp") upon which the decision rests. Plaintiffs request this Court enter declaratory judgment asserting three points. First, that Defendants arbitrarily violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, 40 C.F.R. §§ 1500, *et seq.*, and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A) by failing to provide an analysis of direct, indirect, and cumulative impacts from and reasonable alternatives to proposed oil and gas development activities in the NE NPRA. Second, that the U.S. Fish & Wildlife's ("F&WS") Biological BiOp and the reliance thereon by the Bureau of Land Management ("BLM") on the impact on Stellar and speckled eiders is arbitrary and capricious in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536(a), (b), and the APA, 5 U.S.C. § 702, 706.[4] Third, that the

---

[3] The plaintiffs to this lawsuit were also the plaintiffs in *NAEC*.

[4] The Court notes that Plaintiffs' Motion for Summary Judgment was filed prior to the time the

(continued...)

Defendants acted arbitrarily and capriciously in failing to analyze and explain the decision to dramatically decrease the protection to wildlife and subsistence resources in the TLSA in violation of the National Petroleum Reserve Production Act, ("NPRPA") 42 U.S.C. §§ 6504(b), 6506a,[5/] and the APA, 5 U.S.C. § 706(2)(A).

Plaintiffs challenge the adoption of a plan that reverses a long-standing practice of keeping environmentally sensitive habitat in the TLSA off-limits to oil and gas activities. Plaintiffs allege that Defendant's NEPA analysis, specifically the FEIS: (1) understates the impacts to resources likely to be caused by the preferred alternative, provides a misleading comparison to the other alternatives, and fails to divulge fully the impacts of the decision on sensitive wildlife, such as birds; (2) fails to analyze the impacts of the alternatives in the context of a changing climate; (3) does not analyze the extent to which different local geographic areas are differently affected by disturbance or development; (4) does not analyze all of the activities that are permissible under the ROD, *e.g.*, while the decision removes prior prohibitions against exploration in some areas outside of the winter season, it does not analyze the effects of such exploration; (5) fails to take into account increased development in the NWPA that will be facilitated by development in the NE NPRA and does not reveal the full extent of cumulative impacts to the resources of the Reserve, in that it fails to consider adequately impacts from and

---

[4/](...continued)
Second Amended Complaint was filed. It, therefore, addresses a pleading that has been superceded and of no further effect in this case. 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FED. PRAC. & PROC. CIV., § 1476 (2d ed.); *see also Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir.1992); *Loux v. Ray*, 375 F.2d 55, 57 (9th Cir.1967). Generally, the filing of an amended pleading renders moot any pending motions addressed to the superceded pleading. *See Norman v. United States,* 63 Fed.Cl. 231, 242 (Fed. Cl.2004); *National City Mortgage Co. v. Navarro*, 220 F.R.D. 102, 106 (D. D.C.2004). The Court has compared the Second Amended Complaint to the its predecessor and determined that the amendment, which added the allegations against the BLM in the Second Cause of Action, does not materially affect the issues to be decided by the Court and the additional issues, if any, are fully addressed by the parties in these proceedings. Accordingly, in the absence of objection, the Court will treat the Motion for Summary Judgment and the oppositions thereto as being addressed to the Second Amended Complaint.

[5/] Prior to enactment of the Energy Policy Act of 2005, PUB. L. 109-58, § 347(c), effective August 8, 2005, § 6506a was numbered § 6508 (as it is referred to in the complaint). Although the Energy Policy Act of 2005 redesignated and substantially restructured former § 6508, no material substantive change occurred.

alternatives to proposed oil and gas leasing and development activities in the NE NPRA; (6) relies heavily on untested mitigation measures to provide protection to resources, but fails to explain the basis for the mitigation measures, fails to analyze their effectiveness, fails to cite scientific evidence in support of these mitigation measures and fails to analyze alternative mitigation measures; and (7) presents for the first time an alternative adopting an entirely new approach to attempting to protect wildlife relying on large lease tracts with limits for total area covered by some facilities that was not within the range of alternative the public could have anticipated BLM to be considering and the comments on the draft do not also apply to the chosen alternative. Plaintiffs allege that the Defendants violated the ESA because the BiOp does not consider the full impacts of the action on eiders, including the potential for the oil leases actually authorized, rather than merely a narrowly construed hypothetical scenario, to jeopardize the Steller's and spectacled eiders and the effects of opening the NE NPRA to development on predicted levels of development and eider impact in the adjacent NWPA. Plaintiffs allege that Defendants violated the NPRPA by failing to provide a rational explanation for how this decision is consistent with the duty to provide maximum protection to special areas.

PROCEDURAL BACKGROUND

Although, Congress amended the NPRPA to authorize "an expeditious program of competitive leasing of oil and gas" in the NPR-A in 1980, PUB. L. 96-514 (December 12, 1980), little activity occurred in the NPR-A from the mid-1980's through the mid-1990s. 1 FEIS at 1-8. In 1997 BLM began assessing the potential impacts from oil and gas development in the NPR-A, particularly in the Northeast Planning Area. *Id.* This led first to the issuance of the Northeast National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/Environmental Impact Statement in August 1998 ("1998 NE FEIS"), and the Northeast National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/Environmental Impact Statement Record of Decision, in October 1998 ("1998 NE Plan"). *Id.* Under the 1998 NE Plan, approximately four million acres of the NE NPRA was made available for oil and gas leasing under the conditions and stipulations in that ROD.[6]

---

[6] That NE Plan is the subject of the litigation in *Wilderness Society at al. v. Bruce Babbitt et al.*,

(continued...)

In 2001, BLM also began planning for potential leasing in the adjoining NWPA. *Id.* That planning culminated in Northwest National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/ Environmental Impact Statement in November 2003, and Northwest National Petroleum Reserve-Alaska Final Integrated Final Activity Plan/ Environmental Impact Statement Record of Decision in January 2004. *Id.* In that decision BLM opened approximately 8.8 millions acres in the NWPA for oil and gas leasing, *id.*, and was the subject of the proceedings and decision in *NAEC*.

In 2002, one of the recommendations of the President's National Energy Policy, in part, directed the Secretary of the Interior to "consider additional Environmentally responsible oil and gas development... through further lease sales in the National Petroleum Reserve-Alaska," and that "such consideration should include areas not currently leased in the northeast corner of the National Petroleum Reserve-Alaska." ROD at 3. In implementing this directive, BLM published on June 23, 2003, a notice of intent to amend the 1998 NE Plan and a call for nomination of areas to be addressed in the any amendment of that plan. 68 Fed. Reg.37173. The purpose of the proposed amendment was to evaluate additional lands for potential exploration and development of new oil discoveries and to consider the use of performance-based stipulations similar to those developed for the NWPA. AR 41 at 1; AR 1355 at 2.

