DEAN K. DUNSMORE
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Telephone:(907)271-5452
Facsimile: (907)271-5827
Email: dean.dunsmore@usdoj.gov

ROBERT GULLEY
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, D.C. 20044-7369
Telephone: 202-305-0500
Facsimile: 202-305-0275
Email: robert.gulley@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>GALE NORTON, Secretary of the Interior; HENRI BISSON, et al.<br><br>Defendants, | No. 1:05-cv-00008-JKS |

DEFENDANTS' SUPPLEMENTAL BRIEF

Defendants submit this brief pursuant to the Order Re: Additional Briefing on Preliminary Decision (Docket Entry No. 99). For the reasons set forth herein, the court's Memorandum Decision [*Preliminary*]("Prelim D")[1]/ should be modified, and the court should find that defendants adequately complied with both NEPA, 42 U.S.C. § 4321 *et seq*, and the ESA, 16 U.S.C. §§ 1531-1544, before BLM entered a decision to amend the BLM's 1998 NE Plan for oil and gas leasing in the 4.6-million acre NE NPRA.

Defendants note a factual statement that should be modified in the Prelim D. On page 11 the Court states that leasing has been deferred in Teshekpuk Lake "for at least ten years." Leasing has been deferred in the Lake, but there is no durational limit on that deferral. ROD at 10.

I. THE ANALYSIS OF CUMULATIVE IMPACTS WAS UNDER NEPA ADEQUATE

The court proposes to find BLM's consideration of cumulative impacts associated with activities on the NW NPRA inadequate on two grounds: one, the FEIS does adequately consider those impacts, and two, defendants are judicially estopped from contending that a comprehensive analysis of those impacts is not required by reason of the position they took in the *NAEC* case. For the reasons that follow, we respectfully maintain that these proposed conclusions should be modified.

**A. Judicial estoppel is not applicable**. Judicial estoppel precludes a party from assuming a contrary position in a second proceeding if that a party assumed a different position in a legal proceeding and succeeded in the prior litigation on that position. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). For judicial estoppel to apply, the later position must be clearly inconsistent within its earlier position, the party must have been successful in persuading the first court to accept the earlier position, and the party seeking to assert the inconsistent position must derive an unfair advantage on the opposing party if not estopped. *Zedner v. United States*, 126 S. Ct. 1976, 1987 (2006); *New Hampshire v. Maine*, 532 U.S. at 750-51. The purpose of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from deliberately

---

[1]/   Unless other wise specified, defendants will utilize herein the same acronyms as set forth in the Glossary of Acronyms, pages iii-iv to Defendants' Brief (Docket Entry No. 86).

changing their positions in response to the needs of the moment. *New Hampshire v. Maine*, 532 U.S. at 750. In this instance, defendants have neither taken an inconsistent position, nor changed their position. Further, they did not prevail on the actual argument they presented in the *NAEC* case.

The issue raised by plaintiffs in *Northern Alaska Environment Center et al. v. Gale Norton et al.*, No. 1:04-cv-00006-JKS, was that the EIS at issue in that case was inadequate because it did not consider impacts within the NW NPRA of oil and gas production that will be made possible because of proposed changes in the leasing plan for the NE NPRA. Exhibit 1 hereto at 4-7. There was no dispute that the NW FEIS did not consider such impacts. In response to Plaintiffs' Opening Brief on Counts I-V (Exhibit 1) in that case, defendants contended only that there was no duty to consider those impacts because at the time of the finalization of the NW FEIS any such impacts were speculative, as there was no pending proposal to amend the existing plan for leasing in the NE NPRA or change the conditions that would be imposed on any leases issued under the 1998 NE Plan. Exhibit 2 hereto at 3-8. Defendants did not contend in that brief that these impacts would be considered in the EIS being prepared for amendments to NE NPRA leasing plan. *Id.*[2]/ Nor did they contend that the cumulative impact analysis of the NW FEIS is adequate if the EIS being prepared for possible amendments to the 1998 NE Plan addresses cumulative impacts in the NW NPRA in. *Id.*

This court rejected defendants' contentions that amendment of the 1998 NE Plan was speculative and observed that BLM had a proposal to amend the 1998 NE Plan at the time of the completion of the NW FEIS. 362 F. Supp.2d at 1081-82. The Court then concluded that the NW FEIS was sufficient as these impacts would be considered in the EIS being prepared for any 1998 NE plan amendments.[3]/

---

[2]/   No oral argument was presented to this court in that case on the merits of plaintiffs' claims.

