Deirdre McDonnell
Eric Jorgensen
Michael LeVine
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs Northern Alaska Environmental Center, et al.*

**FILED**

AUG 1 3 2004

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GALE NORTON, Secretary of the Interior, *et al.*, <br><br> Defendants, and <br><br> ARCTIC SLOPE REGIONAL CORPORATION, *et al.*, <br><br> Intervenor-Defendants. | Case No. J04-0006 CV (JKS) |

**PLAINTIFFS' OPENING BRIEF ON COUNTS I-V**

EXHIBIT 1
Page 1 of 7

Dkt # 66

BLM perform its analysis in an EIS that is subject to comment and circulated to the public and decision maker. Merely asserting that it has based its decisions on expert advice cannot fulfill BLM's obligations under NEPA.

    D.    <u>BLM Arbitrarily Constrained the Other Impacts it Considered in the Cumulative Case by Refusing To Consider Other Reasonably Foreseeable Actions.</u>

The final EIS violates NEPA by failing to analyze the cumulative impacts of other reasonably foreseeable future actions. In addition to the direct impacts of a proposed action, "NEPA always requires that an environmental analysis for a single project consider the cumulative impacts of that project together with 'past, present and reasonably foreseeable future actions.'" <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 895 (9th Cir. 2002) (quoting 40 C.F.R. § 1508.7). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" <u>Blue Mountains Diversity Project v. Blackwood</u>, 161 F.3d 1208, 1216 (9th Cir. 1998) (internal citation omitted). The NEPA obligation to consider cumulative impacts attaches to every EIS and is independent of the requirement that related projects be considered in a single comprehensive EIS. <u>See</u> <u>Northern Alaska Environmental Center v. United States Arm Corps of Engineers</u>, No. A98-0217 (D. Alaska May 25, 1999) (noting that the "concept of a comprehensive or programmatic EIS" and the requirement of "consideration of cumulative impacts . . . are two different concepts . . . ."). As the Ninth Circuit has explained, "'the obligation to wrap several cumulative action proposals into one EIS for decision making purposes is separate and distinct from the requirement to consider in the environmental review of one particular proposal, the cumulative impact of that one proposal when taken together with other proposed or reasonably foreseeable actions.'" <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d at 896 n.2 (quoting Terence L. Thatcher, Understanding Interdependence in the Natural Environment: Some Thoughts on Cumulative Impact Assessment under the National Environmental Policy Act, 20 Envtl. L. 611, 633 (1990)). Here, Plaintiffs are not arguing that BLM needed to prepare a single comprehensive EIS



EXHIBIT 1
Page 2 of 7

covering all of the NPR-A or all of the North Slope. Rather, Plaintiffs assert that the cumulative impacts analysis contained in the Northwest EIS is incomplete because it failed to include reasonably foreseeable future actions.

Although the EIS at issue here purports to analyze cumulative impacts as required by NEPA, see 1 FEIS IV-401 to IV-404, the cumulative impacts scenario fails to take account of some reasonably foreseeable actions that will affect the same resources affected by the Northwest leasing decision. To fulfill NEPA's purposes, cumulative impacts must be analyzed as long as they are reasonably foreseeable. See 40 C.F.R. § 1508.7 ("'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."). "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather it is designed to require such analysis as soon as it can reasonably be done." Kern v. United States Bureau of Land Mgmt., 284 F.3d 1062, 1072 (9th Cir. 2002). Here, BLM refused to analyze the impacts of opening more land in the Northeast around Teshekpuk Lake to oil development, and stripping the plan of stipulations that protect resources.

Well before the final EIS in question here was published, BLM announced its intent to consider weakening the wildlife protection measures in the Northeast plan for lands immediately adjacent to the Northwest Planning Area. On April 15, 2003, it issued a press release stating "BLM announced plans to amend its 1998 land use plan for 4.6 million acres of public land in the northeast corner . . . ." Ex. 4 at 1 (BLM 4/15/03 Press Release). The press release described the purpose of the amendments as to evaluate exploration and development opportunities in areas that are now closed and to consider changing the current prescriptive stipulations. See id. A little over two months later, BLM published in the Federal Register a "Notice of Intent to Amend the Northeast National Petroleum Reserve Alaska Integrated Activity Plan." Ex. 3 (68 Fed. Reg. 37,173 (June 23, 2003)).

