Jeffrey W. Leppo
Laura J. Beveridge
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, Washington 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500
E-mail: jwleppo@stoel.com

Attorneys for Intervenor-Defendants
ConocoPhillips Alaska, Inc. and
Anadarko Petroleum Corporation

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER; et al., | Case No. J04-006 CV (JKS) |
| Plaintiffs, | |
| v. | |
| GALE NORTON, Secretary of the Interior; et al., | |
| Defendants, | |
| and | |
| ARCTIC SLOPE REGIONAL CORPORATION, CONOCOPHILLIPS ALASKA, INC. and ANADARKO PETROLEUM CORPORATION, | |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS' CONSOLIDATED OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON
<u>COUNTS I-V AND CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

### 4. The FEIS Analyzes All Reasonably Foreseeable Cumulative Impacts

Plaintiffs contend that BLM should have evaluated the "cumulative impacts" of a June 2003 Notice of Intent ("NOI") announcing the agency's plan to seek proposals for amending the Northeast Planning Area Integrated Activity Plan ("Northeast IAP"). Plaintiffs assert that potential amendments to the Northeast IAP were "definite enough" at the time the FEIS for the Northwest Planning Area was issued to constitute "reasonably foreseeable future actions." Yet the record demonstrates that, at the time in question, BLM was merely commencing a scoping process for the purpose of formulating proposals for future consideration. NEPA does not require federal agencies to consider purely speculative future measures in evaluating cumulative impacts. Because the "actions" plaintiffs believe must be analyzed were not identified when the FEIS was issued, the Court must reject plaintiffs' cumulative impacts argument.

### a. The NOI does not constitute a "reasonably foreseeable future action"

Plaintiffs have failed to establish that the NOI represents a "reasonably foreseeable future action." 40 C.F.R. § 1508.7 (directing federal agencies to consider incremental impact of proposed action when added to reasonably foreseeable future actions). Because NEPA regulations do not elaborate on what constitutes a "reasonably foreseeable future action," BLM must "make that judgment in the first instance." Kern v. Bureau of Land Mgmt., 284 F.3d 1062, 1079 (9th Cir. 2002); Northern Alaska Envtl. Ctr. v. U.S. Army Corps of Eng'rs, Civ. No. A98-217 (D. Alaska, Decision on Review dated May 26, 1999) (agency must "apply its experience and expertise to the facts developed in the record" in order to decide whether an action is reasonably foreseeable) (attached hereto Ex. R). BLM's determination that an action is not "reasonably foreseeable" is, therefore, entitled to deference unless the Court finds that the

---

why the minimum elevation for pipelines was raised from five feet in Northeast to seven feet in Northwest. Pls.' Br. at 34 n.8. Although five feet is generally regarded as adequate, the Kuukpik Corporation requested a minimum elevation of eight feet and BLM settled on seven. See FEIS at VII-59. Finally, plaintiffs complain that an ROP regarding exploratory drilling in the beds of water bodies, unlike its Northeast counterpart, contains an exception if the lessee can demonstrate on a site-specific basis that impacts would be minimal, or it is determined that there is no feasible or prudent alternative. Pls.' Br. at 33-34. The FEIS, however, describes a rigorous process for processing any requested exception. FEIS at II-14 - II-16. Thus, the record does not substantiate plaintiffs' suggestion that the process for obtaining an exception to the Northwest Planning Area ROPs is less rigorous than the process outlined for obtaining exemption from lease or permit stipulations in the Northeast Planning Area.

agency acted arbitrarily or capriciously or made a clear error of judgment. Kern, 284 F.3d at 1079; id. at 1075 (court must defer to agency's determination of what actions are reasonably foreseeable so long as agency's decision is "'fully informed and well-considered'") (quoting Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998)) (additional citations omitted).

