Jeffrey W. Leppo
Laura J. Beveridge
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington 98101
Phone: (206) 624-0900
Fax: (206) 386-7500
Email: jwleppo@stoel.com
Email: ljbeveridge@stoel.com

*Attorneys for Intervenor-Defendant*
*Anadarko Petroleum Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY,<br><br>                Plaintiffs,<br>v.<br><br>DIRK KEMPTHORNE, Secretary of the Interior; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS, Regional Director, United States Fish and Wildlife Service; BUREAU OF LAND MANAGEMENT; UNITED STATES FISH AND WILDLIFE SERVICE; and the UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>                Defendants, and<br><br>CONOCOPHILLIPS ALASKA, INC., ANADARKO PETROLEUM CORPORATION, ARCTIC SLOPE REGIONAL CORPORATION, and the STATE OF ALASKA,<br><br>                Intervenor-Defendants | Case No.<br>   <u>1:05-CV-00008-JKS</u> |

**INTERVENOR-DEFENDANTS ARCTIC SLOPE REGIONAL CORPORATION, ANADARKO PETROLEUM CORPORATION, AND THE STATE OF ALASKA'S RESPONSE TO PRELIMINARY MEMORANDUM DECISION**

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

In response to the Court's invitation to provide additional briefing on its preliminary Memorandum Decision ("Preliminary Decision"), Arctic Slope Regional Corporation, Anadarko Petroleum Corporation, and the State of Alaska (collectively "Intervenors") submit the following.

Intervenors support the Court's preliminary determinations that the Bureau of Land Management ("BLM") was not required to issue a supplemental environmental impact statement ("EIS") on the Final Preferred Alternative and that the analysis of climate change contained in the Final Amended Integrated Activity Plan/Environmental Impact Statement ("FEIS") complies with the requirements of the National Environmental Policy Act ("NEPA").  Intervenors also support the Court's preliminary determination that BLM complied with the National Petroleum Reserves Production Act ("Production Act") when it amended the management plan for the Northeast Planning Area of the National Petroleum Reserve-Alaska ("Petroleum Reserve").

However, Intervenors respectfully disagree with the Court's preliminary conclusions regarding the adequacy of the cumulative case in both BLM's FEIS and Fish & Wildlife Service's ("FWS's") biological opinion ("BiOp").  The Court's preliminary determination that BLM's analysis of cumulative impacts in the FEIS violates NEPA is based on an error of fact. As demonstrated herein, the FEIS does analyze the combined impacts of reasonably foreseeable oil and gas activity in the Northwest Planning Area and the proposed amendment to the Northeast Planning Area management plan.  Intervenors also believe that the Court's preliminary determination that the BiOp does not consider increased development in the Northwest Planning Area as a cumulative effect confuses the broad "cumulative impacts" requirement of NEPA with the narrower "cumulative effects" requirement of the Endangered Species Act ("ESA"), and is therefore based on an error of law.  Finally, the Court has made an error of law in preliminarily ruling that the maximum protections standard applies to the leasing program established by section 6506a of the Production Act.

In the event that the Court's final opinion remands the decisions at issue in this case for further agency action, Intervenors believe that it is not necessary, or appropriate, to enjoin the September 27, 2006, lease sale in its entirety.  As a threshold matter, over two thirds of the leases offered at the sale are in the *Northwest* Planning Area.  Because Northwest Planning Area leases are not at issue in this litigation their sale cannot be enjoined based on the Court's final decision

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

here. However, due to the uncertainty that could attach to Northeast Planning Area leases if the Court's final decision finds a NEPA or ESA violation, Intervenors prefer that the sale of Northeast Planning Area leases be enjoined until the agencies remedy any defects in their decisionmaking.

