Deirdre McDonnell
Layla Hughes
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, et al.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, NORTHERN ALASKA ENVIRONMENTAL CENTER, SIERRA CLUB, and THE WILDERNESS SOCIETY,<br><br>  Plaintiffs,<br><br>    v.<br><br>DIRK KEMPTHORNE, Secretary of the Interior[1]; HENRI BISSON, State Director, Bureau of Land Management; TOM MELIUS, Regional Director, United States Fish and Wildlife Service[2]; BUREAU OF LAND MANAGEMENT, UNITED STATES FISH AND WILDLIFE SERVICE, and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>  Defendants, and<br><br>CONOCOPHILLIPS ALASKA, INC., ANADARKO PETROLEUM CORPORATION, ARCTIC SLOPE REGIONAL CORPORATION, and STATE OF ALASKA,<br><br>  Intervenor-Defendants. | Case No. 1:05-cv-00008-JKS |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO
COURT ORDER OF SEPTEMBER 6, 2006**

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Dirk Kempthorne has been automatically substituted for P. Lynn Scarlett.

[2] Pursuant to Fed. R. Civ. P. 25(d)(1), Tom Melius has been automatically substituted for Rowan Gould.

## INTRODUCTION

This case revolves around the Bureau of Land Management's (BLM) decision to amend the oil and gas leasing plan for the 4.6 million acre Northeast Planning Area. Because of the different administrative designations that have been made over the years, there are a number of relevant land classifications that should be clarified. The focus of the debate here is on a relatively small and highly sensitive area put off limits to leasing by the previous administration within the Teshekpuk Lake Special Area, which is itself only a portion of the Northeast Planning Area.

The preliminary decision reflects some potential confusion about the areas within the Teshekpuk Lake Special Area at issue. The agency decision Plaintiffs challenge did not newly open to leasing the entire 1.7 million acre Teshekpuk Lake Special Area. Cf. Preliminary Decision at 2. Instead, it opened a smaller, highly sensitive area within the designated Special Area in the immediate region of Teshekpuk Lake itself and surrounding wetlands.[1] It was this region within the designated special area that the Department of Interior protected in its 1998 plan decision by not offering these lands for lease. The 1998 decision protected approximately 589,000 acres of these most sensitive lands through a no-lease designation. Pls. Ex. 42 at 12b (1FEIS at 1-4). This 589,000 acre area protected from permanent oil facilities by the 1998 decision represents approximately 30% of the designated Teshekpuk Lake Special Area and only 13% of the 4.6 million acre Planning Area.

---

[1] Of course, the agency decision also weakens stipulations affecting many of the leased areas, including modifying previous prohibitions on surface occupancy in some areas.

Thus, the preliminary decision is incorrect when it states that "F&WS, as well as Plaintiffs . . . preferred that the entire TLSA be placed off-limits to oil and gas activities . . . ." Preliminary Decision at 11. Instead, Fish and Wildlife Service (FWS) explicitly endorsed as its "preferred management approach" Alternative A, which maintained the 589,000 acre no-lease zone, but allowed leasing in the majority of the special area. Plaintiffs too have advocated strongly that BLM should not make any additional land within this smaller sensitive area available to leasing, thus, maintaining the 589,000 acre no-lease zone of the 1998 plan. Plaintiffs also strongly believe that by choosing to make available for leasing this last critical wildlife sanctuary, making essentially the entire 4.6 million acre Planning Area open for leasing, the BLM has lost any pretense of balance in its decision. But these policy positions advocated by Plaintiffs are not a part of the legal arguments addressed below. Instead, the legal issues turn on much narrower questions about BLM's procedural obligations to analyze and explain its decision.

## ARGUMENT

Plaintiffs believe the Court's preliminary decision correctly finds that Defendants' failure to consider the relationship between opening the protected area around Teshekpuk Lake to leasing and increased development in the adjacent Northwest Planning Area and its cumulative impacts on the environment violates NEPA and the ESA. If Defendants raise additional issues relevant to these claims in their supplemental brief, Plaintiffs will address them in their rebuttal brief.

