DEAN K. DUNSMORE
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Telephone:(907)271-5452
Facsimile: (907)271-5827
Email: dean.dunsmore@usdoj.gov

ROBERT GULLEY
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, D.C. 20044-7369
Telephone: 202-305-0500
Facsimile: 202-305-0275
Email: robert.gulley@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, ALASKA WILDERNESS LEAGUE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>GALE NORTON, Secretary of the Interior; HENRI BISSON, et al.<br><br>Defendants, | )<br>)<br>)<br>)<br>) No. 1:05-cv-00008-JKS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEFENDANTS' SUPPLEMENTAL REPLY BRIEF

Defendants submit this reply brief pursuant to the Order Re: Additional Briefing on Preliminary Decision (Docket Entry No. 99), in response to Plaintiffs' Supplemental Brief (Plfs' Supp") (Docket Entry No. 102). For the reasons set forth herein, plaintiffs provide no reason for the Court to modify its Memorandum Decision [*Preliminary*]("Prelim D").[1]/

## I. BLM WAS NOT REQUIRED TO ISSUE A SUPPLEMENTAL EIS

Plaintiffs object to the proposal in the Prelim D that BLM was not required to have prepared a new draft EIS and solicited comments on that draft before adopting the preferred alternative (Alternative D). Plaintiffs contend that a supplemental EIS was required because the preferred alternative and its impacts were substantially different from the alternatives in the draft EIS. However, for these alleged differences plaintiffs rely on a comparison of Alternatives B and D and the impacts associated with those alternatives. As the Court notes, the correct comparison is with Alternative D which falls between the extremes of Alternatives A and C. Alternative C is the broadest alternative and would have made all of the lands in the NE NPRA available for leasing, and thus have had more impacts than Alternative D. *E.G.* compare the less restrictive no permanent facility areas for Alternative C with the larger no surface occupancy areas of Alternative D shown in the ROD Maps 4 & 5,[2]/ and the discussion of impacts of these alternatives on birds in 1 FEIS at 4-280 to 4-285 with 4-355 to 4-361. Contrary to plaintiffs' assertions, a comparison of the no surface occupancy areas of Alternative D shown on ROD Map 5 with FEIS Maps 3-1 to 3-19, shows that under this alternative most of the important areas of bird population and habitat including goose molting habitat is protected under Alternative D. Alternative C would have provided less protection around lakes important for geese than Alternative D.[3]/ Thus, comments on Alternative C could address issues regarding impacts to

---

[1]/ Unless other wise specified, defendants will utilize herein the same acronyms as set forth in the Glossary of Acronyms, pages iii-iv to Defendants' Brief (Docket Entry No. 86).

[2]/ The no surface occupancy areas adopted in the ROD are even more extensive than Alternative D. ROD Map 1.

[3]/ Plaintiffs also ignore the fact that the most sensitive areas would remain closed to leasing, as those areas are subject to no surface occupancy (NSO) restrictions. ROD (Stip. K-4) at 71-72,. Surface disturbance would only be permitted outside of the NSO areas and limited to no more than 300 acres. *Id*. (Stip. K-11) at 75-76. In addition Stipulations K2, 3, 6 and 9, ROD at 70-71, 74, 75, further restrict surface occupancy in the seven large tracts.

geese, and there was ample opportunity for the public to address the possible impacts associated with Alternative D within the scope of any comments on the other alternatives. Therefore, there was no need for the preparation of a supplemental EIS.

Plaintiffs' reliance on Alternative D's use of seven large lease tracts north of Teshekpuk Lake and the 300-acre surface occupancy limitation in those areas does not change the fact that the impacts of Alternative D could have been addressed in comments on Alternative C which would have made all that area available for leasing but with less restrictions.[4]/