Notice of the availability of the Northeast National Petroleum Reserve-Alaska Draft Integrated Final Activity Plan/ Environmental Impact Statement was published on June 9, 2004. 69 Fed. Reg. 32,365. In the draft EIS, BLM considered three alternatives: Alternative A, the "no action" alternative would have kept the 1998 ROD in place; Alternative B, which proposed opening approximately 95% of the NE NPRA to leasing, was identified as the agency's preferred alternative; and Alternative C made the entire planning area available to leasing. *Id.* at 32,366. Alternative B made much of the previously-protected area around Teshekpuk Lake available to leasing, opening an additional 387,000 acres, but maintaining a 213,000 acre no-lease zone in an area northeast of the lake that provides important goose molting habitat. *See id.*; 1 DEIS 2-7 to 2-8. The deferral area in Alternative B closely resembled the goose molting area kept off limits

---

<sup>6</sup>(...continued)
1:98-cv-02395(RWR), pending in the District of Columbia.

by Secretary Watt in the 1980's. *Compare* 3 FEIS Map 2-2 to Pltfs' Exh. 2 (1983 FEIS Map). The DEIS's alternatives B and C contained the same set of mitigation measures, similar to those recently adopted in the NWPA decision, which eliminated many of the stipulations contained in the 1998 NE Plan and converted others from stipulations to "required operating procedures" (ROPs). 1 DEIS at 2-8.

Following public comment and hearing, BLM issued the FEIS in January 2005 and notice of the availability of the FEIS was published on January 28, 2005. 70 Fed. Reg. 4140. The final EIS considered four alternatives—Alternatives A, B, and C from the draft EIS and an entirely new preferred alternative, Alternative D. 1 FEIS at 2-3 to 2-4. The new preferred alternative made almost 4.4 million acres of the planning area, including the entire area around Teshekpuk Lake, immediately available for leasing. *Id*. at 2-4. The only area not immediately made available for leasing was the subsurface land under Teshekpuk Lake itself, which was deferred from leasing. *Id.*

The ROD was issued on January 11, 2006. The ROD adopted with minor modifications and clarifications the preferred alternative in the FEIS. ROD at 3. The ROD makes approximately 389,000 additional acres of land available for oil and gas leasing in the 4.6 million-acre NE NPRA. ROD at 3. This encompasses lands believed to contain the highest oil and gas potential in the NE NPRA and represents a roughly 10% increase in the amount of land previously available for leasing in the planning area. The ROD deferred leasing on the 211,000 acres of Teshekpuk Lake, which provides over-wintering habitat for fish and breeding habitat for waterfowl, and in the Colville River Special Area, which provides important habitat for the Arctic peregrine falcon and other raptors.

## DISCUSSION

In their reply memorandum Plaintiffs acknowledge that three claims—that the decision required site-specific analysis under NEPA, that NEPA requires a more thorough analysis of mitigation measures, and that the ESA analysis cannot be limited to a hypothetical scenario—are governed by the decision in *NAEC* and are abandoned.

## I. Adequacy of NEPA Review

A district court's review of an EIS under NEPA is governed by the APA. *See* 5 U.S.C. § 706. A court may hold unlawful and set aside agency action, findings, and conclusions that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Lathan v. Brinegar*, 506 F.2d 677, 692–93 (9th Cir.1974). An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or if the agency's decision is contrary to the governing law. 5 U.S.C. § 706(2)(A); *Lands Council v. Powell*, 379 F.3d 738, 743 (9th Cir. 2004). While the preparation of an EIS calls for judgment by the agency, courts require full compliance with the procedural requirements of NEPA. *See Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir.1981).

Plaintiffs argue that Defendant's NEPA analysis is deficient by: (1) including a significantly different preferred alternative in the FEIS without preparing a Supplemental Draft EIS; (2) failing to include a complete analysis of cumulative impacts in the NWPA; and (3) failing to consider or compare the effects of oil development alternatives in a warming climate. *See* Docket No. 49 at 19–35; Docket No. 93 at 11–23.

### A. Supplemental Environmental Impact Statement.

Plaintiffs argue that because Alternative D is substantially different than the three alternatives evaluated in the draft EIS, BLM should have issued a supplemental draft EIS to allow for meaningful public and agency comment on what Plaintiffs characterize as a "novel" approach. Docket No. 49 at 26.

Defendants argue that Alternative D was well within the range of the alternatives proposed in the draft EIS, developed in response to comments received on the draft EIS, and the comments received on the three proposed alternatives also applied to Alternative D. Therefore, a supplemental draft EIS soliciting further comment was not required. Docket No. 86-1 at 20–22; see also Docket No. 85-1 at 29–35. Moreover, Defendants argue comments were in fact

received on the FEIS and considered by the BLM.  Docket No. 86-1 at 22–23; Docket No. 85-1 at 35–36.  In reply, Plaintiffs argue because Alternative D adopted a radically different approach to protecting resources appeared for the first time in the final EIS, BLM was required to circulate a supplemental draft EIS for public and agency review and respond to comments on Alternative D.  Docket No. 93-1 at 16.

Alternative A, the No Action Alternative, would continue management according to the 1998 ROD, leaving in place the stipulations and 589,000-acre no-lease area implemented by that decision.  1 DEIS at 2-7, Table 2-1.  The two action alternatives, B and C, would replace the 1998 stipulations with new performance-based stipulations and ROPs and open to leasing some of the area closed in the 1998 decision.  Alternative B, the original Preferred Alternative, would open 387,000 acres, leaving closed 213,000 acres of extremely sensitive wildlife habitat north of Teshekpuk Lake, while Alternative C would open the entire planning area to leasing.  *Id.* at 2-7 to 2-9, 2-13 to 2-33.