[3]/   This conclusion may have been generated by Intervenors' argument in response to plaintiffs' cumulative impacts contentions that "To require otherwise would be to impose upon BLM the impractical task of identifying and analyzing alternatives in advance of the very process designed

(continued...)

On appeal, the Court of Appeals affirmed this Court's decision on this issue and agreed that the cumulative impacts analysis in the EIS for the NW NPRA is sufficient as cumulative impacts on the NW NPRA from amendments of the 1998 NE Plan will be addressed in the EIS being prepared for those amendments. *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969, 979-80 (9th Cir. 2006).[4]/ However, defendants did not make that contention.[5]/ Before the Ninth Circuit, defendants made the same argument that it did in this court in response to plaintiffs' brief (Exhibit 1); that at the time of the issuance of NW FEIS there was no proposal to amend the 1998 NE Plan sufficient to require consideration of the impacts of the amendment in the NW FEIS. Exhibit 4 hereto at 2-4.

Accordingly, the prerequisites for applying the doctrine of equitable estoppel against the defendants are not present in this case, and we urge that the preliminary decision be modified as appropriate.

The preliminary decision states that if the assumptions made by two courts were incorrect, then defendants had a duty to advise them. Prelim D at 14. As shown in Part B below, it is defendants' position that the impacts of amendments to the 1998 NE Plan on the NW NPRA are addressed in the FEIS. Therefore, in defendants' view, there has not been a reason to advise the courts about their assumptions. Further, as the FEIS was already to the public at the time of the briefing and argument of the appeal, plaintiffs were free to argue that the FEIS failed to consider the impacts in NW NPRA associated with modification of the 1998 NE Plan.

**B. Cumulative Impacts Were Adequately Considered**. Before addressing the

---

[3]/   (...continued)
by Congress to accomplish that purpose." Exhibit 3 hereto at 6. Plaintiffs had already acknowledged that BLM could prepare separate EISs for the NW and NE NPRA. Exhibit 1 at 2-3.

[4]/   On September 8, 2006, plaintiffs filed a Petition For Panel Rehearing in that case.

[5]/   Nor was this contention made at oral argument before the Court of Appeals. In fact, issues related to cumulative impacts were not discussed at that argument. These representations are based on counsel's listening to the audio recording of that argument. That recording is available on the Court of Appeals website: www.ca9.us.courts.gov. That argument was held on September 15, 2005.

cumulative impact analysis on amendments to the 1998 NE Plan, defendants respectfully address a misunderstanding in the preliminary decision. Defendants have not admitted that modifications in the ROD to the 1998 NE Plan constitute a "relaxation of environmental protection in the NE NPRA." Prelim D at 14. That is an unsubstantiated characterization made by plaintiffs. The ROD only provides for different forms of conditions on future leases in the NE NPRA, but continues to provide the same "if not greater" protection for the NE NPRA. Defendants' Brief (Docket Entry No. 68) at 20-21, 38-39. Moreover, as discussed below at 6-7, *infra*, the administrative record does not support plaintiffs' allegation that an alleged "relaxation in regulations" will have any actual impact on development in the NW NPRA.

There is no dispute that NEPA requires the FEIS on amendments to the 1998 NE Plan to consider the additional environmental impacts in the NW NPRA that could result from the changes proposed in the NE Plan. Defendants have not contended that this analysis may be delayed until a latter phase, but only that the consideration of cumulative impacts in the FEIS, including those associated with additional development in the NW NPRA, was adequate for the leasing phase. Defendants' Brief (Docket Entry No. 86) at 22. Further, this consideration was not limited just to economic effects and physical activity. *See* Prelim D at 13.