EXHIBIT 1
Page 3 of 7

36

Despite this proposal, BLM explicitly refused to analyze in the Northwest EIS any potential changes to the Northeast plan stating,

> Future changes to existing habitat protections around Teshekpuk Lake are not discussed in the cumulative impact analysis because such changes are speculative at this time and beyond the scope of this document. Any proposed changes would be addressed in a separate NEPA document and any decisions on changes would be made subsequent to that NEPA process.

2 FEIS at VII-194 (response to comment 213-204).

### 1. BLM's Proposal To Amend the Plan for the Northeast Planning Area Is a Reasonably Foreseeable Future Action that Must Be Analyzed in the Cumulative Case.

BLM's own proposal to remove mitigation measures imposed by the Northeast plan and open protected areas around Teshekpuk Lake is clearly a "reasonably foreseeable" future action that needs to be analyzed in the Northwest EIS. See Muckleshoot Indian Tribe v. Forest Service, 177 F.3d 800, 811 (9th Cir. 1999); Neighbors of Cuddy Mtn v. United States Forest Service, 137 F.3d 1372, 1380 (9th Cir. 1998); Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir. 1985). BLM refused to consider changes to the protections in the Northeast plan based on its statement that "such changes are speculative at this time and beyond the scope of this document." 2 FEIS at VII-40, VII-194 (response to comment 213-204). Thus, BLM attempts to raise the bar for when consideration of future proposals is required from "reasonably foreseeable" to already approved.

Courts repeatedly have held that when, as here, a proposal is in the planning stage, it must be considered in the cumulative impacts analysis.[9] See, e.g., Muckleshoot Indian Tribe, 177 F.3d at 812

---

[9] In the briefing on Plaintiffs' motion for a preliminary injunction, Defendants attempted to distinguish these cases, portraying them as further along in the planning process. This recharacterization of the cases is incorrect. In both Muckleshoot Indian Tribe and Tenakee Springs v. Clough, the Ninth Circuit held that proposals were foreseeable enough to require analysis in the cumulative impacts section of the EIS for another project before the agencies had initiated the EIS process for the proposal by publishing a notice of intent in the Federal Register. See Muckleshoot Indian Tribe v. United States Forest Serv., 177 F.3d at 812; Tenakee Springs v. Clough, 915 F.2d at 1313; see also Pls.' Prelim. Inj. Reply at 27-29.

37

EXHIBIT 1
Page 4 of 7

(finding land exchange proposed before decision in question was "reasonably foreseeable"); Neighbors of Cuddy Mtn., 137 F.3d at 1380 (finding proposed timber sales "reasonably foreseeable"); Tenakee Springs v. Clough, 915 F.2d 1308, 1313 (9th Cir. 1990) (citing notice of intent in the Federal Register as evidence of reasonably foreseeable proposals); Thomas, 753 F.2d at 760 (finding timber sales were reasonably foreseeable when "Forest Service issued EA's for, and approved, two of the timber sales nine and sixteen months after it issued the [EA challenged]"). For instance, in Muckleshoot Indian Tribe, the Ninth Circuit found that a land exchange "was not remote or highly speculative," when the proposal had been announced five months before the agency issued the final EIS challenged. Id. at 812. Here, BLM announced its intent to amend the Northeast plan in April of 2003, more than six months before it issued the Northwest final EIS. See Ex. 4 at 1 (BLM 4/15/03 Press Release). Indeed, it has even begun the formal NEPA process. It is untenable for BLM to assert that although its proposal is definite enough for it to engage in a costly NEPA process, it is too speculative to require analysis in the Northwest EIS.

In a similar case, the District of Nevada rejected BLM's argument that a proposal in the NEPA process was too speculative to require inclusion in the cumulative analysis. See Western Land Exch. Project v. United States Bureau of Land Mgt., 315 F. Supp. 2d 1068, 1095 n.10 (D. Nev. 2004). The court stated:

> BLM contends in its reply that the Toquop plant is "in the preliminary planning stage" and therefore "hardly ripe ... for meaningful cumulative impact analysis." BLM neglects the very next sentence of the EA, however, in which it states that "an EIS is currently being prepared by the BLM for this project." If the project was "ripe" enough to deserve its own EIS, it was clearly "ripe" enough to be analyzed as a reasonably foreseeable future project in other NEPA documents. Indeed, it seems that BLM should have possessed some information regarding the project's impacts, given that the agency was in the process of preparing an EIS for it. Furthermore, the agency's decision to prepare an EIS in and of itself shows that BLM regarded the potential impact of the project to be significant, either individually or cumulatively.