While agencies are required to consider future actions that are "all but certain" in scope, they need not hypothesize about speculative measures. Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 812 (9th Cir. 1999). As the Ninth Circuit recently explained,

> Our precedent defines "reasonably foreseeable" in this context to include *only* "proposed actions"...The agency is required to analyze the cumulative effects of projects that it is already proposing. For any project that is not yet proposed, and is more remote in time, however, a cumulative effects analysis would be both speculative and premature.

Lands Council, 379 F.3d. at 746 (emphasis added) (future harvests identified by plaintiffs were not "reasonably foreseeable" where none had been proposed as of date of final EIS);[25] see also United States v. Southern Florida Water Mgmt. Dist., 28 F.3d 1563, 1573 (11th Cir. 1994) (NEPA analysis when no specific federal action has been proposed "would be premature and serve no useful purpose"); Inland Empire, 88 F.3d at 764 ("NEPA does not require the government to do the impractical.").

In an attempt to fit the NOI at issue in this case within the category of "virtually certain" actions requiring consideration, plaintiffs characterize it as a "definite" proposal to lease lands in the Northeast Planning Area while weakening existing environmental protections. See Pls.' Br. at 36. The record contradicts this assertion. Rather than proposing particular lands for leasing or recommending specific alterations to prescriptions, the NOI merely announced BLM's intent to engage in a NEPA planning process with two "objectives" in mind:

> (1) To consider changing the current prescriptive stipulations . . . into a mixture of prescriptive and performance-based stipulations; and, (2) to

---

[25] While plaintiffs may attempt to use Lands Council to assert that a scoping notice constitutes *per se* evidence of a reasonably foreseeable action, the Court must bear in mind that determination of reasonably foreseeable actions is highly fact specific. Ex. R (Northern Alaska Envtl. Ctr., Civ. No. A98-217). As the NOI at issue here and the case cited below demonstrate, the content of scoping notices, and thus the certainty of the actions defined therein, can vary considerably.

>evaluate additional lands for exploration and development opportunities that could provide access to new oil discoveries, while remaining sensitive to biological and subsistence values.

68 Fed. Reg. 37,173, 37,174 (June 23, 2003) (emphasis added) (attached hereto as Ex. S). The NOI sought suggestions for lands that should be considered for leasing, so as to aid the agency "in early scoping and later development of alternatives." Id. at 37,173. This early scoping process consisted of a public comment period, which continued through the end of October 2003, and a series of public meetings held through November 2003, for the purpose of identifying "issues and environmental concerns that the Amended IAP/EIS should address." See Ex. T. Thus, the "proposal" that plaintiffs describe as "definite" was, in fact, a proposal to engage in a process to develop a proposal.[26] Id.; Lands Council, 379 F.3d at 746 (only "proposed actions" are considered reasonably foreseeable under Ninth Circuit precedent).

    Case law relied upon by plaintiffs falls well short of equating an intent to develop a proposal with a "reasonably foreseeable future action." Plaintiffs, for example, cite to Muckleshoot, 177 F.3d 800, for the proposition that "reasonably foreseeable" actions include proposals "in the planning stage." Pls.' Br. at 37. The action at issue in Muckleshoot, however, was a particular land exchange, which had been described in detail and identified in maps prior to the issuance of the EIS in question. The court held that the Forest Service was required to consider this exchange in a cumulative impacts analysis, "[g]iven the virtual certainty of the transaction and its scope." Muckleshoot, 177 F.3d at 812. Similarly, in City of Tenakee Springs v. Clough, the court held that the Forest Service was required to analyze cumulative environmental impacts of "timber harvest operating plans scheduled for implementation." 915 F.2d 1308, 1313 (9th Cir. 1990). The court found that the Forest Service's Notice of Intent to conduct the sales, which detailed the areas to be offered and the number of board feet to be made available, contained sufficiently specific information to mandate a cumulative impacts analysis. Id.; see also Blue Mountains, 161 F.3d at 1214-15 (Forest Service required to consider cumulative impacts of five logging projects identified by name with estimated sale quantities and