I.      **The FEIS Analyzes the Full Cumulative Impact of Reasonably Foreseeable Oil and Gas Activity in the Northwest and Northeast Planning Areas**

In this litigation, Plaintiffs raised a very narrow argument regarding the adequacy of the cumulative impacts analysis contained in the FEIS. Specifically, Plaintiffs argued that BLM's estimate of undiscovered commercially recoverable petroleum in the Northwest Planning Area should have been 20 percent larger than that estimated for the preferred alternative in the Northwest EIS. Plaintiffs' emphasis on economic potential is significant. As Plaintiffs recognize, BLM uses production estimates to determine the corresponding level of environmental impact. See, e.g., FEIS at 4-14 ("level of future activities is directly related to the petroleum-resource potential made available for leasing and development"); id. at 4-15 (estimates of undiscovered oil and gas resources provide a basis for projecting reasonably foreseeable development and analyzing environmental impacts).[1] Intervenors responded to Plaintiffs' mathematical argument in their Opposition Brief, explaining that Plaintiffs relied on the wrong figures and that the cumulative impacts analysis does indeed assume a greater level of production, and therefore environmental impact, in the Northwest Planning Area than originally estimated in the Northwest EIS. See Intervenors' Opp'n Br. at 29-31 (BLM assumed 40 percent more production for purposes of cumulative impacts analysis). Thus, contrary to the Court's Preliminary Decision, Intervenors have not admitted that the FEIS fails to address increased Northwest production, or associated environmental impacts, attributable to amending the Northeast Planning Area management plan.

The Court's Preliminary Decision, however, goes beyond Plaintiffs' narrow argument and asks whether the cumulative impacts analysis is sufficient to satisfy the Court's opinion in Northern Alaska Environmental Center v. Norton, 361 F. Supp. 2d 1069 (D. Alaska 2005) ("NAEC v. Norton"). There, the question at issue was whether BLM had to include the then

---

[1] Federal Defendants have filed conventional copies of the FEIS, the ROD, and the BiOp with Court. Citations to these documents herein are to the original page numbers.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

2

undeveloped amendments to the Northeast Planning Area management plan in the cumulative impacts analysis for the Northwest Planning Area leasing program. The Court held that BLM did not, in part because the cumulative effects of the two decisions would be analyzed in the EIS for the Northeast Planning Area amendments. See id. at 1082. Because the issue as the Court has framed it was not raised by Plaintiffs, and requires citation to portions of the FEIS not previously referenced in Intervenors' Opposition Brief, Intervenors appreciate the opportunity to provide additional briefing on this question now.

Intervenors submit that the EIS *does* contain the analysis the Court seeks regarding the combined environmental impacts of the Northwest and Northeast leasing decisions. Accordingly, Intervenors believe that the Court's Preliminary Decision is based on a factual error. To demonstrate this, it is first necessary to look at how the cumulative impacts analysis in the FEIS is structured. In compliance with guidance promulgated by the Council on Environmental Quality ("CEQ"), BLM's discussion of the cumulative case begins with a description of the scope of the cumulative impacts analysis. FEIS at 4-417; id. § 4.7.1; Davis v. Mineta, 302 F.3d 1104, 1125 n.17 (10th Cir. 2002) (treating NEPA guidance issued by CEQ as persuasive authority); American Rivers v. Fed. Energy Reg. Comm'n, 201 F.3d 1186, 1195 n.15 (9th Cir. 2000) (citing CEQ's guidance on cumulative impacts). In addition to establishing the temporal and geographic scope of the cumulative impacts analysis, the FEIS also identifies the past, present, and reasonably foreseeable future actions that are included in the cumulative case. 40 C.F.R. § 1508.7. As indicated in Intervenors' Opposition Brief, agency determinations regarding reasonably foreseeable future actions, like those regarding the temporal and geographic scope of the cumulative case, are entitled to a high level of deference. Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1075 (9th Cir. 2002); Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003) (scope of cumulative case requires technical expertise and is therefore assigned to "special competency of the appropriate agencies").