There are two minor points in the Court's preliminary decision relating to these claims that Plaintiffs would like to clarify. First, in addition to the reasons stated in the Court's preliminary decision for considering certain documents from the Northwest Planning Area

process, Preliminary Decision at 12, n.8, the documents from the Northwest decision should be considered by the Court because they should have been part of the record for the agency decision in this case. The administrative record consists of all materials directly or indirectly considered by the agency in making its decision. See Thompson v. Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989) ("The whole administrative record, however, is not necessarily those documents that the agency has compiled and submitted as 'the' administrative record. The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." (internal quotation marks and citations omitted)); see also Portland Audubon Soc'y v. Endangered Species Comm., 984 F.2d 1534, 1536-37 (9th Cir. 1989) ("a record that does not include all matters on which the Committee relied does not constitute the 'whole record' required for judicial review"). Specifically, the record includes all documents cited in agency documents. See Ctr. for Biological Diversity v. United States Fish & Wildlife Serv., 402 F. Supp. 2d 1198, 1203 (D. Or. 2005) (denying a motion to strike "a document that was cited in the BiOp [that was before the agency in making its decision], although not in the pages excerpted by any of the parties here"). Because the agency clearly considered, and relied on, the documents here, these documents should be considered a part of the administrative record. See, e.g., Pls. Ex. 42 at 293 (2 FEIS at 6-150).

Second, the Court notes that it could not find in the biological opinion support for Plaintiffs' argument that opening the protected area would lead to increased development in the Northwest Planning Area in the biological opinion. Preliminary Decision at 19 n.10. Plaintiffs suspect that Court may have misunderstood Plaintiffs' citation on page 43 of their opening brief.

Plaintiffs cited there to pages 24-26 of the opening brief discussing the Northwest EIS, not to the previously cited biological opinion.

I.    ALTERNATIVE D IS NOT SUBSTANTIALLY SIMILAR TO ALTERNATIVE B

The preliminary decision correctly lays out the arguments and the law relating to Plaintiffs' claim that NEPA required a supplemental draft EIS in this case. As the Court notes, not every change to a proposal warrants a supplemental draft EIS. Rather, only those changes that are substantial enough that they could not have been anticipated by those commenting on the draft and the comments on the draft do not in fact apply to the new alternative require a supplement. As a factual matter, however, Plaintiffs believe the preliminary decision misstates the essential features of the new preferred alternative—Alternative D. First, the preliminary decision incorrectly states that Alternative D was not a new approach. Second, there is no evidence to support the assertion that Alternative D provides greater protection to resources than Alternative B.[2]

While it is correct that there is no new technology to be examined, Preliminary Decision at 11, this does not mean that there is nothing new about Alternative D compared to the previous alternatives. The 300-acre surface limit used here is new and untested. Unlike previous surface

---

[2] Plaintiffs do not agree with the Court's suggestion that Alternative D is a middle ground alternative. Alternative D makes all of the 4.6 million acre planning area available for leasing, with an unspecified deferral of the lake itself. This alternative is not even a middle ground between Alternative A, which made 87% of the planning area available and Alternative C, which made 100% of the planning area available. In Plaintiffs' view, Alternative D is an extreme alternative, more akin to Alternative C. The question of whether D represents a middle ground, however, is not the relevant question here. When an agency makes significant changes to its proposal, it must circulate a supplemental draft EIS. Here, because Alternative D adopted a new approach to leasing, it should have been the subject of an supplemental draft EIS, regardless of whether BLM was attempting to construct a compromise position.

restrictions, which have designated buffers around particular sensitive areas, the 300-acre per tract limit is based on the idea that the most sensitive areas can be opened to leasing but nevertheless protected by a provision limiting the number or acres that can be disturbed by drill pads and roads. This limit on the size of facilities instead of the location that can be developed has never been used or proposed by BLM in the Reserve before. There is no evidence that opening sensitive areas, but limiting the size of facilities will provide adequate protection. If this proposal had been circulated for comment in the form of a supplemental draft EIS, this idea could have been analyzed more critically, in particular by the experts at FWS.

Further, the preliminary decision's statement that "Alternative D . . . did provide a greater degree of protection than existed under Alternative B," Preliminary Decision at 10, is unsupported by the record. Even the final EIS does not reach the conclusion that the most sensitive resources will receive more protection under Alternative D. According to the final EIS the "Preferred Alternative would likely increase the risk of disturbance to internationally significant populations of molting geese, particularly brant that use the Goose Molting Area when compared to alternatives A and B." Pls. Ex. 42 at 220 (1 FEIS at 4-356). The final EIS also admits that the new preferred alternative fails to increase protection for caribou. Id. at 117 (1 FEIS at 2-140) ("effects to caribou would be similar to those for Alternative B").