## II. THE DISCUSSION OF GLOBAL CLIMATE CHANGE IS ADEQUATE

Plaintiffs mistakenly contend that BLM's analysis of the cumulative impacts of global climate change and energy development rests on an "unsupported assumption" that a warming climate would change the environmental impacts under each alternative in the same way and in the same amount. Plfs' Supp at 7-8. As the Court's preliminary decision states, BLM identified in significant detail the resources that could be adversely impacted and explained that the extent of the combined effects under the various alternatives "would vary dependent on the degree of surface development undertaken." Prelim D at 18. These effects would be greater for activities in areas with higher surface resource values and correspondingly less for activities in areas with lower surface resource values. 2 FEIS at 4-588; ROD at 10. Thus, the cumulative effects would be greater under Alternative C, which would have made all lands in the NE NPRA available for leasing, and least under Alternative A (the No Action alternative). 2 FEIS at 4-588 to 4-589. While plaintiffs may prefer that the comparison of the effects of climate change and energy development under the various alternatives be further delineated or quantified, the inherent uncertainty in predicting the impacts of global climate change would render any such delineation or quantification highly speculative. Speculative analysis is not compelled by NEPA. *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1163 (9th Cir. 1998), *quoting, Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992): agencies "need not consider potential effects that are highly speculative or indefinite."

Moreover, plaintiffs improperly rely on declarations submitted after the administrative

---

[4]/ As noted in the ROD at 10 and Stipulation K-11 at 75-76, any decision to authorize any of the maximum 300 acre surface disturbance (which is only from 0.5 to 0.7 % of each of the tracts) or to authorize any pipeline will only be made after completion of a three-year study to identify both location and additional mitigation measures.

record in this case was closed in asserting that "development in particular sensitive locations may result in more significant impacts than BLM assumed." Plfs' Supp at 9. Based on opinions outside the declarants' areas of expertise, the declarations rest on unsupported assumptions and should be disregarded.[5]/  In contrast, as detailed in Defendants' Brief (Docket Entry No. 86) at 27-29, BLM's analysis of the cumulative effects of global climate change was based on an extensive review and thorough consideration of the relevant studies and scientific literature by known experts on the topic of global climate change.  Accordingly, plaintiffs' opinions do "not undercut the agencies' conclusions, which were based on substantial data and the reasonable opinions of their qualified experts." Prelim D at 18.  The agency's analysis of the cumulative impacts of climate change and energy development satisfies the "hard look" standard under NEPA.

### III. "MAXIMUM PROTECTION" WAS ADEQUATELY DISCUSSED

Plaintiffs have made clear in their supplemental brief at 10 and 11 that they are not alleging that BLM violated any substantive provisions of the NPRPA, but are contending only that defendants have not adequately explained why they have now decided to offer lands for oil and gas leasing within the TLSA not previously made available for this purpose.  As already shown in Defendants' Brief (Docket Entry No. 86) at 12-13, BLM fully explained why it made this decision. That explanation is certainly reasonable and is not arbitrary and capricious. Therefore, the Court has correctly proposed to conclude that plaintiffs' NPRPA based claim must fail. *See* Defendants' Brief (Docket Entry No. 86) at 5-7.

### IV. NO INJUNCTIVE RELIEF SHOULD BE ENTERED

In its preliminary decision, the Court recognized that the lease sales do not authorize any ground disturbing activity weighs against a finding of irreparable injury. Prelim. Dec. at 26.  The Court, however, expressed concern that if the leases are issued based on the Stipulations and ROPs in the ROD, they may prove difficult if not impossible to change subsequently, and, thus, constitute an irreparable harm.  *Id.*  Plaintiffs in their supplemental brief respond only that the ESA provides an additional basis for injunctive relief.  Pls' Supp. at 12.  Neither of these bases are sufficient to support entry of an injunction.  First, BLM has flexibility to add additional

---

[5]/   Plaintiffs have presented no new argument to show that the Court should consider these declarations. Plfs Supp at 2-3.

mitigation if necessary to implement any changes if the Court were to order an additional cumulative effects analysis.  Second, even if the Court were to find a violation of the ESA, Plaintiffs have failed to establish that irreparable harm to listed eiders will flow from the alleged violation.

**A.  Plaintiffs Have Not Established An Irreparable Injury Arising From An Alleged Violation Of NEPA.**  The Court's preliminary conclusion regarding the Stipulations and ROPs is misplaced.  First, the Court has tentatively found that the Stipulations and ROPs provide adequate protection for the TLSA to allow development to "be conducted in a manner that provides maximum protection."  Prelim D at 24.  Thus, the existing Stipulations and ROPs should be adequate to address any additional mitigation arising from any supplemental cumulative effects analysis.