There is little disagreement as to the law to be applied; the disagreement is principally the application of that law to the facts of this case.  A principal purpose of NEPA is to alert the public to what the agency intends to do and to provide the public with enough information to be able to participate intelligently in that process. *See State of California v. Block*, 690 F.2d 753, 772 (9th Cir.1982).  However, this does not mean that an agency must supplement an EIS and provide an opportunity to comment on every change made in a proposed action. *Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1118 (9th Cir.2002).   As Defendants correctly note, agencies have flexibility to modify alternatives discussed in a draft EIS in response to public comments without having to circulate a new draft for comment. *Northwest Environmental Defense Center v. Bonneville Power Admin*., 117 F.3d 1520, 1539 (9th Cir.1997); *Half Moon Bay Fisherman's Marketing Assoc. v. Carlucci*, 857 F.2d 505, 508 (9th Cir.1988).  Plaintiffs acknowledge that a supplemental EIS is required only if an agency makes "substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9( c)(1).  An agency need not prepare a supplement and solicit further comments if the alternative selected is within the range of the alternatives the public could reasonably have anticipated and if the comments

received also apply to the chosen alternative. *Half Moon Bay Fisherman's Marketing Assoc.*, 857 F.2d at 508-09; *State of California v. Block*, 696 F.2d at 772.

The gist of Plaintiffs' argument is that in Alternative D the BLM adopted protective measures that had not at any time before been utilized, to wit: limiting the area that could be covered by drill pads and some other facilities but not pipelines to 300 acres and deferral of leasing the lake itself. Therefore, Plaintiffs argue, Alternative D was not within the range of the three alternatives discussed in the EIS and could not have been reasonably anticipated. Docket No. 49 at 28, Docket No. 93 at 17.

Defendants on the other hand argue that under Alternative C all of NE NPRA would be available for leasing, including all of the TLSA and Teshekpuk Lake subject to the same performance-based stipulations and ROPs considered in Alternative B. DEIS at 2-8 to 2-9; 2-13 to 2-26; 2-27 to 2-33. Alternative B, like Alternative D, would have made the same area, including the TLSA, available for leasing. 1 FEIS at 2-8, 2-11; ROD at 19-20.[7] The only real difference between Alternative B in the DEIS, and Alternative D in the FEIS and ROD is that Alternative D contains some additional or more restrictive stipulations and operating procedures. Compare DEIS at 2-13 to 2-26; 2-27 to 2-23, 2-35 to 2-87, with 1 FEIS at 2-12 to 2-12, 2-37 to 2-56, 2-59 to 2-152, and ROD Appendices A & B. This comparison shows that Alternative D contains more restrictive conditions. Another change in Alternative D from Alternative B is that Alternative D includes a division of the area north of Teshekpuk Lake into seven large lease tracts in which a maximum of only 300 acres of permanent surface disturbance would be permitted. DEIS at 2-7 to 2-9; 2-13 to 2-34; FEIS at 2-11 to 2-12, 2-37 to 2-56; ROD at 20-22, 53-76. Alternatives C and B would have made the Lake available for leasing. Alternative A (the no action alternative) would have closed the Lake for leasing. 3 FEIS Maps, 2-1, 2-3. By deferring any leases in the Lake, Alternative D, like Alternatives B and C, considered the Lake suitable for leasing, but, like Alternative A, deferred any leasing at this time. Docket No. 86-1 at 21–22.

---

[7] Maps 2-1 to 2-3 of the DEIS provide a graphic comparison of the alternatives

Defendants also argue that the preferred Alternative was also developed in response to comments received, including specific proposals from F&WS and ConocoPhillips.  F&WS's proposal supported Alternative B, but suggested the use of prescriptive stipulations from the 1998 NE Plan, and additional modifications to protect important surface resources such as the goose molting habitat north of Teshekpuk Lake and caribou habitat west and south of the Lake. ROD at 42.  ConocoPhillips' proposal supported the adoption the adoption of Alternative C with certain restrictions around lakes in the goose molting area north of the Lake. *Id*.  BLM took these proposals and numerous other public comments into account, and the result was the reasoned Alternative D. *Id*.  Finally, Defendants argue that comments on the FEIS were received and considered before the ROD was issued. *Id*.

The Court agrees with Plaintiffs that the fact the agency received and considered comments subsequent to the publication of the FEIS does not necessarily eliminate the need for a supplemental EIS. Docket No. 93-1 at 20. *See Dubois v. United States Forest Serv*., 102 F.3d 1273, 1292 (1st Cir.1995).  It is, however, some substantive evidence of lack of a need for a supplemental EIS.  More specifically, did the post-FEIS comments indicate that BLM would likely have received comments that added substance to the debate or were more likely to be nothing more than rehashes of prior comments.  Council on Environmental Quality regulations require supplementation where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 CFR § 1502.9(c)(1)(ii).  This regulation requires an agency to take "hard look" at the new information to assess whether supplementation might be necessary. *Marsh v. Oregon natural Resources Council*, 490 U.S. 360, 385 (1989).  In determining whether to issue a supplemental EIS, an agency is expected to use a "rule of reason." *Id.*, 490 U.S. at 373.

While the Court agrees with Plaintiffs that Defendants mischaracterize the position of F&WS on Alternative B, the Court cannot agree that Alternative D was totally unresponsive to the concerns of F&WS (as well as others). Docket No. 93-1 at 18–19.  While Alternative D does not provide the degree of protection that F&WS preferred—total closure—it did provide a greater degree of protection than existed under Alternative B, but less than that under Alternative A (no action).  The problem the Court has with Plaintiffs position and arguments on this point is

that, if adopted, it would render any change to an EIS that did not respond directly and specifically to a concern in the manner the objector states or was contained in some comment, as triggering the requirement for a supplemental EIS in any case in which the agency adopted a compromise between positions. In the case at bar, F&WS, as well as Plaintiffs, quite understandably, preferred that the entire TLSA be placed off-limits to oil and gas activities for the protection of wildlife, in particular the goose molting area. The oil companies, also quite understandably, wanted the TLSA opened without restriction. Neither extreme prevailed. Instead, BLM adopted somewhat of a middle ground, opened a significant part of the TLSA with added restrictions and kept closed for at least 10 years Teshekpuk Lake itself. Strangely enough, BLM did precisely in this case what Plaintiffs so strenuously argued it should have considered in *NAEC*—adopted a middle ground between the extremes of the commentators as well as the positions taken in Alternatives B and C.