The scope of the discussion of cumulative impacts is described in 2 FEIS at 4-418 to 4-419. The geographic domain of that analysis is the entire North Slope which includes all of the NPRA. *Id*. at 4-419. Thus, the analysis specifically includes both the NW NPRA as well as the South Planning Area of the NPRA. *id* at 4-442 to 4-443, and leases issued in the NW NPRA. *Id*. at 4-451. Depending on the resource or activity, the cumulative impacts throughout the entire North Slope are discussed on either a quantitative or qualitative basis, *Id*. 4-419 t0 4-420. Within this framework, the FEIS analyzes the cumulative impacts of the proposed amendment to the 1998 NE Plan in the entire North Slope, including the NW NPRA on a resource by resource basis. These cumulative impacts are discussed for air quality, 2 FEIS at 4-471 to 4-473; paleontological resources, *id*. at 4-474 to 4-477; soil resources, *id*. at 4-477 to 4-481; water resources, *id*. at 4-481 to 4-484; vegetation, *id*. at 4-487 to 4-492; wetlands and floodplains, *id*. at 4-492 to 4-496; fish, *id*. at 4-496 to 4-502; birds, *id*. at 4-503 to 4-512; terresterial mammals

including caribou, *id*. at 4-512 to 4- 519; marine mammals, *id*. at 4-519 to 4-525; threatened and endangered species, *id*. at 4-525 to 4-537; cultural resources, *id*. at 4-538 to 4-542; subsistence, *id*. At 4-542 to 4-557; sociocultural systems, *id*. at 4-557 to 4-562; environmental justice, *id*. at 4-562 to 4-566; coastal zone management, *id*. at 4-566 to 4-572; recreational resources, *id*. At 4-573 to 4-575; visual resources, *id*. at 4-576 to 580; and economy, *id*. at 4-580 to 4-588.

These analyses are often mostly qualitative, but quantitative information is provided for many of the resources, including paleontological resources, id. at 4-475, soil resources, *id,* at 4-479 ; water resources, *id*. at 4-484; and fish, *id*. at 4-501; (additional 4,000 acres for each of these resources impacted by the year 2050 because of development in both the NW NPRA and the South NPRA). Similar analysis and discussion is provided for vegetation, *id*. at 4-490 (additional 9,200 acres affected by dust, changes in hydrology and thermocast and an additional 9,200 acres directly impacted by development); birds, *id*. at 4-508 (additional 9,200 acres affected by dust, changes in hydrology and thermocast, an additional 4,000 acres directly impacted by oil and gas activities, 9,200 acres indirectly impacted by development, and direct and indirect impacts to bird habitat on 0.43 percent of the arctic coastal plain and 0.10 percent of the North Slope); terresterial mammals, *id*. at 4-516 (impacts on caribou on entire North Slope including development in the NW NPRA and the South NPRA, additional 3, 500 acres covered by gravel, 500 acres impacted by gravel mines, additional 9,200 acres indirectly affected by dust, changes in hydrology and thermocast, an additional 4,000 acres of habitat impacted by oil and gas activities between 2030 and 2050, an additional 9,200 acres indirectly impacted by development, 21,000 acres direct impact, 36,000 acres indirect impact, and possible disruption to the movement of caribou with the construction of any pipeline in the NW NPRA); threatened and endangered species, *id*. at 4-527, 4-535 (possible impacts to bowhead whales from increased vessel traffic to supply both off shore and onshore facilities on the North Slope and possible impacts to eiders from surface disturbances on the North Slope including direct impacts to an additional 4,000 acres of eider habitat and 9,200 acres of indirect impacts from development); and *id*. at 5-540 cultural resources (impacts from up to 1,000 acres of additional gravel infrastructure on the North Slope in the next fifty years) and *id*. at 4-546 (possible increase in areas considered off-limits to

subsistence within the entire arctic coastal plain).

The extensive discussion of these potential cumulative impacts for the entire North Slope, therefore, includes all of the NPRA and not only either just the NW or NE NPRA. This discussion clearly shows that BLM conducted the required "hard look" at those impacts given the limited nature of information available at the leasing stage.  Applying the standards recognized in *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006), the Court should find the cumulative impact analysis in the FEIS is in compliance with NEPA.

II. The Court's Preliminary Decision Incorrectly Finds A Violation
Of The Endangered Species Act.

**A.  FWS Correctly Evaluated The Effects Of The Potential Development In The Northwest Planning Area In The Baseline Of The Northeast Biological Opinion.**  The Court's Preliminary Memorandum Decision overlooks one point that is essential to a proper analysis of the NE Biop.  The ESA creates an on-going duty to reevaluate the effects of an action:

> [I]f (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b) "new information" reveals effects of the action that may affect listed species or critical habitat "in a manner or to an extent not previously considered; © if the action is subsequently modified in a manner that causes an effect that was not considered in the biological opinion; or (d) a new species is listed or critical habitat designated that may be affected by the action.