Id. (citations omitted).

BLM cannot wait to analyze the cumulative impacts of the Northwest plan and the Northeast proposal in the EIS it is preparing for the Northeast proposal. See Thomas, 753 F.2d at 760. It is not

"appropriate to defer consideration of cumulative impacts to a future date. 'NEPA requires consideration of the potential impact of an action before the action takes place.'" Neighbors of Cuddy Mtn., 137 F.3d at 1380 (quoting Tenakee Springs v. Clough, 915 F.2d at 1313). Allowing agencies to wait to analyze reasonably foreseeable future actions undermines the very purpose of NEPA's cumulative impacts requirement. See Thomas, 753 F.2d at 760 ("A central purpose of an EIS is to force the consideration of environmental impacts in the decisionmaking process.") Based upon this rationale, the Ninth Circuit in Thomas rejected the Forest Service's contention that it did not need to include a cumulative impacts analysis for future proposals because it would perform separate EISs for the future projects. See id.

    2.    *There Is A Clear Potential for Cumulative Impacts Here that Must Be Analyzed.*

Opening more of the Teshekpuk Lake Special Area to leasing and scaling back stipulations in the Northeast Plan threaten serious cumulative impacts to resources and subsistence users in the area. For example, opening the Teshekpuk Lake area to leasing could have serious impacts on the Teshekpuk Lake Herd, which is the caribou herd most relied upon by subsistence users in the region. See Ex. 21 at 2-3 (AR 5590, Kuukpik DEIS Comments at 11-12) (discussing importance of TLH caribou for subsistence and native corporation's concerns about herd). The final EIS discloses that leasing in the Northwest will have a considerable effect on the Teshekpuk Lake Herd. The final EIS states:

> If several lease sales were to occur under the Preferred Alternative, . . . [a]n increase in the number or miles of roads and pipelines with development under multiple sales is expected to further impede movements of TLH caribou to insect-relief areas along the coast. This effect is expected to persist over the life of the oil fields and may reduce productivity of the TLH.

2 FEIS at V-136.

The FEIS makes clear that its proposal to open further areas in the Teshekpuk Lake area and to relax stipulations has potential cumulative impacts on the Teshekpuk Lake Herd, but fails to analyze such impacts. The final EIS notes that "[o]ngoing and future lease sales in NPR-A could

39

EXHIBIT 1
Page 6 of 7

expose a large number of the TLH calving and summering caribou to exploration and development activities." 1 FEIS at IV-440. Ironically, BLM responded to comments by the Western Arctic Caribou Herd Working Group, Audubon Alaska, and Kuukpik Corporation expressing concern over the impacts on the Teshekpuk Lake Herd by touting the protections of the Northeast plan that it is now planning to reduce:

> Currently, 51 to 74 percent of the defined TLH calving grounds [located in the Northeast] is either closed to leasing or designated as no surface occupancy. Stipulations provide additional protection for caribou in the Northeast NPR-A. Given this protection of calving grounds and proposed stipulations in the TLH insect-relief habitat with the Northwest NPR-A Planning Area, cumulative impacts to this caribou herd should not be significant.

Id. at VII-198.

Based on the clear potential for cumulative impacts on the Teshekpuk Lake Herd, and BLM's explicit acknowledgement that the protective measures in the Northeast plan play a role in reducing impacts to the caribou herd, it was unreasonable for the agency to refuse to discuss its own proposal to change those measures.

## II.     FWS AND BLM HAVE FAILED TO MEET THEIR OBLIGATIONS UNDER ESA

The Endangered Species Act imposes on federal agencies a strict substantive duty to ensure that its actions do not jeopardize the continued existence of a species listed, like the Steller's and spectacled eiders, as threatened or endangered under the Act. Endangered Species Act, 16 U.S.C. § 1536(a)(2) (2000). To facilitate compliance with this strict substantive standard, the Act requires agencies whose actions may affect a listed species to engage in a consultation process with FWS, which results in a biological opinion from the FWS indicating whether an action may cause jeopardy to the species. 16 U.S.C. § 1536(b)(3)(A). "If the biological opinion concludes that the proposed action is likely to jeopardize a protected species, the action agency must modify its proposal." Conner, 848 F.2d at 1452. In this case, the FWS and BLM have not met their obligations under the ESA to protect the Steller's and spectacled eiders.


EXHIBIT 1
Page 7 of 7