---

[26] Specifically, in describing this pre-planning process, BLM stated that: "It is important to understand that BLM **HAS NOT** made any decisions" to (1) change the meaning or intent of any existing Northeast [NPR-A] stipulations; (2) open additional lands for oil and gas leasing; and; (3) reduce setbacks or buffer zones. See Ex. U (original emphasis).

timelines); Native Ecosystems Council v. Dombeck, 304 F.3d 886, 896-97 (9th Cir. 2002) (Forest Service must evaluate cumulative effects of road density amendments in conjunction with timber sales where amendments were necessary to implement sales). Finally, in Western Land Exchange Project v. Bureau of Land Mgmt., 315 F. Supp. 2d 1068 (D. Nev. 2004), unlike in the present case, the court determined the agency must consider cumulative effects of power plant because the agency was already well into the process of drafting an EIS for the project.[27] Id. at 1095 n.10.

Significantly, the Muckleshoot court, in ruling that a cumulative impacts analysis of a proposed land exchange was required, noted that the exchange at issue had not been considered in the Forest Service's earlier programmatic EIS. The reason for this omission was that the exchange had not been "identified with any certainty" at the time of the EIS, thus it "simply was not concrete enough to allow for adequate analysis." Muckleshoot, 177 F.3d at 810-12. Thus, the court required a later-in-time analysis when the exchange was "all but certain." Id. Likewise, here BLM's proposal to develop a proposal was not "concrete enough to allow for adequate analysis" at the time the FEIS was issued, yet full NEPA evaluation will nevertheless occur when a specific proposal and appropriate alternatives have been formulated. Id.; see FEIS at VII-4, VII-194 (although changes to existing Northeast IAP habitat protections were speculative at time of FEIS, any changes ultimately proposed will be fully considered through on-going Northeast IAP NEPA process).[28]

---

[27] Other cases relied upon by plaintiffs are inapposite. Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985), for example, does not address the requirements of a cumulative impacts analysis, but instead discusses when a comprehensive EIS is required for multiple actions. See 753 F.2d at 759-60. The court rejected the Forest Service's contention that future timber sales were too speculative to require comprehensive consideration along with construction of a logging road, given that the purpose of the road was to provide access for future logging. Id. The court further found that the timber sales "were in fact at an advanced stage of planning." Id.; Neighbors of Cuddy Mountain, 137 F.3d 1372, is similarly off-point. Neighbors involved specific timber sales, which were discussed by the Forest Service in a cumulative impacts analysis, although, as the Ninth Circuit found, in an overly general manner that did not satisfy NEPA's "hard look" requirement. See id. at 1378-79. The issue of what constitutes a "reasonably foreseeable" future action was not addressed. Id.

[28] Plaintiffs' repeated assertion that the NOI proposes to "strip" the Northeast IAP of environmental protections is mistaken. See Pls.' Br. at 36. BLM recently released a draft EIS for the Amended Northeast Planning Area IAP ("DEIS"). See http://nenpra.ensr.com/

-36-

In sum, BLM's decision to refrain from conjecture and speculation and to instead conduct review after formulating a specific proposal is fully consistent with NEPA and is entitled to deference. Kern, 284 F.3d at 1075 (court must defer to agency's "'fully informed and well-considered'" determination of whether action is reasonably foreseeable); Northern Alaska Envtl. Ctr., Civ. No. A98-217 at 28 (affirming Corps' "reasonable construction of the concept of what is reasonably foreseeable"). To require otherwise would be to impose upon BLM the impractical task of identifying and analyzing alternatives in advance of the very process designed by Congress to accomplish that objective. Plaintiffs' attempt to "raise the bar" on what constitutes "reasonably foreseeable future action," so as to require theoretical analysis of proposals to develop proposals, should be rejected. See Pls.' Mot. Prelim. Inj. at 23; Inland Empire, 88 F.3d at 764 (NEPA does not require agencies "to do the impractical"); Inland Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981-82 (9th Cir. 1993) (Forest Service did not abuse its discretion in excluding 1,200 harvestable acres from cumulative impacts analysis where the scope of any future harvest was speculative); Pub. Utils. Comm'n of California v. Fed. Energy Regulatory Comm'n, 900 F.2d 269, 283 (D.C. Cir. 1990) (although impacts from successive similar pipeline impacts were "a theoretical possibility," construction of only one pipeline was "reasonably foreseeable;" thus FERC properly limited its cumulative effects analysis to one pipeline); Southern Florida Water Mgmt. Dist., 28 F.3d at 1573 (NEPA analysis of nonspecific proposal would "serve no useful purpose").