In the present case, BLM explicitly included oil and gas activity associated with the decision to open the Northwest Planning Area in the cumulative case. BLM not only identified the 2004 Northwest Planning Area lease sale itself as a past action, FEIS at 4-436, the agency also identified oil and gas development and production expected to result from the 2004 lease sale over the next 20 years as reasonably foreseeable future activity. Id. at 4-442 to 4-443; see

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

3

also id. at 4-450 to 4-451 (listing federal lease sales, including 2004 Northwest Planning Area sale, analyzed in cumulative case).  In addition, as emphasized above and in Intervenors' Opposition Brief, BLM increased the expected economic recovery originally anticipated under the Northwest preferred alternative in the Northwest EIS from 0.37 Bbbl to 0.63 Bbbl – which constitutes a nearly 40 percent increase and is double the amount Plaintiffs believe should be attributed to the changes in the Northeast management plan.[2]  Compare FEIS, Table 4-36 with Intervenors' Opp. Br., Ex. D at 3 (2003 Northwest IAP/EIS, Table IV-16).  As also emphasized above, but worth repeating, economic potential is significant because BLM uses production estimates to determine the anticipated level of environmental impact.  FEIS at 4-14, 4-15, 4-425.

After establishing the parameters of the cumulative case, the FEIS then addresses the combined impacts of *all* the actions identified by BLM, including reasonably foreseeable Northwest oil and gas activity based on an increased estimate of economic recovery, on North Slope surface resources.  Before doing so, the FEIS explains that many cumulative environmental impacts are difficult to quantify – particularly those related to animal behavior – and are therefore assessed qualitatively.  FEIS at 4-419 to 4-420; see also id. at 4-471.  This approach is consistent with NEPA case law.  See, e.g., Clinch Coalition v. Damon, 316 F. Supp. 2d 364, 387 (W.D. Va. 2004) (citing CEQ guidance on cumulative impacts and stating that agencies are not required to quantify impacts where quantification is not needed or cannot be done); Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 994 n.1 (9th Cir. 2004) (acknowledging that not all impacts are susceptible to quantification).  Thus, it is not always possible, or required, for BLM to address impacts related to the increased development expected in the Northwest in numerical terms.  Id.; see also Inland Empire Pub. Lands Council v.

---

[2] Intervenors reiterate that Plaintiffs have not established, as a factual matter, that the 20 percent lost opportunity estimated in the Northwest EIS will be fully recovered under the extensive mitigation measures imposed by the Final Preferred Alternative.  Nonetheless, on reply Plaintiffs continue to question the numbers BLM did use.  However, Plaintiffs' reply misses the mark.  If the same tables in the 2003 Northwest EIS and the present FEIS for the Northeast Planning Area are compared, it is clear that BLM attributed 40 percent more production to the Northwest Planning Area *for cumulative effects purposes* than was previously assumed. Compare Intervenors' Ex. D (2003 Northwest IAP/EIS, Table IV-16 (listing production estimates used in cumulative analysis) with FEIS, Table 4-36 (same).  Plaintiffs' blind reliance on the 20 percent figure pulled from an inapposite section of the Northwest EIS is a thinly veiled attempt to get the Court to compare apples and oranges.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

4

U.S. Forest Serv., 88 F.3d 754, 764 (9th Cir. 1996) (NEPA does not require agencies to do the impractical).

The FEIS's analysis of cumulative impacts to surface resources, and specifically the resources of interest in this litigation, clearly indicates that BLM considered the combined effect of oil and gas activity in both the Northwest and Northeast Planning Areas. BLM's discussion of cumulative impacts on the Teshekpuk Lake caribou herd ("TLH") and listed eider species stand as two cases in point. See FEIS 4-515 to 4-518, 4-519, 4-533 to 4-536, 4-537.