It is also not correct that "Alternative B, like Alternative D, would have made the same area, including the TLSA, available for leasing." Preliminary Decision at 9. The only way in which these two alternatives are the same is in the number of acres made available for lease. Unlike Alternative D, however, Alternative B closed some of the most sensitive core goose molting area to leasing. The deferral of the lake itself is not equivalent to the goose molting area. Although BLM asserts that the lake itself "provides breeding habitat for waterfowl," Pls. Ex. 56

at 5 (ROD at 4), this assertion is counter to the evidence in the record.  The final EIS contains ten maps illustrating high value bird habitat areas.  See Maps 3-10 through 3-19.  A quick review of these maps reveals that all of the bird concentrations are outside of the lake itself.  Thus, deferring the lake instead of putting the goose molting area provides less protection to wildlife.  Indeed, substituting the lake was suggested by an oil company, not an entity interested in wildlife protection.  Pls. Ex. 25 at 3 (Anadarko comments at 3) ("If BLM believes the whole are should not be opened to leasing, we nevertheless encourage BLM to open the area north and east of Teshekpuk Lake, and defer a decision whether to open Teshekpuk Lake itself to leasing.").

      Under Alternative D, the entire goose molting area is open to leasing and pipelines can be placed throughout the area.  See Pls. Ex. 56 at 12 (ROD at 11).  There is simply no support in the record or the final EIS for the notion that pipelines are completely benign.  Indeed, in addition to the potential for leaks, which could be catastrophic to birds, as recent news reports indicate, pipelines may require monitoring and repairs.  Under Alternative D, pipelines can crisscross even the most sensitive goose molting habitat that was off limits under Alternative B.  Thus, it is doubtful that this alternative could provide a comparable level of protection to Alternative B.  As the biologists from FWS cautioned, "alternatives that open a larger area to oil leasing and development, particularly in biologically sensitive areas, will not achieve the same level of resource protection as an alternative that prohibits leasing and development in these areas."  Pls.' Reply Ex. 2 at 4 (FWS Specific Comments at 3).

      The uncertainty over the efficacy of the new preferred alternative is precisely why it needed to be circulated in the form of a supplemental draft EIS for comment.  The comments submitted on the draft did not apply to the new preferred alternative.  Although it may be true that Plaintiffs and FWS would have advocated that the 589,000 acre no leasing zone be

maintained, this does not mean that they would not provide useful comments on the effectiveness of the new alternative as a protective strategy. Indeed, FWS's comments on the draft EIS did not merely endorse Alternative A, they also provided specific detailed comments on Alternative B. A supplemental draft must be prepared here so FWS and others can provide similar comments on Alternative D.

II.     BLM VIOLATED NEPA BY RELYING ON AN ASSUMPTION ABOUT THE EFFECTS OF OIL DEVELOPMENT IN A WARMING CLIMATE RATHER THAN ANALYZING AVAILABLE INFORMATION.

The preliminary decision correctly notes that the final EIS fails to present an evaluation of the effects of oil development under each alternative in the context of a warming climate. See Preliminary Decision at 17. Despite acknowledging this "gap in the analysis," id., however, the preliminary decision concludes that BLM did not violate NEPA. This conclusion is based on an incorrect conclusion about the role assumptions may play in the evaluation of effects on the environment. The Court cannot allow BLM to assume away its NEPA obligations but, rather, should require it to conduct an analysis of the likely effects of the oil development alternatives in a warming climate and to present that analysis in comparative form.

Initially, the preliminary decision is correct in its determination that, while the "FEIS discloses that both oil development and global climate change may have an adverse impact on various aspects of the environment[, i]t does not . . . put the two together to allow the reader to compare the effects of oil development under each alternative in a warming environment." Preliminary Decision at 17. The preliminary decision goes on to recognize correctly that, in concert with global climate change, oil development activities may have significant effects on the environment that are not evaluated for the various alternatives. See id. ("In combination, global climate change and oil development activities may have very significant, even population-

level impacts to important resources, including caribou, polar bears, and birds, that, although recognized in the FEIS is not analyzed in the context of each alternative."). This "gap," however, renders the final EIS illegal.