Second, and most importantly, BLM has the ability to add additional mitigation measures that may be found warranted following any supplemental NEPA analysis.  For example, the ROD specifically provides that the Administrative Officer "may add additional site-specific restrictions as deemed necessary by further NEPA analysis and as developed through consultation with other Federal, State, and NSB regulatory agencies."[6]/  ROD at 52; *id.* at 36 ("Additional protective measures may be developed as part of NEPA evaluations for subsequent permit authorizations.").  In addition, under its regulations, BLM can impose "[a]dditional stipulations needed to protect surface resources and special areas ... at the time the surface use plan and permit to drill are approved."  43 C.F.R. § 3131.3.  Moreover, BLM can condition the permit the lessee must obtain to conduct geophysical activities with such "conditions, restrictions and prohibitions" that BLM "deems necessary or appropriate to mitigate reasonably foreseeable and significant adverse effects on the surface resources."  Ex. C to Intervenors's Suppl. Resp. at 8.

In addition, the Stipulations and ROPs themselves afford BLM flexibility to provide additional protection to the TLSA.  For example, with respect to the goose molting area, Stipulation K-4 requires the lessee, prior to the construction of permanent facilities outside the no

---

[6]/    Further, because many activities will require additional permits, the ROD makes clear that such permits "could include permit conditions that are <u>more stringent</u> than those adopted in the ROD."  ROD at 52 (emphasis added).  This protection is significant because, for example, 4.37 million of the approximately 4.6 million acres may be classified as wetland.  ROD at 27.  Thus, Clean Water Act permits may be required to conduct many activities in these wetlands.

surface occupancy area, to conduct monitoring studies "to adequately determine consequences of development" and to determine "if any changes to the stipulations or any project specific mitigation(s) are necessary." ROD at 10, 71.  The stipulation requires the lessee to implement any changes determined to be necessary.  *Id.*  As a further example, with respect to minimizing disturbance and impacts to caribou in Teshekpuk Lake Caribou Habitat Area, in addition to other stipulations in the lease, Stipulation K-5 requires a lessee to conduct a study and prepare a report to determine facility design and location.  *Id.*  After receipt of the report, a workshop must be convened to identify the best corridor for pipeline construction to minimize the impacts to wildlife including the caribou.  *Id.* at 71-72.

Finally, this is not a case where an agency failed to prepare NEPA documentation or prepared an EA where an EIS was required.  The Court has indicated that it may find one part of BLM's NEPA analysis, the cumulative impacts analysis, to be deficient.  Under such circumstances, injunctive relief is not required under NEPA where adequate protection was in place to protect environmental resources and prevent irreparable harm.  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 644 (9th Cir. 2004) (upholding district court injunction ordering a cumulative impact statement but allowing the activity to proceed at a level reduced to minimize the harm); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815 (9th Cir. 2002) (upholding a district court's decision to allow grazing to continue while Forest Service satisfied its NEPA obligations because interim measures were sufficient to mitigate harm).  After the leases issue, the first development is not expected to occur immediately in the NE NPRA.  1 FEIS at 4-17 to 4-18.  Regardless, BLM has adequate protection in place to protect environmental resources.

For all of these reasons, no injunctive relief is appropriate or necessary to address the alleged violations of NEPA.

**B. Plaintiffs Have Failed To Establish The Need For An Injunction Based On An Alleged Violation Of The ESA.**  With respect to plaintiffs' argument regarding the ESA, federal courts are not obligated to grant an injunction for every violation of the law, including violations of the ESA.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987); *National Wildlife Fed'n v. Burlington Northern RR*, 23 F.3d 1508, 1511 (9th Cir. 1994) (ESA).  Plaintiffs are correct that when considering injunctive relief for violations of the ESA, a court's usual equitable discretion is limited, because Congress has struck the balance of harms and consideration of the public interest in favor of