As for foreseeability, contrary to Plaintiffs' arguments, Docket No. 91-2 at 16–17, there is nothing new or untested about the nature of restrictions utilized by BLM: reduction in the area opened, restrictions on "footprint," and times when activities may or may not be conducted. The case at bar does not involve some new or radical untested technology. Distilled to its essentials, Plaintiffs' argument is in reality that they disagree that Alternative D will adequately protect the environment. Indeed, other than a total closure of TLSA, Plaintiffs have suggested nothing that would, in their opinion, be sufficiently protective. Congress has committed to agency discretion the proper course of action to be taken to protect the environment consistent with the other usages to which public property may be put. A reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of its proposed action. *Selkirk Conservation Alliance*, 336 F.3d 944, 958 (9th Cir.2003); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir.1994).

In this case, BLM considered a viable alternative that appeared reasonable and appropriate in light of the significant alternatives suggested during the DEIS comment period. NEPA requires that it do nothing more. This Court noted in *NAEC*, "[a]n EIS is rendered inadequate by the existence of a viable, but unexamined alternative." 361 F.Supp.2d at 175. It is not, however, required to analyze every potential permutation or variations in the continuum

between various alternatives.  The Court cannot say that BLM abused its discretion in failing to prepare a supplemental EIS prior to adopting Alternative D in the FEIS.

   **B.  Cumulative Impact Analysis**.

   Plaintiffs argue the final EIS violates NEPA by failing to analyze the full cumulative impacts of the plan to open the previously protected area around Teshekpuk Lake, most specifically that it fails to adequately analyze the cumulative effects of the development in the NWPA. Docket No. 49 at 31–32.  Plaintiffs argue that this increase in development could have potentially serious environmental consequences.  BLM has acknowledged that the decision here may affect the Teshekpuk Lake caribou herd.  1 FEIS at 4-368.  The NWPA FEIS indicated that "If several lease sales were to occur under the Preferred Alternative, . . . [development] is expected to further impede movements of TLH caribou to insect-relief areas along the coast.  This effect . . . may reduce productivity of the TLH."  2 NWA FEIS at V-136.  In the case of the threatened eiders, F&WS opined that any development beyond that predicted at the time of the Northwest decision could present significant threats to the species. Pltfs. Ex. 16 at 2, 5 (NW BiOp at C-2, C-8).[8/]

   Defendants argument is in three parts.  First, they argue that, having failed to raise it during the comment period, it has been waived. Docket No. 86-1 at 24–25.  Second, they argue that evaluation at the leasing stage is premature and should be deferred until post-leasing development activities are proposed and concrete information available. *Id*. at 26–27.  Third, they argue that the cumulative effect analysis in the FEIS is adequate.  *Id*. at 27.

   Plaintiffs reply that Plaintiffs raised the issue with sufficient clarity to allow Defendants to understand rule on this issue.  Moreover, the issue was a point being litigated in *NAEC*.

---

   [8/] Defendants have requested that the Court disregard Exhibits 8–10, 12, 16, 45, 59, 60, and 80 and join in the motion to strike Exhibits 45, 59, and 60, which are not part of the certified agency record. Docket No. 86-1 at 12 n. 9.  With respect to Exhibits 8–10, 12, 16 and 80, Defendants acknowledge that they are part of the certified record in *NAEC*.  Although these are not part of the agency record in this case, they are none-the-less subject to judicial notice.  FED. R. EVID. 201.  These document may also be necessary to a determination of whether the Defendants considered the cumulative effect, certainly a relevant factor and one that is directly attacked by Plaintiffs.  To the extent that they establish that Defendants have failed to properly address the cumulative effects, the record may be supplemented. *See Southwest Center for Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1450 (9th Cir.1996). The Court will consider Exhibits 8–10, 12, 16 and 80 in that context.

Docket No. 93-1 at 22–23.  Plaintiffs further point out that under *NAEC* analysis of the cumulative effects was deferred to be addressed in the EIS for NE NPRA.

The Court has examined those portions of the FEIS that Defendants have cited as adequately addressing the cumulative effects of the added development.  While those do discuss the *economic* effects and acknowledge that there will more likely that not be more physical activity, as Plaintiff's argue, they do not address the cumulative *environmental* impact.  For example, while the NWPA FEIS and the NE NPRA FEIS both recognize a potential adverse impact on the Teshekpuk Lake caribou herd, there is no discussion in the NE NPRA FEIS of the effect of the combined activity.

The Court is troubled by the position taken by Defendants.  In *NAEC* Defendants argued that a comprehensive analysis of the cumulative effects was not necessary with respect to leasing in the NWPA in part because the then proposed action in NE NPRA was too speculative.  This Court, in rejecting that argument, stated, 361 F.Supp.2d at 1082 (emphasis added):

> Defendants argue that it is not the stage in the NEPA process that is important, but the definitiveness of the proposed action.  Docket No. 68 at 21–27.  Defendants explain that the proposed amendment to the Northeast IAP/EIS is too speculative to be a reasonably foreseeable action.  *Id.* at 26.  This argument is unpersuasive.  Consistent with Ninth Circuit precedent, the Notice of Intent to amend the Northeast IAP/EIS satisfies the "reasonably foreseeable" requirement for a cumulative effects analysis.  Moreover, the fact that the BLM planned far enough ahead to issue a schedule for the NEPA process provided within the Notice of Intent evidences the foreseeability of the amendment.  *See* 68 Fed. Reg. 37173.  The BLM admitted in the EIS that the protections within the Northeast planning area created insignificant cumulative impacts.  An amendment to the Northeast IAP/EIS would surely alter this conclusion, and therefore the BLM must analyze these effects to satisfy NEPA's "hard look" requirement at some stage.  *The issue is therefore one of timing.  Essentially, the agency has in effect given notice that it will consider all impacts cumulative and site specific in any modification to the EIS in the Northeast planning area.  It would appear that reliance on protections contained in the existing Northeast planning area EIS to find minimal impacts in the NWPA would burden the agency to reconsider this issue in any supplemental EIS in the North East Planning Area that would affect the NWPA.  See, e.g., Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357-58 (9th Cir. 1994) ("having persuaded the district court that it understands its duty to follow NEPA in reviewing future site-specific programs, judicial estoppel will preclude the service from later arguing that it has no further

duty to consider the cumulative impact of site specific programs.") (citations omitted).

Thus the issue boils down to this—while the agency must consider all cumulative impacts before altering the EIS for the Northeast Planning Area, must it nevertheless delay issuing an EIS for the NWPA until all comments are in and a meaningful evaluation of the decision to modify the NEPA EIS can be made?  In other words must both EISs issue together.  *Since the NEPA EIS cannot be modified to change any aspect of the NWPA EIS that depends upon it, the requisite cumulative impact study may await issuance of the NEPA EIS.*  Of course that document, and any action based upon it, i.e. relaxation of environmental protections that impact the NWPA, would be defective and thus unenforceable to the extent that cumulative impacts were not adequately considered.  The BLM did not have to delay issuing an EIS for the NWPA until the NEPA EIS issued.