50 C.F.R. § 402.16(a)-(d).  What this means is that the entire NW Biop **must** be revisited if there is evidence that the effects of the estimated 1260 MMbbl economic potential for recovering oil in the hypothetical scenario (*e.g.*, more than 8 fields) is likely to be exceeded.  *See* NW FEIS at V 5-16.  As a consequence, 1260 MMbbl scenario is the correct scenario to be in the baseline for the NE Biop because it **cannot and will not be** exceeded without a new consultation regarding the overall effects of oil and gas development on the eiders in NW NPRA.

Even if an alleged "relaxation of regulations" has occurred in the NE NPRA, that would not amount to evidence that the development actually is likely to exceed the 1260 MMbbl scenario.  **At best**, it is a red flag alerting to the possibility that additional development may occur in the future.  As we set out in our initial brief, no significant exploration has occurred in the NW NPRA under the NW ROD to give any indication of the actual commercial potential for

development. Moreover, previous exploration efforts did not result in any commercial development. NW FEIS at IV-45. As the Ninth Circuit recognized, at the leasing stage, "there is no way of knowing what plans for development, if any, may eventually materialize." *Northern Alaska Environmental Center v. Kempthorne ("NAEC")*, 457 F.3d 969, 977 (9th Cir. 2006) ("NAEC").

Further, the record shows that Mineral Management Service ("MMS") and BLM stated that the regulations in the NE NPRA constrain development in the NW NPRA because the supporting infrastructure, *e.g.*, pipelines, must pass through the Northeast Planning Area. NW FEIS at IV-69 (20 percent "lost opportunity" is attributable to restrictive regulations in the Northeast Planning Area because "most of the support for Northwest operations must pass" through that area). No evidence exists that the regulations have changed in a manner that would in any way affect basis for the constraints that BLM and MMS identified in their assumptions regarding the 1260 MMbbl scenario.[6]/ In fact, as we pointed out previously, the projected pipeline paths from the Northwest through the Northeast do not even pass through the Teshekpuk Lake area. *See* Defs' Brief (Docket Entry 86) at 39, n.31; NW FEIS Map 108. Plaintiffs apparently read more into the basis for the MMS and BLM assumption but the administrative record does not support that reading.

The evidence for whether reinitiation is required will come from the future consultations regarding actual on-the-ground activities. *See* NW ROD, Appendix at B-13 (Stipulation J-1) ("BLM will not approve any ground disturbing activities that may affect any [listed] species or critical habitat until it completes its obligation under applicable requirements of the [ESA] including completion of any required procedures for conference or consultation."); *Conner v. Burford*, 848 F.2d 1441, 1458, n. 42 (9th Cir. 1988) (recognizing that future consultations would provide a more accurate assessment of post-leasing activities because the comprehensive biological opinion it ordered "will rely on incomplete information as to the exact location, scope

---

[6]/    BLM found that the level of protection afforded by the performance-based regulations adopted in the NE Amended ROD to be "similar to, or even greater than, the level of resource protection provided in the 1998 Northeast IAP/EIS." Defs' Brief (Docket Entry 86) at 38-39.

and timing of future oil and gas activities"). If, from the evidence of what is actually happening, it appears likely that development will exceed the 1260 MMbbl scenario, BLM **will** reinitiate consultation on oil and gas development in the entire Northwest Planning Area.

Finally, nothing in the ESA or the ESA regulations requires the action agency or the consulting agency to re-evaluate the findings of each biological opinion in the environmental baseline to see if anything has changed. The environmental baseline is intended to provide "a snapshot of a species' health at a specified point in time" without the proposed action under consideration.[7]/ U.S. FWS and National Marine Fisheries Service, "Endangered Species Consultation Handbook", 1998 at 4-22. Thus, while it should identify the past, present, and expected factors affecting the current health of listed eiders, the environmental baseline is not intended to be a re-analysis of the effects of the each biological opinion or action in the baseline. So long as a biological opinion remains in effect, FWS should be able to rely on its analysis without having to conduct a new evaluation as part of its baseline analysis.