C.   **FWS's Biological Opinion Complies with the ESA**

As required by the ESA, BLM consulted with FWS regarding the effects of the Preferred Alternative on two eider duck species protected under the ESA.[29] To aid FWS in its analysis of

---

nenpra/documents_DEIS.htm. Significantly, the DEIS concluded that revising protective measures for Northeast Planning Area to match those applicable in the Northwest would not result in any additional adverse environmental consequences. See Ex. V at 3 (DEIS at 2-34); see also Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1025-26 (9th Cir. 1980) (failure to consider data report available before release of final supplemental EIS was harmless error where agency later determined potential environmental effects identified in report were not significant).

[29] BLM consulted with FWS regarding the Alaskan breeding population of the Steller's eiders and the spectacled eider. Both species are listed under the ESA as "threatened." A "threatened species" is one which is likely to become an endangered species within the

-37-

effects, BLM provided FWS with a comprehensive Biological Assessment ("BA").[30] At the conclusion of the consultation, FWS issued a lengthy biological opinion (the "BiOp") finding that BLM's decision to open the Northwest Planning Area to oil and gas leasing, and all reasonably foreseeable effects of post-leasing activities (i.e., exploration, development, production, and abandonment), were not likely to jeopardize the listed eider species. ROD at App. C.

Rotely applying legal theories plucked from the Ninth Circuit's decision in <u>Connor v. Burford</u> to the very different facts of this case, plaintiffs contend that FWS's BiOp is inadequate because it allegedly fails to address the full scope of the proposed action and, instead, unlawfully relies upon promises of future consultations. Compl., Count V; Pls.' Br. at 41-47. Plaintiffs also erroneously claim that the BiOp relied upon an assumption that eider densities were both uniform and "average" across the Northwest Planning Area. Pls.' Br. at 47-50. However, BLM's BA and FWS's BiOp demonstrate both that the requirements of <u>Conner</u> have been fully met and that FWS used "high-end," rather than "average," densities when analyzing the effects of proposed action on listed eider species.

### 1.    The Endangered Species Act

The purpose of the ESA is to provide for the conservation of threatened and endangered species and their ecosystems. 16 U.S.C. § 1531(b). The ESA directs all federal agencies to use their authorities to further this purpose. <u>Id</u>. § 1531(c)(1). FWS shares responsibility with the National Marine Fisheries Service (collectively, the "Services") for administering ESA programs. 50 C.F.R. § 402.01(b). The Services' ESA duties include, but are not limited to, consulting with other federal agencies over action that may affect listed species.[31] 16 U.S.C.

---

foreseeable future. 16 U.S.C. § 1532(20). An "endangered species" is one that is in danger of extinction throughout all or a significant portion of its range. <u>Id</u>. § 1532(6).

[30] FWS regulations define and detail the purposes of a BA. 50 C.F.R. §§ 402.02, 402.12. BLM's BA appears in Appendix 10 as an unnumbered attachment to a transmittal memorandum from BLM to FWS, dated October 2, 2003. FEIS, App. at 20-21. The BA is cited herein as "FEIS, App. 10, BA § __." FWS's BiOp can be found in the ROD at App. C.

[31] ESA consultations must also address effects to designated "critical habitat" of listed species. However, in this instance, there are no designated critical habitats for any ESA-listed species within the action area of BLM's decision.

-38-


EXHIBIT 3
Page 7 of 7

J04-006 CV (JKS)
Seattle-3234327.3 0028116-00020