In discussing cumulative impacts on caribou populations, the FEIS reminds readers that future oil and gas activities which could potentially contribute to impacts on mammal habitat include development in the Northwest Planning Area as well as the Northeast Planning Area. FEIS at 4-516. In addition, the cumulative case recognizes that the areas surrounding Teshekpuk Lake provide important calving and insect-relief habitat for the TLH, and notes, in particular, that future development affecting the TLH's use of these areas will have a greater impact on the herd. Id. The FEIS then goes on to acknowledge that "[d]evelopment of onshore oil and gas resources in the Northwest National Petroleum Reserve-Alaska could result in construction of an additional pipeline that would pass through the [Northeast] Planning Area," which, in turn could temporarily disrupt movement of the TLH and other caribou herds between wintering habitat and calving grounds. Id. Similarly, with regard to threatened eider species, the cumulative case discusses alteration to eider habitat and the increased threat from oil spills that could occur if future oil and gas development occurs in the Northwest Planning Area. Id. at 4-535 (describing, *inter alia*, temporary habitat alteration due to delayed snowmelt, dust deposition, and other activities that affect tundra vegetation as well as more permanent habitat alteration attributable to gravel mining and placement); id. at 4-536 (discussing potential additive cumulative effects on eiders if spills occur in both the Northeast and Northwest Planning Areas); see also id. at 4-537 (concluding that cumulative effects to eiders of future development in Northwest Planning Area, and other areas, will likely be greater than those caused by activities associated with the proposed action alternatives alone).[3]

---

[3] The same is true from other resources addressed in the cumulative cases. See, e.g., FEIS at 4-546 (noting when discussing cumulative impacts on subsistence that future leasing and subsequent exploration and development are "likely to occur" not only in the Northeast, but also

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

5

In addition to specifically mentioning future Northwest oil and gas activity when assessing cumulative impacts to caribou and eiders, future Northwest development is assumed in the cumulative cases' more general discussion of impacts to these, and other, resources. As indicated above, this is because the actions included in the cumulative case have been pre-defined by BLM. See id. at 4-442 to 4-443 (categorizing future Northwest oil and gas activity as reasonably foreseeable). Thus, when BLM explains that "[c]umulative oil and gas development on the North Slope could result in long-term displacement and/or functional loss of habitat" for the TLH and other caribou herds, id. at 4-516, or that future oil and gas activity in the Petroleum Reserve "could expose a large number of the TLH caribou to exploration and development activities on their summer and winter grounds, and during migration," id. at 4-517, such statements must be read to include impacts attributable to future development in the Northwest Planning Area. Likewise, when BLM explains that "[v]ehicular traffic and machinery noise have the potential to affect spectacled and Steller's eiders in newly-developed areas on the North Slope," id. at 4-534, or concludes that the cumulative effects of "future project infrastructure on eider populations, although additive to natural effects, would be expected to be less severe than those caused by previous Arctic oil field developments," id. at 4-537, these statements also must be interpreted to include reasonably foreseeable future oil and gas activities resulting from the 2004 Northwest lease sale.

In sum, it is clear that BLM did take the "hard look" required by NEPA at the combined impact of its decisions to open the Northwest Planning Area to leasing and its more recent decision to amend the management plan for the Northeast Planning Area. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 346 (1989); Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001). Fundamental to this analysis is the categorization of oil and gas activity associated with the 2004 lease sale in the Northwest Planning Area as reasonably foreseeable and BLM's determination that production will be greater in the Northwest than originally anticipated.

---

in the Northwest Planning Areas of the Petroleum Reserve); 4-490 (future Northwest development could contribute to cumulative impacts on vegetation directly by creating infrastructure that would destroy vegetation and indirectly through dust, flooding, changes in drainage patterns, snow drifting, increased air and water pollution, and possibility of chemical or oil spills); 4-508 (future development activities in "northwestern portion" of Petroleum Reserve "could contribute to cumulative impacts on birds" by, *inter alia*, altering habitat).