The preliminary decision characterizes Plaintiffs' argument as one about the method used to consider the combined effects of oil development activities and climate change—that the final EIS considered global climate change as an additive, or incremental, effect while Plaintiffs' experts contend that the effects may be synergistic. See id. at 17-18. In fact, Plaintiffs' argument does not focus on this distinction but, rather, contends that BLM filled the analytical gap recognized by the Court with an unsupported assumption and, in so doing, violated NEPA. Rather than conducting any analysis to show how global warming might change the effects of the various oil development alternatives, BLM simply assumed that a warming climate would change the habitat and wildlife impacts under each alternative in the same way and in the same amount. By so doing, BLM assumed the answer to a question that NEPA requires it to evaluate: given the differences in location and intensity of oil development activities under the various alternatives, how will those alternatives affect the environment in the context of a warming climate.

Undeniably, BLM may rely on reasonable and supported assumptions. The agency, however, may not assume away the analysis NEPA requires it to perform. The case cited in the preliminary decision stands for the proposition that an agency may rely on assumptions, when they are supported by scientific evidence and analysis and when those assumptions are used for further evaluation or decisionmaking. See Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 759-61 (9th Cir. 1996) (describing analysis conducted by Forest Service to support the assumption that protecting habitat would ensure viability of species). That

case does not allow an agency to avoid performing a comparative analysis of alternatives. Nor does it allow the agency to rely on unsupported assumptions. Here, BLM has provided no support or analysis to show that global climate change will have the same incremental effect on important habitat and resources when combined with the oil development alternatives.

The expert affidavits submitted by Plaintiffs show that BLM's assumption may be unwarranted because environmental impacts from the various oil development alternatives may be affected differently by global climate change. The declarations show that, when combined with the effects of global climate change, development in particularly sensitive locations may result in more significant impacts than BLM has assumed. These declarations do not suggest an alternative methodology but, rather, show that the assumption made by BLM may be incorrect.

NEPA requires the agency to evaluate and "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. By assuming that global climate change would have the same incremental effect for each alternative, BLM assumed away its obligation to evaluate the impacts of the various alternatives. Ultimately, the agency may be correct in its assumption. At this time, however, BLM does not know and has not supported its guess. As the preliminary decision recognizes, there is a gap in the analysis on this point. BLM may not fill that gap with an unsupported assumption. NEPA requires the agency to evaluate the effects of the various alternatives in a warming climate, not assume without support what they may be.

III.  MAXIMUM PROTECTION

Plaintiffs do not interpret the maximum protection standard to require no leasing occur in the entire special area, nor have they advocated this position. While as a policy matter, Plaintiffs

believe that the 589,000 acres put off limits by Secretary Babbitt should not be leased, this is not the basis of Plaintiffs' legal argument here. Indeed, Plaintiffs' challenge is not a substantive one. Rather, this claim is based on the APA's requirement that an agency provide a rational explanation of how it is applying the law to the facts, especially when, as here, the agency reverses a previous course. Thus, Plaintiffs do not ask the Court to substitute its judgment for the agency's, but only to enforce the agency's obligation to explain its policy reversal.

The preliminary decision notes that the Defendants have not provided an explanation for how their reduction in protection is consistent with the maximum protection standard. See Preliminary Decision at 23. Nonetheless, the preliminary decision concludes that this is permissible because any additional leasing could be construed as inconsistent with providing maximum protection to surface resources and therefore an explanation for offering sensitive lands for leasing is impossible. Id. Plaintiffs do not agree with this conclusion. Plaintiffs have not argued that any leasing in a designated special area will violate the maximum protection standard. Indeed, Plaintiffs acknowledge that the standard requires the Secretary to balance further protection of resources with the requirement to conduct a leasing program. As demonstrated by previous agency decisions relating to these sensitive lands, there is more than one way of meeting this standard. Plaintiffs do not contend that the 1998 decision was the only means of meeting the maximum protection standard. Plaintiffs' argument, however, is that the APA requires a change in position such as this to be explained. Here, BLM needed to explain how its change in the balance was consistent with the maximum protection standard.