protected species. *Tennessee Valley Authority ("TVA") v. Hill*, 437 U.S. 153, 174 (1978); *Friends of the Earth v. United States Navy*, 841 F.2d 927, 933 (9th Cir. 1988). Plaintiffs, however, ignore that to obtain an injunction for a violation of the ESA, it still must be demonstrated that a "reasonable likelihood" of irreparable harm exists. *National Wildlife Fed'n v. Burlington Northern RR*, 23 F.3d at 1511 ("[T]hese cases [including TVA] do not stand for the proposition that courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA."); *Water Keeper Alliance v. United States Dep't of Defense*, 271 F.3d 21, 34 (1st Cir. 2001) ("[T]he district court correctly required that Water Keeper show potential for irreparable harm "apart from the harm that they argue is inherent in a procedural violation of the ESA's consultation requirements...."); *United States v. Glenn-Colusa Irrigation Dist.*, 788 F. Supp. 1126, 1132 (E.D. Cal. 1992) (injunction appropriate if defendant is violating ESA *and* "injury to the [listed species] is likely and irreparable").

Here, it is beyond dispute that the issuance of the leases will not cause any harm to the listed eiders. The leases do not authorize any on-the-ground activities. *See e.g.*, ROD at 52. Moreover, BLM has established a specific ROP in the ROD for the NE NPRA that makes clear that consultation under the ESA must be completed before any ground disturbing activity occurs and expressly establishes that "BLM may require modifications to or disapprove a proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat." ROD at 67 (ROP J). Thus, no harm to the eiders will result from the alleged violation of the ESA tentatively found by the Court. Accordingly, plaintiffs' argument that the ESA provides another basis for the entry of any injunction is without merit.

**C. Summary.** Plaintiffs have not shown any irreparable harm flowing from the alleged defects in the cumulative effects analysis in the FEIS or in the Biological Opinion. No on-the-ground activities will occur as a result of the issuance of leases. Moreover, while the existing Stipulations and ROPs provide the maximum protection to environmental resources, BLM retains enough flexibility to impose additional mitigation should it be necessary as a result of any further cumulative impact analysis it conducts. In addition, the ROD firmly establishes BLM's ability to provide adequate protection for the listed eiders.

Nonetheless, if the Court believes it must impose some injunctive relief, BLM asks the

Court, until a revised cumulative effects analysis is completed: (1) to leave the ROD in place; and (2) to do no more than enjoin lease sales in the area of the NE NPRA that were not authorized for leasing in the 1998 NE Plan as shown on Exhibit 1 hereto.[7]/ Defendants do not consent to the entry of such an order.  BLM, however, believes that the ability to go forward with some leasing in the NE NPRA is in the public interest.[8]/  If, despite our evidence to the contrary, the Court believes a violation of NEPA, or the ESA, has occurred and that some injunction must be entered to prevent irreparable harm, by limiting the scope of the injunction, the Court would at least attempt to strike a balance between the limited nature of the environmental harm and the harm to the public interest if the opportunity to develop these important oil and gas resources is not allowed to go forward expeditiously.  Moreover, the relief would preclude leasing, until further analysis has been completed, north of Teshekpuk Lake of the tracts which in plaintiffs' view is an unique resource worthy of special recognition. Prelim D at 2.

Dated this 21st  day of September 2006.

/s/ Dean K. Dunsmore
DEAN K. DUNSMORE
DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Telephone:(907)271-5452
Facsimile: (907)271-5827
Email: dean.dunsmore@usdoj.gov

ROBERT GULLEY
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369
Ben Franklin Station
Washington, D.C. 20044-7369
Telephone: 202-305-0500
Facsimile: 202-305-0275
Email: robert.gulley@usdoj.gov

---

[7]/   This is the area north and east of Teshekpuk Lake shown in sage green on Exhibit 1. Exhibit 1 is a modification of Map 1 from the ROD. The sage green portion of Exhibit 1 is not shown in the legend of Map 2 and that legend has not been modified on this exhibit.

[8]/   Congress has directed "an expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve in Alaska" balanced with "such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources...." Pub. L. No. 96-514 (December 12, 1980), 94 Stat 2957.

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 21st day of September 2006 a copy of the foregoing DEFENDANTS' SUPPLEMENTAL REPLY BRIEF with attached Exhibit was served electronically on:

Deirdre McDonnell
Jeffrey W. Leppo
Laura J. Beveridge
Ethan Falatko
David C. Crosby


/s/ Dean K. Dunsmore
DEAN K. DUNSMORE