The Court of Appeals, in affirming, agreed with this Court stating, 2006 WL 2061246, Slip Op. * 9: "In the Notice of Intent, the agency has in effect given notice that it will consider all impacts, cumulative and site specific, in any modification to the EIS in the Northeast Planning Area."

Defendants have admittedly failed to fully address the cumulative impact the relaxation of environmental protection in NE NPR will have when combined with the relaxation in NWPA. This Court and the Court of Appeals both agreed with Defendants that the issue was one of timing.  This Court and the Court of Appeals also relied upon the implicit, if not explicit, representation of Defendants the cumulative impact of development in NE NPRA on the NWPA would be addressed in the NE NPRA EIS.  If this Court and the Court of Appeals were mistaken in their assumption regarding the scope of the NE NPRA EIS, Defendants had an obligation to advise us. This Defendants did not do.  Instead, Defendants now argue that since this proposed action is limited to leasing, any further analysis of the cumulative effect may await the next phase—when plans for development actually occur.  Having relied on the assumption by this Court and the Court of Appeals that the cumulative analysis would be undertaken in the NE NPRA EIS, which Defendants now apparently believe was erroneous, to prevail in *NAEC*, Defendants are judicially estopped from arguing they had no duty to considered the cumulative impact in the NE NPRA EIS.

Having failed to fully consider the cumulative effects of the proposed development in NE NPRA and the previously proposed action in NWPA, Defendants have violated NEPA and abused their discretion.

### C. Effect of Warming Climate.

Plaintiffs argue that while the FEIS acknowledges that (1) oil development activities may have significant impacts on important resources, such as caribou, polar bears, and birds, in the NE NPRA and (2) that global climate may dramatically alter important habitat and change the migration and feeding patterns of wildlife; the FEIS does not put these two important categories of potential effects together to present a comprehensive evaluation of the effects of oil and gas development in a warming climate. Plaintiffs bottom line argument is that the FEIS does not evaluate or compare the effects that oil development activities under the four alternatives will have in the context of a warming climate. Docket No. 49 at 33–35.

Defendants argue that the effect of global warming is more properly discussed as part of the cumulative effects analysis. Docket No. 86-1 at 28. With that observation the Court agrees. Defendants further argue that the cumulative impacts section of the FEIS contains precisely the analysis Plaintiffs allege is missing by setting forth the effects of global climate change as a cumulative impact together with the effects of energy development. For example, the FEIS explains that the impacts of oil and gas activities in the Planning Area "could be much greater. . . than would be the case if the climate were relatively stable" citing 2 FEIS at 4-418. *Id.* Defendants also argue the FEIS presents a careful and detailed analysis of the cumulative impacts of climate change and energy development on each physical, biological and social resource identified in the Description of the Affected Environment; therefore, it properly considered global climate change as a possible cumulative impact in combination with the effects of oil and gas activities and adequately describes the potential impacts of climate change on various resources and activities. Docket No. 86-1 at 28–29. Defendants argue that while emphasizing the scientific uncertainty that exists in predicting with precision the impacts of global climate change, the FEIS nevertheless projects that population levels of some species could be effected as a result of the combined effects of worldwide energy development and climate change. The FEIS acknowledges the possibility that populations of some Arctic species

could be "pushed toward extinction" if key habitat is lost and competition with other species is increased due to global climate change. 2 FEIS at 4-468.  The FEIS then provides thorough, detailed discussions of the potential impacts of oil and gas activities on particular wildlife populations, including caribou, brant and polar bears, each of which were singled out by Plaintiffs as deserving discussion.  According to Defendants, the FEIS explains that "the incremental contribution of an alternative to cumulative impacts is assumed to be proportional to the projected level of activities for that alternative," and recognizes that the cumulative impacts would be greater for activities in areas with higher surface resource values, citing 2 FEIS at 4-588, ROD at 10.  Docket No. 86-1 at 29–31.  Finally, Defendants argue that any attempt to quantify the combined effects of climatic change and development assumes a level of scientific certainty about the effects of global climate change not shown by the record.  In light of the substantial uncertainty inherent in predicting the impacts of global climate change, BLM's analysis of climate change in the cumulative impacts section of the FEIS more than satisfies the "hard look" standard under NEPA. Any attempted delineation or quantification of the effects of global climate change would be highly speculative. Docket No. 86-1 at 32–34.

In reply Plaintiffs take umbrage with the assumption that the effects of global warming will be incrementally worse. Docket No. 93-1 at 24–26.  It is the position of Plaintiffs that BLM "cannot assume that global warming simply will exacerbate impacts in the same way for all alternatives; it must actually analyze that issue and present the results of that analysis in the final EIS." Docket No. 93-1 at 27.  Plaintiffs also quarrel with Defendants' uncertainty argument. While acknowledging that BLM was not required to develop information about global climate change other than what was in the record, the final EIS must nonetheless take what is known about the effects of oil development activities under the four alternatives and analyze and compare it in the context of what is known about global climate change.  Therefore, according to Plaintiffs, the failure to consider or present a direct comparison of the effects of the four alternatives in a warming climate violates NEPA. Docket No. 93-1 at 33.

This case presents an apparent question of first impression.  Although reported decisions discuss the necessity of discussing the effect of a proposed action *on* global warming, Plaintiffs have not cited, nor has the Court's independent research discovered, a reported decision in which

the effect *of* global warming combined with the proposed action was at issue.  The FEIS discloses that both oil development and global climate change may have an adverse impact on various aspects of the environment.  It does not, as Plaintiffs point out, put the two together to allow the reader to compare the effects of oil development under each alternative in a warming environment.  In combination, global climate change and oil development activities may have very significant, even population-level impacts to important resources, including caribou, polar bears, and birds, that, although recognized in the FEIS is not analyzed in the context of each alternative.  Plaintiffs contend this gap in the analysis creates a deficiency in the FEIS.