If the action agency or consulting agency had to re-evaluate each and every completed biological opinion and action in the baseline, as the Court's preliminary decision would seem to require, it would be a staggering task. Such a task would make it impossible to complete consultation within the 135 days provided for by the statute. *See* 16 U.S.C.§ 1536(b)(1). To impose such an interpretation of the regulations here serves no purpose (1) in the context of a lease sale which has no on-the-ground effects; (2) where all future on-the-ground activities in the Northwest and Northeast Planning Areas will undergo consultation before they can be commenced; (3) where consultation regarding the lease sales in both the Northwest and Northeast Planning Areas themselves will have to be reinitiated if the assumptions in the biological opinions will be exceeded; and (4) where the leases themselves will be heavily conditioned with specific stipulations and operating procedures to protect the eider from any

---

[7]/   The effects of the proposed action are then considered in light of the environmental baseline and non-federal future actions to make the jeopardy determination. 50 C.F.R. § 402.02 (definitions of "effects of the action" and "cumulative effects") and § 402.14(g)(4).

development whether it occurs today, tomorrow, or twenty years in the future.[8]/

**B. The Biological Opinion Correctly Evaluated Cumulative Effects.** Unlike NEPA, the Endangered Species Act does not require an evaluation of future federal actions in a biological opinion. NEPA defines the term "cumulative impact" to mean

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (federal or non-federal) or person undertakes such other actions.

40 C.F.R. § 1508.7. By contrast, the ESA defines the term "cumulative effects" to mean:

> [T]hose effects of future State or private activities, **not involving federal activities**, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

50 C.F.R. § 402.02. Thus, unlike under NEPA, the consulting agency is **not** required to look at the future Federal authorization of development on public lands. Therefore, the fact that FWS did not look at the effect of the so-called "relaxation of regulations" in the Northeast Planning Area on any development that possibly may occur in the Northwest Planning Area beyond that assumed in the Northwest Planning Area Biological Opinion is **not** a violation of the ESA. environmental protection in the Plan, on development in the NW NPRA is premised on an assumption that the NE Plan reduces protection. The claim is not supported by the record and, even if it were, the alleged cumulative impact is theoretical and speculative.

### III. NO INJUNCTION SHOULD BE ENTERED

Since, as shown above, the Court should find that BLM adequately complied with both NEPA and the ESA before modifying the 1998 NE Plan, no injunction should be entered. However, even if the Court should find a legal error, an injunction of the proposed lease sale would not be appropriate. Plaintiffs' claim that the EIS for the NE plan does not adequately examine the cumulative impact of the NE Plan amendment, particularly a relaxation of environmental protection in the Plan, on development in the NW NPRA is premised on an assumption that the NE Plan reduces protection. The claim is not supported by the record and,

---

[8]/   *See e.g.*, 3 FEIS, at D-17.

even if it were, the alleged cumulative impact is theoretical and speculative. As we explained on page 43 of Defendants Brief (Docket Entry 86), citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 553-54 (1987), injunctive relief may be imposed only if plaintiff can show irreparable injury. Further, any relief should be "narrowly tailored" to remedy the specific violation. *National Wildlife Federation v. National Marine Fisheries Service*, 422 F.3d 782, 800 (9th 2005). Plaintiffs have not shown irreparable injury from the violation they allege. At most, any remedy should require the agency to supplement the EIS on the NE Plan if evidence emerges that amendment of the Plan increases development in the NW NPRA. This remedy would be consistent with the obligation under NEPA to supplement an EIS when significant new information becomes known. 40 C.F.R. § 1502.9(c)(1).

The Court proposes to vacate both the ROD and the FEIS. Prelim D at 26. Any relief should, at most, vacate only the ROD . The ROD is the decision document, not the FEIS. If BLM still wishes to proceed with modifications to the 1998 NE Plan, the form of further NEPA analysis should be left to the discretion of the agency. BLM could elect to prepare a new integrated EIS, or prepare a supplemental EIS. Vacation of the FEIS could arguably eliminate the latter option.

Dated this 15th day of September 2006.

/s/ Dean K. Dunsmore
DEAN K. DUNSMORE
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Telephone:(907)271-5452
Facsimile: (907)271-5827
Email: dean.dunsmore@usdoj.gov

ROBERT GULLEY
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, D.C. 20044-7369
Telephone: 202-305-0500
Facsimile: 202-305-0275
Email: robert.gulley@usdoj.gov

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 15th day of September 2006 a copy of the foregoing DEFENDANTS' was served electronically on:

Deirdre McDonnell
Jeffrey W. Leppo
Laura J. Beveridge
Ethan Falatko
David C. Crosby


/s/ Dean K. Dunsmore
DEAN K. DUNSMORE