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

6

FEIS at 4-442 to 4-443, Table 4-36.  The scope of the cumulative case then informs BLM's subsequent analysis of cumulative environmental impacts on North Slope resources.  Thus, BLM was aware of and carefully considered the combined impact of the Northwest and Northeast management plans when it made its decision to adopt the Final Preferred Alternative.  Consequently, the Court can be assured that the FEIS contains the analysis that the Court expected to see after its decision in NAEC v. Norton.

## II.  The Biological Opinion Complies with the ESA

The Court has preliminarily determined that BLM acted arbitrarily and capriciously in relying on the BiOp prepared by FWS for the Final Preferred Alternative.  Preliminary Decision, § II.  The basis for the Court's preliminary conclusion is that the BiOp, and the biological assessment ("BA") on which it relies, does not consider the potential increase in Northwest development resulting from amendments to the Northeast Planning Area management plan as a "cumulative effect."  The Court's preliminary determination appears to confuse the expansive definition of "cumulative impact" under NEPA with the more restrictive definition of "cumulative effect" under the ESA.  See, e.g., Preliminary Decision at 20.  Accordingly, the Court's preliminary determination is premised on an error of law.

Under NEPA, "cumulative impact" is defined to include, *inter alia*, impacts resulting from "reasonably foreseeable future actions," including *federal* reasonably foreseeable future actions.  As NEPA's implementing regulations state:

> *Cumulative impact* is the impact on the environment which results from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

40 C.F.R. § 1508.7 (italics in original; underscore added).  In contrast, the ESA's definition of cumulative effects, which also does not include past or present effects, explicitly excludes future *federal* actions.  The ESA's implementing regulations provide as follows:

> *Cumulative effects* are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

50 C.F.R. § 402.02 (italics in original; underscore added); see also Endangered Species Consultation Handbook ("ESA Handbook") at 4-30 (March 1998) (ESA "cumulative effects

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

7

involve *only* future *non-Federal* actions") (underscore in original; italics added); Forest Guardians v. Veneman, 392 F. Supp. 2d 1082, 1092 (D. Ariz. 2005) (relying on ESA Handbook and stating agency interpretations of their own regulations are entitled to substantial deference) (citing Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097 (9th Cir. 2003)).

Moreover, the ESA's analysis of cumulative effects is purposefully narrower than that required by NEPA. FWS and the National Marine Fisheries Service, the federal agencies charged with administering the ESA, have stated this quite clearly in rejecting an argument similar to that preliminarily advanced by the Court. In response to comments on the ESA's implementing regulations arguing that an ESA cumulative effects analysis should include reasonably foreseeable federal actions as well as state and private actions, the Services explained:

> Section 7 consultation will analyze whether the "effects of the action" on listed species, plus any additional, cumulative effects of State and private actions which are reasonably certain to occur in the action area, are likely to jeopardize the continued existence of that species. Based on this analysis, the Federal agency determines whether it can proceed without exceeding the jeopardy standard. If the jeopardy standard is exceeded, the proposed Federal action cannot proceed without an exemption. *This is a substantive prohibition . . . . In contrast, NEPA is procedural in nature, rather than substantive, which would warrant a more expanded review of cumulative effects.* Otherwise, in a particular situation, the jeopardy prohibition could operate to block "nonjeopardy" actions because future, speculative effects occurring after the Federal action is over might, on a cumulative basis, jeopardize a listed species. Congress did not intend that Federal actions be precluded by such speculative actions.

51 Fed. Reg. 19,926, 19,932-33 (June 3, 1986) (emphasis added).

In the present case, the action that the Court believes should have been included in the BiOp's cumulative effects analysis – *i.e.*, increased development in the Northwest Planning Area – is unquestionably a federal action because such activity will require federal authorization. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. Consequently, had FWS analyzed increased Northwest development as a cumulative effect, FWS would have violated the ESA.[4] In addition,

---

[4] In passing, the Court appears to suggest that increased Northwest development might be an "interdependent" action. Intervenors do not understand the Court to have preliminarily determined that increased Northwest development should have been analyzed as an interdependent action, however, to avoid confusion Intervenors submit that an increase in future

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

8

as explained in Intervenors' Opposition Brief, because increased development in the Northwest is a federal action that has not yet undergone section 7 consultation it should not be included in the environmental baseline as Plaintiffs have argued. 50 C.F.R. § 402.02 (defining the environmental baseline to include, *inter alia*, federal actions that have undergone section 7 consultation); Intervenors' Opp'n Br. at 43-46.