To the extent the preliminary decision is based on a conclusion that the agency need not consider closing sensitive areas to leasing when it considers whether it is providing maximum protection to a designated Special Area, and instead need only consider the types of stipulations

it attaches, Preliminary Decision at 24, that conclusion is in error.  Even BLM has never asserted that it need not consider whether sensitive lands should be leased as a part of meeting its maximum protection obligation.  Indeed, its EISs relating to Special Area leasing within the Reserve have regularly considered alternatives, like Alternatives A and B in the FEIS at issue, that would lease part but not all of a Special Area.   As the comments of the FWS here demonstrate, sometimes the most important decision is not just how to lease but whether to lease at all.  The statute does not support this suggestion of the Intervenors that the agency can exclude the question of whether to lease certain sensitive lands from its maximum protection analysis.  Indeed, such a conclusion is inconsistent with the direction of Congress to comply with the maximum protection standard at the lease sale stage, as the preliminary decision recognizes the agency must do.  Preliminary Decision at 22.

     The preliminary decision points out that "Plaintiffs do not point to any additional reasonable restrictions that might be placed on development in the TLSA to maximize protection of the environment."  Preliminary Decision at 24.  This is precisely because Plaintiffs are not challenging the decision as a substantive violation and do not seek a determination from this Court whether the decision meets the maximum protection standard, but rather Plaintiffs challenge the agency's failure to explain how this decision can be compatible with the maximum protection standard.  The 1998 ROD provides an example of a plan that makes the vast majority of the Teshekpuk Lake Special Area available for leasing, but provides a greater degree of protection to the most sensitive resources through a combination of no lease areas and restrictions on surface occupancy.  In addition to leasing the most sensitive lands, the decision at issue in this case also weakens many of the protective stipulations.  The final EIS explicitly recognizes that some of the new required operating procedures (ROPs) will be less protective

than the stipulations they replace. See, e.g., Pls. Ex. 42 at 55, 63, 73, 87 (1 FEIS at 2-78, 2-86, 2-96, 2-110). These examples illustrate that BLM could have provided more protection to resources, but chose not to do so. Under the APA, this choice must be explained with reference to the applicable law. As the preliminary decision notes, the only explanation BLM offers is that there is more oil in the area north of Teshekpuk Lake than previously believed. Preliminary Decision at 21. This fact does not explain BLM's interpretation and application of the maximum protection standard, however.

IV.   RELIEF

The preliminary decision's discussion correctly applies the law concerning injunctive relief in the context of a NEPA violation. The preliminary decision also finds that Defendants violated the ESA, however. In the case of the ESA, the traditional equitable principles do not apply. In enacting the ESA, Congress "foreclosed the exercise of the usual discretion possessed by a court of equity." Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982). "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" Sierra Club v. Marsh, 816 F.2d 1376, 1383 (9th Cir. 1987). Accordingly, the traditional test for injunctive relief is not the test under the ESA. See, e.g., Tennessee Valley Auth.v. Hill, 437 U.S. 153, 173, 193-95 (1978); National Wildlife Fed'n v. NMFS, 422 F.3d 782, 793-94 (9th Cir. 2005) (affirming preliminary injunction that required the Army Corps of Engineers to take affirmative, protective measures at dams on Columbia and Snake Rivers in absence of valid biological opinion); Washington Toxics Coalition v. Envt'l Protection Agency, 413 F.3d 1024, 1035 (9th Cir. 2005) ("The district court was not required to balance interests in protecting endangered species against the costs of the injunction when

crafting its scope. Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species."); Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1073 (9th Cir. 1996) ("Congress has determined that under the ESA the balance of hardships always tips sharply in favor of endangered or threatened species."). As a result, the relief afforded in the preliminary decision is also the appropriate and necessary relief under the ESA.

Dated this 15th day of September 2006.

Respectfully submitted,

 /s/ Deirdre McDonnell
Deirdre McDonnell (AK Bar # 0111082)
Layla Hughes (AK Bar # 0312094)
Eric P. Jorgensen (AK Bar # 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: dmcdonnell@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society, Alaska Wilderness League, Center for Biological Diversity, Natural Resources Defense Council, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2006, a copy of the PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT ORDER OF SEPTEMBER 6, 2006 was served electronically on:

**Dean K. Dunsmore**
U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B. Street, Suite 504
Anchorage, AK 99501-3657

**Jeffrey W. Leppo**
**Laura J. Beveridge**
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101

**David C. Crosby**
DAVID C. CROSBY, P.C.
5280 Thane Road
Juneau, AK 99801-7717

**Ethan Falatko**
**Lawrence Z. Ostrovsky**
STATE OF ALASKA
Office of the Attorney General
P.O. Box 110300
Juneau, AK 99811-0300


  /s/ Deirdre McDonnell
  Deirdre McDonnell