Plaintiffs' argument, while perhaps plausible on its face, fails in the final analysis.  For the most part Plaintiffs rely on the extra-record declarations in Plaintiffs' Exhibits 59 (Schoen Declaration) and 60 (Lentfer Declaration).  With the exception that the declarants assert that the effects may not be just additive but may also be synergistic, Exhibit 59, ¶ 23 and Exhibit 60, ¶ 18, those declarations do not materially differ from the global warming analysis contained in the FEIS. Stripped to its essentials, Plaintiffs' position is not that the combined effects were not considered, but the manner in which they were considered, *i.e.*, not as being merely additive, but synergistic.  NEPA does not require a court to decide whether an EIS is based on the best scientific methodology available, nor does NEPA require a court to resolve disagreements among various scientists as to methodology; instead, the task of the court is to ensure that the agency's procedures resulted in a reasoned analysis and disclosure of the evidence before it, and, furthermore, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if the court might find contrary views more persuasive. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1359 (9th Cir.1994).

If this were a case in which commentators presented evidence and opinion that directly challenged the scientific basis upon which the FEIS rests, it would have been necessary for BLM to have disclosed and responded to them in the FEIS.  *Center for Biological Diversity v. United States Forest Service*, 349 F.3d 1157, 1167 (9th Cir.2003).  That a different scientific methodology should have been used was not presented during the comment period on the DEIS.  That leaves open the question of whether the methodology utilized was unreasonable.  An agency is entitled to rely on reasonable assumptions in its environmental analysis. *Inland Empire*

*Pub. Lands Council v. United States Forest Service*, 88 F.3d 754, 761 (9th Cir.1996).  Moreover, because the Schoen and Lentfer conclusions about synergistic versus additive effects represent a difference of scientific opinion that does not undercut the agencies' conclusions, which were based on substantial data and the reasonable opinions of their qualified experts, they are properly disregarded. *Price Road Neighborhood Ass'n Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1511 n. 1, citing  *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332–33 (9th Cir.1992).

        In this case, BLM identified in significant detail the environmental conditions that could be adversely impacted and, although characterizing it as incremental, noted that the extent of the combined impact under the proposed alternatives would vary dependent upon the degree of surface development undertaken, which at this point is incapable of determination under any scenario that permits development.  The Court cannot say, on the record before it, that the conclusions were unreasonable or unsupported by the record or that BLM acted arbitrarily or capriciously in its analysis of the combined effects of the proposed oil development activities and global warming.

## II.      ESA Violation.

        Plaintiffs argue that the F&WS BiOp improperly failed to take into account the effects of the proposed action in the Northeast Planning Area on development in the Northwest Planning Area.  Specifically, Plaintiffs allege that the BiOp fails to consider the increased impact on the spectacled and Steller's eiders.  Plaintiffs argue that the BiOp must address not only the direct and indirect effects of the proposed action, but must address the effects of interrelated or interdependent actions as well, citing 50 C.F.R. § 402.02.[9]  Plaintiffs assert that the opening of

---

        [9] 50 C.F.R. § 402.02 provides in relevant part:
        *Effects of the action* refers to the direct and indirect effects of an action on the species or
        critical habitat, together with the effects of other activities that are interrelated or
        interdependent with that action, that will be added to the environmental baseline. The
        environmental baseline includes the past and present impacts of all Federal, State, or
        private actions and other human activities in the action area, the anticipated impacts of all
        proposed Federal projects in the action area that have already undergone formal or early
        section consultation, and the impact of State or private actions which are
        contemporaneous with the consultation in process. Indirect effects are those that are
        caused by the proposed action and are later in time, but still are reasonably certain to
                                                                                        (continued...)

TLSA to development would admittedly result in increased development in the NWPA.[10/]
Docket 49-1 at 48–50.

Defendants argue the proposed actions considered in the BiOps for both the NWPA and
NE NPR were simply the hypothetical scenarios required by *Connor v. Burford*, 848 F.2d 1441,
1450 (9th Cir.1988). The RODs for neither the NE NPR nor the NWPA authorizes any ground
disturbing activity. All subsequent actions will require authorization and, thus, be subject to the
consultation requirements of ESA.  Accordingly, Defendants argue, to the extent that there is any
effect of the actions in the NE NPRA on development in the NE NPRA, those effects will be
fully considered in subsequent consultations. If actual development in the NE NPRA proves to
have an effect that invalidates the assumptions used in the NW BiOp, reinitiation of consultation
on the NW BiOp will be required. Docket 86-1 at 39–42.  Intervenors join in this argument.
Docket 85-1 at 51–57.

In reply, Plaintiffs argue that just as the failure to consider the cumulative effects of NE
NPRA and NWPA under NEPA, the failure to consider the cumulative affects under ESA is a
violation.

A court may find a biological assessment inadequate only if the agency fails to consider
an important aspect of the impact on an endangered species or to consider the relevant factors.
*Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901 (9th Cir.2001).  At first blush,
Defendants' argument that like the NWPA in *NAEC*, the BiOp for the NE NPR is nothing more
than a hypothetical scenario required by *Connor* thereby requiring further consultations should
actual operations be contrary to those assumed in the hypothetical appears to have the same
validity as was accepted by this Court and the Court of Appeals in *NAEC*.  However, upon closer
scrutiny, this argument falls.  It is undisputed that operations in the NE NPR and NWPA are to a

[9/](...continued)
occur. Interrelated actions are those that are part of a larger action and depend on the
larger action for their justification. Interdependent actions are those that have no
independent utility apart from the action under consideration.

[10/] Plaintiffs refer to the NE BiOp at 24–26 as establishing this fact.  However, the Court's review
of the NE BiOp does not reveal any indication that opening TLSA will result in increased development in
NWPA.  The NE BiOp does, however, disclose NWPA development as a factor affecting the species in
the NE NPRA.  NE BiOp at 21.

certain extent interdependent and cumulative both in quantity and effect.  It may very well be that the combined operations in the NE NPR and NWPA do not materially impact the BiOp analysis.  On the other hand, as Plaintiffs argue, the baseline upon which the BiOp stands may differ when viewed from a combined standpoint than when viewed separately; or it may not, as Defendants and Intervenors appear to contend.  The problem is that it cannot be determined unless someone takes a look.  While the Court may agree that the likelihood that the BiOp conclusion will change is minimal, ESA and the regulations nonetheless require that all contributing factors be examined and considered.  *See, e.g.*, 50 C.F.R. §§ 402.02; 402.12(a), (f)(4).[11]  Although the contents of Biological Assessment are discretionary, the information must be the best available.  *See* 50 C.F.R. 402.14(d);[12] *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1216 (9th Cir.2004).