Intervenors appreciate the Court's concern that the agencies may appear to be postponing ESA analysis of a potential increase in Northwest oil and gas activity. However, this is the way the ESA is structured. Only those proposed federal actions for which section 7 consultations have been completed are included in the environmental baseline and, as discussed above, federal actions do not fall within the ESA's definition of cumulative effects. 50 C.F.R. § 402.02. Future federal actions that have not undergone consultation are not included in the analysis, but instead are evaluated on their own merits when ripe for decision, in context of the environmental baseline existing at that time. Id. (noting that effects of an action under consultation are "added to the environmental baseline" for future consultations). This sequential approach ensures that each proposed action is fully and accurately analyzed before it occurs. Id.; 51 Fed. Reg. at 19,926 ("Future federal actions proposed for the same area would have to be separately evaluated under section 7 and could not occur unless they were able, in their own right, to avoid jeopardizing the continued existence of the affected species . . . .").

Thus, if and when federal authorization for increased development in the Northwest Planning Area is sought, such development will become a federal action that is now ready for its

---

Northwest oil and gas activity does not fall within the regulatory definitions of either "interrelated" or "interdependent" actions, neither of which speak to future actions. An interrelated action is one that is "part of a larger action [*i.e.*, the proposed action under consultation] and depend[s] on the larger action for [its] justification." 50 C.F.R. § 402.02; ESA Handbook at 4-26 (indicating term "larger action" means "action under consultation"). Federal authorization of increased development in the Northwest Planning Area is not an action currently before the agencies for decision and thus is not part of the "larger action." An interdependent action is one that has "*no* independent utility apart from the action under consultation." 50 C.F.R. § 402.02 (emphasis added). Again, there is no federal action presently before the agencies to be considered as independent or not. Even if there were, increased development in the Northwest Planning Area could occur for many reasons (discovery of greater petroleum potential, technological innovation, an increase in oil prices) which do not depend on amendments to the Northeast Planning Area management plan and would have an independent utility (contribution to nation's energy supply) apart from the proposed action.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

9

own section 7 consultation. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. In the present case, depending on the nature and location of the increased development, this may, or may not, require reinitiation of the Northwest BiOp. Intervenors' Opp'n Br., Ex. X at 4 (Northwest BiOp at C-10) ("If [] development occurs that exceeds the original predictions of potential effects to listed eiders, reinitiation [of the Northwest BiOp] will be required."); Pls.' Opening Br., Ex. 10 at 3 (indicating development would have to be *both* "significant" and in areas with "high concentrations of eiders" to result in population-level impacts); 50 C.F.R. § 402.16(b) (reinitiation is required when new information reveals effects of the action that may affect listed species in a manner not previously considered).[5] In any event, any additional oil and gas activity in the Northwest Planning Area subject to federal approval will have to be done in a manner that does not jeopardize listed eider species. 16 U.S.C. § 1536(a)(2).

### III. The Production Act Limits the Maximum Protection Requirement to Exploration

The Court has preliminarily determined that the maximum protection requirement applies to the leasing program established by section 6506a of the Production Act. 42 U.S.C. § 6506a. The Court appears to have based its preliminary conclusion on an argument put forth by Plaintiffs in their Reply Brief. Plaintiffs attempt to dismiss Intervenors' argument that the clear statutory language of the Production Act, as reflected in the legislative history of the Production Act as originally enacted and as amended in 1980, limits the maximum protection requirement to exploration activities undertaken pursuant to section 6504 by stating that section 6506a(n)(2) cross references section 6504(a). See Pls.' Reply Br. at 10.