In this case, by omitting the cumulative effects of the development in the NE NPR and NWPA, BLM did not provide the best information available in its Biological Assessment, an abuse of its discretion.  Because it did not provide the best information available, the BLM acted

---

[11] 50 C.F.R. 402.12 provides in relevant part:
(a) Purpose. A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.
              * * * *
(f) *Contents.* The contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action. The following may be considered for inclusion:
              * * *
    (4) An analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies.

[12] 50 C.F.R. 402.14 provides in relevant part:
(d) *Responsibility to provide best scientific and commercial data available*. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

arbitrarily and capriciously in relying on the F&WS BiOp. *Resources, Ltd. v. Robinson*, 35 F.3d 1300, 1304–05 (9th Cir.1993).

## III.     Failure to Provide "Maximum Protection."

Congress has decreed that any exploration in the Utukok River and Teshekpuk Lake areas "shall be conducted in a manner which will assure the maximum protection consistent with the requirements of this Act for the exploration of the reserve." 42 U.S.C. § 6504(a).[13]  Plaintiffs argue that BLM has reduced the level of protection for the environment, in particular wildlife, in the TLSA without explanation of how this reversal satisfies the maximum protection mandate of NPRPA.  In particular, Plaintiffs argue that the FEIS offers significantly less protection for critical wildlife habitat than does the 1998 NE Plan.  Plaintiffs' principal argument is that since the 1998 NE Plan provided for no oil development in the TLSA, the opening of the TLSA to leasing is a dramatic reversal of long-standing agency action that prohibited leasing that requires explanation, citing *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).  Plaintiffs' argument focuses on the phrase "maximum protection," arguing that Congress intended that the resources be given as much protection as possible, not just minimal or adequate protection. Docket 49 at 21–25.

Defendants argue that the FEIS does not represent a fundamental change in policy.  According to Defendants the policy at issue is not the exclusion of leasing in the TLSA, but "the policy imposed by the NPRPA to make lands in the NPRA available for oil and gas leasing and development with appropriate restrictions so as to minimize impacts and balance protections with leasing."  Defendants also argue that, in any event, the change was adequately explained in that the TLSA lies within the area having the highest oil and gas potential, referring to ROD 3, 17, and 21. Docket 86-1 at 11–13.  Intervenors join Defendants in this argument.  Docket 85-1 at 24–28.

Intervenors make two additional arguments.  First, it is argued that §6504(a) is limited to the now defunct exploration program; leasing is governed the leasing provision added by the

---

[13]  The Court notes that prior to enactment of the Energy Policy Act of 2005, PUB. L. 109-58, § 347(c), effective August 8, 2005, that provision was designated as §6504(b); prior §6504(a), which prohibited production in NPR-A, was stricken.

Department of the Interior and Related Agencies Appropriations Act of 1981, §6506a(b).[14] Second, that "maximum protection cannot be read as absolute, it is a relative concept and must be read in consistent with the purposes of the Act—establishment of an oil and gas program. Intervenors argue that the opening of TLSA to leasing with appropriate restrictions is consistent with NPRA. Docket 85-1 at 20–24.

In reply, Plaintiffs argue that they have never contended that maximum protection means absolute protection of all resources, but rather recognize that it requires the Secretary to maximize protection of the Special Areas while allowing for a leasing program; but NPRPA does not require every acre of the Reserve be developed. According to Plaintiffs, Congress did not give the Secretary unfettered discretion to strike any balance that she or he sees fit. Rather, that balance is constrained by the Congressional mandate that the outstanding resources of the designated special areas be given maximum protection. According to Plaintiffs this clearly means that BLM must do something more than "mitigate reasonably foreseeable and significantly adverse effects on the surface resources," as is provided for resources outside of special areas. Docket No. 83-1 at 10. Plaintiffs further counter that the reasons given for the change in policy do not adequately explain how the change, *i.e.*, allowing leasing in the TLSA, still provides "maximum protection." Docket 83-1 at 12–14. Finally, Plaintiffs argue that §6504(a) does apply, citing §6506a(n)(2).[15]

The Court agrees with Plaintiffs that the "maximum protection" provision of §6504(a) applies to the leasing activity authorized by the ROD. 42 U.S.C. §6506(n)(2). The Court does

_____

[14] That provision provides: "Activities undertaken pursuant to this section shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska." The Court notes that prior to enactment of the Energy Policy Act of 2005, Pub. L. 109-58, § 347(c), effective August 8, 2005, that provision was contained in 42 U.S.C. § 6508(1). Although the Energy Policy Act of 2005 redesignated and substantially restructured former § 6508, it did not change the relevant language.

[15] That paragraph states in relevant part: "*Provided further*, That any exploration or production undertaken pursuant to this section shall be in accordance with section 6504(a) of this title." As with §6506a(b), the Court notes that prior to enactment of the Energy Policy Act of 2005, Pub. L. 109-58, § 347(b), that provision was contained in 42 U.S.C. § 6208. Although the Energy Policy Act of 2005 redesignated and substantially restructured former § 6508, it did not change the relevant language.

not, however, accept Plaintiffs' other arguments.  Taken literally, as Plaintiffs tend to interpret the requirement, it would bar any leasing at all in the TLSA as only no activity could possibly provide "maximum protection," a point Plaintiffs appear to concede.  "It does not include a conclusion that all of the alternatives succeed at providing maximum protection." Docket 93-1 at 11 n.3. "Plaintiffs have always maintained that alternatives allowing oil development in the most sensitive goose molting and caribou calving habitat are fundamentally inconsistent with the standard." Docket 93-1 at 14 n. 5.  At no point, other than to argue that no leasing in the TLSA should be permitted, do Plaintiffs present an argument that the restrictive measures adopted in the FEIS/ROD do not meet the "maximum protection" standard to the extent that they permit leasing in the TLSA.  The FEIS provides adequate explanation of why leasing is permitted in the TLSA.  It does not, as Plaintiffs contend, explain how permitting leasing as opposed to a continued no-activity position continues "maximum protection."  Indeed, that would be an impossibility because, as Plaintiffs appear to concede, the only way to provide maximum protection is to permit no activity.  Yet that action in itself would violate §6504(a), which expressly contemplates some level of activity within the TLSA, and Congressional intent as contained in the legislative history.