However, the language relied upon by Plaintiffs in section 6506a(n)(2), which discusses NEPA requirements for the initial Petroleum Reserve lease sales, applies only to the first two oil and gas lease sales held in the Petroleum Reserve. 42 U.S.C. § 6506a(n)(2). The full text of section 6506a(n)(2), which is entitled "*Initial lease sales*," provides as follows:

> The detailed environmental studies and assessments that have been conducted on the exploration program and the comprehensive land-use studies carried out in response to sections 105(b) and (c) of Public Law 94-258 [42 U.S.C.A. § 6505(b), (c)] shall be deemed to have fulfilled

---

[5] More specifically, BLM must reinitiate consultation if the take limits set forth in the BiOps are exceeded, due to increased development or for any other reason. 50 C.F.R. § 402.16. These safeguards ensure that unanticipated development will not cumulatively result in jeopardy to eiders. Id.; 51 Fed. Reg. at 19,931-33.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

10

> the requirements of section 102(2)(c) of the National Environmental Policy Act (Public Law 91-190) [42 U.S.C.A. § 4332(2)(C)], with regard to the first two oil and gas lease sales in the National Petroleum Reserve-Alaska: *Provided*, That not more than a total of 2,000,000 acres may be leased in these two sales: *Provided further*, That any exploration or production undertaken pursuant to this section shall be in accordance with section 6504(a) of this title.

Id. (brackets in original). Section 6506a(n)(2) thus states that previously completed environmental documents "shall be deemed" to fulfill the requirements of NEPA for the first two Petroleum Reserve lease sales so long as two provisos are satisfied. First, that the total acreage leased at the first two sales must not exceed 2,000,000 acres and, second (*i.e.*, "*Provided further*"), exploration or production resulting from the first two lease sales must comply with section 6504(a). Zogbi v. Federated Dept. Store, 767 F. Supp. 1037, 1039 (C.D. Cal. 1991) (provisos are construed to apply to the provision or clause immediately preceding it); United States v. State of Washington, 157 F.3d 630, 649 (9th Cir. 1998) (provisos are "strictly construed" in the Ninth Circuit).

By its own terms, section 6506a(n)(2) does not apply to lease sales beyond the first two, which must undergo separate NEPA review. Plaintiffs' attempt to expand the reach of the final sentence in section 6506a(n)(2) beyond the first two lease sales should therefore be rejected. Had Congress intended the maximum protection requirement in section 6504(a) to apply to all leasing activity, Congress would have said so in the provision of the Production Act specifically addressing the mitigation of adverse impacts resulting from the leasing program. See 42 U.S.C. § 6506a(b). Congress would not have buried such a requirement in a separate section dealing only with environmental review of the first two lease sales. Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Accordingly, Intervenors respectfully request that the Court modify its Preliminary Decision to accurately reflect the clear language of the Production Act, which requires BLM to "mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of leasing activity in the Petroleum Reserve. 42 U.S.C. § 6506a(b).

## IV. Injunctive Relief, If Appropriate, Should Be Narrowly Tailored

As demonstrated above, both the FEIS and the BiOp properly consider the combined impacts of future development in the Northwest and Northeast Planning Areas as required by NEPA and the ESA, respectively. Accordingly, Intervenors request that the Court issue a final decision that is consistent with the facts contained in the administrative record and the law, in which case no injunction would issue. However, in the event that the Court's final ruling adopts the conclusions set forth in its Preliminary Decision, Intervenors submit that enjoining the entire lease sale is not appropriate.