> While "maximum protection of such surface values" is not a prohibition of exploration-related activities within such areas, it is intended that such exploration operations will be conducted in a manner which will minimize the adverse impact on the environment.
>
> To this end, the Secretary is expected to take into consideration the needs of resident and migratory wildlife and to schedule exploration activities in a manner which, and at such seasons as, will cause the least adverse influence on fish and wildlife.  In scheduling exploration activities in such an area the Secretary should take steps to minimize any adverse effects on native subsistence requirements and associated fish and wildlife values.

H,R, CONF. REP. NO. 94-942, at 21 (1976) *reprinted in* 1976 U.S.C.C.A.N.  492, 523–24.

The Court agrees that allowing development in the TLSA fails to provide "maximum protection" in the absolute sense.  But that is not the test.  The test is as, Intervenors argue, one of relativity; the degree of protection must be consistent with NPRPA.  One of the stated objectives of NPRPA is the "expeditious program of competitive leasing of oil and gas in the Reserve." 42 U.S.C. § 6506a(a).  Thus, the Secretary of the Interior must necessarily balance the

leasing of the lands in TLSA with the protection of the environment.  In other words, the Secretary must balance the impact on the environment with the countervailing and, inevitably conflicting, mandate to develop a program of competitive leasing.  In accomplishing this task, the Secretary in developing the leasing program must provide the maximum protection for the TLSA.  However, as noted above, maximization of protection of the environment does not mean that a leasing program provide maximum protection, but that to the extent that the leasing program permits development, that development be conducted in a manner that provides maximum protection.

With respect to the TLSA, goose molting area ("GMA") and Teshekpuk Lake Caribou Habitat Area ("TLCHA"), the ROD contains specific lease stipulations.  For example, in addition to closing the Teshekpuk Lake, the K-3 lease stipulation prohibits any surface activity within ¼ mile of the normal highwater mark. ROD at 71.  The K-4 lease stipulation, *inter alia*, prohibits any activity other than pipelines in 242,000 acres of a restricted GMA; restricts activities in scope (ground traffic, visibility, air traffic, *etc*.) and time (June 15 to August 20) to the entire GMA; limits water extraction to prevent hydrological changes in lakes in the GMA; avoids altering goose-feeding habitat types along lakeshore margins; and provides for studies, including on-going studies after development activities have been completed. ROD at 71–72.  The K-5 TLCHA lease stipulation requires, in addition to the restrictions of K-3, *inter alia*, a study of herd movements before any construction of permanent facilities; restricts ground vehicle and aircraft operations, and suspends heavy activities between May 20 and August 20; requires ramps over or burying of pipelines.  ROD 72–74.

Other than to steadfastly adhere to the "no development" mantra, Plaintiffs do not point to any additional reasonable restriction that might be placed on development in the TLSA to maximize protection of the environment.  This Court's review of the FEIS and ROD do not reveal any instances where the concerns of Plaintiffs (and others) were not carefully considered and, to the extent deemed practicable, adopted in some form or another.  NEPA requires that an agency provide an opportunity for public comment and input and give due consideration to that comment and input; it mandates a procedure, not a particular result. *See Dept. of Pub. Transp. v. Public Citizen*, 541 U.S. 752, 756–57 (2004); *Muckleshoot Indian Tribe v. United States Forest*

*Serv.*, 177 F.3d 800, 814 (9th Cir.1999). The extent to which the agency deems mitigation of the inevitable disturbance and injury to the environment is required by the proposed action is committed to the discretion of the agency. This Court may not substitute its judgment for that of the agency on whom Congress has conferred that discretion, *Stryker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227 (1980); *Earth Island Institute v. United States Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir.2006). It can only determine if there has been an abuse of that discretion, either because the agency did not follow the law, the process it followed was flawed, relied on improper factors, is unsupported by the evidence, or is so implausible that it cannot be ascribed to agency expertise. *Basin Mine Watch v. Hankins,* 456 F.3d 955, 962 (9th Cir.2006). In the case at bar, the Court cannot find such an abuse of discretion.

## IV. Injunctive Relief.

The fundamental basis for injunctive relief, even in cases involving violations of environmental laws, is irreparable injury and inadequacy of legal remedies. *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 544-45 (1987) (rejecting a presumption that a failure to adequately evaluate the impact on the environment results in irreparable damage). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.*

The Court having determined that the failure of the FEIS to adequately address the cumulative effects of the development in the NWPA and NE NPRA and that the failure constituted an abuse of discretion, was arbitrary and capricious, the agency action, the ROD based on the invalid FEIS, must be vacated and remanded for further action consistent with this decision. *Defenders of Wildlife v. Environmental Protection Agency*, 420 F.3d 946, 978 (9th Cir.2005). In that case, the "norm"in this circuit is to enjoin further agency action on the invalid EIS in the absence of unusual circumstances. *See National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737–38 (9th Cir.2001).

Defendants argue that the only decision in the ROD is to offer leases for sale, subject to the stipulations and ROPs adopted therein. No actual ground activities are authorized and none

could occur on a lease until after BLM examines the effects of a proposed activity, including consideration of additional protective conditions and approves it.  At this stage, no activity is approved that will cause any irreparable injury to any plaintiff or the environment.  No acre of land, wildlife habitat, or species will be affected at all if these lease sales continue.  Docket 86-1 at 48–49.

The argument advanced by Defendants has significant superficial appeal on its face.  It does, however, suffer from one glaring deficiency: it proposes to issue leases based on the stipulations and conditions contained in the ROD.  Upon remand and consideration of the cumulative effects of the development in the NE NPR and NWPA, it may be necessary to further amend the stipulations and ROPs in the leases, in particular those associated with opening the TLSA.   If leases are issued based upon the stipulations and ROPs in the ROD, they may prove difficult, if not impossible, to change subsequently.  This would constitute an irreparable injury.

## CONCLUSION

Based on the foregoing,

1.     The Record of Decision dated July 11, 2006, and the Final Integrated Activity Plan/Environmental Impact Statement of the Northeast National Petroleum Reserve – Alaska dated January 28, 2005, are hereby vacated and remanded for further action consistent with this decision; and

2.     The Secretary of the Interior is enjoined from taking any further action under the Record of Decision dated January 11, 2006, pending further order of the Court.

The Clerk of the Court will enter judgment accordingly.

Dated: September ___, 2006

_____
JAMES K. SINGLETON, JR.
United States District Judge

MEMORANDUM DECISION [*PRELIMINARY*]
*National Audubon Soc'y v. Kempthorne,*
Case No. 1:05-cv-00008-JKS                              26