Over two-thirds of the leases offered for sale in September are in the *Northwest* Planning Area of the Petroleum Reserve. See Ex. A at 1-2 (maps indicating 494 leases are available for sale in Northwest Planning Area and 201 leases will be offered in Northeast Planning Area); Ex. B (public notice announcing sale of Northwest leases); Ex. C at 1 (Detailed Statement of Sale announcing same). Leases in the Northwest Planning Area are offered pursuant to a Record of Decision, and associated NEPA and ESA analysis, that was previously upheld by this Court and the Ninth Circuit. Ex. C. at 1; NAEC v. Norton, 361 F. Supp. 2d 1069; NAEC v. Kempthorne, 457 F.3d 969. Thus, the validity of the September lease sale as it pertains to the Northwest Planning Area is not at issue in the instant lawsuit. Plaintiffs have not plead, briefed, or prevailed on a legal claim in this lawsuit, or any other lawsuit, that would entitle them to a court order enjoining the sale of Northwest leases. Orantes-Hernandez, 919 F.2d at 558. Accordingly, any injunctive relief issued by this Court must be limited to the sale of leases in the *Northeast* Planning Area based on the decisions challenged in this case.

With regard to the sale of Northeast Planning Area leases, given the uncertainty that could attach to Northeast Planning Area leases if the Court's final decision finds a NEPA or ESA violation, Intervenors, for business reasons, prefer that the sale of Northeast Planning Area leases be enjoined until the agencies remedy any defects in their decisionmaking.

## V. CONCLUSION

For the reasons set forth herein, Intervenors respectfully request that the Court modify its Preliminary Decision and deny Plaintiffs' motion for summary judgment on all grounds. In the alternative, Intervenors request that the Court narrowly tailor any injunctive relief in the manner specified above.

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

DATED this 15th day of September, 2006.

        STOEL RIVES LLP

        s/Laura J. Beveridge
        Jeffrey W. Leppo, AK Bar #0001003
        Laura J. Beveridge, *Pro Hac Vice*
        600 University Street, Suite 3600
        Seattle, Washington  98101
        Phone:  (206) 624-0900
        Fax:  (206) 386-7500
        Email:  jwleppo@stoel.com
        Email:  ljbeveridge@stoel.com

        *Attorneys for Intervenor-Defendant*
        *Anadarko Petroleum Corporation*

        David C. Crosby, AK Bar # 7106006
        *Attorney for Arctic Slope Regional Corporation*

        Ethan Falatko, AK Bar # 0112093
        *Attorney for State of Alaska*

## Certificate of Service

I hereby certify that on September 15, 2006, a copy of foregoing document was served electronically on:

**Deirdre A. McDonnell**
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
*Attorneys for Plaintiffs*

**Dean K. Dunsmore**
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
*Attorneys for Federal Defendants*

**David C. Crosby**
DAVID C. CROSBY, P.C.
5280 Thane Road
Juneau, Alaska 99801-7717
*Attorneys for Arctic Slope Regional Corporation*

**Ethan Falatko**
**Lawrence Ostrovsky**
STATE OF ALASKA
Office of the Attorney General
P.O. Box 110300
Juneau, Alaska 99811-0300
*Attorneys for State of Alaska*

**Jeffrey W. Leppo**
**Laura J. Beveridge**
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101
*Attorneys for ConocoPhillips Alaska, Inc.*

s/Laura J. Beveridge
Laura J. Beveridge

## INDEX TO EXHIBITS

Exhibit A         BLM Maps:   NPR-A Northeast Plan Area Lease Tracts 2006
                              NPR-A Northwest Plan Area Lease Tracts 2006

Exhibit B         Department of the Interior Notice of National Petroleum Reserve – Alaska Oil and Gas Lease Sale 2006.  71 Fed. Reg. 49,471 (August 23, 2006)

Exhibit C         Department of the Interior, Detailed Statement of Sale for National Petroleum Reserve-Alaska, Oil and Gas Lease Sale 2006 (excerpts)

**National Audubon Society, et al. v. Kempthorne, et al.**
1:05-CV-00008-JKS

15

Seattle-3337532.2 0028116-00025